# EXHIBIT A

Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3                          SOUTHERN DIVISION

4

5    KEVIN SWOPE, PAUL

6    VANDERPLOW, JERROD HART,

7                         Plaintiffs,

8         vs.                    Case No. 2:24-cv-10240-MAG-DRG

9                                Hon. Mark A. Goldsmith

10   CITY OF DEARBORN HEIGHTS, a

11   Michigan Municipal Corporation,

12                         Defendant.

13   _____

14

15

16         The Deposition of JERROD HART

17         Taken at 41700 West Six Mile Road, Suite 101

18         Northville, Michigan

19         Commencing at 10:07 a.m.

20         Thursday, August 7, 2025

21         Stenographically reported by:

22         Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR

23

24

25   Job No. 7528578

```
                                                    Page 2

 1    APPEARANCES:

 2

 3    STEPHEN JOSEPH BROWN

 4    Fausone & Grysko PLC

 5    41700 West Six Mile Road, Suite 101

 6    Northville, Michigan 48168

 7    248.912.3240

 8    jbrown@thefgfirm.law

 9         Appearing on behalf of the Plaintiffs.

10

11    MONICA NASHA HUNT

12    The Allen Law Group, PC

13    3031 West Grand Boulevard, Suite 525

14    Detroit, Michigan 48202

15    313.871.5500

16    mhunt@alglawpc.com

17         Appearing on behalf of the Defendant.

18

19    TARIK DAVID TURFE

20    Hammoud, Dakhlallah & Associates PLLC

21    6050 Greenfield Road, Suite 201

22    Dearborn, Michigan 48126

23    313.551.3038

24    tt@hdalawgroup.com

25         Appearing on behalf of Dearborn Heights City Council.
```

Page 3

1   GARY T. MIOTKE

2   Law Offices of Gary T. Miotke

3   6828 Park Avenue

4   Allen Park, Michigan 48101

5   313.388.4809

6        Appearing on behalf of Dearborn Heights City Council.

7

8   ROGER A. FARINHA

9   Corporation Counsel Dearborn Heights

10  6045 Fenton Street

11  Dearborn Heights, Michigan 48127

12  313.689.8437

13  rafarinha@dearbornheightsmi.gov

14       Corporation counsel for Dearborn Heights.

15

16

17

18

19

20

21

22

23

24

25

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 4

1                    TABLE OF CONTENTS

2

3   WITNESS                              PAGE

4   JERROD HART

5

6     EXAMINATION BY MS. HUNT:            5

7     EXAMINATION BY MR. MIOTKE:        191

8     RE-EXAMINATION BY MS. HUNT:       284

9

10                     EXHIBITS

11  EXHIBIT                             PAGE

12  (Exhibits attached to transcript.)

13

14  DEPOSITION EXHIBIT 1                  37

15  Professional Services Employment Agreement Between the

16  City of Dearborn Heights and Jerrod S. Hart 2/21/2022

17  DEPOSITION EXHIBIT 2                  56

18  Professional Services Employment Agreement Between the

19  City of Dearborn Heights and Jerrod S. Hart 12/12/2023

20  DEPOSITION EXHIBIT 3                  62

21  First Amended Complaint and Demand for Jury Trial

22  DEPOSITION EXHIBIT 4                 186

23  Email from Thomas G. Wencel 10/23/23

24  DEPOSITION EXHIBIT 5                 187

25  Email Thread from Dave Abdallah 10/24/2023

Page 5

1    Zoom Videoconference

2    Thursday, August 7, 2025

3    10:07 a.m.

4                          JERROD HART,

5         was thereupon called as a witness herein, and after

6         having first been duly sworn to testify to the truth,

7         the whole truth and nothing but the truth by the

8         stenographer, was examined and testified as follows:

9                          EXAMINATION

10   BY MS. HUNT:

11    Q.    For the record, my name's Monica Hunt from The Allen

12          Law Group representing the City of Dearborn Heights in

13          the matter of Jerrod Hart, Kevin Swope and Paul

14          Vanderplow versus the City of Dearborn Heights and

15          intervening defendant Dearborn Heights City Council.

16          Today is the date and time scheduled for the

17          deposition of Jerrod Hart. Mr. Hart, can you state and

18          spell your name for the record, please.

19    A.    Jerrod, J-E-R-R-O-D, Scott, S-C-O-T-T H-A-R-T.

20                   MS. HUNT: And I apologize for the record.

21          We may want to have the names of the other individuals

22          in the room for purposes of objections and other

23          comments made during the direct.

24                   MR. BROWN:  Sure.  My name is attorney

25          Steven J. Brown.  I'm siting to the left of Mr. Hart,

Page 6

```
 1        and I am the plaintiff's counsel in this case.
 2               MR. TURFE:  Tarik Turfe on behalf of the
 3        intervening defendant.
 4               MR. MIOTKE:  Gary Miotke on behalf of the
 5        intervening defendant, and I will be taking the lead
 6        in the supposition for intervening defendant City of
 7        Dearborn Heights City Council.
 8               MR. FARINHA:  Roger Farinha, corporation
 9        council Dearborn Heights.
10   BY MS. HUNT:
11    Q.  Mr. Hart, have you ever had your deposition taken
12        before?
13    A.  Yes.
14    Q.  Okay. And when was that?
15    A.  I would say roughly 2015 in a case in Novi, and I
16        think it was a couple days before Christmas of 2024 on
17        a Dearborn Heights matter.
18    Q.  Now, were those matters --
19               MR. MIOTKE:  May I make an objection?  It
20        appears the witness is taking notes.
21    A.  Am I not allowed to take notes?
22               MR. MIOTKE:  Not unless you want us to see
23        all the notes.
24    A.  I don't care.
25               MR. BROWN:  I wouldn't take notes myself,
```

Page 7

```
 1        Jerrod.  The lady's taking down everything, so you
 2        don't need to take notes.
 3   A.   That's fine.
 4             MR. BROWN:  It may distract you.
 5             MS. HUNT:  I would say I was going to
 6        request the notes that he takes unless they include
 7        comments by counsel.
 8   BY MS. HUNT:
 9   Q.   But, Mr. Hart, you indicated that in 2015 and 2024,
10        you were deposed.  2015, was it a Novi matter?
11   A.   And that's a rough date.  That's a total guess on when
12        that case would have been.  It could have been '14. I
13        don't know.
14   Q.   All right. Was that as part of your employment with
15        the City of Novi?
16   A.   It was.
17   Q.   And were you named a defendant in that case?
18   A.   No.
19   Q.   Okay.  And in 2024, was that as part of your role as
20        chief of police with the City of Dearborn Heights?
21   A.   Yes.
22   Q.   And were you named a defendant in that case?
23   A.   Yes.
24   Q.   Do you recall the plaintiff in that case?
25   A.   Reyna, Joseph Reyna.
```

Page 8

1   Q.    Okay.  And has that case been disposed of yet, to your
2         knowledge?
3   A.    Not to my knowledge.
4   Q.    Now, I understand that you within the last year had
5         your deposition taken. But I just want to go over a
6         few ground rules just to make it a bit easier for
7         today's deposition, and for the court reporter to take
8         down your testimony and the questions that we're
9         asking.
10              Because the court reporter is taking down
11        everything that's being said today, I would request
12        that you verbalize your answers. No nods of the heads,
13        or shakes of the heads. No uh-huh or huh-huhs. I would
14        ask that you allow me to finish my question before you
15        start answering.  That way the court reporter can hear
16        clearly what my question is, and what your answer is.
17        If you don't understand a question that I ask of you,
18        please ask me to rephrase it. I'm happy to do so. I
19        don't want you answering a question and not, you know,
20        fully understanding the question that was asked of
21        you. And if you don't ask me to rephrase it, I'm going
22        to assume that you understand the question that's
23        being asked of you.
24              During this deposition, your attorney may
25        object to questions that I ask. You're still required

```
                                                    Page 9
 1          to respond to those questions unless your attorney
 2          advises you otherwise, okay?  Is all of that clear to
 3          you?
 4     A.   Yes, it is.
 5     Q.   If you ever need to take a break during this
 6          deposition, happy to break at any time. However, I
 7          request that if there is a question on the table that
 8          you answer that question, and then we'll take the
 9          break before we move on to the next question, okay?
10          Is that understood?
11     A.   Yes.
12     Q.   Okay.  So, Mr. Hart, where do you currently reside?
13     A.   It's a tough answer to give. I live in an RV.
14     Q.   Okay.
15     A.   In a mobile home RV parked in Milan, Michigan.
16     Q.   Okay.  Is that -- is your space in the mobile home
17          park in Milan temporary?
18     A.   I hope so, yes.
19     Q.   Okay.  Do you intend to -- are you traveling like
20          across the state, or across the country, or are you
21          simply moving from --
22     A.   I had to sell my home because of what the city did to
23          me.
24     Q.   Okay.  So your mobile home location is temporary until
25          you find a more permanent residence.  Is what what I
```

```
                                                      Page 10

 1         understand?

 2   A.    I'm building a home.

 3   Q.    And where are you building that home?

 4   A.    In Milan.

 5   Q.    Milan.  Are you currently married?

 6   A.    I am.

 7   Q.    Okay.  And what is your wife's name?

 8   A.    Jolee, J-O-L-E-E.

 9   Q.    Is it the same last name as yours, Hart?

10   A.    Yes, it is.

11   Q.    Okay.  Did you ever speak with Mrs. Hart about any of

12         the issues that are contained within your complaint?

13   A.    It's my wife, yes.

14   Q.    Okay.  Do you intend to call her as a witness in this

15         case as it relates to the claims made in the

16         complaint?

17   A.    I don't know if she's on the witness list or not.

18   Q.    Okay. You don't know.

19   A.    I don't intend to.

20   Q.    Are you currently employed?

21   A.    I am.

22   Q.    Okay.  Where do you work?

23   A.    I work for a company called Empco, E-M-P-C-O.  It's on

24         Big Beaver in Troy, Michigan.

25   Q.    And what is your title with Empco?
```

```
                                                   Page 11
 1    A.    Director of assessment centers and oral boards, or
 2          vice versa, oral boards and assessment centers.
 3    Q.    How long have you worked with Empco?
 4    A.    I was a part time assessor for them since probably
 5          2014. I started full time about 11 months ago.
 6    Q.    Did you work part time with them from 2014 until you
 7          became full time with them?
 8    A.    I was a part time assessor.
 9    Q.    Okay.
10    A.    So as they needed professionals to sit on oral boards
11          and assessment centers, I was one of the people that
12          would be on their list.
13    Q.    Okay.  How often would you say on average per year
14          that you did work with Empco as a part time assessor?
15    A.    Complete guess, twice a year.
16    Q.    Were you paid for those times?
17    A.    Yes.
18    Q.    What were you paid?
19    A.    I do not remember the dollar amount. You get mileage,
20          and then a set fee.
21    Q.    And is that a set fee per each time you sat on the
22          board?
23    A.    Yes.
24    Q.    And when you say approximately two times a year, was
25          that two times a year from '14 through your becoming a
```

```
                                                   Page 12
 1           full time employee?
 2    A.     I'm trying to think of how many times I've sat on the
 3           panel. That's probably highballing it, because most of
 4           the time they would call I couldn't sit on them.
 5    Q.     Now, the fee that you received, was that a stipend, or
 6           was it considered wages?
 7    A.     It was reportable wages to the government, yeah.  It
 8           was -- it's somewhere around three to $400.
 9    Q.     Per seat?
10    A.     Per day, yeah.
11    Q.     And how many days, approximately, would you sit for
12           the board?
13    A.     I think just about every one of them was just a one
14           day process.
15    Q.     Now, in your role as director, you said that's a full
16           time job; is that correct?
17    A.     Correct.
18    Q.     Is that like a 40 hour workweek?
19    A.     I'm a salaried position.
20    Q.     Okay.  And what is your annual salary?
21    A.     Approximately $91,000.
22    Q.     Do you receive any benefits?
23    A.     No.
24    Q.     So you don't get health insurance?
25    A.     No.
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                      586-468-2411
                                                      www.veritext.com

```
                                                   Page 13
 1   Q.   Are you -- is health insurance optional to you?  Are
 2        you able to get health insurance from them?
 3   A.   It was never offered to me.  I don't know if they have
 4        it or not.
 5   Q.   Do you receive any bonuses?
 6   A.   Yes. I found that out in February that there are
 7        bonuses.
 8   Q.   All right. Did you receive a bonus this year?
 9   A.   I did.
10   Q.   What was that bonus?
11   A.   $8,000.
12   Q.   Is that a periodic bonus?  Do you get that every year?
13   A.   The way it was explained to me by the owner is when
14        the company does well, she likes to share the wealth,
15        so to speak, with her employees.
16   Q.   Okay.  So is it your understanding that this is like a
17        discretionary bonus?
18   A.   Yes.  It's not a guarantee.
19   Q.   But you did receive $8,000 this year?
20   A.   Correct.
21   Q.   Has there been any discussion about historically how
22        employees receive bonuses?
23   A.   No.
24   Q.   Do you intend to continue in your position with Empco?
25   A.   Yes.
```

```
                                                    Page 14
 1    Q.   All right. Mr. Hart, I just kind of want to take a
 2         step back and find out a little bit more about your
 3         educational background and employment history. Where
 4         did you go to high school?
 5    A.   John F. Kennedy High School in Taylor.
 6    Q.   And did you graduate from that high school?
 7    A.   I did.
 8    Q.   What degree?
 9    A.   Just a high school diploma.
10    Q.   Okay.  And what year was that?
11    A.   1987.
12    Q.   Did you go to college after that?
13    A.   I did.
14    Q.   Okay.  Where did you go to college?
15    A.   Ferris State University.
16    Q.   Ferris?
17    A.   Yes, Ferris State University in Big Rapids, Michigan.
18    Q.   And did you graduate?
19    A.   I did.
20    Q.   And with what degree?
21    A.   Bachelor of Science degree in criminal justice.
22    Q.   What year was that?
23    A.   1991.
24    Q.   What did you do after that?
25    A.   I had a short period of time of unemployment, and was
```

Page 15

```
 1          then hired by the Novi Police Department in August of

 2          1991.

 3     Q.   Did you graduate from Ferris in the spring of '91?

 4     A.   Yes.

 5     Q.   And what did you do with Novi, in your position with

 6          Novi?

 7     A.   I started out as a patrol officer as we all do. I

 8          started the school resource officer program in '99,

 9          2000. I spent four years there. And then I spent a few

10          years in the detective bureau as an investigator. Then

11          I was promoted in 2006 or seven to sergeant. Then I

12          was promoted to lieutenant couple years later. And

13          then 2012, I'm guessing, 2012, I accepted the position

14          of assistant chief of police of support services.

15     Q.   Did you ever go to the police academy?

16     A.   Yes.

17     Q.   When was that?

18     A.   That was part of my four year degree at Ferris State

19          University.

20     Q.   Okay.

21     A.   That was the draw to it.

22     Q.   Okay.  So it appears you held several positions in the

23          City of Novi. Why did you leave?

24     A.   It was my time. I had 26 years. My boss was going to

25          be there probably another five or six years, the
```

Page 16

```
1            chief/director. And I wanted to go out and look for
2            other opportunities as a chief of police.
3     Q.     Okay.  So you indicated that you started your position
4            as assistant chief, and the support services in 2012.
5            When did you end that?
6     A.     2017 when I left, yeah. I think it was December. For
7            some reason the 10th comes to mind, but I'm not
8            positive on the date.
9     Q.     Okay.  And where did you go after that?
10    A.     I had secured the chief of police position in the City
11           of Saline.
12    Q.     And with the City of Saline, who was your supervisor?
13    A.     Todd Campbell was my first city manager. And there
14           their charter, I believe, was written where there was
15           some also responsibilities, reporting responsibilities
16           to the city council as well. But Todd Campbell was the
17           city manager when I got there.
18    Q.     Okay.  Was Mr. Campbell the one that hired you?
19    A.     City council actually had to hire me, yes.
20    Q.     And this was your first chief of police position; is
21           that correct?
22    A.     Yes.
23    Q.     What were your responsibilities?
24    A.     Day-to-day operations of the police department,
25           budgeting, discipline, investigations. I didn't have a
```

Page 17

```
 1           detective when I first started. Very small police
 2           department. I think I was the 13th or 14th sworn
 3           person when I was hired. Community relations,
 4           attending council meetings.
 5      Q.   And when you say you were the 13th or 14th sworn
 6           person, are you saying that there were 13 or 14 people
 7           on the force at that time or throughout the history
 8           there was only 13 or 14 sworn?
 9      A.   No. That there were just about 13 employees when I got
10           there, 13 to 14 police officers who were certified by
11           MCOLES.
12      Q.   And did you supervise those employees within that
13           police department?
14      A.   Yes.
15      Q.   Okay.  Were you responsible for hiring police
16           officers?
17      A.   Yes, recruiting and hiring.
18      Q.   Okay.  Could you discipline those police officers?
19      A.   Yes.
20      Q.   Could you fire those police officers?
21      A.   Yes.  With the blessing of the city manager.
22      Q.   Did you ever have to fire any police officers while
23           with Saline?
24      A.   Yes.
25      Q.   Do you know approximately how many times?
```

Page 18

```
 1    A.    Just one individual, if I remember correctly.

 2    Q.    Okay.  And how long did you remain as chief of police

 3          with the City of Saline?

 4    A.    Until February of 2022.

 5    Q.    Did you have a pension while you were with Saline?

 6    A.    They had -- yes is the short answer, but it's an age

 7          60 collection on it. And it's obviously a partial.

 8          It's based on the number of years of service, and then

 9          a percentage.

10    Q.    So when you say age 60 of collection, you can only

11          collect once you reach the age of 60?

12    A.    That's correct.

13    Q.    And I didn't ask you. I apologize. How old are you, or

14          if you can give me your date of birth?

15    A.    I was born in 1968 in December.

16    Q.    December what?

17    A.    7th.

18                MR. BROWN: You're 57 years old.

19    A.    57. Yeah, I don't know. I feel 100.

20   BY MS. HUNT:

21    Q.    That's okay. I often still say I'm 25. So you left in

22          February of 2022 the City of Saline. Was that just as

23          the chief of police, or did you leave the city?

24    A.    I left the city as a whole.

25    Q.    And where did you go after that?
```

Page 19

```
 1    A.    I took the job in Dearborn Heights.

 2    Q.    Why did you leave the City of Saline?

 3    A.    I wanted an opportunity to lead a larger police

 4          department.

 5    Q.    Were you aware of like the demographics and the

 6          dynamics within the City of Dearborn Heights prior to

 7          your applying for the chief of police position?

 8                   MR. BROWN:  I'm going to object as vague.

 9                   MR. MIOTKE:  I'm going to object to

10          foundation.

11    BY MS. HUNT:

12    Q.    I'll clarify. Prior to applying for the position of

13          chief of police with the City of Dearborn Heights,

14          were you familiar with the city?

15    A.    Yes.

16    Q.    Okay.  You indicated that you wanted to manage a

17          larger police force. Were you familiar with the police

18          force within the City of Dearborn Heights when you

19          applied?

20    A.    Yes. I grew up next door. My church was in Dearborn

21          Heights for many years.

22    Q.    Had you visited Dearborn Heights before?

23    A.    Yes, I've been -- in my life I've been to Dearborn

24          Heights. I'm not too -- I'm sorry. Go ahead.

25    Q.    How did you apply for the position for the City of
```

Page 20

```
 1         Dearborn Heights chief of police?
 2    A.   I'm not sure that I did. And I guess in the sense of a
 3         traditional application and a process that I'm
 4         familiar with was not present. I got a call from our
 5         director of Michigan Association of Chiefs of Police
 6         who stated that someone had contacted him looking for
 7         someone to go try to clean up a police department, the
 8         Dearborn Heights Police Department. There were a lot
 9         of problems, and would I be interested. And he knew I
10         grew up in the area, was a downriver person, and I'm
11         like I don't know. And he said, well, send me your
12         resume, and I'll send it off, and maybe someone will
13         talk to you.
14    Q.   And what was the position of the individual that
15         contacted you?
16    A.   The director of the Michigan Association of Chiefs of
17         Police, Bob Stevenson.
18    Q.   Had you worked with Mr. Stevenson in the past?
19    A.   He is the director of the chiefs association, so I'm
20         familiar with him. I did not work beside him. He was
21         just our director of chiefs in the state.
22    Q.   Did you send him your resume?
23    A.   I did.
24    Q.   Okay.  And what happened after you sent him your
25         resume with regards to your interest in the chief of
```

Page 21

```
 1        police position in the City of Dearborn Heights?
 2   A.   I got a call from the former chief of police in
 3        Dearborn, Ron Haddad.  And I had a conversation with
 4        chief Haddad.
 5   Q.   Okay.
 6   A.   The sequences I'm not 100 percent on which came first
 7        here in the chicken and the egg, and where the --
 8        where exactly that resume went, if I sent it to Ron,
 9        or if I sent it to Bob. That part I just -- I'm not
10        clear on that.
11   Q.   Okay.
12   A.   But at some point I got a call from Bill Bazzi who
13        said he was the mayor of Dearborn Heights.
14   Q.   You say you got a call from Bill Bazzi. Did you have a
15        conversation with him?
16   A.   I did.
17   Q.   Okay.  Was that telephonically or in person?
18   A.   It was I got a phone call, and I was asked to come in
19        and meet with him and the HR director.
20   Q.   How many meetings did you have with Bill Bazzi prior
21        to coming aboard as chief of police?
22   A.   Unbelievably, one.
23   Q.   How many conversations did you have with the HR
24        director prior to coming aboard?
25   A.   She was there for that meeting with the mayor, which I
```

Page 22

```
 1          was told was just a conversation. And then by the end
 2          of the meeting, I was offered the job.
 3     Q.   So in the meeting with the mayor?
 4     A.   And Margaret.
 5     Q.   And Margaret?
 6     A.   The HR director, I was offered the job.
 7     Q.   Okay.  Did you accept at that time?
 8     A.   No.
 9     Q.   When did you accept?
10     A.   I would say within probably two or three days.
11     Q.   Do you recall when you began your position as chief of
12          police with the City of Dearborn Heights?
13     A.   February 28th, I believe.
14     Q.   Of what year?
15     A.   2022.
16     Q.   Prior to starting your position with the City of
17          Dearborn Heights as chief of police, did you meet with
18          any of your other -- of the other police officers
19          within the police department?
20     A.   No.
21     Q.   Was there --
22     A.   May I --
23     Q.   You can clarify.
24     A.   May I clarify that?  So I guess can you ask me that
25          question again just so I make sure I answer it
```

Page 23

```
 1          correctly.
 2     Q.   Sure. Prior to beginning your position as chief of
 3          police with the City of Dearborn Heights, did you meet
 4          with any of the police officers within the department
 5          of Dearborn Heights?
 6     A.   Yes.
 7     Q.   Okay.  Who did you meet with?
 8     A.   Probably within -- it was one or two days before I
 9          started at the police department, the mayor called and
10          told me that he was sending out two police officers to
11          bring my city vehicle to my house.
12     Q.   Okay.
13     A.   That I had lived in at the time in Milan. So these
14          police officers came, and we sat at my kitchen table,
15          and they proceeded to talk for probably 45 minutes to
16          an hour.
17     Q.   Okay. Do you recall who those officers were?
18     A.   Officer Mazloum and Sergeant Bazzy.
19     Q.   And what was the context of the conversation that you
20          had?
21     A.   How racist the police department was.
22     Q.   Okay.  When you say racist, how so?
23     A.   Sergeant Bazzy did, I would say, 90 percent of the
24          talking. He specifically talked about the SWAT team,
25          Joseph Reyna, Jordan Dottor sending inappropriate text
```

                                                        Page 24

1          messages, talking about having sex with Arab girls.

2          How he was cheated out of an award with the Michigan

3          Association of Chiefs of Police for a shooting that

4          had occurred, and he was told he didn't play a pivotal

5          role.  And he explained to me how his radio traffic

6          was critical to alerting the officers to where the

7          suspect was, who was ultimately, I believe, shot and

8          killed.

9     Q.   And I apologize. Did you say this was from Sergeant

10         Bazzy?

11    A.   Yes. He did 90 percent of the talking.

12    Q.   And was it your understanding that when -- is it

13         Officer Mazloum and Sergeant Bazzy?

14    A.   Correct.

15    Q.   When they indicated that they felt the police

16         department was racist, was that racist against the

17         Middle Eastern employees?

18    A.   Yes.

19    Q.   Okay.  So prior to beginning your position as your

20         first day as chief of police, were those the only two

21         officers that you met with?

22    A.   I don't know if he counts, but I'm going to bring him

23         up because it's a truthful answer is Joe Thomas. As

24         soon as I had accepted the position, the mayor wanted

25         me to have a meeting with Dr. Joseph E. Thomas, Jr.,

Page 25

```
 1          more commonly known as the Jet in law enforcement
 2          community. And I met him at a Big Boys in Brighton,
 3          Michigan, probably a week or two before I started.
 4     Q.   Okay.  And what was Dr. Thomas's position?
 5     A.   He was --
 6                    MR. BROWN:  Vague. Could you repeat that?
 7     BY MS. HUNT:
 8     Q.   You indicated you met with Dr. Joe E. Thomas, Jr.,
 9          a/k/a the Jet. What was his position?
10                    MR. BROWN:  Same objection. What do you
11          mean by position, counsel?
12     BY MS. HUNT:
13     Q.   You indicated that you met with another officer, or
14          you believed you met with another officer. What
15          position did he hold with the City of Dearborn
16          Heights?
17                    MR. BROWN:  Thank you.
18     A.   He was brought in, I believe, a couple weeks before me
19          as a police commissioner.
20     BY MS. HUNT:
21     Q.   Was he a police commissioner within the City of
22          Dearborn Heights?
23     A.   You ask me questions while I'm drinking. Yes.
24     Q.   In your job as chief of police within the City of
25          Dearborn Heights, what were your responsibilities?
```

Page 26

```
 1    A.    Obviously the day-to-day operations. This assignment
 2          was unique in the sense that I was their first
 3          external chief. And I had to consume as much
 4          information as I could and try to determine what was
 5          credible, what was not. I've heard some absolutely
 6          disturbing things from employees. So I've been a
 7          counselor. I've been a cheerleader. I've been a
 8          disciplinarian. I've had to work within the budget. I
 9          had to work with a police commissioner that I'm not
10          sure that I knew what dotted line or straight line
11          came from me to him. And trying to balance best
12          practices with what was going on within the police
13          department.
14    Q.    I just want to take a quick step back. In a meeting
15          with Dr. Joe E. Thomas, Jr. at the Big Boy a few weeks
16          prior to your beginning your job with the City of
17          Dearborn Heights, what was the subject matter of that
18          conversation?
19    A.    The status of the police department. The factions that
20          he had observed within the police department. He told
21          me that he had basically determined that there was
22          really three departments within the department. So I
23          asked him how he knew that, and he stated he had
24          conducted a survey of staff, and had met with many
25          staff members.
```

Page 27

1   Q.   Did he indicate that there was any written report of

2        this survey that he claims to have taken?

3   A.   Not at that time, no.

4   Q.   Did you come to find out that there was any written

5        summary?

6   A.   Yes.

7   Q.   Did you see that?

8   A.   Yes.

9                MR. BROWN:  Has that summary been produced

10       in discovery, counsel?

11               MS. HUNT:  Well, he's indicated that he's

12       seen it.  We have not seen it.

13  BY MS. HUNT:

14  Q.   My next question to you is did you maintain a copy of

15       that?

16  A.   I did.

17  Q.   Okay.  And did you provide your attorney with a copy

18       of that?

19  A.   I don't know if Joe has that. I was told to destroy

20       it, which I knew was wrong.

21  Q.   Who told you to destroy it?

22  A.   Margaret Hazlett, the HR director.

23  Q.   Was this a study that -- or strike that.

24               The survey that Dr. Thomas indicates that

25       he took of which a written report you indicate that

Page 28

```
 1        you've seen, was it your understanding that that was a
 2        city sanctioned survey that was taken?
 3   A.   Can you talk about -- define city sanctioned for me?
 4   Q.   The survey that you indicate that Dr. Thomas claims
 5        that he took, was that a request of either the mayor,
 6        or the city council, or someone in a director or
 7        leadership position?
 8   A.   I do not know the answer to that, and Dr. Thomas is
 9        dead.  I know he was working there. It was specific to
10        the department. And that to me indicated that was a
11        work product.
12   Q.   And I apologize. Did you say that Dr. Thomas started a
13        few weeks prior to your starting?
14   A.   I don't know his exact start date. I thought it was
15        three to four weeks before I started, but I'm not -- I
16        don't know for sure. It could have been a month
17        earlier than I thought.
18   Q.   And you indicate that the conversation that you had
19        with him at the Big Boy was prior to your starting
20        with the City of Dearborn Heights?
21   A.   Yes.  It was prior to my first day.
22   Q.   So is it safe to say that this study or survey that
23        Dr. Thomas indicated that he took was within a few
24        weeks of his starting within the City of Dearborn
25        Heights Police Department?
```

Page 29

1    A.    Yes.

2    Q.    Now, earlier you indicated that you did not destroy

3          the alleged written copy of the survey?

4    A.    That is correct.

5    Q.    Okay.  What did you do with it?

6    A.    I put it in my safe in my office.

7    Q.    Did you ever take it out of the safe?

8    A.    Yes.

9    Q.    Okay.  When did you take it out?

10   A.    I supplied it to a law firm on a lawsuit, on a

11         different lawsuit, and I believe that that was Johnson

12         Rosati.

13   Q.    When did you supply it to them?

14   A.    Maybe '23, '24. I honestly don't know.

15   Q.    The years of '23 or '24?

16   A.    '23 or '24.

17   Q.    Was that when you were still working with the City of

18         Dearborn Heights?

19   A.    Yes.

20   Q.    Did you provide them with a copy, or did you provide

21         them with the only version that you had, or copy that

22         you had?

23   A.    I do not recall.

24   Q.    Do you recall ever putting it back in your safe?

25   A.    Yes. I at one point requested the information back or

Page 30

```
 1          a copy back. I may have a copy, not the original. I'm
 2          not 100 percent on it.
 3     Q.   Do you currently have a copy?
 4     A.   I would have to look in my files. I believe I do.
 5     Q.   Going back to your responsibilities as chief of
 6          police, I understand you felt that this was sort of a
 7          special case, and that you also took part in or
 8          managed the day-to-day operations. What other
 9          responsibilities did you have?
10     A.   I believe I mentioned counseling staff, leading staff,
11          assessing bureaus, operations, trying to lay a path
12          forward.
13     Q.   Did you manage the police officers?
14     A.   Ultimately, yes.
15     Q.   Were you responsible for hiring police officers?
16     A.   Not necessarily, no.
17     Q.   Okay.  And when you say not necessarily, did you have
18          any input in hiring the police officers?
19     A.   I sat on several panels, interview panels, but that
20          was primarily conducted through the HR department and
21          Act 78.
22     Q.   And when you say Act 78, for the record, can you
23          explain?
24     A.   Act 78 commission, it's a state law from, I think, the
25          '30s, and it's something that is utilized in Dearborn
```

```
                                                        Page 31
 1              Heights for the hiring and promotion of staff. It's
 2              like a third independent body, I guess. I'm not sure.
 3    Q.        So you say you sat on panels. Was it just you, one
 4              person from HR, or was there more than one person from
 5              HR?
 6    A.        Usually myself, one person from HR, and then two
 7              commissioners.
 8    Q.        In your management of the police officers, did you
 9              have the ability to discipline police officers?
10    A.        They had a discipline -- they have discipline outlined
11              in their collective bargaining agreement that was very
12              specific. And then ultimately, I guess, it was up to
13              the police chief to either concur or not concur with
14              discipline.
15    Q.        When you say the discipline was within -- laid out
16              within the collective bargaining agreement, as chief
17              of police, did you have the ability to write up a
18              police officer, or give an oral reprimand of a police
19              officer?
20    A.        Yes, I would have that ability.
21    Q.        Now, I understand there was a collective bargaining
22              agreement in place that ultimately governed potential
23              discipline. But did you have the ability to terminate
24              police officers?
25    A.        Yes.
```

Page 32

```
 1   Q.   While with the City of Dearborn Heights, did you ever
 2        terminate any police officers?
 3   A.   Yes.
 4   Q.   All right. Do you recall how many?
 5   A.   I believe it was just one.
 6   Q.   Do you remember that person's name?
 7   A.   Paul Graff.
 8   Q.   Can you spell the last name?
 9   A.   I believe it's G-R-A-F, one F.
10   Q.   Did you make that decision to terminate Mr. Graff
11        unilaterally, or did you speak with other individuals?
12   A.   I spoke to Chris Mikula, who was the labor attorney at
13        the time.
14   Q.   Anyone else?
15   A.   No. I take that back. Dr. Thomas was still alive.
16   Q.   Do you recall why you terminated Mr. Graff?
17   A.   Yes.
18   Q.   Okay.  What was that reason?
19   A.   Because an employee alleged that he produced a weapon,
20        and made a comment about trimming his beard with it
21        while he was standing behind him, and the employee
22        brought this up. This was prior to my arrival. I guess
23        had made a complaint with HR, and it was investigated,
24        and it was the talk of the department when I got
25        there.
```

Page 33

```
 1   Q.   Okay.  I just want to make sure I understand this
 2        correctly.  When he says trimming his beard, the
 3        person -- someone else other than Mr. Graff he was --
 4        he made a comment?
 5   A.   Officer Hammoud was eating lunch in the squad room,
 6        and it's on video where Mr. Graff comes by, comes
 7        back, produces something, and I don't remember all the
 8        specifics of it, but never denied that it could have
 9        been a knife. And at the end of the day, I can't have
10        employees...
11   Q.   And you indicate this happened prior to your starting?
12   A.   Yes.
13   Q.   The incident happened prior to your starting?
14   A.   Yes.
15   Q.   However, you terminated him after you became chief of
16        police?
17   A.   Yeah.  It was quite a large deliberation of what to
18        do, yeah, on my part.
19   Q.   Okay.  So you were aware of how to discipline
20        employees that had taken part in inappropriate
21        activity; is that fair to say?
22                MR. BROWN:  Objection to form. Vague.
23   BY MS. HUNT:
24   Q.   Do you understand the question?
25   A.   No.
```

Page 34

| | | |
|---|---|---|
| 1 | Q. | All right. You just indicated that you did terminate |
| 2 | | Officer Graff; is that correct? |
| 3 | A. | That is correct. |
| 4 | Q. | So coming in, you were aware of the steps to take to |
| 5 | | rid the department or discipline employees that took |
| 6 | | part in inappropriate activity; is that fair? |
| 7 | A. | I know what I will tolerate, and they have a whole |
| 8 | | different set of steps and past practice that was |
| 9 | | really hard on the uptake for me to get up to speed |
| 10 | | with. |
| 11 | Q. | But right off of the bat, you terminated someone? |
| 12 | A. | No.  I would not say right off the bat, no. |
| 13 | Q. | How long after you became chief of police did you |
| 14 | | terminate Officer Graff? |
| 15 | A. | It's a very hard question to answer, because there |
| 16 | | were so many delays and agreed upon deadlines moved. I |
| 17 | | would say probably May, May-ish at the latest. |
| 18 | Q. | All right. |
| 19 | A. | Probably more April. |
| 20 | Q. | So you began in February; is that correct? |
| 21 | A. | Yes. |
| 22 | Q. | And in April or May Officer Graff was terminated? |
| 23 | A. | That is correct. |
| 24 | Q. | When did you begin the process of attempting to have |
| 25 | | him terminated? |

```
                                                          Page 35
 1    A.    Probably within three or four days of the termination.
 2          I had to make -- I had to call Mr. Mikula, and run it
 3          past him, the facts of the case. And then I had made
 4          the decision within a couple of days.
 5    Q.    Okay.  So you started in February. And then in either
 6          April or May you reached out to Mr. Mikula?
 7    A.    Once the investigation was done by the division
 8          commander, which would have been Corey Smith.  It
 9          would have been Captain Corey Smith, so I didn't look
10          at anything or touch anything until that was given to
11          me.  And then the person that did it says I'm retiring
12          in like two days, and leaves the organization.
13    Q.    Who said that?
14    A.    Corey Smith, Captain Smith.
15    Q.    Who ordered the investigation?
16    A.    I don't know if it's necessarily an order.  An
17          employee had alleged that there was misconduct, and
18          there's a process in place to investigate it.
19    Q.    Who started that investigation?
20    A.    I don't know the answer, because I was not there yet
21          when that all broke.
22    Q.    As chief of police, I understand that you indicate to
23          some degree you managed the police force, or the
24          individuals on the police force. Did you have any
25          responsibilities over any other employees within the
```

Page 36

```
 1        police department?
 2   A.   There's a communication section, the dispatch where
 3        there were civilians.  There was a records section.
 4        Then we hired a civilian for the property room, and a
 5        civilian for vehicle maintenance.
 6   Q.   And it was your responsibility to manage these
 7        employees; is that correct?
 8   A.   The day-to-day operations of them would be a direct
 9        supervisor. If it's an officer, it's a sergeant, then
10        a lieutenant, and so on and so forth. For the
11        mechanics and the property room officers, they
12        reported to the directors.
13   Q.   But as the chief of police, did you have the ultimate
14        responsibility of controlling and managing the police
15        department?
16   A.   Controlling is a -- I can't control, but I can lead
17        and direct.
18   Q.   Okay.  When you were with the City of Saline as chief
19        of police, was it part of your responsibilities to
20        make certain that the police department was running
21        functionally?
22   A.   Yes.
23   Q.   Okay. And with the City of Dearborn Heights, was it
24        your responsibility to make certain that the police
25        department was running functionally?
```

```
                                                   Page 37
 1    A.    Yes.

 2    Q.    Okay.  Who were your supervisors?

 3    A.    It's my understanding I reported directly to the

 4          mayor.

 5    Q.    You indicated that you reported directly to the mayor.

 6          Did the mayor have the ability to discipline you at

 7          all?

 8    A.    Oh, yeah, I'm sure he did.

 9    Q.    Did he ever discipline you?

10    A.    No.

11    Q.    While with the City of Dearborn Heights, you indicated

12          that you started in February of 2022. When did you

13          leave?

14    A.    July 3rd of '24.

15    Q.    During that time, did you receive any raises?

16    A.    Yes.

17    Q.    Do you recall how many?

18    A.    To my knowledge, there was one.

19    Q.    Do you recall your salary when you began working with

20          the City of Dearborn Heights?

21    A.    I do not recall. I know it was less than 100. I want

22          to say it was 96 or 98, somewhere in there.

23                    DEPOSITION EXHIBIT 1

24                    Professional Services Employment Agreement

25                    Between the City of Dearborn Heights and
```

```
                                                    Page 38
  1                      Jerrod S. Hart 2/21/2022
  2                      10:57 a.m.
  3    BY MS. HUNT:
  4     Q.   All right. I would like to show you your '22 contract.
  5                      MR. MIOTKE:  Do you have a copy for me?
  6                      MS. HUNT:  I do.
  7                      MR. MIOTKE:  Thank you. This is going to be
  8          1.
  9    BY MS. HUNT:
 10     Q.   Mr. Hart, do you recognize this document?
 11     A.   Yes, I do.
 12     Q.   Okay.
 13     A.   That's my signature.
 14     Q.   Okay.  And it appears that -- what do you recognize
 15          this agreement as?
 16     A.   It looks like my original employment contract with the
 17          City of Dearborn Heights.
 18     Q.   Okay.  And it indicates that if you would take a look
 19          at page two under compensation section, that your
 20          salary is $102,500 per year; is that correct?
 21     A.   That's what it states, yes.
 22     Q.   Is that what you received?
 23     A.   As far as I know.
 24     Q.   You never had any discrepancy with your salary?
 25     A.   I'm not the financial guy in the family. I leave that
```

Page 39

```
 1          to my wife.
 2    Q.    Did your wife ever say you're not bringing in $102,000
 3          before taxes?
 4    A.    No.
 5    Q.    Okay.  That was a no?
 6    A.    No.
 7    Q.    Okay.  And on page one of this agreement under
 8          employment, it lays out your duties; is that correct?
 9    A.    Yes.
10    Q.    Okay.  If we turn to page two, the final sentence
11          under section two, paragraph 2.1 indicates the
12          employee shall perform these specific duties with
13          reasonable care, diligence, skill and expertise, and
14          perform all duties necessary to meet the goals and
15          expectations of the city. Do you see that?
16    A.    Yes, I do.
17    Q.    Okay.  What did you understand the goals and
18          expectations of the city to be?
19    A.    I think that's generally just germane contract
20          language that's put in there. I had set a goal for
21          myself for the police department for the city to
22          deliver a world class police department that delivered
23          the very best service in all areas to the citizens.
24          In other communities it's very easy to know what the
25          goals are because they have goal setting sessions.
```

Page 40

```
 1          They build their budgets around those goals.  In Novi
 2          we had a theme under the words Novi. So in Dearborn
 3          Heights, there was none of that. So there was no way
 4          for me to know what the goals were.
 5     Q.   As chief of police, was it your responsibility as
 6          someone that was supposed to oversee the police
 7          department to assist in setting those goals?
 8     A.   Yes.
 9     Q.   Okay.
10     A.   And I asked the mayor about that process, and I
11          suggested and shared with him what my experience has
12          been in the past on setting those goals, and it went
13          nowhere.
14     Q.   Did you do anything yourself to facilitate those goals
15          or goal setting sessions?
16     A.   No. Other than to recommend to my boss that there has
17          to be a clear vision for the city and goals every
18          year. That's all I could do.
19     Q.   Did you take any steps to schedule a meeting with
20          either other directors or other police officers to
21          advise what you felt the goals should be, or to set up
22          some goal planning session?
23     A.   I guess maybe I'm going to need some clarification,
24          because you're talking about two different things. You
25          started talking about city goals. Now we're talking
```

Page 41

```
 1          more department goals.
 2     Q.   You're correct. With regards to department goals, did
 3          you do anything to facilitate setting those goals?
 4     A.   Yes.
 5     Q.   Okay.  And what did you do?
 6     A.   I reached out to the Department of Justice
 7          collaborative reform initiative within a couple months
 8          of being at the Dearborn Heights Police Department,
 9          and recognizing that nothing looked as it should.
10     Q.   So when you say you reached out to the Department of
11          Justice, was it for purposes of creating departmental
12          goals?
13     A.   I reached out to the Department of Justice
14          collaborative reform initiative, which is a
15          collaborative platform.  They provide support to
16          police departments on -- I had used them before for a
17          strategic plan in Saline. I wanted them to come in and
18          do a more thorough deep dive. We had the -- at some
19          point the survey, which was months after I arrived.
20          They had hired a young lady.  Somehow the commissioner
21          got an assistant to consolidate the survey into a
22          summary document. And that was ongoing. And then I
23          wanted to work with the subject matter experts from
24          the DOJ to come in and assess the police department.
25          And we did have themes. We had goals.
```

Page 42

```
 1   Q.   Okay.  I want to make sure I'm clear when you talk
 2        about the survey. Was there a survey that the
 3        Department of Justice performed, or are you talking
 4        about the survey that Dr. Thomas --
 5   A.   Talking about both, yeah. The survey necessarily with
 6        the Department of Justice collaborative reform
 7        initiative, that was in the sense of on-site visit.
 8        They actually assigned two people to come to the
 9        police department and assist with the assessment in
10        laying a path forward.
11   Q.   Did you receive a copy of that survey?
12   A.   Which survey?
13   Q.   The one that the DOJ did?
14   A.   Not the collaborative reform initiative, no.  Based on
15        their interviews, and their observations, it was way
16        outside of the scope of the support that they could
17        give. So they suggested -- then I started getting
18        phone calls from the Department of Justice
19        organizational assessment folks, OA, which is the
20        highest form of support you can get as a police
21        department that's voluntary, one step below a consent
22        decree.
23   Q.   Did you work with the OA?
24   A.   I did.
25   Q.   And from that collaboration with the OA, did you begin
```

Page 43

1              the process of creating goals or any remediations?

2       A.     This was department driven, and it was driven by the

3              organizational assessment folks. And you can read all

4              about it on the Department of Justice's website.

5       Q.     So you indicated that you began working or reaching

6              out to the DOJ because you realized that there needed

7              to be some clear goals set; is that correct?

8       A.     That there were practices that were ongoing at the

9              police department that should not be going on, the

10             handling of money, and the mishandling of money. A

11             litany of issues that were brought to my attention and

12             my observations.

13                    And although it may sound like I had this

14             wonderful eight to five job, this was drinking from a

15             fire hose.  Every door I opened, and every drawer I

16             opened there was problems within that police

17             department. So that's why I leaned on the

18             organizational assessment to help me with that.

19      Q.     Okay.  So you leaned on the OA to assist you with

20             these issues that you claim that you saw. What did you

21             do in an effort to remediate that, or to create some

22             positive procedures or immediate procedures within the

23             department?

24                    MR. BROWN: Objection to form.

25      BY MS. HUNT:

Page 44

1    Q.   Do you understand the question?

2    A.   No.

3    Q.   Okay.  You indicate that you reached out to the DOJ to

4         assist you with these issues that you claim you saw.

5         After doing that, or in conjunction with the OA, what

6         did you do in an effort to try to clean up the issues

7         that you saw, or create processes to clean up those

8         issues?

9    A.   Well, first of all, it was making myself available in

10        enhancing communication to staff. Sharing why I was

11        there, what my goals were, right, to improve the

12        police department.  To improve the tools that were

13        available to them, the relationships with each other.

14        And, gosh, that's a loaded question. I could probably

15        sit here for hours to talk about and try to remember

16        all the individual conversations and things that we

17        did to strengthen the police department, and get

18        them -- try to boost morale, and at the same time

19        bring their operations up to best practices.

20   Q.   Okay.  So it sounds like you made yourself present.

21        You advised the department why you were there, and had

22        conversations about creating clear goals and

23        processes?

24   A.   Sounds so simple, doesn't it?  That's all I did in two

25        and a half years, no. This is -- this is day-to-day.

Page 45

```
 1          I kept a pillow, and I kept a sleeping bag in my
 2          office, and I slept on my couch many nights to talk to
 3          staff on their level, at their shift, on midnights, to
 4          let them air out their concerns, give them those
 5          cathartic moments. Very angry, angry staff members at
 6          their peers, and it was clear to me that when I would
 7          call command officers up, and I would sit out and
 8          listen to briefings, that sergeants command was part
 9          of the problem. They didn't even know -- they don't
10          know their peers, and they didn't know their
11          community, and that bothered me, and that's all
12          documented. You have my timeline. I know you have
13          that. If you don't, then you got a problem with
14          someone in that city.
15     Q.   Well, to be honest, I asked for a lot of documents
16          from your attorney, and I got --
17     A.   You have them. They were on my computer. They're on
18          email.
19     Q.   If I asked for documents from your attorney and, you
20          know, we don't get them, I'm assuming that I don't get
21          them.
22               MR. BROWN:  Monica, I've told you in
23          writing on numerous occasions that all documents will
24          be produced when you give us your comments to a
25          protective order, and you have failed to do so. So to
```

Page 46

```
 1        now sit here and say that I haven't produced documents
 2        to you when you have written notice of what the hold
 3        up is, which is you, is unfair.
 4                  MS. HUNT:  You indicated that you would
 5        provide the tax document as it relates to the
 6        protective order.
 7                  MR. MIOTKE:  To chime in on Ms. Hunt's
 8        point, remember at this point it's on you to give us
 9        comments on the protective order, drafts that I --
10                  MR. BROWN:  I've given you --
11                  MR. MIOTKE:  No, but you're supposed to get
12        back.  You said you needed to think about it.  That's
13        where we left off.
14                  MR. BROWN:  It's also dishonest to ask me
15        to produce city documents, which is what you're
16        discussing to you. You are the lawyer for the city.
17                  MS. HUNT:  Your client --
18                  MR. BROWN:  All these documents are in your
19        possession.  We're talking about police department
20        documents for the City of Dearborn Heights, and you're
21        the lawyer for the City of Dearborn Heights.
22                  MS. HUNT:  Your client indicated that there
23        were -- that they had claimed in allegations, and
24        alluded to having evidence as to these claims that
25        they have. If I don't have them from my client, and he
```

Page 47

```
 1           claims that he has them, or your clients claim that
 2           they have them, it's incumbent on your client to
 3           produce those.
 4    A.     How can another attorney have them, and you not, just
 5           out of curiosity?
 6                    MR. MIOTKE:  If I may.
 7    A.     This was produced to Todd Flood, and to Johnson
 8           Rosati.  This thing's been spread around and shared.
 9                    MS. HUNT:  I can't get things from another
10           attorney that is not a part of my case. I'm not going
11           to -- I apologize.  I'm not going to talk to your
12           client outside of this.
13                    MR. MIOTKE:  I mean, if I may, it is
14           incumbent on the plaintiffs to produce whatever it is
15           that they have, whether or not the city has it,
16           because we are --
17                    MR. BROWN:  The plaintiffs are not in
18           possession of official documents from jobs after they
19           quit.
20                    MR. MIOTKE:  What I'm saying is is we are a
21           party. We don't have access to it, so it's incumbent
22           on the plaintiffs to produce whatever they have,
23           because I don't know if the city necessarily has those
24           things, doesn't have those things, or if those things
25           were created by someone else, or were created by the
```

Page 48

```
 1           plaintiffs individually. So with that, I don't want to
 2           hold up the continuation of this.  But, you know, on
 3           this point, I certainly would agree with Ms. Hunt.
 4    A.     Did you ask for documents pertaining to us?
 5                   MR. BROWN:  We're not going to talk in
 6           front of these people.
 7    BY MS. HUNT:
 8    Q.     Mr. Hart you indicated earlier that when I asked about
 9           the survey, the written result of the survey that
10           Dr. Thomas took, you indicated that you had to look
11           through your files to see if you still had that; is
12           that correct?
13    A.     Yes.
14    Q.     Okay.  Did you take that, or could you have taken that
15           document with you when you left the City of Dearborn
16           Heights?
17    A.     I do not recall. And just for clarification right now,
18           I have two storage units, a pod, and I'm living out of
19           a duffle bag in an RV.
20    Q.     Understood.  Understood.
21    A.     So my life is completed upside down right now. I don't
22           know. I can't give an honest answer to that.
23    Q.     Okay.  When you left the City of Dearborn Heights in
24           July of '24, did you take documents with you?
25    A.     Yes.
```

1    Q.   Okay.  Do you recall what types of documents you took

2         with you?

3    A.   I do not.

4    Q.   Okay.

5    A.   I just grabbed everything off my desk.

6    Q.   Okay.  When you were chief of police with the City of

7         Dearborn Heights, did you ever print out emails?

8    A.   I'm sure I did, yes.

9    Q.   What did you do with those emails when you printed

10        them out?

11   A.   I do not know.

12   Q.   Could you have put them on your desk?

13   A.   Could have shredded them.  Put them on my desk.

14   Q.   What about police reports, did you keep police reports

15        in your office?

16   A.   I do not recall.

17   Q.   Okay.  What types of documents would you keep on your

18        desk?

19   A.   Current projects, items of significance that would

20        need to be addressed. Quite honestly, my desk was

21        quite a mess most of the time, so sometimes I just

22        throw random papers down there.

23   Q.   Did you take documents out of your safe when you left?

24   A.   When I left, I do not recall.

25   Q.   Okay.  Now, you mentioned that you provided the survey

Page 50

```
 1              results that Dr. Thomas created to another attorney,
 2              the Rosati firm. Do you recall that?
 3    A.   Yes.
 4    Q.   And you asked for a copy back; is that correct?
 5    A.   Yes.
 6    Q.   Okay.  Did you put that copy in your safe?
 7    A.   That is something I would put in my safe, but I don't
 8              know whether I did or not.
 9    Q.   What other types of documents would you put in your
10              safe?
11    A.   Whenever we would get served with a lawsuit, I would
12              pull personnel files, and other investigative reports,
13              and put them in the file so nothing happened to them.
14    Q.   Okay.  So when you say you would pull these files,
15              where would you pull them from?
16    A.   Their personnel files.  I would grab their whole
17              personnel files.  If they were former employees, I'd
18              have to go to another spot and pull that out. There
19              was zero trust there with anyone outside of my
20              directors.
21    Q.   All right. I just want to make sure that I got the
22              sequence correct. So you would pull the employee file?
23    A.   Let's use Reyna as an example.  I get served with a
24              lawsuit on Reyna. I pulled his personnel file. And
25              there's two parts to it, if I remember correctly. I
```

Page 51

```
 1            would grab the whole thing, and I put it in my safe,
 2            and I protected it, and that way no documents ended up
 3            missing.
 4     Q.    And how long would you hold onto that file?
 5     A.    I'm sure it's hopefully still there.
 6     Q.    So that would be -- you're using Reyna as an example.
 7            Were there ever times that you would put a document or
 8            a file in, and then remove it for whatever reason, or
 9            place it back to where you pulled it from?
10     A.    I do not recall.
11     Q.    Okay.  So you would just continue to accumulate files
12            in your safe?
13     A.    Yeah, yes.
14     Q.    And you don't know if you took any of those files or
15            documents with you?
16     A.    I do not recall whether I did or not.
17     Q.    So you don't recall if you took employee files with
18            you when you left the City of Dearborn Heights?
19     A.    I would not have taken anything that would have been
20            an employee's file. That I do know.
21     Q.    So what other types of documents would you put in the
22            safe?
23     A.    Well, that's where I secured the survey. So we had
24            quite a few lawsuits going. There was a former
25            employee who sued the former administration. I want to
```

Page 52

```
 1            say his name was Mahdi Bazzi.  So most of what was in

 2            that safe were a stack of personnel files, so I made

 3            sure that they didn't disappear. And because I could

 4            trust no one else within the organization, I was the

 5            one who had to make all the copies for the law firms

 6            out of those files, and then send them off. So I

 7            wanted to protect them.

 8    Q.     So you're telling me the only things you kept in your

 9            safe were employee files, and the survey results from

10            the survey that Dr. Thomas took?

11                    MR. BROWN:  Objection. Misstates the prior

12            testimony.

13    A.     That's all I recall.  And guns. I had obviously my

14            duty guns and things that I would keep in there as

15            well.

16    BY MS. HUNT:

17    Q.     Other than possibly paperwork, did you take anything

18            else with you when you left the City of Dearborn

19            Heights?

20    A.     No, no. I turned in all of my gear. Took pictures of

21            it, because the place is filthy, and I knew I would

22            probably be alleged to taking something, and made sure

23            that director Vanderplow collected that information

24            and catalogued it.

25    Q.     So you only took photos of like the objects like your
```

Page 53

```
 1        guns and your gear?
 2   A.   Yes.
 3   Q.   Or did you take photos of the --
 4   A.   No, most of my --
 5   Q.   Let me finish so the court reporter can get my entire
 6        question. You took photos of the guns and the gear, or
 7        did you take photos of the documents that were left
 8        there as well?
 9   A.   Just the guns and the gear.
10   Q.   Okay. So we were talking about the OA survey that --
11        or the OA assistance that you had in attempting to set
12        up goals and some remedial action. Did the OA provide
13        you with any recommendations?
14   A.   Yes.
15   Q.   Okay.  And how did they do that?
16   A.   There was a team of subject matter experts that would
17        come from around the country. They would come in for a
18        couple days. They would interview staff, and
19        divisions, and review information. We would have a
20        debrief before they left. And they would not tell me
21        anything that anyone said.  It was confidential
22        conversations. And then we worked on our goals
23        together based on that feedback for a path forward for
24        the police department.
25   Q.   Now, were you expected to implement those
```

Page 54

1          recommendations?

2     A.   Yes.

3     Q.   Or did they assist you in implementing those?

4     A.   They provided support. We did training. We did a lot

5          of training in community oriented policing. I wanted

6          to develop a true community oriented policing

7          department, not just a name. So we had sent several

8          staff members out there. So it was really a

9          collaboration of their recommendations, and they were

10         funding a lot of this work. And they ultimately would

11         have been funding a staffing and utilization study

12         where we would have determined what the staffing

13         levels of the police department should be.

14    Q.   And did they provide this to you in a report?

15    A.   Yes, the report is on the Department of Justice's

16         website.

17    Q.   Did you take any steps to implement other than

18         implement the suggestions made?

19    A.   Yes.

20    Q.   What did you do other than the conversations that you

21         stated that you had?

22    A.   Off the top of my head, my suggestion to them was that

23         I develop an implementation committee, a cross-section

24         of the police department, dispatchers, detectives,

25         record staff, myself, police officers, command

Page 55

```
 1          officers.  No lieutenants, but sergeants and below.
 2          And I put out a memo to the police department asking
 3          who would like to -- what it was about. That they
 4          would have a say in the police department, and the
 5          direction and problem solving.  And I want to say I
 6          had upwards of 15 to 20 people that said they wanted
 7          to participate in it. And I had meetings once a month,
 8          and my administrative assistant kept the minutes.
 9    Q.    Okay.  You started your response by saying your
10          recommendation to them?
11    A.    Yes.
12    Q.    Who is them?
13    A.    The organizational assessment team.  The staff wanted
14          more communication.
15    Q.    So out of these monthly meetings, what tangible
16          activities took place?
17    A.    Well, a lot of it was having FaceTime with the chief
18          in a neutral environment. I would have to go back, and
19          they're a public record, and they should be still in
20          my emails, the agendas. I created an agenda. I asked
21          them to develop agenda items. Once Janet, who was my
22          administrative assistant, was done with the minutes, I
23          would share that with, I believe, the whole
24          department, not just the members, and then the
25          expectation was the police officers would share the
```

Page 56

1        information from those meetings with their shifts.

2   Q.   Okay.  So you expected that the officers would just

3        explain what happened during those meetings to you?

4   A.   Yes, yes.  Tangible very low hanging fruit.  The way

5        the police cars are designed right now, that came from

6        the implementation committee.

7                 I'm trying to think of other things that --

8        any changes that would have -- that would have come

9        out of that, but that's the one that comes to mind

10       right now. We had mockups and voted on which design

11       they like the most.

12                 DEPOSITION EXHIBIT 2

13                 Professional Services Employment Agreement

14                 Between the City of Dearborn Heights and

15                 Jerrod S. Hart 12/12/2023

16                 11:23 a.m.

17  BY MS. HUNT:

18  Q.   I'm going to hand to you what is Exhibit Number 2. I

19       think we kind of got off track early on, but I wanted

20       to go back to your contract with the city. You

21       indicated that you had not been disciplined during

22       your tenure with the City of Dearborn Heights; is that

23       correct?

24  A.   That is correct.

25  Q.   Do you recognize this document?

Page 57

1    A.    This looks like the last contract I had, employment
2          contract.
3    Q.    All right. And you reference that you did receive a
4          raise during your time with the city?
5    A.    That is correct.
6    Q.    And if we look back at section three on page two, it
7          indicates that your new salary during the pendency of
8          this contract would be $126,600; is that right?
9    A.    That is correct.
10   Q.    So is that approximately a $24,000 raise that you
11         received in one year?
12   A.    Based on the other one, yes.
13   Q.    Okay.  From that increase -- strike that.
14                   After your first year of employment with
15         the City of Dearborn Heights, did your job duties
16         change at all?  Were you still -- strike that again.
17                   Did you remain as chief of police with the
18         City of Dearborn Heights?
19   A.    Yes.
20   Q.    Did your job duties change at all?
21   A.    The duties, no.
22   Q.    Okay.  So is it fair to say that your expected
23         responsibilities remained the same over the course of
24         that year and beyond from the first contract that you
25         received?

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

```
                                                    Page 58
 1    A.    That is correct.
 2    Q.    Did you receive benefits during your time with the
 3          City of Dearborn Heights?
 4    A.    I did.
 5    Q.    Okay.  What sorts of benefits did you receive?
 6    A.    Health insurance.
 7    Q.    That was it. All right. Any ancillary benefits such
 8          as, you know --
 9    A.    Car.
10    Q.    Okay.
11    A.    I had a take home car.
12    Q.    Did you have to pay anything for that vehicle?
13    A.    I did not.
14    Q.    Okay.  Insurance at all, maintenance?
15    A.    No.
16    Q.    Okay.
17    A.    Same one they provided to all the other chiefs.
18    Q.    Did you receive like any stipends for equipment or
19          uniform?
20    A.    I believe built into this contract there are some
21          other -- there's a uniform allowance of two percent
22          under 3.3.  MCOLES certification bonus of $3,000.
23    Q.    And did you receive those?
24    A.    I don't know if I did.
25    Q.    Do you ever recall not receiving them?
```

Page 59

```
 1    A.   In my severance, yeah.
 2    Q.   Well, let's talk about your severance. And we're going
 3         to end up backtracking back into your employment. When
 4         did you say you left the City of Dearborn Heights?
 5    A.   July 3rd, 2024.
 6    Q.   And you tendered your resignation to whom?
 7    A.   The mayor.
 8    Q.   And what date did you tender that resignation?
 9    A.   That was a constructive termination and that tendered
10         on July 3rd.
11    Q.   So you gave the mayor your resignation letter on July
12         3rd?
13    A.   I gave the mayor a constructive termination letter.
14    Q.   You handed the mayor?
15    A.   That he concurred with.
16    Q.   Okay.  So the mayor did not stop you from resigning;
17         is that fair to say?
18                   MR. BROWN: Objection. He keeps stating he
19         didn't resign, and you keep insisting he did.
20    A.   Can I grab a water, or are there rules?
21   BY MS. HUNT:
22    Q.   You can grab a water.  I'll wait until you get back to
23         the microphone.
24                   MR. BROWN:  So my objection is the question
25         assumes facts not in evidence. We don't agree that
```

Page 60

```
 1        there was a resignation.
 2   BY MS. HUNT:
 3    Q.   So earlier, Mr. Hart, I asked that you gave a
 4         resignation letter to the mayor, and you indicated
 5         correct, it was a constructive termination?
 6    A.   That is correct.
 7    Q.   Okay.  The document that you handed to the mayor, did
 8         that indicate that your last day was going to be July
 9         3rd?
10    A.   I would have to look at the letter, but I believe it
11         was.
12    Q.   Okay.  And you indicated that he concurred with the --
13    A.   That is correct.
14    Q.   He did not stop you from leaving?
15    A.   He concurred with it. Said he was sorry for the
16         behavior of the city council. Bob Ankrapp was in the
17         room.
18    Q.   And on that same day you left --
19    A.   Yes.
20    Q.   -- your employment with the City of Dearborn Heights?
21    A.   Yes.
22    Q.   Okay.  And you continued to receive the same amount of
23         pay that you were receiving -- or strike that.
24              You continued to receive funds in the
25         amount that you were receiving while you were employed
```

```
                                                    Page 61
 1          within the city; is that correct?
 2     A.   I received a partial honor of my severance.  That is
 3          in, I believe, your Exhibit 2.
 4     Q.   How much did you continue to receive on a regular
 5          basis?
 6     A.   I don't know. I don't know.
 7     Q.   Okay.  You did continue to receive funds?
 8     A.   Yes.
 9     Q.   After you left the City of Dearborn Heights?
10     A.   That is correct.
11     Q.   Did you continue to receive healthcare benefits?
12     A.   Yes.
13     Q.   During your tenure with the City of Dearborn Heights,
14          was your wife covered under your insurance?
15     A.   Yes.
16     Q.   Okay.  What about do you have children?
17     A.   My son is also covered under the family.
18     Q.   How old is your son?
19     A.   25.
20     Q.   After you left your employment with the city, did your
21          wife continue to receive those benefits?
22     A.   Yes.
23     Q.   All right. Did your son continue to receive those
24          benefits?
25     A.   Yes.
```

```
                                                    Page 62
 1                   DEPOSITION EXHIBIT 3
 2                   First Amended Complaint and Demand for Jury
 3                   Trial
 4                   11:31 a.m.
 5                   MR. BROWN: Do you need a break?
 6    A.   I'm fine.
 7                   MR. BROWN: You had a gallon of water.
 8                   MS. HUNT:  We're about to jump into the
 9         complaint that was filed now, so if you want to take a
10         break, this may be a good time to take it.
11                   MR. BROWN:  Take five minutes.
12                   (Break at 11:32 a.m.)
13                   (Back on the record at 11:42 a.m.)
14    BY MS. HUNT:
15    Q.   So we're back on the record. So, Mr. Hart, we're here
16         today because you filed, and two other plaintiffs
17         filed a lawsuit against the City of Dearborn Heights.
18         There was a complaint that was filed, and then an
19         amended complaint, which I'm going to hand you. This
20         is Exhibit 3. Did you have an opportunity to review
21         this lawsuit prior to your attorney filing it?
22    A.   I do not recall whether I did or not.
23    Q.   Do you recall if you --
24                   MR. MIOTKE:  I'm sorry. Is this first
25         amended, is this Number 3?
```

```
                                                        Page 63

 1                    MS. HUNT:  Yes.

 2                    MR. FARINHA:  Yes.

 3      BY MS. HUNT:

 4      Q.   Do you recall if you reviewed the amended complaint

 5           prior to it being filed?

 6      A.   I do not. I do not recall.

 7      Q.   Were you aware that an amended complaint was filed

 8           after your lawsuit was initiated?

 9      A.   Yes.

10      Q.   Okay.  Now, there are a number of allegations that you

11           and your co-plaintiffs make in this lawsuit, but I

12           want to focus on a few of the allegations made. If you

13           could turn to page four. And looking at paragraph

14           Number 20, and it states beginning in January of 2023,

15           Plaintiff's collectively reported violations and

16           suspected violations of law concerning corruption in

17           the city government, corruption in the DHPD, and civil

18           rights violations of the City of Dearborn Heights

19           through it's mayor and city council, to the Michigan

20           State Police, the United States Department of Justice,

21           and the Federal Bureau of Investigation.

22                    The claim here indicates that the

23           plaintiffs, and before I jump into the allegations --

24           before I jump into the allegations contained within

25           that paragraph, are you familiar with Kevin Swope?
```

```
                                                        Page 64
  1     A.    Yes.
  2     Q.    Okay.  Who was or is Kevin Swope?
  3     A.    He was my director of support services.
  4     Q.    Did you hire him?
  5     A.    The mayor hired him at my recommendation.
  6     Q.    Did you interview Mr. Swope?
  7     A.    I did.
  8     Q.    Was that a part of the panel that we discussed
  9           earlier?
 10     A.    No.
 11     Q.    Now, you indicated that it was at the mayor's
 12           recommendation?
 13     A.    No.  At my recommendation.
 14     Q.    At your recommendation the mayor hired him?  I'm
 15           sorry.
 16     A.    Correct, yes.
 17     Q.    When did you interview Mr. Swope, if you recall?
 18     A.    It would have been in the last quarter of 2022.
 19     Q.    And, again, I'm sorry. What did you indicate his title
 20           was?
 21     A.    Director of support -- no. Kevin was a director of
 22           police operations, I think, was his title.
 23     Q.    All right. And why was he hired?
 24     A.    I spoke to Kevin because I recognized that there had
 25           been absolutely zero preparation for succession
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                           586-468-2411
                                                           www.veritext.com

Page 65

```
 1              planning at the police department.  That the culture
 2              of the police department was one that needed to be
 3              changed significantly. And I needed an outside person
 4              who has experience in accreditation, and in
 5              leadership, and that's why I hired Kevin.
 6      Q.      Okay.  So was the purpose of bringing Mr. Swope in to
 7              assist in creating a succession plan, or for him to be
 8              the succession plan?
 9      A.      No. For him to come in and assist me with the work
10              with the organizational assessment, creating solid and
11              contemporary police policies and procedures.
12      Q.      And you indicated you needed an outsider?
13      A.      Yes.
14      Q.      Why?
15      A.      Because there was absolutely zero support from within
16              the police department, especially with the command.
17              And they were also part of the problem.
18      Q.      So you're saying there was absolutely no one within
19              the police department --
20      A.      There was potential.
21      Q.      If I could finish my question.
22      A.      Yeah.
23      Q.      You're saying that there was absolutely no one within
24              the police department that had knowledge or historical
25              knowledge that could assist you with this process?
```

Page 66

```
 1   A.   That's what I was trying to get away from was the

 2        historical knowledge.  The way things had always been

 3        done was improper at all levels.  There are potential

 4        leaders there that if we would have been able to

 5        finish our work would have been developed.

 6   Q.   Did you do anything to try to develop those leaders?

 7   A.   Yes.

 8   Q.   What did you do?

 9   A.   Mentor them, have conversations with them. Staff in

10        command was a punishment there. That's a leadership

11        class that many young leaders go to. And they would go

12        to it a couple months before retirement, and then

13        leave so they didn't have to work the road.

14   Q.   Who are these potential leaders?

15   A.   Michael Guzowski.

16   Q.   Anyone else?

17   A.   No.

18   Q.   Just Michael Guzowski?

19   A.   Guzowski, yep.

20   Q.   In hiring Mr. Swope, or bringing Mr. Swope in, did you

21        have any input in his contract, and creating his

22        contract?

23   A.   I do not recall.

24   Q.   Did you have any input in how much money he would be

25        making, what his benefits were, what the duties of his
```

```
                                                    Page 67
 1        job would be?
 2   A.   That would have -- I do not recall having any input in
 3        that.
 4   Q.   Okay.  You indicated that you identified a need for
 5        this position. Did you have any input in what that
 6        position would be doing day-to-day, and what their
 7        duties or responsibilities would be?
 8   A.   Yes. I developed a job description for the position.
 9   Q.   Did you implement that description on your own, or did
10        you run it by anyone, like take it to HR to take a
11        look at it, the mayor?
12   A.   I do not recall whether I did or not.
13   Q.   Would you have the autonomy to do that on your own?
14   A.   I believe so, but I can't say for certain.
15   Q.   In recommending this position, was this a new position
16        for the city?
17   A.   Yes.
18   Q.   Okay.  In recommending this position to the mayor, did
19        you speak with anyone else about it other than the
20        mayor, of course?
21   A.   I do not recall.
22   Q.   Were you Mr. Swope's supervisor?
23   A.   I was.
24   Q.   Okay. Could you discipline Mr. Swope?
25   A.   Yes.
```

Page 68

1    Q.   Could you fire him?

2    A.   I could ask the mayor to fire him.

3    Q.   Did Mr. Swope supervise any other individuals within

4         the police department?

5    A.   Everyone within the patrol division, captain,

6         lieutenant, sergeants, officers.

7    Q.   When you created this position, did you create the

8         position, or did you have Mr. Swope in mind for this

9         position?

10   A.   No, I --

11                  MR. BROWN:   Objection. Assumes facts not in

12        evidence. You can answer.

13   A.   I created the position for it.

14   BY MS. HUNT:

15   Q.   Okay.

16   A.   Yes.

17   Q.   You created the position. Did you interview for that

18        position?

19   A.   I did.

20   Q.   Interview individuals.

21   A.   I interviewed Kevin for the position.

22   Q.   So Kevin Swope was the only person you interviewed for

23        that position?

24   A.   Yes.

25   Q.   Did you place an ad or do some sort of recruiting for

```
                                                    Page 69
 1         that position?
 2    A.   No.
 3    Q.   How did Kevin Swope come on your radar for this?
 4    A.   He was a recommendation from Bob Pfannes who is the
 5         chief of police in Romulus.
 6    Q.   Now, did Mr. Pfannes become aware of this position?
 7    A.   I don't know necessarily if he became aware of the
 8         position.
 9    Q.   Okay.  How did Mr. Pfannes provide you with Mr.
10         Swope's name?
11    A.   I was asking for any outside leaders that he thought
12         could come in and assist me, and he stated that he
13         knew of one person over at Westland.
14    Q.   Were you aware of Mr. Swope prior to his interviewing
15         for this position?
16    A.   No.
17    Q.   Was it an interview, or did you just have a discussion
18         with him?
19    A.   No, there was an interview. Really at that level it's
20         a fitment issue.
21    Q.   Were you the only person that he met with?
22    A.   No.
23    Q.   Okay.  Who else did he meet with?
24    A.   Roger Farinha and Paul Vanderplow.
25    Q.   How many meeting were there with him?
```

Page 70

```
 1    A.    One.

 2    Q.    Was that one group meeting with Mr. Farinha, yourself

 3          and Mr. Vanderplow?

 4    A.    Yes.

 5    Q.    How soon after that meeting did you offer him the

 6          position?

 7    A.    I do not recall. I had to talk him off the ledge,

 8          because staff compromised the CCTV system within the

 9          police department, took photographs of him and Paul,

10          and then reached out to his agency. That's the fun I

11          was having.

12    Q.    All right. So Mr. Vanderplow was already employed with

13          the city?

14    A.    No.

15    Q.    Let me finish. Mr. Vanderplow was already employed

16          with the city, and then Mr. Swope came in?

17    A.    No.

18    Q.    Okay.  How did Mr. Vanderplow become a part of this

19          meeting?

20    A.    There were several -- there were several FFL dealer

21          break-ins in the City of Dearborn Heights and

22          surrounding communities where vehicles were driven

23          through the front doors.  Suspects would get out, grab

24          a bunch of guns and then flee. I met Paul as he was

25          the special agent in charge of the Detroit field
```

Page 71

```
 1           division for the Alcohol, Tobacco, Firearms and
 2           Explosives. And as I started meeting with Paul about
 3           this case, understood that he had a lot of
 4           investigative and budgeting skills. And the budgeting
 5           skills is not one of my strong suits. So I had asked
 6           him if he was possibly interested in coming to
 7           Dearborn Heights.
 8      Q.   Okay.  So on the date that you met with Mr. Swope with
 9           Mr. Farinha, Mr. Vanderplow was not an employee of the
10           city. Was he still working in the ATF?
11      A.   I don't know his last day. I do not. I can't speak on
12           that. He was not an employee of Dearborn Heights at
13           the time.
14      Q.   So a nonemployee of the City of Dearborn Heights sat
15           in a meeting with a potential employee of the City of
16           Dearborn Heights as a fitment type meeting as
17           indicated earlier?
18      A.   That is correct.
19      Q.   Before I forget, for purposes of the record, you
20           indicated that there were FFL break-ins.  For the
21           transcript purposes, can you identify what FFL is?
22      A.   Federal firearm licensed dealer.
23      Q.   Have you ever had any other interviews or fitment
24           meetings with individuals that were not employees of
25           the City of Dearborn Heights who was not being
```

Page 72

```
 1           interviewed for the subject of potential employment?
 2      A.   Can you dial that in for me a little bit more
 3           succinctly?
 4      Q.   So you indicated that Mr. Vanderplow was not an
 5           employee of the city when you met with Mr. Swope for
 6           purposes of having him join the Dearborn Police
 7           Department. Have you ever had any other meetings with
 8           nonemployees of the city, individuals that do not work
 9           within the city to sit in on potential interviews, or
10           meetings, or interviews, or meeting with potential
11           employees?
12                    MR. MIOTKE:  Objection.  Form. You said
13           Dearborn. You meant Dearborn Heights.
14                    MS. HUNT:  Dearborn Heights. I'm sorry.
15      A.   I'm not crystal clear on the question. They were both
16           being interviewed for positions.
17      BY MS. HUNT:
18      Q.   You had two interviews at the same time?
19      A.   Yeah. You made it sound like there were -- like I just
20           brought Paul in to listen to Kevin, and that's not the
21           case.
22      Q.   So you indicated earlier that Mr. Vanderplow had some
23           financial background that you didn't necessarily have.
24           Were discussions had with him during that meeting
25           about his financial background?
```

Page 73

1    A.    I had already had those.

2    Q.    Okay.

3    A.    And Paul was willing to retire to join the team.

4    Q.    Okay.  He had not joined the team at the time of Mr.

5          Swope's interview or meeting?

6    A.    I do not recall when that meeting was, and when they

7          signed their contracts.

8    Q.    Okay.  But you indicated earlier that he was not an

9          employee for the city?

10   A.    They were not employees at that time. They had not

11         started, no. I believe their first date was January

12         9th, 2023.

13   Q.    So the only meeting -- strike that. Earlier you

14         mentioned that there was only one meeting that you had

15         with Mr. Swope, and that included yourself, Mr.

16         Vanderplow, and Mr. Farinha. The only meeting you had

17         with Mr. Swope included Mr. Vanderplow?

18   A.    That is correct.

19   Q.    And when did you first meet with Mr. Vanderplow?

20   A.    I do not recall the specific dates.

21   Q.    All right. Did you hire him?

22   A.    I didn't, no.

23   Q.    Okay.

24   A.    No.

25   Q.    Like Mr. Swope, did the mayor hire him?

Page 74

1    A.   Yes.

2    Q.   Did you recommend Mr. Vanderplow for this position?

3    A.   Yes.

4    Q.   What was his role?

5    A.   While he was employed at Dearborn Heights?

6    Q.   Correct.

7    A.   I hired him as the director of support services, so

8         he'd be in charge of the investigative staff, records,

9         vehicle maintenance, dispatch, and the budget.

10   Q.   The director of services?

11   A.   Support services.

12   Q.   Support services, was that an existing position, or

13        was that created by you?

14   A.   It was not created by me.

15   Q.   Who held the role prior to Mr. Vanderplow?

16   A.   No one that I'm aware of.

17   Q.   Was that a new position that was created?

18   A.   Yes.

19   Q.   During your time there?

20   A.   It was new to the department.

21   Q.   And you said you didn't create it. Who created it?

22   A.   The mayor.

23   Q.   Did the mayor interview Mr. Vanderplow?

24   A.   I want to say he did, but I can't say for certain. I

25        do not recall.

Page 75

1   Q.   Prior to the meeting with Mr. Swope, that you had with

2        Mr. Swope, and Mr. Vanderplow, and Mr. Farinha, how

3        many other meetings did you have with Mr. Vanderplow

4        prior to his joining the department?

5   A.   I remember at least two breakfasts at Leon's that were

6        either debriefs from search warrants that were

7        concluded the night before, or I've been on search

8        warrants with them to reference the FFL cases. So I

9        would say two, maybe three.

10  Q.   So those are meetings for purposes of operational

11       procedures within the city; is that fair to say?

12  A.   No. It was -- no.

13  Q.   Or maybe activities that had occurred within the city?

14  A.   Yes.

15  Q.   Okay. Did you have any meetings with him about taking

16       on the position of director of support services?

17  A.   Yes.

18  Q.   How many?

19  A.   I believe there was one lunch.

20  Q.   And this is exclusive of the lunch with or the meeting

21       with Mr. Swope and Mr. Farinha?

22  A.   This was outside of that meeting.

23  Q.   Was that an interview, or was that also a fitment?

24  A.   That was a discussion about coming on board.

25  Q.   And when was -- was an offer made to him during that

```
                                                      Page 76
 1          lunch?
 2    A.    No.
 3    Q.    When did an offer go to him?
 4    A.    After he met with the mayor, and I don't know -- I
 5          cannot remember if anyone else was in the room.
 6    Q.    Did you --
 7    A.    But all formal offers would come from HR.
 8    Q.    Okay.  Did you recommend to HR that they offer him a
 9          position?
10    A.    Yes.
11    Q.    And did you recommend to HR that Mr. Swope be offered
12          a position?
13    A.    Yes.
14    Q.    Did you discuss Mr. Vanderplow's potential employment
15          with anyone else other than the mayor?
16    A.    It would have been Margaret.
17    Q.    Hazlett?
18    A.    Yes. Roger.
19                MR. BROWN:  Farinha.
20    A.    Farinha, sorry.
21                MR. FARINHA:  Thank you.
22    A.    Sorry about that. And that's all that I can recall
23          right now. I can't remember if Chris Mikula was a part
24          of those or not.
25    BY MS. HUNT:
```

Page 77

1    Q.    Okay. Were either Mr. Swope, or Mr. Vanderplow, or

2          both involved in the meetings and discussions that you

3          had with OA that we discussed earlier?

4    A.    Yes.

5    Q.    Both or one of them?

6    A.    Kevin consistently. Paul, in and out.

7    Q.    All right. Turning to item number 20 of the complaint

8          that I read earlier, you reference that there were --

9          you made reports to a number of different agencies and

10         entities, including city government, the city council,

11         the mayor, Michigan State Police, the DOJ and the FBI.

12         What complaints did you make to the Michigan State

13         Police?

14   A.    They were predominantly complaints regarding excessive

15         use of force, a ticket fixing, overtime scheme,

16         missing money out of cash fund. They were my auditors.

17         That's all I can -- there was a camera in the women's

18         bathroom locker room on the second floor, and I

19         believe the allocation of city property to a private

20         entity.

21   Q.    When did you take these complaints to the state

22         police?

23   A.    I couldn't give you the exact dates.  I don't know.

24   Q.    Were all of these alleged activities combined in one

25         complaint, or were there several complaints?

Page 78

1    A.    No, there were several. They were ongoing.  As things

2          would come up, we'd make the report.

3    Q.    How did you relay this to the state police?

4    A.    Personal meetings, phone calls.

5    Q.    Anything in writing?

6    A.    I believe that would be through -- that would be a

7          question for director Swope. He was the designated

8          contact for many of those.

9    Q.    Did you have any conversations or in person meetings,

10         phone calls, with anyone with the Michigan State

11         Police as relates to these activities?

12   A.    Phil Menna.

13   Q.    Can you spell Menna?

14   A.    M-E-N-N-A. I want to say he's a captain. Had a long

15         meeting in my office. Don't know the date. I could see

16         the layout in my office, so it was probably right

17         around the end of '22, right after '23, January of

18         '23.

19   Q.    What about the layout in your office makes you believe

20         that it was this timeframe?

21   A.    Because of the way my office was set up when I got

22         there. I moved it.

23   Q.    Did you rearrange your office after?

24   A.    Yes.

25   Q.    This meeting with Mr. Menna in your office, was it

Page 79

```
 1          followed up by any emails, or were notes taken?
 2     A.   I do not recall.
 3     Q.   What were the allegations that were discussed with Mr.
 4          Menna?
 5     A.   I listed the -- out of those that I listed that I can
 6          recall, would have been the cash fund at that time.
 7          The tire machine. And I think there were property
 8          issues as well.
 9     Q.   What about the tire machine?  What was the issue with
10          the tire machine?
11     A.   Probably the rest of our time today, the moral of the
12          story is --
13     Q.   Just an overview.
14     A.   -- employees engaged in bad behavior. Sergeants tried
15          to cover it up, and the end result was me finding out
16          from the sworn officer who was assigned to porter cars
17          to dealerships to get them fixed, that the police
18          department gave a tire machine that was purchased by
19          the city for the department to a tire shop in Dearborn
20          Heights.
21     Q.   And did you do any investigation into that issue?
22     A.   I did.
23     Q.   Okay.  What did you do?
24     A.   I directed Paul Erickson, who was a captain at the
25          time, to conduct an investigation.
```

Page 80

1    Q.   Did he conduct an investigation?

2    A.   Yes.

3    Q.   All right. Did he provide you with feedback or an

4         update as it relates to that allegation?

5    A.   I believe there was ultimately a memorandum. There was

6         discipline involved. And as soon as I found out about

7         the tire machine, I notified the mayor. I believe in

8         that meeting was also Dave Abdallah and Ray Muscat.

9    Q.   And who is Dave Abdallah?

10   A.   Former council chair.

11   Q.   And Ray Muscat?

12   A.   Former council chair pro tem.

13   Q.   So you indicated that with that particular instance

14        with the tire machine discipline was issued. Did you

15        hand down that discipline?

16   A.   I concurred with the discipline.

17   Q.   Okay. Concurred with who?

18   A.   With Paul Erickson's recommendation for discipline.

19   Q.   After this meeting with Mr. Menna, did he -- did you

20        have any further conversations with him?  Did he reach

21        back out to you at all?

22   A.   No. He had sent a -- I do not know what his rank is,

23        maybe inspector, to conduct another audit of the cash

24        fund, and it was still not balanced.

25   Q.   And what did you do about that?

Page 81

1    A.   Started an investigation of Captain Erickson.  And the

2         sergeant who had been off for my whole tenure there

3         came back, was maybe there a week or two.  As soon as

4         he caught wind of it, he left.

5    Q.   Who was that?

6    A.   Sergeant Mitchell.  I do not remember his first name.

7    Q.   So the fact that -- strike that.

8              Did Mr. Erickson or Officer Erickson

9         conclude his investigation?

10   A.   I do not remember. I do not recall.

11   Q.   Did Sergeant Mitchell's return to the force, and then

12        subsequent exit, end the investigation?

13   A.   For us, yes.

14   Q.   Was it the assumption that Sergeant Mitchell was

15        involved in the cash flow or cash fund imbalance?

16   A.   That was to be determined. But he's no longer under

17        Garrity. We did not compel statements from him.

18   Q.   Did you do any other follow up with any other

19        employees or officers as relates to the fund balance

20        issue?

21   A.   I do not recall.

22   Q.   I'm sorry. The cash fund imbalance.

23              So is it safe to say because Sergeant

24        Mitchell quit, the investigation did not conclude?

25   A.   I do not recall. I'd have to go back and look at those

Page 82

```
 1        records which should be at the PD, yeah.
 2   Q.   Do you have any written information or proof that
 3        these claims were taken to the Michigan State Police?
 4   A.   I do not, no.
 5   Q.   What were the claims or allegations that were made to
 6        the United States Department of Justice?
 7   A.   Civil Rights violations, cash fund. I'm trying to
 8        remember what else at the time. That was the
 9        commissioner and I that went down there.
10   Q.   When you say you went down there, where did you go?
11   A.   To the federal building. The name should be in their
12        log.
13   Q.   When you say the federal building, in Detroit?
14   A.   Yes.
15   Q.   Do you remember when you went?
16   A.   I do not recall.
17   Q.   When you say the commissioner, is that Dr. Thomas?
18   A.   Yes.
19   Q.   The cash fund issue is the same issue with regards to
20        it's not balancing?
21   A.   Yes.
22   Q.   Who did you speak with at the Department of Justice?
23   A.   Luttrell Levingston, I do remember we talked a lot,
24        but he was on the Civil Rights side. I had received
25        several Civil Rights violations from the state that
```

Page 83

```
 1         had been filed, and I do not remember the other
 2         person's name.
 3    Q.   Did you speak with both of those individuals, Mr.
 4         Levingston and the other individual in the same
 5         meeting?
 6    A.   Yes.
 7    Q.   All right. Together at the same time?
 8    A.   Yes.
 9    Q.   Okay.  How many times did you go to the federal
10         building?
11    A.   Once.
12    Q.   I'm sorry if I asked you this.  Do you recall the date
13         or the timeframe?
14    A.   I do not recall, no.
15    Q.   And was it the issue of the Civil Rights issue, the
16         cash fund that you discussed with them at that
17         meeting?
18    A.   There were a litany of issues, and I'm trying to
19         recall all of them right now. I'd have to refresh my
20         memory off some documents I guess.
21    Q.   How did you get a meeting with Mr. Levingston and the
22         other individual?
23    A.   The mayor.
24    Q.   All right. Did you receive like an email with regards
25         to the --
```

Page 84

```
 1    A.   Phone conversations. I could have nothing in writing.
 2         There was zero trust in that building.
 3    Q.   There was nothing in writing that you kept at home or
 4         away from the department?
 5    A.   Just the log that we signed in.
 6    Q.   Just the visitor log?
 7    A.   Yep.
 8    Q.   Now, you indicated that you received a number of Civil
 9         Rights complaints. What do you mean you received Civil
10         Rights complaints?
11    A.   From Officer Mazloum against employees, Sergeant
12         Bazzy. I believe there was one from Faten Shokr. There
13         was one from Officer Hammoud on the knife incident. I
14         think those were the four that I predominantly dealt
15         with right after I arrived.  They came in from the
16         MDCR.
17    Q.   So Officer Mazloum, and I'm sorry if I'm not giving
18         their titles, but Officer Mazloum, is he of Middle
19         Eastern descent?
20    A.   I believe so.
21    Q.   What about officer Shokr?
22    A.   Yes.
23    Q.   Officer Bazzy?
24    A.   Yes, Sergeant Bazzy.
25    Q.   And Hammoud?
```

Page 85

1    A.   Yes.

2    Q.   All of Middle Eastern descent?

3    A.   Yes.

4    Q.   What were their Civil Rights complaints?

5    A.   They were against other employees, and quite honestly

6         I'd have to go back. Someone would have to grab them.

7         Those are all in files at the police department.

8    Q.   So they made complaints indicating that there were

9         Civil Rights issues against them from other employees?

10   A.   Yes.

11   Q.   Do you know if they were race related?

12   A.   I believe it was religion.

13   Q.   So it's your understanding that officers of Middle

14        Eastern descent indicate that they were being

15        discriminated against either by race or religion?

16   A.   Correct.

17   Q.   Are those the Civil Rights issues that you spoke with

18        Mr. Levingston and the other Department of Justice

19        employee about?

20   A.   I would have discussed specifically those Civil Rights

21        issues with Luttrell, yes. And I don't know if

22        specifically those had been filed at that point. This

23        would have been during multiple interviews with staff.

24   Q.   Okay.  You had interviews with staff as relates to the

25        Civil Rights issues?

Page 86

```
 1    A.   No, as it relates to just being a boss, and trying to
 2         figure out what's going on in the department.
 3    Q.   But were there discussions about Civil Rights issues?
 4    A.   Their specific -- I guess can you clarify before or
 5         after they were received by the MDCR.
 6    Q.   Well, at any time when you had a discussion with your
 7         employees in the police department, did claims of
 8         Civil Rights issues come up?
 9    A.   Absolutely, yeah.
10    Q.   And did you have any separate conversations with
11         employees related to those Civil Rights issues after
12         you were made aware that a certain employee felt some
13         sort of discrimination or Civil Rights violation?
14    A.   Other than Roger, Chris Mikula, because I had to write
15         the responses, because everyone was busy, and I
16         handled those specifically. I wouldn't even let my
17         administrative assistant pull files for me. I pulled
18         them on my own. So it would have been myself, Roger,
19         Chris Mikula, HR, the mayor, and Paul and Kevin.
20    Q.   Did you speak with any --
21              MR. MIOTKE:  I'm sorry.  Paul and who?
22    A.   Kevin.
23              MR. MIOTKE:  Kevin.
24              MR. BROWN:  Swope.
25              MR. MIOTKE:  Swope.
```

Page 87

```
 1    BY MS. HUNT:

 2     Q.   Did you meet with the subject of the EEOC complaint,

 3          or the Civil Rights complaint?

 4     A.   I was told I couldn't.

 5     Q.   Who told you you couldn't?

 6     A.   The MDCR investigator.  They were simply asking me for

 7          files and any information I had about beard waivers

 8          and, you know, situations that had happened.  And

 9          employees in two of the incidents, I believe, were

10          gone. They had already resigned at that point. They

11          retired.

12     Q.   Do you recall approximately how many of these EEOC

13          complaints that you received?  I'm sorry.  Or civil

14          rights complaints?

15     A.   Four, four, five.

16     Q.   Okay.  What did you do to determine if there was a

17          Civil Rights issue within your police department, and

18          to correct that?

19     A.   During my first staff meeting, of course, I had

20          interviews with all staff. I wasn't -- my goal was to

21          not create what they had referred to as staff as this

22          golden circle.  If you're with the chief, and you're

23          running with the chief in their circles, you can do no

24          wrong. You're good. There's an actual challenge going

25          on. And I said I would create no new circles. We are
```

Page 88

```
 1        going to treat everybody the same.
 2                So that was part of my conversations at
 3        briefings is that we're not going to do this. And then
 4        at a staff meeting where one of the lieutenants was
 5        literally 10 feet away from an Arab sergeant who said,
 6        I don't understand why they have to have beards. I'm
 7        like, Who's they?  And he said, The Arabs. They don't
 8        have them during the police academy.  But they come
 9        here, and they got to get a beard waiver.  And I said,
10        What the hell does it matter to you, right?  And then
11        he went on to explain he doesn't understand why we
12        have to go to the Arab American Museum.  And, you
13        know, there's people that speak Mexican in the
14        community, and we have to focus on Arabs.  That's the
15        kind of level of people I'm dealing with.
16                So as I go working my way through this
17        organizational assessment, and I treated everybody
18        fairly, so I set that standard. I was putting in more
19        than enough time every day to try to turn this ship
20        around. I reached out to Middle Eastern Law
21        Enforcement Officers Association, and I had a couple
22        of meetings with them. And I asked Sergeant Bazzy to
23        take a lead role to -- let's go to the MELOA
24        conference.  It's in Dearborn. Let's get anyone that
25        wants to go start with the Arab police officers,
```

Page 89

```
 1            right?  Let's give them a shot to go to this
 2            conference with me.  And we'll hopefully learn things,
 3            right?  Because there's people from all backgrounds.
 4            And he never did, so Kevin had to do it.
 5                      And we went to that conference. I was
 6            having active discussions with people.  Doctor Talal
 7            Bazzi I met with on more than one occasion.  I had
 8            conference calls with people from Civil Rights groups
 9            asking for assistance. What can I do to get these
10            folks to respect each other to be able to work
11            together, because there are Arab officers there who
12            said they never had backup show up. And that's not
13            cool at all.
14     Q.     The example that you just gave of the officer that
15            discussed not understanding why beards were allowed,
16            or why speaking Mexican was tolerated or promoted,
17            were there any remedial actions that you had with that
18            officer, or was there anything done with that officer
19            with regards to his perceived bias?
20     A.     I addressed it right in the room with everybody
21            present, and I had a follow-up conversation with him
22            and his two sergeants in my administrative conference
23            room.  I documented it. It's at nine, 10 o'clock at
24            night. And called them up there and had a long, long
25            discussion with them, because I'm still in the fact
```

Page 90

```
 1          finding. What is going on. Why are we -- how can we
 2          not know, right, about our community and our
 3          colleagues. So it was just amazing to me.
 4                  I got accused of not having a Santa Claus
 5          in our training room at a Christmas party because of
 6          the Muslims. And I'm like, Are you shitting me, right?
 7          I'm sorry that I swore. I mean, I was so like shocked.
 8          I'm like, You understand that Muslims will put up a
 9          Christmas tree.  That Jesus was seen as prophet?  How
10          do I know these things?  Because I was having
11          conversations with people in the community and
12          learning it.
13                  So I was trying to educate and redirect a
14          lot. I know there's a lot. And I know you have a job
15          to do. But my role was literally a 200 room hotel.
16          Every room's on fire, and there's a family standing in
17          every window saying save me.  This place is on fire,
18          and it remains on fire.  Sorry for the rant.
19     Q.   That's fine. The name of the officer that we're
20          discussing as relates to the beards and the Spanish
21          speaking, what was his name?
22     A.   Lieutenant -- I'm sorry. I've been in counseling, and
23          I've done my best to not let this place consume my
24          life.
25     Q.   That's fine.
```

```
                                            Page 91

 1    A.    Can I ask Roger a question?

 2    Q.    No. But that's fine if you can't remember it. That's

 3          all right. We can talk about it later.

 4                  Was he referred to any diversity or

 5          tolerance training?

 6    A.    Yes. We have annual tolerance and cultural diversity

 7          training at the police department.

 8    Q.    Okay.

 9    A.    And plus there's myself addressing this. Part of the

10          issue is nobody was addressing this.  They're all

11          buddies. It's the good guys club, right?  All my

12          friends. And I wanted to set that tone, but that was

13          not allowed.

14    Q.    Was he referred to this training soon after the

15          incident happened, or the statements --

16    A.    So this would have been --

17    Q.    Let me finish so that the court reporter can get

18          everything.

19    A.    So this would have been --

20    Q.    Was he referred to the training after this incident

21          happened in addressing that incident, or was it the

22          next time these trainings came around he was referred

23          to OA?

24    A.    The next time the trainings came around, which are

25          January, February.
```

```
                                                        Page 92

 1     Q.   Okay.

 2     A.   And this would have been a discussion right before

 3          December before Christmas.

 4     Q.   So before December 25th he made these statements.  And

 5          sometime in January and February he was told he had to

 6          go to tolerance or culture training?

 7     A.   So just to be clear, he wasn't specifically singled

 8          out for it. Everybody goes, you know. So that's it,

 9          yeah.

10     Q.   So he made these statements, and then along with

11          everyone else he went to the cultural training; is

12          that correct?

13     A.   To the best of my recollection, yeah. We'd have to

14          pull the annual training reports.

15     Q.   All right.

16     A.   What's his name?

17     Q.   Did you ever receive any sort of follow-up report or

18          opinion from the DOJ with regards to the information

19          that you provided to them?

20     A.   The organizational assessment?

21     Q.   Oh, no. After your discussion with Mr. Luttrell and

22          the other individual when you went downtown.

23     A.   No.  Anything in writing, no.

24     Q.   All right. Now, you also indicate that you made

25          statements or made complaints to the FBI?
```

Page 93

1    A.   Yes.

2    Q.   Did you, yourself, make a complaint to the FBI?

3    A.   Yes.

4    Q.   Who did you speak with at the FBI?

5    A.   James Tarasca, special agent in charge.

6    Q.   Can you spell Tarasca?

7    A.   I believe it's T-A-R-A-S-C-A.

8    Q.   How did you make contact with Mr. Tarasca?

9    A.   The mayor brought him to the police department.

10   Q.   And did you meet with him at the police department?

11   A.   I did.

12   Q.   Was the mayor there with you?

13   A.   Yes.

14   Q.   Was there anyone else in the room?

15   A.   No.

16   Q.   Do you know why the mayor brought him into the police

17        department?

18   A.   Well, I don't know specifically. You'd have to ask

19        him. But I will say that what I thought he was there

20        for was because the mayor was aware of all the issues

21        that I was dealing with.

22   Q.   In the meeting with Mr. Tarasca, did you speak?

23   A.   Probably about 10 percent.

24   Q.   Okay.  Did you provide any -- did you speak with him

25        about the complaints that you claim that are listed in

Page 94

1          paragraph 20 here?

2     A.   Yes.

3     Q.   Okay.  What did you speak with or tell him about?

4     A.   Specifically about the money issues, and the property.

5          He's not -- I don't believe I discussed the Civil

6          Rights issues with him.  And then there were IOUs that

7          were a previous investigation in that cash fund.

8     Q.   Is this the same issue that you're not sure if the

9          investigation was concluded?

10    A.   The IOUs was concluded.

11    Q.   Okay.  But with regard to the other cash fund issue?

12    A.   I do not recall.

13    Q.   Okay.  But that's the same issue that you're speaking

14         of?

15    A.   They're two separate issues. The IOU and the cash fund

16         are two separate, but the same cash fund.

17    Q.   Okay. But you did speak with Mr. Tarasca about the

18         cash fund issue, and the IOU issue?

19    A.   Yes.

20    Q.   Was there a -- with regards to the property issue, is

21         this beyond the tire machine?

22    A.   Yes.

23    Q.   What is the property issue that you claim?

24    A.   There is a significant portion of the police

25         department that had access to cash, drugs in temporary

Page 95

```
 1          lockers outside of the main property officer. And I
 2          had heard rumblings, stories about things been peeled
 3          off and taken home from the property room.  I heard
 4          stories about people, specifically, the plain clothes
 5          unit, taking items to garages and divvying up jewelry,
 6          and cash, and other items of value.
 7     Q.   And this was discussed with Mr. Tarasca?
 8     A.   I do not recall specifically.
 9     Q.   So when you say you discussed property issues with Mr.
10          Tarasca, what property issue did you discuss?
11     A.   The access and the allegations of items being taken
12          out of property, the records, etc.
13     Q.   Did Mr. Tarasca provide assistance in addressing this?
14     A.   He said he would. I even gave him the example of a
15          detective flying around a drone that was taken into
16          property the night before as evidence of it.
17     Q.   Did you receive any follow up, or any written
18          confirmation of this meeting with Mr. Tarasca?
19     A.   I had multiple phone conversations with the FBI and
20          the DOJ.
21     Q.   You indicated that he said that he would follow up
22          with you. Did he?
23     A.   No.
24     Q.   All right. What did you do about the alleged property
25          issues?
```

Page 96

```
1    A.   Had a meeting with Dave Abdallah, Bill Bazzi, the
2         mayor, Ray Muscat. We talked about the rifle program
3         that was out of control, purchasing weapons on the
4         city's letterhead, and not having a tracking mechanism
5         to see if officers were paying the money back, and
6         also the issues in the property room. I had asked the
7         mayor for authorization to have a complete floor to
8         ceiling, wall to wall inventory of that property room.
9         It had to be done.  It was a mess. And for whatever
10        reason, he brought the other two gentlemen with him,
11        because the cost was going to be about $50,000.
12   Q.   All right. So you met with Mayor Bazzi, councilman
13        Abdallah and councilman Muscat. And it sounds like you
14        talked about a few issues.  Did you take any -- I
15        understand that you wanted, you know, a wall to wall
16        audit.  But did you take any action to remedy this
17        perceived issue?
18   A.   Yeah, the meeting. They authorized it. I had a plan.
19        We enacted it, paid the money, paid professionals to
20        come in and completely go through that property room.
21   Q.   Okay.  And did you receive the audit?
22   A.   Yes.
23   Q.   Okay.  What did you do with the audit?
24   A.   It's in the records of the police department.
25   Q.   Did you implement anything following receiving that
```

Page 97

1        audit?

2    A.   I do not recall the timing, but the property officer

3         was removed from duty, and put on administrative

4         leave, because he was not sending pistol registrations

5         to the state as he should have been doing, which is a

6         misdemeanor. And there were hundreds of them. So even

7         the chief of police had to sit down and enter these

8         records into the state database.  And I had to train,

9         be trained on how to do it. And I hired a civilian, a

10        retired detective from Westland, which is a very

11        common practice in police departments these days.  And

12        he was with -- so it had to have been that employee,

13        Pellerito, had to have been on leave,

14        P-E-L-L-E-R-I-T-O.  He had to be on leave, because I

15        believe the new property officer, the civilian and the

16        part time person, was in place and worked through the

17        issues with the auditors with that team.

18   Q.   So you met with the mayor, and the two members of city

19        council in efforts to push or facilitate this audit.

20        Was there any discussion and efforts to create some

21        sort of program to cure the Civil Rights violation

22        issues that were coming to you?

23   A.   Yes.

24   Q.   What was that?

25   A.   The Department of Justice organizational analysis.

Page 98

```
1          They met with the Civil Rights division. They met with
2          Dawn Ison and her team. She was the US attorney at the
3          time. They met with surrounding chiefs. They met with
4          community leaders, people of marginalized groups,
5          their representatives, to find out everything about
6          what's been going on in Dearborn Heights. And it was
7          their recommendations that would have been additional
8          training, not just pulling somebody off the street.
9          But their subject matter experts that would have come
10         in and done this training.
11    Q.   Okay.  You said would have. Did it ever take place?
12    A.   No. Council thought it was a joke.
13    Q.   Did you ever do anything to facilitate that within the
14         police department?
15    A.   While I was there, absolutely.
16    Q.   What did you do?
17    A.   I was all in. I participated in the meetings. I
18         requested the organizational assessment team come in.
19         I met with their subject matter experts. I sat through
20         their debriefings. When they said staff want to see
21         you one-on-one, I came in on Friday mornings early and
22         took the whole shift to Leon's every Friday, every
23         other shift, and sat down and talked with officers to
24         find out what was going on in the department, paying
25         for it myself. Not putting in for any type of
```

Page 99

```
 1          reimbursement.  And they threatened me with a
 2          grievance because I was --
 3    Q.    Who threatened you?
 4    A.    The unions.  Both the police officer and the command
 5          union threatened the chief of police with a grievance
 6          because some of their staff members felt forced to sit
 7          and talk to me during their work hours.
 8    Q.    And those were the unions that you claim threatened
 9          you; is that correct?
10    A.    I'm not claiming.  They did. And it should be in the
11          organizational assessment. His name is Hassan Aden.
12          Give him a call.
13    Q.    Did you ever keep any notes or records of the meetings
14          that you had with the DOJ, state police, the FBI, as
15          relates to conversations that were had, or any
16          follow-ups that you were expecting?
17    A.    Yes.
18    Q.    Okay.  Where did you keep those notes?
19    A.    You can find them all in my email.
20    Q.    You said earlier that you did not keep written
21          correspondences. These emails, who did they go to?
22    A.    They went to Dana Nessel, Fadwa Hammoud at the AG's
23          office. Kym Worthy.  Possibly her assistant, Tony.
24          Dawn Ison, if I remember correctly, Bob Poikey, and
25          Luttrell Livingston.
```

```
                                                    Page 100

 1    Q.    Okay.  So when you said earlier that you did not keep

 2          any writings or any written correspondences, wouldn't

 3          these be considered written correspondences?

 4    A.    No. It's a record of me going to them, and my complete

 5          disgust at their lack of assistance.

 6    Q.    So the correspondences to AG Nessel, Ison, assistant

 7          AG Hammoud, Prosecutor Worthy, Tony and Bob were

 8          correspondences about their lack of response to you?

 9    A.    That was my parting shot to them.

10    Q.    Okay.

11    A.    Saying I've raised these issues, and you continue to

12          fail to do your job.

13    Q.    Was this one email that you sent to all of them, or

14          did you send individual emails?

15    A.    One.

16    Q.    Okay.  And do you recall when you sent this email?

17    A.    I do not. Would have been sometime before I left.

18    Q.    Do you recall if any of them responded to you?

19    A.    No, they're not going to respond to that.

20    Q.    And you sent this email expressing your

21          dissatisfaction with them not assisting you with the

22          allegations that you made?

23    A.    Correct.

24    Q.    And in this email, did you explain or provide any

25          detail as to what requests you had made to them?
```

Page 101

```
1    A.    I have not seen that email since I sent it, so I do
2          not recall.  The best of my recollection is yes.
3    Q.    Did you maintain a copy of that email for yourself?
4    A.    Not that I'm aware of. I haven't seen anything that --
5          I haven't seen that.
6    Q.    Was this prior to -- strike that.
7                You didn't cc your personal email, or bcc
8          yourself for this email?
9    A.    No, I don't do things like that. I would be very
10         surprised if I did on that.
11   Q.    Would this be an email that you would print out and
12         put in your safe?
13   A.    No. Because I knew it was there, and I knew there was
14         retention.  David Cooper should take 30 seconds and
15         find that bad boy.
16   Q.    All right. Moving on to on page five, the following
17         page, paragraph 22, you indicate that in or around
18         January '23 plaintiffs reports that the chain of
19         custody for evidence and the evidence management
20         system within the DHPD were so deficient as to
21         jeopardize the right to a fair trial for every
22         criminal defendant whose case relied on evidence
23         retained by DHPD. When did you -- well, take a step
24         back. Are you aware or familiar with this allegation?
25   A.    Yes.
```

Page 102

```
 1   Q.   Okay.  When did you determine or believe that you
 2        discovered that there was an evidence management
 3        system issue?
 4   A.   When I was walking out to my car one night, and I
 5        heard a door open that I had not heard, an overhead
 6        bay door.  I walked down, and the garage was full of
 7        bagged marijuana with no secure measures on the door.
 8        20 feet, 30 feet on the other side of that door right
 9        through the parking lot is Home Depot. So anyone could
10        have climbed that fence and walked in and had access
11        to that property. It was not secure. And then, of
12        course, there were issues that were noted in that
13        audit. I should say the inventory report from the
14        private company that we hired.
15   Q.   Did you speak with anyone within the police department
16        when you discovered this marijuana behind the bay
17        door?
18   A.   Paul Vanderplow and Kevin Swope.
19   Q.   How long have Paul and Kevin been in the police
20        department at this time when you discovered the
21        marijuana?
22   A.   Matter of weeks.  Two to four weeks.
23   Q.   How long had you been in the police department?
24   A.   10 months, 11 months.
25   Q.   So almost a year. And what location was this -- was
```

Page 103

1     this marijuana?

2  A.  This was the garage that's below the chief's office.

3     Faces the east.

4  Q.  So it's the garage below what would be your office?

5  A.  The chief's office, yes.

6  Q.  It's facing east. Were you aware that this garage

7     existed?

8  A.  Yes.

9  Q.  You indicated earlier you're walking out to your car.

10     So is this a place that you would normally park?

11  A.  Yes.

12  Q.  So you're aware that the garage was there; is that

13     right?

14  A.  That's right next to the door that, yes.

15  Q.  You indicated that you had never heard the door open

16     before; is that correct?

17  A.  Never.

18  Q.  How did it open this time?

19  A.  I don't know.

20  Q.  Okay.

21  A.  There was a remote somewhere. I never heard any

22     interior door shut that I would normally hear if

23     somebody's going in that area of the PD. It was wild.

24  Q.  When you began working at the police department, did

25     you take a tour of the police station?

```
                                             Page 104
 1    A.   Yes.
 2    Q.   Did you ever go into that area, or the garage area?
 3    A.   Yes.
 4    Q.   When you took the tour of the police department, and
 5         you went into the garage area, what was in that area
 6         at the time?
 7    A.   Televisions in boxes.  When I asked questions about
 8         what is going on in here, they said, Oh, this is one
 9         of the areas we store evidence.  And I said, Well, who
10         has access to it?  Who has keys to these doors?
11         Shrugged shoulders.  Shrugged shoulders. I see there's
12         an opener up top. Does someone have garage door
13         openers that would access this?  Oh, no, chief. Oh,
14         no, chief. In fact, there was shortly thereafter
15         within a couple months when I went to spot check that
16         area, everything was out.
17    Q.   So what was the timeframe when you asked who has
18         access?  Who has remotes?  Was this soon after you
19         started, and you were doing your walk-through?
20    A.   Within probably three months.
21    Q.   Of you starting?
22    A.   Yes.
23    Q.   Okay.  And when you got shrugged shoulders, what did
24         you do?
25    A.   I said, We don't know these things?  How can we not
```

Page 105

```
 1        have chain of custody on our property and if that's in
 2        our custody?  Who has answers to this?  And nobody had
 3        answers.
 4   Q.   Okay. As chief of police, did you do anything to
 5        create some sort of process for that area?
 6   A.   Yes.
 7   Q.   What did you do?
 8   A.   I had staff meetings with the division commanders and
 9        their lieutenants, and I invited sergeants in there.
10        And we would talk about issues of property and
11        evidence. And it was clear no one had a clue when we
12        talk about succession planning. So what's why one of
13        the many, many, many reasons I reached out to the
14        organizational assessment team. It would have been
15        easier to fire everybody and start from scratch. It
16        was that bad. And it still is. And it will always be.
17   Q.   So you had staff meetings with, you said, divisional
18        commands?
19   A.   Yes.
20   Q.   Or department commands. Did you do any follow up with
21        them?
22   A.   Yes.
23   Q.   Okay.
24   A.   Yeah.
25   Q.   Were they doing anything about it?
```

Page 106

1    A.    No.

2    Q.    Okay.  Did you, you know, put down a directive that

3          they were required to create some sort of process, or

4          implement some sort of plan?

5    A.    They had directives. They had directives. They knew

6          how to access them, and they weren't following them.

7    Q.    Did you take any steps to discipline anyone for not

8          following your directive?

9    A.    Yes. With the Captain Erickson.

10   Q.    So you utilized Captain Erickson to discipline, or did

11         you discipline Captain Erickson?

12   A.    No, Captain Erickson would start an investigation. So

13         first there is an allegation of misconduct. There must

14         be an investigation to determine, right?  In almost

15         all instances, these are institutional problems

16         long-standing. What's wrong with the cash fund?  The

17         old guys when they would retire would tell us we just

18         did it this way. That's the answers I would get.

19   Q.    So in paragraph 22 you state that the systems were

20         deficient to jeopardize the right to a fair trial for

21         every criminal defendant whose case relied on evidence

22         retained by the DHPD. Do you know of any trials that

23         were impacted because of this evidence system?

24   A.    No, but I reported it to Tony and Kym Worthy in a

25         meeting, and told them we had significant property

Page 107

```
 1        room issues here.
 2   Q.   Did you meet with Prosecutor Worthy?
 3   A.   Yes.
 4   Q.   In person?
 5   A.   Yes.
 6   Q.   Other than the email that you sent to her indicating
 7        you were disappointed, she didn't assist you with the
 8        allegations that you made.  Did you ever have anything
 9        in writing to her?
10   A.   No. That meeting should have been on my calendar
11        though. David will find that.
12   Q.   Did you meet in your office or her office?
13   A.   Met in my office in my conference room.
14   Q.   Was Tony there with her?
15   A.   Yes.
16   Q.   So what did you talk to Prosecutor Worthy about other
17        than the evidentiary issues?
18   A.   We had discussions of the issues within the police
19        department, what I was doing to address those issues
20        with the police department. My work with the DOJ.
21        Strengthening investigations, things along those
22        lines.
23   Q.   Other than Captain Erickson, who did you utilize for
24        purposes of doing an investigation?
25   A.   He was my guy, unfortunately, from the time I arrived
```

Page 108

```
 1          there, and after the death of the commissioner, until
 2          Kevin and Paul arrived, and that's when they were
 3          ordered to get all investigations from him.
 4     Q.   So you indicate Erickson was your guy. He's the one
 5          that you relied on?
 6     A.   Not somebody I chose, but he was the card that was
 7          given to me, and the person in position. He was a
 8          captain.
 9     Q.   Okay.
10     A.   And he was the only captain left after Captain Corey
11          Smith decided to retire.
12     Q.   Okay.
13     A.   So he was the only command officer I had there.
14     Q.   Okay.
15     A.   In my wing.
16     Q.   So he was the only individual, or the only person that
17          you utilized for investigations?
18     A.   Yes.
19     Q.   Okay. Do you know what nationality Mr. Erickson is?
20     A.   I do not.
21     Q.   Okay.  He's not Middle Eastern?
22     A.   No.
23     Q.   Okay.  Is he African-American?
24     A.   No.
25     Q.   Hispanic?
```

Page 109

```
 1   A.   No.

 2   Q.   Mr. Swope, is he Middle Eastern at all?

 3   A.   No.

 4   Q.   Hispanic, African-American?

 5   A.   Not that I'm aware of.

 6   Q.   Did you consider him to be a white guy?

 7   A.   Yeah.

 8   Q.   Okay.  And Swope the same?

 9   A.   That's who you were asking about.

10   Q.   I'm sorry.  Vanderplow, the same?

11   A.   Yes.

12   Q.   Okay.  So you found yourself surrounded by Erickson,

13        Swope and Vanderplow?

14   A.   Yes.

15   Q.   Okay.  And the only other person that you thought had

16        leadership potential was Mr. Guzowski?

17   A.   Mike Guzowski, that is correct.

18   Q.   All right. Moving on to paragraph three, or 23, I'm

19        sorry, indicates in or around January and February of

20        2023, plaintiffs reported that nearly 900 pistol sales

21        records had not been processed by the DHPD in

22        violation of MCL section 28.422a(3), which requires

23        the police department to process pistol sales records

24        within ten days of receipt. So this was approximately

25        a year after you had started; is that correct?
```

```
                                              Page 110

 1     A.    That is correct.

 2                     MS. HUNT:  Okay.  Off the record.

 3                     (Break at 12:58 p.m.)

 4                     (Tarik Turfe left deposition.)

 5                     (Back on the record at 1:11 p.m.)

 6     BY MS. HUNT:

 7     Q.    So we ended off before the break discussing paragraph

 8           Number 23 and, again, to refresh your recollection it

 9           reads, In or around January and February of 2023,

10           plaintiffs reported that nearly 900 pistol sale

11           records had not been processed by the DHPD in

12           violation of MCL section 28.422a(3), which requires

13           the police department to process pistol sales records

14           within 10 days of receipt. Mr. Hart, were you one of

15           the plaintiffs that reported what was listed here in

16           paragraph 23?

17     A.    Yes.

18     Q.    All right. And this was approximately one year after

19           you started working with the Dearborn Heights Police

20           Department; is that correct?

21     A.    Correct.

22     Q.    How did you discover that the sales records had not

23           been processed?

24     A.    To my recollection, I believe it was Paul Vanderplow

25           who came to me as he was walking around the records
```

Page 111

```
 1         bureau, and found a large stack of pistol sales
 2         records, and started asking questions.
 3    Q.   Are you aware of how Mr. Vanderplow knew that they had
 4         not been processed?
 5    A.   If I remember the conversation correctly, he asked the
 6         girls in records, the ladies in records why they were
 7         there, and they said they were waiting for Corporal
 8         Pellerito to enter them.
 9    Q.   For the court reporter, can you spell Corporal
10         Pellerito?
11    A.   P-E-L-L-E-R-I-T-O.
12    Q.   Pellerito, okay.  Did you or Mr. Vanderplow speak with
13         Corporal Pellerito?
14    A.   Ultimately, yes.
15    Q.   Who did?
16    A.   Paul.
17    Q.   Did Paul discuss with you that conversation?
18    A.   Yes.
19    Q.   What was your understanding of what occurred during
20         that conversation?
21    A.   That Corporal Pellerito was not doing his job duties
22         by entering these into a computer system, and then
23         mailing them to the Michigan State Police as directed
24         on the pistol sales records.
25    Q.   Okay.  Did you speak with Corporal Pellerito about
```

Page 112

1          this?

2    A.   I did not.

3    Q.   Why didn't you?

4    A.   That was Paul's employee to handle the investigation.

5         And if I remember correctly he, Pellerito, was put on

6         administrative leave.  And then Paul was working it

7         out with the unions, a consequence, and then I was

8         making contact with the state police on how to rectify

9         this.

10   Q.   Did the state police ever speak with you about it?

11   A.   Yes.

12   Q.   Was there anything in writing about this?

13   A.   I don't know if I sent email, or just spoke to him on

14        the phone.

15   Q.   Who did you speak with?

16   A.   It's a well-known common practice the firearms section

17        of MSP when you have questions about firearms, you

18        call them.  I got whoever answered the phone.

19   Q.   I don't want to align this with a customer service

20        type person, but it was someone to answer questions as

21        relates to firearms?

22   A.   No.  They had rank. I can't remember what their rank

23        was, and I said we have this. What's the fastest way

24        for me to get this stuff done?

25   Q.   Okay.  What did you do about creating processes or

Page 113

```
 1          some sort of procedure for making certain that this
 2          alleged issue did not occur in the future?
 3    A.    The inspection of the CPL tray, and also put the
 4          records staff in charge of it versus the property
 5          officer. They receive the record, and they enter it.
 6    Q.    Was there any written procedure for this?
 7    A.    No.
 8    Q.    So how was the record staff made aware of this new
 9          procedure, or new process?
10    A.    During a meeting that Director Vanderplow had with
11          them, if I remember correctly, they wanted to do them.
12          And we were all trained. I was even entering them
13          trying to get them entered as quickly as possible.
14    Q.    But there was no written procedure or SOP for this new
15          practice?
16    A.    No.  Not that I'm aware of.
17    Q.    Why was there no written procedure?
18    A.    Because it's an expected job duty. It's something that
19          he had been doing before I got there.  Didn't like me.
20          Chose to not do it. He's no longer in the
21          organization. And the records staff understand that
22          that is their role.  Very smart ladies.  Once they
23          were trained, they conducted it. And I was doing spot
24          checks in that MSP system to see how many we had.
25    Q.    Go ahead and finish your statement.
```

Page 114

1    A.   It's completed.

2    Q.   So transferring this process from the corporal to the

3         employees of the records room, or the records staff,

4         that's the change of process; is that correct?

5    A.   It's a change of responsibility. They would from time

6         to time enter them, so it was not something that was

7         unfamiliar with them.

8    Q.   Okay.

9    A.   To them.

10   Q.   I understand you indicated earlier they are very smart

11        ladies. Why wouldn't procedures, or written procedures

12        be put in place for future employees of that

13        department?

14   A.   Because everyone understood the duty.

15   Q.   Now, I understand you indicated that you did spot

16        checks?

17   A.   Yes. I was monitoring the system.

18   Q.   Was there any formal procedure other than spot checks

19        for making certain that this new process was being

20        performed?

21   A.   Other than my direction to Director Vanderplow to

22        ensure that the new process was working efficiently,

23        and that the ladies were conducting the entries.

24   Q.   Did you ever speak with Mr. Vanderplow about how the

25        new process was working?

Page 115

```
 1   A.   Yes.
 2   Q.   Was there any written follow up, such as any results
 3        of how many sales had gone through to the state, or
 4        pistol sales records had gone through to the state?
 5        Any sort of recordkeeping process as to how this new
 6        process was working, and if it was working?
 7   A.   I do not recall if the pistol sales records were a
 8        part of my monthly record that I would write to the
 9        mayor or not. Part of me wants to say yes, but that
10        could just be bad memory.
11             MR. BROWN:  Does the mayor have those
12        monthly reports?
13   A.   The city has them. They're in email. They were sent
14        via email.
15   BY MS. HUNT:
16   Q.   Did you keep any type of folder on your computer of
17        these emails, or of these memos or reports that you
18        provided to the mayor?
19   A.   I would keep my monthly reports on my computer, yes.
20   Q.   When you left the City of Dearborn Heights in 2025,
21        July of --
22   A.   '24.
23   Q.   2024, did you erase anything off of your computer?
24   A.   No.
25   Q.   Did you clean anything out of your email box?
```

Page 116

```
 1    A.   No.

 2    Q.   How often did you --

 3    A.   Now, let me clarify. Junk emails and things probably.

 4         But whether I did or didn't, David Cooper has a

 5         back-up. So I'm smarter than to do something like

 6         that.

 7                   MR. BROWN: You answered the question.

 8    A.   Just going to stop.

 9  BY MS. HUNT:

10    Q.   Did you ever utilize your work email for nonwork

11         related matters?

12    A.   I do not recall.

13    Q.   Do you have a personal email address?

14    A.   I do.

15    Q.   What is that email address?

16    A.   My first initial jhart202@icloud.com.

17    Q.   Do you currently use that email?

18    A.   I do.

19    Q.   Did you use that email while you were employed with

20         the City of Dearborn Heights?

21    A.   I do not recall when I started that iCloud.

22    Q.   Is there another personal email that you would have

23         used prior to the iCloud?

24    A.   No.

25    Q.   All right. Moving on to paragraph 24, you indicate
```

```
                                                   Page 117
 1           that in March of 2023, plaintiffs reported that police
 2           overtime work was subject to an illegal ticket quota
 3           system, which is prohibited under MCL section
 4           257.750(1).  Were you one of the plaintiffs who made
 5           this report?
 6    A.     Yes.
 7    Q.     Who did you report this to?
 8    A.     This was reported to Michigan State Police as well,
 9           and to Luttrell Levingston possible Civil Rights
10           issue.
11    Q.     This report to the MSP, was this the same conversation
12           that you had as relates to the other Civil Rights
13           issues?
14    A.     No.  These would have specifically been sent to -- I
15           directed Kevin to send them to poor Sergeant White, I
16           believe, is his name who continues to get Dearborn
17           Heights complaints. I think he works through the
18           integrity unit at the prosecutor's office.
19    Q.     Do you know how Mr. Vanderplow -- I'm sorry.  When you
20           say Kevin, is it Kevin Swope?
21    A.     Swope.
22    Q.     Do you know how Mr. Swope provided these complaints or
23           allegations to MSP?
24    A.     I do not.
25    Q.     Did you ever have any conversation with anyone from
```

```
                                                Page 118

1        MSP regarding this alleged illegal ticket quota

2        system?

3   A.   I do not recall specifically.

4   Q.   All right. You don't recall specifically, but do you

5        recall having a conversation with anyone about it?

6   A.   With anyone?

7   Q.   Anyone at MSP.

8   A.   I do not recall specifically.

9   Q.   Do you know if MSP responded to this allegation?

10  A.   They responded to Kevin. I do not know the outcome.

11  Q.   Did Kevin tell you the outcome?

12  A.   Basically, if I remember correctly, it was systemic.

13       Is was a systemic cultural part of this problem, part

14       of the department, that had been going on for years.

15  Q.   So you're indicating that the MSP responded that this

16       is just an ongoing issue that's been going on for

17       quite sometime?

18  A.   Yes.

19  Q.   And what did you do about that?

20  A.   We changed the policy. Actually, implemented a policy

21       that restricted staff from dismissing tickets.

22               MR. MIOTKE:  Are we on 24?

23               MS. HUNT:  Yes.

24  BY MS. HUNT:

25  Q.   So with regards to the police overtime work, it
```

Page 119

1            indicates that plaintiffs reported that police

2            overtime work was subject to an illegal ticket quota

3            system. What was that complaint?

4     A.    David Cooper should be able to find it for you very

5            quickly in a PowerPoint from one of the traffic bureau

6            officers, Officer Barlow, and it's actually a

7            PowerPoint slide that has a lot of horrible things in

8            there. And talks about the number of tickets they're

9            supposed to write while they're on their overtime.

10    Q.    So you just indicated there is a PowerPoint about it.

11           What is your understanding as it relates in the

12           complaint that you made as relates to the overtime?

13    A.    That officers were required to write a certain number

14           of tickets when they were working overtime, not part

15           of a grant, not part of any NHTSA or anyone else.  Not

16           part of any type of enforcement efforts their traffic

17           safety overtime.  And I can't remember the exact

18           number. But it's all laid out for them, and there's

19           also memos in the computer system in the cloud at the

20           police department where officers have been removed

21           from participating in traffic safety if they didn't

22           meet the quota.

23    Q.    And who do you allege implemented this quota system?

24    A.    I've no idea. It wasn't me.

25    Q.    Now, you indicated that as relates to the ticket

Page 120

```
 1          fixing portion of the allegation that the new policy
 2          was implemented.  Is that what you stated?
 3    A.    That is true.
 4    Q.    Was that a written policy?
 5    A.    Yes.
 6    Q.    And who drafted it?
 7    A.    Director Swope.
 8    Q.    And when was that implemented?
 9    A.    I do not know the exact date.
10    Q.    Was there training as relates to this new
11          implementation of the new policy?
12    A.    No. This is a very straightforward policy. No more
13          dismissing tickets. Only judges and magistrates can
14          dismiss a ticket.
15    Q.    Was there a discussion with the officers about this
16          change of policy?
17    A.    I do not recall.
18    Q.    What about -- strike that.
19               Was this discussed with all officers, or
20          just the patrol officers?
21    A.    All staff.
22    Q.    Now, you indicated that there was -- I'm sorry.  Did
23          you say it was Sergeant Barlow?
24    A.    Officer Barlow.
25    Q.    Officer Barlow who created a PowerPoint?
```

Page 121

1    A.   That is correct. His name's on it.

2    Q.   Did you assist him in creating the PowerPoint?

3    A.   No.

4    Q.   Do you know who assisted him in creating the

5         PowerPoint?

6    A.   I've no idea.

7    Q.   Did you see the PowerPoint?

8    A.   Yes.

9    Q.   Was there a presentation provided with this

10        PowerPoint, or was it just sent to you?

11   A.   I found it in the traffic bureau folder.

12   Q.   So it was never sent to you. You located it?

13   A.   I located it, yes.  And I located the letters that

14        removed people from the ability to make overtime,

15        because they didn't meet the standard.

16   Q.   Was this PowerPoint ever provided to anyone?  Strike

17        that.

18             To your knowledge, did Officer Barlow ever

19        present or forward this PowerPoint to anyone?

20   A.   I do not know. Shortly after I asked questions, he and

21        the whole traffic bureau took a poop though.

22   Q.   What do you mean by that?

23   A.   They left.

24   Q.   They left their position?

25   A.   They left the department.

Page 122

```
 1    Q.   Okay.

 2    A.   Do you see you trend, anybody?

 3    Q.   So when --

 4    A.   Sorry. I'm just getting upset with this.

 5    Q.   So Officer Barlow's PowerPoint, you have no

 6         information to determine whether this was a factual

 7         PowerPoint, if it had accurate data in it.  It was

 8         just something that you found that was generated by a

 9         police officer?

10              MR. BROWN:  Objection. Vague.  Compound.

11         Assumes facts not in evidence.

12   BY MS. HUNT:

13    Q.   Do you understand the question?

14    A.   Am I supposed to answer?

15    Q.   Do you understand the question?

16    A.   I do.  Everybody understood what they were supposed to

17         do. Everything was in that PowerPoint, and that's what

18         everybody did.

19    Q.   So did you ever ask anyone about the contents of this

20         PowerPoint?

21    A.   Yes.

22    Q.   Who did you ask?

23    A.   Sergeant Dottor.

24    Q.   Okay.

25    A.   He'd probably take the fifth at this point.
```

Page 123

1    Q.   And what was your conversation with Dottor?

2    A.   That how could this be presented. What are you guys

3         doing?  This is a quota. No, no, no. We were under the

4         impression that it's not a quota. It's not mandatory.

5         And I'm like, Dude, I've got memos from you saying

6         people can no longer work overtime if they didn't meet

7         these standards. So once challenged, people left.

8    Q.   The memos that you claim that you told Dottor I have

9         memos from you, were they drafted by Dottor?

10   A.   They had his name on it.

11   Q.   Do you know who these memos went to?

12   A.   There were specific officers' names on there. I

13        believe one of them was Kyle Anos.

14   Q.   Did you speak with Mr. Anos, or Officer Anos?

15   A.   No. It was just one of --

16                 MR. MIOTKE:  Do you have a spelling on

17        that?

18   A.   I believe A-N-O-S.

19   BY MS. HUNT:

20   Q.   I'm sorry. You never spoke with Mr. Anos, or Officer

21        Anos?

22   A.   No.

23   Q.   So the only person you spoke with was Officer Dottor?

24   A.   Yes.

25   Q.   You indicated that Officer Barlow's name was on the

Page 124

1          PowerPoint. Did you speak with Officer Barlow?

2     A.   No.

3                    MR. FARINHA:  That would be Sergeant

4          Dottor.

5     BY MS. HUNT:

6     Q.   So the only person after finding this memo you spoke

7          with, at least as it relates to police officers and

8          sergeants and all was Sergeant Dottor?

9     A.   The person in charge of the traffic bureau, yes,

10         Sergeant Dottor.

11    Q.   Did you have anyone conduct an investigation?

12    A.   No.

13    Q.   All right. You didn't have Erickson conduct an

14         investigation?

15    A.   No.

16    Q.   All right. So you submitted this to the MPS -- MSP,

17         I'm sorry, and they indicated that it was a systematic

18         problem; is that correct?

19    A.   Systematic, that makes it sound like staff didn't know

20         what they were doing. This was a cultural issue within

21         the police department.

22    Q.   And you had Swope just change the process?

23    A.   He did an investigation.

24    Q.   I thought you just said there was no investigation

25         done?

```
                                               Page 125
 1    A.    That was the PowerPoint.  You were talking about
 2          PowerPoint; am I correct?
 3                  MR. BROWN:  Why don't you just clarify.
 4    BY MS. HUNT:
 5    Q.    As it relates to the -- the PowerPoint is what kind of
 6          opened the door for the ticket fixing issue?
 7    A.    That's not true.
 8    Q.    Were you aware of the ticket fixing issue, the alleged
 9          ticket fixing prior to finding the PowerPoint?
10    A.    I do not recall that.
11                  MR. BROWN:  Okay.  Are we talking about the
12          overtime issue, or the ticket fixing issue?
13    BY MS. HUNT:
14    Q.    Well, here they're combined into kind of one.
15          Overtime work was subject to illegal ticket fixing
16          quota. That's listed in 24. So that's what I'm talking
17          about.
18    A.    Okay.  So Director Swope did conduct an investigation,
19          and it was volumus.  And we were finding that staff
20          were working overtime.  After they'd write a ticket,
21          they'd write things on the ticket like early MLK Day
22          gift to a clearly appeared to be non African-American
23          motorist by their name, and then dismissing the
24          tickets right after they wrote them. So they get
25          credit in the system for their little quota, and then
```

Page 126

1          they were dismissing the tickets afterwards.

2     Q.   Okay.

3     A.   Working the overtime earning the money, then

4          dismissing the tickets.

5     Q.   So what did you take the early MLK gift to mean?

6     A.   I have no idea, because I later found something in

7          that locker's office -- in that officer's locker that

8          said, "make American violent again."  And they were

9          gone. They had already gone by the time this came out.

10    Q.   Who was that officer?

11    A.   Officer O'Donnell.  I'm trying to think of his

12         partner's name.

13    Q.   Is his partner --

14    A.   They were always together. They were gone.

15    Q.   They were gone at the time you left?

16    A.   They were gone.  What the hell's his name?

17    Q.   After finding the, "make America violent" statement in

18         the locker, was it on a poster, or what was it?

19    A.   It's a bumper sticker that was stuck on the inside of

20         the locker.

21    Q.   Did you provide any information to MSP or MCOLES

22         certification committee with regards to this

23         discovery?

24    A.   No.  Not that I'm aware of. I don't know if Kevin or

25         Paul did anything.

Page 127

1   Q.   Is this the type of thing that you would want to make

2        law enforcement certification authorities aware of?

3   A.   What's the violation?  It bothered the hell out of me,

4        don't get me wrong, but is it a free speech issue?  Is

5        it -- what is it, right?  He got fired anyway.  He's

6        no longer in the job.

7   Q.   I understand.

8   A.   Anywhere that I'm aware of.

9   Q.   Okay.  I just have to assume, and correct me if I'm

10       wrong, that there's some standards that police

11       officers have to uphold.  And having the ideation that

12       violence is acceptable may be an issue that MCOLES may

13       want to be aware of?

14  A.   Sure.

15            MR. BROWN: Objection to form.

16  A.   Of course. When there's a state law that says I have

17       to go over any current investigations, etc., I would

18       share that. But he's gone and hired, right?

19  Q.   You said he's hired?

20  A.   So he left. He went to the Oakland County Sheriff's

21       Department. It's my understanding he got terminated

22       shortly thereafter.

23  Q.   All right. So just so that I'm clear, the PowerPoint

24       was not investigated, but the overall ticket fixing

25       was?

Page 128

```
 1   A.   I need to find something for myself. Did I leave
 2        something in your office?
 3                    MS. HUNT:  Off the record.
 4                    (Break at 1:37 p.m.)
 5                    (Back on the record at 1:38 p.m.)
 6   BY MS. HUNT:
 7   Q.   So moving onto item 25, plaintiffs also reported
 8        widespread corruption involving mismanagement of
 9        federal and state forfeiture funds, ticket fixing
10        scheme for friends of law enforcement officers and
11        elected officials, and other Civil Rights violations
12        violations to various public bodies and/or law
13        enforcement agencies. Are you aware of the allegations
14        that are listed here in 25?
15   A.   Yes.
16   Q.   Are you one of the plaintiffs that allegedly reported
17        these claims of widespread corruption?
18   A.   Each specific one not necessarily.
19   Q.   Okay.  Mismanagement of federal and state forfeiture
20        funds. Are you familiar with that one?
21   A.   I am familiar with it.
22   Q.   Did you report it?
23   A.   That would be Director Vanderplow.
24   Q.   So you never reported to anyone a claim of
25        mismanagement of federal and state forfeiture funds?
```

Page 129

```
 1    A.   To the mayor sharing that there were concerns there in
 2         a meeting, yes, but I cannot recall if I reported that
 3         one to MSP or anyone else.
 4    Q.   You indicated that you mentioned to the mayor. Was
 5         this in a regular meeting that you had with the mayor?
 6    A.   Yes. As you can imagine from what you heard, things
 7         got very rough when the commissioner died, and I was
 8         alone. So I would have regular meetings with him and
 9         Margaret.
10    Q.   Okay.  So my question was this was a regular meeting.
11         It wasn't any special meeting, or an email meeting?
12    A.   They were kind of special, because they were going on
13         for -- it was while I was alone.
14    Q.   And when you say alone, this was post Dr. Thomas's
15         death; is that correct?
16    A.   That is correct.
17    Q.   You still had a police force; is that right?
18    A.   There was a police force there. There were no trusted
19         allies.
20    Q.   Okay.
21    A.   In that building.
22    Q.   All right. I just want to understand when you say
23         alone, what do you mean you were alone?
24    A.   I was alone as the only outside change agent that was
25         trying to better this police department.
```

Page 130

1   Q.   All right. So are you saying prior to Mr. Swope and
2        Vanderplow joining the police department?
3   A.   I believe the commissioner died October 1st or 2nd of
4        '22. So really he was in the hospital, right, for a
5        long time. So I had to suspend his law enforcement
6        authority.  Then he dies. Remove him, and it was me
7        every day alone without any real true support for
8        professionalism around me until January 9th of '23
9        when Paul and Kevin started.
10  Q.   Okay.  So the meeting that you had with the mayor, you
11       indicate that you mentioned it to him, and did you say
12       Margaret Hazlett?
13  A.   Yes.
14  Q.   Did you provide him with any documentation or
15       information pertaining to the belief that there was
16       mismanagement of the federal and forfeiture funds, or
17       was this just I think there may be an issue type
18       conversation?
19  A.   No, it would have been actually requesting that he
20       order the treasurer to give access to these funds, and
21       the history to Director Vanderplow. And, to my
22       knowledge, I don't think Paul ever had access to those
23       records.
24  Q.   Okay.  I just want to make sure I'm clear here,
25       because you indicated that these meetings happened

Page 131

```
 1        prior while you were "alone"?
 2   A.   Right.
 3   Q.   And in these meetings, you asked the mayor to provide
 4        Paul Vanderplow with the ability to have some sort of
 5        investigation or open record?
 6   A.   Sure. That was an ongoing. They weren't open, yeah.
 7        But that state forfeiture fund, as soon as I was able
 8        to gain access to it, I'm no financial wizard, and I
 9        noted some irregularities. I talked to the mayor about
10        them. When Paul came on, I said, Paul, you need to
11        make this number one. We have to make sure that we're
12        properly spending, documenting everything.  Every I
13        dotted, and T crossed on this. So this was an ongoing
14        discussion with the forfeiture funds.
15   Q.   So approximately how many times did you speak with the
16        mayor about it?
17   A.   I do not recall specifically how many.  A handful.
18   Q.   So what were you doing about the belief that there was
19        mismanagement of this fund prior to Mr. Vanderplow
20        coming aboard, and you requesting that he be able to
21        take a look at this?
22   A.   I found a guy that worked at the IRS as an
23        investigator to look into it.
24   Q.   And what is his name?
25   A.   Paul Vanderplow.
```

Page 132

```
 1   Q.   Okay.  So when you indicate that you asked for

 2        Vanderplow to have access, was this when he was an

 3        employee?

 4   A.   Yes.

 5   Q.   Or it was --

 6   A.   After his hire date, yes.

 7   Q.   When you found Paul -- strike that.

 8                  Was the purpose of bringing Paul in to take

 9        a look at the potential mismanagement?

10                  MR. BROWN:  Objection. Vague.

11   BY MS. HUNT:

12   Q.   Do you understand the question?

13   A.   I do. I'm just waiting to see if there's any

14        arguments. I loved Paul's -- my mind doesn't think in

15        ones and twos and codes. Paul has the vernacular. He

16        has the experience. So that was one of the things that

17        I really liked about bringing Paul in for things like

18        this, because his history is digging into the

19        documents, right?  And when there's no receipt, and

20        there's an expenditure, that's a problem, right?  So

21        he was stopped at every level to see those records

22        through the treasurer's office.

23   Q.   I'm sorry. I just want to understand what you just

24        said. Did you say he was stopped at every level, or he

25        stopped?
```

Page 133

```
 1    A.   He was stopped. He was not allowed to have access to
 2         those.  And then towards the end of my tenure, I don't
 3         know if it was before -- I think it was before I left,
 4         almost a million dollars disappeared out of that fund,
 5         and I didn't authorize any expenditures.
 6    Q.   I'm sorry. How long ago was that before you left you
 7         said?
 8    A.   Within a couple of weeks. Paul had told me that when I
 9         asked about the forfeiture fund, because we had a lot
10         of money coming due for Axon purchases, in-car
11         cameras, etc., body-worn.  He told me that money had
12         been taken out, and I didn't authorize any of that. I
13         did not have expenditures, etc.
14    Q.   And did you order an investigation as to where this
15         money was?
16    A.   Yes.
17    Q.   Who did you have investigate?
18    A.   Paul Vanderplow.
19    Q.   Did he perform an investigation?
20    A.   I do not know. I left.  My employment came to an end
21         before I had an outcome to that.
22    Q.   From the time you ordered the investigation until the
23         time you left the City of Dearborn Heights, what had
24         been done by way of an investigation into this issue?
25    A.   I do not know. That's a question for Director
```

Page 134

```
 1        Vanderplow.

 2   Q.   Did you ever ask for a follow up or a status of the

 3        investigation?

 4   A.   We had discussed it in the sense of he was still being

 5        blocked from obtaining those records.

 6   Q.   Did you and he have a discussion as to how you could

 7        obtain that information?

 8   A.   I do not remember specifically what that was about, or

 9        if we discussed that.

10   Q.   Now, you indicate that Vanderplow would be the person

11        who would have reported this; is that correct?

12   A.   Correct.

13   Q.   Okay.  Do you know who he reported it to?

14   A.   I do not.

15   Q.   Did he ever tell you that he was going to report it?

16   A.   I told him to report it. I don't know. I don't know

17        the outcome of that.

18   Q.   You told him to report it. Did you tell him who you

19        wanted it to be reported to?

20   A.   No.

21   Q.   You never followed up to see if he actually reported

22        it?

23   A.   No.

24   Q.   And you never followed up to find out whether or not

25        there was a response from whichever agency he reported
```

Carroll Reporting & Video
www.veritext.com        A Veritext Company        586-468-2411
                                                  www.veritext.com

```
                                              Page 135
 1        it to?
 2   A.   I was no longer employed there.
 3   Q.   So how close to your departure did you request this?
 4   A.   It was very close. Very close.
 5   Q.   Within weeks, days, hours?
 6   A.   I would say weeks, weeks.
 7   Q.   We talked about this a few minutes ago, but the ticket
 8        fixing scheme, did you say you reported it?  You were
 9        one of the plaintiffs who reported it?
10   A.   Yes.
11   Q.   Now, how did you become aware that this scheme was for
12        friends of law enforcement and elected officials?
13   A.   There were emails. I'm sorry. Not emails. I was aware
14        of car to car messages.
15   Q.   Can you explain what car to car messages are?
16   A.   So a cop in another community sends a direct message
17        to somebody that wrote a ticket saying, Hey, you just
18        wrote my uncle, my dad, whoever, a ticket.  Will you
19        dismiss it?"  Then that's on the MDC logs.
20                 MR. BROWN:  What does MDC stand for?
21        Sorry.
22   A.   For an old guy like me called mobile data computers.
23        Sometimes mobile data terminals. The computer in the
24        car, in the squad car.
25   BY MS. HUNT:
```

Page 136

1    Q.   Now, from these logs, would you be able to determine
2         which officer received that request?
3    A.   Yes.
4    Q.   Would you be able to see which officer made the
5         request?
6    A.   Yes.
7    Q.   Now, you said from other agencies.  So would an
8         example be that someone from Southgate would say, Hey,
9         to an officer in Dearborn Heights, you wrote my uncle
10        a ticket?
11   A.   The one that I was aware of I believe -- I believe
12        there were two. One came from Westland, and one came
13        from Dearborn.
14   Q.   So there were, that you're aware of, two instances
15        when an officer from an outside agency asked an
16        officer of Dearborn Heights to dismiss a ticket, or
17        get a ticket dismissed for a family member or a
18        friend?
19   A.   The question is that I'm aware of?
20   Q.   Yes.
21   A.   Yes.  Director Swope shared two instances with me.
22   Q.   Are those the two instances?
23   A.   Yes.
24   Q.   If there were other instances, would Mr. Vanderplow
25        share those with you?

Page 137

```
 1     A.    Not Mr. Vanderplow, no.

 2     Q.    I said Mr. Vanderplow, right?

 3     A.    Yes.

 4              MR. BROWN:   Okay.  You mixed up Swope and

 5           Vanderplow.

 6   BY MS. HUNT:

 7     Q.    I'm sorry. I will do that, so correct me. Thank you.

 8           So were you made aware of which officers received

 9           those requests?

10     A.    I believe Kevin was able to determine that.

11     Q.    Okay.  Kevin Swope?

12     A.    Yes.

13     Q.    Do you know who the officers were?

14     A.    I do not.

15     Q.    Did he make you aware of who those officers were at

16           the time that he discovered it?

17     A.    I believe he did bring up their names. I just cannot

18           recall.

19     Q.    Did you have a conversation with those officers?

20     A.    He did.

21     Q.    Did Mr. Swope?

22     A.    Mr. Vanderplow -- I'm sorry.  Now I'm doing it.

23           Director Swope told me that he was interviewing the

24           officers.

25     Q.    Did he advise you of the outcome of that --
```

```
                                              Page 138
 1    A.   Yes.

 2    Q.   -- discussion?  And what was the outcome?

 3    A.   That it was systemic.  It was part of the culture.

 4         That it was acceptable. They've always done it. They

 5         don't see the problem with it.

 6    Q.   So it's your understanding that Mr. Swope had a

 7         conversation with these two officers, and from those

 8         two officers he found out or discovered that this was

 9         a systemic problem?

10    A.   Part of his investigation was interviewing those

11         officers, and the outcome was that it was systemic.

12    Q.   Did he tell you who else he spoke with?

13    A.   No.  Not that I recall.

14    Q.   Was there a memo of this investigation that he

15         provided to you?

16    A.   Yes.

17    Q.   Was it written?

18    A.   Don't know if he provided -- I might have signed off

19         on that, but there is an investigation file on it.

20                   MR. BROWN:  On the city's computers?

21    A.   Yes.

22    BY MS. HUNT:

23    Q.   Did he provide you with a copy of that?

24    A.   To the best of my recollection, he brought it in. He

25         gave it to me. I read it, had some follow-up questions
```

Page 139

```
 1          for him, and we were -- and I signed off on it that it
 2          was systemic, and we were going to change the policy
 3          and move on to the next fire.
 4     Q.   And is this the policy that you indicated, I believe,
 5          Mr. Vanderplow drafted?
 6     A.   Mr. Swope. You can -- I hate to help you out, but
 7          seems like there's not a lot of information here.
 8          PowerDMS is where you'll find that policy. I'm not
 9          sure anyone knows how to use it.
10     Q.   Is PowerDMS part of the police department?
11     A.   It's a documentation platform.  All the policies I
12          wrote, all the communications were in there, and that
13          way I had a record of them to staff.
14     Q.   When you were with the City of Dearborn Heights, who
15          had access to PowerDMS?
16     A.   Well, everyone has read access to it, because that's
17          how policies and procedures are shared. There are
18          certain people, and I was trying to close that number
19          of people who had access to read, write, change
20          policy. So all the command officers knew I was the
21          one. I had to approve everything that went out in
22          those policies. The only other one I could think of is
23          this traffic one, but I wrote the other policies.
24     Q.   When you say traffic, is it the ticket issue, or
25          beyond that?
```

Page 140

1   A.   The ticket.

2   Q.   Was there any other area that this policy would have

3        touched on as relates to traffic other than the

4        ticket?

5   A.   I do not recall.

6   Q.   Okay.  Now, I understand you say you were trying to

7        narrow who had access. While you were with the city,

8        were you the only one that had access to edit the

9        policies?

10  A.   No, no.

11  Q.   Who else had access?

12  A.   The keys to the kingdom were wide open there. Multiple

13       people did. I believe Dottor was one of the primary

14       writers, and had the highest privilege levels. Of

15       course, Reyna who was the accreditation manager, I

16       don't know. The way it was set up was absolutely

17       horrible when launched. It was very hard to just do it

18       over. It was just impossible.  It would be easier to

19       start over. So I worked with that platform for a very

20       long time, and I know it in and out.

21  Q.   So you made a comment that you don't know that anyone

22       currently would know how to use it?

23  A.   Yeah.

24  Q.   Is that for the purposes of access of reading, or for

25       editing, writing?

Page 141

```
 1    A.   Editing.  Where their policies, you know, are.  How to
 2         review a policy, etc.  It was just an unknown. There
 3         were policies in there that staff didn't even know
 4         existed when I got there.
 5    Q.   Did Mr. Swope and Mr. Vanderplow have access to edit?
 6    A.   Director Swope for sure. I don't know if Director
 7         Vanderplow did or not.
 8    Q.   Did you create a policy or some sort of written
 9         procedure as to who should have access to PowerDMS,
10         who should have the privileges of being able to read,
11         write?  I'm sorry.  Write, edit, change?
12    A.   I do not recall.  That's generally in the setup in
13         admin when you'd launch a platform like that.
14    Q.   So when you say you were trying to narrow who had
15         access, how did you narrow it?
16    A.   Going into to try to create groups within the platform
17         to see who had -- I had thought that I had completely
18         taken everybody out of the administrative folder.
19         These are folders in the cloud. And I put one of the
20         mini grievances in there. And then somehow someplace I
21         don't know somebody did it to me, but everyone could
22         read it, and I'm like they can't read it. I'm looking
23         at the privileges. And everyone had access to our
24         administrative folders.
25    Q.   Did just so I'm clear, Mr. Swope spoke with the two
```

Page 142

```
 1        officers that received the request to dismiss the
 2        ticket?
 3   A.   That is what my recollection is, yes.
 4   Q.   Was there any training that was provided to these
 5        officers or any discipline that was?
 6   A.   I'd like to say asked and answered right now, but it's
 7        getting late in the day.  You've already asked me
 8        that, and I've said, no, it's very clear-cut in the
 9        policy.
10   Q.   And I'm asking now about the ticket.
11   A.   Same thing.
12   Q.   Ticket fixing scheme.
13   A.   Same thing. Can't dismiss tickets. You can't, right?
14   Q.   So there was no discipline offered, or any training
15        offered to these officers?
16   A.   No.  It's all the officers knew. This was allowed to
17        go on. It boils down to absolutely abhorrent
18        leadership in that police department.
19   Q.   Now, you mentioned that there was a scheme to dismiss
20        tickets of elected officials. Which elected officials
21        were you aware of that had --
22   A.   Mo Bazzy. Mo Baydoun. Sorry.  It is getting late. Mo
23        Baydoun, I was aware of two traffic stops that he
24        personally rolled up on, and interfered with those
25        traffic stops to try to get his friend, relative,
```

Page 143

```
 1          whoever they were that the officer had pulled over a
 2          break.
 3    Q.    So there were two?
 4    A.    There were two that I was aware of with him.
 5    Q.    Do you know those dates?
 6    A.    I don't.  I want to say one of them happened before I
 7          got there, and that investigation is still in the
 8          file. The other one Mo Baydoun called me on my cell
 9          phone on a Saturday or Sunday to tell me how racist
10          this officer was, and blah, blah, blah.  He had his
11          cousin pulled over, and he just pulled up to the
12          traffic stop, and just wanted to talk to the officer.
13          And I'm like, You can't do that.
14                    And then when I watched the video with
15          Captain Erickson in the following days, the officer
16          did nothing wrong. You got Mo, and I think it's his
17          brother-in-law Jafer, one of the Jafers who roll up on
18          this traffic stop.  And this officer, he's dealing
19          with the motorist that's pulled over, right?  So
20          there's the influence that's going on to take care of
21          things. And I've only heard about emails. I don't know
22          if it's from Kevin or Paul that are out there about
23          the mayor, and possibly other elected officials asking
24          for tickets to be dismissed.
25    Q.    So, to your knowledge, there's only the two incidents
```

Page 144

```
 1          with Mo Baydoun with the exception of what you heard
 2          about possibly the mayor and others?
 3     A.   Correct.
 4     Q.   So you don't know for certain of any other elected
 5          officials that requested tickets to be dismissed other
 6          than the two videos that you saw of Mo Baydoun?
 7     A.   And the other allegations that have been made about
 8          the mayor and others having tickets dismissed.
 9     Q.   But you don't have firsthand knowledge of that?
10     A.   No.
11     Q.   You just heard about them?
12     A.   That's correct.
13     Q.   Did you bring the allegations of ticket fixing or
14          ticket dismissal by the elected officials to any other
15          body, agency?
16     A.   I know the state police were advised. I believe I
17          previously testified to that. They were always a part
18          of my conversation, regardless of which law
19          enforcement agency I was talking to.  But whether it
20          was in their arena or not, it just describes what's
21          going on at this place.
22     Q.   So your discussion with MSP or whomever about the
23          ticket dismissals, I believe, I want to make sure I
24          understand your testimony correctly.  It always
25          involved the elected officials?
```

Page 145

```
1    A.   Not always involved the elected officials, no, no.
2    Q.   But you did speak to MPS about --
3    A.   MSP.
4    Q.   MSP, and that included elected officials?
5    A.   Yes.
6    Q.   And you don't have necessarily anything in writing
7         from MPS?
8    A.   MSP, no.
9    Q.   You're only aware of the two videos with Mo Baydoun
10        that you have firsthand knowledge of?
11   A.   Yes.
12   Q.   Moving onto the next page, there's the allegation on
13        27 that private citizens acting in concert with city
14        council also threatened and took adverse action
15        against the plaintiffs.  And then on the next page on
16        paragraph 38 you mention Khalil Rahal. Is that the
17        private citizen that you are referring to in paragraph
18        27?
19   A.   He's one of them.
20   Q.   Okay.  So with regards to 27, in addition to Khalil
21        Rahal, what other private individuals or private
22        citizens?
23   A.   Sue Kaminski, Rachel LaPointe and her husband, and
24        their platform DBH 411, Pam Swirple, and there's
25        another lady.  I cannot remember her name. And Vince
```

Page 146

```
 1        Drapkowski. He's a former employee of the city.

 2   Q.   What was Mr. Drapovski's title when he was with the

 3        city?

 4   A.   He was the janitor custodian for the police

 5        department. Angela. I cannot remember Angela's last

 6        name.

 7   Q.   So how did Sue Kaminski take adverse action against

 8        you?

 9   A.   So very compare and contrast takes five minutes.

10        Looking at the internet, council meetings, there was

11        an absolute attack, harassment, intimidation that was

12        coordinated by city council.

13             In fact, I believe Mo Baydoun's cousin's

14        platform, TCD, the City of Dearborn. The comments, the

15        allegations all stopped the day I left. Not a mention

16        of how many police officers are on the street now. Not

17        a mention of anything going on at the police

18        department. When the current police chief is failing

19        to discipline an Arab police officer who assaulted a

20        14 year old girl at a safe place that she's supposed

21        to be at with the state.  And he's not reporting

22        accidents, and I can't remember the last thing I heard

23        about him.  Yeah, they're controlling everything. And

24        they're absolutely manipulating it. And it's black and

25        white.
```

Page 147

1    Q.   So Sue Kaminski was critical of you?

2    A.   Oh, it wasn't critical.

3    Q.   Let me finish my question.

4    A.   My goodness, it was personal.

5              MR. BROWN: Let her finish.

6    A.   Sure, yeah.

7    BY MS. HUNT:

8    Q.   So there were comments made by Sue Kaminski that were,

9         I'll use the word, critical of you, and you believe

10        that to be an adverse action?

11   A.   I know it is.

12   Q.   Okay.

13   A.   Intimidate, harass, completely berate someone that

14        does not fall in line with Mo Baydoun, Hassan Saab,

15        Hassan Ahmad, that's their MO. That's.

16             MR. BROWN:  Are you using the phrase

17        adverse action, counsel, in a legal sense now, or are

18        you just talking in English vernacular?

19   BY MS. HUNT:

20   Q.   I'm asking how it was -- it's here in your complaint

21        how you mean adverse actions were taken against you?

22   A.   Yeah, they were used to threaten --

23   Q.   So if you're using the --

24   A.   Sorry.

25   Q.   I'm saying if you believe that is what you just

Page 148

1          stated, I'm just trying to understand what you mean.

2     A.   Sure.  The very first day I met the city council in a

3          restaurant.  I told them I had diabetes. I had some

4          health concerns. Culturally they want -- the Arab

5          culture is to make friends through food, and so on and

6          so forth. There is a lot of food I couldn't eat that

7          day. And I told them all respectfully I have diabetes.

8          I have to very be very controlled on my diet. I'm

9          trying to manage this without insulin. They all knew

10         it, and they took advantage of it.  Instead of being

11         good human beings, they used it to their advantage to

12         cause my glucose to go up.  To cause my heart attack

13         on October 7th at my desk.  And it may be a stretch

14         for you to believe that, but it's something at trial

15         we will absolutely show in black and white.

16              MR. BROWN: Just answer the question.

17    A.   I have to take -- can I take a restroom break?  I'm

18         starting to get really upset.

19              MR. BROWN: All right.

20    A.   Reliving this stuff, apparently six months of therapy

21         isn't enough.

22              (Break at 2:10 p.m.)

23              (Back on the record at 2:12 p.m.)

24              MR. BROWN:  Back on the record.

25    BY MS. HUNT:

Page 149

```
 1   Q.   So we discussed the statements and the actions of Sue
 2        Kaminski.  If I could take a step back, I don't want
 3        to upset you, and I apologize. But when you mentioned
 4        you met the council at, did you say, a coney island?
 5   A.   No, at a restaurant Al Shallal.
 6   Q.   Okay.  Was it the entire commission or council?
 7   A.   I know Dave Abdallah was there, Ray Muscat, Mo
 8        Baydoun, Hassan Ahmad, Nancy Bryer, and Tom Wencel
 9        showed up a few minutes after, and I think he had to
10        leave early. I think he was volunteering somewhere.
11   Q.   Okay.  And you indicate that they caused your insulin
12        to increase. Did you eat while you were there?
13   A.   No. I think we should clarify that.
14   Q.   Okay.
15   A.   As we were eating, I couldn't partake in the bread.
16   Q.   Okay.
17   A.   I couldn't partake in the sweets. That's a large part.
18        Now, I drank that Yemeni coffee like it was going out
19        of style. But so I had to -- I felt compelled to share
20        with them the reason I'm not.
21   Q.   Sure.
22   A.   And they say, Well, it's not sugar.  It's made with
23        honey. I'm like sugar is higher on the glycemic index,
24        right, so we had this conversation. And they're very
25        well aware of my health problems.
```

Page 150

1    Q.   Okay.

2    A.   And there's just no doubt about it. So this is --

3         that's my experience. And that meeting took place, I

4         would say, within days of me starting there.

5              MR. BROWN:  But you're not saying, if you

6         can clarify, that they tried to make you sick at that

7         first meal?

8    A.   At the first meal, no, no.

9    BY MS. HUNT:

10   Q.   Was there ever a time that they tried to force you to

11        eat things that you couldn't eat, or deliberately

12        increase your insulin level?

13   A.   I think that at the Iftar dinners by the time, you

14        know, we got around to that, there was not someone

15        trying to push that. But as someone who's very in

16        touch with Type II diabetes and issues is the cortisol

17        and the stress.

18   Q.   So sticking with that, you made mention to the members

19        of the council that were present at the restaurant

20        that you had diabetes.  Were there any other health

21        issues that you mentioned to them?

22   A.   Not that I can recall at that meeting.

23   Q.   All right. And at the time that you left the City of

24        Dearborn Heights, there were -- there was essentially

25        a new council. There were new members on the council;

```
                                                     Page 151
 1         is that correct?
 2    A.   Hassan Saab, and Denise Malinowski, I think, had
 3         joined.
 4    Q.   And it doesn't appear from the list that you gave me
 5         Tom Wencel was not at this meeting?
 6    A.   He was there, but he came late.
 7    Q.   Okay.  You also mentioned Rachel LaPointe,
 8         L-A-P-O-I-N-T-E?
 9    A.   LaPointe, yes.
10    Q.   And how did any of her actions adversely affect you?
11    A.   She runs a website, her and her husband, called DBH
12         411, I believe it is. And within minutes of me sending
13         out a memorandum to the police department, she had
14         already received this memo and put it up on her
15         website. And this was the defunding, if I remember
16         correctly, of my directors, that council vote.
17    Q.   Have you ever reached out to Ms. LaPointe to determine
18         how she would get a hold of those memorandums?
19    A.   No, not at that point.
20    Q.   When did you discover this?
21    A.   Seconds after it happened.
22    Q.   Thank you. But around what time?
23    A.   This was -- well, I'm trying to think of when they
24         illegally defunded Paul and Kevin's positions. Would
25         have been right after the first of the year of '24, I
```

Page 152

```
 1          believe.
 2    Q.    Okay.  So around January of '24. Was that the first
 3          time you were made aware of Ms. LaPointe and her
 4          website?
 5    A.    No, no, no.
 6    Q.    Were there other memos or department matters that were
 7          placed on her website prior to that January of '24
 8          period of time?
 9    A.    I'm not sure. I didn't monitor it. Somebody just
10          brought to it my attention, and I do not remember who
11          that within minutes it was up.
12    Q.    Did you have a conversation with anyone within your
13          department about this memorandum being made public so
14          quickly?
15    A.    Paul and Kevin, Director Vanderplow and Swope.
16    Q.    Did you direct them to do an investigation, or find
17          out why?
18    A.    Complete waste of time, yeah.
19    Q.    So it was brought to their attention, and it just --
20          you just let it go?
21    A.    Yeah.  It was just the propaganda war that was going
22          on.
23    Q.    What about Pam Swirple?
24    A.    She is the, I believe, still wife of a sergeant who
25          decided to leave the organization after an
```

Page 153

```
 1        investigation into a damaged squad car, and him lying

 2        about throwing a dildo around the -- I'm sorry, around

 3        the squad room.

 4    Q.  Did he leave on his own?

 5    A.  He did, but he didn't want to leave. He was backed

 6        into a corner, in his own words, and he was going to

 7        face discipline.

 8    Q.  Do you recall that officer's name?

 9    A.  Which one?

10    Q.  The officer that's married to Pam Swirple. Would it be

11        Officer Swirple, or do they have the same last name?

12    A.  He was a sergeant. I honestly don't remember.

13    Q.  Okay.  And how did Pam Swirple cause adverse action

14        against you?

15              MR. BROWN:  I'm going to object. It

16        requires a legal opinion from a lay person if you're

17        speaking of adverse action in any legal sense.  If

18        you're just speaking in terms of English, plain

19        English, that's fine.

20    BY MS. HUNT:

21    Q.  Well, I'm trying to determine like what actions were

22        taken against him by these individuals?

23              MR. BROWN:  That's fine. As long as you're

24        not using a term of art in the question, that's fine.

25              MS. HUNT:  I'm just trying to determine
```

Page 154

```
 1          what happened to them.
 2   A.     Pam was very outspoken on internet platforms. She
 3          would send me direct Facebook messages. She sent me a
 4          video of Sergeant Bazzy sitting in his brother's real
 5          estate office saying he's going to be the chief of
 6          police. Joking about it. Wanted action done. She was
 7          just a constant tool to harass, and just cause chaos
 8          in the police department.
 9   Q.     Okay.  And how do you believe that she was working in
10          concert with the council?
11   A.     Hated Mo Baydoun.
12   Q.     She hated Mo Baydoun?
13   A.     Hated him. She told me she hates Arabs, and they're
14          destroying the city, okay, in a meeting. She showed up
15          to a community meeting.  I can't even remember where
16          it was, but it was a former church. It's an Arab
17          meeting place now. Bint something. But she and Angela,
18          I can't remember Angela's last name, came up to me.
19          They're destroying the city. They're using you to
20          destroy the city. Yeah, yeah, yeah. And she's making
21          comments on Mo Baydoun's website about keep up the
22          good work. Stay focused.
23   Q.     Okay.  So you're saying that she and Angela hated Mo
24          Baydoun, and it appears that they --
25   A.     I didn't say Angela. Angela was at a meeting.
```

Page 155

1    Q.    With her?

2    A.    Yeah, yep.

3    Q.    And so considering that the majority of the council

4          is -- I shouldn't say majority. Many members of the

5          council are of Arab descent, she wasn't fond of the

6          council. Would that be your assessment?

7    A.    The council, the mayor, the Arab officers.  Vince,

8          same thing.  Just making the comments. Staffing levels

9          was always their rally cry in public comments.  What

10         are the staffing levels?  How many people were on

11         patrol?  We heard there were only, you know, two squad

12         cars out last night, let's say for an example.  Well,

13         there's two police officers in each squad car, right,

14         after a certain hour. So it was this constant how many

15         officers have left. How many officers -- and I can't

16         share the reasons why people are leaving, but they

17         were leaving for good reasons, and you've heard some

18         of them today. So it was this constant barrage.

19         Nothing, zip, zero out of anyone right now on those

20         platforms.

21   Q.    All right. So how was he working in concert with the

22         council?

23   A.    So same thing, except he and Angela at towards

24         probably like the last six months, I had implemented a

25         DDACTS, Data-Driven Approach to Crime and Traffic

Page 156

```
 1            Safety, and it's called DDACTS. It's a federal
 2            program. You look at your accidents. You look at your
 3            crime. You look at your available resources. It's a
 4            spatial -- it's a time and location way of policing.
 5            It takes an individual's race, etc., out of the
 6            equation. We say this is where incidents are
 7            happening. Just be visible. Be visible in that area if
 8            we're having accidents in an area.
 9                      So I would have meetings, and Director
10            Swope actually started it while I was on my first
11            leave for my heart attack. And they would come to
12            the -- one specific meeting I remember them coming to,
13            they checked in with Mo Baydoun in the audience. I was
14            walked up, and I was making small talk to him before
15            the meeting started. Yep, we're here. Yep, I'll let
16            you know.  And they were constantly throwing
17            absolutely ridiculous accusations at Kevin, and Paul
18            and I. And we would handle them with grace at those
19            meetings with data.
20       Q.   So I'm sorry. It was Vince and Angela that were having
21            these communications with Mo Baydoun prior to the
22            meeting?
23       A.   The one time that I saw, right, and that confirmed my
24            suspicions.
25       Q.   So that was -- and all you heard them say was we'll
```

Page 157

1        check in with you, or kind of small talk?

2   A.   Because they didn't have -- once they came on their

3        own and tried disrupting these meetings, I was not

4        there. I was told by Kevin and Paul that they were --

5        they sent other people to those meetings.

6   Q.   And was this just a thought or a suspicion of Kevin

7        and Paul's, or did they have someone tell them that

8        they were being sent to these meetings, or if you

9        know?

10  A.   It's basically just MO. It's their MO, to put it in

11       law enforcement terms, and I think Mr. Wencel was the

12       most recent sharer of that MO at a meeting.

13  Q.   So as I understand it, as it relates to paragraph

14       seven, the acting in concert with the council.

15               MR. BROWN:  You mean 27, Monica?

16               MS. HUNT:  27.

17  BY MS. HUNT:

18  Q.   Acting in concert with council, it's my understanding

19       that Pam Swirple did not like the council; is that

20       correct?

21  A.   That's what she told me when I first got there.

22  Q.   All right. And the other, Angela and Vince appeared to

23       have had a conversation with Mo prior to a meeting

24       that you overheard about we'll see, or I'll let you

25       know, something to that effect?

```
                                             Page 158
 1    A.   Correct.
 2    Q.   And Ms. Kaminski has a website, or Ms. LaPointe has a
 3         website that she placed some department information
 4         on; is that right?
 5    A.   That's correct.
 6    Q.   Okay.
 7    A.   And you said this was in addition to Khalil when we
 8         started this discussion.
 9    Q.   We'll get to Khalil.
10    A.   Yeah.
11    Q.   There's a whole section about Khalil, paragraph about
12         Mr. Khalil, or Rahal. Now, the next paragraph,
13         threats, retaliations, and other adverse action were,
14         in part, attempts, to force plaintiffs to provide
15         illegal preferential treatment for a police supervisor
16         of Arab ethnicity who was under investigation. Who was
17         the Arab supervisor that was under investigation, do
18         you know?
19    A.   Sergeant Mohamad Bazzy.
20    Q.   Who was trying to force you into -- or force you and
21         your co-plaintiffs to provide preferential treatment?
22    A.   That's covered in paragraph 29.
23    Q.   Okay.
24    A.   That would have council member Mo Baydoun, Hassan
25         Ahmad, and Nancy Bryer.
```

Page 159

1    Q.   What was -- strike that.

2              It says here in 29 that on January 26th of

3         2023 Mo Baydoun asked on three separate occasions for

4         a promotion for Sergeant Bazzy; is that correct?

5    A.   That is correct.

6    Q.   Okay.  Were the three separate occasions on January

7         26th of 2023, or did they happen on separate different

8         days?

9    A.   For purposes of that paragraph, it would have been

10        three separate occasions.

11   Q.   Okay.

12   A.   On the same -- in the same meeting.

13   Q.   Okay. So you're sitting down having a conversation, or

14        having a conversation with Mo Baydoun, and all three

15        times he asked about promoting Bazzy?

16   A.   Yes. He didn't ask. I want to clarify that. He told

17        me.

18   Q.   Here it says he asked on three separate occasions.

19   A.   Asked, told, pretty much the same thing when you're in

20        that meeting.

21   Q.   Were you aware of Sergeant Bazzy's work history with

22        the PD?

23   A.   Not intimately aware.

24   Q.   Were you opposed to promoting Bazzy?

25   A.   Well, Sergeant Bazzy failed the lieutenant's test, and

```
                                                    Page 160
 1          he was not up for any type of promotion. And they

 2          demanded that I move him from his sergeant's position

 3          on a shift to a director level position.

 4     Q.   Was there any communication with council member

 5          Baydoun about the testing for promotions?

 6     A.   Can you clarify for me?

 7     Q.   Sure. That was a bad question. During this

 8          conversation on January 26th of 2023, did you advise

 9          Mr. Baydoun that Sergeant Bazzy had failed his

10          lieutenant's examination?

11     A.   No, I would not notify council to that. And that's

12          controlled by Act 78, not Jerrod Hart.

13     Q.   Was there any discussion about the inability to

14          promote that type of position -- to that type of

15          position?

16               MR. BROWN:  Could you try that again?

17     BY MS. HUNT:

18     Q.   Sure. Was there any discussion with Mr. Baydoun about

19          the inability to promote Mr. Bazzy or Sergeant Bazzy

20          to the director's position that he was seeking?

21     A.   I think I'm getting it. I was the first person that Mo

22          asked to take care of his boy, and to promote him. And

23          I said that can't happen. There's processes in place.

24          He has to, you know, take tests. I just can't appoint,

25          you know, somebody to these positions. They're covered
```

Page 161

```
 1            by Act 78, so on and so forth. And I'm talking about
 2            when you take somebody that's a sergeant, and you bump
 3            them up to these high level positions, they haven't
 4            had time and grade to have that experience, right?
 5            And all of that was explained to him. He could care
 6            less. He looked at the director next to me, I think it
 7            was Paul, and made the same demands.
 8       Q.   So when you say he made three different demands, did
 9            he make three different demands of you, or did he make
10            the demand to you and --
11       A.   First one was to me.
12       Q.   And then to Paul, and then to Kevin?
13       A.   First one was -- I've lived this stuff, so it's hard.
14            First one was to me. Take care of my boy.  He's been
15            through a lot. Blah, blah, blah. I understand.  He'll
16            be given the same opportunities as everyone else. He
17            has to pass tests, blah, blah, blah.
18       Q.   Can I stop you for a second.  Did he use the term take
19            care of my boy?
20       A.   Yes, he did. And when he didn't like my answer, he
21            looked -- again, he was making the same demands. I
22            don't think you guys understand. You know, his family
23            likes him, blah, blah, blah.  And I said, I would
24            think that a lot of my officer's families like them,
25            right?  Paul took -- tried to take a tactical route of
```

Page 162

1         Director Vanderplow to say, Listen, what the chief's

2         saying is he's going to be given every opportunity.

3         This golden circle, whatever, has been broken.

4         Everyone's going to be on the same playing field, so

5         on and so forth. He kept coming. And then Kevin was

6         the last person to attempt to try to diffuse this and

7         say, no, we're not doing this. And then the meeting

8         ended right after that.

9    Q.   Is Mo Baydoun the only person that asked you to

10        promote Sergeant Bazzy?

11   A.   No. Mr. Jamal who was CDBG, community development

12        block grant something. Every time I saw that guy in

13        city hall, and he'd be around people, it'd be like

14        Sergeant Bazzy, the community loves him.  The

15        community loves him.  What do you mean by the

16        community?  The Arab community, right?  They want him

17        promoted. And I was getting pressure from that.

18        Constantly people talking to me about Sergeant Bazzy.

19               Then, of course, there's the video that was

20        released where his brother is alleging there's

21        terrible things going on at the police department, and

22        this guy's going to -- what do you want to be, chief

23        of police?  He's like, Yeah, I want to be the chief of

24        police. That's my recollection from the video with

25        Sergeant Bazzy on there.  This was all a part of the

Page 163

1          same time these demands were coming.

2     Q.   So are you saying there's something wrong with having

3          aspirations of being a chief of police?

4     A.   Absolutely not, there's not.

5     Q.   So from what I'm hearing, other than Mo Baydoun, it

6          was members of the community, although it appears Mr.

7          Jamal worked with the CDBG funding. There were

8          discussions about people liking Sergeant Bazzy; is

9          that right?

10    A.   Yes.

11    Q.   All right. So there's discussion about him being a

12         popular police officer in the city, or at least in

13         some circles?

14    A.   Within the Arab community, yes.

15    Q.   And in the City of Dearborn Heights, would you

16         consider the Arab community to be a significant

17         portion of the community?  It may not be the majority,

18         but a significant portion?

19    A.   Yeah, that's why I was working so hard to connect with

20         it.

21    Q.   In speaking with Mo Baydoun about his want of you to

22         promote Sergeant Bazzy, on that day did he say, Oh,

23         you're going to be fired if you don't promote him?

24    A.   Oh, no.

25    Q.   Did he ever tell you that you would be fired if you

Page 164

```
 1        didn't promote him?
 2   A.   He did not, no.
 3   Q.   Did someone tell you you'd be fired if you did not
 4        promote --
 5   A.   Yes.
 6   Q.   -- Sergeant Bazzy?
 7   A.   Yes.
 8   Q.   Who was that?
 9   A.   Khalil Rahal.
10   Q.   And Khalil Rahal, did he work in the City of Dearborn
11        Heights, or within the governmental unit of Dearborn
12        Heights?
13   A.   Governmental unit?  No, not that I'm aware of.
14   Q.   Khalil Rahal himself, he, it's a he, correct?
15   A.   Um-hmm.
16   Q.   Does he have the ability to fire you?
17   A.   He didn't tell me he was going to fire me.
18   Q.   Okay.
19   A.   He said the city council was going to fire me.
20             MR. MIOTKE:  Objection. It's not
21        responsive.
22   A.   I don't know what that means.
23             MR. MIOTKE:  That means she asked if he has
24        the authority, and then you didn't say yes or no.
25   BY MS. HUNT:
```

Page 165

1    Q.   Does Khalil Rahal, himself, can he fire you?

2    A.   No.

3    Q.   Can he fire Kevin Swope?

4    A.   No.

5    Q.   Can he fire Paul Vanderplow?

6    A.   No.

7    Q.   Does he have the ability to change any of the benefits

8         or salary that either you or your co-plaintiffs have?

9    A.   Not that I'm aware of.

10   Q.   Okay.  Did he, himself, threaten to fire you?

11   A.   That he would threaten me?

12   Q.   Did Khalil Rahal say, I will fire you?

13   A.   No, he couldn't.

14   Q.   Now, you made a statement that he said the council

15        could?

16   A.   He said the council was.

17   Q.   Okay.

18   A.   Yes.

19   Q.   Did the council fire you?

20   A.   Yeah, they did. They constructively terminated me.

21   Q.   Constructive termination. Did you receive a memorandum

22        from the council saying you're fired?

23   A.   From the council, no.

24   Q.   Or a resolution from the council that you're fired?

25   A.   No.

Page 166

1    Q.    Now, sticking with Mr. Rahal, who in paragraph 38 --
2          and I just want to exhaust Mr. Khalil Rahal right now.
3          We'll go back to 32 in a second. It indicates that he
4          is the director of economic development for an
5          international corporation. What corporation is he a
6          director of economic development for?
7    A.    At his party, I was told -- that I was present for, he
8          was no longer going to be the number two to Warren
9          Evans.  That he was hired by DTE.
10   Q.    When was his party?
11   A.    Whenever he changed positions. I do not recall.
12   Q.    Was it around the October 26th, 2023 date?
13   A.    No. He had been at DTE prior to that.
14   Q.    Okay.  Now, in the next paragraph you indicate that he
15         threatened plaintiffs with adverse employment
16         consequence due to their reporting and investigating
17         of Sergeant Bazzy.  What reports and investigation of
18         Bazzy were made?
19   A.    Failure to supervise during a use of force incident.
20   Q.    Again, does Rahal have the ability to fire you
21         himself?
22   A.    No.
23   Q.    Does he have the ability to demote you?
24   A.    No.
25   Q.    And you indicate that he was acting in concert with

Page 167

```
 1        city council.  How do you know that he was acting?
 2   A.   He told me.
 3   Q.   So he just said --
 4   A.   He said, I know these guys. I'm friends with these
 5        guys, and this is what's going to happen. You're going
 6        to get fired. You're going to get fired, and you're
 7        not going to be reelected.  And I can't remember if
 8        Roger was in the room at that point or not. It was
 9        very crystal clear.
10   Q.   When you say he, you're not going to be reelected, who
11        was he talking to?
12   A.   Mayor Bazzi.
13   Q.   And this was just a statement that was made by him.
14        You don't have any independent facts?
15   A.   I should, yeah.
16   Q.   But let me just finish my statement.  You don't have
17        any independent facts that he could or would influence
18        the city council to fire you?
19   A.   I think the disconnect here is Rahal showed the cards.
20        He was part of the conversations. He knew what they
21        were going to do, and he spoke up, and he shouldn't
22        have.  And he was angry that day.
23   Q.   What you heard from Mr. Rahal was just what you heard
24        from Mr. Rahal. You didn't hear anything from council
25        that they have a relationship with Mr. Rahal?
```

Page 168

```
 1    A.   I've observed them with Mr. Rahal. He's told me he's
 2         good friends with them.  He's told me he's good
 3         friends with Sergeant Bazzy, yeah.
 4    Q.   Having a friendship doesn't mean having influence
 5         over?
 6    A.   Oh, absolutely.
 7                   MR. BROWN: Objection.  Argumentative.
 8    BY MS. HUNT:
 9    Q.   Is that correct, that having a friendship with?
10    A.   I don't agree with that. I don't agree with that at
11         all.
12                   MR. BROWN: Objection to form.
13    A.   I don't.
14    BY MS. HUNT:
15    Q.   And when you state that he told Mayor Bazzi he would
16         not be elected, is it fair to say that Mr. Rahal does
17         not have control over the entire electorate for the
18         City of Dearborn Heights?
19                   MR. BROWN: Objection to form.
20         Argumentative.
21    A.   Sure, yeah, yeah.
22    BY MS. HUNT:
23    Q.   Going back to 32, you indicate that on June 16th,
24         2023, there was an excessive force incident Civil
25         Rights violation that occurred during the arrest of a
```

Page 169

1              criminal subject.  Do you see that?

2      A.     Yes, I do.

3      Q.     Do you recall what that excessive force incident was?

4      A.     Yes.

5      Q.     All right. And what was that?

6      A.     A man whose face was smashed into the ground between

7             one and four times by a police officer that was on his

8             back.  Excuse me, as two other police officers were

9             placing him into custody.

10     Q.     Was there an investigation?  Strike that.

11                       Who was the police officer that was

12            involved with the incident?

13     A.     There were three that were there. The one who smashed

14            the individual's face into the ground causing injury

15            was Zyke Bailey.

16     Q.     Bike?

17     A.     Z-Y-K-E, I believe.

18     Q.     B-A-I-L-E-Y?

19     A.     I believe so.

20     Q.     Do you know who the other officers were that were

21            arresting the subject?

22     A.     I do not recall.

23     Q.     Was there an investigation into this incident?

24     A.     Yes.

25     Q.     Who conducted the investigation.

```
                                              Page 170
 1    A.    There were two sergeants and a lieutenant.  Sergeant
 2          Zrien.  Sergeant Bazzy was the supervisor that went to
 3          the scene, and Lieutenant Pawlus.
 4    Q.    So number 32 indicates that there was use of excessive
 5          force. Was the allegation of use of excessive force,
 6          was that investigated?
 7    A.    Yes.
 8    Q.    Okay.  And is that what Sergeant Bazzy, Zrien and
 9          Pawlus investigated?
10    A.    Yes.
11    Q.    Was there a report following that investigation?
12    A.    Yes.
13    Q.    Okay.  Was that a written report?
14    A.    Yes.
15    Q.    Who drafted it?
16    A.    Sergeant Pawlus, Sergeant Zrien.  They were the ones
17          who originally conducted the use of force review, and
18          that was then pushed to Director Swope.
19    Q.    Was there any disciplinary action taken against
20          Officer Bailey following that incident?
21    A.    Yes.
22    Q.    And who implemented that discipline?
23    A.    I agreed to it. I approved it.
24    Q.    So your next paragraph you indicate that Sergeant
25          Bazzy and two other officers -- and other officers and
```

Page 171

```
 1        supervisors committed policy violation in handling
 2        that incident?
 3   A.   Correct.
 4   Q.   What were those incidents?  What was that violation?
 5   A.   I do not recall.  I'd have to look at that in the
 6        file. It's at the police department. I do not recall.
 7   Q.   So you don't recall what the violations were that
 8        Sergeant Bazzy took part in?
 9   A.   I do not, no.
10   Q.   Do you know if there was an investigation of those
11        policies, or violation of those policies?
12   A.   Yes.
13   Q.   Who --
14   A.   Director Swope.
15   Q.   -- formed those investigations, or that investigation?
16   A.   Director Swope.
17   Q.   And was there a written report as to the outcome of
18        that?
19   A.   Yes.
20   Q.   Did you receive that?
21   A.   Yes.
22   Q.   Was there any discipline or any training that came
23        from that?
24   A.   There was discipline, yes.
25   Q.   Against who?
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                            586-468-2411
                                                            www.veritext.com

Page 172

1    A.   To my recollection, Lieutenant Pawlus, Sergeant Bazzy.

2         I don't know if Sergeant Zrien. I believe he was also

3         disciplined. And I think that's it.  But, again, I'd

4         have to look at that investigation.

5              MR. BROWN:  Was there any video of the

6         beating incident?

7    A.   Yes.

8    BY MS. HUNT:

9    Q.   And that was bodycam video, or car cam?

10   A.   There was body-worn camera video, and in-car camera,

11        which is how Director Swope initially noted the issue.

12   Q.   Did you report the beating incident that took place on

13        June 16th, 2023 to any other agency?

14   A.   Yes.

15   Q.   Who did you report it to?

16   A.   Michigan State Police.

17   Q.   All right. How did you report that to them?

18   A.   Kevin. I directed Kevin to contact the state police.

19   Q.   Did you ever follow up with Kevin about whether or not

20        he did report it to MSP?

21   A.   Yeah.  The Wayne County prosecutor issued charges.

22   Q.   Against Bailey?

23   A.   Yes.

24   Q.   You mentioned earlier that city council voted to

25        "defund" the positions of Director Swope and Director

```
                                                   Page 173
 1          Vanderplow. How did you become aware of that, the
 2          proposed resolution?
 3     A.   That was first presented as a -- I don't know if it
 4          was at a council meeting, or as discussion from Mr.
 5          Abdel-Hak through Saab right before Christmas of '24.
 6          And it was while this incident was ongoing.
 7     Q.   What incident?
 8     A.   With Sergeant Bazzy, and Zyke Bailey, and Lieutenant
 9          Pawlus.
10                  MR. BROWN:  Christmas of '24, sir?
11     A.   I'm sorry. '23.
12   BY MS. HUNT:
13     Q.   And is it your understanding that ultimately that
14          proposal did not defund the positions?
15     A.   Because of our court order, yes.
16     Q.   In December of '23?
17     A.   No, in January of '24. Ultimately Saab finally had the
18          intestinal fortitude to show his cards, and bring it
19          back, and it was voted upon.  Even though Kevin,
20          Director Vanderplow, Director Swope and Jerrod Hart's
21          names were in the collective bargaining agreement for
22          COAM, Command Officers Association of Michigan, and
23          that council approved those positions.
24     Q.   Is it your understanding that Mayor Bazzi advised that
25          the positions could not and should not be defunded?
```

Page 174

1           Advice of counsel.  I'm sorry.

2    A.    Do I have specific knowledge that he said they

3          shouldn't be defunded?  I don't recall.

4    Q.    Were those positions defunded?

5    A.    They ultimately were defunded by council by a

6          resolution.

7    Q.    Did Director Vanderplow or Director Swope cease

8          receiving funds into their positions?

9    A.    No.

10   Q.    Did they cease receiving benefits under their

11         positions?

12   A.    Not that I'm aware of.

13   Q.    They continued to get their health insurance, to your

14         knowledge?

15   A.    To my knowledge.

16   Q.    Did the resolution seek to defund your position at

17         all?

18   A.    No. Mine came in the gift of a no confidence vote.

19         You know, the guy working with the DOJ and defending

20         the Arab community.

21   Q.    Did Mr. Swope or Mr. Vanderplow have the ability to

22         continue to perform the functions of their job?

23   A.    At what point?

24   Q.    In January of '24.

25   A.    Oh, as far as I know, it obviously is a worry bead

Page 175

```
 1          when people are threatening to cease your employment.
 2     Q.   Did you file an EEOC complaint?
 3     A.   I did.
 4     Q.   Did you provide a copy of that to your attorney?
 5     A.   It was filed on my behalf from the attorney, to my
 6          knowledge.
 7     Q.   Okay.
 8     A.   I signed it.
 9     Q.   All right. Without getting into any communications
10          that you had with your attorney, the EEOC complaint
11          that you filed, was it with your current counsel?
12     A.   Yes.
13     Q.   Okay. And you indicated in your complaint that you
14          received a right to sue letter. Did you provide that
15          to your attorney, or did your attorney have that, to
16          your knowledge?
17     A.   It's all electronic. I don't know if they have a copy
18          of it.  I believe I did send one, if I remember
19          correctly, in an email.
20     Q.   Is it your understanding that your co-plaintiffs, Mr.
21          Vanderplow and Mr. Swope, also filed similar EEOC
22          claims?
23     A.   That's correct.  Do you mind if I use the restroom?
24     Q.   Sure.
25                      (Break at 2:55 p.m.)
```

```
                                                    Page 176
 1                    (Back on the record at 3:00 p.m.)
 2     BY MS. HUNT:
 3      Q.   Mr. Hart, you made a number of allegations or claims
 4           that you reported a number of things to MPS, to DOJ.
 5      A.   MSP.
 6      Q.   MSP, I'm sorry. MSP, the DOJ, the FBI.  Who did you
 7           make aware that you had provided these agencies with
 8           your allegations?
 9      A.   The mayor, Ray Muscat. It was pretty much common
10           knowledge that I was reporting incidents to
11           authorities.
12                    MR. MIOTKE:  Objection. Form. And
13           foundation.
14     BY MS. HUNT:
15      Q.   All right. So when you say it's common knowledge, did
16           anyone tell you, oh, I know you made these allegations
17           to MSP, or the FBI, or DOJ?
18      A.   Hassan Saab told me that he has a relative that's
19           working in the federal building.  And when he came
20           over to the police department one day we had talked
21           about -- I'm sorry.  He called me on the phone.
22           Somebody had allegedly put a tracking device on his
23           truck. He found it. He was going to leave it on. He's
24           got a relative down at the federal building.  And, of
25           course, we know -- should all know that Hassan Saab
```

Page 177

```
 1              has had federal issues before, and is familiar with
 2              the FBI and the Department of Justice. And has even
 3              alluded to him being an informant for them. And I've
 4              told him that I've reported any and all criminal
 5              behavior to the Department of Justice or the state
 6              police for them to investigate.
 7         Q.   So when Mr. Saab came to you to complain that he felt
 8              a tracking device was on his vehicle, when was that,
 9              do you recall?
10         A.   I know I was in a Walmart.  My first phone call was
11              from the mayor, and it was probably between 7 and 9
12              o'clock at night. I'm going to guess it was sometime
13              in spring of '23.  And I had to to get more wood
14              pellets for my smoker for my son to cook lunch for
15              work the next day.  And that's when he was telling me
16              about this tracker on the phone.
17         Q.   So in that conversation he told you that there was a
18              tracking -- that he believed there was a tracker
19              placed on his car?
20         A.   He said he found it.  He heard noises in his truck.
21              He looked under there.  It was in his wheel well.
22              That's just one of the many things he said.
23         Q.   So at that time, did he make any comment to you that,
24              oh, I know you made some reports to other agencies?
25         A.   I told him that I have made reports to other agencies,
```

Page 178

```
 1          because he was in constant FOIA, constant complainer.
 2          We were constantly reviewing video based on his
 3          allegations of misconduct. And I told him that any and
 4          all issues I find I send to the proper authorities.
 5          And keep in mind he was the very best friend of the
 6          mayor until the Sergeant Bazzy thing happened.  Been
 7          to many dinners with Hassan Saab, Captain Erickson,
 8          Sergeant Bazzy, Officer Mazloum.
 9   Q.     So your claim that you were retaliated against for
10          making these allegations to the different agencies,
11          how has the mayor retaliated against you?
12   A.     The mayor for the large part has been a supporter.
13          But when I reported the tire machine to him, he
14          started getting -- I don't know where the heat was
15          coming from, but he said he's getting heat. Can't we
16          just sell it to them.  And I told him my priority was
17          to get the machine back.  And whatever the city
18          decided to do with that city property was up to them.
19   Q.     Okay. But him indicating that he wanted to just sell
20          it to them, that wasn't retaliation against you; is
21          that correct?
22   A.     It was in the sense of there was -- it was just like,
23          okay, what's the big deal. Did I have any adverse
24          employment actions, no.
25   Q.     So when you indicate that you were retaliated against
```

Page 179

```
 1          by the mayor and the council --
 2                  MR. BROWN: Are you referring to something?
 3                  MS. HUNT:  I am trying to find it.
 4   BY MS. HUNT:
 5    Q.   For the sake of time, there was no adverse action
 6         provided -- or against you from the mayor; is that
 7         correct?
 8    A.   Well, I would say that in my log is a documented
 9         conversation with the mayor.  There was also
10         conversation with the DOJ organizational assessment
11         team that Sergeant Bazzy was creating so much strife
12         for the mayor in the community, in the Arab community.
13         When the word community is used, it means Arab
14         community.  And the mayor told me that straight out.
15         And his plan was to hire another director, or somehow
16         hire this individual named Hussein Farhat to come in
17         and be his voice with the Arab community.
18    Q.   And how did that impact your employment?
19    A.   He is directing my team, and he is disrupting the work
20         of the police department. And he's going to give
21         somebody a director level position that I have to deal
22         with that has no leadership acumen. Has no -- I don't
23         think the guy's ever been a sergeant. And but because
24         he's an Arab, and he knows Mo, and he knows Hassan
25         Saab, and he knows the other players in the community,
```

Page 180

```
 1           and the shot callers, he felt that I needed that at
 2           the police department. And that was really what
 3           started an unraveling within that police department of
 4           my tenure.
 5     Q.    Is it Sergeant Farhat?
 6     A.    No.  He was just a detective at Romulus, to my
 7           knowledge.
 8     Q.    Before Detective Farhat became involved with the City
 9           of Dearborn Heights, were you aware of him?
10     A.    No.
11     Q.    All right.
12     A.    That meeting documented was the first time I heard his
13           name.
14     Q.    So you didn't have any understanding of what his
15           background was, his employment level, his employment
16           experience?
17     A.    Other than what the mayor told me that day, no.
18     Q.    Okay.
19     A.    Not that I can recall.
20     Q.    Is part of the role of the police department to be
21           engaged with the community?
22     A.    Yes.
23     Q.    Community as a whole?
24     A.    Yes.
25     Q.    And do you think it's important for members of the
```

Page 181

```
 1          police department to be able to engage and identify
 2          members of the community as a whole?
 3    A.    Absolutely.
 4    Q.    I want to touch really quickly, you talked about your
 5          health issues with regards to Type 2 diabetes, and I
 6          believe you said heart issues. Other than the members
 7          of the council that were at the restaurant with you
 8          prior to your starting, who else did you make aware of
 9          your health issues?
10    A.    The entire police department.
11    Q.    Would you agree that in any city being -- in any city
12          being the chief of police is a stressful job?
13    A.    I think each job comes with stressors, yes.
14    Q.    And to be clear, you did not assert that the council
15          intentionally tried to increase your insulin level
16          during the dinner or the lunch that you had with them?
17    A.    During the first lunch?
18    Q.    Yes.
19    A.    No.
20    Q.    And how do you believe that you were discriminated
21          against based on your health issues?
22    A.    So there were very public postings from Hassan Saab
23          about wanting a chief from the community, which we
24          have already discussed is the Arab community. He was
25          attacked and -- he attacked and discriminated against
```

Page 182

```
 1        me and my directors by defunding a very thoughtful
 2        roadmap worked out with the Department of Justice to
 3        improve the operations of the police department, the
 4        community relations, the overall health and welfare of
 5        police officers.  And I was replaced with a guy who
 6        was a detective at another community who, to my
 7        knowledge, I don't even know if he has a degree. He
 8        has zero experience.  And he got that job because the
 9        white guy was trying to keep that level playing field.
10                    I have emails.  I have snippets of people
11        attacking my Arab officers where I was the only guy
12        defending them. Was the only person there that was
13        operating on a level playing field, and working my
14        butt off, and this is the reward. So the
15        discrimination is they absolutely came after me. Sent
16        other people in concert in the community to attack us,
17        and attack me.  Tried to take my team away.
18    Q.  So you believe by trying to take your team away they
19        were discriminating against you based on your medical
20        issues, or your health related issues?
21    A.  My medical issues, the other two white guys who were
22        with me that were not from the community, and we were
23        replaced with their friends who have no business being
24        chiefs of police anywhere.
25    Q.  You just indicated you had no idea what Farhat's,
```

Page 183

1              Hussein Farhat's background was. To this day, you
2              don't necessarily know for sure; is that true?
3      A.     That's not a true statement.
4      Q.     You just said you weren't sure if he had a degree.
5      A.     Right. Your context was at the time I had the meeting
6              with the mayor and Roger where they were dropping this
7              guy in my lap.  That now when the whole place is on
8              fire, I got to babysit this guy who's not even up to
9              speed. And he couldn't even do his duties as an
10             emergency manager. Never showed up to work when I was
11             initially hired. Never signed onto his computer, or
12             sent an email for nine months.
13                      So I know what time it is there. And they
14             absolutely manipulated it and harassed me to make my
15             condition worse. I was told by David Abdallah, Chief,
16             go home and spend time with your grandbaby. They're
17             coming after you. They're coming after your guys.
18             They're coming after the mayor.  And in order to get
19             to the mayor, they got to come through you.
20     Q.     During your time with the City of Dearborn Heights,
21             how many training policies did you create or develop?
22     A.     I do not know the answer to that.
23     Q.     Were there any?
24     A.     When you say training policies, define that for me.
25     Q.     Any policies with regards to training, or continuing

Page 184

```
 1          evolvement of understanding the positions of the
 2          employees within the police department?
 3    A.    Job descriptions?
 4    Q.    Whether job descriptions or continuing training.
 5    A.    Anything I develop would be in PowerDMS.
 6    Q.    Do you know if you ever did create any trainings, or
 7          alter or amend any training processes or programs?
 8    A.    I do not recall.
 9    Q.    And you indicate you were brought in to -- I believe
10          you used the word clean up the department.
11    A.    I don't remember using that word.
12    Q.    I think you did, because I wrote it down, but you
13          indicated that you were brought in because there were
14          some issues in the department that you were hoping to
15          fix; is that correct?
16    A.    Well, the mayor told me he wanted me to clean up the
17          police department, but I had to be very careful with
18          that, because that's one person's perspective.  And
19          when you're a new police chief, everybody wants to
20          come with you, and you don't know the background of
21          issues. So I took everything that was said about
22          somebody with a grain of salt until I observed it on
23          my own.
24                   And we see with Sergeant Dottor the
25          allegations about him sending penis pictures, and
```

```
                                              Page 185
1          assaulting police officers in the police department,
2          that was one that I heard before I even started there
3          from the mayor.
4     Q.   And you mentioned that you heard a lot.  Whether
5          before you started, or after you began working there,
6          did you take any actionable efforts to cease those
7          types of behaviors?
8     A.   Sure, yeah.
9     Q.   It sounds like from the testimony you gave that you
10         had a lot of meetings, right?
11    A.   Yes.
12    Q.   Okay.  A lot of conversations with individuals?
13    A.   Yes.
14    Q.   There were some processes that were changed, or
15         trainings which were implemented?
16                   MR. BROWN: Is there a question?
17    BY MS. HUNT:
18    Q.   I'm getting there. Was there any actionable change
19         that was made during your tenure with the city?
20    A.   Oh, yeah. The scales of justice were equal when it
21         came to traffic tickets. They couldn't -- they were
22         not allowed to dismiss.  I mean, how horrible is that?
23         I know Mo Baydoun, and I'm going to call him and get
24         out of my traffic ticket, and somebody else has to pay
25         their traffic ticket?  That should infuriate
```

Page 186

```
 1        everybody.
 2                 Where they were sitting on the ramp on
 3        Southfield is where most of the African-American
 4        community gets off of Southfield. And they were told
 5        to go there. What actionable data was there?  There
 6        was none.  It's an unrealistic speed limit.  So I
 7        implemented data driven approach to crime of traffic
 8        safety, and I brought subject matter experts in from
 9        around the country that were completely appalled at
10        what was going on in that police department through
11        that organizational assessment.
12                         DEPOSITION EXHIBIT 4
13                         Email from Thomas G. Wencel 10/23/23
14                         3:18 p.m.
15   BY MS. HUNT:
16     Q.   This is an email to --
17                     MR. BROWN:  Is this 4?
18   BY MS. HUNT:
19     Q.   This is 4. It's an email from Tom Wencel to -- it
20          appears to be the council at the time, October 23,
21          2023. And it includes you on it. Does this -- do you
22          recall receiving this email?
23     A.   This would have been October 23rd. I was out. My heart
24          attack was on October 10th. So if I did get this
25          email, it would have been upon my return checking
```

Page 187

1       emails.

2    Q.   Okay. All right. Do you recall receiving this upon

3         your return?

4    A.   I do not. I do not.

5                    DEPOSITION EXHIBIT 5

6                    Email Thread from Dave Abdallah 10/24/2023

7                    3:20 p.m.

8    BY MS. HUNT:

9    Q.   I'm going to give you another one. That's the final

10        email, which this will be Exhibit Number 5 which would

11        have been the following day October 24, 2023.  The

12        last email is from Dave Abdallah, but some of the back

13        and forward, there was the final email appears to be

14        from Mr. Wencel.

15                    MR. BROWN: Maybe you could give us the

16        Bates page there, Monica.

17   BY MS. HUNT:

18   Q.   I'm sorry. Starting with 311 and 312, which is the

19        final email from Tom Wencel, which is what you just

20        read that you indicated you received once you

21        returned, or may have received once you returned. And

22        looking at page 308, which is an email from Mo Baydoun

23        from the same day, do you recall receiving that when

24        you returned?

25   A.   Am I reading Baydoun or Paul Vanderplow?

Page 188

```
 1   Q.   307. I apologize.

 2   A.   There were so many of these.

 3              MR. BROWN: I hope this email finds you

 4        well.

 5   A.   Of course that's the opening. Yeah, there were so many

 6        of these emails.  I can't tell you whether I saw this

 7        or not.

 8   BY MS. HUNT:

 9   Q.   So you say so many of these emails with regards to

10        their concerns about Mr. Vanderplow?

11   A.   Yes.

12   Q.   Okay.  So in addition to the email from Tom Wencel,

13        and then this one from Mo Baydoun which discusses

14        their concerns about Vanderplow, and then the next is

15        from Mr. Ahmad, Hassan Ahmad with the same sentiment

16        regarding Mr. Vanderplow?

17   A.   Yes.

18   Q.   After receiving these emails when you returned, and if

19        I could ask -- strike that. When you returned from

20        your medical leave, do you recall when that was?

21   A.   I do not.

22   Q.   Okay.

23   A.   I'd have to look at my personnel file.

24   Q.   Did you have conversations with -- I'm sorry.  That

25        was Number 4.  This is Number 5.  In conjunction with
```

Page 189

```
 1          after receiving the emails from Mo Baydoun, Mr.

 2          Abdallah and, I'm sorry, Mr. Hassan Ahmad, and Mr.

 3          Wencel, did you have any communications with Paul

 4          Vanderplow as to what happened?

 5     A.   Yes.

 6     Q.   Okay.  And did you have any communications with the

 7          council as to what happened?

 8     A.   I authored an email to city council. I don't know if

 9          it was inclusive of a monthly report, or if it was on

10          its own about the decorum, and the relationship

11          between myself, the directors and the council, and

12          working towards a better outcome.

13     Q.   Did you find it concerning that almost half of the

14          members of the council had concerns with the decorum

15          of your director?

16     A.   Absolutely not. I've watched them watch them. They

17          could play them.  He's an emotional guy. But I've

18          watched them do this over and over. I have literally

19          watched it happen. This is -- you're making my case

20          right here with this, and you don't even realize it.

21          Look at the names on there.

22     Q.   I see the names on there.

23     A.   Look at what Tom Wencel just shared in the D7 Dad's

24          Club. This is all -- this is what I'm talking about,

25          this, oh, I'm appalled, and all of this wild emotion.
```

Page 190

```
 1        Hassan Saab who reads, and yet to be investigated
 2        allegation verbatim against Paul Vanderplow, but yet
 3        he wants privacy for himself based on Mr. Wencel's
 4        statement. Come on. This is the essence of what
 5        happened. I was there. I saw it in color.
 6   Q.   You were at that meeting?
 7   A.   No, the harassment. This is how it starts. That's
 8        happened within -- it's in my log.  It's shameful that
 9        you have not got this information from Mr. Cooper. If
10        I would have been there, and this would have been
11        somebody else that had filed this complaint, you guys
12        would have everything to the T, and I would stay all
13        night and make sure you had it. This is their
14        behavior, and it started with a week or two of that
15        meeting where Mo Baydoun demanded I take care of his
16        boy. That's when the appalling behavior against Paul
17        Vanderplow started to come out.
18   Q.   So I just want to make it clear that you were not
19        concerned when you had council members express some
20        discomfort with the actions of one of your directors?
21   A.   Absolutely not.  Absolutely not.
22                  MR. BROWN:  Objection. Misstates prior
23        testimony.
24   A.   I know you have a job to do, ma'am, I do, and I
25        respect you, and I respect your --
```

Page 191

1            MR. BROWN:  Enough.

2   A.   This is just absolutely silliness.

3            MR. BROWN: You're getting tired.

4   A.   I am, and I'm getting frustrated because the guys that

5        tried to make it right were the target, and I have a

6        lot of emails. I have a lot of emails from these guys.

7            MR. BROWN:  There's no question.

8   A.   Doing the exact same thing.

9            MR. BROWN:  There's no question pending,

10       bubbie.  Come on.

11  A.   Against other people.

12           MS. HUNT:  So I agree I think our deponent

13       is probably getting tired, so I will pass this along

14       to Mr. Miotke so that he has a moment or some time to

15       examine.

16           MR. BROWN:  Can we decompress for three

17       minutes?

18           MR. MIOTKE:  For three minutes, yes.

19           (Break at 3:26 p.m.)

20           (Back on the record at 3:29 p.m.)

21                    EXAMINATION

22  BY MR. MIOTKE:

23  Q.   All right. Mr. Hart, are you ready?

24  A.   Yes.

25  Q.   Okay.  Please turn to Exhibit Number 1, the last page

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
www.veritext.com

Page 192

```
 1         of Exhibit Number 1.  Are you with me?
 2                    MR. BROWN:  This is Bates stamped 15?
 3                    MR. MIOTKE:  Yes.
 4    BY MR. MIOTKE:
 5    Q.   Do you see what counsel is referring to as the Bates
 6         stamp in the bottom right corner?
 7    A.   Yes.
 8    Q.   And do you see above that there's a sequence of
 9         numbers, and then the word Ogletree.  Do you see that?
10    A.   Yes.
11    Q.   Did you receive a copy of this contract from Mr.
12         Mikula or his firm before you signed it?
13    A.   I do not recall.
14    Q.   Do you understand that Mr. Mikula's firm is Ogletree
15         Deakins; is that correct?
16    A.   I do not know the exact name of his firm.
17    Q.   Did you have any discussions with Mr. Mikula with
18         respect to this contract before you executed it?
19    A.   I do not recall.
20    Q.   Okay.  Do you recall how you received this agreement
21         before you signed it?
22    A.   I do not recall.
23    Q.   Okay.  It appears that your date that you started was
24         supposed to be, as you previously testified, but also
25         is reflected in page one of this document, February
```

Page 193

```
 1        28th, 2022; is that correct?
 2   A.   Restate.
 3   Q.   Let me restate. Page one, 1.1 terms says that's your
 4        employment was commenced on February 28th, 2022. Do
 5        you see what I'm referring to?
 6   A.   That is correct.
 7   Q.   All right. On the last page, page five, it shows your
 8        signature being 2/21/2022, as well as the mayor's.  Do
 9        you see that?
10   A.   I do.
11   Q.   Okay. Did you sign this with you and the mayor
12        together, or did you sign it separately?
13   A.   I believe this was signed, scanned, and sent back to
14        Margaret.
15   Q.   I see. So you executed this separate from Mayor Bazzi;
16        is that correct?
17   A.   To the best of my recollection.
18   Q.   Please turn to page three. And when you're there, let
19        me know that you got there.  Do you see paragraph 4.1?
20   A.   Yes.
21   Q.   The first line of it indicates employee understands
22        that employment with the city is "at will" and both
23        the city and employee may terminate employment
24        relationship at any time for any reason with or
25        without notice, and with or without cause.  Do you see
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

```
                                              Page 194
 1        that?
 2   A.   And the paragraph continues, yes.
 3   Q.   Okay.  Did you understand that your employment was at
 4        will?
 5   A.   Yes.
 6   Q.   Did you understand what that means?
 7   A.   Yes.
 8   Q.   All right. And at any time, were you a member of
 9        either of the Dearborn Heights police officer unions?
10   A.   No, I was not.
11   Q.   And with respect to Paul Vanderplow, did you ever see
12        his employment agreement?
13   A.   I do not recall if I did or not.
14   Q.   Do you know if he was also an at will employee?
15   A.   He was.
16   Q.   Okay.  And what about Kevin Swope, was he an at will
17        employee as well?
18   A.   Yes.
19   Q.   And were either one of them ever members of the
20        supervisors, police supervisors union?
21   A.   Not to my knowledge.
22   Q.   Okay.  With respect to this agreement, turning back to
23        page three, paragraph 3.2 refers to benefits.  Do you
24        see that?
25   A.   Yes.
```

Page 195

1    Q.   There is a reference toward the end of this paragraph

2         that says a summary of the benefits currently

3         available to director level employees is set forth in

4         the document fringe benefit summary which is attached

5         at Exhibit 1 to this agreement.  Do you see that?

6    A.   No. Where is it in the paragraph?

7    Q.   I'm sorry. It's towards the end in the middle there's

8         the word city, and then period of summary. Do you see

9         what I'm referring to?  Well, right in the middle.

10   A.   Yes.

11   Q.   Okay.  All right. This exhibit does not contain that

12        fringe benefit summary; is that correct?

13   A.   I do not see it.

14              MR. BROWN:  The document speaks for itself,

15        best evidence.

16   BY MR. MIOTKE:

17   Q.   So you don't see it. Do you recall what kind of

18        benefits it referred to in Exhibit Number 1?

19   A.   I do not.

20   Q.   Do you recall if there truly was an Exhibit 1 attached

21        to this?

22   A.   I do not recall. It was a while ago.

23   Q.   All right. Could you turn to Exhibit Number 2, please.

24        Do you have Exhibit Number 2 in front of you?

25   A.   I do.

Page 196

```
 1    Q.    Do you see on page one of this document that it refers
 2          to the term commencing on July 1, 2023?
 3    A.    I do.
 4    Q.    Okay.  Turning to the last page, page five, do you see
 5          your signature on this document?
 6    A.    I do.
 7    Q.    Do you see the mayor's signature on this document?
 8    A.    I do.
 9    Q.    Do you see the date for each of your signatures being
10          12/12/23?
11    A.    Yes.
12    Q.    And is that the date that you signed this document?
13    A.    Yes.
14    Q.    Is this the date that you believe the mayor signed
15          this document?
16    A.    That is my belief.
17    Q.    Did you sign this document together at the same time,
18          or was this done separately?
19    A.    I do not recall.
20    Q.    The commencement date of this agreement is
21          approximately five, five and a half months prior to
22          the date that it was executed. Do you see that?
23    A.    I do.
24    Q.    How did that occur?
25    A.    I don't know. You'd have to ask the mayor.
```

Page 197

1    Q.    Okay. In other words, when I ask how that occurred,

2          what was the genesis for you doing almost a

3          retroactive agreement as best as I can figured out?

4                    MR. BROWN: Objection to form.

5    BY MR. MIOTKE:

6    Q.    Go ahead and answer the question the best you can.

7    A.    Well, it's very common for police officers to get

8          retro pay. And I waited until the very last minute,

9          and all my contracts were updated and passed through

10         council to even attempt, even though I had the ability

11         to ask for raises. And whatever they chose to do, and

12         drew this up, I wasn't going to say no to it.

13   Q.    When you say they, who are you referring to?

14   A.    Margaret Hazlett and Mayor Bazzi.

15   Q.    And you said something about the mayor or about the

16         city council. Do you have any recollection of this

17         particular agreement ever being presented to the City

18         of Dearborn Heights for approval or consideration?

19   A.    So I never said anything about city council. Those are

20         your words, not mine. I don't know the process the

21         mayor went through. That's not my job.

22   Q.    Okay.  Turning again you see that on the third page,

23         once again, under 4.1 it indicates that you're an at

24         will employee; is that correct?

25   A.    Yes.

Page 198

1   Q.   All right. And basically your understanding of what

2        that meant did not change from the time that you

3        entered into the first employment agreement and the

4        second employment agreement; is that correct?

5   A.   What was the question?

6   Q.   Your understanding of what it meant that you were an

7        at will employee did not change from one agreement to

8        the next?

9   A.   No.

10  Q.   Okay.  Now, with respect to the benefits, there's no

11       reference to an Exhibit 1 in this Exhibit Number 2

12       under paragraph 3.2 benefits. Do you see that?  Take a

13       moment to review it. I understand.

14  A.   I do not see any reference to the attachment.

15  Q.   Do you remember any attachment being attached to this

16       Exhibit Number 2?

17  A.   No.

18  Q.   Now, with respect to compensation and termination,

19       there is a reference at page four to you being paid

20       some sort of sum equal to employee's annual base

21       salary together with payment for unused vacation time

22       and accumulated vacation time, etc.  It's the first

23       full paragraph on page four of this agreement, namely,

24       Exhibit Number 2. Do you see that?

25                  MR. BROWN:  Could you rephrase what you're

```
                                            Page 199

 1          referring to, Gary?

 2    BY MR. MIOTKE:

 3    Q.   I'm sorry. And if at any time you're kind of getting

 4         lost, because I'm trying to move quickly here, Mr.

 5         Hart, please let me know, and I'll go from there. But

 6         on page four do you see this paragraph?  I'm just

 7         going to point to it to kind of move things along.

 8    A.   Sure, yes.

 9    Q.   It says in the event the city chooses. Do you see that

10         paragraph?

11    A.   Yes.

12    Q.   Okay.  You previously testified that you got part of

13         your severance. Do you recall that?

14    A.   That is correct.

15    Q.   Do you believe that you're owed any more severance?

16    A.   I do.

17    Q.   How much severance do you believe you're entitled to?

18    A.   If you continue to read that paragraph that you just

19         talked about, in addition, the city shall pay benefits

20         as set forth in the policies of the City of Dearborn

21         Heights.  City shall, in addition, the city shall pay

22         the Consolidated Omnibus Budget Reconciliation Act,

23         COBRA, premiums for the medical, dental, vision

24         insurance for up to one year, unless the employee

25         otherwise secures medical insurance benefits from
```

Page 200

1        another source. I did not get COBRA.

2  Q.  I see. So did you have to pay for your own medical

3        insurance.  Or have you gone without medical

4        insurance?

5  A.  I had to pay for my own through severance.

6  Q.  Okay.  So it was deducted from your severance payment;

7        is that correct?

8  A.  Absolutely.

9  Q.  Okay.  So are you -- so your claim for with respect to

10       this paragraph is limited to what you believe the city

11       should have ended up covering in terms of COBRA

12       payments, or is it something different than that?

13  A.  With respect to that paragraph?

14  Q.  Yes.

15  A.  I believe that the issue there in that paragraph is

16       the COBRA.

17  Q.  Okay.

18  A.  For one year.

19  Q.  Do you know how much that was?

20  A.  I do not know.

21  Q.  Do you have an approximate, or $3,000 a month?

22  A.  I have no access to any pay records through the city.

23       I had to beg for my W-2 so I could file taxes last

24       year. I've asked them to honor the COBRA, and was told

25       it was not going to be honored.  That I would continue

Page 201

```
 1        to pay, and that was through Cameron. And I am
 2        supposed to get my unpaid leave time which you
 3        referenced in another paragraph.
 4   Q.   Okay. How much was the unpaid leave time, do you
 5        believe, approximately?
 6   A.   If you refer to the document that I believe -- how do
 7        you want me to refer to you, Ms. Hunt, Mrs. Hunt, or
 8        Monica?
 9              MS. HUNT:  Monica is fine.
10   A.   Monica produced in my constructive termination letter,
11        I believe the number is 416 hours of leave time.
12   BY MR. MIOTKE:
13   Q.   Okay. So you believe then, let me make sure I've got
14        this right, that you should be paid 416 hours of
15        additional leave time, plus you need to be reimbursed
16        for the COBRA that you did not end up, or that you are
17        forced to end up paying in your understanding of this
18        agreement; is that correct?
19   A.   That is correct.
20   Q.   Okay.  Is there anything else that you believe that
21        you are supposed to have received under this
22        particular employment contract, namely, Exhibit Number
23        2?
24   A.   Not that I could think of at this time.
25   Q.   Okay. You said something about penis pictures earlier?
```

Page 202

```
1    A.    Yes.

2    Q.    And you had also said that before you even started you

3          had learned from the mayor that there was some issue

4          with regard to this?

5    A.    That is correct.

6    Q.    Okay.  And this involves sergeant, former Sergeant

7          Jordan Dottor purportedly sending pictures of his

8          penis to other officers. Is that what your

9          understanding is?

10   A.    That's what the rumors were, yes.

11   Q.    Okay.  What did you do to investigate that?

12   A.    No one would come forward. I've had a conversation

13         with Sergeant Zrien. He said he has pictures on his

14         phone from Dottor.  And I said I need them to start an

15         investigation. And all these things that happened

16         allegedly happened before I arrived.  And Officer

17         Kokoiy said he's seen the pictures, and has them, and

18         he would not turn them over to me.

19                There is an officer who is now at the

20         University of Michigan department of public safety who

21         I was almost able to hire back, Arab American, and he

22         told me as I was trying to recruit him at a coffee

23         shop at State Street and Michigan Avenue that one of

24         his concerns was Dottor, and Dottor was sending him

25         penis pictures.  And by that time Dottor had been
```

Page 203

1    gone, and this employee, or this prospective employee

2    would not produce the pictures as well.

3  Q.  Okay.  So wait a second here. Dottor did not leave the

4    department until after the new collective bargaining

5    agreement had ended up being approved in 2024; is that

6    correct?  I'm sorry, in 2023. He was the president of

7    the supervisor's union.

8  A.  So what's your question?

9  Q.  So my question was was he the president of the

10    supervisor's union?

11  A.  To my knowledge, he was.

12  Q.  And he was the president of the supervisor's union up

13    until at least 2023 when he ended up leaving to go to

14    Ann Arbor; is that correct?

15  A.  I would have to look at the dates.

16  Q.  All right. So I'm just trying to ask you then in 2022

17    you were hired, right?

18  A.  Yes.

19  Q.  So prior to, you know -- after being hired until

20    Sergeant Dottor's gone, what did you do to try to

21    investigate these very significant allegations against

22    Sergeant Dottor?

23  A.  We had started an investigation based on Faten Shokr

24    came up to Director Swope, and told him that she heard

25    a rumor that Dottor and Max Bearden were having an

Page 204

```
 1            affair, and Kevin was telling me this at a briefing.
 2            And I said, Does it have anything to do with work?
 3            Because this was -- there was massive issues all the
 4            time. And he said, Yes. They have information she's
 5            getting is that they're having sex in the traffic
 6            office. So I told Kevin at that point it involves
 7            work, not personal life, and that he is to investigate
 8            it, and he did.
 9    Q.    Okay.  So he did that in 2023, right?
10    A.    Correct. Before Dottor left.
11    Q.    So I'm trying to figure out what you did in 2022?
12    A.    What was there to do?
13    Q.    I mean, did you end up talking to Margaret?
14    A.    Oh, Margaret was there, the HR.
15    Q.    Margaret was aware of this?
16    A.    Absolutely.
17    Q.    Okay.
18    A.    Yeah.
19    Q.    And did you raise this issue with Mr. Mikula?
20    A.    I don't believe I did.
21    Q.    All right. And you didn't raise it with any other
22            attorney employed by the city, did you?
23    A.    I do not recall.
24    Q.    So turning away from that particular issue, though, or
25            just a little follow up on that, you're saying that
```

Page 205

1           you were so focused on corruption, and stuff like
2           that, wouldn't you put this right up at the level of
3           just being really outrageous?
4                       MR. BROWN: Objection to form.
5           Argumentative. Leading.
6      A.   Where's my evidence?  The people that are coming to me
7           and saying they're getting these pictures, and that
8           Dottor's trying to do threesomes with them off-duty,
9           I've heard rumors every day, Gary.
10   BY MR. MIOTKE:
11     Q.   But Officer Bearden was an officer, right?
12     A.   Yes.
13     Q.   All right. Sergeant Dottor was a sergeant, right?
14     A.   I didn't know anything about Bearden until 2023 when
15          Faten Shokr came up, and that's documented in an
16          investigation.
17     Q.   Okay.  Officer Shokr was an officer as well, right?
18     A.   Yes.
19     Q.   Now, officer Kokoiy, can you spell that for the
20          record?
21     A.   I believe it is K-O-K-O-Y.
22     Q.   Thank you.  We'll let that go, because for now that's
23          an issue that's also addressed in some other
24          litigation.
25                      Let me ask you this though, still to follow

Page 206

```
 1        up on that. Paul Erickson, you referred to him as kind
 2        of the go-to guy for you when it came to
 3        investigations; is that correct?
 4   A.   Yes.
 5   Q.   All right. And that would be Captain Erickson, right?
 6   A.   That is correct.
 7   Q.   Okay.  Captain Erickson after Vanderplow and Swope
 8        ended up being hired, kind of suddenly out of nowhere
 9        ended up leaving the department; is that correct?
10   A.   Pattern and practice. As soon as I start uncovering
11        things, people leave. Yes, he did.
12   Q.   What was it that Paul Erickson purportedly did?
13   A.   He was a very ineffective complete abysmal leader
14        within the police department, a product of your Act 78
15        within the community. He was there long enough, so he
16        made captain, and he had zero people skills. In the
17        survey, you will hear a couple of themes that director
18        Thomas did, and Paul Erickson is very much in the
19        middle of being weaponized by certain members of the
20        police department, and Hassan Saab. And as soon as we
21        started investigating and getting his work product,
22        and he was not forthcoming with everything he had,
23        that's when he decided to leave.
24   Q.   Okay.  Well, all right. We'll leave that for the
25        moment. In terms of officers leaving, I mean, you
```

Page 207

1          referred to this pattern. It's my recollection that

2          Sue Kaminski said something along the lines of when

3          you started, after Chief Meyers left, there were 72

4          officers in the Dearborn Heights Police Department. Do

5          you recall any such statements being made by

6          Ms. Kaminski?

7                    MR. BROWN: Objection to form.

8     A.   Bigger question is how would she know?

9  BY MR. MIOTKE:

10    Q.   Well, do you recall her making those statements?

11    A.   In my log, it tells exactly how many people were

12         there, and how many people I was down on day one.

13    Q.   How many people do you recall having, approximately,

14         when you started?

15    A.   I'll have to refer to the record that you have on your

16         server in my log.

17    Q.   I don't have anything.

18    A.   That's a shame. Wow. I don't know who's been asleep at

19         the wheel.

20                   MR. BROWN: All right.

21  BY MR. MIOTKE:

22    Q.   So when it comes to your recollection, how many

23         officers, and supervisors, police officers, police

24         supervisors, MCOLES certified individuals do you

25         recall leaving during the time that you were the

Page 208

```
 1        chief?

 2   A.   I do not recall, but it is outlined in a memo to city

 3        council believed to be in a monthly report because

 4        Ross Jones was calling, and it was the subject of a

 5        FOIA. And there were no more officers that left at the

 6        time of that memo than had left like two years

 7        earlier.  So, again, when we talk about this constant

 8        misinformation and lies, I was able to refute that

 9        with data.

10   Q.   But you also lost officers who were a bit older and

11        more experienced, right, right?

12                  MR. BROWN:  Could you say it again?

13   BY MR. MIOTKE:

14   Q.   You referred to Barlow is one of the sergeants that

15        ended up leaving?

16   A.   He wasn't a sergeant.

17   Q.   Joe Barlow was not a sergeant when he left?

18   A.   No.

19   Q.   Okay.  What about Josh Wolfe?

20   A.   Josh Wolfe, he was not a sergeant.

21   Q.   Okay.  What about Jordan Dottor?

22   A.   So the trifecta in the traffic bureau, right, so we

23        have this alleged sexual activity going on, and that's

24        why that traffic bureau was disbanded.

25   Q.   Okay.
```

Page 209

```
 1    A.    36 or so cameras were added to the police department
 2          in areas where we suspected activity was going on,
 3          multiple proximity cards, and call back of keys in the
 4          key control process were put in place.
 5    Q.    Okay.
 6    A.    So you're talking about the very people who were
 7          sitting next to the guy involved in that whole penis
 8          picture, and alleged misconduct, sexual misconduct
 9          with an officer.
10    Q.    See here's the thing. As a resident, I know that the
11          traffic bureau got disbanded during the time that you
12          were the chief; is that correct?
13    A.    That is correct.
14    Q.    All right. I know that the special ops bureau or
15          division was eliminated during the time that you were
16          the chief; is that correct?
17    A.    That was actually done before I got there, and people
18          were given their orders to go back to patrol, and they
19          weren't following those orders, and I executed the
20          previous order.
21    Q.    Okay.  Was the SWAT team also disbanded during the
22          time of your tenure?
23    A.    Describe disbanded.
24    Q.    Well, did it cease to exist?
25    A.    It did.
```

Page 210

1    Q.   Okay.  And moving onto --

2    A.   Through resignations.

3    Q.   Another issue then would be --

4    A.   All but the Arab.

5              MR. BROWN:  That's enough.

6    BY MR. MIOTKE:

7    Q.   All right.  If your lawyer wants to ask questions

8         about that, then he can.

9              What about the detective bureau?  I mean,

10        my understanding is is that the detective bureau

11        basically went down to Sergeant Derwick and Lieutenant

12        Guzowski during the time that you were the chief; is

13        that fair?

14   A.   I do not recall specifically who was there. There were

15        a lot of people who were in the DROP program that

16        decided to leave. My priority was on the most visible

17        aspect of patrol as people did leave the organization,

18        and people were moved down to patrol. So I can't say

19        how many people it was down to in the detective

20        bureau.

21   Q.   So, for example, and clarify this if you need to,

22        Sergeant Mahood would end up having to leave the

23        detective bureau in order to basically cover patrol

24        activities?

25   A.   Sergeant Mahood volunteered to go back to the road, as

```
                                                     Page 211
 1          did Sergeant Campbell, per discussion I had with
 2          Director Swope is that they both volunteered to go
 3          back to the road.
 4     Q.   And that's what you heard from Kevin Swope; is that
 5          correct?
 6     A.   That's correct.
 7     Q.   You didn't hear that directly from him, did you?
 8     A.   No, but I didn't get a grievance. They were bumped.
 9     Q.   It'd be management rights in order to end up doing
10          that; isn't it?
11     A.   Well, my very first grievance on day one was to fire
12          myself, Gary, so I don't know what management rights
13          that is.
14     Q.   Well, let's talk about that for just a moment. You
15          know that there was a lawsuit that was brought against
16          the city and against Mayor Bazzi in 2023 with respect
17          to your hiring and the hiring of both of the
18          directors, namely, Swope and Vanderplow; is that
19          correct?
20     A.   Correct.
21     Q.   All right.
22               MR. BROWN:  What lawsuit is that, Gary,
23          this one?
24               MR. MIOTKE:  No.
25               MR. BROWN: I'm sorry.
```

Page 212

1   BY MR. MIOTKE:

2   Q.   There was a lawsuit that was brought in the Wayne

3        County Circuit Court against Mayor Bazzi, and against

4        the city alleging that Act 78 was violated; is that

5        correct?

6   A.   Yes.

7   Q.   Okay. And you're also aware that when you were brought

8        in, Chief Meyers had been terminated by the mayor; is

9        that correct?

10  A.   That is correct.

11  Q.   You're also aware that Chief Meyers went to the Act 78

12       commission and protested his termination; is that

13       correct?

14  A.   Yes.

15  Q.   You're also aware that the Act 78 commission said that

16       he was supposed to be reinstated; is that correct?

17  A.   That's correct.

18  Q.   Okay.  So you now do assessments through Empco; is

19       that correct?

20  A.   That's correct.

21  Q.   But you've been in law enforcement for many, many

22       years, right?

23  A.   Correct.

24  Q.   All right.  So you're aware that there are Act 78

25       communities, including Dearborn Heights, that have Act

Page 213

1           78 police and fire civil service; is that correct?

2      A.   That's correct.

3      Q.   And that in order to basically be both appointed and

4           to be promoted, you need to end up following an Act

5           78.  Namely, the employer's supposed to follow Act 78?

6      A.   That's not a true statement.

7      Q.   You're saying that's not a true statement because

8           there are collective bargaining agreements that can

9           end up superseding Act 78?

10     A.   Well, don't put words into my mouth.  I hired an

11          attorney to review the city charter and Act 78.

12     Q.   Who did you hire?

13     A.   Stacy.  I cannot remember her last name from McGraw

14          Morris.  Before I left the job that I had, to go to a

15          complete unknown complete mess, I wanted to know if it

16          was legal.  And her opinion was that, yes, after

17          review of the city charter that that was legal. Why

18          would I go there if it wasn't legal?

19     Q.   Do you understand that there was a grievance that

20          ended up basically being filed by the police

21          supervisor's union fairly recently having to do with

22          the promotion of Hussein Farhat to director, and then

23          trying to make him deputy chief.  Are you aware of

24          that?

25                    MR. BROWN: Objection to form. Your

Page 214

```
 1        questions are leading in the extreme, counsel, to the
 2        point that you're testifying.
 3                   MR. MIOTKE:  He's an adverse witness.  I
 4        can basically ask him leading questions.
 5   A.   Nice guy.  I'm not adverse.
 6   BY MR. MIOTKE:
 7   Q.   Anyways, with that being said, if you need to get
 8        something --
 9   A.   Thank you for permission to stand up.  Come on, Gary.
10        Get to your questions.
11   Q.   I want you to not be distracted is the point.
12   A.   I can pour a cup of coffee and drive a car.
13                   MR. BROWN:  Come on, bubs.
14                   MR. MIOTKE:  All right.
15                   MR. BROWN:  Calm down. We're almost done.
16   BY MR. MIOTKE:
17   Q.   So in terms of the -- in terms of a grievance having
18        been brought with regard to Farhat, were you aware of
19        that having been done recently?
20   A.   No.
21   Q.   Okay.  Then did you ever hear from anyone that the
22        police supervisors union ended up prevailing in any
23        sort of grievance having to do with Act 78, and the
24        city having to comply with it recently?
25   A.   I do not know anything about that.
```

Page 215

```
 1    Q.   Okay.
 2                 MR. FARINHA:  That's not a factual
 3         statement.
 4    A.   You've got to control him. He's got to control me.
 5                 MS. HUNT:  I don't know that I can control
 6         anybody.
 7    BY MR. MIOTKE:
 8    Q.   With respect to Act 78, though, if you could please
 9         turn to Exhibit 3, page six. Paragraphs 29 and 30
10         indicate that to promote Sergeant Bazzy, Act 78 would
11         have to be followed pursuant to the collective
12         bargaining agreement; is that correct?
13                 MR. BROWN:  Objection.  Requires a legal
14         opinion from a layman.
15                 MR. MIOTKE:  It's in his complaint.
16    BY MR. MIOTKE:
17    Q.   Do you see the allegations in paragraphs 29 and 30?
18    A.   I read 29. Let me look at 30.
19    Q.   Okay. When you're done, let me know.
20    A.   Yes, that is correct.
21    Q.   Okay.  And so the statements that are made in your
22         complaint, or first amended complaint, at paragraphs
23         29 and 30 would indicate that it would appear to be a
24         misconduct in office, and a breach of the public trust
25         for Sergeant Bazzy to have been promoted in violation
```

Page 216

1          of Act 78; is that correct?

2     A.   That is correct.

3     Q.   Would that also apply to you?

4     A.   No.

5     Q.   Why not?

6     A.   Because I had an attorney Stacy Belisle, I remember

7          her last name, research it and tell me that within the

8          charter the mayor has the authority to appoint the

9          chief of police.  It was at odds with Act 78, I

10         understand that. And then there was a collective

11         bargaining agreement through PARA for my name, and my

12         two directors were included in there.

13    Q.   When you were originally hired, there was no such

14         collective bargaining agreement; is that correct?

15    A.   No.  Their contract was open. It was one of the

16         contracts I had to work on.

17    Q.   Did the prior contract end up indicating anything

18         about the mayor being able to have the choice to

19         appoint the police chief?

20              MR. BROWN: Objection.

21    A.   No. I do not know.

22              MR. BROWN:  Requires a legal opinion about

23         a contract that isn't applicable to him.

24    A.   I do not recall anyway.

25    BY MR. MIOTKE:

Page 217

1   Q.   Okay. In terms of chief -- or I'm sorry.  In terms of

2        the director positions, did you ever get any legal

3        opinion that indicated that the director positions

4        could be filled without following Act 78?

5   A.   That was not -- personally me, no.

6   Q.   Okay.

7   A.   Nope.

8   Q.   Do you have any understanding about whether the

9        director positions should have been filled by

10       following Act 78?

11            MR. BROWN: Objection to form. Requires a

12       legal opinion from a layman.

13  A.   No, I don't know.

14  BY MR. MIOTKE:

15  Q.   Okay. With respect to the director positions being

16       filled, you indicated that part of your

17       responsibilites were budgets; is that correct?

18  A.   That is correct.

19  Q.   You're familiar with the Dearborn Heights city budget,

20       and the fact that it has a personnel page; is that

21       correct?

22  A.   That is correct.

23  Q.   You're familiar with the Dearborn Heights city budget

24       year being from July 1 of the year in question, to

25       June the 30th of the next year; is that correct?

Page 218

1    A.    That is the budget cycle.

2    Q.    Do you recall the personnel page for the 2022 to 2023

3          budget having any headings for the director positions

4          in the police department?

5    A.    I do not recall. My discussions with Margaret Hazlett

6          and the mayor were that due to the many open positions

7          that there was more than enough money to hire the

8          directors, and that no budget amendment would be

9          needed.

10   Q.    That's what they told you?

11   A.    Yes.

12   Q.    All right. Did you ever verify that with anyone other

13         than them?

14   A.    No.  That was what my boss told me.

15   Q.    Okay.  Have you ever been a party to any lawsuit other

16         than this one?

17   A.    I sued in small claims a carpet company up in Walled

18         Lake once probably about 1993, '94.

19   Q.    Have you ever been -- okay. All right.

20   A.    Really not until I came here.

21   Q.    Okay.

22   A.    Yeah.

23   Q.    Have you ever been divorced?

24   A.    No.

25   Q.    So you've never given any testimony as a party to a

```
                                                    Page 219

1          lawsuit before this one?

2    A.    That's not true.  Yeah, I shared with Ms. Hunt that

3          I've been --

4    Q.    In the Reyna?

5    A.    -- deposed.  What's that?

6    Q.    In the Reyna case you were deposed?

7    A.    Yes, I was also deposed in an OI case that I had

8          nothing to do with.

9                MR. BROWN:  Can I briefly, while there is a

10         question not pending, I'd like the record to reflect

11         that the deponent, Mr. Hart, is rapidly being covered

12         in a rash that's covering his back, his legs, his

13         arms, and he's sitting here and doing his best.  He's

14         also swabbing himself generously with Cortizone-10.

15         And so I just need the record to reflect that he's

16         under a bit of medical stress and discomfort at this

17         point.  And we're going to continue the deposition as

18         best we can, but his physical state should be noted

19         for the record. And with that, back to you, Mr.

20         Miotke.

21   BY MR. MIOTKE:

22   Q.    Okay.  You're building a home in Milan; is that

23         correct?

24   A.    That is correct.

25   Q.    Okay.  What is the property address for that property
```

Page 220

1      that you're building on?

2   A.   14 -- it's on Wells Road north of Sherman. It's a

3      vacant lot.

4           MR. BROWN: I'm going to insist his address

5      be covered by a protective order, or redacted from the

6      transcript.

7           MR. MIOTKE:  I'm not going to object to

8      that happening, but I do want to know how large is

9      that lot.

10  A.   4.6 acres.

11  BY MR. MIOTKE:

12  Q.   Okay.  And there's plans -- the house is being built;

13      is that correct?

14  A.   Slowly.

15  Q.   Was there some sort of design for this house?  Namely,

16      like plans that would show itS layout, and how many

17      square feet it would be?

18  A.   I bought -- well, my wife bought house plans off the

19      internet.

20  Q.   So, approximately, how many square feet do you believe

21      the house is supposed to be?

22  A.   1,700.

23  Q.   Okay.  When was the bonus that you ended up receiving

24      from your current employer paid to you?

25  A.   After the first of the year.

Page 221

1    Q.   January 2025, correct?

2    A.   Yes.

3    Q.   Were you ever paid any amount besides your salary by

4         the City of Dearborn Heights?

5    A.   Yes.

6    Q.   Okay.  And what were those payments for?

7    A.   Well, there was one, and Dearborn Heights has an

8         agreement with Blue Cross-Blue Shield that you can't

9         have insurance for 90 days after your start date. And

10        I'm like I can't go without health insurance, my wife,

11        myself and my son. So they gave me a $5,000 bonus to

12        cover some of the expenses for me having to go on my

13        Novi retiree healthcare.

14   Q.   So the bonus that you received was authorized by the

15        mayor and/or Margaret?

16   A.   Yes.

17   Q.   Okay.  Do you recall whether or not that was in the

18        city budget in any fashion?

19   A.   I have no idea. I wasn't even employed by that time.

20   Q.   You understand based on your own experience being in

21        Novi, that your boss was going to be the police chief

22        for a while, that it made sense if you aspire to

23        advance through police ranks to potentially leave; is

24        that correct?

25                  MR. BROWN: Objection to form. It's totally

Page 222

```
 1        confusing.  Sorry.  Can you try again?
 2   BY MR. MIOTKE:
 3    Q.   Do you understand that there's an incentive to end up
 4         staying with a department where you can end up
 5         advancing through the ranks?
 6    A.   I don't know how to answer that.
 7    Q.   Okay.  Let's ask it a different way. Do you recognize
 8         that it would be beneficial to an employee to have the
 9         opportunity to rise through the ranks of a police
10         department through Act 78 or another competitive
11         process?
12    A.   Yes.
13    Q.   Okay.  And do you understand that your hiring and the
14         hiring of the directors would have ended up being a
15         problem for existing, employees because their
16         opportunities to rise through the ranks were hindered
17         or potentially just stopped in its tracks by virtue of
18         your hiring?
19    A.   Like Sergeant Dottor, right, who was sending the
20         pictures out, he would have an opportunity to be the
21         chief.
22    Q.   Or Joe Reyna?
23    A.   I can't remember what date he told me he was going to
24         be the chief.
25    Q.   Or Joy Reyna who passed the test, and ended up not
```

Page 223

```
 1          being promoted somehow?
 2     A.   Yeah, yeah.
 3     Q.   Yeah.
 4     A.   So what was the question?
 5     Q.   So the question is you understand that it would be
 6          problematic for existing employees that you and the
 7          directors were hired without following Act 78, or the
 8          collective bargaining agreement?
 9     A.   We had many discussions about that, the command staff.
10     Q.   Okay. So this was something that you understood that
11          the command staff was not happy with the development
12          of you and the directors being hired; is that correct?
13     A.   That is correct.
14     Q.   Okay.  And do you have any reason to believe that the
15          command staff and/or its union would end up speaking
16          to members of the city council to express their
17          dissatisfaction with this development?
18     A.   What was the question?  Do I understand that they did,
19          or do I have knowledge that they did?
20     Q.   Do you have knowledge that they did?
21     A.   No.
22     Q.   Do you have any reason to doubt that they would have?
23     A.   I don't know how to respond to that.
24     Q.   Do you have any evidence that they never did so?
25     A.   Just as much evidence as I have that they did. I have
```

```
                                                Page 224
 1        no idea, Gary.
 2   Q.   So if they were to come forward and say that they did
 3        indeed talk to city council members and say we
 4        expressed our dissatisfaction --
 5   A.   Did they say when?
 6   Q.   I'm just asking you if you have any --
 7   A.   Because the when is the important piece.
 8   Q.   Well, the important piece is just for me to get
 9        through the question.  So if we can just do that,
10        particularly because we're kind of on a tight clock,
11        it would probably be the best way to deal with this.
12        So let's go back to the question that I was asking, or
13        something close to it. Do you have any evidence that
14        shows that city council members did not speak to
15        members of the police supervisor's union who expressed
16        their dissatisfaction with you and the directors being
17        hired?
18             MR. BROWN: Objection to form. Compound.
19        Confusing, and I think even double negative.
20   BY MR. MIOTKE:
21   Q.   Can you answer the question?
22   A.   I do not know whether the union did or did not go to
23        city council.
24   Q.   Thank you.
25   A.   Expected play though.
```

```
                                                    Page 225
 1    Q.    I'm sorry.  Expected what?
 2    A.    Expected play.
 3    Q.    All right. Mazloum and Sergeant Bazzy spoke to you for
 4          45 minutes to an hour, from what you testified to
 5          earlier; is that correct?
 6    A.    That is correct.
 7    Q.    All right. And during that conversation, Sergeant
 8          Bazzy spoke about 90 percent of the time, and it
 9          sounds like complained quite a bit about how he
10          believed he was treated in the department; is that
11          correct?
12    A.    Yes.
13    Q.    All right. Did you feel that Sergeant Bazzy after
14          coming over to the police department was treated
15          unfairly, or did you form any opinion?
16    A.    At what point?
17    Q.    Well, did you form any opinion about Sergeant Bazzy's
18          complaint about unfair treatment at any point?
19    A.    I don't believe so.
20    Q.    Okay.
21    A.    That's really hard to respond to. I don't know.
22    Q.    Well, you know, your complaint basically ends up
23          referring to him, if I recall correctly, as not a
24          particularly exemplary officer?
25                    MR. BROWN:  Can you point us to a section,
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

```
                                                 Page 226
 1        sir?
 2   BY MR. MIOTKE:
 3     Q.   I'm just seeing if he remembers. By the way, did you
 4          review the complaint and the amended complaint before
 5          you came to your deposition today?
 6     A.   No.
 7     Q.   Paragraph 28 of the amended complaint, again, Exhibit
 8          3, refers to a police supervisor of Arab ethnicity who
 9          was under investigation. Do you see that?
10              MR. BROWN: You're in the wrong one.
11   BY MR. MIOTKE:
12     Q.   Sorry.
13     A.   I'm there now.
14     Q.   Is that a reference to Sergeant Bazzy?
15     A.   It is.
16     Q.   Okay.  With respect to this, is this investigation the
17          same investigation referred to before having to do
18          with Officer Bailey?
19     A.   Yes.
20     Q.   Was there any other investigation of Sergeant Bazzy?
21     A.   There were.  I don't know if they were formal or
22          informal.
23     Q.   Okay.  Do you recall, I mean, you know, Ms. Hunt ended
24          up asking you questions about Exhibits 4 and 5. Do you
25          recall that, these emails?
```

```
                                              Page 227
 1              MR. BROWN:  Is there a question?  I'm
 2         sorry.
 3    BY MR. MIOTKE:
 4     Q.   Does he recall the questions being asked about Exhibit
 5          4 and 5?
 6     A.   I recall being asked questions about them. I don't
 7          remember exactly word for word.
 8     Q.   All I'm doing is basically getting a foundation for
 9          it, and then quickly moving on, Mr. Hart, so just
10          recognize that I'm not asking you to answer anything
11          beyond what I've asked. Now, obviously it says
12          unexpectable. Presumably that is supposed to be
13          unacceptable/unprofessional?
14              MR. BROWN:  Where are you, sir?
15              MR. MIOTKE:  In the subject lines of
16          Exhibit 4 and 5.
17    BY MR. MIOTKE:
18     Q.   Do you see that?
19     A.   I do see it.
20     Q.   Okay.  And so there was the email originally from
21          councilman Wencel in Exhibit 4, and then there appears
22          to be Mr. Vanderplow talking about what was happening,
23          in his view, followed by a critical email from
24          councilman Baydoun, followed by a critical email from
25          councilman Ahmad, followed by just an email from
```

                                                    Page 228

1           council chair Abdallah in Exhibit 5; is that correct?

2                    MR. BROWN:  Exhibit 5 is what it is, sir.

3           We can't nearly follow your description, but we all

4           have the same pages. We agree with that.

5      BY MR. MIOTKE:

6       Q.   All right. So is it fair to say that councilman Ahmad,

7            councilman Baydoun, councilman Wencel were all not

8            happy with Paul Vanderplow's demeanor toward them?

9                    MR. BROWN:  Objection to form.

10     BY MR. MIOTKE:

11      Q.   Go ahead.

12      A.   It appears they were expressing their displeasure with

13           him, yes.

14      Q.   That's a better word. Thank you. That being said,

15           Sergeant Bazzy ended up asking for a hearing about the

16           discipline you sought to impose on him; is that

17           correct?

18      A.   That's correct, the only one.  The other two took

19           their medicine.

20      Q.   And he went to the Act 78 commission; is that correct?

21      A.   That is correct.

22      Q.   And the Act 78 commission met somewhere in December of

23           2023; is that correct?

24      A.   I believe I was just back from leave, and that sounds

25           like about the right timeline.

Page 229

1    Q.   Okay.  And the Act 78 commission found in Sergeant
2         Bazzy's favor; is that correct?
3    A.   I believe they did.
4    Q.   Okay.  Do you disagree with their decision?
5    A.   Yes.
6    Q.   Okay.
7    A.   The predetermined decision.
8    Q.   All right. What evidence do you have that it was
9         predetermined?
10   A.   Raed Mourad, who is also a very good friend of Mo
11        Baydoun, Hassan Ahmad, Hassan Saab, the mayor, and he
12        told Kevin, and Paul, and myself before the hearing
13        started, Hey, guys.  You just got to learn to get
14        along with them. We got to find a way to get along
15        with them before even one word of testimony was
16        shared.
17   Q.   Okay.
18   A.   That's a sham.
19   Q.   Did you talk to the other two commissioners?
20   A.   To the other two commissioners?
21   Q.   Yeah.
22   A.   No.
23   Q.   All right. And do you remember who the other two --
24   A.   I didn't engage the other one.  He just --
25   Q.   Well, do you recall who the other two commissioners

Page 230

```
 1        were?
 2   A.   Let's see. There's the father of a firefighter. I
 3        can't remember his name. And then the other one owns a
 4        print shop.
 5   Q.   Okay.
 6   A.   In town. So no one there with police experience.
 7   Q.   Okay.  But these are members of the community that
 8        basically ended up being chosen by different people,
 9        and they came up with a decision that was contrary to
10        yours, correct?
11   A.   That is correct.
12   Q.   Okay.  And the discipline that was imposed, as I
13        understand it, was the choice of Kevin Swope, but you
14        approved it before it was implemented; is that a fair
15        statement, or did you actually impose the discipline?
16   A.   You're going to have to restate that.
17   Q.   Okay.  Do you recall who made the decision to
18        discipline Sergeant Bazzy in this situation?
19   A.   That would have been Director Swope.
20   Q.   Okay.  And did you approve his decision?
21   A.   I concurred with it, yes.
22   Q.   Okay.  So do you recall Mohamad Baydoun, Mo Baydoun,
23        talking to you after this Act 78 meeting and hearing
24        took place?
25   A.   Yes.
```

Page 231

```
 1    Q.   Do you recall discussing with him Paul Vanderplow
 2         saying something to Mo Baydoun?
 3    A.   Saying something to Mo Baydoun, no.
 4    Q.   Do you recall him saying -- and when I say him, I'm
 5         talking about Mo Baydoun saying to you that Paul
 6         Vanderplow told him to fuck off?
 7    A.   No.  We were all in the same room together.
 8    Q.   All right.
 9    A.   You're talking after the Act 78 commission meeting?
10    Q.   Or at the Act 78.
11    A.   Or at, absolutely not. You can read about it in my
12         log. I documented it right after it happened.
13    Q.   When you say what happened, you're talking --
14    A.   With Mo.
15    Q.   What do you recall Mo saying?
16    A.   Mo said, You got to get this guy under control. He's
17         out of control. I'm like, You're trying to fire him
18         right before Christmas.  You guys have done nothing
19         but attack him. You're trying to defund them, and you
20         bring in his sham.  So who was at the hearing?  Hassan
21         Saab, Hassan Ahmad, Mo Baydoun, and who walked in
22         after we were told there's no video recording, and no
23         recording whatsoever during this hearing, but Mo's
24         either cousin, I've been told by the mayor, Moussa
25         Dakroub who runs TCD.  And he starts filming it, and
```

Page 232

```
 1           Paul said, Hey, to the commission, he's filming.  And
 2           then we had the great show of, you're so rude. You're
 3           so mean.  All's he did was point out to the commission
 4           that this guy was either livestreaming or videotaping
 5           us.
 6     Q.    Okay.
 7     A.    There was no allegations that Paul said the F word at
 8           that time, no.
 9     Q.    Okay.  All right. So that's your recollection of
10           events from that, correct, that there was no F word
11           drop by Paul at that meeting, or after that meeting?
12     A.    Absolutely not.
13     Q.    Okay.
14     A.    I believe there was a court reporter there, or it was
15           recorded.
16     Q.    All right. Do you recall that there was a vote of no
17           confidence directed at you?
18     A.    Oh, yes.
19     Q.    And that vote of no confidence took place in January
20           2024; is that correct?
21     A.    That sounds about the right timeframe.
22     Q.    And what was your understanding of why the city
23           council adopted this?
24     A.    Continued workplace terrorism, harassment of myself,
25           my directors, and they destroyed my career of it while
```

Page 233

```
 1          they were doing that. You guys got to start putting
 2          these puzzles together. Read that DOJ report. They
 3          take a vote of no confidence.  I'm the only guy that's
 4          running on neutral ground that insists that people of
 5          color and their colleagues are treated fair. And we
 6          follow the constitution, and they take a vote of no
 7          confidence on me. That's absolutely absurd. Absolutely
 8          absurd. You want to tell me that this is because Paul?
 9          Those are fabricated, fabricated outbursts, and
10          orchestrated.
11     Q.   Mr. Hart, you previously indicated and agreed that
12          there were comments that were made at city council
13          meetings by Sue Kaminski, Pam Swirple, Angela, Vince
14          Drapkowski, possibly others that were about you, your
15          department, your leadership team, and were negative;
16          is that correct?
17     A.   That is correct.
18     Q.   And the city council heard these comments; is that
19          correct?
20     A.   That is correct.
21     Q.   Okay.
22     A.   They're there for all of us to see.
23     Q.   Okay.  So what evidence do you have specifically to
24          show that Sue Kaminski in some fashion coordinated the
25          statements that she made with any member of the city
```

Page 234

1     council?

2     A.    There are requests for information that you have

3           failed to produce to my attorney that I'm aware of,

4           phone records.  Phone records of conversations,

5           incoming and outgoing calls and text messages.  It

6           will show it all. I know they were using a dark web at

7           some point.

8     Q.    Okay. But are you saying -- what I'm asking is --

9                 MR. FARINHA:  Let him finish his answer.

10    BY MR. MIOTKE:

11    Q.    I basically don't recognize you because you're an

12          employee representative?

13                MS. HUNT:  Excuse me.

14                MR. MIOTKE:  Party representative and --

15                MS. HUNT:  We are running out of time, so

16          if we could get back to your response just so that we

17          have a clean record.

18    BY MR. MIOTKE:

19    Q.    Yes. So you are aware that these statements were made,

20          again, by these different individuals in the community

21          that you previously testified about, and that the city

22          council heard them, right?

23    A.    That is correct.

24    Q.    Okay.

25    A.    Actually sent them, part of the continued workplace

Page 235

```
 1            terrorism that they engaged in.
 2      Q.    And then I asked what evidence that you had to show
 3            that these individuals who are members of the
 4            community ended up coordinating their statements, and
 5            you said that there were purportedly or expectedly
 6            communications that would be shown between these
 7            individuals and members of the city council that they
 8            had apparently spoken to each other by phone.  Is that
 9            what you're referring to?
10      A.    By phone, in person, through apps, absolutely.
11      Q.    Okay.  So what I am asking specifically is the content
12            of those communications, what do you have in terms of
13            any evidence to show that, for example, Sue Kaminski
14            ended up making these statements because she talked to
15            Mo Baydoun, and Mo Baydoun said, Hey, you got to say
16            these negative things about Chief Hart, for example?
17      A.    You were here the whole time during my deposition. You
18            heard me talk about Angela, right, and checking in
19            with Mo?  And Vince, both of them checking in with Mo
20            before that DDACTS community discussion. And if you
21            would produce the documents that we've asked for, then
22            we would be able to have an intelligent conversation
23            about this.
24      Q.    Well, but what I'm asking you is you are assuming that
25            those documents are consistent with your theory?
```

Page 236

1    A.    Prove me otherwise and produce them.

2    Q.    No. Basically tell me --

3    A.    No, why not?

4    Q.    Tell me what evidence you have that shows --

5    A.    My observation. My observations.

6    Q.    So you don't know any of the communications or

7          discussions between Sue Kaminski and any member of the

8          city council with respect to you and your directors

9          except what was stated during city council meetings;

10         is that correct?

11   A.    We've asked for them.

12                MR. BROWN:  We've asked for them in

13         discovery.

14   A.    You know they're there.

15   BY MR. MIOTKE:

16   Q.    What I'm asking you is do you have anything else?

17         Have you overheard conversations?  Do you have

18         documents?

19   A.    I was right there for the conversation with the check

20         in with Angela.

21   Q.    And what did Angela say?

22   A.    She said she was checking in with Mo, and gave him an

23         update. No, there's only about three or four people

24         here, however many other people there were, blah,

25         blah, blah, right?  Who has conversations like that?

Page 237

1    Q.    So Angela, you're saying Angela has no independent

2          beliefs with regard to how the department was being

3          operated?

4    A.    No, none. She's a citizen. How does she know anything

5          other than to be told what to parrot. And where are

6          those people right now?  Why aren't they blowing up

7          TCD?  Why aren't they blowing up Rachel LaPointe's

8          website?  I don't believe any police officer's been

9          hired in the last like eight months.  So where's the

10         outcry for how many cars were working last night.  The

11         officers are tired. There's a lot of overtime. Where

12         are those outcries?

13   Q.    Have you been watching every city council meeting?

14   A.    I haven't been watching the council meeting. I read

15         the comments, yeah.

16   Q.    So do you know for sure everything that's been said at

17         these city council meetings?

18   A.    Everything that's been said at a city council meeting,

19         absolutely not.  I don't watch that clown show.

20   Q.    All right. So do you have any evidence, and if you

21         have no evidence that's what I'm asking for.  Do you

22         have any evidence other than what you already

23         testified to to show that Vince Drapkowski, Sue

24         Kaminski, Pam Swirple, Rachel LaPointe, her husband,

25         any of these people were working in coordination with

Page 238

1        city council members to make negative statements about

2        you, the directors, or the police department?

3                    MR. BROWN:  All such communications have

4        been asked for in discovery.

5    A.   They're all there. They're all there.

6                    MR. BROWN:  We've asked for all

7        communications involving any naming of any of the

8        plaintiffs.  No texts, no emails.  None of that's been

9        provided.

10   BY MR. MIOTKE:

11   Q.   What I'm asking --

12   A.   You don't even know about the log. How can you not

13       know about the log, and you're in it.  That day you

14       held court in the detective bureau, and everybody shit

15       a brick when I walked in there?  You don't remember

16       that, do you?  It's documented in there. The united

17       front, people that hated each other, now all of a

18       sudden, no, I don't think Reyna's a racist.  I think

19       he's a good guy.  All this stuff is black and white.

20   Q.   You think everyone who basically thought negatively

21       about you --

22   A.   Not at all.

23   Q.   -- and your leadership were all in cahoots with the

24       council, and did not have any feeling that seen the

25       department lose its traffic bureau, its SWAT team --

Page 239

1   A.   Where the sex was going on, right?  So I couldn't get

2        up in front of a council meeting and say, Hey, we have

3        these allegations of stuff going on.  We're putting

4        in, I don't know, I think for some reason 36 extra

5        cameras in the building.  All the money that we had

6        spent to increase video surveillance of the police

7        department, and that doesn't bother anyone?  But I

8        can't get up there and share that information about

9        Dottor, and I'm not.

10               So thin skinned to say that every time

11       somebody brought something up negative about me that

12       they were sent by council. But there is a ring of

13       people who are absolutely used. Absolutely used by

14       council. And that didn't start until I told Mo

15       Baydoun, not happening with Mo Bazzy.  He's got to

16       earn it, and he's going to be given the same absolute

17       level playing field to earn it.

18   Q.   So Pam Swirple, who you've described as being racist

19       against Arabs, and who did not like Sergeant Bazzy,

20       was working together with everyone to try to get --

21       with everyone on this council that you named to try to

22       end up getting Sergeant Bazzy unfairly promoted.  Is

23       that what your point is?

24   A.   No. What my testimony was she hated Arabs. She didn't

25       like the way it was going.  She was pissed about Mark

Page 240

```
 1          Meyers being fired, and about me being brought in.
 2          And it wasn't until the time that Mo Baydoun started
 3          getting some power, and became the council chair, and
 4          I refused to give preferential treatment to his boy,
 5          in his words, did they lock arms.
 6    Q.    Okay.
 7    A.    If you can't see that in black and white, I guess
 8          that's an issue for you.
 9    Q.    I have a far different perspective.
10    A.    Well, you're supposed to.
11    Q.    Anyways, we'll move on from that particular point.
12          Okay. You indicated that there were three departments
13          within the department. Do you recall testifying to
14          that?
15    A.    I testified that that's what Joe Thomas, Dr. Joseph E.
16          Thomas, Jr. told me.
17    Q.    What was the description of those departments?
18    A.    The Arabs, and the people that didn't like the Arabs,
19          and the people that were in between.
20    Q.    Okay.  You referred previously to some document being
21          given to Johnson Rosati. Could that have been given to
22          a firm called Rosati Schultz?
23    A.    Yeah.  I think I know them as Johnson Rosati from my
24          Novi days.
25    Q.    I see.  You indicated that there were some issues with
```

Page 241

1           respect to Paul Graff. Do you recall that?

2      A.   The complaint that Officer Hammoud made against us?

3      Q.   Yes.

4      A.   Okay.

5      Q.   Do you know what happened with those charges?

6      A.   With the criminal charges?

7      Q.   Yes.

8      A.   They were kicked at the district court after Officer

9           Hammoud had testified.

10     Q.   And then the circuit court affirmed that dismissal?

11     A.   I don't know.

12     Q.   Do you know what the Court of Appeals and the circuit

13          court did with those charges?

14     A.   No, no.

15     Q.   Do you know what happened with arbitration?

16     A.   No. Well, actually --

17     Q.   You testified, right?

18     A.   Actually I heard that the arbitrator gave him his job

19          back.

20     Q.   And did a 30 day suspension.  Does that sound about

21          right?

22     A.   I don't know about the 30 day suspension.

23     Q.   Wasn't that what --

24     A.   I know he got his job back.

25     Q.   Didn't Captain Corey Smith recommend a 30 day

Page 242

1    suspension?

2    A.   No. Not that my recollection was. It was a couple day

3         suspension.

4    Q.   Okay.

5    A.   Which pulling a knife on somebody, and a suspension is

6         wild. He either did or didn't do it.

7    Q.   Is it part of your responsibilities to make sure that

8         the department is run legally?

9    A.   Yes.

10   Q.   When you made your reports to these various agencies,

11        did you consider it to be part of your duties to make

12        those reports to those agencies as the senior law

13        enforcement official in Dearborn Heights?

14   A.   Which issues are you speaking of?

15   Q.   Well, let's, I guess, walk through them here, all

16        right?  You ended up indicating that there was a

17        report regarding the chain of custody for evidence and

18        evidence management system within Dearborn Heights?

19   A.   Reported to the Wayne County prosecutor and her number

20        two?

21   Q.   Yes. Did you feel that that was something that you

22        were supposed to do as part of your job duties?

23   A.   Absolutely. They're the prosecuting authority.

24   Q.   With respect to the nearly 900 pistol sales records

25        that were not processed, you reported that to MSP; is

Page 243

```
 1        that correct?
 2   A.   That is correct.
 3   Q.   All right. Did you feel that that was part of your
 4        duties to report that as well to MSP?
 5   A.   I believe there was an MCL number attached to that,
 6        and it was criminal activity, and yes.
 7   Q.   Okay.  In terms of the police overtime that you say
 8        was subject to an illegal ticket quota system, you
 9        reported that to whom?
10   A.   To Michigan State Police.
11   Q.   Did you believe --
12   A.   And that was actually Director Swope, if I remember
13        correctly.
14   Q.   Do you believe that that was something that you and
15        Director Swope needed to make sure was reported to MSP
16        per your duties?
17   A.   Absolutely.
18   Q.   It also says here reported widespread corruption
19        involving mismanagement of federal and state
20        forfeiture funds.  Do you see that?
21   A.   Yes.
22   Q.   Okay.  And who was that reported to, again?
23   A.   That was Director Vanderplow was to report that to the
24        FBI.
25   Q.   And do you believe that that was part of his and your
```

Page 244

1     duties to make sure that that was reported to the FBI?

2  A.  Yes.

3  Q.  You know, as I understood it, there was like two

4     people who you were aware of that ended up getting

5     some sort of breaks on their tickets. And as I

6     understand it, these breaks that were given were given

7     because officers went and voided tickets somehow; is

8     that correct?

9  A.  This was Director Swope's investigation.  Probably

10    better questions for him.  But it was my understanding

11    that officers would leave a note on the traffic door

12    and tell the sergeants to dismiss tickets, or they

13    would go in after they wrote a ticket and dismiss it.

14 Q.  So did they dismiss the tickets, or did they void out

15    the tickets and not send them over to court?

16 A.  Well, here's the problem. The electronic system, I

17    believe, automatically sends it over. So they void it

18    in their car, right?  Could be voided in the car, or

19    they give direction to Sergeant Dottor to dismiss the

20    tickets.

21 Q.  Okay.  All right. Again, as you refer to it in the

22    amended complaint ticket fixing scheme, that was

23    something that was reported again to MSP, right?

24 A.  That is correct.

25 Q.  Okay.  And, again, that was part of your duties and

Page 245

1          the duties of one or more of your directors?

2    A.   Director Swope, correct.

3    Q.   There's a reference to other Civil Rights violations.

4         Do you recall giving testimony upon questioning by Ms.

5         Hunt about those other Civil Rights violations?

6    A.   I do not specifically recall that.

7    Q.   All right. Because see I'm a little unclear on that.

8         I'm not sure if you're saying that you made Civil

9         Rights complaints, or if you were responding to Civil

10        Rights complaints that were made by employees like

11        Officer Shokr and the rest of them.  And it sounded

12        like you were not reporting violations or suspected

13        violations of the law, but were instead responding to

14        allegations against the city?

15   A.   That's not true. It was both of those things.

16   Q.   Okay.  So when it came to speaking to officer -- or

17        let me see here.  There was a list of them that Ms.

18        Hunt went through with you, and I want to make sure.

19        It looked like there was Mazloum, Sergeant Bazzy,

20        Officer Shokr, Officer Hammoud, those were -- were

21        those situations where you reported something, or were

22        those situations where you were like drafting position

23        statement, and submitting it to like the EEOC or

24        Michigan Department of Civil Rights?

25   A.   So those were received MDCR violations, alleged

Page 246

```
 1        violations.
 2   Q.   Okay.  All right. Were there other Civil Rights
 3        violations that you reported, or that one of the
 4        directors reported that you're aware of that you
 5        reported to someone?
 6   A.   To me, the FBI, Department of Justice.  I think it's a
 7        violation of someone's rights to smash their face in
 8        the ground.
 9   Q.   Okay.
10   A.   I think that using certain terminology in the
11        PowerPoint to target certain people coming off the
12        expressway, and that was my -- that was my observation
13        on that.
14   Q.   Okay.  And those things were reported by you to the
15        FBI and the Department of Justice?
16   A.   To as many people that would listen to me.
17   Q.   Okay.  Now, in terms of what you've testified to, it
18        sounds like what you reported you reported to the
19        mayor, to these outside agencies, and in terms of
20        council members Dave Abdallah and Ray Muscat that's
21        what I gather from your testimony. Did I understand
22        that correctly?
23   A.   Yes.  That was my testimony.
24   Q.   By the way, you know, turning to some of the stuff, do
25        you have any reason to believe that city council
```

Page 247

1          members would have wanted Corporal Pellerito to fail

2          to process nearly 900 pistol sale records?

3    A.   When you say referring to this, what are you referring

4          to?

5    Q.   Specifically Exhibit 3, page five, paragraph 23.

6    A.   I don't know. Is that an amended one?  Let me use the

7          restroom real quick. There's a question on the table.

8          The rule we agreed to was not to -- I need to follow

9          the rules. Which paragraph?  I'm sorry.

10   Q.   Number 23.

11   A.   That was something that council was aware of. Is that

12         what your question is?

13                   MR. BROWN:  Repeat the question, Gary.

14   BY MR. MIOTKE:

15   Q.   I'm asking why you would believe that city council

16         would want this failure to take place, or were you

17         under the impression that city council would not want

18         this failure to take place?

19   A.   I have no position on whether the city did or didn't,

20         city council would.

21   Q.   And this was something that was -- that you notified

22         Councilman Abdallah, and Councilman Muscat, or Council

23         Chair Abdallah, and Council Chair Pro Tem Muscat?

24   A.   I don't know if they were there at that point. I don't

25         know the timeline on that.

```
                                                        Page 248
 1                    MR. MIOTKE:  Okay. Well, you answered my
 2            question. You need to take a break, so why don't you
 3            take a break.
 4                          (Break at 4:45 p.m.)
 5                          (Back on the record at 4:48 p.m.)
 6     BY MR. MIOTKE:
 7      Q.   Okay. Mr. Hart, if you could, paragraph 22, if you
 8            could just read that to yourself, please, and then let
 9            know when you're done. And this would be in your first
10            amendment complaint, Exhibit 3, please.
11      A.   Okay.
12      Q.   You're good?  Do you have any reason to believe that
13            the city council would want the police department to
14            have a deficient chain of custody or evidence
15            management system?
16      A.   I have no information as to that.
17      Q.   Okay.  You said something earlier about the treasurer
18            not providing Mr. Vanderplow some sort of access to
19            forfeiture information. Do you recall testifying to
20            that?
21      A.   Yes.
22      Q.   And this would be treasurer Hick-Clayton; is that
23            correct?
24      A.   That is correct.
25      Q.   What was it that she was not providing as -- what was
```

Page 249

```
 1        your understanding of what she needed to provide?
 2   A.   Administrative rights to BS&A so Paul can review
 3        historical and current documents. Thank you for
 4        reminding me of that, because that was also reported
 5        to the state police, not that particular incident, but
 6        her credit card fraud.
 7   Q.   Okay.
 8   A.   Yeah, which city council wanted to hire an attorney
 9        for. It was really weird if we care so much about
10        public funds.
11   Q.   Okay.  So what was it -- could she -- could Mr.
12        Vanderplow have just accessed that information through
13        the comptroller's office?
14   A.   Not to my knowledge.
15   Q.   Okay.  Do you know if he could have accessed that
16        information through the mayor's office through Mariana
17        or the mayor directly?
18   A.   I think that would be a question for Director
19        Vanderplow.
20                 MR. BROWN:  Let the record reflect the
21        client's rash is now rapidly accelerating, and it's on
22        his face and his left eyelid which seems half swollen
23        shut. Doing our best here.
24   A.   Sorry.
25   BY MR. MIOTKE:
```

Page 250

1    Q.   You know, these different issues that you and your

2         fellow plaintiffs raised, other than Officer Bailey

3         being prosecuted, and Officer Graff being prosecuted,

4         was anyone else ever prosecuted with respect to any of

5         these allegations?

6    A.   Those are the two that I remember.

7    Q.   Okay.  Do you know who retired Lieutenant Jim Islek

8         is?

9    A.   No.

10   Q.   Do you remember him speaking at a city council meeting

11        about Paul Vanderplow, and Paul Vanderplow not being

12        MCOLES licensed?

13   A.   I recall hearing about that. When did that take place?

14   Q.   I don't recall. Probably 2023. Does that sound right?

15        Does that sound like when you would have heard about

16        it sometime?

17   A.   I can't remember if I was on medical at that point or

18        not.

19   Q.   Okay.  Was it your understanding that Paul Vanderplow

20        was not MCOLES licensed?

21   A.   Absolutely wasn't.

22   Q.   Okay.  Was Paul Vanderplow going around with a police

23        badge and a loaded firearm despite the fact that he

24        wasn't a sworn peace officer?

25   A.   Paul Vanderplow was a retired special agent in charge

Page 251

1           of the ATF. He's allowed just like I am to carry a

2           firearm based on his retirement from law enforcement.

3           He never had a badge from the Dearborn Heights Police

4           Department.

5     Q.    Well, did he have any sort -- well, did you ever see

6           the video that was posted that Hassan Aoun, also know

7           as Hass Cash, ended up posting Paul Vanderplow

8           directing traffic at an accident at the intersection

9           of John Daly and Ford Road?

10                    MR. BROWN: Objection to form. We don't know

11          what video you're talking about.  We have no

12          understanding that the depiction you've just given us

13          is accurate.

14    BY MR. MIOTKE:

15    Q.    Well, let the witness see if he remembers this.

16    A.    No.

17    Q.    Okay.  Do you recall Paul Vanderplow being involved in

18          high speed chases?

19    A.    Absolutely not.

20    Q.    Do you recall Paul Vanderplow --

21    A.    Previous mayor under you that you worked for there's

22          documentation.

23    Q.    I worked for the last four mayors.

24    A.    Paletko, he was in police pursuit.  In fact, the

25          police chief was ordered to give him a car with lights

Page 252

1          and sirens.

2     Q.   And that was changed, was it not?

3     A.   With me.  The mayor was not going to have that.

4     Q.   It changed before that.

5     A.   No, it wasn't. He had a car with lights and sirens in

6          it when I started, so I don't know what you recall,

7          but the mayor had it.

8     Q.   The mayor had a car with lights and sirens?

9     A.   Yes.

10    Q.   The Mayor Bazzi had a car with lights and sirens?

11    A.   Yes.

12    Q.   All right.

13    A.   Police radio.

14    Q.   All right.  Do you recall any members of the city

15         council ever telling you that the reason that the

16         resolution to defund the director's position was

17         specifically to retaliate against you and your fellow

18         plaintiffs for having made reports of violations or

19         suspected violations of law to any public body or law

20         enforcement agency?

21    A.   I never had any conversations with them about why they

22         did what they did.

23    Q.   Okay.  All right. Now, in your complaint and, again,

24         we'll talk about the first amendment complaint.

25         Exhibit 3, page seven, paragraph 36, if you could

                                                      Page 253

1          please read that to yourself.

2                    MR. BROWN:  It is 36. You're just looking

3          at the paragraphs. You're too deep into the exhibit.

4          Here you go.

5     BY MR. MIOTKE:

6     Q.   Please just read that to yourself.

7     A.   Which part of it?

8     Q.   Just paragraph 36.

9     A.   Okay.

10    Q.   Now, there's a reference to council member Hassan

11         Saab. Do you see that?

12    A.   I do.

13    Q.   Was Councilman Saab a member of the Dearborn Heights

14         City Council on on around September 27th, 2023?

15    A.   I do not believe so.

16    Q.   Okay.

17    A.   But he is now.

18    Q.   Okay.

19    A.   And he's the one that introduced the measure in

20         retaliation.

21    Q.   He introduced the measure in January of 2024.

22    A.   Right. Just a couple months after this.

23    Q.   All right. But he was not a member of the Dearborn

24         Heights City Council at the time until his term

25         actually started January 1st of 2024; is that correct?

Page 254

```
 1    A.    That's correct. I believe he was on the planning

 2          commission.

 3    Q.    Okay.

 4    A.    At that time, he was a representative of the city.

 5    Q.    Are you sure that he was on the planning commission,

 6          or Mayor Bazzi refused to appoint him?

 7    A.    I don't know.  I remember seeing an email from Mr.

 8          Wencel talking about how Hassan Saab is out of

 9          control.  Doesn't know how to control a meeting. And

10          he's very disruptive. And this would have been after

11          the chair of that -- I don't know if it's zoning

12          board, or what it was.  But, yeah, it should be in

13          your files, too, and Mr. Cooper should be able to find

14          that.

15    Q.    Okay.  So at the time my point is I'm just trying to

16          confirm that you don't have some information

17          Councilman Saab became Councilman Saab until January

18          of 2024?

19    A.    That's correct.

20                MR. BROWN:  Okay.  Most likely it's a typo,

21          counsel.  I think my colleague probably just wrote

22          Council Member Hassan Saab just as a label for the man

23          without any attention paid to when he actually became

24          a council member.

25                MR. MIOTKE:  Okay.
```

Page 255

```
 1    BY MR. MIOTKE:

 2    Q.   Khalil Rahal, when do you last remember having any

 3         dealings with Mr. Rahal?

 4    A.   It would have been at the Ford Performing Arts Center.

 5         I believe it is like their city hall.

 6    Q.   In Dearborn?

 7    A.   In Dearborn. And the mayor, and Paul, and Roger and I

 8         were going to a presentation by the Eastern Michigan

 9         District US attorney Dawn Ison and her team.  And the

10         next thing I know I was being pulled out to go talk to

11         Khalil.  And this was, again, after his statements

12         that he made in my conference room.

13    Q.   And when you say the statements that he made, are you

14         referring to what's referred to in paragraph 38 that

15         took place on October the 26th of 2023 as alleged in

16         the complaint?

17    A.   That is correct.

18    Q.   What do you recall from the conversation that you're

19         talking about at the Ford Performing Arts Center?

20    A.   The mayor wanted me to talk to Khalil, and he wanted

21         to know -- we were in the process of reorganizing the

22         police department. And the mayor shared with him some

23         of the positions that we were going to try to create.

24         And the topic was to have Khalil relay the message to

25         Hassan Saab and Mo Baydoun that these were positions
```

Page 256

1        that would be available to Sergeant Bazzy and Sergeant

2        Zrien if they chose to put their hat in the ring.

3   Q.   Okay. And that was just supposed to take place through

4        Act 78 like a normal process?

5   A.   No.  These were just assignments within the police

6        department.

7   Q.   Okay.  Assignments within the police department. So

8        these weren't promotions?

9   A.   Correct.  Funny, that's exactly what he said, too. It

10       wasn't good enough.

11  Q.   Well, I'm not saying it wasn't good enough.  I'm just

12       clarifying.

13  A.   That's what he said after he called Hassan Saab, and I

14       believe Mo Baydoun, and he told me that it would not

15       be good enough. It's not a high enough level position

16       for him. That's why those phone records are so

17       important that you guys keep holding onto.

18  Q.   So there's a reference in paragraph 36 of Councilman

19       Saab -- Council Member Saab would release skeletons.

20       Do you know what that's a reference to?

21  A.   Well, I was not at that council meeting. I don't

22       believe that was the one where he's on video, and that

23       is what prompted the criminal complaint that Director

24       Swope had filed about extortion.

25  Q.   And what happened to that criminal complaint?

Page 257

```
 1    A.    Oh, within seconds Hassan Saab was on Facebook talking
 2          about how he's being targeted by the police
 3          department. Who's working that day?  Sergeant Bazzy,
 4          and Officer Hammoud, and I believe Sergeant Zrien.
 5    Q.    So what happened to that criminal complaint?  Did it
 6          go anywhere?
 7    A.    I don't know.
 8    Q.    You don't know one way or the other?
 9    A.    I don't.
10    Q.    So Kevin Swope would presumably know.  Is that your
11          best guess?
12    A.    I would start there, yeah.
13    Q.    Okay. You understood that Kevin Swope came from the
14          City of Westland Police Department, that's correct?
15    A.    That's correct.
16    Q.    You understand that the City of Westland is an Act 78
17          community; is that correct?
18    A.    That is correct.
19    Q.    All right. Do you understand that the Dearborn Heights
20          Act 78 commission has certain rules and regulations?
21    A.    I'm sure they do.
22    Q.    Do you understand that one of those regulations is
23          that individuals who have been previously employed by
24          another police department who've either been
25          terminated or allowed to resign are not eligible to be
```

Page 258

```
 1         hired in Dearborn Heights?
 2    A.   Am I aware of that?
 3    Q.   Yes.
 4    A.   No.
 5    Q.   Okay.  Do you know who Robert Schurig is?
 6    A.   Yes.
 7    Q.   What's your understanding of his relationship with
 8         Kevin Swope?
 9    A.   That they worked together in Westland, and he got
10         himself into some trouble over there.  And he was at
11         another agency that he had already been cleared by
12         MCOLES to be licensed. That's what I know.
13    Q.   What was the nature of the problems that he had at
14         Westland as Kevin Swope related to you?
15    A.   I believe he was a sergeant, and he was having an
16         affair with one of his subordinates at work. He didn't
17         quite know, because he wasn't the -- like Dearborn
18         Heights where everybody knows everybody's business,
19         they actually did it right in Westland where that
20         complaint and that investigation was not publically
21         known.
22    Q.   Okay. But it didn't lead to at that time Sergeant
23         Schurig being let go, or forced to resign from the
24         City of Westland Police Department?
25    A.   I don't think that's true.  I believe that he took the
```

Page 259

```
 1          high road and resigned, if I remember correctly from
 2          his background investigation.
 3    Q.    Okay.  But he was engaged in some sort of sexual
 4          activities while on duty?
 5    A.    That's the allegation. I don't have any information
 6          that confirms that. That was the information that was
 7          given to me.
 8    Q.    All right. What about the individual who was hired as
 9          the FOIA coordinator from the City of Westland, what's
10          her name?
11    A.    Oh, that's the one that they defunded at the 11th hour
12          on Friday to continue their terrorist activities.
13          Erica, yeah, outstanding young lady.  Very
14          knowledgeable in FOIA.
15    Q.    What's your understanding of the relationship between
16          Kevin Swope and Erica?
17    A.    Oh, this is -- this will go to Saab trying to allege
18          that there was some type of a marital affair. The only
19          thing I knew is that they were colleagues.
20    Q.    Okay.  Do you recall her being hired after full
21          process was handled through the Civil Service
22          Commission in the City of Dearborn Heights?
23    A.    It's my understanding she went through the process.
24          She took a test.
25    Q.    Okay.
```

Page 260

```
1    A.    And went through the process.
2    Q.    Okay. Do you recall the police department being upset
3          that this position was changed from a uniform
4          supervisor position that Ruben Gonzalez was in to a
5          civilian position?
6                    MR. BROWN: Objection to form.
7    A.    Do I understand it?  Sure.
8    BY MR. MIOTKE:
9    Q.    Right.
10   A.    You can go up there and drink coffee all day and send
11         all the FOIA's off to attorneys to fill. Ruben has no
12         training in FOIA.
13   Q.    All right.
14   A.    And this wasn't a secret. I told everybody at the --
15         I'm sorry to chew, and I'm trying to talk.
16   Q.    That's fine.
17   A.    They knew that I was privatizing certain -- and by
18         that I mean I can't have -- you've already brought up
19         the fact that there were so many people leaving the
20         department, right?  How can I afford to have a sworn
21         police officer be a porter for our cars when we have
22         two vehicle maintenance bays downstairs.  So we hired
23         a mechanic. How can we have a detective who wasn't
24         doing his job in the property room doing it horribly,
25         and no formal training.
```

Page 261

1    Q.   So you acknowledge that there were so many people
2         leaving the department; is that correct?
3    A.   I've never denied that, but they left for great
4         reason.
5    Q.   Have you ever discussed with them personally why they
6         ended up leaving?
7    A.   The people that would sit through an exit interview,
8         absolutely, I have.
9    Q.   Who?
10   A.   It's documented in my timeline. I'm trying to think of
11        one kid. Tyler Butkin who was going to an agency where
12        I never had received any type of waiver, which is
13        required by law by that community to have a discussion
14        with the chief, and share that information. I believe
15        he went to Southgate.  Yeah, he talked about the
16        golden circle, and the preferential treatment.
17   Q.   Let me ask you a question here. With respect to
18        Sergeant Dottor, before he ended up going to Ann
19        Arbor, did you end up indicating to the Ann Arbor
20        Police Department that there was a problem?
21   A.   Very predictable.  And, of course, I did.  And I told
22        at least five people that I couldn't believe that Amy
23        Metzer was going to hire this guy. I told her there
24        were unsubstantiated allegations that they were having
25        sex in the police building.  I could care less about

Page 262

1          outside on their own time. Yes, eyes wide open.
2     Q.   Here's the thing though.  My understanding is when
3          there's something that is reported, you as a chief
4          have the ability to report it to MCOLES, and it will
5          cause the person's MCOLES certification to be
6          suspended, at least temporarily?
7     A.   That I have no knowledge of. My obligation with him
8          was when a department was coming to do background
9          investigation, that if they had a waiver I can speak
10         freely with the chief, and that's exactly what I did,
11         except she knew somebody in the detective bureau, and
12         saw them at a graduation party, and they were getting
13         a raw deal from the mayor.
14    Q.   And who was that who said that?
15    A.   I believe it was Ciochon, and that was the
16         conversation I had with Chief Metzer.
17    Q.   Do you remember an officer by the name of Lloyd, last
18         name Lloyd?
19    A.   Officer Lloyd, African-American?
20    Q.   Yes.
21    A.   Yes. Man, I love that kid.
22    Q.   All right. Do you recall his licensing being put on
23         hold because he was purportedly under an
24         investigation, even though he hadn't been?
25    A.   Officer Lloyd?

Page 263

1    Q.    Yes.

2    A.    I have no knowledge of that.  That was a great kid.  I

3          wish I could have kept him.  He was tired of the

4          silliness.

5    Q.    Other than the amounts that you believe were supposed

6          to be paid or reimbursed for your behalf having to do

7          with COBRA payments, were you ever not paid what you

8          believe should have been your normal salary by the

9          City of Dearborn Heights?

10   A.    At what point?

11   Q.    While you were employed there.

12   A.    While I was employed?  We have the COBRA payments. We

13         have my 416 hours of leave time that I've not been

14         paid on. And that's the only thing that I can think of

15         right now.

16   Q.    All right. Because you made a Fair Labor Standards Act

17         claim, which would tend to indicate that you believed

18         you weren't paid for hours that you were actually

19         working or allowed to work. Do you know why that's

20         included in your complaint and first amended

21         complaint?

22   A.    Where is it exactly in here so I can read it.

23   Q.    It would end up being count Roman Numeral III starting

24         at page 13.

25                    MR. BROWN: I'll object to the question as

Page 264

```
 1          requiring a legal opinion from a layman. You can

 2          answer if you can.

 3   BY MR. MIOTKE:

 4     Q.   If you can't answer, or you don't know, just say that.

 5     A.   I don't -- I have no idea how to answer that.

 6                    MR. FARINHA:  It says Swope.

 7                    MR. BROWN:  That's a good point.  It

 8          doesn't apply to the deponent.

 9                    MR. MIOTKE:  Okay.

10   BY MR. MIOTKE:

11     Q.   When you went from the employment contract that's

12          Exhibit Number 1, to the employment contract that is

13          Exhibit Number 2, there was a significant increase in

14          pay of some 20,000 plus dollars, correct?

15     A.   Correct.

16     Q.   Since the term of the second agreement started prior

17          to the time that the second agreement was signed, were

18          you paid retroactively to make up for the difference

19          in the pay?

20     A.   I believe I was.

21     Q.   Okay.  All right. Obviously you became aware prior to

22          the time that you left your employment with the City

23          of Dearborn Heights in July of 2024 that there was a

24          relationship that was not friendly between the mayor

25          and Dearborn Heights City Council; is that correct?
```

Page 265

```
 1   A.   That is correct.
 2   Q.   Okay.  And did you have knowledge of the fact that the
 3        city council and the mayor did not see things the same
 4        way with regard to a lot of things like you being
 5        legally employed, or not legally employed, the
 6        directors being legally employed, not being legally
 7        employed.  You recognize there were differences of
 8        opinion between the mayor and the city council on all
 9        these points?
10   A.   Right after I told Mo Baydoun, or Hassan Ahmad and
11        Nancy Bryer that I wasn't going to play favorites.
12        That's when it started, Gary.
13   Q.   Well, Nancy Bryer didn't end up voting for the
14        defunding motion, did she?
15   A.   I don't know.
16   Q.   Okay.  Let me ask you this question then. If you're
17        saying it had to do with the favorites, why would Tom
18        Wencel care about whether or not Sergeant Bazzy ended
19        up getting any sort of favorable treatment?
20   A.   This was exactly what you talked about. He hated the
21        mayor. They had a common enemy. That's why. And now
22        Tom's experiencing that with the D7 Dad's Club. He
23        shared what the MO is to attack relentless until that
24        person taps out.
25   Q.   Okay.  Well, basically, let me ask you this with
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 266

1      regard to these particular issues. Do you have any

2      reason to believe that Bob Constan wanted to end up

3      having Sergeant Bazzy get favorable treatment?

4   A.   I have no idea. We'd have to ask Bob.

5   Q.   Okay. Do you have any reason to believe that Denise

6      Malinowski-Maxwell would want Sergeant Bazzy to get

7      favorable treatment?

8   A.   Well, she hated the mayor. I mean, you'd have to ask

9      her. She voted without any discussion whatsoever at

10      that meeting to defund the directors. Her first

11      council meeting, wasn't there a minute.  That's why we

12      want those phone records. We're going to show those

13      conversations.  How could she intelligently the first

14      time you sit on a board sit down and vote to defund

15      those positions without having any knowledge or backup

16      on it?

17   Q.   Well, isn't it fair to say that, for example, city

18      council members in the resolution said that you guys

19      were all hired illegally, particularly the directors?

20   A.   Yeah, which is contrary to our names being in that

21      collective bargaining agreement under PARA.  Whether

22      we were or not, whether we were hired illegally or

23      not, okay. So that could be up for discussion. I can

24      kind of see that. But when did those problems start?

25      As soon as I said no, and as soon as Sergeant Bazzy

Page 267

```
 1          had some discipline from his own doing for not taking
 2          a guy getting his butt handed to him at the hands of a
 3          police officer, seriously in dismissing it, and even
 4          laughing on video.
 5     Q.   But you remember the mayor being subjected to a recall
 6          effort, correct?
 7     A.   Yes, there was. I don't remember what time.
 8     Q.   And part of the reason for that recall effort was
 9          because the people bringing the recall believed that
10          he violated Act 78 by hiring you and the directors.
11     A.   So which came first, the filing of the recall, or the
12          agreement in the COAM?
13     Q.   Well --
14     A.   I know that may not matter to you, but it sure does
15          with me.  Everything here is about timing.  And I
16          believe the recall efforts, and when that lawsuit was
17          filed and settled, those dates are very important for
18          us, and I don't know them.
19     Q.   Okay.  But I guess the question becomes if the city
20          council stated, which it did, that these individuals
21          were hired without there being any budget for them, do
22          you have any evidence to dispute that there was a
23          budget for them?
24     A.   There was a budget. Was there a line item?
25     Q.   Was there a line item?
```

Page 268

1    A.    I guess you'd have to ask that question to the
2          comptroller and see if there was a line item. Was
3          there a pool of money that traditionally police
4          departments get.  Say, hey, this is the amount of
5          money that you could spend in this fiscal year, and we
6          can move shell pieces around.  They move shell pieces
7          around.  It's called a budget amendment.
8    Q.    A budget amendment adopted to provide for funding for
9          the director positions prior to them being hired?
10   A.    I don't know the answer to that. That's not my role.
11         That would be something the mayor would do, not the
12         police chief.
13   Q.    With that being said, if the city council felt that it
14         was disrespected by virtue of the mayor just taking it
15         on himself to end up hiring people without there being
16         any money provided for in the budget, can you
17         understand how the city council would feel that that
18         would be inappropriate?
19   A.    The important thing here is a timeline. And timelines
20         are very important in investigations. And the chicken
21         or the egg is very important in there. And they didn't
22         become outraged until I said no.
23   Q.    Well, you said no specifically when?
24   A.    Whatever the date is.
25   Q.    Like October 2023?

Page 269

1         MR. BROWN: You're referring to the
2      promotion of Sergeant Bazzy as saying no; is that
3      right?
4   A.   That meeting with Mo Baydoun, Hassan Ahmad, and Nancy
5      Bryer.
6   BY MR. MIOTKE:
7   Q.   You're saying that that happened when?
8         MR. BROWN:   The dates are in the complaint
9      starting at paragraph 29, and then running through 38.
10  BY MR. MIOTKE:
11  Q.   So you're saying at that point the city council had --
12     and you had already told them in January of 2023 that
13     you weren't going to end up hiring them in any way
14     that was preferential for Sergeant Bazzy?  Namely, you
15     weren't going to end up promoting Sergeant Bazzy
16     outside of --
17  A.   I think you're missing a lot of context there.  I was
18     demanded to take care of his boy, and I said he'd be
19     given the same opportunity to earn it like others. And
20     that is the very moment where trouble started for us.
21  Q.   Yeah.  But the letter of understanding as opposed to
22     collective bargaining agreement that ended up being
23     adopted with the command officers or the supervisors
24     union was adopted after this meeting took place?
25  A.   Correct.

Page 270

1    Q.    So wouldn't that be inconsistent with your causation

2          argument that somehow or other all of a sudden the

3          city council turned against you when you refused to do

4          this when they had ended up already agreeing after you

5          had the conversation in January of 2023 to end up

6          adopting the collective bargaining agreement that

7          allowed or prevented --

8    A.    This is way too long. You're making up the issues.  We

9          were talking about the issue of when the claim was

10         made to give the preferential treatment. And then we

11         talked about the timing of how all of a sudden they

12         were just offended and so mad. So mad at the mayor for

13         hiring us. And I can't speak to what they did or

14         didn't know. They don't know half of what they're

15         doing over there.

16    Q.    All right.

17    A.    Did they read the contract?  Did they see his name in

18         it?  Did they see my name in it?  You'll have to ask

19         them.

20    Q.    That's a good question. Do you have any reason to

21         believe that they even were paying attention to the

22         idea that you and the directors were going to end up

23         being -- so you're saying did they even read it?  Did

24         they even know that there was this language that was

25         included that would foreclose challenges by the unions

```
                                              Page 271

 1         to you and the directors being hired?

 2                   MR. BROWN: Objection. Calls for

 3         speculation.

 4    A.   Watch the meeting, and I believe Tom Wencel brings up

 5         the fact he has issues with it, because there was

 6         something in there about a lawsuit.  Or I can't

 7         remember exactly what it said. But it's there for all

 8         of us to see on a recorded council meeting when they

 9         approved that.

10    BY MR. MIOTKE:

11    Q.   So they approved it, but do you know that any of them

12         actually even read that language other than Tom

13         Wencel?

14    A.   I have no idea whether they read it or not.

15    Q.   Okay.

16    A.   I would say that they're derelict in their duties just

17         like you guys have been trying to point me out, and

18         I've done nothing but play by the rules.

19    Q.   Let's move on from that statement, because you're

20         saying the timeframes really make a difference, yet in

21         this situation you're saying that the thing that would

22         lead to adverse employment action against you took

23         place in January of 2023, yet then you're saying that

24         a positive employment action took place in February or

25         March of 2023.
```

Page 272

1           MR. BROWN: Objection. Misstates prior

2       testimony.

3   BY MR. MIOTKE:

4    Q.   Go ahead and answer the question.

5    A.   I would have to look at my timeline on that. I don't

6         know when the sergeants contract was approved.  And I

7         don't know whether council was derelict in their

8         duties to read the contract.

9    Q.   Well, why don't we take a look then at Exhibit 1 of

10        the first amended complaint, Exhibit 1.

11           MR. BROWN:  Why don't you refer, counsel,

12        to the page. That will help us.

13           MR. MIOTKE:  It would be ECF Number 48-2,

14        page ID .761.

15           MR. BROWN: There we go.

16   BY MR. MIOTKE:

17    Q.   Do you see that page?

18    A.   I do.

19    Q.   Do you see the date that the motion was -- and the

20        meeting took place, and the motion was adopted is

21        February 28th, 2023?

22    A.   I see different dates in here. I see per Mayor Bazzi

23        communication dated February 7th, which would have

24        been a mere week or two after that meeting.

25   BY MR. MIOTKE:

Page 273

```
 1    Q.   But the meeting vote was taken on February 28th. Do
 2         you see that on this page, which is to Mayor Bazzi
 3         from city clerk Senia?
 4    A.   Yes.
 5    Q.   The following is copy of a motion adopted at the
 6         regular meeting of Dearborn Heights City Council held
 7         on February 28th, 2023. Do you see that?
 8    A.   Yes.
 9    Q.   Do you have any reason to doubt that February 28th,
10         2023 is the wrong date?
11    A.   I have no reason to dispute that.
12    Q.   Okay.  So that's still a month after you ended up
13         having this meeting with Mo Baydoun?
14    A.   And Hassan Ahmad, and Nancy Bryer.
15    Q.   Right. And so your point was that all changed
16         thereafter?
17    A.   Sure, it did.
18    Q.   Yet then they ended up doing this stuff that you are
19         also saying shows that the city council wanted you to
20         be grandfathered, but then changed their opinion
21         because of your protected activity?
22    A.   Correct.
23    Q.   All right. But your protected activity took place all
24         over the place during this time period.  And what
25         you're saying is the real problem, namely, disagreeing
```

Page 274

1     with them about Sergeant Bazzy being promoted took

2     place before they ended up taking this vote that was

3     favorable to you and the other plaintiffs?

4              MR. BROWN:  Objection.  Misstates prior

5     testimony.

6  A.  So what you're leaving out is that discipline of

7     Sergeant Bazzy when he did not comply with, and that's

8     part of our contradiction is how can you say the mayor

9     illegally hired Paul, Jerrod and Kevin at the police

10    department when they approved it on the dates that you

11    just said. And Sergeant Bazzy's incident and his

12    hearing, I think, was in November or December. So

13    there's the contradiction.

14 Q.  Let's take it a little further than that, which is why

15    would this be about you in the first place?

16 A.  Because I wanted to play ball.

17 Q.  No, no, no.  Ultimately the language here foreclosed

18    the supervisor's union from challenging your

19    promotions, right?

20 A.  Under PARA, we were included in that contract, yes or

21    no?

22 Q.  No, you weren't.

23 A.  Of course we were.  We went through the bargaining

24    process.

25 Q.  You weren't members of the union.

Page 275

1    A.   Our names in their contract.

2    Q.   But were you members of the union?

3    A.   Our names in their contract.

4    Q.   Was there civil management rights provision that

5         allowed the city council to change anything it wanted

6         to?

7    A.   No, no.

8    Q.   With regards to --

9    A.   Not under the circumstances.

10             MR. BROWN:  Objection.  You're speaking

11        over each other.

12             MS. HUNT:  Object to foundation.

13   A.   Not under those conditions.  It's completely

14        ridiculous.

15   BY MR. MIOTKE:

16   Q.   So I guess the question becomes then were you under

17        the impression that the city could not end up laying

18        you off if there was an economic necessity to do so?

19   A.   I never even gave it a thought.

20   Q.   In your view, did the city have the right to

21        basically, I don't know, bar you for any reason

22        because you were an at will employee?

23             MR. BROWN:  I object to the legal opinion

24        from a layman. It's also pushing relevance even in

25        discovery.

Page 276

1    A.   So am I to answer or not?

2                 MR. BROWN:  If you can.

3    A.   I think that would be a question for the mayor.

4    BY MR. MIOTKE:

5    Q.   Okay. And did you feel that the city still would have

6         the right to lay off the directors under the

7         collective bargaining agreement?

8                 MR. BROWN:  Same objection as prior. Answer

9         if you can.

10   A.   Am I supposed to answer?

11   BY MR. MIOTKE:

12   Q.   Yeah, if you can.

13   A.   I don't know.

14   Q.   You don't know. Let me ask you this. This Exhibit

15        Number 1, the motion that was adopted refers to a

16        collective bargaining agreement, a completed contract.

17        Do you see that in the paragraph right here?

18                 MR. BROWN:  This is page 761, sir?

19                 MR. MIOTKE:  Yes.

20   BY MR. MIOTKE:

21   Q.   It says after further discussion, the motion was

22        amended to reflect the following. Do you see that?

23        Again, on page ID 761.  Motion by Councilwoman Bryer,

24        seconded by Councilman Muscat, and so forth.  Do you

25        see that?

Page 277

1    A.    Yes.

2    Q.    Okay.  And it says to approve the tentative agreement

3          between the city and the Command Officers Association

4          of Michigan/Dearborn Heights Police Supervisors

5          Association for a collective bargaining agreement to

6          expire June 30, 2024, and authorize the mayor and

7          clerk to sign the completed contract on behalf of the

8          city when all changes are incorporated into the

9          document as outlined in 8-F.  Do you see that?

10   A.    Yes.

11   Q.    So the item that follows starting at page 763, this

12         agreement is not a complete agreement, is it?

13                MR. BROWN:  Object to the form of the

14         question.  Requires a legal opinion from a layman.

15   A.    I've no idea.

16   BY MR. MIOTKE:

17   Q.    Okay. All right. In terms of the end of your

18         employment, when you were hired, Swope and Vanderplow

19         did not work for the police department; is that

20         correct?

21   A.    That is correct.

22   Q.    When you were hired, you were under the impression

23         that anyone who was going to end up being your

24         subordinates in a higher level role, captains,

25         lieutenants, their positions would all end up being

```
                                                    Page 278

1          filled through Act 78; is that correct?

2                    MR. BROWN:  Objection to the question.

3          Misstates prior testimony.

4    A.    I have no idea what that process would look like when

5          I was hired.

6    BY MR. MIOTKE:

7    Q.    Okay. Did you care?

8    A.    Of course I cared.

9    Q.    Okay.  So did you end up saying anything, or have any

10         discussion with the mayor, for example, saying, hey,

11         unless I can bring in whoever I want to end up

12         bringing in, then I'm out of here?

13   A.    Absolutely not.

14   Q.    Okay.  You understood that you were going to be

15         working with people that you were going to be working

16         with, correct?

17   A.    What does that mean?

18                    MR. BROWN:  I don't understand that

19         question.

20   BY MR. MIOTKE:

21   Q.    Okay. Did you understand that you were going to be the

22         chief, but you would not necessarily control everyone

23         who would be hired or fired by the city within the

24         police department?

25   A.    I don't know how to answer that question.
```

Page 279

1   Q.   Okay.  Since you obviously did not know Paul

2        Vanderplow or Kevin Swope at the time that you were

3        hired, obviously, it was immaterial to your decision

4        to be employed by the City of Dearborn Heights,

5        whether or not they were going to be hired sometime in

6        the future; is that fair?

7   A.   That is correct.

8   Q.   Okay.  And is there anything in your employment

9        agreements that you can recall that says that you were

10       going to end up having a director of support services,

11       and a director of police operations?

12  A.   No.

13  Q.   All right. So at the time that you ended up leaving

14       your employment with the City of Dearborn Heights, was

15       there anything preventing you from going in and just

16       performing your duties like you had for, what, two and

17       a half years?

18  A.   Yes.

19  Q.   Okay.  What was it specifically that you believe

20       prevented you from going in and simply continuing to

21       be the chief of the police department?

22  A.   Continual harassment and intimidation from city

23       council day-to-day that disrupted my workday. And it

24       was relentless. And, again, we can't wait to speak to

25       some people about it that have it on recording out of

Page 280

```
 1          the word of the babe.  So, yeah, that's it. They made
 2          my life hell.
 3     Q.   Well, any specific events that you can recall?
 4     A.   Everything. Sending me communications that you would
 5          have about bullshit complaints, excuse my language.
 6          About, oh, I just happened to run into this guy today,
 7          and he's a good member of the community.  And he made
 8          a complaint about the officer saying this. They're in
 9          the email form, right?  Hassan Ahmad and the others
10          sending these things relentlessly to distract us from
11          getting our work done, if we watch a video and realize
12          completely fabricated complaint.
13     Q.   Was that something that however you dealt with since
14          the time that you started in 2023?
15     A.   No, this was all ramped up. This was all ramped up.
16          This is all in response to exactly what Mo Baydoun
17          demanded, and I denied, and then the discipline that
18          we tried to enact with Sergeant Bazzy when he failed
19          to supervise the use of force, absolutely.
20     Q.   So when did the ramping up start?
21     A.   You could see them on the emails that you guys have.
22     Q.   When did the ramping up start?
23     A.   Immediately.
24     Q.   Immediately?
25     A.   Immediately after.
```

Page 281

```
 1    Q.    Being what date?  Since our timeline is --
 2    A.    Valentine's Day.  That's a you problem, right, that
 3          you don't have the timeline. So don't put that on me.
 4    Q.    No no, no.
 5    A.    Valentine's Day at a council meeting.
 6    Q.    Valentine's Day of what year?
 7    A.    2023, a mere couple weeks after the meeting with Mo,
 8          and Hassan Ahmad, and Nancy Bryer.
 9    Q.    So why didn't you just at that time just stop working
10          for the City of Dearborn Heights in February of 2023?
11    A.    Because, Gary, no police department in 2023, 2024, and
12          beyond should exist the way that police department was
13          operating. And you are a large part of that as the
14          city attorney.
15    Q.    How do you know?
16    A.    Because the people that are now talking to you said
17          very unfavorable things about you.
18    Q.    Oh.
19    A.    Yeah.
20    Q.    Okay. Like who?
21    A.    Kevin Campbell on how you continually kept people over
22          on criminal complaints that worked midnights so you
23          can bill for the afternoon docket.
24                  MS. HUNT:  I think we're getting beyond the
25          relevant portion.
```

Page 282

1           MR. BROWN:  Guys, if I may, it's 5:30.  The

2       witness has now been sitting here for seven and a half

3       hours. He's covered in rash. He's given it a really

4       good go. And I think we're reaching the end of

5       youthful questions and answers, and getting into

6       bickering and argument.  So I don't want to just say

7       we're walking out of here, because that would be too

8       partisan, but we really need to wind this down.  We've

9       given this deposition a good faith effort.  So maybe

10      we can pick your best questions, and we end at quarter

11      to.  That gives you seven more minutes.

12          MR. MIOTKE:  For the record, I would note

13      that your complaint is all over the place, and quite

14      extensive in that even seven hours would not be

15      considered to be a reasonable amount of time.

16          MR. BROWN:  You can make that motion to the

17      good judge if you prefer. There's a provision in Rule

18      30 for just that argument.

19          MR. MIOTKE:  Yes. So anyways, let me see

20      what I have.

21  BY MR. MIOTKE:

22   Q.   Did any of the unions grieve what you indicated about

23       what you purportedly said was a quota?

24   A.   What part would they grieve?  I'm missing the context.

25   Q.   Well, did they end up grieving that they were being

Page 283

```
 1        forced to involve in a ticket quota at any point?
 2   A.   Of course not. They were making overtime.  They didn't
 3        want to chop that hand off.
 4   Q.   And you admit that you had previously testified that
 5        there were comments made in public comment about
 6        staffing levels being too low; is that correct?
 7   A.   Public comment, social media, all the way around.
 8   Q.   What information or evidence do you have that Bob
 9        Constan, Denise Malinowski-Maxwell, Nancy Bryer and
10        Tom Wencel were committed to some agenda of
11        discrimination against you because you were white?
12   A.   They were fearful of Mo Baydoun, and particularly
13        Hassan Saab.
14   Q.   Did any of them say that to you?
15   A.   Oh, I think we're going to get that from Mr. Wencel
16        about this whole D7 thing.
17   Q.   But the question is is do you have any information
18        right now?
19   A.   I think you have it all.
20   Q.   That's not my question.  Do you have any information
21        or evidence right now to prove that allegation?
22   A.   With me right now, no.
23   Q.   Okay.  All right. Have you posted yourself as being
24        retired on Facebook and LinkedIn?
25   A.   Yes.  Same way Mark Meyers did after he was fired.
```

Page 284

```
 1   Q.   Have you ever had any discussions with Mark Meyers
 2        about him being fired?
 3   A.   No.
 4                 MR. MIOTKE:  Given what we've been told in
 5        terms of timeframes, and as a matter of courtesy to
 6        Ms. Hunt, I am not going to ask any more questions for
 7        the moment. Thank you.
 8                           RE-EXAMINATION
 9   BY MS. HUNT:
10   Q.   You mentioned earlier that you did start receiving
11        severance payments once you left your employment with
12        the City of Dearborn Heights; is that correct?
13   A.   That is correct.
14   Q.   All right. You also received insurance benefits post
15        your leaving the City of Dearborn Heights; is that
16        right?
17   A.   That I paid for, yes.
18   Q.   Isn't it true that the City of Dearborn Heights paid
19        for those premiums?
20   A.   That's not my understanding.
21   Q.   Okay.
22   A.   And if that's the case, that's not right.  That should
23        be COBRA. Direct Swope got COBRA.  Had to fill out the
24        paperwork. And that's unethical that they would
25        continue to do that.
```

Page 285

1    Q.   You did not pay yourself any benefits -- for any

2         benefits that you received from the City of Dearborn

3         Heights after you left your employment?

4    A.   It's my assertion that I was paying for that Blue

5         Cross. No one gave me any paperwork whatsoever to fill

6         out through COBRA like Director Swope got.

7    Q.   Did you make direct payments to the --

8    A.   It was through payroll deduction.

9    Q.   So it's your understanding that it was paid through

10        your payroll?

11   A.   Yes, which I cannot see.  And when I called and told

12        them you have to stop doing that, we have to be -- I

13        have to be put on COBRA, Cameron Sanders said, It's

14        going to be status quo until I hear from anyone else.

15                  MS. HUNT: Okay.  That's all.

16   A.   Please help me get a letter of --

17                  MR. BROWN: No further questions?

18                  MS. HUNT:  No further questions.

19   A.   Somebody needs to get me a letter of --

20                  MR. BROWN:  No further questions, Bub.

21   A.   It should be so simple.

22                  MR. BROWN:  No questions here, so I think

23        we can go off the record.

24                  (The Deposition was concluded at 5:43 p.m.)

25

Page 286

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN   )

3                        ) SS

4    COUNTY OF WAYNE     )

5

6              I, JOANNE MARIE BUGG, certify that this

7         deposition was taken before me on the date

8         hereinbefore set forth; that the foregoing questions

9         and answers were reported by me stenographically and

10        reduced to computer transcription; that this is a

11        true, full and correct transcript of my stenographic

12        notes so taken; and that I am not related to, nor of

13        counsel to, either party nor interested in the event

14        of this cause.

15

16

17

18

19

20

21

22        JOANNE MARIE BUGG, CSR-2592

23        Notary Public

24        Wayne County, Michigan

25        My Commission expires: 2-26-2031

**[& - 23]** Page 1

| & | | | |
|---|---|---|---|
| **&**   2:4,20 | **11:31**   62:4 | **2** | 110:9 117:1 |

**1**

**1**   4:14 37:23
38:8 117:4
191:25 192:1
195:5,18,20
196:2 198:11
217:24 264:12
272:9,10
276:15
**1,700**   220:22
**1.1**   193:3
**10**   88:5 89:23
93:23 102:24
110:14 219:14
**10/23/23**   4:23
186:13
**10/24/2023**
4:25 187:6
**100**   18:19 21:6
30:2 37:21
**101**   1:17 2:5
**102,000**   39:2
**102,500**   38:20
**10240**   1:8
**10:07**   1:19 5:3
**10:57**   38:2
**10th**   16:7
186:24
**11**   11:5 102:24
**11:23**   56:16

**11:31**   62:4
**11:32**   62:12
**11:42**   62:13
**11th**   259:11
**12/12/2023**
4:19 56:15
**12/12/23**
196:10
**126,600**   57:8
**12:58**   110:3
**13**   17:6,8,9,10
263:24
**13th**   17:2,5
**14**   7:12 11:25
17:6,8,10
146:20 220:2
**14th**   17:2,5
**15**   55:6 192:2
**16th**   168:23
172:13
**186**   4:22
**187**   4:24
**191**   4:7
**1968**   18:15
**1987**   14:11
**1991**   14:23
15:2
**1993**   218:18
**1:11**   110:5
**1:37**   128:4
**1:38**   128:5
**1st**   130:3
253:25

**2**

**2**   4:17 56:12,18
61:3 181:5
195:23,24
198:11,16,24
200:23 201:23
264:13
**2-26-2031**
286:25
**2.1**   39:11
**2/21/2022**   4:16
38:1 193:8
**20**   55:6 63:14
77:7 94:1
102:8
**20,000**   264:14
**200**   90:15
**2000**   15:9
**2006**   15:11
**201**   2:21
**2012**   15:13,13
16:4
**2014**   11:5,6
**2015**   6:15 7:9
7:10
**2017**   16:6
**2022**   18:4,22
22:15 37:12
64:18 193:1,4
203:16 204:11
218:2
**2023**   63:14
73:12 109:20

110:9 117:1
159:3,7 160:8
166:12 168:24
172:13 186:21
187:11 196:2
203:6,13 204:9
205:14 211:16
218:2 228:23
250:14 253:14
255:15 268:25
269:12 270:5
271:23,25
272:21 273:7
273:10 280:14
281:7,10,11
**2024**   6:16 7:9
7:19 59:5
115:23 203:5
232:20 253:21
253:25 254:18
264:23 277:6
281:11
**2025**   1:20 5:2
115:20 221:1
**22**   38:4 78:17
101:17 106:19
130:4 248:7
**23**   29:14,15,16
78:17,18
101:18 109:18
110:8,16 130:8
173:11,16
177:13 186:20
247:5,10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[23rd - 6828]**                                           Page 2

**23rd**  186:23
**24**  29:14,15,16
   37:14 48:24
   115:22 116:25
   118:22 125:16
   151:25 152:2,7
   173:5,10,17
   174:24 187:11
**24,000**  57:10
**248.912.3240**
   2:7
**25**  18:21 61:19
   128:7,14
**257.750**  117:4
**2592**  1:22
   286:22
**25th**  92:4
**26**  15:24
**26742**  286:21
**26th**  159:2,7
   160:8 166:12
   255:15
**27**  145:13,18,20
   157:15,16
**27th**  253:14
**28**  226:7
**28.422a**  109:22
   110:12
**284**  4:8
**28th**  22:13
   193:1,4 272:21
   273:1,7,9
**29**  158:22
   159:2 215:9,17

   215:18,23
   269:9
**2:10**  148:22
**2:12**  148:23
**2:24**  1:8
**2:55**  175:25
**2nd**  130:3

**3**

**3**  4:20 62:1,20
   62:25 109:22
   110:12 215:9
   226:8 247:5
   248:10 252:25
**3,000**  58:22
   200:21
**3.2**  194:23
   198:12
**3.3.**  58:22
**30**  101:14
   102:8 215:9,17
   215:18,23
   241:20,22,25
   277:6 282:18
**3031**  2:13
**307**  188:1
**308**  187:22
**30s**  30:25
**30th**  217:25
**311**  187:18
**312**  187:18
**313.388.4809**
   3:5

**313.551.3038**
   2:23
**313.689.8437**
   3:12
**313.871.5500**
   2:15
**32**  166:3
   168:23 170:4
**36**  209:1 239:4
   252:25 253:2,8
   256:18
**37**  4:14
**38**  145:16
   166:1 255:14
   269:9
**3:00**  176:1
**3:18**  186:14
**3:20**  187:7
**3:26**  191:19
**3:29**  191:20
**3rd**  37:14 59:5
   59:10,12 60:9

**4**

**4**  4:22 186:12
   186:17,19
   188:25 226:24
   227:5,16,21
**4.1**  193:19
   197:23
**4.6**  220:10
**40**  12:18
**400**  12:8

**411**  145:24
   151:12
**416**  201:11,14
   263:13
**41700**  1:17 2:5
**45**  23:15 225:4
**48-2**  272:13
**48101**  3:4
**48126**  2:22
**48127**  3:11
**48168**  2:6
**48202**  2:14
**4:45**  248:4
**4:48**  248:5

**5**

**5**  4:6,24 187:5
   187:10 188:25
   226:24 227:5
   227:16 228:1,2
**5,000**  221:11
**50,000**  96:11
**525**  2:13
**56**  4:17
**57**  18:18,19
**5:30**  282:1
**5:43**  285:24

**6**

**60**  18:7,10,11
**6045**  3:10
**6050**  2:21
**62**  4:20
**6828**  3:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

[7 - accusations]                                                      Page 3

| **7** |
| --- |

**7**   1:20 5:2
  177:11
**72**   207:3
**7528578**   1:25
**761**   272:14
  276:18,23
**763**   277:11
**78**   30:21,22,24
  160:12 161:1
  206:14 212:4
  212:11,15,24
  213:1,5,5,9,11
  214:23 215:8
  215:10 216:1,9
  217:4,10
  222:10 223:7
  228:20,22
  229:1 230:23
  231:9,10 256:4
  257:16,20
  267:10 278:1
**7th**   18:17
  148:13 272:23

| **8** |
| --- |

**8**   277:9
**8,000**   13:11,19

| **9** |
| --- |

**9**   177:11
**90**   23:23 24:11
  221:9 225:8

**900**   109:20
  110:10 242:24
  247:2
**91**   15:3
**91,000**   12:21
**94**   218:18
**96**   37:22
**98**   37:22
**99**   15:8
**9th**   73:12 130:8

| **a** |
| --- |

**a.m.**   1:19 5:3
  38:2 56:16
  62:4,12,13
**abdallah**   4:25
  80:8,9 96:1,13
  149:7 183:15
  187:6,12 189:2
  228:1 246:20
  247:22,23
**abdel**   173:5
**abhorrent**
  142:17
**ability**   31:9,17
  31:20,23 37:6
  121:14 131:4
  164:16 165:7
  166:20,23
  174:21 197:10
  262:4
**able**   13:2 66:4
  89:10 119:4
  131:7,20 136:1

136:4 137:10
  141:10 181:1
  202:21 208:8
  216:18 235:22
  254:13
**aboard**   21:21
  21:24 131:20
**above**   192:8
**absolute**
  146:11 239:16
**absolutely**   26:5
  64:25 65:15,18
  65:23 86:9
  98:15 140:16
  142:17 146:24
  148:15 156:17
  163:4 168:6
  181:3 182:15
  183:14 189:16
  190:21,21
  191:2 200:8
  204:16 231:11
  232:12 233:7,7
  235:10 237:19
  239:13,13
  242:23 243:17
  250:21 251:19
  261:8 278:13
  280:19
**absurd**   233:7,8
**abysmal**
  206:13
**academy**   15:15
  88:8

**accelerating**
  249:21
**accept**   22:7,9
**acceptable**
  127:12 138:4
**accepted**   15:13
  24:24
**access**   47:21
  94:25 95:11
  102:10 104:10
  104:13,18
  106:6 130:20
  130:22 131:8
  132:2 133:1
  139:15,16,19
  140:7,8,11,24
  141:5,9,15,23
  200:22 248:18
**accessed**
  249:12,15
**accident**   251:8
**accidents**
  146:22 156:2,8
**accreditation**
  65:4 140:15
**accumulate**
  51:11
**accumulated**
  198:22
**accurate**   122:7
  251:13
**accusations**
  156:17

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                         586-468-2411
www.veritext.com

accused  90:4
acknowledge
  261:1
acres  220:10
act  30:21,22,24
  160:12 161:1
  199:22 206:14
  212:4,11,15,24
  212:25 213:4,5
  213:9,11
  214:23 215:8
  215:10 216:1,9
  217:4,10
  222:10 223:7
  228:20,22
  229:1 230:23
  231:9,10 256:4
  257:16,20
  263:16 267:10
  278:1
acting  145:13
  157:14,18
  166:25 167:1
action  53:12
  96:16 145:14
  146:7 147:10
  147:17 153:13
  153:17 154:6
  158:13 170:19
  179:5 271:22
  271:24
actionable
  185:6,18 186:5

actions  89:17
  147:21 149:1
  151:10 153:21
  178:24 190:20
active  89:6
activities  55:16
  75:13 77:24
  78:11 210:24
  259:4,12
activity  33:21
  34:6 208:23
  209:2 243:6
  273:21,23
actual  87:24
actually  16:19
  42:8 118:20
  119:6 130:19
  134:21 156:10
  209:17 230:15
  234:25 241:16
  241:18 243:12
  253:25 254:23
  258:19 263:18
  271:12
acumen  179:22
ad  68:25
added  209:1
addition
  145:20 158:7
  188:12 199:19
  199:21
additional  98:7
  201:15

address  107:19
  116:13,15
  219:25 220:4
addressed
  49:20 89:20
  205:23
addressing
  91:9,10,21
  95:13
aden  99:11
admin  141:13
administration
  51:25
administrative
  55:8,22 86:17
  89:22 97:3
  112:6 141:18
  141:24 249:2
admit  283:4
adopted  232:23
  268:8 269:23
  269:24 272:20
  273:5 276:15
adopting  270:6
advance  221:23
advancing
  222:5
advantage
  148:10,11
adverse  145:14
  146:7 147:10
  147:17,21
  153:13,17
  158:13 166:15

178:23 179:5
  214:3,5 271:22
adversely
  151:10
advice  174:1
advise  40:21
  137:25 160:8
advised  44:21
  144:16 173:24
advises  9:2
affair  204:1
  258:16 259:18
affect  151:10
affirmed
  241:10
afford  260:20
african  108:23
  109:4 125:22
  186:3 262:19
afternoon
  281:23
ag  100:6,7
ag's  99:22
age  18:6,10,11
agencies  77:9
  128:13 136:7
  176:7 177:24
  177:25 178:10
  242:10,12
  246:19
agency  70:10
  134:25 136:15
  144:15,19
  172:13 252:20

258:11 261:11
**agenda** 55:20
55:21 283:10
**agendas** 55:20
**agent** 70:25
93:5 129:24
250:25
**ago** 11:5 133:6
135:7 195:22
**agree** 48:3
59:25 168:10
168:10 181:11
191:12 228:4
**agreed** 34:16
170:23 233:11
247:8
**agreeing** 270:4
**agreement** 4:15
4:18 31:11,16
31:22 37:24
38:15 39:7
56:13 173:21
192:20 194:12
194:22 195:5
196:20 197:3
197:17 198:3,4
198:7,23
201:18 203:5
215:12 216:11
216:14 221:8
223:8 264:16
264:17 266:21
267:12 269:22
270:6 276:7,16

277:2,5,12,12
**agreements**
213:8 279:9
**ahead** 19:24
113:25 197:6
228:11 272:4
**ahmad** 147:15
149:8 158:25
188:15,15
189:2 227:25
228:6 229:11
231:21 265:10
269:4 273:14
280:9 281:8
**air** 45:4
**al** 149:5
**alcohol** 71:1
**alerting** 24:6
**alglawpc.com**
2:16
**align** 112:19
**alive** 32:15
**all's** 232:3
**allegation** 80:4
101:24 106:13
118:9 120:1
145:12 170:5
190:2 259:5
283:21
**allegations**
46:23 63:10,12
63:23,24 79:3
82:5 95:11
100:22 107:8

117:23 128:13
144:7,13
146:15 176:3,8
176:16 178:3
178:10 184:25
203:21 215:17
232:7 239:3
245:14 250:5
261:24
**allege** 119:23
259:17
**alleged** 29:3
32:19 35:17
52:22 77:24
95:24 113:2
118:1 125:8
208:23 209:8
245:25 255:15
**allegedly**
128:16 176:22
202:16
**alleging** 162:20
212:4
**allen** 2:12 3:4
5:11
**allies** 129:19
**allocation**
77:19
**allow** 8:14
**allowance**
58:21
**allowed** 6:21
89:15 91:13
133:1 142:16

185:22 251:1
257:25 263:19
270:7 275:5
**alluded** 46:24
177:3
**alter** 184:7
**amazing** 90:3
**amend** 184:7
**amended** 4:21
62:2,19,25
63:4,7 215:22
226:4,7 244:22
247:6 263:20
272:10 276:22
**amendment**
218:8 248:10
252:24 268:7,8
**america** 126:17
**american** 88:12
108:23 109:4
125:22 126:8
186:3 202:21
262:19
**amount** 11:19
60:22,25 221:3
268:4 282:15
**amounts** 263:5
**amy** 261:22
**analysis** 97:25
**ancillary** 58:7
**angela** 146:5
154:17,23,25
154:25 155:23
156:20 157:22

233:13 235:18
236:20,21
237:1,1
**angela's** 146:5
154:18
**angry** 45:5,5
167:22
**ankrapp** 60:16
**ann** 203:14
261:18,19
**annual** 12:20
91:6 92:14
198:20
**anos** 123:13,14
123:14,20,21
**answer** 8:16
9:8,13 18:6
22:25 24:23
28:8 34:15
35:20 48:22
68:12 112:20
122:14 148:16
161:20 183:22
197:6 222:6
224:21 227:10
234:9 264:2,4
264:5 268:10
272:4 276:1,8
276:10 278:25
**answered**
112:18 116:7
142:6 248:1
**answering** 8:15
8:19

**answers** 8:12
105:2,3 106:18
282:5 286:9
**anybody** 122:2
215:6
**anyway** 127:5
216:24
**anyways** 214:7
240:11 282:19
**aoun** 251:6
**apologize** 5:20
18:13 24:9
28:12 47:11
149:3 188:1
**appalled** 186:9
189:25
**appalling**
190:16
**apparently**
148:20 235:8
**appeals** 241:12
**appear** 151:4
215:23
**appearances**
2:1
**appeared**
125:22 157:22
**appearing** 2:9
2:17,25 3:6
**appears** 6:20
15:22 38:14
154:24 163:6
186:20 187:13
192:23 227:21

228:12
**applicable**
216:23
**application**
20:3
**applied** 19:19
**apply** 19:25
216:3 264:8
**applying** 19:7
19:12
**appoint** 160:24
216:8,19 254:6
**appointed**
213:3
**approach**
155:25 186:7
**approval**
197:18
**approve** 139:21
230:20 277:2
**approved**
170:23 173:23
203:5 230:14
271:9,11 272:6
274:10
**approximate**
200:21
**approximately**
11:24 12:11,21
17:25 57:10
87:12 109:24
110:18 131:15
196:21 201:5
207:13 220:20

**apps** 235:10
**april** 34:19,22
35:6
**arab** 24:1 88:5
88:12,25 89:11
146:19 148:4
154:16 155:5,7
158:16,17
162:16 163:14
163:16 174:20
179:12,13,17
179:24 181:24
182:11 202:21
210:4 226:8
**arabs** 88:7,14
154:13 239:19
239:24 240:18
240:18
**arbitration**
241:15
**arbitrator**
241:18
**arbor** 203:14
261:19,19
**area** 20:10
103:23 104:2,2
104:5,5,16
105:5 140:2
156:7,8
**areas** 39:23
104:9 209:2
**arena** 144:20
**argument**
270:2 282:6,18

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

[argumentative - attorney]                                      Page 7

argumentative
168:7,20 205:5
arguments
132:14
arms 219:13
240:5
arrest 168:25
arresting
169:21
arrival 32:22
arrived 41:19
84:15 107:25
108:2 202:16
art 153:24
arts 255:4,19
asked 8:20,23
21:18 26:23
40:10 45:15,19
48:8 50:4
55:20 60:3
71:5 83:12
88:22 96:6
104:7,17 111:5
121:20 131:3
132:1 133:9
136:15 142:6,7
159:3,15,18,19
160:22 162:9
164:23 200:24
227:4,6,11
235:2,21
236:11,12
238:4,6

asking 8:9 55:2
69:11 87:6
89:9 109:9
111:2 142:10
143:23 147:20
224:6,12
226:24 227:10
228:15 234:8
235:11,24
236:16 237:21
238:11 247:15
asleep 207:18
aspect 210:17
aspirations
163:3
aspire 221:22
assaulted
146:19
assaulting
185:1
assert 181:14
assertion 285:4
assess 41:24
assessing 30:11
assessment
11:1,2,11 42:9
42:19 43:3,18
55:13 65:10
88:17 92:20
98:18 99:11
105:14 155:6
179:10 186:11
assessments
212:18

assessor 11:4,8
11:14
assigned 42:8
79:16
assignment
26:1
assignments
256:5,7
assist 40:7 42:9
43:19 44:4
54:3 65:7,9,25
69:12 107:7
121:2
assistance
53:11 89:9
95:13 100:5
assistant 15:14
16:4 41:21
55:8,22 86:17
99:23 100:6
assisted 121:4
assisting
100:21
associates 2:20
association
20:5,16,19
24:3 88:21
173:22 277:3,5
assume 8:22
127:9
assumes 59:25
68:11 122:11
assuming 45:20
235:24

assumption
81:14
atf 71:10 251:1
attached 4:12
195:4,20
198:15 243:5
attachment
198:14,15
attack 146:11
148:12 156:11
182:16,17
186:24 231:19
265:23
attacked
181:25,25
attacking
182:11
attempt 162:6
197:10
attempting
34:24 53:11
attempts
158:14
attending 17:4
attention 43:11
152:10,19
254:23 270:21
attorney 5:24
8:24 9:1 27:17
32:12 45:16,19
47:4,10 50:1
62:21 98:2
175:4,5,10,15
175:15 204:22

213:11 216:6 234:3 249:8 255:9 281:14
**attorneys** 260:11
**audience** 156:13
**audit** 80:23 96:16,21,23 97:1,19 102:13
**auditors** 77:16 97:17
**august** 1:20 5:2 15:1
**authored** 189:8
**authorities** 127:2 176:11 178:4
**authority** 130:6 164:24 216:8 242:23
**authorization** 96:7
**authorize** 133:5,12 277:6
**authorized** 96:18 221:14
**automatically** 244:17
**autonomy** 67:13
**available** 44:9 44:13 156:3 195:3 256:1

**avenue** 3:3 202:23
**average** 11:13
**award** 24:2
**aware** 19:5 33:19 34:4 63:7 69:6,7,14 74:16 86:12 93:20 101:4,24 103:6,12 109:5 111:3 113:8,16 125:8 126:24 127:2,8,13 128:13 135:11 135:13 136:11 136:14,19 137:8,15 142:21,23 143:4 145:9 149:25 152:3 159:21,23 164:13 165:9 173:1 174:12 176:7 180:9 181:8 204:15 212:7,11,15,24 213:23 214:18 234:3,19 244:4 246:4 247:11 258:2 264:21
**axon** 133:10

**b**

**b** 169:18
**babe** 280:1
**babysit** 183:8
**bachelor** 14:21
**back** 14:2 26:14 29:24,25 30:1,5 32:15 33:7 46:12 50:4 51:9 55:18 56:20 57:6 59:3,22 62:13,15 80:21 81:3,25 85:6 96:5 101:24 110:5 116:5 128:5 148:23 148:24 149:2 166:3 168:23 169:8 173:19 176:1 178:17 187:12 191:20 193:13 194:22 202:21 209:3 209:18 210:25 211:3 219:12 219:19 224:12 228:24 234:16 241:19,24 248:5
**backed** 153:5
**background** 14:3 72:23,25

180:15 183:1 184:20 259:2 262:8
**backgrounds** 89:3
**backtracking** 59:3
**backup** 89:12 266:15
**bad** 79:14 101:15 105:16 115:10 160:7
**badge** 250:23 251:3
**bag** 45:1 48:19
**bagged** 102:7
**bailey** 169:15 170:20 172:22 173:8 226:18 250:2
**balance** 26:11 81:19
**balanced** 80:24
**balancing** 82:20
**ball** 274:16
**bar** 275:21
**bargaining** 31:11,16,21 173:21 203:4 213:8 215:12 216:11,14 223:8 266:21 269:22 270:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

274:23 276:7
276:16 277:5
**barlow** 119:6
120:23,24,25
121:18 124:1
208:14,17
**barlow's** 122:5
123:25
**barrage** 155:18
**base** 198:20
**based** 18:8
42:14 53:23
57:12 178:2
181:21 182:19
190:3 203:23
221:20 251:2
**basically** 26:21
118:12 157:10
198:1 210:11
210:23 213:3
213:20 214:4
225:22 227:8
230:8 234:11
236:2 238:20
265:25 275:21
**basis** 61:5
**bat** 34:11,12
**bates** 187:16
192:2,5
**bathroom**
77:18
**bay** 102:6,16
**baydoun**
142:22,23

143:8 144:1,6
145:9 147:14
149:8 154:11
154:12,24
156:13,21
158:24 159:3
159:14 160:5,9
160:18 162:9
163:5,21
185:23 187:22
187:25 188:13
189:1 190:15
227:24 228:7
229:11 230:22
230:22 231:2,3
231:5,21
235:15,15
239:15 240:2
255:25 256:14
265:10 269:4
273:13 280:16
283:12
**baydoun's**
146:13 154:21
**bays** 260:22
**bazzi** 21:12,14
21:20 52:1
89:7 96:1,12
167:12 168:15
173:24 193:15
197:14 211:16
212:3 252:10
254:6 272:22
273:2

**bazzy** 23:18,23
24:10,13 84:12
84:23,24 88:22
142:22 154:4
158:19 159:4
159:15,24,25
160:9,19,19
162:10,14,18
162:25 163:8
163:22 164:6
166:17,18
168:3 170:2,8
170:25 171:8
172:1 173:8
178:6,8 179:11
215:10,25
225:3,8,13
226:14,20
228:15 230:18
239:15,19,22
245:19 256:1
257:3 265:18
266:3,6,25
269:2,14,15
274:1,7 280:18
**bazzy's** 159:21
225:17 229:2
274:11
**bcc** 101:7
**bead** 174:25
**beard** 32:20
33:2 87:7 88:9
**bearden** 203:25
205:11,14

**beards** 88:6
89:15 90:20
**beating** 172:6
172:12
**beaver** 10:24
**becoming**
11:25
**beg** 200:23
**began** 22:11
34:20 37:19
43:5 103:24
185:5
**beginning** 23:2
24:19 26:16
63:14
**behalf** 2:9,17
2:25 3:6 6:2,4
175:5 263:6
277:7
**behavior** 60:16
79:14 177:5
190:14,16
**behaviors**
185:7
**beings** 148:11
**belief** 130:15
131:18 196:16
**beliefs** 237:2
**believe** 16:14
22:13 24:7
25:18 29:11
30:4,10 32:5,9
55:23 58:20
60:10 61:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

67:14 73:11
75:19 77:19
78:6,19 80:5,7
84:12,20 85:12
87:9 93:7 94:5
97:15 102:1
110:24 117:16
123:13,18
130:3 136:11
136:11 137:10
137:17 139:4
140:13 144:16
144:23 146:13
147:9,25
148:14 151:12
152:1,24 154:9
169:17,19
172:2 175:18
181:6,20
182:18 184:9
193:13 196:14
199:15,17
200:10,15
201:5,6,11,13
201:20 204:20
205:21 220:20
223:14 225:19
228:24 229:3
232:14 237:8
243:5,11,14,25
244:17 246:25
247:15 248:12
253:15 254:1
255:5 256:14

256:22 257:4
258:15,25
261:14,22
262:15 263:5,8
264:20 266:2,5
267:16 270:21
271:4 279:19
**believed** 25:14
177:18 208:3
225:10 263:17
267:9
**belisle** 216:6
**beneficial**
222:8
**benefit** 195:4
195:12
**benefits** 12:22
58:2,5,7 61:11
61:21,24 66:25
165:7 174:10
194:23 195:2
195:18 198:10
198:12 199:19
199:25 284:14
285:1,2
**berate** 147:13
**best** 26:11
39:23 44:19
90:23 92:13
101:2 138:24
178:5 193:17
195:15 197:3,6
219:13,18
224:11 249:23

257:11 282:10
**better** 129:25
189:12 228:14
244:10
**beyond** 57:24
94:21 139:25
227:11 281:12
281:24
**bias** 89:19
**bickering**
282:6
**big** 10:24 14:17
25:2 26:15
28:19 178:23
**bigger** 207:8
**bike** 169:16
**bill** 21:12,14,20
96:1 281:23
**bint** 154:17
**birth** 18:14
**bit** 8:6 14:2
72:2 208:10
219:16 225:9
**black** 146:24
148:15 238:19
240:7
**blah** 143:10,10
143:10 161:15
161:15,15,17
161:17,17,23
161:23,23
236:24,25,25
**blessing** 17:21

**block** 162:12
**blocked** 134:5
**blowing** 237:6
237:7
**blue** 221:8,8
285:4
**board** 11:22
12:12 75:24
254:12 266:14
**boards** 11:1,2
11:10
**bob** 20:17 21:9
60:16 69:4
99:24 100:7
266:2,4 283:8
**bodies** 128:12
**body** 31:2
133:11 144:15
172:10 252:19
**bodycam** 172:9
**boils** 142:17
**bonus** 13:8,10
13:12,17 58:22
220:23 221:11
221:14
**bonuses** 13:5,7
13:22
**boost** 44:18
**born** 18:15
**boss** 15:24
40:16 86:1
218:14 221:21
**bother** 239:7

bothered 45:11
127:3
bottom 192:6
bought 220:18
220:18
boulevard 2:13
box 115:25
boxes 104:7
boy 26:15
28:19 101:15
160:22 161:14
161:19 190:16
240:4 269:18
boys 25:2
breach 215:24
bread 149:15
break 9:5,6,9
62:5,10,12
70:21 71:20
110:3,7 128:4
143:2 148:17
148:22 175:25
191:19 248:2,3
248:4
breakfasts 75:5
breaks 244:5,6
brick 238:15
briefing 204:1
briefings 45:8
88:3
briefly 219:9
brighton 25:2
bring 23:11
24:22 44:19

137:17 144:13
173:18 231:20
278:11
bringing 39:2
65:6 66:20
132:8,17 267:9
278:12
brings 271:4
broke 35:21
broken 162:3
brother 143:17
162:20
brother's 154:4
brought 25:18
32:22 43:11
72:20 93:9,16
96:10 138:24
152:10,19
184:9,13 186:8
211:15 212:2,7
214:18 239:11
240:1 260:18
brown 2:3 5:24
5:25 6:25 7:4
18:18 19:8
25:6,10,17
27:9 33:22
43:24 45:22
46:10,14,18
47:17 48:5
52:11 59:18,24
62:5,7,11
68:11 76:19
86:24 115:11

116:7 122:10
125:3,11
127:15 132:10
135:20 137:4
138:20 147:5
147:16 148:16
148:19,24
150:5 153:15
153:23 157:15
160:16 168:7
168:12,19
172:5 173:10
179:2 185:16
186:17 187:15
188:3 190:22
191:1,3,7,9,16
192:2 195:14
197:4 198:25
205:4 207:7,20
208:12 210:5
211:22,25
213:25 214:13
214:15 215:13
216:20,22
217:11 219:9
220:4 221:25
224:18 225:25
226:10 227:1
227:14 228:2,9
236:12 238:3,6
247:13 249:20
251:10 253:2
254:20 260:6
263:25 264:7

269:1,8 271:2
272:1,11,15
274:4 275:10
275:23 276:2,8
276:18 277:13
278:2,18 282:1
282:16 285:17
285:20,22
bryer 149:8
158:25 265:11
265:13 269:5
273:14 276:23
281:8 283:9
bs&a 249:2
bub 285:20
bubbie 191:10
bubs 214:13
buddies 91:11
budget 26:8
74:9 199:22
217:19,23
218:1,3,8
221:18 267:21
267:23,24
268:7,8,16
budgeting
16:25 71:4,4
budgets 40:1
217:17
bugg 1:22
286:6,22
build 40:1
building 10:2,3
82:11,13 83:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[building - cdbg]**

84:2 129:21
176:19,24
219:22 220:1
239:5 261:25
**built** 58:20
220:12
**bullshit** 280:5
**bump** 161:2
**bumped** 211:8
**bumper** 126:19
**bunch** 70:24
**bureau** 15:10
63:21 111:1
119:5 121:11
121:21 124:9
208:22,24
209:11,14
210:9,10,20,23
238:14,25
262:11
**bureaus** 30:11
**business**
182:23 258:18
**busy** 86:15
**butkin** 261:11
**butt** 182:14
267:2

**c**

**c** 5:19 10:23
93:7
**cahoots** 238:23
**calendar**
107:10

**call** 10:14 12:4
20:4 21:2,12
21:14,18 35:2
45:7 99:12
112:18 177:10
185:23 209:3
**called** 5:5 10:23
23:9 89:24
135:22 143:8
151:11 156:1
176:21 240:22
256:13 268:7
285:11
**callers** 180:1
**calling** 208:4
**calls** 42:18 78:4
78:10 89:8
234:5 271:2
**calm** 214:15
**cam** 172:9
**camera** 77:17
172:10,10
**cameras** 133:11
209:1 239:5
**cameron** 201:1
285:13
**campbell** 16:13
16:16,18 211:1
281:21
**captain** 35:9,14
68:5 78:14
79:24 81:1
106:9,10,11,12
107:23 108:8

108:10,10
143:15 178:7
206:5,7,16
241:25
**captains**
277:24
**car** 58:9,11
102:4 103:9
133:10 135:14
135:14,15,15
135:24,24
153:1 155:13
172:9,10
177:19 214:12
244:18,18
251:25 252:5,8
252:10
**card** 108:6
249:6
**cards** 167:19
173:18 209:3
**care** 6:24 39:13
143:20 160:22
161:5,14,19
190:15 249:9
261:25 265:18
269:18 278:7
**cared** 278:8
**career** 232:25
**careful** 184:17
**carpet** 218:17
**carry** 251:1
**cars** 56:5 79:16
155:12 237:10

260:21
**case** 1:8 6:1,15
7:12,17,22,24
8:1 10:15 30:7
35:3 47:10
71:3 72:21
101:22 106:21
189:19 219:6,7
284:22
**cases** 75:8
**cash** 77:16 79:6
80:23 81:15,15
81:22 82:7,19
83:16 94:7,11
94:15,16,18,25
95:6 106:16
251:7
**catalogued**
52:24
**cathartic** 45:5
**caught** 81:4
**causation**
270:1
**cause** 148:12
148:12 153:13
154:7 193:25
262:5 286:14
**caused** 149:11
**causing** 169:14
**cc** 101:7
**cctv** 70:8
**cdbg** 162:11
163:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**cease** 174:7,10
175:1 185:6
209:24
**ceiling** 96:8
**cell** 143:8
**center** 255:4,19
**centers** 11:1,2
11:11
**certain** 36:20
36:24 67:14
74:24 86:12
113:1 114:19
119:13 139:18
144:4 155:14
206:19 246:10
246:11 257:20
260:17
**certainly** 48:3
**certificate**
286:1
**certification**
58:22 126:22
127:2 262:5
**certified** 17:10
207:24
**certify** 286:6
**chain** 101:18
105:1 242:17
248:14
**chair** 80:10,12
228:1 240:3
247:23,23
254:11

**challenge** 87:24
**challenged**
123:7
**challenges**
270:25
**challenging**
274:18
**change** 57:16
57:20 114:4,5
120:16 124:22
129:24 139:2
139:19 141:11
165:7 185:18
198:2,7 275:5
**changed** 65:3
118:20 166:11
185:14 252:2,4
260:3 273:15
273:20
**changes** 56:8
277:8
**chaos** 154:7
**charge** 70:25
74:8 93:5
113:4 124:9
250:25
**charges** 172:21
241:5,6,13
**charter** 16:14
213:11,17
216:8
**chases** 251:18
**cheated** 24:2

**check** 104:15
157:1 236:19
**checked** 156:13
**checking**
186:25 235:18
235:19 236:22
**checks** 113:24
114:16,18
**cheerleader**
26:7
**chew** 260:15
**chicken** 21:7
268:20
**chief** 7:20
15:14 16:1,2,4
16:10,20 18:2
18:23 19:7,13
20:1,25 21:2,4
21:21 22:11,17
23:2 24:20
25:24 26:3
30:5 31:13,16
33:15 34:13
35:22 36:13,18
40:5 49:6
55:17 57:17
69:5 87:22,23
97:7 99:5
104:13,14
105:4 146:18
154:5 162:22
162:23 163:3
181:12,23
183:15 184:19

207:3 208:1
209:12,16
210:12 212:8
212:11 213:23
216:9,19 217:1
221:21 222:21
222:24 235:16
251:25 261:14
262:3,10,16
268:12 278:22
279:21
**chief's** 103:2,5
162:1
**chiefs** 20:5,16
20:19,21 24:3
58:17 98:3
182:24
**children** 61:16
**chime** 46:7
**choice** 216:18
230:13
**chooses** 199:9
**chop** 283:3
**chose** 108:6
113:20 197:11
256:2
**chosen** 230:8
**chris** 32:12
76:23 86:14,19
**christmas** 6:16
90:5,9 92:3
173:5,10
231:18

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

church   19:20
154:16
ciochon   262:15
circle   87:22
162:3 261:16
circles   87:23,25
163:13
circuit   212:3
241:10,12
circumstances
275:9
citizen   145:17
237:4
citizens   39:23
145:13,22
city   1:10 2:25
3:6 4:16,19
5:12,14,15 6:6
6:7 7:15,20
9:22 15:23
16:10,12,13,16
16:17,19 17:21
18:3,22,23,24
19:2,6,13,14,18
19:25 21:1
22:12,16 23:3
23:11 25:15,21
25:24 26:16
28:2,3,6,20,24
29:17 32:1
36:18,23 37:11
37:20,25 38:17
39:15,18,21
40:17,25 45:14

46:15,16,20,21
47:15,23 48:15
48:23 49:6
51:18 52:18
56:14,20,22
57:4,15,18
58:3 59:4
60:16,20 61:1
61:9,13,20
62:17 63:17,18
63:19 67:16
70:13,16,21
71:10,14,15,25
72:5,8,9 73:9
75:11,13 77:10
77:10,19 79:19
97:18 115:13
115:20 116:20
133:23 139:14
140:7 145:13
146:1,3,12,14
148:2 150:23
154:14,19,20
162:13 163:12
163:15 164:10
164:19 167:1
167:18 168:18
172:24 178:17
178:18 180:8
181:11,11
183:20 185:19
189:8 193:22
193:23 195:8
197:16,17,19

199:9,19,20,21
199:21 200:10
200:22 204:22
208:2 211:16
212:4 213:11
213:17 214:24
217:19,23
221:4,18
223:16 224:3
224:14,23
232:22 233:12
233:18,25
234:21 235:7
236:8,9 237:13
237:17,18
238:1 245:14
246:25 247:15
247:17,19,20
248:13 249:8
250:10 252:14
253:14,24
254:4 255:5
257:14,16
258:24 259:9
259:22 263:9
264:22,25
265:3,8 266:17
267:19 268:13
268:17 269:11
270:3 273:3,6
273:19 275:5
275:17,20
276:5 277:3,8
278:23 279:4

279:14,22
281:10,14
284:12,15,18
285:2
city's   96:4
138:20
civil   63:17 82:7
82:24,25 83:15
84:8,9 85:4,9
85:17,20,25
86:3,8,11,13
87:3,13,17
89:8 94:5
97:21 98:1
117:9,12
128:11 168:24
213:1 245:3,5
245:8,9,24
246:2 259:21
275:4
civilian   36:4,5
97:9,15 260:5
civilians   36:3
claim   43:20
44:4 47:1
63:22 93:25
94:23 99:8
123:8 128:24
178:9 200:9
263:17 270:9
claimed   46:23
claiming   99:10
claims   10:15
27:2 28:4

Carroll Reporting & Video
www.veritext.com							A Veritext Company							586-468-2411
www.veritext.com

[claims - commencing]                                              Page 15

46:24 47:1
82:3,5 86:7
128:17 175:22
176:3 218:17
**clarification**
40:23 48:17
**clarify**  19:12
22:23,24 86:4
116:3 125:3
149:13 150:6
159:16 160:6
210:21
**clarifying**
256:12
**class**  39:22
66:11
**claus**  90:4
**clayton**  248:22
**clean**  20:7 44:6
44:7 115:25
184:10,16
234:17
**clear**  9:2 21:10
40:17 42:1
43:7 44:22
45:6 72:15
92:7 105:11
127:23 130:24
141:25 142:8
167:9 181:14
190:18
**cleared**  258:11
**clearly**  8:16
125:22

**clerk**  273:3
277:7
**client**  46:17,22
46:25 47:2,12
**client's**  249:21
**clients**  47:1
**climbed**  102:10
**clock**  224:10
**close**  135:3,4,4
139:18 224:13
**clothes**  95:4
**cloud**  119:19
141:19
**clown**  237:19
**club**  91:11
189:24 265:22
**clue**  105:11
**coam**  173:22
267:12
**cobra**  199:23
200:1,11,16,24
201:16 263:7
263:12 284:23
284:23 285:6
285:13
**codes**  132:15
**coffee**  149:18
202:22 214:12
260:10
**collaboration**
42:25 54:9
**collaborative**
41:7,14,15
42:6,14

**colleague**
254:21
**colleagues**  90:3
233:5 259:19
**collect**  18:11
**collected**  52:23
**collection**  18:7
18:10
**collective**  31:11
31:16,21
173:21 203:4
213:8 215:11
216:10,14
223:8 266:21
269:22 270:6
276:7,16 277:5
**collectively**
63:15
**college**  14:12
14:14
**color**  190:5
233:5
**combined**
77:24 125:14
**come**  21:18
27:4 41:17,24
42:8 53:17,17
56:8 65:9 69:3
69:12 76:7
78:2 86:8 88:8
96:20 98:9,18
156:11 179:16
183:19 184:20
190:4,17

191:10 202:12
214:9,13 224:2
**comes**  16:7
33:6,6 56:9
181:13 207:22
**coming**  21:21
21:24 34:4
71:6 75:24
97:22 131:20
133:10 156:12
162:5 163:1
178:15 183:17
183:17,18
205:6 225:14
246:11 262:8
**command**  45:7
45:8 54:25
65:16 66:10
99:4 108:13
139:20 173:22
223:9,11,15
269:23 277:3
**commander**
35:8
**commanders**
105:8
**commands**
105:18,20
**commenced**
193:4
**commencem...**
196:20
**commencing**
1:19 196:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                  586-468-2411
www.veritext.com

**[comment - comptroller's]**                                          Page 16

comment   32:20
  33:4 140:21
  177:23 283:5,7
comments   5:23
  7:7 45:24 46:9
  146:14 147:8
  154:21 155:8,9
  233:12,18
  237:15 283:5
commission
  30:24 149:6
  212:12,15
  228:20,22
  229:1 231:9
  232:1,3 254:2
  254:5 257:20
  259:22 286:25
commissioner
  25:19,21 26:9
  41:20 82:9,17
  108:1 129:7
  130:3
commissioners
  31:7 229:19,20
  229:25
committed
  171:1 283:10
committee
  54:23 56:6
  126:22
common   97:11
  112:16 176:9
  176:15 197:7
  265:21

commonly   25:1
communication
  36:2 44:10
  55:14 160:4
  272:23
communicati...
  139:12 156:21
  175:9 189:3,6
  235:6,12 236:6
  238:3,7 280:4
communities
  39:24 70:22
  212:25
community
  17:3 25:2
  45:11 54:5,6
  88:14 90:2,11
  98:4 135:16
  154:15 162:11
  162:14,15,16
  162:16 163:6
  163:14,16,17
  174:20 179:12
  179:12,13,14
  179:17,25
  180:21,23
  181:2,23,24
  182:4,6,16,22
  186:4 206:15
  230:7 234:20
  235:4,20
  257:17 261:13
  280:7

company   10:23
  13:14 102:14
  218:17
compare   146:9
compel   81:17
compelled
  149:19
compensation
  38:19 198:18
competitive
  222:10
complain   177:7
complained
  225:9
complainer
  178:1
complaint   4:21
  10:12,16 32:23
  62:2,9,18,19
  63:4,7 77:7,25
  87:2,3 93:2
  119:3,12
  147:20 175:2
  175:10,13
  190:11 215:15
  215:22,22
  225:18,22
  226:4,4,7
  241:2 244:22
  248:10 252:23
  252:24 255:16
  256:23,25
  257:5 258:20
  263:20,21

269:8 272:10
  280:8,12
  282:13
complaints
  77:12,14,21,25
  84:9,10 85:4,8
  87:13,14 92:25
  93:25 117:17
  117:22 245:9
  245:10 280:5
  281:22
complete   11:15
  96:7 100:4
  152:18 206:13
  213:15,15
  277:12
completed
  48:21 114:1
  276:16 277:7
completely
  96:20 141:17
  147:13 186:9
  275:13 280:12
comply   214:24
  274:7
compound
  122:10 224:18
compromised
  70:8
comptroller
  268:2
comptroller's
  249:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[computer - continued]                                          Page 17

computer
45:17 111:22
115:16,19,23
119:19 135:23
183:11 286:10
computers
135:22 138:20
concerned
190:19
concerning
63:16 189:13
concerns  45:4
129:1 148:4
188:10,14
189:14 202:24
concert  145:13
154:10 155:21
157:14,18
166:25 182:16
conclude  81:9
81:24
concluded  75:7
94:9,10 285:24
concur  31:13
31:13
concurred
59:15 60:12,15
80:16,17
230:21
condition
183:15
conditions
275:13

conduct  79:25
80:1,23 124:11
124:13 125:18
conducted
26:24 30:20
113:23 169:25
170:17
conducting
114:23
coney  149:4
conference
88:24 89:2,5,8
89:22 107:13
255:12
confidence
174:18 232:17
232:19 233:3,7
confidential
53:21
confirm  254:16
confirmation
95:18
confirmed
156:23
confirms  259:6
confusing
222:1 224:19
conjunction
44:5 188:25
connect  163:19
consent  42:21
consequence
112:7 166:16

consider  109:6
163:16 242:11
consideration
197:18
considered
12:6 100:3
282:15
considering
155:3
consistent
235:25
consistently
77:6
consolidate
41:21
consolidated
199:22
constan  266:2
283:9
constant  154:7
155:14,18
178:1,1 208:7
constantly
156:16 162:18
178:2
constitution
233:6
constructive
59:9,13 60:5
165:21 201:10
constructively
165:20
consume  26:3
90:23

contact  78:8
93:8 112:8
172:18
contacted  20:6
20:15
contain  195:11
contained
10:12 63:24
contemporary
65:11
content  235:11
contents  4:1
122:19
context  23:19
183:5 269:17
282:24
continual
279:22
continually
281:21
continuation
48:2
continue  13:24
51:11 61:4,7
61:11,21,23
100:11 174:22
199:18 200:25
219:17 259:12
284:25
continued
60:22,24
174:13 232:24
234:25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[continues - correct]                                                    Page 18

| | | | |
|---|---|---|---|
| **continues** | 146:23 | 190:9 254:13 | 39:8 41:2 43:7 |
| 117:16 194:2 | **conversation** | **coordinated** | 48:12 50:4,22 |
| **continuing** | 21:3,15 22:1 | 146:12 233:24 | 56:23,24 57:5 |
| 183:25 184:4 | 23:19 26:18 | **coordinating** | 57:9 58:1 60:5 |
| 279:20 | 28:18 89:21 | 235:4 | 60:6,13 61:1 |
| **contract** 38:4 | 111:5,17,20 | **coordination** | 61:10 64:16 |
| 38:16 39:19 | 117:11,25 | 237:25 | 71:18 73:18 |
| 56:20 57:1,2,8 | 118:5 123:1 | **coordinator** | 74:6 85:16 |
| 57:24 58:20 | 130:18 137:19 | 259:9 | 87:18 92:12 |
| 66:21,22 | 138:7 144:18 | **cop** 135:16 | 99:9 100:23 |
| 192:11,18 | 149:24 152:12 | **copies** 52:5 | 103:16 109:17 |
| 201:22 216:15 | 157:23 159:13 | **copy** 27:14,17 | 109:25 110:1 |
| 216:17,23 | 159:14 160:8 | 29:3,20,21 | 110:20,21 |
| 264:11,12 | 177:17 179:9 | 30:1,1,3 38:5 | 114:4 121:1 |
| 270:17 272:6,8 | 179:10 202:12 | 42:11 50:4,6 | 124:18 125:2 |
| 274:20 275:1,3 | 225:7 235:22 | 101:3 138:23 | 127:9 129:15 |
| 276:16 277:7 | 236:19 255:18 | 175:4,17 | 129:16 134:11 |
| **contracts** 73:7 | 262:16 270:5 | 192:11 273:5 | 134:12 137:7 |
| 197:9 216:16 | **conversations** | **corey** 35:8,9,14 | 144:3,12 151:1 |
| **contradiction** | 21:23 44:16,22 | 108:10 241:25 | 157:20 158:1,5 |
| 274:8,13 | 53:22 54:20 | **corner** 153:6 | 159:4,5 164:14 |
| **contrary** 230:9 | 66:9 78:9 | 192:6 | 168:9 171:3 |
| 266:20 | 80:20 84:1 | **corporal** 111:7 | 175:23 178:21 |
| **contrast** 146:9 | 86:10 88:2 | 111:9,13,21,25 | 179:7 184:15 |
| **control** 36:16 | 90:11 95:19 | 114:2 247:1 | 192:15 193:1,6 |
| 96:3 168:17 | 99:15 167:20 | **corporation** | 193:16 195:12 |
| 209:4 215:4,4 | 185:12 188:24 | 1:11 3:9,14 6:8 | 197:24 198:4 |
| 215:5 231:16 | 234:4 236:17 | 166:5,5 | 199:14 200:7 |
| 231:17 254:9,9 | 236:25 252:21 | **correct** 12:16 | 201:18,19 |
| 278:22 | 266:13 | 12:17 13:20 | 202:5 203:6,14 |
| **controlled** | **cook** 177:14 | 16:21 18:12 | 204:10 206:3,6 |
| 148:8 160:12 | **cool** 89:13 | 24:14 29:4 | 206:9 209:12 |
| **controlling** | **cooper** 101:14 | 34:2,3,20,23 | 209:13,16 |
| 36:14,16 | 116:4 119:4 | 36:7 38:20 | 211:5,6,19,20 |

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                   586-468-2411
www.veritext.com

212:5,9,10,13
212:16,17,19
212:20,23
213:1,2 215:12
215:20 216:1,2
216:14 217:17
217:18,21,22
217:25 219:23
219:24 220:13
221:1,24
223:12,13
225:5,6,11
228:1,17,18,20
228:21,23
229:2 230:10
230:11 232:10
232:20 233:16
233:17,19,20
234:23 236:10
243:1,2 244:8
244:24 245:2
248:23,24
253:25 254:1
254:19 255:17
256:9 257:14
257:15,17,18
261:2 264:14
264:15,25
265:1 267:6
269:25 273:22
277:20,21
278:1,16 279:7
283:6 284:12
284:13 286:11

**correctly** 18:1
23:1 33:2
50:25 99:24
111:5 112:5
113:11 118:12
144:24 151:16
175:19 225:23
243:13 246:22
259:1
**corresponden...**
99:21 100:2,3
100:6,8
**corruption**
63:16,17 128:8
128:17 205:1
243:18
**cortisol** 150:16
**cortizone**
219:14
**cost** 96:11
**couch** 45:2
**council** 2:25
3:6 5:15 6:7,9
16:16,19 17:4
28:6 60:16
63:19 77:10
80:10,12 97:19
98:12 145:14
146:10,12
148:2 149:4,6
150:19,25,25
151:16 154:10
155:3,5,6,7,22
157:14,18,19

158:24 160:4
160:11 164:19
165:14,16,19
165:22,23,24
167:1,18,24
172:24 173:4
173:23 174:5
179:1 181:7,14
186:20 189:7,8
189:11,14
190:19 197:10
197:16,19
208:3 223:16
224:3,14,23
228:1 232:23
233:12,18
234:1,22 235:7
236:8,9 237:13
237:14,17,18
238:1,24 239:2
239:12,14,21
240:3 246:20
246:25 247:11
247:15,17,20
247:22,23
248:13 249:8
250:10 252:15
253:10,14,24
254:22,24
256:19,21
264:25 265:3,8
266:11,18
267:20 268:13
268:17 269:11

270:3 271:8
272:7 273:6,19
275:5 279:23
281:5
**councilman**
96:12,13
227:21,24,25
228:6,7,7
247:22,22
253:13 254:17
254:17 256:18
276:24
**councilwoman**
276:23
**counsel** 3:9,14
6:1 7:7 25:11
27:10 147:17
174:1 175:11
192:5 214:1
254:21 272:11
286:13
**counseling**
30:10 90:22
**counselor** 26:7
**count** 263:23
**country** 9:20
53:17 186:9
**counts** 24:22
**county** 127:20
172:21 212:3
242:19 286:4
286:24
**couple** 6:16
15:12 25:18

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[couple - date]                                                                                          Page 20

35:4 41:7
53:18 66:12
88:21 104:15
133:8 206:17
242:2 253:22
281:7
**course**  57:23
67:20 87:19
102:12 127:16
140:15 162:19
176:25 188:5
261:21 274:23
278:8 283:2
**court**  1:1 8:7
8:10,15 53:5
91:17 111:9
173:15 212:3
232:14 238:14
241:8,10,12,13
244:15
**courtesy**  284:5
**cousin**  143:11
231:24
**cousin's**  146:13
**cover**  79:15
210:23 221:12
**covered**  61:14
61:17 158:22
160:25 219:11
220:5 282:3
**covering**
200:11 219:12
**cpl**  113:3

**create**  43:21
44:7 68:7
74:21 87:21,25
97:20 105:5
106:3 141:8,16
183:21 184:6
255:23
**created**  47:25
47:25 50:1
55:20 68:7,13
68:17 74:13,14
74:17,21
120:25
**creating**  41:11
43:1 44:22
65:7,10 66:21
112:25 121:2,4
179:11
**credible**  26:5
**credit**  125:25
249:6
**crime**  155:25
156:3 186:7
**criminal**  14:21
101:22 106:21
169:1 177:4
241:6 243:6
256:23,25
257:5 281:22
**critical**  24:6
147:1,2,9
227:23,24
**cross**  54:23
221:8 285:5

**crossed**  131:13
**crr**  1:22
**cry**  155:9
**crystal**  72:15
167:9
**csr**  1:22 286:22
**cultural**  91:6
92:11 118:13
124:20
**culturally**
148:4
**culture**  65:1
92:6 138:3
148:5
**cup**  214:12
**cure**  97:21
**curiosity**  47:5
**current**  49:19
127:17 146:18
175:11 220:24
249:3
**currently**  9:12
10:5,20 30:3
116:17 140:22
195:2
**custodian**
146:4
**custody**  101:19
105:1,2 169:9
242:17 248:14
**customer**
112:19
**cut**  142:8

**cv**  1:8
**cycle**  218:1

**d**

**d**  5:19
**d7**  189:23
265:22 283:16
**dad**  135:18
**dad's**  189:23
265:22
**dakhlallah**
2:20
**dakroub**
231:25
**daly**  251:9
**damaged**  153:1
**dana**  99:22
**dark**  234:6
**data**  122:7
135:22,23
155:25 156:19
186:5,7 208:9
**database**  97:8
**date**  5:16 7:11
16:8 18:14
28:14 59:8
71:8 73:11
78:15 83:12
120:9 132:6
166:12 192:23
196:9,12,14,20
196:22 221:9
222:23 268:24
272:19 273:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                                          586-468-2411
www.veritext.com

281:1 286:7
**dated**   272:23
**dates**   73:20
    77:23 143:5
    203:15 267:17
    269:8 272:22
    274:10
**dave**   4:25 80:8
    80:9 96:1
    149:7 187:6,12
    246:20
**david**   2:19
    101:14 107:11
    116:4 119:4
    183:15
**dawn**   98:2
    99:24 255:9
**day**   12:10,14
    16:24,24 24:20
    26:1,1 28:21
    30:8,8 33:9
    36:8,8 44:25
    44:25 60:8,18
    67:6,6 71:11
    88:19 125:21
    130:7 142:7
    146:15 148:2,7
    163:22 167:22
    176:20 177:15
    180:17 183:1
    187:11,23
    205:9 207:12
    211:11 238:13
    241:20,22,25

242:2 257:3
    260:10 279:23
    279:23 281:2,5
    281:6
**days**   6:16 12:11
    22:10 23:8
    35:1,4,12
    53:18 97:11
    109:24 110:14
    135:5 143:15
    150:4 159:8
    221:9 240:24
**dbh**   145:24
    151:11
**ddacts**   155:25
    156:1 235:20
**dead**   28:9
**deadlines**   34:16
**deakins**   192:15
**deal**   178:23
    179:21 224:11
    262:13
**dealer**   70:20
    71:22
**dealerships**
    79:17
**dealing**   88:15
    93:21 143:18
**dealings**   255:3
**dealt**   84:14
    280:13
**dearborn**   1:10
    2:22,25 3:6,9
    3:11,14 4:16

4:19 5:12,14
    5:15 6:7,9,17
    7:20 19:1,6,13
    19:18,20,22,23
    20:1,8 21:1,3
    21:13 22:12,17
    23:3,5 25:15
    25:22,25 26:17
    28:20,24 29:18
    30:25 32:1
    36:23 37:11,20
    37:25 38:17
    40:2 41:8
    46:20,21 48:15
    48:23 49:7
    51:18 52:18
    56:14,22 57:15
    57:18 58:3
    59:4 60:20
    61:9,13 62:17
    63:18 70:21
    71:7,12,14,16
    71:25 72:6,13
    72:13,14 74:5
    79:19 88:24
    98:6 110:19
    115:20 116:20
    117:16 133:23
    136:9,13,16
    139:14 146:14
    150:24 163:15
    164:10,11
    168:18 180:9
    183:20 194:9

197:18 199:20
    207:4 212:25
    217:19,23
    221:4,7 242:13
    242:18 251:3
    253:13,23
    255:6,7 257:19
    258:1,17
    259:22 263:9
    264:23,25
    273:6 277:4
    279:4,14
    281:10 284:12
    284:15,18
    285:2
**dearbornheig...**
    3:13
**death**   108:1
    129:15
**debrief**   53:20
**debriefings**
    98:20
**debriefs**   75:6
**december**   16:6
    18:15,16 92:3
    92:4 173:16
    228:22 274:12
**decided**   108:11
    152:25 178:18
    206:23 210:16
**decision**   32:10
    35:4 229:4,7
    230:9,17,20
    279:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **decompress** | 35:23 182:7 | 28:25 30:20 | 151:13 152:6 |
| 191:16 | 183:4 | 32:24 34:5 | 152:13 154:8 |
| **decorum** | **delays** 34:16 | 36:1,15,20,25 | 158:3 162:21 |
| 189:10,14 | **deliberately** | 39:21,22 40:7 | 171:6 176:20 |
| **decree** 42:22 | 150:11 | 41:1,2,6,8,10 | 177:2,5 179:20 |
| **deducted** 200:6 | **deliberation** | 41:13,24 42:3 | 180:2,3,20 |
| **deduction** | 33:17 | 42:6,9,18,21 | 181:1,10 182:2 |
| 285:8 | **deliver** 39:22 | 43:2,4,9,17,23 | 182:3 184:2,10 |
| **deep** 41:18 | **delivered** 39:22 | 44:12,17,21 | 184:14,17 |
| 253:3 | **demand** 4:21 | 46:19 53:24 | 185:1 186:10 |
| **defendant** 1:12 | 62:2 161:10 | 54:7,13,15,24 | 202:20 203:4 |
| 2:17 5:15 6:3,5 | **demanded** | 55:2,4,24 | 206:9,14,20 |
| 6:6 7:17,22 | 160:2 190:15 | 63:20 65:1,2 | 207:4 209:1 |
| 101:22 106:21 | 269:18 280:17 | 65:16,19,24 | 218:4 222:4,10 |
| **defending** | **demands** 161:7 | 68:4 70:9 72:7 | 225:10,14 |
| 174:19 182:12 | 161:8,9,21 | 74:20 75:4 | 233:15 237:2 |
| **deficient** | 163:1 | 79:18,19 82:6 | 238:2,25 239:7 |
| 101:20 106:20 | **demeanor** | 82:22 84:4 | 240:13 242:8 |
| 248:14 | 228:8 | 85:7,18 86:2,7 | 245:24 246:6 |
| **define** 28:3 | **demographics** | 87:17 91:7 | 246:15 248:13 |
| 183:24 | 19:5 | 93:9,10,17 | 251:4 255:22 |
| **defund** 172:25 | **demote** 166:23 | 94:25 96:24 | 256:6,7 257:3 |
| 173:14 174:16 | **denied** 33:8 | 97:25 98:14,24 | 257:14,24 |
| 231:19 252:16 | 261:3 280:17 | 102:15,20,23 | 258:24 260:2 |
| 266:10,14 | **denise** 151:2 | 103:24 104:4 | 260:20 261:2 |
| **defunded** | 266:5 283:9 | 105:20 107:19 | 261:20 262:8 |
| 151:24 173:25 | **dental** 199:23 | 107:20 109:23 | 274:10 277:19 |
| 174:3,4,5 | **department** | 110:13,20 | 278:24 279:21 |
| 259:11 | 15:1 16:24 | 114:13 118:14 | 281:11,12 |
| **defunding** | 17:2,13 19:4 | 119:20 121:25 | **departmental** |
| 151:15 182:1 | 20:7,8 22:19 | 124:21 127:21 | 41:11 |
| 265:14 | 23:4,9,21 | 129:25 130:2 | **departments** |
| **degree** 14:8,20 | 24:16 26:13,19 | 139:10 142:18 | 26:22 41:16 |
| 14:21 15:18 | 26:20,22 28:10 | 146:5,18 | 97:11 240:12 |

240:17 268:4
**departure**
135:3
**depiction**
251:12
**deponent**
191:12 219:11
264:8
**deposed** 7:10
219:5,6,7
**deposition** 1:16
4:14,17,20,22
4:24 5:17 6:11
8:5,7,24 9:6
37:23 56:12
62:1 110:4
186:12 187:5
219:17 226:5
235:17 282:9
285:24 286:7
**depot** 102:9
**deputy** 213:23
**derelict** 271:16
272:7
**derwick** 210:11
**descent** 84:19
85:2,14 155:5
**describe**
209:23
**described**
239:18
**describes**
144:20

**description**
67:8,9 228:3
240:17
**descriptions**
184:3,4
**design** 56:10
220:15
**designated**
78:7
**designed** 56:5
**desk** 49:5,12,13
49:18,20
148:13
**despite** 250:23
**destroy** 27:19
27:21 29:2
154:20
**destroyed**
232:25
**destroying**
154:14,19
**detail** 100:25
**detective** 15:10
17:1 95:15
97:10 180:6,8
182:6 210:9,10
210:19,23
238:14 260:23
262:11
**detectives**
54:24
**determine** 26:4
87:16 102:1
106:14 122:6

136:1 137:10
151:17 153:21
153:25
**determined**
26:21 54:12
81:16
**detroit** 2:14
70:25 82:13
**develop** 54:6,23
55:21 66:6
183:21 184:5
**developed** 66:5
67:8
**development**
162:11 166:4,6
223:11,17
**device** 176:22
177:8
**dhpd** 63:17
101:20,23
106:22 109:21
110:11
**diabetes** 148:3
148:7 150:16
150:20 181:5
**dial** 72:2
**died** 129:7
130:3
**dies** 130:6
**diet** 148:8
**difference**
264:18 271:20
**differences**
265:7

**different** 29:11
34:8 40:24
77:9 159:7
161:8,9 178:10
200:12 222:7
230:8 234:20
240:9 250:1
272:22
**diffuse** 162:6
**digging** 132:18
**dildo** 153:2
**diligence** 39:13
**dinner** 181:16
**dinners** 150:13
178:7
**diploma** 14:9
**direct** 5:23 36:8
36:17 135:16
152:16 154:3
284:23 285:7
**directed** 79:24
111:23 117:15
172:18 232:17
**directing**
179:19 251:8
**direction** 55:5
114:21 244:19
**directive** 106:2
106:8
**directives**
106:5,5
**directly** 37:3,5
211:7 249:17

[director - discussions]                                          Page 24

**director** 11:1
12:15 16:1
20:5,16,19,21
21:19,24 22:6
27:22 28:6
52:23 64:3,21
64:21 74:7,10
75:16 78:7
113:10 114:21
120:7 125:18
128:23 130:21
133:25 136:21
137:23 141:6,6
152:15 156:9
160:3 161:6
162:1 166:4,6
170:18 171:14
171:16 172:11
172:25,25
173:20,20
174:7,7 179:15
179:21 189:15
195:3 203:24
206:17 211:2
213:22 217:2,3
217:9,15 218:3
230:19 243:12
243:15,23
244:9 245:2
249:18 256:23
268:9 279:10
279:11 285:6
**director's**
160:20 252:16

**directors** 36:12
40:20 50:20
151:16 182:1
189:11 190:20
211:18 216:12
218:8 222:14
223:7,12
224:16 232:25
236:8 238:2
245:1 246:4
265:6 266:10
266:19 267:10
270:22 271:1
276:6
**disagree** 229:4
**disagreeing**
273:25
**disappear** 52:3
**disappeared**
133:4
**disappointed**
107:7
**disbanded**
208:24 209:11
209:21,23
**disciplinarian**
26:8
**disciplinary**
170:19
**discipline**
16:25 17:18
31:9,10,10,14
31:15,23 33:19
34:5 37:6,9

67:24 80:6,14
80:15,16,18
106:7,10,11
142:5,14
146:19 153:7
170:22 171:22
171:24 228:16
230:12,15,18
267:1 274:6
280:17
**disciplined**
56:21 172:3
**discomfort**
190:20 219:16
**disconnect**
167:19
**discover**
110:22 151:20
**discovered**
102:2,16,20
137:16 138:8
**discovery**
27:10 126:23
236:13 238:4
275:25
**discrepancy**
38:24
**discretionary**
13:17
**discriminated**
85:15 181:20
181:25
**discriminating**
182:19

**discrimination**
86:13 182:15
283:11
**discuss** 76:14
95:10 111:17
**discussed** 64:8
77:3 79:3
83:16 85:20
89:15 94:5
95:7,9 120:19
134:4,9 149:1
181:24 261:5
**discusses**
188:13
**discussing**
46:16 90:20
110:7 231:1
**discussion**
13:21 69:17
75:24 86:6
89:25 92:2,21
97:20 120:15
131:14 134:6
138:2 144:22
158:8 160:13
160:18 163:11
173:4 211:1
235:20 261:13
266:9,23
276:21 278:10
**discussions**
72:24 77:2
86:3 89:6
107:18 163:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

192:17 218:5
223:9 236:7
284:1
**disgust** 100:5
**dishonest** 46:14
**dismiss** 120:14
135:19 136:16
142:1,13,19
185:22 244:12
244:13,14,19
**dismissal**
144:14 241:10
**dismissals**
144:23
**dismissed**
136:17 143:24
144:5,8
**dismissing**
118:21 120:13
125:23 126:1,4
267:3
**dispatch** 36:2
74:9
**dispatchers**
54:24
**displeasure**
228:12
**disposed** 8:1
**dispute** 267:22
273:11
**disrespected**
268:14
**disrupted**
279:23

**disrupting**
157:3 179:19
**disruptive**
254:10
**dissatisfaction**
100:21 223:17
224:4,16
**distract** 7:4
280:10
**distracted**
214:11
**district** 1:1,2
241:8 255:9
**disturbing** 26:6
**dive** 41:18
**diversity** 91:4,6
**division** 1:3
35:7 68:5 71:1
98:1 105:8
209:15
**divisional**
105:17
**divisions** 53:19
**divorced**
218:23
**divvying** 95:5
**docket** 281:23
**doctor** 89:6
**document**
38:10 41:22
46:5 48:15
51:7 56:25
60:7 192:25
195:4,14 196:1

196:5,7,12,15
196:17 201:6
240:20 277:9
**documentation**
130:14 139:11
251:22
**documented**
45:12 89:23
179:8 180:12
205:15 231:12
238:16 261:10
**documenting**
131:12
**documents**
45:15,19,23
46:1,15,18,20
47:18 48:4,24
49:1,17,23
50:9 51:2,15
51:21 53:7
83:20 132:19
235:21,25
236:18 249:3
**doing** 44:5 67:6
97:5 104:19
105:25 107:19
107:24 111:21
113:19,23
123:3 124:20
131:18 137:22
162:7 191:8
197:2 211:9
219:13 227:8
233:1 249:23

260:24,24
267:1 270:15
273:18 285:12
**doj** 41:24 42:13
43:6 44:3
77:11 92:18
95:20 99:14
107:20 174:19
176:4,6,17
179:10 233:2
**dollar** 11:19
**dollars** 133:4
264:14
**door** 19:20
43:15 102:5,6
102:7,8,17
103:14,15,22
104:12 125:6
244:11
**doors** 70:23
104:10
**dotted** 26:10
131:13
**dottor** 23:25
122:23 123:1,8
123:9,23 124:4
124:8,10
140:13 184:24
202:7,14,24,24
202:25 203:3
203:22,25
204:10 205:13
208:21 222:19
239:9 244:19

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                  www.veritext.com

261:18
**dottor's** 203:20
  205:8
**double** 224:19
**doubt** 150:2
  223:22 273:9
**downriver**
  20:10
**downstairs**
  260:22
**downtown**
  92:22
**dr** 24:25 25:4,8
  26:15 27:24
  28:4,8,12,23
  32:15 42:4
  48:10 50:1
  52:10 82:17
  129:14 240:15
**drafted** 120:6
  123:9 139:5
  170:15
**drafting** 245:22
**drafts** 46:9
**drank** 149:18
**drapkowski**
  146:1 233:14
  237:23
**drapovski's**
  146:2
**draw** 15:21
**drawer** 43:15
**drew** 197:12

**drg** 1:8
**drink** 260:10
**drinking** 25:23
  43:14
**drive** 214:12
**driven** 43:2,2
  70:22 155:25
  186:7
**drone** 95:15
**drop** 210:15
  232:11
**dropping** 183:6
**drugs** 94:25
**dte** 166:9,13
**dude** 123:5
**due** 133:10
  166:16 218:6
**duffle** 48:19
**duly** 5:6
**duties** 39:8,12
  39:14 57:15,20
  57:21 66:25
  67:7 111:21
  183:9 242:11
  242:22 243:4
  243:16 244:1
  244:25 245:1
  271:16 272:8
  279:16
**duty** 52:14 97:3
  113:18 114:14
  205:8 259:4
**dynamics** 19:6

**e**

**e** 5:19 10:8,8,23
  24:25 25:8
  26:15 78:14
  97:14,14
  111:11,11
  151:8 169:17
  169:18 240:15
**earlier** 28:17
  29:2 48:8 60:3
  64:9 71:17
  72:22 73:8,13
  77:3,8 99:20
  100:1 103:9
  114:10 172:24
  201:25 208:7
  225:5 248:17
  284:10
**early** 56:19
  98:21 125:21
  126:5 149:10
**earn** 239:16,17
  269:19
**earning** 126:3
**easier** 8:6
  105:15 140:18
**east** 103:3,6
**eastern** 1:2
  24:17 84:19
  85:2,14 88:20
  108:21 109:2
  255:8

**easy** 39:24
**eat** 148:6
  149:12 150:11
  150:11
**eating** 33:5
  149:15
**ecf** 272:13
**economic** 166:4
  166:6 275:18
**edit** 140:8
  141:5,11
**editing** 140:25
  141:1
**educate** 90:13
**educational**
  14:3
**eeoc** 87:2,12
  175:2,10,21
  245:23
**effect** 157:25
**efficiently**
  114:22
**effort** 43:21
  44:6 267:6,8
  282:9
**efforts** 97:19,20
  119:16 185:6
  267:16
**egg** 21:7 268:21
**eight** 43:14
  237:9
**either** 28:5
  31:13 35:5
  40:20 75:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

77:1 85:15
165:8 194:9,19
231:24 232:4
242:6 257:24
286:13
**elected**  128:11
135:12 142:20
142:20 143:23
144:4,14,25
145:1,4 168:16
**electorate**
168:17
**electronic**
175:17 244:16
**eligible**  257:25
**eliminated**
209:15
**email**  4:23,25
45:18 83:24
99:19 100:13
100:16,20,24
101:1,3,7,8,11
107:6 112:13
115:13,14,25
116:10,13,15
116:17,19,22
129:11 175:19
183:12 186:13
186:16,19,22
186:25 187:6
187:10,12,13
187:19,22
188:3,12 189:8
227:20,23,24

227:25 254:7
280:9
**emails**  49:7,9
55:20 79:1
99:21 100:14
115:17 116:3
135:13,13
143:21 182:10
187:1 188:6,9
188:18 189:1
191:6,6 226:25
238:8 280:21
**emergency**
183:10
**emotion**  189:25
**emotional**
189:17
**empco**  10:23,25
11:3,14 13:24
212:18
**employed**
10:20 60:25
70:12,15 74:5
116:19 135:2
204:22 221:19
257:23 263:11
263:12 265:5,5
265:6,7 279:4
**employee**  12:1
32:19,21 35:17
39:12 50:22
51:17,25 52:9
71:9,12,15
72:5 73:9

85:19 86:12
97:12 112:4
132:3 146:1
193:21,23
194:14,17
197:24 198:7
199:24 203:1,1
222:8 234:12
275:22
**employee's**
51:20 198:20
**employees**
13:15,22 17:9
17:12 24:17
26:6 33:10,20
34:5 35:25
36:7 50:17
71:24 72:11
73:10 79:14
81:19 84:11
85:5,9 86:7,11
87:9 114:3,12
184:2 195:3
222:15 223:6
245:10
**employer**
220:24
**employer's**
213:5
**employment**
4:15,18 7:14
14:3 37:24
38:16 39:8
56:13 57:1,14

59:3 60:20
61:20 72:1
76:14 133:20
166:15 175:1
178:24 179:18
180:15,15
193:4,22,23
194:3,12 198:3
198:4 201:22
264:11,12,22
271:22,24
277:18 279:8
279:14 284:11
285:3
**enact**  280:18
**enacted**  96:19
**ended**  51:2
110:7 162:8
200:11 203:5
203:13 206:8,9
208:15 213:20
214:22 220:23
222:14,25
226:23 228:15
230:8 235:4,14
242:16 244:4
251:7 261:6,18
265:18 269:22
270:4 273:12
273:18 274:2
279:13
**ends**  225:22
**enemy**  265:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                              586-468-2411
                                              www.veritext.com

enforcement
25:1 88:21
119:16 127:2
128:10,13
130:5 135:12
144:19 157:11
212:21 242:13
251:2 252:20
engage 181:1
229:24
engaged 79:14
180:21 235:1
259:3
english 147:18
153:18,19
enhancing
44:10
ensure 114:22
enter 97:7
111:8 113:5
114:6
entered 113:13
198:3
entering
111:22 113:12
entire 53:5
149:6 168:17
181:10
entities 77:10
entitled 199:17
entity 77:20
entries 114:23
environment
55:18

equal 185:20
198:20
equation 156:6
equipment
58:18
erase 115:23
erica 259:13,16
erickson 79:24
81:1,8,8 106:9
106:10,11,12
107:23 108:4
108:19 109:12
124:13 143:15
178:7 206:1,5
206:7,12,18
erickson's
80:18
especially
65:16
essence 190:4
essentially
150:24
estate 154:5
ethnicity
158:16 226:8
evans 166:9
event 199:9
286:13
events 232:10
280:3
everybody 88:1
88:17 89:20
92:8 105:15
122:16,18

141:18 184:19
186:1 238:14
258:18 260:14
everybody's
258:18
everyone's
162:4
evidence 46:24
59:25 68:12
95:16 101:19
101:19,22
102:2 104:9
105:11 106:21
106:23 122:11
195:15 205:6
223:24,25
224:13 229:8
233:23 235:2
235:13 236:4
237:20,21,22
242:17,18
248:14 267:22
283:8,21
evidentiary
107:17
evolvement
184:1
exact 28:14
77:23 119:17
120:9 191:8
192:16
exactly 21:8
207:11 227:7
256:9 262:10

263:22 265:20
271:7 280:16
examination
4:6,7,8 5:9
160:10 191:21
284:8
examine
191:15
examined 5:8
example 50:23
51:6 89:14
95:14 136:8
155:12 210:21
235:13,16
266:17 278:10
except 155:23
236:9 262:11
exception
144:1
excessive 77:14
168:24 169:3
170:4,5
exclusive 75:20
excuse 169:8
234:13 280:5
executed
192:18 193:15
196:22 209:19
exemplary
225:24
exhaust 166:2
exhibit 4:11,14
4:17,20,22,24
37:23 56:12,18

61:3 62:1,20
186:12 187:5
187:10 191:25
192:1 195:5,11
195:18,20,23
195:24 198:11
198:11,16,24
201:22 215:9
226:7 227:4,16
227:21 228:1,2
247:5 248:10
252:25 253:3
264:12,13
272:9,10
276:14
**exhibits** 4:10
4:12 226:24
**exist** 209:24
281:12
**existed** 103:7
141:4
**existing** 74:12
222:15 223:6
**exit** 81:12
261:7
**expectation**
55:25
**expectations**
39:15,18
**expected** 53:25
56:2 57:22
113:18 224:25
225:1,2

**expectedly**
235:5
**expecting**
99:16
**expenditure**
132:20
**expenditures**
133:5,13
**expenses**
221:12
**experience**
40:11 65:4
132:16 150:3
161:4 180:16
182:8 221:20
230:6
**experienced**
208:11
**experiencing**
265:22
**expertise** 39:13
**experts** 41:23
53:16 98:9,19
186:8
**expire** 277:6
**expires** 286:25
**explain** 30:23
56:3 88:11
100:24 135:15
**explained**
13:13 24:5
161:5
**explosives** 71:2

**express** 190:19
223:16
**expressed**
224:4,15
**expressing**
100:20 228:12
**expressway**
246:12
**extensive**
282:14
**external** 26:3
**extortion**
256:24
**extra** 239:4
**extreme** 214:1
**eyelid** 249:22
**eyes** 262:1

**f**

**f** 14:5 32:9,9
232:7,10 277:9
**fabricated**
233:9,9 280:12
**face** 153:7
169:6,14 246:7
249:22
**facebook** 154:3
257:1 283:24
**faces** 103:3
**facetime** 55:17
**facilitate** 40:14
41:3 97:19
98:13

**facing** 103:6
**fact** 81:7 89:25
104:14 146:13
217:20 250:23
251:24 260:19
265:2 271:5
**factions** 26:19
**facts** 35:3
59:25 68:11
122:11 167:14
167:17
**factual** 122:6
215:2
**fadwa** 99:22
**fail** 100:12
247:1
**failed** 45:25
159:25 160:9
234:3 280:18
**failing** 146:18
**failure** 166:19
247:16,18
**fair** 33:21 34:6
57:22 59:17
75:11 101:21
106:20 168:16
210:13 228:6
230:14 233:5
263:16 266:17
279:6
**fairly** 88:18
213:21
**faith** 282:9

fall 147:14
familiar 19:14
  19:17 20:4,20
  63:25 101:24
  128:20,21
  177:1 217:19
  217:23
families 161:24
family 38:25
  61:17 90:16
  136:17 161:22
far 38:23
  174:25 240:9
farhat 179:16
  180:5,8 213:22
  214:18
farhat's 182:25
  183:1
farinha 3:8 6:8
  6:8 63:2 69:24
  70:2 71:9
  73:16 75:2,21
  76:19,20,21
  124:3 215:2
  234:9 264:6
fashion 221:18
  233:24
fastest 112:23
faten 84:12
  203:23 205:15
father 230:2
fausone 2:4
favor 229:2

favorable
  265:19 266:3,7
  274:3
favorites
  265:11,17
fbi 77:11 92:25
  93:2,4 95:19
  99:14 176:6,17
  177:2 243:24
  244:1 246:6,15
fearful 283:12
february 13:6
  18:4,22 22:13
  34:20 35:5
  37:12 91:25
  92:5 109:19
  110:9 192:25
  193:4 271:24
  272:21,23
  273:1,7,9
  281:10
federal 63:21
  71:22 82:11,13
  83:9 128:9,19
  128:25 130:16
  156:1 176:19
  176:24 177:1
  243:19
fee 11:20,21
  12:5
feedback 53:23
  80:3
feel 18:19
  225:13 242:21

243:3 268:17
  276:5
feeling 238:24
feet 88:5 102:8
  102:8 220:17
  220:20
fellow 250:2
  252:17
felt 24:15 30:6
  40:21 86:12
  99:6 149:19
  177:7 180:1
  268:13
fence 102:10
fenton 3:10
ferris 14:15,16
  14:17 15:3,18
ffl 70:20 71:20
  71:21 75:8
field 70:25
  162:4 182:9,13
  239:17
fifth 122:25
figure 86:2
  204:11
figured 197:3
file 50:13,22,24
  51:4,8,20
  138:19 143:8
  171:6 175:2
  188:23 200:23
filed 62:9,16,17
  62:18 63:5,7
  83:1 85:22

175:5,11,21
  190:11 213:20
  256:24 267:17
files 30:4 48:11
  50:12,14,16,17
  51:11,14,17
  52:2,6,9 85:7
  86:17 87:7
  254:13
filing 62:21
  267:11
fill 260:11
  284:23 285:5
filled 217:4,9
  217:16 278:1
filming 231:25
  232:1
filthy 52:21
final 39:10
  187:9,13,19
finally 173:17
financial 38:25
  72:23,25 131:8
find 9:25 14:2
  27:4 98:5,24
  99:19 101:15
  107:11 119:4
  128:1 134:24
  139:8 152:16
  178:4 179:3
  189:13 229:14
  254:13
finding 79:15
  90:1 124:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[finding - forced]

125:9,19
126:17
**finds**  188:3
**fine**  7:3 62:6
90:19,25 91:2
153:19,23,24
201:9 260:16
**finish**  8:14 53:5
65:21 66:5
70:15 91:17
113:25 147:3,5
167:16 234:9
**fire**  17:20,22
43:15 68:1,2
90:16,17,18
105:15 139:3
164:16,17,19
165:1,3,5,10,12
165:19 166:20
167:18 183:8
211:11 213:1
231:17
**firearm**  71:22
250:23 251:2
**firearms**  71:1
112:16,17,21
**fired**  127:5
163:23,25
164:3 165:22
165:24 167:6,6
240:1 278:23
283:25 284:2
**firefighter**
230:2

**firm**  29:10 50:2
192:12,14,16
240:22
**firms**  52:5
**first**  4:21 5:6
16:13,20 17:1
21:6 24:20
26:2 28:21
44:9 57:14,24
62:2,24 73:11
73:19 81:6
87:19 106:13
116:16 148:2
150:7,8 151:25
152:2 156:10
157:21 160:21
161:11,13,14
173:3 177:10
180:12 181:17
193:21 198:3
198:22 211:11
215:22 220:25
248:9 252:24
263:20 266:10
266:13 267:11
272:10 274:15
**firsthand**  144:9
145:10
**fiscal**  268:5
**fitment**  69:20
71:16,23 75:23
**five**  15:25
43:14 62:11
87:15 101:16

146:9 193:7
196:4,21,21
247:5 261:22
**fix**  184:15
**fixed**  79:17
**fixing**  77:15
120:1 125:6,8
125:9,12,15
127:24 128:9
135:8 142:12
144:13 244:22
**flee**  70:24
**flood**  47:7
**floor**  77:18
96:7
**flow**  81:15
**flying**  95:15
**focus**  63:12
88:14
**focused**  154:22
205:1
**foia**  178:1
208:5 259:9,14
260:12
**foia's**  260:11
**folder**  115:16
121:11 141:18
**folders**  141:19
141:24
**folks**  42:19
43:3 89:10
**follow**  81:18
89:21 92:17
95:17,21 99:16

105:20 115:2
134:2 138:25
172:19 204:25
205:25 213:5
228:3 233:6
247:8
**followed**  79:1
134:21,24
215:11 227:23
227:24,25
**following**  96:25
101:16 106:6,8
143:15 170:11
170:20 187:11
209:19 213:4
217:4,10 223:7
273:5 276:22
**follows**  5:8
277:11
**fond**  155:5
**food**  148:5,6
**force**  17:7
19:17,18 35:23
35:24 77:15
81:11 129:17
129:18 150:10
158:14,20,20
166:19 168:24
169:3 170:5,5
170:17 280:19
**forced**  99:6
201:17 258:23
283:1

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[ford - gary]** Page 32

**ford** 251:9
255:4,19
**foreclose**
270:25
**foreclosed**
274:17
**foregoing**
286:8
**forfeiture**
128:9,19,25
130:16 131:7
131:14 133:9
243:20 248:19
**forget** 71:19
**form** 33:22
42:20 43:24
72:12 127:15
168:12,19
176:12 197:4
205:4 207:7
213:25 217:11
221:25 224:18
225:15,17
228:9 251:10
260:6 277:13
280:9
**formal** 76:7
114:18 226:21
260:25
**formed** 171:15
**former** 21:2
50:17 51:24,25
80:10,12 146:1
154:16 202:6

**forth** 36:10
148:6 161:1
162:5 195:3
199:20 276:24
286:8
**forthcoming**
206:22
**fortitude**
173:18
**forward** 30:12
42:10 53:23
121:19 187:13
202:12 224:2
**found** 13:6
80:6 109:12
111:1 121:11
122:8 126:6
131:22 132:7
138:8 176:23
177:20 229:1
**foundation**
19:10 176:13
227:8 275:12
**four** 15:9,18
28:15 35:1
63:13 84:14
87:15,15
102:22 169:7
198:19,23
199:6 236:23
251:23
**fraud** 249:6
**free** 127:4

**freely** 262:10
**friday** 98:21,22
259:12
**friend** 136:18
142:25 178:5
229:10
**friendly** 264:24
**friends** 91:12
128:10 135:12
148:5 167:4
168:2,3 182:23
**friendship**
168:4,9
**fringe** 195:4,12
**front** 48:6
70:23 195:24
238:17 239:2
**fruit** 56:4
**frustrated**
191:4
**fuck** 231:6
**full** 11:5,7 12:1
12:15 102:6
198:23 259:20
286:11
**fully** 8:20
**fun** 70:10
**functionally**
36:21,25
**functions**
174:22
**fund** 77:16
79:6 80:24
81:15,19,22

82:7,19 83:16
94:7,11,15,16
94:18 106:16
131:7,19 133:4
133:9
**funding** 54:10
54:11 163:7
268:8
**funds** 60:24
61:7 128:9,20
128:25 130:16
130:20 131:14
174:8 243:20
249:10
**funny** 256:9
**further** 80:20
274:14 276:21
285:17,18,20
**future** 113:2
114:12 279:6

**g**

**g** 4:23 32:9
186:13
**gain** 131:8
**gallon** 62:7
**garage** 102:6
103:2,4,6,12
104:2,5,12
**garages** 95:5
**garrity** 81:17
**gary** 3:1,2 6:4
199:1 205:9
211:12,22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 214:9 224:1 | **give** 9:13 18:14 | 92:6 96:20 | 47:10,11 48:5 |
| 247:13 265:12 | 31:18 42:17 | 99:21 104:2 | 51:24 56:18 |
| 281:11 | 45:4,24 46:8 | 113:25 127:17 | 59:2 60:8 |
| **gather** 246:21 | 48:22 77:23 | 142:17 148:12 | 62:19 86:2 |
| **gear** 52:20 53:1 | 89:1 99:12 | 152:20 166:3 | 87:24 88:1,3 |
| 53:6,9 | 130:20 179:20 | 183:16 186:5 | 90:1 96:11 |
| **generally** 39:19 | 187:9,15 240:4 | 197:6 199:5 | 98:6,24 100:4 |
| 141:12 | 244:19 251:25 | 203:13 205:22 | 100:19 103:23 |
| **generated** | 270:10 | 206:2 209:18 | 104:8 116:8 |
| 122:8 | **given** 35:10 | 210:25 211:2 | 118:14,16 |
| **generously** | 46:10 108:7 | 213:14,18 | 129:12 134:15 |
| 219:14 | 161:16 162:2 | 221:10,12 | 139:2 141:16 |
| **genesis** 197:2 | 209:18 218:25 | 224:12,22 | 143:20 144:21 |
| **gentlemen** | 239:16 240:21 | 228:11 244:13 | 146:17 149:18 |
| 96:10 | 240:21 244:6,6 | 253:4 255:10 | 152:21 153:6 |
| **germane** 39:19 | 251:12 259:7 | 257:6 258:23 | 153:15 154:5 |
| **getting** 42:17 | 269:19 282:3,9 | 259:17 260:10 | 162:2,4,21,22 |
| 122:4 142:7,22 | 284:4 | 272:4,15 282:4 | 163:23 164:17 |
| 160:21 162:17 | **gives** 282:11 | 285:23 | 164:19 166:8 |
| 175:9 178:14 | **giving** 84:17 | **goal** 39:20,25 | 167:5,5,6,7,10 |
| 178:15 185:18 | 245:4 | 40:15,22 87:20 | 167:21 168:23 |
| 191:3,4,13 | **glucose** 148:12 | **goals** 39:14,17 | 176:23 177:12 |
| 199:3 204:5 | **glycemic** | 39:25 40:1,4,7 | 179:20 185:23 |
| 205:7 206:21 | 149:23 | 40:12,14,17,21 | 186:10 187:9 |
| 227:8 239:22 | **go** 8:5 14:4,12 | 40:25 41:1,2,3 | 197:12 199:7 |
| 240:3 244:4 | 14:14 15:15 | 41:12,25 43:1 | 200:25 208:23 |
| 262:12 265:19 | 16:1,9 18:25 | 43:7 44:11,22 | 209:2 219:17 |
| 267:2 280:11 | 19:24 20:7 | 53:12,22 | 220:4,7 221:21 |
| 281:24 282:5 | 50:18 55:18 | **goes** 92:8 | 222:23 230:16 |
| **gift** 125:22 | 56:20 66:11,11 | **going** 7:5 8:21 | 239:1,3,16,25 |
| 126:5 174:18 | 76:3 81:25 | 15:24 19:8,9 | 250:22 252:3 |
| **girl** 146:20 | 82:10 83:9 | 24:22 26:12 | 255:8,23 |
| **girls** 24:1 111:6 | 85:6 88:12,16 | 30:5 38:7 | 261:11,18,23 |
| | 88:23,25 89:1 | 40:23 43:9 | 265:11 266:12 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[going - handed]**

269:13,15
270:22 277:23
278:14,15,21
279:5,10,15,20
283:15 284:6
285:14
**golden** 87:22
162:3 261:16
**goldsmith** 1:9
**gonzalez** 260:4
**good** 62:10
87:24 91:11
148:11 154:22
155:17 168:2,2
229:10 238:19
248:12 256:10
256:11,15
264:7 270:20
280:7 282:4,9
282:17
**goodness** 147:4
**gosh** 44:14
**governed** 31:22
**government**
12:7 63:17
77:10
**governmental**
164:11,13
**grab** 50:16
51:1 59:20,22
70:23 85:6
**grabbed** 49:5
**grace** 156:18

**grade** 161:4
**graduate** 14:6
14:18 15:3
**graduation**
262:12
**graff** 32:7,10
32:16 33:3,6
34:2,14,22
241:1 250:3
**grain** 184:22
**grand** 2:13
**grandbaby**
183:16
**grandfathered**
273:20
**grant** 119:15
162:12
**great** 232:2
261:3 263:2
**greenfield** 2:21
**grew** 19:20
20:10
**grievance** 99:2
99:5 211:8,11
213:19 214:17
214:23
**grievances**
141:20
**grieve** 282:22
282:24
**grieving** 282:25
**ground** 8:6
169:6,14 233:4
246:8

**group** 2:12
5:12 70:2
**groups** 89:8
98:4 141:16
**grysko** 2:4
**guarantee**
13:18
**guess** 7:11
11:15 20:2
22:24 31:2,12
32:22 40:23
83:20 86:4
177:12 240:7
242:15 257:11
267:19 268:1
275:16
**guessing** 15:13
**guns** 52:13,14
53:1,6,9 70:24
**guy** 38:25
107:25 108:4
109:6 131:22
135:22 162:12
174:19 182:5,9
182:11 183:7,8
189:17 206:2
209:7 214:5
231:16 232:4
233:3 238:19
261:23 267:2
280:6
**guy's** 162:22
179:23

**guys** 91:11
106:17 123:2
161:22 167:4,5
182:21 183:17
190:11 191:4,6
229:13 231:18
233:1 256:17
266:18 271:17
280:21 282:1
**guzowski** 66:15
66:18,19
109:16,17
210:12

**h**

**h** 5:19
**haddad** 21:3,4
**hak** 173:5
**half** 44:25
189:13 196:21
249:22 270:14
279:17 282:2
**hall** 162:13
255:5
**hammoud** 2:20
33:5 84:13,25
99:22 100:7
241:2,9 245:20
257:4
**hand** 56:18
62:19 80:15
283:3
**handed** 59:14
60:7 267:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[handful - heights]                                                      Page 35

**handful** 131:17
**handle** 112:4
  156:18
**handled** 86:16
  259:21
**handling** 43:10
  171:1
**hands** 267:2
**hanging** 56:4
**happen** 159:7
  160:23 167:5
  189:19
**happened**
  20:24 33:11,13
  50:13 56:3
  87:8 91:15,21
  130:25 143:6
  151:21 154:1
  178:6 189:4,7
  190:5,8 202:15
  202:16 231:12
  231:13 241:5
  241:15 256:25
  257:5 269:7
  280:6
**happening**
  156:7 220:8
  227:22 239:15
**happy** 8:18 9:6
  223:11 228:8
**harass** 147:13
  154:7
**harassed**
  183:14

**harassment**
  146:11 190:7
  232:24 279:22
**hard** 34:9,15
  140:17 161:13
  163:19 225:21
**hart** 1:6,16 4:4
  4:16,19 5:4,13
  5:17,17,25
  6:11 7:9 9:12
  10:9,11 14:1
  38:1,10 48:8
  56:15 60:3
  62:15 110:14
  160:12 176:3
  191:23 199:5
  219:11 227:9
  233:11 235:16
  248:7
**hart's** 173:20
**hass** 251:7
**hassan** 99:11
  147:14,15
  149:8 151:2
  158:24 176:18
  176:25 178:7
  179:24 181:22
  188:15 189:2
  190:1 206:20
  229:11,11
  231:20,21
  251:6 253:10
  254:8,22
  255:25 256:13

  257:1 265:10
  269:4 273:14
  280:9 281:8
  283:13
**hat** 256:2
**hate** 139:6
**hated** 154:11
  154:12,13,23
  238:17 239:24
  265:20 266:8
**hates** 154:13
**hazlett** 27:22
  76:17 130:12
  197:14 218:5
**hdalawgroup...**
  2:24
**he'll** 161:15
**head** 54:22
**headings** 218:3
**heads** 8:12,13
**health** 12:24
  13:1,2 58:6
  148:4 149:25
  150:20 174:13
  181:5,9,21
  182:4,20
  221:10
**healthcare**
  61:11 221:13
**hear** 8:15
  103:22 167:24
  206:17 211:7
  214:21 285:14

**heard** 26:5 95:2
  95:3 102:5,5
  103:15,21
  129:6 143:21
  144:1,11
  146:22 155:11
  155:17 156:25
  167:23,23
  177:20 180:12
  185:2,4 203:24
  205:9 211:4
  233:18 234:22
  235:18 241:18
  250:15
**hearing** 163:5
  228:15 229:12
  230:23 231:20
  231:23 250:13
  274:12
**heart** 148:12
  156:11 181:6
  186:23
**heat** 178:14,15
**heights** 1:10
  2:25 3:6,9,11
  3:14 4:16,19
  5:12,14,15 6:7
  6:9,17 7:20
  19:1,6,13,18,21
  19:22,24 20:1
  20:8 21:1,13
  22:12,17 23:3
  23:5 25:16,22
  25:25 26:17

28:20,25 29:18
31:1 32:1
36:23 37:11,20
37:25 38:17
40:3 41:8
46:20,21 48:16
48:23 49:7
51:18 52:19
56:14,22 57:15
57:18 58:3
59:4 60:20
61:9,13 62:17
63:18 70:21
71:7,12,14,16
71:25 72:13,14
74:5 79:20
98:6 110:19
115:20 116:20
117:17 133:23
136:9,16
139:14 150:24
163:15 164:11
164:12 168:18
180:9 183:20
194:9 197:18
199:21 207:4
212:25 217:19
217:23 221:4,7
242:13,18
251:3 253:13
253:24 257:19
258:1,18
259:22 263:9
264:23,25

273:6 277:4
279:4,14
281:10 284:12
284:15,18
285:3
**held** 15:22
74:15 238:14
273:6
**hell** 88:10
127:3 280:2
**hell's** 126:16
**help** 43:18
139:6 272:12
285:16
**hereinbefore**
286:8
**hey** 135:17
136:8 229:13
232:1 235:15
239:2 268:4
278:10
**hick** 248:22
**high** 14:4,5,6,9
161:3 251:18
256:15 259:1
**highballing**
12:3
**higher** 149:23
277:24
**highest** 42:20
140:14
**hindered**
222:16

**hire** 16:19 64:4
73:21,25 132:6
179:15,16
202:21 213:12
218:7 249:8
261:23
**hired** 15:1
16:18 17:3
36:4 41:20
64:5,14,23
65:5 74:7 97:9
102:14 127:18
127:19 166:9
183:11 203:17
203:19 206:8
213:10 216:13
223:7,12
224:17 237:9
258:1 259:8,20
260:22 266:19
266:22 267:21
268:9 271:1
274:9 277:18
277:22 278:5
278:23 279:3,5
**hiring** 17:15,17
30:15,18 31:1
66:20 211:17
211:17 222:13
222:14,18
267:10 268:15
269:13 270:13
**hispanic**
108:25 109:4

**historical** 65:24
66:2 249:3
**historically**
13:21
**history** 14:3
17:7 130:21
132:18 159:21
**hmm** 164:15
**hold** 25:15 46:2
48:2 51:4
151:18 262:23
**holding** 256:17
**home** 9:15,16
9:22,24 10:2,3
58:11 84:3
95:3 102:9
183:16 219:22
**hon** 1:9
**honest** 45:15
48:22
**honestly** 29:14
49:20 85:5
153:12
**honey** 149:23
**honor** 61:2
200:24
**honored**
200:25
**hope** 9:18
188:3
**hopefully** 51:5
89:2
**hoping** 184:14

horrible 119:7
140:17 185:22
horribly
260:24
hose 43:15
hospital 130:4
hotel 90:15
hour 12:18
23:16 155:14
225:4 259:11
hours 44:15
99:7 135:5
201:11,14
263:13,18
282:3,14
house 23:11
220:12,15,18
220:21
hr 21:19,23
22:6 27:22
30:20 31:4,5,6
32:23 67:10
76:7,8,11
86:19 204:14
huh 8:13,13
huhs 8:13
human 148:11
hundreds 97:6
hunt 2:11 4:6,8
5:10,11,20
6:10 7:5,8
18:20 19:11
25:7,12,20
27:11,13 33:23

38:3,6,9 43:25
46:4,17,22
47:9 48:3,7
52:16 56:17
59:21 60:2
62:8,14 63:1,3
68:14 72:14,17
76:25 87:1
110:2,6 115:15
116:9 118:23
118:24 122:12
123:19 124:5
125:4,13 128:3
128:6 132:11
135:25 137:6
138:22 147:7
147:19 148:25
150:9 153:20
153:25 157:16
157:17 160:17
164:25 168:8
168:14,22
172:8 173:12
176:2,14 179:3
179:4 185:17
186:15,18
187:8,17 188:8
191:12 201:7,7
201:9 215:5
219:2 226:23
234:13,15
245:5,18
275:12 281:24
284:6,9 285:15

285:18
hunt's 46:7
husband
145:23 151:11
237:24
hussein 179:16
183:1 213:22

**i**

icloud 116:21
116:23
icloud.com.
116:16
idea 119:24
121:6 126:6
182:25 221:19
224:1 264:5
266:4 270:22
271:14 277:15
278:4
ideation 127:11
identified 67:4
identify 71:21
181:1
iftar 150:13
ii 150:16
iii 263:23
illegal 117:2
118:1 119:2
125:15 158:15
243:8
illegally 151:24
266:19,22
274:9

imagine 129:6
imbalance
81:15,22
immaterial
279:3
immediate
43:22
immediately
280:23,24,25
impact 179:18
impacted
106:23
implement
53:25 54:17,18
67:9 96:25
106:4
implementati...
54:23 56:6
120:11
implemented
118:20 119:23
120:2,8 155:24
170:22 185:15
186:7 230:14
implementing
54:3
important
180:25 224:7,8
256:17 267:17
268:19,20,21
impose 228:16
230:15
imposed
230:12

**impossible**
140:18
**impression**
123:4 247:17
275:17 277:22
**improper** 66:3
**improve** 44:11
44:12 182:3
**inability**
160:13,19
**inappropriate**
23:25 33:20
34:6 268:18
**incentive** 222:3
**incident** 33:13
84:13 91:15,20
91:21 166:19
168:24 169:3
169:12,23
170:20 171:2
172:6,12 173:6
173:7 249:5
274:11
**incidents** 87:9
143:25 156:6
171:4 176:10
**include** 7:6
**included** 73:15
73:17 145:4
216:12 263:20
270:25 274:20
**includes** 186:21
**including** 77:10
212:25

**inclusive** 189:9
**incoming** 234:5
**inconsistent**
270:1
**incorporated**
277:8
**increase** 57:13
149:12 150:12
181:15 239:6
264:13
**incumbent**
47:2,14,21
**independent**
31:2 167:14,17
237:1
**index** 149:23
**indicate** 27:1
27:25 28:4,18
33:11 35:22
44:3 60:8
64:19 85:14
92:24 101:17
108:4 116:25
130:11 132:1
134:10 149:11
166:14,25
168:23 170:24
178:25 184:9
215:10,23
263:17
**indicated** 7:9
16:3 19:16
24:15 25:8,13
27:11 28:10,23

29:2 34:1 37:5
37:11 43:5
46:4,22 48:8
48:10 56:21
60:4,12 64:11
65:12 67:4
71:17,20 72:4
72:22 73:8
80:13 84:8
95:21 103:9,15
114:10,15
119:10,25
120:22 123:25
124:17 129:4
130:25 139:4
175:13 182:25
184:13 187:20
217:3,16
233:11 240:12
240:25 282:22
**indicates** 27:24
38:18 39:11
57:7 63:22
109:19 119:1
166:3 170:4
193:21 197:23
**indicating** 85:8
107:6 118:15
178:19 216:17
242:16 261:19
**individual** 18:1
20:14 44:16
83:4,22 92:22
100:14 108:16

179:16 259:8
**individual's**
156:5 169:14
**individually**
48:1
**individuals**
5:21 32:11
35:24 68:3,20
71:24 72:8
83:3 145:21
153:22 185:12
207:24 234:20
235:3,7 257:23
267:20
**ineffective**
206:13
**influence**
143:20 167:17
168:4
**informal**
226:22
**informant**
177:3
**information**
26:4 29:25
52:23 53:19
56:1 82:2 87:7
92:18 122:6
126:21 130:15
134:7 139:7
158:3 190:9
204:4 234:2
239:8 248:16
248:19 249:12

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

[information - investigator]                                    Page 39

249:16 254:16
259:5,6 261:14
283:8,17,20
**infuriate**
185:25
**initial**  116:16
**initially**  172:11
183:11
**initiated**  63:8
**initiative**  41:7
41:14 42:7,14
**injury**  169:14
**input**  30:18
66:21,24 67:2
67:5
**ins**  70:21 71:20
**inside**  126:19
**insist**  220:4
**insisting**  59:19
**insists**  233:4
**inspection**
113:3
**inspector**  80:23
**instance**  80:13
**instances**
106:15 136:14
136:21,22,24
**institutional**
106:15
**insulin**  148:9
149:11 150:12
181:15
**insurance**
12:24 13:1,2

58:6,14 61:14
174:13 199:24
199:25 200:3,4
221:9,10
284:14
**integrity**
117:18
**intelligent**
235:22
**intelligently**
266:13
**intend**  9:19
10:14,19 13:24
**intentionally**
181:15
**interest**  20:25
**interested**  20:9
71:6 286:13
**interfered**
142:24
**interior**  103:22
**international**
166:5
**internet**  146:10
154:2 220:19
**intersection**
251:8
**intervening**
5:15 6:3,5,6
**interview**  30:19
53:18 64:6,17
68:17,20 69:17
69:19 73:5
74:23 75:23

261:7
**interviewed**
68:21,22 72:1
72:16
**interviewing**
69:14 137:23
138:10
**interviews**
42:15 71:23
72:9,10,18
85:23,24 87:20
**intestinal**
173:18
**intimately**
159:23
**intimidate**
147:13
**intimidation**
146:11 279:22
**introduced**
253:19,21
**inventory**  96:8
102:13
**investigate**
35:18 133:17
177:6 202:11
203:21 204:7
**investigated**
32:23 127:24
170:6,9 190:1
**investigating**
166:16 206:21
**investigation**
35:7,15,19

63:21 79:21,25
80:1 81:1,9,12
81:24 94:7,9
106:12,14
107:24 112:4
124:11,14,23
124:24 125:18
131:5 133:14
133:19,22,24
134:3 138:10
138:14,19
143:7 152:16
153:1 158:16
158:17 166:17
169:10,23,25
170:11 171:10
171:15 172:4
202:15 203:23
205:16 226:9
226:16,17,20
244:9 258:20
259:2 262:9,24
**investigations**
16:25 107:21
108:3,17
127:17 171:15
206:3 268:20
**investigative**
50:12 71:4
74:8
**investigator**
15:10 87:6
131:23

| | | | |
|---|---|---|---|
| **invited**  105:9 | 139:24 172:11 | **items**  49:19 | **jesus**  90:9 |
| **involve**  283:1 | 200:15 202:3 | 55:21 95:5,6 | **jet**  25:1,9 |
| **involved**  77:2 | 204:19,24 | 95:11 | **jewelry**  95:5 |
| 80:6 81:15 | 205:23 210:3 | **j** | **jhart202** |
| 144:25 145:1 | 240:8 270:9 | | 116:16 |
| 169:12 180:8 | **issued**  80:14 | **j**  5:19,25 10:8 | **jim**  250:7 |
| 209:7 251:17 | 172:21 | **jafer**  143:17 | **joanne**  1:22 |
| **involves**  202:6 | **issues**  10:12 | **jafers**  143:17 | 286:6,22 |
| 204:6 | 43:11,20 44:4 | **jamal**  162:11 | **job**  1:25 12:16 |
| **involving**  128:8 | 44:6,8 79:8 | 163:7 | 19:1 22:2,6 |
| 238:7 243:19 | 83:18 85:9,17 | **james**  93:5 | 25:24 26:16 |
| **iou**  94:15,18 | 85:21,25 86:3 | **janet**  55:21 | 43:14 57:15,20 |
| **ious**  94:6,10 | 86:8,11 93:20 | **janitor**  146:4 | 67:1,8 90:14 |
| **irregularities** | 94:4,6,15 95:9 | **january**  63:14 | 100:12 111:21 |
| 131:9 | 95:25 96:6,14 | 73:11 78:17 | 113:18 127:6 |
| **irs**  131:22 | 97:17,22 | 91:25 92:5 | 174:22 181:12 |
| **ish**  34:17 | 100:11 102:12 | 101:18 109:19 | 181:13 182:8 |
| **island**  149:4 | 105:10 107:1 | 110:9 130:8 | 184:3,4 190:24 |
| **islek**  250:7 | 107:17,18,19 | 152:2,7 159:2 | 197:21 213:14 |
| **ison**  98:2 99:24 | 117:13 150:16 | 159:6 160:8 | 241:18,24 |
| 100:6 255:9 | 150:21 177:1 | 173:17 174:24 | 242:22 260:24 |
| **issue**  69:20 | 178:4 181:5,6 | 221:1 232:19 | **jobs**  47:18 |
| 79:9,21 81:20 | 181:9,21 | 253:21,25 | **joe**  24:23 25:8 |
| 82:19,19 83:15 | 182:20,20,21 | 254:17 269:12 | 26:15 27:19 |
| 83:15 87:17 | 184:14,21 | 270:5 271:23 | 208:17 222:22 |
| 91:10 94:8,11 | 204:3 240:25 | **jbrown**  2:8 | 240:15 |
| 94:13,18,18,20 | 242:14 250:1 | **jeopardize** | **john**  14:5 251:9 |
| 94:23 95:10 | 266:1 270:8 | 101:21 106:20 | **johnson**  29:11 |
| 96:17 102:3 | 271:5 | **jerrod**  1:6,16 | 47:7 240:21,23 |
| 113:2 117:10 | **it'd**  162:13 | 4:4,16,19 5:4 | **join**  72:6 73:3 |
| 118:16 124:20 | 211:9 | 5:13,17,19 7:1 | **joined**  73:4 |
| 125:6,8,12,12 | **item**  77:7 128:7 | 38:1 56:15 | 151:3 |
| 127:4,12 | 267:24,25 | 160:12 173:20 | **joining**  75:4 |
| 130:17 133:24 | 268:2 277:11 | 274:9 | 130:2 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **joke** 98:12 | 246:15 | 108:2 117:15 | 195:17 199:3,7 |
| **joking** 154:6 | **justice's** 43:4 | 117:20,20 | 206:1,8 224:10 |
| **jolee** 10:8 | 54:15 | 118:10,11 | 266:24 |
| **jones** 208:4 | **k** | 126:24 130:9 | **kingdom** |
| **jordan** 23:25 | | 137:10,11 | 140:12 |
| 202:7 208:21 | **k** 25:9 169:17 | 143:22 152:15 | **kitchen** 23:14 |
| **joseph** 2:3 7:25 | 205:21,21 | 156:17 157:4,6 | **knew** 20:9 |
| 23:25 24:25 | **kaminski** | 161:12 162:5 | 26:10,23 27:20 |
| 240:15 | 145:23 146:7 | 165:3 172:18 | 52:21 69:13 |
| **josh** 208:19,20 | 147:1,8 149:2 | 172:18,19 | 101:13,13 |
| **joy** 222:25 | 158:2 207:2,6 | 173:19 194:16 | 106:5 111:3 |
| **jr** 24:25 25:8 | 233:13,24 | 204:1,6 211:4 | 139:20 142:16 |
| 26:15 240:16 | 235:13 236:7 | 229:12 230:13 | 148:9 167:20 |
| **judge** 282:17 | 237:24 | 257:10,13 | 259:19 260:17 |
| **judges** 120:13 | **keep** 49:14,17 | 258:8,14 | 262:11 |
| **july** 37:14 | 52:14 59:19 | 259:16 274:9 | **knife** 33:9 |
| 48:24 59:5,10 | 99:13,18,20 | 279:2 281:21 | 84:13 242:5 |
| 59:11 60:8 | 100:1 115:16 | **kevin's** 151:24 | **know** 7:13 8:19 |
| 115:21 196:2 | 115:19 154:21 | **key** 209:4 | 10:17,18 13:3 |
| 217:24 264:23 | 178:5 182:9 | **keys** 104:10 | 17:25 18:19 |
| **jump** 62:8 | 256:17 | 140:12 209:3 | 20:11 24:22 |
| 63:23,24 | **keeps** 59:18 | **khalil** 145:16 | 27:19 28:8,9 |
| **june** 168:23 | **kennedy** 14:5 | 145:20 158:7,9 | 28:14,16 29:14 |
| 172:13 217:25 | **kept** 45:1,1 | 158:11,12 | 34:7 35:16,20 |
| 277:6 | 52:8 55:8 84:3 | 164:9,10,14 | 37:21 38:23 |
| **junk** 116:3 | 162:5 263:3 | 165:1,12 166:2 | 39:24 40:4 |
| **jury** 4:21 62:2 | 281:21 | 255:2,11,20,24 | 45:9,10,10,12 |
| **justice** 14:21 | **kevin** 1:5 5:13 | **kicked** 241:8 | 45:20 47:23 |
| 41:6,11,13 | 63:25 64:2,21 | **kid** 261:11 | 48:2,22 49:11 |
| 42:3,6,18 | 64:24 65:5 | 262:21 263:2 | 50:8 51:14,20 |
| 63:20 82:6,22 | 68:21,22 69:3 | **killed** 24:8 | 58:8,24 61:6,6 |
| 85:18 97:25 | 72:20 77:6 | **kind** 14:1 56:19 | 69:7 71:11 |
| 177:2,5 182:2 | 86:19,22,23 | 88:15 125:5,14 | 76:4 77:23 |
| 185:20 246:6 | 89:4 102:18,19 | 129:12 157:1 | 78:15 80:22 |

**[know - large]**

Page 42

| | | | |
|---|---|---|---|
| 85:11,21 87:8 | 184:6,20 | 263:19 264:4 | **kym** 99:23 |
| 88:13 90:2,10 | 185:23 189:8 | 265:15 267:14 | 106:24 |
| 90:14,14 92:8 | 190:24 192:16 | 267:18 268:10 | **l** |
| 93:16,18 96:15 | 193:19 194:14 | 270:14,14,24 | |
| 103:19 104:25 | 196:25 197:20 | 271:11 272:6,7 | **l** 10:8 97:14,14 |
| 106:2,22 | 199:5 200:19 | 275:21 276:13 | 111:11,11 |
| 108:19 112:13 | 200:20 203:19 | 276:14 278:25 | 151:8 169:18 |
| 117:19,22 | 205:14 207:8 | 279:1 281:15 | **label** 254:22 |
| 118:9,10 120:9 | 207:18 209:10 | **knowledge** 8:2 | **labor** 32:12 |
| 121:4,20 | 209:14 211:12 | 8:3 37:18 | 263:16 |
| 123:11 124:19 | 211:15 213:15 | 65:24,25 66:2 | **lack** 100:5,8 |
| 126:24 133:3 | 214:25 215:5 | 121:18 130:22 | **ladies** 111:6 |
| 133:20,25 | 215:19 216:21 | 143:25 144:9 | 113:22 114:11 |
| 134:13,16,16 | 217:13 220:8 | 145:10 174:2 | 114:23 |
| 137:13 138:18 | 222:6 223:23 | 174:14,15 | **lady** 41:20 |
| 140:16,20,21 | 224:22 225:21 | 175:6,16 | 145:25 259:13 |
| 140:22 141:1,3 | 225:22 226:21 | 176:10,15 | **lady's** 7:1 |
| 141:6,21 143:5 | 226:23 234:6 | 180:7 182:7 | **laid** 31:15 |
| 143:21 144:4 | 236:6,14 237:4 | 194:21 203:11 | 119:18 |
| 144:16 147:11 | 237:16 238:12 | 223:19,20 | **lake** 218:18 |
| 149:7 150:14 | 238:13 239:4 | 249:14 262:7 | **language** 39:20 |
| 155:11 156:16 | 240:23 241:5 | 263:2 265:2 | 270:24 271:12 |
| 157:9,25 | 241:11,12,15 | 266:15 | 274:17 280:5 |
| 158:18 160:24 | 241:22,24 | **knowledgeable** | **lap** 183:7 |
| 160:25 161:22 | 244:3 246:24 | 259:14 | **lapointe** 145:23 |
| 164:22 167:1,4 | 247:6,24,25 | **known** 25:1 | 151:7,9,17 |
| 169:20 171:10 | 248:9 249:15 | 112:16 258:21 | 152:3 158:2 |
| 172:2 173:3 | 250:1,7 251:6 | **knows** 139:9 | 237:24 |
| 174:19,25 | 251:10 252:6 | 179:24,24,25 | **lapointe's** |
| 175:17 176:16 | 254:7,9,11 | 258:18 | 237:7 |
| 176:25,25 | 255:10,21 | **kokoiy** 202:17 | **large** 33:17 |
| 177:10,24 | 256:20 257:7,8 | 205:19 | 111:1 149:17 |
| 178:14 182:7 | 257:10 258:5 | **kyle** 123:13 | 178:12 220:8 |
| 183:2,13,22 | 258:12,17 | | 281:13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[larger - levingston]                                                        Page 43

**larger**  19:3,17
**late**  142:7,22
   151:6
**latest**  34:17
**laughing**  267:4
**launch**  141:13
**launched**
   140:17
**law**  2:12 3:2
   5:12 25:1
   29:10 30:24
   52:5 63:16
   88:20 127:2,16
   128:10,12
   130:5 135:12
   143:17 144:18
   157:11 212:21
   242:12 245:13
   251:2 252:19
   252:19 261:13
**lawsuit**  29:10
   29:11 50:11,24
   62:17,21 63:8
   63:11 211:15
   211:22 212:2
   218:15 219:1
   267:16 271:6
**lawsuits**  51:24
**lawyer**  46:16
   46:21 210:7
**lay**  30:11
   153:16 276:6
**laying**  42:10
   275:17

**layman**  215:14
   217:12 264:1
   275:24 277:14
**layout**  78:16,19
   220:16
**lays**  39:8
**lead**  6:5 19:3
   36:16 88:23
   258:22 271:22
**leader**  206:13
**leaders**  66:4,6
   66:11,14 69:11
   98:4
**leadership**  28:7
   65:5 66:10
   109:16 142:18
   179:22 233:15
   238:23
**leading**  30:10
   205:5 214:1,4
**leaned**  43:17,19
**learn**  89:2
   229:13
**learned**  202:3
**learning**  90:12
**leave**  15:23
   18:23 19:2
   37:13 38:25
   66:13 97:4,13
   97:14 112:6
   128:1 149:10
   152:25 153:4,5
   156:11 176:23
   188:20 201:2,4

201:11,15
203:3 206:11
206:23,24
210:16,17,22
221:23 228:24
244:11 263:13
**leaves**  35:12
**leaving**  60:14
   155:16,17
   203:13 206:9
   206:25 207:25
   208:15 260:19
   261:2,6 274:6
   279:13 284:15
**ledge**  70:7
**left**  5:25 16:6
   18:21,24 46:13
   48:15,23 49:23
   49:24 51:18
   52:18 53:7,20
   59:4 60:18
   61:9,20 81:4
   100:17 108:10
   110:4 115:20
   121:23,24,25
   123:7 126:15
   127:20 133:3,6
   133:20,23
   146:15 150:23
   155:15 204:10
   207:3 208:5,6
   208:17 213:14
   249:22 261:3
   264:22 284:11

285:3
**legal**  147:17
   153:16,17
   213:16,17,18
   215:13 216:22
   217:2,12 264:1
   275:23 277:14
**legally**  242:8
   265:5,5,6,6
**legs**  219:12
**leon's**  75:5
   98:22
**letter**  59:11,13
   60:4,10 175:14
   201:10 269:21
   285:16,19
**letterhead**  96:4
**letters**  121:13
**level**  45:3 69:19
   88:15 132:21
   132:24 150:12
   160:3 161:3
   179:21 180:15
   181:15 182:9
   182:13 195:3
   205:2 239:17
   256:15 277:24
**levels**  54:13
   66:3 140:14
   155:8,10 283:6
**levingston**
   82:23 83:4,21
   85:18 117:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[licensed - lunch]                                              Page 44

**licensed**  71:22
  250:12,20
  258:12
**licensing**
  262:22
**lies**  208:8
**lieutenant**
  15:12 36:10
  68:6 90:22
  170:1,3 172:1
  173:8 210:11
  250:7
**lieutenant's**
  159:25 160:10
**lieutenants**
  55:1 88:4
  105:9 277:25
**life**  19:23 48:21
  90:24 204:7
  280:2
**lights**  251:25
  252:5,8,10
**liked**  132:17
**likely**  254:20
**likes**  13:14
  161:23
**liking**  163:8
**limit**  186:6
**limited**  200:10
**line**  26:10,10
  147:14 193:21
  267:24,25
  268:2

**lines**  107:22
  207:2 227:15
**linkedin**  283:24
**list**  10:17 11:12
  151:4 245:17
**listed**  79:5,5
  93:25 110:15
  125:16 128:14
**listen**  45:8
  72:20 162:1
  246:16
**litany**  43:11
  83:18
**literally**  88:5
  90:15 189:18
**litigation**
  205:24
**little**  14:2 72:2
  125:25 204:25
  245:7 274:14
**live**  9:13
**lived**  23:13
  161:13
**livestreaming**
  232:4
**living**  48:18
**livingston**
  99:25
**lloyd**  262:17,18
  262:19,25
**loaded**  44:14
  250:23
**located**  121:12
  121:13,13

**location**  9:24
  102:25 156:4
**lock**  240:5
**locker**  77:18
  126:7,18,20
**locker's**  126:7
**lockers**  95:1
**log**  82:12 84:5
  84:6 179:8
  190:8 207:11
  207:16 231:12
  238:12,13
**logs**  135:19
  136:1
**long**  11:3 18:2
  34:13 51:4
  78:14 89:24,24
  102:19,23
  106:16 130:5
  133:6 140:20
  153:23 206:15
  270:8
**longer**  81:16
  113:20 123:6
  127:6 135:2
  166:8
**look**  16:1 30:4
  35:9 38:18
  48:10 57:6
  60:10 67:11
  81:25 131:21
  131:23 132:9
  156:2,2,3
  171:5 172:4

  188:23 189:21
  189:23 203:15
  215:18 272:5,9
  278:4
**looked**  41:9
  161:6,21
  177:21 245:19
**looking**  20:6
  63:13 141:22
  146:10 187:22
  253:2
**looks**  38:16
  57:1
**lose**  238:25
**lost**  199:4
  208:10
**lot**  20:8 45:15
  54:4,10 55:17
  71:3 82:23
  90:14,14 102:9
  119:7 133:9
  139:7 148:6
  161:15,24
  185:4,10,12
  191:6,6 210:15
  220:3,9 237:11
  265:4 269:17
**love**  262:21
**loved**  132:14
**loves**  162:14,15
**low**  56:4 283:6
**lunch**  33:5
  75:19,20 76:1
  177:14 181:16

181:17
**luttrell** 82:23
85:21 92:21
99:25 117:9
**lying** 153:1

**m**

**m** 10:23 78:14
**ma'am** 190:24
**machine** 79:7,9
79:10,18 80:7
80:14 94:21
178:13,17
**mad** 270:12,12
**made** 5:23
10:15 32:20,23
33:4 35:3
44:20 52:2,22
54:18 63:12
72:19 75:25
77:9 82:5 85:8
86:12 92:4,10
92:24,25
100:22,25
107:8 113:8
117:4 119:12
136:4 137:8
140:21 144:7
147:8 149:22
150:18 152:3
152:13 161:7,8
165:14 166:18
167:13 176:3
176:16 177:24

177:25 185:19
206:16 207:5
215:21 221:22
230:17 233:12
233:25 234:19
241:2 242:10
245:8,10
252:18 255:12
255:13 263:16
270:10 280:1,7
283:5
**mag** 1:8
**magistrates**
120:13
**mahdi** 52:1
**mahood** 210:22
210:25
**mailing** 111:23
**main** 95:1
**maintain** 27:14
101:3
**maintenance**
36:5 58:14
74:9 260:22
**majority** 155:3
155:4 163:17
**make** 6:19 8:6
22:25 32:10
33:1 35:2
36:20,24 42:1
50:21 52:5
63:11 77:12
78:2 93:2,8
121:14 126:8

126:17 127:1
130:24 131:11
131:11 137:15
144:23 148:5
150:6 161:9,9
176:7 177:23
181:8 183:14
190:13,18
191:5 201:13
213:23 238:1
242:7,11
243:15 244:1
245:18 264:18
271:20 282:16
285:7
**makes** 78:19
124:19
**making** 44:9
66:25 112:8
113:1 114:19
154:20 155:8
156:14 161:21
178:10 189:19
207:10 235:14
270:8 283:2
**malinowski**
151:2 266:6
283:9
**man** 169:6
254:22 262:21
**manage** 19:16
30:13 36:6
148:9

**managed** 30:8
35:23
**management**
31:8 101:19
102:2 211:9,12
242:18 248:15
275:4
**manager** 16:13
16:17 17:21
140:15 183:10
**managing**
36:14
**mandatory**
123:4
**manipulated**
183:14
**manipulating**
146:24
**march** 117:1
271:25
**margaret** 22:4
22:5 27:22
76:16 129:9
130:12 193:14
197:14 204:13
204:14,15
218:5 221:15
**marginalized**
98:4
**mariana**
249:16
**marie** 1:22
286:6,22

**marijuana**
102:7,16,21
103:1
**marital** 259:18
**mark** 1:9
239:25 283:25
284:1
**married** 10:5
153:10
**massive** 204:3
**matter** 5:13
6:17 7:10
26:17 41:23
53:16 88:10
98:9,19 102:22
186:8 267:14
284:5
**matters** 6:18
116:11 152:6
**max** 203:25
**maxwell** 266:6
283:9
**mayor** 21:13,25
22:3 23:9
24:24 28:5
37:4,5,6 40:10
59:7,11,13,14
59:16 60:4,7
63:19 64:5,14
67:11,18,20
68:2 73:25
74:22,23 76:4
76:15 77:11
80:7 83:23

86:19 93:9,12
93:16,20 96:2
96:7,12 97:18
115:9,11,18
129:1,4,5
130:10 131:3,9
131:16 143:23
144:2,8 155:7
167:12 168:15
173:24 176:9
177:11 178:6
178:11,12
179:1,6,9,12,14
180:17 183:6
183:18,19
184:16 185:3
193:11,15
196:14,25
197:14,15,21
202:3 211:16
212:3,8 216:8
216:18 218:6
221:15 229:11
231:24 246:19
249:17 251:21
252:3,7,8,10
254:6 255:7,20
255:22 262:13
264:24 265:3,8
265:21 266:8
267:5 268:11
268:14 270:12
272:22 273:2
274:8 276:3

277:6 278:10
**mayor's** 64:11
193:8 196:7
249:16
**mayors** 251:23
**mazloum** 23:18
24:13 84:11,17
84:18 178:8
225:3 245:19
**mcgraw** 213:13
**mcl** 109:22
110:12 117:3
243:5
**mcoles** 17:11
58:22 126:21
127:12 207:24
250:12,20
258:12 262:4,5
**mdc** 135:19,20
**mdcr** 84:16
86:5 87:6
245:25
**meal** 150:7,8
**mean** 25:11
47:13 84:9
90:7 121:22
126:5 129:23
147:21 148:1
157:15 162:15
168:4 185:22
204:13 206:25
210:9 226:23
232:3 260:18
266:8 278:17

**means** 164:22
164:23 179:13
194:6
**meant** 72:13
198:2,6
**measure**
253:19,21
**measures** 102:7
**mechanic**
260:23
**mechanics**
36:11
**mechanism**
96:4
**media** 283:7
**medical** 182:19
182:21 188:20
199:23,25
200:2,3 219:16
250:17
**medicine**
228:19
**meet** 21:19
22:17 23:3,7
39:14 69:23
73:19 87:2
93:10 107:2,12
119:22 121:15
123:6
**meeting** 21:25
22:2,3 24:25
26:14 40:19
69:25 70:2,5
70:19 71:2,15

71:16 72:10,24
73:5,6,13,14,16
75:1,20,22
78:15,25 80:8
80:19 83:5,17
83:21 87:19
88:4 93:22
95:18 96:1,18
106:25 107:10
113:10 129:2,5
129:10,11,11
130:10 150:3
150:22 151:5
154:14,15,17
154:25 156:12
156:15,22
157:12,23
159:12,20
162:7 173:4
180:12 183:5
190:6,15
230:23 231:9
232:11,11
237:13,14,18
239:2 250:10
254:9 256:21
266:10,11
269:4,24 271:4
271:8 272:20
272:24 273:1,6
273:13 281:5,7
**meetings**  17:4
21:20 55:7,15
56:1,3 71:24

72:7,10 75:3
75:10,15 77:2
78:4,9 88:22
98:17 99:13
105:8,17 129:8
130:25 131:3
146:10 156:9
156:19 157:3,5
157:8 185:10
233:13 236:9
237:17
**meloa**  88:23
**member**  136:17
158:24 160:4
194:8 233:25
236:7 253:10
253:13,23
254:22,24
256:19 280:7
**members**  26:25
45:5 54:8
55:24 97:18
99:6 150:18,25
155:4 163:6
180:25 181:2,6
189:14 190:19
194:19 206:19
223:16 224:3
224:14,15
230:7 235:3,7
238:1 246:20
247:1 252:14
266:18 274:25
275:2

**memo**  55:2
124:6 138:14
151:14 208:2,6
**memorandum**
80:5 151:13
152:13 165:21
**memorandums**
151:18
**memory**  83:20
115:10
**memos**  115:17
119:19 123:5,8
123:9,11 152:6
**menna**  78:12
78:13,25 79:4
80:19
**mention**  145:16
146:15,17
150:18
**mentioned**
30:10 49:25
73:14 129:4
130:11 142:19
149:3 150:21
151:7 172:24
185:4 284:10
**mentor**  66:9
**mere**  272:24
281:7
**mess**  49:21
96:9 213:15
**message**  135:16
255:24

**messages**  24:1
135:14,15
154:3 234:5
**met**  24:21 25:2
25:8,13,14
26:24 69:21
70:24 71:8
72:5 76:4 89:7
96:12 97:18
98:1,1,3,3,19
107:13 148:2
149:4 228:22
**metzer**  261:23
262:16
**mexican**  88:13
89:16
**meyers**  207:3
212:8,11 240:1
283:25 284:1
**mhunt**  2:16
**michael**  66:15
66:18
**michigan**  1:2
1:11,18 2:6,14
2:22 3:4,11
9:15 10:24
14:17 20:5,16
24:2 25:3
63:19 77:11,12
78:10 82:3
111:23 117:8
172:16 173:22
202:20,23
243:10 245:24

255:8 277:4
286:2,24
**microphone**
59:23
**middle** 24:17
84:18 85:2,13
88:20 108:21
109:2 195:7,9
206:19
**midnights** 45:3
281:22
**mike** 109:17
**mikula** 32:12
35:2,6 76:23
86:14,19
192:12,17
204:19
**mikula's**
192:14
**milan** 9:15,17
10:4,5 23:13
219:22
**mile** 1:17 2:5
**mileage** 11:19
**million** 133:4
**mind** 16:7 56:9
68:8 132:14
175:23 178:5
**mine** 174:18
197:20
**mini** 141:20
**minute** 197:8
266:11

**minutes** 23:15
55:8,22 62:11
135:7 146:9
149:9 151:12
152:11 191:17
191:18 225:4
282:11
**miotke** 3:1,2
4:7 6:4,4,19,22
19:9 38:5,7
46:7,11 47:6
47:13,20 62:24
72:12 86:21,23
86:25 118:22
123:16 164:20
164:23 176:12
191:14,18,22
192:3,4 195:16
197:5 199:2
201:12 205:10
207:9,21
208:13 210:6
211:24 212:1
214:3,6,14,16
215:7,15,16
216:25 217:14
219:20,21
220:7,11 222:2
224:20 226:2
226:11 227:3
227:15,17
228:5,10
234:10,14,18
236:15 238:10

247:14 248:1,6
249:25 251:14
253:5 254:25
255:1 260:8
264:3,9,10
269:6,10
271:10 272:3
272:13,16,25
275:15 276:4
276:11,19,20
277:16 278:6
278:20 282:12
282:19,21
284:4
**misconduct**
35:17 106:13
178:3 209:8,8
215:24
**misdemeanor**
97:6
**mishandling**
43:10
**misinformation**
208:8
**mismanagem...**
128:8,19,25
130:16 131:19
132:9 243:19
**missing** 51:3
77:16 269:17
282:24
**misstates** 52:11
190:22 272:1
274:4 278:3

**mitchell** 81:6
81:14,24
**mitchell's**
81:11
**mixed** 137:4
**mlk** 125:21
126:5
**mo** 142:22,22
142:22 143:8
143:16 144:1,6
145:9 146:13
147:14,15
149:7 154:11
154:12,21,23
156:13,21
157:10,10,12
157:23 158:24
159:3,14
160:21 162:9
163:5,21
179:24 185:23
187:22 188:13
189:1 190:15
229:10 230:22
231:2,3,5,14,15
231:16,21
235:15,15,19
235:19 236:22
239:14,15
240:2 255:25
256:14 265:10
265:23 269:4
273:13 280:16
281:7 283:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**mo's** 231:23
**mobile** 9:15,16
  9:24 135:22,23
**mockups** 56:10
**mohamad**
  158:19 230:22
**moment** 191:14
  198:13 206:25
  211:14 269:20
  284:7
**moments** 45:5
**money** 43:10
  43:10 66:24
  77:16 94:4
  96:5,19 126:3
  133:10,11,15
  218:7 239:5
  268:3,5,16
**monica** 2:11
  5:11 45:22
  157:15 187:16
  201:8,9,10
**monitor** 152:9
**monitoring**
  114:17
**month** 28:16
  55:7 200:21
  273:12
**monthly** 55:15
  115:8,12,19
  189:9 208:3
**months** 11:5
  41:7,19 66:12
  102:24,24

  104:15,20
  148:20 155:24
  183:12 196:21
  237:9 253:22
**moral** 79:11
**morale** 44:18
**mornings**
  98:21
**morris** 213:14
**motion** 265:14
  272:19,20
  273:5 276:15
  276:21,23
  282:16
**motorist**
  125:23 143:19
**mourad** 229:10
**moussa** 231:24
**mouth** 213:10
**move** 9:9 139:3
  160:2 199:4,7
  240:11 268:6,6
  271:19
**moved** 34:16
  78:22 210:18
**moving** 9:21
  101:16 109:18
  116:25 128:7
  145:12 210:1
  227:9
**mps** 124:16
  145:2,7 176:4
**msp** 112:17
  113:24 117:11

  117:23 118:1,7
  118:9,15
  124:16 126:21
  129:3 144:22
  145:3,4,8
  172:20 176:5,6
  176:6,17
  242:25 243:4
  243:15 244:23
**multiple** 85:23
  95:19 140:12
  209:3
**municipal** 1:11
**muscat** 80:8,11
  96:2,13 149:7
  176:9 246:20
  247:22,23
  276:24
**museum** 88:12
**muslims** 90:6,8

**n**

**n** 78:14,14
  123:18 151:8
**name** 5:18,24
  10:7,9 32:6,8
  52:1 54:7
  69:10 81:6
  82:11 83:2
  90:19,21 92:16
  99:11 117:16
  123:10,25
  125:23 126:12
  126:16 131:24

  145:25 146:6
  153:8,11
  154:18 180:13
  192:16 213:13
  216:7,11 230:3
  259:10 262:17
  262:18 270:17
  270:18
**name's** 5:11
  121:1
**named** 7:17,22
  179:16 239:21
**names** 5:21
  123:12 137:17
  173:21 189:21
  189:22 266:20
  275:1,3
**naming** 238:7
**nancy** 149:8
  158:25 265:11
  265:13 269:4
  273:14 281:8
  283:9
**narrow** 140:7
  141:14,15
**nasha** 2:11
**nationality**
  108:19
**nature** 258:13
**nearly** 109:20
  110:10 228:3
  242:24 247:2
**necessarily**
  30:16,17 35:16

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[necessarily - o]**                                                                 Page 50

42:5 47:23
69:7 72:23
128:18 145:6
183:2 278:22
**necessary**
39:14
**necessity**
275:18
**need**   7:2 9:5
40:23 49:20
62:5 67:4
128:1 131:10
201:15 202:14
210:21 213:4
214:7 219:15
247:8 248:2
282:8
**needed**   11:10
43:6 46:12
65:2,3,12
180:1 218:9
243:15 249:1
**needs**   285:19
**negative**
224:19 233:15
235:16 238:1
239:11
**negatively**
238:20
**nessel**   99:22
100:6
**neutral**   55:18
233:4

**never**   13:3 33:8
38:24 89:4,12
103:15,17,21
121:12 123:20
128:24 134:21
134:24 183:10
183:11 197:19
218:25 223:24
251:3 252:21
261:3,12
275:19
**new**   57:7 67:15
74:17,20 87:25
97:15 113:8,9
113:14 114:19
114:22,25
115:5 120:1,10
120:11 150:25
150:25 184:19
203:4
**nhtsa**   119:15
**nice**   214:5
**night**   75:7
89:24 95:16
102:4 155:12
177:12 190:13
237:10
**nights**   45:2
**nine**   89:23
183:12
**nods**   8:12
**noises**   177:20
**non**   125:22

**nonemployee**
71:14
**nonemployees**
72:8
**nonwork**
116:10
**nope**   217:7
**normal**   256:4
263:8
**normally**
103:10,22
**north**   220:2
**northville**   1:18
2:6
**notary**   286:1
286:23
**note**   244:11
282:12
**noted**   102:12
131:9 172:11
219:18
**notes**   6:20,21
6:23,25 7:2,6
79:1 99:13,18
286:12
**notice**   46:2
193:25
**notified**   80:7
247:21
**notify**   160:11
**november**
274:12
**novi**   6:15 7:10
7:15 15:1,5,6

15:23 40:1,2
221:13,21
240:24
**number**   18:8
56:18 62:25
63:10,14 77:7
77:9 84:8
110:8 119:8,13
119:18 131:11
139:18 166:8
170:4 176:3,4
187:10 188:25
188:25 191:25
192:1 195:18
195:23,24
198:11,16,24
201:11,22
242:19 243:5
247:10 264:12
264:13 272:13
276:15
**numbers**   192:9
**numeral**
263:23
**numerous**
45:23

**o**

**o**   5:19,19 10:8
10:23 97:14
111:11 123:18
151:8 205:21
205:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                                    586-468-2411
www.veritext.com

[o'clock - officers]                                                    Page 51

o'clock  89:23
177:12
o'donnell
126:11
oa  42:19,23,25
43:19 44:5
53:10,11,12
77:3 91:23
oakland  127:20
object  8:25
19:8,9 153:15
220:7 263:25
275:12,23
277:13
objection  6:19
25:10 33:22
43:24 52:11
59:18,24 68:11
72:12 122:10
127:15 132:10
164:20 168:7
168:12,19
176:12 190:22
197:4 205:4
207:7 213:25
215:13 216:20
217:11 221:25
224:18 228:9
251:10 260:6
271:2 272:1
274:4 275:10
276:8 278:2
objections  5:22

objects  52:25
obligation
262:7
observation
236:5 246:12
observations
42:15 43:12
236:5
observed  26:20
168:1 184:22
obtain  134:7
obtaining
134:5
obviously  18:7
26:1 52:13
174:25 227:11
264:21 279:1,3
occasion  89:7
occasions  45:23
159:3,6,10,18
occur  113:2
196:24
occurred  24:4
75:13 111:19
168:25 197:1
october  130:3
148:13 166:12
186:20,23,24
187:11 255:15
268:25
odds  216:9
offended
270:12

offer  70:5
75:25 76:3,8
offered  13:3
22:2,6 76:11
142:14,15
offers  76:7
office  29:6 45:2
49:15 78:15,16
78:19,21,23,25
99:23 103:2,4
103:5 107:12
107:12,13
117:18 126:7
128:2 132:22
154:5 204:6
215:24 249:13
249:16
officer  15:7,8
23:18 24:13
25:13,14 31:18
31:19 33:5
34:2,14,22
36:9 79:16
81:8 84:11,13
84:17,18,21,23
89:14,18,18
90:19 95:1
97:2,15 99:4
108:13 113:5
119:6 120:24
120:25 121:18
122:5,9 123:14
123:20,23,25
124:1 126:10

126:11 136:2,4
136:9,15,16
143:1,10,12,15
143:18 146:19
153:10,11
163:12 169:7
169:11 170:20
178:8 194:9
202:16,19
205:11,11,17
205:17,19
209:9 225:24
226:18 241:2,8
245:11,16,20
245:20 250:2,3
250:24 257:4
260:21 262:17
262:19,25
267:3 280:8
officer's  126:7
153:8 161:24
237:8
officers  17:10
17:16,18,20,22
22:18 23:4,10
23:14,17 24:6
24:21 30:13,15
30:18 31:8,9
31:24 32:2
36:11 40:20
45:7 54:25
55:1,25 56:2
68:6 81:19
85:13 88:21,25

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
www.veritext.com

**[officers - okay]** Page 52

| | | | |
|---|---|---|---|
| 89:11 96:5 | **oh** 37:8 92:21 | 48:14,23 49:1 | 129:20 130:10 |
| 98:23 119:6,13 | 104:8,13,13 | 49:4,6,17,25 | 130:24 132:1 |
| 119:20 120:15 | 147:2 163:22 | 50:6,14 51:11 | 134:13 137:4 |
| 120:19,20 | 163:24 168:6 | 53:10,15 55:9 | 137:11 140:6 |
| 123:12 124:7 | 174:25 176:16 | 56:2 57:13,22 | 145:20 147:12 |
| 127:11 128:10 | 177:24 185:20 | 58:5,10,14,16 | 149:6,11,14,16 |
| 137:8,13,15,19 | 189:25 204:14 | 59:16 60:7,12 | 150:1 151:7 |
| 137:24 138:7,8 | 232:18 257:1 | 60:22 61:7,16 | 152:2 153:13 |
| 138:11 139:20 | 259:11,17 | 63:10 64:2 | 154:9,14,23 |
| 142:1,5,15,16 | 280:6 281:18 | 65:6 67:4,18 | 158:6,23 159:6 |
| 146:16 155:7 | 283:15 | 67:24 68:15 | 159:11,13 |
| 155:13,15,15 | **oi** 219:7 | 69:9,23 70:18 | 164:18 165:10 |
| 169:8,20 | **okay** 6:14 7:19 | 71:8 73:2,4,8 | 165:17 166:14 |
| 170:25,25 | 8:1 9:2,9,12,14 | 73:23 75:15 | 170:8,13 175:7 |
| 173:22 182:5 | 9:16,19,24 | 76:8 77:1 | 175:13 178:19 |
| 182:11 185:1 | 10:7,11,14,18 | 79:23 80:17 | 178:23 180:18 |
| 197:7 202:8 | 10:22 11:9,13 | 83:9 85:24 | 185:12 187:2 |
| 206:25 207:4 | 12:20 13:16 | 87:16 91:8 | 188:12,22 |
| 207:23,23 | 14:10,14 15:20 | 92:1 93:24 | 189:6 191:25 |
| 208:5,10 | 15:22 16:3,9 | 94:3,11,13,17 | 192:20,23 |
| 237:11 244:7 | 16:18 17:15,18 | 96:21,23 98:11 | 193:11 194:3 |
| 244:11 269:23 | 18:2,21 19:16 | 99:18 100:1,10 | 194:16,22 |
| 277:3 | 20:24 21:5,11 | 100:16 102:1 | 195:11 196:4 |
| **offices** 3:2 | 21:17 22:7 | 103:20 104:23 | 197:1,22 |
| **official** 47:18 | 23:7,12,17,22 | 105:4,23 106:2 | 198:10 199:12 |
| 242:13 | 24:19 25:4 | 108:9,12,14,19 | 200:6,9,17 |
| **officials** 128:11 | 27:17 29:5,9 | 108:21,23 | 201:4,13,20,25 |
| 135:12 142:20 | 30:17 32:18 | 109:8,12,15 | 202:6,11 203:3 |
| 142:20 143:23 | 33:1,19 35:5 | 110:2 111:12 | 204:9,17 |
| 144:5,14,25 | 36:18,23 37:2 | 111:25 112:25 | 205:17 206:7 |
| 145:1,4 | 38:12,14,18 | 114:8 122:1,24 | 206:24 208:19 |
| **ogletree** 192:9 | 39:5,7,10,17 | 125:11,18 | 208:21,25 |
| 192:14 | 40:9 41:5 42:1 | 126:2 127:9 | 209:5,21 210:1 |
| | 43:19 44:3,20 | 128:19 129:10 | 212:7,18 |

214:21 215:1
215:19,21
217:1,6,15
218:15,19,21
219:22,25
220:12,23
221:6,17 222:7
222:13 223:10
223:14 225:20
226:16,23
227:20 229:1,4
229:6,17 230:5
230:7,12,17,20
230:22 232:6,9
232:13 233:21
233:23 234:8
234:24 235:11
240:6,12,20
241:4 242:4
243:7,22
244:21,25
245:16 246:2,9
246:14,17
248:1,7,11,17
249:7,11,15
250:7,19,22
251:17 252:23
253:9,16,18
254:3,15,20,25
256:3,7 257:13
258:5,22 259:3
259:20,25
260:2 264:9,21
265:2,16,25

266:5,23
267:19 271:15
273:12 276:5
277:2,17 278:7
278:9,14,21
279:1,8,19
281:20 283:23
284:21 285:15
**old** 18:13,18
61:18 106:17
135:22 146:20
**older** 208:10
**omnibus**
199:22
**once** 18:11 35:7
55:7,21 83:11
113:22 123:7
157:2 187:20
187:21 197:23
218:18 284:11
**ones** 132:15
170:16
**ongoing** 41:22
43:8 78:1
118:16 131:6
131:13 173:6
**open** 102:5
103:15,18
131:5,6 140:12
216:15 218:6
262:1
**opened** 43:15
43:16 125:6

**opener** 104:12
**openers** 104:13
**opening** 188:5
**operated** 237:3
**operating**
182:13 281:13
**operational**
75:10
**operations**
16:24 26:1
30:8,11 36:8
44:19 64:22
182:3 279:11
**opinion** 92:18
153:16 213:16
215:14 216:22
217:3,12
225:15,17
264:1 265:8
273:20 275:23
277:14
**opportunities**
16:2 161:16
222:16
**opportunity**
19:3 62:20
162:2 222:9,20
269:19
**opposed** 159:24
269:21
**ops** 209:14
**optional** 13:1
**oral** 11:1,2,10
31:18

**orchestrated**
233:10
**order** 35:16
45:25 46:6,9
130:20 133:14
173:15 183:18
209:20 210:23
211:9 213:3
220:5
**ordered** 35:15
108:3 133:22
251:25
**orders** 209:18
209:19
**organization**
35:12 52:4
113:21 152:25
210:17
**organizational**
42:19 43:3,18
55:13 65:10
88:17 92:20
97:25 98:18
99:11 105:14
179:10 186:11
**oriented** 54:5,6
**original** 30:1
38:16
**originally**
170:17 216:13
227:20
**outbursts**
233:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

outcome
118:10,11
133:21 134:17
137:25 138:2
138:11 171:17
189:12
outcries 237:12
outcry 237:10
outgoing 234:5
outlined 31:10
208:2 277:9
outraged
268:22
outrageous
205:3
outside 42:16
47:12 50:19
65:3 69:11
75:22 95:1
129:24 136:15
246:19 262:1
269:16
outsider 65:12
outspoken
154:2
outstanding
259:13
overall 127:24
182:4
overhead 102:5
overheard
157:24 236:17
oversee 40:6

overtime 77:15
117:2 118:25
119:2,9,12,14
119:17 121:14
123:6 125:12
125:15,20
126:3 237:11
243:7 283:2
overview 79:13
owed 199:15
own 67:9,13
86:18 153:4,6
157:3 184:23
189:10 200:2,5
221:20 262:1
267:1
owner 13:13
owns 230:3

**p**

p 10:23 97:14
111:11 151:8
p.m. 110:3,5
128:4,5 148:22
148:23 175:25
176:1 186:14
187:7 191:19
191:20 248:4,5
285:24
page 4:3,11
38:19 39:7,10
57:6 63:13
101:16,17
145:12,15

187:16,22
191:25 192:25
193:3,7,7,18
194:23 196:1,4
196:4 197:22
198:19,23
199:6 215:9
217:20 218:2
247:5 252:25
263:24 272:12
272:14,17
273:2 276:18
276:23 277:11
pages 228:4
paid 11:16,18
96:19,19
198:19 201:14
220:24 221:3
254:23 263:6,7
263:14,18
264:18 284:17
284:18 285:9
paletko 251:24
pam 145:24
152:23 153:10
153:13 154:2
157:19 233:13
237:24 239:18
panel 12:3 64:8
panels 30:19,19
31:3
papers 49:22
paperwork
52:17 284:24

285:5
para 216:11
266:21 274:20
paragraph
39:11 63:13,25
94:1 101:17
106:19 109:18
110:7,16
116:25 145:16
145:17 157:13
158:11,12,22
159:9 166:1,14
170:24 193:19
194:2,23 195:1
195:6 198:12
198:23 199:6
199:10,18
200:10,13,15
201:3 226:7
247:5,9 248:7
252:25 253:8
255:14 256:18
269:9 276:17
paragraphs
215:9,17,22
253:3
park 3:3,4 9:17
103:10
parked 9:15
parking 102:9
parrot 237:5
part 7:14,19
11:4,6,8,14
15:18 21:9

**[part - penis]** Page 55

30:7 33:18,20
34:6 36:19
45:8 47:10
64:8 65:17
70:18 76:23
88:2 91:9
97:16 115:8,9
118:13,13
119:14,15,16
138:3,10
139:10 144:17
149:17 158:14
162:25 167:20
171:8 178:12
180:20 199:12
217:16 234:25
242:7,11,22
243:3,25
244:25 253:7
267:8 274:8
281:13 282:24
**partake**   149:15
149:17
**partial**   18:7
61:2
**participate**
55:7
**participated**
98:17
**participating**
119:21
**particular**
80:13 197:17
201:22 204:24

240:11 249:5
266:1
**particularly**
224:10 225:24
266:19 283:12
**parting**   100:9
**partisan**   282:8
**partner**   126:13
**partner's**
126:12
**parts**   50:25
**party**   47:21
90:5 166:7,10
218:15,25
234:14 262:12
286:13
**pass**   161:17
191:13
**passed**   197:9
222:25
**past**   20:18 34:8
35:3 40:12
**path**   30:11
42:10 53:23
**patrol**   15:7
68:5 120:20
155:11 209:18
210:17,18,23
**pattern**   206:10
207:1
**paul**   1:5 5:13
32:7 69:24
70:9,24 71:2
72:20 73:3

77:6 79:24
80:18 86:19,21
102:18,19
108:2 110:24
111:16,17
112:6 126:25
130:9,22 131:4
131:10,10,25
132:7,8,15,17
133:8,18
143:22 151:24
152:15 156:17
157:4 161:7,12
161:25 165:5
187:25 189:3
190:2,16
194:11 206:1
206:12,18
228:8 229:12
231:1,5 232:1
232:7,11 233:8
241:1 249:2
250:11,11,19
250:22,25
251:7,17,20
255:7 274:9
279:1
**paul's**   112:4
132:14 157:7
**pawlus**   170:3,9
170:16 172:1
173:9
**pay**   58:12
60:23 185:24

197:8 199:19
199:21 200:2,5
200:22 201:1
264:14,19
285:1
**paying**   96:5
98:24 201:17
270:21 285:4
**payment**
198:21 200:6
**payments**
200:12 221:6
263:7,12
284:11 285:7
**payroll**   285:8
285:10
**pc**   2:12
**pd**   82:1 103:23
159:22
**peace**   250:24
**peeled**   95:2
**peers**   45:6,10
**pellerito**   97:13
111:8,10,12,13
111:21,25
112:5 247:1
**pellets**   177:14
**pendency**   57:7
**pending**   191:9
219:10
**penis**   184:25
201:25 202:8
202:25 209:7

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**pension** 18:5
**people** 11:11
  17:6 42:8 48:6
  55:6 88:13,15
  89:3,6,8 90:11
  95:4 98:4
  121:14 123:6,7
  139:18,19
  140:13 155:10
  155:16 157:5
  162:13,18
  163:8 175:1
  182:10,16
  191:11 205:6
  206:11,16
  207:11,12,13
  209:6,17
  210:15,17,18
  210:19 230:8
  233:4 236:23
  236:24 237:6
  237:25 238:17
  239:13 240:18
  240:19 244:4
  246:11,16
  260:19 261:1,7
  261:22 267:9
  268:15 278:15
  279:25 281:16
  281:21
**perceived**
  89:19 96:17
**percent** 21:6
  23:23 24:11

  30:2 58:21
  93:23 225:8
**percentage**
  18:9
**perform** 39:12
  39:14 133:19
  174:22
**performed** 42:3
  114:20
**performing**
  255:4,19
  279:16
**period** 14:25
  152:8 195:8
  273:24
**periodic** 13:12
**permanent**
  9:25
**permission**
  214:9
**person** 17:3,6
  20:10 21:17
  31:4,4,6 33:3
  35:11 65:3
  68:22 69:13,21
  78:9 97:16
  107:4 108:7,16
  109:15 112:20
  123:23 124:6,9
  134:10 153:16
  160:21 162:6,9
  182:12 235:10
  265:24

**person's** 32:6
  83:2 184:18
  262:5
**personal** 78:4
  101:7 116:13
  116:22 147:4
  204:7
**personally**
  142:24 217:5
  261:5
**personnel**
  50:12,16,17,24
  52:2 188:23
  217:20 218:2
**perspective**
  184:18 240:9
**pertaining** 48:4
  130:15
**pfannes** 69:4,6
  69:9
**phil** 78:12
**phone** 21:18
  42:18 78:4,10
  84:1 95:19
  112:14,18
  143:9 176:21
  177:10,16
  202:14 234:4,4
  235:8,10
  256:16 266:12
**photographs**
  70:9
**photos** 52:25
  53:3,6,7

**phrase** 147:16
**physical** 219:18
**pick** 282:10
**picture** 209:8
**pictures** 52:20
  184:25 201:25
  202:7,13,17,25
  203:2 205:7
  222:20
**piece** 224:7,8
**pieces** 268:6,6
**pillow** 45:1
**pissed** 239:25
**pistol** 97:4
  109:20,23
  110:10,13
  111:1,24 115:4
  115:7 242:24
  247:2
**pivotal** 24:4
**place** 31:22
  35:18 51:9
  52:21 55:16
  68:25 90:17,23
  97:16 98:11
  103:10 114:12
  144:21 146:20
  150:3 154:17
  160:23 172:12
  183:7 209:4
  230:24 232:19
  247:16,18
  250:13 255:15
  256:3 269:24

[place - police]                                                           Page 57

271:23,24
272:20 273:23
273:24 274:2
274:15 282:13
**placed** 152:7
158:3 177:19
**placing** 169:9
**plain** 95:4
153:18
**plaintiff** 7:24
**plaintiff's** 6:1
63:15
**plaintiffs** 1:7
2:9 47:14,17
47:22 48:1
62:16 63:11,23
101:18 109:20
110:10,15
117:1,4 119:1
128:7,16 135:9
145:15 158:14
158:21 165:8
166:15 175:20
238:8 250:2
252:18 274:3
**plan** 41:17 65:7
65:8 96:18
106:4 179:15
**planning** 40:22
65:1 105:12
254:1,5
**plans** 220:12
220:16,18

**platform** 41:15
139:11 140:19
141:13,16
145:24 146:14
**platforms**
154:2 155:20
**play** 24:4
189:17 224:25
225:2 265:11
271:18 274:16
**players** 179:25
**playing** 162:4
182:9,13
239:17
**plc** 2:4
**please** 5:18
8:18 191:25
193:18 195:23
199:5 215:8
248:8,10 253:1
253:6 285:16
**pllc** 2:20
**plus** 91:9
201:15 264:14
**pod** 48:18
**poikey** 99:24
**point** 21:12
29:25 41:19
46:8,8 48:3
85:22 87:10
122:25 151:19
167:8 174:23
199:7 204:6
214:2,11

219:17 225:16
225:18,25
232:3 234:7
239:23 240:11
247:24 250:17
254:15 263:10
264:7 269:11
271:17 273:15
283:1
**points** 265:9
**police** 7:20 15:1
15:14,15 16:2
16:10,20,24
17:1,10,13,15
17:18,20,22
18:2,23 19:3,7
19:13,17,17
20:1,5,7,8,17
21:1,2,21
22:12,17,18,19
23:3,4,9,10,14
23:21 24:3,15
24:20 25:19,21
25:24 26:9,12
26:19,20 28:25
30:6,13,15,18
31:8,9,13,17,18
31:18,24 32:2
33:16 34:13
35:22,23,24
36:1,13,14,19
36:20,24 39:21
39:22 40:5,6
40:20 41:8,16

41:24 42:9,20
43:9,16 44:12
44:17 46:19
49:6,14,14
53:24 54:13,24
54:25 55:2,4
55:25 56:5
57:17 63:20
64:22 65:1,2
65:11,16,19,24
68:4 69:5 70:9
72:6 77:11,13
77:22 78:3,11
79:17 82:3
85:7 86:7
87:17 88:8,25
91:7 93:9,10
93:16 94:24
96:24 97:7,11
98:14 99:4,5
99:14 102:15
102:19,23
103:24,25
104:4 105:4
107:18,20
109:23 110:13
110:19 111:23
112:8,10 117:1
117:8 118:25
119:1,20 122:9
124:7,21
127:10 129:17
129:18,25
130:2 139:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                        586-468-2411
                                                        www.veritext.com

| | | | |
|---|---|---|---|
| 142:18 144:16 | 258:24 260:2 | 16:3,10,20 | **possession** |
| 146:4,16,17,18 | 260:21 261:20 | 19:7,12,25 | 46:19 47:18 |
| 146:19 151:13 | 261:25 267:3 | 20:14 21:1 | **possible**   113:13 |
| 154:6,8 155:13 | 268:3,12 274:9 | 22:11,16 23:2 | 117:9 |
| 158:15 162:21 | 277:4,19 | 24:19,24 25:4 | **possibly**   52:17 |
| 162:23,24 | 278:24 279:11 | 25:9,11,15 | 71:6 99:23 |
| 163:3,12 169:7 | 279:21 281:11 | 28:7 67:5,6,8 | 143:23 144:2 |
| 169:8,11 171:6 | 281:12 | 67:15,15,18 | 233:14 |
| 172:16,18 | **policies**   65:11 | 68:7,8,9,13,17 | **post**   129:14 |
| 176:20 177:6 | 139:11,17,22 | 68:18,21,23 | 284:14 |
| 179:20 180:2,3 | 139:23 140:9 | 69:1,6,8,15 | **posted**   251:6 |
| 180:20 181:1 | 141:1,3 171:11 | 70:6 74:2,12 | 283:23 |
| 181:10,12 | 171:11 183:21 | 74:17 75:16 | **poster**   126:18 |
| 182:3,5,24 | 183:24,25 | 76:9,12 108:7 | **posting**   251:7 |
| 184:2,17,19 | 199:20 | 121:24 160:2,3 | **postings**   181:22 |
| 185:1,1 186:10 | **policing**   54:5,6 | 160:14,15,20 | **potential**   31:22 |
| 194:9,20 197:7 | 156:4 | 174:16 179:21 | 65:20 66:3,14 |
| 206:14,20 | **policy**   118:20 | 245:22 247:19 | 71:15 72:1,9 |
| 207:4,23,23 | 118:20 120:1,4 | 252:16 256:15 | 72:10 76:14 |
| 209:1 213:1,20 | 120:11,12,16 | 260:3,4,5 | 109:16 132:9 |
| 214:22 216:9 | 139:2,4,8,20 | **positions**   15:22 | **potentially** |
| 216:19 218:4 | 140:2 141:2,8 | 72:16 151:24 | 221:23 222:17 |
| 221:21,23 | 142:9 171:1 | 160:25 161:3 | **pour**   214:12 |
| 222:9 224:15 | **pool**   268:3 | 166:11 172:25 | **power**   240:3 |
| 225:14 226:8 | **poop**   121:21 | 173:14,23,25 | **powerdms** |
| 230:6 237:8 | **poor**   117:15 | 174:4,8,11 | 139:8,10,15 |
| 238:2 239:6 | **popular**   163:12 | 184:1 217:2,3 | 141:9 184:5 |
| 243:7,10 | **porter**   79:16 | 217:9,15 218:3 | **powerpoint** |
| 248:13 249:5 | 260:21 | 218:6 255:23 | 119:5,7,10 |
| 250:22 251:3 | **portion**   94:24 | 255:25 266:15 | 120:25 121:2,5 |
| 251:24,25 | 120:1 163:17 | 268:9 277:25 | 121:7,10,16,19 |
| 252:13 255:22 | 163:18 281:25 | **positive**   16:8 | 122:5,7,17,20 |
| 256:5,7 257:2 | **position**   12:19 | 43:22 271:24 | 124:1 125:1,2 |
| 257:14,24 | 13:24 15:5,13 | | 125:5,9 127:23 |

246:11

**practice** 34:8
97:11 112:16
113:15 206:10

**practices** 26:12
43:8 44:19

**predetermined**
229:7,9

**predictable**
261:21

**predominantly**
77:14 84:14

**prefer** 282:17

**preferential**
158:15,21
240:4 261:16
269:14 270:10

**premiums**
199:23 284:19

**preparation**
64:25

**present** 20:4
44:20 89:21
121:19 150:19
166:7

**presentation**
121:9 255:8

**presented**
123:2 173:3
197:17

**president** 203:6
203:9,12

**pressure**
162:17

**presumably**
227:12 257:10

**pretty** 159:19
176:9

**prevailing**
214:22

**prevented**
270:7 279:20

**preventing**
279:15

**previous** 94:7
209:20 251:21

**previously**
144:17 192:24
199:12 233:11
234:21 240:20
257:23 283:4

**primarily**
30:20

**primary**
140:13

**print** 49:7
101:11 230:4

**printed** 49:9

**prior** 19:6,12
21:20,24 22:16
23:2 24:19
26:16 28:13,19
28:21 32:22
33:11,13 52:11
62:21 63:5
69:14 74:15
75:1,4 101:6
116:23 125:9

130:1 131:1,19
152:7 156:21
157:23 166:13
181:8 190:22
196:21 203:19
216:17 264:16
264:21 268:9
272:1 274:4
276:8 278:3

**priority** 178:16
210:16

**privacy** 190:3

**private** 77:19
102:14 145:13
145:17,21,21

**privatizing**
260:17

**privilege**
140:14

**privileges**
141:10,23

**pro** 80:12
247:23

**probably** 11:4
12:3 15:25
22:10 23:8,15
25:3 34:17,19
35:1 44:14
52:22 78:16
79:11 93:23
104:20 116:3
122:25 155:24
177:11 191:13
218:18 224:11

244:9 250:14
254:21

**problem** 45:9
45:13 55:5
65:17 118:13
124:18 132:20
138:5,9 222:15
244:16 261:20
273:25 281:2

**problematic**
223:6

**problems** 20:9
43:16 106:15
149:25 258:13
266:24

**procedure**
113:1,6,9,14,17
114:18 141:9

**procedures**
43:22,22 65:11
75:11 114:11
114:11 139:17

**proceeded**
23:15

**process** 12:14
20:3 34:24
35:18 40:10
43:1 65:25
105:5 106:3
109:23 110:13
113:9 114:2,4
114:19,22,25
115:5,6 124:22
197:20 209:4

222:11 247:2
255:21 256:4
259:21,23
260:1 274:24
278:4
**processed**
109:21 110:11
110:23 111:4
242:25
**processes** 44:7
44:23 112:25
160:23 184:7
185:14
**produce** 46:15
47:3,14,22
203:2 234:3
235:21 236:1
**produced** 27:9
32:19 45:24
46:1 47:7
201:10
**produces** 33:7
**product** 28:11
206:14,21
**professional**
4:15,18 37:24
56:13
**professionali...**
130:8
**professionals**
11:10 96:19
**program** 15:8
96:2 97:21
156:2 210:15

**programs**
184:7
**prohibited**
117:3
**projects** 49:19
**promote**
160:14,19,22
162:10 163:22
163:23 164:1,4
215:10
**promoted**
15:11,12 89:16
162:17 213:4
215:25 223:1
239:22 274:1
**promoting**
159:15,24
269:15
**promotion** 31:1
159:4 160:1
213:22 269:2
**promotions**
160:5 256:8
274:19
**prompted**
256:23
**proof** 82:2
**propaganda**
152:21
**proper** 178:4
**properly**
131:12
**property** 36:4
36:11 77:19

79:7 94:4,20
94:23 95:1,3,9
95:10,12,16,24
96:6,8,20 97:2
97:15 102:11
105:1,10
106:25 113:4
178:18 219:25
219:25 260:24
**prophet** 90:9
**proposal**
173:14
**proposed** 173:2
**prosecuted**
250:3,3,4
**prosecuting**
242:23
**prosecutor**
100:7 107:2,16
172:21 242:19
**prosecutor's**
117:18
**prospective**
203:1
**protect** 52:7
**protected** 51:2
273:21,23
**protective**
45:25 46:6,9
220:5
**protested**
212:12
**prove** 236:1
283:21

**provide** 27:17
29:20,20 41:15
46:5 53:12
54:14 69:9
80:3 93:24
95:13 100:24
126:21 130:14
131:3 138:23
158:14,21
175:4,14 249:1
268:8
**provided** 49:25
54:4 58:17
92:19 115:18
117:22 121:9
121:16 138:15
138:18 142:4
176:7 179:6
238:9 268:16
**providing**
248:18,25
**provision** 275:4
282:17
**proximity**
209:3
**public** 55:19
128:12 152:13
155:9 181:22
202:20 215:24
249:10 252:19
283:5,7 286:23
**publically**
258:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

pull   50:12,14
   50:15,18,22
   86:17 92:14
pulled   50:24
   51:9 86:17
   143:1,11,11,19
   255:10
pulling   98:8
   242:5
punishment
   66:10
purchased
   79:18
purchases
   133:10
purchasing
   96:3
purportedly
   202:7 206:12
   235:5 262:23
   282:23
purpose   65:6
   132:8
purposes   5:22
   41:11 71:19,21
   72:6 75:10
   107:24 140:24
   159:9
pursuant
   215:11
pursuit   251:24
push   97:19
   150:15

pushed   170:18
pushing   275:24
put   29:6 39:20
   49:12,13 50:6
   50:7,9,13 51:1
   51:7,21 55:2
   90:8 97:3
   101:12 106:2
   112:5 113:3
   114:12 141:19
   151:14 157:10
   176:22 205:2
   209:4 213:10
   256:2 262:22
   281:3 285:13
putting   29:24
   88:18 98:25
   233:1 239:3
puzzles   233:2

q

quarter   64:18
   282:10
question   8:14
   8:16,17,19,20
   8:22 9:7,8,9
   22:25 27:14
   33:24 34:15
   44:1,14 53:6
   59:24 65:21
   72:15 78:7
   91:1 116:7
   122:13,15
   129:10 132:12

133:25 136:19
147:3 148:16
153:24 160:7
185:16 191:7,9
197:6 198:5
203:8,9 207:8
217:24 219:10
223:4,5,18
224:9,12,21
227:1 247:7,12
247:13 248:2
249:18 261:17
263:25 265:16
267:19 268:1
270:20 272:4
275:16 276:3
277:14 278:2
278:19,25
283:17,20
questioning
   245:4
questions   8:8
   8:25 9:1 25:23
   104:7 111:2
   112:17,20
   121:20 138:25
   210:7 214:1,4
   214:10 226:24
   227:4,6 244:10
   282:5,10 284:6
   285:17,18,20
   285:22 286:8
quick   26:14
   247:7

quickly   113:13
   119:5 152:14
   181:4 199:4
   227:9
quit   47:19
   81:24
quite   33:17
   49:20,21 51:24
   85:5 118:17
   225:9 258:17
   282:13
quo   285:14
quota   117:2
   118:1 119:2,22
   119:23 123:3,4
   125:16,25
   243:8 282:23
   283:1

r

r   5:19,19,19
   32:9 93:7
   97:14 111:11
race   85:11,15
   156:5
rachel   145:23
   151:7 237:7,24
racist   23:21,22
   24:16,16 143:9
   238:18 239:18
radar   69:3
radio   24:5
   252:13

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[raed - recall]** Page 62

**raed** 229:10

**rafarinha** 3:13

**rahal** 145:16
145:21 158:12
164:9,10,14
165:1,12 166:1
166:2,20
167:19,23,24
167:25 168:1
168:16 255:2,3

**raise** 57:4,10
204:19,21

**raised** 100:11
250:2

**raises** 37:15
197:11

**rally** 155:9

**ramp** 186:2

**ramped** 280:15
280:15

**ramping**
280:20,22

**random** 49:22

**rank** 80:22
112:22,22

**ranks** 221:23
222:5,9,16

**rant** 90:18

**rapidly** 219:11
249:21

**rapids** 14:17

**rash** 219:12
249:21 282:3

**raw** 262:13

**ray** 80:8,11
96:2 149:7
176:9 246:20

**reach** 18:11
80:20

**reached** 35:6
41:6,10,13
44:3 70:10
88:20 105:13
151:17

**reaching** 43:5
282:4

**read** 43:3 77:8
138:25 139:16
139:19 141:10
141:22,22
187:20 199:18
215:18 231:11
233:2 237:14
248:8 253:1,6
263:22 270:17
270:23 271:12
271:14 272:8

**reading** 140:24
187:25

**reads** 110:9
190:1

**ready** 191:23

**real** 130:7
154:4 247:7
273:25

**realize** 189:20
280:11

**realized** 43:6

**really** 26:22
34:9 54:8
69:19 130:4
132:17 148:18
180:2 181:4
205:3 218:20
225:21 249:9
271:20 282:3,8

**rearrange**
78:23

**reason** 16:7
32:18 51:8
96:10 149:20
193:24 223:14
223:22 239:4
246:25 248:12
252:15 261:4
266:2,5 267:8
270:20 273:9
273:11 275:21

**reasonable**
39:13 282:15

**reasons** 105:13
155:16,17

**recall** 7:24
22:11 23:17
29:23,24 32:4
32:16 37:17,19
37:21 48:17
49:1,16,24
50:2 51:10,16
51:17 52:13
58:25 62:22,23

63:4,6 64:17
66:23 67:2,12
67:21 70:7
73:6,20 74:25
76:22 79:2,6
81:10,21,25
82:16 83:12,14
83:19 87:12
94:12 95:8
97:2 100:16,18
101:2 115:7
116:12,21
118:3,4,5,8
120:17 125:10
129:2 131:17
137:18 138:13
140:5 141:12
150:22 153:8
166:11 169:3
169:22 171:5,6
171:7 174:3
177:9 180:19
184:8 186:22
187:2,23
188:20 192:13
192:19,20,22
194:13 195:17
195:20,22
196:19 199:13
204:23 207:5
207:10,13,25
208:2 210:14
216:24 218:2,5
221:17 225:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                     www.veritext.com

[recall - reference] Page 63

226:23,25
227:4,6 229:25
230:17,22
231:1,4,15
232:16 240:13
241:1 245:4,6
248:19 250:13
250:14 251:17
251:20 252:6
252:14 255:18
259:20 260:2
262:22 267:5,8
267:9,11,16
279:9 280:3
**receipt** 109:24
110:14 132:19
**receive** 12:22
13:5,8,19,22
37:15 42:11
57:3 58:2,5,18
58:23 60:22,24
61:4,7,11,21,23
83:24 92:17
95:17 96:21
113:5 165:21
171:20 192:11
**received** 12:5
38:22 57:11,25
61:2 82:24
84:8,9 86:5
87:13 136:2
137:8 142:1
151:14 175:14
187:20,21

192:20 201:21
221:14 245:25
261:12 284:14
285:2
**receiving** 58:25
60:23,25 96:25
174:8,10
186:22 187:2
187:23 188:18
189:1 220:23
284:10
**recent** 157:12
**recently** 213:21
214:19,24
**recognize**
38:10,14 56:25
222:7 227:10
234:11 265:7
**recognized**
64:24
**recognizing**
41:9
**recollection**
92:13 101:2
110:8,24
138:24 142:3
162:24 172:1
193:17 197:16
207:1,22 232:9
242:2
**recommend**
40:16 74:2
76:8,11 241:25

**recommendat...**
55:10 64:5,12
64:13,14 69:4
80:18
**recommendat...**
53:13 54:1,9
98:7
**recommending**
67:15,18
**reconciliation**
199:22
**record** 5:11,18
5:20 30:22
54:25 55:19
62:13,15 71:19
100:4 110:2,5
113:5,8 115:8
128:3,5 131:5
139:13 148:23
148:24 176:1
191:20 205:20
207:15 219:10
219:15,19
234:17 248:5
249:20 282:12
285:23
**recorded**
232:15 271:8
**recording**
231:22,23
279:25
**recordkeeping**
115:5

**records** 36:3
74:8 82:1
95:12 96:24
97:8 99:13
109:21,23
110:11,13,22
110:25 111:2,6
111:6,24 113:4
113:21 114:3,3
115:4,7 130:23
132:21 134:5
200:22 234:4,4
242:24 247:2
256:16 266:12
**recruit** 202:22
**recruiting**
17:17 68:25
**rectify** 112:8
**redacted** 220:5
**redirect** 90:13
**reduced** 286:10
**reelected** 167:7
167:10
**refer** 201:6,7
207:15 244:21
272:11
**reference** 57:3
75:8 77:8
195:1 198:11
198:14,19
226:14 245:3
253:10 256:18
256:20

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**referenced**
201:3
**referred** 87:21
91:4,14,20,22
195:18 206:1
207:1 208:14
226:17 240:20
255:14
**referring**
145:17 179:2
192:5 193:5
195:9 197:13
199:1 225:23
235:9 247:3,3
255:14 269:1
**refers** 194:23
196:1 226:8
276:15
**reflect** 219:10
219:15 249:20
276:22
**reflected**
192:25
**reform** 41:7,14
42:6,14
**refresh** 83:19
110:8
**refused** 240:4
254:6 270:3
**refute** 208:8
**regard** 94:11
202:4 214:18
237:2 265:4
266:1

**regarding**
77:14 118:1
188:16 242:17
**regardless**
144:18
**regards** 20:25
41:2 82:19
83:24 89:19
92:18 94:20
118:25 126:22
145:20 181:5
183:25 188:9
275:8
**registrations**
97:4
**regular** 61:4
129:5,8,10
273:6
**regulations**
257:20,22
**reimbursed**
201:15 263:6
**reimbursement**
99:1
**reinstated**
212:16
**related** 85:11
86:11 116:11
182:20 258:14
286:12
**relates** 10:15
46:5 78:11
80:4 81:19
85:24 86:1

90:20 99:15
112:21 117:12
119:11,12,25
120:10 124:7
125:5 140:3
157:13
**relations** 17:3
182:4
**relationship**
167:25 189:10
193:24 258:7
259:15 264:24
**relationships**
44:13
**relative** 142:25
176:18,24
**relay** 78:3
255:24
**release** 256:19
**released** 162:20
**relentless**
265:23 279:24
**relentlessly**
280:10
**relevance**
275:24
**relevant** 281:25
**relied** 101:22
106:21 108:5
**religion** 85:12
85:15
**reliving** 148:20
**remain** 18:2
57:17

**remained** 57:23
**remains** 90:18
**remedial** 53:12
89:17
**remediate**
43:21
**remediations**
43:1
**remedy** 96:16
**remember**
11:19 18:1
32:6 33:7
44:15 46:8
50:25 75:5
76:5,23 81:6
81:10 82:8,15
82:23 83:1
91:2 99:24
111:5 112:5,22
113:11 118:12
119:17 134:8
145:25 146:5
146:22 151:15
152:10 153:12
154:15,18
156:12 167:7
175:18 184:11
198:15 213:13
216:6 222:23
227:7 229:23
230:3 238:15
243:12 250:6
250:10,17
254:7 255:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

259:1 262:17 267:5,7 271:7

**remembers** 226:3 251:15

**reminding** 249:4

**remote** 103:21

**remotes** 104:18

**remove** 51:8 130:6

**removed** 97:3 119:20 121:14

**reorganizing** 255:21

**repeat** 25:6 247:13

**rephrase** 8:18 8:21 198:25

**replaced** 182:5 182:23

**report** 27:1,25 54:14,15 78:2 92:17 102:13 117:5,7,11 128:22 134:15 134:16,18 170:11,13 171:17 172:12 172:15,17,20 189:9 208:3 233:2 242:17 243:4,23 262:4

**reportable** 12:7

**reported** 1:21 36:12 37:3,5 63:15 106:24 109:20 110:10 110:15 117:1,8 119:1 128:7,16 128:24 129:2 134:11,13,19 134:21,25 135:8,9 176:4 177:4 178:13 242:19,25 243:9,15,18,22 244:1,23 245:21 246:3,4 246:5,14,18,18 249:4 262:3 286:9

**reporter** 8:7,10 8:15 53:5 91:17 111:9 232:14

**reporting** 16:15 146:21 166:16 176:10 245:12

**reports** 49:14 49:14 50:12 77:9 92:14 101:18 115:12 115:17,19 166:17 177:24 177:25 242:10 242:12 252:18

**representative** 234:12,14 254:4

**representatives** 98:5

**representing** 5:12

**reprimand** 31:18

**request** 7:6 8:11 9:7 28:5 135:3 136:2,5 142:1

**requested** 29:25 98:18 144:5

**requesting** 130:19 131:20

**requests** 100:25 137:9 234:2

**required** 8:25 106:3 119:13 261:13

**requires** 109:22 110:12 153:16 215:13 216:22 217:11 277:14

**requiring** 264:1

**research** 216:7

**reside** 9:12

**residence** 9:25

**resident** 209:10

**resign** 59:19 257:25 258:23

**resignation** 59:6,8,11 60:1 60:4

**resignations** 210:2

**resigned** 87:10 259:1

**resigning** 59:16

**resolution** 165:24 173:2 174:6,16 252:16 266:18

**resource** 15:8

**resources** 156:3

**respect** 89:10 190:25,25 192:18 194:11 194:22 198:10 198:18 200:9 200:13 211:16 215:8 217:15 226:16 236:8 241:1 242:24 250:4 261:17

**respectfully** 148:7

**respond** 9:1 100:19 223:23 225:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
www.veritext.com

[responded - right]                                              Page 66

**responded**
  100:18 118:9
  118:10,15
**responding**
  245:9,13
**response**  55:9
  100:8 134:25
  234:16 280:16
**responses**
  86:15
**responsibilities**
  16:15,15,23
  25:25 30:5,9
  35:25 36:19
  57:23 67:7
  217:17 242:7
**responsibility**
  36:6,14,24
  40:5 114:5
**responsible**
  17:15 30:15
**responsive**
  164:21
**rest**  79:11
  245:11
**restate**  193:2,3
  230:16
**restaurant**
  148:3 149:5
  150:19 181:7
**restricted**
  118:21
**restroom**
  148:17 175:23

  247:7
**result**  48:9
  79:15
**results**  50:1
  52:9 115:2
**resume**  20:12
  20:22,25 21:8
**retained**
  101:23 106:22
**retaliate**
  252:17
**retaliated**
  178:9,11,25
**retaliation**
  178:20 253:20
**retaliations**
  158:13
**retention**
  101:14
**retire**  73:3
  106:17 108:11
**retired**  87:11
  97:10 250:7,25
  283:24
**retiree**  221:13
**retirement**
  66:12 251:2
**retiring**  35:11
**retro**  197:8
**retroactive**
  197:3
**retroactively**
  264:18

**return**  81:11
  186:25 187:3
**returned**
  187:21,21,24
  188:18,19
**review**  53:19
  62:20 141:2
  170:17 198:13
  213:11,17
  226:4 249:2
**reviewed**  63:4
**reviewing**
  178:2
**reward**  182:14
**reyna**  7:25,25
  23:25 50:23,24
  51:6 140:15
  219:4,6 222:22
  222:25
**reyna's**  238:18
**rid**  34:5
**ridiculous**
  156:17 275:14
**rifle**  96:2
**right**  7:14 13:8
  14:1 32:4 34:1
  34:11,12,18
  38:4 44:11
  48:17,21 50:21
  56:5,10 57:3,8
  58:7 61:23
  64:23 70:12
  73:21 76:23
  77:7 78:16,17

  80:3 83:7,19
  83:24 84:15
  88:10 89:1,3
  89:20 90:2,6
  91:3,11 92:2
  92:15,24 95:24
  96:12 101:16
  101:21 102:8
  103:13,14
  106:14,20
  109:18 110:18
  116:25 118:4
  124:13,16
  125:24 127:5
  127:18,23
  129:17,22
  130:1,4 131:2
  132:19,20
  137:2 142:6,13
  143:19 148:19
  149:24 150:23
  151:25 155:13
  155:19,21
  156:23 157:22
  158:4 161:4,25
  162:8,16 163:9
  163:11 166:2
  169:5 172:17
  173:5 175:9,14
  176:15 180:11
  183:5 185:10
  187:2 189:20
  191:5,23 192:6
  193:7 194:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                    www.veritext.com

**[right - saab]**

195:9,11,23
198:1 201:14
203:16,17
204:9,21 205:2
205:11,13,13
205:17 206:5,5
206:24 207:20
208:11,11,22
209:14 210:7
211:21 212:22
212:24 214:14
218:12,19
222:19 225:3,7
225:13 228:6
228:25 229:8
229:23 231:8
231:12,18
232:9,16,21
234:22 235:18
236:19,25
237:6,20 239:1
241:17,21
242:16 243:3
244:18,21,23
245:7 246:2
250:14 252:12
252:14,23
253:22,23
257:19 258:19
259:8 260:9,13
260:20 262:22
263:15,16
264:21 265:10
269:3 270:16

273:15,23
274:19 275:20
276:6,17
277:17 279:13
280:9 281:2
283:18,21,22
283:23 284:14
284:16,22
**rights** 63:18
82:7,24,25
83:15 84:9,10
85:4,9,17,20,25
86:3,8,11,13
87:3,14,17
89:8 94:6
97:21 98:1
117:9,12
128:11 168:25
211:9,12 245:3
245:5,9,10,24
246:2,7 249:2
275:4
**ring** 239:12
256:2
**rise** 222:9,16
**rmr** 1:22
**road** 1:17 2:5
2:21 66:13
210:25 211:3
220:2 251:9
259:1
**roadmap** 182:2
**robert** 258:5

**roger** 3:8 6:8
69:24 76:18
86:14,18 91:1
167:8 183:6
255:7
**role** 7:19 12:15
24:5 74:4,15
88:23 90:15
113:22 180:20
268:10 277:24
**roll** 143:17
**rolled** 142:24
**roman** 263:23
**romulus** 69:5
180:6
**ron** 21:3,8
**room** 5:22 33:5
36:4,11 60:17
76:5 77:18
89:20,23 90:5
90:15 93:14
95:3 96:6,8,20
107:1,13 114:3
153:3 167:8
231:7 255:12
260:24
**room's** 90:16
**rosati** 29:12
47:8 50:2
240:21,22,23
**ross** 208:4
**rough** 7:11
129:7

**roughly** 6:15
**route** 161:25
**rpr** 1:22
**ruben** 260:4,11
**rude** 232:2
**rule** 247:8
282:17
**rules** 8:6 59:20
247:9 257:20
271:18
**rumblings** 95:2
**rumor** 203:25
**rumors** 202:10
205:9
**run** 35:2 67:10
242:8 280:6
**running** 36:20
36:25 87:23
233:4 234:15
269:9
**runs** 151:11
231:25
**rv** 9:13,15
48:19

**s**

**s** 4:16,19 5:19
38:1 56:15
93:7 123:18
**saab** 147:14
151:2 173:5,17
176:18,25
177:7 178:7
179:25 181:22

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

190:1 206:20
229:11 231:21
253:11,13
254:8,17,17,22
255:25 256:13
256:19,19
257:1 259:17
283:13
**safe** 28:22 29:6
29:7,24 49:23
50:6,7,10 51:1
51:12,22 52:2
52:9 81:23
101:12 146:20
**safety** 119:17
119:21 156:1
186:8 202:20
**sake** 179:5
**salaried** 12:19
**salary** 12:20
37:19 38:20,24
57:7 165:8
198:21 221:3
263:8
**sale** 110:10
247:2
**sales** 109:20,23
110:13,22
111:1,24 115:3
115:4,7 242:24
**saline** 16:11,12
17:23 18:3,5
18:22 19:2
36:18 41:17

**salt** 184:22
**sanctioned**
28:2,3
**sanders** 285:13
**santa** 90:4
**sat** 11:21 12:2
23:14 30:19
31:3 71:14
98:19,23
**saturday** 143:9
**save** 90:17
**saw** 43:20 44:4
44:7 144:6
156:23 162:12
188:6 190:5
262:12
**saying** 17:6
47:20 55:9
65:18,23 90:17
100:11 123:5
130:1 135:17
147:25 150:5
154:5,23 162:2
163:2 165:22
204:25 205:7
213:7 231:2,3
231:4,5,15
234:8 237:1
245:8 256:11
265:17 269:2,7
269:11 270:23
271:20,21,23
273:19,25
278:9,10 280:8

**says** 33:2 35:11
127:16 159:2
159:18 193:3
195:2 199:9
227:11 243:18
264:6 276:21
277:2 279:9
**scales** 185:20
**scanned** 193:13
**scene** 170:3
**schedule** 40:19
**scheduled** 5:16
**scheme** 77:15
128:10 135:8
135:11 142:12
142:19 244:22
**school** 14:4,5,6
14:9 15:8
**schultz** 240:22
**schurig** 258:5
258:23
**science** 14:21
**scope** 42:16
**scott** 5:19
**scratch** 105:15
**search** 75:6,7
**seat** 12:9
**second** 77:18
161:18 166:3
198:4 203:3
264:16,17
**seconded**
276:24

**seconds** 101:14
151:21 257:1
**secret** 260:14
**section** 36:2,3
38:19 39:11
54:23 57:6
109:22 110:12
112:16 117:3
158:11 225:25
**secure** 102:7,11
**secured** 16:10
51:23
**secures** 199:25
**see** 6:22 27:7
39:15 48:11
78:15 96:5
98:20 104:11
113:24 121:7
122:2 132:13
132:21 134:21
136:4 138:5
141:17 157:24
169:1 184:24
189:22 192:5,8
192:9 193:5,9
193:15,19,25
194:11,24
195:5,8,13,17
196:1,4,7,9,22
197:22 198:12
198:14,24
199:6,9 200:2
209:10 215:17
226:9 227:18

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

227:19 230:2
233:22 240:7
240:25 243:20
245:7,17 251:5
251:15 253:11
265:3 266:24
268:2 270:17
270:18 271:8
272:17,19,22
272:22 273:2,7
276:17,22,25
277:9 280:21
282:19 285:11
**seeing** 226:3
254:7
**seek** 174:16
**seeking** 160:20
**seems** 139:7
249:22
**seen** 27:12,12
28:1 90:9
101:1,4,5
202:17 238:24
**sell** 9:22 178:16
178:19
**send** 20:11,12
20:22 52:6
100:14 117:15
154:3 175:18
260:10
**sending** 23:10
23:25 97:4
151:12 184:25

202:7,24
222:19 280:4
280:10
**sends** 135:16
244:17
**senia** 273:3
**senior** 242:12
**sense** 20:2 26:2
42:7 134:4
147:17 153:17
178:22 221:22
**sent** 20:24 21:8
21:9 54:7
80:22 100:13
100:16,20
101:1 107:6
112:13 115:13
117:14 121:10
121:12 154:3
157:5,8 182:15
183:12 193:13
234:25 239:12
**sentence** 39:10
**sentiment**
188:15
**separate** 86:10
94:15,16 159:3
159:6,7,10,18
193:15
**separately**
193:12 196:18
**september**
253:14

**sequence** 50:22
192:8
**sequences** 21:6
**sergeant** 15:11
23:18,23 24:9
24:13 36:9
81:2,6,11,14,23
84:11,24 88:5
88:22 117:15
120:23 122:23
124:3,8,10
152:24 153:12
154:4 158:19
159:4,21,25
160:9,19 161:2
162:10,14,18
162:25 163:8
163:22 164:6
166:17 168:3
170:1,2,8,16,16
170:24 171:8
172:1,2 173:8
178:6,8 179:11
179:23 180:5
184:24 202:6,6
202:13 203:20
203:22 205:13
205:13 208:16
208:17,20
210:11,22,25
211:1 215:10
215:25 222:19
225:3,7,13,17
226:14,20

228:15 229:1
230:18 239:19
239:22 244:19
245:19 256:1,1
257:3,4 258:15
258:22 261:18
265:18 266:3,6
266:25 269:2
269:14,15
274:1,7,11
280:18
**sergeant's**
160:2
**sergeants** 45:8
55:1 68:6
79:14 89:22
105:9 124:8
170:1 208:14
244:12 272:6
**seriously** 267:3
**served** 50:11,23
**server** 207:16
**service** 18:8
39:23 112:19
213:1 259:21
**services** 4:15
4:18 15:14
16:4 37:24
56:13 64:3
74:7,10,11,12
75:16 279:10
**session** 40:22
**sessions** 39:25
40:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

set  11:20,21
  34:8 39:20
  40:21 43:7
  53:11 78:21
  88:18 91:12
  140:16 195:3
  199:20 286:8
setting  39:25
  40:7,12,15
  41:3
settled  267:17
setup  141:12
seven  15:11
  157:14 252:25
  282:2,11,14
several  15:22
  30:19 54:7
  70:20,20 77:25
  78:1 82:25
severance  59:1
  59:2 61:2
  199:13,15,17
  200:5,6 284:11
sex  24:1 204:5
  239:1 261:25
sexual  208:23
  209:8 259:3
shakes  8:13
shallal  149:5
sham  229:18
  231:20
shame  207:18
shameful  190:8

share  13:14
  55:23,25
  127:18 136:25
  149:19 155:16
  239:8 261:14
shared  40:11
  47:8 136:21
  139:17 189:23
  219:2 229:16
  255:22 265:23
sharer  157:12
sharing  44:10
  129:1
shell  268:6,6
sheriff's  127:20
sherman  220:2
shield  221:8
shift  45:3 98:22
  98:23 160:3
shifts  56:1
ship  88:19
shit  238:14
shitting  90:6
shocked  90:7
shokr  84:12,21
  203:23 205:15
  205:17 245:11
  245:20
shooting  24:3
shop  79:19
  202:23 230:4
short  14:25
  18:6

shortly  104:14
  121:20 127:22
shot  24:7 89:1
  100:9 180:1
shoulders
  104:11,11,23
show  38:4
  89:12 148:15
  173:18 220:16
  232:2 233:24
  234:6 235:2,13
  237:19,23
  266:12
showed  149:9
  154:14 167:19
  183:10
shown  235:6
shows  193:7
  224:14 236:4
  273:19
shredded  49:13
shrugged
  104:11,11,23
shut  103:22
  249:23
sick  150:6
side  82:24
  102:8
sign  193:11,12
  196:17 277:7
signature  38:13
  193:8 196:5,7
  286:21

signatures
  196:9
signed  73:7
  84:5 138:18
  139:1 175:8
  183:11 192:12
  192:21 193:13
  196:12,14
  264:17
significance
  49:19
significant
  94:24 106:25
  163:16,18
  203:21 264:13
significantly
  65:3
silliness  191:2
  263:4
similar  175:21
simple  44:24
  285:21
simply  9:21
  87:6 279:20
singled  92:7
sir  173:10
  226:1 227:14
  228:2 276:18
sirens  252:1,5,8
  252:10
sit  11:10 12:4
  12:11 44:15
  45:7 46:1 72:9
  97:7 99:6

261:7 266:14
266:14
**site** 42:7
**siting** 5:25
**sitting** 154:4
159:13 186:2
209:7 219:13
282:2
**situation**
230:18 271:21
**situations** 87:8
245:21,22
**six** 1:17 2:5
15:25 148:20
155:24 215:9
**skeletons**
256:19
**skill** 39:13
**skills** 71:4,5
206:16
**skinned** 239:10
**sleeping** 45:1
**slept** 45:2
**slide** 119:7
**slowly** 220:14
**small** 17:1
156:14 157:1
218:17
**smart** 113:22
114:10
**smarter** 116:5
**smash** 246:7
**smashed** 169:6
169:13

**smith** 35:8,9,14
35:14 108:11
241:25
**smoker** 177:14
**snippets** 182:10
**social** 283:7
**solid** 65:10
**solving** 55:5
**somebody** 98:8
108:6 135:17
141:21 152:9
160:25 161:2
176:22 179:21
184:22 185:24
190:11 239:11
242:5 262:11
285:19
**somebody's**
103:23
**someone's**
246:7
**someplace**
141:20
**son** 61:17,18,23
177:14 221:11
**soon** 24:24 70:5
80:6 81:3
91:14 104:18
131:7 206:10
206:20 266:25
266:25
**sop** 113:14
**sorry** 19:24
60:15 62:24

64:15,19 72:14
76:20,22 81:22
83:12 84:17
86:21 87:13
90:7,18,22
109:10,19
117:19 120:22
122:4 123:20
124:17 132:23
133:6 135:13
135:21 137:7
137:22 141:11
142:22 147:24
153:2 156:20
173:11 174:1
176:6,21
187:18 188:24
189:2 195:7
199:3 203:6
211:25 217:1
222:1 225:1
226:12 227:2
247:9 249:24
260:15
**sort** 30:6 68:25
86:13 92:17
97:21 105:5
106:3,4 113:1
115:5 131:4
141:8 198:20
214:23 220:15
244:5 248:18
251:5 259:3
265:19

**sorts** 58:5
**sought** 228:16
**sound** 43:13
72:19 124:19
241:20 250:14
250:15
**sounded**
245:11
**sounds** 44:20
44:24 96:13
185:9 225:9
228:24 232:21
246:18
**source** 200:1
**southern** 1:3
**southfield**
186:3,4
**southgate**
136:8 261:15
**space** 9:16
**spanish** 90:20
**spatial** 156:4
**speak** 10:11
13:15 32:11
67:19 71:11
82:22 83:3
86:20 88:13
93:4,22,24
94:3,17 102:15
111:12,25
112:10,15
114:24 123:14
124:1 131:15
145:2 224:14

262:9 270:13
279:24
**speaking** 89:16
90:21 94:13
153:17,18
163:21 223:15
242:14 245:16
250:10 275:10
**speaks** 195:14
**special** 30:7
70:25 93:5
129:11,12
209:14 250:25
**specific** 28:9
31:12 39:12
73:20 86:4
123:12 128:18
156:12 174:2
280:3
**specifically**
23:24 85:20,22
86:16 92:7
93:18 94:4
95:4,8 117:14
118:3,4,8
131:17 134:8
210:14 233:23
235:11 245:6
247:5 252:17
268:23 279:19
**specifics** 33:8
**speculation**
271:3

**speech** 127:4
**speed** 34:9
183:9 186:6
251:18
**spell** 5:18 32:8
78:13 93:6
111:9 205:19
**spelling** 123:16
**spend** 183:16
268:5
**spending**
131:12
**spent** 15:9,9
239:6
**spoke** 32:12
64:24 85:17
112:13 123:20
123:23 124:6
138:12 141:25
167:21 225:3,8
**spoken** 235:8
**spot** 50:18
104:15 113:23
114:15,18
**spread** 47:8
**spring** 15:3
177:13
**squad** 33:5
135:24 153:1,3
155:11,13
**square** 220:17
220:20
**ss** 286:3

**stack** 52:2
111:1
**stacy** 213:13
216:6
**staff** 26:24,25
30:10,10 31:1
44:10 45:3,5
53:18 54:8,25
55:13 66:9
70:8 74:8
85:23,24 87:19
87:20,21 88:4
98:20 99:6
105:8,17 113:4
113:8,21 114:3
118:21 120:21
124:19 125:19
139:13 141:3
223:9,11,15
**staffing** 54:11
54:12 155:8,10
283:6
**stamp** 192:6
**stamped** 192:2
**stand** 135:20
214:9
**standard** 88:18
121:15
**standards**
123:7 127:10
263:16
**standing** 32:21
90:16 106:16

**start** 8:15
28:14 88:25
105:15 106:12
140:19 202:14
206:10 221:9
233:1 239:14
257:12 266:24
280:20,22
284:10
**started** 11:5
15:7,8 16:3
17:1 23:9 25:3
28:12,15 35:5
35:19 37:12
40:25 42:17
55:9 71:2
73:11 81:1
104:19 109:25
110:19 111:2
116:21 130:9
156:10,15
158:8 178:14
180:3 185:2,5
190:14,17
192:23 202:2
203:23 206:21
207:3,14
229:13 240:2
252:6 253:25
264:16 265:12
269:20 280:14
**starting** 22:16
28:13,19,24
33:11,13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[starting - subjected]**                                          Page 73

104:21 148:18
150:4 181:8
187:18 263:23
269:9 277:11
**starts**  190:7
231:25
**state**  5:17 9:20
14:15,17 15:18
20:21 30:24
63:20 77:11,12
77:21 78:3,10
82:3,25 97:5,8
99:14 106:19
111:23 112:8
112:10 115:3,4
117:8 127:16
128:9,19,25
131:7 144:16
146:21 168:15
172:16,18
177:5 202:23
219:18 243:10
243:19 249:5
286:2
**stated**  20:6
26:23 54:21
69:12 120:2
148:1 236:9
267:20
**statement**
113:25 126:17
165:14 167:13
167:16 183:3
190:4 213:6,7

215:3 230:15
245:23 271:19
**statements**
81:17 91:15
92:4,10,25
149:1 207:5,10
215:21 233:25
234:19 235:4
235:14 238:1
255:11,13
**states**  1:1 38:21
63:14,20 82:6
**stating**  59:18
**station**  103:25
**status**  26:19
134:2 285:14
**stay**  154:22
190:12
**staying**  222:4
**stenographer**
5:8
**stenographic**
286:11
**stenographic...**
1:21 286:9
**step**  14:2 26:14
42:21 101:23
149:2
**stephen**  2:3
**steps**  34:4,8
40:19 54:17
106:7
**steven**  5:25

**stevenson**
20:17,18
**sticker**  126:19
**sticking**  150:18
166:1
**stipend**  12:5
**stipends**  58:18
**stop**  59:16
60:14 116:8
143:12,18
161:18 281:9
285:12
**stopped**  132:21
132:24,25
133:1 146:15
222:17
**stops**  142:23,25
**storage**  48:18
**store**  104:9
**stories**  95:2,4
**story**  79:12
**straight**  26:10
179:14
**straightforward**
120:12
**strategic**  41:17
**street**  3:10 98:8
146:16 202:23
**strengthen**
44:17
**strengthening**
107:21
**stress**  150:17
219:16

**stressful**
181:12
**stressors**
181:13
**stretch**  148:13
**strife**  179:11
**strike**  27:23
57:13,16 60:23
73:13 81:7
101:6 120:18
121:16 132:7
159:1 169:10
188:19
**strong**  71:5
**stuck**  126:19
**study**  27:23
28:22 54:11
**stuff**  112:24
148:20 161:13
205:1 238:19
239:3 246:24
273:18
**style**  149:19
**subject**  26:17
41:23 53:16
72:1 87:2 98:9
98:19 117:2
119:2 125:15
169:1,21 186:8
208:4 227:15
243:8
**subjected**
267:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

submitted
124:16
submitting
245:23
subordinates
258:16 277:24
subsequent
81:12
succession
64:25 65:7,8
105:12
succinctly 72:3
sudden 238:18
270:2,11
suddenly 206:8
sue 145:23
146:7 147:1,8
149:1 175:14
207:2 233:13
233:24 235:13
236:7 237:23
sued 51:25
218:17
sugar 149:22
149:23
suggested
40:11 42:17
suggestion
54:22
suggestions
54:18
suite 1:17 2:5
2:13,21

suits 71:5
sum 198:20
summary 27:5
27:9 41:22
195:2,4,8,12
sunday 143:9
superseding
213:9
supervise 17:12
68:3 166:19
280:19
supervisor
16:12 36:9
67:22 158:15
158:17 170:2
226:8 260:4
supervisor's
203:7,10,12
213:21 224:15
274:18
supervisors
37:2 171:1
194:20,20
207:23,24
214:22 269:23
277:4
supplied 29:10
supply 29:13
support 15:14
16:4 41:15
42:16,20 54:4
64:3,21 65:15
74:7,11,12
75:16 130:7

279:10
supporter
178:12
supposed 40:6
46:11 119:9
122:14,16
146:20 192:24
201:2,21
212:16 213:5
220:21 227:12
240:10 242:22
256:3 263:5
276:10
supposition 6:6
sure 5:24 20:2
22:25 23:2
26:10 28:16
31:2 33:1 37:8
42:1 49:8
50:21 51:5
52:3,22 94:8
127:14 130:24
131:6,11 139:9
141:6 144:23
147:6 148:2
149:21 152:9
160:7,18
168:21 175:24
183:2,4 185:8
190:13 199:8
201:13 237:16
242:7 243:15
244:1 245:8,18
254:5 257:21

260:7 267:14
273:17
surprised
101:10
surrounded
109:12
surrounding
70:22 98:3
surveillance
239:6
survey 26:24
27:2,24 28:2,4
28:22 29:3
41:19,21 42:2
42:2,4,5,11,12
48:9,9 49:25
51:23 52:9,10
53:10 206:17
suspect 24:7
suspected
63:16 209:2
245:12 252:19
suspects 70:23
suspend 130:5
suspended
262:6
suspension
241:20,22
242:1,3,5
suspicion 157:6
suspicions
156:24
swabbing
219:14

**[swat - talked]**

Page 75

swat 23:24
 209:21 238:25
sweets 149:17
swirple 145:24
 152:23 153:10
 153:11,13
 157:19 233:13
 237:24 239:18
swollen 249:22
swope 1:5 5:13
 63:25 64:2,6
 64:17 65:6
 66:20,20 67:24
 68:3,8,22 69:3
 69:14 70:16
 71:8 72:5
 73:15,17,25
 75:1,2,21
 76:11 77:1
 78:7 86:24,25
 102:18 109:2,8
 109:13 117:20
 117:21,22
 120:7 124:22
 125:18 130:1
 136:21 137:4
 137:11,21,23
 138:6 139:6
 141:5,6,25
 152:15 156:10
 165:3 170:18
 171:14,16
 172:11,25
 173:20 174:7

174:21 175:21
 194:16 203:24
 206:7 211:2,4
 211:18 230:13
 230:19 243:12
 243:15 245:2
 256:24 257:10
 257:13 258:8
 258:14 259:16
 264:6 277:18
 279:2 284:23
 285:6
swope's 67:22
 69:10 73:5
 244:9
swore 90:7
sworn 5:6 17:2
 17:5,8 79:16
 250:24 260:20
system 70:8
 101:20 102:3
 106:23 111:22
 113:24 114:17
 117:3 118:2
 119:3,19,23
 125:25 242:18
 243:8 244:16
 248:15
systematic
 124:17,19
systemic
 118:12,13
 138:3,9,11
 139:2

systems 106:19

**t**

t 3:1,2 5:19,19
 5:19 93:7
 97:14 111:11
 131:13 151:8
 190:12
table 4:1 9:7
 23:14 247:7
tactical 161:25
take 6:21,25
 7:2 8:7 9:5,8
 14:1 26:14
 29:7,9 32:15
 34:4 38:18
 40:19 48:14,24
 49:23 52:17
 53:3,7 54:17
 58:11 62:9,10
 62:11 67:10,10
 77:21 88:23
 96:14,16 98:11
 101:14,23
 103:25 106:7
 122:25 126:5
 131:21 132:8
 143:20 146:7
 148:17,17
 149:2 160:22
 160:24 161:2
 161:14,18,25
 182:17,18
 185:6 190:15

198:12 233:3,6
 247:16,18
 248:2,3 250:13
 256:3 269:18
 272:9 274:14
taken 1:17 6:11
 8:5 27:2 28:2
 33:20 48:14
 51:19 79:1
 82:3 95:3,11
 95:15 133:12
 141:18 147:21
 153:22 170:19
 273:1 286:7,12
takes 7:6 146:9
 156:5
talal 89:6
talk 20:13
 23:15 28:3
 32:24 42:1
 44:15 45:2
 47:11 48:5
 59:2 70:7 91:3
 99:7 105:10,12
 107:16 143:12
 156:14 157:1
 208:7 211:14
 224:3 229:19
 235:18 252:24
 255:10,20
 260:15
talked 23:24
 82:23 96:2,14
 98:23 131:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[talked - text]**                                                                                    Page 76

135:7 176:20
181:4 199:19
235:14 261:15
265:20 270:11
**talking** 23:24
24:1,11 40:24
40:25,25 42:3
42:5 46:19
53:10 125:1,11
125:16 144:19
147:18 161:1
162:18 167:11
189:24 204:13
209:6 227:22
230:23 231:5,9
231:13 251:11
254:8 255:19
257:1 270:9
281:16
**talks** 119:8
**tangible** 55:15
56:4
**taps** 265:24
**tarasca** 93:5,6
93:8,22 94:17
95:7,10,13,18
**target** 191:5
246:11
**targeted** 257:2
**tarik** 2:19 6:2
110:4
**tax** 46:5
**taxes** 39:3
200:23

**taylor** 14:5
**tcd** 146:14
231:25 237:7
**team** 23:24
53:16 55:13
73:3,4 97:17
98:2,18 105:14
179:11,19
182:17,18
209:21 233:15
238:25 255:9
**telephonically**
21:17
**televisions**
104:7
**tell** 53:20 94:3
106:17 118:11
134:15,18
138:12 143:9
157:7 163:25
164:3,17
176:16 188:6
216:7 233:8
236:2,4 244:12
**telling** 52:8
177:15 204:1
252:15
**tells** 207:11
**tem** 80:12
247:23
**temporarily**
262:6
**temporary** 9:17
9:24 94:25

**ten** 109:24
**tend** 263:17
**tender** 59:8
**tendered** 59:6,9
**tentative** 277:2
**tenure** 56:22
61:13 81:2
133:2 180:4
185:19 209:22
**term** 153:24
161:18 196:2
253:24 264:16
**terminals**
135:23
**terminate**
31:23 32:2,10
34:1,14 193:23
**terminated**
32:16 33:15
34:11,22,25
127:21 165:20
212:8 257:25
**termination**
35:1 59:9,13
60:5 165:21
198:18 201:10
212:12
**terminology**
246:10
**terms** 153:18
157:11 193:3
200:11 206:25
214:17,17
217:1,1 235:12

243:7 246:17
246:19 277:17
284:5
**terrible** 162:21
**terrorism**
232:24 235:1
**terrorist**
259:12
**test** 159:25
222:25 259:24
**testified** 5:8
144:17 192:24
199:12 225:4
234:21 237:23
240:15 241:9
241:17 246:17
283:4
**testify** 5:6
**testifying** 214:2
240:13 248:19
**testimony** 8:8
52:12 144:24
185:9 190:23
218:25 229:15
239:24 245:4
246:21,23
272:2 274:5
278:3
**testing** 160:5
**tests** 160:24
161:17
**text** 23:25
234:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[texts - ticket]**

| | | | |
|---|---|---|---|
| **texts** 238:8 | 119:7 125:21 | 258:25 261:10 | **threatened** |
| **thank** 25:17 | 129:6 132:16 | 263:14 269:17 | 99:1,3,5,8 |
| 38:7 76:21 | 132:17 143:21 | 274:12 276:3 | 145:14 166:15 |
| 137:7 151:22 | 150:11 162:21 | 281:24 282:4 | **threatening** |
| 205:22 214:9 | 176:4 177:22 | 283:15,19 | 175:1 |
| 224:24 228:14 | 199:7 202:15 | 285:22 | **threats** 158:13 |
| 249:3 284:7 | 206:11 235:16 | **third** 31:2 | **three** 12:8 |
| **thefgfirm.law** | 245:15 246:14 | 197:22 | 22:10 26:22 |
| 2:8 | 265:3,4 280:10 | **thomas** 4:23 | 28:15 35:1 |
| **theme** 40:2 | 281:17 | 24:23,25 25:8 | 57:6 75:9 |
| **themes** 41:25 | **think** 6:16 12:2 | 26:15 27:24 | 104:20 109:18 |
| 206:17 | 12:13 16:6 | 28:4,8,12,23 | 159:3,6,10,14 |
| **theory** 235:25 | 17:2 30:24 | 32:15 42:4 | 159:18 161:8,9 |
| **therapy** 148:20 | 39:19 46:12 | 48:10 50:1 | 169:13 191:16 |
| **thin** 239:10 | 56:7,19 64:22 | 52:10 82:17 | 191:18 193:18 |
| **thing** 51:1 | 79:7 84:14 | 186:13 206:18 | 194:23 236:23 |
| 127:1 142:11 | 117:17 126:11 | 240:15,16 | 240:12 |
| 142:13 146:22 | 130:17,22 | **thomas's** 25:4 | **threesomes** |
| 155:8,23 | 132:14 133:3 | 129:14 | 205:8 |
| 159:19 178:6 | 139:22 143:16 | **thorough** 41:18 | **throw** 49:22 |
| 191:8 209:10 | 149:9,10,13 | **thought** 28:14 | **throwing** 153:2 |
| 255:10 259:19 | 150:13 151:2 | 28:17 69:11 | 156:16 |
| 262:2 263:14 | 151:23 157:11 | 93:19 98:12 | **thursday** 1:20 |
| 268:19 271:21 | 160:21 161:6 | 109:15 124:24 | 5:2 |
| 283:16 | 161:22,24 | 141:17 157:6 | **ticket** 77:15 |
| **thing's** 47:8 | 167:19 172:3 | 238:20 275:19 | 117:2 118:1 |
| **things** 26:6 | 179:23 180:25 | **thoughtful** | 119:2,25 |
| 40:24 44:16 | 181:13 184:12 | 182:1 | 120:14 125:6,8 |
| 47:9,24,24,24 | 191:12 201:24 | **thread** 4:25 | 125:9,12,15,20 |
| 52:8,14 56:7 | 224:19 238:18 | 187:6 | 125:21 127:24 |
| 66:2 78:1 89:2 | 238:18,20 | **threaten** | 128:9 135:7,17 |
| 90:10 95:2 | 239:4 240:23 | 147:22 165:10 | 135:18 136:10 |
| 101:9 104:25 | 246:6,10 | 165:11 | 136:16,17 |
| 107:21 116:3 | 249:18 254:21 | | 139:24 140:1,4 |

**[ticket - told]**                                                                 Page 78

142:2,10,12
144:13,14,23
185:24,25
243:8 244:13
244:22 283:1
**tickets** 118:21
119:8,14
120:13 125:24
126:1,4 142:13
142:20 143:24
144:5,8 185:21
244:5,7,12,14
244:15,20
**tight** 224:10
**time** 5:16 9:6
11:4,5,6,7,8,14
11:21 12:1,4
12:16 14:25
15:24 17:7
22:7 23:13
27:3 32:13
37:15 44:18
49:21 57:4
58:2 62:10
71:13 72:18
73:4,10 74:19
79:6,11,25
82:8 83:7 86:6
88:19 91:22,24
97:16 98:3
102:20 103:18
104:6 107:25
114:5,6 126:9
126:15 130:5

133:22,23
137:16 140:20
150:10,13,23
151:22 152:3,8
152:18 156:4
156:23 161:4
162:12 163:1
177:23 179:5
180:12 183:5
183:13,16,20
186:20 191:14
193:24 194:8
196:17 198:2
198:21,22
199:3 201:2,4
201:11,15,24
202:25 204:4
207:25 208:6
209:11,15,22
210:12 221:19
225:8 232:8
234:15 235:17
239:10 240:2
253:24 254:4
254:15 258:22
262:1 263:13
264:17,22
266:14 267:7
273:24 279:2
279:13 280:14
281:9 282:15
**timeframe**
78:20 83:13
104:17 232:21

**timeframes**
271:20 284:5
**timeline** 45:12
228:25 247:25
261:10 268:19
272:5 281:1,3
**timelines**
268:19
**times** 11:16,24
11:25 12:2
17:25 51:7
83:9 131:15
159:15 169:7
**timing** 97:2
267:15 270:11
**tire** 79:7,9,10
79:18,19 80:7
80:14 94:21
178:13
**tired** 191:3,13
237:11 263:3
**title** 10:25
64:19,22 146:2
**titles** 84:18
**tobacco** 71:1
**today** 5:16 8:11
62:16 79:11
155:18 226:5
280:6
**today's** 8:7
**todd** 16:13,16
47:7
**together** 53:23
83:7 89:11

126:14 193:12
196:17 198:21
231:7 233:2
239:20 258:9
**told** 22:1 23:10
24:4 26:20
27:19,21 45:22
87:4,5 92:5
106:25 123:8
133:8,11
134:16,18
137:23 148:3,7
154:13 157:4
157:21 159:16
159:19 166:7
167:2 168:1,2
168:15 176:18
177:4,17,25
178:3,16
179:14 180:17
183:15 184:16
186:4 200:24
202:22 203:24
204:6 218:10
218:14 222:23
229:12 231:6
231:22,24
237:5 239:14
240:16 256:14
260:14 261:21
261:23 265:10
269:12 284:4
285:11

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[tolerance - truck]**

**tolerance** 91:5
  91:6 92:6
**tolerate** 34:7
**tolerated** 89:16
**tom** 149:8
  151:5 186:19
  187:19 188:12
  189:23 265:17
  271:4,12
  283:10
**tom's** 265:22
**tone** 91:12
**tony** 99:23
  100:7 106:24
  107:14
**took** 19:1 27:25
  28:5,23 30:7
  34:5 48:10
  49:1 51:14,17
  52:10,20,25
  53:6 55:16
  70:9 98:22
  104:4 121:21
  145:14 148:10
  150:3 161:25
  171:8 172:12
  184:21 228:18
  230:24 232:19
  255:15 258:25
  259:24 269:24
  271:22,24
  272:20 273:23
  274:1

**tool** 154:7
**tools** 44:12
**top** 54:22
  104:12
**topic** 255:24
**total** 7:11
**totally** 221:25
**touch** 35:10
  150:16 181:4
**touched** 140:3
**tough** 9:13
**tour** 103:25
  104:4
**toward** 195:1
  228:8
**towards** 133:2
  155:23 189:12
  195:7
**town** 230:6
**track** 56:19
**tracker** 177:16
  177:18
**tracking** 96:4
  176:22 177:8
  177:18
**tracks** 222:17
**traditional**
  20:3
**traditionally**
  268:3
**traffic** 24:5
  119:5,16,21
  121:11,21
  124:9 139:23

139:24 140:3
  142:23,25
  143:12,18
  155:25 185:21
  185:24,25
  186:7 204:5
  208:22,24
  209:11 238:25
  244:11 251:8
**train** 97:8
**trained** 97:9
  113:12,23
**training** 54:4,5
  90:5 91:5,7,14
  91:20 92:6,11
  92:14 98:8,10
  120:10 142:4
  142:14 171:22
  183:21,24,25
  184:4,7 260:12
  260:25
**trainings** 91:22
  91:24 184:6
  185:15
**transcript** 4:12
  71:21 220:6
  286:11
**transcription**
  286:10
**transferring**
  114:2
**traveling** 9:19
**tray** 113:3

**treasurer**
  130:20 248:17
  248:22
**treasurer's**
  132:22
**treat** 88:1
**treated** 88:17
  225:10,14
  233:5
**treatment**
  158:15,21
  225:18 240:4
  261:16 265:19
  266:3,7 270:10
**tree** 90:9
**trend** 122:2
**trial** 4:21 62:3
  101:21 106:20
  148:14
**trials** 106:22
**tried** 79:14
  150:6,10 157:3
  161:25 181:15
  182:17 191:5
  280:18
**trifecta** 208:22
**trimming** 32:20
  33:2
**trouble** 258:10
  269:20
**troy** 10:24
**truck** 176:23
  177:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[true - understand]**                                      Page 80

**true**  54:6 120:3
125:7 130:7
183:2,3 213:6
213:7 219:2
245:15 258:25
284:18 286:11
**truly**  195:20
**trust**  50:19
52:4 84:2
215:24
**trusted**  129:18
**truth**  5:6,7,7
**truthful**  24:23
**try**  20:7 26:4
44:6,15,18
66:6 88:19
141:16 142:25
160:16 162:6
203:20 222:1
239:20,21
255:23
**trying**  12:2
26:11 30:11
56:7 66:1 82:7
83:18 86:1
90:13 113:13
126:11 129:25
139:18 140:6
141:14 148:1,9
150:15 151:23
153:21,25
158:20 179:3
182:9,18 199:4
202:22 203:16

204:11 205:8
213:23 231:17
231:19 254:15
259:17 260:15
261:10 271:17
**tt**  2:24
**turfe**  2:19 6:2,2
110:4
**turn**  39:10
63:13 88:19
191:25 193:18
195:23 202:18
215:9
**turned**  52:20
270:3
**turning**  77:7
194:22 196:4
197:22 204:24
246:24
**twice**  11:15
**two**  11:24,25
22:10 23:8,10
24:20 25:3
31:6 35:12
38:19 39:10,11
40:24 42:8
44:24 48:18
50:25 57:6
58:21 62:16
72:18 75:5,9
81:3 87:9
89:22 94:15,16
96:10 97:18
102:22 136:12

136:14,21,22
138:7,8 141:25
142:23 143:3,4
143:25 144:6
145:9 155:11
155:13 166:8
169:8 170:1,25
182:21 190:14
208:6 216:12
228:18 229:19
229:20,23,25
242:20 244:3
250:6 260:22
272:24 279:16
**twos**  132:15
**tyler**  261:11
**type**  71:16
98:25 112:20
115:16 119:16
127:1 130:17
150:16 160:1
160:14,14
181:5 259:18
261:12
**types**  49:1,17
50:9 51:21
185:7
**typo**  254:20

| u |

**uh**  8:13
**ultimate**  36:13
**ultimately**  24:7
30:14 31:12,22

54:10 80:5
111:14 173:13
173:17 174:5
274:17
**um**  164:15
**unacceptable**
227:13
**unbelievably**
21:22
**uncle**  135:18
136:9
**unclear**  245:7
**uncovering**
206:10
**under**  38:19
39:7,11 40:2
58:22 61:14,17
81:16 117:3
123:3 158:16
158:17 174:10
177:21 197:23
198:12 201:21
219:16 226:9
231:16 247:17
251:21 262:23
266:21 274:20
275:9,13,16
276:6 277:22
**understand**  8:4
8:17,22 10:1
30:6 31:21
33:1,24 35:22
39:17 44:1
88:6,11 90:8

96:15 113:21
114:10,15
122:13,15
127:7 129:22
132:12,23
140:6 144:24
148:1 157:13
161:15,22
192:14 194:3,6
198:13 213:19
216:10 221:20
222:3,13 223:5
223:18 230:13
244:6 246:21
257:16,19,22
260:7 268:17
278:18,21
**understanding**
8:20 13:16
24:12 28:1
37:3 85:13
89:15 111:19
119:11 127:21
138:6 157:18
173:13,24
175:20 180:14
184:1 198:1,6
201:17 202:9
210:10 217:8
232:22 244:10
249:1 250:19
251:12 258:7
259:15,23
262:2 269:21

284:20 285:9
**understands**
193:21
**understood**
9:10 48:20,20
71:3 114:14
122:16 223:10
244:3 257:13
278:14
**unemployment**
14:25
**unethical**
284:24
**unexpectable**
227:12
**unfair** 46:3
225:18
**unfairly** 225:15
239:22
**unfamiliar**
114:7
**unfavorable**
281:17
**unfortunately**
107:25
**uniform** 58:19
58:21 260:3
**unilaterally**
32:11
**union** 99:5
194:20 203:7
203:10,12
213:21 214:22
223:15 224:15

224:22 269:24
274:18,25
275:2
**unions** 99:4,8
112:7 194:9
270:25 282:22
**unique** 26:2
**unit** 95:5
117:18 164:11
164:13
**united** 1:1
63:20 82:6
238:16
**units** 48:18
**university**
14:15,17 15:19
202:20
**unknown** 141:2
213:15
**unpaid** 201:2,4
**unprofessional**
227:13
**unraveling**
180:3
**unrealistic**
186:6
**unsubstantiat...**
261:24
**unused** 198:21
**update** 80:4
236:23
**updated** 197:9
**uphold** 127:11

**ups** 99:16
**upset** 122:4
148:18 149:3
260:2
**upside** 48:21
**uptake** 34:9
**upwards** 55:6
**use** 50:23 77:15
116:17,19
139:9 140:22
147:9 161:18
166:19 170:4,5
170:17 175:23
247:6 280:19
**used** 41:16
116:23 147:22
148:11 179:13
184:10 239:13
239:13
**using** 51:6
147:16,23
153:24 154:19
184:11 234:6
246:10
**usually** 31:6
**utilization**
54:11
**utilize** 107:23
116:10
**utilized** 30:25
106:10 108:17

| v |
|---|
| **vacant** 220:3 |
| **vacation** |
| 198:21,22 |
| **vague** 19:8 |
| 25:6 33:22 |
| 122:10 132:10 |
| **valentine's** |
| 281:2,5,6 |
| **value** 95:6 |
| **vanderplow** |
| 1:6 5:14 52:23 |
| 69:24 70:3,12 |
| 70:15,18 71:9 |
| 72:4,22 73:16 |
| 73:17,19 74:2 |
| 74:15,23 75:2 |
| 75:3 77:1 |
| 102:18 109:10 |
| 109:13 110:24 |
| 111:3,12 |
| 113:10 114:21 |
| 114:24 117:19 |
| 128:23 130:2 |
| 130:21 131:4 |
| 131:19,25 |
| 132:2 133:18 |
| 134:1,10 |
| 136:24 137:1,2 |
| 137:5,22 139:5 |
| 141:5,7 152:15 |
| 162:1 165:5 |
| 173:1,20 174:7 |

174:21 175:21
187:25 188:10
188:14,16
189:4 190:2,17
194:11 206:7
211:18 227:22
231:1,6 243:23
248:18 249:12
249:19 250:11
250:11,19,22
250:25 251:7
251:17,20
277:18 279:2
**vanderplow's**
76:14 228:8
**various** 128:12
242:10
**vehicle** 23:11
36:5 58:12
74:9 177:8
260:22
**vehicles** 70:22
**verbalize** 8:12
**verbatim** 190:2
**verify** 218:12
**vernacular**
132:15 147:18
**versa** 11:2
**version** 29:21
**versus** 5:14
113:4
**vice** 11:2
**video** 33:6
143:14 154:4

162:19,24
172:5,9,10
178:2 231:22
239:6 251:6,11
256:22 267:4
280:11
**videoconfere...**
5:1
**videos** 144:6
145:9
**videotaping**
232:4
**view** 227:23
275:20
**vince** 145:25
155:7 156:20
157:22 233:13
235:19 237:23
**violated** 212:4
267:10
**violation** 86:13
97:21 109:22
110:12 127:3
168:25 171:1,4
171:11 215:25
246:7
**violations**
63:15,16,18
82:7,25 128:11
128:12 171:7
245:3,5,12,13
245:25 246:1,3
252:18,19

**violence** 127:12
**violent** 126:8
126:17
**virtue** 222:17
268:14
**visible** 156:7,7
210:16
**vision** 40:17
199:23
**visit** 42:7
**visited** 19:22
**visitor** 84:6
**voice** 179:17
**void** 244:14,17
**voided** 244:7
244:18
**volumus**
125:19
**voluntary**
42:21
**volunteered**
210:25 211:2
**volunteering**
149:10
**vote** 151:16
174:18 232:16
232:19 233:3,6
266:14 273:1
274:2
**voted** 56:10
172:24 173:19
266:9
**voting** 265:13

| | | | |
|---|---|---|---|
| **vs** 1:8 | 98:20 112:19 | **war** 152:21 | 238:6 282:8 |
| **w** | 127:1,13 | **warrants** 75:6 | 284:4 |
| **w** 200:23 | 129:22 130:24 | 75:8 | **wealth** 13:14 |
| **wages** 12:6,7 | 132:23 143:6 | **warren** 166:8 | **weapon** 32:19 |
| **wait** 59:22 | 144:23 148:4 | **waste** 152:18 | **weaponized** |
| 203:3 279:24 | 149:2 153:5 | **watch** 189:16 | 206:19 |
| **waited** 197:8 | 159:16 162:16 | 237:19 271:4 | **weapons** 96:3 |
| **waiting** 111:7 | 162:22,23 | 280:11 | **web** 234:6 |
| 132:13 | 163:21 166:2 | **watched** | **website** 43:4 |
| **waiver** 88:9 | 181:4 190:18 | 143:14 189:16 | 54:16 151:11 |
| 261:12 262:9 | 201:7 214:11 | 189:18,19 | 151:15 152:4,7 |
| **waivers** 87:7 | 220:8 233:8 | **watching** | 154:21 158:2,3 |
| **walk** 104:19 | 245:18 247:16 | 237:13,14 | 237:8 |
| 242:15 | 247:17 248:13 | **water** 59:20,22 | **week** 25:3 81:3 |
| **walked** 102:6 | 266:6,12 | 62:7 | 190:14 272:24 |
| 102:10 156:14 | 278:11 282:6 | **way** 8:15 13:13 | **weeks** 25:18 |
| 231:21 238:15 | 283:3 | 40:3 42:15 | 26:15 28:13,15 |
| **walking** 102:4 | **wanted** 16:1 | 51:2 56:4 66:2 | 28:24 102:22 |
| 103:9 110:25 | 19:3,16 24:24 | 78:21 88:16 | 102:22 133:8 |
| 282:7 | 41:17,23 52:7 | 106:18 112:23 | 135:5,6,6 |
| **wall** 96:8,8,15 | 54:5 55:6,13 | 133:24 139:13 | 281:7 |
| 96:15 | 56:19 91:12 | 140:16 156:4 | **weird** 249:9 |
| **walled** 218:17 | 96:15 113:11 | 222:7 224:11 | **welfare** 182:4 |
| **walmart** | 134:19 143:12 | 226:3 229:14 | **wells** 220:2 |
| 177:10 | 154:6 178:19 | 239:25 246:24 | **wencel** 4:23 |
| **want** 5:21 6:22 | 184:16 213:15 | 257:8 265:4 | 149:8 151:5 |
| 8:5,19 14:1 | 247:1 249:8 | 269:13 270:8 | 157:11 186:13 |
| 26:14 33:1 | 255:20,20 | 281:12 283:7 | 186:19 187:14 |
| 37:21 42:1 | 266:2 273:19 | 283:25 | 187:19 188:12 |
| 48:1 50:21 | 274:16 275:5 | **wayne** 172:21 | 189:3,23 |
| 51:25 55:5 | **wanting** 181:23 | 212:2 242:19 | 227:21 228:7 |
| 62:9 63:12 | **wants** 88:25 | 286:4,24 | 254:8 265:18 |
| 74:24 78:14 | 115:9 184:19 | **we've** 235:21 | 271:4,13 |
| | 190:3 210:7 | 236:11,12 | 283:10,15 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **wencel's** 190:3 | **who've** 257:24 | 228:14 229:15 | 88:16 103:24 |
| **went** 21:8 | **wide** 140:12 | 232:7,10 280:1 | 110:19 112:6 |
| 40:12 82:9,10 | 262:1 | **words** 40:2 | 114:22,25 |
| 82:15 88:11 | **widespread** | 153:6 197:1,20 | 115:6,6 119:14 |
| 89:5 92:11,22 | 128:8,17 | 213:10 240:5 | 125:20 126:3 |
| 99:22 104:5,15 | 243:18 | **work** 10:22,23 | 154:9 155:21 |
| 123:11 127:20 | **wife** 10:13 39:1 | 11:6,14 20:20 | 163:19 174:19 |
| 139:21 170:2 | 39:2 61:14,21 | 26:8,9 28:11 | 176:19 182:13 |
| 197:21 210:11 | 152:24 220:18 | 41:23 42:23 | 185:5 189:12 |
| 212:11 228:20 | 221:10 | 54:10 65:9 | 237:10,25 |
| 244:7 245:18 | **wife's** 10:7 | 66:5,13 72:8 | 239:20 257:3 |
| 259:23 260:1 | **wild** 103:23 | 89:10 99:7 | 263:19 278:15 |
| 261:15 264:11 | 189:25 242:6 | 107:20 116:10 | 278:15 281:9 |
| 274:23 | **willing** 73:3 | 117:2 118:25 | **workplace** |
| **west** 1:17 2:5 | **wind** 81:4 | 119:2 123:6 | 232:24 234:25 |
| 2:13 | 282:8 | 125:15 154:22 | **works** 117:17 |
| **westland** 69:13 | **window** 90:17 | 159:21 164:10 | **workweek** |
| 97:10 136:12 | **wing** 108:15 | 177:15 179:19 | 12:18 |
| 257:14,16 | **wish** 263:3 | 183:10 204:2,7 | **world** 39:22 |
| 258:9,14,19,24 | **witness** 4:3 5:5 | 206:21 216:16 | **worn** 133:11 |
| 259:9 | 6:20 10:14,17 | 258:16 263:19 | 172:10 |
| **whatsoever** | 214:3 251:15 | 277:19 280:11 | **worry** 174:25 |
| 231:23 266:9 | 282:2 | **workday** | **worse** 183:15 |
| 285:5 | **wizard** 131:8 | 279:23 | **worthy** 99:23 |
| **wheel** 177:21 | **wolfe** 208:19 | **worked** 11:3 | 100:7 106:24 |
| 207:19 | 208:20 | 20:18 53:22 | 107:2,16 |
| **whichever** | **women's** 77:17 | 97:16 131:22 | **wow** 207:18 |
| 134:25 | **wonderful** | 140:19 163:7 | **write** 31:17 |
| **white** 109:6 | 43:14 | 182:2 251:21 | 86:14 115:8 |
| 117:15 146:25 | **wood** 177:13 | 251:23 258:9 | 119:9,13 |
| 148:15 182:9 | **word** 147:9 | 281:22 | 125:20,21 |
| 182:21 238:19 | 179:13 184:10 | **working** 28:9 | 139:19 141:11 |
| 240:7 283:11 | 184:11 192:9 | 29:17 37:19 | 141:11 |
| | 195:8 227:7,7 | 43:5 71:10 | |

writers   140:14
writing   45:23
  78:5 84:1,3
  92:23 107:9
  112:12 140:25
  145:6
writings   100:2
written   16:14
  27:1,4,25 29:3
  46:2 48:9 82:2
  95:17 99:20
  100:2,3 113:6
  113:14,17
  114:11 115:2
  120:4 138:17
  141:8 170:13
  171:17
wrong   27:20
  87:24 106:16
  127:4,10
  143:16 163:2
  226:10 273:10
wrote   125:24
  135:17,18
  136:9 139:12
  139:23 184:12
  244:13 254:21

**y**

y   169:17,18
  205:21
yeah   12:7,10
  16:6 18:19
  33:17,18 37:8

42:5 51:13
59:1 65:22
72:19 82:1
86:9 92:9,13
96:18 105:24
109:7 131:6
140:23 146:23
147:6,22
152:18,21
154:20,20,20
155:2 158:10
162:23 163:19
165:20 167:15
168:3,21,21
172:21 185:8
185:20 188:5
204:18 218:22
219:2 223:2,2
223:3 229:21
237:15 240:23
249:8 254:12
257:12 259:13
261:15 266:20
269:21 276:12
280:1 281:19
year   8:4 11:13
  11:15,24,25
  13:8,12,19
  14:10,22 15:18
  22:14 38:20
  40:18 57:11,14
  57:24 102:25
  109:25 110:18
  146:20 151:25

199:24 200:18
200:24 217:24
217:24,25
220:25 268:5
281:6
years   15:9,10
  15:12,24,25
  18:8,18 19:21
  29:15 44:25
  118:14 208:6
  212:22 279:17
yemeni   149:18
yep   66:19 84:7
  155:2 156:15
  156:15
young   41:20
  66:11 259:13
youthful   282:5

**z**

z   169:17
zero   50:19
  64:25 65:15
  84:2 155:19
  182:8 206:16
zip   155:19
zoning   254:11
zoom   5:1
zrien   170:2,8
  170:16 172:2
  202:13 256:2
  257:4
zyke   169:15
  173:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.