# EXHIBIT B

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4     _____

5     KEVIN SWOPE, PAUL VANDERPLOW,

6     and JERROD HART,

7            Plaintiffs,

8         v.                      Case No.

9     CITY OF DEARBORN HEIGHTS, a    2:24-cv-10240-MAG-DRG

10    Michigan Municipal Corporation,

11            Defendant,

12         and

13    DEARBORN HEIGHTS CITY

14    COUNCIL,

15            Intervening

16            Defendant.

17    _____

18               DEPOSITION OF KEVIN SWOPE

19    DATE:         Monday, August 18, 2025

20    TIME:         10:07 a.m.

21    LOCATION:     Fausone & Grysko, PLC

22                  41700 Six Mile Road, Suite 101

23                  Northville, MI 48168

24    REPORTED BY:  Jahkarah L. Haynes-Young

25    JOB NO.:      7548430

Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFFS KEVIN SWOPE, PAUL VANDERPLOW,
 3   and JERROD HART:
 4        STEPHEN JOSEPH BROWN, ESQUIRE
 5        Fausone & Grysko, PLC
 6        41700 West Six Mile Road, Suite 101
 7        Northville, MI 48168
 8        jbrown@thefgfirm.law
 9        (248) 912-3213
10
11   ON BEHALF OF DEFENDANT CITY OF DEARBORN HEIGHTS:
12        MONICA HUNT, ESQUIRE
13        Allen Law Group PC
14        3011 West Grand Boulevard, Suite 525
15        Detroit, MI 48202
16        mhunt@alglawpc.com
17        (313) 871-5500
18
19        ROGER FARINHA, ESQUIRE
20        Dearborn Heights Corporation Counsel
21        14207 Ford Road
22        Dearborn, MI 48126
23        rafarinha@dearbornheightsmi.gov
24        (313) 846-1910
25
```

Page 3

1         A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF INTERVENING DEFENDANT DEARBORN HEIGHTS

3    CITY COUNCIL:

4         GARY T. MIOTKE, ESQUIRE

5         Miotke Law Office

6         6828 Park Avenue

7         Allen Park, MI 48101

8         gmiotke@miotkelawoffice.com

9         (313) 388-4809

10

11        TARIK D. TURFE, ESQUIRE

12        Hammoud, Daklallah, & Associates, PLLC

13        6050 Greenfield Road, Suite 201

14        Dearborn, MI 48126

15        tt@hdalawgroup.com

16        (313) 551-3038

17

18

19

20

21

22

23

24

25

```
                                              Page 4
 1                   I N D E X
 2   EXAMINATION:                               PAGE
 3        By Ms. Hunt                             8
 4        By Mr. Miotke                         162
 5        By Ms. Hunt                           304
 6        By Mr. Miotke                         306
 7
 8                 E X H I B I T S
 9   NO.            DESCRIPTION                  PAGE
10   Exhibit 1      Copy of Contract 1           42
11   Exhibit 2      Copy of Contract 2           43
12   Exhibit 3      First Amended Complaint and Demand
13                  for Jury Trial              48
14   Exhibit 4      11/20/23 Letter Re: SMIP Program
15                  2024                         97
16   Exhibit 5      1/9/24 Letter Re: Whistleblower  105
17   Exhibit 6      E-Mail Chain Re:
18                  Unacceptable/Unprofessional,
19                  Beginning 10/24/23          116
20   Exhibit 7      12/4/24 E-Mail Re: Resignation   123
21   Exhibit 8      Swope Employment Agreement  126
22   Exhibit 9      10/2/24 Document Re: Interest in
23                  South Haven Police Chief Position  130
24   Exhibit 10     11/5/24 South Haven Police Chief
25                  Interview Schedule          133
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

Page 5

1              E X H I B I T S (Cont'd)

2    NO.            DESCRIPTION                    PAGE

3    Exhibit 11     11/27/24 Letter Re: Conditional

4                   Offer Letter of Employment      135

5    Exhibit 12     12/04/24 Letter Re: City of

6                   Dearborn Heights Resignation    141

7    Exhibit 13     5/28/24 Council Meeting Notice   210

8    Exhibit 14     5/28/24 Regular Meeting Minutes  211

9    Exhibit 15     1/23/24 Motion of No Confidence  251

10

11          D O C U M E N T S   R E Q U E S T E D

12   NO.            DESCRIPTION                    PAGE

13   1              The Red File                     23

14   2              Master Timeline, The File        29

15   3              Survey in the Safe               37

16   4              Supplemental Request for Documents

17                  Listed or Referenced by Swope    66

18   5              Document Signed with FBI        161

19

20

21

22

23

24

25

Page 6

1              P R O C E E D I N G S

2              THE REPORTER:  Good morning.  My name

3      is Jahkarah Young; I am the reporter assigned by

4      Veritext to take the record of this proceeding.  We

5      are now on the record at 10:07 a.m.

6                   This is the deposition of Kevin Swope,

7      taken in the matter of Kevin Swope, Paul Vanderplow,

8      Jerrod Hart vs. City of Dearborn Heights, a Michigan

9      Municipal Corporation, Case No. 2:24-cv-10240-MAG-DRG.

10     This is taken on August 18, 2025, at the Law Firm of

11     Fausone & Grysko, PLC, at 41700 Six Mile Road,

12     Suite 100 [sic], Northville, Michigan 48168.

13                   I'm a notary authorized to take

14     acknowledgements and administer oaths in Michigan.

15                   Additionally, absent an objection on

16     the record before the witness is sworn, all parties

17     and the witness understand and agree that any

18     certified transcript produced from the recording of

19     this proceeding:

20                        - is intended for all uses permitted

21                          under applicable procedural and

22                          evidentiary rules and laws in the

23                          same manner as a deposition recorded

24                          by stenographic means; and

25                        - shall constitute written stipulation

```
                                                Page  7

 1                     of such.

 2                     At  this  time,  will  everyone  in

 3     attendance  please  identify  themselves  for  the  record,

 4     beginning  from  my  right.

 5                     MS.  HUNT:   Good  morning.   For  the

 6     record,  Monica  Hunt  on  behalf  of  the  defendant,  City

 7     of  Dearborn  Heights.

 8                     MR.  FARINHA:   Roger  Farinha,  P62269,  on

 9     behalf  of  the  City  of  Dearborn  Heights  as  City

10     attorney  corporation  counsel.

11                     MR.  MIOTKE:   Gary  Miotke  appearing  on

12     behalf  of  intervening  defendant,  Dearborn  Heights  City

13     Council.

14                     MR.  TURFE:   Tarik  Turfe  on  behalf  of

15     the  intervening  defendant,  Dearborn  Heights  City

16     Council.

17                     MR.  BROWN:   Attorney  Stephen  J.  Brown

18     here  on  behalf  of  the  plaintiffs.

19                     MR.  SWOPE:   Kevin  Swope.

20                     THE  REPORTER:   Hearing  no  objections,  I

21     will  not  swear  on  the  witness.

22                     Mr.  Swope,  will  you  please  raise  your

23     right  hand.

24     //

25     //
```

Page 8

```
 1  WHEREUPON,
 2                      KEVIN SWOPE,
 3  called as a witness and having been first duly sworn
 4  to tell the truth, the whole truth, and nothing but
 5  the truth, was examined and testified as follows:
 6                  THE REPORTER:  You may proceed.
 7                      EXAMINATION
 8  BY MS. HUNT:
 9      Q    Okay.  Good morning, Mr. Swope.
10      A    Good morning.
11      Q    We are here for your deposition, to take
12  your deposition today as part of the lawsuit that you
13  filed against the City of Dearborn Heights.
14          Ms. Young gave you a few ground rules before
15  we began.  I'd just like to add to that list.  I
16  believe she indicated that she is taking notes or
17  taking the transcript down.  It's important that for
18  her purposes of taking the transcript down and that
19  it's not jarbled that you let me finish my question
20  before you start to answer, and I will do my very best
21  to allow you to finish your answer before I start
22  speaking again.
23          If there's ever a time that I ask you a
24  question and you don't understand the question that
25  I'm asking, please ask for me to clarify.  If you
```

Page 9

1    answer the question, then I'm going to assume that you

2    understood what the question was, and the answer that

3    you give will stand.  Is that understandable?

4         A    Yes.

5         Q    Okay.  If you ever need to take a break,

6    please let us know.  We're happy to take short breaks

7    throughout this.  This may be a longer deposition.

8    But I do ask that you answer the question that's on

9    the table before we take a break.

10        A    Okay.

11        Q    During the course of this deposition, your

12   attorney or anyone else in this room may object to a

13   question that I ask.  Unless your attorney instructs

14   you not to answer, you're still required to answer

15   that question.

16             All right.  Have you -- are you on any

17   medications or have you taken any substances that

18   would hinder or alter your ability to answer questions

19   today?

20        A    No.

21             MS. HUNT:  Okay.  The City of Dearborn

22   Heights, particularly Mayor Bazzi, has asked that I

23   place on the record the objection of having Mr. Miotke

24   and Mr. Turfe in today's deposition.  As requested,

25   that is a part of now the record, so ...

```
                                              Page 10

 1                    MR. TURFE:  What's the reason for that?
 2                    MS. HUNT:  The reason is that he's --
 3       the belief is that for purposes of the intervention,
 4       the Court allowed for you all to be -- or, I'm sorry,
 5       for the Council to be a part of this case.  There was
 6       never any order or agreement by the Court for the
 7       actual attorneys to be representing the City of
 8       Dearborn Heights City Council as intervening parties.
 9                    The belief is that while the Court
10       ordered or allowed for the entry of the Council
11       itself, it did not allow for your appearance on their
12       behalf, particularly for purposes of depositions.
13                    MR. TURFE:  And why didn't the Mayor
14       make this objection at the last deposition?
15                    MS. HUNT:  That is a question you'd
16       have to ask of the Mayor.  I'm telling you what --
17                    MR. TURFE:  So am I allowed to ask the
18       Mayor that question?
19                    MS. HUNT:  Once the Mayor has his
20       deposition taken, that is a question that you would be
21       able to ask, as you would be able to ask any other
22       question, absent any valid objection or my -- or
23       whomever is representing the Mayor at that time, their
24       request that he not answer that question.
25                    MR. TURFE:  Does the Mayor retain
```

Page 11

1    separate counsel?

2              MS. HUNT:  This is not my deposition,

3    so I'm not going to --

4              MR. TURFE:  I mean, you're --

5              MS. HUNT:  -- I don't know --

6              MR. TURFE:  -- you're bringing up

7    matters, and we have a right --

8              MS. HUNT:  You asked a question.  I'm

9    fully trying to answer your question.  I have -- I

10   don't know -- Roger, it's fine.  I don't know what the

11   Mayor is doing on his own.  I will say I am the

12   counsel for the City of Dearborn Heights today, so

13   that is the answer that I've given you.

14             MR. MIOTKE:  If I may, we've previously

15   sent a communication to Ms. Hunt indicating that we

16   object, and it was acknowledged by Ms. Hunt, to

17   Mr. Farinha being here in any fashion as an attorney

18   purportedly representing the City, based on a clear

19   conflict of interest.  We aren't asking for anyone to

20   respond to that.

21             Last deposition, Mr. Farinha was here

22   as the City's party representative.  We are just going

23   to make sure it's clear for the record that our

24   objection, which was expressed to Ms. Hunt, is a

25   continuing objection.  We don't expect anyone to

Page 12

```
 1    respond to it.  We already stated why we had ended up
 2    making that objection, and let's not waste our seven
 3    hours on this type of thing.  Let's get to it, if we
 4    can.
 5    BY MS. HUNT:
 6         Q    All right.  So, Mr. Swope, do you understand
 7    the ground rules that --
 8         A    I do?
 9         Q    -- indicated?  Okay.  Thank you.
10              I understand you gave your name for the
11    record, but can you please spell it?
12         A    Yeah.  Kevin Swope, K-E-V-I-N, S-W-O-P-E.
13         Q    Okay.  And your current address?
14         A    It's 9779 Willow Oak Drive, Green Oak
15    Township, Michigan 48116.
16         Q    How long have you lived on the Willow Oak
17    address?
18         A    Since July of 2024.
19         Q    Okay.  Where did you live prior to that?
20         A    I lived in -- I've always lived in Brighton
21    for the last 10 years or so, 13 years, but 5574 Eggert
22    Place, Brighton, Michigan 48116.
23         Q    And how long were you at that address?
24         A    Four years probably.
25         Q    Okay.  And where are you currently employed?
```

```
                                              Page 13
 1        A     I work at Comerica Park in Detroit.
 2        Q     And what do you do with Comerica Park?
 3        A     I'm a security manager.
 4        Q     Is that a full-time position?
 5        A     Yes, it is.
 6        Q     All right.  Year round?
 7        A     Yes.
 8        Q     Okay.  And when did you start working as
 9    security manager with Comerica Park?
10        A     February -- approximately February 18th of
11    2025.
12        Q     And are you paid hourly, or are you on a
13    salary?
14        A     Salary.
15        Q     Okay.  What is your salary?
16        A     Eighty thousand per year.
17        Q     Do you receive benefits?
18        A     Yes.
19        Q     Okay.  And what are those?
20        A     I can 401(K) match, health insurance option,
21    dental insurance option, vision insurance options,
22    paid time off.
23        Q     Now, you indicated that the health, dental,
24    and vision are options.  Are you taking advantage of
25    those benefits?
```

```
                                            Page 14

 1        A    Dental and vision.

 2        Q    Okay.  Not health?

 3        A    No.

 4        Q    Okay.  Do you receive that elsewhere?

 5        A    Yes.

 6        Q    Okay.  How?

 7        A    City of Dearborn Heights.

 8        Q    Are you married?

 9        A    Yes.

10        Q    And what is -- a wife, husband?  Wife?

11        A    Wife, yeah, yep.

12        Q    Wife?  Okay.  I just want to be sure.

13             What is your wife's name?

14        A    Michelle.

15        Q    Okay.  Same last name?

16        A    Yes.

17        Q    Okay.  And is your -- do you have children?

18        A    Yes.

19        Q    What are their ages?

20        A    Twenty-five, twelve, then I have

21   stepchildren as well, twenty-three, nineteen, and

22   seventeen.

23        Q    Are any of your children receiving health

24   insurance from your insurance policy with the City of

25   Dearborn Heights?
```

Page 15

1        A    Yes.

2        Q    Which ones?

3        A    All of them.

4        Q    Okay.  And what about your wife?

5        A    Yes.

6        Q    Now, we'll get into later your time with the

7    City of Dearborn Heights, but the health insurance

8    that you're receiving, is that the same type of

9    insurance or health insurance you were receiving when

10   you were employed with the City?

11       A    Yes.

12       Q    Okay.  Are you paying a COBRA?

13       A    No.  Well -- no.  The City paid 100 percent

14   of COBRA per -- per the severance agreement.

15       Q    Now, you filed a lawsuit in this case,

16   making a number of allegations against the City of

17   Dearborn Heights and the City Council.  Did you speak

18   with your wife or any of your children at any time

19   regarding those issues that you allege in your

20   complaint?

21       A    Yes.

22            MR. BROWN:  Objection to the extent it

23   raises a privilege.

24            MS. HUNT:  Okay.  I'll just have to

25   ask, what privilege are you asserting?

```
                                              Page 16
 1              MR. BROWN:  Husband and wife's
 2   privilege, spousal privilege.
 3              MS. HUNT:  Okay.  Not sure that applies
 4   here, but okay.
 5   BY MS. HUNT:
 6       Q    As it relates to anything that you spoke
 7   with your wife about, do you plan on calling her as a
 8   witness to discuss or to testify to that during either
 9   a trial or any hearings?
10       A    No.
11       Q    What about your children?
12       A    No.
13       Q    Okay.  Did you go to college?
14       A    Yes.
15       Q    Where did you go to college?
16       A    Columbia Southern University.
17       Q    Okay.  Where is that located?
18       A    It's an online college. I think they're in
19   Orange Beach, Alabama.
20       Q    Okay.  When did you take classes with
21   Columbia South?
22       A    I can't really recall, but I believe it
23   started in 2020, and I ended in 2024 at some point.
24       Q    Okay.  Did you have any class -- did you
25   take any classes or any training beyond high school
```

```
                                              Page 17
 1    prior to you starting at Columbia South?
 2        A    Through work.  I mean, at the police
 3    academy, obviously, and some leadership classes and
 4    just some classes, you know, in training for the
 5    police department.
 6        Q    When did you go to the police department?
 7        A    1998.
 8        Q    Okay.  And --
 9        A    In Detroit.
10        Q    Was it through to Detroit Police Department?
11        A    That's correct.
12        Q    Okay.  And when did you graduate from the
13    academy?
14        A    January -- or, I'm sorry, August of 1999.
15        Q    Okay.  Where did you go to high school?
16        A    I went to high school in Garden City.
17        Q    And did you graduate from there?
18        A    Yes.
19        Q    What year did you graduate?
20        A    1996.
21        Q    And what was your first job after completing
22    the academy?
23        A    I was a patrol officer at the Tenth Precinct
24    in Detroit.
25        Q    Okay.  When did that start?
```

```
                                              Page 18
1        A     In I think it was August of 1998.  I think I
2    said August of '99, but it was August of 1998.
3        Q     Okay.  So you graduated from the academy in
4    1998?
5        A     That's correct.
6        Q     Okay.  And you also started in '98?
7        A     Yeah, January of '98 I started.
8        Q     Okay.  And how long were you with the Tenth
9    Precinct?
10       A     Approximately three years.
11       Q     As patrol for all three?
12       A     That's correct.
13       Q     All right.  And so around 2001, is that when
14   you left?
15       A     That's correct.
16       Q     Okay.  And what did you do then?
17       A     Then I went to the Sixth Precinct.
18       Q     And what did you do with the Sixth?
19       A     Patrol.
20       Q     For how long?
21       A     A patrol officer.  I was there for -- until
22   April of 2004.
23       Q     Okay.  And then where did you go?
24       A     I went to the Westland Police Department.
25       Q     And how long were you with Westland?
```

Page 19

1        A     I was with Westland from 2004 until 2023,

2    January of '23.

3        Q     And when you started in 2004, what rank were

4    you?

5        A     A patrolman.

6        Q     Okay.  And how long did you work as patrol?

7        A     I was in patrol for approximately ten years.

8        Q     Okay.  And what did you do after that?

9        A     I -- I got promoted, became a patrol -- I'm

10   sorry, a -- just a sergeant.  I held different, you

11   know, responsibilities within the department.  I was a

12   sergeant for maybe five years or so, four years, and

13   then I got promoted to lieutenant, and then I held

14   different responsibilities as -- as a lieutenant as

15   well.

16       Q     Okay.  And you stayed as lieutenant until

17   you left in '23?

18       A     That's correct.

19       Q     Okay.  And where did you go in '23?

20       A     I went to Dearborn Heights.

21       Q     And what was your title with Dearborn

22   Heights?

23       A     Director of police operations.

24       Q     As director of police operations, did you

25   have the responsibility of doing any police-type work,

Page 20

1    investigations, patrol if necessary?

2         A    If -- it was in the job description to

3    handle any work as -- you know, as a police officer

4    would, yes.

5         Q    All right.  What were your responsibilities

6    as director of police operations?

7         A    Pretty much all the administrative tasks of

8    the police department.  I assisted the chief of police

9    with -- with pretty much running -- running the police

10   department, whether that was, you know, creating

11   policy or scheduling, you know, manpower, hiring,

12   doing background investigations, internal

13   investigations, leadership in general, coming up with

14   hiring processes and promotional processes, and pretty

15   much doing everything that -- that a police department

16   would have to do is what I was responsible with.

17        Q    Okay.  And in your role as director of

18   police operations, who was your supervisor?

19        A    Chief Jerrod Hart.

20        Q    And did you supervise anyone?

21        A    Yes, everybody beneath, you know, my rank.

22        Q    Now, you mentioned Chief Hart was your

23   supervisor.  What about a deputy chief?

24        A    There was not a deputy chief.  There was the

25   director of support services, Paul Vanderplow, who was

Page 21

1    my equivalent.

2        Q    Now, when you say there wasn't a deputy

3    chief, was that role not filled, or was there no role

4    for deputy chief at the time?

5        A    I don't think there was a role for the

6    deputy chief.

7        Q    Did that change while you were with City of

8    Dearborn Heights?

9        A    I guess it depends who you ask, but I felt

10   that there was a deputy chief position created later

11   on in the -- right before I left, yeah.

12       Q    Now, when you say that you supervised from

13   your rank down, did that include the director of

14   supportive services?

15       A    No.

16       Q    So would you say that you were lateral with

17   that position?

18       A    Yes.

19       Q    Who supervised that position?

20       A    Jerrod Hart.

21       Q    So in general, it would be the chief of

22   police that would supervise that position; is that

23   right?

24       A    That -- that specific position, correct.

25       Q    Okay.  Now, you indicated that part of your

Page 22

1   role was to conduct internal investigations.  What
2   sort of investigations would you -- internal
3   investigations would you conduct?
4                   MR. BROWN:  Objection.  It misstates
5   prior testimony.
6   BY MS. HUNT:
7       Q    As part of your role as director of police
8   operations, did you conduct internal investigations?
9       A    I did.
10      Q    Okay.  And what sort of investigations did
11  you conduct?
12      A    I would conduct any investigation or review
13  investigations that were conducted by subordinate
14  personnel, anything that involved a complaint from a
15  citizen or maybe an internal matter, maybe a
16  discipline-type of matter that -- that occurred within
17  the police department.
18      Q    Okay.  So you said you would review
19  investigation reports by -- I'm sorry, investigations
20  conducted by subordinates.  Okay.  Did you ever
21  yourself conduct investigations?
22      A    Yes.
23      Q    All right.  So what kind of investigations
24  would you conduct?
25      A    I mean, I would conduct all types of

Page 23

1    investigations.  I -- we have an investigation
2    list -- I think you probably have a copy of it -- of
3    all internal investigations that we completed since we
4    were -- I was at the police department.  It's called
5    "The Red File."  And I mean, there's anything from a
6    citizen complaint to ticket fixing.  I'm sure we all
7    know about that one.  You know, complaints amongst
8    officers against one another --
9                    MR. BROWN:  Is The Red File on City
10   computer systems?
11                   THE WITNESS:  Yes, it is.
12                   MR. BROWN:  Monica, I'd like you to
13   produce The Red File in discovery.
14                   THE WITNESS:  There was -- there was
15   just every single complaint that pretty much was made
16   against the police department or within, I probably
17   looked at.
18   BY MS. HUNT:
19       Q    Now, while with the City of Dearborn
20   Heights -- strike that.
21            Did your position ever change from director
22   of police operations while you were with the City of
23   Dearborn Heights?
24       A    It did.
25       Q    Okay.  And what did your position change to?

```
                                        Page 24
 1        A     At one point, I was interim police chief,
 2   and then acting police chief, and then ultimately
 3   police chief.
 4        Q     And who promoted you to the interim police
 5   chief?
 6        A     Mayor -- Mayor Bazzi.
 7        Q     Okay.  What about your role as acting police
 8   chief?  Who --
 9        A     That's more -- that's more of a -- the
10   police chief can direct someone to control the police
11   department in their absence, so that would be Jerrod
12   Hart.
13        Q     Okay.  So this was not after you became
14   interim police chief.  It was during your role as
15   director of police operations?
16        A     That's correct.
17        Q     Okay.  So is it fair to say on a sporadic
18   basis, you would be the acting police chief?
19        A     Yes.
20        Q     Okay.  So who promoted you to your role as
21   police chief?
22        A     Mayor Bazzi.
23        Q     All right.  Going back to your indication
24   that you performed internal investigations, how did
25   you initiate investigations?  Strike that.
```

Page 25

```
 1              How did an investigation or matters for
 2      investigation come to you?
 3         A     They would normally come via, like, a
 4      citizen complaint to the police department or some
 5      type of internal complaint from, like, a sergeant or
 6      maybe a lieutenant that would, you know, make its way
 7      up to the chain of command and end up on my desk.
 8              Sometimes Chief Hart would -- would have
 9      something and -- and assign it to me, and then I would
10      do an investigation.
11              Sometimes it'd be something that I found on
12      my own.  Maybe I would, you know, check out a --
13      whether it was a -- a use of force or a police pursuit
14      or something like that to where there could be some
15      policy violations that we found, then we would
16      investigate that as well -- or I would investigate
17      that as well.
18         Q     All right.  Were you required to get
19      authority from anyone to conduct investigations?
20         A     No.
21         Q     So you unilaterally decided which
22      investigations you were going to conduct?
23         A     Some of them.
24         Q     And what about the others?
25         A     Some of them, like I said, were -- were
```

Page 26

1  brought up through the chain of command, and then some
2  were brought from, you know, Chief Hart himself.
3      Q    So those that were not given to you by a
4  lieutenant or a sergeant based on something that they
5  found or witnessed, or through Chief Hart, those
6  are -- those investigations were unilaterally
7  conducted on your --
8      A    So there's a -- so there's a policy and
9  procedure on how to conduct investigations.  So a
10  policy violation could happen, the investigation would
11  take place, and then all the dispositions and all the
12  recommendation was -- recommendations would go through
13  the chief of police.
14      Q    I want to take a step back.  How did you
15  learn about the position of director of police
16  operations with the City of Dearborn Heights?
17      A    So I learned about that position through the
18  Chief of Westland.
19      Q    What was the name of the Chief of Westland?
20      A    Jedrusik, Chief Jedrusik.
21      Q    Is Chief Rusik [sic] still with the Westland
22  Police Department?
23      A    No.
24      Q    When did he leave?
25      A    I'm not sure.

Page 27

```
 1      Q    Was it after you left?
 2      A    Yes.
 3      Q    So what did you do after you learned about
 4  this position from Chief Rusik [sic]?
 5      A    I reached out to Jerrod Hart.
 6      Q    Did you know Chief Hart prior to your reach
 7  out?
 8      A    No.
 9      Q    Was your communication with him initially in
10  person, by phone, e-mail, text?
11      A    By phone.
12      Q    All right.  Through a phone call, you guys
13  spoke?
14      A    Yes.
15      Q    Okay.
16      A    Actually, you know, it could -- could have
17  been an e-mail.  I mean, I -- I know there's -- it
18  could have been an e-mail, then a phone call.
19      Q    Okay.  Did you advise him that you were
20  interested in the position, or were you inquiring more
21  about the position?  What was the conversation on?
22      A    I was inquiring more about the position, but
23  I was definitely interested.
24      Q    Okay.  Did you ever meet with Chief Hart?
25      A    Yes.
```

Page 28

1        Q     To discuss the position?

2        A     Yes.

3        Q     Okay.  And did you interview for that

4    position?

5        A     I did.

6        Q     Who did you interview with?

7        A     I met with Chief Hart and Paul Vanderplow.

8        Q     Where did you meet?

9        A     Dearborn Heights Police Department.

10        Q     Do you recall the date that you met with

11    Chief Hart and Mr. Vanderplow?

12        A     No.  It was December -- it's on the timeline

13    that you guys were provided, the master timeline that

14    should be located on your servers at the police

15    department.  But it might be December 12, 2022.

16        Q     I'm sorry, did you say December 12th?

17        A     Yeah, I think it might've been, like,

18    December 12th.  It was in the evening time.

19        Q     Now, you just mentioned a master timeline.

20    Did you create this timeline?

21        A     No.

22        Q     Who created this timeline?

23        A     Jerrod Hart.

24        Q     And you indicate that it's on the computers

25    at the police department?

Page 29

```
 1      A    Yes.

 2      Q    How --

 3             MR. BROWN:  If you could please produce

 4   that in discovery, Monica, that'd be great.

 5             MS. HUNT:  Well, I have to know if it

 6   exists first, because ...

 7   BY MS. HUNT:

 8      Q    How are you -- how are you sure that it is

 9   still on the --

10             MR. TURFE:  If I may, for the record --

11             MS. HUNT:  Well, no.  I have a question

12   that I have started.

13   BY MS. HUNT:

14      Q    So what is your -- how are -- how are -- how

15   is it your belief that it is still on the computers of

16   the police department?

17      A    I had a copy of it in my e-mail files, and

18   it should be there.  I think you guys have access to

19   all my e-mails.  It's called -- I have a -- a file

20   that I named "The File," which I suggest you guys look

21   up.  Everything should be there.

22             MR. MIOTKE:  Okay.  I would just note

23   for the record, as Mr. Brown did, I would think that

24   these things should have been at least identified in

25   initial disclosures and should end up being produced,
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

1    not just to plaintiff's counsel, but to intervening

2    defendant's counsel as well.  Thank you.

3    BY MS. HUNT:

4        Q    Did you take any copies of any of these

5    files with you when you left?

6        A    Yes.

7        Q    What did you take with you when you left?

8        A    Thousands of pages of documents that were

9    authorized for me to take by Mayor Bazzi.  I -- I

10   couldn't name them all, I have so many.

11       Q    If you could give, like, a subject matter or

12   a type of file.

13       A    Well, multiple e-mails, ticket fixing

14   investigation, inappropriate interactions from Council

15   to citizens to intervening in -- in traffic stops,

16   harassment against certain people within the

17   department.  I mean, it could go on and on.  I could

18   sit here for hours.

19       Q    Okay.  When you say "multiple e-mails," is

20   it more than two?

21       A    Probably thousands.

22       Q    And when you say you took them with you, did

23   you take papers, or was it on a flash drive, or did

24   you e-mail them to your personal e-mail?

25       A    A little bit of both.

Page 31

```
 1        Q    Okay.  Both of which?
 2        A    Everything you just said.  So not
 3   personal -- so documents, and then, also, I put them
 4   on a flash drive.
 5        Q    Was there any overlap in physical documents
 6   versus what's on the flash drive, or do you have
 7   physical documents, and the same documents are also on
 8   a flash drive?
 9        A    No, I think they're all -- they're all
10   copies of -- I think I have some -- if I have it on
11   paper, it's on the -- it's on the flash drive.
12        Q    Okay.
13             MR. MIOTKE:  And I want to also note
14   that this is something also that should be produced by
15   plaintiffs and identified by them and plaintiff's
16   counsel as well.  There's no -- if you already have
17   it.  The City Council has no ability to end up getting
18   these without them being produced in discovery, so ...
19             MR. BROWN:  Plaintiff's discovery
20   production is discussed in writing various times,
21   including most recently on August 12, 2025, when I
22   sent you correspondence precisely about the subject of
23   when plaintiffs will produce their document
24   production.  All that's pending at the present moment
25   is the completion of an agreed-upon protective order.
```

```
                                             Page 32

 1                 Mr. Miotke and myself have already

 2      agreed as to the terms of that order, and we're

 3      waiting for comments from Ms. Hunt before the

 4      protective order can be filed with the Court,

 5      hopefully entered, and after that our document

 6      production will be forthcoming --

 7                 MR. MIOTKE:  Okay.  Thank you.

 8                 MR. BROWN:  -- soon thereafter.

 9                 MR. MIOTKE:  Thank you.

10      BY MS. HUNT:

11          Q    What was the purpose of taking the

12      documents?

13          A    Well, I was told by Mayor Bazzi that if I

14      didn't take the documents and produce them later

15      in -- in a lawsuit, that they would probably

16      disappear.

17          Q    When did he tell you that?

18          A    He said that on multiple occasions

19      throughout the -- the end of my tenure there at the

20      Dearborn Heights Police Department.

21          Q    Did he tell you any of this in writing?

22          A    Not that I can recall.

23          Q    So it was all verbal?

24          A    Yes.

25          Q    When you became chief of police, when you
```

Page 33

```
1    took over the role of chief of police, did you occupy
2    the chief's office?
3         A    I did.
4         Q    Okay.  When you were in the chief's office,
5    did you ever utilize the safe?
6         A    I had my own safe.  So there's two safes.
7         Q    Okay.  Where was your safe located?
8         A    It was inside Jake Hatten's -- Captain's
9    office.
10        Q    Why didn't you utilize the safe in the
11   chief's office?
12        A    Because there's documents in there that I
13   necessarily weren't privy to.  I did not have to
14   access that safe to -- to do my job.
15        Q    Okay.  When you say you weren't privy to
16   those documents, you were the chief of police.  Why do
17   you believe you wouldn't be privy to those documents?
18        A    Because it wasn't my safe.
19        Q    Was the safe installed by the -- to your
20   knowledge, was the safe installed by the police
21   department or an individual?
22        A    I'm not sure where that safe came from.
23        Q    Okay.  So what makes you believe that it was
24   not your safe?
25        A    Because it wasn't my -- I had my own safe,
```

Page 34

```
 1    so there shouldn't have been anything in that safe
 2    other than -- you know, apparently the chief had some
 3    documents and -- and whatnot in there, so I never
 4    accessed the safe.
 5         Q    So when you said "The chief had some
 6    documents in there," you mean Chief Hart?
 7         A    Jerrod Hart.
 8         Q    Okay.  So when you became chief of police,
 9    you didn't feel it would be necessary to take a look
10    and see what documents were in there?
11         A    So when I became chief of police, I looked
12    everywhere where -- where I was supposed to look, just
13    like I didn't go down to the property room and open up
14    every single door in the property room.
15         Q    Okay.  But you did go to the property room?
16         A    Of course.
17         Q    Okay.  Did you consider the office to be
18    your space for purposes of operating as chief of
19    police?
20         A    Yes.
21         Q    Okay.  Did you open drawers that were in the
22    desk?
23         A    Yes.
24         Q    Okay.  When Chief Hart left, was there any
25    expectation that he would return?
```

```
                                                  Page 35
 1        A    Not the last time, no.
 2        Q    Okay.  So -- and the last time he left,
 3   that's when you became acting -- or chief of police;
 4   is that correct?
 5        A    That's correct.
 6        Q    Okay.  So why would you believe that
 7   anything in the office would not be pertinent for you
 8   to do your job -- pertinent for you to do your job, or
 9   you were not able to access it or should not access
10   it?
11        A    I could've --
12             MR. BROWN:  Objection to form.
13   Objection to form, confusing, misstates prior
14   testimony.
15   BY MS. HUNT:
16        Q    Do you understand the question?
17        A    Yes.
18        Q    Okay.
19        A    I could access it.  But since I knew what
20   was in it, I did not have to access it at any point in
21   time to do my job.
22        Q    Okay.  So what was in it?
23        A    So there was some documents in there
24   apparently for -- they did some type of survey for the
25   police department, I don't know, a year and a half,
```

Page 36

```
 1   two years before I got there, talking about how they
 2   can make the police department better, what
 3   suggestions officers could have to -- to make the
 4   department a better place to work, that type of stuff.
 5              I did not need to look at those documents,
 6   because I had a copy.
 7        Q    Okay.  So you say you had a copy.  Did you
 8   review the copy that you had?
 9        A    I looked at it, yes.
10        Q    Okay.  Did you ever see the copy that was in
11   the safe?
12        A    I don't know if I've ever seen the original
13   copy or not.
14        Q    Okay.  So it's your understanding that it
15   was the original copy that was in the safe?
16        A    That was -- that's my understanding.
17        Q    Okay.  So having never looked at the copy
18   that was in the safe, you don't know that it
19   necessarily matches the copy that you have; is that
20   correct?
21        A    That's correct.
22        Q    Okay.  Did you ever open the safe and see
23   that copy of that document in there?
24        A    No.
25        Q    Okay.  So how is it your belief that the
```

Page 37

1    original copy of the survey documents was in the safe?

2        A    'Cause I was told that.

3        Q    Who told you that?

4        A    Chief Hart, Jerrod Hart.

5                MR. BROWN:  Ms. Hunt, if you could

6    please produce a copy of that survey in discovery.

7    Thank you.

8                MS. HUNT:  That's if it's still there.

9                THE WITNESS:  There's digital copies of

10   that as well.  It's in the --

11   BY MS. HUNT:

12       Q    Do you have digital copies of that?

13       A    It's in the file, in the e-mail file.

14       Q    So you indicated that you took thousands of

15   documents with you when you left?

16       A    That's correct.

17       Q    And was that one of the documents that you

18   took with you?

19       A    I can't recall.  If it was, I -- I supplied

20   it to my attorney.

21       Q    Okay.  So you don't know for certain

22   that -- having never actually seen the document in the

23   safe, you don't know for certain with personal -- upon

24   personal information that that document is still in

25   the safe; is that correct?

```
                                          Page 38
 1        A    That's correct.

 2        Q    What else was in the safe?

 3        A    I'm not sure.

 4        Q    Is it because you never opened the safe to

 5   see?

 6        A    Correct.

 7        Q    So you indicated that you utilized the safe

 8   in Chief Hatten's -- or, I'm sorry, was it Lt. Hatten?

 9   Capt. Hatten.

10        A    Capt. Hatten, yeah.

11        Q    Capt. Hatten.  What did you keep in that

12   safe?

13        A    Just my firearms.

14        Q    Who had access to that safe?

15        A    Just myself, and there was an extra key in

16   Paul Vanderplow's office in the key box.

17        Q    Where was that key box located?

18        A    In Paul Vanderplow's office --

19        Q    Where in his office?

20        A    -- like, within a closet.

21        Q    Was that closet locked?

22        A    Sometimes.  Just depends on the day, I

23   guess.

24        Q    Who all knew about the key?

25        A    Probably just Paul and I.
```

Page 39

1      Q     Did Capt. Hatten have access to the safe?

2      A     No.

3      Q     So it was just your firearms that you kept

4   in there?

5      A     Just my firearms.

6      Q     Did you take any --

7      A     And my taser.

8      Q     How often did you access the safe?

9      A     Not often.  I can't recall.

10     Q     Was it, like, weekly or monthly?

11     A     Probably not, 'cause I normally carried one

12  firearm, and the other firearms just sort of sat there

13  until I needed them.

14     Q     Are those department-issued arms?

15     A     Yes.

16     Q     Taser as well?

17     A     Yes.

18     Q     Did you keep any documents in that safe?

19     A     No.

20     Q     All right.  When you left the City of

21  Dearborn Heights, did you take the firearms and the

22  taser out of that safe?

23     A     Yes.  Before -- they were out before I even

24  left.

25     Q     Okay.  When did you take them out?

```
                                              Page 40
 1       A    I can't recall.
 2       Q    Was it during your time -- strike that.
 3       A    I was chief.
 4       Q    You were chief of police?
 5       A    Yeah.
 6       Q    Was it soon after you became chief of police
 7   or ...
 8       A    I can't recall.
 9       Q    Okay.  Was it during the time that you were
10   considering leaving?
11       A    I can't recall.
12       Q    When you took the firearms out, where did
13   you put them?
14       A    In the chief's office in the closet.
15       Q    Were they, like, in a safe or a carrier
16   or ...
17       A    They were in a -- in boxes, in gun boxes.
18       Q    Were they locked?
19       A    Yeah.  That location's locked.
20       Q    So going back to your meeting with Chief
21   Hart and Mr. Vanderplow -- I'm sorry, did you say that
22   was December 12, 2022?
23       A    I believe it was December 12, 2022.
24       Q    Okay.  All right.  Was that simply a get-to-
25   know-you meeting, or was that an interview?
```

Page 41

1        A      I think it -- I mean, it was an interview.

2        Q      Okay.  Did you interview with anyone else?

3        A      Just -- no, just those two.

4        Q      All right.  Did you meet with anyone else on

5    the 12th?

6        A      No, just those two people.

7        Q      When you met with Chief Hart and

8    Mr. Vanderplow, what did you understand

9    Mr. Vanderplow's position with the police department

10   to be?

11       A      Honestly, I didn't even know who he was at

12   that point in time.

13       Q      Did you know if he was employed with the

14   police department?

15       A      I mean, it felt like he was, because he was

16   asking me questions about -- you know, that you would

17   get, like, during an interview.

18       Q      Did he tell you what his position was?

19       A      I can't recall if he did or not.

20       Q      When were you offered the position of

21   director of police operations?

22       A      I -- I can't recall.  I got a job offer from

23   Margaret Hazlett.

24       Q      I'm going to hand you a document that I

25   would like to have admitted as Exhibit No. 1.

```
                                                   Page 42

 1                  (Exhibit 1 was marked for

 2                  identification.)

 3              Now, you indicated you got an offer or a

 4    communication from a Ms. Hazlett; is that correct?

 5        A    That's correct.

 6        Q    Did it include a copy of the document that

 7    you see in front of you?

 8        A    No.

 9        Q    Okay.  What did the communication include?

10        A    This one was -- so this one was in December

11    of 2023, so -- but the one that I got from --

12        Q    I'm sorry.

13        A    That's okay.

14        Q    It may have --

15        A    The one I got from Ms. Hazlett was the

16    initial job offer.

17        Q    Okay.  All right.  So there was a -- the

18    communication that you received from Ms. Hazlett in

19    December of 2022, but did that include a contract?

20        A    Yes, it did.

21        Q    Okay.  Did you negotiate the contract at

22    all, or did you just accept it?

23        A    It was negotiated a little bit.

24        Q    All right.

25                  MR. MIOTKE:  Can we go off the record
```

```
                                              Page 43

 1    just a moment, please?

 2                    MS. HUNT:  Sure.

 3                    THE REPORTER:  Off the record,

 4    10:49 a.m.

 5                    (Off the record.)

 6                    THE REPORTER:  Back on the record,

 7    10:50 a.m.

 8    BY MS. HUNT:

 9         Q    All right.  So Mr. Miotke jogged my memory,

10    so I'm going to give that -- those two to you, which

11    will now be Exhibit 2, but it's a little bit off.

12    There you go.

13                    (Exhibit 2 was marked for

14                    identification.)

15              Is that the -- what's before you, is this a

16    copy of the contract that you received from

17    Ms. Hazlett?

18         A    It appears to be.

19         Q    Okay.  And as part of your job as -- strike

20    that.

21              As part of this contract, did you receive a

22    salary?

23         A    I did.

24         Q    All right.  And on Page No. 2, section 3.1,

25    it indicates that the salary you received was $90,000
```

Page 44

1    per year; is that correct?

2         A    That's correct.

3         Q    Okay.  Did you receive benefits as well?

4         A    Yes.

5         Q    Okay.  And the benefits received, are

6    those -- section 3.2 on page 3 lists a number of

7    benefits -- or is a section titled "Benefits."  Did

8    you read this prior to your signing and taking on the

9    position?

10        A    Yes.

11        Q    Okay.  As part of your benefits package, did

12   you receive the benefits listed in paragraph 3.2?

13        A    I can't remember if I took the medical

14   insurance or not for the first year, but, yes, I did

15   receive benefits.

16        Q    Okay.  If you did not take the medical

17   insurance for the first year, was that your decision

18   to opt out?

19        A    Yes.

20        Q    Did you receive medical benefits elsewhere?

21        A    If I did, it was what -- through the City of

22   Westland.

23        Q    Okay.  Was there ever a time that

24   you -- during your tenure with the City of Dearborn

25   Heights that you did not receive the benefits

Page 45

1    that -- or the pay that you were offered in your
2    contract?
3         A    While I was working there?
4         Q    Yes.
5         A    No.
6         Q    All right.  And you ended up getting
7    a -- or, I'm sorry, a raise; is that correct?
8         A    Yes, yes.
9         Q    Okay.  When did you receive your first
10   raise?
11        A    My first raise was probably that second
12   contract.  I'm guessing this -- this is it right here.
13        Q    What's listed as Exhibit 1?
14        A    Yeah.
15        Q    All right.  And who offered you that raise?
16        A    That was done through the H.R. Department,
17   Margaret Hazlett, and I would assume the Mayor.
18        Q    Did anyone talk to you about the raise?
19        A    I think we had many discussions about, you
20   know, getting a raise.  And, yes, we talked about it.
21        Q    When you say "we," who's "we"?
22        A    Margaret, myself, the Mayor, Chief
23   Hart -- or Jerrod Hart.
24        Q    Did you ever ask the Mayor for a raise?
25        A    Yes.

Page 46

1        Q     When did you first ask the Mayor for a

2    raise?

3        A     I can't remember.  It was an e-mail

4    communication.  It actually might have been through

5    H.R. rather than the Mayor.  But, yes, I know it would

6    be pushed uphill.

7        Q     And was that a request for a raise during

8    your first year of working with the City?

9        A     Yes, I believe so.  Yeah.

10       Q     And looking back at Exhibit 1 on page 2,

11   again, paragraph 3.1, there was a salary listed of

12   $117,200 per year, beginning July of '23; is that

13   correct?

14       A     That's correct.

15       Q     Is that the raise that you just indicated

16   that you had requested?

17       A     Yes.

18       Q     Okay.  And did you receive that pay?

19       A     I did.

20       Q     All right.  Did you -- it appears that the

21   effective date is approximately six months prior to

22   your signing; is that correct?

23       A     That's correct.

24       Q     Did you receive retroactive payment?

25       A     I remember -- I do remember getting retro

Page 47

1    payment on that.  I don't know how much it was,

2    though.

3         Q    All right.  Was that received by you in one

4    check, or was it over a course of checks?

5         A    I can't recall.

6         Q    And when I say "checks," one pay, whether

7    it's direct deposit or not.

8         A    Yeah, I can't recall.

9         Q    Okay.  But you did receive it?

10        A    Yes, I did.

11        Q    For purposes of this raise, did you -- did

12   your job duties change at all?

13        A    No.

14        Q    You continued to perform in the director

15   position, director of police operations, as you had

16   for the year of 2023?

17        A    Yes.

18        Q    Okay.  I understand that you met with Chief

19   Hart and Mr. Vanderplow on December 12th of 2022.

20   When did you start with the City of Dearborn Heights?

21        A    January 9, 2023.

22        Q    So in less than one year, you received a

23   $27,000 raise?

24        A    Yes.  Well, if that's the math, yes.

25        Q    Approximately $27,000?

Page 48

1      A     Yes.

2      Q     Okay.  Did you talk to anyone else about

3  your raise?

4      A     Not that I can call -- recall.

5      Q     Did Mr. -- was Mr. Vanderplow a part of the

6  conversations regarding your request for a raise?

7      A     I know he had conversations.  I don't know

8  if we were all together, but there was some e-mails

9  back and forth, I think with Margaret.

10     Q     All right.  I'm going to hand to you what I

11  have marked as Exhibit No. 3.

12                  (Exhibit 3 was marked for

13                  identification.)

14           Now, this is an amended complaint that was

15  filed by your attorney on your behalf as well as your

16  co-plaintiffs' behalf.  Do you recall this amended

17  complaint being filed?

18     A     My attorney told me about, you know, things

19  being filed, but I -- I'm not sure if this is -- you

20  know, what document this is.

21     Q     Okay.  Did you review it prior to it being

22  filed?

23     A     Probably.

24     Q     Okay.  All right.  So part of your

25  allegations in this complaint is that there were

Page 49

```
 1   certain reports that were made to other external
 2   agencies.  If you take a look on page 20 -- I'm sorry,
 3   page 4, paragraph 20.  It indicates, "Beginning
 4   January of 2023, plaintiffs collectively reported
 5   violations and suspected violations of law concerning
 6   corruption in the City government, corruption in the
 7   DPD, civil rights violations to the City of Dearborn
 8   Heights through its Mayor and City Council to the
 9   Michigan State Police, United States Department of
10   Justice, and Federal Bureau of Investigations."
11           Do you see that?
12      A    I do.
13      Q    Okay.  You indicated -- or the complaint
14   indicates in January of 2023.  That's the month you
15   began working there; is that correct?
16      A    That's correct.
17      Q    Okay.  Did you yourself make any complaints
18   to the agencies listed here?
19      A    No.
20      Q    Okay.  So the allegation in paragraph 20 say
21   "plaintiffs collectively."  Were you aware of any
22   complaints that were made in January of 2023?
23      A    I can't recall which complaints were made in
24   January 2023.  I could have been aware, but there were
25   so many, I just can't remember the dates.
```

Page 50

1        Q    But you yourself never made any complaints
2    in January of 2023?
3        A    No, I don't believe so.
4        Q    In January of 2023, to your knowledge, what
5    complaints could have been made?
6        A    I don't know what could have been made.  I
7    would have to look at some type of filing to say if
8    they were made or not.  I'm not going to speculate.
9        Q    Okay.  You mentioned that you took thousands
10   of pages of documents with you.  Did you take any
11   reports to agencies like the Attorney General, FBI, or
12   MSP?
13       A    No.  Those were given to those agencies
14   rather than -- there wasn't be -- there'd be nothing
15   for me to take --
16       Q    All right.  You didn't keep --
17       A    -- to them.
18       Q    -- copies of them?
19       A    Well, I mean there's no actual report
20   that -- that is made to submit documents to MSP or the
21   FBI.  Those are normally in-person meetings where we
22   handed the documents off.
23       Q    Okay.  So every time you've made a report,
24   if you've made a report to the FBI or MSP, it was
25   always in person?

Page 51

1              MR. MIOTKE:  Objection, form.

2   BY MS. HUNT:

3       Q    Was that an always -- was that -- those

4   conversations or reports being made always in person?

5       A    No.

6       Q    Okay.  So whenever you made a report --

7   strike that.

8            Did you ever deliver investigative reports

9   that you generated to any external agency?

10      A    Yes.

11      Q    Okay.  Did you keep copies of those reports?

12      A    I mean, they're official documents of the

13  police department.  Yes.

14      Q    So are you saying that your report would be

15  actual documents and not a report that is, like, a

16  memorandum that is generated by you?

17      A    That's correct, for the most part, yeah.

18      Q    When you provided those reports, did you

19  keep copies of the documents that you would have

20  provided to those agencies?

21      A    There are copies of documents.  Did I keep

22  them?  Yes, I guess they're in the -- you know, the

23  record management system.  They're in internal

24  investigation files.  Yes.

25      Q    When you maintain those copies, are they

Page 52

```
 1   formatted in such a way that it can be reflected this
 2   is what was sent -- these documents were sent to MSP,
 3   or these documents were sent to the FBI?
 4        A    Some of the times, yes.
 5        Q    Okay.  Now, you indicated that there were
 6   in-person reports that were made.
 7        A    That's correct.
 8        Q    When in-person reports were made, generally
 9   when you would make those reports, who was with you?
10        A    Well, it just depends.  Paul Vanderplow,
11   Jerrod Hart.  That's it.
12        Q    So just the three plaintiffs in this case
13   would be the ones present for those particular
14   meetings?
15        A    That I -- that I can recall.
16        Q    Okay.  In January of 2023, do you recall
17   meeting with any external agencies such as the FBI or
18   the Department of Justice, MSP?
19        A    No.
20        Q    And in reviewing either the documents that
21   you took with you when you left or any document in the
22   file management system, did you recall seeing or
23   coming across any of the documents provided in January
24   of 2023 to MSP, the Department of Justice, or the FBI?
25        A    I would not know, 'cause I don't know what
```

Page 53

1   was reported in January 2023.

2       Q    Moving on to paragraph 20 -- I'm sorry, 22,

3   it states, "In or around 2023, plaintiffs reported

4   that the chain of custody for evidence and evidence

5   management system within DHPD were so deficient to

6   jeopardize the rights to a fair trial for every

7   criminal defendant whose case relied on evidence

8   retained by DHPD."

9            Do you recall in January of 2023 who you

10  reported this chain of custody issue to?

11                MR. MIOTKE:  Objection to form.  The

12  "you" is difficult in this situation, because we've

13  had testimony in terms of plaintiff, and this

14  plaintiff's saying he didn't, so it's really getting

15  unclear for the record.

16                MS. HUNT:  I'm asking him, "Did you,

17  Mr. Swope."  And I understand what was stated earlier.

18  I'm clarifying for each of these allegations.

19                MR. MIOTKE:  Thank you.

20  BY MS. HUNT:

21      Q    For you, Mr. Swope, did you report this

22  chain of custody issue?

23      A    No.

24      Q    All right.  Do you recall if in January of

25  2023 an issue with regards to chain of custody was

Page 54

1    ever disclosed or reported to anyone?

2                   MR. BROWN:  Objection, foundation.

3                   THE WITNESS:  Yes.

4    BY MS. HUNT:

5         Q    You do know if it was reported?

6         A    Yeah.  I don't know if it was in January,

7    but it was reported.

8         Q    Okay.  So in January of 2023, you do not

9    know if there was an issue with regards to chain of

10   custody being reported, but you recall it being

11   reported at a later date?

12        A    Yeah.  There was discussions with, you know,

13   MSP, the FBI about these -- these matters.

14        Q    When was the discussion --

15        A    And its -- I'm sorry.  And the MSP, I think

16   the Attorney General's office as well.

17        Q    In the discussions with -- or strike that.

18             Do you recall when the discussions with MSP

19   took place with regards to the chain of custody

20   issues?

21        A    I do not.

22        Q    Were you involved in those communications?

23        A    No.

24        Q    Okay.  Do you know who was involved in those

25   communications?

Page 55

```
 1        A    Yes.

 2        Q    And who would that be?

 3        A    That'd be Jerrod Hart.

 4        Q    Anyone else?

 5        A    Not that I can recall.

 6        Q    And how do you know that Chief Hart was a

 7   part of these discussions?

 8        A    Just from speaking about the -- the property

 9   room issues.

10        Q    So when you say "speaking about property

11   room issues," what do you mean?

12        A    Speaking with, you know, Jerrod Hart about

13   our property room downstairs in our basement of the

14   police department and how we were going to remedy some

15   of the issues that -- that were going on down there.

16        Q    And did he tell you then that he spoke with

17   MSP?

18        A    I -- I can't recall when he told me that,

19   but I do know MSP came and did an audit at the police

20   department.

21                 THE REPORTER:  One moment.

22                 THE WITNESS:  I'm sorry.

23                 THE REPORTER:  Will you repeat the end

24   of your answer?

25                 THE WITNESS:  Yes.  I was -- I was -- I
```

Page 56

```
 1    know that MSP did an audit at the police department

 2    for the property room.

 3    BY MS. HUNT:

 4        Q    So in January of 2023, did you report these

 5    issues with regards to the property room and the chain

 6    of custody with the FBI?

 7        A    I did not.

 8        Q    Okay.  Do you know who did?

 9        A    It would have to be Jerrod Hart.

10        Q    And is it your belief that that took place

11    in January of 2023?

12        A    I couldn't -- I couldn't -- I -- I don't

13    know.

14        Q    And how do you know that that report took

15    place?

16        A    I was told that Jerrod Hart -- by Jerrod

17    Hart that this information was relayed to -- to

18    multiple agencies due to the fact that the property

19    room was just so mismanaged.

20        Q    And you added "and the AG."  The AG was

21    informed?

22        A    Yes.

23        Q    Was that in January of 2023?

24        A    I'm not sure when that was, but it was due

25    to the large amount of pistol sales records that were
```

Page 57

1    not being registered.

2        Q    Now, you mentioned earlier that part of your

3    responsibilities were scheduling, hiring, leadership,

4    management, putting together processes and procedures.

5    Did you begin putting together processes and

6    procedures of correcting what you call the

7    "mismanagement" of the property room?

8        A    I don't think I worked on that policy.  I

9    think Dir. Vanderplow -- or Paul Vanderplow and Jerrod

10   Hart did that.  I'd have to refer to some type of

11   document that would be able to tell me that or not.

12       Q    Did you have any -- did you have anything to

13   do with the audit of the property room?  Did you help

14   conduct it or participate with the MSP?

15       A    Not with MSP but with a third-party company,

16   yes.

17       Q    And what was the name of the third-party

18   company?

19       A    I believe it was called Fortis maybe, Fortis

20   Group.  I'm not sure.

21       Q    Did you receive a copy of the audit?

22       A    At some point, I did receive a copy of the

23   audit.

24       Q    Okay.  And is that a document that you

25   would've taken with you?

Page 58

1          A    I did not take that document.

2          Q    Earlier, you indicated that there were so

3    many documents, you don't know exactly what you had.

4    How do you know that you did not take that document?

5          A    Because I don't even really remember reading

6    too much of that document.  It was a director of

7    support services project.

8          Q    Now paragraph 20 -- I'm sorry -- 22

9    indicates that "The evidence management system within

10   DHPD were so deficient as to jeopardize the right to a

11   fair trial for every criminal defendant whose case

12   relied on evidence retained by the DHPD."

13              Are you aware of any defendant who had their

14   case jeopardized because of the mismanagement?

15         A    No, not that I know of.

16         Q    You were never made aware of any issues or

17   complaints about chain of custody issues?

18         A    Not that I can recall.

19         Q    Now, you mentioned earlier the pistol sales

20   records where you touched on that in 23.  It

21   indicates, "In or around January, February -- January

22   and February of 2023, plaintiffs reported that nearly

23   900 pistol sales records had not been processed by

24   DHPD in violation of MCL 28.422a(3), which requires

25   police department to -- the police department to

Page 59

1   process pistol sales records within ten days of

2   receipt."

3            Who did you make that report to?

4        A    I --

5                MR. BROWN:  Objection, form.

6                THE WITNESS:  I --

7                THE REPORTER:  I'm sorry?  What was the

8   objection?

9                MR. BROWN:  Objection, form.

10               THE REPORTER:  Thank you.

11  BY MS. HUNT:

12       Q    Who did you make that report to?

13       A    I did not make that report.

14       Q    Do you know if Chief Hart made that report?

15       A    I don't know who made it.

16       Q    Okay.  All right.  So you don't know if

17  Mr. Vanderplow made it?

18       A    I'm not sure.

19       Q    Okay.  Do you know that a report was made?

20       A    Yes.

21       Q    How do you know a report was made?

22       A    Just from discussions with Vanderplow and

23  Hart about the situation.  I know that we reached out

24  to MSP and, you know, let them know that we had a

25  bunch of records that we were going to be entering.

Page 60

1   So I know there was a process on a report, because
2   there was a resolution to how we were going to get
3   this done.
4        Q    Okay.  So just to make sure that I
5   understand what you just testified to or your
6   testimony, you reached out to MSP to advise them that
7   you were going to start submitting these records,
8   these pistol sales records?
9        A    Someone did, yes.
10       Q    Okay.  All right.  Do you know who reached
11  out to them to let them know that?
12       A    It was one of the two, Vanderplow or Hart.
13       Q    Or Hart.  Okay.
14            Is it your understanding that that was
15  simply a heads up, this is why you're going to get so
16  many from us, or was this a complaint?
17       A    It was a -- a little bit of both, I guess,
18  because they're going to wonder why we had 900 that
19  weren't done.
20       Q    Did you ever speak to anyone from MSP about
21  the 900 pistol sale records that hadn't been
22  processed?
23       A    No.
24       Q    As part of your job as director of police
25  operations, did you put together any processes or

Page 61

1    training sessions for purposes of remedying this

2    issue?

3         A    I did not put together them, but we did

4    instruct our staff to take training and get permission

5    to process these sales records, because you have to be

6    trained to be able to go inside the system and put the

7    information in.

8         Q    Okay.  You say you instructed your staff to

9    take training.  Did you provide training?

10        A    It's a state training that you do online.

11             This is a support services function, so I

12   didn't have too much to do on this -- this particular

13   issue.

14        Q    So to kind of backtrack, when you indicated

15   that you supervised everyone from your position down,

16   is that just as it relates to police officers?

17        A    No.  No.

18        Q    Did it -- does it include 9-1-1 dispatch?

19        A    Yes.

20        Q    Okay.  Does it include any clerks that are

21   at the police department?

22        A    Yes.

23        Q    Okay.  Does it include staff within the

24   records room?

25        A    Yes.

Page 62

1    Q    Okay.  So those that would be getting

2  training to submit -- to be able to access the system

3  to submit these pistol sales, would you say that you

4  supervised them?

5    A    I would say as in -- in the hierarchy of the

6  police department, everyone beneath the rank of

7  director of police operations was responsible

8  to -- you know, to that position, but they were not my

9  direct reports, as that was a support services

10 function, which would be people who directly reported

11 to Paul Vanderplow.

12    Q    Okay.  Given the nature of pistol sales

13 records, people purchasing guns and the department's

14 relaying that to MSP, as director of police

15 operations, would you say that you have a vested

16 interest in making sure that those records are being

17 properly submitted?

18    A    Yes.

19    Q    All right.  Did you do any oversight to make

20 certain that the support staff was getting the

21 training to submit these records?

22    A    Not directly, but I did know that they did

23 take the training, and they came in on overtime and

24 completed these -- these entries.  And when I say

25 "they," the -- the clerks.

Page 63

1      Q     All right.  Do you recall how many?

2      A     There's only three clerks in there, but I

3   think two of them were really doing a lot of them.  I

4   don't know about the third.

5      Q     And how were you aware of these actions?

6      A     Just through conversations with them

7   directly, and then just also just asking about, you

8   know, what's the status on all these, you know, pistol

9   sales records, because it's a -- it's a big deal to

10  not have these done.

11     Q     In your position as director of police

12  operations, did you have a set schedule?

13     A     Not necessarily.

14     Q     Okay.  But generally, when did you come in

15  to the station?

16     A     Probably around 8, 8 a.m.  Just depends on

17  what was going on that day.

18     Q     Okay.  And generally, when would you leave

19  for the day?

20     A     Between like five and seven.

21     Q     Would you consider this like an on-call

22  position?

23     A     Yes.

24     Q     Now, you mentioned earlier that there were

25  subordinates that would do investigations?

Page 64

1           A     Yes.

2           Q     Is there a particular subordinate, or is

3     there a particular rank that would investigate or do

4     internal investigations?

5           A     It -- it just depends on how the issue

6     originated.  Sometimes there would be -- let's say

7     someone violated a pursuit policy.  That would

8     originate normally from the sergeant on the shift or

9     the lieutenant.  But if there was, like, an

10    internal -- I'm sorry, a citizen complaint, that would

11    normally go straight to the captain.  I think

12    originally -- I mean, at one point he was a

13    lieutenant, like, a -- in professional standards, I

14    think, is what his title was.  But some would go

15    straight to him.

16          Q     Okay.  Moving on to paragraph 24, it states,

17    "In March of 2023, plaintiffs reported that police

18    overtime work was subject to an illegal ticket quota

19    system, which prohibit -- which is prohibited under

20    MCL Section 257, dash -- I'm sorry, point 750, part

21    1."

22                In March of 2023, did you report any police

23    overtime issues?

24          A     Yes.

25          Q     All right.  Who did you --

Page 65

1    A    Well, I mean, report to who?  I mean, did we

2    investigate it?  Yes.

3    Q    Okay.  When you say "we investigated," who

4    is "we"?

5    A    Police administration.

6    Q    And who would that be?

7    A    I -- I did the internal investigation on

8    this -- this issue.

9    Q    All right.  So was it more than just you?

10   A    It was -- I mean, the chief -- chief of

11   police, Jerrod Hart, he knew about this.  Paul

12   Vanderplow knew about it.  City administration knew

13   about it.  It was a -- it was a big investigation.

14   Q    And when you say the "City administration,"

15   who do you --

16   A    The Mayor.

17   Q    Okay.  Now, earlier you said "we

18   investigated," but you indicated that it was just --

19   that you did the investigation.  Was there --

20   A    I completed the internal investigation.

21   Q    Okay.  Was there anybody that worked with

22   you?  Not who knew about it, but who worked with you?

23   A    No.  I typed it up.

24   Q    Okay.  So the actual investigation itself,

25   did anybody work with you in the investigation?

Page 66

1    A    I mean, other than the people I interviewed,
2 no one really worked with me per se, other than maybe
3 the court administrator and the assistant court
4 administrator.
5    Q    All right.  Who did you interview?
6    A    I'd have to look at the document, but I
7 interviewed Sgt. Dotter, Jordan Dotter, the court
8 administrator, the assistant court administrator, I
9 think Ofc. Bailey.  I'd have to look at the document
10 to determine who else I interviewed.
11    Q    Did you take that document with you?
12    A    I can't recall.  I think -- you know what?
13 I think I do have that one.
14             MS. HUNT:  And instead of -- and I know
15 Mr. Miotke was going to ask for it.  Instead of asking
16 for each and every document that Mr. Swope lists, I
17 will be sending a supplemental request for documents
18 with regards to these documents listed or referenced
19 by Mr. Swope.
20             MR. BROWN:  We will be doing the same,
21 actually, since these documents are reproductions of
22 documents on the City's computer systems.
23             It seems strange that Mr. Swope would
24 be asked to produce documents that are official
25 Dearborn Heights City documents that reside on

Page 67

```
 1   Dearborn Heights City servers.
 2                MS. HUNT:  Well --
 3                MR. MIOTKE:  Not to get too far afield,
 4   but it's typical for plaintiffs and defendants to
 5   produce everything that they have in these types of
 6   cases, so we would expect that from the intervening
 7   defendant's standpoint.  Thanks.
 8                MS. HUNT:  And the fact that Mr. Swope
 9   did indicate that he took thousands of pages with him,
10   they are documents in his possession that we would be
11   requesting.
12   BY MS. HUNT:
13      Q    So, Mr. Swope, when you prepared this report
14   in March of 2023, who did you provide it to?
15      A    Chief Jerrod Hart.
16      Q    Do you know what Chief Hart did with it?
17      A    I mean, it gets filed in an internal
18   investigation file.
19      Q    So as it relates to -- and I want to focus
20   on the police overtime work that was -- and you later
21   state or the complainant later states it's subject to
22   an illegal ticket quota system.  As it relates to the
23   police overtime, was that in and of itself an issue or
24   an issue as a part of your investigation?
25      A    I guess that's a confusing question.  Go
```

Page 68

1    ahead.

2        Q    Did you find that there was an issue with

3    regards to police receiving overtime or there being an

4    overtime management issue within the police

5    department?

6        A    No.  I don't think this was a response to

7    the actual overtime being worked.  It was more of a

8    response to ticket dismissals and ticket quotas.

9        Q    So when you indicate that there was an

10   "illegal ticket quota system," was this what was

11   investigated by you?

12       A    It was a ticket dismissal issue.  The

13   ticket -- illegal ticket quota system was, we learned

14   about it, and we rectified it by stopping it.  It was

15   a long-term practice at the -- at the P.D.

16       Q    Okay.  And what was that practice?

17       A    They had to write a certain amount, and I

18   can't tell you how many.  I think it was like six or

19   something.  They had to write a certain amount of

20   ticket with -- tickets within a certain amount of time

21   to be eligible for the overtime.  And if they did not

22   hit those tickets, they would not be allowed to work

23   the overtime.

24             There's a PowerPoint that I do not have that

25   is located on the City's computers, which I think

Page 69

```
 1   Ofc. Barlow made, that talked about staying away from
 2   certain locations because officers need to get their
 3   tickets in, you know, so they can continue to work
 4   overtime.
 5        Q    Now, you said "they" would have to write a
 6   certain amount of tickets.  Who is "they"?
 7        A    So that would be any officer or sergeant or
 8   lieutenant even that -- that's working overtime that
 9   wanted to continue to be able to work overtime.  They
10   had to have a certain amount of tickets per shift.
11        Q    All right.  And you indicated that
12   Sgt. Barlow created a PowerPoint?
13        A    He was an officer.
14        Q    Ofc. Barlow.
15        A    Ofc. Barlow, yes.  He -- he worked in the
16   traffic bureau.
17        Q    Did Ofc. Barlow, does he make policy in the
18   police department?
19        A    No.
20        Q    All right.  Could he create procedures in
21   the police department?
22        A    I don't think so.
23        Q    Did he supervise any police officers?
24        A    No.
25        Q    Now, did Ofc. Barlow, who you indicated
```

```
                                            Page 70
 1    created this PowerPoint, did he indicate or, to your
 2    knowledge, did he create it on someone's behalf?
 3        A    I'm not -- I'm not certain.  This happened
 4    before I arrived at the police department.
 5        Q    All right.  As part of your investigation,
 6    did you interview Ofc. Barlow?
 7        A    No.  I think he was gone already.  He went
 8    to Huron Township.  I can't recall.  I really can't
 9    recall.
10        Q    During the course of your investigation, did
11    you speak with anyone that was familiar with this
12    PowerPoint?
13        A    Not that I can recall.
14        Q    Did you speak with anyone who indicated that
15    they followed the PowerPoint?
16        A    Not necessarily the PowerPoint, but the rule
17    of writing the tickets, yes.
18        Q    And who was that?
19        A    Sgt. Dotter, Jordan Dotter.
20        Q    That was the only one that indicated --
21        A    That I can remember, yes.
22        Q    Okay.  So you interviewed -- I'm sorry,
23    strike that.
24             Do you recall how many people you
25    interviewed as a part of your investigation?
```

Page 71

1      A    I don't.  If you had the document, I could
2   look at it.
3      Q    All right.  But you indicated that you do
4   believe you have a copy of that document yourself?
5      A    I believe so, yeah.
6      Q    Now, you indicated that this was rectified.
7   How was it rectified?
8      A    We began to -- we sent out a direct order.
9   It's in -- it can be located in PowerDMS, which is a
10  record management system for -- for the department.
11  But basically saying, hey, you know, these are the
12  hours you can work.  You know, this is the way you're
13  supposed to do things, and you can't dismiss tickets.
14        And we gave the -- the traffic safety
15  program, we gave it some guidelines so people couldn't
16  do things that were not professional, or they couldn't
17  engage in any type of misconduct.
18     Q    How was this relayed to your officers?  How
19  was it relayed to your officers?
20     A    Oh, relayed.  So that was done via
21  directive.  I -- I would assume I sent an e-mail on
22  it, too, but the directive should be in PowerDMS.
23     Q    So the directive is, like, a memorandum
24  or --
25     A    Yep, exactly.

Page 72

1          Q     All right.  Did you ever have any training
2     with the officers?
3          A     No, but they -- in PowerDMS, you have to
4     acknowledge it and sign it.
5          Q     Okay.  Who reviewed the acknowledgements to
6     ensure that everyone reviewed and signed it?
7          A     It just depends on who looks at PowerDMS
8     that day.  It -- so PowerDMS, like if I send something
9     out to 70 people, it'll say, you know, how many people
10    still have an outgoing -- I'm sorry, a pending
11    document not signed.  And then a sergeant would tell
12    that person, "Hey, you have a document that you didn't
13    sign."
14         Q     Okay.  Are you aware of how many people
15    actually reviewed and signed?
16         A     Not without looking at the PowerDMS system.
17    I could not tell you.
18         Q     Was there any effort to make certain that
19    everyone reviewed the directive and signed it?
20         A     Yeah.  I -- I sent e-mails regularly telling
21    people to sign all their PowerDMS documents.
22         Q     For purposes of the ticket quota issue, did
23    you make certain that everyone reviewed and signed?
24         A     I can't recall.
25         Q     So I want to take a look at Page No. 6,

Page 73

1   Paragraph No. 29.  The paragraph reads, "On

2   January 26, 2023, Councilmember Mo Baydoun asked on

3   three separate occasions that DHPD Sgt. Mohamad Bazzy

4   of Arab ethnicity be promoted outside of the

5   established promotional system and CBA requirements."

6            On January 26, 2023, you were employed by

7   the City of Dearborn Heights Police Department; is

8   that correct?

9        A    That's correct.

10       Q    Okay.  You had been on maybe about three

11   weeks, maybe two and a half?

12       A    Two, yeah.  Correct.

13       Q    Do you recall meeting with Councilmember Mo

14   Baydoun --

15       A    Yes.

16       Q    -- on January 26th?

17       A    I do.

18       Q    Okay.  Do you know who -- do you know

19   Sgt. Bazzy?

20       A    I do.

21       Q    Okay.  And is he currently still a sergeant?

22       A    I have -- I don't know.

23       Q    Okay.  I'm sorry.  At the time that you

24   left, was he still a sergeant?

25       A    Yes.

Page 74

1        Q     Okay.  What was the purpose of the meeting

2     with Councilman Baydoun?

3        A     It was just a meeting to get to know the

4     Council people.  I think there was three of them

5     there, if I can remember right.  It was Hassan Ahmad,

6     Mo Baydoun, and Nancy Bryer.

7        Q     Do you know how long the meeting was?

8        A     I can't recall.

9        Q     Okay.  Do you recall where it was?

10       A     In the chief's conference room at the police

11    department.

12       Q     Was anyone else there with you?

13       A     Paul Vanderplow and Chief Hart, Jerrod Hart.

14       Q     Okay.  Do you recall Councilman Baydoun --

15    then-Councilman Baydoun asking for Sgt. Bazzy to be

16    promoted?

17       A     Yes.

18       Q     How did he ask?

19       A     So he didn't come out and say "Promote, you

20    know, Sgt. Bazzy," but it was more of a, you know,

21    "Sgt. Bazzy says he has been, you know, passed up, you

22    know, for lieutenant's position several times, and he

23    deserves, you know, to -- to get a promotion."  He

24    said that once.

25            Another time, it was along the same lines.

Page 75

```
 1    You know, "You guys need to, you know, promote him.
 2    He's a good -- you know, good officer."
 3              And then he did it -- did it a third time.
 4         Q    Okay.  Did he make this request of -- or
 5    make these statements to each of you, or was it just
 6    on three separate occasions he asked for a
 7    promotion --
 8         A    Yeah, we were --
 9         Q    -- for Bazzy?
10         A    Yeah, we were there at the conference table
11    like this, and he was sitting in the middle, actually.
12    And it was just pretty much the first time, it was to
13    Chief Hart.  The second time, it was -- I think I was
14    in the middle, to me.  And the third time, it was to
15    Paul Vanderplow.  And each time we're like, "Well, you
16    know, we have a process for that."  And -- yeah.
17         Q    At that time, were you aware of Sgt. Bazzy?
18         A    No.  No.
19         Q    Did --
20         A    I knew Sgt. Bazzy just from being there, but
21    I wasn't aware of him.  Like, I did not know him.
22         Q    Okay.  Do you recall Chief Hart making any
23    statements as a regard -- in regards to the request
24    made by Sergeant -- or, I'm sorry, Councilman Baydoun?
25         A    I can't recall exactly what he said, but the
```

Page 76

1    message was that there's a process for -- for
2    promotions.
3         Q    I'm sorry.  You indicated earlier that
4    Councilman Baydoun indicated that he believed Bazzy to
5    be a good officer?
6         A    Yes.
7         Q    Okay.  Did you take this as Councilman
8    Baydoun hoping to elevate the good officers within the
9    City of Dearborn Heights Police Department?
10        A    I took -- partially, yes.
11        Q    Okay.  When you say "partially," what's the
12   other part?
13        A    The other part is the fact that I -- I
14   believe that he was trying to speak for his friend to
15   get him a promotion to lieutenant.
16        Q    Did you believe him to be sincere when he
17   thought he was a good officer?
18        A    Yes.
19        Q    Now, you mentioned -- you indicated that --
20   you mentioned that there was a promotional process; is
21   that correct?
22        A    That's correct.
23        Q    What is that process?
24        A    So the -- the process is, so the -- let's
25   say there's a sergeant position open.  The position

Page 77

1    would be posted.  People would then have a certain

2    amount of time to apply for that -- for that position.

3    If they meet all the qualifications, then they would

4    be given a -- they would apply, they'd get approved,

5    and they would get a test date.  They'd receive all

6    the study materials, and then eventually they would

7    take that test.

8              If they passed the test, they would then do

9    an oral board.  And then after the oral board, a list

10   would be made based on their scores, and then it would

11   be certified by the Act 78 Commission.  And then any

12   type of promotions could happen based off of vacant

13   positions in the police department.

14       Q    Is that for all positions in the police

15   department?

16       A    Well, historically, up until ours, I guess.

17       Q    So you understand that your positions

18   deviated from that process?

19       A    Of course.

20       Q    On paragraph 20 -- or 32, I'm sorry, it

21   says, "On or around June 16th of 2023, an excessive

22   force incident, civil rights violation occurred during

23   the arrest of a criminal subject."

24              Are you familiar with that incident?

25       A    Yes.

Page 78

1      Q    All right.  How were you made aware of this
2  incident?
3      A    When I first got hired, part of my duties
4  was to go over use of force incidents.  And in
5  this -- on this particular day, I reviewed the use of
6  force incident and observed a use of force that I did
7  not think was appropriate.
8      Q    So the day that you went over the use of
9  force incident, was that June 16th, or was that the
10  date of the incident itself?
11      A    I believe that was the date of the incident
12  itself.  I'd have to refer to the -- the writeup.
13      Q    Okay.  Do you recall when you found out
14  about this incident?
15      A    It was just probably a couple days later.
16  Because normally what I'll do is I'll review use of
17  force a day or so after the incident.
18      Q    How often do you get use of force incidents?
19      A    Quite often, and -- but I'd have to look at
20  the use of force log.
21      Q    Okay.  The incident report, is that a -- is
22  it simply like a police report, or is there some
23  additional information, camera that's -- body cam
24  video, anything that's attached to it?
25      A    Yeah.  So the review included, you know,

```
                                                     Page 79
 1    looking at the video, reading the police report, and
 2    looking at a use of force form, which is completed by
 3    the officer and signed off on by the supervisors.
 4         Q    And what caused you to believe that this was
 5    excessive force?
 6         A    When I watched the video, I noticed the
 7    officer involved smashed the gentleman's face into the
 8    concrete.
 9         Q    Did you talk to that officer?
10         A    Yes.  I mean eventually, yes.
11         Q    Okay.  Who was the officer?  I'm sorry.
12         A    Ofc. Zyke Bailey.
13         Q    Okay.  What was your process after reviewing
14    these types of incidents?
15         A    So I immediately notified Jerrod Hart, and
16    that way -- you know, 'cause it was going to be a
17    major incident within the City.  After that, we just
18    began an internal investigation.  We interview people,
19    you know, look at the videos, save the videos,
20    determine what could've been done differently.  At
21    some point, determine if someone was, you know, in
22    violation of policy.  And, then, in this instance, we
23    contacted the Michigan State Police.
24         Q    Did you contact MSP?
25         A    Yes.
```

Page 80

1      Q     Okay.  Did you speak with them, or did you

2    submit documents to them, both?

3      A     Yeah, so I -- I -- yeah, so I spoke with

4    them on the phone, and then I dropped the documents

5    off to MSP.

6      Q     Did they conduct an interview?

7      A     Yeah, they interviewed people.  They did a

8    criminal investigation.

9      Q     All right.  And is this independent of the

10    conversations that you indicated you had with these

11    individuals, including Ofc. Bailey?

12      A     That's correct, yes.

13      Q     Did they provide you with any results or --

14      A     Eventually, yes.  It took a long time.  I

15    forgot how long it took, but, God, it felt like it

16    took a year or so.  They ended up charging him with

17    a -- a misdemeanor assault.  Just when I say "him,"

18    Bailey.

19      Q     Did you take any action on part of the

20    police department?

21      A     Yeah.  Internal investigation with

22    discipline, yes, we did.

23      Q     Who did you discipline?

24      A     Well, Zyke Bailey received discipline,

25    Sgt. Bazzy received discipline, Sgt. Zrien received

Page 81

1    discipline, and Lt. Pawlus received discipline.

2         Q    Was that provided by you, discipline handed

3    down by you?

4         A    Yes.

5         Q    Did you go through their Union or any ...

6         A    Yes.  We -- we use the Union representatives

7    to -- they stand by normally when we give the

8    discipline, especially severe discipline --

9         Q    Is your position covered by CBA?

10        A    Partially.

11        Q    What do you mean "partially"?

12        A    Meaning our names are in it, so I guess I

13   would be guided by it.

14        Q    Have you ever filed a grievance with your

15   Union?

16        A    I'm not a Union employee, no.

17        Q    And, I'm sorry, when I say "filed a

18   grievance with your Union," have you ever utilized the

19   CBA, like, grievance policies?

20        A    No, not -- no, I don't -- I don't think

21   those apply to me.

22        Q    So you believe your name is in the CBA, but

23   you're not governed by any of the policies or certain

24   policies?

25        A    So I --

Page 82

```
 1              MR. BROWN:  Objection to form, calls
 2    for a legal opinion from a layman.
 3    BY MS. HUNT:
 4        Q    I'm asking your --
 5              MR. BROWN:  Also -- also misstates the
 6    prior testimony.
 7    BY MS. HUNT:
 8        Q    I'm trying to understand what you believe
 9    your protections are under the CBA.
10              MR. BROWN:  Same objection.
11    BY MS. HUNT:
12        Q    Do you understand what I'm asking?
13        A    Yes.
14        Q    Okay.
15        A    So the protection was to protect the job and
16    the position, not necessarily to protect any type of,
17    you know, discipline-type matter or to give me any
18    remedy to rectify any discipline or any grievances.
19        Q    So you indicated that Ofc. Bailey was
20    investigated by MSP.  Were any of the other officers
21    that you mentioned, Ofc. Bazzy, Zrien, and
22    Paulson -- Pawlus?
23        A    I'm not sure if they investigated them or
24    not.
25        Q    And, I'm sorry, you indicated that you
```

Page 83

1    handed out discipline to them?

2        A    Yes.

3        Q    Okay.  Was there any training provided to

4    them, any remedial training?

5        A    Yes.

6        Q    All right.  What was provided?

7        A    I'd have to look at the training documents,

8    but I do know Ofc. Bailey was given an abundant amount

9    of -- of use of force training, and there was some

10   leadership courses given to the supervisors, but I

11   can't -- I can't recall exactly what.

12       Q    Okay.  Was this after this incident's

13   investigation had wrapped up, or was this a part of

14   other training programs?

15       A    It was part of the discipline process.

16       Q    Okay.  Were you -- strike that.

17            Was the rest of the police force, other

18   individuals, other officers provided with any

19   refresher courses as a result of this?

20       A    We had a pretty comprehensive training plan

21   at Dearborn Heights when I was there, so I would

22   assume everyone received the appropriate amount of

23   training in response to this incident.  I'd have to

24   look at training files, though.

25       Q    Now, you mentioned that Chief Hart was your

Page 84

1    supervisor when you were director of police

2    operations; is that correct?

3         A    Yes.

4         Q    When you became chief of police, who

5    supervised you?

6         A    Mayor Bazzi.

7         Q    Okay.  In your role as director of police

8    operations, did Chief Hart have the ability to

9    discipline you?

10        A    Yes.

11        Q    Okay.  Anyone else?

12        A    Everybody in the department.

13        Q    No, anyone else had the -- or the ability to

14   discipline you?

15        A    Oh, I'm sorry.

16        Q    That's okay.

17        A    Mayor Bazzi.

18        Q    So Chief Hart and Bazzi?

19        A    That's correct.

20        Q    Okay.  Would that be the same as for

21   terminations?

22        A    I would assume so.

23        Q    Okay.  Did Chief Hart ever -- did Chief Hart

24   ever discipline you?

25        A    No.

Page 85

1      Q    Okay.  Looking on page 7, paragraph 38, it
2   says, "On October 26, 2023, Hart, Swope, and Mayor
3   Bazzi met with a prominent member of the community,
4   Khalil Rahal, director of economic development for an
5   international corporation."
6           Do you see that paragraph?
7      A    I -- yes.
8      Q    Okay.  Do you recall the meeting on
9   October 26, 2023?
10     A    Yes.
11     Q    All right.  And it indicates that Khalil
12  Rahal is the director of economic development for an
13  international corporation.  Do you know what
14  corporation?
15     A    I'm not sure if it's an international
16  corporation, but at the time, he worked for DTE.
17     Q    Do you recall why you met with Mr. Rahal?
18     A    Mr. Rahal, well, he was concerned about
19  Sgt. Bazzy, and I think he wanted -- I don't know what
20  he wanted, but the meeting was to discuss -- he wanted
21  to talk about the use of force incident and just the
22  discipline of Sgt. Bazzy.
23     Q    Was Mr. Rahal an employee within the City of
24  Dearborn Heights?
25     A    No.

Page 86

```
 1        Q    All right.  Was he on any boards or
 2   councils, to your knowledge?
 3        A    Not that I know of.
 4        Q    Was it your understanding that he was a
 5   citizen of the City of Dearborn Heights, or a
 6   resident?
 7        A    I'm not sure where he lived, but I -- I knew
 8   he -- to me, he was a prominent business person that
 9   was a -- also a private citizen.
10        Q    Did he have the ability to fire you?
11        A    No.
12        Q    Did he have the ability to discipline you?
13        A    No.
14        Q    All right.  Paragraph 39 indicates that
15   "Rahal threatened plaintiffs with adverse employment
16   consequences due to their reporting an investigation
17   of Sgt. Bazzy."
18             Did Mr. Rahal state that he was going to
19   threaten you -- or, I'm sorry, did he threaten to fire
20   you because of your investigation?
21        A    No.
22        Q    So is it your understanding that Mr. Rahal
23   had no ability to adversely impact your employment --
24        A    Not necessarily.
25        Q    -- based on your investigation of
```

Page 87

1   Sgt. Bazzy?

2        A    No.  That was not my understanding at the

3   time.

4        Q    It was not your understanding that he had

5   the ability to do that?

6        A    I felt that politically he had the ability

7   to impact our jobs in a negative manner.

8        Q    Did you believe that he could have

9   Sergeant -- I'm sorry, Chief Hart discipline you or

10  created an adverse employment action against your

11  employment?

12       A    Not Chief Hart, no.

13       Q    Okay.  Mayor Bazzi?

14       A    Not necessarily.

15       Q    But those are the only two that could impact

16  your employment, or negatively affect your employment;

17  is that correct?

18       A    No.  There's additional people, including,

19  you know, the City Council.

20       Q    On October 26, 2023, did you believe that

21  Mayor -- I'm sorry, Mr. Rahal -- strike that.

22            On October 26, 2023, did you believe that

23  the Council could impact your position?

24       A    Yes.

25       Q    What made you think that?

Page 88

1      A     Because he basically -- or he did, he told

2   us that, you know, if we did not, you know, make, you

3   know, this Sgt. Bazzy thing go away per se, that the

4   Mayor wouldn't -- you know, the Mayor wouldn't get

5   reelected.  And then he said that "And then you two,"

6   and he pointed at Chief Hart and myself, you know,

7   "you won't be working here anymore, 'cause if the

8   Mayor's gone, you're gone."  That type of stuff.

9      Q     Okay.  Does Mr. Rahal control how the

10  citizens of Dearborn Heights vote?

11     A     I don't think so.

12     Q     Would he have the ability to impact how they

13  voted for Mayor for the next election?

14              MR. BROWN:  Objection to form.

15              THE WITNESS:  I'm --

16  BY MS. HUNT:

17     Q     Is it your understanding that he had the

18  ability to direct how the citizens of Dearborn Heights

19  would vote for Mayor --

20     A     No.

21     Q     -- or influence their vote?

22     A     No.

23     Q     Okay.  Now, you indicated that he claimed

24  that he -- that you believed that he had a

25  relationship with City Council.  What made you believe

Page 89

1   that?

2       A    I was told that he had a relationship with

3   City Council, and he was talking about City Council in

4   general when we were -- during that meeting.

5       Q    Did you ever see him have conversations with

6   members of City Council?

7       A    I don't know if I've ever seen him since or

8   before that day.

9       Q    Did anyone from City Council ever mention

10  him to you?

11      A    No.

12      Q    Did anyone from City Council ever say, "Hey,

13  how did your meeting with Mr. Rahal go?"

14      A    Not that I can recall.

15      Q    So No. 40 asked -- or states that "Rahal was

16  acting in concert with City Council."

17           How do you know that he was acting in

18  concert with City Council?

19      A    Because Mr. Rahal actually stated during --

20  during our meeting that he knows how Council is going

21  to vote.  They already have their votes.  So,

22  therefore, that would lead one to believe that he has

23  a relationship with City Council.

24      Q    He indicated that he knows how they're going

25  to vote about what?

Page 90

1        A     Just about our -- our budget, the police

2     budget, which eventually, you know, comes down to our

3     jobs, getting rid of the -- you know, the police

4     directors.

5        Q     So in October -- on October 26, 2023,

6     Mr. Rahal indicated that he knew how the Council was

7     going to vote on budgets; is that correct?

8        A     Yeah.  He knows how -- he has -- you know,

9     he told us he had five -- five councilmen that will

10    vote any way he wants.

11       Q     All right.  And this is on a budget

12    that -- in October of 2023, had the budget for the

13    '23/'24 year been set?

14       A     Yeah, it wasn't just budgets.  I think it

15    was just in general that he was -- he had the ability

16    to get five votes and I guess do what he wants with

17    these five votes.

18       Q     And did anyone on Council ever say that they

19    were bending to the wishes of Mr. Rahal?

20       A     No.

21       Q     So this was just a statement made by who you

22    call a prominent businessman in the City?

23       A     That's correct.

24       Q     That had no other connection to City

25    government --

```
                                           Page 91
 1        A     Correct.
 2        Q     -- other than what you've indicated he
 3   stated?
 4        A     Correct.
 5              MR. BROWN:  So, guys, it's almost noon.
 6   I'd like to take a brief break, if we could, of five
 7   minutes, just for the restroom purposes, if that
 8   works.
 9              MS. HUNT:  Sure.
10              MR. MIOTKE:  Yeah, that sounds
11   reasonable.  Thank you.
12              MR. BROWN:  Let's go off the record.
13              THE REPORTER:  Off the record,
14   11:59 a.m.
15              (Off the record.)
16              THE REPORTER:  Back on the record,
17   12:11 p.m.
18   BY MS. HUNT:
19        Q     Mr. Swope, earlier in this deposition when
20   we were discussing your background, I failed to ask
21   you, and I'm going to ask you now, have you ever sat
22   for a deposition before?
23        A     I think I did a long time ago, maybe
24   in -- when I worked in Detroit.
25        Q     Okay.  Was that for work, or was it for a
```

Page 92

1    personal matter?

2        A    It was for work.

3        Q    Okay.  Were you a party to a lawsuit then,

4    or were you just testifying?

5        A    No, I think there was a lawsuit.

6        Q    Okay.  Were you named as a defendant?

7        A    Yes.

8        Q    And you said it was during your time in the

9    City of Detroit as a police officer?

10       A    Yes.

11       Q    Okay.  So was that in the nineties, early

12   two thousands?

13       A    I think it was in late nineties.  Could've

14   been 2000.  Can't remember if it was an actual

15   deposition or it was just, like, a prep for a

16   deposition.

17       Q    Okay.  And is it safe to say that lawsuit is

18   no longer pending?

19       A    Yeah, no, that was -- nothing came about it.

20       Q    Have you been a party to any other lawsuits

21   other than this one?

22       A    Like, a -- like, being sued?

23       Q    Yes.

24       A    Yes.

25       Q    All right.  How many?

Page 93

1      A    Oh, I don't know how many now, but it was,

2    like, zero up until I worked for Dearborn Heights, and

3    I think one -- one or two maybe.  I've never been

4    officially served in a lawsuit, but I think the City

5    might have accepted on my behalf somehow.

6      Q    Okay.  Are you -- all of these were in the

7    function of you being either a police officer,

8    director, or chief of police?

9      A    That's correct.

10     Q    Okay.  Not in your personal life?

11     A    No.  No.

12     Q    Okay.  And the ones that you indicated that

13   you believe the City accepted on your behalf, has

14   anyone ever provided you with a copy of those or that

15   lawsuit or those lawsuits?

16     A    No.

17     Q    Is it your belief that you were named as a

18   defendant or just a person with knowledge?

19     A    I think in one of them, I think Jenny

20   Twardzik filed a lawsuit, and I think I may have been

21   named a defendant.  I've never seen it.

22          But the other one, I think there was, like,

23   a lawsuit against the City.  I'm not sure if I was

24   named individually or not.

25     Q    Okay.  In the case that you indicate Jenny

Page 94

1    Twardzik -- can you spell that last name for the court

2    reporter?

3         A    Sure, T-W-A-R-D-Z-I-K.

4         Q    Did anyone ever contact you from the City or

5    an attorney or representative of the City with regards

6    to your possibly being named as a defendant?

7         A    Yes.

8         Q    All right.  And who was that?

9         A    Andrea Pike.

10        Q    Okay.  All right.  As the director of police

11   operations, did you take part in City Council

12   meetings?

13        A    Yes.

14        Q    All right.  What was your capacity?

15        A    I -- I showed up to City Council meetings

16   just in case someone had a question for the police

17   department, or I would propose -- you know, if we were

18   asking for some equipment or had a motion for some

19   type of funding, I would show up and -- and speak on

20   that.

21        Q    Did you show up to every meeting?

22        A    I was there quite a bit.  I wouldn't say

23   every meeting, but most of them.

24        Q    All right.  Did you appear only for meetings

25   that there was a police issue on the agenda, or did

Page 95

1    you just show up just in case?

2        A    No, I was all -- I -- I just showed up just

3    in case.  I -- I would say most times there was no

4    police issue whatsoever.

5        Q    Did the police department, like, secure the

6    meetings or have a presence at the meetings?

7        A    Yes.

8        Q    Okay.  Is that for each meeting, every

9    meeting?

10       A    Yes.

11       Q    Did Chief Hart attend the meetings?

12       A    Yes, he did.

13       Q    All right.  Was his attendance as regular as

14   yours, or was it on a more sporadic basis?

15       A    Probably more sporadic.

16       Q    Was his rationale for attending the same as

17   yours, for purposes of answering questions, to your

18   knowledge?

19       A    I believe so.

20       Q    Now, you indicated that as part of -- strike

21   that.

22            When we went over your contracts, you

23   indicated that you received certain benefits during

24   the course of your employment; is that correct?

25       A    That's correct.

```
                                                  Page 96
1          Q     Benefits pursuant to your contract?
2          A     Yes.
3          Q     All right.  During the course of your
4     employment, is it your understanding that you received
5     all the benefits that you were entitled to?
6          A     While employed, yes.
7          Q     Yes.  Okay.  What sorts of trainings did you
8     take, like professional or continuing education
9     trainings?
10         A     While at Dearborn Heights?
11         Q     While with Dearborn Heights, yes.
12         A     So I've been to some chief conferences,
13    which basically, you know, there's, like, breakout
14    sessions on certain topics.  There was an FBI
15    leadership course, which basically talks about
16    leadership and how to be a better leader.  And that's,
17    I think, about it.
18         Q     Okay.  These conferences, are they
19    voluntary?
20         A     It's something that you would seek out.
21         Q     Okay.  And when you say "you would seek
22    out," is it that you decided on your own to take these
23    conferences -- or take these trainings?
24         A     Yes.
25         Q     All right.  They weren't a part of your
```

Page 97

1    requirement to maintain, like, your MCOLES or anything

2    to that effect?

3         A    No.

4         Q    Licenses for being a police officer?

5         A    No.

6         Q    All right.  Were they required for you to

7    continue as a police chief once you became a police

8    chief?

9         A    No.

10        Q    All right.  I think this is No. 4.

11                  (Exhibit 4 was marked for

12                   identification.)

13                  All right.  So, Mr. Swope, I handed you a

14   packet.  It's several pages long.  The top is a letter

15   that you sent to Mayor Bazzi and Chief Hart with

16   regards to the SMIP program.  Just are you familiar

17   with this document?

18        A    Very familiar.

19        Q    Okay.  Did you draft this cover letter --

20        A    I did --

21        Q    -- or this cover?  Okay.

22                  And did you provide this to Mayor Bazzi and

23   Chief Hart?

24        A    Yes.

25        Q    Okay.  And it appears here that this is a

Page 98

```
 1   Senior Management Institute for Police Program Session
 2   that takes place in -- that took place in Boston; is
 3   that correct?
 4        A    That's correct.
 5        Q    Okay.  And did you go to this training?
 6        A    No.
 7        Q    All right.  This training, this -- I'm
 8   sorry, the Senior Management Institute for Police
 9   Program Session -- and if it's okay for purposes of
10   the transcript, I'm just going to call it "this
11   program" -- for this program, was it a requirement of
12   your duties as a police officer to attend this?
13        A    No.
14        Q    Okay.  You could continue to be director of
15   police operations had you not attended this?
16        A    Yes.
17        Q    Okay.  You continued to operate as director
18   of police operations, even though you didn't attend
19   this?
20        A    That's correct.
21        Q    And you became promoted to police chief
22   after not attending this program; is that correct?
23        A    That's correct.
24        Q    Okay.  Were you denied the ability to go to
25   this program?
```

Page 99

1      A    Yes.

2      Q    How were you denied the ability to go?

3      A    The funding was not approved.

4      Q    Okay.  Could you have paid for this on your

5  own to go?

6      A    Yes.

7      Q    Okay.  And when you say "the funding wasn't

8  approved," who didn't approve the funding?

9      A    City Council.

10     Q    Okay.  Did City Council say that had you

11  paid on your own, you still would not be able to go?

12     A    I don't know if we ever had that

13  conversation.

14     Q    Okay.  So by not attending this particular

15  program, it did not impact the ability for you to

16  perform your job; is that --

17     A    Correct.

18     Q    Thank you.  Did you seek alternative methods

19  of funding for the position?

20          MR. BROWN:  Objection, vague.

21  BY MS. HUNT:

22     Q    All right.  Did you contact the program to

23  see if they had scholarships for programming -- to

24  attend the program?  I'm sorry.

25     A    I did read up on the scholarships, and I

```
                                        Page 100
 1    don't think I was -- I don't think I could have
 2    qualified for it.  The information's on the site, but
 3    I could not qualify for some reason.
 4         Q    Did you contact the program to determine if
 5    there were other methods of being able to qualify for
 6    scholarships or funding?
 7         A    No.
 8         Q    Did you contact the County to determine if
 9    there was some special funding for local trainings?
10         A    Not the County, no.
11         Q    All right.  Or the state police?
12         A    The Department of Justice, yes.
13         Q    You contacted the Department of
14    Justice -- I'm sorry --
15         A    Yes, COPS office.
16         Q    -- Department -- okay.
17              And did they respond to you?
18         A    There was no funding available to support
19    this.
20         Q    Okay.  So you contacted the Department of
21    Justice.  You did not contact -- sorry, contact MSP?
22         A    No.
23         Q    Okay.  There was a time when the City
24    Council brought a resolution to cease funding to your
25    position.  Do you recall that?
```

                                        Page 101

1        A    Yes.

2        Q    All right.  How did you first learn about

3   that?

4        A    I'm not sure how I first learned about it.

5        Q    All right.  Did you receive a notice, do you

6   know, or did someone tell you?

7        A    I can't recall.

8        Q    Okay.  What did you do after you learned

9   that there was the resolution to cease funding to your

10  position?

11       A    I'm not sure if I really did anything.  I

12  think we just -- I just waited for the results of any

13  type of vote.

14       Q    Do you recall when you learned of this?

15       A    I couldn't even -- I can't even recall when

16  it happened, to be honest with you.  I think the end

17  of '23.  I -- I don't know.

18       Q    Okay.  Did you attend the City Council

19  meeting where this topic was being discussed?

20       A    Yes.  It happened on a few different

21  occasions.

22       Q    Okay.  You indicated that the first -- or

23  one took place in '23.  Do you believe that that was

24  the first time you learned of this proposed

25  resolution?

Page 102

1        A     Yes, because I think when they voted on

2    it -- it was 2024.

3        Q     So do you recall what happened in 2023 when

4    the initial resolution was made?

5        A     It was -- I believe it was tabled.

6        Q     All right.  And during that time, did you

7    continue to receive your payments?

8        A     Yes.

9        Q     Pursuant to your contract?

10       A     Yes.

11       Q     All right.  And your benefits?

12       A     Yes.

13       Q     Did you continue to be able to perform the

14   duties or functions of your job?

15       A     Yes.

16       Q     Okay.  Do you know how soon thereafter the

17   second or the next time it was brought forward?

18       A     I can't recall.  It might have been the

19   first meeting after the first of the year.  I'd have

20   to look.

21       Q     All right.  Did you attend that meeting?

22       A     Virtually.

23       Q     Okay.  During the first meeting in 2023

24   where it was tabled, did you make any comment during

25   that time?

Page 103

1          MR. MIOTKE:  Objection, form.

2    BY MS. HUNT:

3          Q    Do you understand the question?  Do you want

4    clarification?

5          A    I can't recall making any comments.

6          Q    Okay.  You indicated earlier that during --

7    if there's, like, a police budget issue or an issue

8    impacting the police department, you would be there

9    for purposes of answering questions.  Would you -- I'm

10   sorry.  Would you also make comment?

11         A    Just depends.  Normally it was answering

12   questions.

13         Q    Okay.

14         A    I would never stand up and just make

15   comments.  I normally didn't do that.

16         Q    All right.  During public comment, would you

17   ever make comments?

18         A    No.

19         Q    Okay.  During the '23 session, were any

20   questions asked of you?

21         A    I don't think about this, about defunding.

22   I don't believe so.

23         Q    Okay.  With regards to the '24 meeting, did

24   you -- you attended that virtually?

25         A    Yes.

```
                                          Page 104

1        Q     Were any questions asked of you --
2        A     No.
3        Q     -- during that meeting?
4              Do you recall the outcome?
5        A     They voted to defund the position at some
6   point.
7        Q     Did you -- was there more than one meeting
8   in 2024 regarding this issue?
9        A     I wish I -- I could recall what meeting they
10   defunded it, but we'd have to look at the -- the
11   minutes.
12        Q     Okay.  Did your paychecks ever stop?  Strike
13   that.
14              Did you ever stop receiving a paycheck in
15   2024?
16        A     No.
17        Q     All right.  Did you continue to operate the
18   functions of your job as pursuant to your contract?
19        A     Yes.
20        Q     All right.  Did you continue to receive your
21   benefits?
22        A     Yes.
23        Q     Were you ever stopped from doing your job or
24   attempted to be stopped from doing your job?
25        A     No.  Well, attempted?  Yes.  But did it
```

Page 105

1    actually happen?  No.

2        Q    All right.  So you were able to continue to

3    perform your job pursuant to the terms of your

4    contract and the requirements of the police

5    department?

6        A    Yes.

7        Q    All right.  In 2024, were you receiving

8    health insurance from the City?

9        A    Yes.

10       Q    And that continued?

11       A    Yes, it did.

12       Q    And that's continuing through today?

13       A    That's correct.

14       Q    This, I think, is 5.

15                (Exhibit 5 was marked for

16                identification.)

17            Have you seen this document before?

18       A    I have read this before.

19       Q    Okay.  Now, I know you did not draft it.

20   How did you get this document?

21       A    I can't recall.  I might have received it

22   via e-mail.

23       Q    Okay.  When you received it via e-mail, who

24   did you receive it from?

25       A    You know, I would suggest looking at my e-

Page 106

1    mail files, because I know for a fact it's in there.

2         Q    Okay.  Did you take a copy of this with you

3    when you left as a part of the thousands of documents

4    you took?

5         A    No, I can't recall this particular document.

6    As I read it, it's becoming more familiar, but I don't

7    know if I've seen it since I've read it initially.

8         Q    All right.  Now, it's titled

9    "Whistleblower."  Do you see that, or under the "Re"?

10        A    It's a great title, yes.

11        Q    So as it relates to this document, did you

12   draft this document?

13        A    No, I did not.

14        Q    All right.  Did you ever yourself make a

15   whistleblower claim to anyone?

16        A    About what -- what was going on?

17        Q    Correct.

18        A    Yes, I did.

19        Q    To who?

20        A    To Margaret -- Margaret Hazlett.

21        Q    All right.  How was that made?

22        A    E-mail.

23        Q    Do you have that e-mail?

24        A    You have that e-mail.

25        Q    As the part of the documents that you took,

Page 107

1    did you --

2         A     Not that I can recall.

3              There was a lot of e-mails sent to H.R.

4    talking about some issues that we had that never get

5    resolved or responded to.  The only way we would get

6    response would be from the Mayor.

7         Q     Now, it appears that the Mayor's -- I'm

8    sorry, chief's issues, well, they discuss the Act 78

9    issue.  They discussed the meeting that -- I'm sorry,

10   what appears to be the meeting that you had with

11   Mr. Rahal where he talks about -- or unless there was

12   a different meeting you had where there was the

13   request to appease an employee; is that correct?

14                  MR. BROWN:  Objection to form,

15   confusing, compound, vague, best evidence.

16   BY MS. HUNT:

17        Q     Well, let's take a look at where -- do you

18   see where it says "Takeaways from this meeting"?

19        A     Yes, I do.

20        Q     All right.  And it states that "We,

21   including Dir. Swope, Mayor Bazzi, and I, we were

22   warned if we didn't appease this employee, we would

23   all be fired, and the Mayor would lose reelection."

24        A     That is consistent with everything that's

25   been said, yes.

Page 108

1      Q     Okay.  Was there any other meeting with

2  regard -- or other than the Rahal meeting where this

3  topic was broached?

4      A     Being fired?

5      Q     Or with regards to not appeasing an

6  employee?

7      A     I don't -- I believe he's talking about the

8  Rahal thing.

9      Q     Okay.  The next bullet point says, "When the

10 individual is asked if the Council cares about our

11 work or the DOJ COPS OA, he said, 'It's a joke to all

12 of them, and we want to fail, because it would be on

13 us, not them; therefore, securing their political

14 futures.'"

15           Do you know what this was -- this topic was

16 about?

17     A     Yes.  So during that same meeting with

18 Mr. Rahal, he was telling us that the members of City

19 Council, they don't necessarily care about the DOJ

20 COPS program that we were involved in, because they

21 find it to be a joke, which, you know, they -- they

22 joked about some type of making t-shirts or something

23 like that.  It was a big joke to them, allegedly.

24           And Mr. Rahal basically told us that that

25 was the case, that Council did not believe that our

Page 109

```
 1    efforts to make the police department better
 2    was -- were serious.
 3         Q    And that goes into the third bullet point.
 4    "The individual who anticipated -- who is anticipated
 5    to be deposed also shared how the Council thinks
 6    matters under investigation are a joke.  They're
 7    considering having t-shirt made about the
 8    investigation."
 9         A    That's what I just mentioned, yes.
10         Q    Okay.  And do you know what Chief Hart was
11    referring to when he says "being deposed"?
12         A    Well, I would assume since, you know, the
13    lawsuit was pending at that time or about to be filed,
14    that Mr. Rahal would be called as a witness in the
15    case to talk about our conversation that day.
16         Q    All right.  And you've indicated before that
17    despite all of the power Mr. Rahal seems to believe he
18    has, you have not seen him since this meeting?
19         A    I have --
20              MR. BROWN:  Objection to form.
21    BY MS. HUNT:
22         Q    Is that correct?
23         A    I have not seen him.
24         Q    Okay.  And he did not come to City Council
25    meetings?  Is that -- while you were -- at any City
```

```
                                           Page 110
 1    Council meeting that you attended?
 2         A    If he did, I did not see him.
 3         Q    Okay.  Do you recall at any of the meetings
 4    that you attended, if he spoke at any meetings?
 5         A    I don't recall him speaking at any meetings.
 6         Q    The -- or the final, under "This key
 7    takeaway," "When asked how our employee has so much
 8    pull in the community, he said, 'It is well -- he is
 9    well connected to certain members of City Council, has
10    very wealthy and influential connections to make this
11    a reality.'"
12              Do you recall that conversation during
13    the --
14         A    Yes.
15         Q    -- during the meeting?
16         A    Yeah.
17         Q    Okay.
18         A    Not -- not word for word.
19         Q    Okay.  And to your knowledge, what employee
20    was he speaking of?
21         A    Sgt. Bazzy.
22         Q    Okay.  And you indicated that Sgt. Bazzy
23    remained a sergeant during your tenure with the City?
24         A    Yes.
25         Q    All right.  And is it your understanding
```

Page 111

1   he's still a sergeant?

2        A    Yes.

3        Q    All right.  So is it your understanding that

4   no matter how much pull he had, he remained a

5   sergeant?

6        A    I mean, under my leadership, yes.

7        Q    Okay.  And is your understanding to this

8   day, he's still a sergeant?

9        A    I would believe he is.

10       Q    Okay.  So despite the high talk of

11  Mr. Rahal, he remained a sergeant, despite his

12  pressure to --

13       A    Yes.

14            MR. BROWN:  Objection to form.

15  BY MS. HUNT:

16       Q    Thank you.

17            When did you learn that Chief Hart was

18  leaving?

19       A    It was the date he went and had a meeting

20  with -- with the Mayor.  I can't remember the exact

21  date, but it was -- it was not pre-planned.  It was

22  like -- it happened real fast.

23       Q    Okay.  Did he have a conversation with you

24  after that meeting with the Mayor?

25       A    We talked every day pretty much, so I would

Page 112

1    assume we did, we talked that day.

2         Q    Did he talk to you about what he was meeting

3    with the Mayor about?

4         A    He did -- yes.  I think we talked about how

5    his health was being impacted due to the issues he was

6    having with some members of the City and that -- that

7    he told the Mayor that, you know, this place was going

8    to kill him.

9         Q    In that meeting, did he tell you that he was

10   resigning?

11        A    It wasn't a meeting.  It was a phone call,

12   and I can't recall if he -- what he said that -- about

13   his employment.  'Cause we would always be like, oh,

14   my God, what's today going to -- what's going to

15   happen today; right?  So I can't remember.

16        Q    And when did you learn that he was

17   resigning?

18        A    Can't recall if it was that day or the day

19   after.

20        Q    Okay.  Did you ever speak with the Mayor

21   with regards to Chief Hart's resignation?

22        A    Yeah, whatever day that was, could have been

23   the day after that meeting between him and Chief Hart.

24             MR. BROWN:  Counsel, I'm going to

25   object to the term "resignation" to the extent you're

Page 113

```
 1    actually meaning he resigned and wasn't constructively
 2    terminated.  If you're just using the phrase loosely,
 3    that's fine.  But to the extent you're trying to get
 4    the witness to admit that Chief Hart was resigned and
 5    was not constructively terminated, then this will be a
 6    standing objection, and I won't interrupt your
 7    questioning once more on this.
 8                    MS. HUNT:  All right.  I accept your
 9    standing objection.  Not quite sure about the speaking
10    objection, but I understand your standing objection.
11    BY MS. HUNT:
12       Q    So with regards to your conversation with
13    the Mayor, was that in person or on the phone?
14       A    It was in person.
15       Q    Okay.  And what was that conversation about?
16       A    I -- I think it was just about Chief Hart,
17    you know, not doing good.  You know, his health
18    was -- was declining, and that he was going to have me
19    be the interim police chief, you know, in the meantime
20    until everything was, you know, settled down.
21       Q    Were you surprised that he tapped you as
22    interim?
23       A    No.
24       Q    Okay.  When did you begin your role as
25    interim?
```

Page 114

```
1        A    I can't recall.
2        Q    Did you wait until after Chief Hart
3   resigned?
4        A    I'm not sure when he was actually dismissed
5   from the -- the department, but as soon as I had the
6   conversation with the Mayor, as soon as the -- the
7   Chief was no longer in the building, I became, you
8   know, interim acting -- acting chief.
9        Q    Okay.  Did you meet with your subordinates,
10  any of the other members of the police department once
11  you became interim?
12       A    I met with them quite often.  I'm not sure
13  exactly if I had a -- I know I didn't have a
14  department meeting, but I would attend briefings quite
15  often.
16       Q    You didn't have a group meeting to indicate
17  "Chief's gone.  I'm now interim until a permanent is
18  named"?
19       A    No.
20       Q    As interim, how did your duties change?
21       A    Well, I no longer had someone to approve my
22  work, you know, so, therefore, I just -- I was
23  the -- the CEO of the police department.  So,
24  therefore, I was responsible for everything, you know,
25  related to the police department, or at least
```

Page 115

1    overseeing those items and tasks.

2        Q    Did you continue to take part in

3    investigations?

4        A    Yes.

5        Q    All right.  Did Chief Hart take part in

6    investigations?

7        A    He did.  He did some investigations.  We'd

8    have to refer to The Red File to see who did certain

9    investigations, but yes.

10        Q    And when you say you continued to take part

11    in investigations, I mean, did you continue to

12    investigate yourself?  Strike that.

13            Did you yourself conduct investigations?

14        A    Yeah.  So we didn't have -- we weren't fully

15    staffed in the administrative offices.  So, therefore,

16    I had to do things that, you know, a police

17    chief -- or chief of police would -- would not

18    normally do, like, you know, lower-level

19    investigations.

20        Q    Was it during that time as interim that

21    you -- strike that.

22            You indicated earlier that there was the

23    position of deputy chief of police that was added, is

24    that correct, during your tenure?

25        A    That's correct.

Page 116

1      Q    Was that during your tenure as interim or

2   when you became the police chief?

3      A    I believe I was police chief at that time.

4      Q    Now, at any time during your employment with

5   the police department, either as director or as

6   interim, did you become aware of the concerns that the

7   Council had with Dir. Vanderplow?

8                 MR. BROWN:  Objection to form.

9   BY MS. HUNT:

10     Q    Do you understand the question?

11                MR. BROWN:  Assumes facts not in

12   evidence.

13                THE WITNESS:  I knew that City Council

14   did not like Dir. Vanderplow.

15   BY MS. HUNT:

16     Q    Okay.  Were you ever made aware of the

17   Council having concerns about his behavior at certain

18   City Council meetings?

19                MR. BROWN:  Same objection.

20                THE WITNESS:  Yes.

21   BY MS. HUNT:

22     Q    Okay.  This is No. 6.

23                (Exhibit 6 was marked for

24                identification.)

25     A    Thank you.

Page 117

1        Q    So I handed you what would be a thread of e-

2    mails.  The top appears to be the final e-mail from

3    Dave Abdallah, who at the time was City Council

4    president.  Do you see that?

5        A    I do.

6        Q    Okay.  Were you familiar with Mr. Abdallah?

7        A    Yes.

8        Q    Okay.  We can go to what is stamped CODH

9    0311.  Toward the very bottom, there is an e-mail from

10   Thomas Wencel.  Are you familiar with Mr. Wencel?

11       A    Yes.

12       Q    Okay.  And it appears that you were listed

13   on this e-mail chain.  Do you see that?

14       A    Yep.

15       Q    It's about three lines from --

16       A    Yeah, I see it.

17       Q    Okay.  Do you recall receiving this e-mail?

18       A    I'll have to read it real quick.  There's

19   just been so many of these.  Yes, I remember this one.

20       Q    Okay.  Did you attend that City Council

21   meeting?  Do you recall?

22       A    Let me read the rest of this paragraph where

23   it talks about what he did.  I'm not exactly sure

24   which one this was.  This might be the K-9 one.

25       Q    Okay.

Page 118

1      A     If it is, then yes.

2      Q     Okay.  Do you recall -- do you recall -- I'm

3   sorry if I just asked you this.  Do you recall

4   receiving this e-mail?

5      A     My name's on it, and I -- it's familiar to

6   me, so I would assume I -- I received it, yes.

7      Q     All right.  After you received this e-mail,

8   did you have any thoughts about the e-mail?

9      A     Well, if this is the K-9 one, my thought was

10   that Dir. Vanderplow did a fine job responding to

11   Council and that City Council -- you know, their

12   actions were aggressive towards him and that he has a

13   First Amendment right to speak at a public meeting.

14      Q     Do you recall him being rude or belligerent?

15             MR. BROWN:  Objection to form, vague.

16             THE WITNESS:  I think that

17   Dir. Vanderplow, if this is what I'm speaking of or

18   remembering, did a fine job.

19   BY MS. HUNT:

20      Q     But you're not sure that this is the

21   particular --

22      A     We'd have to -- if you -- you know, I would

23   suggest that we watch the video from this Council

24   meeting.  Then I'll be able to discuss further.  But

25   until that happens, I won't be able to really comment

Page 119

1    on it.

2        Q    Okay.  And if we take a look at -- we'll

3    move ahead more toward the top, what's -- the last

4    three numbers of 307.  With regards to the same

5    meeting, there was another e-mail from Mo Baydoun,

6    current president at the time City Councilmember, with

7    the same concerns about Mr. Vanderplow.  Do you --

8                    MR. BROWN:  Objection to form, best

9    evidence.

10   BY MS. HUNT:

11       Q    Do you receive -- do you recall receiving

12   this e-mail?

13       A    I'll have to take a look at it again.  I'm

14   familiar with it.

15       Q    Okay.  Did it concern you that you had at

16   this point more than one City Council person being

17   concerned about his behavior?

18       A    No, because this is a tactic that they used

19   multiple times, and those documents are located in my

20   e-mails.  It's -- it's the same thing over and over

21   and over and over.

22       Q    Was there any -- well, before I ask that

23   question, soon thereafter, there was an e-mail by

24   Chair Ahmad.  Do you recall receiving that one as

25   well?

Page 120

```
 1       A     This one in 0306?

 2                   MR. BROWN:  We're asking if that's the

 3     correct Bate.

 4                   MS. HUNT:  Oh, I'm sorry, yes, 305 --

 5                   MR. MIOTKE:  Yeah, just -- just --

 6                   MS. HUNT:  -- starting at 305, but the

 7     body is on 306.

 8                   MR. MIOTKE:  Yeah, just objection,

 9     passing him out as now the Council Chair.  It says,

10     "Dear" --

11                   MS. HUNT:  I'm sorry --

12                   MR. MIOTKE:  -- "Dear Chair" -- just to

13     be clear.

14                   MS. HUNT:  Thank you.

15                   THE WITNESS:  Yeah, I have to read this

16     for a second, because I've received so many e-mails

17     like this where they just pile on.

18                   It's familiar to me, too.

19     BY MS. HUNT:

20       Q     Okay.  Was there any concern about so many

21     Council people being concerned about -- concern on

22     your part.  Was there any concern on your part about

23     so many Council people indicating that

24     Mr. Vanderplow's behavior was unprofessional?

25                   MR. BROWN:  Objection to form, best
```

Page 121

1    evidence, vague, confusing, assumes facts not in
2    evidence.
3                    THE WITNESS:  I was not concerned due
4    to the fact that I was there for, I believe
5    this -- this meeting.  And what they believed or what
6    it seemed like they believed was not accurate.
7                    You know, Tom Wencel himself on
8    recorded video or audio talks about how these tactics
9    are common, and they're bullying and harassing and
10   discriminatory towards people they don't like.  And
11   this is -- just proves the fact that what he says in
12   that audio is accurate and true.
13   BY MS. HUNT:
14       Q    Was there ever any discussion with Council
15   about their concerns with Mr. Vanderplow's behavior?
16       A    I talked to --
17                    MR. BROWN:  Objection, form.
18                    Let me make my objections.
19                    THE WITNESS:  Got it.
20                    MR. BROWN:  Objection to form, assumes
21   facts not evidence, vague, compound.
22                    THE WITNESS:  I talked to Council quite
23   often.
24   BY MS. HUNT:
25       Q    About their concerns with Mr. Vanderplow?

Page 122

1       A     Yes, all their concerns.

2       Q     Okay.  Who did you speak with?

3       A     Well, I spoke with all councilmembers at

4    some point.

5       Q     Okay.  About their -- specifically about

6    their concerns with Vanderplow?

7       A     In this incident, I can't recall, but there

8    are other instances where I talked to all members of

9    Council about the harassment of Dir. Vanderplow.

10      Q     Now you used the term "harassment."  What

11   did he say that they did to him that was considered

12   harassment, other than being concerned about his

13   behavior?

14      A     I mean, when?  Just about this incident or

15   just in general?

16      Q     Well, you said you spoke with them about

17   this incident?  Or did you speak with them about this

18   particular --

19      A     Well, I asked you before that I need to look

20   at the video to see if this was the K-9 incident.

21   Yes.

22      Q     Okay.  So you spoke with them about other

23   incidents?

24      A     All types of incidents.

25      Q     Okay.  All right.  And with regards to your

Page 123

1    claim that Mr. Vanderplow indicated that he was being

2    harassed, what was his claim to you?

3                    MR. BROWN:  Objection to form.

4    BY MS. HUNT:

5         Q    Detailing that label of "harassment."

6         A    In general?

7         Q    Correct.

8         A    Well, I can start reading on page 1 of this

9    complaint and go on for another hundred pages --

10        Q    So everything listed in this complaint are

11   the claims of harassment that you're indicating?

12        A    Mostly, yes.

13        Q    Okay.  When did you decide to leave the City

14   of Dearborn Heights?

15        A    Well, it was when I responded to the Mayor

16   saying I'd -- I'd resign.

17        Q    Let me hand you what would be Exhibit 6.

18                    MR. BROWN:  I think the last one was 6,

19   Monica.

20                    MS. HUNT:  Oh sorry, 7.  Thank you.

21                    (Exhibit 7 was marked for

22                    identification.)

23   BY MS. HUNT:

24        Q    Is this the e-mail that you referenced?

25        A    Yes.

Page 124

1        Q    Okay.  This was dated December 4, 2024, at

2    11:18 a.m.?

3        A    Correct.

4        Q    Okay.  So did you have a conversation with

5    the Mayor prior to this e-mail being sent?

6        A    Yes.

7        Q    Okay.  What was that conversation?

8        A    I mean, which -- I mean, I've had a lot of

9    conversations with the Mayor.

10       Q    I'm sorry.  Prior to -- did you have a

11   conversation with him about your resignation prior to

12   this December 4th e-mail?  Meaning on December 4th,

13   did you have a conversation with him about your

14   resignation?

15       A    Yes.

16       Q    Okay.  Was that before he sent this e-mail?

17       A    Yes.

18       Q    Okay.  What was that conversation?

19       A    The conversation was about my contract and

20   the terms and the resignation.

21       Q    Okay.  Did you tell him you were going to

22   resign?

23       A    I told him I would resign.

24       Q    Okay.  Did you tell him why you were

25   resigning?

Page 125

1      A      We had a conversation about the resignation,

2   yes.

3      Q      Okay.  And what was that conversation?

4      A      Mayor Bazzi was stressed out about an unfair

5   labor practice that was filed by the unions, based on

6   negotiations that were going on.  So there was also

7   multiple grievances due to the fact that Hussein

8   Farhat was placed into a position contrary to what the

9   negotiations were -- were, and there was multiple

10  grievances.  And so we had a conversation

11  about -- about those things.

12     Q      When you say Hussein Farhat was placed in a

13  position that there was action regarding, what

14  position was he placed in?

15     A      Well, initially I think it was a director of

16  police operations, and then it spiraled into the

17  deputy chief position.

18     Q      Who made that transition of him going

19  from -- strike that.

20            Who ordered the transition of him going from

21  director of police operations to deputy chief?

22     A      I think that was a -- no, I don't think, I

23  know that was a strategic conversation between the

24  Mayor, Roger, and myself, and Hussein Farhat.

25     Q      Okay.  And, I'm sorry, I kind of skipped a

Page 126

1    step here.  When you became chief of police, you

2    received a new contract; is that correct?

3         A    That's correct.

4         Q    All right.  And this is 8.

5                   (Exhibit 8 was marked for

6                   identification.)

7              Now, is this the contract that was given to

8    you when you became chief of police?

9                   MR. MIOTKE:  I'm sorry.  For the

10   record, this is 8?

11                  MS. HUNT:  8.

12                  THE WITNESS:  8, yep.

13                  MR. MIOTKE:  Okay.  Thank you.

14                  THE WITNESS:  I'm going to have to read

15   it, because I think there was two versions.

16   BY MS. HUNT:

17        Q    Were there two versions that you signed?

18        A    I'm going to have to read this to refresh my

19   recollection.  This looks like the -- the one, yes.

20        Q    Okay.  And as chief of police, if we take a

21   look at page 2, paragraph 3.1, your salary was

22   measured at a $126,600 per year?

23        A    Yes.

24        Q    All right.  And that would appear to be

25   retroactive back to July 3rd of that year; is that

Page 127

1    correct?

2         A    Correct.

3         Q    And you signed that contract on October 15th

4    of 2024?

5         A    Yes.

6         Q    Okay.  Did you receive the retroactive pay

7    that would've been provided under this contract?

8         A    Yes.

9         Q    Okay.  And what is listed as, it appears to

10   be a second 3.1 under "Benefits," do you recall -- did

11   you recall reviewing the benefits package as a part of

12   this contract?

13        A    Yes, I read the contract.  Yep.

14        Q    And did you receive the benefits that were

15   listed under this section?

16        A    Yes.

17        Q    Okay.  Do you ever -- did you ever recall

18   not receiving anything as a part of your contract

19   while you were employed with the City of Dearborn

20   Heights?

21        A    No.

22        Q    All right.  Now, in speaking about your

23   resignation, in your conversation with Mayor Bazzi

24   with these issues regarding the grievances that had

25   been filed and the discussion about your resignation,

```
                                              Page 128

 1    did you tell him that you were looking to leave the

 2    City of Dearborn Heights?

 3                   MR. BROWN:  Object to the form of

 4    question, assumes facts not in evidence.

 5                   THE WITNESS:  Yes.  I told him that I

 6    had an offer.

 7    BY MS. HUNT:

 8         Q    Okay.  And who was that offer with?

 9         A    The City of South Haven.

10         Q    Okay.  This conversation -- and I'm sorry if

11    I asked you this earlier -- was this on December 4th

12    of 2024?

13         A    I believe so.

14         Q    Okay.

15         A    Well, I know I had it -- there's a couple

16    conversations, one of them being that -- that morning,

17    and another one was previous to that.  We had it at

18    City Hall in the evening -- or, actually, at night.

19    It was before the tree lighting ceremony, whatever

20    date that was, in Dearborn Heights.

21         Q    Okay.  And what did he say when you told him

22    that you had an offer?

23         A    Well, he asked, you know, who it was, you

24    know, how could we resolve this, you know, that type

25    of stuff.  It was just a conversation about, you know,
```

                                        Page 129

1    what would happen, you know, going forward, that --

2    you know, what he's going to do with, you know,

3    Hussein Farhat.  Those type of conversations occurred.

4         Q     And when he asked how you could resolve it,

5    what did you say?

6         A     Yeah, I mean we were talking about all the

7    grievances and unfair labor practices, and we talked

8    about -- you know, we negotiated that, hey, if -- you

9    know, these things can go away; right?  He wanted

10   Hussein Farhat as chief of police, and I instructed

11   him and I told him that I was not -- I was not going

12   to leave, you know, unless my contract was going to be

13   fulfilled, and he agreed.

14        Q     So on December 4th, you told him you were

15   not going to leave unless your contract would be

16   fulfilled?

17        A     Yes.  That -- that was our -- our

18   conversation basically stated that my contract would

19   be fulfilled once I left.

20        Q     Okay.  And you indicated that you had an

21   offer at that point?

22        A     That's correct.

23        Q     Okay.  Did you provide any indication to the

24   City of South Haven that you were going to start

25   working with them?

Page 130

1      A    I'm not sure if I did by then or not.  I
2   could have.  I may have.
3      Q    So if you had, how were you going to stay
4   with the City of Dearborn Heights?
5      A    Because if the City of Dearborn Heights was
6   not going to fulfill the obligation of my contract,
7   then I would've withdrawn from the process in South
8   Haven.
9      Q    This is Exhibit 9.
10               (Exhibit 9 was marked for
11               identification.)
12               MR. MIOTKE:  Do you have the original
13   one, it looks like -- Roger?  Oh, you have two of
14   them.  Okay.  I see.
15               MS. HUNT:  Yeah.  I didn't copy these
16   with them.
17               MR. MIOTKE:  Oh, okay.  Very good.
18   Thank you.
19   BY MS. HUNT:
20      Q    So the document that I just handed you, are
21   you familiar with this document?
22      A    Yes.
23      Q    Okay.  And the date of this document is
24   October 2nd of 2024?
25      A    That's correct.

Page 131

1    Q    Okay.  And this is the document that you
2    provided to the City of South Haven to advise of your
3    interest in their position as chief of police; is that
4    correct?
5    A    Yes.  Yes.
6    Q    All right.  Is this a document that you
7    actually submitted to the City of South Haven?
8    A    Yes.
9    Q    Okay.  And in this submission, it includes
10   what's equivalent to a CV or a curriculum vitae, a
11   resume providing your background --
12   A    That's correct.
13   Q    -- in law enforcement; right?
14   A    Yes.
15   Q    Did you have an interest in taking this job?
16   A    Yes, it was a backup plan for when I got
17   fired by Dearborn Heights.
18   Q    All right.  At this point in October of '24,
19   you had just received a new contract with a
20   retroactive pay; is that correct?
21   A    That's correct.
22   Q    So what made you think you would get fired?
23   A    Because of the fact that City Council wanted
24   me fired.
25   Q    All right.  Did you sign the contract?

Page 132

1      A    Yes, I did.

2      Q    All right.  Did the Mayor tell you that this

3  is a temporary contract?

4      A    No, there's an end date on it.

5      Q    Okay.  The end date was, if I recall ...

6      A    Somewhere 2026.

7      Q    Yes.  Does your contract as a director have

8  an end date as well?

9      A    Yes.

10     Q    Do most of the contracts that you see have

11  end dates?

12     A    I see a lot of contracts, but I would assume

13  so.

14     Q    Employment contracts within the City of

15  Dearborn Heights.

16     A    I've only seen a few, but mine -- mine do,

17  yes.

18     Q    Okay.  All of the contracts that you had

19  with the City of Dearborn Heights had end dates?

20     A    Yes.

21     Q    All right.  And prior to that time, you had

22  never been fired --

23     A    Not fired --

24     Q    -- from the City of Dearborn Heights?

25     A    Defunded but not fired.

Page 133

1      Q    You continued to receive your pay; is that
2    correct?
3      A    That's correct.
4      Q    All right.  You've indicated that you
5    never -- that there was never a time you did not
6    receive your paycheck?
7      A    That's correct.
8      Q    And there was never a time while working
9    with the City of Dearborn Heights that you never
10   received your benefits?
11     A    While I was working, correct.
12     Q    While you were working; correct?
13     A    Yes, correct.
14     Q    All right.  And you ended up interviewing
15   with the City of Dearborn Heights -- or, I'm sorry,
16   South Haven; is that correct?
17     A    I did.
18     Q    All right.  I'm going to provide what is
19   Exhibit 10.
20              (Exhibit 10 was marked for
21               identification.)
22           Did you interview with the City of South
23   Haven on November 5th of 2024?
24     A    Yes.
25     Q    Okay.  Do you recall interviewing with this

Page 134

1    panel of individuals:  Kate Hosier, Kim Wise, I'm
2    assuming Ross Stein, Chief Jay Allen, Darryl Williams,
3    and James Carmody --
4         A    Yes.
5         Q    -- on November 5th?
6         A    Yes.
7         Q    All right.  And how long was that interview?
8         A    I am not sure.  It looks like it was
9    probably -- I'm not sure how long it was.  Probably an
10   hour.
11        Q    All right.  Was that in person or virtual?
12        A    In person.
13        Q    Okay.  Was it in South Haven?
14        A    Yes, it was.
15        Q    All right.  Did you tell anyone in the City
16   of Dearborn Heights, whether it's the Mayor or
17   Mr. Vanderplow, that you were interviewing for this
18   position?
19        A    I can't recall if I told -- I know I didn't
20   tell the Mayor.  I'm not sure if I told Director -- or
21   Paul Vanderplow or not.  I know I did.  Yes, he knew.
22        Q    Vanderplow knew?
23        A    Yeah, he knew.
24        Q    Okay.  So it appears you made the short list
25   for this position; is that correct?

Page 135

1        A    Yes.

2        Q    All right.  And ultimately became the chief?

3        A    That's correct.

4        Q    All right.  During this interview, did you

5    express your interest, your continued interest to be a

6    part of this South Haven Police Department?

7        A    Yes.

8        Q    All right.  Did you advise them that, you

9    know, this is only in the event I don't keep my job in

10   Dearborn Heights?

11       A    No.

12       Q    After this interview, did you let anyone

13   else know other than Vanderplow that you were

14   interviewing?

15       A    I don't recall.

16       Q    All right.  Anyone else in the police

17   department?

18       A    Oh, no.

19       Q    Okay.  All right.  Let me give you what's

20   No. 27.  Now, this is No. 11.

21                  (Exhibit 11 was marked for

22                   identification.)

23                  And this is an e-mail dated November 27th --

24   I'm sorry, a letter dated November 27th.  Do you

25   recall receiving this letter?

Page 136

1      A     Yes.

2      Q     Okay.  This appears to be a conditional

3   offer letter of employment?

4      A     Yes.

5      Q     And it appears that on that same date, you

6   signed it; is that correct?

7      A     Yes.

8      Q     All right.  So, on November 27th of 2024,

9   you signed a letter of intent to be employed by the

10  City of South Haven?

11     A     That's correct.

12     Q     Okay.  And it indicated that your job duties

13  were to begin January 6th; is that correct?

14     A     I've got to look.

15     Q     Of 2025.  It is the final paragraph.

16     A     Yes.

17     Q     Okay.  The next line under the date that you

18  were to begin says, "Please sign and return this offer

19  of employment at your earliest convenience, but not

20  later than November 27, 2024."

21            And you signed it on the 27th?

22     A     Yes.

23     Q     And you submitted it on the 27th?

24     A     I would assume so.

25     Q     Okay.  So at that time, the City of South

Page 137

1    Haven, is it your belief they understood that you were
2    going to be their next chief of police?
3        A    I believe they had to do my background
4    investigation still, so I'm not sure what they
5    believed.
6        Q    All right.  So on November 27th, it was your
7    intent to begin working with the City of South Haven
8    on January 6th?
9        A    Not necessarily.
10       Q    All right.  Why would you send them a letter
11   of intent to work with them if you were not planning
12   to work with them?
13       A    Well, my intent was to have a backup plan
14   because of the fact that I knew that my job in
15   Dearborn Heights was -- was about to be up, due to the
16   fact that Hussein Farhat was being forced into the
17   police department in a position he was not qualified
18   for.  And the Mayor stated that he needed an Arab-
19   American police chief so he could be reelected.
20       Q    All right.  So you spent close to two months
21   of your life interviewing for this position, driving
22   to South Haven, having this panel interview you and
23   disqualify other individuals with the thought that you
24   were not going to take the position if the City of
25   Dearborn Heights continued to -- would continue to

Page 138

1    employ you.  Is that what you're saying?

2                    MR. BROWN:  Objection to form,

3    argumentative, assumes facts not in evidence.

4                    THE WITNESS:  No.

5    BY MS. HUNT:

6        Q    Okay.  So why did you spend the last two

7    months interviewing, meeting with individuals from the

8    City of South Haven if you did not intend to take the

9    position?

10       A    As I stated before, it was a backup plan for

11   when I possibly got fired by the City of Dearborn

12   Heights.  My answer won't change on that.

13       Q    And after you signed this letter of intent

14   to work with the City of South Haven, having a job

15   offer, a salary provided to you, what appears to be

16   benefits provided to you, in addition to what appears

17   to be one-time payments or bonuses provided to you,

18   you indicate -- it is still your indication that you

19   did not plan to work with them?

20                    MR. BROWN:  Objection to form, assumes

21   facts not in evidence.

22                    MS. HUNT:  I will give you standing

23   objections.

24                    THE WITNESS:  I -- I don't get the

25   question.

Page 139

1    BY MS. HUNT:

2        Q    You signed a letter indicating that you were

3    going to begin working with them, given the background

4    check.  Was there any indication that you would not

5    pass your background check?

6        A    It was up in the air.  I did receive a lot

7    of calls and feedback from the recruiter talking about

8    how the City was concerned about the drama in Dearborn

9    Heights.  So, yeah, there was -- there was definitely

10   some issues there in the background check, but only

11   related to my employment with Dearborn Heights.

12       Q    All right.  Did anyone from the City ever

13   reach out and say, "Well, we may not give you this

14   offer.  We may pull this back"?

15       A    Yes.

16       Q    Who did?

17       A    The recruiter said that the Mayor --

18       Q    Was the recruiter with the City of

19   Dearborn -- or South Haven?

20       A    No.  No.

21       Q    Okay.  Who in the City of South Haven?

22       A    No one -- no one called me directly.

23       Q    All right.  Were you asked about any of

24   these issues during your interview?

25       A    I can't recall.

Page 140

1       Q     All right.  So it appears your interview was

2    on November 5th, in which quite a few questions were

3    asked of you.  There's quite a bit of feedback, if you

4    take a look at the documents attached to Exhibit 10.

5             Approximately 20 days later, they provide

6    you with this -- with an offer.  And during that time,

7    no one reached out to you other than the recruiter to

8    ask you additional questions about your background?

9       A     That's correct.  That's how recruitment

10   processes work.

11      Q     And you were still hired; is that correct?

12      A     That's correct.

13      Q     All right.  But you ended up leaving, is

14   that correct, the City of South Haven?

15      A     That's correct.

16      Q     When did you leave?

17      A     January or -- I can't recall.  I don't know.

18   February.

19      Q     Was it in the winter of '25?

20      A     Yeah, no, it was February, maybe the second

21   week in -- in February.

22      Q     All right.  So you lasted approximately a

23   month?

24      A     Approximately.

25      Q     Okay.  When was your last day with the City

Page 141

1    of Dearborn Heights?

2         A    I can't recall when my last physical day

3    was.

4         Q    Was it in December of '24?

5         A    I can't recall.

6         Q    Was it after you sent -- strike that.

7              This is No. 12.

8                   (Exhibit 12 was marked for

9                   identification.)

10             Do you recall receiving -- or drafting and

11   sending this e-mail to Mayor Bazzi?

12        A    Yes.

13        Q    All right.  Was that done on December 4th?

14        A    Yeah, I wrote this on December 4th.

15        Q    Okay.  And it indicates that "On 12/4/24,

16   you requested an e-mail that I resign from the

17   position of the police chief for the City of Dearborn

18   Heights effective no later than 1/10 of '24."

19             I'm going to assume that's supposed to be

20   1/10 of '25; is that correct?

21        A    That's correct.

22        Q    Okay.  And this is in regards or a followup

23   to what is Exhibit No. 7 from Mayor Bazzi; is that

24   correct?

25        A    Yes.

Page 142

1       Q    All right.  Was your last day on January 10

2   of 2024?

3       A    I can't recall.  We'd have to look at the

4   time sheets, but I know that I had the burn time.

5       Q    All right.  When you say "burn time," for

6   the record, can you describe --

7       A    There was, like -- like, vacation time and

8   whatnot that -- that I used.

9       Q    So is it your indication that you would've

10  not been physically present in the police department,

11  but you would still be deemed an employee but on

12  vacation or leave?

13      A    That's correct.

14      Q    Okay.  Do you recall how much time

15  you -- strike that.

16           Did you burn any time?

17      A    Yes.

18      Q    Okay.  Do you recall how much?

19      A    I do not.  I sent a detailed plan to Cameron

20  Eggly, so he would have that in my file.

21      Q    Now, this e-mail indicates that you were

22  going to resign effective no later than 1/10 of '24.

23  Do --

24           MR. BROWN:  Monica, you're

25  incorporating the typo.

                                                    Page 143

1                    MR. TURFE:   Should be '25; right?

2                    MS. HUNT:   Correct.   It should be '25.

3                    MR. BROWN:   Right.

4                    MS. HUNT:   I'm reading it as is, but

5        I'm going to ask the next --

6                    MR. BROWN:   Just so we're all on the

7        same page, yeah.

8        BY MS. HUNT:

9            Q     Yeah.   My question next was going to be, was

10       it your intention -- or was it your understanding that

11       you remained as an employee of the City of Dearborn

12       Heights on 1/10 of '25?

13           A     That's correct.

14           Q     Okay.   So on 1/10 of '25, you were still an

15       employee of Dearborn Heights?

16           A     Per se.   I mean, I guess I was.   Yeah.   Yep.

17           Q     Did you begin your employment with South

18       Haven, on January 6th of --

19           A     Yes.

20           Q     Okay.   So you were on the payroll for both

21       places --

22           A     Yes.

23           Q     -- at the same time?

24                 Did you make the City of South Haven aware

25       that you were still on the payroll of Dearborn

Page 144

1   Heights?

2        A    It's a common -- it's a common thing in

3   police work where you burn your time and then you move

4   on to the next place.  That's what you're going to do.

5   And you cannot, you know, be police officers in two

6   different places.  But at the time, I wasn't a

7   certified police officer in both places, but even

8   though you can be in Michigan.

9        Q    All right.  My question to you was, was

10   South Haven aware that you were still effectively on

11   the roles of --

12        A    You'll have -- you'll have to ask South

13   Haven.

14        Q    Okay.  You didn't make them aware of it, to

15   your knowledge?

16        A    I can't recall.

17        Q    Did you ever, while working for the month or

18   six week -- five weeks with South Haven, receive

19   benefits, health benefits, insurance, vision, dental

20   health from the City of South Haven?

21        A    I'm not sure.  Maybe vision or dental.

22   Maybe.

23        Q    Okay.  And you indicated earlier that you're

24   still receiving health from the City of Dearborn

25   Heights; is that correct?

Page 145

1      A    That's correct.

2      Q    Was that from the time you left the City of

3  Dearborn Heights?

4      A    Yes.

5      Q    So you never ceased having health insurance

6  from the City of Dearborn Heights?

7      A    Correct.

8      Q    Okay.  You indicated that you burned time.

9  Did you burn all of the time that you had with the

10  City?

11     A    No.

12     Q    What time did you have remaining?

13     A    I'd have to check, or someone would have to

14  check with payroll to see what time was taken from me

15  during that portion of time.

16     Q    What category of time is that?  Is that

17  vacation?  Sick time?  What are the categories?

18     A    It was -- I think it might have been a

19  combination of personal days and vacation time.  Like

20  I said, you'll have to check.

21              MS. HUNT:  I think my time with

22  Mr. Swope is wrapping up, so if you can give me two

23  minutes to go over my notes.

24              MR. BROWN:  Sure.

25              MS. HUNT:  Or does anyone want to take

```
                                          Page 146
 1    a break, and then we come back in five or so, or is
 2    two fine?
 3                 MR. MIOTKE:  I'm sorry, for how long?
 4    Do you want to take a look over your notes?
 5                 MS. HUNT:  I'm just going to go over my
 6    notes really quickly to make sure that I covered
 7    everything.
 8                 MR. BROWN:  You want to go on break?
 9                 MR. MIOTKE:  Yeah, it might be a good
10    idea.
11                 MS. HUNT:  If you guys are -- all
12    right.
13                 MR. MIOTKE:  And then I'm going to
14    start if you don't have anything --
15                 MS. HUNT:  Then it's you.  It's you.
16                 MR. MIOTKE:  Okay.  All right.
17                 MR. BROWN:  Okay.  Who wants an ice
18    cream sandwich?
19                 THE REPORTER:  Are we going off the
20    record?
21                 MS. HUNT:  We're going off the record.
22    I'm so sorry.
23                 THE REPORTER:  Off the record,
24    1:25 p.m.
25                 (Off the record.)
```

```
                                          Page 147

 1              THE REPORTER:  Back on the record,

 2    1:41 p.m.

 3              You may proceed.

 4    BY MS. HUNT:

 5        Q    Okay.  Mr. Swope, I just have a few more

 6    questions for you.  If we can go back to Exhibit

 7    No. 3.

 8        A    Oh, okay.  Oh, the big one.  Got it.

 9        Q    And we talked briefly about some of the

10    actions that you, Mr. Vanderplow, and Mister -- and

11    Chief Hart determined to not necessarily be moving

12    smoothly or swimmingly within the City of Dearborn

13    Heights Police Department.  But I wanted to touch on,

14    if we take a look at page 5, paragraph 25.  The

15    paragraph indicates, "Plaintiffs also reported

16    widespread corruption involving mismanagement of

17    federal and state forfeiture funds, ticket fixing

18    scheme for friends of law enforcement officers and

19    elected officials, and other civil rights violations

20    to various public bodies and/or law enforcement

21    agencies."

22              Did you make any reports as it relates to

23    the mismanagement of federal and state forfeiture

24    funds?

25        A    Paul Vanderplow handled those complaints.
```

Page 148

1      Q    What were those complaints?

2      A     That the federal and state forfeiture fund

3   balances weren't accounting, weren't proper.  For an

4   example, the treasurer provided a statement showing

5   that we had, like, $300,000 in forfeiture funds.  And

6   when -- when questioned about it, a few days later I

7   went to her office, and she showed me the same account

8   that had $1.8 million.  So, therefore, there was some

9   type of movement there in between the time that she

10  provided me the document -- or the initial amount and

11  the time she showed me the -- the screenshot of what

12  was in there, almost like she transferred money.

13     Q    Did you ask her about it?

14     A     Paul Vanderplow did.

15     Q    Okay.  At the time that she showed you this

16  difference in balance, did you ask her where the

17  difference came from?

18     A    No.

19     Q    All right.  What did you do with that

20  information?

21     A     I reported that to Paul Vanderplow.

22     Q    All right.  Did you do any sort of

23  investigation yourself about it?

24     A    I did not.

25     Q    All right.  Did you -- do you know who

Page 149

1     Mr. Vanderplow made this report to?

2          A     I do not.

3          Q     All right.  It indicates here various public

4     bodies and law enforcement agencies with regards to

5     the mismanagement of federal and state forfeiture

6     funds, just that piece there.  Do you know any agency

7     or entity that these fund -- or these complaints were

8     made to?

9          A     I'd have to confirm by documentation

10    that -- that is probably within the City government

11    where those complaints went to.

12         Q     Did you take any of that information with

13    you when you left?

14         A     No.

15         Q     Did you ever follow up with Mr. Vanderplow

16    about the outcome of his report with regards to the

17    treasurer?

18         A     Well, depends on which one.  There was a

19    couple of them submitted to the state police.  I think

20    they're still pending.  I don't know.  I -- I guess

21    Roger would probably know.

22         Q     Did you ever keep, like, a status on them

23    or, like, an attempt to follow up to see what was

24    happening with them while you were employed with the

25    City of Dearborn Heights?

Page 150

1        A     Yeah.  So I would contact the detective

2     bureau lieutenant -- at the time it was

3     Lt. Guzowski -- and just ask status on cases with, you

4     know, maybe, like, a high profile suspect.  And every

5     time I contacted him about one of these cases with the

6     treasurer, it's just he hadn't received any action

7     upon it by the state police yet.

8        Q     As director of police operations or chief of

9     police, did you do anything internally to correct

10    these issues?

11       A     Yeah.  We had an ongoing investigation into

12    the -- the funds, and we -- you know, we -- we just

13    always had some type of pushback in getting us

14    documentation and bank records and whatnot.  So, yes,

15    we -- it was an ongoing effort to get these funds in

16    order.  Plus Paul Vanderplow, who handled the -- the

17    forfeiture funds, he allowed our department to come

18    back into compliance, because when we arrived there,

19    we were not in compliance with the forfeiture

20    accounts.

21       Q     What did you do by way of remedying or

22    rehabilitating the staff to make certain that this

23    didn't occur in the future?

24       A     Well, we handled -- we began to handle all

25    forfeiture transactions, which there weren't many, if

Page 151

1    just a couple.  So we didn't really have to remedy

2    anything with the police department staff, because no

3    one else handled it but pretty much Dir. Vanderplow.

4         Q    The next item mentions a ticket fixing

5    scheme for friends of law enforcement officers,

6    elected officials -- and elected officials.  Is this

7    the quote, unquote, "scheme" or "quota" that we

8    referenced earlier?

9         A    Yes.  This is the ticket fixing scheme

10   where, you know, thousands of tickets were dismissed.

11        Q    And your indication that this is a scheme,

12   is that based on the PowerPoint that you referenced

13   earlier?

14        A    No.  It's based on, you know, Sgt. Dotter

15   came to me and talked about how these tickets were

16   being dismissed.  I received information also from the

17   court administrators talking about tickets being

18   dismissed, and there was actually a scheme that

19   involved dismissing tickets at hearings, civil

20   and -- civil infraction conference hearings that were

21   monitored by police department employees and not the

22   court.

23        Q    Is it your contention that it's illegal at

24   that point to dismiss a ticket at the civil infraction

25   hearing?

Page 152

1       A     Depends how it's done, yes.

2       Q     Are you saying that all of the tickets that

3    were dismissed were illegally dismissed?

4       A     No.

5       Q     Did you take the effort to pinpoint which

6    ones were illegally dismissed, if any?

7       A     The -- yes, I -- I did.  Not all of them.

8    There was too many of them.  But a lot of them.

9       Q     And I'm sorry if I asked you this before.

10   Who did you report this quote, unquote, "scheme" to?

11      A     We reported it to the state police, and we

12   also reported it to the FBI.

13      Q     Was there any response from either of those?

14      A     Well, we met with them both, so I would

15   assume they're still being looked at.

16      Q     When was the last time you met with them?

17      A     I can't recall.

18      Q     At the time that you met with them, did

19   they -- start with the state police.  Did the state

20   police provide any indication as to what their

21   investigation or their followup would be?

22      A     No.  What I do is I turn the stuff over, and

23   I -- I leave it as a separate investigation, and I

24   have my internal investigation.  So whatever they do

25   with it is -- is what they do with it.

Page 153

1        Q    Who did you meet with at the state police?

2        A    Well, Lt. Ed Price was the person in charge

3   of the unit.  I can't recall what sergeant received

4   the case.

5        Q    All right.  Is it Ed Price that you met

6   with?

7        A    I know I spoke with Ed Price on the phone.

8   I met with Ed Price at least once at the police

9   department when he came by to pick up some -- a case.

10       Q    When you spoke with him when he came by to

11  pick up the case, was that a case related to the

12  complaint that you were making or something else?

13       A    I think it -- I can't recall exactly

14  which -- which time that was.

15       Q    When he came to pick up that case, did you

16  speak with him about the ticket fixing scheme?

17       A    We spoke with -- I spoke with him about all

18  the misconduct at the police department.

19       Q    Did he provide any followup to you from that

20  conversation?

21       A    We spoke every so often, and I would just

22  ask, "Hey, is this case still going on?"

23            "Yep."

24            And a lot of times it wasn't even -- it

25  hadn't even been assigned yet.  So I mean it would go

Page 154

1   six months, seven months without it even being

2   assigned.

3        Q    Who did you speak with at the FBI?

4        A    There was a team of people there at the FBI

5   that -- that we spoke to in person, and I can't

6   exactly recall what the -- all the agents' names.

7        Q    Where -- in what location did you speak with

8   them?

9        A    At the FBI headquarters in Detroit.

10            And, also, I mean I've talked to them in

11  parking lots.  I've talked to them all -- all types of

12  different locations.  Coffee shops.

13       Q    Were the parking lots and coffee shops

14  meetings or planned meetings?

15       A    Yeah, I signed a document stating I wouldn't

16  talk about it.  It was a federal document ordered by I

17  think a U.S. attorney.  So I don't know if I can

18  really talk about that.

19       Q    You signed a -- was it a confidentiality

20  document with regards to your --

21       A    -- investigations.

22       Q    In the City of Dearborn Heights?

23       A    It could have been anywhere.  I mean there's

24  investigations that go on across borders, but yeah.

25       Q    Okay.  Was that just with the FBI?

Page 155

1      A    Yes.

2      Q    Okay.  When did you sign that document?

3      A    I can't recall.

4      Q    Was it while you were working with --

5  employed with the City of Dearborn Heights?

6      A    Yes.

7      Q    Was it with regards to all documents or all

8  investigations that you had with the City of Dearborn

9  Heights?

10     A    I don't know.  We're going to have to

11  request that document, because I can't recall exactly

12  what it said.

13     Q    Do you have a copy of that document?

14     A    No.

15     Q    When you signed it, were you at the FBI

16  headquarters or in their offices?

17     A    No.

18     Q    All right.  Did they e-mail it to you, or do

19  you recall?

20     A    No.

21     Q    All right.  Do you recall what your position

22  with the chief -- or with Dearborn Heights was at the

23  time?

24     A    I believe I was director of police

25  operations.

Page 156

1      Q     All right.  Do you know why they asked you
2    to sign this document?
3      A     Because they didn't want me to talk about
4    what the investigation was.
5      Q     So in your complaint, you reference -- you
6    and your co-plaintiffs reference speaking with the FBI
7    about a number of -- or a number of issues:  civil
8    rights violations, I believe you just indicated the
9    ticket fixing quota.  So is it your belief that none
10   of these complaints that you reference in your
11   complaint or allegations that you reference in your
12   complaint with regards to reporting to FBI, that you
13   cannot -- you're not able to discuss them?
14     A     Well, I would like to clarify on that sheet
15   exactly what I can and can't discuss.
16              MS. HUNT:  All right.  I guess,
17   Mr. Brown, I'm going to ask if there can be some
18   clarification as to that, if you can take a look.  I
19   don't know if Mr. Swope has provided you with that.
20              MR. BROWN:  No, I don't have a copy.
21   I'll look at it, though.
22              MS. HUNT:  But I think we need to
23   figure out what can be discussed.
24   BY MS. HUNT:
25     Q     All right.  Is it your understanding that

Page 157

1    you are the only person within the Dearborn Heights
2    Police Department to sign one of these, or do you
3    know?
4         A    I don't know.
5         Q    One of these documents with the FBI.
6         A    I don't know.  We don't talk about it.
7         Q    When was the last time you communicated with
8    the FBI as it relates to a matter within the City of
9    Dearborn Heights?
10        A    I can't recall.
11        Q    All right.  Was it when you were with the
12   City of Dearborn Heights?
13        A    No.
14        Q    So after January of 2025, you've spoken with
15   them?
16        A    Oh, yeah.
17        Q    All right.  Is that in regards to matters
18   pertaining to the City of Dearborn Heights?
19        A    And -- and other areas around there, yes.
20        Q    When you say "other areas around there" --
21        A    I -- I don't know if I should be talking
22   about this.
23                  THE WITNESS:  What do you --
24                  MR. BROWN:  Well, if you're
25   uncomfortable, then don't.  We'll look at the

Page 158

1    document.

2                    MR. TURFE:  Can we look at it now and

3    just to get some clarity?

4                    THE WITNESS:  I think you'd have to

5    call the FBI to get it.

6                    MR. BROWN:  I don't have it.  This is

7    first I've heard of it.

8                    MR. MIOTKE:  He doesn't have it.

9                    THE WITNESS:  You know, the FBI

10   probably ain't going to give it to you.

11   BY MS. HUNT:

12       Q    Did they not provide you with a copy, or did

13   you just --

14       A    No, they didn't give me --

15       Q    -- use the copy --

16       A    -- they didn't give me a copy.

17                   MR. TURFE:  -- just take it on faith

18   that this document exists?

19   BY MS. HUNT:

20       Q    Did -- when you signed this document -- and

21   I believe I just asked you this -- do you recall where

22   you were when you signed the document?

23       A    I think, you know, this -- my -- I think my

24   safety's in danger when we're talking about, you know,

25   the FBI investigating people within the business

Page 159

1    community, right, and the -- the -- some powerful

2    people in the area.  And I don't think that, you know,

3    playing, you know, games where we're asking these tiny

4    questions to finally get an answer that I'm not going

5    to talk about is -- I think we're wasting some time

6    here --

7         Q    Well --

8         A    -- 'cause I don't think I can.  According to

9    that paper, I can't.

10        Q    Well -- in your complaint. you've listed

11   that these allegations, reports were made to the FBI,

12   and we've received nothing other than this -- until

13   this afternoon -- it doesn't appear your attorney was

14   aware of it -- that there was this confidentiality

15   regarding these issues.

16        A    I can speak on all these issues, all these,

17   100 percent.

18              MR. MIOTKE:  But for the record, we're

19   entitled to discovery on these issues.  So my sense

20   would be that we move from this issue, but understand

21   we're going to need to reopen the deposition after we

22   get clarification with regard to this, if that's what

23   we need to do.

24              MR. FARINHA:  You're going to have to

25   write the FBI -- he doesn't have to give it to you,

Page 160

```
 1    for his safety, just to put it on the record.
 2                    MR. MIOTKE:  That's -- that's --
 3                    MS. HUNT:  I think that --
 4                    MR. BROWN:  I agree -- I agree with
 5    the --
 6                    MR. MIOTKE:  -- they're not --
 7                    MR. BROWN:  -- I agree with the
 8    approach -- of just putting parentheses around this
 9    and moving on, and we can discuss it or litigate it or
10    do what we need to do at a later date.  And obviously,
11    if it later turns out that you were entitled to hear
12    about this stuff and you weren't, then I would also
13    agree that reopening the deposition seems like --
14                    MR. MIOTKE:  And I would also --
15                    MR. BROWN:  -- a reasonable thing to
16    do.
17                    MR. MIOTKE:  -- I would also note
18    that -- my sense would be you would not be able to
19    base any part of your claim on anything that we don't
20    have discovery on.  I think -- would that be your
21    position?  I mean that would be our position.
22                    MS. HUNT:  That would be my position,
23    and that may be a, you know --
24                    MR. BROWN:  Well, I mean you
25    could -- you could look inside your own files and --
```

```
                                              Page 161

 1                  THE REPORTER:  One at a time.

 2                  MR. BROWN:  -- you could look inside

 3     your own files and see what's on the City computer

 4     systems with respect to reports sent to the FBI.  You

 5     could do that, which you haven't.

 6                  MR. MIOTKE:  Well, but if it's a basis

 7     for the claim, then it needs to end up being able to

 8     be explored.  If it's not a basis for your claim,

 9     particularly if it's a -- say for example, "I spoke to

10     the FBI after I left the City of Dearborn Heights,"

11     and you know, it's not a basis for the claim, I would

12     be like, "Oh, well, who cares," because it couldn't

13     have affected anything in the first place.  But if it

14     is part of the basis for the claim, then it should be

15     able to be explored by counsel for the defendant and

16     for the intervening defendant.

17                  MR. BROWN:  Sure.  And we've just

18     discussed this, and I agree with your approach of

19     trying to find this document, if it exists, if we can

20     find it, if it's supplied by the FBI, then researching

21     whether or not it's a legal basis for shielding

22     information from you, and then handling future

23     discovery from the conclusions of that analysis.

24     That's all I can do.

25                  MS. HUNT:  Well, I will ask that
```

Page 162

1    plaintiffs do what they can to provide that document.
2    This is a quasi-privilege that, it sounds like, that's
3    being approached or invoked.  So we would request that
4    that is something that the plaintiff attempt to
5    provide or locate.
6                        MR. BROWN:  Sure.
7                        MS. HUNT:  Thank you.  And we will move
8    on now.
9                        And I'm going to move on by handing it
10   over to Mr. Miotke.
11                       MR. MIOTKE:  Okay.  Thank you.
12                            EXAMINATION
13   BY MR. MIOTKE:
14        Q    Mr. Swope, I just have some followup, a
15   bunch of follow-up questions with respect to questions
16   that were asked by Ms. Hunt.  I would add one more
17   thing to the list of rules, which is if you don't
18   understand a question that I ask, please ask me to
19   rephrase it and clarify it, because sometimes I do
20   that, sometimes other people do it, but I kind of get
21   ahead of myself sometimes.
22        A    Okay.
23        Q    So if you don't understand, please let me
24   rephrase.  All right?
25        A    Okay.

Page 163

1          Q     Okay.  What's your middle name?

2          A     Michael.

3          Q     Okay.  And you lived at some address in

4     Brighton, Some 5574.  I don't recall the exact

5     address.

6          A     Yes, Eggert.

7          Q     How do you spell that?

8          A     E-G-G-E-R-T.

9          Q     Okay.  And you live where now?

10         A     I live on Willow Oak Drive in Brighton,

11    Green Oak Township, Brighton mailing address.

12         Q     I see.  And with whom did you live at the

13    5574 address?

14         A     My wife and five -- or four kids.

15         Q     Including stepchildren and --

16         A     That's correct.

17         Q     Okay.  With whom do you live at the current

18    address?

19         A     My -- same, the same group of people.

20         Q     Same people?  Okay.  And you testified that

21    you're being paid $80,000 per year; is that correct?

22         A     That's correct.

23         Q     Okay.  Why did you leave South Haven?

24         A     I left South Haven for a few different

25    reasons.  The -- the number one reason was that I

```
                                              Page 164
 1    was ...
 2                    MR. BROWN:   Thanks, Amanda.
 3                    THE WITNESS:   So the number one reason
 4    was the fact that I could not afford to obtain
 5    housing, because I was going to use the payouts from
 6    Dearborn Heights to -- to purchase a home.   That's --
 7    that's the first reason.
 8                    And the second reason was because I had
 9    a family emergency with my mom, who fell down and
10    broke a bunch of bones and -- and whatnot, so I had to
11    be closer to help take care of her.
12    BY MR. MIOTKE:
13        Q    Okay.   Did either one of these things have
14    to do with any action taken by the City of South
15    Haven?
16        A    No.
17        Q    All right.   With regard to the payouts that
18    you've alleged are to be owed by the City, how much is
19    it that you believe you are owed?
20        A    Two hundred four thousand dollars.
21        Q    All right.   And that is for payout,
22    severance, or what?
23        A    So payout -- so salary.   So it's a
24    severance, according to the contract.
25        Q    So how many years of severance is that
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                              586-468-2411
                                              www.veritext.com

Page 165

1    supposed to be?

2        A    It's one.

3        Q    So what was your last salary?

4        A    Salary was $126,600.

5        Q    Okay.  And how do we get to $204,000?

6        A    Because I had vacation time banked.  I had

7    sick time banked.  I had all these different banks of

8    time, which gets paid out when you leave a -- when you

9    leave a City, and I still haven't received it.

10   Even -- you know, the City has supplied an e-mail that

11   states I should have been paid.  Ms. Monica Hunt sent

12   that.  I have a copy of it.  And I still haven't got

13   the money.

14       Q    All right.  Well, let me ask you this.  Of

15   that $204,000, how much of it is what you consider to

16   be severance and how much of it is what you consider

17   to be payouts, banks?

18       A    So the salary is 126, and then any -- the

19   contract -- contract also reads all benefits in which

20   would have been received, which is sick time, vacation

21   time, those type of banks.

22       Q    All right.  But you've also testified that

23   you've been receiving health insurance benefits.

24       A    That's in there, too.

25       Q    Okay.  Is that included within the $204,000,

Page 166

1    or is that something that's being paid by the City

2    that you're not including within the $204,000?

3        A    No, that's a separate section inside the

4    contract.

5        Q    Okay.  And when you say "within the

6    contract," if we could look at the contract that I

7    believe you're referring to, which would be Exhibit 8.

8    And if you could review it, and if you can do so

9    quickly, tell me what provision you're referring to.

10            Okay.  And just for the record, your

11   attorney helped you turn to the correct page; is that

12   correct?

13       A    Yeah.  I'm -- I'm reading it.

14       Q    What page is that, just so we ...

15       A    It looks like it's page 5.

16       Q    Okay.  Is it the top of page 5?

17       A    Yep, first paragraph.  Yeah, about midway

18   through, "City shall pay the COBRA premiums for the

19   medical, dental, and vision insurances for up to one

20   year."

21       Q    Okay.  All right.  So the City is not

22   currently paying that severance; is that correct?

23       A    That's correct.

24       Q    Do you know if the City budget ever provided

25   for such a severance?

Page 167

1       A     I don't know.

2       Q     Okay.  Do you understand that the Mayor only

3   has the authority to fix compensation or benefits

4   pursuant to a plan and a budget adopted by the City

5   Council?  Do you know --

6                 MR. BROWN:  Objection --

7   BY MR. MIOTKE:

8       Q     -- of any such thing?

9                 MR. BROWN:  Objection to form, calls

10  for legal expertise by a lay opinion, assumes facts

11  not in evidence, argumentative, misleading.

12  BY MR. MIOTKE:

13      Q     If you know or don't know, just tell me.

14      A     I don't know.

15      Q     Okay.  So -- and, actually, while we're

16  still here with this particular agreement, this is all

17  part of a paragraph, 4.1 that starts on page 4; is

18  that correct?

19      A     Yes, that's correct.

20      Q     Okay.  And this paragraph 4.1 says, at least

21  in part at the start, "Employee understands that

22  employment with the City is," quote, unquote, "'at

23  will,' and both the City and employee may terminate

24  the employment relationship at any time for any reason

25  with or without notice and with or without cause.  And

Page 168

1    wages earned shall be paid at the next payroll

2    session."

3                 You see that language that I just read; is

4    that correct?

5         A    That's correct.

6         Q    Did I read it correctly?

7         A    Yes.

8         Q    Okay.  Did you have any other understanding

9    other than that you were an at will employee at any

10   time that you were employed by the City of Dearborn

11   Heights?

12                 MR. BROWN:  Objection to form, calls

13   for a legal conclusion from a lay witness, misleading,

14   confusing.

15   BY MR. MIOTKE:

16        Q    What's your understanding?

17        A    Okay.  No.

18        Q    What do you mean?

19        A    I mean it was a yes/no question you asked,

20   and I answered no, so ...

21        Q    So you basically understood that you were an

22   at will employee?

23        A    Yes.

24        Q    All right.  And that was from the beginning

25   of the time that you started your employment with the

Page 169

1    City of Dearborn Heights until you ended your

2    employment with the City of Dearborn Heights; is that

3    correct?

4         A    Yes, that's correct.

5         Q    Okay.  And you gave some testimony

6    previously about union/non-union employee.  I kind of

7    want to clarify that.  Were you ever a member of the

8    Police Supervisors/Command Officers Union when you

9    were employed by the City of Dearborn Heights at any

10   point?

11        A    No.

12        Q    Okay.  Were you, as you understand it, ever

13   covered by the Collective Bargaining Agreement?

14                   MR. BROWN:  Objection to form, calls

15   for a legal conclusion from a lay witness.

16                   THE WITNESS:  In regards to -- covered,

17   yes.  My name is in there for the position of director

18   of police operations.

19   BY MR. MIOTKE:

20        Q    Well, you understand that if you are covered

21   by a Collective Bargaining Agreement and have a

22   concern about the terms and conditions of your

23   employment that you have an obligation to end up

24   grieving that within a certain time under the

25   Collective Bargaining Agreement; is that correct?

```
                                               Page 170

 1              MR. BROWN:  Objection to form,

 2     misleading question, assumes facts not in evidence,

 3     assumes legal expertise from a lay witness.

 4              THE WITNESS:  I think that our -- our

 5     matter has been sent to court and is being litigated

 6     as we speak, two years later.

 7     BY MR. MIOTKE:

 8        Q    Well, you worked for the City of Westland

 9     and the City of Detroit as patrol officer; is that

10     correct?

11        A    That's correct.

12        Q    Okay.  Did you ever at any point have any

13     sort of union membership when you were employed by

14     either the City of Detroit Police Department or the

15     City of Westland Police Department?

16        A    Yes, both.

17        Q    Okay.  Did you ever have any position as an

18     officer in any of the unions that you were part of?

19        A    Yes.

20        Q    What positions did you have?

21        A    So I was the vice president of the

22     Union -- Patrol Union in Westland, and I was also the,

23     I think treasurer maybe -- no, not treasurer,

24     secretary of the Westland Union as well.

25        Q    Okay.  In Detroit, were you ever an officer?
```

Page 171

1      A     No.  I was an officer, but I was not

2   on -- on any of the boards.  So I was not an officer

3   of the Union, no.

4      Q     Okay.  All right.  So during the time that

5   you were an officer in the Union, were you involved in

6   grievance administration?

7      A     Yes.

8      Q     Okay.  And you did understand that there

9   were requirements with regard to needing to file

10  grievances within a certain amount of time; is that

11  correct?

12              MR. BROWN:  Objection to form,

13  misleading question, assumes facts not in evidence,

14  assumes lay expertise from -- I'm sorry, assumes legal

15  expertise from a lay witness, argumentative.

16              THE WITNESS:  Yes.

17  BY MR. MIOTKE:

18     Q     Okay.  All right.  So in this situation, did

19  you have any belief prior to the time that this

20  lawsuit was filed that you had any obligation to file

21  any sort of grievance under the Collective Bargaining

22  Agreement pertaining to your employment with the City

23  of Dearborn Heights?

24     A     No.

25     Q     Okay.  Did you believe that the Collective

Page 172

1    Bargaining Agreement mentioned you and/or the
2    positions held by you as well as Paul Vanderplow as
3    well as individually Chief Hart as something that
4    would not be subject to grievance?
5                    MR. BROWN:  Objection to form, vague,
6    ambiguous.
7    BY MR. MIOTKE:
8        Q    Okay.  I'll clarify that, because it is not
9    a good question.  All right.
10                   So what was your understanding of your
11   obligation, if any, to grieve any adverse employment
12   action taken by the City of Dearborn Heights relative
13   to your employment as the director of police
14   operations?
15                   MR. BROWN:  Objection to form, calls
16   for a legal conclusion from a lay witness.
17                   THE WITNESS:  I did not believe that
18   the grievance procedure applied to us.  We believed
19   that our -- our procedure would be different.  That's
20   why we filed this lawsuit.
21   BY MR. MIOTKE:
22       Q    And you believe that it would be pursuant to
23   the different personal -- professional service
24   employment agreements that you had; is that correct?
25                   MR. BROWN:  Objection to form, calls

Page 173

1    for a legal conclusion from a lay witness.

2                    THE WITNESS:  So are we talking about

3    the contract between me and the City, or are we

4    talking about the contract --

5    BY MR. MIOTKE:

6         Q    All three of them.

7         A    Okay.  So the -- the contract between

8    the -- let's say the Supervisory Union and the City,

9    that wouldn't necessarily apply to us, other than the

10   fact that our positions were secured in the police

11   department, but the rest of it does not -- does not

12   apply.  Because I mean, it says right on the front of

13   it, you know, obviously, the -- the agreements between

14   those two parties, and we're part of the City's

15   administration.

16        Q    Right.  And as a matter of fact, you were

17   executive level employees; is that correct?

18        A    That's correct.

19        Q    All right.  So you understood that your --

20   and you still do understand that the terms and

21   conditions of your employment are based on the

22   Professional Services Employment Agreements that you

23   had with the City of Dearborn Heights; is that

24   correct?

25                    MR. BROWN:  Objection to form, calls

```
                                            Page 174
 1   for a legal conclusion from a lay witness.
 2                THE WITNESS:  Yes.
 3   BY MR. MIOTKE:
 4       Q    Okay.  And that's in part why you, for
 5   example, have based your lawsuit on these employment
 6   agreements; is that correct?
 7                MR. BROWN:  Same objection.
 8                THE WITNESS:  No.
 9   BY MR. MIOTKE:
10       Q    Okay.  Have you made any sort of
11   administrative claim with any agency of the State of
12   Michigan?
13       A    Yes.
14       Q    And with whom?
15       A    With the State of Michigan, it was a
16   claim -- wages and hours.
17       Q    Wage and hour division?
18       A    Yes.
19       Q    Under the department of labor?
20       A    That's correct.
21       Q    Okay.  And what does that claim pertain to?
22       A    Not being paid out a severance.
23       Q    Okay.  And that severance is what's
24   dictated, in your opinion, by Exhibit No. 8 that we
25   were just talking about; is that correct?
```

```
                                              Page 175

 1        A     Yes.  Yes.

 2        Q     And in particular, paragraph 4.1 that starts

 3    on page 4 and continues on to page 5 of Exhibit No. 8;

 4    is that correct?

 5        A     That's correct.

 6        Q     Okay.  Did you ever pay any union dues to

 7    the Police Supervisors or Command Officers Union in

 8    the City of Dearborn Heights?

 9        A     No.

10        Q     When you were employed by the City of

11    Westland, did you do so?

12        A     Yes.

13        Q     Okay.  Did you understand yourself to be a

14    member of the Collective Bargaining Agreement covered

15    by the supervisor's contract in the City of Westland?

16        A     Yes.

17        Q     Okay.  And just to clarify for a moment, the

18    City of Westland is an Act 78 Community; is that

19    correct?

20        A     That's correct.

21        Q     And it has been since well before you were

22    ever employed there; is that correct?

23        A     That is correct.

24        Q     Okay.  As a matter of fact, you were

25    selected through the Act 78 process in the City of
```

Page 176

1    Westland; is that correct?

2        A    That's correct.

3        Q    Were you interviewed by commissioners when

4    you ended up being hired?

5        A    Yes.

6        Q    Lynn Sonnenberg, by any chance?

7        A    No, I don't -- I don't believe so, no.

8        Q    Okay.  All right.  Charles Copeland?  Those

9    names don't sound familiar?

10       A    No.

11       Q    Okay.  We'll move on.

12       A    Yeah, no, sorry.

13       Q    I'm dating myself.

14            All right.  So you went through that

15   process, and then you became a patrol officer;

16   correct?

17       A    That's correct.

18       Q    Okay.  And what are the ranks -- at the time

19   that you left the City of Westland, what were the

20   various ranks within the police department among

21   MCOLES sworn peace officers?

22       A    So it was patrolman and then sergeant,

23   lieutenant, deputy chief, and then chief.

24       Q    Okay.  How many lieutenants were there?

25       A    Seven.

Page 177

1      Q    Okay.  And per the Collective Bargaining

2  Agreement that existed when you left between the City

3  of Westland and the Police Supervisors Union, what was

4  the process for selection of chief?

5      A    So the process for the selection of chief

6  was the same as the process for everyone else.  So it

7  was, they posted -- they posted -- it was pretty much

8  the same process as Dearborn Heights.  So they posted

9  the position.  They give you time to study -- or they

10  posted the position.  You applied.  Once they approved

11  you, you get a chance to study.  They set a date for

12  the test.  You take the written test.  Once you pass

13  that, you take the oral board test.

14          After that, they take all your scores, put

15  them together, and then the Commission then certifies

16  the list.  You end up one through whatever, and then

17  when a vacancy occurs, the top person gets the

18  position.

19      Q    Now, there was a chief who you spoke to

20  about the position in Dearborn Heights; is that

21  correct?

22      A    Yes.

23      Q    What was his name again?

24      A    Are you talking about Jerrod Hart?

25      Q    No, no, no, no.

```
                                          Page 178

 1        A    Oh, Jeff Jedrusik from Westland, yes.

 2        Q    Yes.  Okay.  Is he a friend of yours?

 3        A    Well, he was the chief.  I worked with him

 4   for a long time.  Now, I wouldn't call him a friend,

 5   but a really close work acquaintance.

 6        Q    Okay.  So, like, a work colleague for a long

 7   time?

 8        A    Yes.

 9        Q    Okay.  So professional but close as

10   colleagues; correct?

11        A    Yes.

12        Q    Okay.  And it seems kind of unusual that he

13   would speak to you about a position with a different

14   department.  Why do you think that happened?

15        A    Well, because I was talking about retiring,

16   just due to the fact that I was up for retirement,

17   'cause I had my Detroit time plus my Westland time.

18   That gave me my Act 88 retirement, so I could retire

19   and immediately collect a pension and then work

20   another job, and then get paid from that job as well.

21        Q    I see.  So rather than wanting to stay with

22   Westland, it would make more sense for you to start to

23   draw your pension and then to be actively employed

24   elsewhere; is that correct?

25        A    That's correct.
```

Page 179

1     Q    Okay.  And so at this time, you are

2  collecting a City of Westland Police Pension; is that

3  correct?

4     A    Yes.

5     Q    Okay.  Do you receive any sort of healthcare

6  benefits as well from the City of Westland?

7     A    No.

8     Q    Are you eligible to do so?

9     A    Yes.

10    Q    Okay.  Is there any reason you have not done

11 so?

12    A    Because I already have healthcare benefits.

13    Q    Through the City of Dearborn Heights?

14    A    Yes.

15    Q    Okay.  What's your understanding of when

16 those benefits through the City of Dearborn Heights

17 will cease?

18    A    January 9th.

19    Q    Of?

20    A    Of this coming up year.  So for the next

21 election period coming, like, October, I'll be getting

22 benefits from Westland, more than likely.

23    Q    I see.  Okay.  And that would cover you and

24 your dependents; is that --

25    A    That's correct.

Page 180

```
 1        Q    Okay.  So your plan to leave the City of
 2   Westland came down to an economic choice.  Is that
 3   fair or ...
 4        A    I would -- I would say so, yes.  Yeah.
 5        Q    All right.  When you were with the City of
 6   Westland, you were part of -- what was the name of the
 7   union for police supervisors?
 8        A    It was WPLA, so Westland Police -- or
 9   W -- Westland -- W-L-P-S-A, Police Supervisors
10   Association.
11        Q    Which is --
12        A    POAM.
13        Q    Oh, okay.
14        A    Through POAM.
15        Q    Right.  So for the record, that's just
16   P-O-A-M; correct?
17        A    That's correct.
18        Q    All right.  And they have their offices on
19   Troy Road; is that correct?
20        A    That's the one.
21        Q    Okay.  So when you ended up being a member
22   of that Union, you paid dues to them; correct?
23        A    That's correct.
24        Q    All right.  And as a lieutenant, you were a
25   member of that bargaining unit; is that correct?
```

Page 181

1        A      Yes.

2        Q      Okay.  Did you ever believe that you were a

3    member of the Supervisors Bargaining Unit in the City

4    of Dearborn Heights?

5        A      No.

6        Q      Okay.  So let's move on to another point

7    here.  Okay.

8               What was your intention in terms of -- I

9    mean, you took the position out in South Haven.  What

10   was your intention in terms of a living arrangement

11   with regard to that?

12       A      So my intention was to use the -- the

13   proceeds from my -- my severance, and then I was also

14   going to my -- sell my home up in Houghton Lake and

15   use both of those and purchase a home in South Haven.

16       Q      Okay.  And did you ever have discussions one

17   on one with the Mayor about the payment of severance?

18       A      Mayor Bazzi?

19       Q      That is correct.

20       A      Yes.

21       Q      And when do you recall those discussions

22   taking place?

23       A      It was that day.  I think it was

24   December 4th maybe.

25       Q      Okay.  Did you ever have any discussions

Page 182

```
 1   with him thereafter?
 2        A    I think I sent, like, some e-mails
 3   requesting to be paid.
 4        Q    Did he --
 5        A    I don't know if I talked to him verbally
 6   about it, but I know I sent e-mails to him and Cameron
 7   Eggly, and maybe even the comptroller.
 8        Q    And at that time, do you recall who the
 9   comptroller is since --
10        A    It was Shannon, Shannon -- gosh, I forgot
11   her last name.
12        Q    Okay.  But Shannon?
13        A    Yes.
14        Q    So we have at least have a name.  And at
15   that time, Cameron was the H.R. director; is that
16   correct?
17        A    That is correct.
18        Q    Okay.  Do you recall receiving any sort of
19   response to your request from the City?
20        A    Yes, a few different responses.
21        Q    And from whom?
22        A    Cameron Eggly.  At one point, he -- he sent
23   an amount that I was going to get in a check, and the
24   amount wasn't -- wasn't right.  So I said, "Hey, you
25   know, this isn't on there."
```

Page 183

1        And he goes, "Oh, yeah, you're right."  And

2    then he said, "I'm going to send it to the comptroller

3    to be paid."

4        And I didn't really hear anything back

5    since -- since then, really.

6        Q    Okay.  So how much did he say in that

7    letter, approximately?

8        A    It was like -- I'd have -- I mean, like,

9    once again it's on -- it's on the e-mails, but it's

10   like $167,000, I think is what it was.

11       Q    Okay.  Do you know what that was supposed to

12   include?

13       A    I'd have to check the e-mail.

14       Q    Okay.  And you said you received some

15   responses.  So you received a response from Cameron

16   Eggly.  Do you remember any other responses that you

17   received from the City?

18       A    At one point, I sent the Mayor an e-mail,

19   and I just asked him to check with the comptroller to

20   see when a check would be mailed or when a check would

21   be written or whatever I said.  And he -- it was a

22   very simple response, like, "Okay.  I'll check."

23       Q    Okay.  Do you recall any other

24   communications being received from either Mr. Eggly or

25   Mayor Bazzi with respect to this?

Page 184

1        A     Not -- not from those two.

2        Q     Anyone else?

3        A     I did receive one from Paul Vanderplow.

4        Q     Okay.  And who was Mr. Vanderplow speaking

5    on behalf of at that time?

6        A     I'm not sure if he was speaking on behalf of

7    anyone.  He was just relaying information that he

8    thought was important to me.

9        Q     Okay.  Was that by e-mail?

10       A     Yes.

11       Q     And that e-mail was sent to just you or to

12   more than just you?

13       A     I can't recall.  I think it was sent to me

14   and our attorneys.

15       Q     Okay.  Do you recall not what was stated by

16   Mr. Vanderplow, but was it a forwarded e-mail?

17       A     I can't recall.

18       Q     In other words, you had made mention that

19   Ms. Hunt had sent some sort of an e-mail.  Do you

20   recall that?

21       A     Oh, I get what you're saying now.  Yes, it

22   was -- it was an e-mail.  I don't know if it was

23   forwarded or if it was a copy and paste, but it was

24   definitely from Ms. Hunt.

25       Q     Okay.  So something in that communication

```
                                            Page 185
 1    had something from Ms. Hunt to someone who was still
 2    employed by the City; is that correct?
 3         A    Yeah.  It was sent directly to Director --
 4    or Paul Vanderplow.  He was on the chain.
 5         Q    Okay.
 6         A    Yeah.
 7         Q    And then he somehow or other forwarded this
 8    over to you --
 9         A    That's --
10         Q    -- and your attorney; correct?
11         A    -- that's correct.
12         Q    Okay.  You weren't an original recipient of
13    that e-mail, were you?
14         A    No.
15         Q    Was Mr. Brown or any other attorney
16    associated with him on that e-mail chain?
17         A    I don't know.
18         Q    Okay.  And so it contains some statement
19    made by Ms. Hunt, presumably in an attorney-client
20    privileged sort of matter; is that correct?
21                   MR. BROWN:  Hold on.  I'm going
22    to -- objection, assumes legal knowledge by a lay
23    witness.  And if a litigant is CC'd on an e-mail, it's
24    by definition not privileged.  The third party -- if
25    an opposing litigant is CC'd on an e-mail, it's by
```

Page 186

1  definition not a privileged e-mail.
2              MS. HUNT:  I believe it was a --
3              MR. MIOTKE:  This is something we
4  could -- I mean, now, let me finish, and then -- I
5  believe that, frankly, it was probably a privileged
6  communication, and I'm going to end up probably
7  objecting to any sort of admission of this.
8              Ms. Hunt?
9              MS. HUNT:  And I think part of your
10  question assumes -- I'm sorry -- assumes information
11  that's not in evidence.  And I think what -- we can
12  talk off record as to what that document was, but it
13  wasn't any information contained by me with regards to
14  what his indication is what he would be receiving.
15  But we can have that --
16              MR. MIOTKE:  Okay.  We can talk about
17  that.  Yeah, I just want to be clear that I'm not
18  going into this with the idea of trying to insist on
19  waiving any sort of privilege.  To me, it sounds like
20  it would be a privileged communication that someone
21  said, "Hey, I got this," and sent over.  But we'll
22  save that argument for another day.
23  BY MR. MIOTKE:
24     Q    Okay.  So were there any other
25  communications that you can recall beyond what you've

Page 187

1    already talked about with Mayor Bazzi, Cameron Eggly,

2    and this communication from Paul Vanderplow?

3         A    Not that I can recall, no.

4         Q    Okay.  With respect to the wage and hour

5    complaint with the Michigan Department of Labor, are

6    you represented by counsel with respect to that

7    particular matter?

8         A    I believe the way it was relayed to me is

9    that it is part of this litigation.

10        Q    Okay.  So has Mr. Brown or someone from his

11   firm filed an appearance in that matter?

12        A    No.  That matter has been dismissed.

13        Q    All right.  Was there some sort of

14   resolution with respect to that matter?

15        A    No.

16        Q    Was there a disposition with regard --

17        A    Oh, disposition, yes.

18        Q    What was the disposition?

19        A    They referred me to arbitration.

20        Q    So has there been some sort of arbitration

21   that's taking place with respect to that matter?

22        A    No.  I was advised by my attorneys that the

23   matter's being taken care of in this -- in this

24   lawsuit.

25        Q    All right.  So when you said "it was

Page 188

1    referred to arbitration," is it your understanding
2    that that was a recommendation that it be or was -- I
3    mean, I'm not sure how it was referred to arbitration.
4        A    No.   I -- I think it was basically stating
5    that the jurisdiction would be arbitration.   So
6    basically, it was a resolution saying, hey, you know,
7    we're not going to investigate this.   This should be
8    going to arbitration.
9        Q    Okay.   Did it say what the basis for
10   arbitration was?   Because I don't recall there being,
11   like, an arbitration provision in this agreement.
12       A    It was sent -- I would assume that the
13   resolution was -- or the --
14       Q    -- disposition?
15       A    -- the disposition was sent to the City as
16   well, since the complaint was on the City.   I also
17   supplied that to Mr. Brown so it could be entered into
18   this case one day.
19       Q    Okay.   All right.   So -- and the reason I
20   ask, and I understand that you are a layperson, but
21   you do have some familiarity with arbitration,
22   correct, from basically being a Union officer; right?
23       A    From one side of it, yes, yes.
24       Q    Okay.   And when I say that, you understand
25   that the reason why you have arbitration in union

```
                                            Page 189
 1    management matters is because of Collective Bargaining
 2    Agreements providing for arbitration; right?
 3                  MR. BROWN:  Hold on.  Objection to
 4    form, assumes expert opinion, expert legal opinion
 5    from a lay witness.
 6    BY MR. MIOTKE:
 7        Q    Okay.  Go ahead.
 8        A    I'm not sure.
 9        Q    Okay.  So my question is, was there anything
10    that the department of labor pointed to as authority
11    for the idea that it was supposed to go into
12    arbitration?
13        A    No.  It -- it was basically, we're not going
14    to review this.  The proper jurisdiction for this is
15    arbitration.
16        Q    Okay.  All right.
17        A    And that was based off all the documents I
18    sent them, which is pretty much the stuff we're all
19    looking at here today.
20        Q    Okay.  All right.  You said that you've
21    spoken to your wife and/or children with regard to
22    these particular matters, this complaint.  Do you
23    recall giving that testimony?
24        A    Not children, but wife.
25        Q    Okay.  When you spoke to your wife about
```

Page 190

```
 1    these matters, was anyone else present other than an
 2    attorney representing you?
 3        A    I don't know if I've talked about the actual
 4    case, but just how miserable Dearborn Heights was.  I
 5    think that's what I was talking about.
 6        Q    Okay.  And I don't want to know the content
 7    of the communications between you and your wife.
 8        A    Yeah, right.
 9        Q    What I'm looking at is who you spoke to --
10        A    So no.  The answer is no.  No one was -- no
11    one was there other than my wife.
12        Q    Okay.  All right.  You graduated from Garden
13    City East?  Garden City West?  Garden City?  When?
14        A    It was -- when it was just the one high
15    school, Garden City High School.  They got rid of the
16    east and west thing.
17        Q    Dating myself once again.  So what year was
18    that again?
19        A    1996.
20        Q    Okay.  And you got your college degree in
21    2024; is that correct?
22        A    That's correct.
23        Q    All right.  Prior to that, you had training
24    through the police departments and went to the police
25    academy; is that correct?
```

Page 191

1        A    That's correct.

2        Q    Any other training, education, staffing,

3    command school, anything else like that?

4        A    Yeah, I went to Eastern Michigan Staffing

5    Command.  That's -- that's probably the highest level

6    of -- of training that I went to in my career.  But I

7    mean, I've gone to, you know, new -- new -- you know,

8    new police chief executive school.  I've been to -- I

9    mean, Westland we were really heavy in training, so I

10   mean, we were in training all the time.  I used to be

11   the accreditation manager, so a lot of accreditation

12   training for CALEA.  So just a bunch of different

13   trainings, yeah, lots.

14       Q    Okay.  When did you attend Staffing Command

15   school at EMU?

16       A    2017, I think it was, yeah.

17       Q    Okay.  And I guess I have a question.  Since

18   you were familiar with Act 78 and went through Act 78

19   to become employed in Westland, what was your

20   understanding of the process for you to end up being

21   hired in the City of Dearborn Heights?

22            MR. BROWN:  Objection to form, unfair

23   characterization of previous testimony.

24            THE WITNESS:  So my --

25   //

Page 192

1   BY MR. MIOTKE:

2        Q    Well, I'm going to push back on that for a

3   moment, so I'm going to withdraw my prior question.

4             While you were employed by the City of

5   Westland as a police officer and a police supervisor,

6   you gained familiarity with Act 78 and how it was

7   supposed to be handled; is that correct?

8        A    Yes.

9        Q    Okay.  And did you know that the City of

10  Dearborn Heights was an Act 78 Community at or before

11  the time that you were hired as a director in Dearborn

12  Heights?

13       A    I didn't know, because I -- I wasn't too

14  familiar with Dearborn Heights.

15       Q    Okay.  So when did you become aware that

16  Dearborn Heights was an Act 78 Community?

17       A    Probably during my -- the time when I was

18  sort of offered the job or asking about the job, right

19  around that particular time.

20       Q    All right.  And who did you learn that it

21  was an Act 78 Community from?

22       A    Well, I just sort of, you know, did some

23  research and looked at all the -- you know, some of

24  the things that were online.  I don't know if I

25  necessarily asked about it, because in my mind, the

Page 193

1    Mayor has the authority to, you know, appoint

2    his -- his people.  Because every community is

3    different, you can adopt different rules for Act 78.

4    So in my mind, because I'm a rule follower, is I was

5    brought in legally -- you know, my contract is

6    negotiated legally -- and I was put in a position that

7    I was allowed to have.

8         Q    Okay.  So would it be fair to characterize

9    your answer as, to the best of your understanding, you

10   were hired legally and assumed that you were?

11        A    Yes, sir.

12        Q    Okay.  Now, when you ended up starting with

13   Dearborn Heights, you became aware that the Police

14   Supervisors Union and the Patrol Officers Union,

15   however, did not view what the Mayor did as being

16   appropriate; is that correct?

17        A    That's correct.

18        Q    All right.  You are aware that there were

19   actually grievances that were filed with regard to

20   your hiring, Chief Hart's hiring, and Mr. Vanderplow's

21   hiring; is that correct?

22        A    That's correct.

23        Q    You were also aware that ultimately they

24   filed a lawsuit -- and when I say that, I'm talking

25   about the police unions filed a lawsuit against Mayor

```
                                            Page 194
 1    Bazzi and the City with respect to your hiring?
 2        A    That's correct.
 3        Q    Okay.  And that essentially the Collective
 4    Bargaining Agreement between the Police Supervisors
 5    Union and the City that's referenced in your complaint
 6    that was adopted sometime in early 2023 put those
 7    grievances in that litigation to bed; is that correct?
 8        A    That is correct.
 9        Q    Okay.  Okay.  Having come from an Act 78
10    Community, would it strike you as being surprising
11    that your being hired from the outside would be
12    upsetting to people?
13        A    No, no.
14        Q    Okay.  So you would understand how they
15    would be upset; is that correct?
16               MR. BROWN:  Objection to form, calls
17    for speculation as to what other people think and
18    feel.
19               THE WITNESS:  Yes.
20    BY MR. MIOTKE:
21        Q    Okay.  And were you aware of any other
22    issues that had arisen before the time that you became
23    employed by the City of Dearborn Heights that
24    pertained to the City's police department?
25               MR. BROWN:  Objection to form,
```

Page 195

1    ambiguous question, vague.

2                    THE WITNESS:  There's a laundry list of

3    things that were -- that are on the master timeline

4    that we talked about earlier that, you know, I read.

5    So I understand that there were some issues, some

6    property room issues.  There was a lot of, like,

7    harassment between people, amongst the officers and

8    whatnot, so yes.

9    BY MR. MIOTKE:

10       Q    All right.  Do you recall at any time

11   hearing that there were concerns expressed by members

12   of the public at City Council meetings with respect to

13   how the police department was being operated or how it

14   was doing in general?

15       A    At what point?

16       Q    Prior to the time that you were hired.

17       A    I don't know about performance-wise, but

18   I -- I do know that there was some discussions over,

19   you know, Mark Meyers and how he got let go and not

20   let go, but I don't know exactly about the

21   performance, what was talked about at Council

22   meetings, about how the P.D. was being operated.  I

23   have no clue.

24       Q    So how did you learn about the issues with

25   former Chief Myers?

```
                                              Page 196

 1      A    Well, just from, you know, speaking with,
 2  you know, people who worked at the police department
 3  or even in the City, Mayor Bazzi and Chief Hart.
 4           Also, I mean, just googling the situation,
 5  you know, looking at it online, reading news articles,
 6  and then speaking with, you know, Act 78
 7  Commissioners.  So all different types of ways.
 8      Q    Okay.  What do you recall Mayor Bazzi saying
 9  to you about Mark Meyers and the end of his
10  employment?
11                 MS. HUNT:  Object as to form.
12                 THE WITNESS:  I just remember, you
13  know, Mayor Bazzi talked about how, you know, Mark
14  Meyers wasn't doing a good job.  The police department
15  wasn't, you know, operating appropriately.  There was
16  a lot of, you know, corruption.  There was -- you
17  know, the -- the police department building wasn't
18  being taken care of.
19                 And, you know, obviously with -- with
20  Mark Meyers being the chief of police, I think that's,
21  you know, why Mayor Bazzi got rid of him, according to
22  our conversations.
23  BY MR. MIOTKE:
24      Q    Okay.  Did he ever -- did the Mayor, that
25  is, ever say anything to you about why he did not
```

```
                                          Page 197
 1    follow the Act 78 process and have anyone attend the
 2    hearing on behalf of the City?
 3                    MR. BROWN:  Object --
 4                    MS. HUNT:  Object as to -- object as to
 5    form.  Go ahead.
 6                    MR. BROWN:  Objection to form, assumes
 7    facts not in evidence.
 8                    THE WITNESS:  No.
 9    BY MR. MIOTKE:
10        Q    Okay.  Do you know that Mark Meyers ended up
11    attending the Act 78 hearing where his dismissal was
12    supposed to be considered, and there was an article in
13    the local newspaper about that?
14                    MR. BROWN:  Objection to form,
15    misleading question, assumes facts not in evidence,
16    foundation.
17                    THE WITNESS:  I heard that, but I can't
18    confirm anything that happened that day.
19    BY MR. MIOTKE:
20        Q    Do you -- well, did you ever review any
21    article online about him attending?
22        A    I think I seen a picture of him there in the
23    newspaper, but I can't exactly remember what was in
24    the news article.  But I do remember seeing that, yes.
25        Q    Did that article also mention that he was
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

                                    Page 198

1    supposed to be reinstated per order of the Act 78

2    Commission?

3         A    Yes.

4         Q    Okay.  And what was your thinking with

5    respect to that?

6         A    Well, I -- I didn't know what was going to

7    happen.  You know, I was sort of concerned about my

8    job security at that point in time, because, you know,

9    when I took the job and came to the City and actually

10   retired from -- from Westland, I didn't know exactly

11   what I was walking into.  And when I got here -- or

12   when I got there, it -- it wasn't exactly what I

13   thought I was going to be.

14        Q    All right.  So when you ended up getting

15   into the City employment, you understood that it was a

16   contentious situation between the police

17   administration and management and the police unions;

18   is that correct?

19              MR. BROWN:  Objection to form,

20   ambiguous, vague.

21              THE WITNESS:  I could tell that there

22   was a disagreement about the process of how we were

23   brought in and how the chief was brought in, and how

24   Mike -- Mark Meyers was dismissed.

25   //

Page 199

1    BY MR. MIOTKE:

2        Q    Okay.  And you're aware that these issues

3    were never really dealt with completely; is that

4    correct?

5                MR. BROWN:  Same objection.  Objection

6    to form, ambiguous, vague, complex, confusing, assumes

7    facts not in evidence.

8                THE WITNESS:  I don't know if they've

9    been resolved or not since I've been gone, but I do

10   know it was an ongoing process for my entire tenure

11   there.

12   BY MR. MIOTKE:

13       Q    Right, including during the time that

14   Hussein Farhat was purportedly made deputy chief; is

15   that correct?

16                MR. BROWN:  Same objection as the last

17   one.

18                THE WITNESS:  Yes.

19   BY MR. MIOTKE:

20       Q    All right.  And as a matter of fact, the

21   Mayor, as I understand it, originally tried to make

22   Mr. Farhat a new director of police operations in your

23   place?

24                MR. BROWN:  Are you asking the witness

25   to confirm what you understand, sir?

```
                                            Page 200
 1              MR. MIOTKE:  Yes.
 2              MR. BROWN:  Well, that's impossible.
 3    Objection to form.
 4              MR. MIOTKE:  Okay.
 5              THE WITNESS:  Yeah.  Yes.  He was
 6    originally going to be brought in under director of
 7    police operations and was -- and he ended up a deputy
 8    chief.  But it was just semantics, truly, by name,
 9    because he was going to do the same job.
10    BY MR. MIOTKE:
11         Q    And the Command Officers Union ended up
12    filing an unfair labor practice with MERC regarding
13    that; is that correct?
14         A    Correct.
15         Q    And MERC, for the record, is M-E-R-C;
16    correct?
17         A    As far as I can remember, yes.
18         Q    Okay.  And they also filed a grievance; is
19    that correct?
20         A    I think they filed multiple grievances, but
21    yes.
22         Q    Okay.  Were you ever asked to testify with
23    respect to that grievance?
24         A    No.
25         Q    Do you -- have you ever heard what the
```

Page 201

1    disposition of that grievance was?

2       A    I thought they were all dismissed upon when

3    I left.

4       Q    All right.  Do you ever recall there being

5    an arbitration opinion that among other things ended

6    up saying that the City had to pay a thousand dollars

7    to the Union?

8       A    No.  No.  That must have happened after I

9    left.

10      Q    Okay.  So you're not aware of any opinion

11   and award of arbitrator dated June 18, 2025, with

12   respect to this issue of Mr. Farhat allegedly being

13   promoted; is that correct?

14      A    No, that's correct.

15      Q    Okay.  Did you ever speak -- strike that.

16           You were aware that a decent number of

17   officers and supervisors left the P.D. during the time

18   that Jerrod Hart became the chief in Dearborn Heights;

19   is that correct?

20               MR. BROWN:  Objection to form,

21   misleading question, calls for speculation, unfair

22   characterization.

23               THE WITNESS:  Yes.

24   BY MR. MIOTKE:

25      Q    Okay.  Do you have any notion of how many

Page 202

1    officers left between the time that Chief Hart became

2    the chief and the time that he left the department?

3         A    I do not.  I could not tell you that.

4    There's documentation on it, 'cause I've done reports

5    on it that I do not have, that could be located, you

6    know, on -- on probably the computer I had.  But we

7    hired a lot more than we lost at some point since I've

8    been there, since I was there.  Starting January of

9    2023, we hired more than we lost.

10        Q    Okay.  So during your tenure, more were

11   hired than lost in terms of -- so more were recruited

12   than ended up leaving the department during the time

13   period that you were there; is that correct?

14        A    Correct.

15        Q    But you're not sure necessarily how that was

16   working out prior to?

17        A    There is a list of people, and I mean, it's

18   a big list, but I don't have that information in my

19   head.  But it -- it is available on my documentation.

20        Q    Do you have a recollection of approximately

21   how many employees left?

22        A    I wish I could tell you.  I -- I don't know.

23        Q    Okay.  All right.  Was it your understanding

24   that there was a traffic bureau in the police

25   department before Jerrod Hart became the police chief?

```
                                             Page 203
 1        A    Yes.
 2        Q    Was it your understanding that there was a
 3   SWAT team in the police department before Jerrod Hart
 4   became the police chief?
 5        A    Yes.
 6        Q    Was it your understanding that the detective
 7   bureau lost several of its investigators who had to go
 8   out on the road to work patrol after Jerrod Hart
 9   became the chief?
10             MR. BROWN:  Objection, assumes facts
11   not in evidence, misleading.
12             THE WITNESS:  I can't -- I'm not sure
13   how many people were there before Chief Hart got
14   there.
15   BY MR. MIOTKE:
16        Q    Okay.  But when you were there, I mean,
17   basically wasn't it only Lt. Guzowski and Sgt. Derwick
18   who were in the detective bureau as MCOLES licensed
19   peace officers?
20        A    For a moment, but not long.  We ended up
21   putting a lot of people up -- they had a nice, healthy
22   amount of people up there by the time I left.  But
23   at -- at some point in time, there was a small group
24   of people.
25        Q    Okay.  Do you recall any of the other
```

Page 204

1   people?  Were they promoted, or did you just bring in

2   people from the outside?  How did you repopulate the

3   detective bureau?

4         A     With the agreement that was the police

5   officer's contract allowed for police officers to be

6   placed into the detective bureau rather than just

7   sergeants.  So police officers were able to lateral

8   into the police -- or, I'm sorry, into the detective

9   bureau.

10        Q     Did that lead to any sort of grievances?

11        A     Yes.

12        Q     Okay.  In other words, weren't you supposed

13  to be a sergeant or the rank of sergeant or above to

14  end up being in the detective bureau?

15        A     So there's conflicting contracts on that.

16  So the sergeant's contract says yes, and then the

17  patrol contract says it could happen.  So there's

18  conflicting information there.

19        Q     Okay.  All right.  And did the individuals

20  who ended up being selected as officers who were going

21  to be assigned to the detective bureau, did they go

22  through any sort of testing or any sort of competitive

23  process under Act 78?

24        A     No.  It wasn't a promotion.  It was a

25  lateral position.

Page 205

1      Q    So you considered that within management
2  rights to do that?
3      A    Yeah.  So they interviewed for the position,
4  and the best candidates were chosen.
5      Q    Okay.  I don't want to get into this too
6  much, because it's my understanding that this is part
7  of the reason for the Twardzik lawsuit.  Am I correct
8  about that?
9      A    Yes.
10     Q    Okay.  And do you know if you are a named
11 defendant in that lawsuit or not a named defendant in
12 that lawsuit?
13     A    I was, but I'm not anymore.  They dismissed
14 me from the lawsuit.
15     Q    All right.  When you say you were dismissed
16 from the lawsuit, was that because the whole lawsuit
17 settled, or -- if you know.
18     A    I don't -- I don't know.  Andrea Pike called
19 me and said, "If anyone asks you about it, you're
20 dismissed.  Don't worry about it."  And I don't know
21 what happened after that.
22     Q    Okay.  All right.  So you are not aware of
23 any terms of any sort of settlement or resolution?
24     A    No, I'm not.
25     Q    Okay.  All right.  Have you ever been a

Page 206

1    party -- I know Ms. Hunt asked about this.  Have you

2    ever been a party to any sort of lawsuit, including

3    divorce proceedings, bankruptcy proceedings, any sort

4    of legal proceeding whatsoever, other than this

5    lawsuit and Twardzik lawsuit, as far as you know?

6         A    My divorce, I think it was 2005.  But other

7    than that, legal proceedings, no.

8         Q    Okay.

9         A    I mean, there's my son's conservatorship;

10   right?  I guess that's, like, a civil-type --

11        Q    Right.

12        A    -- civil-type thing.  But it's not, like, a

13   lawsuit or anything like that, so ...

14        Q    So is that something through Wayne County

15   Probate Court or --

16        A    Yes.  Yep.

17        Q    Okay.  So is it Wayne County or is it

18   Livingston County?

19        A    No, it was Wayne County, 'cause I used to

20   live in Wayne County.

21        Q    I see.  Okay.  Are you still your son's

22   conservator?

23        A    No, no.  He's -- he was just little.

24   He's -- he's 25 now, so ...

25        Q    Oh, okay.  So was he, like, injured in an

Page 207

1    accident or something like that?

2         A    No.  His -- his mother was killed.

3         Q    I'm sorry to hear that.

4         A    And we were divorced, so we had to -- there

5    was a conservatorship so I could take care of, like --

6         Q    -- her estate?

7         A    -- his financial stuff, and -- I didn't

8    handle her estate.  Her mother did.  But for him to be

9    able to then manage, be the trustee and everything, I

10   had to be the conservator as well.

11        Q    All right.  Because there was over $5,000 in

12   value, and you had to be a conservator for him?

13        A    That's -- that's correct.

14        Q    All right.  And at that time, he was a

15   minor; is that correct?

16        A    That's correct.

17        Q    Okay.  All right.  You've used the term

18   "interim police chief, acting police chief, police

19   chief."  I'm trying to clarify that, because my

20   understanding is, is that former-Chief Hart was on and

21   off duty at various points.  Was he on and off duty at

22   various points?

23        A    Yeah --

24             MR. BROWN:  Objection to form,

25   contains -- misstates prior testimony, assumes facts

Page 208

1    not in evidence.

2              THE WITNESS:  Yes.

3    BY MR. MIOTKE:

4        Q    All right.  So during the time that you were

5    a director, approximately how many times did you act

6    as either an interim police chief or an acting police

7    chief?

8        A    So acting police chief, I would say six

9    times maybe.  And a lot of times, what happens is when

10   the chief of police leaves for the weekend and they go

11   on vacation or something, they'll name an acting

12   police chief just in case something happens.  That's

13   the point of contact for any type of major emergency.

14       Q    Okay.  All right.  So other than those

15   weekend situations, how many times, if any, were you

16   the acting or interim police chief?

17       A    I think there was two different -- two other

18   occasions where Chief Hart had some medical issues

19   where I became the -- the acting police chief for a

20   longer period of time.  I can't remember how -- how --

21   I know you're going to ask how long, but I can't

22   necessarily tell you that.  It was -- it was maybe a

23   month or so at least.

24       Q    Okay.  And was there any difference between

25   acting police chief and interim police chief?

Page 209

1        A     No.  So interim police chief is basically
2    the chief is gone, and there's no police chief to tell
3    you that you're acting; right?  So you're now
4    the -- the police chief until the Mayor hires someone
5    full time or hires someone as police chief.
6        Q     Okay.  So you were acting police chief
7    during former-Chief Hart's tenure two occasions, and
8    then you became interim police chief when he left;
9    correct?
10       A     That's correct.
11       Q     Okay.  Now, when Exhibit 4 was submitted --
12   you got it in front of you, by any chance?
13       A     Oh, okay.
14       Q     Okay.  When it was submitted, you were the
15   director of police operations; is that correct?
16       A     That's correct.  Jerrod's initials are on
17   that form there.
18       Q     Okay.  But was there a delay between the
19   time that this was submitted by you to the Mayor and
20   copied to former-Chief Hart and the time that it
21   actually got onto a City Council agenda?
22       A     I don't know.  I mean, if it was sitting
23   maybe prepared as a motion waiting for a next Council
24   meeting.  I'm not exactly sure if there was a delay.
25   I can't recall one.

Page 210

1       Q    Well, let's help you out, then, with that.
2  I'll do this.  Okay.  I don't remember where we left
3  off.
4                  MS. HUNT:  I think this is 13.
5                  MR. TURFE:  Should be 13.
6                  MR. MIOTKE:  13.  I know it's unlucky.
7                  (Exhibit 13 was marked for
8                  identification.)
9  BY MR. MIOTKE:
10      Q    Yeah.  And I want to make sure that
11 whichever one is there -- I think I had four of them.
12                 MR. TURFE:  Yeah, I gave two --
13                 MR. MIOTKE:  Oh, I'm sorry.
14 BY MR. MIOTKE:
15      Q    All right.  Okay.  Do you have Exhibit 13 in
16 front of you?
17      A    Yes.
18      Q    Okay.  And if you would please look at the
19 second page of Exhibit 13 and look at item 9-B under
20 "Reports from City Officials."
21      A    Okay.  Got it.
22      Q    All right.  Okay.  Do you recall this item,
23 namely, this training that was supposed to take place
24 in Massachusetts -- which I guess we could just call
25 PERF, P-E-R-F, all caps -- do you remember it being

Page 211

1    added to a City Council agenda as a separate item from

2    the rest of the claims?

3         A    I don't recall that.

4         Q    Okay.  Do you recall attending a meeting

5    where it was discussed and where the City Council

6    ended up having a vote of three to three with respect

7    to this item?

8         A    I don't know if I was there, but I do know

9    that that happened.

10        Q    Okay.  All right.  Let's try to help you out

11   a little bit more.  Let's go with, what are we on, 14

12   now?

13                  MR. TURFE:  Yes.

14                  MR. MIOTKE:  All right.

15                  (Exhibit 14 was marked for

16                  identification.)

17                  MR. FARINHA:  You didn't make a copy --

18                  MR. TURFE:  He only had four of them,

19   so I figured I've give one to the witness.

20   BY MR. MIOTKE:

21        Q    Okay.  So do you have Exhibit 14 in front of

22   you?

23        A    Yes.

24        Q    All right.  And if you could turn to the

25   second page and look under the listing under 38.

```
                                            Page 212

 1        A    Yeah.  Got it.

 2        Q    Do you see that?

 3        A    Yes, I do.

 4        Q    All right.  And it seems like PERF-C/OSMIP,

 5   $10,600 has been crossed out.  Do you see that?

 6        A    Yes.

 7        Q    Okay.  And if you go to the first page at

 8   the -- toward the bottom, above the boxes that have

 9   all the different claims, there's a reference to

10   motion by Councilman Ahmad, seconded by Councilman

11   Saab to approve current claims in ACH/wire transfers

12   61 through 655 as submitted, with the removal of

13   claims 636 and 639 and the removal of 638 that'd be

14   re-added to the agenda as item 9-B so that it may be

15   considered separately.

16             Do you see that?

17        A    Yes.

18        Q    Okay.  So does this refresh your

19   recollection about these events having to do with this

20   particular item?

21        A    It does, but I don't know if I was there or

22   not.

23        Q    Okay.  Do you recall ever watching a City

24   Council meeting?

25        A    Yes.
```

Page 213

1          Q     And do you recall for this particular day?
2          A     I -- I wish I could tell you.  I -- I most
3     likely watched this, though, because I had -- I had an
4     item on the agenda to be approved.
5          Q     Okay.  Well, I guess the question is, since
6     I just watched this video, I'm wondering if you have
7     any recollection of having attended a meeting where
8     this item was discussed on May the 28th of 2024.
9          A     No, it says I wasn't -- it doesn't even list
10    me as being there, so I must not have been there.
11         Q     Yeah, I know it doesn't list you, but if you
12    were to watch the meeting, do you have any
13    recollection of appreciating the discussion that this
14    was a competitive exam if only four classes, a lot
15    didn't go, and then Council Chair Baydoun said
16    something about the Mayor and Roger being excited?
17    And then you said something about probably a lot
18    disappointed who didn't go?  And you said something
19    along the lines of the DOJ doesn't have a huge budget,
20    but, you know, this is the type of training that could
21    save us millions of dollars, and we got a million
22    dollars in our forfeiture?  Does any of that sound
23    familiar to you?
24               MS. HUNT:  I'm going to object as to
25    form, and -- I'll leave it there.

```
                                        Page 214

 1              MR. BROWN:  I'm also going to object.

 2      It's beyond compound.  It's confusing.  It's

 3      ambiguous.  It assumes facts not in evidence,

 4      misleading.

 5      BY MR. MIOTKE:

 6          Q    Well, I'm just trying to see if any of this

 7      helps you remember this, because ...

 8          A    It does not.

 9          Q    Okay.

10          A    I mean if I'm on camera saying it, then I

11      said it.

12              MR. MIOTKE:  All right.  Yeah, that's

13      right.  Oh, yeah.  Actually, I don't know that we can

14      make this an exhibit, but let's go to -- where are we

15      on that, Tarik?

16              MR. TURFE:  It's going to be ...

17              MR. MIOTKE:  -- 1:17:54?

18              MR. TURFE:  Yes.

19              MR. MIOTKE:  Okay.

20              MR. TURFE:  Of the --

21              MR. MIOTKE:  -- 5/28/2024 meeting.

22              THE WITNESS:  Okay.

23              MR. BROWN:  Hold on.

24              MS. HUNT:  Perhaps, Gary, can you put

25      your microphone near it, so that the court reporter
```

Page 215

1    can take it?

2                    MR. MIOTKE:  Okay.

3                    THE REPORTER:  May I -- may I

4    interrupt?  You are -- you can make it as an exhibit,

5    if you would like.

6                    MS. HUNT:  Okay.

7                    MR. MIOTKE:  We can make it as an

8    exhibit?

9                    THE REPORTER:  Yes.  You could send it

10   via e-mail.

11                   MR. MIOTKE:  I'm not sure -- Tarik

12   probably knows how to do it better than I do.

13                   MR. TURFE:  It's a nearly four-hour

14   video, and we're going to reference just a couple of

15   minutes, but we will have it into the record via the

16   microphone.

17                   MR. MIOTKE:  Yeah.  Right.  Maybe just

18   play what he's saying.  I don't remember when he

19   starts, but ...

20                   MR. TURFE:  This should be right about

21   then.  If not, we can go back.

22                   MR. MIOTKE:  Yeah --

23                   MS. HUNT:  What was that time again?

24                   MR. TURFE:  I have it marked at

25   1:17:54.

```
                                           Page 216

1                MR. MIOTKE:  Right.  And I think the

2       discussion starts around 1:08:40, with me ending up

3       giving a long glob of advice to the City Council.

4                So if we just play a little bit of the

5       witness and see if this helps refresh his

6       recollection.  If not, we're probably going to not ask

7       a lot of questions about this, because if you don't

8       have a recollection about it, there's no point.

9                (Video played.)

10               "MR. SWOPE:  He's back again; right?  I

11      appreciate you guys bringing it to a discussion.

12               "UNIDENTIFIED SPEAKER:  Yeah.

13               "MR. SWOPE:  So I guess one of the

14      questions, or one of the concerns is the fact that,

15      you know, was my competition, you know, one, you know,

16      out of a hundred?  I don't know.  You know, I couldn't

17      tell you that; right?  But what I can tell you is that

18      the competition to get in to the training, there's --

19      there's a waitlist; right?  There's not -- everyone

20      who -- who has to go, they don't get to go; right?  So

21      they have to choose one way or another to -- to say,

22      'Hey, you, you're going'; right?  And then they create

23      a waitlist for everyone else.

24               "So throughout the -- the history of

25      this training, there's only so many people that have
```

Page 217

1   ever went; right?  Therefore, that means that for you

2   to go, it's competitive; correct?  Because if they

3   only have four classes per year, and it's been going

4   on for 40 years, there's a lot of people who didn't

5   have an opportunity to get to this class."

6                   MR. MIOTKE:  Why don't we stop there.

7   BY MR. MIOTKE:

8       Q    All right.  Does this help refresh your

9   recollection or -- like, if I'm going to ask questions

10  and you say you'd just have to watch the video, I

11  don't want to waste everyone's time with that.

12               Do you have any independent recollection

13  right now of having attended this meeting and spoken

14  on this?

15      A    I do.

16      Q    All right.  Do you have any recollection of

17  anyone else speaking with respect to this matter,

18  including myself, Councilman Saab, Council Chair

19  Baydoun, Councilwoman Bryer?  Do you have any

20  recollection of any of that?

21      A    No.  That just refreshed my recollection on

22  what I said.

23      Q    Okay.  All right.  All right.  So I'm going

24  to move on from this just because.  But I would still

25  move back to Exhibit 14 for a moment.  Go to the

Page 218

1    fourth page and have you look at item 24-228.  Just
2    read that to yourself, and then after you've done so,
3    let me know that you're done.
4         A     I'm done.
5         Q     Okay.  So does reading this particular text
6    with regard to Motion 24-228 help you recall how this
7    matter was handled by the City Council ultimately?
8         A     Yes.  It was similar to other matters that
9    were handled -- handled by City Council the same way.
10        Q     Okay.  All right.  But you don't have any
11   recollection about what Councilman Saab said versus
12   what Council Chair Baydoun said versus what
13   Councilwoman Bryer said; is that correct?
14        A     No.
15        Q     I should ask that better.  Do you have any
16   recollection?
17        A     I have no recollection.
18        Q     Okay.  Thank you.  All right.  Yeah, we're
19   good on that.
20              Do you recall there, however, being any
21   indication from the City Council at any meeting about
22   the cost of this training?
23        A     Yes.  It's in the motion.
24        Q     Okay.  And when I say the cost of it, I mean
25   that the cost of it was too much, at least in the mind

```
                                           Page 219
 1    of some councilmembers.
 2         A    I don't recall.  I don't recall that.
 3         Q    Do you recall any of the councilmembers
 4    raising an issue that the administration had
 5    misrepresented this training to the City Council?
 6         A    That's what I was talking about in that
 7    video.
 8         Q    Okay.
 9         A    Yes.
10         Q    So you do recall councilmembers talking
11    about, "Hey, this isn't what was stated by the Mayor
12    or Mr. Farinha"?
13         A    I can't recall if that's what they said, but
14    I do know there's some question about how people got
15    chosen to go there.
16         Q    All right.  Do you recall Councilman
17    Saab -- and if you don't, just say you don't recall.
18    Do you remember Councilman Saab saying, "Hey, I would
19    want the administration to come back with the
20    information that they were saying or explain it, and
21    then we could reconsider it"?  Do you recall that
22    coming up?
23                   MR. BROWN:  Objection to form.  I think
24    we should watch the video if that's what he said.
25                   MR. MIOTKE:  No, I'm asking if he
```

```
                                              Page 220
 1   recalls it.
 2                 THE WITNESS:  I don't --
 3                 MR. MIOTKE:  That's my question.
 4                 THE WITNESS:  Yeah, I don't recall it.
 5   BY MR. MIOTKE:
 6       Q    Okay.  Mayor Bazzi promoted you to chief; is
 7   that correct?
 8       A    That's correct.
 9       Q    All right.  And is it fair to say that Mayor
10   Bazzi had been a strong advocate for you?
11       A    Yes.
12       Q    All right.  As a matter of fact, my
13   recollection is prior to this lawsuit being served on
14   the City, you and Mayor Bazzi actually went on local
15   news and spoke to some reporter about this situation;
16   is that correct?
17                 MR. BROWN:  Objection, vague, misstates
18   facts not in evidence, foundation.
19                 THE WITNESS:  Yes.
20   BY MR. MIOTKE:
21       Q    Okay.  And did the two of you speak to a
22   reporter, or did you just speak to a camera guy
23   holding a camera, if you recall?
24       A    I think it was a guy holding the camera and
25   maybe someone taking notes.
```

Page 221

1        Q    All right.  But regardless, Mayor Bazzi
2    ended up, you know, helping you in this situation with
3    the City Council considering defunding your position
4    and position of Paul Vanderplow; right?
5                    MS. HUNT:  Object as to form.
6                    THE WITNESS:  I think Mayor Bazzi was
7    doing what he thought was right for -- for the City.
8    I'm not sure if he was helping us, but he was doing
9    what he thought was, you know, within his power.
10   BY MR. MIOTKE:
11       Q    All right.  When did you first retain the
12   law firm that represents you?
13       A    I think it was, like -- they actually called
14   me.  It was like a day after --
15                   MR. BROWN:  I'm going to object to the
16   extent --
17   BY MR. MIOTKE:
18       Q    Yeah.  I don't need to know --
19                   MR. BROWN:  Let's not talk about what
20   we said --
21   BY MR. MIOTKE:
22       Q    -- any of the substance of the
23   communications.  I just need to -- like, when I say
24   when, I mean, like, the date, which is not privileged.
25       A    Don't know.

Page 222

1        Q    Okay.  Do you recall if it was -- you made
2   it sound like it was sometime just prior to the
3   lawsuit being filed; is that correct?
4        A    Yes.
5        Q    All right.  And when we say "just prior,"
6   would that be a week?  A month?
7        A    I'm not -- I'm not exactly sure.
8        Q    Well, you know that there was a motion that
9   ended up being made by at that time City Councilman
10  Abdel-Hak regarding the defunding of the director
11  positions in December of 2023; right?
12       A    Yes, I do remember that.
13       Q    Okay.  And then either that motion was
14  withdrawn or tabled, as you stated; is that correct?
15       A    That's correct.
16       Q    All right.  And do you know when the
17  retention of your attorneys took place relative to
18  that first time?
19       A    After.
20       Q    Okay.  And do you recall if the retention of
21  the attorneys took place closer to that first motion
22  coming up in December of 2023 or closer to January 9,
23  2024?
24       A    It was -- I believe it was after we were
25  defunded, our positions were defunded.

Page 223

1      Q    Okay.  All right.  All right.

2      A    I -- I'm not sure, to be honest with you.

3      Q    All right.  But that's your best

4   recollection right now?

5      A    Yeah.

6      Q    Okay.  Were you the interim chief at the

7   time that this matter came up on May the 28th of 2024?

8   Or I should say acting chief.

9      A    Was that the day of the video?

10      Q    Yes.

11      A    I think I saw four -- four stars on there,

12   so that -- that would've made me the interim.  I was

13   interim at that point in time.

14      Q    Okay.  All right.  Do you recall Jerrod Hart

15   ever coming back on duty from May the 28th of 2024

16   through the time that he left his employment in July

17   of 2024?

18      A    I'd have to check the records, 'cause I did

19   separate him in MCOLES.  So documents that are kept on

20   the City servers will show those MCOLES documents, and

21   it would be nice to be able to see that before I said

22   what date that -- or if he came back or not.  Because

23   he did leave, and he came back, and he left again, so

24   those activities were kept inside the MCOLES records.

25      Q    Okay.  And when you went over to South

```
                                           Page 224
 1    Haven, do you recall giving interviews to local media?
 2        A    Yes.
 3        Q    All right.  Do you recall saying that Chief
 4    Hart had retired from his position as police chief?
 5        A    I may have.
 6        Q    All right.  Do you believe that he did
 7    retire from his position in July of 2024?
 8                  MR. BROWN:  Objection to form, calls
 9    for a legal conclusion from a lay witness.
10    BY MR. MIOTKE:
11        Q    Go ahead.
12        A    No.
13        Q    What did you believe?
14        A    Well, he -- he didn't receive a retirement,
15    so I would assume he didn't retire.
16            But when people leave their jobs in law
17    enforcement, the word is normally "retire," or as a
18    generalization.
19        Q    Okay.  So did you find that at all
20    misleading?
21                  MR. BROWN:  Objection to form,
22    ambiguous.  What's "misleading"?
23    BY MR. MIOTKE:
24        Q    Referring to him as retiring when you did
25    not feel that he retired?
```

Page 225

```
 1       A    No.  I didn't think it was relevant.
 2       Q    Okay.  You said that part of your duties was
 3  hiring employees; is that correct?
 4       A    That's correct.
 5       Q    Do you recall the police department trying
 6  to hire at least one non-U.S. citizen?
 7       A    No.  No.
 8       Q    A Mr. Fawaz?
 9       A    I don't know who Mr. Fawaz is.
10       Q    Okay.  Were you employed by the City
11  when -- was it Robert Schurig --
12       A    Yes.
13       Q    -- was hired?
14       A    Yep.
15       Q    Okay.  Do you recall the people who were on
16  the hiring list when Robert Schurig was hired?
17       A    I -- I don't know who's on that particular
18  list.
19       Q    Okay.  Do you recall there ever being a
20  highlighted portion for three names in red with no
21  written test scores that was on that list?
22             MR. BROWN:  Objection, best evidence,
23  ambiguous, vague, misleading, assumes facts not in
24  evidence.
25             THE WITNESS:  No.
```

```
                                              Page 226

 1   BY MR. MIOTKE:

 2       Q    Okay.  How do you know -- is it Robert

 3   Schurig?

 4       A    Robert Schurig.

 5       Q    How do you spell that last name?

 6       A    S-C-H-U-R-I-G.

 7       Q    Oh, okay.  And now he's employed as a police

 8   officer in the City of Dearborn Heights; is that

 9   correct?

10       A    Yes.

11       Q    Is he a friend of yours?

12       A    No.

13       Q    All right.  How is it that you know him?

14       A    I know him from the City of Westland.

15       Q    All right.  And how did his employment end

16   with the City of Westland?

17       A    He resigned.

18       Q    All right.  Did he resign in lieu of

19   termination?

20       A    I don't think so.

21       Q    Did he resign being under investigation for

22   alleged improper conduct with a subordinate?

23       A    So he resigned before investigation.  I'm

24   not exactly sure what the investigation entailed, but

25   he left the department.
```

Page 227

1      Q    Okay.  So it wasn't within your job

2   responsibilities to investigate him when his

3   situation, whatever it might be, occurred in the City

4   of Westland; is that correct?

5      A    That's correct.  Lt. Farrar handled that

6   investigation.

7      Q    All right.  Do you have any knowledge of

8   what was stated on his MCOLES, the statement from the

9   City of Westland to MCOLES regarding his separation

10   from employment with Westland?

11      A    I can't recall.

12      Q    All right.  Were you involved in his hiring

13   at the City of Dearborn Heights?

14      A    I think Chief Hart was -- he was still

15   there, so his hiring was done by the Act 78 process

16   and authorized by the Mayor and Chief Hart.

17      Q    Okay.  Do you recall what was being done at

18   that time with regard to recruiting individuals to

19   become patrol officers in the City of Dearborn

20   Heights; vis-a-vis, how were people selected, or how

21   did they end up getting into the recruitment process?

22            MR. BROWN:  Objection, compound.

23            You can answer.

24            THE WITNESS:  All types of different

25   ways.  Just recruitment, word of mouth, social media.

Page 228

1   Margaret Hazlett, who's the H.R. director, you know,

2   she's the person who, you know, made up, like, flyers,

3   you know, for social media and to leave at job fairs.

4   All types of different ways.

5   BY MR. MIOTKE:

6       Q    All right.  Do you know how now-Ofc. Hojeije

7   ended up basically being involved or contacted or

8   became part of the process in Dearborn Heights?

9       A    Hojeije.  That might have been a

10  recommendation from Mayor Bazzi, if I can remember

11  right.

12      Q    Do you remember anyone else who was

13  recommended by Mayor Bazzi?

14      A    Yes.  I think his name was Berro, maybe.

15      Q    B-E-R-O?

16      A    Yes.  B-E-R-R-O, I think.  I'm not sure.

17      Q    All right.

18      A    And Hussein Farhat.

19      Q    Anyone else that you can remember?

20      A    Not offhand.

21      Q    Have you ever heard anything about any

22  employment issue with Patrol Ofc. Berro?

23              MR. BROWN:  Objection, ambiguous,

24  vague.

25              You can answer.

Page 229

1              THE WITNESS:  I don't have any direct
2    knowledge, but I've heard some things.
3    BY MR. MIOTKE:
4       Q    Okay.  Because it seemed that Jerrod Hart
5    was providing some information regarding that, and I'm
6    trying to follow up on that.  So what was it that you
7    believe you heard regarding Ofc. Berro?
8              MR. BROWN:  Objection, question assumes
9    facts not in evidence.
10             THE WITNESS:  So I heard that
11   Ofc. Berro was involved in a use of force where
12   he's -- you know, punched a -- I think it was a 14-
13   year-old girl in the face during the force.
14             I also heard that he was involved in a
15   police pursuit without calling it out, got in an
16   accident.
17             There's another part where apparently
18   he got in an accident with a vehicle and didn't report
19   it to department staff.
20             But other than that, I have no proof of
21   any of that.
22   BY MR. MIOTKE:
23      Q    Okay.  That 14-year-old girl, was she in any
24   fashion held by Vista Maria?
25             MR. BROWN:  I'm sorry, could you say

```
                                            Page 230
1    that again?
2    BY MR. MIOTKE:
3         Q    Held by Vista Maria, in custody.  Is that
4    what you've been told?
5         A    Yes.
6         Q    Okay.  Was she cuffed?
7         A    I don't know any of the details.
8         Q    Did you hear that she had been cuffed?
9         A    I did not hear that.
10        Q    Okay.  All right.  Moving on from that
11   situation, you had some questions earlier with regard
12   to Paul Vanderplow.  Do you recall Ms. Hunt asking you
13   questions about Paul Vanderplow and the City Council
14   appearing to have some issues with him?
15        A    Yes.
16        Q    Okay.  Was he ever a sworn peace officer at
17   any time while you were either director or interim
18   chief?
19        A    No.
20        Q    Or chief?
21        A    No.
22        Q    Okay.  Had he ever, as far as you know, been
23   engaged in any high speed chases with lights and
24   sirens on his vehicle?
25        A    No.
```

Page 231

1      Q    All right.  Do you remember that there was a

2    chase that took place on Michigan Avenue that went

3    into Dearborn; is that correct?

4              MR. BROWN:  Objection to form.

5    Question assumes facts not in evidence, misleading.

6              THE WITNESS:  We were involved a

7    lot -- in a lot of police chases, like, I think

8    a -- over 120 in a year, which is a lot.  So I'm not

9    exactly sure which one.  I would assume a lot of them

10   went into Dearborn.

11   BY MR. MIOTKE:

12     Q    All right.  Do you recall that there was a

13   story with Paul Vanderplow being shown in the

14   background, and it was a news story televised, and it

15   showed him at the scene of an accident in West

16   Dearborn.  Does that help you any?

17             MR. BROWN:  Objection to form,

18   misstates prior testimony.  Question assumes facts not

19   in evidence, misleading, calls for speculation.

20             THE WITNESS:  So Paul Vanderplow would

21   make a lot of our scenes, due to the fact that he was

22   the person in charge of our investigative bureau, so

23   he'd be there investigating things.

24   BY MR. MIOTKE:

25     Q    So as far as you know, he never ended up

Page 232

1    going to a scene with a police vehicle with lights and
2    sirens on or lights or sirens on; is that correct?
3         A    Not that I know of.
4         Q    All right.  Would that have been appropriate
5    for him to have done so?
6         A    Well, he was not a sworn police officer.
7    He -- so he couldn't actively pursue vehicles.  He
8    can't, you know, operate a vehicle, pull cars over,
9    that type of stuff.  He can move cars around for
10   traffic purposes, but, no, he can't pursue cars.  He
11   can't conduct emergency vehicle operations.
12        Q    Okay.  In your view, would he have
13   been -- would it have been appropriate for him to
14   direct traffic at an accident, a motor vehicle
15   accident?
16        A    I think anyone could direct traffic through
17   civilian traffic directors.  I mean if you look at
18   City of Detroit, everyone's -- you know, all civilians
19   direct traffic there.  We have police reserves who are
20   civilians that direct traffic.  So, yes, I believe
21   that -- you know, civilians can direct traffic.
22        Q    All right.  But that's under the supervision
23   of another sworn officer who's MCOLES licensed; is
24   that correct?
25        A    I would -- I would say that people who

Page 233

1    direct traffic at the scene of an accident are good

2    bystanders.  They're good human beings who want to

3    stop and help the police stay safe while they're

4    investigating crimes.  So I would say that both people

5    under the direction of the police and also people who

6    are providing assistance to the police, both can do

7    that.  I don't think there's a law that states that a

8    person cannot do that.

9        Q    Did you ever see any sort of YouTube video

10   that was posted by -- Hassan Aoun, also known as Hass

11   Cash, showing Mr. Vanderplow directing traffic at an

12   accident at the intersection of John Daly and Ford

13   Road in the City of Dearborn Heights?

14               MR. BROWN:  Objection to form.

15   Question assumes facts not in evidence, misleading.

16               THE WITNESS:  No.

17   BY MR. MIOTKE:

18       Q    Okay.  Did anyone ever tell you that Paul

19   Vanderplow had directed traffic at that location?

20       A    Paul Vanderplow told me.

21       Q    Okay.  Do you think that Paul Vanderplow had

22   the authority to execute on a search warrant as an

23   MCOLES -- not an MCOLES sworn peace officer?

24       A    It depends on the situation.  I don't

25   believe that Paul Vanderplow had the authority to kick

Page 234

1   a door in himself and fulfill a search warrant from

2   the court, but I do believe he had the authority based

3   upon being the head investigator for the City of

4   Dearborn Heights to be present at the scene, yes.

5       Q   Do you think it would be appropriate in

6   executing a search warrant to end up ripping drywall

7   down in a house?

8               MR. BROWN:  Objection to form.  The

9   question assumes facts not in evidence.

10              THE WITNESS:  I guess it would

11  be -- depend on the case.

12  BY MR. MIOTKE:

13      Q   Have you ever heard that Paul Vanderplow did

14  so?

15      A   No.

16      Q   Okay.  There were several people who were

17  hired by the City of Dearborn Heights in some sort of

18  police function after you became a director.  You're

19  aware of that; correct?

20              MR. BROWN:  Objection to form,

21  ambiguous, assumes facts not in evidence.

22      A   Yes.  We added plenty of positions to assist

23  out -- you know, assist at the police department.

24      Q   Okay.  So other than Ofc. Schurig, who else

25  do you know who was hired by the City of Dearborn

Page 235

1    Heights who had been at the City of Westland?

2        A    There's a -- there's a few different people.

3    So there is Robert Schurig.  There's a gentleman named

4    Pat Boucher.  There's Torolski, Jon Torolski, Dan

5    Serrano, Elliana Huerta.  That might be it.

6        Q    Okay.  And I'm going to ask you based on

7    your recollection, and leaving aside -- well, let's

8    start with Schurig.  Schurig, did you have any

9    involvement in his hiring that you recall?

10       A    Not that I recall.

11       Q    Now, with respect to each one of those other

12   individuals, I'd ask you, did you have any involvement

13   in their hiring?

14       A    Yes.

15       Q    Who did you have involvement in the hiring

16   of?

17       A    Probably all of them.

18       Q    Okay.

19       A    Well, I guess depends, different --

20   different levels of involvement, but at one point or

21   another, all of them.

22       Q    Okay.  And if you can recall the names, the

23   one that stands out for me is Serrano.  Mr. Serrano,

24   is that correct?

25       A    Dan Serrano, correct.

Page 236

1      Q    Dan Serrano?  What was he hired to do?

2      A    He was hired as a DB assistant.  I think his

3   real title would be support services aide, I think is

4   what they were calling him.  But it was basically --

5   he was a DB assistant.

6      Q    So was he retired from the City of Westland

7   Police Department?

8      A    Yes.  He had long been retired and working

9   another security job somewhere.

10     Q    Okay.  Did he wear a badge from the City of

11  Westland as well as a firearm?

12     A    When he was in Westland?  Yes.

13     Q    No, in Dearborn Heights.

14     A    No.

15     Q    All right.  Did he wear some sort of a badge

16  when he was at the City of Dearborn Heights?

17     A    Not that I know of.

18     Q    Okay.  Do you recall the Police Unions being

19  upset or expressing some sort of dissatisfaction with

20  him being hired in this position?

21          MR. BROWN:  Objection to form, assumes

22  facts not in evidence.

23          THE WITNESS:  I understand the Police

24  Unions wanted something in the contract or some extra

25  money or something to allow such a thing to occur.  So

Page 237

1    I do understand there was -- there was some type of

2    contention, but it was resolved with the contract

3    settlement.

4    BY MR. MIOTKE:

5         Q    Okay.  Do you recall when that was resolved?

6         A    I don't recall.

7         Q    Okay.  You had mentioned a woman.  I forgot

8    what her name was.  What was her name?

9         A    Elliana Huerta.

10        Q    Yes.  What was she hired?

11        A    She was hired as a police officer.  She went

12   through the Act 78 process in Dearborn Heights.

13        Q    Okay.  Do you know if she's still employed

14   by the City?

15        A    Yes, she is.

16        Q    Okay.  Is she still a police officer?

17        A    Yes.

18        Q    Okay.  And what was your involvement with

19   her hiring?

20        A    I mean, it was just basically, "Hey, you

21   should come work here"; right?  'Cause I think

22   we -- we hired her as a public service aide, a cadet

23   in the jails.  And then when she got there, we're

24   like, "You're doing a good job.  You should actually

25   be a police officer."  And she went through the

Page 238

1    process and got hired.

2        Q    When she was employed at the City of

3    Westland, what did she do?

4        A    She was just a -- she was -- she was a

5    young -- a young employee, so she was a public service

6    aide there.  She worked in the jails over there.

7        Q    Okay.  Who else was the next person?

8        A    Jon Torolski.

9        Q    Yes.  What was he hired to do?

10       A    So he was a retired Westland lieutenant, and

11   he was -- a lot of years in -- in the detective

12   bureau.  He was hired to be a DB assistant as well.

13       Q    Did the Police Union or Unions express any

14   dissatisfaction with respect to him being hired?

15       A    They were -- he was hired at the same time

16   as Dan Serrano, so they had the same concerns that

17   they did with Dan.  So it was all resolved together,

18   but yes.

19       Q    Okay.  I think there was one more person.

20       A    Pat Boucher?

21       Q    Yes.

22       A    So he was hired to run the property room.

23       Q    Okay.

24       A    And he was also a Westland -- he was a

25   detective in the Westland Police Department.  So he

```
                                            Page 239
 1    was hired in the property room.
 2           We didn't get much pushback whatsoever from
 3    the Unions on hiring him.  I think it was a job no one
 4    wanted.
 5       Q    Okay.  All right.  So there wasn't a problem
 6    that -- because Cpl. Pellerito had been in that
 7    position, and then he left and ...
 8       A    Yeah.  No one really wanted that job.  Yeah.
 9       Q    All right.  Was there a FOIA coordinator
10    person who was brought in?
11       A    That's Erika Mazzitello.
12       Q    Okay.  And did you have any involvement in
13    her being hired?
14       A    Yes.
15       Q    Okay.
16       A    Well, I -- I was the one who told her to
17    come, you know, apply for the position in Dearborn
18    Heights.  But she went through the Act 78 -- not Act
19    78, the civil service process in Dearborn Heights.
20       Q    Okay.  And do you recall who else went
21    through that at the same time she did?
22       A    That same process?
23       Q    Yes.
24       A    No, I do not.
25       Q    Do you recall if it was ever -- the position
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
                                                www.veritext.com

```
                                          Page 240

 1   was ever posted?

 2        A    I don't recall, but I'm almost certain it

 3   was.

 4        Q    Was there any -- and when you say "almost

 5   certain it was," do you have personal recollection of

 6   that?

 7        A    No.

 8        Q    Okay.  And do you recall the TPOAM raising

 9   some concerns about that position --

10              MR. BROWN:  Sorry, Mr. Miotke, I'm not

11   steeped in this culture as you are.  What's a TPOM?

12              MR. MIOTKE:  It's the Technical Police

13   Officers Association of Michigan.  In other words,

14   it's the one that handles the clericals in the police

15   department.

16              MR. BROWN:  Got you.

17   BY MR. MIOTKE:

18        Q    Did I say that correctly?

19        A    Yeah.  So they handle all -- pretty much all

20   the Union activity other than the police department in

21   the whole city.

22              But I don't remember too much pushback.  I

23   think they just wanted to ensure that there was a

24   civil service process done, and then they gained some

25   items in their contract for allowing that position
```

Page 241

1    to -- to stay there within the police department.

2        Q    Okay.  And that position had originally been

3    held by Lt. Gonzalez; is that correct?

4        A    That responsibility was held by Lt. Gonzalez

5    and the records bureau, correct.

6        Q    Did the patrol -- or, I'm sorry, the

7    Supervisors Union express any dissatisfaction with

8    respect to that?

9        A    I don't recall too much pushback from the

10   Supervisors Union.  There -- there could have been.  I

11   can't recall.

12       Q    Okay.  Do you recall -- let's move back into

13   the 2023 timeframe.  Do you recall people, members of

14   the public speaking at City Council meetings about the

15   state of the police department?

16                  MR. BROWN:  Objection, ambiguous.

17                  THE WITNESS:  I mean, I remember people

18   talking about the police department.  Not everybody,

19   but, you know, some things I -- I heard, yeah.

20   BY MR. MIOTKE:

21       Q    And you remember some people speaking

22   negatively about the state of the Dearborn Heights

23   Police Department?

24       A    Yes.

25       Q    Okay.  And during his testimony, Jerrod Hart

```
                                            Page 242
 1   had made it sound like some of these private citizens
 2   had come forward because they were acting in concert
 3   with members of the City Council.  Does any of that
 4   sound familiar to you?
 5        A    I have heard that, and, you know, I
 6   believe -- I believe some of that just -- yes.
 7        Q    Who do you believe came forward because they
 8   were -- and spoke critically about the police
 9   department at Dearborn Heights City Council meetings
10   because they were acting in concert with City
11   councilmembers?
12        A    Well, you know, Jerrod Hart and I had
13   different interactions with members of the community.
14   I'm sure you noticed.  Some of the people that -- that
15   I know he believes came forward are the same people I
16   believe that, you know, are close with City Council,
17   and that would be, like, Angela --
18        Q    Do you remember her last name or not?
19        A    Angela ...
20        Q    You can --
21        A    You know her.  You know her.
22        Q    I know who you're talking about.
23        A    All right.  A young lady named Angela.  I
24   had a decent relationship with her.  Vince Drapkowski,
25   same thing.  And then we had Rachel LaPointe, Sue
```

Page 243

1    Kaminski, you know, all these -- these people, I

2    believe, had close relationships with City Council to

3    support their agenda.  I can't prove that they were

4    being paid or anything like that, but I do believe

5    that they were supporters of the agendas of the

6    Council people, which happens in politics.

7         Q    Okay.  So Jerrod Hart testified that he felt

8    that they were actually interested in the pro

9    Sgt. Bazzy agenda; namely, trying to have him promoted

10   outside of Act 78.  Do you believe that?

11              MR. BROWN:  I'm going to object to the

12   question as an unfair characterization of Jerrod

13   Hart's previous testimony.

14              THE WITNESS:  I'm not sure if I believe

15   that, but what I do believe is that anything that the

16   Council told them to support, it seems like they

17   supported.  So, therefore, if that was one of their

18   agenda items, I do believe that they would -- they

19   would support that.

20   BY MR. MIOTKE:

21        Q    Okay.  Did Pam Swirple come forward and

22   speak negatively about the police department that you

23   can recall?

24        A    Yes.

25        Q    Okay.  And you know that Pam Swirple is the

Page 244

1    wife of Matt Swirple, who's a former sergeant with the

2    Dearborn Heights Police Department; is that correct?

3         A     That's correct.

4         Q     Do you have any evidence of why Pam Swirple

5    would purportedly want Sgt. Bazzy to get promoted to

6    lieutenant instead of her own husband?

7         A     I never really had a problem with Pam

8    Swirple, so I don't know anything about her.  I know

9    she -- she talked a lot -- you know, badly about the

10   police department on social media, but I never had any

11   interactions -- interactions with her whatsoever.  So

12   I'm not sure anything about her or her thought

13   process.

14        Q     Okay.

15        A     I don't -- I couldn't even tell you what she

16   looks like.

17        Q     See, and this is where I want to get into

18   this.  I want to ask, do you have any evidence

19   that -- let's go through them -- Sue Kaminski ended up

20   acting in concert with members of the City Council

21   when she made negative comments about the police

22   department?

23        A     No.

24        Q     Do you have any evidence that Rachel

25   LaPointe was acting in concert with members of the

```
                                             Page 245
 1   City Council when she made negative statements about
 2   the police department?
 3       A    I'm trying to think about that one.  Not
 4   that I can recall.
 5       Q    Okay.  Do you recall -- or do you have any
 6   evidence of Angela -- and for the record, I'll just
 7   say Angela Venegas.
 8       A    There you go.
 9       Q    Okay.  Does that help?
10       A    Yep.
11       Q    Is that -- yes.  So tomorrow we don't end up
12   asking Paul Vanderplow, and he'll say Angela.
13            So Angela Venegas is the name of the person
14   you're referring to; correct?
15       A    Yes.
16       Q    Okay.  Do you have any evidence of Angela
17   Venegas acting in concert with the City Council when
18   she commented negatively about the police department?
19       A    No.
20       Q    Do you have any evidence of Vince Drapkowski
21   acting in concert with the City Council when he
22   commented negatively about the police department?
23       A    No.
24       Q    All right.
25       A    But we're saying "evidence."  We're talking
```

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                  www.veritext.com

Page 246

```
 1   direct evidence, not circumstantial, what we believe;
 2   right?  Is that what you're saying?
 3        Q    Well, why don't we expand to that.  When you
 4   say "direct evidence," I'm taking that to end up
 5   meaning information that you observed.
 6        A    Correct.
 7        Q    Correct?  Do you have anything that you
 8   otherwise believe to be circumstantial evidence with
 9   respect to any of those individuals, or one or more of
10   those individuals?
11        A    Yes.  In -- in my opinion, for example, you
12   know, Angela Venegas, right, would -- would come up
13   with something, and it -- it was always something.
14   This one was a -- a found gun on the -- on the
15   sidewalk.  And then immediately Mo Baydoun was -- was,
16   like, within minutes or, you know, an hour making
17   comments and -- you know, had concerns and made phone
18   calls.
19             Or it'd be vice versa.  Mo Baydoun
20   would -- or any of the councilmembers would -- would
21   say, "Hey, this is a problem for Dearborn Heights,"
22   and then Angela Venegas would then -- that would be
23   her hot topic that she's calling us about.
24             So those -- that type of circumstantial
25   evidence is what we have, not direct evidence, like
```

Page 247

1    smoking gun-type stuff, correct.

2        Q    Okay.  But would it be a fair statement to

3    end up being concerned about, if I recall correctly, a

4    gun that was, like, left on Warren unattended?

5                  MR. BROWN:  Objection to form, assumes

6    facts not evidence, misleading, ambiguous.

7    BY MR. MIOTKE:

8        Q    I mean, is that the situation that you were

9    referring to?

10       A    So that -- yeah, that is a situation, but

11   that's not exactly what -- I mean, that's not what

12   happened, and --

13       Q    Well, what happened?

14       A    So what happened was a -- a gentleman who

15   was a CPL holder left his home north of there, and he

16   was traveling southbound on Warren Road and turned

17   left.  So -- but what he did was he left his gun on

18   top of his car.  And this was in, like, December or

19   something.  So when he turned left, the gun

20   flipped -- flipped onto -- onto the easement, and then

21   it snowed for the winter; right?  And then

22   springtime -- 'cause, you know, Angela -- she was

23   always doing nice things, right, cleaning up -- she

24   went, and I think her and maybe another neighbor saw

25   the weapon there, and that's how that got there;

Page 248

1    right?

2             So -- but it is concerning, but at the same

3    time, it's not -- it's not necessarily a police

4    department issue to where we did anything wrong.  All

5    we did was recover a gun that was left on a -- you

6    know, on -- on a car; right?  But it became

7    this -- this thing where the police department got

8    attacked for it, even though, you know, we had

9    absolutely nothing to do with anything in that

10   situation.

11            So those things, those circumstances are

12   what Council and a few citizens would always attack

13   the police department for.  But, yes, it's concerning.

14       Q    Well, do you have -- do you have any other

15   circumstantial evidence that you can point to, other

16   than that particular incident?

17       A    I'd have to refer to our -- our master

18   timeline if -- if I had an opportunity to do so.

19   There was a lot that went on.

20       Q    Yeah.  And, you know, because -- you would

21   agree that it would be a valid concern if the City of

22   Dearborn Heights doesn't have a traffic bureau?

23               MR. BROWN:  Objection to form,

24   speculative, misleading.

25               THE WITNESS:  No, not necessarily.  Our

Page 249

1    traffic bureau was a -- a club where officers were

2    hanging out on a Union basis and -- and, you know,

3    apparently raping other officers, you know, in the

4    police department.  So, therefore, when those types of

5    activities are happening or even there's a sense that

6    it's just not right, sometimes you have to make

7    decisions to eliminate certain bureaus until we can

8    reevaluate what the situation was.  And I'm so glad we

9    did that, because, you know, who knows what would be

10   happening with -- with that officer if we didn't do

11   that.

12   BY MR. MIOTKE:

13        Q    Well, the traffic bureau -- I mean, and you

14   said something about the rape, so I assume you're

15   referring to the Bearden situation; is that correct?

16        A    That's correct.

17        Q    And did you not speak to Bearden, and he

18   said that his involvement was consensual with

19   Sgt. Dotter; is that correct?

20        A    No.

21        Q    He did not?

22        A    He did not.

23        Q    Then why wasn't someone prosecuted right

24   then --

25        A    Because he said there was no involvement at

```
                                              Page 250
 1   all.
 2        Q    Oh, he said that there was --
 3        A    Yeah, none.
 4        Q    -- no involvement whatsoever?
 5        A    That's correct.
 6        Q    Okay.  And when did you speak to him about
 7   that?
 8        A    I can't remember.  I did an internal
 9   investigation.  It would be on The Red File as well.
10        Q    Would that have been -- it was
11   obviously -- was that in 2023 or 2024?
12        A    2023.
13        Q    All right.  And have you read the Bearden
14   lawsuit or not?
15        A    No, I have not, nope.
16        Q    Okay.  So getting back, however, to comments
17   made at Council meetings, do you have any other
18   circumstantial evidence of some purported acting in
19   concert between people who spoke at City Council
20   meetings and people who did not -- and the City
21   Council?
22        A    I would have to review my e-mails, because
23   there are plenty of opportunities for -- or there's
24   plenty of times where people did -- did that where
25   we'd get an e-mail and then five e-mails from Council.
```

Page 251

1   But it's all there in the documents.

2        Q    All right.  Well, let me ask you this.

3   Could it have been possible in this situation that

4   Angela had ended up contacting or saying the things

5   and then Mo Baydoun and other councilmembers just

6   jumped on it as a political issue?

7                  MR. BROWN:  Objection to form, calls

8   for speculation.

9                  THE WITNESS:  Yes.

10  BY MR. MIOTKE:

11       Q    All right.  And you understand that at least

12  in 2024 there's a very contentious relationship

13  between the City Council and the Mayor.  Is that --

14                 MR. BROWN:  Objection to form, complex,

15  confusing, ambiguous.

16                 THE WITNESS:  Yes.

17  BY MR. MIOTKE:

18       Q    Okay.  As a matter of fact, there were three

19  motions that were adopted for no confidence in the

20  Corporation Council, then Chief Hart and the Mayor; is

21  that correct?

22       A    That sounds correct.

23       Q    All right.  We're on 15, I guess?

24                 (Exhibit 15 was marked for

25                 identification.)

```
                                             Page 252

 1              MR. BROWN:  Yes, sir.

 2   BY MR. MIOTKE:

 3       Q    And, Mr. Swope, I'd just ask you to --

 4              MR. BROWN:  Hold on, sorry.  We're

 5   getting an extra sticky here.

 6              MR. MIOTKE:  Oh, okay.

 7              THE WITNESS:  All right.

 8   BY MR. MIOTKE:

 9       Q    Just read over, I mean there are only, like,

10   a few lines each.  Read over Exhibit 15 to yourself,

11   and just let me know when you're done.

12       A    Yeah, it's a very confusing document, the

13   first one.  I am all done.

14       Q    Okay.  So you're aware that the City Council

15   ended up adopting these votes of no confidence in

16   then-Corporation Counsel Farinha, then-Police Chief

17   Jerrod Hart, and Mayor Bazzi; is that correct?

18       A    That's correct.

19              MS. HUNT:  Object as to the form.

20   BY MR. MIOTKE:

21       Q    Okay.

22       A    Yes.

23       Q    Okay.  And so is it fair to say that in

24   January of 2024, there was a fair amount of distrust

25   and disagreement between the Mayor and his
```

Page 253

1   administration on the one hand and the City Council or
2   the majority of the City Council on the other hand; is
3   that correct?
4         A    It appears to be.
5         Q    All right.  And you understood that this
6   kind of tension was how it was going to be when you
7   were employed by the City of Dearborn Heights; is that
8   correct?
9               MR. BROWN:  Objection to form.
10              THE WITNESS:  When I first started off?
11  Is that what you're saying?  When I was -- when I, you
12  know, was hired?  I didn't think it was going to last
13  years.  No, absolutely not.  I didn't think I was
14  going to be harassed or, you know, discriminated
15  against or anything like that.  I thought that, you
16  know, we were going to resolve whatever issues, and
17  we'd move on.
18  BY MR. MIOTKE:
19        Q    Okay.  But it did not appear that that ended
20  up happening; is that correct?
21        A    That's correct.
22        Q    All right.  You understand that the majority
23  of the Dearborn Heights City Council while you were
24  employed was older, white, non-Arab; is that correct?
25              MR. BROWN:  Objection to form, assumes

Page 254

1   facts not in evidence, misleading.

2                   THE WITNESS:  Well, Wencel, Nancy,

3   Constan.  Who else was on there?

4   BY MR. MIOTKE:

5       Q    Okay.  So you would agree that Councilman

6   Wencel, Councilwoman Bryer, Councilman Constan were

7   all older and white and non-Arab; is that correct?

8       A    Yes.

9       Q    All right.  And you would also understand

10  that Councilwoman Malinowski Maxwell is also older,

11  white, and non-Arab; is that correct?

12      A    Yes.

13      Q    All right.  Did you have any evidence that

14  they acted with any sort of discriminatory animus to

15  you based on your age?

16      A    Yes.

17      Q    What?

18      A    Well, I mean there's plenty of examples

19  of -- of how we were mistreated within, you know, the

20  police department, you know, one being the fact that,

21  you know, being denied -- being denied training

22  opportunities to -- to head to a -- to a high level

23  experience training.  I believe that that was one

24  thing that was done against me because of the fact

25  that I wasn't going to be around long because of my

Page 255

1    age.  I mean, that's -- that's something that you

2    could -- you could look at specifically and -- and

3    state that that could be the case.

4        Q    Well, you state that they could be the case.

5    Do you recall any of them -- any members of the City

6    Council saying, "Well, I'm going to vote against this

7    because, you know, Kevin Swope is too old"?

8        A    No.

9        Q    Do you have any evidence that they

10   specifically held your age against you in denying that

11   kind of training?

12       A    No.  No one's ever -- I never seen anything

13   written or verbally towards me about my age.

14       Q    Okay.  Do you have any sort of evidence that

15   any councilmembers specifically held against you the

16   fact that you were white or non-Arab with regard to

17   that training?

18       A    Not to that training.

19       Q    Okay.  Do you have any sort of evidence that

20   they held anything that you consider to be

21   whistleblowing against you in denying that training?

22       A    Yes.

23       Q    What?

24       A    Well, I mean it's on video at a Council

25   meeting where Hassan Saab stated that "He can't have

Page 256

```
 1   this training because he has filed a lawsuit against
 2   us.  It's in litigation, so we can't -- it has to be
 3   part of the lawsuit."  That's on video.  So, yes,
 4   direct evidence.
 5        Q    All right.  Did he say that you can't get
 6   it?  Is that a direct quote?
 7        A    Yes.  Well, I -- I don't know if it's a
 8   direct quote, but it's -- he's -- that's exactly what
 9   he said.
10        Q    Have you listened to that recently?
11        A    No.
12        Q    Okay.  Any other evidence that that training
13   was withheld from you, as far as you're concerned,
14   because you engaged in any sort of whistleblowing, as
15   you see it?
16        A    Other than the evidence of -- no, not
17   necessarily.
18        Q    Okay.  When you ended up -- and I'm a little
19   unclear on this, because you had testified about this
20   confidentiality agreement that you had to sign when
21   you spoke to the FBI; is that correct?
22        A    That's correct.
23        Q    So it's my impression that you only shared
24   this information with individuals on a need-to-know
25   basis; is that correct?
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 257

1      A     What -- what information are we talking

2    about?

3      Q     The information that you consider

4    whistleblowing?

5                    MR. BROWN:  I think that's --

6                    THE WITNESS:  I'm confused.

7                    MR. BROWN:  Can you rephrase it?

8                    MR. MIOTKE:  Well, I might break it

9    down, but I'm trying to get kind of a general handle

10   on it.

11                   MR. BROWN:  We don't know if you're

12   talking about the confidentiality agreement or the

13   whistleblowing.

14                   MR. MIOTKE:  Well, I'm talking

15   about -- let's do this.

16   BY MR. MIOTKE:

17     Q     What things did you feel were covered in

18   terms of the things that you said to law enforcement

19   by the confidentiality agreement?  What issues?

20     A     Will you please -- I -- you're going to have

21   to rephrase that, 'cause I have no -- so, basically,

22   when I talked to the FBI about these items, I could

23   talk in here obviously about all these items.  There's

24   just other stuff that -- that doesn't pertain to this

25   case that I can't talk about.  It has nothing to do

Page 258

1    with this case whatsoever.

2        Q    All right.  So -- because what I'm trying to

3    understand is, you spoke to the FBI about certain

4    things, and I'm trying to figure out who you spoke to

5    those -- who else you spoke -- you know, since you

6    can't tell us in the course of a deposition, I'm

7    trying to figure out who else you spoke to --

8        A    I mean --

9        Q    -- either at the City or otherwise about

10   these items that you've raised issues about.

11       A    Mayor Bazzi received that letter.  I think

12   we -- it was entered into evidence earlier.  Chief

13   Jerrod Hart wrote that one.

14            There was some issues that were brought up

15   to Margaret Hazlett, not necessarily about criminal

16   cases or corruption, but about just the way we were

17   being, you know, treated.  I'd have to look at

18   that -- that document to say when that was sent.

19            But other than that, there wasn't really

20   anyone else that we would talk to about it.

21       Q    Okay.  So your recollection is that when you

22   ended up raising them -- why don't we do this?  Why

23   don't we go to -- well, I'll just do this, because we

24   could probably get through it faster.  When issues

25   were raised about the chain of custody as alleged in

Page 259

1  paragraph 22 of the First Amended Complaint, which is

2  Exhibit 3?

3      A    Yeah, got it.  All right.

4      Q    Who do you recall speaking to about that

5  issue, if anyone?

6      A    So that was handled by Dir. Vanderplow and

7  Chief Hart.

8      Q    Okay.  So as far as you can recall, you just

9  spoke to them about those issues; is that correct?

10     A    For the -- yes.

11     Q    Okay.  With respect to the 900 pistol sales

12  records that had not been processed by the Dearborn

13  Heights Police Department as alleged in paragraph 23,

14  did you have involvement with that or not?

15     A    I took a training on how to put, you know,

16  those pistol -- or those pistol records into the

17  system.  I contacted Michigan State Police, but not

18  the criminal division, but just the division that

19  oversees the input of those records, just to clarify,

20  you know, what is needed for someone to put that

21  information in.  That way I could get a password to

22  get in the system.

23          But other than that, that was handled by

24  Chief Hart and Vanderplow.

25     Q    Okay.  So, essentially, you've outlined you

```
                                        Page 260
1    talked to Hart, Vanderplow, and some division of MSP
2    about this.
3         A    Correct.
4         Q    And no one else that you can recall?
5         A    Not that I can recall, no.
6         Q    Okay.  Paragraph 24 said that there was
7    police overtime work that was subject to an illegal
8    ticket quota system.  Do you see that?
9         A    I do.
10        Q    Okay.  Do you recall if you spoke to anyone
11   about that issue?
12        A    Yes.
13        Q    All right.  And who did you speak to?
14        A    That was the FBI and also the Michigan State
15   Police.  And I did not specifically speak to these
16   people, but the AG's office on this one as well.
17        Q    Okay.  So you didn't personally speak to the
18   AG's office about this issue?
19        A    That's correct.
20        Q    So your discussions were only with Chief
21   Hart, Dir. Vanderplow, and -- anyone else?
22        A    And then the two law enforcement agencies,
23   the FBI and the Michigan State Police.
24        Q    And you don't recall speaking to anyone else
25   about this issue; is that correct?  Except for --
```

Page 261

1        A     Well, I mean --

2        Q     -- other people you interviewed?

3        A     Yeah, I mean, people I interviewed and then

4    obviously, like, Mayor Bazzi, like, you know, these

5    people.  But Roger was, you know, obviously privy to

6    the information.

7        Q     Okay.  And when you end up saying that --

8    and, by the way, did you speak to Sgt. Dotter about

9    this issue?

10       A     I received a lot of information from

11   Sgt. Dotter about this issue.

12       Q     Okay.  Did Sgt. Dotter say that the quote,

13   unquote, "quota system" was illegal, or did he say

14   that it was not illegal?

15       A     I don't think he said either.  He's the one

16   who provided the details on how it occurred, how

17   the -- the tickets were being dismissed.  And then,

18   also, you know, he sent e-mails out allegedly before I

19   got there, telling people that if they didn't write a

20   certain amount of tickets, then they would not be able

21   to work the detail, the overtime detail.

22       Q     Was he the Union president at that time for

23   the Supervisors Union?

24       A     He was when I got there, yes.

25       Q     Okay.  Well, then, why would he want

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                               586-468-2411
www.veritext.com

Page 262

1    something illegally done?  This is the type of thing

2    that unions routinely will end up grieving, if it's

3    illegal.

4         A    So the reason Sgt. Dotter came to me about

5    these issues is because the court administrator and

6    the assistant court administrator went to him

7    complaining about officers dismissing so many tickets.

8    Specifically, he named Sgt. Bazzy, Sgt. Zrien, and

9    it's -- it's in the -- it's in the internal

10   investigation.  But it's almost like he was telling

11   on -- he was telling on them --

12        Q    Anyone --

13        A    -- not thinking in his mind that he was just

14   as -- as in violation as they were.

15        Q    Okay.  Well, did anyone get disciplined in

16   this situation regarding this?

17        A    So Ofc. Bailey, he -- he got disciplined,

18   because after we told everyone to stop doing what they

19   were doing in regards to ticket dismissals, he did it

20   again.

21             But the problem was so widespread that what

22   we decided was that we were going to internally make

23   it a policy update in a direction to stop that

24   activity.  And then we left it up to the outside

25   jurisdictions to decide if they were going to charge

Page 263

1    anybody or not.

2        Q    All right.  If my recollection of former-

3    Chief Hart's testimony is correct, he basically made

4    it sound like no one did anything at a law enforcement

5    level because the issue of dismissing these tickets

6    was considered to be widespread.  Does that ring any

7    bells?

8        A    Yeah, it's like it --

9             MR. BROWN:  Objection, misstates prior

10   testimony, unfair characterization of Chief Hart's

11   testimony.

12            THE WITNESS:  I would say that -- I

13   would call it systematic at the time.

14   BY MR. MIOTKE:

15       Q    Okay.  All right.  And let me make sure I

16   understand this.  From what you've testified to, it

17   sounds like what this was is an officer would issue a

18   ticket, and then an officer would void out that ticket

19   before it ended up -- either before it got to court or

20   after it got to court, but at the level where there

21   was an officer dealing with it as opposed to a

22   prosecutor dealing with it.  Am I understanding what

23   your understanding of this is?

24       A    Yes.  There was many different ways that

25   tickets were being dismissed, but I have never seen

Page 264

1    a -- a prosecutor involved in any type of the ticket
2    dismissing or anything like that.
3         Q    Yeah.  And you had made the reference that
4    it was, like, hearings when an officer was there?
5         A    That's correct.
6         Q    All right.  So that would presumably be with
7    the magistrate?
8         A    That's correct.
9         Q    Okay.  All right.  Okay.
10        A    And from what -- just to clarify that, the
11   magistrate was not on the -- they're all Zoom
12   hearings.  The magistrate was not present.  So the
13   officer would handle this hearing, right, and dismiss
14   all these tickets, and basically, they would get
15   everybody to take impeding traffic.  Whoever was left
16   would end up getting another court date where they
17   would go in front of the magistrate.
18             So the officer's job was to get everyone to
19   either take an impeding or just dismiss the ticket.
20   And then the officer would notate on a file how that
21   worked.  You know, this person took impeding, this
22   person got dismissed, and then some court clerk would
23   sign -- or court person would sign off on it, and it
24   was done.
25        Q    So -- and correct me if I'm wrong, but my

Page 265

1    understanding was that impedings and double parkings
2    were not an uncommon plea to end up being taken if a
3    person had a decent driving record.  Are we talking
4    about those types of situations, or are we talking
5    about just the whole ticket being dismissed as opposed
6    to it being reduced?
7          A    Both.  Both.  I mean, there's no problem
8    with people taking an impeding or, you know, something
9    like that.  But the problem was the dismissals; right?
10   I don't -- the dismissal's based on just
11   recommendations from officers, like, "Hey, this is
12   Chami's cousin," right, was on one ticket.  You know,
13   "Early MLK Day" was on another ticket.  I mean, there
14   was multiple different comments made on tickets that
15   were dismissed before they even made it to court.  So
16   there's multiple different ways tickets were being
17   dismissed and voided, which was inappropriate.
18         Q    Okay.  All right.  And do you have any
19   evidence of any specific tickets that were dismissed
20   for an elected official?
21         A    I'm trying to think here.
22         Q    Well, take your time, although, I would note
23   for the record that we have been waiting a little bit,
24   but go ahead.
25         A    I don't believe so.

Page 266

1          Q    Okay.  Paragraph 25 talks about
2     mismanagement of federal and state forfeiture funds.
3     Wasn't that an issue that you reported something over
4     to Paul Vanderplow, presumably the chief, but do you
5     recall reporting it to anyone else?
6          A    The forfeiture funds?
7          Q    Yeah.
8          A    I think that's something -- no, I don't
9     think -- I know that's something that Dir. Vanderplow,
10    that was his task, and he had always from the -- the
11    second he walked in the door, he was always trying to
12    fix that forfeiture account and process.  And so I
13    didn't necessarily report anything to him or to
14    anyone, because Dir. Vanderplow was already working
15    with the State and -- and when I say "the State," not
16    necessarily the state police for investigations, but
17    the State to be in compliance with the forfeiture
18    account.
19         Q    I see.  So -- but you -- so the people that
20    you spoke to from the City with regard to that issue
21    were Paul Vanderplow, as I understand it, the City
22    treasurer?
23         A    Yes.
24         Q    And perhaps the Mayor?
25         A    The Mayor.

Page 267

1        Q    Anyone else?

2        A    Chief Hart, obviously.

3        Q    Okay.

4        A    Roger.

5        Q    All right.  Anyone else beyond those people?

6        A    Not that I can recall.

7        Q    Okay.  The next portion of 25 talks about a

8   "ticket fixing scheme for friends of law enforcement

9   officers and elected officials."

10            You see that?

11       A    Yes.

12       Q    I think we kind of covered that.  Was that

13  what we were talking about just a few minutes ago,

14  about the illegal ticket --

15       A    For the most -- for the most part.  I -- I

16  think I would add the fact of certain elected

17  officials pulling up to traffic stops and asking

18  officers, you know, "Hey, don't write this guy.  He's

19  a good guy" type of thing.  There was internal

20  investigations involving those instances on The Red

21  File as well.  There's video, I've seen it, where, you

22  know, officer -- or, I'm sorry, elected officials

23  tried to intervene in -- in some of these traffic

24  stops.

25       Q    What elected officials do you recall?

Page 268

1       A    Mo Baydoun.

2       Q    On how many occasions?

3       A    I think there was at least three.

4       Q    All right.  Anyone else other than -- any

5  other member of the City Council other than Mo

6  Baydoun?

7       A    I don't think so.

8       Q    Okay.  There's also reference here to "other

9  civil rights violations."  Do you see that?

10      A    Yeah.  So what that, you know, refers to is

11 the fact that under the color of law, you know, like,

12 specifically, like, Bailey smashing someone's face

13 into the ground.  So I think that that is one thing

14 that's considered a civil rights violation.

15      Q    Okay.  Who did you speak to about that?

16      A    That would be the FBI and also the Michigan

17 State Police.

18      Q    Okay.  And I would assume that you also

19 spoke to then-Chief Hart; yes?

20      A    Chief Hart, yes.  Vanderplow knew about it.

21 Roger knew about it.  Mayor Bazzi, the City Council.

22 We had a meeting with City Council and -- about it.

23      Q    Okay.  Did the City Council, when you met

24 with them, express any sort of desire for this not to

25 end up being reported, or did they just take in the

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 269

1   information?

2       A    I think at the time of the meeting,

3   they -- they just took in the information.

4       Q    All right.  I mean, I guess part of the

5   question is, did you telling the City Council, "Hey,

6   look, Bailey used excessive force," cause them to say,

7   "Oh, geez, well, you can't touch Bailey," for whatever

8   reason, or, "We want excessive force to be imposed,

9   so, you know, we're upset with you reporting this"?

10  Did they say anything that gave you an indication that

11  they would hold this against you?

12      A    For sure, definitely.  The -- Hassan Saab

13  himself said that, you know, "This guy deserves --

14  this guy deserved the beat-down he got."  He said, you

15  know, "The police should be able to, you know, use

16  force and -- and beat people up if -- 'cause he

17  assaulted someone else, so the police should be able

18  to -- to do this."

19      Q    When did Hassan Saab say that?  Because

20  there's been a lot of reference to him being -- in

21  your complaint or your amended complaint to him being

22  a councilmember when he wasn't a councilmember.

23      A    Yeah.  He didn't say that when he was a

24  councilmember.

25      Q    Okay.  So do you remember any person who was

Page 270

1    on the City Council giving any indication that they

2    felt that what Bailey did was appropriate?

3        A    So the indication that -- that we got was as

4    soon as we disciplined Bailey and Sgt. Bazzy that we

5    were getting harassed and intimidated and voted

6    against and defunded.  And I've been accused in

7    Council meetings by Hassan while he's a Councilman,

8    Hassan Saab of steering bids, of doing these other

9    things such as not only steering bids but hiring

10   people when I wasn't supposed to against hiring

11   practices of MCOLES.  You know, he's claiming that I,

12   you know, fraudulently signed Chief Hart's name on a

13   motion when it was a system problem, not a me problem.

14           There's many instances of -- of these types

15   of actions that were taken against us immediately

16   after we disciplined Bailey and Bazzy and Pawlus and

17   Zrien.

18       Q    What -- well, what ended up happening with

19   Bazzy's discipline?  As I understand it, it was not

20   upheld by Act 78; is that correct?

21       A    That's correct.

22       Q    Okay.  And Zrien and Pawlus accepted the

23   discipline; is that correct?

24       A    That's correct.

25       Q    Okay.  And Bailey, what happened to the

```
                                          Page 271
 1    criminal charges against him?
 2         A    A jury -- I think a jury found him not
 3    responsible.
 4         Q    Not guilty?
 5         A    I believe so.
 6         Q    So a jury acquitted him; is that correct?
 7         A    That's correct.
 8         Q    All right.  Is he now a Dearborn Heights
 9    police officer, if you know?
10         A    I don't know.
11         Q    Okay.  Was he fired based on this incident?
12         A    He was placed on administrative leave, and
13    then he was brought back after his --
14         Q    After the acquittal?
15         A    -- after acquittal, yeah.
16         Q    Okay.
17         A    Actually, you know what?  He was brought
18    back before the acquittal, because the internal
19    investigation was complete, and he was brought back
20    as -- he wasn't a police officer, but he was brought
21    back as a civilian.
22         Q    All right.  Do you know what his status is
23    now as a police officer?
24         A    I don't.  I -- I do know that before I left,
25    he was brought back to full sworn police officer.
```

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                    586-468-2411
                                                                          www.veritext.com

Page 272

1      Q    Okay.  Do you have any other evidence, other

2    than the evidence or the statements that you made with

3    respect to Hassan Saab, that anyone else on the City

4    Council felt that what Bailey did was appropriate?

5                 MR. BROWN:  Objection, ambiguous, calls

6    for speculation.

7                 THE WITNESS:  So there was a lot of

8    talk about the Bailey incident and issue, so I can't

9    exactly tell you, you know, how people felt, but it's

10   on recorded -- a lot of it was at Council meetings, so

11   I would assume that it'd be easy for someone to access

12   that information on how the Council took that incident

13   and what they thought of it.

14   BY MR. MIOTKE:

15      Q    Well, help me out here, because when did you

16   speak to the City Council?  Was it in a closed

17   session, or was it in an open meeting?

18      A    I spoke to City Council quite -- quite a

19   bit.  I mean, I talked to him not even in a meeting.

20   Sometimes it would be in the hallway.

21                 So I went to -- I went to Hassan's -- I met

22   Hassan Saab for four hours for coffee one day.  I

23   mean, it was all different -- you know, I met Mo

24   Baydoun and Hassan Ahmad at a coffee house one day.

25   So I mean it's -- we talked to -- you know, as a

Page 273

1   professional, I tried to involve myself with everybody

2   at all times.

3        Q    Well, what I'm asking for right now is your

4   recollection of any of them saying anything that gives

5   you any reason to believe, or if you have any other

6   evidence of any City councilmember other than Hassan

7   Saab believing that Bailey was treated

8   inappropriately.

9        A    So the conversations normally didn't involve

10  Bailey.  It -- it involved Sgt. Bazzy.  So a lot of

11  Council's opinions towards Sgt. Bazzy was that he was

12  not treated appropriately with the discipline that he

13  received.

14       Q    Okay.  But nothing about Bailey, other than

15  what Hassan Saab basically said, that you can recall?

16       A    I mean, there was plenty of -- just plenty

17  of evidence to show that they were not satisfied with

18  how that investigation turned out.

19       Q    All right.  But specifically, I'm trying to

20  get to the idea of them wanting Bailey to have been

21  treated differently.

22       A    Like I said before, it was they wanted

23  Sgt. Bazzy to be treated differently.

24       Q    Okay.  Now, let me ask you this.

25  Sgt. Bazzy -- they wanted Sgt. Bazzy to be treated

Page 274

1    differently, but ultimately the discipline against him

2    ended up being thrown out by the Act 78 Commission;

3    right?

4         A    Right.  So we weren't going to win that

5    Act 78 hearing anyways before we walked in.  Our

6    attorney was actually suing the Act 78 Commission.

7    The Act 78 Commission does not like the Mayor.  They

8    hate the Mayor; right?  They also -- I got hired

9    outside of Act 78 in violation of what they considered

10   Act 78 rules.  So before we even walked in the door,

11   we lost that -- that hearing.  So that's -- that's how

12   that works; right?

13              I -- I think I do know that -- that there

14   was Act 78 Commissioners that had a wedding recently,

15   and -- and, you know, I think all the Council was at

16   that wedding.  Last summer, I think it was.  So,

17   therefore, I believe that that hearing was lost before

18   we even walked in the door.

19        Q    Well, given the fact that that hearing was

20   lost before you went into the door in December of

21   2023, if I'm correct; right?

22        A    I can't recall the date.

23        Q    All right.  But it was done before there was

24   a vote in January of 2024 with regard to defunding the

25   director positions; is that correct?

Page 275

```
 1        A    I don't -- I can't recall the date on -- on
 2    that.  I'd have to look at something to show me the
 3    date.
 4        Q    Okay.  Well, if there is evidence that it,
 5    indeed -- namely, the Act 78 Commission meeting --
 6    took place before the vote to defund, why would you
 7    think that the vote to defund would be retaliatory or
 8    discriminatory?
 9                MR. BROWN:  Objection, confusing,
10    vague, ambiguous.
11                THE WITNESS:  I think everything
12    together that we endured, all of us, Chief Hart,
13    Vanderplow, myself was a -- was a -- a big picture of
14    harassment, retaliation, and discrimination in
15    response to us whistleblowing, right, us disciplining
16    Sgt. Bazzy.
17    BY MR. MIOTKE:
18        Q    All right.  But Sgt. Bazzy -- they already
19    got a win on Sgt. Bazzy.  Why would they need to end
20    up doing anything with respect to you thereafter?
21                MR. BROWN:  Objection to form.
22                THE WITNESS:  I guess that's a question
23    you need to ask them.
24    BY MR. MIOTKE:
25        Q    What if they say it wasn't retaliatory?
```

Page 276

1  They did it for reasons that have nothing to do with

2  Sgt. Bazzy?

3               MR. BROWN:   Objection to form.

4  BY MR. MIOTKE:

5       Q     What would be your response?

6       A     That that's not accurate and true.

7       Q     And what would be your evidence that that's

8  not accurate or true?

9       A     Well, I have plenty of evidence about the

10 amount of harassment.  You know, I -- I think that

11 when the City provides its documents, when it talks

12 about, you know, this councilman sending this

13 councilman an e-mail or text message, and it talks

14 about the how they're conspiring to -- to, for one,

15 violate Open Meeting Act, and -- and also to vote a

16 certain way; right?  These three-three tied votes

17 aren't necessarily done because someone was sick;

18 right?  They're done by -- they're done on purpose;

19 right?  Someone will automatically -- they don't show

20 up to the meeting on purpose; right?  I think after

21 this meeting where it tied three-three, Wencel walked

22 in, like, a few minutes later; right?  That's

23 how -- that's how things go around there in Dearborn

24 Heights.  So there's never necessarily something that

25 is circumstantial.  I mean, it's --there's always

Page 277

1    something there.

2         Q    All right.  But what evidence do you have?

3    Again, what evidence do you have?

4         A    Well, as soon as, you know, the City

5    provides its documents, I'm sure we'll have plenty of

6    evidence.

7         Q    Well, let's talk about that.  If your

8    assumption turns out to be correct, do you have any

9    other evidence that would show that anything, anything

10   that you complained about ended up motivating the City

11   Council to retaliate against you or discriminate

12   against you?  Anything up to this point?

13        A    Yes.

14        Q    What?

15             MR. BROWN:  I'm going to object to

16   form, if I may.  Confusing, vague, compound.

17   BY MR. MIOTKE:

18        Q    Okay.  What's your additional evidence of

19   retaliation or discrimination?

20        A    You know, we have -- we have a lot of -- I

21   mean, I could sit here for hours, and I think we

22   already have, but we need to talk about exactly, you

23   know, these -- these things that are occurring at the

24   Council meetings being called out and having

25   MSP -- you know, "MSP needs to investigate Swope for

Page 278

1    this."  "Swope is, you know, illegal hire" -- I
2    already -- we already talked about this.  "Swope is
3    illegally hiring people."  "Swope is, you know, doing
4    FOIA requests," you know, claiming and putting out
5    there that I'm having an affair on my wife with Erika
6    Mazzitello.  You know what I mean?
7            These -- this is, like, harassing and -- and
8    just major issues for me as a professional and in my
9    personal life, when, you know, people like -- people
10   in Council are conspiring to -- to make me look bad
11   because they don't like the Mayor.  They -- I -- I get
12   it.  But, still, they didn't have to do what they did
13   to all of us.
14       Q    Okay.  Well, so you understand that some of
15   the way you were treated -- namely, you and the other
16   plaintiffs -- related directly to the fact that you
17   were part of Mayor Bazzi's administration and the City
18   Council -- or the majority of the City Council doesn't
19   like the Mayor, and the Mayor doesn't like the
20   majority of the City Council; is that correct?
21            MR. BROWN:  Objection to form.
22            THE WITNESS:  Yes.
23   BY MR. MIOTKE:
24       Q    Okay.  All right.  How much were you paid by
25   the City of Dearborn Heights in 2024?

Page 279

1      A    I'm guess -- I'd have to look, but I'm
2  guessing 140 maybe, 130.
3      Q    Okay.  So there have been some
4  controversies, maybe you're aware of them, about
5  bonuses being paid to department heads.  Do you recall
6  an issue like this coming up about Margaret Hazlett in
7  2024?
8      A    I remember --
9              MR. BROWN:  Objection to form, assumes
10  facts not in evidence.
11              THE WITNESS:  I can recall something
12  coming up about Margaret.
13  BY MR. MIOTKE:
14      Q    Okay.  Did you ever receive any compensation
15  from the City of Dearborn Heights over and above your
16  salary as stated in any of your employment contracts?
17      A    I don't recall receiving anything that we
18  should not have received.
19      Q    That doesn't answer my question, because my
20  view of what you should have received and your view
21  might be different.
22      A    Yeah.  Well, I guess you -- you hold
23  the -- you know, the City holds the documents on what
24  I was paid, so I would suggest --
25      Q    Yeah, I don't.

```
                                           Page 280
```

1      A    Okay.

2      Q    All right?

3      A    Well, the City does, and -- and I guess that

4  question would -- would have to be answered by the

5  people who review the City documents, because I don't

6  recall receiving anything that I should not have

7  received.

8      Q    Well, did you ever receive any bonuses?

9      A    Well, I have an MCOLES bonus listed in my

10  contract.  I don't think I received any just

11  here's -- here's 20 grand.  No.

12      Q    Okay.  Did you ever receive something like

13  $2,500 as a bonus?

14      A    I don't recall if I did or not.  I don't

15  think so.  I think that's a uniform allowance.

16      Q    All right.  So as I understand it, you, per

17  the contract, were getting a uniform allowance and

18  getting an MCOLES bonus; correct?

19      A    Uniform allowance, MCOLES bonus.  We get

20  paid out on our holiday pay each -- each year.

21  There's another -- something else.

22      Q    Longevity?

23      A    Sick time.

24      Q    Sick time.

25      A    Yeah.

Page 281

1        Q    Okay.  Do you recall getting anything

2    beyond  --

3        A    And then we --

4        Q    -- those amounts paid to you?

5        A    -- and then we could buy back every year.

6    We could buy back a certain amount of bank time.  But

7    I don't recall anything beyond what I should have

8    received, no.

9        Q    Okay.  All right.

10              MR. BROWN:  Guys, can we take a two-

11    minute break?

12              MR. MIOTKE:  Yes.

13              MR. BROWN:  Thanks.

14              THE REPORTER:  Off the record,

15    4:28 p.m.

16              (Off the record.)

17              THE REPORTER:  Back on the record.

18    It's 4:35 p.m.

19              You may proceed.

20    BY MR. MIOTKE:

21        Q    You know that there was a preliminary

22    injunction that was entered in this case; is that

23    correct?

24        A    Yes.

25        Q    Did you ever have any discussions with the

Page 282

1    Mayor or Mr. Farinha about that preliminary injunction

2    before it was entered?  You personally?

3         A    I would assume so.  I don't -- I'm not -- I

4    would assume so.  Yeah.

5         Q    Do you have any recollections about that?

6         A    Well, I just know that the Mayor said,

7    "Continue to come to -- to work and do your job, and,

8    you know, you're going to still get paid."  Those

9    types of discussions, yes.

10        Q    Okay.  And so your understanding was that

11   the preliminary injunction was in place and has been

12   in place since close to the very beginning of the

13   lawsuit?

14                  MS. HUNT:  Object as to form.

15                  MR. BROWN:  Objection, calls for a

16   legal opinion from a lay witness.

17                  THE WITNESS:  Yes.

18   BY MR. MIOTKE:

19        Q    Okay.  And that injunction preserved the

20   status quo.  In other words, it would keep you

21   employed until this lawsuit was over.  Is that your

22   understanding?

23                  MS. HUNT:  Same objection.

24                  MR. BROWN:  Same objection.

25                  THE WITNESS:  Not -- no, not

Page 283

1    necessarily.

2    BY MR. MIOTKE:

3        Q    And why do you -- what do you mean by that?

4        A    Because I just couldn't do whatever I wanted

5    and -- and remain employed by the City.

6        Q    Okay.  All right.  So you understood

7    that -- but your leaving the City was not based on

8    that injunction being lifted, was it?

9                    MR. BROWN:  Objection to form.

10                   THE WITNESS:  No.

11   BY MR. MIOTKE:

12       Q    Okay.  And when you left the City, you

13   understood that the injunction was still in force;

14   correct?

15       A    Yes.

16       Q    And you understood that while you couldn't

17   do anything that you wanted, that your employment

18   would be preserved during the course of this

19   litigation as long as that injunction was in place?

20                   MR. BROWN:  Same objection.

21                   THE WITNESS:  Not necessarily in the

22   chief of -- chief of police position, because I

23   was -- the director of police operations position

24   was -- was guaranteed in that contract, so not

25   necessarily.

Page 284

1   BY MR. MIOTKE:

2        Q    All right.  So what was your understanding

3   when your employment ended about the injunction?  And

4   I'm not asking you for legal opinion.  I'm asking you

5   for what you believed.

6        A    I believe that it was still -- it was still,

7   you know, valid.

8        Q    And that it still protected you?

9        A    Yes.

10       Q    Okay.  So I'm having a few issues here with

11  respect to you leaving the City of Dearborn Heights

12  and that somehow or other being about discrimination

13  or retaliation or something else inappropriate.  And

14  part of my question here is, are you saying that Mayor

15  Bazzi discriminated against you in some fashion that

16  caused you to leave the City of Dearborn Heights?

17                 MR. BROWN:  Objection to form, complex,

18  rambling, ambiguous, argumentative, misstates prior

19  testimony.

20                 THE WITNESS:  What I'm saying is that I

21  was -- the intent was to have a -- a police chief in

22  the City of Dearborn Heights was -- who was Arab-

23  American, and that would -- was at the time going to

24  be Hussein Farhat.  Hussein Farhat had, you know, less

25  qualifications, less experience, pretty much

Page 285

1    couldn't -- couldn't do the job.  As a matter of fact,
2    as emergency manager, I was doing his job for -- for
3    months.  Didn't even know where he was.
4              And so I do believe that the move for
5    Hussein Farhat had to be chief of police or entered
6    into the police department as a director or deputy
7    chief was racially and ethnically motivated and caused
8    major harassment issues for myself.
9    BY MR. MIOTKE:
10        Q    Okay.  Well --
11        A    Yes, I think it was the totality of -- of
12   all City -- City leadership that caused issues for
13   myself, Dir. Vanderplow, and -- and Chief Hart, even
14   though Mayor Bazzi did do many great things for us.
15   But at the same time, you know, Hussein Farhat, that
16   situation was not -- it was not appropriate.
17        Q    Okay.  Well, but the Mayor never tried to
18   make Hussein Farhat the chief or interim chief until
19   you had said you were leaving; is that correct?
20        A    That's not accurate.  So Hussein Farhat was
21   brought onto the police department, and before I even
22   left, before I even said I was going anywhere, he was
23   wearing, you know, he -- he was introducing himself
24   as -- as the interim police chief, and then he was
25   also recruiting people to be hired at the police

Page 286

1   department to be his assistants and directors.

2          So, therefore, the writing was on the wall,

3   and the conversation with Mayor Bazzi was the fact

4   that he had all these grievances, and he had

5   this -- this unfair labor practice that he was not

6   going to get from under.  And the negotiation was done

7   to where he would be able to have Hussein Farhat his

8   police chief, because all that stuff would go away,

9   and that the -- the issue for me would be that I would

10  have to leave.  And that was a negotiation that --

11  that business people have, and that was determined to

12  be the case that day.

13      Q    Between who and who was this negotiation

14  for?

15      A    That was between me, the employee, and

16  Mayor, who's the employer.  That's how negotiations

17  go.

18      Q    So you're -- okay.  So because from the City

19  Council perspective -- and you understand I represent

20  the City Council; right?

21      A    Yes.

22      Q    City Council had nothing to do with your

23  interaction with Mayor Bazzi at that time; is that

24  correct?

25              MR. BROWN:  Objection, misstates prior

Page 287

1    testimony.

2              THE WITNESS:  I'm not sure what

3    communications they were having.  I would assume they

4    did talk, because they talk, you know, via e-mail

5    every single day.  I -- you know, I see it.

6    BY MR. MIOTKE:

7         Q    All right.  But I guess the question is, do

8    you have any evidence that the City Council

9    specifically said -- or any member of the City Council

10   specifically said, "Bring in Farhat, and get rid of

11   Swope"?

12        A    Well, I guess there is a social media post

13   posted by Hassan Saab that talked about bringing in a

14   police chief from the community.

15        Q    Okay.

16        A    So, therefore, you know, one would be led to

17   believe that "the community" means the Arab-American

18   community.  So, yes, I guess that is evidence in that.

19        Q    Anything else?

20        A    Not that I could think of at the moment.

21        Q    Okay.  And you understand, at least your

22   last dealings with them, are that Hassan Saab,

23   Councilman Saab and Mayor Bazzi are not on good terms;

24   is that correct?

25        A    Yes.

Page 288

1       Q    Okay.  And you understand that the majority

2   of the City Council is not on good terms with Mayor

3   Bazzi as well?

4       A    Yes.

5       Q    All right.  So what I'm trying to get at is

6   if you have any evidence that, for example, I or

7   Mr. Turfe would be unaware of that somehow or other,

8   the City Council was trying to influence things with

9   Mayor Bazzi to cause you to leave the City of Dearborn

10  Heights, beyond what you've already testified to.

11      A    Yeah.  So Mayor Bazzi will testify to the

12  fact that -- because he told me about this -- that

13  when he was at Mr. Mourad's wedding; right -- he's the

14  Act 78 Commissioner -- that he was approached by

15  members of the City Council that said, "Hey, you bring

16  in Arab-American chief, and everything's good.

17  We -- we're not going to have any problems"; right?

18  So that was told to me by -- by my employer; right?

19  So what -- how am I supposed to feel with my job being

20  on the line when that's being said to the Mayor,

21  right, by City councilmen; right?  That's scary.

22      Q    All right.  Well, let me ask you this,

23  though.  Was there anything preventing you from just

24  continuing to work for the City of Dearborn Heights in

25  your role as chief?

Page 289

1      A    Other than the fact that the Mayor said
2   resign by this date?  No, not necessarily.
3      Q    All right.  Well, it's my understanding that
4   the Mayor will testify that you prompted him to end up
5   sending that communication.  Is that false?
6                MS. HUNT:  I'm going to object as to
7   form, as to, you know, people are testifying here as
8   to what Mayor Bazzi will testify to.  I think we leave
9   it to Mayor Bazzi to testify at some point.
10                THE WITNESS:  So prompted?  No.
11   Discussed and negotiated?  We did have a long
12   discussion, and I think we talked about our discussion
13   already.
14   BY MR. MIOTKE:
15      Q    Did he -- and you gave some testimony, but I
16   was --
17      A    Yeah.
18      Q    -- unclear on it.
19      A    Okay.
20      Q    What specifically do you recall him saying
21   about you staying or going?
22      A    Well, Mayor Bazzi and I had a long
23   conversation.  We actually talked at -- you know, at
24   least two different times, once at night and once
25   during a day, like I said earlier.  And Mayor Bazzi

Page 290

1    was wondering how he could cut -- get out from under

2    the unfair labor practices and the grievances.  And it

3    was obvious that it couldn't happen.

4           Ken Wilson, who was the labor attorney

5    for -- you know, for the City, Roger, myself, I mean,

6    there's e-mails going back and forth talking about how

7    it's impossible to beat these -- these cases and these

8    grievances, and the City had to give -- had to give

9    in.

10          So our discussion was, hey, here's the

11   options.  The only way you get out from under this is

12   if -- if I wasn't the chief, because then, therefore,

13   if you kept -- and if -- 'cause he had to have Hussein

14   Farhat in position; right?  So, therefore, if he did

15   not promote Hussein Farhat, he could never get from

16   underneath these grievances and these unfair labor

17   practices, which were a huge thing for -- for the

18   Mayor at that time.

19      Q    Well, let's talk about that for a moment,

20   because the Supervisors Union was who was bringing the

21   unfair labor practice and the grievances; correct?

22      A    Correct.  Correct.

23      Q    Not the Mayor.  Mayor didn't want these

24   against him; right?

25      A    Right.

Page 291

1      Q    All right.  So what evidence do you have --
2   I mean, it's just not making sense to see that somehow
3   or other Hussein Farhat comes in, and necessarily
4   everything is patched up.

5      A    We were current -- we were working on a
6   contract, and we sat down every single day, and
7   we -- we bargained a contract.  Hussein Farhat was
8   named in the contract.  We came up with a -- a
9   tentative agreement that allowed Hussein Farhat
10  to -- to possibly sit in the position of deputy chief
11  as long as the Union got what they wanted in regards
12  to money and these other positions and captain
13  positions and everything.

14           And then that fell through.  There -- but so
15  the Mayor continued with the whole plan with Hussein
16  Farhat without the Union's approval, and that's when
17  the Union filed all those grievances and unfair labor
18  practices; right?  So that's -- that's the whole
19  Hussein Farhat thing that you're talking about.

20      Q    All right.

21      A    Yeah.

22      Q    But what I'm trying to see is at that point,
23  why don't you just say, you know, Mr. Wilson,
24  Mr. Farinha, you all chime in and say, "Mayor, we're
25  going to lose these grievances.  We're going to lose

Carroll Reporting & Video                    586-468-2411
www.veritext.com          A Veritext Company          www.veritext.com

Page 292

1    this unfair labor practice."  And then you just say

2    that and continue to act as chief.  I don't understand

3    why you couldn't just continue to act as chief.

4         A    Because the pressure I was getting from all

5    different areas was to the point where Hussein Farhat

6    was not going anywhere.  Hussein Farhat was being

7    forced upon, you know, the police department.  Hussein

8    Farhat was brought in against, you know, the -- the

9    best wishes of not only myself but also Ken Wilson,

10   who negotiates the contract.  He specifically told me

11   that.

12             But with that being said, the Mayor, you

13   know, he wanted Hussein Farhat, for whatever reason,

14   to be part of the police department, and, therefore,

15   that caused major issues for -- for the Mayor; right?

16   And the Mayor, the only way he could keep Hussein

17   Farhat, right, was to get rid of me; right?  And that

18   was talked about and the Mayor said, "Yeah, let's do

19   it."  And then he asked me to resign.

20        Q    You're saying in a conversation with him

21   that took place, he asked you to resign?

22        A    No.  In an e-mail, he asked me to resign.

23        Q    When you talked to him, did he tell you to

24   resign?

25        A    No.  No, he did not tell me to resign.

Page 293

1      Q     When you talked to him, did he ask you to

2    resign?

3      A     No.

4      Q     Because I'm just -- so it's just in that e-

5    mail that has already been admitted as an exhibit

6    that --

7      A     Right.  We talked about options of how those

8    unfair labor practices could be resolved; right?  My

9    job is to provide all the information possible,

10   because that's what I do.  I'm a rule follower, and

11   I -- I -- you know, I give options; right?  And the

12   Mayor decided to go with an option that -- that he

13   chose.  No one wrote that e-mail for the Mayor.  The

14   Mayor wrote the e-mail for himself.

15     Q     Okay.  Well, why didn't you just say, "Well,

16   I'm not going to go"?

17     A     Because I would've been fired by

18   January 10th.  I'd rather have been asked to resign in

19   the police world than be fired.

20     Q     How could he fire you when there's a

21   preliminary injunction keeping you in place?

22     A     There's a lot of things that are going on

23   when there's a preliminary injunction.

24     Q     Okay.  But my question is --

25     A     So, therefore -- I've been harassed

                                            Page 294

1    for -- since that injunctions been in place; right?  I

2    think we know that.  I've been accused of doing ticket

3    enforcement -- I need -- I've been accused of, you

4    know, not providing some -- some traffic direction at

5    the houses of worship within the City, because, you

6    know, I don't want to, you know, keep Arab-Americans

7    safe.  That's all nonsense; right?

8             But these are the attacks and criticisms

9    that I was getting while working there within the City

10   of Dearborn Heights.  And it's just constant

11   harassment, and that's what -- what I got for two

12   years.

13       Q    Okay.  So that happened for two years.

14       A    Yeah.

15       Q    But what I'm looking at is it happened for

16   two years.  You have an injunction in place.  How is

17   this anything that's new, other than you just say,

18   "Hey, look" --

19       A    Employees --

20       Q    -- "I'm going to stay on.  I have the

21   injunction in place.  Mayor, respectfully, I'm not

22   going to resign"?

23       A    That's not how it works.  When -- when

24   you -- when you get, you know, dismissed from a job,

25   right, by the person who has the authority to hire and

Page 295

1   fire you, then -- then you have to leave; right?  And

2   they already had a lawsuit, right, so at the end of

3   the day, it's going to resolve itself.  So someone

4   asks you to resign, you resign rather than get fired.

5        Q    Okay.  Well, the sequence of events is also

6   kind of strange.  In other words, you were already

7   applied for employment over at South Haven; right?

8                  MR. BROWN:  Objection to form,

9   argumentative, vague, ambiguous, misstates prior

10  testimony.

11  BY MR. MIOTKE:

12       Q    Right?

13       A    I've learned always to have a -- a back-up

14  plan for employment.

15       Q    Did you tell the people at the City of South

16  Haven that they were just your backup plan?

17       A    No, of course not.

18       Q    Okay.  And did you put anything in your

19  resume that should not have been put in there?

20       A    No.

21       Q    All right.  Did you say that you attended

22  the PERF training?

23       A    I also -- I also told them that I didn't

24  attend the PERF.

25       Q    Okay.  Even though it was included that you

Page 296

1    did attend the PERF?

2         A    Right, because when I updated my resume, I

3    was supposed to attend PERF.  So they were told that

4    when I sent that resume, I was supposed to go to PERF,

5    when I -- when I developed that resume.

6         Q    When did you develop the resume?

7         A    I -- I can't recall exactly what day I did.

8    It's not timestamped.  But with that being said --

9         Q    Did you develop in an anticipation that you

10   were going to end up seeking other employment?

11        A    I developed it with anticipation I was going

12   to PERF, so it was a clerical error.

13        Q    All right.  But that would've had to end up

14   being before midsummer of 2024; correct?

15        A    I can't recall when I did that.

16        Q    All right.  Because, obviously, the training

17   was still an issue in May of 2024.

18        A    I guess if that's your math.  I'm not

19   exactly sure when I did my resume.

20        Q    So -- and then you submitted what you needed

21   to submit over to the City of South Haven, if I recall

22   correctly, sometime in October of 2024, October the

23   2nd of 2024.

24        A    That's correct.

25        Q    All right.  So in October of 2024, that was

Page 297

1    after the PERF training was supposed to take place?

2         A    I -- exactly.  I told the PERF -- or the

3    person at South Haven, the recruiter -- and you could

4    bring him in for a deposition -- that I did not go to

5    PERF.  I submitted the application before I seen the

6    error.

7              A lot of people prepare things before.  I'm

8    sure you do it a lot as an attorney.

9         Q    Well, could you look at Exhibit 9, please?

10             MR. BROWN:  You're good.  9?

11             MR. MIOTKE:  9, last page.

12             THE REPORTER:  Mr. Brown, will you put

13   your mic on?

14             MR. BROWN:  Oh, sorry.

15             It's your resume, Kevin.  Here you go.

16             THE WITNESS:  Okay.  All right.

17   BY MR. MIOTKE:

18        Q    All right.  So you see the last page, in the

19   middle it says, "PERF Southern Management Institute

20   for Police"?

21        A    That's correct.

22        Q    All right.  And on the first page of Exhibit

23   No. 9, it says October 2, 2024?

24        A    Yes.

25        Q    All right.  So -- and for PERF, it says that

Page 298

1    you attended the training in July of 2024; right?

2        A     Session 92, July 2024.

3        Q     Yeah.  So when you submitted Exhibit 9 in

4    October of 2024, the information that you submitted

5    was not true?

6        A     That's not accurate --

7               MR. BROWN:  He's already explained this

8    to you, Gary.  You're badgering him at this point.

9    He's given you the explanation three times.  He's told

10   you what the problem is.

11              MR. MIOTKE:  But the explanation

12   doesn't make sense, and that's why he's going to end

13   up getting -- in other words, he submitted -- what he

14   just needs to say is, "That was inaccurate."

15              THE WITNESS:  I said that multiple

16   times already.

17              MR. BROWN:  He said it was a clerical

18   error.

19   BY MR. MIOTKE:

20       Q     Okay.  But why, then, did you submit it with

21   that inaccuracy?  You said you did it because you had

22   prepared this resume in anticipation that you were

23   going to PERF, but you submitted this resume as part

24   of something that post-dates PERF.  Did you just not

25   look over it before you submitted it?

Page 299

1        A     Yeah.   This resume could have been done in

2    March.   It could have been done in April, May, June.

3    I don't know.   But I also could tell you -- hey, call

4    the recruiter in -- I don't know who the guy's name

5    is -- but he'll tell you that I told him I did not go

6    to PERF.

7        Q     Okay.

8        A     Obviously, it's public record.   It got

9    denied 15 times.

10       Q     Okay.   Other than the Mayor's statement to

11   you that he was at Mr. Mourad's wedding where City

12   Councilmembers purportedly told him about Hussein

13   Farhat, do you have any information or knowledge that

14   the Mayor actually attended Mr. Mourad's wedding?

15       A     No.

16       Q     If Mr. Mourad says that the Mayor never

17   attended his wedding, would you be able to dispute

18   that?

19       A     No.

20       Q     Okay.   Just looking over some notes.   Excuse

21   me for a moment.

22             You know that the City Council ended up

23   saying that it was adopting the resolution to fund

24   your positions because Act 78 had not been followed in

25   filling those positions; is that correct?

```
                                                 Page 300
 1                MR. BROWN:  Objection to form, assumes
 2    facts not in evidence, misleading.
 3    BY MR. MIOTKE:
 4        Q    Have you read the resolution?
 5        A    I'm not sure if I read the resolution or
 6    not.  I would assume I have.
 7        Q    All right.  Do you recall the City Council
 8    saying that Act 78 was not followed when you were
 9    hiring --
10        A    I remember hearing that many times.
11        Q    Okay.  And did you also hear that the
12    positions were filled with you and Mr. Vanderplow when
13    there was no money budgeted for those positions?
14        A    I don't know if I recall hearing that.
15        Q    Do you have any evidence to dispute the idea
16    that the City Council relied on the failure to follow
17    Act 78 in adopting the defunding resolution?
18                MS. HUNT:  I'm going to object as to --
19                MR. BROWN:  I'm utterly confused, Gary.
20    I'm sorry.  Could you rephrase that?
21                MS. HUNT:  I'm objecting as to form.
22                MR. MIOTKE:  Okay.  I'll try to
23    rephrase it.
24    BY MR. MIOTKE:
25        Q    Do you have -- well, first of all, do you
```

```
                                               Page 301
 1   acknowledge that Act 78 was not followed in hiring you
 2   and Mr. Vanderplow?
 3                  MR. BROWN:  Objection, assumes -- I'm
 4   sorry.  It asks for a legal opinion from a lay
 5   witness.
 6                  THE WITNESS:  I'm not sure if Act 78
 7   had to be followed.  I hear different -- different
 8   interpretations of the City Charter.
 9   BY MR. MIOTKE:
10       Q    Okay.  Well, I'm asking this.  Did you go
11   through an Act 78 process in terms of filling that
12   position --
13                  MR. BROWN:  Same objection.
14                  THE WITNESS:  No.
15   BY MR. MIOTKE:
16       Q    Okay.  Do you believe that Paul Vanderplow
17   went through an Act 78 process to be selected?
18                  MR. BROWN:  Same objection.
19                  THE WITNESS:  No, he did not.
20   BY MR. MIOTKE:
21       Q    And --
22       A    Which he's not subject to Act 78, because
23   he's a civilian.
24       Q    Well, and you've stated that there are
25   different interpretations of Act 78.  So you
```

```
                                           Page 302
 1   acknowledge that there are differences of opinion
 2   between the City's administration and the City Council
 3   with respect to that issue; correct?
 4        A    That's correct.
 5        Q    Okay.  Have you ever heard that City
 6   Councilmembers were concerned that there was no money
 7   budgeted for you and for Vanderplow to be employed in
 8   the director positions at the time that you were
 9   hired?
10        A    I don't recall hearing that.
11        Q    Okay.  Would you agree that if there wasn't
12   money in the budget for the two of you to be hired,
13   that that would be a legitimate non-discriminatory,
14   non-retaliatory reason for the City Council to adopt
15   the resolution defunding your positions?
16              MR. BROWN:  Objection to form,
17   misleading, argumentative, hypothetical, speculative,
18   calls for a legal conclusion from a lay witness.
19              THE WITNESS:  I don't even know how to
20   answer that question, just due to the fact that I
21   don't think it -- it applied.  I thought the Mayor had
22   the -- the right to move money within his budget
23   freely, according to what I was told.
24   BY MR. MIOTKE:
25        Q    Okay.  You acknowledge that the City Council
```

```
                                            Page 303
 1    has a difference of opinion and has had a difference
 2    of opinion with the Mayor with regard to that issue;
 3    is that correct?
 4         A    I -- I do.
 5         Q    All right.  Do you have any evidence to
 6    dispute that they relied on the lack of budgetary
 7    authority as one of the reasons why they voted to
 8    defund your position and Paul Vanderplow's position?
 9                    MR. BROWN:  Objection, complex and
10    confusing question, calls for speculation, misleading.
11                    THE WITNESS:  I don't know.
12    BY MR. MIOTKE:
13         Q    All right.  Do you have any evidence to show
14    that they, as in the City Council, did not honestly
15    believe that you were hired in violation of Act 78;
16    namely, you and Paul Vanderplow?
17                    MR. BROWN:  Objection, calls for
18    speculation.
19                    THE WITNESS:  I can't -- I can't state
20    whether City Council, because there's different City
21    Councilmembers on -- on Council itself.  I couldn't
22    tell you what they believed at any point in time.
23    BY MR. MIOTKE:
24         Q    Okay.  Just a few more.  When you and the
25    other plaintiffs reported these issues that you
```

Page 304

1    reported, did you, as in you personally, Kevin Swope,

2    feel that it was part of your duties to end up

3    reporting these things?

4          A    Yes.

5                    MR. MIOTKE:  Okay.  I have nothing

6    further at this time.  Thank you.

7                         EXAMINATION

8    BY MS. HUNT:

9          Q    Really quickly, you mentioned that when

10   Farhat was interim chief, he was walking around

11   picking his staff and calling him -- I'm sorry, deputy

12   chief.  I'll repeat -- I'll start over.

13              You indicated when Farhat was deputy chief,

14   he was walking around calling himself "interim chief."

15   Do you recall that testimony?

16         A    Yes.

17         Q    Okay.  Did you ever say anything to him,

18   like, "Why are you doing this?  You're not the interim

19   chief"?

20         A    I -- I don't think I seen him when he was

21   doing that.  And then he was placed on leave or

22   something, so I really didn't see him much.  He was

23   barely in the building.

24         Q    So how were you aware that he was making

25   these statements?

Page 305

1          A     I was told.

2          Q     Okay.  Who told you that?

3          A     Paul Vanderplow, Mayor Bazzi.

4          Q     Okay.  Did you ask Mr. Vanderplow did he

5    address this with Mister -- or with Deputy Chief --

6          A     Yeah, I think they had some conversations,

7    because I think Hussein Farhat suspended Paul

8    Vanderplow at some point.  I think they had some type

9    of contentious relationship.  Me and Farhat -- me and

10   Hussein Farhat had a good relationship, but not those

11   two.  So there must have been some type of

12   conversation.

13         Q     Okay.  Did you just say you and Mr. Farhat

14   had a good relationship?

15         A     Yeah.  We were nice to each other, yeah.

16         Q     Okay.  So why didn't you give him a call and

17   say, "Why are you making these statements?"

18         A     Because I -- I couldn't prove it.  I wasn't

19   going to call someone out on something that I -- you

20   know, that I considered drama at the point, at that

21   point in time.

22         Q     Okay.  If you felt that that was -- that it

23   was impacting your job or he was coming after your

24   job, why wouldn't you make that call to him?

25         A     A lot of people come after my job.  Everyone

Page 306

1   has a right to want to succeed in their careers.

2       Q    Okay.  So he had every right to have the

3   goal of being a chief of police?

4       A    Of course.

5               MS. HUNT:  Okay.  I have no further

6   questions.

7               MR. MIOTKE:  Just a couple based on

8   those questions.

9                       EXAMINATION

10  BY MR. MIOTKE:

11      Q    You said you were told this by Paul

12  Vanderplow; correct?

13      A    Yes.

14      Q    When did he tell you this?

15      A    I'm not sure.  I talk to Paul every day.  So

16  at some point, you know, what, December, January.  I'm

17  not sure.  When -- when one of the times Farhat was

18  actually around.  So I'd have to look at his -- his

19  time sheet, I guess.

20      Q    Was this before or after you had submitted

21  your resignation to the Mayor?

22      A    I don't know.  I'm not sure.

23      Q    All right.  Well, you submitted your

24  resignation to the Mayor around December the 4th of

25  2024; correct?

Page 307

```
 1        A     That's -- that's correct.
 2        Q     All right.  So -- and you said you spoke to
 3   the Mayor about this as well; right?
 4        A     I don't know if I spoke to the Mayor, but I
 5   was told things by the Mayor.  Like, I don't
 6   know -- things --
 7        Q     How were you told these things by the
 8   Mayor --
 9        A     So --
10        Q     -- like, having to do with Hussein Farhat
11   talking about himself as the interim chief?
12        A     So we have conversations all the time.  So
13   when -- you know, you talk to the Mayor, you talk to
14   Paul Vanderplow, the chief, it's just long
15   conversations, and you hear all the drama.  You hear,
16   you know, things that are true.  You hear things that
17   are just word of mouth.  So just from general
18   conversation, things come up, and these are the things
19   that come up when you just have general conversations
20   with people that have, you know, multiple
21   responsibilities and deal with multiple people.  So
22   that's how that happens.
23        Q     Well, the clarity in this situation's
24   important, because if this is before you submitted the
25   resignation or after you submitted the resignation,
```

Page 308

```
1    you understand how that would end up being different,
2    if he's potentially going to be in because you're
3    already gone.  Then I don't know how that would've
4    ended up influencing your decision to leave.
5         A    I don't think that did influence my
6    decision.  I've never said that.  But what I am going
7    to say is --
8         Q    Hold on.  Well, let me ask you that.
9         A    Yeah, go ahead.
10        Q    And if you need to continue your thought --
11        A    No, go ahead.
12        Q    -- then, afterwards.
13             So is it fair to say that Hussein Farhat
14   referring to himself as interim chief had no impact on
15   your decision to leave the Dearborn Heights Police
16   Department?  Is that fair to say?
17        A    Yeah, I didn't necessarily care what -- what
18   Farhat said.  It was the facts of the case, that he
19   was brought into the -- the police department when he
20   probably -- he shouldn't have been there at -- at the
21   point in time when he did come in.
22        Q    And the City Council took no official
23   actions that you're aware of to end up bringing him
24   in; is that correct?
25        A    No.  I mean, they -- there's no action.  The
```

Page 309

1    Mayor hired him.

2                    MR. MIOTKE:  All right.  Okay.  I have

3    nothing further.

4                    MS. HUNT:  All set.

5                    MR. MIOTKE:  Okay.  Very good.  Thank

6    you.

7                    MR. BROWN:  We're good.

8                    THE REPORTER:  One moment, guys.

9                    Ms. Hunt, will you be ordering the

10   transcript?

11                   MS. HUNT:  Yes, please.  E-trans,

12   please.

13                   THE REPORTER:  Okay.  Mr. Miotke, will

14   you be ordering the transcript?

15                   MR. MIOTKE:  Yes.

16                   THE REPORTER:  Okay.  Mr. Turfe, will

17   you be ordering?  No?

18                   MR. TURFE:  No.

19                   THE REPORTER:  Mr. Brown, will you be

20   ordering?

21                   MR. BROWN:  Yes, ma'am.

22                   THE REPORTER:  Okay.  And then --

23   that's all.

24                   Hearing no objections, off the record,

25   5:09 p.m.

Page 310

1              (Whereupon, at 5:09 p.m., the

2          proceeding was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                        586-468-2411
                                                        www.veritext.com

Page 311

1              CERTIFICATE OF DEPOSITION OFFICER
2              I, JAHKARAH L. HAYNES-YOUNG, the officer
3    before whom the foregoing proceedings were taken, do
4    hereby certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.

17                         JAHKARAH L. HAYNES-YOUNG
18                         Notary Public in and for the
19                              State of Michigan
20
21
22
23
24
25

Page 312

1                     CERTIFICATE OF TRANSCRIBER

2              I, LAURA MORIN, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14                              *Laura Morin*

15                                          LAURA MORIN

16

17

18

19

20

21

22

23

24

25

**[& - 2024]**                                    Page 1

| & | | | |
|---|---|---|---|
| **&**   1:21 2:5 3:12 6:11 | **10th**   293:18 | 229:23 | 77:20 140:5 280:11 |

**&**   1:21 2:5 3:12
   6:11

**0**

**0306**   120:1
**0311**   117:9

**1**

**1**   4:10,10 5:13
   41:25 42:1
   45:13 46:10
   64:21 123:8
**1.8**   148:8
**1/10**   141:18,20
   142:22 143:12
   143:14
**1/23/24**   5:9
**1/9/24**   4:16
**10**   4:24 12:21
   133:19,20
   140:4 142:1
**10,600**   212:5
**10/2/24**   4:22
**10/24/23**   4:19
**100**   6:12 15:13
   159:17
**101**   1:22 2:6
**10240**   1:9 6:9
**105**   4:16
**10:07**   1:20 6:5
**10:49**   43:4
**10:50**   43:7

**10th**   293:18
**11**   5:3 135:20
   135:21
**11/20/23**   4:14
**11/27/24**   5:3
**11/5/24**   4:24
**116**   4:19
**117,200**   46:12
**11:18**   124:2
**11:59**   91:14
**12**   5:5 28:15
   31:21 40:22,23
   141:7,8
**12/04/24**   5:5
**12/4/24**   4:20
   141:15
**120**   231:8
**123**   4:20
**126**   4:21
   165:18
**126,600**   126:22
   165:4
**12:11**   91:17
**12th**   28:16,18
   41:5 47:19
**13**   5:7 12:21
   210:4,5,6,7,15
   210:19
**130**   4:23 279:2
**133**   4:25
**135**   5:4
**14**   5:8 211:11
   211:15,21
   217:25 229:12

229:23
**140**   279:2
**141**   5:6
**14207**   2:21
**15**   5:9 251:23
   251:24 252:10
   299:9
**15th**   127:3
**161**   5:18
**162**   4:4
**167,000**   183:10
**16th**   77:21 78:9
**18**   1:19 6:10
   201:11
**18th**   13:10
**1996**   17:20
   190:19
**1998**   17:7 18:1
   18:2,4
**1999**   17:14
**1:08:40**   216:2
**1:17:54**   214:17
   215:25
**1:25**   146:24
**1:41**   147:2

**2**

**2**   4:11,11 5:14
   43:11,13,24
   46:10 126:21
   297:23
**2,500**   280:13
**20**   49:2,3,20
   53:2 58:8

77:20 140:5
280:11
**2000**   92:14
**2001**   18:13
**2004**   18:22
   19:1,3
**2005**   206:6
**201**   3:13
**2017**   191:16
**2020**   16:23
**2022**   28:15
   40:22,23 42:19
   47:19
**2023**   19:1
   42:11 47:16,21
   49:4,14,22,24
   50:2,4 52:16
   52:24 53:1,3,9
   53:25 54:8
   56:4,11,23
   58:22 64:17,22
   67:14 73:2,6
   77:21 85:2,9
   87:20,22 90:5
   90:12 102:3,23
   194:6 202:9
   222:11,22
   241:13 250:11
   250:12 274:21
**2024**   4:15
   12:18 16:23
   102:2 104:8,15
   105:7 124:1
   127:4 128:12

**[2024 - 5th]**

130:24 133:23
136:8,20 142:2
190:21 213:8
222:23 223:7
223:15,17
224:7 250:11
251:12 252:24
274:24 278:25
279:7 296:14
296:17,22,23
296:25 297:23
298:1,2,4
306:25

**2025**   1:19 6:10
13:11 31:21
136:15 157:14
201:11

**2026**   132:6

**204,000**   165:5
165:15,25
166:2

**210**   5:7

**211**   5:8

**22**   53:2 58:8
259:1

**23**   5:13 19:2,17
19:19 46:12
58:20 90:13
101:17,23
103:19 259:13

**24**   64:16 90:13
103:23 131:18
141:4,18
142:22 260:6

**24-228**   218:1,6

**248**   2:9

**25**   140:19
141:20 143:1,2
143:12,14
147:14 206:24
266:1 267:7

**251**   5:9

**257**   64:20

**26**   73:2,6 85:2
85:9 87:20,22
90:5

**26338**   312:14

**26th**   73:16

**27**   135:20
136:20

**27,000**   47:23,25

**27th**   135:23,24
136:8,21,23
137:6

**28.422a**   58:24

**28th**   213:8
223:7,15

**29**   5:14 73:1

**2:24**   1:9 6:9

**2nd**   130:24
296:23

**3**

**3**   4:12 5:15
44:6 48:11,12
58:24 147:7
259:2

**3.1**   43:24 46:11
126:21 127:10

**3.2**   44:6,12

**300,000**   148:5

**3011**   2:14

**30234**   311:16

**304**   4:5

**305**   120:4,6

**306**   4:6 120:7

**307**   119:4

**313**   2:17,24 3:9
3:16

**32**   77:20

**37**   5:15

**38**   85:1 211:25

**388-4809**   3:9

**39**   86:14

**3rd**   126:25

**4**

**4**   4:14 5:16
49:3 97:10,11
124:1 167:17
175:3 209:11

**4.1**   167:17,20
175:2

**40**   89:15 217:4

**401**   13:20

**41700**   1:22 2:6
6:11

**42**   4:10

**43**   4:11

**48**   4:13

**48101**   3:7

**48116**   12:15,22

**48126**   2:22
3:14

**48168**   1:23 2:7
6:12

**48202**   2:15

**4:28**   281:15

**4:35**   281:18

**4th**   124:12,12
128:11 129:14
141:13,14
181:24 306:24

**5**

**5**   4:16 5:18
105:14,15
147:14 166:15
166:16 175:3

**5,000**   207:11

**5/28/2024**
214:21

**5/28/24**   5:7,8

**525**   2:14

**551-3038**   3:16

**5574**   12:21
163:4,13

**5:09**   309:25
310:1

**5th**   133:23
134:5 140:2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| 6 |
| --- |

**6**  4:17 72:25
  116:22,23
  123:17,18
**6050**  3:13
**61**  212:12
**636**  212:13
**638**  212:13
**639**  212:13
**655**  212:12
**66**  5:17
**6828**  3:6
**6th**  136:13
  137:8 143:18

| 7 |
| --- |

**7**  4:20 85:1
  123:20,21
  141:23
**70**  72:9
**750**  64:20
**7548430**  1:25
**78**  77:11 107:8
  175:18,25
  191:18,18
  192:6,10,16,21
  193:3 194:9
  196:6 197:1,11
  198:1 204:23
  227:15 237:12
  239:18,19
  243:10 270:20
  274:2,5,6,7,9
  274:10,14

  275:5 288:14
  299:24 300:8
  300:17 301:1,6
  301:11,17,22
  301:25 303:15

| 8 |
| --- |

**8**  4:3,21 63:16
  63:16 126:4,5
  126:10,11,12
  166:7 174:24
  175:3
**80,000**  163:21
**846-1910**  2:24
**871-5500**  2:17
**88**  178:18

| 9 |
| --- |

**9**  4:22 47:21
  117:24 118:9
  122:20 130:9
  130:10 210:19
  212:14 222:22
  297:9,10,11,23
  298:3
**9-1-1**  61:18
**90,000**  43:25
**900**  58:23
  60:18,21
  259:11
**912-3213**  2:9
**92**  298:2
**97**  4:15
**9779**  12:14

**98**  18:6,7
**99**  18:2
**9th**  179:18

| a |
| --- |

**a.m.**  1:20 6:5
  43:4,7 63:16
  91:14 124:2
**abdallah**  117:3
  117:6
**abdel**  222:10
**ability**  9:18
  31:17 84:8,13
  86:10,12,23
  87:5,6 88:12
  88:18 90:15
  98:24 99:2,15
  311:10 312:7
**able**  10:21,21
  35:9 57:11
  61:6 62:2 69:9
  99:11 100:5
  102:13 105:2
  118:24,25
  156:13 160:18
  161:7,15 204:7
  207:9 223:21
  261:20 269:15
  269:17 286:7
  299:17
**above**  204:13
  212:8 279:15
**absence**  24:11

**absent**  6:15
  10:22
**absolutely**
  248:9 253:13
**abundant**  83:8
**academy**  17:3
  17:13,22 18:3
  190:25
**accept**  42:22
  113:8
**accepted**  93:5
  93:13 270:22
**access**  29:18
  33:14 35:9,9
  35:19,20 38:14
  39:1,8 62:2
  272:11
**accessed**  34:4
**accident**  207:1
  229:16,18
  231:15 232:14
  232:15 233:1
  233:12
**account**  148:7
  266:12,18
**accounting**
  148:3
**accounts**
  150:20
**accreditation**
  191:11,11
**accurate**  121:6
  121:12 276:6,8
  285:20 298:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com          586-468-2411
www.veritext.com

311:9 312:5
**accused** 270:6
294:2,3
**ach** 212:11
**acknowledge**
72:4 301:1
302:1,25
**acknowledged**
11:16
**acknowledge...**
6:14 72:5
**acquaintance**
178:5
**acquittal**
271:14,15,18
**acquitted** 271:6
**act** 77:11 107:8
175:18,25
178:18 191:18
191:18 192:6
192:10,16,21
193:3 194:9
196:6 197:1,11
198:1 204:23
208:5 227:15
237:12 239:18
239:18 243:10
270:20 274:2,5
274:6,7,9,10,14
275:5 276:15
288:14 292:2,3
299:24 300:8
300:17 301:1,6
301:11,17,22

301:25 303:15
**acted** 254:14
**acting** 24:2,7
24:18 35:3
89:16,17 114:8
114:8 207:18
208:6,8,11,16
208:19,25
209:3,6 223:8
242:2,10
244:20,25
245:17,21
250:18
**action** 80:19
87:10 125:13
150:6 164:14
172:12 308:25
311:12,16
312:8,12
**actions** 63:5
118:12 147:10
270:15 308:23
**actively** 178:23
232:7
**activities**
223:24 249:5
**activity** 240:20
262:24
**actual** 10:7
50:19 51:15
65:24 68:7
92:14 190:3
**actually** 27:16
37:22 46:4

66:21 72:15
75:11 89:19
105:1 113:1
114:4 128:18
131:7 151:18
167:15 193:19
198:9 209:21
214:13 220:14
221:13 237:24
243:8 271:17
274:6 289:23
299:14 306:18
**add** 8:15
162:16 267:16
**added** 56:20
115:23 211:1
212:14 234:22
**addition**
138:16
**additional**
78:23 87:18
140:8 277:18
**additionally**
6:15
**address** 12:13
12:17,23 163:3
163:5,11,13,18
305:5
**administer**
6:14
**administration**
65:5,12,14
171:6 173:15
198:17 219:4

219:19 253:1
278:17 302:2
**administrative**
20:7 115:15
174:11 271:12
**administrator**
66:3,4,8,8
262:5,6
**administrators**
151:17
**admission**
186:7
**admit** 113:4
**admitted** 41:25
293:5
**adopt** 193:3
302:14
**adopted** 167:4
194:6 251:19
**adopting**
252:15 299:23
300:17
**advantage**
13:24
**adverse** 86:15
87:10 172:11
**adversely**
86:23
**advice** 216:3
**advise** 27:19
60:6 131:2
135:8
**advised** 187:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **advocate** 220:10 | 254:5 302:11 | **allegations** 15:16 48:25 | 272:5 275:10 284:18 295:9 |
| **affair** 278:5 | **agreed** 31:25 32:2 129:13 | 53:18 156:11 159:11 | **amended** 4:12 48:14,16 259:1 269:21 |
| **affect** 87:16 | **agreement** 4:21 | **allege** 15:19 | **amendment** 118:13 |
| **affected** 161:13 | 10:6 15:14 | **alleged** 164:18 | **american** 137:19 284:23 |
| **afford** 164:4 | 167:16 169:13 169:21,25 | 226:22 258:25 259:13 | 287:17 288:16 |
| **afield** 67:3 | 171:22 172:1 | **allegedly** | **americans** 294:6 |
| **afternoon** 159:13 | 175:14 177:2 188:11 194:4 | 108:23 201:12 261:18 | **amount** 56:25 68:17,19,20 |
| **ag** 56:20,20 | 204:4 256:20 257:12,19 | **allen** 2:13 3:7 134:2 | 69:6,10 77:2 83:8,22 148:10 |
| **ag's** 260:16,18 | 291:9 | **allow** 8:21 10:11 236:25 | 171:10 182:23 182:24 203:22 |
| **age** 254:15 255:1,10,13 | **agreements** 172:24 173:13 | **allowance** 280:15,17,19 | 252:24 261:20 276:10 281:6 |
| **agencies** 49:2 49:18 50:11,13 | 173:22 174:6 189:2 | **allowed** 10:4 10:10,17 68:22 | **amounts** 281:4 |
| 51:20 52:17 56:18 147:21 | **ahead** 68:1 119:3 162:21 | 150:17 193:7 204:5 291:9 | **analysis** 161:23 |
| 149:4 260:22 | 189:7 197:5 224:11 265:24 | **allowing** 240:25 | **andrea** 94:9 205:18 |
| **agency** 51:9 149:6 174:11 | 308:9,11 | **alter** 9:18 | **angela** 242:17 242:19,23 |
| **agenda** 94:25 209:21 211:1 | **ahmad** 74:5 119:24 212:10 | **alternative** 99:18 | 245:6,7,12,13 245:16 246:12 |
| 212:14 213:4 243:3,9,18 | 272:24 | **amanda** 164:2 | 246:22 247:22 251:4 |
| **agendas** 243:5 | **aide** 236:3 237:22 238:6 | **ambiguous** 172:6 195:1 | **animus** 254:14 |
| **agents** 154:6 | **ain't** 158:10 | 198:20 199:6 214:3 224:22 | **answer** 8:20,21 9:1,2,8,14,14 |
| **ages** 14:19 | **air** 139:6 | 225:23 228:23 234:21 241:16 | 9:18 10:24 |
| **aggressive** 118:12 | **alabama** 16:19 | 247:6 251:15 | |
| **ago** 91:23 267:13 | **alglawpc.com** 2:16 | | |
| **agree** 6:17 160:4,4,7,13 | **allegation** 49:20 | | |
| 161:18 248:21 | | | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
www.veritext.com

11:9,13 55:24
138:12 159:4
190:10 193:9
227:23 228:25
279:19 302:20
**answered**
168:20 280:4
**answering**
95:17 103:9,11
**anticipated**
109:4,4
**anticipation**
296:9,11
298:22
**anybody**  65:21
65:25 263:1
**anymore**  88:7
205:13
**anyways**  274:5
**aoun**  233:10
**apparently**
34:2 35:24
229:17 249:3
**appear**  94:24
126:24 159:13
253:19
**appearance**
10:11 187:11
**appearing**  7:11
230:14
**appears**  43:18
46:20 97:25
107:7,10 117:2
117:12 127:9

134:24 136:2,5
138:15,16
140:1 253:4
**appease**  107:13
107:22
**appeasing**
108:5
**applicable**  6:21
**application**
297:5
**applied**  172:18
177:10 295:7
302:21
**applies**  16:3
**apply**  77:2,4
81:21 173:9,12
239:17
**appoint**  193:1
**appreciate**
216:11
**appreciating**
213:13
**approach**
160:8 161:18
**approached**
162:3 288:14
**appropriate**
78:7 83:22
193:16 232:4
232:13 234:5
270:2 272:4
285:16
**appropriately**
196:15 273:12

**approval**
291:16
**approve**  99:8
114:21 212:11
**approved**  77:4
99:3,8 177:10
213:4
**approximately**
13:10 18:10
19:7 46:21
47:25 140:5,22
140:24 183:7
202:20 208:5
**april**  18:22
299:2
**arab**  73:4
137:18 253:24
254:7,11
255:16 284:22
287:17 288:16
294:6
**arbitration**
187:19,20
188:1,3,5,8,10
188:11,21,25
189:2,12,15
201:5
**arbitrator**
201:11
**area**  159:2
**areas**  157:19,20
292:5
**argument**
186:22

**argumentative**
138:3 167:11
171:15 284:18
295:9 302:17
**arisen**  194:22
**arms**  39:14
**arrangement**
181:10
**arrest**  77:23
**arrived**  70:4
150:18
**article**  197:12
197:21,24,25
**articles**  196:5
**aside**  235:7
**asked**  9:22 11:8
66:24 73:2
75:6 89:15
103:20 104:1
108:10 110:7
118:3 122:19
128:11,23
129:4 139:23
140:3 152:9
156:1 158:21
162:16 168:19
183:19 192:25
200:22 206:1
292:19,21,22
293:18
**asking**  8:25
11:19 41:16
53:16 63:7
66:15 74:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com                 586-468-2411
www.veritext.com

[asking - aware]

82:4,12 94:18
120:2 159:3
192:18 199:24
219:25 230:12
245:12 267:17
273:3 284:4,4
301:10
**asks** 205:19
295:4 301:4
**assault** 80:17
**assaulted**
269:17
**asserting** 15:25
**assign** 25:9
**assigned** 6:3
153:25 154:2
204:21
**assist** 234:22
234:23
**assistance**
233:6
**assistant** 66:3,8
236:2,5 238:12
262:6
**assistants**
286:1
**assisted** 20:8
**associated**
185:16
**associates** 3:12
**association**
180:10 240:13
**assume** 9:1
45:17 71:21

83:22 84:22
109:12 112:1
118:6 132:12
136:24 141:19
152:15 188:12
224:15 231:9
249:14 268:18
272:11 282:3,4
287:3 300:6
**assumed**
193:10
**assumes** 116:11
121:1,20 128:4
138:3,20
167:10 170:2,3
171:13,14,14
185:22 186:10
186:10 189:4
197:6,15 199:6
203:10 207:25
214:3 225:23
229:8 231:5,18
233:15 234:9
234:21 236:21
247:5 253:25
279:9 300:1
301:3
**assuming** 134:2
**assumption**
277:8
**attached** 78:24
140:4
**attack** 248:12

**attacked** 248:8
**attacks** 294:8
**attempt** 149:23
162:4
**attempted**
104:24,25
**attend** 95:11
98:12,18 99:24
101:18 102:21
114:14 117:20
191:14 197:1
295:24 296:1,3
**attendance** 7:3
95:13
**attended** 98:15
103:24 110:1,4
213:7 217:13
295:21 298:1
299:14,17
**attending**
95:16 98:22
99:14 197:11
197:21 211:4
**attorney** 7:10
7:17 9:12,13
11:17 37:20
48:15,18 50:11
54:16 94:5
154:17 159:13
166:11 185:10
185:15,19
190:2 274:6
290:4 297:8
311:14 312:10

**attorneys** 10:7
184:14 187:22
222:17,21
**audio** 121:8,12
311:8 312:3
**audit** 55:19
56:1 57:13,21
57:23
**august** 1:19
6:10 17:14
18:1,2,2 31:21
**authority** 25:19
167:3 189:10
193:1 233:22
233:25 234:2
294:25 303:7
**authorized**
6:13 30:9
227:16
**automatically**
276:19
**available**
100:18 202:19
**avenue** 3:6
231:2
**award** 201:11
**aware** 49:21,24
58:13,16 63:5
72:14 75:17,21
78:1 116:6,16
143:24 144:10
144:14 159:14
192:15 193:13
193:18,23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[aware - bazzy]** Page 8

194:21 199:2
201:10,16
205:22 234:19
252:14 279:4
304:24 308:23

**b**

**b**  4:8 5:1
210:19 212:14
228:15,16
**back**  24:23
26:14 40:20
43:6 46:10
48:9 91:16
126:25 139:14
146:1 147:1,6
150:18 183:4
192:2 215:21
216:10 217:25
219:19 223:15
223:22,23
241:12 250:16
271:13,18,19
271:21,25
281:5,6,17
290:6 295:13
**background**
20:12 91:20
131:11 137:3
139:3,5,10
140:8 231:14
**backtrack**
61:14

**backup**  131:16
137:13 138:10
295:16
**bad**  278:10
**badge**  236:10
236:15
**badgering**
298:8
**badly**  244:9
**bailey**  66:9
79:12 80:11,18
80:24 82:19
83:8 262:17
268:12 269:6,7
270:2,4,16,25
272:4,8 273:7
273:10,14,20
**balance**  148:16
**balances**  148:3
**bank**  150:14
281:6
**banked**  165:6,7
**bankruptcy**
206:3
**banks**  165:7,17
165:21
**barely**  304:23
**bargained**
291:7
**bargaining**
169:13,21,25
171:21 172:1
175:14 177:1
180:25 181:3

189:1 194:4
**barlow**  69:1,12
69:14,15,17,25
70:6
**base**  160:19
**based**  11:18
26:4 77:10,12
86:25 125:5
151:12,14
173:21 174:5
189:17 234:2
235:6 254:15
265:10 271:11
283:7 306:7
**basement**
55:13
**basically**  71:11
88:1 96:13,15
108:24 129:18
168:21 188:4,6
188:22 189:13
203:17 209:1
228:7 236:4
237:20 257:21
263:3 264:14
273:15
**basis**  24:18
95:14 161:6,8
161:11,14,21
188:9 249:2
256:25
**bate**  120:3
**baydoun**  73:2
73:14 74:2,6

74:14,15 75:24
76:4,8 119:5
213:15 217:19
218:12 246:15
246:19 251:5
268:1,6 272:24
**bazzi**  9:22 24:6
24:22 30:9
32:13 84:6,17
84:18 85:3
87:13 97:15,22
107:21 125:4
127:23 141:11
141:23 181:18
183:25 187:1
194:1 196:3,8
196:13,21
220:6,10,14
221:1,6 228:10
228:13 252:17
258:11 261:4
268:21 284:15
285:14 286:3
286:23 287:23
288:3,9,11
289:8,9,22,25
305:3
**bazzi's**  278:17
**bazzy**  73:3,19
74:15,20,21
75:9,17,20
76:4 80:25
82:21 85:19,22
86:17 87:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

88:3 110:21,22
243:9 244:5
262:8 270:4,16
273:10,11,23
273:25,25
275:16,18,19
276:2
**bazzy's** 270:19
**beach** 16:19
**bearden** 249:15
249:17 250:13
**beat** 269:14,16
290:7
**becoming**
106:6
**bed** 194:7
**began** 8:15
49:15 71:8
79:18 150:24
**beginning** 4:19
7:4 46:12 49:3
168:24 282:12
**behalf** 2:2,11
3:2 7:6,9,12,14
7:18 10:12
48:15,16 70:2
93:5,13 184:5
184:6 197:2
**behavior**
116:17 119:17
120:24 121:15
122:13
**beings** 233:2

**belief** 10:3,9
29:15 36:25
56:10 93:17
137:1 156:9
171:19
**believe** 8:16
16:22 33:17,23
35:6 40:23
46:9 50:3
57:19 71:4,5
76:14,16 78:11
79:4 81:22
82:8 87:8,20
87:22 88:25
89:22 93:13
95:19 101:23
102:5 103:22
108:7,25
109:17 111:9
116:3 121:4
128:13 137:3
155:24 156:8
158:21 164:19
166:7 171:25
172:17,22
176:7 181:2
186:2,5 187:8
222:24 224:6
224:13 229:7
232:20 233:25
234:2 242:6,6
242:7,16 243:2
243:4,10,14,15
243:18 246:1,8

254:23 265:25
271:5 273:5
274:17 284:6
285:4 287:17
301:16 303:15
**believed** 76:4
88:24 121:5,6
137:5 172:18
284:5 303:22
**believes** 242:15
**believing** 273:7
**belligerent**
118:14
**bells** 263:7
**bending** 90:19
**beneath** 20:21
62:6
**benefits** 13:17
13:25 44:3,5,7
44:7,11,12,15
44:20,25 95:23
96:1,5 102:11
104:21 127:10
127:11,14
133:10 138:16
144:19,19
165:19,23
167:3 179:6,12
179:16,22
**berro** 228:14
228:22 229:7
229:11
**best** 8:20
107:15 119:8

120:25 193:9
205:4 223:3
225:22 292:9
311:10 312:6
**better** 36:2,4
96:16 109:1
215:12 218:15
**beyond** 16:25
186:25 214:2
267:5 281:2,7
288:10
**bids** 270:8,9
**big** 63:9 65:13
108:23 147:8
202:18 275:13
**bit** 30:25 42:23
43:11 60:17
94:22 140:3
211:11 216:4
265:23 272:19
**board** 77:9,9
177:13
**boards** 86:1
171:2
**bodies** 147:20
149:4
**body** 78:23
120:7
**bones** 164:10
**bonus** 280:9,13
280:18,19
**bonuses** 138:17
279:5 280:8

| | | | |
|---|---|---|---|
| **borders** 154:24 | 239:10 258:14 | 173:25 174:7 | 297:12,14 |
| **boston** 98:2 | 271:13,17,19 | 185:15,21 | 298:7,17 300:1 |
| **bottom** 117:9 | 271:20,25 | 187:10 188:17 | 300:19 301:3 |
| 212:8 | 285:21 292:8 | 189:3 191:22 | 301:13,18 |
| **boucher** 235:4 | 308:19 | 194:16,25 | 302:16 303:9 |
| 238:20 | **brown** 2:4 7:17 | 197:3,6,14 | 303:17 309:7 |
| **boulevard** 2:14 | 7:17 15:22 | 198:19 199:5 | 309:19,21 |
| **box** 38:16,17 | 16:1 22:4 23:9 | 199:16,24 | **bryer** 74:6 |
| **boxes** 40:17,17 | 23:12 29:3,23 | 200:2 201:20 | 217:19 218:13 |
| 212:8 | 31:19 32:8 | 203:10 207:24 | 254:6 |
| **break** 9:5,9 | 35:12 37:5 | 214:1,23 | **budget** 90:1,2 |
| 91:6 146:1,8 | 54:2 59:5,9 | 219:23 220:17 | 90:11,12 103:7 |
| 257:8 281:11 | 66:20 82:1,5 | 221:15,19 | 166:24 167:4 |
| **breakout** 96:13 | 82:10 88:14 | 224:8,21 | 213:19 302:12 |
| **breaks** 9:6 | 91:5,12 99:20 | 225:22 227:22 | 302:22 |
| **brief** 91:6 | 107:14 109:20 | 228:23 229:8 | **budgetary** |
| **briefings** | 111:14 112:24 | 229:25 231:4 | 303:6 |
| 114:14 | 116:8,11,19 | 231:17 233:14 | **budgeted** |
| **briefly** 147:9 | 118:15 119:8 | 234:8,20 | 300:13 302:7 |
| **brighton** 12:20 | 120:2,25 | 236:21 240:10 | **budgets** 90:7 |
| 12:22 163:4,10 | 121:17,20 | 240:16 241:16 | 90:14 |
| 163:11 | 123:3,18 128:3 | 243:11 247:5 | **building** 114:7 |
| **bring** 204:1 | 138:2,20 | 248:23 251:7 | 196:17 304:23 |
| 287:10 288:15 | 142:24 143:3,6 | 251:14 252:1,4 | **bullet** 108:9 |
| 297:4 | 145:24 146:8 | 253:9,25 257:5 | 109:3 |
| **bringing** 11:6 | 146:17 156:17 | 257:7,11 263:9 | **bullying** 121:9 |
| 216:11 287:13 | 156:20 157:24 | 272:5 275:9,21 | **bunch** 59:25 |
| 290:20 308:23 | 158:6 160:4,7 | 276:3 277:15 | 162:15 164:10 |
| **broached** 108:3 | 160:15,24 | 278:21 279:9 | 191:12 |
| **broke** 164:10 | 161:2,17 162:6 | 281:10,13 | **bureau** 49:10 |
| **brought** 26:1,2 | 164:2 167:6,9 | 282:15,24 | 69:16 150:2 |
| 100:24 102:17 | 168:12 169:14 | 283:9,20 | 202:24 203:7 |
| 193:5 198:23 | 170:1 171:12 | 284:17 286:25 | 203:18 204:3,6 |
| 198:23 200:6 | 172:5,15,25 | 295:8 297:10 | 204:9,14,21 |

231:22 238:12
241:5 248:22
249:1,13
**bureaus** 249:7
**burn** 142:4,5
142:16 144:3
145:9
**burned** 145:8
**business** 86:8
158:25 286:11
**businessman**
90:22
**buy** 281:5,6
**bystanders**
233:2

**c**

**c** 2:1 3:1 5:11
6:1 200:15
212:4 226:6
**cadet** 237:22
**calea** 191:12
**call** 27:12,18
48:4 57:6
63:21 90:22
98:10 112:11
158:5 178:4
210:24 263:13
299:3 305:16
305:19,24
**called** 8:3 23:4
29:19 57:19
109:14 139:22
205:18 221:13

277:24
**calling** 16:7
229:15 236:4
246:23 304:11
304:14
**calls** 82:1 139:7
167:9 168:12
169:14 172:15
172:25 173:25
194:16 201:21
224:8 231:19
246:18 251:7
272:5 282:15
302:18 303:10
303:17
**cam** 78:23
**camera** 78:23
214:10 220:22
220:23,24
**cameron**
142:19 182:6
182:15,22
183:15 187:1
**candidates**
205:4
**capacity** 94:14
**caps** 210:25
**capt** 38:9,10,11
39:1
**captain** 64:11
291:12
**captain's** 33:8
**car** 247:18
248:6

**care** 108:19
164:11 187:23
196:18 207:5
308:17
**career** 191:6
**careers** 306:1
**cares** 108:10
161:12
**carmody** 134:3
**carried** 39:11
**carrier** 40:15
**cars** 232:8,9,10
**case** 1:8 6:9
10:5 15:15
52:12 53:7
58:11,14 93:25
94:16 95:1,3
108:25 109:15
153:4,9,11,11
153:15,22
188:18 190:4
208:12 234:11
255:3,4 257:25
258:1 281:22
286:12 308:18
**cases** 67:6
150:3,5 258:16
290:7
**cash** 233:11
**categories**
145:17
**category**
145:16

**cause** 37:2
39:11 52:25
79:16 88:7
112:13 159:8
167:25 178:17
202:4 206:19
223:18 237:21
247:22 257:21
269:6,16 288:9
290:13
**caused** 79:4
284:16 285:7
285:12 292:15
**cba** 73:5 81:9
81:19,22 82:9
**cc'd** 185:23,25
**cease** 100:24
101:9 179:17
**ceased** 145:5
**ceo** 114:23
**ceremony**
128:19
**certain** 30:16
37:21,23 49:1
62:20 68:17,19
68:20 69:2,6
69:10 70:3
72:18,23 77:1
81:23 95:23
96:14 110:9
115:8 116:17
150:22 169:24
171:10 240:2,5
249:7 258:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                        586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 261:20 267:16 | charges 271:1 | 84:4,8,18,23,23 | 224:3,4 227:14 |
| 276:16 281:6 | charging 80:16 | 87:9,12 88:6 | 227:16 230:18 |
| certificate | charles 176:8 | 93:8 95:11 | 230:20 251:20 |
| 311:1 312:1 | charter 301:8 | 96:12 97:7,8 | 252:16 258:12 |
| certified 6:18 | chase 231:2 | 97:15,23 98:21 | 259:7,24 |
| 77:11 144:7 | chases 230:23 | 109:10 111:17 | 260:20 263:3 |
| certifies 177:15 | 231:7 | 112:21,23 | 263:10 266:4 |
| certify 311:4 | check 25:12 | 113:4,16,19 | 267:2 268:19 |
| 312:2 | 47:4 139:4,5 | 114:2,7,8 | 268:20 270:12 |
| chain 4:17 25:7 | 139:10 145:13 | 115:5,17,17,23 | 275:12 283:22 |
| 26:1 53:4,10 | 145:14,20 | 116:2,3 125:17 | 283:22 284:21 |
| 53:22,25 54:9 | 182:23 183:13 | 125:21 126:1,8 | 285:5,7,13,18 |
| 54:19 56:5 | 183:19,20,20 | 126:20 129:10 | 285:18,24 |
| 58:17 117:13 | 183:22 223:18 | 131:3 134:2 | 286:8 287:14 |
| 185:4,16 | checks 47:4,6 | 135:2 137:2,19 | 288:16,25 |
| 258:25 | chief 4:23,24 | 141:17 147:11 | 290:12 291:10 |
| chair 119:24 | 20:8,19,22,23 | 150:8 155:22 | 292:2,3 304:10 |
| 120:9,12 | 20:24 21:3,4,6 | 172:3 176:23 | 304:12,13,14 |
| 213:15 217:18 | 21:10,21 24:1 | 176:23 177:4,5 | 304:19 305:5 |
| 218:12 | 24:2,3,5,8,10 | 177:19 178:3 | 306:3 307:11 |
| chami's 265:12 | 24:14,18,21 | 191:8 193:20 | 307:14 308:14 |
| chance 176:6 | 25:8 26:2,5,13 | 195:25 196:3 | chief's 33:2,4 |
| 177:11 209:12 | 26:18,19,20,21 | 196:20 198:23 | 33:11 40:14 |
| change 21:7 | 27:4,6,24 28:7 | 199:14 200:8 | 74:10 107:8 |
| 23:21,25 47:12 | 28:11 32:25 | 201:18 202:1,2 | 114:17 |
| 114:20 138:12 | 33:1,16 34:2,5 | 202:25 203:4,9 | children 14:17 |
| characterizati... | 34:6,8,11,18,24 | 203:13 207:18 | 14:23 15:18 |
| 191:23 201:22 | 35:3 37:4 38:8 | 207:18,19,20 | 16:11 189:21 |
| 243:12 263:10 | 40:3,4,6,20 | 208:6,7,8,10,12 | 189:24 |
| characterize | 41:7 45:22 | 208:16,18,19 | chime 291:24 |
| 193:8 | 47:18 55:6 | 208:25,25 | choice 180:2 |
| charge 153:2 | 59:14 65:10,10 | 209:1,2,2,4,5,6 | choose 216:21 |
| 231:22 262:25 | 67:15,16 74:13 | 209:7,8,20 | chose 293:13 |
| | 75:13,22 83:25 | 220:6 223:6,8 | |

Carroll Reporting & Video
www.veritext.com        A Veritext Company        586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **chosen**   205:4 | 89:23 90:22,24 | 165:9,10 166:1 | 236:16 237:14 |
| 219:15 | 92:9 93:4,13 | 166:18,21,24 | 238:2 240:21 |
| **circumstances** | 93:23 94:4,5 | 167:4,22,23 | 241:14 242:3,9 |
| 248:11 | 94:11,15 99:9 | 168:10 169:1,2 | 242:10,16 |
| **circumstantial** | 99:10 100:23 | 169:9 170:8,9 | 243:2 244:20 |
| 246:1,8,24 | 101:18 105:8 | 170:14,15 | 245:1,17,21 |
| 248:15 250:18 | 108:18 109:24 | 171:22 172:12 | 248:21 250:19 |
| 276:25 | 109:25 110:9 | 173:3,8,23 | 250:20 251:13 |
| **citizen**   22:15 | 110:23 112:6 | 175:8,10,15,18 | 252:14 253:1,2 |
| 23:6 25:4 | 116:13,18 | 175:25 176:19 | 253:7,23 255:5 |
| 64:10 86:5,9 | 117:3,20 | 177:2 179:2,6 | 258:9 266:20 |
| 225:6 | 118:11 119:6 | 179:13,16 | 266:21 268:5 |
| **citizens**   30:15 | 119:16 123:13 | 180:1,5 181:3 | 268:21,22,23 |
| 88:10,18 242:1 | 127:19 128:2,9 | 182:19 183:17 | 269:5 270:1 |
| 248:12 | 128:18 129:24 | 185:2 188:15 | 272:3,16,18 |
| **city**   1:9,13 2:11 | 130:4,5 131:2 | 188:16 190:13 | 273:6 276:11 |
| 3:3 5:5 6:8 7:6 | 131:7,23 | 190:13,13,15 | 277:4,10 |
| 7:9,9,12,15 | 132:14,19,24 | 191:21 192:4,9 | 278:17,18,20 |
| 8:13 9:21 10:7 | 133:9,15,22 | 194:1,5,23 | 278:25 279:15 |
| 10:8 11:12,18 | 134:15 136:10 | 195:12 196:3 | 279:23 280:3,5 |
| 14:7,24 15:7 | 136:25 137:7 | 197:2 198:9,15 | 283:5,7,12 |
| 15:10,13,16,17 | 137:24 138:8 | 201:6 209:21 | 284:11,16,22 |
| 17:16 21:7 | 138:11,14 | 210:20 211:1,5 | 285:12,12 |
| 23:9,19,22 | 139:8,12,18,21 | 212:23 216:3 | 286:18,20,22 |
| 26:16 31:17 | 140:14,25 | 218:7,9,21 | 287:8,9 288:2 |
| 39:20 44:21,24 | 141:17 143:11 | 219:5 220:14 | 288:8,9,15,21 |
| 46:8 47:20 | 143:24 144:20 | 221:3,7 222:9 | 288:24 290:5,8 |
| 49:6,7,8 65:12 | 144:24 145:2,6 | 223:20 225:10 | 294:5,9 295:15 |
| 65:14 66:25 | 145:10 147:12 | 226:8,14,16 | 296:21 299:11 |
| 67:1 73:7 76:9 | 149:10,25 | 227:3,9,13,19 | 299:22 300:7 |
| 79:17 85:23 | 154:22 155:5,8 | 230:13 232:18 | 300:16 301:8 |
| 86:5 87:19 | 157:8,12,18 | 233:13 234:3 | 302:2,5,14,25 |
| 88:25 89:3,3,6 | 161:3,10 | 234:17,25 | 303:14,20,20 |
| 89:9,12,16,18 | 164:14,18 | 235:1 236:6,10 | 308:22 |

**city's** 11:22 66:22 68:25 173:14 194:24 302:2

**civil** 49:7 77:22 147:19 151:19 151:20,24 156:7 206:10 206:12 239:19 240:24 268:9 268:14

**civilian** 232:17 271:21 301:23

**civilians** 232:18 232:20,21

**claim** 106:15 123:1,2 160:19 161:7,8,11,14 174:11,16,21

**claimed** 88:23

**claiming** 270:11 278:4

**claims** 123:11 211:2 212:9,11 212:13

**clarification** 103:4 156:18 159:22

**clarify** 8:25 156:14 162:19 169:7 172:8 175:17 207:19 259:19 264:10

**clarifying** 53:18

**clarity** 158:3 307:23

**class** 16:24 217:5

**classes** 16:20 16:25 17:3,4 213:14 217:3

**cleaning** 247:23

**clear** 11:18,23 120:13 186:17

**clerical** 296:12 298:17

**clericals** 240:14

**clerk** 264:22

**clerks** 61:20 62:25 63:2

**client** 185:19

**close** 137:20 178:5,9 242:16 243:2 282:12

**closed** 272:16

**closer** 164:11 222:21,22

**closet** 38:20,21 40:14

**club** 249:1

**clue** 195:23

**cobra** 15:12,14 166:18

**codh** 117:8

**coffee** 154:12 154:13 272:22 272:24

**colleague** 178:6

**colleagues** 178:10

**collect** 178:19

**collecting** 179:2

**collective** 169:13,21,25 171:21,25 175:14 177:1 189:1 194:3

**collectively** 49:4,21

**college** 16:13 16:15,18 190:20

**color** 268:11

**columbia** 16:16 16:21 17:1

**combination** 145:19

**come** 25:2,3 63:14 74:19 109:24 146:1 150:17 194:9 219:19 237:21 239:17 242:2 243:21 246:12 282:7 305:25 307:18,19 308:21

**comerica** 13:1 13:2,9

**comes** 90:2 291:3

**coming** 20:13 52:23 179:20 179:21 219:22 222:22 223:15 279:6,12 305:23

**command** 25:7 26:1 169:8 175:7 191:3,5 191:14 200:11

**comment** 102:24 103:10 103:16 118:25

**commented** 245:18,22

**comments** 32:3 103:5,15,17 244:21 246:17 250:16 265:14

**commission** 77:11 177:15 198:2 274:2,6 274:7 275:5

**commissioner** 288:14

**commissioners** 176:3 196:7 274:14

**common** 121:9 144:2,2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

communicated
157:7
communication
11:15 27:9
42:4,9,18 46:4
184:25 186:6
186:20 187:2
289:5
communicati...
54:22,25
183:24 186:25
190:7 221:23
287:3
community
85:3 110:8
159:1 175:18
192:10,16,21
193:2 194:10
242:13 287:14
287:17,18
company 57:15
57:18
compensation
167:3 279:14
competition
216:15,18
competitive
204:22 213:14
217:2
complainant
67:21
complained
277:10

complaining
262:7
complaint 4:12
15:20 22:14
23:6,15 25:4,5
48:14,17,25
49:13 60:16
64:10 123:9,10
153:12 156:5
156:11,12
159:10 187:5
188:16 189:22
194:5 259:1
269:21,21
complaints
23:7 49:17,22
49:23 50:1,5
58:17 147:25
148:1 149:7,11
156:10
complete
271:19
completed 23:3
62:24 65:20
79:2
completely
199:3
completing
17:21
completion
31:25
complex 199:6
251:14 284:17
303:9

compliance
150:18,19
266:17
compound
107:15 121:21
214:2 227:22
277:16
comprehensive
83:20
comptroller
182:7,9 183:2
183:19
computer
23:10 66:22
161:3 202:6
computers
28:24 29:15
68:25
concern 119:15
120:20,21,22
169:22 248:21
concerned
85:18 119:17
120:21 121:3
122:12 139:8
198:7 247:3
256:13 302:6
concerning
49:5 248:2,13
concerns 116:6
116:17 119:7
121:15,25
122:1,6 195:11
216:14 238:16

240:9 246:17
concert 89:16
89:18 242:2,10
244:20,25
245:17,21
250:19
concluded
310:2
conclusion
168:13 169:15
172:16 173:1
174:1 224:9
302:18
conclusions
161:23
concrete 79:8
conditional 5:3
136:2
conditions
169:22 173:21
conduct 22:1,3
22:8,11,12,21
22:24,25 25:19
25:22 26:9
57:14 80:6
115:13 226:22
232:11
conducted
22:13,20 26:7
conference
74:10 75:10
151:20
conferences
96:12,18,23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

confidence   5:9
251:19 252:15
confidentiality
154:19 159:14
256:20 257:12
257:19
confirm   149:9
197:18 199:25
conflict   11:19
conflicting
204:15,18
confused   257:6
300:19
confusing
35:13 67:25
107:15 121:1
168:14 199:6
214:2 251:15
252:12 275:9
277:16 303:10
connected
110:9
connection
90:24
connections
110:10
consensual
249:18
consequences
86:16
conservator
206:22 207:10
207:12

conservators...
206:9 207:5
consider   34:17
63:21 165:15
165:16 255:20
257:3
considered
122:11 197:12
205:1 212:15
263:6 268:14
274:9 305:20
considering
40:10 109:7
221:3
consistent
107:24
conspiring
276:14 278:10
constan   254:3
254:6
constant
294:10
constitute   6:25
constructively
113:1,5
cont'd   3:1 5:1
contact   79:24
94:4 99:22
100:4,8,21,21
150:1 208:13
contacted
79:23 100:13
100:20 150:5
228:7 259:17

contacting
251:4
contained
186:13
contains
185:18 207:25
content   190:6
contention
151:23 237:2
contentious
198:16 251:12
305:9
continue   69:3,9
97:7 98:14
102:7,13
104:17,20
105:2 115:2,11
137:25 282:7
292:2,3 308:10
continued
47:14 98:17
105:10 115:10
133:1 135:5
137:25 291:15
continues
175:3
continuing
11:25 96:8
105:12 288:24
contract   4:10
4:11 42:19,21
43:16,21 45:2
45:12 96:1
102:9 104:18

105:4 124:19
126:2,7 127:3
127:7,12,13,18
129:12,15,18
130:6 131:19
131:25 132:3,7
164:24 165:19
165:19 166:4,6
166:6 173:3,4
173:7 175:15
193:5 204:5,16
204:17 236:24
237:2 240:25
280:10,17
283:24 291:6,7
291:8 292:10
contracts   95:22
132:10,12,14
132:18 204:15
279:16
contrary   125:8
control   24:10
88:9
controversies
279:4
convenience
136:19
conversation
27:21 99:13
109:15 110:12
111:23 113:12
113:15 114:6
124:4,7,11,13
124:18,19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[conversation - correct]                                                                Page 17

| | | | |
|---|---|---|---|
| 125:1,3,10,23 | 165:12 184:23 | 134:25 135:3 | 198:18 199:4 |
| 127:23 128:10 | 211:17 | 136:6,11,13 | 199:15 200:13 |
| 128:25 129:18 | **corporation** | 140:9,11,12,14 | 200:14,16,19 |
| 153:20 286:3 | 1:10 2:20 6:9 | 140:15 141:20 | 201:13,14,19 |
| 289:23 292:20 | 7:10 85:5,13 | 141:21,24 | 202:13,14 |
| 305:12 307:18 | 85:14,16 | 142:13 143:2 | 205:7 207:13 |
| **conversations** | 251:20 252:16 | 143:13 144:25 | 207:15,16 |
| 48:6,7 51:4 | **correct**   17:11 | 145:1,7 150:9 | 209:9,10,15,16 |
| 63:6 80:10 | 18:5,12,15 | 163:16,21,22 | 217:2 218:13 |
| 89:5 124:9 | 19:18 21:24 | 166:11,12,22 | 220:7,8,16 |
| 128:16 129:3 | 24:16 35:4,5 | 166:23 167:18 | 222:3,14,15 |
| 196:22 273:9 | 36:20,21 37:16 | 167:19 168:4,5 | 225:3,4 226:9 |
| 305:6 307:12 | 37:25 38:1,6 | 169:3,4,25 | 227:4,5 231:3 |
| 307:15,19 | 42:4,5 44:1,2 | 170:10,11 | 232:2,24 |
| **coordinator** | 45:7 46:13,14 | 171:11 172:24 | 234:19 235:24 |
| 239:9 | 46:22,23 49:15 | 173:17,18,24 | 235:25 241:3,5 |
| **copeland**   176:8 | 49:16 51:17 | 174:6,20,25 | 244:2,3 245:14 |
| **copied**   209:20 | 52:7 73:8,9,12 | 175:4,5,19,20 | 246:6,7 247:1 |
| **copies**   30:4 | 76:21,22 80:12 | 175:22,23 | 249:15,16,19 |
| 31:10 37:9,12 | 84:2,19 87:17 | 176:1,2,16,17 | 250:5 251:21 |
| 50:18 51:11,19 | 90:7,23 91:1,4 | 177:21 178:10 | 251:22 252:17 |
| 51:21,25 | 93:9 95:24,25 | 178:24,25 | 252:18 253:3,8 |
| **cops**   100:15 | 98:3,4,20,22,23 | 179:3,25 | 253:20,21,24 |
| 108:11,20 | 99:17 105:13 | 180:16,17,19 | 254:7,11 |
| **copy**   4:10,11 | 106:17 107:13 | 180:22,23,25 | 256:21,22,25 |
| 23:2 29:17 | 109:22 115:24 | 181:19 182:16 | 259:9 260:3,19 |
| 36:6,7,8,10,13 | 115:25 120:3 | 182:17 185:2 | 260:25 263:3 |
| 36:15,17,19,23 | 123:7 124:3 | 185:10,11,20 | 264:5,8,25 |
| 37:1,6 42:6 | 126:2,3 127:1 | 188:22 190:21 | 270:20,21,23 |
| 43:16 57:21,22 | 127:2 129:22 | 190:22,25 | 270:24 271:6,7 |
| 71:4 93:14 | 130:25 131:4 | 191:1 192:7 | 274:21,25 |
| 106:2 130:15 | 131:12,20,21 | 193:16,17,21 | 277:8 278:20 |
| 155:13 156:20 | 133:2,3,7,11,12 | 193:22 194:2,7 | 280:18 281:23 |
| 158:12,15,16 | 133:13,16 | 194:8,15 | 283:14 285:19 |

[correct - court]                                                    Page 18

| | | | |
|---|---|---|---|
| 286:24 287:24 | 110:9 116:7,13 | 287:8,9 288:2 | **counsel** 2:20 |
| 290:21,22,22 | 116:17,18 | 288:8,15 | 7:10 11:1,12 |
| 296:14,24 | 117:3,20 | 299:22 300:7 | 30:1,2 31:16 |
| 297:21 299:25 | 118:11,11,23 | 300:16 302:2 | 112:24 161:15 |
| 302:3,4 303:3 | 119:16 120:9 | 302:14,25 | 187:6 252:16 |
| 306:12,25 | 120:21,23 | 303:14,20,21 | 311:11,14 |
| 307:1 308:24 | 121:14,22 | 308:22 | 312:7,10 |
| **correcting** 57:6 | 122:9 131:23 | **council's** | **county** 100:8 |
| **correctly** 168:6 | 167:5 195:12 | 273:11 | 100:10 206:14 |
| 240:18 247:3 | 195:21 209:21 | **councilman** | 206:17,18,19 |
| 296:22 | 209:23 211:1,5 | 74:2,14,15 | 206:20 |
| **corresponden...** | 212:24 213:15 | 75:24 76:4,7 | **couple** 78:15 |
| 31:22 | 216:3 217:18 | 212:10,10 | 128:15 149:19 |
| **corruption** | 218:7,9,12,21 | 217:18 218:11 | 151:1 215:14 |
| 49:6,6 147:16 | 219:5 221:3 | 219:16,18 | 306:7 |
| 196:16 258:16 | 230:13 241:14 | 222:9 254:5,6 | **course** 9:11 |
| **cost** 218:22,24 | 242:3,9,16 | 270:7 276:12 | 34:16 47:4 |
| 218:25 | 243:2,6,16 | 276:13 287:23 | 70:10 77:19 |
| **could've** 35:11 | 244:20 245:1 | **councilmember** | 95:24 96:3,15 |
| 79:20 92:13 | 245:17,21 | 73:2,13 119:6 | 258:6 283:18 |
| **council** 1:14 | 248:12 250:17 | 269:22,22,24 | 295:17 306:4 |
| 3:3 5:7 7:13,16 | 250:19,21,25 | 273:6 | **courses** 83:10 |
| 10:5,8,10 | 251:13,20 | **councilmemb...** | 83:19 |
| 15:17 30:14 | 252:14 253:1,2 | 122:3 219:1,3 | **court** 1:1 10:4 |
| 31:17 49:8 | 253:23 255:6 | 219:10 242:11 | 10:6,9 32:4 |
| 74:4 87:19,23 | 255:24 268:5 | 246:20 251:5 | 66:3,3,7,8 94:1 |
| 88:25 89:3,3,6 | 268:21,22,23 | 255:15 299:12 | 151:17,22 |
| 89:9,12,16,18 | 269:5 270:1,7 | 302:6 303:21 | 170:5 206:15 |
| 89:20,23 90:6 | 272:4,10,12,16 | **councilmen** | 214:25 234:2 |
| 90:18 94:11,15 | 272:18 274:15 | 90:9 288:21 | 262:5,6 263:19 |
| 99:9,10 100:24 | 277:11,24 | **councils** 86:2 | 263:20 264:16 |
| 101:18 108:10 | 278:10,18,18 | **councilwoman** | 264:22,23 |
| 108:19,25 | 278:20 286:19 | 217:19 218:13 | 265:15 |
| 109:5,24 110:1 | 286:20,22 | 254:6,10 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                            586-468-2411
www.veritext.com

**cousin** 265:12
**cover** 97:19,21
 179:23
**covered** 81:9
 146:6 169:13
 169:16,20
 175:14 257:17
 267:12
**cpl** 239:6
 247:15
**cream** 146:18
**create** 28:20
 69:20 70:2
 216:22
**created** 21:10
 28:22 69:12
 70:1 87:10
**creating** 20:10
**crimes** 233:4
**criminal** 53:7
 58:11 77:23
 80:8 258:15
 259:18 271:1
**critically** 242:8
**criticisms**
 294:8
**crossed** 212:5
**cuffed** 230:6,8
**culture** 240:11
**current** 12:13
 119:6 163:17
 212:11 291:5
**currently** 12:25
 73:21 166:22

**curriculum**
 131:10
**custody** 53:4
 53:10,22,25
 54:10,19 56:6
 58:17 230:3
 258:25
**cut** 290:1
**cv** 1:9 6:9
 131:10

**d**

**d** 3:11 4:1 5:11
 5:11 6:1 94:3
**daklallah** 3:12
**daly** 233:12
**dan** 235:4,25
 236:1 238:16
 238:17
**danger** 158:24
**darryl** 134:2
**dash** 64:20
**date** 1:19 28:10
 46:21 54:11
 77:5 78:10,11
 111:19,21
 128:20 130:23
 132:4,5,8
 136:5,17
 160:10 177:11
 221:24 223:22
 264:16 274:22
 275:1,3 289:2

**dated** 124:1
 135:23,24
 201:11
**dates** 49:25
 132:11,19
 298:24
**dating** 176:13
 190:17
**dave** 117:3
**day** 38:22
 63:17,19 72:8
 78:5,8,17 89:8
 109:15 111:8
 111:25 112:1
 112:18,18,22
 112:23 140:25
 141:2 142:1
 181:23 186:22
 188:18 197:18
 213:1 221:14
 223:9 265:13
 272:22,24
 286:12 287:5
 289:25 291:6
 295:3 296:7
 306:15
**days** 59:1 78:15
 140:5 145:19
 148:6
**db** 236:2,5
 238:12
**deal** 63:9
 307:21

**dealing** 263:21
 263:22
**dealings** 287:22
**dealt** 199:3
**dear** 120:10,12
**dearborn** 1:9
 1:13 2:11,20
 2:22 3:2,14 5:6
 6:8 7:7,9,12,15
 8:13 9:21 10:8
 11:12 14:7,25
 15:7,17 19:20
 19:21 21:8
 23:19,23 26:16
 28:9 32:20
 39:21 44:24
 47:20 49:7
 66:25 67:1
 73:7 76:9
 83:21 85:24
 86:5 88:10,18
 93:2 96:10,11
 123:14 127:19
 128:2,20 130:4
 130:5 131:17
 132:15,19,24
 133:9,15
 134:16 135:10
 137:15,25
 138:11 139:8
 139:11,19
 141:1,17
 143:11,15,25
 144:24 145:3,6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 147:12 149:25 | **december** | **defendants** | 18:24 19:11 |
| 154:22 155:5,8 | 28:12,15,16,18 | 67:4 | 20:8,10,15 |
| 155:22 157:1,9 | 40:22,23 42:10 | **deficient** 53:5 | 22:17 23:4,16 |
| 157:12,18 | 42:19 47:19 | 58:10 | 24:11 25:4 |
| 161:10 164:6 | 124:1,12,12 | **definitely** 27:23 | 26:22 28:9,15 |
| 168:10 169:1,2 | 128:11 129:14 | 139:9 184:24 | 28:25 29:16 |
| 169:9 171:23 | 141:4,13,14 | 269:12 | 30:17 32:20 |
| 172:12 173:23 | 181:24 222:11 | **definition** | 33:21 35:25 |
| 175:8 177:8,20 | 222:22 247:18 | 185:24 186:1 | 36:2,4 39:14 |
| 179:13,16 | 274:20 306:16 | **defund** 104:5 | 41:9,14 45:16 |
| 181:4 190:4 | 306:24 | 275:6,7 303:8 | 49:9 51:13 |
| 191:21 192:10 | **decent** 201:16 | **defunded** | 52:18,24 55:14 |
| 192:11,14,16 | 242:24 265:3 | 104:10 132:25 | 55:20 56:1 |
| 193:13 194:23 | **decide** 123:13 | 222:25,25 | 58:25,25 61:21 |
| 201:18 226:8 | 262:25 | 270:6 | 62:6 68:5 |
| 227:13,19 | **decided** 25:21 | **defunding** | 69:18,21 70:4 |
| 228:8 231:3,10 | 96:22 262:22 | 103:21 221:3 | 71:10 73:7 |
| 231:16 233:13 | 293:12 | 222:10 274:24 | 74:11 76:9 |
| 234:4,17,25 | **decision** 44:17 | 300:17 302:15 | 77:13,15 80:20 |
| 236:13,16 | 308:4,6,15 | **degree** 190:20 | 84:12 94:17 |
| 237:12 239:17 | **decisions** 249:7 | **delay** 209:18 | 95:5 100:12,13 |
| 239:19 241:22 | **declining** | 209:24 | 100:16,20 |
| 242:9 244:2 | 113:18 | **deliver** 51:8 | 103:8 105:5 |
| 246:21 248:22 | **deemed** 142:11 | **demand** 4:12 | 109:1 114:5,10 |
| 253:7,23 | **defendant** 1:11 | **denied** 98:24 | 114:14,23,25 |
| 259:12 271:8 | 1:16 2:11 3:2 | 99:2 254:21,21 | 116:5 135:6,17 |
| 276:23 278:25 | 7:6,12,15 53:7 | 299:9 | 137:17 142:10 |
| 279:15 284:11 | 58:11,13 92:6 | **dental** 13:21,23 | 147:13 150:17 |
| 284:16,22 | 93:18,21 94:6 | 14:1 144:19,21 | 151:2,21 153:9 |
| 288:9,24 | 161:15,16 | 166:19 | 153:18 157:2 |
| 294:10 308:15 | 205:11,11 | **denying** 255:10 | 170:14,15 |
| **dearbornheig...** | **defendant's** | 255:21 | 173:11 174:19 |
| 2:23 | 30:2 67:7 | **department** | 176:20 178:14 |
| | | 17:5,6,10 | 187:5 189:10 |

Carroll Reporting & Video
www.veritext.com                      A Veritext Company                      586-468-2411
                                                                              www.veritext.com

| | | | |
|---|---|---|---|
| 194:24 195:13 | **deposit** 47:7 | **detailed** 142:19 | **different** 19:10 |
| 196:2,14,17 | **deposition** 1:18 | **detailing** 123:5 | 19:14 101:20 |
| 202:2,12,25 | 6:6,23 8:11,12 | **details** 230:7 | 107:12 144:6 |
| 203:3 225:5 | 9:7,11,24 | 261:16 | 154:12 163:24 |
| 226:25 229:19 | 10:14,20 11:2 | **detective** 150:1 | 165:7 172:19 |
| 234:23 236:7 | 11:21 91:19,22 | 203:6,18 204:3 | 172:23 178:13 |
| 238:25 240:15 | 92:15,16 | 204:6,8,14,21 | 182:20 191:12 |
| 240:20 241:1 | 159:21 160:13 | 238:11,25 | 193:3,3 196:7 |
| 241:15,18,23 | 258:6 297:4 | **determine** | 208:17 212:9 |
| 242:9 243:22 | 311:1 | 66:10 79:20,21 | 227:24 228:4 |
| 244:2,10,22 | **depositions** | 100:4,8 | 235:2,19,20 |
| 245:2,18,22 | 10:12 | **determined** | 242:13 263:24 |
| 248:4,7,13 | **deputy** 20:23 | 147:11 286:11 | 265:14,16 |
| 249:4 254:20 | 20:24 21:2,4,6 | **detroit** 2:15 | 272:23 279:21 |
| 259:13 279:5 | 21:10 115:23 | 13:1 17:9,10 | 289:24 292:5 |
| 285:6,21 286:1 | 125:17,21 | 17:24 91:24 | 301:7,7,25 |
| 292:7,14 | 176:23 199:14 | 92:9 154:9 | 303:20 308:1 |
| 308:16,19 | 200:7 285:6 | 170:9,14,25 | **differently** |
| **department's** | 291:10 304:11 | 178:17 232:18 | 79:20 273:21 |
| 62:13 | 304:13 305:5 | **develop** 296:6,9 | 273:23 274:1 |
| **departments** | **derwick** 203:17 | **developed** | **difficult** 53:12 |
| 190:24 | **describe** 142:6 | 296:5,11 | **digital** 37:9,12 |
| **depend** 234:11 | **description** 4:9 | **development** | 311:8 312:3 |
| **dependents** | 5:2,12 20:2 | 85:4,12 | **dir** 57:9 107:21 |
| 179:24 | **deserved** | **deviated** 77:18 | 116:7,14 |
| **depends** 21:9 | 269:14 | **dhpd** 53:5,8 | 118:10,17 |
| 38:22 52:10 | **deserves** 74:23 | 58:10,12,24 | 122:9 151:3 |
| 63:16 64:5 | 269:13 | 73:3 | 259:6 260:21 |
| 72:7 103:11 | **desire** 268:24 | **dictated** 174:24 | 266:9,14 |
| 149:18 152:1 | **desk** 25:7 34:22 | **difference** | 285:13 |
| 233:24 235:19 | **despite** 109:17 | 148:16,17 | **direct** 24:10 |
| **deposed** 109:5 | 111:10,11 | 208:24 303:1,1 | 47:7 62:9 71:8 |
| 109:11 | **detail** 261:21 | **differences** | 88:18 229:1 |
| | 261:21 | 302:1 | 232:14,16,19 |

[direct - dispute]                                                      Page 22

232:20,21
233:1 246:1,4
246:25 256:4,6
256:8
**directed**  233:19
**directing**
233:11
**direction**  233:5
262:23 294:4
**directive**  71:21
71:22,23 72:19
**directly**  62:10
62:22 63:7
139:22 185:3
278:16
**director**  19:23
19:24 20:6,17
20:25 21:13
22:7 23:21
24:15 26:15
41:21 47:14,15
58:6 60:24
62:7,14 63:11
84:1,7 85:4,12
93:8 94:10
98:14,17 116:5
125:15,21
132:7 134:20
150:8 155:24
169:17 172:13
182:15 185:3
192:11 199:22
200:6 208:5
209:15 222:10

228:1 230:17
234:18 274:25
283:23 285:6
302:8
**directors**  90:4
232:17 286:1
**disagreement**
198:22 252:25
**disappear**
32:16
**disappointed**
213:18
**discipline**
22:16 80:22,23
80:24,25 81:1
81:1,2,8,8
82:17,18 83:1
83:15 84:9,14
84:24 85:22
86:12 87:9
270:19,23
273:12 274:1
**disciplined**
262:15,17
270:4,16
**disciplining**
275:15
**disclosed**  54:1
**disclosures**
29:25
**discovery**
23:13 29:4
31:18,19 37:6
159:19 160:20

161:23
**discriminate**
277:11
**discriminated**
253:14 284:15
**discrimination**
275:14 277:19
284:12
**discriminatory**
121:10 254:14
275:8 302:13
**discuss**  16:8
28:1 85:20
107:8 118:24
156:13,15
160:9
**discussed**  31:20
101:19 107:9
156:23 161:18
211:5 213:8
289:11
**discussing**
91:20
**discussion**
54:14 121:14
127:25 213:13
216:2,11
289:12,12
290:10
**discussions**
45:19 54:12,17
54:18 55:7
59:22 181:16
181:21,25

195:18 260:20
281:25 282:9
**dismiss**  71:13
151:24 264:13
264:19
**dismissal**  68:12
197:11
**dismissal's**
265:10
**dismissals**  68:8
262:19 265:9
**dismissed**
114:4 151:10
151:16,18
152:3,3,6
187:12 198:24
201:2 205:13
205:15,20
261:17 263:25
264:22 265:5
265:15,17,19
294:24
**dismissing**
151:19 262:7
263:5 264:2
**dispatch**  61:18
**disposition**
187:16,17,18
188:14,15
201:1
**dispositions**
26:11
**dispute**  299:17
300:15 303:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                     www.veritext.com

**disqualify**
137:23
**dissatisfaction**
236:19 238:14
241:7
**district** 1:1,2
**distrust** 252:24
**division** 1:3
174:17 259:18
259:18 260:1
**divorce** 206:3,6
**divorced** 207:4
**document** 4:22
5:18 31:23
32:5 36:23
37:22,24 41:24
42:6 48:20
52:21 57:11,24
58:1,4,6 66:6,9
66:11,16 71:1
71:4 72:11,12
97:17 105:17
105:20 106:5
106:11,12
130:20,21,23
131:1,6 148:10
154:15,16,20
155:2,11,13
156:2 158:1,18
158:20,22
161:19 162:1
186:12 252:12
258:18

**documentation**
149:9 150:14
202:4,19
**documents**
5:16 30:8 31:3
31:5,7,7 32:12
32:14 33:12,16
33:17 34:3,6
34:10 35:23
36:5 37:1,15
37:17 39:18
50:10,20,22
51:12,15,19,21
52:2,3,20,23
58:3 66:17,18
66:21,22,24,25
67:10 72:21
80:2,4 83:7
106:3,25
119:19 140:4
155:7 157:5
189:17 223:19
223:20 251:1
276:11 277:5
279:23 280:5
**doing** 11:11
19:25 20:12,15
63:3 66:20
104:23,24
113:17 195:14
196:14 221:7,8
237:24 247:23
262:18,19
270:8 275:20

278:3 285:2
294:2 304:18
304:21
**doj** 108:11,19
213:19
**dollars** 164:20
201:6 213:21
213:22
**door** 34:14
234:1 266:11
274:10,18,20
**dotter** 66:7,7
70:19,19
151:14 249:19
261:8,11,12
262:4
**double** 265:1
**downstairs**
55:13
**dpd** 49:7
**draft** 97:19
105:19 106:12
**drafting** 141:10
**drama** 139:8
305:20 307:15
**drapkowski**
242:24 245:20
**draw** 178:23
**drawers** 34:21
**drg** 1:9 6:9
**drive** 12:14
30:23 31:4,6,8
31:11 163:10

**driving** 137:21
265:3
**dropped** 80:4
**drywall** 234:6
**dte** 85:16
**due** 56:18,24
86:16 112:5
121:3 125:7
137:15 178:16
231:21 302:20
**dues** 175:6
180:22
**duly** 8:3 311:5
**duties** 47:12
78:3 98:12
102:14 114:20
136:12 225:2
304:2
**duty** 207:21,21
223:15

**e**

**e** 2:1,1 3:1,1 4:1
4:8,17,20 5:1
5:11,11,11,11
6:1,1 12:12,12
27:10,17,18
29:17,19 30:13
30:19,24,24
37:13 46:3
48:8 71:21
72:20 105:22
105:23,25
106:22,23,24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

107:3 117:1,2 117:9,13,17 118:4,7,8 119:5,12,20,23 120:16 123:24 124:5,12,16 135:23 141:11 141:16 142:21 155:18 163:8,8 165:10 182:2,6 183:9,13,18 184:9,11,16,19 184:22 185:13 185:16,23,25 186:1 200:15 210:25 215:10 228:15,16 250:22,25,25 261:18 276:13 287:4 290:6 292:22 293:4 293:13,14 309:11

**earlier** 53:17 57:2 58:2,19 63:24 65:17 76:3 91:19 103:6 115:22 128:11 144:23 151:8,13 195:4 230:11 258:12 289:25

**earliest** 136:19

**early** 92:11 194:6 265:13

**earned** 168:1

**easement** 247:20

**east** 190:13,16

**eastern** 1:2 191:4

**easy** 272:11

**economic** 85:4 85:12 180:2

**ed** 153:2,5,7,8

**education** 96:8 191:2

**effect** 97:2

**effective** 46:21 141:18 142:22

**effectively** 144:10

**effort** 72:18 150:15 152:5

**efforts** 109:1

**eggert** 12:21 163:6

**eggly** 142:20 182:7,22 183:16,24 187:1

**eighty** 13:16

**either** 16:8 52:20 93:7 116:5 152:13 164:13 170:14 183:24 208:6

222:13 230:17 258:9 261:15 263:19 264:19

**elected** 147:19 151:6,6 265:20 267:9,16,22,25

**election** 88:13 179:21

**elevate** 76:8

**eligible** 68:21 179:8

**eliminate** 249:7

**elliana** 235:5 237:9

**emergency** 164:9 208:13 232:11 285:2

**employ** 138:1

**employed** 12:25 15:10 41:13 73:6 96:6 127:19 136:9 149:24 155:5 168:10 169:9 170:13 175:10,22 178:23 185:2 191:19 192:4 194:23 225:10 226:7 237:13 238:2 253:7,24 282:21 283:5 302:7 311:11 311:14 312:8

312:11

**employee** 81:16 85:23 107:13 107:22 108:6 110:7,19 142:11 143:11 143:15 167:21 167:23 168:9 168:22 169:6 238:5 286:15 311:13 312:10

**employees** 151:21 173:17 202:21 225:3 294:19

**employer** 286:16 288:18

**employment** 4:21 5:4 86:15 86:23 87:10,11 87:16,16 95:24 96:4 112:13 116:4 132:14 136:3,19 139:11 143:17 167:22,24 168:25 169:2 169:23 171:22 172:11,13,24 173:21,22 174:5 196:10 198:15 223:16 226:15 227:10 228:22 279:16

283:17 284:3
295:7,14
296:10
**emu** 191:15
**ended** 12:1
16:23 45:6
80:16 133:14
140:13 169:1
176:4 180:21
193:12 197:10
198:14 200:7
200:11 201:5
202:12 203:20
204:20 211:6
221:2 222:9
228:7 231:25
244:19 251:4
252:15 253:19
256:18 258:22
263:19 270:18
274:2 277:10
284:3 299:22
308:4
**endured**
275:12
**enforcement**
131:13 147:18
147:20 149:4
151:5 224:17
257:18 260:22
263:4 267:8
294:3
**engage** 71:17

**engaged** 230:23
256:14
**ensure** 72:6
240:23
**entailed** 226:24
**entered** 32:5
188:17 258:12
281:22 282:2
285:5
**entering** 59:25
**entire** 199:10
**entitled** 96:5
159:19 160:11
**entity** 149:7
**entries** 62:24
**entry** 10:10
**equipment**
94:18
**equivalent** 21:1
131:10
**erika** 239:11
278:5
**error** 296:12
297:6 298:18
**es** 311:4
**especially** 81:8
**esquire** 2:4,12
2:19 3:4,11
**essentially**
194:3 259:25
**established**
73:5
**estate** 207:6,8

**ethnically**
285:7
**ethnicity** 73:4
**evening** 28:18
128:18
**event** 135:9
**events** 212:19
295:5
**eventually** 77:6
79:10 80:14
90:2
**everybody**
20:21 84:12
241:18 264:15
273:1
**everyone's**
217:11 232:18
**everything's**
288:16
**evidence** 53:4,4
53:7 58:9,12
107:15 116:12
119:9 121:1,2
121:21 128:4
138:3,21
167:11 170:2
171:13 186:11
197:7,15 199:7
203:11 208:1
214:3 220:18
225:22,24
229:9 231:5,19
233:15 234:9
234:21 236:22

244:4,18,24
245:6,16,20,25
246:1,4,8,25,25
247:6 248:15
250:18 254:1
254:13 255:9
255:14,19
256:4,12,16
258:12 265:19
272:1,2 273:6
273:17 275:4
276:7,9 277:2
277:3,6,9,18
279:10 287:8
287:18 288:6
291:1 300:2,15
303:5,13
**evidentiary**
6:22
**exact** 111:20
163:4
**exactly** 58:3
71:25 75:25
83:11 114:13
117:23 153:13
154:6 155:11
156:15 195:20
197:23 198:10
198:12 209:24
222:7 226:24
231:9 247:11
256:8 272:9
277:22 296:7
296:19 297:2

[exam - familiar]                                                   Page 26

**exam** 213:14
**examination**
  4:2 8:7 162:12
  304:7 306:9
**examined** 8:5
**example** 148:4
  161:9 174:5
  246:11 288:6
**examples**
  254:18
**except** 260:25
**excessive** 77:21
  79:5 269:6,8
**excited** 213:16
**excuse** 299:20
**execute** 233:22
**executing**
  234:6
**executive**
  173:17 191:8
**exhibit** 4:10,11
  4:12,14,16,17
  4:20,21,22,24
  5:3,5,7,8,9
  41:25 42:1
  43:11,13 45:13
  46:10 48:11,12
  97:11 105:15
  116:23 123:17
  123:21 126:5
  130:9,10
  133:19,20
  135:21 140:4
  141:8,23 147:6

  166:7 174:24
  175:3 209:11
  210:7,15,19
  211:15,21
  214:14 215:4,8
  217:25 251:24
  252:10 259:2
  293:5 297:9,22
  298:3
**existed** 177:2
**exists** 29:6
  158:18 161:19
**expand** 246:3
**expect** 11:25
  67:6
**expectation**
  34:25
**experience**
  254:23 284:25
**expert** 189:4,4
**expertise**
  167:10 170:3
  171:14,15
**explain** 219:20
**explained**
  298:7
**explanation**
  298:9,11
**explored** 161:8
  161:15
**express** 135:5
  238:13 241:7
  268:24

**expressed**
  11:24 195:11
**expressing**
  236:19
**extent** 15:22
  112:25 113:3
  221:16
**external** 49:1
  51:9 52:17
**extra** 38:15
  236:24 252:5

**f**

**f** 210:25
**face** 79:7
  229:13 268:12
**fact** 56:18 67:8
  76:13 106:1
  121:4,11 125:7
  131:23 137:14
  137:16 164:4
  173:10,16
  175:24 178:16
  199:20 216:14
  220:12 231:21
  251:18 254:20
  254:24 255:16
  267:16 268:11
  274:19 278:16
  285:1 286:3
  288:12 289:1
  302:20
**facts** 116:11
  121:1,21 128:4

  138:3,21
  167:10 170:2
  171:13 197:7
  197:15 199:7
  203:10 207:25
  214:3 220:18
  225:23 229:9
  231:5,18
  233:15 234:9
  234:21 236:22
  247:6 254:1
  279:10 300:2
  308:18
**fail** 108:12
**failed** 91:20
**failure** 300:16
**fair** 24:17 53:6
  58:11 180:3
  193:8 220:9
  247:2 252:23
  252:24 308:13
  308:16
**fairs** 228:3
**faith** 158:17
**false** 289:5
**familiar** 70:11
  77:24 97:16,18
  106:6 117:6,10
  118:5 119:14
  120:18 130:21
  176:9 191:18
  192:14 213:23
  242:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                   586-468-2411
                                                                   www.veritext.com

**familiarity**
188:21 192:6
**family** 164:9
**far** 67:3 200:17
206:5 230:22
231:25 256:13
259:8
**farhat** 125:8,12
125:24 129:3
129:10 137:16
199:14,22
201:12 228:18
284:24,24
285:5,15,18,20
286:7 287:10
290:14,15
291:3,7,9,16,19
292:5,6,8,13,17
299:13 304:10
304:13 305:7,9
305:10,13
306:17 307:10
308:13,18
**farinha** 2:19
7:8,8 11:17,21
159:24 211:17
219:12 252:16
282:1 291:24
**farrar** 227:5
**fashion** 11:17
229:24 284:15
**fast** 111:22
**faster** 258:24

**fausone** 1:21
2:5 6:11
**fawaz** 225:8,9
**fbi** 5:18 50:11
50:21,24 52:3
52:17,24 54:13
56:6 96:14
152:12 154:3,4
154:9,25
155:15 156:6
156:12 157:5,8
158:5,9,25
159:11,25
161:4,10,20
256:21 257:22
258:3 260:14
260:23 268:16
**february** 13:10
13:10 58:21,22
140:18,20,21
**federal** 49:10
147:17,23
148:2 149:5
154:16 266:2
**feedback** 139:7
140:3
**feel** 34:9 194:18
224:25 257:17
288:19 304:2
**fell** 164:9
291:14
**felt** 21:9 41:15
80:15 87:6
243:7 270:2

272:4,9 305:22
**figure** 156:23
258:4,7
**figured** 211:19
**file** 5:13,14
23:5,9,13
29:19,20 30:12
37:13,13 52:22
67:18 115:8
142:20 171:9
171:20 250:9
264:20 267:21
**filed** 8:13 15:15
32:4 48:15,17
48:19,22 67:17
81:14,17 93:20
109:13 125:5
127:25 171:20
172:20 187:11
193:19,24,25
200:18,20
222:3 256:1
291:17
**files** 29:17 30:5
51:24 83:24
106:1 160:25
161:3
**filing** 50:7
200:12
**filled** 21:3
300:12
**filling** 299:25
301:11

**final** 110:6
117:2 136:15
**finally** 159:4
**financial** 207:7
**financially**
311:15 312:11
**find** 68:2
108:21 161:19
161:20 224:19
**fine** 11:10
113:3 118:10
118:18 146:2
**finish** 8:19,21
186:4
**fire** 86:10,19
293:20 295:1
**firearm** 39:12
236:11
**firearms** 38:13
39:3,5,12,21
40:12
**fired** 107:23
108:4 131:17
131:22,24
132:22,23,25
138:11 271:11
293:17,19
295:4
**firm** 6:10
187:11 221:12
**first** 4:12 8:3
17:21 29:6
44:14,17 45:9
45:11 46:1,8

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

75:12 78:3
101:2,4,22,24
102:19,19,23
118:13 158:7
161:13 164:7
166:17 212:7
221:11 222:18
222:21 252:13
253:10 259:1
297:22 300:25
**five** 14:20
19:12 63:20
90:9,9,16,17
91:6 144:18
146:1 163:14
250:25
**fix** 167:3
266:12
**fixing** 23:6
30:13 147:17
151:4,9 153:16
156:9 267:8
**flash** 30:23
31:4,6,8,11
**flipped** 247:20
247:20
**flyers** 228:2
**focus** 67:19
**foia** 239:9
278:4
**follow** 149:15
149:23 162:15
197:1 229:6
300:16

**followed** 70:15
299:24 300:8
301:1,7
**follower** 193:4
293:10
**follows** 8:5
**followup**
141:22 152:21
153:19 162:14
**force** 25:13
77:22 78:4,6,6
78:9,17,18,20
79:2,5 83:9,17
85:21 229:11
229:13 269:6,8
269:16 283:13
**forced** 137:16
292:7
**ford** 2:21
233:12
**foregoing**
311:3,4 312:4
**forfeiture**
147:17,23
148:2,5 149:5
150:17,19,25
213:22 266:2,6
266:12,17
**forgot** 80:15
182:10 237:7
**form** 35:12,13
51:1 53:11
59:5,9 79:2
82:1 88:14

103:1 107:14
109:20 111:14
116:8 118:15
119:8 120:25
121:17,20
123:3 128:3
138:2,20 167:9
168:12 169:14
170:1 171:12
172:5,15,25
173:25 189:4
191:22 194:16
194:25 196:11
197:5,6,14
198:19 199:6
200:3 201:20
207:24 209:17
213:25 219:23
221:5 224:8,21
231:4,17
233:14 234:8
234:20 236:21
247:5 248:23
251:7,14
252:19 253:9
253:25 275:21
276:3 277:16
278:21 279:9
282:14 283:9
284:17 289:7
295:8 300:1,21
302:16
**formatted** 52:1

**former** 195:25
207:20 209:7
209:20 244:1
263:2
**forth** 48:9
290:6
**forthcoming**
32:6
**fortis** 57:19,19
**forward** 102:17
129:1 242:2,7
242:15 243:21
**forwarded**
184:16,23
185:7
**found** 25:11,15
26:5 78:13
246:14 271:2
**foundation**
54:2 197:16
220:18
**four** 12:24
19:12 163:14
164:20 210:11
211:18 213:14
215:13 217:3
223:11,11
272:22
**fourth** 218:1
**frankly** 186:5
**fraudulently**
270:12
**freely** 302:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**friend** 76:14
178:2,4 226:11
**friends** 147:18
151:5 267:8
**front** 42:7
173:12 209:12
210:16 211:21
264:17
**fulfill** 130:6
234:1
**fulfilled** 129:13
129:16,19
**full** 13:4 209:5
271:25
**fully** 11:9
115:14
**function** 61:11
62:10 93:7
234:18
**functions**
102:14 104:18
**fund** 148:2
149:7 299:23
**funding** 94:19
99:3,7,8,19
100:6,9,18,24
101:9
**funds** 147:17
147:24 148:5
149:6 150:12
150:15,17
266:2,6
**further** 118:24
304:6 306:5

309:3 311:13
312:9
**future** 150:23
161:22
**futures** 108:14

**g**

**g** 6:1 163:8,8
226:6
**gained** 192:6
240:24
**games** 159:3
**garden** 17:16
190:12,13,13
190:15
**gary** 3:4 7:11
214:24 298:8
300:19
**geez** 269:7
**general** 20:13
21:21 50:11
89:4 90:15
122:15 123:6
195:14 257:9
307:17,19
**general's** 54:16
**generalization**
224:18
**generally** 52:8
63:14,18
**generated** 51:9
51:16
**gentleman**
235:3 247:14

**gentleman's**
79:7
**getting** 31:17
45:6,20 46:25
53:14 62:1,20
90:3 150:13
179:21 198:14
227:21 250:16
252:5 264:16
270:5 280:17
280:18 281:1
292:4 294:9
298:13
**girl** 229:13,23
**give** 9:3 30:11
43:10 81:7
82:17 135:19
138:22 139:13
145:22 158:10
158:14,16
159:25 177:9
211:19 290:8,8
293:11 305:16
**given** 11:13
26:3 50:13
62:12 77:4
83:8,10 126:7
139:3 274:19
298:9
**gives** 273:4
**giving** 189:23
216:3 224:1
270:1

**glad** 249:8
**glob** 216:3
**gmiotke** 3:8
**go** 16:13,15
17:6,15 18:23
19:19 26:12
30:17 34:13,15
42:25 43:12
61:6 64:11,14
67:25 78:4
81:5 88:3
89:13 91:12
98:5,24 99:2,5
99:11 117:8
123:9 129:9
145:23 146:5,8
147:6 153:25
154:24 189:7
189:11 195:19
195:20 197:5
203:7 204:21
208:10 211:11
212:7 213:15
213:18 214:14
215:21 216:20
216:20 217:2
217:25 219:15
224:11 244:19
245:8 258:23
264:17 265:24
276:23 286:8
286:17 293:12
293:16 296:4
297:4,15 299:5

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

301:10 308:9
308:11
**goal** 306:3
**god** 80:15
112:14
**goes** 109:3
183:1
**going** 9:1 11:3
11:22 24:23
25:22 40:20
41:24 43:10
48:10 50:8
55:14,15 59:25
60:2,7,15,18
63:17 66:15
79:16 86:18
89:20,24 90:7
91:21 98:10
106:16 112:7
112:14,14,24
113:18 124:21
125:6,18,20
126:14,18
129:1,2,11,12
129:15,24
130:3,6 133:18
137:2,24 139:3
141:19 142:22
143:5,9 144:4
146:5,13,19,21
153:22 155:10
156:17 158:10
159:4,21,24
162:9 164:5

181:14 182:23
183:2 185:21
186:6,18 188:7
188:8 189:13
192:2,3 198:6
198:13 200:6,9
204:20 208:21
213:24 214:1
214:16 215:14
216:6,22 217:3
217:9,23
221:15 232:1
235:6 243:11
253:6,12,14,16
254:25 255:6
257:20 262:22
262:25 274:4
277:15 282:8
284:23 285:22
286:6 288:17
289:6,21 290:6
291:25,25
292:6 293:16
293:22 294:20
294:22 295:3
296:10,11
298:12,23
300:18 305:19
308:2,6
**gonzalez** 241:3
241:4
**good** 6:2 7:5
8:9,10 75:2,2
76:5,8,17

113:17 130:17
146:9 172:9
196:14 218:19
233:1,2 237:24
267:19 287:23
288:2,16
297:10 305:10
305:14 309:5,7
**googling** 196:4
**gosh** 182:10
**governed** 81:23
**government**
49:6 90:25
149:10
**graduate** 17:12
17:17,19
**graduated** 18:3
190:12
**grand** 2:14
280:11
**great** 29:4
106:10 285:14
**green** 12:14
163:11
**greenfield** 3:13
**grievance**
81:14,18,19
171:6,21 172:4
172:18 200:18
200:23 201:1
**grievances**
82:18 125:7,10
127:24 129:7
171:10 193:19

194:7 200:20
204:10 286:4
290:2,8,16,21
291:17,25
**grieve** 172:11
**grieving** 169:24
262:2
**ground** 8:14
12:7 268:13
**group** 2:13
57:20 114:16
163:19 203:23
**grysko** 1:21 2:5
6:11
**guaranteed**
283:24
**guess** 21:9
38:23 51:22
60:17 67:25
77:16 81:12
90:16 143:16
149:20 156:16
191:17 206:10
210:24 213:5
216:13 234:10
235:19 251:23
269:4 275:22
279:1,22 280:3
287:7,12,18
296:18 306:19
**guessing** 45:12
279:2
**guided** 81:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **guidelines** 71:15 | **handed** 50:22 81:2 83:1 97:13 117:1 130:20 | 249:10 253:20 270:18 | 79:15 83:25 84:8,18,23,23 85:2 87:9,12 |
| **guilty** 271:4 | | **happens** 118:25 208:9 | 88:6 95:11 |
| **gun** 40:17 246:14 247:1,4 247:17,19 248:5 | **handing** 162:9 | 208:12 243:6 307:22 | 97:15,23 109:10 111:17 112:23 113:4 |
| | **handle** 20:3 150:24 207:8 240:19 257:9 264:13 | **happy** 9:6 | 113:16 114:2 |
| **guns** 62:13 | | **harassed** 123:2 253:14 270:5 293:25 | 115:5 147:11 172:3 177:24 |
| **guy** 220:22,24 267:18,19 269:13,14 | **handled** 147:25 150:16,24 151:3 192:7 218:7,9,9 227:5 259:6,23 | | 196:3 201:18 202:1,25 203:3 |
| | | **harassing** 121:9 278:7 | 203:8,13 |
| **guy's** 299:4 | | **harassment** 30:16 122:9,10 122:12 123:5 123:11 195:7 275:14 276:10 285:8 294:11 | 207:20 208:18 209:20 223:14 |
| **guys** 27:12 28:13 29:18,20 75:1 91:5 146:11 216:11 281:10 309:8 | **handles** 240:14 | | 224:4 227:14 227:16 229:4 241:25 242:12 |
| | **handling** 161:22 | | |
| | **hanging** 249:2 | | 243:7 251:20 252:17 258:13 |
| **guzowski** 150:3 203:17 | **happen** 26:10 77:12 105:1 112:15 129:1 198:7 204:17 290:3 | | 259:7,24 260:1 260:21 267:2 268:19,20 |
| **h** | | **hart** 1:6 2:3 6:8 20:19,22 21:20 24:12 25:8 26:2,5 27:5,6 27:24 28:7,11 28:23 34:6,7 34:24 37:4,4 40:21 41:7 45:23,23 47:19 52:11 55:3,6 55:12 56:9,16 56:17 57:10 59:14,23 60:12 60:13 65:11 67:15,16 74:13 74:13 75:13,22 | 275:12 285:13 |
| **h** 4:8 5:1 226:6 | | | **hart's** 112:21 193:20 209:7 243:13 263:3 263:10 270:12 |
| **h.r.** 45:16 46:5 107:3 182:15 228:1 | **happened** 70:3 101:16,20 102:3 111:22 178:14 197:18 201:8 205:21 211:9 247:12 247:13,14 270:25 294:13 294:15 | | |
| **hak** 222:10 | | | **hass** 233:10 |
| **half** 35:25 73:11 | | | **hassan** 74:5 233:10 255:25 269:12,19 270:7,8 272:3 272:22,24 |
| **hall** 128:18 | | | |
| **hallway** 272:20 | | | |
| **hammoud** 3:12 | | | |
| **hand** 7:23 41:24 48:10 123:17 253:1,2 | **happening** 149:24 249:5 | | |

273:6,15
287:13,22
**hassan's**
272:21
**hate** 274:8
**hatten** 38:8,9
38:10,11 39:1
**hatten's** 33:8
38:8
**haven** 4:23,24
128:9 129:24
130:8 131:2,7
133:16,23
134:13 135:6
136:10 137:1,7
137:22 138:8
138:14 139:19
139:21 140:14
143:18,24
144:10,13,18
144:20 163:23
163:24 164:15
181:9,15 224:1
295:7,16
296:21 297:3
**haynes** 1:24
311:2,17
**hazlett** 41:23
42:4,15,18
43:17 45:17
106:20 228:1
258:15 279:6
**hdalawgroup...**
3:15

**he'll** 245:12
299:5
**head** 202:19
234:3 254:22
**headquarters**
154:9 155:16
**heads** 60:15
279:5
**health** 13:20,23
14:2,23 15:7,9
105:8 112:5
113:17 144:19
144:20,24
145:5 165:23
**healthcare**
179:5,12
**healthy** 203:21
**hear** 160:11
183:4 207:3
230:8,9 300:11
301:7 307:15
307:15,16
**heard** 158:7
197:17 200:25
228:21 229:2,7
229:10,14
234:13 241:19
242:5 302:5
**hearing** 7:20
151:25 195:11
197:2,11
264:13 274:5
274:11,17,19
300:10,14

302:10 309:24
**hearings** 16:9
151:19,20
264:4,12
**heavy** 191:9
**heights** 1:9,13
2:11,20 3:2 5:6
6:8 7:7,9,12,15
8:13 9:22 10:8
11:12 14:7,25
15:7,17 19:20
19:22 21:8
23:20,23 26:16
28:9 32:20
39:21 44:25
47:20 49:8
66:25 67:1
73:7 76:9
83:21 85:24
86:5 88:10,18
93:2 96:10,11
123:14 127:20
128:2,20 130:4
130:5 131:17
132:15,19,24
133:9,15
134:16 135:10
137:15,25
138:12 139:9
139:11 141:1
141:18 143:12
143:15 144:1
144:25 145:3,6
147:13 149:25

154:22 155:5,9
155:22 157:1,9
157:12,18
161:10 164:6
168:11 169:1,2
169:9 171:23
172:12 173:23
175:8 177:8,20
179:13,16
181:4 190:4
191:21 192:10
192:12,14,16
193:13 194:23
201:18 226:8
227:13,20
228:8 233:13
234:4,17 235:1
236:13,16
237:12 239:18
239:19 241:22
242:9 244:2
246:21 248:22
253:7,23
259:13 271:8
276:24 278:25
279:15 284:11
284:16,22
288:10,24
294:10 308:15
**held** 19:10,13
172:2 229:24
230:3 241:3,4
255:10,15,20

help  57:13
   164:11 210:1
   211:10 217:8
   218:6 231:16
   233:3 245:9
   272:15
helped  166:11
helping  221:2,8
helps  214:7
   216:5
hereto  311:15
   312:11
hey  71:11
   72:12 89:12
   129:8 153:22
   182:24 186:21
   188:6 216:22
   219:11,18
   237:20 246:21
   265:11 267:18
   269:5 288:15
   290:10 294:18
   299:3
hierarchy  62:5
high  16:25
   17:15,16
   111:10 150:4
   190:14,15
   230:23 254:22
highest  191:5
highlighted
   225:20
hinder  9:18

hire  225:6
   278:1 294:25
hired  78:3
   140:11 176:4
   191:21 192:11
   193:10 194:11
   195:16 202:7,9
   202:11 225:13
   225:16 234:17
   234:25 236:1,2
   236:20 237:10
   237:11,22
   238:1,9,12,14
   238:15,22
   239:1,13
   253:12 274:8
   285:25 302:9
   302:12 303:15
   309:1
hires  209:4,5
hiring  20:11,14
   57:3 193:20,20
   193:21 194:1
   225:3,16
   227:12,15
   235:9,13,15
   237:19 239:3
   270:9,10 278:3
   300:9 301:1
historically
   77:16
history  216:24
hit  68:22

hojeije  228:6,9
hold  185:21
   189:3 214:23
   252:4 269:11
   279:22 308:8
holder  247:15
holding  220:23
   220:24
holds  279:23
holiday  280:20
home  164:6
   181:14,15
   247:15
honest  101:16
   223:2
honestly  41:11
   303:14
hopefully  32:5
hoping  76:8
hosier  134:1
hot  246:23
houghton
   181:14
hour  134:10
   174:17 187:4
   215:13 246:16
hourly  13:12
hours  12:3
   30:18 71:12
   174:16 272:22
   277:21
house  234:7
   272:24

houses  294:5
housing  164:5
huerta  235:5
   237:9
huge  213:19
   290:17
human  233:2
hundred  123:9
   164:20 216:16
hunt  2:12 4:3,5
   7:5,6 8:8 9:21
   10:2,15,19
   11:2,5,8,15,16
   11:24 12:5
   15:24 16:3,5
   22:6 23:18
   29:5,7,11,13
   30:3 32:3,10
   35:15 37:5,8
   37:11 43:2,8
   51:2 53:16,20
   54:4 56:3
   59:11 66:14
   67:2,8,12 82:3
   82:7,11 88:16
   91:9,18 99:21
   103:2 107:16
   109:21 111:15
   113:8,11 116:9
   116:15,21
   118:19 119:10
   120:4,6,11,14
   120:19 121:13
   121:24 123:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

123:20,23
126:11,16
128:7 130:15
130:19 138:5
138:22 139:1
143:2,4,8
145:21,25
146:5,11,15,21
147:4 156:16
156:22,24
158:11,19
160:3,22
161:25 162:7
162:16 165:11
184:19,24
185:1,19 186:2
186:8,9 196:11
197:4 206:1
210:4 213:24
214:24 215:6
215:23 221:5
230:12 252:19
282:14,23
289:6 300:18
300:21 304:8
306:5 309:4,9
309:11
**huron** 70:8
**husband** 14:10
16:1 244:6
**hussein** 125:7
125:12,24
129:3,10
137:16 199:14

228:18 284:24
284:24 285:5
285:15,18,20
286:7 290:13
290:15 291:3,7
291:9,15,19
292:5,6,7,13,16
299:12 305:7
305:10 307:10
308:13
**hypothetical**
302:17

**i**

**ice** 146:17
**idea** 146:10
186:18 189:11
273:20 300:15
**identification**
42:2 43:14
48:13 97:12
105:16 116:24
123:22 126:6
130:11 133:21
135:22 141:9
210:8 211:16
251:25
**identified**
29:24 31:15
**identify** 7:3
**illegal** 64:18
67:22 68:10,13
151:23 260:7
261:13,14

262:3 267:14
278:1
**illegally** 152:3
152:6 262:1
278:3
**immediately**
79:15 178:19
246:15 270:15
**impact** 86:23
87:7,15,23
88:12 99:15
308:14
**impacted** 112:5
**impacting**
103:8 305:23
**impeding**
264:15,19,21
265:8
**impedings**
265:1
**important** 8:17
184:8 307:24
**imposed** 269:8
**impossible**
200:2 290:7
**impression**
256:23
**improper**
226:22
**inaccuracy**
298:21
**inaccurate**
298:14

**inappropriate**
30:14 265:17
284:13
**inappropriately**
273:8
**incident** 77:22
77:24 78:2,6,9
78:10,11,14,17
78:21 79:17
83:23 85:21
122:7,14,17,20
248:16 271:11
272:8,12
**incident's**
83:12
**incidents** 78:4
78:18 79:14
122:23,24
**include** 21:13
42:6,9,19
61:18,20,23
183:12
**included** 78:25
165:25 295:25
**includes** 131:9
**including** 31:21
80:11 87:18
107:21 163:15
166:2 199:13
206:2 217:18
**incorporating**
142:25
**independent**
80:9 217:12

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
www.veritext.com

Case 2:24-cv-10240-MAG-DRG ECF No. 115-3, PageID.4230 Filed 02/10/26 Page 348 of 397

[indicate - interactions] Page 35

| | | | |
|---|---|---|---|
| **indicate** 28:24 | **indication** | 256:24 257:1,3 | **insist** 186:18 |
| 67:9 68:9 70:1 | 24:23 129:23 | 259:21 261:6 | **installed** 33:19 |
| 93:25 114:16 | 138:18 139:4 | 261:10 269:1,3 | 33:20 |
| 138:18 | 142:9 151:11 | 272:12 293:9 | **instance** 79:22 |
| **indicated** 8:16 | 152:20 186:14 | 298:4 299:13 | **instances** 122:8 |
| 12:9 13:23 | 218:21 269:10 | **information's** | 267:20 270:14 |
| 21:25 37:14 | 270:1,3 | 100:2 | **institute** 98:1,8 |
| 38:7 42:3 | **individual** | **informed** 56:21 | 297:19 |
| 46:15 49:13 | 33:21 108:10 | **infraction** | **instruct** 61:4 |
| 52:5 58:2 | 109:4 | 151:20,24 | **instructed** 61:8 |
| 61:14 65:18 | **individually** | **initial** 29:25 | 129:10 |
| 69:11,25 70:14 | 93:24 172:3 | 42:16 102:4 | **instructs** 9:13 |
| 70:20 71:3,6 | **individuals** | 148:10 | **insurance** |
| 76:3,4,19 | 80:11 83:18 | **initially** 27:9 | 13:20,21,21 |
| 80:10 82:19,25 | 134:1 137:23 | 106:7 125:15 | 14:24,24 15:7 |
| 88:23 89:24 | 138:7 204:19 | **initials** 209:16 | 15:9,9 44:14 |
| 90:6 91:2 | 227:18 235:12 | **initiate** 24:25 | 44:17 105:8 |
| 93:12 95:20,23 | 246:9,10 | **injunction** | 144:19 145:5 |
| 101:22 103:6 | 256:24 | 281:22 282:1 | 165:23 |
| 109:16 110:22 | **influence** 88:21 | 282:11,19 | **insurances** |
| 115:22 123:1 | 288:8 308:5 | 283:8,13,19 | 166:19 |
| 129:20 133:4 | **influencing** | 284:3 293:21 | **intend** 138:8 |
| 136:12 144:23 | 308:4 | 293:23 294:16 | **intended** 6:20 |
| 145:8 156:8 | **influential** | 294:21 | **intent** 136:9 |
| 304:13 | 110:10 | **injunctions** | 137:7,11,13 |
| **indicates** 43:25 | **information** | 294:1 | 138:13 284:21 |
| 49:3,14 58:9 | 37:24 56:17 | **injured** 206:25 | **intention** |
| 58:21 85:11 | 61:7 78:23 | **input** 259:19 | 143:10 181:8 |
| 86:14 141:15 | 148:20 149:12 | **inquiring** 27:20 | 181:10,12 |
| 142:21 147:15 | 151:16 161:22 | 27:22 | **interaction** |
| 149:3 | 184:7 186:10 | **inside** 33:8 | 286:23 |
| **indicating** | 186:13 202:18 | 61:6 160:25 | **interactions** |
| 11:15 120:23 | 204:18 219:20 | 161:2 166:3 | 30:14 242:13 |
| 123:11 139:2 | 229:5 246:5 | 223:24 | 244:11,11 |

A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **interest** 4:22 11:19 62:16 131:3,15 135:5 135:5 | **interpretations** 301:8,25 | **intimidated** 270:5 | **investigations** 20:1,12,13 22:1,2,3,8,10 22:13,19,21,23 |
| **interested** 27:20,23 243:8 311:15 312:12 | **interrupt** 113:6 215:4 | **introducing** 285:23 | 23:1,3 24:24 24:25 25:19,22 |
| **interim** 24:1,4 24:14 113:19 | **intersection** 233:12 | **investigate** 25:16,16 64:3 65:2 115:12 188:7 227:2 277:25 | 26:6,9 49:10 63:25 64:4 115:3,6,7,9,11 |
| 113:22,25 114:8,11,17,20 115:20 116:1,6 207:18 208:6 208:16,25 209:1,8 223:6 | **intervene** 267:23 | **investigated** 65:3,18 68:11 82:20,23 | 115:13,19 154:21,24 155:8 266:16 267:20 |
| **intervening** 1:15 3:2 7:12 7:15 10:8 30:1 30:15 67:6 161:16 | **investigating** 158:25 231:23 233:4 | **investigative** 51:8 231:22 |
| 223:12,13 230:17 285:18 285:24 304:10 304:14,18 307:11 308:14 | **intervention** 10:3 | **investigation** 22:12,19 23:1 25:1,2,10 26:10 30:14 51:24 65:7,13 65:19,20,24,25 67:18,24 70:5 70:10,25 79:18 80:8,21 83:13 86:16,20,25 109:6,8 137:4 148:23 150:11 152:21,23,24 156:4 226:21 226:23,24 227:6 250:9 262:10 271:19 273:18 | **investigator** 234:3 |
| **interview** 4:25 28:3,6 40:25 41:1,2,17 66:5 70:6 79:18 80:6 133:22 134:7 135:4,12 137:22 139:24 140:1 | **investigators** 203:7 |
| **internal** 20:12 22:1,2,8,15 23:3 24:24 25:5 51:23 64:4,10 65:7 65:20 67:17 79:18 80:21 152:24 250:8 262:9 267:19 271:18 | **invoked** 162:3 |
| **involve** 273:1,9 |
| **involved** 22:14 54:22,24 79:7 108:20 151:19 171:5 227:12 228:7 229:11 229:14 231:6 264:1 273:10 |
| **interviewed** 66:1,7,10 70:22,25 80:7 176:3 205:3 261:2,3 |
| **interviewing** 133:14,25 134:17 135:14 137:21 138:7 | **involvement** 235:9,12,15,20 237:18 239:12 249:18,25 250:4 259:14 |
| **internally** 150:9 262:22 |
| **international** 85:5,13,15 | **interviews** 224:1 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**involving**
  147:16 267:20
**issue**  53:10,22
  53:25 54:9
  61:2,13 64:5
  65:8 67:23,24
  68:2,4,12
  72:22 94:25
  95:4 103:7,7
  104:8 107:9
  159:20 201:12
  219:4 228:22
  248:4 251:6
  259:5 260:11
  260:18,25
  261:9,11 263:5
  263:17 266:3
  266:20 272:8
  279:6 286:9
  296:17 302:3
  303:2
**issued**  39:14
**issues**  15:19
  54:20 55:9,11
  55:15 56:5
  58:16,17 64:23
  107:4,8 112:5
  127:24 139:10
  139:24 150:10
  156:7 159:15
  159:16,19
  194:22 195:5,6
  195:24 199:2
  208:18 230:14

  253:16 257:19
  258:10,14,24
  259:9 262:5
  278:8 284:10
  285:8,12
  292:15 303:25
**it'd**  25:11
  246:19 272:11
**it'll**  72:9
**item**  151:4
  210:19,22
  211:1,7 212:14
  212:20 213:4,8
  218:1
**items**  115:1
  240:25 243:18
  257:22,23
  258:10

**j**

**j**  7:17
**jahkarah**  1:24
  6:3 311:2,17
**jails**  237:23
  238:6
**jake**  33:8
**james**  134:3
**january**  17:14
  18:7 19:2
  47:21 49:4,14
  49:22,24 50:2
  50:4 52:16,23
  53:1,9,24 54:6
  54:8 56:4,11

  56:23 58:21,21
  73:2,6,16
  136:13 137:8
  140:17 142:1
  143:18 157:14
  179:18 202:8
  222:22 252:24
  274:24 293:18
  306:16
**jarbled**  8:19
**jay**  134:2
**jbrown**  2:8
**jedrusik**  26:20
  26:20 178:1
**jeff**  178:1
**jenny**  93:19,25
**jeopardize**  53:6
  58:10
**jeopardized**
  58:14
**jerrod**  1:6 2:3
  6:8 20:19
  21:20 24:11
  27:5 28:23
  34:7 37:4
  45:23 52:11
  55:3,12 56:9
  56:16,16 57:9
  65:11 67:15
  74:13 79:15
  177:24 201:18
  202:25 203:3,8
  223:14 229:4
  241:25 242:12

  243:7,12
  252:17 258:13
**jerrod's**  209:16
**job**  1:25 17:21
  20:2 33:14
  35:8,8,21
  41:22 42:16
  43:19 47:12
  60:24 82:15
  99:16 102:14
  104:18,23,24
  105:3 118:10
  118:18 131:15
  135:9 136:12
  137:14 138:14
  178:20,20
  192:18,18
  196:14 198:8,9
  200:9 227:1
  228:3 236:9
  237:24 239:3,8
  264:18 282:7
  285:1,2 288:19
  293:9 294:24
  305:23,24,25
**jobs**  87:7 90:3
  224:16
**jogged**  43:9
**john**  233:12
**joke**  108:11,21
  108:23 109:6
**joked**  108:22
**jon**  235:4 238:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **jordan** 66:7 | **keeping** 293:21 | **know** 9:6 11:5 | 88:2,2,3,4,6 |
| 70:19 | **ken** 290:4 | 11:10,10 17:4 | 89:7,17 90:2,3 |
| **joseph** 2:4 | 292:9 | 19:11 20:3,10 | 90:8 93:1 |
| **july** 12:18 | **kept** 39:3 | 20:11,21 23:7 | 94:17 96:13 |
| 46:12 126:25 | 223:19,24 | 23:7 25:6,12 | 99:12 101:6,17 |
| 223:16 224:7 | 290:13 | 26:2 27:6,16 | 102:16 105:19 |
| 298:1,2 | **kevin** 1:5,18 | 27:17 29:5 | 105:25 106:1,7 |
| **jumped** 251:6 | 2:2 6:6,7 7:19 | 34:2 35:25 | 108:15,21 |
| **june** 77:21 78:9 | 8:2 12:12 | 36:12,18 37:21 | 109:10,12 |
| 201:11 299:2 | 255:7 297:15 | 37:23 40:25 | 112:7 113:17 |
| **jurisdiction** | 304:1 | 41:11,13,16 | 113:17,19,20 |
| 188:5 189:14 | **key** 38:15,16,17 | 45:20 46:5 | 114:8,13,22,24 |
| **jurisdictions** | 38:24 110:6 | 47:1 48:7,7,18 | 115:16,18 |
| 262:25 | **khalil** 85:4,11 | 48:20 50:6 | 118:11,22 |
| **jury** 4:13 271:2 | **kick** 233:25 | 51:22 52:25,25 | 121:7 125:23 |
| 271:2,6 | **kids** 163:14 | 54:5,6,9,12,24 | 128:15,23,24 |
| **justice** 49:10 | **kill** 112:8 | 55:6,12,19 | 128:24,25 |
| 52:18,24 | **killed** 207:2 | 56:1,8,13,14 | 129:1,2,2,8,9 |
| 100:12,14,21 | **kim** 134:1 | 58:3,4,15 | 129:12 134:19 |
| **k** | **kind** 22:23 | 59:14,15,16,19 | 134:21 135:9 |
| | 61:14 125:25 | 59:21,23,24,24 | 135:13 140:17 |
| **k** 12:12 13:20 | 162:20 169:6 | 60:1,10,11 | 142:4 144:5 |
| 94:3 117:24 | 178:12 253:6 | 62:8,22 63:4,8 | 148:25 149:6 |
| 118:9 122:20 | 255:11 257:9 | 63:8 66:12,14 | 149:20,21 |
| **kaminski** 243:1 | 267:12 295:6 | 67:16 69:3 | 150:4,12 |
| 244:19 | **knew** 35:19 | 71:11,12 72:9 | 151:10,14 |
| **kate** 134:1 | 38:24 65:11,12 | 73:18,18,22 | 153:7 154:17 |
| **keep** 38:11 | 65:12,22 75:20 | 74:3,7,20,20,21 | 155:10 156:1 |
| 39:18 50:16 | 86:7 90:6 | 74:22,23 75:1 | 156:19 157:3,4 |
| 51:11,19,21 | 116:13 134:21 | 75:1,2,16,21 | 157:6,21 158:9 |
| 135:9 149:22 | 134:22,23 | 78:25 79:16,19 | 158:23,24 |
| 282:20 292:16 | 137:14 268:20 | 79:21 82:17 | 159:2,3 160:23 |
| 294:6 | 268:21 | 83:8 85:13,19 | 161:11 165:10 |
| | | 86:3 87:19 | 166:24 167:1,5 |

167:13,13,14
173:13 182:5,6
182:25 183:11
184:22 185:17
188:6 190:3,6
191:7,7 192:9
192:13,22,23
192:24 193:1,5
195:4,17,18,19
195:20 196:1,2
196:5,6,13,13
196:15,16,17
196:19,21
197:10 198:6,7
198:8,10 199:8
199:10 202:6
202:22 205:10
205:17,18,20
206:1,5 208:21
209:22 210:6
211:8,8 212:21
213:11,20
214:13 216:15
216:15,15,16
216:16 218:3
219:14 221:2,9
221:18,25
222:8,16 225:9
225:17 226:2
226:13,14
228:1,2,3,6
229:12 230:7
230:22 231:25
232:3,8,18,21

234:23,25
236:17 237:13
239:17 241:19
242:5,12,15,16
242:21,21,22
243:1,25 244:8
244:8,9 246:12
246:16,17
247:22 248:6,8
248:20 249:2,3
249:9 252:11
253:12,14,16
254:19,20,21
255:7 256:7,24
257:11 258:5
258:17 259:15
259:20 261:4,5
261:18 264:21
265:8,12 266:9
267:18,22
268:10,11
269:9,13,15,15
270:11,12
271:9,10,17,22
271:24 272:9
272:23,25
274:13,15
276:10,12
277:4,20,23,25
278:1,3,4,6,9
279:23 281:21
282:6,8 284:7
284:24 285:3
285:15,23

287:4,5,16
289:7,23 290:5
291:23 292:7,8
292:13 293:11
294:2,4,6,6,24
299:3,4,22
300:14 302:19
303:11 305:20
306:16,22
307:4,6,13,16
307:20 308:3

**knowledge**
33:20 50:4
70:2 86:2
93:18 95:18
110:19 144:15
185:22 227:7
229:2 299:13
311:10 312:6

**known**   233:10

**knows**   89:20,24
90:8 215:12
249:9

**l**

**l**   1:24 180:9
311:2,17
**label**   123:5
**labor**   125:5
129:7 174:19
187:5 189:10
200:12 286:5
290:2,4,16,21
291:17 292:1

293:8
**lack**   303:6
**lady**   242:23
**lake**   181:14
**language**   168:3
**lapointe**   242:25
244:25
**large**   56:25
**lasted**   140:22
**late**   92:13
**lateral**   21:16
204:7,25
**laundry**   195:2
**laura**   312:2,15
**law**   2:13 3:5
6:10 49:5
131:13 147:18
147:20 149:4
151:5 221:12
224:16 233:7
257:18 260:22
263:4 267:8
268:11
**laws**   6:22
**lawsuit**   8:12
15:15 32:15
92:3,5,17 93:4
93:15,20,23
109:13 171:20
172:20 174:5
187:24 193:24
193:25 205:7
205:11,12,14
205:16,16

[lawsuit - list] Page 40

206:2,5,5,13
220:13 222:3
250:14 256:1,3
282:13,21
295:2
**lawsuits** 92:20
93:15
**lay** 167:10
168:13 169:15
170:3 171:14
171:15 172:16
173:1 174:1
185:22 189:5
224:9 282:16
301:4 302:18
**layman** 82:2
**layperson**
188:20
**lead** 89:22
204:10
**leader** 96:16
**leadership** 17:3
20:13 57:3
83:10 96:15,16
111:6 285:12
**learn** 26:15
101:2 111:17
112:16 192:20
195:24
**learned** 26:17
27:3 68:13
101:4,8,14,24
295:13

**leave** 26:24
63:18 123:13
128:1 129:12
129:15 140:16
142:12 152:23
163:23 165:8,9
180:1 213:25
223:23 224:16
228:3 271:12
284:16 286:10
288:9 289:8
295:1 304:21
308:4,15
**leaves** 208:10
**leaving** 40:10
111:18 140:13
202:12 235:7
283:7 284:11
285:19
**led** 287:16
**left** 18:14 19:17
21:11 27:1
30:5,7 34:24
35:2 37:15
39:20,24 52:21
73:24 106:3
129:19 145:2
149:13 161:10
163:24 176:19
177:2 201:3,9
201:17 202:1,2
202:21 203:22
209:8 210:2
223:16,23

226:25 239:7
247:4,15,17,17
247:19 248:5
262:24 264:15
271:24 283:12
285:22
**legal** 82:2
161:21 167:10
168:13 169:15
170:3 171:14
172:16 173:1
174:1 185:22
189:4 206:4,7
224:9 282:16
284:4 301:4
302:18
**legally** 193:5,6
193:10
**legitimate**
302:13
**letter** 4:14,16
5:3,4,5 97:14
97:19 135:24
135:25 136:3,9
137:10 138:13
139:2 183:7
258:11
**level** 115:18
173:17 191:5
254:22 263:5
263:20
**levels** 235:20
**licensed** 203:18
232:23

**licenses** 97:4
**lieu** 226:18
**lieutenant**
19:13,14,16
25:6 26:4 64:9
64:13 69:8
76:15 150:2
176:23 180:24
238:10 244:6
**lieutenant's**
74:22
**lieutenants**
176:24
**life** 93:10
137:21 278:9
**lifted** 283:8
**lighting** 128:19
**lights** 230:23
232:1,2
**likely** 179:22
213:3
**line** 136:17
288:20
**lines** 74:25
117:15 213:19
252:10
**list** 8:15 23:2
77:9 134:24
162:17 177:16
195:2 202:17
202:18 213:9
213:11 225:16
225:18,21

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

listed 5:17 44:12 45:13 46:11 49:18 66:18 117:12 123:10 127:9 127:15 159:10 280:9
listened 256:10
listing 211:25
lists 44:6 66:16
litigant 185:23 185:25
litigate 160:9
litigated 170:5
litigation 187:9 194:7 256:2 283:19
little 30:25 42:23 43:11 60:17 206:23 211:11 216:4 256:18 265:23
live 12:19 163:9,10,12,17 206:20
lived 12:16,20 12:20 86:7 163:3
living 181:10
livingston 206:18
local 100:9 197:13 220:14 224:1

locate 162:5
located 16:17 28:14 33:7 38:17 68:25 71:9 119:19 202:5
location 1:21 154:7 233:19
location's 40:19
locations 69:2 154:12
locked 38:21 40:18,19
log 78:20
long 12:16,23 18:8,20,25 19:6 68:15 74:7 80:14,15 91:23 97:14 134:7,9 146:3 178:4,6 203:20 208:21 216:3 236:8 254:25 283:19 289:11 289:22 291:11 307:14
longer 9:7 92:18 114:7,21 208:20
longevity 280:22
look 29:20 34:9 34:12 36:5

49:2 50:7 66:6 66:9 71:2 72:25 78:19 79:19 83:7,24 102:20 104:10 107:17 119:2 119:13 122:19 126:21 136:14 140:4 142:3 146:4 147:14 156:18,21 157:25 158:2 160:25 161:2 166:6 210:18 210:19 211:25 218:1 232:17 255:2 258:17 269:6 275:2 278:10 279:1 294:18 297:9 298:25 306:18
looked 23:17 34:11 36:9,17 152:15 192:23
looking 46:10 72:16 79:1,2 85:1 105:25 128:1 189:19 190:9 196:5 294:15 299:20
looks 72:7 126:19 130:13 134:8 166:15 244:16

loosely 113:2
lose 107:23 291:25,25
lost 202:7,9,11 203:7 274:11 274:17,20
lot 63:3 107:3 124:8 132:12 139:6 152:8 153:24 191:11 195:6 196:16 202:7 203:21 208:9 213:14 213:17 216:7 217:4 231:7,7 231:8,9,21 238:11 244:9 248:19 261:10 269:20 272:7 272:10 273:10 277:20 293:22 297:7,8 305:25
lots 154:11,13 191:13
lower 115:18
lt 38:8 81:1 150:3 153:2 203:17 227:5 241:3,4
lynn 176:6

m

m 5:11 180:16 200:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**ma'am** 309:21
**made** 23:15
  49:1,22,23
  50:1,5,6,8,20
  50:23,24 51:4
  51:6 52:6,8
  58:16 59:14,15
  59:17,19,21
  69:1 75:24
  77:10 78:1
  87:25 88:25
  90:21 102:4
  106:21 109:7
  116:16 125:18
  131:22 134:24
  149:1,8 159:11
  174:10 184:18
  185:19 199:14
  222:1,9 223:12
  228:2 242:1
  244:21 245:1
  246:17 250:17
  263:3 264:3
  265:14,15
  272:2
**mag** 1:9 6:9
**magistrate**
  264:7,11,12,17
**mail** 4:17,20
  27:10,17,18
  29:17 30:24,24
  37:13 46:3
  71:21 105:22
  105:23 106:1

106:22,23,24
117:2,9,13,17
118:4,7,8
119:5,12,23
123:24 124:5
124:12,16
135:23 141:11
141:16 142:21
155:18 165:10
183:13,18
184:9,11,16,19
184:22 185:13
185:16,23,25
186:1 215:10
250:25 276:13
287:4 292:22
293:5,13,14
**mailed** 183:20
**mailing** 163:11
**mails** 29:19
  30:13,19 48:8
  72:20 107:3
  117:2 119:20
  120:16 182:2,6
  183:9 250:22
  250:25 261:18
  290:6
**maintain** 51:25
  97:1
**major** 79:17
  208:13 278:8
  285:8 292:15
**majority** 253:2
  253:22 278:18

278:20 288:1
**make** 10:14
  11:23 25:6
  36:2,3 49:17
  52:9 59:3,12
  59:13 60:4
  62:19 69:17
  72:18,23 75:4
  75:5 88:2
  102:24 103:10
  103:14,17
  106:14 109:1
  110:10 121:18
  143:24 144:14
  146:6 147:22
  150:22 178:22
  199:21 210:10
  211:17 214:14
  215:4,7 231:21
  249:6 262:22
  263:15 278:10
  285:18 298:12
  305:24
**makes** 33:23
**making** 12:2
  15:16 62:16
  75:22 103:5
  108:22 153:12
  246:16 291:2
  304:24 305:17
**malinowski**
  254:10
**manage** 207:9

**management**
  51:23 52:22
  53:5 57:4 58:9
  68:4 71:10
  98:1,8 189:1
  198:17 205:1
  297:19
**manager** 13:3,9
  191:11 285:2
**manner** 6:23
  87:7
**manpower**
  20:11
**march** 64:17,22
  67:14 299:2
**margaret** 41:23
  45:17,22 48:9
  106:20,20
  228:1 258:15
  279:6,12
**maria** 229:24
  230:3
**mark** 195:19
  196:9,13,20
  197:10 198:24
**marked** 42:1
  43:13 48:11,12
  97:11 105:15
  116:23 123:21
  126:5 130:10
  133:20 135:21
  141:8 210:7
  211:15 215:24
  251:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **married**  14:8 | 10:23,25 11:11 | 268:21 274:7,8 | **mean**  11:4 17:2 |
| **massachusetts** | 24:6,6,22 30:9 | 278:11,17,19 | 22:25 23:5 |
| 210:24 | 32:13 45:17,22 | 278:19 282:1,6 | 27:17 30:17 |
| **master**  5:14 | 45:24 46:1,5 | 284:14 285:14 | 34:6 41:1,15 |
| 28:13,19 195:3 | 49:8 65:16 | 285:17 286:3 | 50:19 51:12 |
| 248:17 | 84:6,17 85:2 | 286:16,23 | 55:11 64:12 |
| **match**  13:20 | 87:13,21 88:4 | 287:23 288:2,9 | 65:1,1,10 66:1 |
| **matches**  36:19 | 88:4,13,19 | 288:11,20 | 67:17 79:10 |
| **materials**  77:6 | 97:15,22 107:6 | 289:1,4,8,9,22 | 81:11 111:6 |
| **math**  47:24 | 107:21,23 | 289:25 290:18 | 115:11 122:14 |
| 296:18 | 111:20,24 | 290:23,23 | 124:8,8 129:6 |
| **matt**  244:1 | 112:3,7,20 | 291:15,24 | 143:16 153:25 |
| **matter**  6:7 | 113:13 114:6 | 292:12,15,16 | 154:10,23 |
| 22:15,16 30:11 | 123:15 124:5,9 | 292:18 293:12 | 160:21,24 |
| 82:17 92:1 | 125:4,24 | 293:13,14 | 168:18,19 |
| 111:4 157:8 | 127:23 132:2 | 294:21 299:14 | 173:12 181:9 |
| 170:5 173:16 | 134:16,20 | 299:16 302:21 | 183:8 186:4 |
| 175:24 185:20 | 137:18 139:17 | 303:2 305:3 | 188:3 191:7,9 |
| 187:7,11,12,14 | 141:11,23 | 306:21,24 | 191:10 196:4 |
| 187:21 199:20 | 167:2 181:17 | 307:3,4,5,8,13 | 202:17 203:16 |
| 217:17 218:7 | 181:18 183:18 | 309:1 | 206:9 209:22 |
| 220:12 223:7 | 183:25 187:1 | **mayor's**  88:8 | 214:10 218:24 |
| 251:18 285:1 | 193:1,15,25 | 107:7 299:10 | 221:24 232:17 |
| **matter's** | 196:3,8,13,21 | **mazzitello** | 237:20 241:17 |
| 187:23 | 196:24 199:21 | 239:11 278:6 | 247:8,11 |
| **matters**  11:7 | 209:4,19 | **mcl**  58:24 | 249:13 252:9 |
| 25:1 54:13 | 213:16 219:11 | 64:20 | 254:18 255:1 |
| 109:6 157:17 | 220:6,9,14 | **mcoles**  97:1 | 255:24 258:8 |
| 189:1,22 190:1 | 221:1,6 227:16 | 176:21 203:18 | 261:1,3 265:7 |
| 218:8 | 228:10,13 | 223:19,20,24 | 265:13 269:4 |
| **maxwell** | 251:13,20 | 227:8,9 232:23 | 272:19,23,25 |
| 254:10 | 252:17,25 | 233:23,23 | 273:16 276:25 |
| **mayor**  9:22 | 258:11 261:4 | 270:11 280:9 | 277:21 278:6 |
| 10:13,16,18,19 | 266:24,25 | 280:18,19 | 283:3 290:5 |

[mean - mind] Page 44

291:2 308:25
**meaning** 81:12
113:1 124:12
246:5
**means** 6:24
217:1 287:17
**measured**
126:22
**media** 224:1
227:25 228:3
244:10 287:12
**medical** 44:13
44:16,20
166:19 208:18
**medications**
9:17
**meet** 27:24
28:8 41:4 77:3
114:9 153:1
**meeting** 5:7,8
40:20,25 52:17
73:13 74:1,3,7
85:8,20 89:4
89:13,20 94:21
94:23 95:8,9
101:19 102:19
102:21,23
103:23 104:3,7
104:9 107:9,10
107:12,18
108:1,2,17
109:18 110:1
110:15 111:19
111:24 112:2,9

112:11,23
114:14,16
117:21 118:13
118:24 119:5
121:5 138:7
209:24 211:4
212:24 213:7
213:12 214:21
217:13 218:21
255:25 268:22
269:2 272:17
272:19 275:5
276:15,20,21
**meetings** 50:21
52:14 94:12,15
94:24 95:6,6
95:11 109:25
110:3,4,5
116:18 154:14
154:14 195:12
195:22 241:14
242:9 250:17
250:20 270:7
272:10 277:24
**member** 85:3
169:7 175:14
180:21,25
181:3 268:5
287:9
**members** 89:6
108:18 110:9
112:6 114:10
122:8 195:11
241:13 242:3

242:13 244:20
244:25 255:5
288:15
**membership**
170:13
**memorandum**
51:16 71:23
**memory** 43:9
**mention** 89:9
184:18 197:25
**mentioned**
20:22 28:19
50:9 57:2
58:19 63:24
76:19,20 82:21
83:25 109:9
172:1 237:7
304:9
**mentions** 151:4
**merc** 200:12,15
**message** 76:1
276:13
**met** 28:7,10
41:7 47:18
85:3,17 114:12
152:14,16,18
153:5,8 268:23
272:21,23
**methods** 99:18
100:5
**meyers** 195:19
196:9,14,20
197:10 198:24

**mhunt** 2:16
**mi** 1:23 2:7,15
2:22 3:7,14
**mic** 297:13
**michael** 163:2
**michelle** 14:14
**michigan** 1:2
1:10 6:8,12,14
12:15,22 49:9
79:23 144:8
174:12,15
187:5 191:4
231:2 240:13
259:17 260:14
260:23 268:16
311:19
**microphone**
214:25 215:16
**middle** 75:11
75:14 163:1
297:19
**midsummer**
296:14
**midway** 166:17
**might've** 28:17
**mike** 198:24
**mile** 1:22 2:6
6:11
**million** 148:8
213:21
**millions** 213:21
**mind** 192:25
193:4 218:25
262:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

mine   132:16,16
minor   207:15
minute   281:11
minutes   5:8
   91:7 104:11
   145:23 215:15
   246:16 267:13
   276:22
miotke   3:4,5
   4:4,6 7:11,11
   9:23 11:14
   29:22 31:13
   32:1,7,9 42:25
   43:9 51:1
   53:11,19 66:15
   67:3 91:10
   103:1 120:5,8
   120:12 126:9
   126:13 130:12
   130:17 146:3,9
   146:13,16
   158:8 159:18
   160:2,6,14,17
   161:6 162:10
   162:11,13
   164:12 167:7
   167:12 168:15
   169:19 170:7
   171:17 172:7
   172:21 173:5
   174:3,9 186:3
   186:16,23
   189:6 192:1
   194:20 195:9

196:23 197:9
197:19 199:1
199:12,19
200:1,4,10
201:24 203:15
208:3 210:6,9
210:13,14
211:14,20
214:5,12,17,19
214:21 215:2,7
215:11,17,22
216:1 217:6,7
219:25 220:3,5
220:20 221:10
221:17,21
224:10,23
226:1 228:5
229:3,22 230:2
231:11,24
233:17 234:12
237:4 240:10
240:12,17
241:20 243:20
247:7 249:12
251:10,17
252:2,6,8,20
253:18 254:4
257:8,14,16
263:14 272:14
275:17,24
276:4 277:17
278:23 279:13
281:12,20
282:18 283:2

283:11 284:1
285:9 287:6
289:14 295:11
297:11,17
298:11,19
300:3,22,24
301:9,15,20
302:24 303:12
303:23 304:5
306:7,10 309:2
309:5,13,15
miotkelawoff...
   3:8
misconduct
   71:17 153:18
misdemeanor
   80:17
miserable
   190:4
misleading
   167:11 168:13
   170:2 171:13
   197:15 201:21
   203:11 214:4
   224:20,22
   225:23 231:5
   231:19 233:15
   247:6 248:24
   254:1 300:2
   302:17 303:10
mismanaged
   56:19
mismanagem...
   57:7 58:14

147:16,23
149:5 266:2
misrepresented
   219:5
misstates   22:4
   35:13 82:5
   207:25 220:17
   231:18 263:9
   284:18 286:25
   295:9
mister   147:10
   305:5
mistreated
   254:19
mlk   265:13
mo   73:2,13
   74:6 119:5
   246:15,19
   251:5 268:1,5
   272:23
mohamad   73:3
mom   164:9
moment   31:24
   43:1 55:21
   175:17 192:3
   203:20 217:25
   287:20 290:19
   299:21 309:8
monday   1:19
money   148:12
   165:13 236:25
   291:12 300:13
   302:6,12,22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

monica 2:12 7:6 23:12 29:4 123:19 142:24 165:11

monitored 151:21

month 49:14 140:23 144:17 208:23 222:6

monthly 39:10

months 46:21 137:20 138:7 154:1,1 285:3

morin 312:2,15

morning 6:2 7:5 8:9,10 128:16

mother 207:2,8

motion 5:9 94:18 209:23 212:10 218:6 218:23 222:8 222:13,21 270:13

motions 251:19

motivated 285:7

motivating 277:10

motor 232:14

mourad 299:16

mourad's 288:13 299:11 299:14

mouth 227:25 307:17

move 119:3 144:3 159:20 162:7,9 176:11 181:6 217:24 217:25 232:9 241:12 253:17 285:4 302:22

movement 148:9

moving 53:2 64:16 147:11 160:9 230:10

msp 50:12,20 50:24 52:2,18 52:24 54:13,15 54:18 55:17,19 56:1 57:14,15 59:24 60:6,20 62:14 79:24 80:5 82:20 100:21 260:1 277:25,25

multiple 30:13 30:19 32:18 56:18 119:19 125:7,9 200:20 265:14,16 298:15 307:20 307:21

municipal 1:10 6:9

myers 195:25

**n**

n 2:1 3:1 4:1 5:11 6:1 12:12

name 6:2 12:10 14:13,15 26:19 30:10 57:17 81:22 94:1 163:1 169:17 177:23 180:6 182:11,14 200:8 208:11 226:5 228:14 237:8,8 242:18 245:13 270:12 299:4

name's 118:5

named 29:20 92:6 93:17,21 93:24 94:6 114:18 205:10 205:11 235:3 242:23 262:8 291:8

names 81:12 154:6 176:9 225:20 235:22

nancy 74:6 254:2

nature 62:12

near 214:25

nearly 58:22 215:13

necessarily 33:13 36:19 63:13 70:16 82:16 86:24 87:14 108:19 137:9 147:11 173:9 192:25 202:15 208:22 248:3,25 256:17 258:15 266:13,16 276:17,24 283:1,21,25 289:2 291:3 308:17

necessary 20:1 34:9

need 9:5 36:5 69:2 75:1 122:19 156:22 159:21,23 160:10 221:18 221:23 256:24 275:19,23 277:22 294:3 308:10

needed 39:13 137:18 259:20 296:20

needing 171:9

needs 161:7 277:25 298:14

negative 87:7 244:21 245:1

negatively
87:16 241:22
243:22 245:18
245:22
negotiate 42:21
negotiated
42:23 129:8
193:6 289:11
negotiates
292:10
negotiation
286:6,10,13
negotiations
125:6,9 286:16
neighbor
247:24
neither 311:11
312:7
never 10:6 34:3
36:17 37:22
38:4 50:1
58:16 93:3,21
103:14 107:4
132:22 133:5,5
133:8,9 145:5
199:3 231:25
244:7,10
255:12 263:25
276:24 285:17
290:15 299:16
308:6
new 126:2
131:19 191:7,7
191:8 199:22

294:17
news 196:5
197:24 220:15
231:14
newspaper
197:13,23
nice 203:21
223:21 247:23
305:15
night 128:18
289:24
nineteen 14:21
nineties 92:11
92:13
non 169:6
225:6 253:24
254:7,11
255:16 302:13
302:14
nonsense 294:7
noon 91:5
nope 250:15
normally 25:3
39:11 50:21
64:8,11 78:16
81:7 103:11,15
115:18 224:17
273:9
north 247:15
northville 1:23
2:7 6:12
notary 6:13
311:18

notate 264:20
note 29:22
31:13 160:17
265:22
notes 8:16
145:23 146:4,6
220:25 299:20
notice 5:7
101:5 167:25
noticed 79:6
242:14
notified 79:15
notion 201:25
november
133:23 134:5
135:23,24
136:8,20 137:6
140:2
number 15:16
44:6 156:7,7
163:25 164:3
201:16
numbers 119:4

**o**

o 5:11 6:1
12:12 180:16
228:15,16
oa 108:11
oak 12:14,14
12:16 163:10
163:11
oaths 6:14

object 9:12
11:16 112:25
128:3 196:11
197:3,4,4
213:24 214:1
221:5,15
243:11 252:19
277:15 282:14
289:6 300:18
objecting 186:7
300:21
objection 6:15
9:23 10:14,22
11:24,25 12:2
15:22 22:4
35:12,13 51:1
53:11 54:2
59:5,8,9 82:1
82:10 88:14
99:20 103:1
107:14 109:20
111:14 113:6,9
113:10,10
116:8,19
118:15 119:8
120:8,25
121:17,20
123:3 138:2,20
167:6,9 168:12
169:14 170:1
171:12 172:5
172:15,25
173:25 174:7
185:22 189:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 191:22 194:16 | observed 78:6 | 83:8 228:6,22 | 263:18,21 |
| 194:25 197:6 | 246:5 | 229:7,11 | 264:4,13,20 |
| 197:14 198:19 | obtain 164:4 | 234:24 262:17 | 267:22 271:9 |
| 199:5,5,16 | obvious 290:3 | offer 5:4 41:22 | 271:20,23,25 |
| 200:3 201:20 | obviously 17:3 | 42:3,16 128:6 | 311:1,2 |
| 203:10 207:24 | 160:10 173:13 | 128:8,22 | officer's 204:5 |
| 219:23 220:17 | 196:19 250:11 | 129:21 136:3 | 264:18 |
| 224:8,21 | 257:23 261:4,5 | 136:18 138:15 | officers 23:8 |
| 225:22 227:22 | 267:2 296:16 | 139:14 140:6 | 36:3 61:16 |
| 228:23 229:8 | 299:8 | offered 41:20 | 69:2,23 71:18 |
| 231:4,17 | occasions 32:18 | 45:1,15 192:18 | 71:19 72:2 |
| 233:14 234:8 | 73:3 75:6 | offhand 228:20 | 76:8 82:20 |
| 234:20 236:21 | 101:21 208:18 | office 3:5 33:2 | 83:18 144:5 |
| 241:16 247:5 | 209:7 268:2 | 33:4,9,11 | 147:18 151:5 |
| 248:23 251:7 | occupy 33:1 | 34:17 35:7 | 169:8 175:7 |
| 251:14 253:9 | occur 150:23 | 38:16,18,19 | 176:21 193:14 |
| 253:25 263:9 | 236:25 | 40:14 54:16 | 195:7 200:11 |
| 272:5 275:9,21 | occurred 22:16 | 100:15 148:7 | 201:17 202:1 |
| 276:3 278:21 | 77:22 129:3 | 260:16,18 | 203:19 204:5,7 |
| 279:9 282:15 | 227:3 261:16 | officer 17:23 | 204:20 227:19 |
| 282:23,24 | occurring | 18:21 20:3 | 240:13 249:1,3 |
| 283:9,20 | 277:23 | 69:7,13 75:2 | 262:7 265:11 |
| 284:17 286:25 | occurs 177:17 | 76:5,17 79:3,7 | 267:9,18 |
| 295:8 300:1 | october 85:2,9 | 79:9,11 92:9 | offices 115:15 |
| 301:3,13,18 | 87:20,22 90:5 | 93:7 97:4 | 155:16 180:18 |
| 302:16 303:9 | 90:5,12 127:3 | 98:12 144:7 | official 51:12 |
| 303:17 | 130:24 131:18 | 170:9,18,25 | 66:24 265:20 |
| objections 7:20 | 179:21 296:22 | 171:1,2,5 | 308:22 |
| 121:18 138:23 | 296:22,25 | 176:15 188:22 | officially 93:4 |
| 309:24 | 297:23 298:4 | 192:5 226:8 | officials 147:19 |
| obligation | ofc 66:9 69:1 | 230:16 232:6 | 151:6,6 210:20 |
| 130:6 169:23 | 69:14,15,17,25 | 232:23 233:23 | 267:9,17,22,25 |
| 171:20 172:11 | 70:6 79:12 | 237:11,16,25 | oh 71:20 84:15 |
| | 80:11 82:19,21 | 249:10 263:17 | 93:1 112:13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

120:4 123:20
130:13,17
135:18 147:8,8
157:16 161:12
178:1 180:13
183:1 184:21
187:17 206:25
209:13 210:13
214:13 226:7
250:2 252:6
269:7 297:14
**okay**    8:9 9:5,10
9:21 12:9,13
12:19,25 13:8
13:15,19 14:2
14:4,6,12,15,17
15:4,12,24
16:3,4,13,17,20
16:24 17:8,12
17:15,25 18:3
18:6,8,16,23
19:6,8,16,19
20:17 21:25
22:10,18,20
23:25 24:7,13
24:17,20 27:15
27:19,24 28:3
29:22 30:19
31:1,12 32:7
33:4,7,15,23
34:8,15,17,21
34:24 35:2,6
35:18,22 36:7
36:10,14,17,22

36:25 37:21
39:25 40:9,24
41:2 42:9,13
42:17,21 43:19
44:3,5,11,16,23
45:9 46:18
47:9,18 48:2
48:21,24 49:13
49:17,20 50:9
50:23 51:6,11
52:5,16 54:8
54:24 56:8
57:24 59:16,19
60:4,10,13
61:8,20,23
62:1,12 63:14
63:18 64:16
65:3,17,21,24
68:16 70:22
72:5,14 73:10
73:18,21,23
74:1,9,14 75:4
75:22 76:7,11
78:13,21 79:11
79:13 80:1
82:14 83:3,12
83:16 84:7,11
84:16,20,23
85:1,8 87:13
88:9,23 91:25
92:3,6,11,17
93:6,10,12,25
94:10 95:8
96:7,18,21

97:19,21,25
98:5,9,14,17,24
99:4,7,10,14
100:16,20,23
101:8,18,22
102:16,23
103:6,13,19,23
104:12 105:19
105:23 106:2
108:1,9 109:10
109:24 110:3
110:17,19,22
111:7,10,23
112:20 113:15
113:24 114:9
116:16,22
117:6,8,12,17
117:20,25
118:2 119:2,15
120:20 122:2,5
122:22,25
123:13 124:1,4
124:7,16,18,21
124:24 125:3
125:25 126:13
126:20 127:6,9
127:17 128:8
128:10,14,21
129:20,23
130:14,17,23
131:1,9 132:5
132:18 133:25
134:13,24
135:19 136:2

136:12,17,25
138:6 139:21
140:25 141:15
141:22 142:14
142:18 143:14
143:20 144:14
144:23 145:8
146:16,17
147:5,8 148:15
154:25 155:2
162:11,22,25
163:1,3,9,17,20
163:23 164:13
165:5,25 166:5
166:10,16,21
167:2,15,20
168:8,17 169:5
169:12 170:12
170:17,25
171:4,8,18,25
172:8 173:7
174:4,10,21,23
175:6,13,17,24
176:8,11,18,24
177:1 178:2,6
178:9,12 179:1
179:5,10,15,23
180:1,13,21
181:2,6,7,16,25
182:12,18
183:6,11,14,22
183:23 184:4,9
184:15,25
185:5,12,18

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

| | | | |
|---|---|---|---|
| 186:16,24 | 223:1,6,14,25 | 268:8,15,18,23 | 113:7 114:10 |
| 187:4,10 188:9 | 224:19 225:2 | 269:25 270:22 | 129:19 153:8 |
| 188:19,24 | 225:10,15,19 | 270:25 271:11 | 177:10,12 |
| 189:7,9,16,20 | 226:2,7 227:1 | 271:16 272:1 | 183:9 190:17 |
| 189:25 190:6 | 227:17 229:4 | 273:14,24 | 289:24,24 |
| 190:12,20 | 229:23 230:6 | 275:4 277:18 | **one's** 255:12 |
| 191:14,17 | 230:10,16,22 | 278:14,24 | **ones** 15:2 52:13 |
| 192:9,15 193:8 | 232:12 233:18 | 279:3,14 280:1 | 93:12 152:6 |
| 193:12 194:3,9 | 233:21 234:16 | 280:12 281:1,9 | **ongoing** 150:11 |
| 194:9,14,21 | 234:24 235:6 | 282:10,19 | 150:15 199:10 |
| 196:8,24 | 235:18,22 | 283:6,12 | **online** 16:18 |
| 197:10 198:4 | 236:10,18 | 284:10 285:10 | 61:10 192:24 |
| 199:2 200:4,18 | 237:5,7,13,16 | 285:17 286:18 | 196:5 197:21 |
| 200:22 201:10 | 237:18 238:7 | 287:15,21 | **open** 34:13,21 |
| 201:15,25 | 238:19,23 | 288:1 289:19 | 36:22 76:25 |
| 202:10,23 | 239:5,12,15,20 | 293:15,24 | 272:17 276:15 |
| 203:16,25 | 240:8 241:2,12 | 294:13 295:5 | **opened** 38:4 |
| 204:12,19 | 241:25 243:7 | 295:18,25 | **operate** 98:17 |
| 205:5,10,22,25 | 243:21,25 | 297:16 298:20 | 104:17 232:8 |
| 206:8,17,21,25 | 244:14 245:5,9 | 299:7,10,20 | **operated** |
| 207:17 208:14 | 245:16 247:2 | 300:11,22 | 195:13,22 |
| 208:24 209:6 | 250:6,16 | 301:10,16 | **operating** |
| 209:11,13,14 | 251:18 252:6 | 302:5,11,25 | 34:18 196:15 |
| 209:18 210:2 | 252:14,21,23 | 303:24 304:5 | **operations** |
| 210:15,18,21 | 253:19 254:5 | 304:17 305:2,4 | 19:23,24 20:6 |
| 210:22 211:4 | 255:14,19 | 305:13,16,22 | 20:18 22:8 |
| 211:10,21 | 256:12,18 | 306:2,5 309:2 | 23:22 24:15 |
| 212:7,18,23 | 258:21 259:8 | 309:5,13,16,22 | 26:16 41:21 |
| 213:5 214:9,19 | 259:11,25 | **old** 229:13,23 | 47:15 60:25 |
| 214:22 215:2,6 | 260:6,10,17 | 255:7 | 62:7,15 63:12 |
| 217:23 218:5 | 261:7,12,25 | **older** 253:24 | 84:2,8 94:11 |
| 218:10,18,24 | 262:15 263:15 | 254:7,10 | 98:15,18 |
| 219:8 220:6,21 | 264:9,9 265:18 | **once** 10:19 | 125:16,21 |
| 222:1,13,20 | 266:1 267:3,7 | 74:24 97:7 | 150:8 155:25 |

Carroll Reporting & Video
www.veritext.com                     A Veritext Company                     586-468-2411
                                                                            www.veritext.com

169:18 172:14
199:22 200:7
209:15 232:11
283:23
**opinion** 82:2
167:10 174:24
189:4,4 201:5
201:10 246:11
282:16 284:4
301:4 302:1
303:1,2
**opinions**
273:11
**opportunities**
250:23 254:22
**opportunity**
217:5 248:18
**opposed** 263:21
265:5
**opposing**
185:25
**opt** 44:18
**option** 13:20,21
293:12
**options** 13:21
13:24 290:11
293:7,11
**oral** 77:9,9
177:13
**orange** 16:19
**order** 10:6
31:25 32:2,4
71:8 150:16
198:1

**ordered** 10:10
125:20 154:16
**ordering** 309:9
309:14,17,20
**original** 36:12
36:15 37:1
130:12 185:12
**originally**
64:12 199:21
200:6 241:2
**originate** 64:8
**originated** 64:6
**osmip** 212:4
**outcome** 104:4
149:16 311:16
312:12
**outgoing** 72:10
**outlined** 259:25
**outside** 73:4
194:11 204:2
243:10 262:24
274:9
**overlap** 31:5
**overseeing**
115:1
**oversees**
259:19
**oversight** 62:19
**overtime** 62:23
64:18,23 67:20
67:23 68:3,4,7
68:21,23 69:4
69:8,9 260:7
261:21

**owed** 164:18,19
**own** 11:11
25:12 33:6,25
96:22 99:5,11
160:25 161:3
244:6

**p**

**p** 2:1,1 3:1,1
6:1 12:12
180:9,16
210:25
**p.d.** 68:15
195:22 201:17
**p.m.** 91:17
146:24 147:2
281:15,18
309:25 310:1
**p62269** 7:8
**package** 44:11
127:11
**packet** 97:14
**page** 4:2,9 5:2
5:12 43:24
44:6 46:10
49:2,3 72:25
85:1 123:8
126:21 143:7
147:14 166:11
166:14,15,16
167:17 175:3,3
210:19 211:25
212:7 218:1
297:11,18,22

**pages** 30:8
50:10 67:9
97:14 123:9
**paid** 13:12,22
15:13 99:4,11
163:21 165:8
165:11 166:1
168:1 174:22
178:20 180:22
182:3 183:3
243:4 278:24
279:5,24
280:20 281:4
282:8
**pam** 243:21,25
244:4,7
**panel** 134:1
137:22
**paper** 31:11
159:9
**papers** 30:23
**paragraph**
44:12 46:11
49:3,20 53:2
58:8 64:16
73:1,1 77:20
85:1,6 86:14
117:22 126:21
136:15 147:14
147:15 166:17
167:17,20
175:2 259:1,13
260:6 266:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                   586-468-2411
www.veritext.com

**parentheses** 160:8

**park** 3:6,7 13:1 13:2,9

**parking** 154:11 154:13

**parkings** 265:1

**part** 8:12 9:25 10:5 21:25 22:7 43:19,21 44:11 48:5,24 51:17 55:7 57:2 60:24 64:20 67:24 70:5,25 76:12 76:13 78:3 80:19 83:13,15 94:11 95:20 96:25 106:3,25 115:2,5,10 120:22,22 127:11,18 135:6 160:19 161:14 167:17 167:21 170:18 173:14 174:4 180:6 186:9 187:9 205:6 225:2 228:8 229:17 256:3 267:15 269:4 278:17 284:14 292:14 298:23 304:2

**partially** 76:10 76:11 81:10,11

**participate** 57:14

**particular** 52:13 61:12 64:2,3 78:5 99:14 106:5 118:21 122:18 167:16 175:2 187:7 189:22 192:19 212:20 213:1 218:5 225:17 248:16

**particularly** 9:22 10:12 161:9

**parties** 6:16 10:8 173:14 311:12,14 312:8,11

**party** 11:22 57:15,17 92:3 92:20 185:24 206:1,2

**pass** 139:5 177:12

**passed** 74:21 77:8

**passing** 120:9

**password** 259:21

**paste** 184:23

**pat** 235:4 238:20

**patched** 291:4

**patrol** 17:23 18:11,19,21 19:6,7,9 20:1 170:9,22 176:15 193:14 203:8 204:17 227:19 228:22 241:6

**patrolman** 19:5 176:22

**paul** 1:5 2:2 6:7 20:25 28:7 38:16,18,25 52:10 57:9 62:11 65:11 74:13 75:15 134:21 147:25 148:14,21 150:16 172:2 184:3 185:4 187:2 221:4 230:12,13 231:13,20 233:18,20,21 233:25 234:13 245:12 266:4 266:21 301:16 303:8,16 305:3 305:7 306:11 306:15 307:14

**paulson** 82:22

**pawlus** 81:1 82:22 270:16 270:22

**pay** 45:1 46:18 47:6 127:6 131:20 133:1 166:18 175:6 201:6 280:20

**paycheck** 104:14 133:6

**paychecks** 104:12

**paying** 15:12 166:22

**payment** 46:24 47:1 181:17

**payments** 102:7 138:17

**payout** 164:21 164:23

**payouts** 164:5 164:17 165:17

**payroll** 143:20 143:25 145:14 168:1

**pc** 2:13

**peace** 176:21 203:19 230:16 233:23

**pellerito** 239:6

**pending** 31:24 72:10 92:18 109:13 149:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com                          586-468-2411
                                          www.veritext.com

**pension** 178:19
178:23 179:2
**people** 30:16
41:6 62:10,13
66:1 70:24
71:15 72:9,9
72:14,21 74:4
77:1 79:18
80:7 87:18
120:21,23
121:10 154:4
158:25 159:2
162:20 163:19
163:20 193:2
194:12,17
195:7 196:2
202:17 203:13
203:21,22,24
204:1,2 216:25
217:4 219:14
224:16 225:15
227:20 232:25
233:4,5 234:16
235:2 241:13
241:17,21
242:14,15
243:1,6 250:19
250:20,24
260:16 261:2,3
261:5,19 265:8
266:19 267:5
269:16 270:10
272:9 278:3,9
278:9 280:5

285:25 286:11
289:7 295:15
297:7 305:25
307:20,21
**percent** 15:13
159:17
**perf** 210:25
212:4 295:22
295:24 296:1,3
296:4,12 297:1
297:2,5,19,25
298:23,24
299:6
**perform** 47:14
99:16 102:13
105:3
**performance**
195:17,21
**performed**
24:24
**period** 179:21
202:13 208:20
**permanent**
114:17
**permission**
61:4
**permitted** 6:20
**person** 27:10
50:21,25 51:4
52:6,8 72:12
86:8 93:18
113:13,14
119:16 134:11
134:12 153:2

154:5 157:1
177:17 228:2
231:22 233:8
238:7,19
239:10 245:13
264:21,22,23
265:3 269:25
294:25 297:3
**personal** 30:24
31:3 37:23,24
92:1 93:10
145:19 172:23
240:5 278:9
**personally**
260:17 282:2
304:1
**personnel**
22:14
**perspective**
286:19
**pertain** 174:21
257:24
**pertained**
194:24
**pertaining**
157:18 171:22
**pertinent** 35:7
35:8
**phone** 27:10,11
27:12,18 80:4
112:11 113:13
153:7 246:17
**phrase** 113:2

**physical** 31:5,7
141:2
**physically**
142:10
**pick** 153:9,11
153:15
**picking** 304:11
**picture** 197:22
275:13
**piece** 149:6
**pike** 94:9
205:18
**pile** 120:17
**pinpoint** 152:5
**pistol** 56:25
58:19,23 59:1
60:8,21 62:3
62:12 63:8
259:11,16,16
**place** 9:23
12:22 26:11
36:4 54:19
56:10,15 98:2
98:2 101:23
112:7 144:4
161:13 181:22
187:21 199:23
210:23 222:17
222:21 231:2
275:6 282:11
282:12 283:19
292:21 293:21
294:1,16,21
297:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[placed - police]                                               Page 54

**placed** 125:8,12 125:14 204:6 271:12 304:21
**places** 143:21 144:6,7
**plaintiff** 53:13 162:4
**plaintiff's** 30:1 31:15,19 53:14
**plaintiffs** 1:7 2:2 7:18 31:15 31:23 48:16 49:4,21 52:12 53:3 58:22 64:17 67:4 86:15 147:15 156:6 162:1 278:16 303:25
**plan** 16:7 83:20 131:16 137:13 138:10,19 142:19 167:4 180:1 291:15 295:14,16
**planned** 111:21 154:14
**planning** 137:11
**play** 215:18 216:4
**played** 216:9
**playing** 159:3
**plc** 1:21 2:5 6:11

**plea** 265:2
**please** 7:3,22 8:25 9:6 12:11 29:3 37:6 43:1 136:18 162:18 162:23 210:18 257:20 297:9 309:11,12
**plenty** 234:22 250:23,24 254:18 273:16 273:16 276:9 277:5
**pllc** 3:12
**plus** 150:16 178:17
**poam** 180:12 180:14
**point** 16:23 24:1 35:20 41:12 57:22 64:12,20 79:21 104:6 108:9 109:3 119:16 122:4 129:21 131:18 151:24 169:10 170:12 181:6 182:22 183:18 195:15 198:8 202:7 203:23 208:13 216:8 223:13 235:20 248:15 277:12 289:9

291:22 292:5 298:8 303:22 305:8,20,21 306:16 308:21
**pointed** 88:6 189:10
**points** 207:21 207:22
**police** 4:23,24 17:2,5,6,10 18:24 19:23,24 19:25 20:3,6,8 20:8,9,15,18 21:22 22:7,17 23:4,16,22 24:1,2,3,4,7,10 24:10,14,15,18 24:21 25:4,13 26:13,15,22 28:9,14,25 29:16 32:20,25 33:1,16,20 34:8,11,19 35:3,25 36:2 40:4,6 41:9,14 41:21 47:15 49:9 51:13 55:14,19 56:1 58:25,25 60:24 61:16,21 62:6 62:7,14 63:11 64:17,22 65:5 65:11 67:20,23 68:3,4 69:18

69:21,23 70:4 73:7 74:10 76:9 77:13,14 78:22 79:1,23 80:20 83:17 84:1,4,7 90:1,3 92:9 93:7,8 94:10,16,25 95:4,5 97:4,7,7 98:1,8,12,15,18 98:21 100:11 103:7,8 105:4 109:1 113:19 114:10,23,25 115:16,17,23 116:2,3,5 125:16,21 126:1,8,20 129:10 131:3 135:6,16 137:2 137:17,19 141:17 142:10 144:3,5,7 147:13 149:19 150:7,8,9 151:2,21 152:11,19,20 153:1,8,18 155:24 157:2 169:8,18 170:14,15 172:13 173:10 175:7 176:20 177:3 179:2

| | | | |
|---|---|---|---|
| 180:7,8,9 | 259:17 260:7 | 47:15 61:15 | 300:13 302:8 |
| 190:24,24 | 260:15,23 | 62:8 63:11,22 | 302:15 |
| 191:8 192:5,5 | 266:16 268:17 | 74:22 76:25,25 | **possession** |
| 193:13,25 | 269:15,17 | 77:2 81:9 | 67:10 |
| 194:4,24 | 271:9,20,23,25 | 82:16 87:23 | **possible** 251:3 |
| 195:13 196:2 | 283:22,23 | 99:19 100:25 | 293:9 |
| 196:14,17,20 | 284:21 285:5,6 | 101:10 104:5 | **possibly** 94:6 |
| 198:16,17 | 285:21,24,25 | 115:23 125:8 | 138:11 291:10 |
| 199:22 200:7 | 286:8 287:14 | 125:13,14,17 | **post** 287:12 |
| 202:24,25 | 292:7,14 | 131:3 134:18 | 298:24 |
| 203:3,4 204:4 | 293:19 297:20 | 134:25 137:17 | **posted** 77:1 |
| 204:5,7,8 | 306:3 308:15 | 137:21,24 | 177:7,7,8,10 |
| 207:18,18,18 | 308:19 | 138:9 141:17 | 233:10 240:1 |
| 208:6,6,8,10,12 | **policies** 81:19 | 155:21 160:21 | 287:13 |
| 208:16,19,25 | 81:23,24 | 160:21,22 | **potentially** |
| 208:25 209:1,2 | **policy** 14:24 | 169:17 170:17 | 308:2 |
| 209:4,5,6,8,15 | 20:11 25:15 | 177:9,10,18,20 | **power** 109:17 |
| 224:4 225:5 | 26:8,10 57:8 | 178:13 181:9 | 221:9 |
| 226:7 229:15 | 64:7 69:17 | 193:6 204:25 | **powerdms** 71:9 |
| 231:7 232:1,6 | 79:22 262:23 | 205:3 221:3,4 | 71:22 72:3,7,8 |
| 232:19 233:3,5 | **political** 108:13 | 224:4,7 236:20 | 72:16,21 |
| 233:6 234:18 | 251:6 | 239:7,17,25 | **powerful** 159:1 |
| 234:23 236:7 | **politically** 87:6 | 240:9,25 241:2 | **powerpoint** |
| 236:18,23 | **politics** 243:6 | 283:22,23 | 68:24 69:12 |
| 237:11,16,25 | **portion** 145:15 | 290:14 291:10 | 70:1,12,15,16 |
| 238:13,25 | 225:20 267:7 | 301:12 303:8,8 | 151:12 |
| 240:12,14,20 | **position** 4:23 | **positions** 77:13 | **practice** 68:15 |
| 241:1,15,18,23 | 13:4 21:10,17 | 77:14,17 | 68:16 125:5 |
| 242:8 243:22 | 21:19,22,24 | 170:20 172:2 | 200:12 286:5 |
| 244:2,10,21 | 23:21,25 26:15 | 173:10 222:11 | 290:21 292:1 |
| 245:2,18,22 | 26:17 27:4,20 | 222:25 234:22 | **practices** 129:7 |
| 248:3,7,13 | 27:21,22 28:1 | 274:25 291:12 | 270:11 290:2 |
| 249:4 252:16 | 28:4 41:9,18 | 291:13 299:24 | 290:17 291:18 |
| 254:20 259:13 | 41:20 44:9 | 299:25 300:12 | 293:8 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 56

| | | | |
|---|---|---|---|
| **pre** 111:21 | 177:7 189:18 | **privy** 33:13,15 | 310:2 312:4 |
| **precinct** 17:23 | 240:19 284:25 | 33:17 261:5 | **proceedings** |
| 18:9,17 | **preventing** | **pro** 243:8 | 206:3,3,7 |
| **precisely** 31:22 | 288:23 | **probably** 12:24 | 311:3,5,6,9 |
| **preliminary** | **previous** | 23:2,16 30:21 | 312:6 |
| 281:21 282:1 | 128:17 191:23 | 32:15 38:25 | **proceeds** |
| 282:11 293:21 | 243:13 | 39:11 45:11 | 181:13 |
| 293:23 | **previously** | 48:23 63:16 | **process** 59:1 |
| **premiums** | 11:14 169:6 | 78:15 95:15 | 60:1 61:5 |
| 166:18 | **price** 153:2,5,7 | 134:9,9 149:10 | 75:16 76:1,20 |
| **prep** 92:15 | 153:8 | 149:21 158:10 | 76:23,24 77:18 |
| **prepare** 297:7 | **prior** 12:19 | 186:5,6 191:5 | 79:13 83:15 |
| **prepared** 67:13 | 17:1 22:5 27:6 | 192:17 202:6 | 130:7 175:25 |
| 209:23 298:22 | 35:13 44:8 | 213:17 215:12 | 176:15 177:4,5 |
| 312:3 | 46:21 48:21 | 216:6 235:17 | 177:6,8 191:20 |
| **presence** 95:6 | 82:6 124:5,10 | 258:24 308:20 | 197:1 198:22 |
| **present** 31:24 | 124:11 132:21 | **probate** 206:15 | 199:10 204:23 |
| 52:13 142:10 | 171:19 190:23 | **problem** 239:5 | 227:15,21 |
| 190:1 234:4 | 192:3 195:16 | 244:7 246:21 | 228:8 237:12 |
| 264:12 | 202:16 207:25 | 262:21 265:7,9 | 238:1 239:19 |
| **preserved** | 220:13 222:2,5 | 270:13,13 | 239:22 240:24 |
| 282:19 283:18 | 231:18 263:9 | 298:10 | 244:13 266:12 |
| **president** 117:4 | 284:18 286:25 | **problems** | 301:11,17 |
| 119:6 170:21 | 295:9 311:5 | 288:17 | **processed** |
| 261:22 | **private** 86:9 | **procedural** | 58:23 60:22 |
| **pressure** | 242:1 | 6:21 | 259:12 |
| 111:12 292:4 | **privilege** 15:23 | **procedure** 26:9 | **processes** 20:14 |
| **presumably** | 15:25 16:2,2 | 172:18,19 | 20:14 57:4,5 |
| 185:19 264:6 | 162:2 186:19 | **procedures** | 60:25 140:10 |
| 266:4 | **privileged** | 57:4,6 69:20 | **produce** 23:13 |
| **pretty** 20:7,9 | 185:20,24 | **proceed** 8:6 | 29:3 31:23 |
| 20:14 23:15 | 186:1,5,20 | 147:3 281:19 | 32:14 37:6 |
| 75:12 83:20 | 221:24 | **proceeding** 6:4 | 66:24 67:5 |
| 111:25 151:3 | | 6:19 206:4 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[produced - pursuit]                                              Page 57

| | | | |
|---|---|---|---|
| **produced** 6:18 | **promotion** | **protections** | 237:22 238:5 |
| 29:25 31:14,18 | 74:23 75:7 | 82:9 | 241:14 299:8 |
| **production** | 76:15 204:24 | **protective** | 311:18 |
| 31:20,24 32:6 | **promotional** | 31:25 32:4 | **pull** 110:8 |
| **professional** | 20:14 73:5 | **prove** 243:3 | 111:4 139:14 |
| 64:13 71:16 | 76:20 | 305:18 | 232:8 |
| 96:8 172:23 | **promotions** | **proves** 121:11 | **pulling** 267:17 |
| 173:22 178:9 | 76:2 77:12 | **provide** 61:9 | **punched** |
| 273:1 278:8 | **prompted** | 67:14 80:13 | 229:12 |
| **profile** 150:4 | 289:4,10 | 97:22 129:23 | **purchase** 164:6 |
| **program** 4:14 | **proof** 229:20 | 133:18 140:5 | 181:15 |
| 71:15 97:16 | **proper** 148:3 | 152:20 153:19 | **purchasing** |
| 98:1,9,11,11,22 | 189:14 | 158:12 162:1,5 | 62:13 |
| 98:25 99:15,22 | **properly** 62:17 | 293:9 | **purported** |
| 99:24 100:4 | **property** 34:13 | **provided** 28:13 | 250:18 |
| 108:20 | 34:14,15 55:8 | 51:18,20 52:23 | **purportedly** |
| **programming** | 55:10,13 56:2 | 81:2 83:3,6,18 | 11:18 199:14 |
| 99:23 | 56:5,18 57:7 | 93:14 127:7 | 244:5 299:12 |
| **programs** | 57:13 195:6 | 131:2 138:15 | **purpose** 32:11 |
| 83:14 | 238:22 239:1 | 138:16,17 | 74:1 276:18,20 |
| **prohibit** 64:19 | **propose** 94:17 | 148:4,10 | **purposes** 8:18 |
| **prohibited** | **proposed** | 156:19 166:24 | 10:3,12 34:18 |
| 64:19 | 101:24 | 261:16 | 47:11 61:1 |
| **project** 58:7 | **prosecuted** | **provides** | 72:22 91:7 |
| **prominent** 85:3 | 249:23 | 276:11 277:5 | 95:17 98:9 |
| 86:8 90:22 | **prosecutor** | **providing** | 103:9 232:10 |
| **promote** 74:19 | 263:22 264:1 | 131:11 189:2 | **pursuant** 96:1 |
| 75:1 290:15 | **protect** 82:15 | 229:5 233:6 | 102:9 104:18 |
| **promoted** 19:9 | 82:16 | 294:4 | 105:3 167:4 |
| 19:13 24:4,20 | **protected** | **provision** 166:9 | 172:22 |
| 73:4 74:16 | 284:8 | 188:11 | **pursue** 232:7 |
| 98:21 201:13 | **protection** | **public** 103:16 | 232:10 |
| 204:1 220:6 | 82:15 | 118:13 147:20 | **pursuit** 25:13 |
| 243:9 244:5 | | 149:3 195:12 | 64:7 229:15 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

**push** 192:2
**pushback**
150:13 239:2
240:22 241:9
**pushed** 46:6
**put** 31:3 40:13
60:25 61:3,6
160:1 177:14
193:6 194:6
214:24 259:15
259:20 295:18
295:19 297:12
**putting** 57:4,5
160:8 203:21
278:4

**q**

**qualifications**
77:3 284:25
**qualified** 100:2
137:17 311:7
**qualify** 100:3,5
**quasi** 162:2
**question** 8:19
8:24,24 9:1,2,8
9:13,15 10:15
10:18,20,22,24
11:8,9 29:11
35:16 67:25
94:16 103:3
116:10 119:23
128:4 138:25
143:9 144:9
162:18 168:19

170:2 171:13
172:9 186:10
189:9 191:17
192:3 195:1
197:15 201:21
213:5 219:14
220:3 229:8
231:5,18
233:15 234:9
243:12 269:5
275:22 279:19
280:4 284:14
287:7 293:24
302:20 303:10
**questioned**
148:6
**questioning**
113:7
**questions** 9:18
41:16 95:17
103:9,12,20
104:1 140:2,8
147:6 159:4
162:15,15
216:7,14 217:9
230:11,13
306:6,8
**quick** 117:18
**quickly** 146:6
166:9 304:9
**quite** 78:19
94:22 113:9
114:12,14
121:22 140:2,3

272:18,18
**quo** 282:20
**quota** 64:18
67:22 68:10,13
72:22 151:7
156:9 260:8
261:13
**quotas** 68:8
**quote** 151:7
152:10 167:22
256:6,8 261:12

**r**

**r** 2:1 3:1 5:11
6:1 94:3 163:8
200:15 210:25
226:6 228:15
228:16,16
**rachel** 242:25
244:24
**racially** 285:7
**rafarinha** 2:23
**rahal** 85:4,12
85:17,18,23
86:15,18,22
87:21 88:9
89:13,15,19
90:6,19 107:11
108:2,8,18,24
109:14,17
111:11
**raise** 7:22 45:7
45:10,11,15,18
45:20,24 46:2

46:7,15 47:11
47:23 48:3,6
**raised** 258:10
258:25
**raises** 15:23
**raising** 219:4
240:8 258:22
**rambling**
284:18
**rank** 19:3
20:21 21:13
62:6 64:3
204:13
**ranks** 176:18
176:20
**rape** 249:14
**raping** 249:3
**rather** 46:5
50:14 178:21
204:6 293:18
295:4
**rationale** 95:16
**reach** 27:6
139:13
**reached** 27:5
59:23 60:6,10
140:7
**read** 44:8 99:25
105:18 106:6,7
117:18,22
120:15 126:14
126:18 127:13
168:3,6 195:4
218:2 250:13

**[read - received]** Page 59

| | | | |
|---|---|---|---|
| 252:9,10 300:4 | **recall** 16:22 | 142:14,18 | 273:15 274:22 |
| 300:5 | 28:10 32:22 | 144:16 152:17 | 275:1 279:5,11 |
| **reading** 58:5 | 37:19 39:9 | 153:3,13 154:6 | 279:17 280:6 |
| 79:1 123:8 | 40:1,8,11 | 155:3,11,19,21 | 280:14 281:1,7 |
| 143:4 166:13 | 41:19,22 47:5 | 157:10 158:21 | 289:20 296:7 |
| 196:5 218:5 | 47:8 48:4,16 | 163:4 181:21 | 296:15,21 |
| **reads** 73:1 | 49:23 52:15,16 | 182:8,18 | 300:7,14 |
| 165:19 | 52:22 53:9,24 | 183:23 184:13 | 302:10 304:15 |
| **real** 111:22 | 54:10,18 55:5 | 184:15,17,20 | **recalls** 220:1 |
| 117:18 236:3 | 55:18 58:18 | 186:25 187:3 | **receipt** 59:2 |
| **reality** 110:11 | 63:1 66:12 | 188:10 189:23 | **receive** 13:17 |
| **really** 16:22 | 70:8,9,13,24 | 195:10 196:8 | 14:4 43:21 |
| 53:14 58:5 | 72:24 73:13 | 201:4 203:25 | 44:3,12,15,20 |
| 63:3 66:2 70:8 | 74:8,9,14 | 209:25 210:22 | 44:25 45:9 |
| 101:11 118:25 | 75:22,25 78:13 | 211:3,4 212:23 | 46:18,24 47:9 |
| 146:6 151:1 | 83:11 85:8,17 | 213:1 218:6,20 | 57:21,22 77:5 |
| 154:18 178:5 | 89:14 100:25 | 219:2,2,3,10,13 | 101:5 102:7 |
| 183:4,5 191:9 | 101:7,14,15 | 219:16,17,21 | 104:20 105:24 |
| 199:3 239:8 | 102:3,18 103:5 | 220:4,23 222:1 | 119:11 127:6 |
| 244:7 258:19 | 104:4,9 105:21 | 222:20 223:14 | 127:14 133:1,6 |
| 304:9,22 | 106:5 107:2 | 224:1,3 225:5 | 139:6 144:18 |
| **reason** 10:1,2 | 110:3,5,12 | 225:15,19 | 179:5 184:3 |
| 100:3 163:25 | 112:12,18 | 227:11,17 | 224:14 279:14 |
| 164:3,7,8 | 114:1 117:17 | 230:12 231:12 | 280:8,12 |
| 167:24 179:10 | 117:21 118:2,2 | 235:9,10,22 | **received** 42:18 |
| 188:19,25 | 118:3,14 | 236:18 237:5,6 | 43:16,25 44:5 |
| 205:7 262:4 | 119:11,24 | 239:20,25 | 47:3,22 80:24 |
| 269:8 273:5 | 122:7 127:10 | 240:2,8 241:9 | 80:25,25 81:1 |
| 292:13 302:14 | 127:11,17 | 241:11,12,13 | 83:22 95:23 |
| **reasonable** | 132:5 133:25 | 243:23 245:4,5 | 96:4 105:21,23 |
| 91:11 160:15 | 134:19 135:15 | 247:3 255:5 | 118:6,7 120:16 |
| **reasons** 163:25 | 135:25 139:25 | 259:4,8 260:4 | 126:2 131:19 |
| 276:1 303:7 | 140:17 141:2,5 | 260:5,10,24 | 133:10 150:6 |
| | 141:10 142:3 | 266:5 267:6,25 | 151:16 153:3 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

159:12 165:9
165:20 183:14
183:15,17,24
258:11 261:10
273:13 279:18
279:20 280:7
280:10 281:8
**receiving** 14:23
15:8,9 68:3
104:14 105:7
117:17 118:4
119:11,24
127:18 135:25
141:10 144:24
165:23 182:18
186:14 279:17
280:6
**recently** 31:21
256:10 274:14
**recipient**
185:12
**recollection**
126:19 202:20
212:19 213:7
213:13 216:6,8
217:9,12,16,20
217:21 218:11
218:16,17
220:13 223:4
235:7 240:5
258:21 263:2
273:4
**recollections**
282:5

**recommendat...**
26:12 188:2
228:10
**recommendat...**
26:12 265:11
**recommended**
228:13
**reconsider**
219:21
**record** 6:4,5,16
7:3,6 9:23,25
11:23 12:11
29:10,23 42:25
43:3,5,6 51:23
53:15 71:10
91:12,13,15,16
126:10 142:6
146:20,21,23
146:25 147:1
159:18 160:1
166:10 180:15
186:12 200:15
215:15 245:6
265:3,23
281:14,16,17
299:8 309:24
311:9 312:5
**recorded** 6:23
121:8 272:10
311:6
**recording** 6:18
311:8 312:4
**records** 56:25
58:20,23 59:1

59:25 60:7,8
60:21 61:5,24
62:13,16,21
63:9 150:14
223:18,24
241:5 259:12
259:16,19
**recover** 248:5
**recruited**
202:11
**recruiter** 139:7
139:17,18
140:7 297:3
299:4
**recruiting**
227:18 285:25
**recruitment**
140:9 227:21
227:25
**rectified** 68:14
71:6,7
**rectify** 82:18
**red** 5:13 23:5,9
23:13 115:8
225:20 250:9
267:20
**reduced** 265:6
311:7
**reelected** 88:5
137:19
**reelection**
107:23
**reevaluate**
249:8

**refer** 57:10
78:12 115:8
248:17
**reference** 156:5
156:6,10,11
212:9 215:14
264:3 268:8
269:20
**referenced** 5:17
66:18 123:24
151:8,12 194:5
**referred** 187:19
188:1,3
**referring**
109:11 166:7,9
224:24 245:14
247:9 249:15
308:14
**refers** 268:10
**reflected** 52:1
**refresh** 126:18
212:18 216:5
217:8
**refreshed**
217:21
**refresher** 83:19
**regard** 75:23
108:2 159:22
164:17 171:9
181:11 187:16
189:21 193:19
218:6 227:18
230:11 255:16
266:20 274:24

303:2
**regarding**
  15:19 48:6
  104:8 125:13
  127:24 159:15
  200:12 222:10
  227:9 229:5,7
  262:16
**regardless**
  221:1
**regards**   53:25
  54:9,19 56:5
  66:18 68:3
  75:23 94:5
  97:16 103:23
  108:5 112:21
  113:12 119:4
  122:25 141:22
  149:4,16
  154:20 155:7
  156:12 157:17
  169:16 186:13
  262:19 291:11
**registered**   57:1
**regular**   5:8
  95:13
**regularly**   72:20
**rehabilitating**
  150:22
**reinstated**
  198:1
**related**   114:25
  139:11 153:11
  278:16 311:11

312:7
**relates**   16:6
  61:16 67:19,22
  106:11 147:22
  157:8
**relationship**
  88:25 89:2,23
  167:24 242:24
  251:12 305:9
  305:10,14
**relationships**
  243:2
**relative**   172:12
  222:17 311:13
  312:10
**relayed**   56:17
  71:18,19,20
  187:8
**relaying**   62:14
  184:7
**relevant**   225:1
**relied**   53:7
  58:12 300:16
  303:6
**remain**   283:5
**remained**
  110:23 111:4
  111:11 143:11
**remaining**
  145:12
**remedial**   83:4
**remedy**   55:14
  82:18 151:1

**remedying**   61:1
  150:21
**remember**
  44:13 46:3,25
  46:25 49:25
  58:5 70:21
  74:5 92:14
  111:20 112:15
  117:19 183:16
  196:12 197:23
  197:24 200:17
  208:20 210:2
  210:25 214:7
  215:18 219:18
  222:12 228:10
  228:12,19
  231:1 240:22
  241:17,21
  242:18 250:8
  269:25 279:8
  300:10
**remembering**
  118:18
**removal**   212:12
  212:13
**reopen**   159:21
**reopening**
  160:13
**repeat**   55:23
  304:12
**rephrase**
  162:19,24
  257:7,21
  300:20,23

**repopulate**
  204:2
**report**   50:19,23
  50:24 51:6,14
  51:15 53:21
  56:4,14 59:3
  59:12,13,14,19
  59:21 60:1
  64:22 65:1
  67:13 78:21,22
  79:1 149:1,16
  152:10 229:18
  266:13
**reported**   1:24
  49:4 53:1,3,10
  54:1,5,7,10,11
  58:22 62:10
  64:17 147:15
  148:21 152:11
  152:12 266:3
  268:25 303:25
  304:1
**reporter**   6:2,3
  7:20 8:6 43:3,6
  55:21,23 59:7
  59:10 91:13,16
  94:2 146:19,23
  147:1 161:1
  214:25 215:3,9
  220:15,22
  281:14,17
  297:12 309:8
  309:13,16,19
  309:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**reporting**
86:16 156:12
266:5 269:9
304:3
**reports** 22:19
49:1 50:11
51:4,8,11,18
52:6,8,9 62:9
147:22 159:11
161:4 202:4
210:20
**represent**
286:19
**representative**
11:22 94:5
**representatives**
81:6
**represented**
187:6
**representing**
10:7,23 11:18
190:2
**represents**
221:12
**reproductions**
66:21
**request** 5:16
10:24 46:7
48:6 66:17
75:4,23 107:13
155:11 162:3
182:19
**requested** 9:24
46:16 141:16

**requesting**
67:11 182:3
**requests** 278:4
**required** 9:14
25:18 97:6
**requirement**
97:1 98:11
**requirements**
73:5 105:4
171:9
**requires** 58:24
**research**
192:23
**researching**
161:20
**reserves** 232:19
**reside** 66:25
**resident** 86:6
**resign** 123:16
124:22,23
141:16 142:22
226:18,21
289:2 292:19
292:21,22,24
292:25 293:2
293:18 294:22
295:4,4
**resignation**
4:20 5:6
112:21,25
124:11,14,20
125:1 127:23
127:25 306:21
306:24 307:25

307:25
**resigned** 113:1
113:4 114:3
226:17,23
**resigning**
112:10,17
124:25
**resolution** 60:2
100:24 101:9
101:25 102:4
187:14 188:6
188:13 205:23
299:23 300:4,5
300:17 302:15
**resolve** 128:24
129:4 253:16
295:3
**resolved** 107:5
199:9 237:2,5
238:17 293:8
**respect** 161:4
162:15 183:25
187:4,6,14,21
194:1 195:12
198:5 200:23
201:12 211:6
217:17 235:11
238:14 241:8
246:9 259:11
272:3 275:20
284:11 302:3
**respectfully**
294:21

**respond** 11:20
12:1 100:17
**responded**
107:5 123:15
**responding**
118:10
**response** 68:6,8
83:23 107:6
152:13 182:19
183:15,22
275:15 276:5
**responses**
182:20 183:15
183:16
**responsibilities**
19:11,14 20:5
57:3 227:2
307:21
**responsibility**
19:25 241:4
**responsible**
20:16 62:7
114:24 271:3
**rest** 83:17
117:22 173:11
211:2
**restroom** 91:7
**result** 83:19
**results** 80:13
101:12
**resume** 131:11
295:19 296:2,4
296:5,6,19
297:15 298:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[resume - right]                                                 Page 63

| | | | |
|---|---|---|---|
| 298:23 299:1 | 166:8 189:14 | 95:13 96:3,25 | 165:14,22 |
| **retain**   10:25 | 197:20 250:22 | 97:6,10,13 | 166:21 168:24 |
| 221:11 | 280:5 | 98:7 99:22 | 171:4,18 172:9 |
| **retained**   53:8 | **reviewed**   72:5 | 100:11 101:2,5 | 173:12,16,19 |
| 58:12 | 72:6,15,19,23 | 102:6,11,21 | 176:8,14 180:5 |
| **retaliate** | 78:5 | 103:16 104:17 | 180:15,18,24 |
| 277:11 | **reviewing** | 104:20 105:2,7 | 182:24 183:1 |
| **retaliation** | 52:20 79:13 | 106:8,14,21 | 187:13,25 |
| 275:14 277:19 | 127:11 | 107:20 109:16 | 188:19,22 |
| 284:13 | **rid**   90:3 190:15 | 110:25 111:3 | 189:2,16,20 |
| **retaliatory** | 196:21 287:10 | 112:15 113:8 | 190:8,12,23 |
| 275:7,25 | 292:17 | 115:5 118:7,13 | 192:18,20 |
| 302:14 | **right**   7:4,23 | 122:25 126:4 | 193:18 195:10 |
| **retention** | 9:16 11:7 12:6 | 126:24 127:22 | 198:14 199:13 |
| 222:17,20 | 13:6 18:13 | 129:9 131:6,13 | 199:20 201:4 |
| **retire**   178:18 | 20:5 21:11,23 | 131:18,25 | 202:23 204:19 |
| 224:7,15,17 | 22:23 24:23 | 132:2,21 133:4 | 205:15,22,25 |
| **retired**   198:10 | 25:18 27:12 | 133:14,18 | 206:10,11 |
| 224:4,25 236:6 | 39:20 40:24 | 134:7,11,15 | 207:11,14,17 |
| 236:8 238:10 | 41:4 42:17,24 | 135:2,4,8,16,19 | 208:4,14 209:3 |
| **retirement** | 43:9,24 45:6 | 136:8 137:6,10 | 210:15,22 |
| 178:16,18 | 45:12,15 46:20 | 137:20 139:12 | 211:10,14,24 |
| 224:14 | 47:3 48:10,24 | 139:23 140:1 | 212:4 214:12 |
| **retiring**   178:15 | 50:16 53:24 | 140:13,22 | 214:13 215:17 |
| 224:24 | 58:10 59:16 | 141:13 142:1,5 | 215:20 216:1 |
| **retro**   46:25 | 60:10 62:19 | 143:1,3 144:9 | 216:10,17,19 |
| **retroactive** | 63:1 64:25 | 146:12,16 | 216:20,22 |
| 46:24 126:25 | 65:9 66:5 | 148:19,22,25 | 217:1,8,13,16 |
| 127:6 131:20 | 69:11,20 70:5 | 149:3 153:5 | 217:23,23 |
| **return**   34:25 | 71:3 72:1 74:5 | 155:18,21 | 218:10,18 |
| 136:18 | 78:1 80:9 83:6 | 156:1,16,25 | 219:16 220:9 |
| **review**   22:12 | 85:11 86:1,14 | 157:11,17 | 220:12 221:1,4 |
| 22:18 36:8 | 90:11 92:25 | 159:1 162:24 | 221:7,11 222:5 |
| 48:21 78:16,25 | 94:8,10,14,24 | 164:17,21 | 222:11,16 |

223:1,1,3,4,14
224:3,6 226:13
226:15,18
227:7,12 228:6
228:11,17
230:10 231:1
231:12 232:4
232:22 236:15
237:21 239:5,9
242:23 245:24
246:2,12
247:21,23
248:1,6 249:6
249:23 250:13
251:2,11,23
252:7 253:5,22
254:9,13 256:5
258:2 259:3
260:13 263:2
263:15 264:6,9
264:13 265:9
265:12,18
267:5 268:4
269:4 271:8,22
273:3,19 274:3
274:4,8,12,21
274:23 275:15
275:18 276:16
276:18,19,20
276:22 277:2
278:24 280:2
280:16 281:9
283:6 284:2
286:20 287:7

288:5,13,17,18
288:21,21,22
289:3 290:14
290:24,25
291:1,18,20
292:15,17,17
293:7,8,11
294:1,7,25
295:1,2,7,12,21
296:2,13,16,25
297:16,18,22
297:25 298:1
300:7 302:22
303:5,13 306:1
306:2,23 307:2
307:3 309:2
**rights** 49:7
53:6 77:22
147:19 156:8
205:2 268:9,14
**ring** 263:6
**ripping** 234:6
**road** 1:22 2:6
2:21 3:13 6:11
180:19 203:8
233:13 247:16
**robert** 225:11
225:16 226:2,4
235:3
**roger** 2:19 7:8
11:10 125:24
130:13 149:21
213:16 261:5
267:4 268:21

290:5
**role** 20:17 21:3
21:3,5 22:1,7
24:7,14,20
33:1 84:7
113:24 288:25
**roles** 144:11
**room** 9:12
34:13,14,15
55:9,11,13
56:2,5,19 57:7
57:13 61:24
74:10 195:6
238:22 239:1
**ross** 134:2
**round** 13:6
**routinely** 262:2
**rude** 118:14
**rule** 70:16
193:4 293:10
**rules** 6:22 8:14
12:7 162:17
193:3 274:10
**run** 238:22
**running** 20:9,9
**rusik** 26:21
27:4

| s |
|---|

**s** 2:1 3:1 4:8 5:1
5:11,11 6:1
12:12 180:9
226:6

**saab** 212:11
217:18 218:11
219:17,18
255:25 269:12
269:19 270:8
272:3,22 273:7
273:15 287:13
287:22,23
**safe** 5:15 33:5,6
33:7,10,14,18
33:19,20,22,24
33:25 34:1,4
36:11,15,18,22
37:1,23,25
38:2,4,7,12,14
39:1,8,18,22
40:15 92:17
233:3 294:7
**safes** 33:6
**safety** 71:14
160:1
**safety's** 158:24
**salary** 13:13,14
13:15 43:22,25
46:11 126:21
138:15 164:23
165:3,4,18
279:16
**sale** 60:21
**sales** 56:25
58:19,23 59:1
60:8 61:5 62:3
62:12 63:9
259:11

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

sandwich
  146:18
sat 39:12 91:21
  291:6
satisfied 273:17
save 79:19
  186:22 213:21
saw 223:11
  247:24
saying 51:14
  53:14 71:11
  123:16 138:1
  152:2 184:21
  188:6 196:8
  201:6 214:10
  215:18 219:18
  219:20 224:3
  245:25 246:2
  251:4 253:11
  255:6 261:7
  273:4 284:14
  284:20 289:20
  292:20 299:23
  300:8
says 74:21
  77:21 85:2
  107:18 108:9
  109:11 120:9
  121:11 136:18
  167:20 173:12
  204:16,17
  213:9 297:19
  297:23,25
  299:16

scary 288:21
scene 231:15
  232:1 233:1
  234:4
scenes 231:21
schedule 4:25
  63:12
scheduling
  20:11 57:3
scheme 147:18
  151:5,7,9,11,18
  152:10 153:16
  267:8
scholarships
  99:23,25 100:6
school 16:25
  17:15,16
  190:15,15
  191:3,8,15
schurig 225:11
  225:16 226:3,4
  234:24 235:3,8
  235:8
scores 77:10
  177:14 225:21
screenshot
  148:11
se 66:2 88:3
  143:16
search 233:22
  234:1,6
second 45:11
  75:13 102:17
  120:16 127:10

  140:20 164:8
  210:19 211:25
  266:11
seconded
  212:10
secretary
  170:24
section 43:24
  44:6,7 64:20
  127:15 166:3
secure 95:5
secured 173:10
securing
  108:13
security 13:3,9
  198:8 236:9
see 34:10 36:10
  36:22 38:5
  42:7 49:11
  85:6 89:5
  99:23 106:9
  107:18 110:2
  115:8 117:4,13
  117:16 122:20
  130:14 132:10
  132:12 145:14
  149:23 161:3
  163:12 168:3
  178:21 179:23
  183:20 206:21
  212:2,5,16
  214:6 216:5
  223:21 233:9
  244:17 256:15

  260:8 266:19
  267:10 268:9
  287:5 291:2,22
  297:18 304:22
seeing 52:22
  197:24
seek 96:20,21
  99:18
seeking 296:10
seemed 121:6
  229:4
seems 66:23
  109:17 160:13
  178:12 212:4
  243:16
seen 36:12
  37:22 89:7
  93:21 105:17
  106:7 109:18
  109:23 132:16
  197:22 255:12
  263:25 267:21
  297:5 304:20
selected 175:25
  204:20 227:20
  301:17
selection 177:4
  177:5
sell 181:14
semantics
  200:8
send 72:8
  137:10 183:2
  215:9

**[sending - sick]**                                      Page 66

sending   66:17
  141:11 276:12
  289:5
senior   98:1,8
sense   159:19
  160:18 178:22
  249:5 291:2
  298:12
sent   11:15
  31:22 52:2,2,3
  71:8,21 72:20
  97:15 107:3
  124:5,16 141:6
  142:19 161:4
  165:11 170:5
  182:2,6,22
  183:18 184:11
  184:13,19
  185:3 186:21
  188:12,15
  189:18 258:18
  261:18 296:4
separate   11:1
  73:3 75:6
  152:23 166:3
  211:1 223:19
separately
  212:15
separation
  227:9
sequence   295:5
sergeant   19:10
  19:12 25:5
  26:4 64:8 69:7

72:11 73:21,24
  75:24 76:25
  87:9 110:23
  111:1,5,8,11
  153:3 176:22
  204:13,13
  244:1
sergeant's
  204:16
sergeants   204:7
serious   109:2
serrano   235:5
  235:23,23,25
  236:1 238:16
served   93:4
  220:13
servers   28:14
  67:1 223:20
service   172:23
  237:22 238:5
  239:19 240:24
services   20:25
  21:14 58:7
  61:11 62:9
  173:22 236:3
session   98:1,9
  103:19 168:2
  272:17 298:2
sessions   61:1
  96:14
set   63:12 90:13
  177:11 309:4
settled   113:20
  205:17

settlement
  205:23 237:3
seven   12:2
  63:20 154:1
  176:25
seventeen
  14:22
several   74:22
  97:14 203:7
  234:16
severance
  15:14 164:22
  164:24,25
  165:16 166:22
  166:25 174:22
  174:23 181:13
  181:17
severe   81:8
sgt   66:7 69:12
  70:19 73:3,19
  74:15,20,21
  75:17,20 80:25
  80:25 85:19,22
  86:17 87:1
  88:3 110:21,22
  151:14 203:17
  243:9 244:5
  249:19 261:8
  261:11,12
  262:4,8,8
  270:4 273:10
  273:11,23,25
  273:25 275:16
  275:18,19

276:2
shannon
  182:10,10,12
shared   109:5
  256:23
sheet   156:14
  306:19
sheets   142:4
shielding
  161:21
shift   64:8 69:10
shirt   109:7
shirts   108:22
shops   154:12
  154:13
short   9:6
  134:24
show   94:19,21
  95:1 223:20
  273:17 275:2
  276:19 277:9
  303:13
showed   94:15
  95:2 148:7,11
  148:15 231:15
showing   148:4
  233:11
shown   231:13
sic   6:12 26:21
  27:4
sick   145:17
  165:7,20
  276:17 280:23
  280:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

side 188:23
sidewalk
246:15
sign 72:4,13,21
131:25 136:18
155:2 156:2
157:2 256:20
264:23,23
signature
311:16 312:14
signed 5:18
72:6,11,15,19
72:23 79:3
126:17 127:3
136:6,9,21
138:13 139:2
154:15,19
155:15 158:20
158:22 270:12
signing 44:8
46:22
similar 218:8
simple 183:22
simply 40:24
60:15 78:22
sincere 76:16
single 23:15
34:14 287:5
291:6
sir 193:11
199:25 252:1
sirens 230:24
232:2,2

sit 30:18
277:21 291:10
site 100:2
sitting 75:11
209:22
situation 53:12
59:23 171:18
196:4 198:16
220:15 221:2
227:3 230:11
233:24 247:8
247:10 248:10
249:8,15 251:3
262:16 285:16
situation's
307:23
situations
208:15 265:4
six 1:22 2:6
6:11 46:21
68:18 144:18
154:1 208:8
sixth 18:17,18
skills 311:10
312:6
skipped 125:25
small 203:23
smashed 79:7
smashing
268:12
smip 4:14
97:16
smoking 247:1

smoothly
147:12
snowed 247:21
social 227:25
228:3 244:10
287:12
someone's 70:2
268:12
son's 206:9,21
sonnenberg
176:6
soon 32:8 40:6
102:16 114:5,6
119:23 270:4
277:4
sorry 10:4
17:14 19:10
22:19 28:16
38:8 40:21
42:12 45:7
49:2 53:2
54:15 55:22
58:8 59:7
64:10,20 70:22
72:10 73:23
75:24 76:3
77:20 79:11
81:17 82:25
84:15 86:19
87:9,21 98:8
99:24 100:14
100:21 103:10
107:8,9 118:3
120:4,11

123:20 124:10
125:25 126:9
128:10 133:15
135:24 146:3
146:22 152:9
171:14 176:12
186:10 204:8
207:3 210:13
229:25 240:10
241:6 252:4
267:22 297:14
300:20 301:4
304:11
sort 22:2,10
39:12 148:22
170:13 171:21
174:10 179:5
182:18 184:19
185:20 186:7
186:19 187:13
187:20 192:18
192:22 198:7
204:10,22,22
205:23 206:2,3
233:9 234:17
236:15,19
254:14 255:14
255:19 256:14
268:24
sorts 96:7
sound 176:9
213:22 222:2
242:1,4 263:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

sounds   91:10
  162:2 186:19
  251:22 263:17
south   4:23,24
  16:21 17:1
  128:9 129:24
  130:7 131:2,7
  133:16,22
  134:13 135:6
  136:10,25
  137:7,22 138:8
  138:14 139:19
  139:21 140:14
  143:17,24
  144:10,12,18
  144:20 163:23
  163:24 164:14
  181:9,15
  223:25 295:7
  295:15 296:21
  297:3
southbound
  247:16
southern   1:3
  16:16 297:19
space   34:18
speak   15:17
  60:20 70:11,14
  76:14 80:1
  94:19 112:20
  118:13 122:2
  122:17 153:16
  154:3,7 159:16
  170:6 178:13

201:15 220:21
220:22 243:22
249:17 250:6
260:13,15,17
261:8 268:15
272:16
speaker   216:12
speaking   8:22
  55:8,10,12
  110:5,20 113:9
  118:17 127:22
  156:6 184:4,6
  196:1,6 217:17
  241:14,21
  259:4 260:24
special   100:9
specific   21:24
  265:19
specifically
  122:5 255:2,10
  255:15 260:15
  262:8 268:12
  273:19 287:9
  287:10 289:20
  292:10
speculate   50:8
speculation
  194:17 201:21
  231:19 251:8
  272:6 303:10
  303:18
speculative
  248:24 302:17

speed   230:23
spell   12:11 94:1
  163:7 226:5
spend   138:6
spent   137:20
spiraled   125:16
spoke   16:6
  27:13 55:16
  80:3 110:4
  122:3,16,22
  153:7,10,17,17
  153:21 154:5
  161:9 177:19
  189:25 190:9
  220:15 242:8
  250:19 256:21
  258:3,4,5,7
  259:9 260:10
  266:20 268:19
  272:18 307:2,4
spoken   157:14
  189:21 217:13
sporadic   24:17
  95:14,15
spousal   16:2
springtime
  247:22
staff   61:4,8,23
  62:20 150:22
  151:2 229:19
  304:11
staffed   115:15
staffing   191:2,4
  191:14

stamped   117:8
stand   9:3 81:7
  103:14
standards
  64:13
standing   113:6
  113:9,10
  138:22
standpoint
  67:7
stands   235:23
stars   223:11
start   8:20,21
  13:8 17:25
  47:20 60:7
  123:8 129:24
  146:14 152:19
  167:21 178:22
  235:8 304:12
started   16:23
  18:6,7 19:3
  29:12 168:25
  253:10
starting   17:1
  120:6 193:12
  202:8
starts   167:17
  175:2 215:19
  216:2
state   49:9
  61:10 67:21
  79:23 86:18
  100:11 147:17
  147:23 148:2

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

149:5,19 150:7
152:11,19,19
153:1 174:11
174:15 241:15
241:22 255:3,4
259:17 260:14
260:23 266:2
266:15,15,16
266:17 268:17
303:19 311:19
**stated** 12:1
53:17 89:19
91:3 129:18
137:18 138:10
184:15 219:11
222:14 227:8
255:25 279:16
301:24
**statement**
90:21 148:4
185:18 227:8
247:2 299:10
**statements**
75:5,23 245:1
272:2 304:25
305:17
**states** 1:1 49:9
53:3 64:16
67:21 89:15
107:20 165:11
233:7
**stating** 154:15
188:4

**station** 63:15
**status** 63:8
149:22 150:3
271:22 282:20
**stay** 130:3
178:21 233:3
241:1 294:20
**stayed** 19:16
**staying** 69:1
289:21
**steeped** 240:11
**steering** 270:8
270:9
**stein** 134:2
**stenographic**
6:24
**step** 26:14
126:1
**stepchildren**
14:21 163:15
**stephen** 2:4
7:17
**sticky** 252:5
**stipulation**
6:25
**stop** 104:12,14
217:6 233:3
262:18,23
**stopped** 104:23
104:24
**stopping** 68:14
**stops** 30:15
267:17,24

**story** 231:13,14
**straight** 64:11
64:15
**strange** 66:23
295:6
**strategic**
125:23
**stressed** 125:4
**strike** 23:20
24:25 40:2
43:19 51:7
54:17 70:23
83:16 87:21
95:20 104:12
115:12,21
125:19 141:6
142:15 194:10
201:15
**strong** 220:10
**study** 77:6
177:9,11
**stuff** 36:4 88:8
128:25 152:22
160:12 189:18
207:7 232:9
247:1 257:24
286:8
**subject** 30:11
31:22 64:18
67:21 77:23
172:4 260:7
301:22
**submission**
131:9

**submit** 50:20
62:2,3,21 80:2
296:21 298:20
**submitted**
62:17 131:7
136:23 149:19
209:11,14,19
212:12 296:20
297:5 298:3,4
298:13,23,25
306:20,23
307:24,25
**submitting**
60:7
**subordinate**
22:13 64:2
226:22
**subordinates**
22:20 63:25
114:9
**substance**
221:22
**substances**
9:17
**succeed** 306:1
**sue** 242:25
244:19
**sued** 92:22
**suggest** 29:20
105:25 118:23
279:24
**suggestions**
36:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

suing   274:6
suite   1:22 2:6
   2:14 3:13 6:12
summer   274:16
supervise   20:20
   21:22 69:23
supervised
   21:12,19 61:15
   62:4 84:5
supervision
   232:22
supervisor
   20:18,23 84:1
   192:5
supervisor's
   175:15
supervisors
   79:3 83:10
   169:8 175:7
   177:3 180:7,9
   181:3 193:14
   194:4 201:17
   241:7,10
   261:23 290:20
supervisory
   173:8
supplemental
   5:16 66:17
supplied   37:19
   161:20 165:10
   188:17
support   20:25
   58:7 61:11
   62:9,20 100:18

236:3 243:3,16
243:19
supported
243:17
supporters
243:5
supportive
21:14
supposed   34:12
   71:13 141:19
   165:1 183:11
   189:11 192:7
   197:12 198:1
   204:12 210:23
   270:10 288:19
   296:3,4 297:1
sure   11:23
   14:12 16:3
   23:6 26:25
   29:8 33:22
   38:3 43:2
   48:19 56:24
   57:20 59:18
   60:4 62:16
   82:23 85:15
   86:7 91:9
   93:23 94:3
   101:4,11 113:9
   114:4,12
   117:23 118:20
   130:1 134:8,9
   134:20 137:4
   144:21 145:24
   146:6 161:17

162:6 184:6
188:3 189:8
202:15 203:12
209:24 210:10
215:11 221:8
222:7 223:2
226:24 228:16
231:9 242:14
243:14 244:12
263:15 269:12
277:5 287:2
296:19 297:8
300:5 301:6
306:15,17,22
surprised
113:21
surprising
194:10
survey   5:15
   35:24 37:1,6
suspect   150:4
suspected   49:5
suspended
   305:7
swat   203:3
swear   7:21
swimmingly
147:12
swirple   243:21
243:25 244:1,4
244:8
swope   1:5,18
2:2 4:21 5:17
6:6,7 7:19,19

7:22 8:2,9 12:6
12:12 53:17,21
66:16,19,23
67:8,13 85:2
91:19 97:13
107:21 145:22
147:5 156:19
162:14 216:10
216:13 252:3
255:7 277:25
278:1,2,3
287:11 304:1
sworn   6:16 8:3
176:21 230:16
232:6,23
233:23 271:25
311:5
system   51:23
52:22 53:5
58:9 61:6 62:2
64:19 67:22
68:10,13 71:10
72:16 73:5
259:17,22
260:8 261:13
270:13
systematic
263:13
systems   23:10
66:22 161:4

**t**

t   3:4 4:8 5:1,11
5:11 94:3

108:22 109:7
163:8
**table** 9:9 75:10
**tabled** 102:5,24
222:14
**tactic** 119:18
**tactics** 121:8
**take** 6:4,13
8:11 9:5,6,9
16:20,25 26:11
26:14 30:4,7,9
30:23 32:14
34:9 39:6,21
39:25 44:16
49:2 50:10,15
58:1,4 61:4,9
62:23 66:11
72:25 76:7
77:7 80:19
91:6 94:11
96:8,22,23
106:2 107:17
115:2,5,10
119:2,13
126:20 137:24
138:8 140:4
145:25 146:4
147:14 149:12
152:5 156:18
158:17 164:11
177:12,13,14
207:5 210:23
215:1 264:15
264:19 265:22

268:25 281:10
297:1
**takeaway**
110:7
**takeaways**
107:18
**taken** 6:7,10
9:17 10:20
57:25 145:14
164:14 172:12
187:23 196:18
265:2 270:15
311:3,12 312:9
**takes** 98:2
**talk** 45:18 48:2
79:9 85:21
109:15 111:10
112:2 154:16
154:18 156:3
157:6 159:5
186:12,16
221:19 257:23
257:25 258:20
272:8 277:7,22
287:4,4 290:19
306:15 307:13
307:13
**talked** 45:20
69:1 111:25
112:1,4 121:16
121:22 122:8
129:7 147:9
151:15 154:10
154:11 182:5

187:1 190:3
195:4,21
196:13 244:9
257:22 260:1
272:19,25
278:2 287:13
289:12,23
292:18,23
293:1,7
**talking** 36:1
89:3 107:4
108:7 129:6
139:7 151:17
157:21 158:24
173:2,4 174:25
177:24 178:15
190:5 193:24
219:6,10
241:18 242:22
245:25 257:1
257:12,14
265:3,4 267:13
290:6 291:19
307:11
**talks** 96:15
107:11 117:23
121:8 266:1
267:7 276:11
276:13
**tapped** 113:21
**tarik** 3:11 7:14
214:15 215:11
**taser** 39:7,16
39:22

**task** 266:10
**tasks** 20:7
115:1
**team** 154:4
203:3
**technical**
240:12
**televised**
231:14
**tell** 8:4 32:17
32:21 41:18
55:16 57:11
68:18 72:11,17
101:6 112:9
124:21,24
128:1 132:2
134:15,20
166:9 167:13
198:21 202:3
202:22 208:22
209:2 213:2
216:17,17
233:18 244:15
258:6 272:9
292:23,25
295:15 299:3,5
303:22 306:14
**telling** 10:16
72:20 108:18
261:19 262:10
262:11 269:5
**temporary**
132:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

ten  19:7 59:1
tension  253:6
tentative  291:9
tenth  17:23
  18:8
tenure  32:19
  44:24 110:23
  115:24 116:1
  199:10 202:10
  209:7
term  68:15
  112:25 122:10
  207:17
terminate
  167:23
terminated
  113:2,5
termination
  226:19
terminations
  84:21
terms  32:2
  53:13 105:3
  124:20 169:22
  173:20 181:8
  181:10 202:11
  205:23 257:18
  287:23 288:2
  301:11
test  77:5,7,8
  177:12,12,13
  225:21
testified  8:5
  60:5 163:20

165:22 243:7
  256:19 263:16
  288:10
testify  16:8
  200:22 288:11
  289:4,8,9
testifying  92:4
  289:7 311:5
testimony  22:5
  35:14 53:13
  60:6 82:6
  169:5 189:23
  191:23 207:25
  231:18 241:25
  243:13 263:3
  263:10,11
  284:19 287:1
  289:15 295:10
  304:15
testing  204:22
text  27:10
  218:5 276:13
thank  12:9 30:2
  32:7,9 37:7
  53:19 59:10
  91:11 99:18
  111:16 116:25
  120:14 123:20
  126:13 130:18
  162:7,11
  218:18 304:6
  309:5
thanks  67:7
  164:2 281:13

that'd  29:4
  55:3 212:13
thefgfirm.law
  2:8
thing  12:3 88:3
  108:8 119:20
  144:2 160:15
  162:17 167:8
  190:16 206:12
  236:25 242:25
  248:7 254:24
  262:1 267:19
  268:13 290:17
  291:19
things  29:24
  48:18 71:13,16
  115:16 125:11
  129:9 164:13
  192:24 195:3
  201:5 229:2
  231:23 241:19
  247:23 248:11
  251:4 257:17
  257:18 258:4
  270:9 276:23
  277:23 285:14
  288:8 293:22
  297:7 304:3
  307:5,6,7,16,16
  307:18,18
think  16:18
  18:1,1 21:5
  23:2 28:17
  29:18,23 31:9

31:10 41:1
  45:19 48:9
  54:15 57:8,9
  63:3 64:11,14
  66:9,12,13
  68:6,18,25
  69:22 70:7
  74:4 75:13
  78:7 81:20
  85:19 87:25
  88:11 90:14
  91:23 92:5,13
  93:3,4,19,19,20
  93:22 96:17
  97:10 100:1,1
  101:12,16
  102:1 103:21
  105:14 112:4
  113:16 118:16
  123:18 125:15
  125:22,22
  126:15 131:22
  145:18,21
  149:19 153:13
  154:17 156:22
  158:4,23,23
  159:2,5,8
  160:3,20 170:4
  170:23 178:14
  181:23 182:2
  183:10 184:13
  186:9,11 188:4
  190:5 191:16
  194:17 196:20

[think - time]                                                    Page 73

| | | | |
|---|---|---|---|
| 197:22 200:20 | **thinks** 109:5 | 298:9 | 75:3,12,13,14 |
| 206:6 208:17 | **third** 57:15,17 | **thrown** 274:2 | 75:15,17 77:2 |
| 210:4,11 216:1 | 63:4 75:3,14 | **ticket** 23:6 | 80:14 85:16 |
| 219:23 220:24 | 109:3 185:24 | 30:13 64:18 | 87:3 91:23 |
| 221:6,13 | **thomas** 117:10 | 67:22 68:8,8 | 92:8 100:23 |
| 223:11 225:1 | **thought** 76:17 | 68:10,12,13,13 | 101:24 102:6 |
| 226:20 227:14 | 118:9 137:23 | 68:20 72:22 | 102:17,25 |
| 228:14,16 | 184:8 198:13 | 147:17 151:4,9 | 109:13 115:20 |
| 229:12 231:7 | 201:2 221:7,9 | 151:24 153:16 | 116:3,4 117:3 |
| 232:16 233:7 | 244:12 253:15 | 156:9 260:8 | 119:6 132:21 |
| 233:21 234:5 | 272:13 302:21 | 262:19 263:18 | 133:5,8 136:25 |
| 236:2,3 237:21 | 308:10 | 263:18 264:1 | 138:17 140:6 |
| 238:19 239:3 | **thoughts** 118:8 | 264:19 265:5 | 142:4,4,5,7,14 |
| 240:23 245:3 | **thousand** 13:16 | 265:12,13 | 142:16 143:23 |
| 247:24 253:12 | 164:20 201:6 | 267:8,14 294:2 | 144:3,6 145:2 |
| 253:13 257:5 | **thousands** 30:8 | **tickets** 68:20,22 | 145:8,9,12,14 |
| 258:11 261:15 | 30:21 37:14 | 69:3,6,10 | 145:15,16,17 |
| 265:21 266:8,9 | 50:9 67:9 | 70:17 71:13 | 145:19,21 |
| 267:12,16 | 92:12 106:3 | 151:10,15,17 | 148:9,11,15 |
| 268:3,7,13 | 151:10 | 151:19 152:2 | 150:2,5 152:16 |
| 269:2 271:2 | **thread** 117:1 | 261:17,20 | 152:18 153:14 |
| 274:13,15,16 | **threaten** 86:19 | 262:7 263:5,25 | 155:23 157:7 |
| 275:7,11 | 86:19 | 264:14 265:14 | 159:5 161:1 |
| 276:10,20 | **threatened** | 265:16,19 | 165:6,7,8,20,21 |
| 277:21 280:10 | 86:15 | **tied** 276:16,21 | 167:24 168:10 |
| 280:15,15 | **three** 14:21 | **time** 1:20 7:2 | 168:25 169:24 |
| 285:11 287:20 | 18:10,11 52:12 | 8:23 10:23 | 171:4,10,19 |
| 289:8,12 294:2 | 63:2 73:3,10 | 13:4,22 15:6 | 176:18 177:9 |
| 302:21 304:20 | 74:4 75:6 | 15:18 21:4 | 178:4,7,17,17 |
| 305:6,7,8 | 117:15 119:4 | 28:18 35:1,2 | 179:1 182:8,15 |
| 308:5 | 173:6 211:6,6 | 35:21 40:2,9 | 184:5 191:10 |
| **thinking** 198:4 | 225:20 251:18 | 41:12 44:23 | 192:11,17,19 |
| 262:13 | 268:3 276:16 | 50:23 68:20 | 194:22 195:10 |
| | 276:16,21,21 | 73:23 74:25 | 195:16 198:8 |

[time - training]

199:13 201:17
202:1,2,12
203:22,23
207:14 208:4
208:20 209:5
209:19,20
215:23 217:11
222:9,18 223:7
223:13,16
227:18 230:17
238:15 239:21
248:3 261:22
263:13 265:22
269:2 280:23
280:24 281:6
284:23 285:15
286:23 290:18
302:8 303:22
304:6 305:21
306:19 307:12
308:21
**timeframe**
241:13
**timeline**   5:14
28:12,13,19,20
28:22 195:3
248:18
**times**   31:20
52:4 74:22
95:3 119:19
153:24 208:5,9
208:9,15
250:24 273:2
289:24 298:9

298:16 299:9
300:10 306:17
**timestamped**
296:8
**tiny**   159:3
**title**   19:21
64:14 106:10
236:3
**titled**   44:7
106:8
**today**   8:12 9:19
11:12 105:12
112:14,15
189:19
**today's**   9:24
**together**   48:8
57:4,5 60:25
61:3 177:15
238:17 275:12
**told**   32:13 37:2
37:3 48:18
55:18 56:16
88:1 89:2 90:9
108:24 112:7
124:23 128:5
128:21 129:11
129:14 134:19
134:20 230:4
233:20 239:16
243:16 262:18
288:12,18
292:10 295:23
296:3 297:2
298:9 299:5,12

302:23 305:1,2
306:11 307:5,7
**tom**   121:7
**tomorrow**
245:11
**took**   30:22 33:1
37:14,18 40:12
44:13 50:9
52:21 54:19
56:10,14 67:9
76:10 80:14,15
80:16 98:2
101:23 106:4
106:25 181:9
198:9 222:17
222:21 231:2
259:15 264:21
269:3 272:12
275:6 292:21
308:22
**top**   97:14 117:2
119:3 166:16
177:17 247:18
**topic**   101:19
108:3,15
246:23
**topics**   96:14
**torolski**   235:4,4
238:8
**totality**   285:11
**touch**   147:13
269:7
**touched**   58:20

**toward**   117:9
119:3 212:8
**towards**   118:12
121:10 255:13
273:11
**township**   12:15
70:8 163:11
**tpoam**   240:8
**tpom**   240:11
**traffic**   30:15
69:16 71:14
202:24 232:10
232:14,16,17
232:19,20,21
233:1,11,19
248:22 249:1
249:13 264:15
267:17,23
294:4
**trained**   61:6
**training**   16:25
17:4 61:1,4,9,9
61:10 62:2,21
62:23 72:1
83:3,4,7,9,14
83:20,23,24
98:5,7 190:23
191:2,6,9,10,12
210:23 213:20
216:18,25
218:22 219:5
254:21,23
255:11,17,18
255:21 256:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

256:12 259:15
295:22 296:16
297:1 298:1
**trainings**  96:7
96:9,23 100:9
191:13
**trans**  309:11
**transactions**
150:25
**transcriber**
312:1
**transcript**  6:18
8:17,18 98:10
309:10,14
312:3,5
**transcriptionist**
311:8
**transferred**
148:12
**transfers**
212:11
**transition**
125:18,20
**traveling**
247:16
**treasurer**  148:4
149:17 150:6
170:23,23
266:22
**treated**  258:17
273:7,12,21,23
273:25 278:15
**tree**  128:19

**trial**  4:13 16:9
53:6 58:11
**tried**  199:21
267:23 273:1
285:17
**troy**  180:19
**true**  121:12
276:6,8 298:5
307:16 311:9
312:5
**truly**  200:8
**trustee**  207:9
**truth**  8:4,4,5
**try**  211:10
300:22
**trying**  11:9
76:14 82:8
113:3 161:19
186:18 207:19
214:6 225:5
229:6 243:9
245:3 257:9
258:2,4,7
265:21 266:11
273:19 288:5,8
291:22
**tt**  3:15
**turfe**  3:11 7:14
7:14 9:24 10:1
10:13,17,25
11:4,6 29:10
143:1 158:2,17
210:5,12
211:13,18

214:16,18,20
215:13,20,24
288:7 309:16
309:18
**turn**  152:22
166:11 211:24
**turned**  247:16
247:19 273:18
**turns**  160:11
277:8
**twardzik**  93:20
94:1 205:7
206:5
**twelve**  14:20
**twenty**  14:20
14:21
**two**  30:20 33:6
36:1 41:3,6
43:10 60:12
63:3 73:11,12
87:15 88:5
92:12 93:3
126:15,17
130:13 137:20
138:6 144:5
145:22 146:2
164:20 170:6
173:14 184:1
208:17,17
209:7 210:12
220:21 260:22
281:10 289:24
294:11,13,16
302:12 305:11

**type**  12:3 15:8
19:25 22:16
25:5 30:12
35:24 36:4
50:7 57:10
71:17 77:12
82:16,17 88:8
94:19 101:13
108:22 128:24
129:3 148:9
150:13 165:21
206:10,12
208:13 213:20
232:9 237:1
246:24 247:1
262:1 264:1
267:19 305:8
305:11
**typed**  65:23
**types**  22:25
67:5 79:14
122:24 154:11
196:7 227:24
228:4 249:4
265:4 270:14
282:9
**typewriting**
311:7
**typical**  67:4
**typo**  142:25

**u**

**u**  5:11,11 226:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**u.s.** 154:17
  225:6
**ultimately** 24:2
  135:2 193:23
  218:7 274:1
**unacceptable**
  4:18
**unattended**
  247:4
**unaware** 288:7
**unclear** 53:15
  256:19 289:18
**uncomfortable**
  157:25
**uncommon**
  265:2
**under** 6:21
  64:19 82:9
  106:9 109:6
  110:6 111:6
  127:7,10,15
  136:17 169:24
  171:21 174:19
  200:6 204:23
  210:19 211:25
  211:25 226:21
  232:22 233:5
  268:11 286:6
  290:1,11
**underneath**
  290:16
**understand**
  6:17 8:24 12:6
  12:10 35:16

41:8 47:18
53:17 60:5
77:17 82:8,12
103:3 113:10
116:10 159:20
162:18,23
167:2 169:12
169:20 171:8
173:20 175:13
188:20,24
194:14 195:5
199:21,25
236:23 237:1
251:11 253:22
254:9 258:3
263:16 266:21
270:19 278:14
280:16 286:19
287:21 288:1
292:2 308:1
**understandable**
  9:3
**understanding**
  36:14,16 60:14
  86:4,22 87:2,4
  88:17 96:4
  110:25 111:3,7
  143:10 156:25
  168:8,16
  172:10 179:15
  188:1 191:20
  193:9 202:23
  203:2,6 205:6
  207:20 263:22

263:23 265:1
282:10,22
284:2 289:3
**understands**
  167:21
**understood** 9:2
  137:1 168:21
  173:19 198:15
  253:5 283:6,13
  283:16
**unfair** 125:4
  129:7 191:22
  200:12 201:21
  243:12 263:10
  286:5 290:2,16
  290:21 291:17
  292:1 293:8
**unidentified**
  216:12
**uniform** 280:15
  280:17,19
**unilaterally**
  25:21 26:6
**union** 81:5,6,15
  81:16,18 169:6
  169:6,8 170:13
  170:22,22,24
  171:3,5 173:8
  175:6,7 177:3
  180:7,22
  188:22,25
  193:14,14
  194:5 200:11
  201:7 238:13

240:20 241:7
241:10 249:2
261:22,23
290:20 291:11
291:17
**union's** 291:16
**unions** 125:5
  170:18 193:25
  198:17 236:18
  236:24 238:13
  239:3 262:2
**unit** 153:3
  180:25 181:3
**united** 1:1 49:9
**university**
  16:16
**unlucky** 210:6
**unprofessional**
  4:18 120:24
**unquote** 151:7
  152:10 167:22
  261:13
**unusual** 178:12
**update** 262:23
**updated** 296:2
**upheld** 270:20
**uphill** 46:6
**upset** 194:15
  236:19 269:9
**upsetting**
  194:12
**use** 25:13 78:4
  78:5,6,8,16,18
  78:20 79:2

[use - voided]

Page 77

| | | | |
|---|---|---|---|
| 81:6 83:9 | **value** 207:12 | 303:16 305:3,4 | 216:9 217:10 |
| 85:21 158:15 | **vanderplow** | 305:8 306:12 | 219:7,24 223:9 |
| 164:5 181:12 | 1:5 2:2 6:7 | 307:14 | 233:9 255:24 |
| 181:15 229:11 | 20:25 28:7,11 | **vanderplow's** | 256:3 267:21 |
| 269:15 | 40:21 41:8 | 38:16,18 41:9 | **videos** 79:19,19 |
| **used** 119:18 | 47:19 48:5 | 120:24 121:15 | **view** 193:15 |
| 122:10 142:8 | 52:10 57:9,9 | 193:20 303:8 | 232:12 279:20 |
| 191:10 206:19 | 59:17,22 60:12 | **various** 31:20 | 279:20 |
| 207:17 269:6 | 62:11 65:12 | 147:20 149:3 | **vince** 242:24 |
| **uses** 6:20 | 74:13 75:15 | 176:20 207:21 | 245:20 |
| **using** 113:2 | 116:7,14 | 207:22 | **violate** 276:15 |
| **utilize** 33:5,10 | 118:10,17 | **vehicle** 229:18 | **violated** 64:7 |
| **utilized** 38:7 | 119:7 121:25 | 230:24 232:1,8 | **violation** 26:10 |
| 81:18 | 122:6,9 123:1 | 232:11,14 | 58:24 77:22 |
| **utterly** 300:19 | 134:17,21,22 | **vehicles** 232:7 | 79:22 262:14 |
| **v** | 135:13 147:10 | **venegas** 245:7 | 268:14 274:9 |
| | 147:25 148:14 | 245:13,17 | 303:15 |
| **v** 1:8 12:12 | 148:21 149:1 | 246:12,22 | **violations** |
| **vacancy** 177:17 | 149:15 150:16 | **verbal** 32:23 | 25:15 49:5,5,7 |
| **vacant** 77:12 | 151:3 172:2 | **verbally** 182:5 | 147:19 156:8 |
| **vacation** 142:7 | 184:3,4,16 | 255:13 | 268:9 |
| 142:12 145:17 | 185:4 187:2 | **veritext** 6:4 | **virtual** 134:11 |
| 145:19 165:6 | 221:4 230:12 | **versa** 246:19 | **virtually** |
| 165:20 208:11 | 230:13 231:13 | **versions** 126:15 | 102:22 103:24 |
| **vague** 99:20 | 231:20 233:11 | 126:17 | **vis** 227:20,20 |
| 107:15 118:15 | 233:19,20,21 | **versus** 31:6 | **vision** 13:21,24 |
| 121:1,21 172:5 | 233:25 234:13 | 218:11,12 | 14:1 144:19,21 |
| 195:1 198:20 | 245:12 259:6 | **vested** 62:15 | 166:19 |
| 199:6 220:17 | 259:24 260:1 | **vice** 170:21 | **vista** 229:24 |
| 225:23 228:24 | 260:21 266:4,9 | 246:19 | 230:3 |
| 275:10 277:16 | 266:14,21 | **video** 78:24 | **vitae** 131:10 |
| 295:9 | 268:20 275:13 | 79:1,6 118:23 | **void** 263:18 |
| **valid** 10:22 | 285:13 300:12 | 121:8 122:20 | **voided** 265:17 |
| 248:21 284:7 | 301:2,16 302:7 | 213:6 215:14 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**voluntary**
  96:19
**vote** 88:10,19
  88:21 89:21,25
  90:7,10 101:13
  211:6 255:6
  274:24 275:6,7
  276:15
**voted** 88:13
  102:1 104:5
  270:5 303:7
**votes** 89:21
  90:16,17
  252:15 276:16
**vs** 6:8

**w**

**w** 12:12 94:3
  180:9,9
**wage** 174:17
  187:4
**wages** 168:1
  174:16
**wait** 114:2
**waited** 101:12
**waiting** 32:3
  209:23 265:23
**waitlist** 216:19
  216:23
**waiving** 186:19
**walked** 266:11
  274:5,10,18
  276:21

**walking** 198:11
  304:10,14
**wall** 286:2
**want** 14:12
  26:14 31:13
  67:19 72:25
  103:3 108:12
  145:25 146:4,8
  156:3 169:7
  186:17 190:6
  205:5 210:10
  217:11 219:19
  233:2 244:5,17
  244:18 261:25
  269:8 290:23
  294:6 306:1
**wanted** 69:9
  85:19,20,20
  129:9 131:23
  147:13 236:24
  239:4,8 240:23
  273:22,25
  283:4,17
  291:11 292:13
**wanting** 178:21
  273:20
**wants** 90:10,16
  146:17
**warned** 107:22
**warrant** 233:22
  234:1,6
**warren** 247:4
  247:16

**waste** 12:2
  217:11
**wasting** 159:5
**watch** 118:23
  213:12 217:10
  219:24
**watched** 79:6
  213:3,6
**watching**
  212:23
**way** 25:6 52:1
  71:12 79:16
  90:10 107:5
  150:21 187:8
  216:21 218:9
  258:16 259:21
  261:8 276:16
  278:15 290:11
  292:16
**wayne** 206:14
  206:17,19,20
**ways** 196:7
  227:25 228:4
  263:24 265:16
**we've** 11:14
  53:12 159:12
  161:17
**wealthy** 110:10
**weapon** 247:25
**wear** 236:10,15
**wearing** 285:23
**wedding**
  274:14,16
  288:13 299:11

  299:14,17
**week** 140:21
  144:18 222:6
**weekend**
  208:10,15
**weekly** 39:10
**weeks** 73:11
  144:18
**wencel** 117:10
  117:10 121:7
  254:2,6 276:21
**went** 17:16
  18:17,24 19:20
  70:7 78:8
  95:22 111:19
  148:7 149:11
  176:14 190:24
  191:4,6,18
  217:1 220:14
  223:25 231:2
  231:10 237:11
  237:25 239:18
  239:20 247:24
  248:19 262:6
  272:21,21
  274:20 301:17
**west** 2:6,14
  190:13,16
  231:15
**westland** 18:24
  18:25 19:1
  26:18,19,21
  44:22 170:8,15
  170:22,24

175:11,15,18
176:1,19 177:3
178:1,17,22
179:2,6,22
180:2,6,8,9
191:9,19 192:5
198:10 226:14
226:16 227:4,9
227:10 235:1
236:6,11,12
238:3,10,24,25
**whatnot**   34:3
142:8 150:14
164:10 195:8
**whatsoever**
95:4 206:4
239:2 244:11
250:4 258:1
**whichever**
210:11
**whistleblower**
4:16 106:9,15
**whistleblowing**
255:21 256:14
257:4,13
275:15
**white**   253:24
254:7,11
255:16
**widespread**
147:16 262:21
263:6
**wife**   14:10,10
14:11,12 15:4

15:18 16:7
163:14 189:21
189:24,25
190:7,11 244:1
278:5
**wife's**   14:13
16:1
**williams**   134:2
**willow**   12:14
12:16 163:10
**wilson**   290:4
291:23 292:9
**win**   274:4
275:19
**winter**   140:19
247:21
**wire**   212:11
**wise**   134:1
195:17
**wish**   104:9
202:22 213:2
**wishes**   90:19
292:9
**withdraw**
192:3
**withdrawn**
130:7 222:14
**withheld**
256:13
**witness**   6:16,17
7:21 8:3 16:8
23:11,14 37:9
54:3 55:22,25
59:6 88:15

109:14 113:4
116:13,20
118:16 120:15
121:3,19,22
126:12,14
128:5 138:4,24
157:23 158:4,9
164:3 168:13
169:15,16
170:3,4 171:15
171:16 172:16
172:17 173:1,2
174:1,2,8
185:23 189:5
191:24 194:19
195:2 196:12
197:8,17
198:21 199:8
199:18,24
200:5 201:23
203:12 208:2
211:19 214:22
216:5 220:2,4
220:19 221:6
224:9 225:25
227:24 229:1
229:10 231:6
231:20 233:16
234:10 236:23
241:17 243:14
248:25 251:9
251:16 252:7
253:10 254:2
257:6 263:12

272:7 275:11
275:22 278:22
279:11 282:16
282:17,25
283:10,21
284:20 287:2
289:10 297:16
298:15 301:5,6
301:14,19
302:18,19
303:11,19
311:4
**witnessed**   26:5
**woman**   237:7
**wonder**   60:18
**wondering**
213:6 290:1
**word**   110:18,18
224:17 227:25
307:17
**words**   184:18
204:12 240:13
282:20 295:6
298:13
**work**   13:1 17:2
19:6,25 20:3
36:4 64:18
65:25 67:20
68:22 69:3,9
71:12 91:25
92:2 108:11
114:22 137:11
137:12 138:14
138:19 140:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

144:3 178:5,6
178:19 203:8
237:21 260:7
261:21 282:7
288:24
**worked** 57:8
65:21,22 66:2
68:7 69:15
85:16 91:24
93:2 170:8
178:3 196:2
238:6 264:21
**working** 13:8
45:3 46:8
49:15 69:8
88:7 129:25
133:8,11,12
137:7 139:3
144:17 155:4
202:16 236:8
266:14 291:5
294:9
**works** 91:8
274:12 294:23
**world** 293:19
**worry** 205:20
**worship** 294:5
**would've** 57:25
127:7 130:7
142:9 223:12
293:17 296:13
308:3
**wpla** 180:8

**wrapped** 83:13
**wrapping**
145:22
**write** 68:17,19
69:5 159:25
261:19 267:18
**writeup** 78:12
**writing** 31:20
32:21 70:17
286:2
**written** 6:25
177:12 183:21
225:21 255:13
**wrong** 248:4
264:25
**wrote** 141:14
258:13 293:13
293:14

**x**

**x** 4:1,8 5:1

**y**

**yeah** 12:12
14:11 18:7
21:11 28:17
38:10 40:5,19
45:14 46:9
47:8 51:17
54:6,12 71:5
72:20 73:12
75:8,10,16
78:25 80:3,3,7
80:21 90:8,14
91:10 92:19

110:16 112:22
115:14 117:16
120:5,8,15
129:6 130:15
134:23 139:9
140:20 141:14
143:7,9,16
146:9 150:1,11
154:15,24
157:16 166:13
166:17 176:12
180:4 183:1
185:3,6 186:17
190:8 191:4,13
191:16 200:5
205:3 207:23
210:10,12
212:1 213:11
214:12,13
215:17,22
216:12 218:18
220:4 221:18
223:5 239:8,8
240:19 241:19
247:10 248:20
250:3 252:12
259:3 261:3
263:8 264:3
266:7 268:10
269:23 271:15
279:22,25
280:25 282:4
288:11 289:17
291:21 292:18

294:14 298:3
299:1 305:6,15
305:15 308:9
308:17
**year** 13:6,16
17:19 35:25
44:1,14,17
46:8,12 47:16
47:22 80:16
90:13 102:19
126:22,25
163:21 166:20
179:20 190:17
217:3 229:13
229:23 231:8
280:20 281:5
**years** 12:21,21
12:24 18:10
19:7,12,12
36:1 164:25
170:6 217:4
238:11 253:13
294:12,13,16
**yep** 14:11
71:25 117:14
126:12 127:13
143:16 153:23
166:17 206:16
225:14 245:10
**young** 1:24 6:3
8:14 238:5,5
242:23 311:2
311:17

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[youtube - zyke]**                                      Page 81

| youtube   233:9 |
|---|
| **z** |

**z**   94:3
**zero**   93:2
**zoom**   264:11
**zrien**   80:25
  82:21 262:8
  270:17,22
**zyke**   79:12
  80:24

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.