# EXHIBIT C

```
                                              Page 1
  1            UNITED STATES DISTRICT COURT

  2            EASTERN DISTRICT OF MICHIGAN

  3                 SOUTHERN DIVISION

  4   _____

  5   KEVIN SWOPE, PAUL VANDERPLOW,

  6   and JERROD HART,

  7          Plaintiffs,

  8      v.                       Case No.

  9   CITY OF DEARBORN HEIGHTS, a     2:24-cv-10240-MAG-DRG

 10   Michigan Municipal Corporation,

 11          Defendant.

 12   _____

 13            DEPOSITION OF PAUL VANDERPLOW

 14   DATE:         Tuesday, August 19, 2025

 15   TIME:         10:11 a.m.

 16   LOCATION:     Law Firm of Fausone & Grysko, PLC

 17                 41700 West Six Mile Road, Suite 101

 18                 Northville, MI 48168

 19   REPORTED BY:  Jahkarah L. Haynes-Young

 20   JOB NO.:      7548431

 21

 22

 23

 24

 25
```

Page 2

1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS KEVIN SWOPE, PAUL VANDERPLOW,

3    AND JERROD HART:

4          STEPHEN JOSEPH BROWN, ESQUIRE

5          Fausone & Grysko PLC

6          41700 West Six Mile Road, Suite 101

7          Northville, MI 48168

8          jbrown@thefgfirm.law

9          (248) 912-3213

10

11   ON BEHALF OF DEFENDANT CITY OF DEARBORN HEIGHTS:

12         MONICA HUNT, ESQUIRE

13         Allen Law Group PC (MI)

14         3011 West Grand Boulevard, Suite 525

15         Detroit, MI 48202

16         mhunt@alglawpc.com

17         (313) 871-5500

18

19         ROGER FARINHA, ESQUIRE

20         Dearborn Heights Corporation Counsel

21         14207 Ford Road

22         Dearborn, MI 48126

23         rafarinha@dearbornheightsmi.gov

24         (313) 846-1910

25

```
 1           A P P E A R A N C E S (Cont'd)
 2    ON BEHALF OF INTERVENING DEFENDANT DEARBORN HEIGHTS
 3    CITY COUNCIL:
 4          GARY T. MIOTKE, ESQUIRE
 5          Miotke Law
 6          6828 Park Avenue
 7          Allen Park, MI 48101
 8          gmiotke@miotkelawoffice.com
 9          (313) 388-4809
10
11          TARIK D. TURFE, ESQUIRE
12          Hammoud & Dakhlallah Law Group
13          6050 Greenfield Road, Suite 201
14          Dearborn, MI 48126
15          tt@hdalawgroup.com
16          (313) 551-3038
17
18
19
20
21
22
23
24
25
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                      586-468-2411
                                                     www.veritext.com

Page 4

1                     I N D E X

2   EXAMINATION:                                       PAGE

3        By Ms. Hunt                                    8

4        By Mr. Miotke                                 220

5        By Mr. Brown                                  325

6        By Mr. Miotke                                 332

7        By Mr. Brown                                  336

8

9                    E X H I B I T S

10  NO.            DESCRIPTION                         PAGE

11  Exhibit 1      Professional Services Employment

12                 Agreement Between the City of

13                 Dearborn Heights and Paul D.

14                 Vanderplow - January 9, 2023

15                 through June 30, 2025               55

16  Exhibit 2      Professional Services Employment

17                 Agreement Between the City of

18                 Dearborn Heights and Paul D.

19                 Vanderplow - July 1, 2023, to June

20                 30, 2026                            60

21  Exhibit 3      Professional Services Employment

22                 Agreement Between the City of

23                 Dearborn Heights and Paul D.

24                 Vanderplow - January 1, 2025 to

25                 January 1, 2027                     69

Page 5

1                    E X H I B I T S  (Cont'd)

2     NO.            DESCRIPTION                    PAGE

3     Exhibit 4      First Amended Complaint and

4                    Demand for Jury Trial           85

5     Exhibit 5      December 3, 2024, Email Chain

6                    Notice of Hostile Actions      175

7     Exhibit 6      Ms. Hicks-Clayton Letter

8                    Regarding AMEX Card            185

9     Exhibit 7      Letter to Ms. Hunt from

10                   Mr. Grysko April 23, 2025      286

11    Exhibit 8      Affidavit in Support of

12                   Plaintiffs' Motion for Rule to

13                   Show Cause                     295

14    Exhibit 9      MapQuest Directions from 25637

15                   Michigan Avenue to Heights Market   298

16    Exhibit 10     Still Frame from Video taken from

17                   Councilman Saab's House         300

18    Exhibit 11     October 2023 Email Chain

19                   Unexpected/Unprofessional      308

20

21              D O C U M E N T S   R E Q U E S T E D

22    NO.            DESCRIPTION                    PAGE

23    1              Files on Flash Drive            98

24    2              Documents Relating to

25                   Ms. Hicks-Clayton              189

Page 6

```
 1              P R O C E E D I N G S
 2              THE REPORTER:  Good morning.  My name
 3   is Jahkarah Young; I'm the reporter assigned by
 4   Veritext to take the record of this proceeding.  We
 5   are now on the record at 10:11 a.m.
 6              This is the deposition of Paul
 7   Vanderplow taken in a matter of Kevin Swope, Paul
 8   Vanderplow, and Jerrod Hart vs. City of Dearborn
 9   Heights, a Michigan municipal corporation, Case Number
10   2:24-cv-10240-MAG-DRG.
11              This is taken on August 19, 2025, at
12   the Law Firm of Fausone & Grysko, PLC, at 41700 Six
13   Mile Road, Suite 101, Northville, Michigan 48168.
14              I'm a notary authorized to take
15   acknowledgments and administer oaths in Michigan.
16              Additionally, absent an objection on
17   the record before the witness is sworn, all parties
18   and the witness understand and agree that any
19   certified transcript produced from the recording of
20   this proceeding:
21                   - is intended for all uses permitted
22                     under applicable procedural and
23                     evidentiary rules and laws in the
24                     same manner as a deposition recorded
25                     by stenographic means; and
```

```
                                            Page  7
 1                      - shall constitute written stipulation
 2                         of such.
 3                      At this time, will everyone in
 4     attendance please identify themselves for the record,
 5     beginning for my right.
 6                      MS. HUNT:  Good morning.  Monica Hunt
 7     on behalf of the defendant, City of Dearborn Heights.
 8                      MR. TURFE:  Good morning.  Tarik Turfe
 9     on behalf of the intervening defendant, City of
10     Dearborn Heights City Council.
11                      MR. BROWN:  Good morning.  Stephen J.
12     Brown here on behalf of the plaintiffs.
13                      MR. VANDERPLOW:  Paul Vanderplow.
14                      THE REPORTER:  Hearing no objections, I
15     will swear in the witness.
16                      Mr. Vanderplow, will you please raise
17     your right hand?
18     WHEREUPON,
19                         PAUL VANDERPLOW,
20     called as a witness and having been first duly sworn
21     to tell the truth, the whole truth, and nothing but
22     the truth, was examined and testified as follows:
23                      THE REPORTER:  You may proceed.
24     //
25     //
```

```
                                                   Page 8
 1                      EXAMINATION
 2    BY MS. HUNT:
 3        Q    Good morning, Mr. Vanderplow.
 4        A    Good morning.
 5        Q    I'm not certain if the court reporter asked,
 6    but can you spell your name for the record, please?
 7        A    V as in Victor, A-N-D-E-R-P-L-O-W.  First
 8    name Paul, P-A-U-L.
 9        Q    All right.  Thank you for that.  Mr.
10    Vanderplow, have you ever had your deposition taken
11    before?
12        A    I have.
13        Q    Okay.  When was that?
14        A    I don't recall.
15        Q    Okay.  Was it for purposes of a work-related
16    matter?
17        A    Yes.
18        Q    Okay.  Do you recall if you were a party to
19    the -- strike that.
20             Was it a part of a lawsuit?
21        A    I believe it was.
22        Q    Okay.  How many times do you recall?
23        A    I don't recall.
24        Q    Okay.  Do you recall if you were a named
25    party to that lawsuit?
```

```
                                                    Page 9

 1          A     I don't recall.

 2          Q     Okay.  Have you ever had your deposition

 3    taken for non-work-related matters?

 4          A     I don't recall.

 5          Q     Okay.  So we're going to go over a few

 6    ground rules now.  I know the court reporter gave

 7    some, but like she stated prior to swearing us all --

 8    or taking attendance today and swearing you in, she is

 9    reporting or transcripting everything that is said

10    here today.

11               So for purposes of a clear transcript,

12    please let me finish the question that I ask of you.

13    I will do my best to allow you to finish the answer

14    that you are giving.  That way she can hear one person

15    talking at one time and we can have a clear record.

16               If I ever ask you a question that you don't

17    understand, please feel free to ask me to rephrase it.

18    If you don't ask me to rephrase it, I'm going to

19    assume that you understood the question, and the

20    answer that you give will stand.

21               If you -- you'll hear objections today from

22    some of the attorneys in the room.  You're still

23    required to respond unless your attorney instructs you

24    not to.  Is that understood?

25          A     Yes.
```

```
                                               Page 10

 1      Q    Okay.  In the event you need to take a

 2  break, I'm going to ask that you --

 3      A    Can you please stop so I can focus on you

 4  and let them finish getting settled please?  'Cause I

 5  can't hear you with him moving around.

 6                MR. BROWN:  Let the record reflect that

 7  Attorney Gary Miotke just entered the room.  And we

 8  also have with us the city's corporate counsel at this

 9  time.

10                MS. HUNT:  Roger Farinha also entered

11  the room after attendance.

12  BY MS. HUNT:

13      Q    Okay.  Can I resume now?

14      A    Please.

15      Q    Are you okay with that?

16      A    Yes.

17      Q    Okay.  If you ever need to take a break,

18  please let me know.  I will ask that you answer the

19  question that's on the table.  We cannot take a break

20  if there's still a question on the table that you have

21  not answered.  Is that understood?

22      A    Understood.

23                MS. HUNT:  Okay.  And similar to the

24  objection that I placed on the record yesterday, my

25  client has instructed me to include that they're
```

```
                                                  Page 11
 1   objecting to the presence of Mr. Turfe and Mr. Miotke.
 2                   THE WITNESS:  Understood.
 3                   MS. HUNT:  All right.
 4                   MR. TURFE:  I just want to note for the
 5   record that Mayor Bill Bazzi has no bearing to make
 6   any objection at any point in this case.  He's not a
 7   named party.  He's not even shown up for his
 8   deposition.  So he has no right nor any basis in law,
 9   in fact, to make any such objection.
10                   MR. BROWN:  I agree.
11                   MS. HUNT:  For clarity of the record, I
12   simply stated that my client -- I didn't -- today I
13   did not mention Mr. Bazzi.
14                   MR. FARINHA:  And Mr. --
15                   MR. TURFE:  Did the city council
16   authorize you make that objection behalf the city?
17                   MR. FARINHA:  And Mr. Bazzi was present
18   for his deposition.
19                   MS. HUNT:  Okay.
20                   THE REPORTER:  One at a time.
21                   MR. TURFE:  Did the city council
22   instruct you to make that objection to our presence?
23                   MS. HUNT:  No.  No.  I'm not the
24   counsel for the city attorney -- for the city council.
25                   MR. TURFE:  The city council passes our
```

```
                                         Page 12
 1   claims --
 2                THE WITNESS:  Would you like me to
 3   leave?
 4                MS. HUNT:  No.  No, it's fine.  We're
 5   not going after --
 6                MR. TURFE:  If the mayor is making
 7   decisions on behalf of the city without the consent or
 8   knowledge of the city council, that's a problem that
 9   needs to be addressed.
10                MS. HUNT:  Then that --
11                MR. BROWN:  Federal court denied
12   your --
13                MS. HUNT:  Jesus Christ.  Okay.  Stop.
14                THE REPORTER:  One moment.
15                MS. HUNT:  The objection is on the
16   record.  Your statement is noted.
17                MR. MIOTKE:  And we have another
18   statement, which is, as we've stated before and we
19   stated yesterday, Mr. Farinha is presumably supposed
20   to be here only as a party representative.  He has no
21   authority to otherwise represent.
22                The city has not filed an appearance,
23   and we believe he has a clear conflict of interest.
24   We're not expecting a response.  We're just noting it
25   for the record.
```

```
                                          Page 13

 1              And if we can just continue, that would
 2    be helpful.  Thank you.
 3              MS. HUNT:  All right.  So noted.
 4    BY MS. HUNT:
 5        Q    Okay.  Mr. Vanderplow, where do you
 6    currently reside?
 7        A    City of Livonia.
 8        Q    Okay.  How long have you lived in the city
 9    of Livonia?
10        A    About three years.
11        Q    Who do you live with?
12        A    My wife.
13        Q    Okay.  What's your wife's name?
14        A    Karen.
15        Q    Where did you live prior to residing in
16    Livonia?
17        A    Virginia.
18        Q    What city in Virginia?
19        A    Woodbridge.
20        Q    How long were you living in Woodbridge,
21    Virginia?
22        A    Four years.
23        Q    Prior to living in your current residence in
24    Livonia, did you ever live in the state of Michigan?
25        A    Yes.
```

```
                                              Page 14
 1        Q    Okay.  When did you live in Michigan?
 2        A    1995 through 1999.
 3        Q    All right.  And where were you living then?
 4        A    Which time?
 5        Q    During '95 and '99, what cities did you live
 6   in?
 7        A    Novi, Saint Clair Shores, Clinton Township,
 8   Grand Rapids.  I think that was it.
 9        Q    Okay.  In '99, where did you move to?
10        A    San Jose, California.
11        Q    And how long were you in San Jose?
12        A    Six years.
13        Q    All right.  And where did you move after
14   that?
15        A    City of Chicago.
16        Q    And how long were you in Chicago?
17        A    Strike that.  It was actually Illinois.  I
18   was stationed in Chicago.
19        Q    Okay.  So you did not reside in the city of
20   Chicago?
21        A    That is correct.  I was mistaken.
22        Q    Okay.  All right.  Where did you live in
23   Illinois?
24        A    Aurora.
25        Q    All right.  And how long were you in Aurora?
```

```
                                             Page 15
 1        A     Three years.
 2        Q     All right.  And that appears to take us to
 3    somewhere around 2009?
 4        A     Yes.
 5        Q     Okay.  And where did you live then?
 6        A     Washington D.C.  Technically Virginia.
 7        Q     All right.  And how long?
 8        A     Three years.
 9        Q     All right.  Where did you go next?
10        A     Texas, Dallas.  Technically McKinney.
11        Q     And how long were you in McKinney?
12        A     Three years.
13        Q     And where did you go when you left McKinney?
14        A     Virginia.
15        Q     All right.  And that was the four-year
16    stint?
17        A     Four to six, yeah, roughly, the time frame
18    works out.
19        Q     And then you came to Michigan?
20        A     I did.
21        Q     Okay.  Where did you go to high school?
22        A     Saint Joseph High School in Westchester,
23    Illinois.
24        Q     Did you graduate?
25        A     Yes.
```

Page 16

1     Q    In what year?

2     A    1989.

3     Q    Did you attend college?

4     A    I did.

5     Q    Where did you go?

6     A    Arizona State.

7     Q    And what years?

8     A    '89 to '94.

9     Q    Did you get a degree?

10    A    I did.

11    Q    What type of degree?

12    A    B.S. in finance and accounting.

13    Q    Do you have any graduate- or master-level

14   degrees?

15    A    No.

16    Q    So was Arizona State your last education

17   post-high school?

18    A    No.  No.

19    Q    Okay.  Where did you go?

20    A    I've taken several classes for work, whether

21   it's Maryland University, Northwestern.

22    Q    Did you receive any sort of certificates or

23   licenses from those classes?

24    A    I did.  I don't remember what they're

25   called.  Northwestern was an executive management

Page 17

1   certification for law enforcement.  That's about the
2   only one I remember.  I was also a -- I was on track
3   to be a certified fire investigator, so I took several
4   graduate-level courses on fire dynamics.
5        Q    And where were you when you took those
6   classes for the fire investigator?
7        A    California.
8        Q    Was that when you were in San Jose?
9        A    Correct.
10       Q    Okay.  Now, you say you were on track.  Why
11  didn't you finish that?
12       A    I was transferred by ATF to Chicago to be a
13  supervisor.
14       Q    All right.  When you left Arizona State,
15  what did you do?  Like, where -- did you go to work,
16  or did you start --
17       A    I went to work at Chase Manhattan Bank as an
18  investigator.
19            THE REPORTER:  I just want to remind
20  you just to slow down and wait for the entire question
21  to get out before you start to respond.
22            THE WITNESS:  Will do.
23            THE REPORTER:  Thank you.
24  BY MS. HUNT:
25       Q    And how long did you work with Chase?

```
                                              Page 18
 1        A    Roughly two years, I think.  Maybe a year
 2   and a half.
 3        Q    Were you an investigator the full two years?
 4        A    I was.
 5        Q    Okay.  And when you left that position,
 6   where did you go?
 7        A    I went to the Internal Revenue Service,
 8   Criminal Investigation Division.
 9        Q    And how long were you with the IRS?
10        A    About five and a half years.
11        Q    Were you in the Criminal Investigation
12   Division the entire five years?
13        A    I was.
14        Q    Okay.  What was your title?
15        A    Special agent.
16        Q    Did you maintain that title the entire five
17   years?
18        A    I did.
19        Q    All right.  And once you left the IRS, where
20   did you go?
21        A    ATF.
22        Q    What did you do with the ATF?
23        A    Started as a special agent.
24        Q    How long were you a special agent?
25        A    Technically my whole career, but I would
```

Page 19

1    hold other titles.  You were always a special agent,

2    but I would hold other position and titles along with

3    that.

4         Q    Okay.  So what was your -- where did -- when

5    you started with the ATF, what was your position?

6         A    Special agent.

7         Q    Okay.  Was there another type of underlying

8    position or title that you would have with the ATF?

9         A    Certified fire investigator trainee.

10        Q    How long were you a trainee?

11        A    About two years.

12        Q    And did you remain with the ATF after that?

13        A    I did.

14        Q    Where did you -- or what position did you

15   hold?

16        A    I would then go to be a group supervisor for

17   the Chicago field division.

18        Q    How long did you hold that position?

19        A    About two years.

20        Q    All right.  Anything else with the ATF?

21        A    Oh, plenty.

22        Q    Okay.  How long were you with the ATF?

23        A    Almost 22 years.

24        Q    Okay.  What was your last position with the

25   ATF?

Page 20

1      A     Special agent in charge, Detroit field

2   division.

3      Q     When did that position end for you?

4      A     December 31, 2022.

5      Q     All right.  Is that when you went to the

6   City of Dearborn Heights?

7      A     That is correct.

8      Q     When you were with the IRS, it appears you

9   were there for five years?

10     A     Yes.

11     Q     What were your responsibilities and duties?

12     A     As a special agent with the IRS, it was my

13  duty to investigate crimes involving the tax code

14  Title 26, money laundering, bank secrecy.

15        And at some point, we were doing terroristic

16  issues as well, but as a new agent I didn't do much of

17  that.  Most of my time was spent on tax violations,

18  bank secrecy, and money laundering.

19     Q     All right.  What about when you were with

20  Chase?  What were your responsibilities?

21     A     Credit card investigator.  And I was very

22  good at it.

23     Q     How did you learn about -- strike that.

24        Were you familiar with the City of Dearborn

25  Heights Police Department prior to your starting in

```
                                          Page 21
 1   that position?

 2        A    Oh, absolutely.

 3        Q    Okay.  How were you familiar with it?

 4        A    It was known throughout the law enforcement

 5   community as a less-than-stellar department.

 6        Q    As an IRS agent and an ATF agent, how much

 7   interaction did you have with local departments?

 8               MR. BROWN:  Could you clarify that,

 9   Monica, when you mean police departments or --

10               MS. HUNT:  Yes, with local police

11   departments.

12               THE WITNESS:  IRS, I had quite a bit.

13   My first case was with a city in Oakland County.

14   Almost every case I had involved a -- a local city

15   department when I was at the IRS, now that I think

16   about it.

17               And then at ATF, we pride ourselves in

18   working with state, local, tribal, federal partners to

19   combat violent crime.

20   BY MS. HUNT:

21        Q    Now, you mentioned that you currently live

22   with your wife, Karen.  Do you have children?

23        A    I do.

24        Q    All right.  What are their ages?

25        A    Twenty and 22.
```

Page 22

1      Q    All right.  Do they still reside with you?

2      A    Depends on what time of the year.

3      Q    Okay.  Are they away at college?

4      A    One is, yes.  One is a United States Marine.

5      Q    Okay.  Have you shared with them any of the

6  concerns or allegations that you've made in your

7  complaint?

8      A    They read what they read in the paper.  And

9  unfortunately, my son was an employee of Dearborn

10  Heights for a while, so he's aware of some of it.

11      Q    Okay.  Did you ever talk to them about the

12  issues that you were dealing with at work?

13      A    No.

14      Q    Okay.  Did you ever talk to them about the

15  claims that you have in your complaint of feeling, you

16  know, harassed or treated unfairly?  Were those ever

17  discussed?

18      A    I don't recall.

19      Q    Okay.  Do you intend to call either your

20  wife or either of your children as a witness in this

21  case?

22            MR. BROWN:  That's really a lawyer's

23  question --

24  BY MS. HUNT:

25      Q    If you don't know --

```
                                                    Page 23
 1              MR. BROWN:   Yeah.
 2    BY MS. HUNT:
 3         Q    If you don't know, then --
 4         A    I don't know.
 5         Q    So how did you learn about the position of
 6    director of support services with the Dearborn Heights
 7    Police Department?
 8         A    I was recruited.
 9         Q    All right.  Recruited by whom?
10         A    Jerrod Hart.
11         Q    Did you know Jerrod Hart prior to him
12    reaching out to you about this position?
13         A    I did not.  And he didn't reach out to me
14    about this position specifically.
15         Q    Okay.  All right.  How did he communicate
16    with you with regards to this position?
17         A    Can you clarify that question?
18         Q    Sure.  You indicated that you learned about
19    this position from Mr. Hart.
20         A    I did.
21         Q    Is that correct?
22         A    Yes.
23         Q    Okay.  How did he inform you of this
24    position?
25         A    After working with him on a couple different
```

Page 24

```
 1   projects involving Dearborn Heights, he asked to meet
 2   with me and approached me about taking the position.
 3        Q    Okay.  So you knew Mr. Hart prior to him
 4   talking to you about this position?
 5        A    Yes.
 6        Q    Okay.  Now, you indicated that you worked
 7   with him on several assignments previously.  Is that
 8   fair?  Is that correct?
 9        A    For about two or three months before, so
10   it's a very brief time.
11        Q    Okay.  Was that two to three months prior to
12   him informing you of this position?
13        A    Correct.
14        Q    Okay.  So this was during his time at
15   Dearborn Heights?
16        A    Correct.
17        Q    Okay.  What was the issue that you were
18   working on with him?
19        A    The first one was he called me as the
20   special agent in charge with ATF -- and I had not
21   known or heard of him before this.
22             He contacted me directly 'cause he found an
23   issue with registered firearms by the department and
24   asked me as a special agent in charge to come assist
25   his department in working out that issue, which is not
```

Page 25

1   unlikely or -- or not uncommon -- excuse me --
2   uncommon for a police chief to reach out to ATF for
3   that kind of thing.
4        Q    All right.  Did you assist him in that with
5   that project?
6        A    We did.
7        Q    Okay.  Was there anyone else in the ATF that
8   assisted you with this particular project?
9        A    I assigned personnel to it.
10       Q    Okay.  And when you say personnel, what does
11  that entail?
12       A    I had several ATF personnel go out and
13  conduct an inventory and try to ensure that their
14  paperwork was in line, which it was not.
15       Q    Do you recall -- I know you said it's two to
16  three months.  Do you recall the months or the time
17  frame?
18       A    Roughly July of 2022.
19       Q    Is that the beginning or the end of the
20  investigation?
21       A    The beginning.
22       Q    And do you know when it wrapped up?
23       A    Maybe three/four weeks later.
24       Q    Three to four weeks?
25       A    Yeah.

Page 26

1    Q    Okay.  Now, you indicated earlier that it
2  was two to three months prior to, so when did he reach
3  out to you about that position?

4    A    I don't recall the exact month.

5    Q    With regards to the investigation that you
6  assigned personnel to, was -- those individuals that
7  you assigned, were they the only individuals that went
8  out to the city of Dearborn Heights to conduct the
9  investigation, or did you go out as well?

10   A    No, they were the only ones.  That was below
11 my level.  I don't do that.

12   Q    All right.  And again, how many people did
13 you indicate that went out?

14   A    I don't know.

15   Q    Was it more than one?

16   A    Yes.

17   Q    Was it less than five?

18   A    That's fair.

19   Q    Okay.  Less than three?

20   A    I don't know.

21   Q    In general, how many investigators or ATF
22 personnel would you assign to an assignment similar to
23 this?

24   A    I don't assign anybody.  I task it out to my
25 staff, and they determine how many are needed.

Page 27

1      Q     So is that what you did in this particular

2   instance?

3      A     It is, yes.

4      Q     Was there a report generated after the

5   investigation was concluded?

6      A     I'm unsure.

7      Q     Would you have prepared a report if one was

8   created?

9      A     No.

10      Q     Who would've done that?

11      A     Whoever the staff member was.

12      Q     Would they have provided you with the

13   results of the investigation?

14      A     They might have.  I don't know.  It was

15   pretty -- quite frankly, it was another job in the day

16   of an ATF agent or ATF manager.  I had several going

17   on at the time.

18      Q     If a report was generated or created, is

19   that something that would have gone to the police

20   department, to the Dearborn Heights Police Department

21   in this instance?

22      A     I don't know.  Not necessarily.

23      Q     Would you have reached back out to the

24   individual that contacted you in the first place?

25      A     Yes.

Page 28

1      Q    Do you recall reaching back out to Chief

2   Hart?

3      A    I would.  Ironically, there was another

4   incident that happened after that.

5      Q    Okay.  And what was that?

6      A    That's when a gang called the Kia Boys went

7   through Metro Detroit stealing vehicles and ramming

8   them into federal firearms licensees and stealing

9   guns.  Two or three of the crime scenes were in

10  Dearborn Heights.  And ironically, it would bring ATF

11  back out to Dearborn Heights shortly after that.

12     Q    All right.  And when you say Kia Boys, it's

13  spelled like the car, K-I-A?

14     A    Yeah, because they would steal Kias because

15  they're so easily stolen.  And they would just run

16  them into the front of the buildings.

17     Q    And I'm sorry.  You indicated that there

18  were two to three incidents in the city?

19     A    Yes.

20     Q    All right.  Do you recall when those were?

21     A    August or September of 22', give or take.

22     Q    Now, you indicated that that would bring you

23  back out to the city.  Did you go out yourself?

24     A    I did.

25     Q    All right.  Who did you meet with then?

Page 29

```
 1        A     Well, several people from the department.
 2        Q     All right.  And who were those individuals?
 3        A     I remember Chief Hart, believe Lieutenant
 4   Guzowski at the time.  I remember Kevin Campbell or
 5   who I would later come to know as Kevin Campbell.
 6   Mike Gondek and several other members I can't recall.
 7              There were just a lot of them at the time,
 8   but those would stick out 'cause I would obviously
 9   know them later.
10        Q     Okay.  And while with -- back out at the
11   city of Dearborn Heights with regards to this vehicle
12   theft ring, what was your role in the investigation?
13        A     I was the agent in charge.
14        Q     Did you conduct any investigations or
15   interviews during your time there?
16        A     No.
17        Q     All right.  Now, I know you're the agent in
18   charge.  Did you -- were you boots on the ground with
19   others?
20        A     Yes.
21        Q     Okay.  How long did that investigation take?
22        A     For the most part, something in my mind
23   tells me like three to five weeks.
24        Q     Now, you indicated that this was something
25   that was going across Metro Detroit?
```

```
                                                 Page 30
 1       A     Metro Detroit, St. Louis, Kentucky.  Pretty
 2  much through the Midwest.
 3       Q     All right.  So it wasn't isolated to the
 4  city of Dearborn Heights?
 5       A     It's not.  In fact, in this incidence, I
 6  believe Garden City got hit too and Westland, I
 7  believe.
 8       Q     Were you in charge of investigating within
 9  those cities as well?
10       A     I was.
11       Q     Okay.  When that investigation wrapped up
12  with regards to the Kia Boys, did you have any more
13  dealings with the City of Dearborn Heights prior to
14  joining as an employee?
15       A     No.
16       Q     All right.  So was it after you wrapped up
17  your investigation with the Kia Boys that Chief Hart
18  reached out?
19       A     Seems about the right time.
20       Q     Okay.  So was it two to three months after
21  that incident that he reached out to you?
22       A     No, it was maybe a couple of weeks.
23       Q     Okay.  Now, I know you don't recall exactly
24  when he reached out to you, but do you recall, like,
25  the season?  Was it winter?  Was it around
```

Page 31

1    Thanksgiving?

2         A    It was fall.

3         Q    Early fall, late fall?

4         A    I believe early because the commissioner was

5    still alive and working.

6         Q    When you say the commissioner --

7         A    Commissioner Joe Thomas.  Dr. Joe Thomas.

8    Excuse me.

9         Q    All right.  So I'm sorry if I asked you this

10   already.  How did Chief Hart communicate the issue

11   regarding this position to you?  Was it, like, by

12   phone, in person, email?

13        A    We met for a meal.

14        Q    Okay.  When you met with Chief Hart, was it

15   just the two of you?

16        A    Yes.  But something tells me that Dr. Thomas

17   joined us as well.

18        Q    Was it that he joined later in the meal

19   or --

20        A    Yeah, I believe so.  He came late, if I

21   remember right.

22        Q    Okay.  Do you recall how soon after Chief

23   Hart first communicated the message regarding this job

24   to you that you ended up meeting with him?

25        A    It was all kind of at the same time.

Page 32

```
 1        Q     Okay.  So within days?
 2        A     Yes.  Yes, was the answer.
 3        Q     Do you recall where you met?
 4        A     I'm sorry?
 5        Q     Do you recall where you met?  Where did you
 6    have the meal?
 7        A     I don't -- I don't recall.
 8        Q     What was discussed at this meeting?
 9        A     The problems he was having at the city, the
10    things he needed done.  As a fellow executive manager,
11    I understood intimately what his needs were.  As you
12    see in my career, I've been moved around a lot.  The
13    reason I've been moved around a lot is I get put in
14    places that need fixing, and I fix them.
15        Q     Did he offer you the position at that time?
16        A     No.  We talked about what he was looking
17    for.  He talked about what his needs were.
18        Q     Did he ask you to consider the position?
19        A     Yes, he did.
20        Q     What did he tell you about the position?
21        A     Generally what traits and what skills he was
22    looking for, things he was trying to do with it --
23    "it" being the position -- what -- what they needed.
24        Q     Did he indicate that this was a newly
25    created position?
```

Page 33

1          A     I don't recall.

2          Q     Did you come to find out that it was a newly

3    created position?

4          A     I'm trying to answer that question.  Not

5    that it was newly created.  It seemed, from my

6    knowledge of workings of police departments, I

7    understand there are civilian deputy chiefs; there are

8    civilian staff.  I'm not sure.  Can you rephrase that?

9          Q     Sure.  Did you come to find out or did you

10   ever find out that the position of director of support

11   services was not staffed at the time that you spoke

12   with Chief Hart --

13         A     That is --

14         Q     -- about the position?

15         A     That is correct.  It -- I did learn that,

16   that it was not staffed.

17         Q     Okay.  Did you come to learn that that

18   position was not a historically staffed position

19   within the City of Dearborn Heights?

20         A     Later on, yes.

21         Q     Okay.  Did you come to find out ever that

22   the functions and the duties of that position were

23   amended or changed prior to your coming in to the City

24   of Dearborn Heights?

25         A     Amended or -- can you rephrase that?

Page 34

1      Q     Sure.  Did you ever come to find out that

2  the functions and duties of that position of director

3  of support services was -- those duties had been

4  changed from the current -- or from a historical --

5  I'm going to start over because I'm confusing myself.

6  I apologize.

7            Historically, did you know what the

8  functions of that job were?

9      A     Not at the time.

10     Q     Okay.  All right.  Did you ever come to find

11 out that the position that you took over was

12 substantially different from the historical duties of

13 that position?

14     A     I'm thinking 'cause I want to be able to

15 answer this clear -- obviously contextually correct.

16     Q     Sure.

17     A     It's a little -- so from what I remember,

18 they had a job of whatever was doing this, so it -- to

19 me, it just seemed like it was an amalgamation of many

20 different duties because so many things weren't being

21 done, is what I'm trying to get to.  I'm not trying to

22 be evasive, but unfortunately --

23     Q     When Chief Hart spoke with you, when you had

24 your meal with him and Commissioner Thomas later

25 joined, did he express to you what the requirements of

Page 35

1    the job were?

2         A    Yes.

3         Q    Okay.  What did he say that they were?

4         A    They were looking for somebody to run fiscal

5    management of the department; physical plant

6    management of the department building, its assets such

7    as cars, guns, pretty much anything not in a uniform,

8    with the exception of investigations, dispatch,

9    records.

10            So it was anything revolving around the

11   police department to make it run.

12        Q    All right.  Was it your understanding that

13   you were a civilian employee?

14        A    Absolutely.

15        Q    Okay.  At the time that you started with the

16   police, with Dearborn Heights Police Department, you

17   had not graduated from the police academy?

18        A    That is correct, not -- not a state police

19   academy.

20        Q    Did you graduate from another police --

21        A    Three.

22        Q    Okay.  And what were those?

23        A    Federal Law Enforcement Training Center,

24   Criminal Investigation Training Program, basic

25   training for the Internal Revenue Service, basic

Page 36

1    training for the Bureau of Alcohol, Tobacco, and

2    Firearms.

3        Q    Right.  But you were not MCOLE certified; is

4    that right?

5        A    That is correct.

6        Q    Now, I understand you're currently going

7    through the police academy; is that correct?

8        A    I am.

9        Q    Okay.  Do you know when you will complete

10   that?

11       A    October 16, 12:30.

12       Q    Counting down the minutes?

13       A    Yes, ma'am.

14       Q    And what agency are you going through the

15   academy with?

16       A    I'm technically right now called

17   pre-service.  I do not have a job at this time.

18       Q    Okay.  Is it your intent to work as a law

19   enforcement officer once you graduate?

20       A    It is, yes.

21       Q    All right.  Where are you currently

22   employed?

23       A    I do some consulting work.  I also have a

24   part-time job with the Ilitch Corporation, and that is

25   it.

Page 37

```
 1       Q     All right.   When you say you do consulting
 2   work, is it through your own company, or are you
 3   working with another company?
 4       A     Both.
 5       Q     Okay.   What is the name of your company?
 6       A     1811 Systems.
 7       Q     A Team 11?
 8       A     Negative.   The number 18.
 9       Q     Oh, eight --
10       A     1811, one, eight, one, one, Systems.
11       Q     And what does 1811 Systems do?
12       A     I provide consulting work for fiscal,
13   operational, logistics of law enforcement and business
14   entities.
15       Q     When did you start 1811?
16       A     I don't recall.
17       Q     Was it within the past year?
18       A     No, it was a little bit before that.
19       Q     Okay.   Last two years?
20       A     Seems about right.
21       Q     Were you still with the City of Dearborn
22   Heights when --
23       A     I was.
24       Q     Do you currently have any assignments with
25   1811?
```

Page 38

```
 1        A     I do.
 2        Q     Do you routinely get assignments through
 3   1811?
 4        A     "Routine" is not adequate.
 5        Q     Okay.  Are you consistently working on
 6   assignments with 1811?
 7        A     "Consistent" is fair.
 8        Q     Okay.  Do you know approximately how much
 9   1811 made financially-wise in the last year?
10        A     I don't.
11        Q     Do you file taxes?
12        A     Oh, yes.
13        Q     Okay.  And did you file taxes for the '24
14   year?
15        A     I did.
16        Q     All right.  And do you recall what was
17   listed as income?
18        A     Not at the top of my head, no.
19        Q     All right.  Did you do that yourself, or did
20   you have a tax assistance?
21        A     I did my own taxes, but I don't recall off
22   the top of my head.
23        Q     Okay.  Did you file taxes for the '23 year?
24        A     I did.
25        Q     What about '22?
```

```
                                                  Page 39

 1        A     Yes.

 2        Q     For 1811?

 3        A     No.

 4        Q     Okay.  For '22, you did not?

 5        A     I did not.

 6        Q     Okay.  Did you for '23 for 1811?

 7        A     Yes.  I believe there was some income in

 8   that year.

 9        Q     Okay.  Was there income in '24?

10        A     Yes.

11        Q     Okay.  Do you know if there was profit in

12   '24?

13        A     Yes.

14        Q     Do you recall the law enforcement agencies

15   that you've worked with with 1811?

16        A     It's classified.

17        Q     Are there -- the investigations, is it the

18   investigations themselves that you're indicating as

19   classified or the crux of the subject matter or the --

20        A     All of it.

21        Q     All right.  Do you have contracts with these

22   particular clients of 1811?

23        A     I do.

24        Q     Okay.  Is there a confidentiality clause

25   within those contracts?
```

```
                                        Page 40
 1        A    There is.
 2        Q    Now, you mentioned that you work for your
 3   own -- for 1811 and then also other companies as a
 4   consultant?
 5        A    They're all together.  So I -- one company
 6   does several clients.
 7        Q    Okay.  So it isn't that you work as a
 8   consultant outside of 1811?
 9        A    Correct.
10        Q    And you indicated that you're a part-time
11   employee with Ilitch.  What do you do with Ilitch?
12        A    I'm crowd control.
13        Q    All right.  Is that year-round?
14        A    I just started.  I do a game or two.
15        Q    Okay.  Are those the Tiger games?
16        A    It is.
17        Q    Okay.  And when did you start with that?
18        A    May.
19        Q    Of '25?
20        A    Correct.
21        Q    And you say you've done a game or two.  For
22   the entire season, you've done one or two games?
23        A    Correct.
24        Q    All right.  How much do you make during
25   those games?
```

Page 41

```
 1        A    $17 an hour.
 2        Q    With 1811, do you obtain any benefits like
 3   health insurance?
 4        A    No.
 5        Q    Pension, 401(k) contributions, any of that?
 6        A    No.
 7        Q    All right.  Do you have a pension with --
 8   from the IRS?
 9        A    Yes.
10        Q    Okay.  What about ATF?
11        A    It's all together.  It's a federal pension.
12        Q    All right.  Are you receiving anything from
13   that now?
14        A    Yes.
15        Q    When did you start receiving your pension?
16        A    January 1, 2023.
17        Q    And approximately what do you receive
18   monthly?
19        A    I don't recall.
20        Q    You don't recall how much is given to you
21   each month from your federal pension?
22        A    No.
23        Q    Is it directly deposited?
24        A    It is.
25        Q    Do you recall what day of the month it's
```

```
                                       Page 42

 1   deposited?

 2        A    I believe the 1st.

 3        Q    Does the direct deposit go into an account

 4   shared with your wife?

 5        A    It does.

 6        Q    Is anyone else on that account?

 7        A    No.

 8        Q    Do you receive -- strike that.

 9             Are you currently insured for health

10   insurance?

11        A    I am.

12        Q    Okay.  And where do you receive your health

13   insurance?

14        A    Can you rephrase that?

15        Q    Sure.  Do you pay for your own health

16   insurance?

17        A    Yes.

18        Q    Okay.  And is that independent from the

19   marketplace, or are you receiving it from a previous

20   employer?

21        A    Previous employer.

22        Q    Who was the previous employer?

23        A    U.S. Government.

24        Q    Is your wife on that plan as well?

25        A    She is.
```

Page 43

1      Q     Okay.  What about your kids?

2      A     They are.

3      Q     Both of them?

4      A     They are.

5      Q     Okay.  So you had this meeting with Mr. --

6    or Chief Hart and perhaps Joe Thomas.  When was the

7    next time you had a conversation with Chief Hart about

8    the position of director of support services?

9      A     A few days later.

10     Q     All right.  Did you reach out to him, or did

11   he reach out to you?

12     A     He reached out to me.

13     Q     And what was that conversation?

14     A     Just had I thought about what he had asked,

15   what he was looking for, what my thoughts were.

16     Q     Okay.  And what did you tell him?

17     A     I said it seemed interesting, seemed like it

18   was something I was highly capable of doing and

19   helping.

20     Q     All right.  Did you offer to come aboard, or

21   did he ask you to come aboard?

22     A     He asked me.

23     Q     All right.  Was it in that meeting?

24     A     I don't recall.

25     Q     All right.  And when you say he reached out

Page 44

```
 1   to you, was it by phone?

 2        A    I would assume so.

 3        Q    Did you ever meet with Chief Hart again

 4   prior to your starting your employment?

 5        A    I did.

 6        Q    All right.  And when was that?

 7        A    I don't recall.

 8        Q    Do you recall where it was?

 9        A    I would meet at the police department.

10        Q    Okay.  Was there more than one time that you

11   met at the police department with Chief Hart prior to

12   you starting your employment?

13        A    Two or three times total.

14        Q    What was the purpose of those meetings?

15        A    It was to meet with him, meet with the

16   mayor, to see if I was who what -- if I was who they

17   were looking for.

18        Q    So these two to three meetings, they were

19   prior to your accepting the position?

20        A    One meeting was prior to me accepting.  Then

21   I believe I accepted, and then I had a second meeting

22   with Chief when he interviewed Kevin Swope.

23        Q    Okay.  So when you interviewed with Kevin

24   Swope, that was after you had accepted the position?

25        A    Yes.
```

Page 45

1      Q     Okay.  Was it prior to your starting, your

2   start date?

3      A     Yes.

4      Q     Do you recall what your start date was?

5      A     January 9, 2023, 8 a.m.

6      Q     Did you and Mr. Swope start on the same day?

7      A     We did.

8      Q     All right.  So you had one meeting with

9   Chief Hart.  The second meeting, was that when you

10  accepted the position in the police department?

11     A     I -- I think so.  There might have been a

12  phone call there.  It -- it just all kind of bled

13  together after a minute.

14     Q     Was there ever what you considered an

15  interview for the position?

16     A     Yes.

17     Q     And which meeting was that?

18     A     Pretty much every one.

19     Q     Was that every meeting prior to your

20  accepting or --

21     A     Correct.

22     Q     -- including the one with the mayor?

23     A     Can you rephrase that?

24     Q     Sure.  You indicated that you met with -- in

25  addition to Mr. Hart, during one of the meetings you

Page 46

1   also met with the mayor?

2       A    Correct.

3       Q    All right.  Would you consider the meeting

4   that you had with the mayor as an interview?

5       A    I would.

6       Q    Okay.  Was this after you had advised you

7   would accept the position?

8       A    No.

9       Q    Okay.  Who did you tell that you would

10  accept the position?

11      A    Believe Chief Hart.

12      Q    Did you tell the mayor?

13      A    I -- I don't think it was a tell kind of

14  thing.

15      Q    Did you notify the mayor that you had or

16  would accept the position?

17      A    I didn't talk to him like that.

18      Q    Did you, after notifying -- strike that.

19           Did you notify Chief Hart that you would

20  accept the position?

21      A    Yes.

22      Q    All right.  After notifying Chief Hart that

23  you were going to accept the position, did you receive

24  any paperwork or any information?

25      A    I'm --

Page 47

```
 1        Q    What did you receive?
 2        A    I'm sure I did, typical I-9 verification
 3   through Margaret Hazlett, HR director.  At some point
 4   I received a contract.  I don't remember when that
 5   was.
 6        Q    Okay.  When you began -- I'm sorry.  When
 7   you received the contract, do you recall how much your
 8   salary was?
 9        A    I believe 90,000.
10        Q    Okay.  Were you receiving benefits?
11        A    Can you clarify that?
12        Q    Sure.  Were you set to receive health
13   insurance?
14        A    No.
15        Q    All right.  Were you receiving health
16   insurance from another -- a previous employer at the
17   time?
18        A    Yes.
19        Q    All right.  And who was that?
20        A    U.S. Government.
21        Q    All right.  Did that continue throughout
22   your time with the city?
23        A    It did.
24        Q    Okay.  So you never received health
25   insurance from the City of Dearborn Heights?
```

Page 48

```
 1        A    I did not.
 2        Q    Okay.  Were you scheduled to receive any
 3   vision/dental insurance from the city?
 4        A    I think there was some provision for it.
 5        Q    Okay.  Did you receive it?
 6        A    I don't -- I don't ever recall using it.
 7        Q    Okay.  Did you have dental and vision
 8   insurance?
 9        A    Yes.
10        Q    Was that through the government as well?
11        A    It is.
12        Q    Okay.  And is that the insurance that you
13   utilize when you --
14        A    Yes.
15        Q    Okay.  Same for your family?
16        A    Yes.
17        Q    Okay.  You indicated that your salary for
18   your first contract was 90,000; is that correct?
19        A    From what I recall, yes.
20        Q    Okay.  Did you receive the $90,000?
21        A    Not in a lump sum.
22        Q    Correct.  Over the course of a year, did you
23   receive your ninety -- the $90,000 minus any
24   deductions that would be necessary?
25        A    Correct.
```

```
                                                Page 49
 1        Q    Okay.  Was there ever a time that you didn't
 2   receive your salary during that first year?
 3        A    My first check bounced.
 4        Q    Okay.  Who did you advise of that the check
 5   was returned?
 6        A    What's that treasurer's name?
 7   Hicks-Clayton.
 8        Q    Do you know why it was returned?
 9        A    Yeah.  I would find out later that she
10   doesn't know how to put proper funding into accounts.
11   Her words.
12        Q    Do you know if anyone else's check was
13   returned during that first pay period?
14        A    During that pay period?
15        Q    Yes.
16        A    No, I don't know.
17        Q    Did you ask anybody else?
18        A    No.
19        Q    Was that rectified?
20        A    It took a minute, yeah, it was --
21        Q    When you say a minute, how long?
22        A    Three weeks.
23        Q    In that time, did you receive another
24   paycheck?
25        A    No.
```

Page 50

1      Q    So the first check that you received was
2  returned for, I'm assuming what you --
3      A    It was -- it was technically held.  The bank
4  told me that the account was flagged as problematic,
5  and they wouldn't honor it.
6      Q    Okay.  Your bank held it?
7      A    Well, a bank.  A clearing house bank held it
8  because the account that it was drawn upon, I was
9  told, and I quote "problematic" and that it needed to
10  be verified.
11      Q    And was it the clearing house that took
12  three weeks to remove the flag and release your check?
13      A    I don't know who at that end.  I -- you
14  would have to ask the city.
15      Q    After that, you did receive a "makeup check"
16  or a payment for that time period; is that correct?
17      A    Yes.
18      Q    Okay.  Was there ever any other time that
19  you did not receive your paycheck?
20      A    Oh, yeah.
21      Q    When?
22      A    When I was fired.
23      Q    Okay.  So when you left the city, you did
24  not receive a --
25      A    Not a penny.

Page 51

1      Q    Did you not receive your last paycheck?

2      A    I -- it took a phone call to get my full

3  last paycheck.

4      Q    But you did receive that?

5      A    After a while, yes.

6      Q    So between your starting in January of 2009

7  [sic] to when you ended your employment -- and when

8  did you leave?

9      A    May 9, 2025.

10     Q    All right.  So beginning January 9th of 2023

11 through May 9th of 2025, the only paychecks you did

12 not receive was your first and your last in a timely

13 fashion; is that correct?

14     A    Correct.

15     Q    And did you ever come to learn why your

16 final paycheck was untimely?

17     A    No.

18     Q    All right.  Approximately how long after you

19 left did you receive it?

20     A    I don't recall.

21     Q    And I just want to make sure it's -- that I

22 understand your testimony correctly.  The reason the

23 first paycheck was not -- did not clear is because it

24 was being held by a clearing house --

25     A    Because --

Page 52

1      Q     -- because the city's account was flagged?

2      A     Yes.

3      Q     Okay.  But it is your understanding that the

4   city processed for you to be paid?

5      A     Yes.

6      Q     Okay.  As director of support services with

7   the City of Dearborn Heights, who was your supervisor?

8      A     Jerrod Hart.

9      Q     All right.  Did you supervise any employees?

10     A     I did.

11     Q     Who did you supervise?

12     A     I don't recall the full list.

13     Q     All right.  What titles or departments did

14  you supervise?

15     A     Investigations, records, dispatch, physical

16  plant maintenance, canine, FOIA, and some levels of

17  fiscal responsibilities by Janet Lucas.  Although, to

18  be clear, I was not her supervisor directly, just a

19  couple of the functions.

20     Q     I'm sorry.  Janet --

21     A     Lucas.

22     Q     -- Lucas.  Now, what levels of financial

23  responsibilities were those?

24     A     Paying the bills, receiving grant funds,

25  forfeiture account maintenance and caretaking.

Page 53

1      Q     When you say grant funds, were you applying

2   for grants or --

3      A     I was.

4      Q     -- were you just managing the grant funds?

5      A     I beg your pardon.  I answered too soon.  It

6   was not only applying but managing what was there

7   prior to my arrival.

8      Q     Are you a grant writer?

9      A     Technically.

10     Q     Okay.  What was Janet Lucas's position?

11     A     Executive assistant, I believe, is her

12  title.

13     Q     And when you say paying bills, was it paying

14  bills for the police department only?

15     A     It was, ma'am.

16     Q     Okay.  Did you physically write the checks,

17  or did you just oversee the facilitation of payments?

18     A     Oversee the facilitation and approval to be

19  forwarded to the comptroller's office for a check to

20  be written and then paid to the vendor.

21     Q     Okay.  Were you responsible for providing,

22  like, either check registers or a list of account

23  payables to go to the city council?

24     A     Janet Lucas would do that, yes.  I did not

25  do that as a function.

Page 54

```
 1        Q    Okay.  Okay.  Did you oversee her function
 2   in doing that?
 3        A    I did.
 4        Q    All right.
 5                 THE REPORTER:  -- slow down.
 6                 THE WITNESS:  Understood, ma'am.
 7   BY MS. HUNT:
 8        Q    What do you mean by caretaking?  What was
 9   that function?  You indicated that part of your
10   functions with physical responsibility was caretaking.
11        A    So on, let's say, the forfeiture account,
12   because it was such -- because it was such a mess, it
13   had to be verified, audited, watched.  That is what I
14   call caretaking.
15        Q    Thank you for that.
16                 MS. HUNT:  And if we could take a brief
17   break, my mother has called a number of times --
18                 THE WITNESS:  Understood.
19                 MS. HUNT:  -- so I want to make sure --
20                 THE WITNESS:  Please.
21                 THE REPORTER:  Off the record, 11:08
22   a.m.
23                 (Off the record.)
24                 THE REPORTER:  Back on the record,
25   11:21 a.m.
```

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                    586-468-2411
                                                                          www.veritext.com

Page 55

1              You may proceed.

2    BY MS. HUNT:

3        Q    Okay.  Mr. Vanderplow, I'm going to hand

4    you -- and I'm sorry.  I should have done this

5    before -- what we will enter as Exhibit 1.

6                   (Exhibit 1 was marked for

7                   identification.)

8              And do you recognize this document?

9                   MR. MIOTKE:  We haven't received one.

10                  UNIDENTIFIED SPEAKER:  You'll receive

11   it in a second.

12                  MR. MIOTKE:  Thank you.

13   BY MS. HUNT:

14       Q    Do you recognize this document?

15                  MR. BROWN:  Do you have an extra copy?

16                  MR. FARINHA:  Here --

17                  MS. HUNT:  I don't.

18                  MR. BROWN:  That's fine.

19                  MR. FARINHA:  Well, hold on.  Here.

20                  MR. BROWN:  That's fine.  That's fine.

21                  MR. FARINHA:  Since I've been able to

22   confirm that it's what -- I don't necessarily need

23   this one.

24                  MR. BROWN:  That's -- Roger is handing

25   me his.  That's fine.  Thank you.

```
                                                      Page 56

 1                MR. FARINHA:  Okay.

 2                MR. BROWN:  Thanks, Roger.

 3                MS. HUNT:  Well, I kind of need one,

 4    Gary, because I'm asking questions on it.

 5                MR. MIOTKE:  Oh, here you go.  No.  No,

 6    because I have one, you know, since -- yeah.

 7                MS. HUNT:  Thank you for sharing it

 8    with me, though.

 9                MR. MIOTKE:  You're welcome.

10    BY MS. HUNT:

11        Q    Do you recognize this document?

12        A    I do.

13        Q    All right.  Is this your initial contract

14    with the City of Dearborn Heights?

15        A    It appears to be.

16        Q    All right.  And if we take a look at what is

17    section 3.1, which is the salary and compensation

18    portion of the contract, do you see that?

19        A    I do.

20        Q    Okay.  It indicates that $90,000 was your

21    salary -- or $90,000 per year was your annual salary;

22    is that correct?

23        A    Correct.

24        Q    Okay.  And we discussed earlier you did

25    receive, over the course of that first year, your
```

Page 57

1      $90,000?

2           A     Correct.

3           Q     Moving on to section 3.2, it discusses

4      benefits.  It discusses things like benefits to

5      include medical, dental, vision, life insurance in

6      addition to some other benefits.

7                I understand that you did not utilize the

8      city's medical, dental, and health -- medical, dental,

9      and vision insurance; is that correct?

10          A     Correct.

11          Q     All right.  Did you receive life insurance?

12          A     No.

13          Q     All right.  Did you receive a policy?

14          A     I don't recall receiving one.

15          Q     Okay.  Did you receive the opportunity to

16     take part in a life insurance policy with the city?

17          A     I don't recall.

18          Q     All right.  In 3.3 -- strike that.

19               Were there ever any benefits that you

20     understood that you were entitled to during the term

21     of this contract that you did not receive?

22          A     I don't understand the question.

23          Q     Okay.  The term of this contract, if we look

24     at 1.1, is January 9 of '23 through June 30th of '25;

25     is that correct?

Page 58

1        A    Yes.

2        Q    Okay.  You did have subsequent contracts to

3    this particular contract that were entered into prior

4    to June 30th of 2025; is that correct?

5        A    Yes.

6        Q    Okay.  While operating under the term of the

7    contract that's before you that's listed as Exhibit 1,

8    were there ever any benefits that you believed you

9    were entitled to under this contract that you did not

10   receive?

11       A    No.

12       Q    Okay.  Section 3.3 indicates that there is a

13   uniform allowance that you would -- the employee will

14   be paid $2,000 annual stipend for the purpose of

15   maintaining a set of uniforms.  Did you receive the

16   $2,000?

17       A    I did.

18       Q    All right.  Did you receive -- did you

19   utilize those for uniforms?

20       A    I did.

21       Q    All right.  As director of support services,

22   when you first began that position, you indicated that

23   there were a number of departments that you oversaw.

24       A    Correct.

25       Q    Is that correct?

Page 59

1        A     Yes.

2        Q     Did you meet regularly with those

3   departments?

4        A     I did.

5        Q     Okay.  How often did you meet with them?

6        A     Daily.

7        Q     All right.  Did you have standing meetings

8   with those departments or the department heads?

9        A     Not a standing meeting, but I would meet on

10  various issues.

11       Q     All right.  Was it issue-specific, or were

12  there ever just team meetings or overall meetings?

13       A     Both.

14       Q     So for purposes of the non-issue specific

15  meetings, did you have -- were they like status

16  meetings, or did you have set schedule or set agendas

17  for those types of meetings?

18       A     It depends.

19       Q     When you met with the teams or the

20  departments, was it the entire department, or did you

21  meet with just department heads or mix or both?

22       A     Both.

23       Q     How often did you meet with Chief Hart for,

24  like, status meetings or agenda-type meetings?

25       A     He had a weekly staff meeting, but I would

Page 60

1   talk to him continuous throughout the day.

2        Q    Were you responsible for creating processes

3   and procedures for the departments that you oversaw?

4        A    Yes.

5        Q    All right.  Did you ever create processes

6   and procedures for those departments?

7        A    Yes.

8        Q    Was that a regular type of -- strike that.

9             Were you continuously updating processes or

10  procedures, or were you amending them completely?

11  What was the format of your creating --

12       A    Depending on what the --

13             MR. BROWN:  Object to form.

14             You can answer.

15             THE WITNESS:  Depending on what the

16  subject was.

17  BY MS. HUNT:

18       Q    Okay.  And we'll get back to that in a

19  second.  I'm going to hand to you another contract

20  that I'm going to have admitted as Exhibit 2.

21             (Exhibit 2 was marked for

22             identification.)

23             And are you familiar with this contract?

24       A    I am familiar with it.

25       Q    Okay.  This contract has a term of July 1,

```
                                          Page 61
 1   2023, through June 30th of 2023.  That's in 1.1.  Do
 2   you see that?
 3                MR. BROWN:  I think you misstated that,
 4   Monica.
 5   BY MS. HUNT:
 6      Q    I'm sorry.  July 1, 2023, through June 30,
 7   2026.  That's in 1.1.  Do you see that?
 8      A    I do.
 9      Q    Okay.  The term -- the commencement date of
10   this particular contract is approximately six months
11   after you began your employment with the City of
12   Dearborn Heights; is that correct?
13      A    Correct.
14      Q    What was the purpose of this updated
15   contract?
16      A    They adjusted some of the terms.
17      Q    Okay.  Compensation was adjusted; is that
18   correct?
19      A    Yes.
20      Q    Okay.  In 3.1, it indicates that you were
21   set to receive $117,220 per year.  Do you see that?
22      A    I do.
23      Q    Okay.  And did you -- this contract is dated
24   December 20, 2023; is that correct?
25      A    No.
```

```
                                             Page 62

1        Q    I'm sorry.  December 12, 2023?

2        A    It is.

3        Q    Is that correct?  Thank you.

4        A    That is correct.

5        Q    All right.  And 3.1 indicates that this

6   contract was effective July 1, 2023.  That's stated in

7   3.1; correct?

8        A    Correct.

9        Q    Did you receive retroactive payment for the

10  six months or six or so months from the time that you

11  signed this contract back to the July 1st date?

12       A    I believe I did.

13       Q    Okay.  Do you recall if you received one

14  payment, or was it a payment over time?

15       A    I don't recall.

16       Q    Okay.  But you did receive the retroactive

17  payment?

18       A    I did.

19       Q    Okay.  And did you receive, over the course

20  of the year that this contract was in effect, the one

21  $117,220 that's listed -- minus deductions, of course,

22  that's listed in this section of the contract?

23       A    Prorated for the amount of time of the

24  contract?

25       Q    Correct.
```

Page 63

1          A     Correct.

2          Q     All right.  Section 3.3 indicates that the

3     employee will be paid 2 percent of base salary as

4     annual stipend for purposes of maintaining a set of

5     uniforms.

6                Did you receive that 2 percent?

7          A     I did.

8          Q     All right.  Were there any benefits under

9     this contract that you believe that you were entitled

10    to that you did not receive?

11         A     Can you rephrase that?

12         Q     Sure.  Well, let's take a look at 3.2.  That

13    indicates the benefits that you are -- would be

14    entitled to or that are available to you.  Do you see

15    that?

16         A     I do.

17         Q     Okay.  And we've already discussed your

18    receiving medical, dental, vision elsewhere; is that

19    correct?

20         A     Correct.

21         Q     All right.  With regards to the benefits

22    that are listed in 3.2, are there any benefits that

23    you believe that you were entitled to that you did not

24    receive?

25         A     I received everything.

Page 64

1      Q    Okay.  So it appears, in less than a year of

2    your employment with the City of Dearborn Heights, you

3    received approximately a $27,000 pay raise, which was

4    retroactive to six months prior to you signing this

5    contract?

6      A    Correct.

7      Q    Is that correct?

8      A    Yes.

9      Q    Okay.  And who did you -- strike that.

10         Did you request the pay raise?

11     A    No.

12     Q    Okay.  Who offered you the pay raise?

13     A    It came when the city negotiated a new

14   contract with the police union.

15     Q    Were you a member of the police union?

16     A    No.

17     Q    Were you governed by the CBA?

18     A    No.

19     Q    Do you know if your position or your name

20   was referenced in any of the CBAs associated with the

21   police department?

22              MR. BROWN:  I'm going to object to

23   form.

24   BY MS. HUNT:

25     Q    Do you understand the question?

Page 65

```
 1        A     Yes.
 2        Q     Okay.  Is that a yes that you knew that your
 3   name or your position or --
 4        A     I understand the question.
 5        Q     Okay.  So can you answer the question?
 6                    THE WITNESS:  Joe?
 7                    MR. BROWN:  Go ahead.
 8                    THE WITNESS:  Okay.
 9                    Yes, I was mentioned in a CBA.
10   BY MS. HUNT:
11        Q     Okay.  Was it your name or your title that
12   was listed?
13        A     Thought by name.
14        Q     Okay.  Do you know why you were listed in
15   the CBA?
16                    MR. BROWN:  Objection to form.
17                    Answer.
18                    THE WITNESS:  It was put into the
19   command union contract.  I believe myself, Swope, and
20   Hart was put in.
21   BY MS. HUNT:
22        Q     Okay.  Was it your understanding that you
23   were a part of the bargaining unit?
24                    MR. BROWN:  Objection to form.  Calls
25   for a legal conclusion from a lay witness.
```

Page 66

```
 1   BY MS. HUNT:
 2        Q    Right.  I'll clarify the question for you.
 3        A    Okay.
 4        Q    Was it your understanding that you received
 5   the benefits of the bargaining unit?
 6                   MR. BROWN:  Same objection.
 7                   MS. HUNT:  You can answer.
 8                   MR. BROWN:  Yeah.  As a standing
 9   matter, every time I object, I'll object.  Unless I
10   specifically tell you not to answer and after I'm done
11   objecting, then you can go ahead and answer.
12                   THE WITNESS:  Okay.
13                   Can you ask the question again?
14   BY MS. HUNT:
15        Q    Sure.  Was it your understanding that since
16   your name was placed within the CBA that you received
17   the benefits of being a part of the bargaining unit of
18   the union that was subject to that CBA?
19        A    No, that is not my --
20                   MR. BROWN:  Same objection.
21                   Go ahead.
22                   THE WITNESS:  That is -- that was not
23   my understanding.
24   BY MS. HUNT:
25        Q    Okay.  Were there any other individuals
```

Page 67

```
 1   listed by name within the CBA that you -- what you
 2   indicate Chief Hart and Chief -- Mr. Swope were --
 3   strike that.
 4            Was there any other individuals listed by
 5   name other than you, Chief Hart, and Mr. Swope within
 6   the CBA that you were listed in?
 7            MR. BROWN:  I'm going to object as
 8   vague.  Confusing.
 9   BY MS. HUNT:
10       Q    Do you understand the question?
11       A    No.  Can you rephrase?
12       Q    Sure.  You indicated that you, Chief Hart,
13   and Mr. Swope were listed by name within the CBA; is
14   that correct?
15       A    Correct.
16       Q    Were there any other individuals listed in
17   the manner that you were listed in the CBA?
18       A    I don't recall.
19       Q    All right.  Did you read the CBA?
20       A    Yes.
21       Q    All right.  And I'm sorry if I asked.  Do
22   you recall why you were placed by name in the CBA?
23            MR. BROWN:  Same objection.  Calls for
24   a legal conclusion from a lay witness.
25            THE WITNESS:  I don't know why they did
```

Page 68

```
 1   that.
 2   BY MS. HUNT:
 3       Q    Okay.  But you did receive the benefits of
 4   the employees governed under that CBA?
 5                 MR. BROWN:  Same objection.  Also
 6   vague, ambiguous.
 7   BY MS. HUNT:
 8       Q    Is that correct?
 9       A    I received benefit based on this contract
10   that I'm holding in my hand marked 2.
11       Q    And is it your understanding that the
12   contract marked as Exhibit 2 mirrors the compensation
13   that's listed within the CBA for the employees
14   governed by that particular CBA?
15                 MR. MIOTKE:  Objection.  Form.
16   Foundation.
17   BY MS. HUNT:
18       Q    Do you understand the question?
19       A    I have no idea what I'm being asked right
20   now.
21       Q    Okay.  So you indicated that you were paid
22   pursuant to your contract; is that correct?
23       A    Agreed.
24       Q    All right.  Is it your understanding that
25   the compensation terms of your contract mirrors those
```

Page 69

1    that were within the CBA in which your name was

2    listed?

3                  MR. BROWN:  I'm object to form.  Calls

4    for a legal conclusion from a lay witness.

5                  MR. MIOTKE:  And I'm going to object to

6    form and foundation.

7                  Go ahead.

8    BY MS. HUNT:

9        Q    Do you understand the question?

10       A    Yes.  I don't believe -- I don't think I can

11   answer that.  I can -- that one is connected to the

12   other.

13                  I don't have that knowledge.

14       Q    Okay.  So you don't know?

15       A    That's a fair statement, yes.

16       Q    Okay.  All right.  Just so that we get all

17   of your contracts out of the way, I'm going to share

18   with you what is Exhibit 3.

19                  (Exhibit 3 was marked for

20                  identification.)

21                  THE WITNESS:  Marking that with a V?

22                  MR. BROWN:  V for Vanderplow.

23                  THE WITNESS:  Okay.  Okay.

24   BY MS. HUNT:

25       Q    And do you recognize this document that's

Page 70

1    before you marked as Exhibit 3?

2         A    I do.

3         Q    Okay.  And this contract was, if you turn to

4    the last page, dated January 2, 2025; is that correct?

5         A    It is.

6         Q    Do you recall signing this contract?

7         A    I do.

8         Q    All right.  And it appears, in this

9    contract, if we look at 3.1, there is a compensation

10   that remains at $117,220; is that correct?

11        A    That's correct.

12        Q    All right.  What was the purpose of you

13   signing this new contract?

14        A    The mayor wanted to extend the term.

15        Q    Okay.  And the term extends to January 1st

16   of 2027?

17        A    Correct.

18        Q    All right.  Was there any changes in the

19   duties or responsibilities provided to you under this

20   contract?

21        A    Under the contract, no.

22        Q    Okay.  Looking back at Exhibit 2, I

23   understand that there was an increase in salary, which

24   you state is based off of -- negotiated with the

25   unions, that's similar to those that were negotiated

Page 71

```
 1  with the unions.  Was there any change in your
 2  responsibilities or duties in that contract?
 3                  MR. BROWN:  I'm going to object to form
 4  as a -- sorry.  Assumes facts not in evidence.
 5                  You can answer.
 6                  THE WITNESS:  No additional duties were
 7  augmented with the new contract.
 8  BY MS. HUNT:
 9      Q    Okay.  Was it your understanding that this
10  January of '25 contracts simply extended the term of
11  your contract?
12      Q    Yes.
13      Q    All right.  Did you receive, under this new
14  contract, all of the benefits that you believe you
15  were entitled to as listed within the contract?
16      A    No.
17      Q    All right.  What did you not receive?
18      A    The amounts you told them not to pay me.
19      Q    The amount that I've told them not to pay
20  you?
21      A    Yes, ma'am.
22      Q    Okay.  And what amounts are those?
23      A    Anything that was due and owing to me upon
24  termination of my employment.
25      Q    And what amounts do you believe that to be?
```

Page 72

1    A    Everything remaining on the contract balance
2   of the time remaining.
3              MR. BROWN:  So, Monica, if you could
4   clarify, when you use the phrase "benefits," I want to
5   make sure you're using it the way we use the phrase
6   "benefits," which would include severance.  Are you
7   including severance in benefits?
8              MS. HUNT:  Well, I'm using benefits
9   that are encompassed in this particular contract under
10  3.1.  I believe the others were 3.2 or 3.3.
11             MR. BROWN:  So we're talking now just
12  about 3.1 benefits and not the severance, which is
13  under 4.1; is that right?
14             MS. HUNT:  Correct.  If we are looking
15  at the January of '25 contract, I am talking about
16  3.1.
17             MR. BROWN:  All right.  Thank you.
18  BY MS. HUNT:
19    Q    So, Mr. Vanderplow, you've indicated, when
20  we first started this deposition, that you received
21  the paycheck, albeit late, the paycheck that -- your
22  last paycheck that you did in fact work for that you
23  would be compensated for; is that correct?
24    A    Correct.
25    Q    Okay.  In your position as director of

Page 73

```
 1   support services, did you supervise Mr. Swope?
 2        A    No.
 3        Q    How did your position as director -- what
 4   was the relationship between your position as director
 5   and Mr. Swope's position as director of police
 6   operations?
 7        A    We were equal.
 8        Q    Okay.  Did you work together on issues?
 9        A    Yes.
10        Q    Now, as I understand it, Mr. Swope, in his
11   position, dealt with a lot of police investigations,
12   internal investigations, as well as investigations
13   brought to his team by the public.  Is that a fair
14   statement?
15        A    It is.
16        Q    Okay.  Did your team conduct any
17   investigations?
18        A    Do you want to get that?
19        Q    It's my Apple phone is going to always --
20        A    Okay.  I'm sorry.  Can you say the question
21   again?
22        Q    Sure.  Did your team ever conduct
23   investigations?
24        A    The investigations division did, yes.
25        Q    Okay.  And how many employees did the
```

Page 74

1    investigation division consist of?

2         A    It depends on what time frame, ma'am.

3         Q    Okay.  When you first started, was there an

4    investigation division?

5         A    Yes.

6         Q    Okay.  How many employees were there?

7         A    I think six.

8         Q    Okay.  What type of positions did that

9    encompass?  Was it police officers, civilians,

10   administration?

11        A    It was detective sergeants and one

12   lieutenant.

13        Q    So how many detectives were there?

14        A    I think six, which would make seven total,

15   give or take.

16        Q    Okay.  Okay.  So there were six detectives,

17   a sergeant, and a lieutenant?  That would be eight.

18   So --

19        A    No, ma'am.  All the detectives were

20   sergeants.  And one lieutenant.

21        Q    Okay.  And one lieutenant.  Okay.  What

22   about when you ended your position as director of

23   support services, how many employees were within the

24   investigation division?

25        A    Six or seven.

Page 75

1      Q    Was it the same makeup, primarily
2   detectives?
3      A    No.  No, it was not the same makeup.
4      Q    Okay.  And what was the makeup?
5      A    There were -- well, so I beg your pardon.
6   There were four detective sergeants, two officer
7   detectives, possibly three -- I would like a org chart
8   in front of me to be certain -- and then two
9   investigative aides, support aides.  Yeah.  And
10  whatever that totals to.
11     Q    Okay.  Okay.  When did you end your position
12  as director of support services?
13     A    May 9, 2025.
14     Q    At some point you began operating as the
15  interim comptroller; is that correct?
16     A    That's correct.
17     Q    Okay.  As interim comptroller, did you still
18  operate as director of support services?
19     A    I dual roled, yes.
20     Q    Dual roled.  All right.  Did you split your
21  time between the two positions?
22     A    Yes.
23     Q    Did you receive a new contract for your
24  position as interim comptroller?
25     A    I did not.

Page 76

1          Q    So you continued to be paid the annual

2     salary spread out prorated over the year of 117,000

3     and some odd dollars for your time when you worked as

4     interim comptroller as well; is that correct?

5          A    That's correct.

6          Q    Okay.  Did you receive any additional

7     compensation at all during that time?

8          A    I did not.  The answer was I did not.  I

9     don't think I spoke up.

10         Q    Did you ever receive any bonuses when you

11    were working with the City of Dearborn Heights?

12         A    No.

13         Q    Now, during -- strike that.

14              From January of 2023 through May of 2025,

15    there appears to be a slight change in the makeup of

16    the investigative unit.  During that time, was there a

17    fluctuation of people coming and going?  Or was there

18    a process that changed the makeup of the investigative

19    unit?

20                   MR. BROWN:  I'm going to object as

21    compound and confusing.

22    BY MS. HUNT:

23         Q    Do you understand the question?

24         A    I do not.

25         Q    Okay.  Did you ever make any policy or

Page 77

1    procedural changes as to who or how many individuals

2    would sit on the investigative unit?

3          A     We did.

4          Q     Okay.  Was that a policy that was made?

5          A     I don't think "policy" is the right word.

6          Q     Okay.  Was there a written document that

7    discussed how the makeup of the investigative unit

8    would look?

9          A     Yes.

10         Q     Okay.  Did you create that document?

11         A     I believe I created parts of it.  It was a

12   team effort.

13         Q     What was the purpose for the change?

14         A     The chief's desire to reorganize the

15   department into a more efficient and updated

16   department.

17         Q     Okay.  Do you recall when that change was

18   made?

19         A     I don't.

20         Q     Was it toward the beginning or when you

21   first started with the department or more toward the

22   end?

23         A     It was neither for what you just asked me.

24         Q     All right.  So somewhere in the middle?

25         A     Yes, ma'am.

Page 78

```
 1        Q    All right.  When you left in May of 2025,
 2   did you take anything with you from the police
 3   department?
 4        A    I don't understand the question.
 5        Q    Did you take any weapons with you?
 6        A    No.
 7        Q    Okay.  Did you take any documents with you?
 8        A    I had my work files.
 9        Q    Okay.  What did your work files consist of?
10        A    I don't recall off the top of my head.
11        Q    Okay.  Do you know approximately how many
12   files you took?
13        A    "Take" isn't the right word.
14        Q    Okay.  You carried them out with you?
15        A    No, ma'am.
16        Q    Okay.  How did you -- you just indicated
17   that you had your work files; correct?
18        A    Correct.
19        Q    Did those leave -- when you left the City of
20   Dearborn Heights, were those work files or those files
21   that you took along with you when you left on your
22   very last day?
23        A    Well, I have electronic copies of things I
24   made.  But most of them were left in hard copies in my
25   office.
```

Page 79

```
 1        Q    Okay.  All right.  So when you say
 2   electronic copies, electronic copies of what types of
 3   documents?
 4        A    Financial schedules of projects, other
 5   projects I worked on.
 6        Q    Did you put these documents on a flash drive
 7   and take them with you, or did you email them to
 8   yourself?
 9        A    I think mostly on a drive.
10        Q    Okay.  Did you ever take with you any
11   investigative reports?
12        A    I'm sure I have copies of some, yes.
13        Q    Would those be on the drive as well?
14        A    I would assume.
15        Q    The procedures that we discussed, would
16   those be on that drive as well or electronically with
17   you?
18        A    I would assume working copy, sure.
19        Q    You say working copy.  Are final drafts on
20   there?
21        A    I have no idea.  I would have to look.
22        Q    When was the last time you looked at that
23   file or the electronic drive?
24        A    May 9, 2025.
25        Q    The documents that are on the drive that you
```

Page 80

1    just indicated that you had, did you download all of

2    that information on May 9th, or was it over the course

3    of your employment you just started saving to a drive?

4         A    It was through the course of my employment.

5         Q    Okay.  While with the City of Dearborn

6    Heights, did you have your own office?

7         A    I did.

8         Q    Okay.  Did you have a safe in that office?

9         A    I did.

10        Q    All right.  Did you utilize the safe?

11        A    I did.

12        Q    What did you keep in the safe?

13        A    Various items that were obviously sensitive.

14        Q    All right.  What type of items would that

15   be?

16        A    I would receive reports on employees.  I had

17   a couple of internal affairs issues I kept in there.

18   When employees left and they would turn in their

19   weapons, I would lock them up temporarily until I can

20   get them down to the vault.

21        Q    When you left, did you take anything out of

22   the safe?

23        A    No.

24        Q    When you left, do you know what was in the

25   safe?

Page 81

1        A     A couple files, I believe.

2        Q     Do you know which files?

3        A     No, I don't.

4        Q     Were there any weapons in the safe?

5        A     No.  I turned all those in, made sure they

6   got down to the vault.

7        Q     During your time with the City of Dearborn

8   Heights, did you carry a weapon?

9        A     Oh, yes.

10       Q     Now, I understand you were in as a civilian

11  employee; is that correct?

12       A     Yes.

13       Q     All right.  Did you -- do you have a license

14  to carry?

15       A     I do.

16       Q     Okay.  Are you carrying today?  It's fine if

17  you are; we just like to know.

18       A     [No audible answer.]

19              MR. BROWN:  Hart had his packed on his

20  chest.

21  BY MS. HUNT:

22       Q     I would take your silence as a yes.  Okay.

23  That's fine.  Do you typically carry your weapon with

24  you wherever you go?

25       A     I do.

Page 82

1      Q    Okay.  Do you -- when you were with the City
2    of Dearborn Heights, did you have a vehicle assigned
3    to you?
4      A    I did.
5      Q    All right.  Was it equipped with a siren?
6      A    Yes.
7      Q    Did it -- was it equipped with lights?
8      A    Oh, yeah.
9      Q    As a civilian employee, did you have the
10   authority to utilize the lights and -- well, I'll
11   start with lights.
12               MR. BROWN:  I'm going to object because
13   it calls for a legal conclusion from a lay witness.
14               You can answer.
15               THE WITNESS:  I did use them on
16   traffic, yes.
17   BY MS. HUNT:
18     Q    All right.  When you say on traffic, what do
19   you mean?
20     A    I used my vehicle as a blocking vehicle to
21   protect officers on scene.
22     Q    Okay.  Did you ever engage in chases?
23     A    No.
24     Q    Okay.  Did you ever engage in traffic stops?
25     A    No.

Page 83

1      Q    Okay.  Did you -- I just asked about lights.

2   Did you ever utilize your siren?

3      A    Sure.

4      Q    Okay.  And when would you utilize the siren?

5      A    On traffic.

6      Q    That's for protecting police officers at

7   scenes as well?

8      A    Correct.

9      Q    Did you ever utilize your lights and sirens

10  for any other purpose?

11     A    No.

12     Q    The weapon that you carried when you were a

13  civilian employee, was that a weapon that you yourself

14  purchased, or was it provided by the department?

15     A    It's my weapon.

16     Q    Okay.  Did you ever brandish that during the

17  course of your employment with the City of Dearborn

18  Heights?

19     A    I don't understand "brandish."

20     Q    Did you ever pull out your weapon during the

21  course of your employment with the City of Dearborn

22  Heights while at work or operating as either the

23  director of support services or interim comptroller?

24     A    I gave demonstrations.

25     Q    Okay.  Did you ever pull it out other than

Page 84

1    for demonstrations?

2         A     No, not that I recall.

3         Q     All right.  You never tried to make arrests

4    with it?

5         A     No.

6                    MS. HUNT:  All right.  All right.  So I

7    think we've killed enough trees with this one alone,

8    but I'll give some more.

9                    I will give that to the two of you.

10                   MR. BROWN:  One for you, one for me.

11   V4.

12                   MS. HUNT:  I think we're going to have

13   to give the --

14                   MR. BROWN:  V4.

15                   MR. TURFE:  Is that the complaint?

16                   MR. BROWN:  Yes.

17                   MS. HUNT:  This is the complaint.

18                   MR. TURFE:  I got it already.

19                   MS. HUNT:  You have it?  Do you have

20   it?

21                   MR. MIOTKE:  The complaint or the --

22                   MS. HUNT:  The complaint.

23                   MR. MIOTKE:  I did not bring it.

24                   MR. TURFE:  This is unmarked, so you

25   can mark it.

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                www.veritext.com

Page 85

1                    MR. MIOTKE:  Oh, so this is the same?
2                    MR. TURFE:  Yes.
3                    MR. MIOTKE:  Okay.
4                    MS. HUNT:  This is 4.
5                    MR. MIOTKE:  This must be from
6      yesterday's.
7                    MR. BROWN:  Yeah.
8                    MR. TURFE:  This is from yesterday.
9                    MR. MIOTKE:  Okay.  All right.  Yeah,
10     then I don't need a copy.
11                   MS. HUNT:  So this is Exhibit 4, but
12     was marked yesterday as Exhibit 3.
13                       (Exhibit 4 was marked for
14                       identification.)
15                   MR. BROWN:  Correct.
16                   MR. MIOTKE:  The first amended
17     complaint?
18                   MR. BROWN:  Correct.  ECF number 48.
19                   MS. HUNT:  All right.  I, for some
20     reason, do not have my copy.  Oh, yes.  I'll give it
21     to you.  I found my copy.  Here.
22     BY MS. HUNT:
23          Q    All right.  Mr. Vanderplow, this is an
24     amended complaint that was filed by your attorney on
25     your behalf.  It amends the original complaint that

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                      586-468-2411
                                                      www.veritext.com

Page 86

```
 1   was filed in this case.  Were you aware that there was

 2   an amended complaint filed in this case?

 3        A    I was.

 4        Q    Okay.  Did you have an opportunity to review

 5   the amended complaint prior to it being filed?

 6        A    Prior?  I believe so, yes.

 7        Q    Okay.  Do you -- are you aware of the claims

 8   that were made within the complaint?

 9        A    I do.

10        Q    Okay.  All right.  Now, part of the claims

11   that were made were that -- or I should say some of

12   the statements that were made in the complaint were

13   that there were some reports that were made to

14   higher-level agencies or independent agencies such as

15   the AG's Office, the FBI.  Are you familiar with that?

16               MR. BROWN:  I'm going to object as

17   misleading and best evidence.

18               You can answer.

19               THE WITNESS:  Am I aware were they

20   contacted?

21   BY MS. HUNT:

22        Q    Are you aware that those allegations are

23   made within your complaint?

24        A    Yes.

25        Q    Okay.  If we can turn to page number 4 of
```

Page 87

1    Exhibit 4.

2         A    Page number 4 Of Exhibit 4?

3              MR. BROWN:  Yeah.  No, this is Exhibit

4    4.

5              THE WITNESS:  Oh, okay.

6    BY MS. HUNT:

7         Q    All right.  And looking at paragraph 20, it

8    states "Beginning in January 2023, Plaintiffs

9    collectively reported violations and suspected

10   violations of law concerning corruption in the city

11   government, corruption in DHPD, civil rights

12   violations to the Dearborn Heights through its mayor

13   and city council to Michigan State Police, the U.S.

14   Department of Justice, and the Federal Bureau of

15   Investigations."  Do you see that?

16        A    I do.

17        Q    Okay.  You began working with -- in the City

18   of Dearborn Heights in January of 2023; is that

19   correct?

20        A    Correct.

21        Q    All right.  Did you yourself make any

22   complaints to the agencies or entities listed here in

23   January of 2023?

24        A    Not in January of 2023.

25        Q    Okay.  All right.  Are you aware of any

Page 88

1    complaints or reported suspected violations that were

2    reported to the agencies and organizations listed in

3    paragraph 20 in the month of January of the year 2023?

4         A    Yes.

5         Q    Okay.  Who made those reports?

6         A    Jerrod Hart.

7         Q    All right.  Do you know what those reports

8    were?

9         A    Not specifically.

10        Q    Okay.  Do you know who he made reports to?

11        A    I don't recall the names.

12        Q    Okay.  Do you recall why reports were made?

13        A    Yes.

14        Q    Okay.  And what were those reports?  Or why

15   were those reports made?

16        A    Because the activity described was in

17   violation of various federal state laws.

18        Q    So in January of 2023, were the reports made

19   a -- were they complaints or were they notifications

20   of the issues that you discussed?

21                  MR. MIOTKE:  Objection to form.

22                  MR. BROWN:  Same objection.  Vague,

23   ambiguous.

24   BY MS. HUNT:

25        Q    Do you understand the question?

Page 89

1          A     No.

2          Q     Do you want me to rephrase?  Okay.  You

3     indicated that Chief Hart made some reports in January

4     of 2023.

5          A     Correct.

6          Q     Is that correct?

7          A     Correct.

8          Q     Is it your understanding that the reports

9     that he made, were they complaints to these agencies,

10    or were they notifications that particular issues or

11    instances had arisen?

12                    MR. BROWN:  Same objection.

13                    THE WITNESS:  I don't know what the

14    difference is in your wording.

15    BY MS. HUNT:

16         Q     Okay.  Was this a -- Chief Hart's reporting,

17    was it a -- making someone aware of the issue or was

18    it a request for investigation or rehabilitation?

19         A     I can categorize it as both, I believe.

20         Q     Okay.  Now, you mentioned -- you just

21    responded that this was -- he was reporting the issues

22    listed.  Now, the paragraph 20 states that there were

23    violations of law concerning corruption.  What was the

24    corruption that was of concern in the report?

25                    MR. BROWN:  I'm going to object to

Page 90

1    form.

2                 THE WITNESS:  I don't recall at this

3    time.

4    BY MS. HUNT:

5        Q    Okay.  Do you recall ever seeing a report or

6    results of the investigation or if any -- strike that.

7             Do you know if any of the agencies that the

8    reports were made to conducted an investigation as it

9    relates to the corruption?

10       A    I have no knowledge.

11       Q    Okay.  Do you know if there was a report or

12   a final result of any investigation or -- with regards

13   to the report or the reporting that was made?

14       A    I have no knowledge.

15       Q    Okay.  It also indicates that there were

16   civil rights violations within the City of Dearborn

17   Heights.  Were you aware of any civil rights

18   violations that were reported by Chief Hart in January

19   of '23?

20       A    There were reports.  What they were, I

21   don't -- I don't know.

22       Q    Okay.  Do you know if there were -- was

23   there an investigation done by any of the agencies

24   which the reports were made to?

25       A    You would have to ask them.

Page 91

1      Q    Okay.  You don't know?

2      A    I don't know.

3      Q    Okay.  Do you know if there was any report

4    reflecting the results of any interviews or

5    investigations made as a part of the civil rights

6    violations reported in January of '23 by Hart?

7      A    I thought one just finalized with Ahmad

8    Mazloum, who's now a sergeant.  I thought I heard that

9    finalized out.  That's the one I can recall off the

10   top of my head.

11     Q    Okay.  Was that a report made by Chief Hart

12   in January of '23 regarding Mazloum?

13     A    I thought it was.  Unfortunately, it all

14   kind of runs together.

15     Q    Okay.  And you say you thought you heard

16   that it just finalized.  Was this -- did you hear this

17   after you left the City of Dearborn Heights?

18     A    I don't recall.

19     Q    Okay.  Did you ever see a report regarding

20   the finalization of any investigation with Ahmad

21   Mazloum?

22     A    I did not see a report, no.

23     Q    Okay.  And do you recall the rank of Mr.

24   Mazloum?

25     A    At which time?

Page 92

```
 1        Q    Was he employed with the City of Dearborn
 2   Heights when you left?
 3        A    Yes.
 4        Q    Okay.  What was his rank when you left?
 5        A    Sergeant.
 6        Q    Okay.  What about when you started?
 7        A    Officer.
 8        Q    Switching to the next page and looking at
 9   22, it states "In or around January of 2023,
10   Plaintiffs reported that the chain of custody for
11   evidence and the evidence management system within
12   DHPD were so deficient as to jeopardize the right to a
13   fair trial for every criminal defendant whose case
14   relied on evidence retained by DHPD."
15             Do you see that?
16        A    I do.
17        Q    All right.  In January of 2023, did you
18   report any chain of custody issues?
19        A    Yes.
20        Q    Okay.  Who did you report the chain of
21   custody issues to?
22        A    Jerrod Hart.
23        Q    What did you report to him?
24        A    That the evidence vault was a cataclysmic
25   failure.
```

Page 93

1      Q      Who is responsible for the evidence fault?

2      A      That was part of the problem.  I don't know.

3      Q      Okay.  So you reported that you believed

4  that the evidence fault was a failure.  Did you put

5  this to him, like, in a memorandum, or was it during

6  the course of a meeting that you had a discussion with

7  him?

8      A      It was definitely in a meeting.  I believe I

9  wrote an email to him outlining my concerns.  I don't

10  think I did a report on that.  I think I did it on an

11  email because it was so exigent.

12      Q      Okay.  Did you report this to anyone else

13  other than Chief Hart?

14      A      Yes.

15      Q      Who?

16      A      The FBI.

17      Q      All right.  When did you report it to the

18  FBI?

19      A      I don't recall the actual time.

20      Q      Okay.  Was it in January of 2023?

21      A      I believe so, yes.  Might -- to be clear, it

22  might have been a week or two after that.  The time

23  frame, let's call it within my first nine weeks.

24      Q      Okay.  When you say a week or two after

25  that, was it a week or two after January or a week or

```
                                                  Page 94
 1    two after you reported it to Hart?
 2        A      January.
 3        Q      Okay.  So January or February, you reported
 4    it to the FBI?
 5        A      That is fair.
 6        Q      Okay.  How did you report it to the FBI?
 7        A      I spoke to an agent.
 8        Q      Do you recall the name of the agent?
 9        A      I don't.
10        Q      Did you speak to this agent by phone?
11        A      Yes.
12        Q      Okay.  Did call the FBI to speak with this
13    agent?
14        A      I did.
15        Q      Okay.
16        A      One second.  As we were sitting here, I
17    recalled the name.
18        Q      Okay.  Can you tell me the name?
19        A      I can.  It's Agent Marquart.  No.  No,
20    I'm -- I'm close.  Marquart, M-A-R-Q-U-A-R-T, I
21    believe.  And I'm pulling that straight out of memory.
22        Q      Okay.  So the first name is Marquart?
23        A      No, that's the last name.  I -- I actually
24    don't recall the first name.
25        Q      Okay.  Okay.  But it begins within M-A-Q?
```

Page 95

```
 1       A    I believe so, yeah.

 2       Q    Okay.  Do you know what office this agent is

 3   located out of?

 4       A    Detroit.

 5       Q    Okay.  How did you come to speak with this

 6   agent?

 7       A    I called.

 8       Q    Okay.  You called this agent directly?

 9       A    I called the FBI.

10       Q    Okay.  And this is the agent you were

11   assigned to?

12       A    Yes.

13       Q    Or --

14       A    Given to.

15       Q    Okay.  Did you provide this agent with any

16   documents pertaining to the complaint that you were

17   making?

18       A    I don't believe so, no.

19       Q    All right.  Was this just a verbal complaint

20   that was made?

21       A    It was a discussion, yes.

22       Q    Okay.  Did you speak with this agent more

23   than once?

24       A    Yes.

25       Q    All right.  How often did you speak with
```

```
                                              Page 96
 1   this agent?
 2        A    I don't recall.
 3        Q    All right.  Did you speak with anyone else
 4   in the FBI pertaining to this issue of the chain of
 5   custody and evidence room?
 6        A    I don't recall.
 7        Q    All right.  Was there an investigation done
 8   by the FBI?
 9        A    I don't know.
10        Q    All right.  I understand that you spoke with
11   this agent a few times.  Do you know over a course of
12   what time period did you speak with this agent?
13        A    On and off for about a year.
14        Q    Over the course of the year, did they ever
15   come to the City of Dearborn Heights and take a look
16   in the evidence room?
17        A    No.
18        Q    So is it fair to say that it was just
19   discussions back and forth?
20        A    No, it -- after we had the audit done by the
21   outside agency, I think we talked then too and
22   discussed their findings.
23        Q    When you spoke with the agent at the FBI,
24   was this considered a matter that was open with them?
25        A    I don't know how they would classify that.
```

Page 97

1     Q     Okay.  Did they ever send you any

2  documentation pertaining to the conversations or the

3  complaint that you made?

4     A     No.

5     Q     All right.  And you indicated that there was

6  an outside agency that did an audit; is that correct?

7     A     There were two, yes.

8     Q     Okay.  What were those agencies?

9     A     I believe MSP, Michigan State Police, came

10 in before I was hired.  And then after I was hired, I

11 asked for an independent company to audit the vault.

12    Q     All right.  And what was the name of that

13 company?

14    A     I don't remember.

15    Q     But it was not a law enforcement agency?

16    A     It was not.

17    Q     Okay.  Was it a governmental agency?

18    A     No.

19    Q     Do you recall the cost of this third-party

20 agency coming in and doing the audit?

21    A     Top of my head, I thought 50,000 sound about

22 correct.

23    Q     Okay.  Did you have to get approval from the

24 council for this audit to take place?

25    A     I don't remember that flow, how that worked.

Page 98

1      Q     Do you know how long the audit with the

2   third party --

3      A     I thought they were there two or three

4   weeks.

5      Q     Was this specific to the chain of custody

6   issue and the evidence vault?

7      A     Yes.

8      Q     Did they provide a report after?

9      A     They did.

10     Q     Did you receive that report?

11     A     I did.

12     Q     Did you maintain a copy of that report?

13     A     Yes.

14     Q     All right.  Would that report be on the

15  thumb drive or the electronic drive that you indicated

16  you had with you?

17     A     I'm sure a copy, yeah.

18     Q     And again, after the -- I shouldn't say

19  again because it wasn't discussed today.  But I will

20  be requesting a copy of that drive following today's

21  deposition.

22             MR. MIOTKE:  And the intervening

23  defendant would expect it to be produced as part of

24  discovery and as a supplement to initial disclosures.

25             MR. BROWN:  As long as we're at it, the

Page 99

```
 1   plaintiffs will ask for the same document from the
 2   City of Dearborn Heights because it is actually a City
 3   of Dearborn Heights document which is maintained on
 4   their computer systems and has not been produced in
 5   the last year.
 6                  So we're all requesting it from each
 7   other.
 8                  MR. MIOTKE:  Yeah.  And I would request
 9   it from the city as well --
10                  MS. HUNT:  It's like the Superman
11   pointing at each other.
12                  MR. MIOTKE:  -- because obviously City
13   Council doesn't -- the city council doesn't have any
14   access to these either.
15                  MR. BROWN:  Gary, we all agree that
16   every party who receives a document in discovery in
17   this proceeding means that every other party gets that
18   document.  There's never a case in which I would
19   produce just one thing to Monica and another thing to
20   you.  You'll get everything she gets and vice versa.
21                  MR. MIOTKE:  Yeah.  But I mean that in
22   terms of what the city produces.  And as I stated
23   yesterday, that things should be produced by both the
24   city as the employer and the plaintiffs as parties to
25   this litigation.
```

```
                                          Page 100
```

1              I don't see that anyone specifically

2    has the burden.  If they have it, they should produce

3    it.  So enough, I think, probably said on that.

4              MR. BROWN:  I'm also told that the city

5    council actually has a copy of this report, that it

6    was actually produced to the city council and

7    discussed before the city council.  So they should

8    have that in their own records as well.

9              But I agree with you that regardless of

10   what people may have or not have, you shouldn't guess

11   that the other guy has it, and you should just produce

12   everything in your capacity that you have.

13             Which means, of course, that the city

14   council should also be producing this record back to

15   us because it apparently also has it in its own

16   vaults.

17             MR. MIOTKE:  Yeah.  The city council is

18   unaware of having such a document and will have to ask

19   your client some questions about why he would believe

20   this to be the case.

21             MS. HUNT:  Well, we will await that

22   question when I pass this along to Mr. Miotke.

23             Oh, you know what?  I'll ask you now.

24   BY MS. HUNT:

25        Q    Why do you believe the council has this

Page 101

1    particular audit report?

2                    MR. BROWN:  We can't talk now.

3    BY MS. HUNT:

4        Q    Oh, there's a question on the table.

5        A    Oh, I beg your pardon.

6        Q    That's fine.

7        A    A closed session was held.  And my question

8    is, am I allowed to talk about what happens in a

9    closed session?

10       Q    You are not.  Were you a party to -- a part

11   of the closed session?

12       A    I was.

13       Q    Okay.  And this document was a part of that

14   closed session?

15       A    I don't know how to answer that at this

16   point.

17       Q    I'm not going to ask you questions about

18   what was stated in the closed session --

19       A    Okay.

20       Q    -- because if that is the issue, then I will

21   move along.

22       A    It was discussed then.

23                    MS. HUNT:  Okay.  I'm just thinking if

24   they would actually have a habit if it was part of

25   closed session because typically those are returned.

Page 102

1    So discovery issue still an issue.  Yeah.

2              MR. MIOTKE:  It would either be

3    returned or it would be kept by the city clerk.

4              MS. HUNT:  Yeah.

5              MR. MIOTKE:  Not by the city council.

6              MS. HUNT:  So discovery is still an

7    issue with that.  So -- okay.

8    BY MS. HUNT:

9        Q    Moving along, the -- you indicated that MSP

10   also came in prior to your starting with the City of

11   Dearborn Heights.  Was that investigation -- strike

12   that.

13             Did they conduct an investigation?

14       A    They conducted an audit.

15       Q    An audit.  Okay.  Was that audit pertaining

16   to the chain of custody issue?

17       A    Yes.

18       Q    Okay.  Was it your understanding that Chief

19   Hart was aware of the chain of custody and evidence

20   management issue prior to your coming aboard?

21       A    Yes.

22       Q    Okay.  And it was him that brought in the

23   MSP?

24       A    It was either him or Dr. Thomas.  I can't

25   recall which one.

Page 103

```
 1        Q    Okay.  Had that audit concluded by the time
 2   you started?
 3        A    It had.
 4        Q    Okay.  Did you receive or ever see a copy of
 5   the audit report?
 6        A    I saw some notes, from my recollection.  I
 7   don't recall seeing a formal report like we did with
 8   the third-party company, but I saw some
 9   recommendations.
10        Q    Okay.  How did you see the recommendations?
11        A    They were -- it was -- I -- I literally
12   found it in a file in the -- in the commissioner's
13   desk when he passed.
14        Q    Was that before or after you received the
15   report from the third-party consultant?
16        A    Way before.
17        Q    Okay.  So you received the -- or found the
18   results of the MSP audit before the results were given
19   to you by the --
20        A    Yes.
21        Q    Okay.  Was there any effort to implement the
22   recommendations made by MSP?
23        A    Yes.
24        Q    All right.  When did those start?
25        A    I would assume as -- as soon as the chief
```

Page 104

1  heard from MSP.  That was before my time.

2      Q    Okay.  So you were not there when those

3  particular recommendations from MSP were attempted to

4  be implemented?

5      A    Correct.

6      Q    So you don't know what the chief did to try

7  to implement those?

8      A    I do not.

9      Q    Okay.  Did you yourself, as director of

10  support services, do anything to implement or attempt

11  to implement the result or the recommendations by MSP?

12      A    Yes.

13      Q    Okay.  What did you do?

14      A    I went for a initial tour of the vault,

15  which I was actually not allowed to do for my first

16  three days there.  Then after ordering Captain

17  Erickson to let me in, I was aghast by what I saw.

18      Q    Okay.  So you toured the vault?

19      A    Yes.

20      Q    Did you do anything else to try to implement

21  the recommendations by MSP?

22      A    Oh, yeah.  After I toured that mess, we

23  started putting in policies and procedures and

24  corrective actions of which the employee who is

25  responsible failed miserably.

Page 105

1          Q     Okay.  Let's start with the policies and
2     procedures.  Did you amend or draft new policies and
3     procedures?
4          A     I don't think we had to amend or draft.  We
5     just had to actually follow them.
6          Q     Okay.  Did you have any training or meetings
7     about following the policies and procedures?
8          A     Yes.
9          Q     Who did you have those meetings or trainings
10    with?
11         A     Chris Pellerito.
12         Q     Okay.  Who is Chris Pellerito?
13         A     He was the one-time keeper of the vault.
14         Q     Okay.  Now, you mentioned earlier that
15    Erickson would not let you in?
16         A     Correct.
17         Q     You had to order him or her to let you in?
18         A     It's a him.
19         Q     Him.  Did Erickson -- officer, sergeant?
20         A     I think he was a captain at the time.
21         Q     Captain Erickson.  Did Captain Erickson
22    oversee the vault or have any management
23    responsibilities over the vault?
24         A     It was my understanding that he kind of had
25    management of it.  It was always kind of hard to tell

```
                                          Page 106
 1   who was actually running what, but he actually had a

 2   physical key that I didn't have at the time.

 3        Q    Okay.  Did you ever come to get a copy of

 4   that key?

 5        A    I did.

 6        Q    Okay.  Now, you mentioned in your words that

 7   someone failed miserably at maintaining that the

 8   vault.  Who was that person?

 9        A    Any number of people working there at the

10   time.

11        Q    All right.  So you indicated that you had --

12   that you met with Chris Pellerito?

13        A    Correct.

14        Q    Did you meet with anyone else?

15        A    Lieutenant Guzowski.

16        Q    Did you meet with anyone that worked in the

17   or with the vault other than Pellerito?

18        A    That was kind of the problem.  You never

19   really knew who had access to it.  Everybody had a

20   key, I came to find.

21        Q    What did you do to minimize the -- strike

22   that.

23             What did you do to limit the number of

24   individuals with keys?

25        A    I changed the locks.
```

Page 107

1      Q    Did you ever have training with regards to
2   how to manage the vault?
3      A    Yes.
4      Q    Who did you have meetings with -- or
5   trainings?  I'm sorry.
6      A    Well, Guzowski, Pellerito, one or two of the
7   other detectives.
8      Q    Okay.  With regards to the third-party
9   audit, you received a report?
10     A    [No audible response.]
11     Q    Did you --
12     A    Stand by.  Yes.  Your -- the answer was yes
13  to that.  I nodded.
14     Q    Did you receive -- I'm sorry.
15          Were there recommendations within the
16  report?
17     A    Yes.
18     Q    All right.  Did you attempt to implement
19  those?
20     A    We did -- we did implement those.
21     Q    Now, I understand you said you had trainings
22  earlier with Pellerito and Lieutenant --
23     A    Guzowski.
24     Q    -- Guzowski.  What were the -- what did that
25  training entail?

Page 108

1          A     Oh, I don't know.  Actually logging in

2    evidence the day it comes in, putting it in the proper

3    place, ensuring that it actually has evidence numbers,

4    ensuring things weren't just thrown into garages.  You

5    know, basic stuff.

6          Q     Did you lead the trainings?

7          A     On some occasions, yes.

8          Q     Did you ever use a third party to train?

9          A     So when we brought in that third party, I

10   believe Pellerito was gone by then.  So we hired a

11   part-time person who then came in and implemented

12   those.  So at that point, I wouldn't call it training;

13   it was more of implementation.  Pellerito left when

14   all this was going on.

15         Q     Who was -- I'm sorry -- the part-time person

16   that you brought in?

17         A     Pat Boucher.  B-O-U-C-H-E-R, I believe,

18   Boucher.

19         Q     Was Pat an employee of the city or more of a

20   consultant?

21         A     No, he was an employee, part-time.

22         Q     Did Pat manage the -- strike that.

23               Was Pat brought in to manage the evidence

24   vault?

25         A     He was.

Page 109

1       Q    Moving on to the next allegation on page 5

2  states "In or around January and February of 2023,

3  Plaintiffs reported that nearly 900 pistol sales

4  records had not been processed by the DHPD in

5  violation of MCL 28.422a(3), which requires the police

6  department to process pistol sales records within ten

7  days of receipt."  Do you see that?

8       A    Oh, yes.

9       Q    Earlier in our conversation or in this

10 deposition, you indicated that when you spoke with

11 Chief Hart, he referenced to you issues with pistol

12 sales.  Do you recall that testimony?

13      A    No.

14      Q    Okay.  You indicated that in your discussion

15 with Chief Hart as to the functions of the job of

16 director of supportive services, that he made a

17 comment about needing to -- you know, processes around

18 gun sales.  Do you recall that?

19      A    We -- I didn't speak of that.

20      Q    Okay.  We'll go back on the record or look

21 at the record later.  But with regards to your

22 understanding of -- well, strike that.

23           Let's just look at this.  Did you make any

24 reports in January and February of 2023 with regards

25 to pistol sales not being processed?

Page 110

1      A     That seems about the time frame.  When I saw

2   the pistol sales records in a pile in records, I went

3   straight to Chief Hart.

4      Q     Did you make the report to any independent

5   agencies?

6      A     We teamed up on that one.  I believe the

7   chief called the state.  I don't know exactly who he

8   called on that one.  Pistol sales records are a state

9   issue.  It's not like a "ATF issue."

10           So quite frankly, that's a state thing that

11   the chief knew more about than I.  What I did know was

12   they weren't processed.

13      Q     When did you make this report to Chief Hart?

14      A     The time frame there seems about accurate.

15   I would -- I believe it was towards the end of

16   January, beginning of February.

17      Q     Did Chief Hart ever tell you who he made the

18   reports to?

19      A     No, I -- I don't recall.

20      Q     All right.  Did he ever tell you that he had

21   made reports to an independent or an outside agency?

22      A     Yes.

23      Q     All right.  Do you recall when he told you

24   that?

25      A     Almost immediately after me telling him, he

Page 111

1   made a -- I believe as -- when I told him, he made

2   it -- we made it -- that that was our catastrophe of

3   the day drill.  So we dealt with it, like, that day.

4   I believe he called MSP, contacted MSP, and then we

5   had to start working the problem.

6        Q    All right.  Did you ever learn what MSP's

7   response was?

8        A    I don't recall.  I don't remember.

9        Q    Did MSP ever come into the police department

10  to conduct an audit or do an investigation?

11       A    I don't remember.

12       Q    All right.  Did you ever speak with anyone

13  at MSP regarding this issue?

14       A    I did.

15       Q    Who did you speak with?

16       A    It was a -- a -- somebody in the pistol

17  sales, pistol reporting area.  I asked them about the

18  process because I had to teach myself.

19       Q    Did you, as director of supportive services,

20  do anything to correct this issue?

21       A    I did.

22       Q    What did you do?

23       A    Made up a -- made a work plan for staff to

24  enter the permits, ensured that these got in as quick

25  as possible.  Then we put into place who was going to

Page 112

```
 1   process them and how.
 2         Q    Did you make any personnel changes?
 3         A    Yes.  Initially, these were supposed to be
 4   handled by Chris Pellerito, who failed to do so.  So
 5   we reassigned the duties to the clerks in the records
 6   division.
 7         Q    So it sounds as if Chris Pellerito was
 8   responsible for processing the pistol sales records;
 9   is that correct?
10         A    That's correct.
11         Q    And he was responsible for -- he, right,
12   Chris Pellerito?
13         A    Yeah, it's a he.  Correct.
14         Q    Okay.  Was responsible for the evidence
15   vault; is that correct?
16         A    Correct.
17         Q    Was there any training or attempted
18   rehabilitation or discipline given to Pellerito for
19   his what appears to be inability to perform the
20   functions of his job?
21         A    Yes, all of those.
22         Q    Okay.  What was done discipline-wise?
23         A    I forgot what we ended up doing with that.
24   I would have to look at the file.  I really just don't
25   recall.  He would retire shortly after all this
```

                                              Page 113

1    started.

2             And as we're speaking, Lieutenant -- I'm

3    blanking on his name right now.  There was a

4    lieutenant who "ran" records at the time too.  He

5    retired shortly after we found this.  I don't recall

6    his name.

7                  MR. MIOTKE:  Maybe to make the record

8    clear, Gonzalez?

9                  THE WITNESS:  Do you remember the first

10   name?

11                 MR. MIOTKE:  Ruben.

12                 THE WITNESS:  Yes, that is correct.

13   Ruben Gonzalez.

14                 MR. BROWN:  If I may also make the

15   record clear, is there any distinction being drawn

16   between the so-called evidence room and the property

17   room, or are those one in the same?

18   BY MS. HUNT:

19        Q    Well, that's question I'm going to ask you.

20   Are those two different rooms, the evidence room and

21   the property room?

22        A    No, to me they're the same.

23        Q    Okay.  And the evidence vault, is that also

24   the same?

25        A    That is the same.

Page 114

1      Q     Okay.  So the evidence room, the property

2   room, and the vaults, those are just interchangeable

3   names for that one room?

4      A     That is correct.

5      Q     All right.  And that -- I'll ask you, what's

6   held in that room?

7      A     Evidence obtained from various crimes and

8   collected by the agency -- or by the department.

9      Q     All right.  Now, the remainder of this

10  paragraph 22 indicates that "the management system

11  within DHPD were so deficient as to jeopardize the

12  right to a fair trial for every criminal defendant

13  who's" --

14            MR. MIOTKE:  Monica, could you just

15  stop for a moment?  We're getting some sound out

16  there.

17            MR. BROWN:  I'll handle it.  I left

18  the --

19            MR. FARINHA:  I got it, even though

20  that's the --

21            MR. MIOTKE:  It might not -- who you --

22            MR. BROWN:  That may be Fausone's wife.

23            MR. TURFE:  Well, whoever it is,

24  just --

25            MR. BROWN:  All right.

Page 115

1   BY MS. HUNT:

2        Q    I'll restart the question.  The remainder of

3   paragraph 22 indicates that "the evidence management

4   system within DHPD were so deficient as to jeopardize

5   the right to a fair trial for every criminal defendant

6   whose case relied on evidence retained by DHPD."  Do

7   you see that?

8        A    I do.

9        Q    Do you know of any criminal case that was

10  impacted by the management system within the DHPD or

11  this evidence vault?

12       A    I don't know of anyone specifically.

13       Q    Okay.  Did anyone ever tell you that there

14  was a particular case was impacted because of the

15  evidence?

16       A    I don't recall.

17       Q    All right.  So I went back to 22.  I'm going

18  to go down to 24 now.  "In March of 2023, Plaintiffs

19  reported that police overtime work was subject to an

20  illegal ticket quota system, which is prohibited under

21  MCL Section 257.750(1)."  Do you see that?

22       A    I do.

23       Q    Okay.  So can you explain to me -- strike

24  that.

25            Are you familiar with the allegation that's

Page 116

1    made within this paragraph?

2        A    I am.

3        Q    Okay.  So it indicates that "the police

4    overtime work was subject to an illegal ticket quota

5    system."

6             Can you explain to me what that means?

7        A    That was not my area.  That was Kevin

8    Swope's.

9        Q    Okay.  Were you familiar with the claim of

10   there being an illegal ticket quota system?

11       A    Anecdotally, yes.

12       Q    Did you do any investigations regarding it?

13       A    I did not.  That was not mine.

14       Q    Did you ever learn or did you --

15            MR. BROWN:  Guys, go off the record.

16            MR. MIOTKE:   Yeah.

17            MR. BROWN:  I'll go out and ask for

18   quiet.

19            THE REPORTER:  Off the record, 12:36

20   p.m.

21            (Off the record.)

22            THE REPORTER:  Back on the record,

23   12:48 p.m.

24            You may proceed.

25            MS. HUNT:  Thank you.

Page 117

1    BY MS. HUNT:

2        Q    Mr. Vanderplow, we left off talking about

3    paragraph 24, which discusses an alleged report that

4    police overtime work was subject to an illegal ticket

5    quota system.  And I believe I asked -- and I want to

6    hear your answer if I did ask -- did you do anything

7    by way of investigating this claim?

8        A    No.

9        Q    Okay.  Do you know -- strike that.

10       Did you discuss this issue at all with Mr.

11   Swope?

12       A    Yes.

13       Q    Okay.  Did you discuss it with Chief Hart?

14       A    Yes.

15       Q    Okay.  During your discussions, were you or

16   your team asked to take part in any of the

17   investigation?

18       A    I don't know if Lieutenant Guzowski was.  He

19   might have.  I turned this whole thing over to Kevin,

20   to Mr. Swope.  This was his expertise and area, and I

21   let him do it.

22       Q    Okay.  You yourself, did you have any input

23   or take part in the investigation at all?

24       A    The only thing I found later when I was

25   cleaning an office out was a sticky note on a -- on a

Page 118

1    desk from an employee who had left talking about

2    having a ticket dismissed after all this had been

3    uncovered.  And I turned it over to Director Swope.

4        Q    Do you recall whose office that was?

5        A    Joel -- Joel, J-O-E-L, Barlow, I believe was

6    his name.

7        Q    What was Mr. Barlow's position?

8        A    He was in the traffic bureau at the time.

9        Q    Was he a police officer?

10       A    He was.

11       Q    Did the sticky note have any other

12   information on it like any names or dates?

13       A    I'm sure it -- it had some type -- it had a

14   name.  It had a number on it and something to the

15   effect of "ticket needs to be dismissed," something

16   along those lines.  It just -- it was literally on an

17   orange sticky.  It stuck out, and I turned it over to

18   Director Swope and let him look at it.  I don't know

19   the results from there.

20       Q    Okay.  And you don't know if this was as a

21   result of an action in court or a discussion with the

22   prosecutor?

23       A    I do not.

24       Q    Okay.  Moving on to number 25 on the same

25   page, page 5, "Plaintiffs also reported widespread

Page 119

1    corruption involving mismanagement of federal and

2    state forfeiture funds, a 'ticket fixing scheme' for

3    friends of law enforcement officers and elected

4    officials, and other civil rights violations to

5    various public bodies and/or law enforcement

6    agencies."  Do you see that claim?

7         A    I do.

8         Q    Okay.  Are you familiar with the allegations

9    made within this paragraph?

10        A    Yes, I'm aware of the allegations.

11        Q    Okay.  Let's start with the reported

12   widespread corruption involving mismanagement of

13   federal and state forfeiture funds.

14        A    Correct.

15        Q    You're familiar with that claim?

16        A    Yes, I am.

17        Q    Okay.  What is your definition of widespread

18   corruption?

19        A    Just a --

20                 MR. BROWN:  Objection to form.

21                 THE WITNESS:  -- total mismanagement of

22   a system, mis- or non-management.  I guess, what would

23   that be?  Malfeasance, non-feasance.

24   BY MS. HUNT:

25        Q    Now, with regards to the claim here of

Page 120

1   widespread corruption involving management of federal
2   and state forfeiture funds, what was that
3   mismanagement as it relates to the state and federal
4   forfeiture funds?
5       A    Lack of record keeping, lack of proper use,
6   lack of city record keeping as well, utilization of
7   funds for items that were not allowable.
8       Q    Prior to your starting with the city, who
9   was responsible for the oversight of the forfeiture
10  funds?
11      A    I have no idea.  That was part of the
12  problem.
13      Q    Okay.  Who did -- did you make reports
14  regarding this, what you -- what is stated as
15  corruption?
16      A    Chief Hart.
17      Q    You told Chief Hart.  Okay.  Did you tell
18  anybody else?
19      A    We would end up having meetings with the
20  mayor, and we explained it to him during a briefing
21  here or there when he would come in.
22      Q    All right.  Anyone, any external agencies,
23  any law enforcement agencies?
24      A    The FBI.
25      Q    When did you talk to the FBI?

Page 121

1        A    May/June of '23.

2        Q    How did you bring this to the attention of

3   the FBI?

4        A    Oh, and also the Internal Revenue Service.

5   I beg your pardon.

6        Q    All right.  And when did you share this with

7   the IRS?

8        A    About the same time frame.

9        Q    May or June of '23?

10        A    That's correct.

11        Q    Starting with the FBI, how did you bring

12   this to their attention?

13        A    I called that Agent Marquart that I spoke of

14   earlier, described the scenario to her.  It was a

15   female.

16        Q    Okay.  And what was her response?

17        A    It was -- on the federal level, when you

18   hear certain things, coming from experience, you hear

19   it; you understand that it doesn't seem right, but

20   you're going to need additional information to move

21   forward on.  I was asked for -- if I were to document

22   more to bring it to them.

23        Q    Did you document more?

24        A    I tried my hardest.

25        Q    What do you mean you tried?  Like, what did

Page 122

1    you do?

2        A    As I started digging into the files for the

3    various years, I was stonewalled at every turn trying

4    to obtain documents from bank accounts, treasurer's

5    office, the comptroller's office, and internal

6    documentations within the department, none of which

7    existed or it was hard to actually get.

8        Q    All right.  When you say it was hard to

9    actually get, were you unable to locate them or were

10   you not permitted to locate them?

11       A    Both.

12       Q    Now, you indicated that you were

13   stonewalled.  Who stonewalled you?

14       A    That Hicks-Clayton.  I would ask for records

15   and get a nonsensical answer or response.

16       Q    Did you speak with anyone about your -- in

17   a -- your -- strike.

18            Did you speak with anyone about

19   Hicks-Clayton not providing you with the information

20   that you requested?

21       A    I did.

22       Q    Who did you speak with?

23       A    Mr. Farinha.

24       Q    Did you ultimately obtain any information?

25       A    Minimal.  Not enough to where I would say it

Page 123

1   was probative.

2        Q    Did you speak with anyone else?

3        A    Our independent auditor, Michelle.  I forget

4   her last name, and I actually forget the company she

5   worked for.  I just heard the name.  I -- I heard it

6   was Plante Moran, and I agree with that.

7        Q    So was Plante Moran the third party that

8   also did the investigation with regards to the vault?

9        A    No.

10       Q    Or was that a different --

11       A    No, it was a different company.  I've

12   actually been trying to think of that company.  I

13   can't remember it.

14       Q    Okay.  Okay.  So Plante Moran, they audit

15   the financial aspects of the city.  Is that what

16   you're -- is that correct?

17       A    Yeah.

18                 MR. MIOTKE:  Objection.  Form.

19   Foundation.

20                 THE REPORTER:  Will you repeat your

21   objection?

22                 MR. MIOTKE:  Objection.  Form.

23   Foundation.

24                 THE REPORTER:  Thank you.

25                 MR. MIOTKE:  Will you repeat your

Page 124

1    answer, sir?

2              THE WITNESS:  Yes, that -- I believe my

3    answer was yes, she does -- they do some form of

4    bookkeeping, auditing, continual review, I believe.

5    BY MS. HUNT:

6         Q    Did -- you indicated you reached out to

7    Michelle from Plante Moran.  Did she provide you with

8    any information?

9         A    She tried.  She looked up various

10   transactions that I asked about.  And in one case, I

11   remember her saying specifically, "I don't understand

12   what this is."

13        Q    Okay.  Did you know what she meant by that

14   statement?

15        A    I did.

16        Q    Okay.  What did she mean?

17        A    In the system that we use, BS&A, as a

18   transaction is entered into the city record, there

19   would be substantiation behind it, whether it's a

20   invoice, a document, something explaining it.

21             And a couple of the transactions that I

22   noted, at least started with, I asked her about, and

23   she couldn't explain what they were for.

24        Q    Michelle could not explain?

25        A    Michelle could not explain it.

Page 125

```
 1        Q    So what was your next step in correcting --
 2   strike that.  I'm sorry.
 3             I want to ask you about your communications
 4   with the IRS.  Who did you contact?
 5        A    A duty agent.
 6        Q    You said duty agent?
 7        A    Duty agent, correct.  I did not get a name,
 8   or at least I don't recall a name.
 9        Q    Okay.  Okay.  How did you contact the duty
10   agent?
11        A    The general number.
12        Q    Okay.  Did you have more than one
13   conversation with this agent?
14        A    Maybe two, three at most.
15        Q    Okay.  What was the -- what were those
16   conversations about?
17        A    Again, very similar to what I had with the
18   FBI.  I explained initially what I was looking at, the
19   steps I had already taken, i.e., looking into some of
20   the transactions, trying to understand what
21   documentation would substantiate these transactions.
22             And their response was the same.  If you
23   have -- if you ever come up with the documentation --
24   I know the levels of what they're looking for -- bring
25   it to them.  And again, this took so long with almost
```

1  no actual help from the city.  I never got to the
2  point where I was able to forward it.
3      Q    Okay.  Do you know who Ms. Hicks-Clayton's
4  supervisor was?
5      A    I have no idea.
6      Q    Did you ever try to find out who her
7  supervisor would be?
8      A    Well, that was part of the problem here in
9  the city.  She's an elected official.  I don't know
10 who she answers to.  She appeared to not answer to
11 anybody.
12     Q    And what was her position?
13     A    I think she's the treasurer.
14     Q    Did you ever get any sort of written
15 communication from the FBI or the IRS with regards to
16 the mismanagement of federal funds or state forfeiture
17 funds?
18     A    No, I never got to the point that I was able
19 to deliver the information that I think would've gone
20 to them.
21     Q    Okay.  So who, employee-wise, was
22 responsible -- strike that.
23          What department works with the federal and
24 state forfeiture funds?
25     A    Police department.

Page 127

1      Q     Okay.  So which employees were responsible

2   for oversight or at least processing the funds?

3      A     I have no idea.

4      Q     All right.  When you came in and started

5   leading that team, did you put people in place?

6      A     Yes.

7      Q     Okay.  And what role -- what individuals did

8   you put in place?

9      A     Me.

10      Q     All right.  You alone?

11      A     Well, myself and Janet Lucas and the chief

12   as the overall approver.

13      Q     Did you have any meetings or trainings as it

14   relates to who could -- strike that.

15          Did you have any meetings or trainings as it

16   relates to what types of activities those funds could

17   be used for or purchases those funds could be used

18   for?

19      A     Since it was me, there was no real training

20   to have.  I understand the rules.

21      Q     Okay.  All right.  What about with Ms.

22   Lucas?

23      A     I did have some discussions with her on how

24   we were going to process these, what accounts they

25   needed to go to, documentation we needed to keep.  She

Page 128

1    was very uneducated as to what that was.

2        Q    Okay.  Was she working with that or those

3    funds prior to your starting?

4        A    It was hard to say because when I asked her

5    questions, she would -- had very vague answers.  It

6    seemed like she didn't know.

7        Q    Okay.  And was it your understanding that

8    she just did not know versus just not performing her

9    duties well?

10       A    It seemed like she didn't know.  She's a

11   very capable person.

12            As we've been sitting talking, I remember

13   one name I saw on documents, Valkenburgh --

14   Valkenburgh.  Is that -- I don't -- I'm just pulling

15   this out of my memory.

16            The record keeping was just so shoddy.  But

17   I -- Voiles too.  Valkenburgh and Voiles strike a

18   bell.  But quite frankly, ma'am, I -- it was -- the

19   documentation was very haphazard.

20       Q    Okay.  And when you say Voiles, is that

21   V-O-I-L-S?

22       A    V-O-I-L-E-S, I believe.  Gary, I think, is

23   his name.

24       Q    And in sitting here coming up with those

25   names, was it your understanding that they were

Page 129

1    employees that worked with these funds?

2         A    I -- they were definitely in command.  What

3    their ranks were, I don't know, but I would see their

4    names on other documents.  But they weren't here when

5    I was here.

6         Q    Okay.  Now, you mentioned that you had

7    conversations with Ms. Lucas about the fund.  What

8    about with Chief Hart?

9         A    Oh, yes.

10        Q    All right.  Was there, like, any training or

11   any guidance to Chief Hart?

12        A    Sure.  I mean, and -- and "training" is not

13   the right word.  I think it was guidance, if you will.

14   He -- he clearly understands federal forfeiture law as

15   I do, so we were just working through the issues.

16        Q    Okay.  Now, the ticket fixing scheme, which

17   is the next issue in this paragraph, there was also

18   what I assume this would be, "Plaintiff also reported

19   widespread corruption" -- or "reported a ticket fixing

20   scheme for friends of law enforcement officers and

21   elected officials."  Are you familiar with that claim?

22        A    Yes.  Yes.

23        Q    All right.  Did you -- well, what is your

24   understanding of the "ticket fixing" scheme?

25        A    Again, that was handled primarily by

Page 130

1    Director Swope.  But I did hear of, you know, multiple

2    occasions of family or friends of officers would get

3    tickets; they would get dismissed.

4           I heard another instance where somebody --

5    somebody got a ticket and -- and Mo Baydoun wanted it

6    rescinded.  But those specific instances, I would have

7    to refer to Chief Hart or Director Swope.

8       Q    Okay.  So with regards to the ticket fixing

9    scheme that's referenced in 25, are you indicating

10   that that is part of the illegal ticket quota system

11   referenced in 24, in paragraph 24?

12      A    I would consider all the ticket issues as

13   one issue but several facets to where you had, you

14   know, people writing tickets on overtime, but then

15   they would get dismissed arbitrarily.  And then you

16   had individuals with knowledge of city employees who

17   knew to -- who knew to call to get a ticket dismissed.

18      Q    All right.  Do you know how the tickets were

19   being dismissed?

20      A    I don't.  That wasn't my function.

21      Q    All right.  Did you ever report to anyone a

22   claim of there being tickets improperly dismissed due

23   to who the ticket receiver knows, whether it's an

24   officer, an elected official?

25           MR. BROWN:  Objection to form.

Page 131

1   Compound.

2                  You can answer.

3   BY MS. HUNT:

4        Q    Do you understand the question?

5        A    I don't.

6        Q    Okay.  Did you ever make a report to anyone

7   about a ticket being dismissed, improperly dismissed,

8   because of who the person who received the ticket

9   knew?

10       A    I thought I remembered one or two.  I don't

11   remember the details off the top of my head.

12       Q    That you reported?

13       A    I did.

14       Q    Do you recall who you reported that to?

15       A    Director Swope.

16       Q    Do you know how you came to find out that

17   the tickets that were dismissed or requested to be

18   dismissed was being done so in an illegal manner?

19       A    Over time with my employment, people came to

20   identify me as somebody they could either talk to or

21   pass information off to.  I've had -- I can't tell you

22   how many phone calls I would receive anonymously from

23   citizens or other officers.

24                  They would say, "Hey, Paul, we heard this

25   went on.  You know, can you take a look at it?"

Page 132

1       Q      All right.  So from your statement, it
2    appears that you received more than two calls from
3    either other employees or citizens with regards to
4    this issue?
5       A      Seems, yes.
6       Q      What did you do with those calls or those
7    concerns from the citizens?
8       A      Went straight to Swope with those.
9       Q      And that is beyond the two that you just
10   told me about?
11      A      Yes.
12      Q      Did you put this in the form of writing, or
13   was it just a phone call or in-person meeting?
14      A      Some were verbal.  If you check your email
15   system showing emails from me, you have that.  You
16   have all the emails between Swope and I.  Cooper --
17   Director Cooper can go search those.
18      Q      Did you -- you mentioned earlier that you
19   took documents with you by a electronic drive.  Do you
20   recall that?
21      A      Again, I have copies.  I don't take
22   documents, ma'am.
23      Q      Okay.  You have copies of documents on an
24   electronic drive?
25      A      Yes.

Page 133

1      Q    You have that drive in your possession?

2      A    This second?

3      Q    Not today, but you have it; you can access

4  it at some point?

5      A    Somewhere, yes.

6      Q    Yes.  You said somewhere.  Do you know where

7  it is at your home?  Or is it at your home?

8      A    I would assume so, yeah.

9      Q    Okay.  Does any of the documents on that

10  electronic drive or the device contain any emails?

11      A    I would assume -- I -- I would assume a few.

12  But you -- the city has them all.

13      Q    All right.  I'm asking you, does the drive

14  contain emails?

15      A    Sure.  I -- I archived a few emails.  Sure.

16  The better place would be through Director Cooper and

17  the city system.

18      Q    Now, the next part of paragraph 25 indicates

19  "other civil" -- or "Plaintiffs reported other civil

20  rights violations to various public bodies and/or law

21  enforcement agencies."

22      A    Correct.

23      Q    What civil rights violations did you report?

24      A    Did I report?  That wasn't my area.

25      Q    Okay.  Are you familiar with any civil

Page 134

1   rights violations that were reported by either Mr.

2   Swope or Chief Hart?

3        A    I remember one or two:  the one civil rights

4   violation against Officer Hammoud by Paul Graf at the

5   time; the Officer Mazloum; I thought Sergeant Bazzy

6   had one.  I thought there was another officer, Mahdi

7   Bazzi, I believe.

8        Q    And that's separate from Sergeant Bazzy that

9   you just mentioned?

10       A    That's correct.  That's a different one.

11  Those are the ones I recall off the top of my head.

12       Q    And these are reports made by either Mr.

13  Swope or Chief Hart; is that correct?

14       A    Correct.

15       Q    Okay.  Do you know when the report with

16  regards to a civil rights violation was made on

17  Hammoud?

18       A    I don't.

19       Q    Do you recall if it was Chief Hart or Mr.

20  Swope that made that violation report?

21       A    That was Hart because it was before we got

22  there.

23       Q    Okay.  Do you know which agency that was

24  reported to?

25       A    I don't.

Page 135

1       Q     Okay.  What about Mazloum?  Do you know who
2   reported that?
3       A     I don't.
4       Q     Okay.  Do you know when?
5       A     No.
6       Q     Do you know which agency?
7       A     I would assume -- I thought one was MSP, and
8   the other was the Michigan EEO office or whatever that
9   official title is on that Michigan department
10  handles --
11      Q     EEOC?
12      A     EEOC.  And then I know the chief had
13  multiple conversations with Luttrell.  Oh, I'm
14  forgetting his last name.  Luttrell with the U.S.
15  Attorney's Office at the time.
16      Q     Did you ever have any meetings with
17  Luttrell?
18      A     I was present for one, maybe two.  But --
19      Q     Where did these meetings take place?
20      A     I thought we were at the U.S. Attorney's
21  Office for one.  I don't recall the second one.
22  Again, they all kind of bleed together.
23      Q     Is this the U.S. Attorney's Office in
24  Detroit?
25      A     It is.

Page 136

```
1       Q    Do you recall the reason you were there

2  visiting with Luttrell?

3       A    It was some concerns the chief had, and I

4  accompanied him.

5       Q    Okay.  Do you know what the concerns were?

6       A    I don't recall off the top of my head.

7       Q    You indicated that you believe there were

8  two meetings that you accompanied the chief with

9  Luttrell.  Were they with regards to the same subject

10  matter, both meetings?

11       A    I think we talked about those, but there

12  were so many other concerns that I know the chief had

13  that he brought up that he would discuss with

14  Luttrell.  And I think there was one or two other

15  staff members there.  I don't recall.

16            But again, that was the way we split the

17  work.  If the chief handled it, he handled it.  I had

18  my own concerns I was -- I was dealing with.

19       Q    All right.  With regards to Sergeant Bazzy,

20  is that Mohamad Bazzy?

21       A    Yes.

22       Q    Okay.  What -- do you recall who made the

23  civil rights violation report about -- against him?

24       A    It wasn't against him.  It was for him.

25       Q    For him.  Okay.  So what was that incident,
```

Page 137

1    if you know?

2        A    He had some issues before we got there that

3    were reported.  I think he had something with Joe

4    Reyna, I remember, or Kevin Campbell.  I -- I --

5    again, they all kind of bleed together, but I remember

6    before we got there that had happened.  It had been

7    reported.

8           We were -- read into some of the various

9    shenanigans that were going on with it.  And then I

10   know Kevin looked into some of -- Director Swope

11   looked into some of them.  I looked into one or two.

12   Like, they said something happened, and I could never

13   verify it.

14          And I just ended up turning the whole thing

15   over to Director Swope.  And I think it went through

16   some type of process, either through EEOC or

17   something.  Again, there was -- there -- I guess

18   Sergeant Bazzy had a couple things going on, so I

19   don't know ultimately how all that played out.

20       Q    All right.  Now, earlier when you started

21   describing this scenario, you indicated that it was

22   filed for him.  So is it your understanding that his

23   civil right -- that there was an allegation or report

24   of his civil rights being violated?

25       A    That's what I recall, yes.

Page 138

1    Q    Okay.  Okay.  Did you ever come to learn the
2  outcome of that issue?
3    A    Again, they all kind of bled together.  I
4  can't recall how it worked out.
5    Q    Okay.  Was Sergeant Bazzy still employed
6  with the Dearborn Heights Police Department when you
7  left in May of 2025?
8    A    I don't know what his status was.
9    Q    Did you ever work with Sergeant Bazzy?
10   A    Sure.
11   Q    Okay.  In what capacity?
12   A    He would be on a call or on shift and an
13 event would happen or an incident would happen; I'd
14 show up at the same time.
15   Q    You would show up to -- would that be like
16 the scene of an police issue or a police matter?
17   A    Yes.
18   Q    What would be the purpose of your appearance
19 at police matters outside of the department?
20   A    Oh, it's, you know, supervision of
21 personnel, ensuring -- and then I would also morph
22 into some of the public affairs.  I would do news
23 interviews.  But mostly it was to ensure supervision
24 of personnel, safety.  And again, it would -- it would
25 evolve into public affairs issues.

```
                                            Page 139
 1       Q     Would you appear at these -- and I'm just
 2   going to use the term "scene."
 3       A     Sure.
 4       Q     Would you understand what I mean if I say
 5   that?
 6       A     I do.
 7       Q     If you were to appear on the scene -- or
 8   strike that.
 9             Would you appear on the scene after an event
10   occurs and is being investigated, or would you
11   appear -- strike that.
12             Is that when you would typically appear?
13                  MR. BROWN:  Objection to form.  Can you
14   try again, please?
15   BY MS. HUNT:
16       Q     Do you understand the question?
17       A     No.
18       Q     Okay.  Would you -- when you appeared on the
19   scene, would it be after an event occurred?
20       A     Yes.
21       Q     Okay.  Would it be during the investigation
22   period?
23       A     Yes.
24       Q     Okay.  Would you appear during an active
25   incident?
```

```
                                            Page 140
 1      A     No, because it wouldn't be safe for me to be

 2   there.  So if there was an active scene, let's say,

 3   maybe I would be -- I would stage up blocks away.  And

 4   then once it was handled -- but I don't even remember

 5   doing that with Dearborn Heights.  I don't recall

 6   doing that.

 7           Mostly I was there to supervise and

 8   understand what the investigators were doing.

 9      Q     Now, I know we went over your work history,

10   but I just want to be clear, based on what you just

11   said.  Is the City of Dearborn Heights the only local

12   police agency that you've been employed by?

13      A     Yes.

14      Q     Okay.  Now, with regards to -- is it Mahdi

15   Bazzi?

16      A     Mahdi Bazzi.

17      Q     Yes.  What was Mahdi's position with the

18   police department?

19      A     I -- I believe police officer.  It happened

20   before I got there.

21      Q     All right.  Was he no longer employed when

22   you started?

23      A     Correct.

24      Q     Okay.  Do you know who filed the report

25   about civil rights violations related to him?
```

Page 141

```
 1        A     I thought Chief Hart did.
 2        Q     Okay.  Was this that his rights were
 3   violated or he violated someone else's rights?
 4        A     No, his rights.
 5        Q     All right.  Do you recall the outcome of
 6   that complaint?
 7        A     I don't.
 8        Q     Do you know if that outcome was issued prior
 9   to your starting with the department?
10        A     No, I thought it happened past year, but I
11   don't recall what the actual outcome was.
12        Q     When reports following a complaint of civil
13   rights violations or some other violation is made to a
14   law enforcement agency, a state level or federal level
15   law enforcement agency, when those reports come to the
16   City of Dearborn Heights Police Department, would you
17   receive a copy of them?
18        A     I thought I did, yes.
19        Q     Okay.  On all of them, even though you
20   weren't involved with them?  Or strike that.
21              Would you receive copies of all of the
22   resulting reports or memos even if you were not
23   involved with the investigation or complaint?
24        A     I wouldn't know.  I don't know what I get or
25   don't get.
```

Page 142

1       Q    Okay.  Okay.  Would you ever get reports
2   that you knew nothing about?
3       A    Yes, I think I had.
4       Q    Okay.  And in those instances, what would
5   you do with those reports?
6       A    Depending on what it is or who it involved,
7   I would either forward it to like a Director Swope or
8   Chief Hart or maybe didn't even involve us.  I --
9   it -- that one is hard to answer.
10      Q    Okay.  Would you ever, like, file them away,
11  or would you hold onto either a copy or an electronic
12  copy of the report?
13      A    No, 'cause I -- I pass them along to the
14  people who need to know.
15      Q    I'm sorry if I asked you this already.  Did
16  you ever file a civil rights complaint on behalf of
17  anyone or against anyone --
18      A    I --
19      Q    -- other than this lawsuit?
20      A    With the City of Dearborn Heights?
21      Q    Yes.
22      A    No.
23      Q    Prior to the City of Dearborn Heights?
24      A    Yes.
25      Q    When was that?

Page 143

1          A     With ATF.

2          Q     Okay.  What was that incident?

3          A     The director of human resources at ATF said

4    she was going to send certain individuals after me.

5    And if you want me to quote it, I will, but I'd rather

6    not.

7          Q     I am okay -- well, can you just explain

8    without using any derogatory -- I'm assuming

9    derogatory terms would be used.

10         A     Oh, yeah.  Oh, yeah.  The head of HR at the

11   time was caught in a fabrication by me.  And in a

12   meeting she said if I wanted to get down and dirty,

13   she would send her N words from Philly after me in an

14   open meeting with my director in it.

15         Q     All right.  And you filed a complaint based

16   on that?

17         A     I did.

18         Q     Okay.  And was there any investigation into

19   that?

20         A     Oh, yeah.

21         Q     All right.  And what was the result?

22         A     No violation found.  Apparently that's

23   acceptable.

24         Q     And you indicated that was the director of

25   HR.  Did you continue to work with her after that

Page 144

1    incident?

2         A    No, she was actually let go shortly after

3    that.  And I retired shortly after that.

4         Q    Were there ever any other violations -- I'm

5    sorry -- civil rights violations that you filed other

6    than this complaint and what you just referenced?

7         A    Restate the question.

8         Q    Were there ever any other civil rights

9    violations that you have filed either on your behalf

10   or on someone else's behalf with regards to -- or with

11   exception of your complaint filed in this matter and

12   the incident that you just referenced regarding your

13   former HR director?

14        A    I think in 15 years of management at ATF I

15   had one or two.  I had a few employees that had some

16   issues that I helped report.

17        Q    That was on behalf of someone else?

18        A    It was on behalf of somebody else, but not

19   for me.

20        Q    All right.  All right.  So if we turn to the

21   next page on number 27 --

22                  MR. BROWN:  See the time?

23                  THE WITNESS:  I do, sir.

24                  MS. HUNT:  Is there a time issue?

25                  MR. BROWN:  There is not.

Page 145

1           MS. HUNT:  Okay.

2      BY MS. HUNT:

3           Q    Twenty-seven, "Moreover, private citizens

4      acting in concert with the city council also

5      threatened and took adverse actions against the

6      plaintiffs."  Are you aware or do you understand this

7      paragraph?

8           A    Yes.

9           Q    Okay.  Is it your belief that there were

10     private citizens acting in concert with the city

11     council that took adverse actions against you?

12          A    Absolutely.

13          Q    Who were the private citizens?

14          A    Gary Miotke.

15          Q    Anyone else?

16          A    Rachel LaPointe.

17          Q    Anyone else?

18          A    There are three other individuals.  I could

19     see their faces.  I can't remember.  Vince Drapkowski.

20     I have no idea how to spell his name.  Angela Venegas,

21     I believe.  That's all I can recall at this time.  Oh,

22     Hassan Aoun.  Hass Cash, he goes by.

23          Q    What was the last name?

24          A    Cash.  First name Hass, H-A-S [sic].

25     Last --

Page 146

1      Q    Okay.  I know he goes by Hass Cash.  But --

2      A    I --

3                MR. FARINHA:  A-O-U-N.

4                THE WITNESS:  Yeah.  I don't know how

5      to spell that.

6                MR. FARINHA:  Aoun.

7      BY MS. HUNT:

8      Q    Hassan Aoun would be his given name?

9      A    I guess.  I have never figured that out.

10      Q    So with regards to Mr. Aoun, how do you

11      believe that he was working in concert with the city

12      council?

13      A    He would make statements during open city

14      council meetings that were flat-out false.  And the

15      only way he could have gotten his information is by

16      council members who would have been privy to that.

17      Q    So it's your belief that he received

18      information from city council members?

19      A    Yes.

20      Q    Okay.  How do you reconcile him receiving

21      information from City Council with him acting in

22      concert with City Council?

23                MR. BROWN:  Objection to form.

24      Confusing.

25                THE WITNESS:  I don't --

Page 147

1   BY MS. HUNT:

2        Q    Do you understand the question?

3        A    I don't.

4        Q    Now, you just indicated that, when I asked

5   you how were they working in concert with City

6   Council, you've indicated that he had information or

7   made statements with regards to information that only

8   City Council had; is that correct?

9        A    Yes.

10       Q    How was that acting in concert with them to

11  threaten you?

12       A    Isn't that definitional?  If they -- if he

13  has information he got from Council, he goes up and

14  makes false filthy defamatory statements against me.

15  That is how that works out.

16       Q    What did he say about you?

17       A    I don't recall if the top of my head.  I

18  can -- would have to go back to the numerous

19  recordings on city council meetings.

20       Q    Did he ever say, "so-and-so told me this," a

21  city council member?

22       A    No.

23       Q    Did he ever say a certain city council

24  member asked that he threatened or defame you?

25       A    Restate the question.

Page 148

1      Q     Has he ever -- you indicated that he made

2    statements.  Was this at public comment?

3      A     Yes.

4      Q     Okay.  Did he ever make statements outside

5    of public comment?

6      A     He had at time to times, yes.

7      Q     Okay.  Where were those statements made?

8      A     General public when he'd show up to events.

9      Q     Okay.  Would he be speaking to a crowd, or

10   would he be talking to individuals --

11     A     Most --

12     Q     -- at those meetings, at those events?

13     A     Most of the time it seemed like he was

14   talking to himself, like out loud.  But sometimes he

15   would talk to other individuals loud enough to where

16   others would hear him.

17     Q     Okay.  So in the times that he was speaking

18   at public comment, and you indicated he made false and

19   defamatory statements about you, did he ever make

20   mention that a member of City Council or members of

21   City Council asked him to make those statements about

22   you?

23     A     It would be along the lines of, like,

24   "Councilman Saab said," and then he would go on and

25   repeat the lie.  Or like "Baydoun said."  You know,

Page 149

1   according to him, "Baydoun said this."  You can check

2   the -- I -- I would actually refer to the -- the city

3   council recordings.

4               MR. BROWN:  We're speaking about Hass

5   Cash now; is that right?

6               THE WITNESS:  Yes, sir.

7               MS. HUNT:  Yes.

8               MR. BROWN:  All right.  Thank you.

9   BY MS. HUNT:

10      Q    So he indicated he's just repeating

11  something that he claims to have heard someone else

12  say?

13      A    In some instances, yes.

14      Q    Did Mr. Aoun work for the City of Dearborn

15  Heights?

16      A    I have no idea.

17      Q    All right.  Did he supervise you?

18      A    No.

19      Q    Okay.  Did he have any ability to discipline

20  or hire or fire anyone within the City of Dearborn

21  Heights?

22      A    No.

23      Q    All right.  Did he have the ability to

24  discipline, hire, or fire you?

25      A    No.

Page 150

```
 1       Q    Okay.  You mentioned Angela Venegas.

 2       A    I believe that's her name.  Yeah.

 3       Q    All right.  Who is Angela?

 4       A    Some citizen who shows up to every meeting.

 5       Q    Did she speak at public comment?

 6       A    Always.

 7       Q    All right.  What makes you think she was

 8  acting in a concert with this council?

 9       A    Same thing.  She had information that a

10  normal citizen wouldn't have.

11       Q    How did that impact you?

12       A    It impacted my reputation, impacted the way

13  I conducted business.  It impacted the way Council

14  treated me at open meetings.

15       Q    What did she say about you?

16       A    Again, check the recordings.

17       Q    I'm asking you.  You indicated that

18  she -- at least in the paragraph here, took adverse

19  action against you that was -- could be considered

20  threatening.

21       A    Director --

22       Q    What did she say?

23       A    "Director Vanderplow is doing things that

24  aren't allowed," and those are just out and out lies.

25  "Director Vanderplow tried to take a canine, a -- a
```

Page 151

1   police dog, away from an officer," which was untrue.

2   Just various stories like that.

3           Again, I don't have them -- have the exact

4   quotes in front of me, but they are contained in the

5   city council meeting records.

6           MR. MIOTKE:  I'm going to note for the

7   record that the witness needs to actually respond to

8   these questions.  If he doesn't want to, then from our

9   position, his failure to make a response is going to

10  be the record that we have.

11          MS. HUNT:  Okay.

12          MR. BROWN:  I object to that strange

13  narrative question and statement that's inappropriate,

14  isn't a formal objection, and --

15          MR. MIOTKE:  Consider it an objection

16  based on it being nonresponsive.  He can't say, "Look

17  at the city council videos."

18          MR. BROWN:  He just followed up

19  with -- he followed up with a substantive answer --

20          MS. HUNT:  Well --

21          MR. BROWN:  -- including talk about

22  dogs.

23          MS. HUNT:  And I was going to follow up

24  with another question.  I did follow up and ask him to

25  answer.

Page 152

```
 1              MR. MIOTKE:  Okay.
 2              MS. HUNT:  And so there will be another
 3   question.
 4   BY MS. HUNT:
 5      Q    With regards to your statement about
 6   particular statements that she made, did she make
 7   any -- I'm speaking of Angela Venegas.  Did she
 8   indicate that she learned that information from a
 9   particular council member or council members?
10      A    No.  Again, it was -- she would get up --
11   as -- as a general rule, would get up in public
12   comment and then say, "Well, as Councilman
13   what's-his -- whatever name, pick a name, said, you
14   know, I'm echoing what they're saying."
15      Q    Was she a citizen of Dearborn Heights?
16      A    Yes.
17      Q    Would you consider her to be a concerned
18   citizen of Dearborn Heights?
19              MR. BROWN:  Objection to form.
20   Speculative.
21   BY MS. HUNT:
22      Q    I'm asking would you consider her to be a
23   concerned citizen of the city that she lives in?
24              MR. BROWN:  Same objection.
25              THE WITNESS:  You would have to ask
```

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
                                                      www.veritext.com

Page 153

```
 1   her.
 2   BY MS. HUNT:
 3        Q    All right.  Rachel LaPointe, what did she
 4   do?  Strike that.
 5             Who is Rachel LaPointe?
 6        A    A citizen of Dearborn Heights.
 7        Q    Okay.  Did she work within the City of
 8   Dearborn Heights?
 9        A    I think --
10        Q    Strike that.  Did she work in the City of
11   Dearborn Heights as a governmental entity?
12                  MR. BROWN:  Objection to form.
13   BY MS. HUNT:
14        Q    Do you understand what I'm saying?
15        A    I don't.
16        Q    Okay.  Did she -- was she employed by the
17   City of Dearborn Heights?
18        A    I believe she was on a committee.  I don't
19   know if she was paid.
20        Q    Okay.  Would this be sort of like a citizens
21   committee or like a board?
22        A    I believe so, yes.
23        Q    Okay.  Do you know if that was an elected
24   position, or was she appointed by someone?
25        A    I think she was appointed.
```

Page 154

1      Q    Do you know what that board did?

2      A    No.  And I could be wrong on the board thing

3  too.  But I thought she had mentioned something like

4  that.

5      Q    Okay.  Okay.  And did she have any -- Rachel

6  LaPointe have any ability to impact the function of

7  your job by the way of either disciplining you,

8  hiring, firing you?

9      A    No.

10     Q    Okay.  Anyone else in the city that she had

11 that ability to hire, fire, discipline?

12     A    No.

13     Q    And what was it that you indicate that she

14 said that was -- that either threatened you or created

15 adverse action against you?

16     A    So again, I would refer back to the

17 recordings.

18          But it seemed like anytime my name came up

19 or I was involved with something, she would stand up

20 at public comment, spew some esoteric and false fact,

21 which would then perpetuate whatever nonsense

22 narrative was going on, thereby ruining my reputation

23 because, again, I don't have the bully pulpit.  They

24 do.

25     Q    Okay.  Did you attend city council meetings?

Page 155

1          A     For a while I did, yes.

2          Q     All right.  You say for a while.  When you

3     first started, did you attend city council meetings?

4          A     I did.

5          Q     Did you -- how often did you attend?

6          A     Every two weeks.

7          Q     Okay.  When did you stop attending meetings?

8          A     Oh, when the silliness really took off and

9     the nonsense went back and forth.

10         Q     All right.  How long did you attend

11    meetings?  Like, was it for a year?  Was it a year and

12    a half?  Was it nine months?

13         A     Between 9 and 12 months maybe.  I would have

14    to go back and look at the recordings to see which

15    ones I showed up to.

16         Q     Okay.  All right.  Did you attend meetings

17    when -- strike that.

18               Did you attend meetings after you stopped

19    attending on a regular basis?

20                    MR. BROWN:  Confusing.  Sorry.

21    BY MS. HUNT:

22         Q     Okay.  Do you understand the question?

23         A     No.

24         Q     Okay.  Was there ever a time where because

25    you had something on the agenda that you had to speak

Page 156

```
 1   of or there was a topic you had to speak on that
 2   occurred after you stopped attending on a regular
 3   basis that you would attend for the meeting that you
 4   had an issue with?
 5        A    I would, until Councilman Wencel said he
 6   would no longer approve anything that I presented.  So
 7   in betterment of the department, I stopped going.
 8        Q    When did he say that?
 9        A    It was a certain time and date.  I'd have to
10   look.  It's on the recording.
11        Q    Do you recall if it was -- do you recall
12   what time frame with regards to your employment?  Was
13   it like at the beginning, the end, the middle?
14        A    First year.
15        Q    The first year of your -- did you ever have
16   a conversation with Mr. Wencel as to why he made that
17   statement?
18        A    No.
19        Q    Did you have a conversation with anyone
20   about why he made that statement?
21        A    I might have.  I don't recall who.
22        Q    Who would you have spoken with?
23        A    I don't -- maybe the chief more than
24   anything.
25        Q    Wouldn't you want to know why he would make
```

Page 157

1   such a statement?

2       A    I -- I can't explain most of what I heard

3   come off that dais, so I don't know.

4       Q    As a director within the police department,

5   is it important to know how you can get things

6   approved if you needed particular funding or

7   particular items for your department?

8                    MR. BROWN:  Objection to form.

9                    THE WITNESS:  I -- I don't understand.

10  BY MS. HUNT:

11      Q    Okay.  As the director, a director within

12  the police department, director of supportive

13  services, isn't it important for you to understand

14  what you can and need to do in order to make certain

15  funding for your department is -- or for your area is

16  approved or specific items or things that you need for

17  purposes of running your department?

18              Isn't it important that you understand how

19  to get those things done?

20                    MR. BROWN:  Objection to form.

21  Ambiguous.  Unintelligible.  Compound.  Argumentative.

22                    THE WITNESS:  Can you simplify it,

23  please?

24  BY MS. HUNT:

25      Q    Sure.  Isn't it important for you to know

```
                                            Page 158
 1   how to get things that you need for your department?

 2        A    Yes.

 3        Q    All right.  So why wouldn't you go to Mr.

 4   Wencel and ask, "Why would you not approve anything

 5   that I bring forward?"

 6        A    Oh, I understand the process.  I don't need

 7   him to explain it to me.

 8        Q    All right.  All right.  He made a statement

 9   indicating that he would not approve anything that you

10   would bring forward; is that correct?

11        A    That's what he said, yes.

12        Q    Okay.  Why would you not go to him and ask

13   him why that statement was made?

14        A    He made it an open -- made it in an open

15   meeting.  He made his statement.  I -- I don't know

16   what more I can do.

17        Q    Okay.  You don't think it's important to

18   determine how you can make certain that your

19   department receives what it needs?

20        A    I went to my chief.

21             MR. BROWN:  Objection to form.

22             Go ahead.

23             THE WITNESS:  I went to my chief.

24   BY MS. HUNT:

25        Q    Okay.  Do you know what did Chief -- Chief
```

Page 159

1    Hart, is that who you went to?

2         A    Yeah.

3         Q    Okay.  Do you know what Chief Hart did in

4    follow up to your meeting with him?

5         A    I -- I don't know.

6         Q    All right.  Did you ever ask him?

7         A    Yeah.

8         Q    All right.  What did he say?

9         A    I don't recall.

10        Q    Now, you stated the name -- and for purposes

11   of clarity in developing a full record, you indicated

12   that Mr. Miotke made certain statements about you.

13        A    Correct.

14        Q    What did he say?

15        A    Again, multiple statements.  He would go up

16   and prattle on about various issues affecting the

17   department.  He would speak with non-facts and just,

18   again, prattle on incessantly as to what was going on

19   and actually never once state a correct fact.

20        Q    Did you ever talk to Mr. Miotke about

21   his -- strike that.

22             Was this at public comment?

23        A    Yes.

24        Q    Did you ever talk to Mr. Miotke about that?

25        A    No.

Page 160

1        Q    Okay.  You never spoke with him about why he

2   was making what you call false facts?

3        A    A couple of times when he actually was

4   working for the city when I was here, I asked to talk

5   to him three times, and he failed to show all three

6   times.  So that gave me the clue.

7                   THE WITNESS:  I'm sorry, sir?

8                   MR. MIOTKE:  No.  No, we're not getting

9   into it.  Come on.  You're doing well.

10                  THE WITNESS:  Oh, I just didn't hear

11   it.  I thought I missed something.

12   BY MS. HUNT:

13        Q    And again, Mr. Miotke didn't -- he wasn't

14   your supervisor?

15        A    God, no.

16        Q    He didn't have the ability to hire you, fire

17   you, or discipline you?

18        A    I don't think that's a fair statement.  I

19   think he could, as the corporate counsel of the city.

20        Q    You indicated that -- let's take a step

21   back.  You started in twenty -- I'm sorry -- January

22   of '23; is that correct?

23        A    Correct.

24        Q    All right.  Do you recall when Mr. Miotke

25   left the city as city attorney?

                                              Page 161

1          A     I think the mayor relieved him, what, in --

2     I don't remember the month.   It was a couple months

3     after.

4          Q     All right.   And when he came, made

5     statements at public comment, was he city counsel -- a

6     city attorney at that time?

7          A     No.

8          Q     All right.   So when he was making those

9     statements, he did not have the ability to hire, fire,

10    or discipline you; is that correct?

11         A     Well, I don't know what his job is now.   He

12    could have, his -- whatever title he gave himself.   I

13    don't know what that is.

14         Q     Okay.   Do you know when the -- strike that.

15               Are you aware of when the city council

16    intervened in this matter?

17         A     January of '24, I'm guessing.   I don't know.

18         Q     Okay.   Are you aware when the court allowed

19    for them to intervene?

20         A     I've never seen a document that says they

21    can.

22         Q     Okay.   Number 28 indicates that "threats,

23    retaliation, and other adverse actions were in part

24    attempts to force Plaintiffs to provide illegal

25    preferential treatment for a police supervisor of Arab

Page 162

```
1    ethnicity who was under investigation."  Are you
2    familiar with this paragraph?
3         A    I am.
4         Q    Okay.  Who was the supervisor that was under
5    investigation?
6         A    It should have been Mo Bazzy if -- if that
7    is this.  And I believe it is Sergeant Mohamad Bazzy.
8         Q    Okay.  You say it should have been.  Are you
9    not sure or --
10        A    No, it is.
11        Q    What makes you -- strike that.
12             How were you threatened with regards to
13   Sergeant Bazzy?
14        A    We were in a meeting, and Councilman Baydoun
15   asked us to promote Sergeant Bazzy to a position
16   within the police department that he didn't earn.  He
17   asked us three times during a meeting.  All three
18   times, we denied the request.
19             And after that, the rhetoric, the
20   hostilities ramped up from these individuals, Mo
21   Baydoun, Hassan Ahmad, I believe is his name.
22        Q    When did this meeting take place?
23        A    March of '23.  I would want to take a look
24   at a record.  I don't -- I believe it's March '23.
25        Q    Now, when you indicated you were asked --
```

```
                                          Page 163
 1    strike that.

 2            Who was in the meeting with -- I assume it

 3    was you?

 4        A    It was.

 5        Q    And Mr. Baydoun?

 6        A    It was Chief Hart to my left.  I sat in the

 7    middle, Director Swope on my right.  Nancy Bryer sat

 8    across from Director Swope.  Believe Mo Baydoun sat

 9    across from me.  And I thought it was the -- the third

10    individual is Hassan Ahmad, council member, sat by the

11    chief.

12            So if I remember right, six people were in

13    the room.  And off the top of my head, I think Roger

14    Farinha might have been in the room too, but I -- I

15    might be mistaken on that.  But at least the three of

16    us were, the three -- chief, myself, and Director

17    Swope.

18        Q    In March of '23?

19        A    Yes.

20        Q    All right.  Now, when you indicate that he

21    asked you three times, did he ask you three times, or

22    did he --

23        A    He asked on three separate occasions.  On

24    each occasion -- Chief Hart answered the first time,

25    said it would not be viable.  "We aren't doing that."
```

Page 164

1    He asked again.  I said, "We're not doing that."  He

2    asked a third time; Director Swope said, "We're not

3    doing that."

4        Q    Okay.  Did Mr. Baydoun say anything like "If

5    you don't do this, you're going to be disciplined or

6    you're going to be fired" during that meeting?

7        A    Not at that time, no.

8        Q    Did he explain to you why he wanted this

9    particular officer to be promoted?

10       A    No.

11       Q    Did you know anything about Sergeant Bazzy

12   at the time?

13       A    I had some beginning information and

14   beginning interactions with him, rather.

15       Q    Do you know how long he had been with the

16   police department?

17       A    At that time during that meeting, I knew a

18   couple of years, obviously several years because he

19   was a sergeant.

20       Q    So in the grand scheme of things, he was a

21   long-term employee?

22            MR. BROWN:  Objection to form.

23   Mischaracterized prior testimony.

24   BY MS. HUNT:

25       Q    Would you understand him to be at least an

Page 165

1    established employee within the department?

2                    MR. BROWN:  Same objection.

3                    THE WITNESS:  He had been there some

4    time, but I -- the only comment I remember that whole

5    thing was that Mo Baydoun said he wanted people that

6    represented the community.

7    BY MS. HUNT:

8        Q     What did you take that to mean?

9        A     Apparently he wanted an Arab member.

10       Q     I'm sorry.  An Arab what?

11       A     Arab member.

12       Q     Member.  So it was your understanding that

13   he wanted someone of Arab descent to be elevated

14   within the police department so that he looked like

15   the people that was within the community.  Is that

16   what you understood it to mean?

17                    MR. BROWN:  Objection.  Form.

18                    THE WITNESS:  Can you restate that?

19   BY MS. HUNT:

20       Q     Was it your understanding that Mr. Baydoun

21   wanted someone within the -- I'm sorry -- to promote

22   someone within the police department that would look

23   like the people that were in the community that the

24   police department served?

25       A     That was my understanding, yes.

Page 166

1      Q     Okay.  Now, you indicate that this was

2   illegal preferential treatment for who would be Bazzy;

3   is that correct?

4      A     Correct.

5      Q     All right.  How was his request illegal?

6      A     He was asking us to promote outside the

7   established promotional process that Sergeant Bazzy

8   had already demonstrated he couldn't pass.  And you

9   know what?  Check that.  To be fair, I don't know if

10  we had found out he failed the lieutenant's test at

11  that point.

12            So I -- I want to curtail my statement for a

13  second.  But at the time this meeting, it definitely

14  was, he wanted us to promote him outside an

15  established promotional process.

16     Q     Did he ask you about the promotional

17  process?

18     A     He who, ma'am?

19     Q     I'm sorry.  Mr. Baydoun.

20     A     Can you rephrase the question?

21     Q     Sure.  Did Mr. Baydoun ask about how

22  promotions worked or how the promotional process

23  worked?

24     A     I only hesitate answering that because I

25  remember having that discussion.  I don't know -- I

Page 167

1  thought we had it that day 'cause that's what I found

2  so incredulous coming from a -- a lifetime of

3  government service is that there's a process.

4  　　　　And I was kind of shocked he didn't think

5  that was a thing, but we also had it at other times

6  too.

7  　　Q　　Okay.  So when you say it was discussed that

8  day, was it that you had spoken with him about it or

9  after his request there was the detail of "This is

10  what the process is"?

11  　　A　　After his request, his first request with

12  the chief, 'cause I was -- I was shocked he even asked

13  it.

14  　　Q　　Okay.  You were shocked that someone asked

15  if a particular sergeant who had been with the

16  department for years could be promoted?

17  　　A　　No.

18  　　　　　　MR. BROWN:  Objection.  Misstates prior

19  testimony.  Mischaracterizes prior testimony.

20  Argumentative.

21  　　　　　　THE WITNESS:  Yeah, that -- that's not

22  what I said.

23  BY MS. HUNT:

24  　　Q　　Okay.  Well, you just indicated that you

25  were shocked that he would ask you if what appears to

Page 168

1   be the second and third time if Bazzy could be

2   promoted; is that correct?

3        A    To a position of which he didn't earn.

4   Please finish the statement.

5        Q    But you indicated at that time you weren't

6   sure if he was -- if you knew that he had not earned

7   that -- if he had failed the lieutenant's exam; is

8   that correct?

9        A    Don't worry about the lieutenant -- Mo --

10       Q    Well, I'm worried about it, so I'm asking

11  about it.

12       A    Mo -- Mo Baydoun -- Mo Baydoun asked us to

13  promote him to two or three of levels above which he

14  would've been even eligible for.  He would then take a

15  lieutenant's test down the road that, had he passed,

16  he would've been eligible.  But he didn't pass.

17            So take -- hold that discussion off to the

18  side for a second.  During that meeting in March, Mo

19  Baydoun asked for us to promote him to basically my

20  job as a director, which he was not eligible for.

21       Q    Did you take an exam within the Dearborn

22  Heights Police Department to obtain your job?

23       A    No.

24       Q    So you don't know if you would've passed or

25  failed that position -- that test?

Page 169

1      A     Put the test in front of me.  I don't know.

2      Q     But it was a test you didn't take; correct?

3      A     There was no test to give.  Even if we were

4   to put him to captain, as -- as he wanted, whether it

5   was lieutenant, captain, or whatever, deputy chief, he

6   had not -- he would not have been eligible for it.

7      Q     Moving on to number 23, you indicate --

8                MR. BROWN:  Sorry, Monica.

9                MS. HUNT:  I'm sorry.  Thirty-two.

10                MR. BROWN:  There you go.

11  BY MS. HUNT:

12      Q     "On or around June 16th of 2023, an

13  excessive force incident civil rights violation

14  occurred during --

15      A     Oh, yeah.

16      Q     -- the arrest of a criminal subject."  Do

17  you recall -- or do you see that?

18      A     I do see it.

19      Q     Okay.  Is this civil rights violation

20  incident different from the one we spoke about

21  earlier?

22      A     Yes.

23      Q     Okay.  Do you -- are you aware of the

24  circumstances surrounding this June 16, 2023,

25  incident?

Page 170

1     A    On a high level, yes.

2     Q    Okay.  Were you involved at all in the

3  investigation?

4     A    No.

5     Q    Were you involved in the reporting?

6     A    No.

7     Q    Okay.  What was your understanding of this

8  incident?

9     A    From my recollection, there was a arrest at

10  a local business.  Three officers show up.  The

11  individual became rowdy or -- or became combative.

12  The officers went to take him into custody.  And one

13  of the officers utilized force outside what was

14  necessary to bring him into custody.

15          The -- it went unreported for a time.  The

16  only way it was found is when Director Swope was

17  reviewing body cam and saw it.

18     Q    Do you know what Director Swope did at that

19  time?

20     A    He started an inquiry.  And I believe once

21  an inquiry was done, we -- he forwarded it to MSP,

22  Michigan State Police.  From there, you would have to

23  ask him.  That's what I recall.

24     Q    Were you involved at all in the inquiry?

25     A    No.

1    Q    All right.  Did you do any investigations or

2    interviews?

3    A    No.

4    Q    Did you see the body cam video?

5    A    I don't think I did.  I remember him

6    describing it.  I don't think I did 'cause it wasn't

7    my incident.

8    Q    Now, there was a time that the Dearborn

9    Heights City Council made a motion to alter the

10   funding associated with your position.  Do you recall

11   that?

12   A    I do.

13   Q    Okay.  How did you become aware of that?

14   A    Through the -- I think they filed the motion

15   in the packet, and somebody forwarded it to me.

16   Q    All right.  Do you recall how many times

17   that motion was made?

18   A    I thought twice.

19   Q    All right.  Do you recall when it was first

20   made?

21   A    I thought the first time was December of

22   '23, if I remember right.

23        And then they tabled it, I thought, and then

24   it came back up in January of '24.

25   Q    All right.  In December of '23, were you

Page 172

1    still attending city council meetings on a regular

2    basis?

3         A    I don't think I was.

4         Q    Did you attend the city council meeting in

5    which the first motion was made with regards to the

6    funding of your position?

7         A    I don't recall.

8         Q    All right.  Did you speak with anybody about

9    that motion?

10        A    I would assume I did, yeah.

11        Q    Okay.  Do you know who you spoke with?

12        A    No, whether it was Chief Hart or Director

13   Swope, maybe the mayor, I don't recall.

14        Q    Okay.  And you mentioned that it was tabled;

15   is that correct?

16        A    A general term, yes.

17        Q    All right.  The motion was not voted on that

18   evening; is that correct?

19        A    Okay.  Fair enough.  Yes.

20        Q    Oh, I'm asking you, is that correct?

21        A    I beg your pardon.  I don't -- I really

22   don't recall how they -- quite frankly, during these

23   meetings, they're so chaotic I can never follow what

24   they're doing.

25        Q    Okay.  Did you watch the meeting?

Page 173

1       A    I think I might have watched it afterwards.
2    That's why my recollection is a little foggy.  I don't
3    know if I watched it real-time or if I watched it
4    afterwards after I heard what happened.
5       Q    Okay.  So in December of '23 when you
6    indicate that you believe the first motion was
7    brought, after that meeting, were you still receiving
8    your regular pay?
9       A    Yes.
10      Q    Okay.  And through the next meeting --
11   strike that.
12           You indicated that you believe it was
13   brought back for motion in January of '24.  Is that
14   accurate?
15      A    Seems about right.
16      Q    Okay.  Between the December meeting in which
17   they may have tabled the motion through when it was
18   brought back in January of '24, did you continue to
19   receive your pay as required under your contract?
20      A    Yes.
21      Q    Okay.  Do you recall, did you attend the
22   January 2024 meeting in which you believe the motion
23   was brought back to the table?
24      A    I really don't recall.  I can't recall if I
25   went, if I watched it, or I watched it afterwards.

```
                                        Page 174

 1       Q    Okay.  Okay.  You do recall at least seeing
 2  what happened during the meeting?
 3       A    Yes.
 4       Q    Whether it's in real-time or afterwards?
 5       A    Yes.
 6       Q    Okay.  Do you recall what happened with that
 7  motion?
 8       A    No, I really don't.
 9       Q    Okay.  Was there ever a time -- well, strike
10  that.
11            After that meeting, did you continue to
12  receive your regular pay as required under your
13  contract?
14       A    Yes.
15       Q    Okay.  Okay.  Did you continue to receive
16  the benefits as required under your contract?
17            MR. BROWN:  Including severance,
18  Monica, or excluding severance?
19            MS. HUNT:  No.  We're talking about the
20  benefits that we were talking about that he's entitled
21  to as an employee of the City of Dearborn Heights.
22            THE WITNESS:  In January of '24?
23  BY MS. HUNT:
24       Q    Correct.
25       A    I thought I had to park my car for a while.
```

Page 175

1    I thought I -- I thought I wasn't able to use my city

2    car for a while.  That -- off the top of my head,

3    that's kind of ringing a bell.  But to be fair and to

4    be clear, I think I got everything.

5        Q    Okay.  And you continued to work within the

6    City of Dearborn Heights?

7        A    I did.

8        Q    Okay.  And in December of '23, you signed a

9    new contract; is that correct?  I believe that was

10   Exhibit Number 2 that we looked at.  That extended the

11   term of your employment?

12       A    Yes.

13       Q    Okay.  And that extension continued?

14       A    Yes.

15       Q    All right.  I am going to hand you what is

16   going to be Exhibit 5.

17                   (Exhibit 5 was marked for

18                   identification.)

19                   MS. HUNT:  Let me make sure -- oh, you

20   don't want it.  I'm sorry.

21                   MR. BROWN:  One for each of us.

22                   THE WITNESS:  Okay.

23                   THE REPORTER:  If I may interrupt, if

24   you could give the original with the green sticker --

25                   MS. HUNT:  Oh, yes.

Page 176

1                    THE REPORTER:  Thank you.

2                    MS. HUNT:  Here, I'll give you that.

3                    MR. BROWN:  That's yours, V5.  So I

4      have too many.  Does anyone need one?

5                    MS. HUNT:  I'll take it back, then.

6                    THE WITNESS:  And for administrative

7      purposes, I don't have the green copies of 3 and 4.

8                    MS. HUNT:  Okay.  Four is the complaint

9      that you already have.  Is that okay?

10                    MR. BROWN:  We can figure this out at

11     the end, guys, I believe.  Right?

12                    THE WITNESS:  Okay.

13                    MS. HUNT:  Yes.

14     BY MS. HUNT:

15          Q    So I just handed you what appears to be an

16     email thread that began with you and Mayor Bazzi on

17     December 3, 2024.  Do you see that?

18          A    I do.

19          Q    It's on the second page.  If you go to the

20     very last page, which is Bates stamped 290 --

21          A    Yes.

22          Q    -- in your signature line, you have acting

23     chief of staff?

24          A    Correct.

25          Q    All right.  Who are you acting as chief of

Page 177

1    staff for or for what department?

2        A    Chief of staff for the mayor.  Mariana

3    Hernandez was on some type of leave.

4        Q    Okay.  How long were you acting as chief of

5    staff for the mayor?

6        A    Four weeks.

7        Q    What responsibilities did you have in that

8    regard?

9              MR. BROWN:  To clarify the record, is

10   that four weeks, F-O-U-R, or for weeks, F-O-R?

11             THE WITNESS:  F-O-U-R.

12             MS. HUNT:  Okay.

13             MR. BROWN:  Thank you.

14   BY MS. HUNT:

15       Q    As acting chief of staff for the mayor, did

16   you have additional duties other than your job as the

17   director of supportive services?

18       A    I did.

19       Q    Okay.  What were those duties?

20       A    Facilitation of mayor's office

21   administrative tasks, city business as it appears

22   to -- or as it pertains to departments completing

23   mayoral directions, that kind of thing.

24       Q    All right.  Now, you start this email

25   with -- I'll put it politely -- concerns about the

Page 178

1    treasurer?

2         A    Correct.

3         Q    Is that correct?

4         A    Yes.

5         Q    You stated earlier that you had concerns

6    with her handling of forfeiture funds; is that

7    correct?

8         A    Correct.

9         Q    Did you ever -- strike that.

10            Are you familiar with the incident that you

11   were speaking to Mayor Bazzi about in this complaint?

12        A    Yeah, I kind of remember it.  Yeah.

13        Q    Okay.  What was the issue?

14        A    We bounced a police union check.

15        Q    Did you talk to her about the check being

16   bounced?

17        A    I did.

18        Q    Why was the check bounced?

19        A    You'd have to ask her.

20        Q    What did she tell you?

21        A    I don't remember.  Some nonsensical answer I

22   couldn't make head or tail out of.

23        Q    Did the returned check ever get rectified?

24        A    I would assume it did, yes.

25        Q    How did you come to find out that the check

Page 179

1    had been returned?

2         A    As the acting chief of staff, Janet Lucas,

3    called me telling me that the union had complained

4    that the check bounced or something along that line.

5    And as chief of staff, I was asked to check into the

6    issue.  And frankly, I would've done it as support

7    services as well.

8         Q    How did you check into the issue?

9         A    Called Clayton.

10        Q    And did you have a conversation with her?

11   Did you have a meeting with her?

12        A    We had a conversation.

13        Q    Okay.  Was that by phone?

14        A    Always, or more times than not.

15        Q    All right.  And did she provide you with an

16   explanation as to why the check was bounced?

17        A    She said something, as a trained financial

18   individual, I couldn't make head or tail whatever she

19   said.  It didn't make sense to me.

20        Q    Did you ask her for clarification?

21        A    Multiple times.

22        Q    All right.  As a trained financial

23   professional, did you ever have the -- or ask her to

24   sit down with you so that you can explain?

25        A    Oh, yes.

Page 180

1      Q    All right.  Did you ever prepare trainings

2   for her?

3      A    It's not my job to train her.  She's the

4   professional.  Just look at her signature page.  She

5   has certifications from everybody known to God.

6      Q    All right.  But you just indicated that you

7   knew that she had -- or did not feel that she had the

8   acumen to perform the job.  Is that fair?

9      A    I didn't vote for her.

10     Q    All right.  So do you live in the City of

11  Dearborn Heights?

12     A    No.

13     Q    Okay.  So you couldn't vote for her; is that

14  correct?

15     A    No, I wouldn't anyway.

16     Q    Okay.  So with understanding that you did

17  not believe that she understood this part of her job,

18  did you offer to sit down or -- I'm sorry -- create

19  trainings to assist her with this position?

20     A    Again, I can only explain it to her.  I

21  can't understand it for her.

22     Q    All right.  In this email, you indicate that

23  the treasurer engaged in harassing and defamatory

24  behavior?

25     A    Correct.

Page 181

1      Q     Who is this harassing and defamatory
2   behavior toward?
3      A     Me.
4      Q     What did she say to you?
5      A     Again, some nonsensical, you know,
6   "You're -- you're yelling at me."  We were on the
7   phone.  There was no yelling.  She made up various
8   facts of, you know, "You're making a bigger deal out
9   of this than it needs to be."  No, I'm making it an
10  inappropriate level deal.
11            Again, I -- I really wish I recorded her so
12  everybody else can enjoy the nonsensical stuff that
13  comes out of her mouth.  I wish I had.  Quite frankly,
14  she's one of the most condescending, ill-advised,
15  uneducated individuals I've ever met in my life.
16     Q     Okay.  So you indicated that her engaging in
17  harassing and defamatory behavior toward you --
18     A     Yes.
19     Q     -- was her saying that you're yelling at
20  her?
21     A     Yes.
22     Q     And that you're making a bigger deal of the
23  issue than it was?
24     A     For the most part, yes, generally speaking.
25     Q     Okay.  And then you go on to talk to the

Page 182

1    mayor about her knowledge being vastly limited.

2         A    Yes.

3         Q    Calling her unprofessional?

4         A    Yes.

5         Q    And indicating that she has proven that her

6    actual knowledge, skills, and abilities were limited?

7         A    Yes.

8         Q    You indicated that she has nonsensical

9    segues while avoiding main conversation; is that

10   correct?

11             MR. BROWN:  Objection.  Best evidence.

12   The document speaks for itself.  Is there a question

13   we can answer about the document?

14             MS. HUNT:  I've been asking him.

15   BY MS. HUNT:

16        Q    Is that what you've indicated to the mayor

17   during the course of this communication with him?

18        A    Yes.

19        Q    Okay.  And you don't find that to be

20   defamatory?

21        A    No.

22             MR. BROWN:  Objection.  Argumentative.

23   BY MS. HUNT:

24        Q    Okay.  But it's your --

25             THE REPORTER:  I didn't hear your

Page 183

1   answer.

2                   THE WITNESS:  It was no.

3                   THE REPORTER:  Thank you.

4   BY MS. HUNT:

5       Q    But to be clear, to your knowledge, what she

6   said to you was that you were yelling at her and that

7   you're making a bigger deal out of the bounced check?

8       A    Out of -- more or less, yes.  I

9   would've -- there were other issues being said.  I

10  don't recall them at this time.

11      Q    All right.  She indicates that, in that

12  conversation, if we turn to the very first page, which

13  is Bates 288, that you immediately elevated and that

14  she respectfully requested that you not elevate or

15  raise your voice.  Do you recall that?

16      A    I recall reading it.

17      Q    Okay.  Would that be what you just stated,

18  at least translated into that you were yelling at her?

19                  MR. BROWN:  Objection to form.

20  Ambiguous.  Vague.  Unintelligible.

21  BY MS. HUNT:

22      Q    When she says here she "requested that he

23  not elevate and raise his voice," is that what you

24  took as her asking you or telling you that you were

25  yelling at her?

Page 184

1       A     She said it during the conversation too.

2       Q     Right.  During the conversation with you?

3       A     Yes.

4       Q     That you were yelling at her?

5       A     Yes.

6       Q     And that's what you indicated was, I think

7    you said, harassing and defamatory?

8       A     Yes.

9                   MR. BROWN:  Objection.  Misstates prior

10   testimony.

11   BY MS. HUNT:

12      Q     She also goes on to say that you continued

13   to raise -- I would assume -- you said "he's

14   continued."  I would assume that to be that he

15   continued to raise his voice.  Is that what you

16   understood it to mean?

17                  MR. BROWN:  Objection to form.  Best

18   evidence.

19                  THE WITNESS:  You would have to ask

20   her.

21   BY MS. HUNT:

22      Q     Okay.  All right.  And she indicated that

23   she -- "that he continued, and I hung up," meaning she

24   hung up.  "No one should ever be yelled at or treated

25   in such disrespect."  Did she hang up the call on you?

Page 185

1   Do you recall that?

2        A    I don't remember.

3        Q    Okay.  Do you know if there was a

4   conversation after that phone call with Ms.

5   Hicks-Clayton with regards to the unpaid check or the

6   returned check?

7        A    I don't recall.

8        Q    Okay.  You don't recall if there's a

9   conversation between the two of you?

10       A    That's correct.

11       Q    Okay.  I am handing what is now 6.

12                  (Exhibit 6 was marked for

13                  identification.)

14                  MS. HUNT:  Here you go.

15                  MR. BROWN:  That's one for each of us.

16                  THE WITNESS:  I didn't know if you

17  wanted to look that first.

18                  MR. BROWN:  Oh, sorry.

19  BY MS. HUNT:

20       Q    Now, this is a email that was provided to

21  the Dearborn City Council.  It appears to at least be

22  directed to Chairman Baydoun.  Have you seen this

23  document before?

24       A    No.  At least I don't recall seeing it, to

25  be fair.

Page 186

1        Q     Okay.  All right.  Do you recall

2   investigating a Ticketmaster charge?

3        A     Oh, yes.

4        Q     Okay.  What was that charge?

5        A     So at some point in time, a American Express

6   bill hits Mariana Hernandez, and there's charges on

7   there she didn't understand.  She didn't even know we

8   had the card at the time.  She looked at the charges;

9   she couldn't understand what they were.

10            She checked into it briefly.  She told me,

11  said, "I don't know what these are."  So she turned it

12  over to me.  By this time I was already internal

13  affairs for the city.  So I started looking into them

14  for -- I don't know.  I took maybe an hour or so,

15  checked all the charges.

16            If I remember right, there were five

17  charges, give or take.  I believe I'm correct.  Four

18  charges to Zoom, the -- the teleconferencing system,

19  and one charge to Ticketmaster.

20            Within, again, an hour talking to Zoom, I

21  could tell that they were actual charges that the city

22  established back in 2020 during COVID to establish

23  a -- you know, the online council meetings back when

24  all this started.

25            So they had set up these accounts.  They

Page 187

1  kind of forgot what account they were being charged

2  to.  They forgot they had them.  And we clarified

3  those.  The fifth charge is what the problem was.  It

4  was to Ticketmaster.  City is not buying tickets to

5  events.

6          So I started checking into it, made a few

7  phone calls with Ticketmaster.  And come to find out,

8  it was for a concert, some religious singer, some

9  Christian rock group or something, if I remember

10 right, to perform somewhere down in Ohio.

11         Do a couple more checks.  Come to find out

12 that the tickets were actually received by Lisa

13 Hicks-Clayton daughter in a town she lives in in Ohio.

14 Even further found that Lisa Hicks-Clayton and her

15 daughter had attended one of these concerts at another

16 venue earlier on.

17         When I found that this -- this is what it

18 was, hey, it happens in governmental work.  There's

19 credit cards for business, you know, credit cards for

20 the government, credit cards for individuals.

21 Sometimes they get mixed up.  I've seen it happen a

22 lot.

23         It happened to individuals I worked with at

24 ATF.  It's not a big deal.  It's a rectifiable issue,

25 but it's not a big deal.  I presented it to Lisa

Page 188

1    Hicks-Clayton.  Come to find out, she started throwing
2    a fit, asking why I was looking into it.
3              As this proceeded, she denied the charge was
4    hers.  She denied she had anything to do with it.  And
5    the more and more I kept asking, she kept denying it
6    more.  I believe she signed at least two affidavits
7    with the credit card company saying that wasn't her
8    charge.
9              Once I got to a point where this got outside
10   my purview, because now it's kind of "criminal" 'cause
11   it involves money, it's no longer a city police or
12   city procedural issue that my purview is, I turned it
13   over to the detective bureau at Dearborn Heights
14   Police.
15             At that point, I'm not sure how they
16   proceeded with it, whether they finished
17   investigating, 'cause I was hands off.  I did hear in
18   the past day or two Ms. Clayton has now accepted this
19   charge as it was done by our daughter.
20        Q    That you heard that within the last day of
21   two of today?
22        A    Today.
23        Q    Who did you hear that from?
24        A    I heard a rumor through a source.
25        Q    And who was that source?

```
                                             Page 189
 1      A    Individual who called me and said, "Hey,
 2   Paul, you should hear this."
 3      Q    Is that person still with the police
 4   department?
 5      A    They're not with -- it wasn't with the
 6   police department.  I don't know who it was.
 7      Q    You don't know who it was?
 8      A    Yeah.
 9      Q    So you heard some random gossip and believed
10   it to be true?
11      A    I didn't say I believed it to be true.  I
12   said I just heard it.  You can verify that with the
13   city.  But when all this was going on, multiple times
14   the treasurer accused me of targeting her; this wasn't
15   her.
16           But this is a classic example of how Clayton
17   decides to do business.  She is questioned on things.
18   She decides to state she's being targeted even though
19   she's the actual perpetrator.
20           MR. BROWN:  Monica, if you have any
21   documentation concerning what actually happened with
22   Hicks-Clayton over the last few days, I'd like to see
23   that produced in discovery, if you could.
24           MS. HUNT:  I don't know what that says.
25           UNIDENTIFIED SPEAKER:  What's that?
```

Page 190

1           MS. HUNT:  I have no idea what that
2    says.
3    BY MS. HUNT:
4        Q    So after this incident went to the detective
5    bureau, you have no idea what happened with it --
6        A    I don't.
7        Q    -- until you heard this rumor yesterday?
8        A    Mm-hmm.
9        Q    Okay.  So you don't know what information
10   was discussed during the course of that investigation?
11       A    I don't.
12       Q    All right.  You don't know whether or not
13   there was -- strike that.  You don't know what Ms.
14   Clayton testified to as it relates to that
15   investigation?
16       A    I don't, no.
17       Q    Okay.  Did you ever receive access to the
18   AMEX account?
19       A    Partially, yes.
20       Q    All right.  Partially, what does that mean?
21       A    I received some information.  I actually
22   made a formal request to be placed on the account to
23   gain full access, and I was denied.
24       Q    Who denied you?
25       A    Clayton.

Page 191

1    Q    Did you go to the mayor and ask for access?

2    A    I did.

3    Q    All right.  Did he provide you with access?

4    A    He asked that the treasurer do it, and she

5    refused.

6    Q    All right.  Did you go to the chief of

7    police and ask to advise that access was needed?

8    A    That's not within that chief's purview.

9    Chief can't make that person do that.

10   Q    All right.  But the chief is over the police

11   department; is that correct?

12   A    Yes.

13   Q    And this was a piece that you -- an employee

14   of the police department was investigating; is that

15   correct?

16   A    I did this as internal affairs for the city,

17   not the police department.

18   Q    All right.  Did you act as internal affairs?

19   A    I did.

20   Q    How long were you acting as internal

21   affairs?

22   A    I think I got that role in January of 2024.

23   Q    Who worked --

24   A    Maybe a little bit more before that.

25   Q    Who worked with you in internal affairs?

Page 192

1        A      Nobody.

2        Q      So you were the entire internal affairs

3   department?

4        A      For the city, yes.

5        Q      For the City of Dearborn Heights?

6        A      For the city only.  The police department

7   had its own process.  I only handled city matters,

8   city procedural matters.

9        Q      And how long did you do that?

10       A      I think it was from January 2024 until I

11  left.

12       Q      Who handled IA for the police department?

13       A      Swope would've been the overseer for that.

14  And then I know Captain Hatten took various portions

15  of it, and Lieutenant Guzowski.  You would have to ask

16  Swope.

17              MR. BROWN:  So, Monica, you were having

18  a separate conversation and didn't respond to me,

19  which is understandable.

20              But I'm asking you now, if you could,

21  to produce all documentation in your possession with

22  respect to how this incident culminated and whether

23  Hicks-Clayton did, in fact, in the end, acknowledge

24  those charges were her daughter's.

25              Thank you.

Page 193

1    BY MS. HUNT:

2         Q    And I will ask you, Mr. Vanderplow, on the

3    electronic device that you indicated that you maintain

4    some city documents on, did you maintain any documents

5    related to this particular investigation that you did?

6         A    Yes.

7         Q    Okay.

8               MS. HUNT:  So I'll say same.

9               MR. BROWN:  Yes, ma'am.  Everyone gets

10   everything.  Everything I send to you will also be

11   sent to Gary.

12              MS. HUNT:  Same here.

13   BY MS. HUNT:

14        Q    There was a point in time where we talked

15   about it earlier that you became interim comptroller?

16        A    Correct.

17        Q    Do you recall that?

18        A    I do.

19        Q    Do you recall what date you began as interim

20   comptroller?

21        A    Late March/early April of '25, whatever day

22   the comptroller walked off the job.

23        Q    What were your responsibilities as

24   comptroller, interim comptroller?

25        A    Facilitation of the role as according to the

Page 194

1   job description.

2        Q    What changed in your day-to-day

3   responsibilities?

4        A    As far as --

5        Q    Taking on the duties as interim comptroller.

6        A    Just manage the office, manage the duties of

7   the department.

8        Q    Were there any particular individuals

9   that -- strike that.

10            Were there individuals that you took on the

11   role of supervising?

12        A    Yeah, about five, five individuals.

13        Q    Who are those individuals?

14        A    I don't recall the names.  I can give you --

15        Q    Do you recall the title?

16        A    There were three people over in the water

17   department.  There was Mahdi Baydoun, a young lady who

18   sat next to him -- and I -- I beg your pardon; I

19   forget her name.  And then a third individual who

20   handled payroll.  And I -- I'm sorry; I forget her

21   name.  If you said them, I'd recognize it, but I don't

22   recall.

23        Q    And you retained that position until you

24   left in May of '25?

25        A    Until I was constructively terminated, yes.

Page 195

1        Q    All right.  Now, in your complaint, I'm
2    looking at --
3              MR. BROWN:  The big one.
4    BY MS. HUNT:
5        Q    -- page 11.  You have indicated that your
6    First Amendment rights were violated.  How were -- how
7    do you believe your First Amendment rights were
8    violated?
9        A    Well, I was told I can't present in front of
10   council.  I can't present anything anymore.
11       Q    Who told you you couldn't present anything?
12       A    Tom Wencel.
13       Q    And that's the incident when you indicated
14   that he claimed he would not vote on anything that
15   you --
16       A    Oh, he didn't claim it.  He said it.  It's
17   on the recording.
18       Q    Did he say you can't come back before city
19   council?
20       A    I don't want to paraphrase him.  I'd rather
21   refer to the recording for his actual words.
22       Q    Okay.  Did you take it that he meant that
23   you could not come back before city council?
24       A    Yes.
25       Q    Does Tom Wencel vote for the entire city

Page 196

```
 1    council?
 2         A    He's one of seven.
 3         Q    One of seven.  So there are six other votes
 4    that would vote on any matter that you brought before
 5    city council; is that correct?
 6         A    Yes.
 7         Q    All right.  So Tom Wencel's vote isn't the
 8    end-all with regards to particular matters brought
 9    before the council; is that correct?
10         A    Correct.
11         Q    How else were your First Amendment rights
12    violated?
13         A    Every time I would speak even before that, I
14    would be interrupted.  I would be corrected.  I would
15    be told I was not accurate.  Just a general denial of
16    full expression as a city employee.
17         Q    And where did these interruptions take
18    place?
19         A    City council meetings.
20         Q    Was it during public comment?
21         A    No, it was during department report.
22         Q    Okay.  So your claim is that you would
23    either be corrected or interrupted when making a
24    report?
25         A    That, and -- and the other general lying
```

Page 197

1    that city council would state that I had done or

2    didn't do or whatever the case may be, whereas

3    anything I would say would then be immediately --

4    comments would be made to where I wouldn't be able to

5    follow up on.

6           Therefore, I was denied my ability to speak.

7       Q   Who told you you couldn't follow up on?

8       A   Oh, Councilman Saab, Councilperson Baydoun.

9    Again, it's in the recordings.

10      Q   So I'm asking you, when did they tell you

11   that you could not speak and follow up to a

12   presentation that you were giving?

13      A   Again, as I was speaking or answering their

14   questions and they did not like the answers they

15   heard, they would cut me off and not allow me to

16   finish.

17          I don't know how much clearer I can be on

18   that.

19      Q   Well, I'm asking you, when did this happen?

20      A   I would have to go back to the recordings

21   and mark the specific dates.

22      Q   Was that it as it relates to your First

23   Amendment rights?

24      A   Yes.

25          MR. BROWN:  Objection to form.

Page 198

```
 1   BY MS. HUNT:
 2       Q    Are those the only allegations that you have
 3   as to your First Amendment rights being violated?
 4               MR. BROWN:  Same objection.  Calls for
 5   a legal conclusion from a lay witness as well.
 6               THE WITNESS:  I'm not sure how to
 7   answer your question.
 8   BY MS. HUNT:
 9       Q    Are there any -- I'm sorry.  Are there any
10   other incidents that you can tell me in which you
11   believe your First Amendment rights were violated?
12       A    Not off the top of my head.
13       Q    All right.  Now, you also made a
14   whistleblower claim.  Do you know what the
15   Whistleblower Protection Act is?
16       A    I do.
17       Q    Are you familiar with that?
18       A    I am.
19       Q    Okay.  And you made the claim that you were
20   either retaliated against or harassed for certain
21   reportings; is that correct?
22       A    Correct.
23       Q    What reportings were you retaliated against
24   for?
25       A    A couple I can think of off the top of my
```

Page 199

1    head would be notification of the evidence room being

2    in complete disarray; refusal to promote people who

3    were not credible, if you will, to take that position;

4    findings of various other issues within the

5    department, such as finding a shotgun in an abandoned

6    vehicle, finding -- I know when they found the tire

7    machine at a private entity, the city's tire machine

8    at a private entity, and following up on that; the

9    forfeiture accounts, when we started looking into

10   that.  And -- just off the top of my head.

11        Q    How were you retaliated against when you

12   discovered the forfeiture accounts were not managed

13   properly?

14        A    Again, it's -- it's just a general -- you

15   identify a problem.  You bring it up to whether it's

16   council or whatever.  And instead of actually

17   addressing the problem, they disparage and make you

18   the bad guy, i.e., you know, one time we looked at the

19   treasurer.

20             We found money missing out of the treasury.

21   Nobody ever followed up on that, but they sure did

22   want to make sure that they said I was to blame or I

23   was the reason why this was such a big deal.  Not one

24   time did anybody ask where did that money go.

25        Q    So the forfeiture accounts, the ones that we

```
                                              Page 200
 1   spoke about earlier with regards to the federal and
 2   state forfeiture funds --
 3        A    Yes.
 4        Q    -- you're saying that you were retaliated
 5   against or harassed for discovering the mismanaged
 6   funds?
 7        A    Yes.
 8        Q    How were you retaliated against or harassed?
 9        A    Well, oddly enough, here we are on page 11,
10   number 55.  Council Member Saab filed a false stalking
11   report against me that didn't actually happen.
12        Q    That's Officer Saab?
13        A    No.  No, that's Council thing Saab.
14        Q    I'm sorry.  Not Officer Saab.  Councilman
15   Saab?
16        A    Yes.
17        Q    Okay.  That's one individual; correct?
18        A    Mm-hmm.
19        Q    All right.
20             THE REPORTER:  Is that a yes or no?
21             THE WITNESS:  Yes.  I beg your pardon.
22             THE REPORTER:  Thank you.
23   BY MS. HUNT:
24        Q    When did he file that complaint against you?
25        A    March '24.
```

Page 201

1      Q    Of what year?

2      A    March of '24.

3      Q    March of '24.  And if I remember correctly,

4   you indicate that you discovered the forfeiture fund

5   issue was in January of '23?

6      A    Yes.

7      Q    Okay.  So you're saying Councilman Saab

8   waited a year to file a report against you?

9      A    He wasn't a councilman but a month at this

10  point.

11     Q    What does that have to -- what does that

12  mean?

13     A    He started his term in the beginning of '24.

14  So as soon as it came -- he came in, he did this.

15     Q    Okay.  Okay.  So he waited to become a city

16  councilman to file a complaint against you?

17     A    I guess he just learned -- he just learned.

18     Q    So he waited for you -- to become a city

19  councilman to start this complaint and retaliation

20  process against you.  Is that what you're indicating?

21     A    He did.  He did, yeah.

22     Q    All right.  Now, you mentioned that there

23  was a shotgun located in a vehicle that you

24  discovered.  When was that?

25     A    I'd have to look at the exact date.  It was

Page 202

1    the summer of '23.

2        Q    All right.  Who did you report that to?

3        A    The on-duty sergeant, whoever that was, as

4    well as Director Swope and Chief Hart.

5        Q    How were you retaliated against because --

6    for reporting that located shotgun?

7        A    Again, it's -- it's, as things were coming

8    up, the statements and treatment from council members

9    would ramp up as I'd find things and bring them up to

10   people's attention.  They would start with the, you

11   know -- and again, it's well documented in council

12   meetings.

13           "Vanderplow is, you know, running rogue.

14   He's doing this; he's doing that."  And it's just a

15   general defamation of my name and my characteristics

16   and my qualifications.

17       Q    So it's your understanding that them

18   indicating that -- strike that.

19           Is your understanding that the council

20   indicating that you were possibly running rogue, your

21   words --

22       A    I didn't use "running rogue."  That wasn't

23   my word.

24       Q    You just indicated that you indicated -- you

25   said that they said you were either going rogue or

Page 203

1   rogue; is that correct?

2       A    Am I allowed to ask for clarification on

3   that?

4               MS. HUNT:  I will ask for

5   clarification.

6               THE REPORTER:  One moment.

7               (The reporter repeated the record as

8               requested.)

9               THE REPORTER:  You may proceed.

10               MS. HUNT:  Thank you.

11               THE WITNESS:  Before I start, I beg

12   your pardon, ma'am.

13   BY MS. HUNT:

14       Q    That's fine.  We --

15       A    I'm sorry.

16       Q    I understand that sometimes when we talk we,

17   you know --

18       A    I beg your pardon.  That is --

19       Q    -- start talking and not quite follow what

20   we're doing or saying.  Okay.  So it's your indication

21   or statements that by indicating that you were running

22   rogue and that you -- that they were disparaging or

23   retaliating against you?

24       A    Yes, ma'am.

25       Q    All right.

Page 204

1            THE WITNESS:  Thank you for looking

2    that up.

3    BY MS. HUNT:

4        Q    And throughout this time, you continued

5    to -- strike that.

6            You received a raise while with the City of

7    Dearborn Heights; is that correct?

8        A    In what time frame, ma'am?

9        Q    If I recall correctly, you received about a

10   $27,000 raise in December of '23 that was retroactive

11   to July of '23?

12       A    You are correct.

13       Q    Is that correct?

14       A    Yes.

15       Q    And you had your contract extended during

16   this time as well; is that correct?

17       A    Yes, the mayor did that.

18       Q    Okay.  Now, your -- we're looking at what is

19   now Exhibit 4 --

20            MR. BROWN:  The amended complaint?

21            MS. HUNT:  -- of the amended complaint.

22   Correct.

23   BY MS. HUNT:

24       Q    If we look at page 29, it's dated December

25   20 of '24.  Do you see that?

Page 205

1     A     Yeah.

2     Q     And I think if we look at the top, it

3   indicates that it was filed December 20th of '24; is

4   that correct?

5     A     Yes.

6     Q     At that time, what Fair Labor Standards Act

7   complaint or claim do you feel you had?

8               MR. BROWN:  I'm going to object to the

9   question as calling for a legal opinion or conclusion

10   from a lay witness.

11               THE WITNESS:  At this time, I can't

12   answer that.  I would refer to my attorney on that.

13   BY MS. HUNT:

14     Q     Okay.  Do you know what the Fair Labor

15   Standards Act is?

16     A     I am --

17               MR. BROWN:  Same objection.

18               MS. HUNT:  I'm just asking if he knows

19   what it is.

20               THE WITNESS:  I'm aware of it, yes.

21   BY MS. HUNT:

22     Q     Okay.  Sitting here today, do you know or do

23   you believe you have a claim under the Fair Labor

24   Standards Act?

25     A     Based on discussions with my attorney, yes.

Page 206

1    Q    Okay.  In '24 -- I'm sorry -- December 24th

2    of 2024, did you believe that you had claims under the

3    Fair Labor Standards Act?

4              MR. BROWN:  Same objection.  Calls for

5    legal expertise and legal conclusion from a lay

6    witness.

7              THE WITNESS:  According to my

8    discussions with my attorney, I do believe that.

9    BY MS. HUNT:

10    Q    You've also indicated, which is listed on

11    page 15, that your employment contract was breached.

12    Do you see that?

13              MR. BROWN:  What paragraph, please?

14              MS. HUNT:  Page 15.  It's the count,

15    breach of employment contract.

16              MR. BROWN:  Oh, I'm sorry.  The whole

17    count.

18    BY MS. HUNT:

19    Q    In December of '24 when this complaint was

20    filed, how do you believe your contract was breached?

21    A    I believe at this point in '24 was the first

22    time they tried to defund the position, if I remember

23    the timeline right.

24    Q    In December -- or I'm sorry.  In 2024?

25    A    Yeah.  Yeah, I believe.  You know what?  No,

Page 207

1    I'm not right on that time.  I beg your pardon.  I

2    think at this time -- 2024 -- I'm trying to put the

3    timeline right -- the various acts of -- oh, I -- I

4    was on the contract.

5         Trying -- again, trying to put the timeline

6    right.  I think it was the culminative acts of council

7    with whether it was the stalking complaint, the

8    various comments made to me, various comments made

9    in -- in open council meetings that did not allow me

10   to actually facilitate my -- my duties.

11        Again, based on discussions with my

12   attorney, I would refer that question to him.

13   Q    But as you sit here today, you believe it's

14   based on comments that were made to you by council?

15   A    Among other things, again, things that I'm

16   not recalling off the top of my head, presented with

17   this 20 minutes ago or whatever it was.

18   Q    Okay.  So were you, prior to 2024, with the

19   exception of the one check that was returned --

20   A    Sure.

21   Q    -- when you first became employed, did you

22   regularly receive your paycheck?

23   A    I did.

24   Q    And you regularly received the benefits that

25   you had feel you were entitled to it at the time?

Page 208

1        A     Yes.

2        Q     Okay.  You were able to perform the

3    functions of your job?

4        A     No.

5        Q     How were you not able to perform the

6    functions of your job?

7        A     Again, I was not allowed to put my name on

8    any document going before council.  I was not allowed

9    to present in front of council.  Any document that I

10   authored and put somebody else's name on was approved.

11   So no, I would not consider myself as being -- being

12   able to function in my position.

13       Q     Did anyone tell you that you could not --

14   other than Wencel indicating that he would not approve

15   anything that you brought to council, did anyone else

16   tell you that you cannot bring anything before

17   council?

18       A     I know Saab made a few comments here and

19   there echoing that same thing.  And matter of fact, I

20   think Saab tried to get to where I couldn't speak at

21   council meetings.  I would have to check back on the

22   recordings for the exact quote he made.

23             And again, when Saab would read unverified

24   allegations on me into the record into the recording,

25   tends to ruin your credibility.

Page 209

1      Q    But for purposes of the question that I
2   asked, no one told you that you could not present
3   before council or you were not allowed to present
4   before council; is that correct?
5      A    Tom --
6              MR. BROWN:   Objection to form.
7   Misstates prior testimony.
8   BY MS. HUNT:
9      Q    No one told you that; is that correct?
10      A    Tom Wencel did.
11      Q    If I remember correctly, Mr. Wencel
12   indicated that he would not approve anything, your
13   words, that he would not approve anything that you
14   brought before council.  He did not indicate to you
15   that you could not present before counsel?
16      A    No.  I believe if we look back at the
17   recording, he also said "You need to get somebody
18   else."  And again, I would -- I would state let's go
19   back and look at the recording.
20      Q    Well, if that's what you're stating now, I
21   can tell you I do not believe that's a part of the
22   record, but when we see the transcript, we will
23   determine --
24              MR. BROWN:   We're not talking about the
25   transcript here, Monica.  I think the recording in

Page 210

1    that instance is --

2              MS. HUNT:  The record of the city

3    council meetings?

4              MR. BROWN:  Yes, the videotape.

5              MS. HUNT:  Okay.  My apologies on that,

6    then.

7              THE REPORTER:  I just want to remind

8    everyone to please speak one at a time.

9              MR. BROWN:  Sorry.

10              THE REPORTER:  Thank you.

11              MS. HUNT:  Sorry.

12   BY MS. HUNT:

13     Q    Now, we talked earlier about particular

14   civil rights issues that you may have reported on

15   behalf of yourself or others, particularly in other

16   positions that you held outside of the City of

17   Dearborn Heights.

18              But in this particular claim, you make

19   complaints or claims of civil rights issues that

20   were -- or claims that you're bringing as it relates

21   to your position or your job at the City of Dearborn

22   Heights.  How do you believe that your civil rights

23   were violated?

24     A    Again, I -- I faced undue ridicule and

25   statements by members of council, whereas other

Page 211

1   members of this department have not had to do it.

2           For instance, Farhat, Hussein Farhat, he

3   didn't face the same issues that I did.  You know,

4   Sergeant Bazzy -- Sergeant Bazzy had various issues

5   that he was not held to task for by council as I have

6   been for.  And those are examples.

7       Q    Okay.  So you're saying that because

8   Sergeant -- or Farhat and Sergeant Bazzy did not face,

9   essentially, scrutiny from the council, you were --

10  your civil rights were violated?

11      A    Yes.

12      Q    Okay.  Anything else?

13      A    Not that I can recall at this time.

14      Q    And why do you believe you were treated

15  differently than Bazzy and Farhat?

16      A    Well, like the statement made by

17  Councilperson Baydoun early on, they wanted somebody

18  who represented their community, and apparently I was

19  not that person.

20      Q    Now, you also indicate that you were

21  discriminated against in addition to the violation of

22  the civil rights.

23      A    Okay.

24      Q    How do you believe -- or at least as is

25  related in your complaint, tell me how you believe you

Page 212

1   were discriminated against while employed with the

2   City of Dearborn Heights.

3       A    I was not allowed to sign financial

4   instruments as a -- as the acting interim comptroller.

5   That was voted six-nothing that I wasn't able to do

6   that, but yet they just had a vote a week or so ago

7   where they approved an individual to do that who has

8   vastly less experience or education than I do.

9       Q    So you believe you were discriminated

10  against by not being allowed to sign documents?

11      A    By not being able to discharge the duties of

12  my job at the time.

13      Q    Was that the only duty of your job to --

14      A    No, there were several.

15      Q    -- to sign off on financial documents?

16      A    There were several.  That was one of the

17  main jobs.

18      Q    Was there anything else?

19      A    There were other functions such as access to

20  view bank accounts, see other financial documents

21  throughout the city, see other financial transactions

22  for the city and to facilitate those.

23      Q    And how do you believe that because you

24  weren't able to access financial transactions or view

25  bank accounts you were being discriminated against?

Page 213

1    Here it specifically says you were discriminated

2    against because of your age, race, and being over the

3    age of 40.

4                    MR. BROWN:  Where does it say that,

5    Monica?  What --

6                    MS. HUNT:  This is the ALCO, claim

7    number 6.

8                    MR. BROWN:  What paragraph?

9                    MS. HUNT:  101, 102.

10                   THE WITNESS:  Based on conversations

11   with my attorney that I met that requirement.

12   BY MS. HUNT:

13       Q    So you're indicating that because of your

14   age and your race and I believe -- your age and your

15   race, you were discriminated against -- strike that.

16           Because of your age and race, you're

17   claiming that you were being retaliated and

18   discriminated against by not being allowed to access

19   bank accounts and financial transactions; is that

20   right?

21                   MR. BROWN:  Objection.  Misstates prior

22   testimony.

23   BY MS. HUNT:

24       Q    Is that the claim that you're making?

25       A    Yes, among other things.  Yes.

```
                                        Page 214
 1        Q    Okay.  What are the other things?
 2        A    Discussions I had with my attorney indicated
 3   to me that I met this requirement.
 4        Q    Okay.  So you met the requirement to make
 5   the allegations.  I'm curious to what happened to you
 6   that makes you believe you were discriminated against
 7   because of these things, because of your age and
 8   because of your race.
 9        A    Based on the items listed in this complaint
10   and other items that I've already discussed, I believe
11   I have met this requirement.
12        Q    Okay.  So I'm asking you -- and I can read
13   what's in the complaint.  But and I know we discussed
14   a lot of things here, but what things make you believe
15   that you were being discriminated against?
16        A    Again, as -- as I've previously stated, the
17   ability for me to discharge the duties of my job, no
18   matter what title I held or what duties I held, were
19   truncated by comments and actions by your clients.
20        Q    So who in the City of Dearborn Heights,
21   understanding the city council is here for purposes of
22   this matter separate, who in the City of Dearborn
23   Heights administration discriminated against you based
24   on your age and race?
25        A    The one I can think of is the treasurer,
```

Page 215

1    based on her actions to me specifically but not to

2    others of Arab or Muslim culture.  She treated me in a

3    disparate way.

4         Q    How did she treat you in a disparate way?

5         A    Refused to take phone calls, would refuse to

6    have an intelligent conversation, would have

7    discussions that were nonsensical, and would deny

8    requests on a repeated basis.

9         Q    Do you know if any other employee within the

10   City of Dearborn Heights of, as you state, Arab

11   descent or Middle Eastern descent called and spoke

12   with the treasurer in elevated tones?

13        A    I have no idea.

14        Q    Okay.  You don't know if any employee of

15   Arab descent within the City of Dearborn Heights

16   called and yelled at her?

17             MR. BROWN:  Objection.  Assumes facts

18   not in evidence.  Misstates prior testimony.

19   BY MS. HUNT:

20        Q    I'm just asking you, do you know if any --

21   if they ever called and yelled at her?

22        A    I don't know.

23        Q    All right.  How were you discriminated

24   against because -- based on your age?  If we're

25   looking -- strike that.

Page 216

1          Looking at page 21, count number 8, there's
2    an indication that it was a federal -- the Federal Age
3    Discrimination in Employment.  So based on your age,
4    how were you discriminated against during your
5    employment with the City of Dearborn Heights?
6          A    Based upon the actions displayed to me and
7    to me alone, I don't see anybody else younger than me
8    being treated in such a manner.
9          Q    Okay.  What are those actions that were
10   displayed to you?
11         A    Again, the defamatory statements, the
12   unsubstantiated statements during open council
13   meetings, the false complaints, the other actions by
14   council that are on record.  Nobody else had to endure
15   such nonsense as I have.
16         Q    How do you know that was based on your age?
17         A    I didn't see anybody younger than me being
18   told those things.  So it must be because of my age
19   and my race.
20         Q    Who else over the age of 40 that you know of
21   received the same treatment, as you would say?
22         A    Hart and Swope.
23         Q    Anyone else?
24         A    No.
25         Q    So just the plaintiffs in this case?

Page 217

1      A     From what I can see, yes.

2      Q     All right.

3             MR. BROWN:  Guys, it's going on three

4      o'clock.  I'd like to take a bio break if we could,

5      two minutes, three minutes.

6             MS. HUNT:  That's fine.

7             THE REPORTER:  Off the record, 2:54

8      p.m.

9             (Off the record.)

10            THE REPORTER:  Back on the record.

11     3:07 p.m.

12            MS. HUNT:  All right.  Sorry.  I wasn't

13     prepared.

14     BY MS. HUNT:

15     Q     Okay.  Mr. Vanderplow, I kind of want to

16     continue and start wrapping up at least my portion.

17     Continuing this, going through the complaint with you,

18     I think when we left off, we talked about your claims

19     of discrimination --

20     A     Okay.

21     Q     -- as alleged in your complaint with regards

22     to your employment with the City of Dearborn Heights.

23     You go on to indicate, at least as a claim, that there

24     was some First Amendment retaliation.  We talked

25     earlier about your First Amendment claim.  Do you

Page 218

1    recall that?

2         A     I do.

3         Q     Okay.  And if I recall correctly, that was

4    with regards to your assertion that you weren't able

5    to speak at council meetings; is that correct?

6         A     Among other things, yes.

7         Q     Okay.  What are the other things?

8         A     Again, it's just general conversations that

9    we would try to have with council members and

10   reporting issues, whether they would be denounced

11   while we're speaking or as I would be trying to

12   present things or have discussions either verbally or

13   email, they would be truncated by members of council.

14        Q     Okay.  When you indicate -- you stated

15   amongst other things when I asked about your being

16   able to speak at council meetings.  Your other

17   communications or speaking to council, where -- what

18   platform would those take place in?

19        A     Mostly email.

20        Q     In email?

21        A     Yeah.

22        Q     Okay.  So you are stating through email

23   they -- the city council was quashing your ability --

24   your First Amendment rights?

25        A     Yes.

Page 219

1        Q     How did that happen?

2        A     I would bring up a -- a situation, whether

3    it was, let's say, missing money from the treasurer's

4    office.

5              As I would bring that up, several emails

6    would follow afterwards saying, you know, I'm making

7    it up or whatever the case may be to where I wouldn't

8    be able to deliver the full message or deliver the

9    full situation.

10             When I would go -- when I was attending

11   council meetings in the beginning, I would go up and

12   have discussions about things we would want to do for

13   the police department.  And I would be cut off or just

14   flat out told that, you know, I won't be heard.

15             Things would be taken off the council

16   agenda, just removed by council members with no

17   explanation.  Therefore, I wouldn't be able to present

18   or have a discussion about certain situations, whereas

19   other people are given extra minutes to speak when

20   asked.  I wasn't even afforded that.

21       Q     How were you retaliated against?

22       A     Well, again, I mean, I was constructively

23   fired in May of this year.  I wasn't able to do my

24   job.  Every time I did try to do something for the

25   department or the city, depending on what role I was

Page 220

1   playing or utilizing, I wasn't allowed to fulfill

2   those duties.

3           So I would say the ultimate termination is

4   pretty divisive.

5       Q    Did anybody tell you to quit?

6       A    No, I didn't quit.

7       Q    Are you still receiving any payment or

8   benefits from the City of Dearborn Heights?

9       A    I haven't got a penny from the city since

10  you told them not to pay me.

11      Q    All right.  And after May 9th of 2025, you

12  have not provided any services to the City of Dearborn

13  Heights; is that correct?

14      A    No.

15      Q    That's not correct or --

16      A    I beg your pardon.  You are correct.  I have

17  not provided any services.  I beg your pardon.

18              MS. HUNT:  All right.  I have no

19  further questions.

20              It's all you, Gary.

21              MR. MIOTKE:  Thank you.

22                     EXAMINATION

23  BY MR. MIOTKE:

24      Q    Mr. Vanderplow, you were asked a number of

25  questions by Ms. Hunt with respect to your pay and

Page 221

1    benefits.  You recall those questions, yes?

2         A    I do.

3         Q    All right.  And I guess at this time, what,

4    if anything, do you believe the city owes you that you

5    have not been provided in terms of pay, benefits,

6    severance, anything involving any sort of monetary

7    benefit or compensation?

8         A    I did not receive the payouts for any of my

9    accrued time, whether holiday pay -- or holiday, sick

10   time, personal time that's afforded to anyone who

11   leaves the city regardless of departure.  According to

12   this contract, I am afforded a certain amount of

13   compensation based on being relieved to my duties.

14        Q    Are you saying severance pay?  Is that what

15   you mean by that?

16        A    In page 5 of 6 of Exhibit 3, section 4.1,

17   yes, that's what enumerates that.

18        Q    Okay.  So you're saying that you are still

19   entitled to severance.  And you are saying that you

20   are still entitled to holiday pay payouts or sick

21   time; is that correct?

22        A    Correct.  And I didn't even ask for an extra

23   year of service to meet some type of retirement like

24   Hassane Jamal was afforded.

25        Q    Okay.  And in terms of no payouts, holiday,

Page 222

1   sick time, or severance, what is the dollar amount,

2   gross dollar amount, that you believe that you are

3   owed by the City of Dearborn Heights?

4       A    According to my calculations, give or take,

5   $300,000.

6            I don't have the figures in front of me.

7       Q    All right.  Okay.  So let's break that down

8   in terms of the $300,000.  Of that amount, how much is

9   severance?

10      A    Well, it would -- it -- I would say I would

11  characterize that as payment of salary, if we want to

12  call that a severance.  So according to my contract,

13  if I am relieved of my duties, I am allowed X amount

14  of that to be paid.

15           And then there's other amounts to be

16  categorized as holiday and -- and personal time and

17  such.   I --

18      Q    Are you -- so you are talking about salary?

19      A    Yes.

20      Q    Okay.  Setting aside salary, you believe

21  you're still owed a salary?

22      A    I believe I'm owed the balance of my

23  contract as it states there, yes.

24      Q    All right.  And please turn, then -- and

25  this is Exhibit 3 -- to paragraph 4.1 on page 5.

Page 223

1       A    Yes.

2       Q    The first sentence reads "Employee

3    understands that employment with the city is 'at will'

4    and both the city and employee may terminate the

5    employment relationship at any time for any reason

6    with or without notice and with or without cause, and

7    wages earned and shall be paid at the next payroll

8    session."

9            Do you see that?

10      A    I do see it.

11      Q    All right.  And did you ever believe that

12   your employment with the City of Dearborn Heights was

13   anything other than at will?

14              MR. BROWN:  Objection to form.  Calls

15   for a legal conclusion or a legal expertise from a lay

16   witness.  Misleading.

17              THE WITNESS:  Can you restate the

18   question?

19   BY MR. MIOTKE:

20      Q    Did you ever understand your employment to

21   be anything other than at will while you were employed

22   by the City of Dearborn Heights?

23              MR. BROWN:  Same objection.

24              THE WITNESS:  No, I think is how I need

25   to answer your question.

Page 224

1  BY MR. MIOTKE:

2      Q    Okay.  Let's ask it another way to confirm

3  that we're on the same page.

4      A    Please.

5      Q    You always understood your employment to be

6  at will while you were employed by the City of

7  Dearborn Heights; is that correct?

8               MR. BROWN:  Objection to form.  My

9  client is not an employment attorney, so this calls

10  for a legal conclusion and legal expertise from a lay

11  witness.

12               THE WITNESS:  I knew I had a contract.

13  And the contract, as you even see in the next sentence

14  or the next paragraph, "in the event the city chooses

15  to terminate this agreement before January 1, 2027,

16  the city shall pay employee a sum equal to the

17  employee's annual base salary together with payment

18  for unused vacation time and accumulative vacation

19  time," so on and so forth.

20               I don't need to read the whole

21  paragraph; you can do that.

22  BY MR. MIOTKE:

23      Q    No, nor did I ask about it.

24      A    Well --

25      Q    So I'm not sure why you're volunteering

Page 225

1    that, but let's go back to the question that I was
2    asking.  "Employee understands that employment with
3    the city is at will."  Did you understand that your
4    employment with the city was at will?
5                    MR. BROWN:  Repeat my same objection
6    from the last question.
7                    THE WITNESS:  I knew I had a contract.
8    BY MR. MIOTKE:
9        Q    Did you know that -- do you have any reason
10   to believe, any evidence, that would say that you were
11   employed by the city other than as an at-will
12   employee?
13                    MR. BROWN:  Same objection.
14   BY MR. MIOTKE:
15       Q    Any evidence?
16       A    My contract.
17       Q    And I've just read this, and we've gone over
18   it like three times.  That contract says "Employee
19   understands that employment with the city is 'at
20   will.'"  Do you see that sentence?
21       A    I do.
22                    MR. BROWN:  Objection.  Best evidence.
23   BY MR. MIOTKE:
24       Q    Okay.  Do you have anything else in that
25   contract that says that, as far as you're aware, that

Page 226

1   you are not an at-will employee and never were an

2   at-will employee of the city?

3                   MR. BROWN:  Objection.  Calls for legal

4   expertise from a lay witness.

5                   THE WITNESS:  I actually don't even

6   understand the question you just asked.

7   BY MR. MIOTKE:

8       Q    Okay.  Do you know of any other provision in

9   this contract that says that you could only be

10  terminated for cause?

11                  MR. BROWN:  Objection.  Asked and

12  answered.  As well as my other previous objections.

13  BY MR. MIOTKE:

14      Q    Go ahead.

15      A    Again, I -- I have a contract that says in

16  the next paragraph and -- and -- what I'm entitled to

17  should I be terminated.

18      Q    All right.  But is there anything in this

19  contract, as far as you know, that says that you could

20  be terminated for any reason at any time with or

21  without notice and with or without cause?

22                  Anywhere else in this contract that you're

23  aware of where it says you could only be terminated

24  for a reason with notice or with cause?

25                  MR. BROWN:  Same objection.  Calls for

Page 227

1   a legal conclusion from a lay witness.

2            THE WITNESS:  I don't see anything, but

3   I'm not a labor attorney.

4   BY MR. MIOTKE:

5       Q    Okay.  Very good.  So let's break this down

6   because the next paragraph says "In the event the city

7   chooses to terminate this agreement before January 1,

8   2027, the city shall pay employee of sum equal to the

9   employee's annual salary together with payment for

10  unused vacation time and accumulated vacation time and

11  unused sick days and all other accumulated benefits as

12  set forth in the policies of the City of Dearborn

13  Heights."  You see that; correct?

14      A    I do.

15      Q    Okay.  So let's break this down where it

16  says that your annual salary should end up being

17  paid -- okay.  Hold on here.  It says that you should

18  be paid your annual base salary.  How much was your

19  annual base salary?

20      A    $117,220.

21      Q    Okay.  So are you saying that you're

22  supposed to be paid 117,000 and some dollars, or are

23  you saying that you're supposed to be paid something

24  in addition to that?

25      A    Well, you would add the years from 2025 till

Page 228

1    2027.  And again, I'll -- I'll beg your forgiveness on
2    the exact total.  But if you take from when this was
3    filed to January 1, 2027, it came out to, let's just
4    say for conversation's sake, $300,000.
5        Q    Okay.  How much of the approximately
6    $300,000 do you attribute to unused vacation?
7        A    I don't have those numbers in front of me.
8        Q    Do you know how much would be based on
9    unused sick days?
10       A    Same answer.  I don't have the numbers in
11   front of me.
12       Q    Do you know about how much of it would be
13   accumulated benefits and set forth in the policies of
14   the City of Dearborn Heights?
15       A    Again, I don't have the numbers in front of
16   me.
17       Q    You've mentioned something about Ms. Hunt
18   purportedly telling someone that you should not be
19   paid?
20       A    Correct.  Yeah.
21       Q    All right.  What do you base that allegation
22   on?
23       A    An email that was sent.
24       Q    By whom?
25       A    Ms. Hunt.

Page 229

1      Q    To whom?

2      A    To a number of people.  I was apparently put

3  on this email and -- are you okay, sir?

4      Q    Yeah, I'm fine.

5      A    Oh, okay.  A number of people were put on an

6  email, and I happened to be put on it.  And of the

7  email, I don't have it in front of me, but it said, in

8  sum and substance, I shouldn't be paid until this is

9  concluded, even -- even the amounts of my contract

10 earned to this -- to the date of my termination.

11     Q    Was the email -- were you included as a

12 recipient of the email?

13     A    Yeah.

14     Q    Okay.  Who else --

15     A    That would be yes.

16     Q    Who else was included as a recipient of that

17 email?

18     A    I don't recall.  I don't have it in front of

19 me.

20     Q    Okay.  Do you believe that the city chose to

21 terminate this employment agreement?

22     A    I believe City --

23          MR. BROWN:  I'm sorry.

24          Calls for a legal conclusion from a lay

25 witness.

Page 230

1    BY MR. MIOTKE:

2         Q    Do you believe the city did or did not do

3    so?

4         A    Can you restate your question?

5         Q    Do you believe that the city chose to

6    terminate this employment contract, Exhibit Number 3?

7                    MR. BROWN:  Same objection.

8                    Answer if you can.

9                    THE WITNESS:  I'm not sure what the

10   city chose to do or not to do.

11   BY MR. MIOTKE:

12        Q    All right.  Let's move on to another issue

13   here.  You said something early in the deposition

14   about being an executive manager or something along

15   those lines.  Do you recall giving that testimony?

16        A    I do.

17        Q    Okay.  Did you believe that while you were

18   employed as director of support services, you were

19   employed as an executive-level employee?

20        A    On some level, yes.

21        Q    Okay.  And turning back to Exhibit Number 3,

22   the second page --

23                    MR. BROWN:  Yes, sir.

24   BY MR. MIOTKE:

25        Q    -- paragraph 2.2, doesn't this provision say

Page 231

1    "Except to the extent prohibited by or in material

2    conflict with applicable laws and authorities, the

3    employee shall attend meetings of the city council,

4    both public and closed, to the extent permitted by

5    Michigan Open Meetings Act.

6            "The employee may elect a designee to appear

7    on their behalf when needed."  Do you see that?

8            MR. BROWN:  We do see it.  What's your

9    question, sir?

10           MR. MIOTKE:  Yes, that's the question.

11   BY MR. MIOTKE:

12   Q    I'm just confirming you see it.  Yes, sir?

13   A    Yes, I see it.

14   Q    Okay.  But you previously testified that you

15   did not end up attending meetings after a certain

16   point; is that correct?

17   A    Yes.

18   Q    All right.  Is it fair to say that you were

19   not meeting this contractual obligation?

20           MR. BROWN:  Objection to form.  Calls

21   for legal expertise from a lay witness.  And also

22   misstates prior testimony.

23           You can answer if you --

24           THE WITNESS:  I take "shall" not

25   "must."  "Shall" means optional.  "Must" means must.

Page 232

1   And it also says in here "The employee may elect a
2   designee to appear."
3   BY MR. MIOTKE:
4       Q    All right.  Well, did you ever elect a
5   designee to appear on your behalf?
6       A    Sure.  We had members of the police
7   department go.
8       Q    Do you recall who specifically you asked to
9   appear on your behalf as a designee?
10      A    Whether it was Director Swope or Chief Hart
11  or --
12      Q    Okay.  What about in 2025, since this
13  contract is from 2025?
14      A    I don't understand the question.
15      Q    Who did you designate in 2025 to appear on
16  your behalf?
17      A    As far as -- we had members of the police
18  department go.
19      Q    Okay.  Well, it says "The employee may elect
20  a designee to appear on their behalf when needed."  Do
21  you see that?
22      A    I do.  I've said I do.
23      Q    All right.  And so did you ever elect to
24  send a designee on your behalf in 2025?
25      A    Sure.  We had members of the police

Page 233

1  department go.

2      Q    And who do you recall sending there to cover

3  for you?

4      A    I don't know.  You'd have to go back and

5  look at the recordings.

6      Q    So your best recollection is that you don't

7  recall either way who the people were who were

8  designated to go on your behalf.  Is that fair?

9              MR. BROWN:  Objection.  Misstates prior

10  testimony.  Asked and answered.

11              THE WITNESS:  As I said, members of the

12  police department went.

13  BY MR. MIOTKE:

14      Q    And do you recall specifically any that you

15  designated to go on your behalf?

16      A    The designation is if somebody from the

17  police department is there.  That's the designation.

18      Q    Okay.  I think you previously testified that

19  you were never a member of the police supervisors

20  union; is that correct?

21      A    That's correct.

22      Q    And was it your understanding that the terms

23  and conditions of your employment were set forth in

24  Exhibits 1, 2, and 3 while you were employed by the

25  City of Dearborn Heights?

Page 234

1              MR. BROWN:  Objection.  My client is
2    not a labor attorney.  Calls for a legal conclusion
3    from a lay witness.
4    BY MR. MIOTKE:
5         Q    In other words, you're making a claim --
6    I'll take it this way, then.  In other words, you're
7    making a claim that you are entitled to certain
8    benefits under a contract, Exhibit Number 3; correct?
9         A    Yes.
10         Q    Are you making any claim that you're
11    entitled to benefits under the police supervisor's
12    contract?
13         A    I'm making a claim that I'm entitled to
14    benefits based on my contract.
15         Q    Okay.  So your claims for breach of
16    contract, as far as you know, are based on the
17    employment agreements, Exhibits 1, 2, and 3, that you
18    previously testified about?
19         A    Yes.
20         Q    Is that correct?
21              MR. BROWN:  Repeat it --
22              THE WITNESS:  Yes.
23    BY MR. MIOTKE:
24         Q    Okay.  And is it fair to say, as far as you
25    know, you were never a member of -- well, did you ever

Page 235

1    believe that you were a member of the bargaining unit
2    for the police command officers or supervisors union?
3         A    No.
4         Q    You had previously given testimony about
5    driving a police vehicle; is that correct?
6         A    That's correct.
7         Q    Was that a fully marked police vehicle?
8         A    No.
9         Q    Was it a semi-marked vehicle?
10        A    No.
11        Q    All right.  Did it have lights and sirens
12   equipped to it?
13        A    It did.
14        Q    Okay.  You had indicated that you had used
15   those lights on occasion; is that correct?
16        A    Correct.
17        Q    You had indicated that you had used the
18   siren on occasion; is that correct?
19        A    Yes.
20        Q    Do you know approximately how many times you
21   used the lights on that vehicle?
22        A    I don't.
23        Q    Do you know approximately how many times you
24   used a siren on that vehicle?
25        A    I don't.

Page 236

1      Q    Was it one or more vehicles?

2      A    I don't understand the question.

3      Q    In other words, did you use the same vehicle

4   during your entire tenure with the City of Dearborn

5   Heights?

6      A    I did.

7      Q    Okay.  So with respect to that vehicle, is

8   there a specific car number for that vehicle?

9      A    No.

10      Q    Okay.  Is there a way it's designated in the

11   police department system?  Like, you know, sometimes

12   they'll say, like, squad car 63 or something like

13   that.

14      A    I think I numbered it admin 3 just in the

15   inventory system.

16      Q    Okay.  And because it's equipped with lights

17   and sirens, it would keep track of when those were

18   used during your tenure; is that correct?

19      A    No.

20      Q    All right.  So you mean it would not pop on

21   in terms of, say, a dashboard cam whenever you would

22   end up using lights or sirens?

23      A    I didn't have a dashboard cam.

24      Q    Okay.  In terms of the number of times that

25   you used lights on that vehicle, can you give an

Page 237

1    estimate?

2         A    An estimate to what?

3         Q    The number of times that you used lights.

4         A    I don't recall.

5         Q    Under 50?

6         A    Maybe.  I don't know.

7         Q    All right.  You don't recall one way or the

8    other?

9         A    I don't.

10        Q    Same thing with respect to the number of

11   times you used the siren on that vehicle?

12        A    Correct.

13        Q    Okay.  Did you leave the ATF because of the

14   interaction that you had with the one HR employee that

15   you previously testified about?

16        A    No.

17        Q    What was this individual's name?

18        A    I don't remember her name.  I'd have to go

19   look.

20        Q    Do you remember who -- your supervisor's

21   name?

22        A    Yeah, it's Rob Cekada.

23        Q    Okay.  Can you spell the last name for the

24   record, please?

25        A    C-E-K-A-D-A.  He's currently the deputy

Page 238

1    director of ATF.

2         Q    Where is he located in terms of his

3    employment?

4         A    Washington, D.C.

5         Q    Okay.  You are currently attending the

6    police academy; correct?

7         A    I am.

8         Q    By whom are you sponsored, if anyone?

9         A    I'm not.

10        Q    During the time that you were employed by

11   the City of Dearborn Heights Police Department, were

12   you ever MCOLES licensed as a sworn peace officer?

13        A    I am not, nor was I.

14        Q    Okay.  What is the business organization or

15   the form of business organization of 1811 Systems?

16        A    I don't understand the question.

17        Q    You understand that there are different

18   forms of business organization; is that correct?

19        A    I do.

20        Q    All right.  You understand that, for

21   example, you could be a sole proprietorship, a

22   partnership, an LLC, a regular corporation, and so

23   forth; is that correct?

24        A    Correct.

25        Q    Okay.  So what kind of business organization

Page 239

1    is 1811 Systems?

2        A    I believe it's an LLC.

3        Q    Do you know when that LLC was formed?

4        A    Sometime in 2024, I believe.

5        Q    Okay.  Did you do business through an

6    assumed name with regard to 1811 Systems before 2024?

7        A    No.

8        Q    Did you do business in 2023 as 1811 Systems?

9        A    No.

10       Q    All right.  Do you recall the approximate

11   amount of gross income that you've made through 1811

12   Systems?

13       A    I don't.  I'd have to go look.

14       Q    Did you at some point learn that Mayor Bazzi

15   was going to be up for an ambassadorship to Tunisia?

16       A    Can you state that again?

17       Q    Sure.  Are you aware that at some point

18   President Trump nominated Mayor Bazzi to be the U.S.

19   ambassador to Tunisia?

20       A    Sure.  Yes.

21       Q    Okay.  When do you recall first learning

22   that?

23       A    I don't recall.

24       Q    All right.  Did you ever have discussions

25   with him after President Trump was elected about the

Page 240

1    possibility that Mayor Bazzi would end up being

2    nominated for some sort of appointment in the Trump

3    administration?

4        A    No.

5        Q    Did you ever speak to Mayor Bazzi since he

6    was nominated about him being nominated for the

7    ambassadorship?

8        A    Oh, sure.

9        Q    Okay.  And did he ever give any indication

10   to you about what he considered his prospects?

11       A    I think he'd say, "Hey, you know, I

12   think I -- I'm a viable candidate.  I think I'd be a

13   viable nominee."

14       Q    All right.  Did he suggest at any point that

15   it might be smart for you to consider perhaps being

16   ready to move on since he wasn't going to be able to

17   continue on as mayor?

18       A    Never.

19       Q    All right.  Did you have some sort of notion

20   of your employment being able to continue after he

21   ended up leaving the City of Dearborn Heights?

22       A    I hadn't really thought about it.

23       Q    Okay.  You gave some testimony to the effect

24   of you took a phone call -- or it took a phone call to

25   get, I thought you said, full-ass paycheck.  Is that

Page 241

1    what you said, or did I misunderstand what you said?

2        A    I don't understand what you're talking about

3    right now.

4        Q    Well, I thought you used the term "full-ass

5    paycheck."

6        A    What the fuck?

7        Q    No?  That's what I took you to say.  Do you

8    recall testifying something different than that?  I'm

9    perfectly fine with an explanation.

10               MS. HUNT:  I feel like I would repeat

11   that.

12               THE WITNESS:  I don't even understand

13   what you're saying.

14               MR. MIOTKE:  Okay.

15               MR. BROWN:  I don't think the client

16   ever used the phrase "full-ass paycheck," although

17   we'd all want one, I'm sure.

18               MR. MIOTKE:  Okay.

19               THE WITNESS:  I can't even think of

20   words that would be similar to that.

21               MR. MIOTKE:  Okay.

22               MS. HUNT:  Can't wait for the

23   transcript now.

24   BY MR. MIOTKE:

25       Q    You said some levels of financial issues

Page 242

```
 1   were not clear to Janet Lucas.  Did I understand your
 2   testimony correctly?
 3                 MR. BROWN:  I'm sorry.  Say that again,
 4   Gary.  I --
 5   BY MR. MIOTKE:
 6        Q    You had discussed Janet Lucas in your prior
 7   testimony; is that correct?
 8        A    Yes.
 9        Q    And you had said something to the effect of
10   discussing Ms. Lucas's understanding of certain
11   financial matters.  Do you recall giving that
12   testimony?
13        A    I do.
14        Q    You said that she was very capable, if I
15   recall your testimony; is that correct?
16        A    Yes.
17        Q    So what was it exactly that you felt you
18   needed to go over with or explain to her?
19        A    I think a lot of it came down to actual
20   forfeiture amounts, amounts being transferred back and
21   forth that I saw on the -- on the limited statements I
22   did have.
23             I think she also didn't -- nobody really
24   understood what the actual balance was in that
25   account, and that's what I was really trying to nail
```

Page 243

1   down.

2       Q    When you left, do you recall what the actual

3   balance was in that account?

4       A    To this day, I have no idea.

5       Q    Okay.  So were payments made from that

6   forfeiture account without the city council

7   specifically voting on the money to end up being paid?

8       A    I have no idea because I can't substantiate

9   what actually transpired, so I can't go back to any

10  type of meeting to see what was approved or not

11  approved.

12      Q    All right.  There have been references in

13  the last two depositions to the situation with

14  Sergeant Dotter.  Do you recall Sergeant Dotter?

15      A    I do.

16      Q    Okay.  Did you ever conduct any sort of

17  internal investigation with respect to Sergeant

18  Dotter?

19      A    I remember we started hearing about some

20  issues within the traffic bureau, and that fell under

21  me.  However, they also involved uniformed personnel,

22  so that involved Director Swope.

23           Director Swope got some information directly

24  from someone regarding some activity, and we kind of

25  combined our discussions on that.  I took it as an

Page 244

```
 1   operational side.  Kevin, Director Swope, took it as

 2   the information he received.

 3           So it's a nuanced answer to what you just

 4   asked me.  We looked into a few comments we had heard

 5   along with some other things that we saw in the

 6   traffic bureau at the time.

 7   Q     Did you feel that it was part of your job,

 8   if someone raised issues that could suggest sexual

 9   harassment, for you to investigate that?

10   A     Yes.

11   Q     Other than the situation or the alleged

12   situation with Sergeant Dotter, were there ever any

13   other times that you became aware of any sort of

14   alleged sexual harassment situation or things that

15   would suggest inappropriate actions that might have to

16   do with sexual harassment?

17   A     I remember when I first came to the

18   department, there was some allegation that Officer

19   Zrien at the time had some relationship with

20   Carrie -- I forget her last name -- another female

21   officer who was the former wife of Captain Hatten.

22           So I guess technically her name would be

23   Carrie Hatten, but I don't remember what her maiden

24   name was.  And we looked into that, and we didn't find

25   any credibility at that point with that one.
```

Page 245

1              I remember hearing, right when I got there,

2       there was an indication that Sergeant Bazzy had a

3       physical altercation with Officer Shokr that was

4       reported by Officer Younis.  I did not handle that

5       one.  Kevin handled -- Director Swope handled that

6       one.

7              Those are the ones I remember off the top of

8       my head.

9       Q     Did you ever personally see anything or hear

10      about anything that struck you as potentially

11      involving some sort of possibility of sexual

12      harassment?

13      A     No, because if I did, I would've report it.

14      I mean, I would work it through with the chief and --

15      and other appropriate avenues.

16      Q     Okay.  You indicated that you received retro

17      pay based on your second employment contract; is that

18      correct?

19      A     Yes.

20      Q     All right.  Do you recall whether or not the

21      city council had done any sort of budget amendment or

22      approved any sort of budget amendment to increase your

23      compensation?

24      A     I don't recall.

25      Q     Do you recall whether or not there was

Page 246

1   actually a line item in the city budget for your

2   position or for Director Swope's position when you

3   were originally hired?

4        A    I don't recall.  And I don't recall seeing a

5   budget at the time of my employment.

6        Q    Did you assume that if you became employed

7   that it was being done appropriately under the city

8   charter?

9        A    When I came on, sure.  Yes, I -- I believe I

10  did.  I believe that to be true.

11       Q    Okay.  You had given testimony when it came

12  to the retro pay of it being prorated for the time on

13  the contract.  Could you explain what you mean by

14  that?

15       A    Well, it didn't prorate it back to the

16  beginning of the calendar year.  It prorated it back

17  to the beginning of July 1st when the union contract,

18  I guess, was ratified.

19       Q    All right.  So did you just receive a large

20  check for that compensation?

21       A    I believe I did, yeah.

22       Q    Okay.  Do you recall if that was received in

23  2023 or 2024?

24       A    I don't recall.

25       Q    Okay.  When would you normally get paid?  In

Page 247

1   other words, was there a delay between the time that

2   you worked and the time that the check ended up being

3   issued?

4       A     No, I thought the city paid on the week

5   earned 'cause I think that was always the issue, if I

6   remember right.  So you worked two weeks; you get paid

7   on Friday for that Friday.  I don't think they did

8   anything in arrears at the time.

9       Q     Okay.  So would it be fair to say that based

10  on Exhibit 2, which has a date of December the 12th of

11  2023 on page 5 of it, that you believe the retro pay

12  would've been paid in 2023?

13      A     No, I don't believe that.  Until I see a

14  document to confirm it, I can't.

15      Q     You don't know one way or the other?

16      A     That's correct.

17      Q     Okay.  Do you understand the distinction

18  between a letter of understanding and a collective

19  bargaining agreement?

20      A     Ostensibly, yes.

21      Q     Okay.  There's a reference in the first

22  amended complaint to you and your fellow plaintiffs

23  being mentioned in the collective bargaining agreement

24  or CBA.  Does that sound familiar to you?

25              MR. BROWN:  Can you point us to a page

Page 248

1    ID, Mr. Miotke, if you could?

2    BY MR. MIOTKE:

3        Q    I think it's page 4, paragraph 19.

4        A    Okay.

5        Q    Do you see paragraph 19 says "In relevant

6    part the CBA approved by the city council states" and

7    then you see that?

8        A    I do.

9        Q    Okay.  If you could, turn to Exhibit Number

10   1.  And again, that would be Exhibit Number 1 to

11   Exhibit Number 4.

12               MR. BROWN:  Perhaps we could use the

13   page ID stamping at the top for the number?

14               MR. MIOTKE:  Yeah.  It's page ID -- it

15   starts at page ID 0.760.  Does that help?  Are we on

16   the same page?

17               MR. BROWN:  760.  We're at 760.  Yes,

18   sir.

19               MR. MIOTKE:  Yes.  Okay.

20   BY MR. MIOTKE:

21       Q    So there's a cover page for the exhibit.  It

22   says Exhibit Number 1.  Do you see that?

23       A    I do.

24       Q    Okay.  And then the next page appears to be

25   a communication from City Clerk Senia to Mayor Bazzi.

Page 249

1    Do you see that?

2         A    I do.

3         Q    And then there is a motion that's about

4    midway through the page.  It says it's the second

5    motion.

6              It says "Motion by Councilwoman Bryer,

7    seconded by Councilman Muscat to approve the tentative

8    agreement between the city and the Command Officers

9    Association of Michigan/Dearborn Heights Police

10   Supervisors Association for a collective bargaining

11   agreement to expire June 30, 2024, and authorize the

12   mayor and clerk to sign the completed contract on

13   behalf of the city when all changes are incorporated

14   into the document as outlined in 8F."

15             And then and it also says "per Mayor Bazzi,

16   communication dated February 7, 2023."  Do you see

17   that?

18        A    I do.

19        Q    And then the next page after that is a

20   letter from Mayor Bazzi to the city council pertaining

21   to this tentative agreement and also thereafter

22   containing some pages pertaining to this tentative

23   agreement.  Do you see that?

24        A    I do.

25        Q    Okay.  My question for you is, did you ever

```
                                           Page 250

 1   see the final agreement?

 2        A    Not off the top of my head.  I can't --

 3   sitting here today, I can't recall.

 4        Q    Okay.  Do you recall if there was any

 5   difference in the language as set forth in the letter

 6   of understanding or tentative agreement and the final

 7   collective bargaining agreement?

 8        A    I don't recall that.

 9        Q    Okay.  I know you don't have the document in

10   front of you from Ms. Hunt that you say that you were

11   included on this email string, but how long was that

12   email, if you can recall?

13        A    I don't know.  It's within your email

14   system.  You could look it up.

15        Q    Well, you do realize I represent the city

16   council, not the --

17        A    No, I don't have any realization of that.

18        Q    Okay.  All right.  Well, let's assume for

19   purposes of this deposition -- and this can be

20   disagreed with at some other point -- that I don't

21   necessarily have access to the things that the city

22   administration would end up having access to.

23             So that being said, is there anything you

24   can tell me about the length of that email?  Was it

25   just, like, one sentence?  Was it multiple paragraphs?
```

Page 251

1        A     I don't recall off the top of my head.

2        Q     All right.  Do you recall what you believe

3    Ms. Hunt purportedly said was the reason not to pay

4    you?

5        A     I --

6               MS. HUNT:  Object as to form.

7    BY MR. MIOTKE:

8        Q     Go ahead.

9        A     I'm not actually sure what I should do here.

10              THE WITNESS:  Do I answer it?

11              MR. BROWN:  Yes.  Answer it.

12              MS. HUNT:  I just objected as to form.

13              THE WITNESS:  Okay.

14              I -- I don't recall, really.  I mean,

15    I -- I remember seeing the email.  I laughed.  I put

16    it aside.  I forwarded, you know, to -- to my

17    attorney, and I don't recall from that point on.

18              MR. BROWN:  We have the email, Gary,

19    and we'll produce it to you, as we will to Monica.

20              MR. MIOTKE:  Okay.  Sounds good.

21    BY MR. MIOTKE:

22        Q     You previously testified that you ended your

23    employment as director of support services on May 9,

24    2025; is that correct?

25              MR. BROWN:  Objection to form.

Page 252

1    Misleading.  Misstates prior testimony.

2    BY MR. MIOTKE:

3        Q    Well, you did testify to that; correct?

4              MR. BROWN:  I believe the testimony was

5    that he was constructively discharged.  He doesn't

6    agree that he quit.  He doesn't agree that --

7              MR. MIOTKE:  Well, I said ended.

8              MR. BROWN:  He doesn't believe that he

9    ended.  He believed it was ended on him, I believe.

10   BY MR. MIOTKE:

11       Q    Well, did your employment end on May 9,

12   2025?

13       A    Yes.

14       Q    And when it did -- so your position with the

15   City of Dearborn Heights was director of support

16   services; is that correct?

17       A    Correct.

18       Q    Okay.  Now, you said that you had a dual

19   role as interim comptroller; is that correct?

20       A    Correct.

21       Q    All right.  And you had previously ended up

22   also being an acting or interim chief of staff; is

23   that correct?

24       A    Correct.

25       Q    All right.  Were there any other roles or

Page 253

1    positions that you had on an acting or interim basis?

2         A    I don't believe so.

3         Q    You understood that if you were an acting or

4    interim position or in an interim or acting position,

5    that that did not mean that you were going to

6    necessarily continue in that position; is that

7    correct?

8         A    Correct.

9         Q    All right.  As a matter of fact, when the

10   position ended as, what was it, acting chief of staff,

11   did you ever bring any claim against the city with

12   respect to that ending?

13        A    No, 'cause the term was done.  Mariana came

14   back.

15        Q    Okay.  And if the mayor had decided to put

16   anyone else into the role of comptroller, your

17   position as interim comptroller would've ended as

18   well; is that correct?

19        A    Yes.

20        Q    All right.  And he never appointed you as

21   the comptroller; is that correct?

22        A    Correct.

23        Q    All right.  When you were the acting -- was

24   it the acting chief of staff?

25        A    What's the question?

Page 254

1        Q    Was the title acting chief of staff or

2   interim chief of staff?

3        A    I guess acting.

4        Q    Do you see any difference between acting and

5   interim?

6        A    No.

7        Q    Okay.  Did you get business cards made up?

8        A    No.

9        Q    All right.  You had mentioned that the city

10  council had not approved you to sign documents.  Is

11  that -- did I understand your testimony correctly?

12       A    Financial instruments, documents.

13       Q    Okay.  Now, when you say financial

14  instruments or documents, what specific types of

15  documents do you believe that you were not allowed to

16  sign?

17       A    Checks to pay city bills as a comptroller

18  would.

19       Q    All right.  Well, let me ask you this.  In

20  the absence of you being able to sign those documents,

21  isn't it true that the comptroller or the mayor

22  would've been able to sign those documents?

23       A    Well yes, the comptroller.  I don't believe

24  the mayor is in that line, no.

25       Q    Okay.  What about the clerk?

Page 255

1       A     I believe she can.  Sure.

2       Q     Right.  Do you recall, at that meeting,

3    Treasurer Hicks-Clayton stating, "Well, if you don't

4    approve this, then the city clerk will be able to sign

5    these checks"?

6       A     Yeah.

7       Q     All right.  Do you have any reason to doubt

8    that the city clerk would've been able to sign those

9    checks?

10      A     No.

11      Q     Do you understand that as the comptroller,

12   your role as interim comptroller was to be the interim

13   accountant for the city?

14      A     Yes.

15      Q     All right.  Does not being able to sign

16   checks necessarily keep you from being able to do

17   accounting for the city?

18      A     Yes.

19      Q     How is that?

20      A     I can't facilitate transactions as

21   promulgated by their job description.

22      Q     All right.  But someone else could end up

23   signing those after you end up saying they're fine; is

24   that correct?

25      A     No.

Page 256

1      Q     The city clerk couldn't end up signing them?

2      A     Well, she can sign them, but if I am not

3  afforded the ability to see the transactions, I can't

4  validate what is what.

5      Q     Well, wouldn't you be able to go on BS&A and

6  confirm that these transactions appear to be correct?

7      A     Not the -- what -- the information I was

8  given, no.

9      Q     Who gave you that information?

10     A     Whether it came from the treasurer's office,

11 whether it came from other personnel, that is not a

12 well-oiled machine there.

13     Q     I understand that.  But you were aware that

14 the city was not necessarily operating as a well-oiled

15 machine from the very time that you started with the

16 city; is that correct?

17     A     Yes.  That's why I was brought there to help

18 bring some assemblance of order.

19     Q     Right.  So you understood that there was a

20 certain level of things that needed to be cleaned up?

21     A     Oh, yes.

22     Q     Okay.  And you were also aware after you

23 started at some point that there was a contentious

24 relationship between Mayor Bazzi and the majority of

25 the city council; is that correct?

```
                                               Page 257
 1        A    Yes.

 2        Q    All right.  And it remained so during your

 3   entire tenure?

 4        A    Yes.

 5        Q    All right.  And you were aware that you were

 6   a political appointee; is that correct?

 7                  MR. BROWN:  I'm going to object to the

 8   form of the question as misleading.

 9   BY MR. MIOTKE:

10        Q    Go ahead and answer the question.

11        A    I don't know what a political appointee is.

12        Q    Were you hired through civil service?

13        A    No.

14        Q    Were you hired through Act 78 Civil Service?

15        A    No.

16        Q    Were you otherwise selected to end up being

17   in the position by any sort of competitive or

18   merit-based process?

19        A    No.

20        Q    Did the mayor make the decision to hire you?

21        A    I don't know if it was the mayor and/or the

22   chief.  I can't answer that one.

23        Q    Okay.  Did all of your contracts contain the

24   language "whereas the mayor is empowered to appoint

25   and retain a full-time police director of support
```

Page 258

1   services and hereby appoints employee for the

2   effective and efficient operation of the city's police

3   department"?

4          On the first page, second paragraph of each

5   of these contracts, namely Exhibits 1, 2, and 3.

6     A     What are you asking me?  You read it to me.

7   What are you asking me?

8     Q     Did I read it accurately?

9     A     Yes.

10    Q     Okay.  So did you believe that the mayor

11  ended up making this decision to hire you and retain

12  you on his own, or did he appear to do it with someone

13  else?

14    A     I don't know how to answer that.

15    Q     Okay.  Did you -- were you under the

16  impression that only the mayor had the authority to

17  hire, fire, or discipline you?

18    A     At the time, I guess that's true, yes.

19    Q     Okay.  And let's talk about that when you

20  say at the time.  Did your understanding change?

21    A     No.

22    Q     All right.  So throughout the entire time

23  that you were employed by the City of Dearborn

24  Heights, it was always your understanding that only

25  the mayor had the authority to hire, fire, or

Page 259

1    otherwise discipline you?

2        A    Actually, now when we talk about it in those

3    terms, apparently council had the ability to remove me

4    through their action.  But as far as firing and

5    disciplining, I -- that's -- well, disciplining,

6    council tried to do that too.

7             So I think I disagree with that.  I think

8    council purported to have the ability to fire and/or

9    discipline me.

10       Q    Did you believe that the council had that

11   authority?  Or do you believe that the counsel assume

12   that it had that authority but in your view wrongfully

13   assumed that?

14       A    Can you rephrase that question?

15       Q    Yes.  Do you believe that the city council,

16   in your view, accurately had any sort of authority to

17   in any way remove you or discipline you with respect

18   to your position, namely the director of support

19   services?

20             MR. BROWN:  I'm going to object to the

21   question as calling for a legal conclusion from a lay

22   witness.  My client, in addition to not being a labor

23   attorney, is not a muni law attorney either.

24             You can answer if you can.

25             THE WITNESS:  I can't.

Page 260

1  BY MR. MIOTKE:

2      Q    All right.  In the electronic documents that

3  you ended up putting onto the drive, do you recall if

4  the "red file" was included within that?

5      A    Oh, absolutely.

6      Q    Okay.  Do you recall whether or not the

7  surveys that were conducted by Dr. Thomas, were they

8  included there?

9      A    I don't recall that.  That wasn't in my

10 possession.

11     Q    All right.  Other than the items that you

12 already testified to as being included in your office

13 safe, were there any other are sensitive items that

14 were included in the safe?

15     A    I think from time to time I would secure

16 items there, whether it was -- if an employee retired,

17 let's say.  Now that you reminded me of Ruben

18 Gonzalez's name, I think I had his badge in there

19 after he retired until I gave it over to the union to

20 present to him.

21     Q    Okay.  Anything else that you can recall?

22     A    Again, I would hold weapons there from

23 people who would resign and didn't have a chance to

24 get them down to the equipment room or -- or gun

25 vault.

Page 261

1          Had a couple other files in there like, oh,

2     the Shell credit card system.  I -- I facilitated the

3     credit cards that everybody used for gas.  I kept that

4     locked up in there.

5          Q    Okay.  Anything else?

6          A    Not that I recall.

7          Q    Okay.  You testified that you carried a

8     weapon as an employee of the city; is that correct?

9          A    I carried a weapon as Paul Vanderplow.

10         Q    All right.  But you did so while you were on

11    duty with the city; is that correct?

12         A    I wasn't on duty; I worked there.

13         Q    Right.  Well, I mean, do you recall there

14    ever being any communications with MMRMA with respect

15    to you carrying a firearm as an individual who's not

16    MCOLES licensed?

17         A    Never.

18              MR. BROWN:  Objection to the form of

19    the question.

20    BY MR. MIOTKE:

21         Q    Did you have any discussions with then Chief

22    Hart or anyone else about your ability to carry a

23    weapon as the director of support services?

24              MR. BROWN:  Objection to the form of

25    the question.  It's also misleading.

Page 262

1    BY MR. MIOTKE:

2         Q    Go ahead and answer the question.

3         A    I don't know how to answer that.  Can you

4    rephrase?

5         Q    Do you recall having any discussions with

6    then Chief Hart about whether or not it was okay for

7    you to carry a firearm while you were employed by the

8    City of Dearborn Heights?

9              MR. BROWN:  Objection to the form of

10   the question.  It's misleading.

11             THE WITNESS:  I did have discussions

12   with the chief.  I am authorized under LEOSA to carry

13   a firearm as a retired law enforcement official.  And

14   I have that ability to do that.  Based upon the

15   rhetoric that was being spewed by certain people, I

16   felt I needed the ability to protect myself if needed.

17   BY MR. MIOTKE:

18        Q    All right.  Well, I guess the question

19   becomes, you had that authority, but you did not

20   necessarily have that authority as a city employee.

21   Would you agree with that statement?

22             In other words, if the city said "You're not

23   going to be carrying a gun while you're employed

24   here," would you have to end up following that

25   requirement?

```
                                            Page 263

 1              MR. BROWN:   Objection.   The question
 2    calls for speculation and is misleading.
 3    BY MR. MIOTKE:
 4         Q    If you know.
 5         A    I don't know how to answer that.
 6         Q    Okay.   There were a number of questions that
 7    were asked about civil rights complaints.   And what I
 8    wanted to confirm with regard to those civil rights
 9    complaints is whether or not they were complaints that
10    were made to you or that you reported or you just
11    processed them on behalf of the city.
12              So starting with that, you said that Officer
13    Hammoud ended up making some sort of a complaint
14    involving Paul Graf.   Do you recall that?
15         A    I recall it, yes.
16         Q    Okay.   So was that a situation where you
17    took any action on behalf of Officer Hammoud regarding
18    that matter or not?
19         A    I -- it was before I -- before I got there.
20    However, after getting there, Officer Hammoud
21    approached me in my office, talked about it, and was
22    very concerned with how he was being treated within
23    the department.   And I spoke to him about it.
24              We worked through some of his concerns
25    and -- and how to rectify those.   So at the very
```

Page 264

```
 1   least, I -- meeting with him to try to alleviate any
 2   issues he might have.
 3        Q    Okay.  Did you conduct any sort of
 4   investigation with respect to that matter?
 5        A    I talked to him.  I -- he -- he had made
 6   some statements that, you know, some of his fellow
 7   officers weren't treating him properly.
 8             I don't know if it was really an
 9   investigation or more so of a management intercession
10   to work out differences between employees in that
11   case -- an instance, rather, not case, instance.
12        Q    Sergeant Bazzy's complaint, was that
13   something that you raised or advocated for him, or was
14   that something that was responded to?
15        A    Well, there were several complaints by the
16   sergeant.  I can't outline each and every one right
17   now 'cause there were so many.  But when we first
18   arrived, he made several allegations of disparate
19   treatment by people such as Joe Reyna or Kevin
20   Campbell.
21             I can't recall some of the other names.  And
22   I don't want to just throw out a name.  Those are the
23   two I remember specifically.  And I checked into them.
24   I found some indications of some issues.
25             Some other claims he made, I couldn't find
```

Page 265

1    other indications to.  But you have to understand

2    there were so many complaints by him I almost couldn't

3    keep track of him after a while.

4         Q    Okay.  What about Mahdi Bazzi?  Was that

5    situation before you?

6         A    That was before me.

7         Q    All right.  So these civil rights complaints

8    were not situations where you ended up going, say, to

9    the Michigan Department of Civil Rights or the U.S.

10   Equal Employment Opportunity Commission and made a

11   complaint; is that correct?

12        A    I -- on those, correct.  I did not.

13   They -- they would call and question me on them as I

14   would -- you know, it takes time to get through the

15   process.  And I remember them calling and asking on

16   them, but I only answered as a functionary for the

17   department.

18        Q    Okay.  And when you say they called, who

19   were you referring to?

20        A    I think EEOC called.  Michigan EEOC called.

21   Then another entity called as well.  But again, I'm

22   just not recalling at this time.

23        Q    Okay.  So you were acting as a functionary

24   of the department with respect to those complaints; is

25   that correct?

Page 266

1       A     Correct.  Yeah.

2       Q     Okay.  If we could, turn back to the amended

3    complaint, which is Exhibit 4.  Okay.  Now, Ms. Hunt

4    has asked you a lot of questions, so I am going to try

5    not to beat a dead horse on this.  But I do have a

6    number of questions here.

7              On page 4, paragraph 22, this pertains to

8    the evidence management system.  Do you recall that?

9       A     I do.

10      Q     Do you recall giving some testimony about a

11   city council meeting in a closed session?

12      A     Yes.

13      Q     Do you recall when that city council meeting

14   closed session took place?

15      A     I don't recall.

16      Q     Do you recall what was supposed to be the

17   basis for having a closed session?

18      A     I don't.

19      Q     Okay.  Do you recall anything about how it

20   was phrased in terms of an agenda item?

21      A     I don't think I can talk about that.

22      Q     Well, if it was phrased as an agenda item,

23   it would be on a public agenda; correct?

24      A     Then I guess check the public agendas.  I

25   don't recall.

Page 267

1      Q    Okay.  So you don't recall?

2      A    No.

3      Q    All right.  And you don't recall the date?

4      A    I don't.

5      Q    All right.  What evidence do you have that

6   the city council would hold against you your reporting

7   this chain of custody issue to anyone else?

8      A    Restate the question.

9      Q    Well, do you have any reason to believe that

10  the city council would want the chain of custody for

11  evidence and the evidence management system within the

12  police department not to function correctly?

13     A    Do I have any evidence that they don't want

14  it to function correctly?

15     Q    Yes.

16     A    No.

17     Q    All right.  I mean, what I'm trying to get

18  at is, do you think that this in some way would be

19  something that the city council would want to

20  continue?

21     A    Based on what was discussed in the closed

22  session, I can't answer your question.

23     Q    Okay.  Well, other than what's in the city

24  council or whatever you said was said at the closed

25  session, do you have any evidence that would show that

Page 268

1    the city council did not want the evidence and

2    evidence management system within the police

3    department to be corrected?

4              MR. BROWN:  Objection to form.

5              THE WITNESS:  Based on what was

6    discussed in the city -- closed city council meeting,

7    I can't answer that question.  If you want to lift the

8    sanctions on what can be discussed in a closed

9    session, I'm all for it.

10   BY MR. MIOTKE:

11       Q    Yeah.  I'm just trying to understand why --

12   you know, whether or not you think this was something

13   that the city council had had a problem within terms

14   of you guys making things better.

15       A    You're asking me a question I can't answer,

16   but then you're incredulous why I can't answer it.

17       Q    Well, I'm asking about it.  So are you

18   saying that there is no evidence pertinent to my

19   question other than that might be in the -- from the

20   city council closed session?

21       A    I'm not even sure what was just asked.

22       Q    All right.

23              MR. BROWN:  Do you need a break?  Want

24   to get some fresh air?

25              THE WITNESS:  Sure.

```
                                            Page 269
 1                MR. BROWN:  Maybe two minutes just to
 2     kind of stretch our legs.
 3                MR. MIOTKE:  Okay.
 4                THE REPORTER:  Off the record, 4:13
 5     p.m.
 6                (Off the record.)
 7                THE REPORTER:  Back on the record, 4:20
 8     p.m.
 9                You may proceed.
10     BY MR. MIOTKE:
11         Q    Okay.  Mr. Vanderplow, paragraph 23 is the
12     reference to the 900 pistol sale records?
13         A    Correct.
14         Q    All right.  And you had involvement with
15     respect to that particular matter?
16         A    I did.
17         Q    And with respect to that involvement, it's
18     my understanding that you spoke to then Chief Hart,
19     Director Swope, and the FBI; is that correct?
20         A    Correct.
21         Q    Do you recall speaking to anyone else with
22     respect to this issue?
23         A    The State of Michigan.
24         Q    Do you recall speaking to anyone else beyond
25     the State of Michigan, Hart, Swope, and the FBI?
```

Page 270

1      A    I believe I called the City of Dearborn to

2  ask for help in not only taking some of these for us,

3  i.e., having citizens file their pistol purchase

4  permits with them until we got the backlog through.

5  But that was it.

6      Q    When did the backlog start?

7      A    I don't remember when -- what the time frame

8  was.  All I remember was seeing a pile.  And we

9  counted; it was like 900.

10     Q    Well --

11     A    At least six months.  To answer your

12  question, it was at least six months.

13     Q    Okay.  Because Mr. Hart ended up saying that

14  the officer did not process these because he did not

15  like him.  Do you have any reason to believe that --

16  what was it -- Corporal Pellerito did not process

17  these pistol sales records because he did not like

18  Chief Hart?

19          MR. BROWN:  I'm going to object to the

20  form of the question.  I was at the Hart deposition,

21  and I don't quite remember it that way.  So I think

22  misstating prior testimony.

23  BY MR. MIOTKE:

24     Q    Okay.  Go ahead.

25     A    I -- I don't know how to answer that.

Page 271

1      Q     All right.  Do you have any reason to
2   believe that the city council wanted these pistol
3   sales records not to be processed?
4      A     You know, I -- I think it kind of comes down
5   to even your earlier statement of, you know, the
6   contentious relation between council and the mayor.  I
7   don't know whether or not they wanted the city to
8   function, not function.
9            They just didn't want to hear it fixed on
10  the mayor's watch, and they sure didn't want to hear
11  it fixed by, you know, the three white guys that got
12  brought in.
13     Q     Well, do you have any evidence that they did
14  not want the pistol sales records issued to be fixed?
15     A     I don't think so much of that, but what I do
16  know is when we did bring in Arab members to the
17  department, such as Farhat, he was allowed and was
18  able to do certain things and do certain things with
19  his job that I was not allowed.
20           So they would listen to him but not me.  So
21  I restate my claim of, I don't know what they wanted
22  done or not done.  I think they wanted the city to
23  fail or look bad under the -- under the term of Mayor
24  Bazzi.
25     Q     Okay.  So you're saying that this was a

Page 272

1    political thing; is that correct?

2        A    No, I'm saying it's a white thing.  I think

3    had I been an Arab male or an Arab individual, I think

4    they probably would've listened.  But they did not

5    want the efforts to be corrected and or found out by a

6    white male.

7        Q    Do you think that Councilman Wencel is white

8    or Arab?

9        A    I don't know what he claim is his ethnicity.

10       Q    Based on your observations of him, do you

11   think he's white?

12       A    I've stopped doing that a long time ago.

13       Q    All right.  Do you think that Councilwoman

14   Bryer is white or Arab?

15       A    I have no idea how she identifies.

16       Q    What about Councilman Constan?

17       A    I have no idea how he identifies.

18       Q    What about Councilwoman Malinowski-Maxwell?

19       A    I have no real interaction with her.  I

20   don't know.

21       Q    All right.  What about Councilman Saab?

22       A    I don't know.

23       Q    What about Council Chair Baydoun?

24       A    He stated in the past what his ethnicity

25   was.  I think he -- he claimed Arab male, if I

Page 273

1   remember him saying that.  But again, based on my

2   recollection of what he said only.

3       Q    What about Counsel Chair pro tem Hassan

4   Ahmad?

5       A    I have no idea.

6       Q    All right.  Other than what you've already

7   stated, do you have any other reason or evidence to

8   believe that the city council would hold the 900

9   pistol sale records not being processed against you?

10      A    I'm -- I'm not sure of your question.

11      Q    All right.  Let me ask it this way.  Other

12  than what you've already testified to, do you have any

13  evidence or information that you believe shows that

14  the city council retaliated against you for reporting

15  the nearly 900 pistol sales records not being

16  processed?

17      A    Again, I stated -- again, I don't think it

18  was the actual situation.

19           I think it was the mere fact that I brought

20  it up and they didn't like the fact that a white male

21  brought it up.

22      Q    And that's all you've got evidence-wise; is

23  that correct?

24           MR. BROWN:  Objection to form.

25           THE WITNESS:  That's my statement.

Page 274

1    BY MR. MIOTKE:

2       Q    All right.  Now, paragraph 24 makes

3    reference to an illegal ticket quota system; is that

4    correct?

5       A    It is.

6       Q    All right.  And there's also a reference to

7    a ticket fixing scheme for friends of law enforcement

8    officers and elected officials in paragraph 25.

9       A    Correct.

10      Q    And as I understood your testimony, there

11   were several aspects to these issues with tickets,

12   different facets.  Did I understand your testimony

13   correctly?

14      A    I guess, yes.

15      Q    Okay.  What evidence or information do you

16   have -- well, let's start with this.  This was not

17   something that you personally reported or took the

18   lead on, I should say; is that correct?

19      A    That's correct.

20      Q    All right.  So other than you speaking to

21   the mayor, then Chief Hart, Kevin Swope, do you recall

22   discussing either the illegal ticket quota system or

23   the ticket fixing scheme with anyone else?

24      A    No.  I think I was asked about it by the

25   FBI.  And I think we discussed it in generalities, but

Page 275

1    even then I would've pointed to either Chief Hart or

2    Director Swope 'cause I just -- that was not my thing.

3         Q    Okay.  In terms of the mismanagement of

4    federal and state forfeiture funds, with whom did you

5    discuss this?

6         A    FBI Agent Marquart.

7         Q    And presumably you discussed it with Chief

8    Hart, Director Swope, and the mayor as well; is that

9    correct?

10        A    Correct.

11        Q    Did you discuss it with MSP?

12        A    No, I did not.

13        Q    Do you recall discussing it with anyone

14   else?

15        A    Well, I would have discussions with the

16   various comptrollers and treasurer, trying to gain

17   documents and understand what was going on.  I know I

18   spoke to Mr. Farinha about it.

19             I would ask various employees about it,

20   about their historical knowledge of it.  I would try

21   to collect documents that were available to try to

22   understand it.  That was about the extent.

23        Q    Okay.  So that's the extent of the people

24   that you spoke to with regard to that issue; is that

25   correct?

Page 276

1      A     Can you say that again?  I didn't hear you.

2      Q     So that is the extent of the people that you

3   spoke to about the forfeiture issue; is that correct?

4      A     Oh, and DEA, the -- the actual facilitator

5   of the forfeiture funds to the department.  And

6   actually, and I -- and I beg your pardon.  I actually

7   think it's the Asset Forfeiture Management

8   Fund -- Management System, AFMS.

9           It's an -- it's a DOJ entity that actually

10  processes the payments from the seizures from such,

11  like DEA or ATF or FBI, and then sends them over to

12  the department.

13     Q     Okay.  Anyone else that you can think of, or

14  does that cover it?

15     A     That about covers it.

16     Q     Okay.  In paragraph 25, there's the other

17  civil rights violations that are referred to.

18     A     Okay.

19     Q     Do you see that?

20     A     I do.

21     Q     Have you already covered in your prior

22  testimony all the civil rights violations that were

23  reported by you?

24     A     The ones I can recall at this time, yes.

25     Q     Okay.  In terms of the city council holding

Page 277

1    anything -- any of these things that are listed,

2    starting in page 4, paragraph 20, through page 5,

3    paragraph 25, have we already covered why you believe

4    the city council would retaliate against you with

5    respect to any of these things?

6                    MR. BROWN:  Well, I'm going to object

7    to the form of the question as it is compound in the

8    sense that it covers six separate paragraphs of the

9    complaint and we don't really know what specifically

10   you're talking about right now.

11                    But subject to that objection, you can

12   answer.

13                    THE WITNESS:  I'm not even sure of the

14   question.  Say it again.

15   BY MR. MIOTKE:

16       Q    Well, you had indicated that you felt that

17   the members of the city council held against you the

18   report of, I believe, the pistol sales, if I recall

19   correctly, because you were a white guy who raised the

20   issue, and they didn't want to see that happen.

21           At least that's my understanding of your

22   testimony.  You recall that testimony?

23       A    I do.

24       Q    All right.  In terms of why you believe the

25   city council -- well, let's start with this.  Do you

Page 278

1   believe that the city council otherwise retaliated

2   against you for these other things that are listed in

3   paragraphs 20 through 25?

4               MR. BROWN:  Objection.  Vague.

5   Compound.

6   BY MR. MIOTKE:

7       Q    Other than the pistol sale records?

8               MR. BROWN:  Same objection.

9               THE WITNESS:  I believe they have, yes.

10  BY MR. MIOTKE:

11      Q    All right.  Do you have any evidence or

12  reasons to believe that other than what you already

13  testified to, namely that you are a white guy and they

14  didn't want to see a white guy raising this issue?

15      A    Through the various statements and actions

16  and recorded council meetings and other

17  communications, I believe that is true that they have

18  held this against me being a white guy that has

19  identified these issues.

20      Q    Okay.  And when you say the statements, are

21  the statements that you're referring to all just the

22  statements that were made in city council meetings

23  that were recorded?

24      A    They're in other places.

25      Q    What other places are they?

```
                                            Page 279
1       A    Just various interactions with them both in
2   and around city events.
3       Q    For example, what?
4       A    I don't know.  The stupid Christmas tree
5   lighting comments were made various times hanging
6   around City Hall when I was there if they would be
7   there.
8       Q    Well, what comments were made by whom at the
9   Christmas tree lighting?
10      A    I don't have them at this -- the specific
11  things, nor do I record conversations.
12           But I know in almost every instance where I
13  was and a council member was, some comment and/or
14  divisive statement was made by one or more as to my
15  either being there or my participation or any actions
16  taken by me in performance of my duties.
17      Q    Okay.  And specifically who do you recall on
18  the city council ever making any such comments?
19      A    Baydoun, Saab, Wencel, Abdallah.  I can't
20  confirm Hassan Ahmad.   I heard a couple of things,
21  but I can't -- I won't say that he -- I won't
22  attribute it to him.
23      Q    What do you recall former Council Chair
24  Abdallah saying?
25      A    I remember he walked out and said, "You need
```

1  to understand" something along the lines of, you know,

2  "You're not our community. You know, you don't

3  understand it. You know, we don't always like to hear

4  this," something along that line.

5      Q    And you understand that he hasn't been a

6  member of the Dearborn Heights City Council since the

7  end of 2023; is that correct?

8      A    He was for my first year here.

9      Q    All right. What do you recall Council Chair

10  Baydoun or Councilman Baydoun saying?

11     A    I would have to look through some of the

12  recordings.

13     Q    Do you recall anything based on your

14  recollection right now?

15     A    No, not right now.

16     Q    What about Councilman Saab? Do you recall

17  anything based on your recollection that he said?

18     A    Not right now.

19     Q    All right. And I don't know -- Councilman

20  Wencel, do you recall anything that he said?

21     A    Oh, yeah. He said he didn't understand why

22  I was working here. I'm not part of the community. I

23  have a recording. I believe I turned it over.

24     Q    Yeah, we haven't received it.

25     A    Well I -- I don't know what to tell you on

Page 281

```
 1   that.  But I would refer to the recording on that.
 2        Q    When he said you were not part of the
 3   community, did you take that that he said you were not
 4   part of the Arab American community or not a part of
 5   Dearborn Heights?
 6        A    You would have to ask him.
 7        Q    All right.  So you don't know one way or the
 8   other?
 9        A    I took it to meant that I wasn't part of the
10   Arab community, but you would have to ask him to
11   clarify it.
12        Q    All right.  If he said it was that you
13   weren't part of the Dearborn Heights community, would
14   you dispute that's what he meant?
15        A    Yes.
16        Q    Based on what?
17        A    Based on his comment, time, context, my --
18   my interpretation of it.
19        Q    So you think that Councilman Wencel would
20   discriminate against you because you're an older white
21   male?
22        A    Yes.
23        Q    Do you know that Councilman Wencel is
24   probably older than you are?
25        A    I have no idea what he is.
```

Page 282

1      Q    All right.  So you don't know if he's an
2  older white male?
3      A    You would have to ask him.
4      Q    You made reference to Michelle from Plante
5  Moran.  Do you recall that?
6      A    I do.
7      Q    Was it your understanding that Plante Moran
8  were the city's auditors or that they were
9  consultants?
10     A    I don't know what their official designation
11  is.
12     Q    All right.  Well, you were the interim
13  comptroller for a little bit.  Do you understand that
14  there was another firm that had been engaged to end up
15  actually doing the city audit?
16     A    No.
17     Q    Do you know if Plante Moran -- or were you
18  under the impression that Plante Moran was doing city
19  audits?
20     A    I did not have a clarification on that.
21     Q    Were you aware that there was a flood in the
22  city hall basement a number of years ago?
23     A    No.
24     Q    Did anyone ever say to you that there was a
25  flood in the city hall's basement years ago?

Page 283

1       A     I don't recall.  But --

2       Q     Do you -- okay.

3       A     I -- I want to be clear.  And to justify

4    your question, I remember the city had a -- having

5    severe flooding problems.  I don't recall if it

6    involved city hall.

7       Q     Okay.  When you left your city employment in

8    May of 2025, was there anything preventing you from

9    continuing to perform the duties of director of

10   support services?

11              MR. BROWN:  Objection to form.

12   Misleading.  We don't stipulate that we left anything

13   in an affirmative way.  Our claim is that he was

14   fired.

15              MR. MIOTKE:  Let's do this.  Let's

16   withdraw that because, you know, obviously I don't see

17   it the same way.

18   BY MR. MIOTKE:

19      Q     When your city employment ended in May of

20   2025, was there anything preventing you from coming in

21   and continuing to perform your duties as director of

22   support services in the city's police department?

23              MR. BROWN:  Objection.  Confusing.

24              THE WITNESS:  It's confusing.  Please

25   restate.

Page 284

1   BY MR. MIOTKE:

2        Q    Could you have gone in and continued to

3   perform your duties as director of support services

4   after May 9th of 2025?

5        A    I did not believe so, no.

6        Q    Why not?

7        A    If I was not allowed to do my job as an

8   acting comptroller, every other statement or every

9   other duty I tried to perform was met with some type

10  of divisive response.  No, I did not believe I had

11  that ability.

12       Q    So was there anything physically keeping you

13  from being able to go in and perform your duties as

14  director of support services after May 9th of 2025?

15       A    I didn't have access.

16       Q    If you had been granted access, would you

17  have been able to continue to act as director of

18  support services?

19                 MR. BROWN:  Objection.  Calls for

20  speculation.

21                 THE WITNESS:  I don't know how to

22  answer that.

23  BY MR. MIOTKE:

24       Q    Well, I'm trying to clarify, because you're

25  saying you were constructively discharged.  I'm trying

```
                                                Page 285
 1    to understand what it was specifically that you feel
 2    prevented you from continuing to work as director of
 3    support services.
 4                   MR. BROWN:  I'm going to object as
 5    asked and answered.
 6                   THE WITNESS:  I -- again, everything
 7    that I had been doing was either met with a negative
 8    connotation and/or I was met with divisive talk from
 9    Councilman Saab, et al.  I believe as soon as I was
10    constructively terminated, my access was immediately
11    revoked.
12                   Earlier in January, then Interim Chief
13    Farhat tried to suspend me against the court order.
14    So every time I looked around, somebody was trying to
15    get rid of me.  So I didn't see this being a viable
16    option.
17    BY MR. MIOTKE:
18        Q    Well, you spoke of the court order, the
19    preliminary injunction; is that correct?
20        A    Correct.
21        Q    As far as you know, that continued to be
22    enforced and still is enforced to today; is that
23    correct?
24        A    I guess, yes.
25        Q    All right.  Do you have any evidence or
```

Page 286

1    information that would cause you to believe it's not

2    enforced?

3        A    No.

4        Q    Okay.  So --

5        A    But even with that said, I was still voted

6    six-nothing to do a very rudimentary function of my

7    job that had never been done before and never been

8    voted that way, and not, what, two weeks ago they

9    allowed and voted for a Arab male to be able to

10   perform those functions.

11       Q    Well, did he ever tell you that he was an

12   Arab male?

13       A    Yes.

14       Q    And that would be Mahdi Baydoun?

15       A    Yes.

16       Q    But let's circle back.  What changed --

17   okay.

18            Let's do it this way.  I don't know where

19   we're at.

20                MS. HUNT:  This would be Exhibit 7.

21                (Exhibit 7 was marked for

22                identification.)

23                MR. MIOTKE:  Okay.  Okay.  So -- wait.

24                Tarik, I think you were passing these

25   on.  Okay.

Page 287

1    BY MR. MIOTKE:

2         Q    Do you have Exhibit 7 in front of you?

3         A    Not yet.

4              MR. BROWN:  Here you go.  Sorry.

5              THE WITNESS:  She's --

6              MR. BROWN:  Yeah.

7              MR. MIOTKE:  Oh, she's marking it.

8              MR. BROWN:  Ms. Young will do it.

9              THE WITNESS:  Thank you, ma'am.

10   BY MR. MIOTKE:

11        Q    You have it now?

12        A    I do.

13        Q    Okay.  On the first page of Exhibit 7,

14   there's an -- and this is a letter from Mr. Grysko to

15   Ms. Hunt.  Do you see that?

16        A    I do.  And you've seen this letter before;

17   is that correct?

18        Q    I have.  And you were copied with this

19   letter, were you not?

20        A    I was.

21        Q    And in the first paragraph on the first page

22   it says "Please take notice that Plaintiffs now

23   consider Mr. Paul Vanderplow to have been

24   constructively discharged effective as of April 22,

25   2024."  Do you see that?

Page 288

```
 1        A    I do.

 2        Q    And you continued to perform your duties per

 3   this letter as a courtesy for the city up through May

 4   9, 2024; is that correct?

 5        A    In a fashion, yes.

 6        Q    And in a fashion, by that you mean that

 7   you -- the letter should be May 9, 2025; is that

 8   correct?

 9        A    I have -- I don't understand what you're

10   asking.

11                  MR. BROWN:  There's a typo in the

12   letter.  There's --

13                  THE WITNESS:  Oh, I'm sorry.  Yeah.  I

14   didn't even recognize that, but yes, apparently there

15   is in there.

16                  MR. BROWN:  There's two typos in the

17   first paragraph.

18                  THE WITNESS:  Oh, yes.  Yeah.

19   BY MR. MIOTKE:

20        Q    Yes.  So it should say effectively as of

21   April 22, 2025; is that correct?

22        A    I would say that's correct, yes.

23        Q    And you would say also that it should be May

24   9, 2025; is that correct?

25        A    That's correct.
```

Page 289

1      Q      Okay.  So you continued to perform your

2    duties from April 22nd up through May the 9th of 2025;

3    is that correct?

4      A      Correct.

5      Q      All right.  And you were granted access by

6    the city to the city's facilities; is that correct?

7      A      That is not correct.

8      Q      How is that?

9      A      I didn't go into the city offices.  I

10   remained available via phone to answer questions to

11   help employees with transition, to ensure I didn't

12   leave employees in the lurch and not be able to do

13   their jobs.

14           So in essence, I granted the city a two-week

15   notice, if you will, give or take, to enable people so

16   they aren't left wondering.

17     Q      All right.  Well, in terms of you getting

18   paid, were you paid during that two-week period?

19     A      I was.

20     Q      All right.  Did the mayor say anything like

21   "You can't come into work"?

22     A      No, but he understood the situation as I've

23   outlined in this letter, and he took it as such.  He

24   appreciated my ability to at least work with the staff

25   to ensure that people had the ability to do their jobs

Page 290

1  and not lay waiting for answers that I might only

2  have.

3       Q    Well, what was the difference between the

4  vote that took place on April the 22 of

5  twenty-twenty -- what was the difference in your

6  employment between what took place on April the 22nd

7  before the city council vote not to approve you as a

8  signer on the accounts and thereafter?

9       A    They basically made me functionally

10  ineffective.  Without being able to discharge the

11  duties of that job, what good was I?

12       Q    Okay.  But you weren't the signer on the

13  account before that meeting, were you?

14       A    No, but it was really bogging up city

15  administration.  It was bogging up our ability to

16  function as an entity.

17       Q    And that would be purely with regard to the

18  comptroller duties?

19       A    On that level, yes.

20       Q    Okay.  It had nothing to do with the

21  director of support services, did it?

22       A    No.  That had -- as far as the support

23  services, that -- I was so maligned by Councilman Saab

24  that I was combat ineffective with that job as well.

25  Everything that came out of his mouth was so divisive

Page 291

1    that the -- the ability to actually facilitate

2    operations was -- that was minimal.

3        Q    Okay.  But you were still performing the

4    duties of that job, director of support services,

5    before you became the interim comptroller; is that

6    correct?

7                    MR. BROWN:  Objection.  Argumentative.

8    BY MR. MIOTKE:

9        Q    Go ahead and answer the question.

10       A    Excuse me?

11       Q    You were still performing the duties of the

12   job director of support services?

13       A    Let's be clear.  The only person that tells

14   me to answer questions is my attorney.  Please don't

15   do that to me.

16                   MR. BROWN:  No.  No, you can answer.

17   I'm sorry.  I'm sorry.  Go ahead.  Answer.

18                   THE WITNESS:  I was able to perform it

19   on some truncated level, but not to the -- not to the

20   point that I felt that I was able to actually do my

21   duties based on all the nonsense put forth by

22   individuals such as Saab.  No.

23   BY MR. MIOTKE:

24       Q    Okay.  Well, but you got paid from January

25   of 2025 up until the time -- when did you become the

Page 292

1    interim comptroller?

2        A    As we stated earlier, I believe it was

3    sometime in late March, maybe mid-March.

4        Q    So from January 2025 up until the time you

5    became the interim comptroller, you were performing

6    the duties of director of support services; is that

7    correct?

8        A    At some part, yes, when I wasn't being

9    interfered with by Hussein Farhat.

10       Q    Okay.  And you understood that Hussein

11   Farhat reported to the mayor and that the mayor was

12   not affecting your terms and conditions of employment;

13   is that correct?

14       A    I don't know what that means.

15       Q    Well, did the mayor end up saying, "Hey,

16   you've got to leave"?

17       A    No.

18       Q    All right.  So you were still able to

19   perform your duties as you had in, say, February of

20   '25 to the same extent that you had when you were the

21   interim comptroller in March of 2025; is that correct?

22               MR. BROWN:  Objection.  Misstates prior

23   testimony.  Confusing.  Compound.

24               THE WITNESS:  Yeah.  I don't know what

25   you just said.

Page 293

1    BY MR. MIOTKE:

2        Q    Well, I'm just trying to clarify what you

3    considered to be any -- was there any change between

4    how you were treated in January of 2025 as director of

5    support services and how you were treated as director

6    of support services in April of 2025?

7        A    Oh, yeah, I was absolutely mistreated

8    between those two time periods.  So in January 2025 --

9        Q    No.  No, I asked if there was a change.

10       A    Yes.

11       Q    What was the change?

12       A    The change was in January of 2025, Saab read

13   unsubstantiated workplace claims against me into the

14   official record, which damaged my reputation within

15   the department, made it so I couldn't defend myself

16   because I didn't have the bully pulpit.

17            Nowhere else have we ever read employee

18   complaints on other employees into the record.  Once

19   that was done, I was combat ineffective to be able to

20   work at the police department because I had all these

21   claims laid against me, unsubstantiated claims, but

22   yet he put them into the ethos.

23            So now, because that happened, I was unable

24   to be able to do my job effectively within the police

25   department.

Page 294

1      Q    When was that date again?

2      A    Sometime in January.  You were there; you

3  should know.  In fact, you allowed it to happen.

4      Q    Did you submit a resignation at that time in

5  January of 2025?

6      A    No.

7      Q    Okay.  Have you listened to the recording

8  from the April 22, 2022, meeting?

9      A    No.  I lived it once.  I don't want to hear

10  it again.

11      Q    Please turn to Exhibit, I believe, 4, page

12  11, paragraphs 55 and 56.

13      A    Okay.

14      Q    Paragraph 55 makes reference to Councilman

15  Saab filing an entirely meritless and false police

16  complaint against you.  Do you see that?

17      A    I do.

18      Q    All right.  And 56 says "The false police

19  report caused Plaintiff Vanderplow to be placed on a

20  temporary leave of duty due to having been falsely

21  accused of committing a crime."  Do you see that?

22      A    I do.

23      Q    Did you receive all of the pay that you were

24  supposed to receive during the time that you were on

25  this temporary leave of duty?

Page 295

1        A      Yeah.

2        Q      All right.  We could make this --

3               MR. MIOTKE:  What are we on now?

4               THE REPORTER:  Eight.

5               MR. MIOTKE:  Eight?

6               (Exhibit 8 was marked for

7               identification.)

8               THE REPORTER:  Yes.

9               MR. MIOTKE:  Okay.

10              MR. BROWN:  Got it?

11              THE WITNESS:  Thank you.

12   BY MR. MIOTKE:

13       Q      What, if anything, have you done to prepare

14   for your deposition today?

15       A      Spoke with my attorney.

16       Q      Did you review any documents?

17       A      Not really, no.

18       Q      Well, when you say not really, that causes

19   me to believe that you reviewed some documents.  Did

20   you review any documents?

21       A      Yeah, I read my deposition notice for today.

22       Q      All right.  Did you review any other

23   documents?

24       A      No.  No.

25       Q      Exhibit 8 purports to be an affidavit in

Page 296

1    support of Plaintiffs' motion for rule to show cause.

2    Have you seen this document before?

3         A    I -- yes, I have.

4         Q    Okay.  If you look at the last page of this

5    document, page 6, there's a signature that purports to

6    be your signature; is that correct?

7         A    It is.

8         Q    And you did sign this document in the

9    presence of a notary public?

10        A    I did.

11        Q    And prior to the time that you ended up

12   signing this document, you read it over to confirm

13   that it was factually accurate; is that correct?

14        A    It is.

15        Q    And you understood that this was something

16   important for this lawsuit; is that correct?

17        A    It is.

18        Q    You also understood that the statements that

19   you were making in it were under penalty of perjury;

20   is that correct?

21        A    Correct.

22        Q    All right.  Turning page 4, paragraph 10 --

23        A    Okay.

24        Q    -- there is the statement -- and I'm going

25   to read it and confirm that we're on the same page in

Page 297

1    terms of what it says -- "Saab and I had no

2    interaction whatsoever as I passed him in my police

3    vehicle on John Daly Street on March 4, 2024.  I did

4    not roll down the window.  I did not speak to him.

5            "I did not stare at him or fix my gaze in

6    any way.  I did not gesture at him or take any other

7    communicative or threatening action.  I did not speed

8    up or slow down my vehicle or turn the wheel in any

9    abnormal way.  I simply drove past just as I would've

10   done if Saab had not been there at all."

11           Did I read that correctly?

12       A    Yeah.

13       Q    Okay.  Do you normally drive past people's

14   homes holding up a cell phone?

15               MR. BROWN:  Objection to form.  I'm

16   sorry.  Assumes facts not in evidence.

17               THE WITNESS:  I did not drive past

18   Councilman Saab's house holding up a phone.

19   BY MR. MIOTKE:

20       Q    Okay.  You did drive past Councilman Saab's

21   house; is that correct?

22       A    Unfortunately.

23       Q    Yeah.  Paragraph 13 on page 5 states -- and

24   I'm going to ask you to confirm this.

25       A    Oh, you're going to read it?

```
                                              Page 298
 1      Q    "Later that same day, March 4, 2024, after
 2  finishing my investigation at the business located on
 3  Ford Michigan Avenue, I again took John Daly Street to
 4  return to my office, this time driving south.  Again I
 5  saw Mr. Saab working by the street, and again I had no
 6  interaction with him whatsoever.
 7          "I did nothing whatsoever out of the
 8  ordinary on my return trip to the Justice Center.  I
 9  just drove by Mr. Saab as if he were not there."  Did
10  I read that correctly?
11      A    Yes.
12      Q    Okay.  The reference to the business located
13  on Ford Michigan Avenue, was that supposed to be Ford
14  Road or Michigan Avenue?
15      A    Ford Road.
16      Q    Okay.  Just a question in terms of that.
17  Let's go to --
18                MR. MIOTKE:  What are we on, 9?
19                (Exhibit 9 was marked for
20                identification.)
21                MS. HUNT:  Yes, 9.  Sorry.
22  BY MR. MIOTKE:
23      Q    Exhibit Number 9 is directions that I
24  printed out from MapQuest that show the best route, at
25  least today, as being on Michigan Avenue to Inkster
```

Page 299

1    down Ford Road.  Do you see what I'm referring to

2    here?

3         A    I do.

4         Q    Did you do any sort of MapQuest or anything

5    else before you ended up going to the business on Ford

6    Road?

7         A    No.

8         Q    All right.  Why did you drive down John

9    Daly?

10        A    It's the most direct route.

11        Q    Did you understand that John Daly would take

12   you through Inkster where you would have numerous stop

13   signs to end up having to stop at?

14        A    I don't understand the question.

15        Q    Well, did you -- when you drove that route,

16   you recall there being a whole bunch of stop signs?

17        A    I guess.  Sure.

18        Q    So why did you want to take that route?

19        A    Because the place I was going to was right

20   on the corner of John Daly and Ford Road.

21        Q    It wasn't right on the corner; is that

22   correct?

23        A    It's, what, maybe 50 yards off.

24        Q    To the east; correct?

25        A    Yes.

```
                                            Page 300

 1        Q    Okay.  All right.  Mr. Vanderplow, you've

 2   been handed Exhibit Number 10.

 3                  (Exhibit 10 was marked for

 4                  identification.)

 5             I'd ask you to review all three pages of it.

 6   And after you've done so, let me know that you've done

 7   so.

 8        A    I see it.

 9        Q    Have you seen this set of documents before?

10        A    I have.

11        Q    On the first page, this appears to be a

12   picture taken from Councilman Saab's house.

13                  MR. BROWN:  I'm going to object this to

14   foundation.  I don't know what this is.  There's no

15   evidence of what it is.

16   BY MR. MIOTKE:

17        Q    That being said, do you see that there is a

18   vehicle on the right side of this page, a dark vehicle

19   right in the middle?  Do you see that?

20        A    I do.

21        Q    Can you recognize whether or not that was

22   the city vehicle that you drove on March 4, 2024?

23        A    Not in this picture.

24        Q    Okay.  Why don't we go to the next page?

25   Have you seen this page before?
```

Page 301

1       A     I have.

2       Q     Can you tell based on this picture whether

3  or not this is the city vehicle that you drove?

4       A     It has similar characteristics.  I can't

5  tell if it's mine or not.

6       Q     Okay.  Do you see that it appears that

7  some -- the driver of the vehicle is holding up

8  something?

9              Do you see that?

10             MR. BROWN:  Objection to form.  Calls

11 for speculation.  Misstates prior testimony.  Vague.

12             THE WITNESS:  I see blotches.

13 BY MR. MIOTKE:

14      Q     All right.  Did you drive by Mr. Saab's

15 house holding up your cell phone?

16      A     I don't recall doing that, no, 'cause I had

17 no reason to.  I could care less about Councilman

18 Saab.

19      Q     All right.  Let's go to the next page.

20             Does this appear to be a picture of the

21 vehicle that you were driving on March 4, 2024?

22             MR. BROWN:  Objection.  Asked and

23 answered.

24             THE WITNESS:  It has similar

25 characteristics of the car I drove.

```
                                          Page 302
 1   BY MR. MIOTKE:

 2       Q    Do you know whether or not this is a picture

 3   of you?

 4       A    I -- I don't know.

 5       Q    If Councilman Saab says that it is a picture

 6   of you driving your city vehicle, would you dispute

 7   that?

 8                MR. BROWN:  Objection to form.  Calls

 9   for speculation.

10                THE WITNESS:  I don't know what he

11   would say.  I don't know.

12   BY MR. MIOTKE:

13       Q    I'm not asking you if you know what he would

14   say.  I'm asking you if you would dispute that you are

15   the driver of this vehicle if Councilman Saab was to

16   testify that you indeed were the driver of this

17   vehicle.

18       A    It was probably me.  I mean, it matches

19   general characteristics.  I do find it funny in the

20   one photo that's zoomed out, the supposed phone is

21   dark, but when you zoom in, miraculously the one area

22   where I'm supposedly holding a phone is now lit.

23                As a semi-professional photographer, I know

24   exposure limits like that is almost impossible.  So

25   I'm shocked that the one area that's supposedly a
```

Page 303

1  phone is now all of a sudden illuminated in a less

2  than 720p image.  And frankly, I remember going by.  I

3  actually think that's my Jimmy John's cup.

4      Q    Do you recall attending a hearing in front

5  of Judge Goldsmith?

6      A    Yeah.

7      Q    Yes.  Do you recall your attorney during

8  that hearing saying that you did drive by?

9      A    I believe he did, and I -- sure.  Yes.

10     Q    Do you recall what else your attorney said

11 with respect to whether or not you held up the phone?

12     A    I don't recall that.

13          MR. BROWN:  Objection to form.

14 BY MR. MIOTKE:

15     Q    Just a second.  Okay.  Well, what we're

16 going to do with this is we'll get a transcript.  But

17 let me ask you this.  Why did you respond to this

18 location?

19     A    I was given information that then -- I

20 believe it's Hashems Market was conducting violations

21 against city ordinance code and that city ordinances

22 had been ticketed and then dismissed.  I was given

23 that information, and I had the time to go over and

24 take a look at the business.

25          I had about an hour to do so.  I left my

Page 304

1    office in a direct route over there.  I went and

2    looked at the business.

3           While I was there, I was actually hungry.  I

4    went to Jimmy John's.  I bought a sandwich, ate that

5    sandwich, and then got back to the department 'cause I

6    believe I had a meeting later on that afternoon.

7       Q    Well, let me ask you this.  You were never

8    an ordinance enforcement officer, were you?

9       A    No.

10      Q    Bill Dishroom at that time was the director

11   of ordinance enforcement; is that correct?

12      A    Yeah.

13      Q    And did you ever speak to Mr. Farinha about

14   this particular situation?

15      A    Oh, I did.

16      Q    And did you ever look at any of the court

17   records with respect to this?

18      A    I got to a point with it, and I just turned

19   it over to people such as Bill Dishroom.

20      Q    Okay.  Did you ever speak to anyone at the

21   court and find out that there was a register of

22   actions that showed that the case appeared to be

23   handled and there was some sort of compliance

24   violation?

25      A    When I went to the business and saw they

Page 305

1    were constructing some type of hardened structure in
2    the alleyway and made some preliminary inquiries to
3    it, I was told that Bill Dishroom was aware of it.  So
4    I just discontinued my inquiry.
5         Q    Okay.  Who called you and told you about
6    this situation?
7         A    An individual in the city.
8         Q    Named who -- what?
9         A    Ash Hoffman.
10        Q    And what was Ash Hoffman's role in the city?
11        A    At the time, I think she was helping out in
12   the mayor's office taking complaints from citizens.
13        Q    All right.  And did she ever indicate to you
14   why she did not call over to Mr. Dishroom?
15        A    Because the -- the allegations were that
16   this thing was being built, and tickets were being
17   issued and then dismissed.
18        Q    Okay.  Who did you believe that she was
19   giving you this information for?
20                  MR. BROWN:  Objection.  Calls for
21   speculation.
22   BY MR. MIOTKE:
23        Q    Well, did she say that she was calling you
24   at the direction of anyone?
25        A    No, she was not doing that.  She didn't

Page 306

1    state that.

2         Q    All right.  How many other ordinance

3    violations have you responded to?

4         A    I checked into a couple that were mentioned.

5    I don't know, tree down or something like that, cement

6    not being done.

7         Q    Do you recall when?

8         A    Within the past year.

9         Q    Do you recall what address?

10        A    No.

11        Q    Do you recall having any discussions with

12   ordinance enforcement about those things?

13        A    I did, yeah.

14        Q    Why did you feel the need that you needed to

15   show up with regard to those things?

16        A    I don't know.  Question was asked.  As city

17   internal affairs, I checked into it.  I checked into a

18   lot of things.

19        Q    Were you aware that different members of the

20   city council felt that you were disrespectful to them?

21        A    I don't know what I was aware of what they

22   felt.

23        Q    Well, do you recall an email string where

24   basically Councilman Wencel ended up saying that he

25   felt that you were very disrespectful --

Page 307

```
1       A     Thanks.
2       Q     -- and basically said that "I'm finding it
3   hard to take him seriously and will not support or
4   vote in favor of any of his requested agenda items
5   brought before City Council."  Do you -- you do recall
6   that communication; correct?
7       A     I do.
8       Q     You do?
9       A     Now that you've read it.
10      Q     Yeah.  And you do recall -- as a matter of
11  fact, you referenced that earlier in your testimony;
12  is that correct?
13      A     I did.
14      Q     And then you sent an email to him that
15  basically took exception with what he ended up saying;
16  is that correct?
17              MR. BROWN:  Mr. Miotke, if you're
18  reading from an exhibit or a document, then --
19              MR. MIOTKE:  Well, this is Exhibit 6
20  from yesterday.
21              MR. BROWN:  I'm sorry.  Well, do you
22  have an Exhibit 6 for today, sir, because otherwise --
23              MR. MIOTKE:  No, because I thought that
24  Ms. Hunt would end up having it.
25              MS. HUNT:  I do have copies of it.  I
```

```
                                                 Page 308
 1    chose not to discuss it, but I have copies if you want
 2    to pass it out.
 3                    MR. MIOTKE:  Yeah, if we could do that,
 4    then.  Yeah.
 5                    MS. HUNT:  Is this the full thread that
 6    you're --
 7                    MR. MIOTKE:  Yes, the full thread.  And
 8    it starts with 035 -- 0305.  Yeah.  I don't need a
 9    copy, but I'm not sure --
10                    MS. HUNT:  Do you want one, Tarik?
11                    MR. MIOTKE:  What are we on, 11?
12                    THE REPORTER:  Yes.
13                    MR. MIOTKE:  Thank you.  Thank you.
14                    MS. HUNT:  I'm sorry.  I thought you --
15                    MR. BROWN:  So this will be Vanderplow
16    11?
17                    MR. MIOTKE:  Yes.
18                    (Exhibit 11 was marked for
19                    identification.)
20                    MR. BROWN:  Which was Swope 6?
21                    MR. MIOTKE:  Yes.
22                    MR. BROWN:  Okay.  Thank you.
23    BY MR. MIOTKE:
24         Q    Okay.  So do you see on the bottom there
25    are -- there's a stamp here that's like CODH and then
```

Page 309

1    a series of four numbers?

2        A    The Bates stamps, sir?

3        Q    Yes, that is correct.  All right.  If you

4    could, go to Bates stamp number 0308.

5        A    Okay.

6        Q    And I'd ask you to read the email that you

7    sent that starts on 0308 and continues through 0311.

8    And after you've done so, let me know that you've done

9    so.

10       A    I recall it.

11       Q    Okay.  Now, when you sent this, you sent

12   this as part of your duties; is that correct?

13       A    Sure.

14       Q    All right.  And by the way, we've talked

15   about any number of different things today in terms of

16   things that you recall reporting to various

17   individuals and entities, for example, the evidence

18   management system, the pistol sales, the ticket

19   quotas, the forfeiture funds.

20            Were all these things done as part of your

21   duties as an employee of the City of Dearborn Heights?

22       A    Yes.

23       Q    Okay.  Turning back to Exhibit Number 11, do

24   you think that your tone in this email was

25   appropriate?

```
                                            Page 310

 1        A     Yes.

 2        Q     On page 309, going to the fourth bullet

 3   point -- and it's about a third of the way down.

 4        A     Yes.

 5        Q     It starts with "My comments were ONLY" -- in

 6   capital letters, ONLY.  Do you see where I'm referring

 7   to that?

 8        A     No.  Where?  What page again are we at?

 9        Q     Page 309.

10        A     Oh, okay.  Yeah, I see it.  Yeah.

11        Q     Yeah.  And this is the quote:  "My comments

12   were ONLY in response to a ridiculous question and

13   frankly was valid."  Do you see that?

14        A     I do.

15        Q     All right.  Do you think that Councilman

16   Wencel's question was ridiculous?

17        A     Absolutely.

18        Q     All right.  Do you think it was appropriate

19   for you to address a member of the city council and

20   say that his question was ridiculous?

21                    MR. BROWN:  Objection to form.

22                    THE WITNESS:  I did then, and I do now.

23   BY MR. MIOTKE:

24        Q     Okay.  Do you think that it would be

25   potentially difficult and make things difficult in
```

Page 311

1   terms of your role if you are telling City Council

2   members that they're asking ridiculous questions?

3                   MR. BROWN:  Objection to form.

4                   THE WITNESS:  If they ask a ridiculous

5   question, sir, I'm going to answer it in such a

6   manner.  But even my answer at the time was very

7   valid.

8   BY MR. MIOTKE:

9       Q    Okay.  You have this paragraph, "I too have

10  been disgusted."  You see that paragraph?

11      A    I do.

12      Q    You stand by everything that's stated in the

13  "I too have been disgusted with actions of some on the

14  council"?

15      A    I did then, and I do now.

16      Q    All right.  It says "I have been accused of

17  dereliction of duty.  This is a very serious charge.

18  And since it was broadcast to multiple third parties,

19  you are advised that it is a violation of," and then

20  there's a statutory quote.  Do you see that?

21      A    I do.

22      Q    Who do you consider to be the multiple third

23  parties?

24      A    Well, all the people on Zoom or whatever it

25  was that they were broadcasting, all the people in the

Page 312

1    attendance of the meeting.  I -- I don't know.  You.
2    You were there.
3         Q    All right.  And the comments that were made
4    were made by Councilman Wencel.  Is that what you're
5    talking about?
6         A    Yes.
7         Q    And they were made by him as part of the
8    city council meeting; is that correct?
9         A    Yes.
10        Q    Okay.  Let's move on to page 0310.
11              MR. BROWN:  Madam Court Reporter, can
12   you tell us please what we're at with time?
13              MS. HUNT:  Six hours and 20 minutes.
14   BY MR. MIOTKE:
15        Q    Okay.  Going further, last paragraph on this
16   page says "The only thing I am responsible for is
17   responding to a ridiculous question with a corollary
18   statement outlining the absurdity that was proffered."
19   Do you stand by that statement?
20        A    Yes.
21        Q    And again, you're referring to Councilman
22   Wencel's statement as being ridiculous and absurd; is
23   that correct?
24        A    I am.
25        Q    Okay.  And you stand by all of those

```
                                            Page 313
 1   statements that you made to the city council?
 2               MR. BROWN:  Objection.  Asked and
 3   answered.  Yes.
 4   BY MR. MIOTKE:
 5       Q    Is that a yes?
 6       A    Yes.
 7       Q    You understand that a lot of people believe
 8   that Act 78 was violated by you being hired; is that
 9   correct?
10               MR. BROWN:  Objection to form.  Assumes
11   facts not in evidence.  Misleading.  Ambiguous.
12   Argumentative.
13   BY MR. MIOTKE:
14       Q    Go ahead.
15       A    I don't know what people know or don't know.
16       Q    Okay.  Do you recall that issue being raised
17   by individuals at city council meetings?
18       A    On some level, yes.
19       Q    Okay.  And do you recall that taking place
20   prior to there being any vote to defund your position?
21       A    Yes.
22       Q    And you recall that there was a lot of
23   contention between the city council, the majority of
24   the city council, and the mayor; is that correct?
25       A    Yes.
```

Page 314

1          Q     Do you recall giving testimony in the

2    Command Officers Association of Michigan and Dearborn

3    Heights Police Officers Association grievance against

4    the City of Dearborn Heights regarding the purported

5    attempt to have Hussein Farhat fill a position of

6    director of police operations?

7          A     I don't recall any of that.  I don't even

8    know what you're talking about 'cause the question was

9    meandering.

10         Q     Do you recall testifying that the city's

11   record keeping was dismal and that you were unable to

12   find any employer record evidencing adoption of Act 78

13   and that you even called the attorney general's office

14   for confirmation of adoption but not receiving a call?

15         A     I remember looking into some of that, yes.

16         Q     Do you recall testifying to that?

17         A     Testifying?  No, I don't recall testifying.

18   I would have to see a document as to what you're

19   talking about.

20         Q     You've given some testimony about private

21   individuals making comments at city council meetings.

22         A     Yes.

23         Q     Do you recall -- or what evidence do you

24   have that any of these individuals, other than what

25   you've already testified to, did so in concert with

Page 315

1    members of the city council?

2         A    Since we don't have discovery, I can't

3    verify or deny anything more at this time.  I wish I

4    would have access to discovery to be able to vet that

5    out, sir.

6         Q    Okay.  Well, do you have anything showing,

7    for example, that Rachel LaPointe had communications

8    with the city council members before she ended up

9    speaking at public comment and commenting on things in

10   the police department?

11                  MR. BROWN:  Objection.  Asked and

12   answered.

13                  THE WITNESS:  I'll restate my answer.

14   Because I've not been given discovery to validate my

15   observations, I can't answer that at this time.

16   BY MR. MIOTKE:

17        Q    Okay.  The question is, what evidence do you

18   have at this time?  Anything?

19        A    I don't have anything at this time 'cause

20   it's not been turned over to me, even though I do know

21   records might exist.

22        Q    Okay.  When you say records might exist, do

23   you know that such records exist or not?

24        A    I can't until I at least take a look at

25   various things to be turned over.

Page 316

1        Q    So based on what you know now, you have

2    nothing in terms of evidence that Rachel LaPointe

3    acted in concert with any member of the city council

4    before she spoke during public comment at city council

5    meetings?

6                   MR. BROWN:  Objection to form.

7    Misstates prior testimony.

8                   THE WITNESS:  I don't even know what

9    your question was.

10   BY MR. MIOTKE:

11       Q    What evidence do you have?  Any?  If you

12   have any evidence, I want to know if you have that

13   evidence.

14       A    The only thing I know is Rachel LaPointe

15   made comments and may -- relayed other information

16   that only select people knew at a time.  The only one

17   she could have gotten it from is either somebody like

18   myself, which did not happen, or somebody on council

19   who would've been privy to it.

20                   Since the pool is limited and it's not me,

21   ergo, it's them.

22       Q    How do you know that there weren't other

23   people on the police department who might have ended

24   up providing her with that information?

25       A    Because I was the only one on the email

Page 317

1    string.

2         Q    Okay.  Specifically what information are you

3    referring to?

4         A    Again, sir, I'm not going to go back and

5    forth with you on this.  I've asked and been -- been

6    asking for certain documents I can't get my hands on

7    right now.

8         Q    What was the topic that she addressed?

9         A    Pick one.  Pick anything she opens her mouth

10   on.

11        Q    Okay.  So you mentioned a specific email.

12   What email are you referring to?

13        A    Just any type of communication that I have

14   with, you know, anybody within council, within the

15   mayor's office, whatever it may be.  Anytime I have a

16   discussion on city business, lo and behold, Rachel

17   LaPointe knows.

18             And there's only a few people on emails.  So

19   it's either members of council who is part of it or

20   me, and I'm testifying it's not me.  Ergo, it's them.

21        Q    Okay.  But I'm trying to see specifically

22   what item you're talking about.

23        A    I can't recall an item specific this second.

24   I would ask to be able to review documents and refresh

25   my recollection.

Page 318

1       Q     What about Angela Venegas, any specific --

2       A     Same thing.

3       Q     What about me?  Since you mentioned me.

4       A     Oh, you walk up for public comment, ask for

5    extra minutes, and prattle on for time after time.

6    And the only way you would have your information is

7    you would have to get it direct, Gary.

8       Q     From city council members?

9       A     I would assume so.

10      Q     I represent the city council; right?

11      A     You didn't then.

12      Q     Okay.  So when are you referring to me

13   saying something?

14      A     Before you got whatever job you're holding

15   right now.

16      Q     All right.  And after I left the City of

17   Dearborn Heights?

18      A     I would assume so, yeah.

19      Q     You had said that you had actually tried to

20   arrange to have meetings with me three times.

21      A     Yes.

22      Q     And that's when I was still doing work for

23   the City of Dearborn Heights as prosecutor.  Is that

24   what you're saying?

25      A     Yes.

Page 319

1          Q     What were we supposed to be meeting about?

2          A     I had received several complaints about you

3    and how you handle our officers when they had to

4    testify, holding them over, received multiple

5    complaints from people like Lieutenant Guzowski,

6    Sergeant Campbell, Sergeant Mahood, Sergeant Sycon

7    [ph] on the way you handle officers showing up for

8    trial.

9          Q     All right.  And how did you purportedly

10   communicate with me with regard to that?

11         A     I remember looking at you one time in the

12   hallway saying, "Gary, I would like to speak to you."

13   You said, "Yeah.  Yeah."  And I never saw you.  I

14   believe I sent you two emails to that effect to speak

15   to you.  But at the very least I had approached you,

16   and you never showed up.

17         Q     And those emails were sent on the city

18   system?

19         A     I believe so, yes.  It would have to be.

20         Q     Okay.  All right.  We'll see.

21         A     Do you deny I spoke to you in the hallway?

22   Is that what you're saying?

23              MR. BROWN:  That's fine.

24   BY MR. MIOTKE:

25         Q     I'm not here to testify.

Page 320

1      A     Oh, I'm just --

2      Q     But for the record, I do.

3      A     Okay.

4      Q     With respect to the information that you're

5   saying that I had that I would only have from the city

6   council, what evidence do you have that I would only

7   have that evidence if I was acting in concert with the

8   city council?

9      A     I don't know at this time.  I would like to

10  refer to documentation at a later time to refresh my

11  recollection.

12     Q     Okay.  But right now you can't remember

13  anything; is that correct?

14             MR. BROWN:  Objection.  Misstates prior

15  testimony.

16  BY MR. MIOTKE:

17     Q     I want your best recollection right now.

18  What do you recall?

19     A     I don't recall at this time.

20     Q     Okay.  What do you recall in terms of any

21  evidence that would show that Vince Drapkowski was

22  acting in concert with the city council before he

23  ended up making comments during public comment at city

24  council meetings?

25     A     Same answer.

Page 321

1    Q    All right.  Do you understand that all the

2    individuals who were speaking were speaking during

3    public comment and had a First Amendment right to

4    speak during city council meetings?

5    A    Yes, I fully understand that.

6    Q    Do you recall specifically what Councilman

7    Baydoun, now Council Chair Baydoun, said in the

8    meeting with regard to promoting Sergeant Bazzy?

9    A    Something along the effect of the first time

10   he asked, he said he wanted to see Sergeant Bazzy

11   within -- promoted within the department to such a

12   level, you know, such as a deputy chief or a director,

13   something along those lines.

14       And I remember Chief Hart at the time

15   saying, "Well, that's not the process.  That's not how

16   that works."  Conversation then goes on for a little

17   bit.  Baydoun brings it up again the second time.

18       And again he goes something to effect of,

19   you know, "Somebody like Sergeant Bazzy needs to be up

20   in -- in leadership of -- of this level."  I again

21   then explained that's not how the -- that's not how

22   that works.

23       I think he -- I thought he mentioned captain

24   at one time because Erickson had just left or

25   something like that.  And then finally, little bit

Page 322

1    more into the conversation, he said something again

2    along those lines, and then Director Swope addressed

3    it.

4        Q    Okay.  Was there any discussion of wanting

5    Sergeant Bazzy to be on, like, a community committee

6    or task force?  Do you recall any discussion of that?

7        A    Yeah, I do.  Yeah.

8        Q    Okay.  And what's your recollection of that

9    discussion?

10        A    I think, if I remember right, that's what we

11    had proposed.  Like, hey, that sounds like a good

12    idea.  I mean Sergeant Bazzy clearly is magnanimous.

13    I mean, he has a outgoing personality.  Sounded like

14    fairly viable.

15        Q    Okay.  Now, are you stating that based on

16    that discussion the city council in some way is

17    retaliating against you or discriminating against you?

18        A    A hundred percent.  In fact, all the

19    problems started pretty much right after that meeting

20    when we refused to afford Sergeant Bazzy some level of

21    promotion of which he did not deserve.

22        Q    And that was in in January of 2023; is that

23    correct?

24        A    About that time frame, yes.

25        Q    Okay.  Yet then on February the 28th, the

Page 323

1   city council approved the resolution that's referred

2   to in your complaint at paragraph 18 as retaining you,

3   Hart, and Swope; is that correct?

4        A    Yes.

5        Q    All right.  So if they were really out to

6   get you at that point, they could have just declined

7   to end up approving that tentative agreement; is that

8   correct?

9        A    I would assume so, yes.

10       Q    All right.  Do you have any evidence why

11  they did not do so?

12       A    Because they didn't want to upset the police

13  union and not ratify the contract, I would assume.

14       Q    Okay.  So is there any actual evidence you

15  have to show that?

16       A    No.

17            MR. MIOTKE:  All right.  We're just

18  going to take a moment.  I'm going to talk to Tarik,

19  and we'll be right back.

20            THE REPORTER:  Going off the record?

21            MR. BROWN:  Yes, ma'am.

22            THE REPORTER:  Off the record, 5:30

23  p.m.

24            (Off the record.)

25            THE REPORTER:  Back on the record, 5:33

Page 324

1   p.m.

2   BY MR. MIOTKE:

3        Q    Mr. Vanderplow, you had referred to a couple

4   of matters.  How many times have you been a party to a

5   lawsuit other than this particular lawsuit?

6        A    Three or four, times I think, give or take.

7        Q    All right.  So there's the IB electric

8   lawsuit, Wayne County Circuit Court?

9        A    Right.

10       Q    Okay.  Then Jenny Twardzik --

11       A    Oh, I forgot about those.  Yeah, keep going.

12   I'm sorry.  I forgot.

13       Q    -- filed a complaint against you?

14       A    Yeah.

15       Q    Anything else?

16       A    I had a civil lawsuit in Virginia where my

17   neighbor's tree fell on my yard.  I thought I might

18   have had one within ATF, but I don't -- it's not

19   ringing a bell.  I think that's about it.

20       Q    Okay.  Do you remember -- and so that's the

21   best of your recollection; is that correct?

22       A    Correct.

23            MR. MIOTKE:  All right.  I think we're

24   good for now.  Thank you.

25            MS. HUNT:  No further questions.

```
                                                Page 325

1              MR. BROWN:  This is Stephen Brown.  I
2     have a few questions.
3                        EXAMINATION
4     BY MR. BROWN:
5         Q    Mr. Vanderplow, you weren't here yesterday.
6     But after the deposition -- and I'll ask counsel to
7     confirm that this is accurate -- I asked Attorney
8     Turfe for the whereabouts of Hassan Saab for purposes
9     of getting his deposition scheduled.
10             And Mr. Turfe told me that Hassan Saab was
11    traveling.  Is that accurate?
12             MR. MIOTKE:  I don't know --
13             MR. TURFE:  I'm not answering
14    questions.  This isn't my deposition.
15             MR. MIOTKE:  Yeah, I would agree.  I
16    would object to you putting this question to him.
17             MR. BROWN:  That's fine.
18    BY MR. BROWN:
19        Q    Mr. Vanderplow, do you have any current
20    information as to the whereabouts of Hassan Saab?
21        A    Yeah, a couple different people in the
22    community have stated that he is still in town.
23        Q    What's the freshest information you have
24    with respect to the whereabouts of Hassan Saab?
25        A    Sunday afternoon.
```

Page 326

1      Q     And where is he?

2      A     Supposedly in the Dearborn Heights area.

3      Q     Thank you.  Mr. Vanderplow, I want to talk

4  to you briefly about the IB Electric lawsuit that you

5  were party to.  Do you remember that?

6      A     Unfortunately.

7      Q     Now, as I understand, when you were a

8  director of support services, you were actually in

9  charge of the building management for the police

10  department?

11      A     That's correct, for the Justice Center.

12      Q     And where is the Justice Center with respect

13  to Dearborn Heights City Hall?

14      A     Three/four miles south on Michigan Avenue.

15      Q     Fair to say they're different buildings,

16  then?

17      A     They are different buildings.

18      Q     And do you remember anything happening with

19  the lights changing at that building?

20      A     Yeah.  I came in one day, and I had two or

21  three employees in my office complaining about how

22  bright the new lights were and they were giving them

23  headaches.  I -- I frankly didn't understand what they

24  were talking about 'cause I didn't know we were

25  replacing lights.

Page 327

1           I think I was out the day or two before or

2    whatever.  But lights were being replaced in the

3    Justice Center, and I didn't know why.  And I started

4    asking around like, "How did we get to this point of

5    replacing lights without telling me?"

6           And then as I started doing an inquiry, I

7    found that we had signed a contract with a company, as

8    referenced by Mr. Miotke, IB Electric, to change

9    lights in the Justice Center.

10       Q    And who had signed the contract?

11       A    Well, that was part of the problem.  It was

12   signed by -- it was approved by a one-time employee,

13   Michael Blackburn, who then pointed a finger at Judge

14   Turfe approving it.

15       Q    So did you do anything to discuss the matter

16   with Judge Turfe?

17       A    Yeah, I discussed the matter with quite a

18   few people, and the -- the trail led back to Judge

19   Turfe approving it.

20       Q    Did Judge Turfe ever tell you that he had

21   approved it?

22       A    He had mentioned that he got talked to about

23   it and he said, "Yeah, go ahead and do it."

24       Q    Was the contract no-bid?

25       A    Correct.

```
                                              Page 328

 1       Q     Are no-bid contracts allowed in Dearborn

 2   Heights?

 3       A     Absolutely not.

 4       Q     Who else was involved in this no-bid

 5   contract?

 6       A     A gentleman I -- I would hear later was

 7   Kahlil Rahal.  He was, I guess, the DTE representative

 8   who spearheaded it.  Michael Blackburn.  There was

 9   another employee; I'm blanking on his name.  He -- he

10   knew about it at the time it was being done.  I forget

11   his name.

12       Q     Who was the vendor?

13       A     IB Electric.

14       Q     Were you concerned about a no-bid contract?

15       A     Very much so.

16       Q     And why is that?

17       A     As been hammered into my head from various

18   interactions with city council, contracts in the city

19   that require services require three bids.  And as well

20   as not only fiscally, you know, doing business without

21   a bid is -- is bad for governmental operations.

22       Q     Are kickbacks common with no-bid contracts?

23       A     They have been in the past, yes.

24       Q     Are you aware of other vendors that would've

25   bid on this lighting job had they been given the
```

Page 329

1    opportunity?

2        A    Yeah.

3                MR. MIOTKE:  Objection.  Form.

4    Foundation.

5                THE WITNESS:  As part of the program,

6    DTE provides businesses with a list of over 30 vendors

7    that could be contacted to -- to conduct the exchange.

8    BY MR. BROWN:

9        Q    What did those vendors tell you about

10   bidding on jobs at Dearborn Heights?

11               MR. MIOTKE:  Objection.  Form.

12   Foundation.

13               THE WITNESS:  I contacted a few of the

14   vendors and just asked, "Hey, if -- if this job had

15   come open, would you have -- would you have done it?"

16   And at least three vendors I called -- and no, I don't

17   recall the actual numbers 'cause I just pointed on the

18   map or pointed on the brochure and picked some.

19               All three said they would've been more

20   than happy to bid on that job and that they've

21   actually been trying to do business within Dearborn

22   Heights and were never able to.

23   BY MR. BROWN:

24       Q    But as I understand, was the contract amount

25   for the lightings reimbursed by DTE?

```
                                             Page 330
 1        A     It was, by the end, yes.
 2        Q     And DTE is the same corporation for which
 3   Kahlil Rahal works; is that right?
 4        A     Apparently, yes.
 5        Q     And how is the city harmed by this
 6   particular contract if the entire contract amount is
 7   eventually reimbursed by DTE?
 8        A     Well, I think the fact it's reimbursed is
 9   immaterial.  I think, you know, the mere fact of you
10   have business going to a company that was not bid, you
11   have a job that was done without proper supervision,
12   quality control.
13             And frankly, I've never -- in my two and a
14   half years with the city, I've never seen a judge
15   approve a work order to do anything in that building.
16             As a matter of fact, when it came to, like,
17   things like the generator that went down on a routine
18   basis, I would get calls from the administrative --
19   head of administration over at the court; I'm blanking
20   on her name -- you know, demanding that I fix it, that
21   I get it done.
22             So they have -- the -- the rule in the
23   building was the police department facilitate
24   operations for the building, and that came to me.
25        Q     So did you conduct an investigation then of
```

```
                                        Page 331
 1   Judge Turfe's actions?
 2       A     I did.
 3       Q     And is Judge Turfe, to your knowledge, the
 4   same individual who is the father to Attorney Tarik
 5   Turfe sitting here in the room and actually a counsel
 6   of record to the city council?
 7             MS. HUNT:  Objection to foundation.
 8   And speculation.
 9             MR. MIOTKE:  Same.
10             THE WITNESS:  I would find that out
11   later, yes.  Or more recently, yes.
12   BY MR. BROWN:
13       Q     And what's the answer?
14       A     I believe he is the son of Judge Turfe.
15       Q     What happened to you when you started to
16   investigate this particular transaction?
17       A     Oh, man.  I was maligned multiple times in
18   open council meetings, even after the facts had come
19   out of what actually happened with that transaction.
20             Had an -- an attorney, Dennis Harris, I
21   think his name was, who went up there for 30 minutes
22   and spewed untruths into the record and was never
23   forced to recant those when it was found out later
24   that he was wrong.
25       Q     Were you ever sued in connection with your
```

```
                                            Page 332

 1   investigation?

 2       A    Yeah, I was.

 3       Q    Who sued you?

 4       A    Imad Boussi and IB Electric.

 5       Q    And has the matter been resolved to this

 6   date?

 7       A    I don't think it has.  I think it's still

 8   outstanding.

 9            I know part of it was withdrawn with

10   prejudice, but I thought some of it was still pending.

11       Q    Withdrawn with prejudice against you or

12   against all parties?

13       A    I think against me.

14       Q    And is this the same Kahlil Rahal that's

15   mentioned in the complaint, your first amended

16   complaint?

17            MR. MIOTKE:  Objection.  Form.

18   Foundation.

19            THE WITNESS:  Yes, it is.

20            MR. BROWN:  No further questions.

21            MR. MIOTKE:  Monica, do you have any --

22            MS. HUNT:  I have no questions.

23                   EXAMINATION

24   BY MR. MIOTKE:

25       Q    The owner of the building is not the City of
```

Page 333

1   Dearborn Heights; is that correct?

2       A    I believe it's the tax incentive TIFA.

3       Q    It's the Dearborn Heights Tax Increment

4   Financing Authority; is that correct?  Also known as

5   the TIFA?

6       A    Thank you.  Yes, that is correct.

7       Q    Okay.  And the city is a tenant of the TIFA;

8   is that correct?

9       A    Correct.

10      Q    All right.  Did you raise any issues with

11  Tom Rosco or the TIFA board with respect to this

12  matter?

13      A    I brought it up to Tom.  He had no idea what

14  was going on.

15      Q    Did Tom have any problem with what ended up

16  taking place?

17              MR. BROWN:  Objection.  Ambiguous.

18              THE WITNESS:  He was actually -- he was

19  concerned when I brought it up to him because he

20  didn't know that it was being done either.

21  BY MR. MIOTKE:

22      Q    Okay.  Did the city lose any money in this

23  situation?

24      A    No.

25      Q    All right.  What were the findings of the

Page 334

```
 1   investigation with respect to Judge Turfe and Mike
 2   Blackburn?
 3        A    I don't have the report sitting in front of
 4   me.  So from memory, Judge Turfe was -- he did admit
 5   to "approving it," which was against pretty much
 6   everything policy-wise in the city.
 7             Michael Blackburn, after denying and lying
 8   about it, finally, if I remember right, came up and
 9   said he had had a part in it.  We found additional
10   documents from IB Electric that verified those
11   statements that he actually had approved it.
12             Michael Blackburn was relieved of his duties
13   for this, and I think a couple other issues.  And I
14   don't -- I -- I'm going to claim I don't fully
15   understand what his dismissal was on at this time.
16   And that was about it.
17        Q    Did you fire him?
18        A    I didn't fire anybody.
19        Q    Did you communicate to Mike Blackburn that
20   he was being fired?
21        A    I was there when he was fired.
22        Q    Who fired him?
23        A    The mayor.
24        Q    All right.  Who else was present other than
25   you, Mike Blackburn, and the mayor?
```

Page 335

1       A    I thought the union rep was there too.

2       Q    Was there a civil service hearing with

3    respect to his discharge?

4       A    I thought there was, yeah.

5       Q    And he prevailed; is that correct?

6       A    I don't remember.

7       Q    Do you know the disposition one way or the

8    other?

9       A    I don't.

10           MR. MIOTKE:  I have nothing further.

11   All right.  Very good.

12           MR. TURFE:  Wait.  Give me one second.

13   One second.

14           THE REPORTER:  One moment.  We're still

15   on the record.

16           MR. BROWN:  Yeah.

17           MS. HUNT:  Oh, I'm sorry.

18   BY MR. MIOTKE:

19       Q    Do you, based on your personal knowledge,

20   know that Hassan Saab was in the United States on or

21   after August the 14th of this year?

22       A    No, I don't know.

23           MR. MIOTKE:  Okay.

24           MR. BROWN:  I have one last question.

25   One last question, and then we're done.  Sorry.

Page 336

```
 1                    EXAMINATION
 2   BY MR. BROWN:
 3       Q    Mr. Vanderplow, you had mentioned that you
 4   have a collection of documents on a drive in your
 5   possession; is that correct?
 6       A    Correct.
 7       Q    Does the city have a copy of every single
 8   document --
 9       A    They should.
10       Q    -- on that drive?
11       A    Yes.
12            MR. BROWN:  No further questions.
13            THE REPORTER:  Ms. Hunt, will you be
14   ordering the transcript?
15            MS. HUNT:  I will, yes.
16            THE REPORTER:  Mr. Miotke, will you be
17   ordering?
18            MR. MIOTKE:  Yes.
19            THE REPORTER:  Mr. --
20            MR. BROWN:  Brown.
21            THE REPORTER:  -- Brown, will you be
22   ordering?
23            MR. BROWN:  Yes, ma'am.
24            THE REPORTER:  Okay.  Hearing no
25   objections, we are now off the record at 5:46 p.m.
```

Page 337

1           (Signature waived.)

2           (Whereupon, at 5:46 p.m., the

3           proceeding was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 338

1          CERTIFICATE OF DEPOSITION OFFICER

2              I, JAHKARAH L. HAYNES-YOUNG, the officer

3     before whom the foregoing proceedings were taken, do

4     hereby certify that any witness(es) in the foregoing

5     proceedings, prior to testifying, were duly sworn;

6     that the proceedings were recorded by me and

7     thereafter reduced to typewriting by a qualified

8     transcriptionist; that said digital audio recording of

9     said proceedings are a true and accurate record to the

10    best of my knowledge, skills, and ability; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this was taken;

13    and, further, that I am not a relative or employee of

14    any counsel or attorney employed by the parties

15    hereto, nor financially or otherwise interested in the

16    outcome of this action.

17                              JAHKARAH L. HAYNES-YOUNG

18                              Notary Public in and for the

19                              State of Michigan

20

21

22

23

24

25

Page 339

1                  CERTIFICATE OF TRANSCRIBER

2              I, DAVID SHAHVERDIAN, do hereby certify that

3      this transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                                      DAVID SHAHVERDIAN

16

17

18

19

20

21

22

23

24

25

**[& - 2025]**

**&**

**&** 1:16 2:5 3:12
6:12

**0**

**0.760.** 248:15
**0305** 308:8
**0308** 309:4,7
**0310** 312:10
**0311** 309:7
**035** 308:8

**1**

**1** 4:11,19,24,25
5:23 41:16
55:5,6 58:7
60:25 61:6
62:6 115:21
224:15 227:7
228:3 233:24
234:17 248:10
248:10,22
258:5
**1.1** 57:24
**1.1.** 61:1,7
**10** 5:16 296:22
300:2,3
**101** 1:17 2:6
6:13 213:9
**102** 213:9
**10240** 1:9 6:10
**10:11** 1:15 6:5
**11** 5:18 37:7
195:5 200:9

294:12 308:11
308:16,18
309:23
**117,000** 76:2
227:22
**117,220** 61:21
62:21 70:10
227:20
**11:21** 54:25
**12** 62:1 155:13
**12:30** 36:11
**12:48** 116:23
**12th** 247:10
**13** 297:23
**14207** 2:21
**14th** 335:21
**15** 144:14
206:11,14
**16** 36:11
169:24
**16th** 169:12
**17** 41:1
**175** 5:6
**18** 37:8 323:2
**1811** 37:6,10,11
37:15,25 38:3
38:6,9 39:2,6
39:15,22 40:3
40:8 41:2
238:15 239:1,6
239:8,11
**185** 5:8
**189** 5:25

**19** 1:14 6:11
248:3,5
**1989** 16:2
**1995** 14:2
**1999** 14:2
**1st** 42:2 62:11
70:15 246:17

**2**

**2** 4:16 5:24
60:20,21 63:3
63:6 68:10,12
70:4,22 175:10
233:24 234:17
247:10 258:5
**2,000** 58:14,16
**2.2** 230:25
**20** 61:24 87:7
88:3 89:22
204:25 207:17
277:2 278:3
312:13
**2009** 15:3 51:6
**201** 3:13
**2020** 186:22
**2022** 20:4
25:18 294:8
**2023** 4:14,19
5:18 41:16
45:5 51:10
61:1,1,6,24
62:1,6 76:14
87:8,18,23,24
88:3,18 89:4

92:9,17 93:20
109:2,24
115:18 169:12
169:24 239:8
246:23 247:11
247:12 249:16
280:7 322:22
**2024** 5:5
173:22 176:17
191:22 192:10
206:2,24 207:2
207:18 239:4,6
246:23 249:11
287:25 288:4
297:3 298:1
300:22 301:21
**2025** 1:14 4:15
4:24 5:10 6:11
51:9,11 58:4
70:4 75:13
76:14 78:1
79:24 138:7
220:11 227:25
232:12,13,15
232:24 251:24
252:12 283:8
283:20 284:4
284:14 288:7
288:21,24
289:2 291:25
292:4,21 293:4
293:6,8,12
294:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                             586-468-2411
www.veritext.com

**[2026 - 5]**                                                  Page 2

**2026**   4:20 61:7
**2027**   4:25
   70:16 224:15
   227:8 228:1,3
**20th**   205:3
**21**   216:1
**22**   19:23 21:25
   28:21 38:25
   39:4 92:9
   114:10 115:3
   115:17 266:7
   287:24 288:21
   290:4 294:8
**220**   4:4
**22nd**   289:2
   290:6
**23**   5:10 38:23
   39:6 57:24
   90:19 91:6,12
   121:1,9 160:22
   162:23,24
   163:18 169:7
   171:22,25
   173:5 175:8
   201:5 202:1
   204:10,11
   269:11
**24**   38:13 39:9
   39:12 115:18
   117:3 130:11
   130:11 161:17
   171:24 173:13
   173:18 174:22
   200:25 201:2,3

   201:13 204:25
   205:3 206:1,19
   206:21 274:2
**248**   2:9
**24th**   206:1
**25**   40:19 57:24
   71:10 72:15
   118:24 130:9
   133:18 193:21
   194:24 274:8
   276:16 277:3
   278:3 292:20
**25637**   5:14
**257.750**   115:21
**26**   20:14
**27**   144:21
**27,000**   64:3
   204:10
**28**   161:22
**28.422a**   109:5
**286**   5:10
**288**   183:13
**28th**   322:25
**29**   204:24
**290**   176:20
**295**   5:13
**298**   5:15
**2:24**   1:9 6:10

**3**

**3**   4:21 5:5
   69:18,19 70:1
   85:12 109:5
   176:7,17

   221:16 222:25
   230:6,21
   233:24 234:8
   234:17 236:14
   258:5
**3.1**   56:17 61:20
   62:5,7 70:9
   72:12
**3.1.**   72:10,16
**3.2**   57:3 63:22
   72:10
**3.2.**   63:12
**3.3**   57:18 58:12
   63:2
**3.3.**   72:10
**30**   4:15,20 61:6
   249:11 329:6
   331:21
**300**   5:17
**300,000**   222:5,8
   228:4,6
**3011**   2:14
**30234**   338:16
**308**   5:19
**309**   310:2,9
**30th**   57:24 58:4
   61:1
**31**   20:4
**313**   2:17,24 3:9
   3:16
**32489**   339:14
**325**   4:5
**332**   4:6

**336**   4:7
**388-4809**   3:9
**3:07**   217:11

**4**

**4**   5:3 85:4,11
   85:13 86:25
   87:1,2,2,4
   176:7 204:19
   248:3,11 266:3
   266:7 277:2
   294:11 296:22
   297:3 298:1
   300:22 301:21
**4.1**   72:13
   221:16 222:25
**40**   213:3
   216:20
**401**   41:5
**41700**   1:17 2:6
   6:12
**48**   85:18
**48101**   3:7
**48126**   2:22
   3:14
**48168**   1:18 2:7
   6:13
**48202**   2:15

**5**

**5**   5:5 109:1
   118:25 175:16
   175:17 221:16
   222:25 247:11
   277:2 297:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

**50** 237:5
  299:23
**50,000** 97:21
**525** 2:14
**55** 4:15 200:10
  294:12,14
**551-3038** 3:16
**56** 294:12,18
**5:46** 336:25
  337:2

**6**

**6** 5:7 185:11,12
  213:7 221:16
  296:5 307:19
  307:22 308:20
**60** 4:20
**6050** 3:13
**63** 236:12
**6828** 3:6
**69** 4:25

**7**

**7** 5:9 249:16
  286:20,21
  287:2,13
**720p** 303:2
**7548431** 1:20
**760** 248:17,17
**78** 257:14
  313:8 314:12

**8**

**8** 4:3 5:11 45:5
  216:1 295:6,25

**846-1910** 2:24
**85** 5:4
**871-5500** 2:17
**89** 16:8
**8f** 249:14

**9**

**9** 4:14 5:14
  45:5 47:2 51:9
  57:24 75:13
  79:24 155:13
  251:23 252:11
  288:4,7,24
  298:18,19,21
  298:23
**90,000** 47:9
  48:18,20,23
  56:20,21 57:1
**900** 109:3
  269:12 270:9
  273:8,15
**912-3213** 2:9
**94** 16:8
**95** 14:5
**98** 5:23
**99** 14:5,9
**9th** 51:10,11
  80:2 220:11
  284:4,14 289:2

**a**

**a.m.** 1:15 6:5
  45:5 54:22,25
**abandoned**
  199:5

**abdallah**
  279:19,24
**abilities** 182:6
**ability** 149:19
  149:23 154:6
  154:11 160:16
  161:9 197:6
  214:17 218:23
  256:3 259:3,8
  261:22 262:14
  262:16 284:11
  289:24,25
  290:15 291:1
  338:10 339:7
**able** 34:14
  55:21 126:2,18
  175:1 197:4
  208:2,5,12
  212:5,11,24
  218:4,16 219:8
  219:17,23
  240:16,20
  254:20,22
  255:4,8,15,16
  256:5 271:18
  284:13,17
  286:9 289:12
  290:10 291:18
  291:20 292:18
  293:19,24
  315:4 317:24
  329:22
**abnormal**
  297:9

**aboard** 43:20
  43:21 102:20
**above** 168:13
**absence** 254:20
**absent** 6:16
**absolutely** 21:2
  35:14 145:12
  260:5 293:7
  310:17 328:3
**absurd** 312:22
**absurdity**
  312:18
**academy** 35:17
  35:19 36:7,15
  238:6
**accept** 46:7,10
  46:16,20,23
**acceptable**
  143:23
**accepted** 44:21
  44:24 45:10
  188:18
**accepting**
  44:19,20 45:20
**access** 99:14
  106:19 133:3
  190:17,23
  191:1,3,7
  212:19,24
  213:18 250:21
  250:22 284:15
  284:16 285:10
  289:5 315:4

**accompanied**
136:4,8
**account** 42:3,6
50:4,8 52:1,25
53:22 54:11
187:1 190:18
190:22 242:25
243:3,6 290:13
**accountant**
255:13
**accounting**
16:12 255:17
**accounts** 49:10
122:4 127:24
186:25 199:9
199:12,25
212:20,25
213:19 290:8
**accrued** 221:9
**accumulated**
227:10,11
228:13
**accumulative**
224:18
**accurate**
110:14 173:14
196:15 296:13
325:7,11 338:9
339:5
**accurately**
258:8 259:16
**accused** 189:14
294:21 311:16

**acknowledge**
192:23
**acknowledg...**
6:15
**act** 191:18
198:15 205:6
205:15,24
206:3 231:5
257:14 284:17
313:8 314:12
**acted** 316:3
**acting** 145:4,10
146:21 147:10
150:8 176:22
176:25 177:4
177:15 179:2
191:20 212:4
252:22 253:1,3
253:4,10,23,24
254:1,3,4
265:23 284:8
320:7,22
**action** 118:21
150:19 154:15
259:4 263:17
297:7 338:12
338:16 339:8
339:12
**actions** 5:6
104:24 145:5
145:11 161:23
214:19 215:1
216:6,9,13
244:15 278:15

279:15 304:22
311:13 331:1
**active** 139:24
140:2
**activities**
127:16
**activity** 88:16
243:24
**acts** 207:3,6
**actual** 93:19
126:1 141:11
182:6 186:21
189:19 195:21
242:19,24
243:2 273:18
276:4 323:14
329:17
**actually** 14:17
94:23 99:2
100:5,6 101:24
104:15 105:5
106:1,1 108:1
108:3 122:7,9
123:4,12 144:2
149:2 151:7
159:19 160:3
187:12 189:21
190:21 199:16
200:11 207:10
226:5 243:9
246:1 251:9
259:2 276:6,6
276:9 282:15
291:1,20 303:3

**304**:3 318:19
326:8 329:21
331:5,19
333:18 334:11
**acumen** 180:8
**add** 227:25
**addition** 45:25
57:6 211:21
227:24 259:22
**additional** 71:6
76:6 121:20
177:16 334:9
**additionally**
6:16
**address** 306:9
310:19
**addressed** 12:9
317:8 322:2
**addressing**
199:17
**adequate** 38:4
**adjusted** 61:16
61:17
**admin** 236:14
**administer**
6:15
**administration**
74:10 214:23
240:3 250:22
290:15 330:19
**administrative**
176:6 177:21
330:18

**admit**  334:4
**admitted**  60:20
**adoption**
  314:12,14
**adverse**  145:5
  145:11 150:18
  154:15 161:23
**advise**  49:4
  191:7
**advised**  46:6
  181:14 311:19
**advocated**
  264:13
**affairs**  80:17
  138:22,25
  186:13 191:16
  191:18,21,25
  192:2 306:17
**affecting**
  159:16 292:12
**affidavit**  5:11
  295:25
**affidavits**  188:6
**affirmative**
  283:13
**afford**  322:20
**afforded**
  219:20 221:10
  221:12,24
  256:3
**afms**  276:8
**afternoon**
  304:6 325:25

**ag's**  86:15
**age**  213:2,3,14
  213:14,16
  214:7,24
  215:24 216:2,3
  216:16,18,20
**agencies**  39:14
  86:14,14 87:22
  88:2 89:9 90:7
  90:23 97:8
  110:5 119:6
  120:22,23
  133:21
**agency**  36:14
  96:21 97:6,15
  97:17,20
  110:21 114:8
  134:23 135:6
  140:12 141:14
  141:15
**agenda**  59:24
  155:25 219:16
  266:20,22,23
  307:4
**agendas**  59:16
  266:24
**agent**  18:15,23
  18:24 19:1,6
  20:1,12,16
  21:6,6 24:20
  24:24 27:16
  29:13,17 94:7
  94:8,10,13,19
  95:2,6,8,10,15

95:22 96:1,11
  96:12,23
  121:13 125:5,6
  125:7,10,13
  275:6
**ages**  21:24
**aghast**  104:17
**ago**  207:17
  212:6 272:12
  282:22,25
  286:8
**agree**  6:18
  11:10 99:15
  100:9 123:6
  252:6,6 262:21
  325:15
**agreed**  68:23
**agreement**  4:12
  4:17,22 224:15
  227:7 229:21
  247:19,23
  249:8,11,21,23
  250:1,6,7
  323:7
**agreements**
  234:17
**ahead**  65:7
  66:11,21 69:7
  158:22 226:14
  251:8 257:10
  262:2 270:24
  291:9,17
  313:14 327:23

**ahmad**  91:7,20
  162:21 163:10
  273:4 279:20
**aides**  75:9,9
**air**  268:24
**al**  285:9
**albeit**  72:21
**alco**  213:6
**alcohol**  36:1
**alglawpc.com**
  2:16
**alive**  31:5
**allegation**
  109:1 115:25
  137:23 228:21
  244:18
**allegations**
  22:6 86:22
  119:8,10 198:2
  208:24 214:5
  264:18 305:15
**alleged**  117:3
  217:21 244:11
  244:14
**allen**  2:13 3:7
**alleviate**  264:1
**alleyway**  305:2
**allow**  9:13
  197:15 207:9
**allowable**
  120:7
**allowance**
  58:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                      586-468-2411
                                                                      www.veritext.com

| | | | |
|---|---|---|---|
| **allowed** 101:8 | 197:23 198:3 | 66:7,10,11 | **answering** |
| 104:15 150:24 | 198:11 217:24 | 69:11 71:5 | 166:24 197:13 |
| 161:18 203:2 | 217:25 218:24 | 76:8 81:18 | 325:13 |
| 208:7,8 209:3 | 245:21,22 | 82:14 86:18 | **answers** 126:10 |
| 212:3,10 | 321:3 | 101:15 107:12 | 128:5 197:14 |
| 213:18 220:1 | **amends** 85:25 | 117:6 122:15 | 290:1 |
| 222:13 254:15 | **american** 186:5 | 124:1,3 126:10 | **anybody** 26:24 |
| 271:17,19 | 281:4 | 131:2 142:9 | 49:17 120:18 |
| 284:7 286:9 | **amex** 5:8 | 151:19,25 | 126:11 172:8 |
| 294:3 328:1 | 190:18 | 178:21 182:13 | 199:24 216:7 |
| **alter** 171:9 | **amount** 62:23 | 183:1 198:7 | 216:17 220:5 |
| **altercation** | 71:19 221:12 | 205:12 223:25 | 317:14 334:18 |
| 245:3 | 222:1,2,8,13 | 228:10 230:8 | **anymore** |
| **amalgamation** | 239:11 329:24 | 231:23 244:3 | 195:10 |
| 34:19 | 330:6 | 251:10,11 | **anytime** 154:18 |
| **ambassador** | **amounts** 71:18 | 257:10,22 | 317:15 |
| 239:19 | 71:22,25 | 258:14 259:24 | **anyway** 180:15 |
| **ambassadors...** | 222:15 229:9 | 262:2,3 263:5 | **aoun** 145:22 |
| 239:15 240:7 | 242:20,20 | 267:22 268:7 | 146:6,8,10 |
| **ambiguous** | **anecdotally** | 268:15,16 | 149:14 |
| 68:6 88:23 | 116:11 | 270:11,25 | **apologies** 210:5 |
| 157:21 183:20 | **angela** 145:20 | 277:12 284:22 | **apologize** 34:6 |
| 313:11 333:17 | 150:1,3 152:7 | 289:10 291:9 | **apparently** |
| **amend** 105:2,4 | 318:1 | 291:14,16,17 | 100:15 143:22 |
| **amended** 5:3 | **annual** 56:21 | 311:5,6 315:13 | 165:9 211:18 |
| 33:23,25 85:16 | 58:14 63:4 | 315:15 320:25 | 229:2 259:3 |
| 85:24 86:2,5 | 76:1 224:17 | 331:13 | 288:14 330:4 |
| 204:20,21 | 227:9,16,18,19 | **answered** | **appear** 139:1,7 |
| 247:22 266:2 | **anonymously** | 10:21 53:5 | 139:9,11,12,24 |
| 332:15 | 131:22 | 163:24 226:12 | 231:6 232:2,5 |
| **amending** | **answer** 9:13,20 | 233:10 265:16 | 232:9,15,20 |
| 60:10 | 10:18 32:2 | 285:5 301:23 | 256:6 258:12 |
| **amendment** | 33:4 34:15 | 313:3 315:12 | 301:20 |
| 195:6,7 196:11 | 60:14 65:5,17 | | |

[appearance - asking]                                                    Page 7

**appearance**
12:22 138:18
**appeared**
126:10 139:18
304:22
**appears**   15:2
20:8 56:15
64:1 70:8
76:15 112:19
132:2 167:25
176:15 177:21
185:21 248:24
300:11 301:6
**apple**   73:19
**applicable**   6:22
231:2
**applying**   53:1,6
**appoint**   257:24
**appointed**
153:24,25
253:20
**appointee**
257:6,11
**appointment**
240:2
**appoints**   258:1
**appreciated**
289:24
**approached**
24:2 263:21
319:15
**appropriate**
245:15 309:25
310:18

**appropriately**
246:7
**approval**   53:18
97:23
**approve**   156:6
158:4,9 208:14
209:12,13
249:7 255:4
290:7 330:15
**approved**
157:6,16
208:10 212:7
243:10,11
245:22 248:6
254:10 323:1
327:12,21
334:11
**approver**
127:12
**approving**
323:7 327:14
327:19 334:5
**approximate**
239:10
**approximately**
38:8 41:17
51:18 61:10
64:3 78:11
228:5 235:20
235:23
**april**   5:10
193:21 287:24
288:21 289:2
290:4,6 293:6

294:8
**arab**   161:25
165:9,10,11,13
215:2,10,15
271:16 272:3,3
272:8,14,25
281:4,10 286:9
286:12
**arbitrarily**
130:15
**archived**
133:15
**area**   111:17
116:7 117:20
133:24 157:15
302:21,25
326:2
**argumentative**
157:21 167:20
182:22 291:7
313:12
**arisen**   89:11
**arizona**   16:6,16
17:14
**arrange**   318:20
**arrears**   247:8
**arrest**   169:16
170:9
**arrests**   84:3
**arrival**   53:7
**arrived**   264:18
**ash**   305:9,10
**aside**   222:20
251:16

**asked**   8:5 24:1
24:24 31:9
43:14,22 67:21
68:19 77:23
83:1 97:11
111:17 117:5
117:16 121:21
124:10,22
128:4 142:15
147:4,24
148:21 160:4
162:15,17,25
163:21,23
164:1,2 167:12
167:14 168:12
168:19 179:5
191:4 209:2
218:15 219:20
220:24 226:6
226:11 232:8
233:10 244:4
263:7 266:4
268:21 274:24
285:5 293:9
301:22 306:16
313:2 315:11
317:5 321:10
325:7 329:14
**asking**   56:4
133:13 150:17
152:22 166:6
168:10 172:20
182:14 183:24
188:2,5 192:20

[asking - authored]

197:10,19
205:18 214:12
215:20 225:2
258:6,7 265:15
268:15,17
288:10 302:13
302:14 311:2
317:6 327:4
**aspects** 123:15
274:11
**ass** 240:25
241:4,16
**assemblance**
256:18
**assertion** 218:4
**asset** 276:7
**assets** 35:6
**assign** 26:22,24
**assigned** 6:3
25:9 26:6,7
82:2 95:11
**assignment**
26:22
**assignments**
24:7 37:24
38:2,6
**assist** 24:24
25:4 180:19
**assistance**
38:20
**assistant** 53:11
**assisted** 25:8
**associated**
64:20 171:10

**association**
249:9,10 314:2
314:3
**assume** 9:19
44:2 79:14,18
103:25 129:18
133:8,11,11
135:7 163:2
172:10 178:24
184:13,14
246:6 250:18
259:11 318:9
318:18 323:9
323:13
**assumed** 239:6
259:13
**assumes** 71:4
215:17 297:16
313:10
**assuming** 50:2
143:8
**ate** 304:4
**atf** 17:12 18:21
18:22 19:5,8
19:12,20,22,25
21:6,17 24:20
25:2,7,12
26:21 27:16,16
28:10 41:10
110:9 143:1,3
144:14 187:24
237:13 238:1
276:11 324:18

**attempt** 104:10
107:18 314:5
**attempted**
104:3 112:17
**attempts**
161:24
**attend** 16:3
154:25 155:3,5
155:10,16,18
156:3 172:4
173:21 231:3
**attendance** 7:4
9:8 10:11
312:1
**attended**
187:15
**attending**
155:7,19 156:2
172:1 219:10
231:15 238:5
303:4
**attention** 121:2
121:12 202:10
**attorney** 9:23
10:7 11:24
85:24 160:25
161:6 205:12
205:25 206:8
207:12 213:11
214:2 224:9
227:3 234:2
251:17 259:23
259:23 291:14
295:15 303:7

303:10 314:13
325:7 331:4,20
338:14 339:10
**attorney's**
135:15,20,23
**attorneys** 9:22
**attribute** 228:6
279:22
**audible** 81:18
107:10
**audio** 338:8
339:3
**audit** 96:20
97:6,11,20,24
98:1 101:1
102:14,15,15
103:1,5,18
107:9 111:10
123:14 282:15
**audited** 54:13
**auditing** 124:4
**auditor** 123:3
**auditors** 282:8
**audits** 282:19
**augmented**
71:7
**august** 1:14
6:11 28:21
335:21
**aurora** 14:24
14:25
**authored**
208:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**authorities**
231:2
**authority**  12:21
82:10 258:16
258:25 259:11
259:12,16
262:19,20
333:4
**authorize**
11:16 249:11
**authorized**
6:14 262:12
**available**  63:14
275:21 289:10
**avenue**  3:6 5:15
298:3,13,14,25
326:14
**avenues**  245:15
**avoiding**  182:9
**await**  100:21
**aware**  22:10
86:1,7,19,22
87:25 89:17
90:17 102:19
119:10 145:6
161:15,18
169:23 171:13
205:20 225:25
226:23 239:17
244:13 256:13
256:22 257:5
282:21 305:3
306:19,21
328:24

**b**

**b**  4:9 5:1
108:17
**b.s.**  16:12
**back**  27:23
28:1,11,23
29:10 54:24
60:18 62:11
70:22 96:19
100:14 109:20
115:17 116:22
147:18 154:16
155:9,14
160:21 171:24
173:13,18,23
176:5 186:22
186:23 195:18
195:23 197:20
208:21 209:16
209:19 217:10
225:1 230:21
233:4 242:20
243:9 246:15
246:16 253:14
266:2 269:7
286:16 304:5
309:23 317:4
323:19,25
327:18
**backlog**  270:4
270:6
**bad**  199:18
271:23 328:21

**badge**  260:18
**balance**  72:1
222:22 242:24
243:3
**bank**  17:17
20:14,18 50:3
50:6,7,7 122:4
212:20,25
213:19
**bargaining**
65:23 66:5,17
235:1 247:19
247:23 249:10
250:7
**barlow**  118:5
**barlow's**  118:7
**base**  63:3
224:17 227:18
227:19 228:21
**based**  68:9
70:24 140:10
143:15 151:16
205:25 207:11
207:14 213:10
214:9,23 215:1
215:24 216:3,6
216:16 221:13
228:8 234:14
234:16 245:17
247:9 257:18
262:14 267:21
268:5 272:10
273:1 280:13
280:17 281:16

281:17 291:21
301:2 316:1
322:15 335:19
**basement**
282:22,25
**basic**  35:24,25
108:5
**basically**
168:19 290:9
306:24 307:2
307:15
**basis**  11:8
155:19 156:3
172:2 215:8
253:1 266:17
330:18
**bates**  176:20
183:13 309:2,4
**baydoun**  130:5
148:25 149:1
162:14,21
163:5,8 164:4
165:5,20
166:19,21
168:12,12,19
185:22 194:17
197:8 211:17
272:23 279:19
280:10,10
286:14 321:7,7
321:17
**bazzi**  11:5,13
11:17 134:7
140:15,16

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                        586-468-2411
www.veritext.com

176:16 178:11
239:14,18
240:1,5 248:25
249:15,20
256:24 265:4
271:24
**bazzy**  134:5,8
136:19,20
137:18 138:5,9
162:6,7,13,15
164:11 166:2,7
168:1 211:4,4
211:8,15 245:2
321:8,10,19
322:5,12,20
**bazzy's**  264:12
**bearing**  11:5
**beat**  266:5
**beg**  53:5 75:5
101:5 121:5
172:21 194:18
200:21 203:11
203:18 207:1
220:16,17
228:1 276:6
**began**  47:6
58:22 61:11
75:14 87:17
176:16 193:19
**beginning**  7:5
25:19,21 51:10
77:20 87:8
110:16 156:13
164:13,14

201:13 219:11
246:16,17
**begins**  94:25
**behalf**  2:2,11
3:2 7:7,9,12
11:16 12:7
85:25 142:16
144:9,10,17,18
210:15 231:7
232:5,9,16,20
232:24 233:8
233:15 249:13
263:11,17
**behavior**
180:24 181:2
181:17
**behold**  317:16
**belief**  145:9
146:17
**believe**  8:21
12:23 29:3
30:6,7 31:4,20
39:7 42:2
44:21 46:11
47:9 53:11
62:12 63:9,23
65:19 69:10
71:14,25 72:10
77:11 81:1
86:6 89:19
93:8,21 94:21
95:1,18 97:9
100:19,25
108:10,17

110:6,15 111:1
111:4 117:5
118:5 124:2,4
128:22 134:7
136:7 140:19
145:21 146:11
150:2 153:18
153:22 162:7
162:21,24
163:8 170:20
173:6,12,22
175:9 176:11
180:17 186:17
188:6 195:7
198:11 205:23
206:2,8,20,21
206:25 207:13
209:16,21
210:22 211:14
211:24,25
212:9,23
213:14 214:6
214:10,14
221:4 222:2,20
222:22 223:11
225:10 229:20
229:22 230:2,5
230:17 235:1
239:2,4 246:9
246:10,21
247:11,13
251:2 252:4,8
252:9 253:2
254:15,23

255:1 258:10
259:10,11,15
267:9 270:1,15
271:2 273:8,13
277:3,18,24
278:1,9,12,17
280:23 284:5
284:10 285:9
286:1 292:2
294:11 295:19
303:9,20 304:6
305:18 313:7
319:14,19
331:14 333:2
**believed**  58:8
93:3 189:9,11
252:9
**bell**  128:18
175:3 324:19
**benefit**  68:9
221:7
**benefits**  41:2
47:10 57:4,4,6
57:19 58:8
63:8,13,21,22
66:5,17 68:3
71:14 72:4,6,7
72:8,12 174:16
174:20 207:24
220:8 221:1,5
227:11 228:13
234:8,11,14
**best**  9:13 86:17
182:11 184:17

225:22 233:6
298:24 320:17
324:21 338:10
339:6
**better**  133:16
268:14
**betterment**
156:7
**beyond**  132:9
269:24
**bid**  327:24
328:1,4,14,21
328:22,25
329:20 330:10
**bidding**  329:10
**bids**  328:19
**big**  187:24,25
195:3 199:23
**bigger**  181:8,22
183:7
**bill**  11:5 186:6
304:10,19
305:3
**bills**  52:24
53:13,14
254:17
**bio**  217:4
**bit**  21:12 37:18
191:24 282:13
321:17,25
**blackburn**
327:13 328:8
334:2,7,12,19
334:25

**blame**  199:22
**blanking**  113:3
328:9 330:19
**bled**  45:12
138:3
**bleed**  135:22
137:5
**blocking**  82:20
**blocks**  140:3
**blotches**  301:12
**board**  153:21
154:1,2 333:11
**bodies**  119:5
133:20
**body**  170:17
171:4
**bogging**  290:14
290:15
**bonuses**  76:10
**bookkeeping**
124:4
**boots**  29:18
**bottom**  308:24
**boucher**  108:17
108:18
**bought**  304:4
**boulevard**  2:14
**bounced**  49:3
178:14,16,18
179:4,16 183:7
**boussi**  332:4
**boys**  28:6,12
30:12,17

**brandish**  83:16
83:19
**breach**  206:15
234:15
**breached**
206:11,20
**break**  10:2,17
10:19 54:17
217:4 222:7
227:5,15
268:23
**brief**  24:10
54:16
**briefing**  120:20
**briefly**  186:10
326:4
**bright**  326:22
**bring**  28:10,22
84:23 121:2,11
121:22 125:24
158:5,10
170:14 199:15
202:9 208:16
219:2,5 253:11
256:18 271:16
**bringing**
210:20
**brings**  321:17
**broadcast**
311:18
**broadcasting**
311:25
**brochure**
329:18

**brought**  73:13
102:22 108:9
108:16,23
136:13 173:7
173:13,18,23
196:4,8 208:15
209:14 256:17
271:12 273:19
273:21 307:5
333:13,19
**brown**  2:4 4:5
4:7 7:11,12
10:6 11:10
12:11 21:8
22:22 23:1
55:15,18,20,24
56:2 60:13
61:3 64:22
65:7,16,24
66:6,8,20 67:7
67:23 68:5
69:3,22 71:3
72:3,11,17
76:20 81:19
82:12 84:10,14
84:16 85:7,15
85:18 86:16
87:3 88:22
89:12,25 98:25
99:15 100:4
101:2 113:14
114:17,22,25
116:15,17
119:20 130:25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

139:13 144:22
144:25 146:23
149:4,8 151:12
151:18,21
152:19,24
153:12 155:20
157:8,20
158:21 164:22
165:2,17
167:18 169:8
169:10 174:17
175:21 176:3
176:10 177:9
177:13 182:11
182:22 183:19
184:9,17
185:15,18
189:20 192:17
193:9 195:3
197:25 198:4
204:20 205:8
205:17 206:4
206:13,16
209:6,24 210:4
210:9 213:4,8
213:21 215:17
217:3 223:14
223:23 224:8
225:5,13,22
226:3,11,25
229:23 230:7
230:23 231:8
231:20 233:9
234:1,21

241:15 242:3
247:25 248:12
248:17 251:11
251:18,25
252:4,8 257:7
259:20 261:18
261:24 262:9
263:1 268:4,23
269:1 270:19
273:24 277:6
278:4,8 283:11
283:23 284:19
285:4 287:4,6
287:8 288:11
288:16 291:7
291:16 292:22
295:10 297:15
300:13 301:10
301:22 302:8
303:13 305:20
307:17,21
308:15,20,22
310:21 311:3
312:11 313:2
313:10 315:11
316:6 319:23
320:14 323:21
325:1,1,4,17,18
329:8,23
331:12 332:20
333:17 335:16
335:24 336:2
336:12,20,20
336:21,23

**bryer**  163:7
249:6 272:14
**bs&a**  124:17
256:5
**budget**  245:21
245:22 246:1,5
**building**  35:6
326:9,19
330:15,23,24
332:25
**buildings**  28:16
326:15,17
**built**  305:16
**bullet**  310:2
**bully**  154:23
293:16
**bunch**  299:16
**burden**  100:2
**bureau**  36:1
87:14 118:8
188:13 190:5
243:20 244:6
**business**  37:13
150:13 170:10
177:21 187:19
189:17 238:14
238:15,18,25
239:5,8 254:7
298:2,12 299:5
303:24 304:2
304:25 317:16
328:20 329:21
330:10

**businesses**
329:6
**buying**  187:4

**c**

**c**  2:1 3:1 5:21
6:1 108:17
237:25
**calculations**
222:4
**calendar**
246:16
**california**
14:10 17:7
**call**  22:19
45:12 51:2
54:14 93:23
94:12 108:12
130:17 132:13
138:12 160:2
184:25 185:4
222:12 240:24
240:24 265:13
305:14 314:14
**called**  7:20
16:25 24:19
28:6 36:16
54:17 95:7,8,9
110:7,8 111:4
113:16 121:13
179:3,9 189:1
215:11,16,21
265:18,20,20
265:21 270:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                   www.veritext.com

305:5 314:13
329:16
**calling** 182:3
205:9 259:21
265:15 305:23
**calls** 65:24
67:23 69:3
82:13 131:22
132:2,6 187:7
198:4 206:4
215:5 223:14
224:9 226:3,25
229:24 231:20
234:2 263:2
284:19 301:10
302:8 305:20
330:18
**cam** 170:17
171:4 236:21
236:23
**campbell** 29:4
29:5 137:4
264:20 319:6
**candidate**
240:12
**canine** 52:16
150:25
**capable** 43:18
128:11 242:14
**capacity**
100:12 138:11
**capital** 310:6
**captain** 104:16
105:20,21,21

169:4,5 192:14
244:21 321:23
**car** 28:13
174:25 175:2
236:8,12
301:25
**card** 5:8 20:21
186:8 188:7
261:2
**cards** 187:19
187:19,20
254:7 261:3
**care** 301:17
**career** 18:25
32:12
**caretaking**
52:25 54:8,10
54:14
**carrie** 244:20
244:23
**carried** 78:14
83:12 261:7,9
**carry** 81:8,14
81:23 261:22
262:7,12
**carrying** 81:16
261:15 262:23
**cars** 35:7
**case** 1:8 6:9
11:6 21:13,14
22:21 86:1,2
92:13 99:18
100:20 115:6,9
115:14 124:10

197:2 216:25
219:7 264:11
264:11 304:22
**cash** 145:22,24
146:1 149:5
**cataclysmic**
92:24
**catastrophe**
111:2
**categorize**
89:19
**categorized**
222:16
**caught** 143:11
**cause** 5:13 10:4
24:22 29:8
34:14 142:13
167:1,12 171:6
188:10,17
223:6 226:10
226:21,24
247:5 253:13
264:17 275:2
286:1 296:1
301:16 304:5
314:8 315:19
326:24 329:17
**caused** 294:19
**causes** 295:18
**cba** 64:17 65:9
65:15 66:16,18
67:1,6,13,17,19
67:22 68:4,13
68:14 69:1

247:24 248:6
**cbas** 64:20
**cekada** 237:22
**cell** 297:14
301:15
**cement** 306:5
**center** 35:23
298:8 326:11
326:12 327:3,9
**certain** 8:5 75:8
121:18 143:4
147:23 156:9
157:14 158:18
159:12 198:20
219:18 221:12
231:15 234:7
242:10 256:20
262:15 271:18
271:18 317:6
**certificate**
338:1 339:1
**certificates**
16:22
**certification**
17:1
**certifications**
180:5
**certified** 6:19
17:3 19:9 36:3
**certify** 338:4
339:2
**chain** 5:5,18
92:10,18,20
96:4 98:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                    www.veritext.com

102:16,19
267:7,10
**chair** 272:23
273:3 279:23
280:9 321:7
**chairman**
185:22
**chance** 260:23
**change** 71:1
76:15 77:13,17
258:20 293:3,9
293:11,12
327:8
**changed** 33:23
34:4 76:18
106:25 194:2
286:16
**changes** 70:18
77:1 112:2
249:13
**changing**
326:19
**chaotic** 172:23
**characteristics**
202:15 301:4
301:25 302:19
**characterize**
222:11
**charge** 20:1
24:20,24 29:13
29:18 30:8
186:2,4,19
187:3 188:3,8
188:19 311:17

326:9
**charged** 187:1
**charges** 186:6,8
186:15,17,18
186:21 192:24
**chart** 75:7
**charter** 246:8
**chase** 17:17,25
20:20
**chases** 82:22
**check** 49:3,4,12
50:1,12,15
53:19,22
132:14 149:1
150:16 166:9
178:14,15,18
178:23,25
179:4,5,8,16
183:7 185:5,6
207:19 208:21
246:20 247:2
266:24
**checked** 186:10
186:15 264:23
306:4,17,17
**checking** 187:6
**checks** 53:16
187:11 254:17
255:5,9,16
**chest** 81:20
**chicago** 14:15
14:16,18,20
17:12 19:17

**chief** 25:2 28:1
29:3 30:17
31:10,14,22
33:12 34:23
43:6,7 44:3,11
44:22 45:9
46:11,19,22
59:23 67:2,2,5
67:12 89:3,16
90:18 91:11
93:13 102:18
103:25 104:6
109:11,15
110:3,7,11,13
110:17 117:13
120:16,17
127:11 129:8
129:11 130:7
134:2,13,19
135:12 136:3,8
136:12,17
141:1 142:8
156:23 158:20
158:23,25,25
159:3 163:6,11
163:16,24
167:12 169:5
172:12 176:23
176:25 177:2,4
177:15 179:2,5
191:6,9,10
202:4 232:10
245:14 252:22
253:10,24

254:1,2 257:22
261:21 262:6
262:12 269:18
270:18 274:21
275:1,7 285:12
321:12,14
**chief's** 77:14
191:8
**chiefs** 33:7
**children** 21:22
22:20
**chooses** 224:14
227:7
**chose** 229:20
230:5,10 308:1
**chris** 105:11,12
106:12 112:4,7
112:12
**christ** 12:13
**christian** 187:9
**christmas**
279:4,9
**circle** 286:16
**circuit** 324:8
**circumstances**
169:24
**cities** 14:5 30:9
**citizen** 150:4,10
152:15,18,23
153:6
**citizens** 131:23
132:3,7 145:3
145:10,13
153:20 270:3

| | | | |
|---|---|---|---|
| 305:12 | 146:11,13,18 | 223:3,4,12,22 | 289:6,9,14 |
| **city** 1:9 2:11 | 146:21,22 | 224:6,14,16 | 290:7,14 |
| 3:3 4:12,17,22 | 147:5,8,19,21 | 225:3,4,11,19 | 300:22 301:3 |
| 6:8 7:7,9,10 | 147:23 148:20 | 226:2 227:6,8 | 302:6 303:21 |
| 11:15,16,21,24 | 148:21 149:2 | 227:12 228:14 | 303:21 305:7 |
| 11:24,25 12:7 | 149:14,20 | 229:20,22 | 305:10 306:16 |
| 12:8,22 13:7,8 | 151:5,17 | 230:2,5,10 | 306:20 307:5 |
| 13:18 14:15,19 | 152:23 153:7 | 231:3 233:25 | 309:21 310:19 |
| 20:6,24 21:13 | 153:10,17 | 236:4 238:11 | 311:1 312:8 |
| 21:14 26:8 | 154:10,25 | 240:21 243:6 | 313:1,17,23,24 |
| 28:18,23 29:11 | 155:3 160:4,19 | 245:21 246:1,7 | 314:4,21 315:1 |
| 30:4,6,13 32:9 | 160:25,25 | 247:4 248:6,25 | 315:8 316:3,4 |
| 33:19,23 37:21 | 161:5,6,15 | 249:8,13,20 | 317:16 318:8 |
| 47:22,25 48:3 | 171:9 172:1,4 | 250:15,21 | 318:10,16,23 |
| 50:14,23 52:4 | 174:21 175:1,6 | 252:15 253:11 | 319:17 320:5,8 |
| 52:7 53:23 | 177:21 180:10 | 254:9,17 255:4 | 320:22,23 |
| 56:14 57:16 | 185:21 186:13 | 255:8,13,17 | 321:4 322:16 |
| 61:11 64:2,13 | 186:21 187:4 | 256:1,14,16,25 | 323:1 326:13 |
| 76:11 78:19 | 188:11,12 | 258:23 259:15 | 328:18,18 |
| 80:5 81:7 82:1 | 189:13 191:16 | 261:8,11 262:8 | 330:5,14 331:6 |
| 83:17,21 87:10 | 192:4,5,6,7,8 | 262:20,22 | 332:25 333:7 |
| 87:13,17 90:16 | 193:4 195:18 | 263:11 266:11 | 333:22 334:6 |
| 91:17 92:1 | 195:23,25 | 266:13 267:6 | 336:7 |
| 96:15 99:2,2,9 | 196:5,16,19 | 267:10,19,23 | **city's** 10:8 52:1 |
| 99:12,13,22,24 | 197:1 201:15 | 268:1,6,6,13,20 | 57:8 199:7 |
| 100:4,6,7,13,17 | 201:18 204:6 | 270:1 271:2,7 | 258:2 282:8 |
| 102:3,5,10 | 210:2,16,21 | 271:22 273:8 | 283:22 289:6 |
| 108:19 120:6,8 | 212:2,21,22 | 273:14 276:25 | 314:10 |
| 123:15 124:18 | 214:20,21,22 | 277:4,17,25 | **civil** 87:11 |
| 126:1,9 130:16 | 215:10,15 | 278:1,22 279:2 | 90:16,17 91:5 |
| 133:12,17 | 216:5 217:22 | 279:6,18 280:6 | 119:4 133:19 |
| 140:11 141:16 | 218:23 219:25 | 282:15,18,22 | 133:19,23,25 |
| 142:20,23 | 220:8,9,12 | 282:25 283:4,6 | 134:3,16 |
| 145:4,10 | 221:4,11 222:3 | 283:7,19 288:3 | 136:23 137:23 |

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

137:24 140:25
141:12 142:16
144:5,8 169:13
169:19 210:14
210:19,22
211:10,22
257:12,14
263:7,8 265:7
265:9 276:17
276:22 324:16
335:2
**civilian** 33:7,8
35:13 81:10
82:9 83:13
**civilians** 74:9
**claim** 116:9
117:7 119:6,15
119:25 129:21
130:22 195:16
196:22 198:14
198:19 205:7
205:23 210:18
213:6,24
217:23,25
234:5,7,10,13
253:11 271:21
272:9 283:13
334:14
**claimed** 195:14
272:25
**claiming**
213:17
**claims** 12:1
22:15 86:7,10

149:11 206:2
210:19,20
217:18 234:15
264:25 293:13
293:21,21
**clair** 14:7
**clarification**
179:20 203:2,5
282:20
**clarified** 187:2
**clarify** 21:8
23:17 47:11
66:2 72:4
177:9 281:11
284:24 293:2
**clarity** 11:11
159:11
**classes** 16:20
16:23 17:6
**classic** 189:16
**classified** 39:16
39:19
**classify** 96:25
**clause** 39:24
**clayton** 5:7,25
49:7 122:14,19
179:9 185:5
187:13,14
188:1,18
189:16,22
190:14,25
192:23 255:3
**clayton's** 126:3

**cleaned** 256:20
**cleaning**
117:25
**clear** 9:11,15
12:23 34:15
51:23 52:18
93:21 113:8,15
140:10 175:4
183:5 242:1
283:3 291:13
**clearer** 197:17
**clearing** 50:7
50:11 51:24
**clearly** 129:14
322:12
**clerk** 102:3
248:25 249:12
254:25 255:4,8
256:1
**clerks** 112:5
**client** 10:25
11:12 100:19
224:9 234:1
241:15 259:22
**clients** 39:22
40:6 214:19
**clinton** 14:7
**close** 94:20
**closed** 101:7,9
101:11,14,18
101:25 231:4
266:11,14,17
267:21,24
268:6,8,20

**clue** 160:6
**code** 20:13
303:21
**codh** 308:25
**collect** 275:21
**collected** 114:8
**collection**
336:4
**collective**
247:18,23
249:10 250:7
**collectively**
87:9
**college** 16:3
22:3
**combat** 21:19
290:24 293:19
**combative**
170:11
**combined**
243:25
**come** 24:24
29:5 33:2,9,17
33:21 34:1,10
43:20,21 51:15
95:5 96:15
106:3 111:9
120:21 125:23
138:1 141:15
157:3 160:9
178:25 187:7
187:11 188:1
195:18,23
289:21 329:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

331:18
**comes**  108:2
181:13 271:4
**coming**  33:23
76:17 97:20
102:20 121:18
128:24 167:2
202:7 283:20
**command**
65:19 129:2
235:2 249:8
314:2
**commencem...**
61:9
**comment**
109:17 148:2,5
148:18 150:5
152:12 154:20
159:22 161:5
165:4 196:20
279:13 281:17
315:9 316:4
318:4 320:23
321:3
**commenting**
315:9
**comments**
197:4 207:8,8
207:14 208:18
214:19 244:4
279:5,8,18
310:5,11 312:3
314:21 316:15
320:23

**commission**
265:10
**commissioner**
31:4,6,7 34:24
**commissioner's**
103:12
**committee**
153:18,21
322:5
**committing**
294:21
**common**
328:22
**communicate**
23:15 31:10
319:10 334:19
**communicated**
31:23
**communication**
126:15 182:17
248:25 249:16
307:6 317:13
**communicati...**
125:3 218:17
261:14 278:17
315:7
**communicative**
297:7
**community**
21:5 165:6,15
165:23 211:18
280:2,22 281:3
281:4,10,13
322:5 325:22

**companies**  40:3
**company**  37:2
37:3,5 40:5
97:11,13 103:8
123:4,11,12
188:7 327:7
330:10
**compensated**
72:23
**compensation**
56:17 61:17
68:12,25 70:9
76:7 221:7,13
245:23 246:20
**competitive**
257:17
**complained**
179:3
**complaining**
326:21
**complaint**  5:3
22:7,15 84:15
84:17,21,22
85:17,24,25
86:2,5,8,12,23
95:16,19 97:3
141:6,12,23
142:16 143:15
144:6,11 176:8
178:11 195:1
200:24 201:16
201:19 204:20
204:21 205:7
206:19 207:7

211:25 214:9
214:13 217:17
217:21 247:22
263:13 264:12
265:11 266:3
277:9 294:16
323:2 324:13
332:15,16
**complaints**
87:22 88:1,19
89:9 210:19
216:13 263:7,9
263:9 264:15
265:2,7,24
293:18 305:12
319:2,5
**complete**  36:9
199:2
**completed**
249:12
**completely**
60:10
**completing**
177:22
**compliance**
304:23
**compound**
76:21 131:1
157:21 277:7
278:5 292:23
**comptroller**
75:15,17,24
76:4 83:23
193:15,20,22

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                   586-468-2411
www.veritext.com

193:24,24
194:5 212:4
252:19 253:16
253:17,21
254:17,21,23
255:11,12
282:13 284:8
290:18 291:5
292:1,5,21
**comptroller's**
53:19 122:5
**comptrollers**
275:16
**computer**   99:4
**concern**   89:24
**concerned**
152:17,23
263:22 328:14
333:19
**concerning**
87:10 89:23
189:21
**concerns**   22:6
93:9 132:7
136:3,5,12,18
177:25 178:5
263:24
**concert**   145:4
145:10 146:11
146:22 147:5
147:10 150:8
187:8 314:25
316:3 320:7,22

**concerts**
187:15
**concluded**   27:5
103:1 229:9
337:3
**conclusion**
65:25 67:24
69:4 82:13
198:5 205:9
206:5 223:15
224:10 227:1
229:24 234:2
259:21
**condescending**
181:14
**conditions**
233:23 292:12
**conduct**   25:13
26:8 29:14
73:16,22
102:13 111:10
243:16 264:3
329:7 330:25
**conducted**   90:8
102:14 150:13
260:7
**conducting**
303:20
**confidentiality**
39:24
**confirm**   55:22
224:2 247:14
256:6 263:8
279:20 296:12

296:25 297:24
325:7
**confirmation**
314:14
**confirming**
231:12
**conflict**   12:23
231:2
**confusing**   34:5
67:8 76:21
146:24 155:20
283:23,24
292:23
**connected**
69:11
**connection**
331:25
**connotation**
285:8
**consent**   12:7
**consider**   32:18
46:3 130:12
151:15 152:17
152:22 208:11
240:15 287:23
311:22
**considered**
45:14 96:24
150:19 240:10
293:3
**consist**   74:1
78:9
**consistent**   38:7

**consistently**
38:5
**constan**   272:16
**constitute**   7:1
**constructing**
305:1
**constructively**
194:25 219:22
252:5 284:25
285:10 287:24
**consultant**   40:4
40:8 103:15
108:20
**consultants**
282:9
**consulting**
36:23 37:1,12
**cont'd**   3:1 5:1
**contact**   125:4,9
**contacted**
24:22 27:24
86:20 111:4
329:7,13
**contain**   133:10
133:14 257:23
**contained**
151:4
**containing**
249:22
**contention**
313:23
**contentious**
256:23 271:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

[context - correct]

Page 19

context   281:17
contextually
   34:15
continual   124:4
continue   13:1
   47:21 143:25
   173:18 174:11
   174:15 217:16
   240:17,20
   253:6 267:20
   284:17
continued   76:1
   175:5,13
   184:12,14,15
   184:23 204:4
   284:2 285:21
   288:2 289:1
continues
   309:7
continuing
   217:17 283:9
   283:21 285:2
continuous
   60:1
continuously
   60:9
contract   47:4,7
   48:18 56:13,18
   57:21,23 58:3
   58:7,9 60:19
   60:23,25 61:10
   61:15,23 62:6
   62:11,20,22,24
   63:9 64:5,14

65:19 68:9,12
68:22,25 70:3
70:6,9,13,20,21
71:2,7,11,14,15
72:1,9,15
75:23 173:19
174:13,16
175:9 204:15
206:11,15,20
207:4 221:12
222:12,23
224:12,13
225:7,16,18,25
226:9,15,19,22
229:9 230:6
232:13 234:8
234:12,14,16
245:17 246:13
246:17 249:12
323:13 327:7
327:10,24
328:5,14
329:24 330:6,6
contracts   39:21
   39:25 58:2
   69:17 71:10
   257:23 258:5
   328:1,18,22
contractual
   231:19
contributions
   41:5
control   40:12
   330:12

conversation
   43:7,13 109:9
   125:13 156:16
   156:19 179:10
   179:12 182:9
   183:12 184:1,2
   185:4,9 192:18
   215:6 321:16
   322:1
conversation's
   228:4
conversations
   97:2 125:16
   129:7 135:13
   213:10 218:8
   279:11
cooper   132:16
   132:17 133:16
copied   287:18
copies   78:23,24
   79:2,2,12
   132:21,23
   141:21 176:7
   307:25 308:1
copy   55:15
   79:18,19 85:10
   85:20,21 98:12
   98:17,20 100:5
   103:4 106:3
   141:17 142:11
   142:12 308:9
   336:7
corner   299:20
   299:21

corollary
   312:17
corporal
   270:16
corporate   10:8
   160:19
corporation
   1:10 2:20 6:9
   36:24 238:22
   330:2
correct   14:21
   17:9 20:7
   23:21 24:8,13
   24:16 33:15
   34:15 35:18
   36:5,7 40:9,20
   40:23 45:21
   46:2 48:18,22
   48:25 50:16
   51:13,14 56:22
   56:23 57:2,9
   57:10,25 58:4
   58:24,25 61:12
   61:13,18,24
   62:3,4,7,8,25
   63:1,19,20
   64:6,7 67:14
   67:15 68:8,22
   70:4,10,11,17
   72:14,23,24
   75:15,16 76:4
   76:5 78:17,18
   81:11 83:8
   85:15,18 87:19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

87:20 89:5,6,7
97:6,22 104:5
105:16 106:13
111:20 112:9
112:10,13,15
112:16 113:12
114:4 119:14
121:10 123:16
125:7 133:22
134:10,13,14
140:23 147:8
158:10 159:13
159:19 160:22
160:23 161:10
166:3,4 168:2
168:8 169:2
172:15,18,20
174:24 175:9
176:24 178:2,3
178:7,8 180:14
180:25 182:10
185:10 186:17
191:11,15
193:16 196:5,9
196:10 198:21
198:22 200:17
203:1 204:7,12
204:13,16,22
205:4 209:4,9
218:5 220:13
220:15,16
221:21,22
224:7 227:13
228:20 231:16

233:20,21
234:8,20 235:5
235:6,15,16,18
236:18 237:12
238:6,18,23,24
242:7,15
245:18 247:16
251:24 252:3
252:16,17,19
252:20,23,24
253:7,8,18,21
253:22 255:24
256:6,16,25
257:6 261:8,11
265:11,12,25
266:1,23
269:13,19,20
272:1 273:23
274:4,9,18,19
275:9,10,25
276:3 280:7
285:19,20,23
287:17 288:4,8
288:21,22,24
288:25 289:3,4
289:6,7 291:6
292:7,13,21
296:6,13,16,20
296:21 297:21
299:22,24
304:11 307:6
307:12,16
309:3,12 312:8
312:23 313:9

313:24 320:13
322:23 323:3,8
324:21,22
326:11 327:25
333:1,4,6,8,9
335:5 336:5,6
**corrected**
196:14,23
268:3 272:5
**correcting**
125:1
**corrective**
104:24
**correctly**  51:22
201:3 204:9
209:11 218:3
242:2 254:11
267:12,14
274:13 277:19
297:11 298:10
**corruption**
87:10,11 89:23
89:24 90:9
119:1,12,18
120:1,15
129:19
**cost**  97:19
**council**  3:3
7:10 11:15,21
11:24,25 12:8
53:23 87:13
97:24 99:13,13
100:5,6,7,14,17
100:25 102:5

145:4,11
146:12,14,16
146:18,21,22
147:6,8,13,19
147:21,23
148:20,21
149:3 150:8,13
151:5,17 152:9
152:9 154:25
155:3 161:15
163:10 171:9
172:1,4 185:21
186:23 195:10
195:19,23
196:1,5,9,19
197:1 199:16
200:10,13
202:8,11,19
207:6,9,14
208:8,9,15,17
208:21 209:3,4
209:14 210:3
210:25 211:5,9
214:21 216:12
216:14 218:5,9
218:13,16,17
218:23 219:11
219:15,16
231:3 243:6
245:21 248:6
249:20 250:16
254:10 256:25
259:3,6,8,10,15
266:11,13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

267:6,10,19,24
268:1,6,13,20
271:2,6 272:23
273:8,14
276:25 277:4
277:17,25
278:1,16,22
279:13,18,23
280:6,9 290:7
306:20 307:5
310:19 311:1
311:14 312:8
313:1,17,23,24
314:21 315:1,8
316:3,4,18
317:14,19
318:8,10 320:6
320:8,22,24
321:4,7 322:16
323:1 328:18
331:6,18
**councilman**
5:17 148:24
152:12 156:5
162:14 197:8
200:14 201:7,9
201:16,19
249:7 272:7,16
272:21 280:10
280:16,19
281:19,23
285:9 290:23
294:14 297:18
297:20 300:12

301:17 302:5
302:15 306:24
310:15 312:4
312:21 321:6
**councilperson**
197:8 211:17
**councilwoman**
249:6 272:13
272:18
**counsel** 2:20
10:8 11:24
160:19 161:5
209:15 259:11
273:3 325:6
331:5 338:11
338:14 339:7
339:10
**count** 206:14
206:17 216:1
**counted** 270:9
**counting** 36:12
**county** 21:13
324:8
**couple** 23:25
30:22 52:19
80:17 81:1
124:21 137:18
160:3 161:2
164:18 187:11
198:25 261:1
279:20 306:4
324:3 325:21
334:13

**course** 48:22
56:25 62:19,21
80:2,4 83:17
83:21 93:6
96:11,14
100:13 182:17
190:10
**courses** 17:4
**court** 1:1 8:5
9:6 12:11
118:21 161:18
285:13,18
304:16,21
312:11 324:8
330:19
**courtesy** 288:3
**cover** 233:2
248:21 276:14
**covered** 276:21
277:3
**covers** 276:15
277:8
**covid** 186:22
**create** 60:5
77:10 180:18
**created** 27:8,18
32:25 33:3,5
77:11 154:14
**creating** 60:2
60:11
**credibility**
208:25 244:25
**credible** 199:3

**credit** 20:21
187:19,19,20
188:7 261:2,3
**crime** 21:19
28:9 294:21
**crimes** 20:13
114:7
**criminal** 18:8
18:11 35:24
92:13 114:12
115:5,9 169:16
188:10
**crowd** 40:12
148:9
**crux** 39:19
**culminated**
192:22
**culminative**
207:6
**culture** 215:2
**cup** 303:3
**curious** 214:5
**current** 13:23
34:4 325:19
**currently** 13:6
21:21 36:6,21
37:24 42:9
237:25 238:5
**curtail** 166:12
**custody** 92:10
92:18,21 96:5
98:5 102:16,19
170:12,14
267:7,10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

cut  197:15
219:13
cv  1:9 6:10

**d**

d  3:11 4:1,13
4:18,23 5:21
5:21 6:1 8:7
237:25
d.c.  15:6 238:4
daily  59:6
dais  157:3
dakhlallah
3:12
dallas  15:10
daly  297:3
298:3 299:9,11
299:20
damaged
293:14
dark  300:18
302:21
dashboard
236:21,23
date  1:14 45:2
45:4 61:9
62:11 156:9
193:19 201:25
229:10 247:10
267:3 294:1
332:6
dated  61:23
70:4 204:24
249:16

dates  118:12
197:21
daughter
187:13,15
188:19
daughter's
192:24
david  339:2,15
day  27:15
41:25 45:6
60:1 78:22
108:2 111:3,3
167:1,8 188:18
188:20 193:21
194:2,2 243:4
298:1 326:20
327:1
days  32:1 43:9
104:16 109:7
189:22 227:11
228:9
dea  276:4,11
dead  266:5
deal  181:8,10
181:22 183:7
187:24,25
199:23
dealing  22:12
136:18
dealings  30:13
dealt  73:11
111:3
dearborn  1:9
2:11,20,22 3:2

3:14 4:13,18
4:23 6:8 7:7,10
20:6,24 22:9
23:6 24:1,15
26:8 27:20
28:10,11 29:11
30:4,13 33:19
33:24 35:16
37:21 47:25
52:7 56:14
61:12 64:2
76:11 78:20
80:5 81:7 82:2
83:17,21 87:12
87:18 90:16
91:17 92:1
96:15 99:2,3
102:11 138:6
140:5,11
141:16 142:20
142:23 149:14
149:20 152:15
152:18 153:6,8
153:11,17
168:21 171:8
174:21 175:6
180:11 185:21
188:13 192:5
204:7 210:17
210:21 212:2
214:20,22
215:10,15
216:5 217:22
220:8,12 222:3

223:12,22
224:7 227:12
228:14 233:25
236:4 238:11
240:21 249:9
252:15 258:23
262:8 270:1
280:6 281:5,13
309:21 314:2,4
318:17,23
326:2,13 328:1
329:10,21
333:1,3
dearbornheig...
2:23
december  5:5
20:4 61:24
62:1 171:21,25
173:5,16 175:8
176:17 204:10
204:24 205:3
206:1,19,24
247:10
decided  253:15
decides  189:17
189:18
decision  257:20
258:11
decisions  12:7
declined  323:6
deductions
48:24 62:21
defamation
202:15

[defamatory - designate]                                    Page 23

**defamatory**
147:14 148:19
180:23 181:1
181:17 182:20
184:7 216:11
**defame** 147:24
**defend** 293:15
**defendant** 1:11
2:11 3:2 7:7,9
92:13 98:23
114:12 115:5
**deficient** 92:12
114:11 115:4
**definitely** 93:8
129:2 166:13
**definition**
119:17
**definitional**
147:12
**defund** 206:22
313:20
**degree** 16:9,11
**degrees** 16:14
**delay** 247:1
**deliver** 126:19
219:8,8
**demand** 5:4
**demanding**
330:20
**demonstrated**
166:8
**demonstrations**
83:24 84:1

**denial** 196:15
**denied** 12:11
162:18 188:3,4
190:23,24
197:6
**dennis** 331:20
**denounced**
218:10
**dental** 48:3,7
57:5,8,8 63:18
**deny** 215:7
315:3 319:21
**denying** 188:5
334:7
**department**
20:25 21:5,15
23:7 24:23,25
27:20,20 29:1
35:5,6,11,16
44:9,11 45:10
53:14 59:8,20
59:21 64:21
77:15,16,21
78:3 83:14
87:14 109:6
111:9 114:8
122:6 126:23
126:25 135:9
138:6,19
140:18 141:9
141:16 156:7
157:4,7,12,15
157:17 158:1
158:19 159:17

162:16 164:16
165:1,14,22,24
167:16 168:22
177:1 189:4,6
191:11,14,17
192:3,6,12
194:7,17
196:21 199:5
211:1 219:13
219:25 232:7
232:18 233:1
233:12,17
236:11 238:11
244:18 258:3
263:23 265:9
265:17,24
267:12 268:3
271:17 276:5
276:12 283:22
293:15,20,25
304:5 315:10
316:23 321:11
326:10 330:23
**departments**
21:7,9,11 33:6
52:13 58:23
59:3,8,20 60:3
60:6 177:22
**departure**
221:11
**depending**
60:12,15 142:6
219:25

**depends** 22:2
59:18 74:2
**deposit** 42:3
**deposited**
41:23 42:1
**deposition** 1:13
6:6,24 8:10 9:2
11:8,18 72:20
98:21 109:10
230:13 250:19
270:20 295:14
295:21 325:6,9
325:14 338:1
**depositions**
243:13
**deputy** 33:7
169:5 237:25
321:12
**dereliction**
311:17
**derogatory**
143:8,9
**descent** 165:13
215:11,11,15
**described**
88:16 121:14
**describing**
137:21 171:6
**description**
4:10 5:2,22
194:1 255:21
**deserve** 322:21
**designate**
232:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                     586-468-2411
www.veritext.com

**designated**
233:8,15
236:10
**designation**
233:16,17
282:10
**designee** 231:6
232:2,5,9,20,24
**desire** 77:14
**desk** 103:13
118:1
**detail** 167:9
**details** 131:11
**detective** 74:11
75:6 188:13
190:4
**detectives**
74:13,16,19
75:2,7 107:7
**determine**
26:25 158:18
209:23
**detroit** 2:15
20:1 28:7
29:25 30:1
95:4 135:24
**developing**
159:11
**device** 133:10
193:3
**dhpd** 87:11
92:12,14 109:4
114:11 115:4,6
115:10

**difference**
89:14 250:5
254:4 290:3,5
**differences**
264:10
**different** 23:25
34:12,20
113:20 123:10
123:11 134:10
169:20 238:17
241:8 274:12
306:19 309:15
325:21 326:15
326:17
**differently**
211:15
**difficult** 310:25
310:25
**digging** 122:2
**digital** 338:8
339:3
**direct** 42:3
299:10 304:1
318:7
**directed** 185:22
**direction**
305:24
**directions** 5:14
177:23 298:23
**directly** 24:22
41:23 52:18
95:8 243:23
**director** 23:6
33:10 34:2

43:8 47:3 52:6
58:21 72:25
73:3,4,5 74:22
75:12,18 83:23
104:9 109:16
111:19 118:3
118:18 130:1,7
131:15 132:17
133:16 137:10
137:15 142:7
143:3,14,24
144:13 150:21
150:23,25
157:4,11,11,12
163:7,8,16
164:2 168:20
170:16,18
172:12 177:17
202:4 230:18
232:10 238:1
243:22,23
244:1 245:5
246:2 251:23
252:15 257:25
259:18 261:23
269:19 275:2,8
283:9,21 284:3
284:14,17
285:2 290:21
291:4,12 292:6
293:4,5 304:10
314:6 321:12
322:2 326:8

**dirty** 143:12
**disagree** 259:7
**disagreed**
250:20
**disarray** 199:2
**discharge**
212:11 214:17
290:10 335:3
**discharged**
252:5 284:25
287:24
**discipline**
112:18,22
149:19,24
154:11 160:17
161:10 258:17
259:1,9,17
**disciplined**
164:5
**disciplining**
154:7 259:5,5
**disclosures**
98:24
**discontinued**
305:4
**discovered**
199:12 201:4
201:24
**discovering**
200:5
**discovery**
98:24 99:16
102:1,6 189:23
315:2,4,14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

discriminate
281:20
discriminated
211:21 212:1,9
212:25 213:1
213:15,18
214:6,15,23
215:23 216:4
discriminating
322:17
discrimination
216:3 217:19
discuss   117:10
117:13 136:13
275:5,11 308:1
327:15
discussed   22:17
32:8 56:24
63:17 77:7
79:15 88:20
96:22 98:19
100:7 101:22
167:7 190:10
214:10,13
242:6 267:21
268:6,8 274:25
275:7 327:17
discusses   57:3
57:4 117:3
discussing
242:10 274:22
275:13
discussion   93:6
95:21 109:14

118:21 166:25
168:17 219:18
317:16 322:4,6
322:9,16
discussions
96:19 117:15
127:23 205:25
206:8 207:11
214:2 215:7
218:12 219:12
239:24 243:25
261:21 262:5
262:11 275:15
306:11
disgusted
311:10,13
dishroom
304:10,19
305:3,14
dismal   314:11
dismissal
334:15
dismissed
118:2,15 130:3
130:15,17,19
130:22 131:7,7
131:17,18
303:22 305:17
disparage
199:17
disparaging
203:22
disparate   215:3
215:4 264:18

dispatch   35:8
52:15
displayed
216:6,10
disposition
335:7
dispute   281:14
302:6,14
disrespect
184:25
disrespectful
306:20,25
distinction
113:15 247:17
district   1:1,2
division   1:3
18:8,12 19:17
20:2 73:24
74:1,4,24
112:6
divisive   220:4
279:14 284:10
285:8 290:25
document   55:8
55:14 56:11
69:25 77:6,10
99:1,3,16,18
100:18 101:13
121:21,23
124:20 161:20
182:12,13
185:23 208:8,9
247:14 249:14
250:9 296:2,5

296:8,12
307:18 314:18
336:8
documentation
97:2 125:21,23
127:25 128:19
189:21 192:21
320:10
documentatio...
122:6
documented
202:11
documents
5:24 78:7 79:3
79:6,25 95:16
122:4 128:13
129:4 132:19
132:22,23
133:9 193:4,4
212:10,15,20
254:10,12,14
254:15,20,22
260:2 275:17
275:21 295:16
295:19,20,23
300:9 317:6,24
334:10 336:4
dog   151:1
dogs   151:22
doing   20:15
34:18 43:18
54:2 97:20
112:23 140:5,6
140:8 150:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
                                                                    www.veritext.com

160:9 163:25
164:1,3 172:24
202:14,14
203:20 272:12
282:15,18
285:7 301:16
305:25 318:22
327:6 328:20
**doj**  276:9
**dollar**  222:1,2
**dollars**  76:3
227:22
**dotter**  243:14
243:14,18
244:12
**doubt**  255:7
**download**  80:1
**dr**  31:7,16
102:24 260:7
**draft**  105:2,4
**drafts**  79:19
**drapkowski**
145:19 320:21
**drawn**  50:8
113:15
**drg**  1:9 6:10
**drill**  111:3
**drive**  5:23 79:6
79:9,13,16,23
79:25 80:3
98:15,15,20
132:19,24
133:1,10,13
260:3 297:13

297:17,20
299:8 301:14
303:8 336:4,10
**driver**  301:7
302:15,16
**driving**  235:5
298:4 301:21
302:6
**drove**  297:9
298:9 299:15
300:22 301:3
301:25
**dte**  328:7 329:6
329:25 330:2,7
**dual**  75:19,20
252:18
**due**  71:23
130:22 294:20
**duly**  7:20 338:5
**duties**  20:11
33:22 34:2,3
34:12,20 70:19
71:2,6 112:5
128:9 177:16
177:19 194:5,6
207:10 212:11
214:17,18
220:2 221:13
222:13 279:16
283:9,21 284:3
284:13 288:2
289:2 290:11
290:18 291:4
291:11,21

292:6,19
309:12,21
334:12
**duty**  20:13
125:5,6,7,9
202:3 212:13
261:11,12
284:9 294:20
294:25 311:17
**dynamics**  17:4

**e**

**e**  2:1,1 3:1,1 4:1
4:9 5:1,21,21
5:21,21 6:1,1
8:7 108:17
118:5 128:22
237:25
**earlier**  26:1
56:24 105:14
107:22 109:9
121:14 132:18
137:20 169:21
178:5 187:16
193:15 200:1
210:13 217:25
271:5 285:12
292:2 307:11
**early**  31:3,4
193:21 211:17
230:13
**earn**  162:16
168:3

**earned**  168:6
223:7 229:10
247:5
**easily**  28:15
**east**  299:24
**eastern**  1:2
215:11
**ecf**  85:18
**echoing**  152:14
208:19
**education**
16:16 212:8
**eeo**  135:8
**eeoc**  135:11,12
137:16 265:20
265:20
**effect**  62:20
118:15 240:23
242:9 319:14
321:9,18
**effective**  62:6
258:2 287:24
**effectively**
288:20 293:24
**efficient**  77:15
258:2
**effort**  77:12
103:21
**efforts**  272:5
**eight**  37:9,10
74:17 295:4,5
**either**  22:19,20
53:22 83:22
99:14 102:2,24

131:20 132:3
134:1,12
137:16 142:7
142:11 144:9
154:7,14
196:23 198:20
202:25 218:12
233:7 259:23
274:22 275:1
279:15 285:7
316:17 317:19
333:20
**elect**  231:6
232:1,4,19,23
**elected**  119:3
126:9 129:21
130:24 153:23
239:25 274:8
**electric**  324:7
326:4 327:8
328:13 332:4
334:10
**electronic**
78:23 79:2,2
79:23 98:15
132:19,24
133:10 142:11
193:3 260:2
**electronically**
79:16
**elevate**  183:14
183:23
**elevated**  165:13
183:13 215:12

**eligible**  168:14
168:16,20
169:6
**else's**  49:12
141:3 144:10
208:10
**email**  5:5,18
31:12 79:7
93:9,11 132:14
176:16 177:24
180:22 185:20
218:13,19,20
218:22 228:23
229:3,6,7,11,12
229:17 250:11
250:12,13,24
251:15,18
306:23 307:14
309:6,24
316:25 317:11
317:12
**emails**  132:15
132:16 133:10
133:14,15
219:5 317:18
319:14,17
**employed**
36:22 92:1
138:5 140:12
140:21 153:16
207:21 212:1
223:21 224:6
225:11 230:18
230:19 233:24

238:10 246:6
258:23 262:7
262:23 338:11
338:14 339:8
339:11
**employee**  22:9
30:14 35:13
40:11 58:13
63:3 81:11
82:9 83:13
104:24 108:19
108:21 118:1
126:21 164:21
165:1 174:21
191:13 196:16
215:9,14 223:2
223:4 224:16
225:2,12,18
226:1,2 227:8
230:19 231:3,6
232:1,19
237:14 258:1
260:16 261:8
262:20 293:17
309:21 327:12
328:9 338:13
339:10
**employee's**
224:17 227:9
**employees**  52:9
68:4,13 73:25
74:6,23 80:16
80:18 127:1
129:1 130:16

132:3 144:15
264:10 275:19
289:11,12
293:18 326:21
**employer**  42:20
42:21,22 47:16
99:24 314:12
**employment**
4:11,16,21
44:4,12 51:7
61:11 64:2
71:24 80:3,4
83:17,21
131:19 156:12
175:11 206:11
206:15 216:3,5
217:22 223:3,5
223:12,20
224:5,9 225:2
225:4,19
229:21 230:6
233:23 234:17
238:3 240:20
245:17 246:5
251:23 252:11
265:10 283:7
283:19 290:6
292:12
**empowered**
257:24
**enable**  289:15
**encompass**
74:9

**encompassed**
72:9
**ended**  31:24
51:7 74:22
112:23 137:14
240:21 247:2
251:22 252:7,9
252:9,21
253:10,17
258:11 260:3
263:13 265:8
270:13 283:19
296:11 299:5
306:24 307:15
315:8 316:23
320:23 333:15
**endure**  216:14
**enforced**
285:22,22
286:2
**enforcement**
17:1 21:4
35:23 36:19
37:13 39:14
97:15 119:3,5
120:23 129:20
133:21 141:14
141:15 262:13
274:7 304:8,11
306:12
**engage**  82:22
82:24
**engaged**  180:23
282:14

**engaging**
181:16
**enjoy**  181:12
**ensure**  25:13
138:23 289:11
289:25
**ensured**  111:24
**ensuring**  108:3
108:4 138:21
**entail**  25:11
107:25
**enter**  55:5
111:24
**entered**  10:7,10
58:3 124:18
**entire**  17:20
18:12,16 40:22
59:20 192:2
195:25 236:4
257:3 258:22
330:6
**entirely**  294:15
**entities**  37:14
87:22 309:17
**entitled**  57:20
58:9 63:9,14
63:23 71:15
174:20 207:25
221:19,20
226:16 234:7
234:11,13
**entity**  153:11
199:7,8 265:21
276:9 290:16

**enumerates**
221:17
**equal**  73:7
224:16 227:8
265:10
**equipment**
260:24
**equipped**  82:5
82:7 235:12
236:16
**ergo**  316:21
317:20
**erickson**
104:17 105:15
105:19,21,21
321:24
**es**  338:4
**esoteric**  154:20
**esquire**  2:4,12
2:19 3:4,11
**essence**  289:14
**essentially**
211:9
**establish**
186:22
**established**
165:1 166:7,15
186:22
**estimate**  237:1
237:2
**et**  285:9
**ethnicity**  162:1
272:9,24

**ethos**  293:22
**evasive**  34:22
**evening**  172:18
**event**  10:1
138:13 139:9
139:19 224:14
227:6
**events**  148:8,12
187:5 279:2
**eventually**
330:7
**everybody**
106:19 180:5
181:12 261:3
**evidence**  71:4
86:17 92:11,11
92:14,24 93:1
93:4 96:5,16
98:6 102:19
108:2,3,23
112:14 113:16
113:20,23
114:1,7 115:3
115:6,11,15
182:11 184:18
199:1 215:18
225:10,15,22
266:8 267:5,11
267:11,13,25
268:1,2,18
271:13 273:7
273:13,22
274:15 278:11
285:25 297:16

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                    586-468-2411
www.veritext.com

300:15 309:17
313:11 314:23
315:17 316:2
316:11,12,13
320:6,7,21
323:10,14
**evidencing**
314:12
**evidentiary**
6:23
**evolve**  138:25
**exact**  26:4
151:3 201:25
208:22 228:2
**exactly**  30:23
110:7 242:17
**exam**  168:7,21
**examination**
4:2 8:1 220:22
325:3 332:23
336:1
**examined**  7:22
**example**
189:16 238:21
279:3 309:17
315:7
**examples**  211:6
**except**  231:1
**exception**  35:8
144:11 207:19
307:15
**excessive**
169:13

**exchange**  329:7
**excluding**
174:18
**excuse**  25:1
31:8 291:10
**executive**  16:25
32:10 53:11
230:14,19
**exhibit**  4:11,16
4:21 5:3,5,7,9
5:11,14,16,18
55:5,6 58:7
60:20,21 68:12
69:18,19 70:1
70:22 85:11,12
85:13 87:1,2,3
175:10,16,17
185:12 204:19
221:16 222:25
230:6,21 234:8
247:10 248:9
248:10,11,21
248:22 266:3
286:20,21
287:2,13
294:11 295:6
295:25 298:19
298:23 300:2,3
307:18,19,22
308:18 309:23
**exhibits**  233:24
234:17 258:5
**exigent**  93:11

**exist**  315:21,22
315:23
**existed**  122:7
**expect**  98:23
**expecting**
12:24
**experience**
121:18 212:8
**expertise**
117:20 206:5
223:15 224:10
226:4 231:21
**expire**  249:11
**explain**  115:23
116:6 124:23
124:24,25
143:7 157:2
158:7 164:8
179:24 180:20
242:18 246:13
**explained**
120:20 125:18
321:21
**explaining**
124:20
**explanation**
179:16 219:17
241:9
**exposure**
302:24
**express**  34:25
186:5
**expression**
196:16

**extend**  70:14
**extended**  71:10
175:10 204:15
**extends**  70:15
**extension**
175:13
**extent**  231:1,4
275:22,23
276:2 292:20
**external**  120:22
**extra**  55:15
219:19 221:22
318:5

| f |
| --- |

**f**  177:10,10,11
**fabrication**
143:11
**face**  211:3,8
**faced**  210:24
**faces**  145:19
**facets**  130:13
274:12
**facilitate**
207:10 212:22
255:20 291:1
330:23
**facilitated**
261:2
**facilitation**
53:17,18
177:20 193:25
**facilitator**
276:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

facilities  289:6
fact  11:9 30:5
  72:22 154:20
  159:19 192:23
  208:19 253:9
  273:19,20
  294:3 307:11
  322:18 330:8,9
  330:16
facts  71:4
  159:17 160:2
  181:8 215:17
  297:16 313:11
  331:18
factually
  296:13
fail  271:23
failed  104:25
  106:7 112:4
  160:5 166:10
  168:7,25
failure  92:25
  93:4 151:9
fair  24:8 26:18
  38:7 69:15
  73:13 92:13
  94:5 96:18
  114:12 115:5
  160:18 166:9
  172:19 175:3
  180:8 185:25
  205:6,14,23
  206:3 231:18
  233:8 234:24

247:9 326:15
fairly  322:14
fall  31:2,3,3
false  146:14
  147:14 148:18
  154:20 160:2
  200:10 216:13
  294:15,18
falsely  294:20
familiar  20:24
  21:3 60:23,24
  86:15 115:25
  116:9 119:8,15
  129:21 133:25
  162:2 178:10
  198:17 247:24
family  48:15
  130:2
far  194:4
  225:25 226:19
  232:17 234:16
  234:24 259:4
  285:21 290:22
farhat  211:2,2
  211:8,15
  271:17 285:13
  292:9,11 314:5
farinha  2:19
  10:10 11:14,17
  12:19 55:16,19
  55:21 56:1
  114:19 122:23
  146:3,6 163:14
  275:18 304:13

fashion  51:13
  288:5,6
father  331:4
fault  93:1,4
fausone  1:16
  2:5 6:12
fausone's
  114:22
favor  307:4
fbi  86:15 93:16
  93:18 94:4,6
  94:12 95:9
  96:4,8,23
  120:24,25
  121:3,11
  125:18 126:15
  269:19,25
  274:25 275:6
  276:11
feasance
  119:23
february  94:3
  109:2,24
  110:16 249:16
  292:19 322:25
federal  12:11
  21:18 28:8
  35:23 41:11,21
  87:14 88:17
  119:1,13 120:1
  120:3 121:17
  126:16,23
  129:14 141:14
  200:1 216:2,2

275:4
feel  9:17 180:7
  205:7 207:25
  241:10 244:7
  285:1 306:14
feeling  22:15
fell  243:20
  324:17
fellow  32:10
  247:22 264:6
felt  242:17
  262:16 277:16
  291:20 306:20
  306:22,25
female  121:15
  244:20
field  19:17 20:1
fifth  187:3
figure  176:10
figured  146:9
figures  222:6
file  38:11,13,23
  79:23 103:12
  112:24 142:10
  142:16 200:24
  201:8,16 260:4
  270:3
filed  12:22
  85:24 86:1,2,5
  137:22 140:24
  143:15 144:5,9
  144:11 171:14
  200:10 205:3
  206:20 228:3

Carroll Reporting & Video
www.veritext.com
A Veritext Company
586-468-2411
www.veritext.com

324:13
**files** 5:23 78:8,9
78:12,17,20,20
81:1,2 122:2
261:1
**filing** 294:15
**fill** 314:5
**filthy** 147:14
**final** 51:16
79:19 90:12
250:1,6
**finalization**
91:20
**finalized** 91:7,9
91:16
**finally** 321:25
334:8
**finance** 16:12
**financial** 52:22
79:4 123:15
179:17,22
212:3,15,20,21
212:24 213:19
241:25 242:11
254:12,13
**financially** 38:9
338:15 339:11
**financing** 333:4
**find** 33:2,9,10
33:21 34:1,10
49:9 106:20
126:6 131:16
178:25 182:19
187:7,11 188:1

202:9 244:24
264:25 302:19
304:21 314:12
331:10
**finding** 199:5,6
307:2
**findings** 96:22
199:4 333:25
**fine** 12:4 55:18
55:20,20,25
81:16,23 101:6
203:14 217:6
229:4 241:9
255:23 319:23
325:17
**finger** 327:13
**finish** 9:12,13
10:4 17:11
168:4 197:16
**finished** 188:16
**finishing** 298:2
**fire** 17:3,4,6
19:9 149:20,24
154:11 160:16
161:9 258:17
258:25 259:8
334:17,18
**firearm** 261:15
262:7,13
**firearms** 24:23
28:8 36:2
**fired** 50:22
164:6 219:23
283:14 334:20

334:21,22
**firing** 154:8
259:4
**firm** 1:16 6:12
282:14
**first** 5:3 7:20
8:7 21:13
24:19 27:24
31:23 48:18
49:2,3,13 50:1
51:12,23 56:25
58:22 72:20
74:3 77:21
85:16 93:23
94:22,24
104:15 113:9
145:24 155:3
156:14,15
163:24 167:11
171:19,21
172:5 173:6
183:12 185:17
195:6,7 196:11
197:22 198:3
198:11 206:21
207:21 217:24
217:25 218:24
223:2 239:21
244:17 247:21
258:4 264:17
280:8 287:13
287:21,21
288:17 300:11
321:3,9 332:15

**fiscal** 35:4
37:12 52:17
**fiscally** 328:20
**fit** 188:2
**five** 18:10,12
18:16 20:9
26:17 29:23
186:16 194:12
194:12
**fix** 32:14 297:5
330:20
**fixed** 271:9,11
271:14
**fixing** 32:14
119:2 129:16
129:19,24
130:8 274:7,23
**flag** 50:12
**flagged** 50:4
52:1
**flash** 5:23 79:6
**flat** 146:14
219:14
**flood** 282:21,25
**flooding** 283:5
**flow** 97:25
**fluctuation**
76:17
**focus** 10:3
**foggy** 173:2
**foia** 52:16
**follow** 105:5
151:23,24
159:4 172:23

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                www.veritext.com

197:5,7,11
203:19 219:6
**followed**
151:18,19
199:21
**following** 98:20
105:7 141:12
199:8 262:24
**follows** 7:22
**force** 161:24
169:13 170:13
322:6
**forced** 331:23
**ford** 2:21 298:3
298:13,13,15
299:1,5,20
**foregoing**
338:3,4 339:4
**forfeiture**
52:25 54:11
119:2,13 120:2
120:4,9 126:16
126:24 129:14
178:6 199:9,12
199:25 200:2
201:4 242:20
243:6 275:4
276:3,5,7
309:19
**forget** 123:3,4
194:19,20
244:20 328:10
**forgetting**
135:14

**forgiveness**
228:1
**forgot** 112:23
187:1,2 324:11
324:12
**form** 60:13
64:23 65:16,24
68:15 69:3,6
71:3 88:21
90:1 119:20
123:18,22
124:3 130:25
132:12 139:13
146:23 152:19
153:12 157:8
157:20 158:21
164:22 165:17
183:19 184:17
197:25 209:6
223:14 224:8
231:20 238:15
251:6,12,25
257:8 261:18
261:24 262:9
268:4 270:20
273:24 277:7
283:11 297:15
301:10 302:8
303:13 310:21
311:3 313:10
316:6 329:3,11
332:17
**formal** 103:7
151:14 190:22

**format** 60:11
**formed** 239:3
**former** 144:13
244:21 279:23
**forms** 238:18
**forth** 96:19
155:9 224:19
227:12 228:13
233:23 238:23
242:21 250:5
291:21 317:5
**forward** 121:21
126:2 142:7
158:5,10
**forwarded**
53:19 170:21
171:15 251:16
**found** 24:22
85:21 103:12
103:17 113:5
117:24 143:22
166:10 167:1
170:16 187:14
187:17 199:6
199:20 264:24
272:5 327:7
331:23 334:9
**foundation**
68:16 69:6
123:19,23
300:14 329:4
329:12 331:7
332:18

**four** 13:22
15:15,17 25:23
25:24 75:6
176:8 177:6,10
186:17 309:1
324:6 326:14
**fourth** 310:2
**frame** 5:16
15:17 25:17
74:2 93:23
110:1,14 121:8
156:12 204:8
270:7 322:24
**frankly** 27:15
110:10 128:18
172:22 179:6
181:13 303:2
310:13 326:23
330:13
**free** 9:17
**fresh** 268:24
**freshest** 325:23
**friday** 247:7,7
**friends** 119:3
129:20 130:2
274:7
**front** 28:16
75:8 151:4
169:1 195:9
208:9 222:6
228:7,11,15
229:7,18
250:10 287:2
303:4 334:3

**fuck**  241:6
**fulfill**  220:1
**full**  18:3 51:2
  52:12 159:11
  190:23 196:16
  219:8,9 240:25
  241:4,16
  257:25 308:5,7
**fully**  235:7
  321:5 334:14
**function**  53:25
  54:1,9 130:20
  154:6 208:12
  267:12,14
  271:8,8 286:6
  290:16
**functionally**
  290:9
**functionary**
  265:16,23
**functions**  33:22
  34:2,8 52:19
  54:10 109:15
  112:20 208:3,6
  212:19 286:10
**fund**  129:7
  201:4 276:8
**funding**  49:10
  157:6,15
  171:10 172:6
**funds**  52:24
  53:1,4 119:2
  119:13 120:2,4
  120:7,10

126:16,17,24
127:2,16,17
128:3 129:1
178:6 200:2,6
275:4 276:5
309:19
**funny**  302:19
**further**  187:14
  220:19 312:15
  324:25 332:20
  335:10 336:12
  338:13 339:9

**g**

**g**  6:1
**gain**  190:23
  275:16
**game**  40:14,21
**games**  40:15,22
  40:25
**gang**  28:6
**garages**  108:4
**garden**  30:6
**gary**  3:4 10:7
  56:4 99:15
  128:22 145:14
  193:11 220:20
  242:4 251:18
  318:7 319:12
**gas**  261:3
**gaze**  297:5
**general**  26:21
  125:11 148:8
  152:11 172:16

196:15,25
199:14 202:15
218:8 302:19
**general's**
  314:13
**generalities**
  274:25
**generally**  32:21
  181:24
**generated**  27:4
  27:18
**generator**
  330:17
**gentleman**
  328:6
**gesture**  297:6
**getting**  10:4
  114:15 160:8
  263:20 289:17
  325:9
**give**  9:20 28:21
  74:15 84:8,9
  84:13 85:20
  169:3 175:24
  176:2 186:17
  194:14 222:4
  236:25 240:9
  289:15 324:6
  335:12
**given**  41:20
  95:14 103:18
  112:18 146:8
  219:19 235:4
  246:11 256:8

303:19,22
314:20 315:14
328:25
**giving**  9:14
  197:12 230:15
  242:11 266:10
  305:19 314:1
  326:22
**gmiotke**  3:8
**go**  9:5 15:9,13
  15:21 16:5,19
  17:15 18:6,20
  19:16 25:12
  26:9 28:23
  42:3 53:23
  56:5 65:7
  66:11,21 69:7
  81:24 109:20
  115:18 116:15
  116:17 127:25
  132:17 144:2
  147:18 148:24
  155:14 158:3
  158:12,22
  159:15 169:10
  176:19 181:25
  185:14 191:1,6
  197:20 199:24
  209:18 217:23
  219:10,11
  225:1 226:14
  232:7,18 233:1
  233:4,8,15
  237:18 239:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

242:18 243:9
251:8 256:5
257:10 262:2
270:24 284:13
287:4 289:9
291:9,17
298:17 300:24
301:19 303:23
309:4 313:14
317:4 327:23
**god**  160:15
180:5
**goes**  145:22
146:1 147:13
184:12 321:16
321:18
**going**  9:5,18
10:2 12:5
27:16 29:25
34:5 36:6,14
46:23 55:3
60:19,20 64:22
67:7 69:5,17
71:3 73:19
76:17,20 82:12
84:12 86:16
89:25 101:17
108:14 111:25
113:19 115:17
121:20 127:24
137:9,18 139:2
143:4 151:6,9
151:23 154:22
156:7 159:18

164:5,6 175:15
175:16 189:13
202:25 205:8
208:8 217:3,17
239:15 240:16
253:5 257:7
259:20 262:23
265:8 266:4
270:19 275:17
277:6 285:4
296:24 297:24
297:25 299:5
299:19 300:13
303:2,16 310:2
311:5 312:15
317:4 323:18
323:18,20
324:11 330:10
333:14 334:14
**goldsmith**
303:5
**gondek**  29:6
**gonzalez**  113:8
113:13
**gonzalez's**
260:18
**good**  6:2 7:6,8
7:11 8:3,4
20:22 227:5
251:20 290:11
322:11 324:24
335:11
**gossip**  189:9

**gotten**  146:15
316:17
**governed**  64:17
68:4,14
**government**
42:23 47:20
48:10 87:11
167:3 187:20
**governmental**
97:17 153:11
187:18 328:21
**graduate**  15:24
16:13 17:4
35:20 36:19
**graduated**
35:17
**graf**  134:4
263:14
**grand**  2:14
14:8 164:20
**grant**  52:24
53:1,4,8
**granted**  284:16
289:5,14
**grants**  53:2
**green**  175:24
176:7
**greenfield**  3:13
**grievance**
314:3
**gross**  222:2
239:11
**ground**  9:6
29:18

**group**  2:13
3:12 19:16
187:9
**grysko**  1:16 2:5
5:10 6:12
287:14
**guess**  100:10
119:22 137:17
146:9 201:17
221:3 244:22
246:18 254:3
258:18 262:18
266:24 274:14
285:24 299:17
328:7
**guessing**
161:17
**guidance**
129:11,13
**gun**  109:18
260:24 262:23
**guns**  28:9 35:7
**guy**  100:11
199:18 277:19
278:13,14,18
**guys**  116:15
176:11 217:3
268:14 271:11
**guzowski**  29:4
106:15 107:6
107:23,24
117:18 192:15
319:5

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**h**

**h** 4:9 5:1
108:17 145:24
**habit** 101:24
**half** 18:2,10
155:12 330:14
**hall** 279:6
282:22 283:6
326:13
**hall's** 282:25
**hallway** 319:12
319:21
**hammered**
328:17
**hammoud** 3:12
134:4,17
263:13,17,20
**hand** 7:17 55:3
60:19 68:10
175:15
**handed** 176:15
300:2
**handing** 55:24
185:11
**handle** 114:17
245:4 319:3,7
**handled** 112:4
129:25 136:17
136:17 140:4
192:7,12
194:20 245:5,5
304:23

**handles** 135:10
**handling** 178:6
**hands** 188:17
317:6
**hang** 184:25
**hanging** 279:5
**haphazard**
128:19
**happen** 138:13
138:13 187:21
197:19 200:11
219:1 277:20
294:3 316:18
**happened** 28:4
137:6,12
140:19 141:10
173:4 174:2,6
187:23 189:21
190:5 214:5
229:6 293:23
331:15,19
**happening**
326:18
**happens** 101:8
187:18
**happy** 329:20
**harassed** 22:16
198:20 200:5,8
**harassing**
180:23 181:1
181:17 184:7
**harassment**
244:9,14,16
245:12

**hard** 78:24
105:25 122:7,8
128:4 142:9
307:3
**hardened**
305:1
**hardest** 121:24
**harmed** 330:5
**harris** 331:20
**hart** 1:6 2:3 6:8
23:10,11,19
24:3 28:2 29:3
30:17 31:10,14
31:23 33:12
34:23 43:6,7
44:3,11 45:9
45:25 46:11,19
46:22 52:8
59:23 65:20
67:2,5,12
81:19 88:6
89:3 90:18
91:6,11 92:22
93:13 94:1
102:19 109:11
109:15 110:3
110:13,17
117:13 120:16
120:17 129:8
129:11 130:7
134:2,13,19,21
141:1 142:8
159:1,3 163:6
163:24 172:12

202:4 216:22
232:10 261:22
262:6 269:18
269:25 270:13
270:18,20
274:21 275:1,8
321:14 323:3
**hart's** 89:16
**hashems**
303:20
**hass** 145:22,24
146:1 149:4
**hassan** 145:22
146:8 162:21
163:10 273:3
279:20 325:8
325:10,20,24
335:20
**hassane** 221:24
**hatten** 192:14
244:21,23
**haynes** 1:19
338:2,17
**hazlett** 47:3
**hdalawgroup...**
3:15
**head** 38:18,22
78:10 91:10
97:21 131:11
134:11 136:6
143:10 147:17
163:13 175:2
178:22 179:18
198:12 199:1

199:10 207:16
245:8 250:2
251:1 328:17
330:19
**headaches**
326:23
**heads** 59:8,21
**health** 41:3
42:9,12,15
47:12,15,24
57:8
**hear** 9:14,21
10:5 91:16
117:6 121:18
121:18 130:1
148:16 160:10
182:25 188:17
188:23 189:2
245:9 271:9,10
276:1 280:3
294:9 328:6
**heard** 24:21
91:8,15 104:1
123:5,5 130:4
131:24 149:11
157:2 173:4
188:20,24
189:9,12 190:7
197:15 219:14
244:4 279:20
**hearing** 7:14
243:19 245:1
303:4,8 335:2
336:24

**heights** 1:9
2:11,20 3:2
4:13,18,23
5:15 6:9 7:7,10
20:6,25 22:10
23:6 24:1,15
26:8 27:20
28:10,11 29:11
30:4,13 33:19
33:24 35:16
37:22 47:25
52:7 56:14
61:12 64:2
76:11 78:20
80:6 81:8 82:2
83:18,22 87:12
87:18 90:17
91:17 92:2
96:15 99:2,3
102:11 138:6
140:5,11
141:16 142:20
142:23 149:15
149:21 152:15
152:18 153:6,8
153:11,17
168:22 171:9
174:21 175:6
180:11 188:13
192:5 204:7
210:17,22
212:2 214:20
214:23 215:10
215:15 216:5

217:22 220:8
220:13 222:3
223:12,22
224:7 227:13
228:14 233:25
236:5 238:11
240:21 249:9
252:15 258:24
262:8 280:6
281:5,13
309:21 314:3,4
318:17,23
326:2,13 328:2
329:10,22
333:1,3
**held** 50:3,6,7
51:24 101:7
114:6 210:16
211:5 214:18
214:18 277:17
278:18 303:11
**help** 126:1
248:15 256:17
270:2 289:11
**helped** 144:16
**helpful** 13:2
**helping** 43:19
305:11
**hereto** 338:15
339:11
**hernandez**
177:3 186:6
**hesitate** 166:24

**hey** 131:24
187:18 189:1
240:11 292:15
322:11 329:14
**hicks** 5:7,25
49:7 122:14,19
126:3 185:5
187:13,14
188:1 189:22
192:23 255:3
**high** 15:21,22
16:17 170:1
**higher** 86:14
**highly** 43:18
**hire** 149:20,24
154:11 160:16
161:9 257:20
258:11,17,25
**hired** 97:10,10
108:10 246:3
257:12,14
313:8
**hiring** 154:8
**historical** 34:4
34:12 275:20
**historically**
33:18 34:7
**history** 140:9
**hit** 30:6
**hits** 186:6
**hmm** 190:8
200:18
**hoffman** 305:9

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**hoffman's**
  305:10
**hold**  19:1,2,15
  19:18 55:19
  142:11 168:17
  227:17 260:22
  267:6 273:8
**holding**  68:10
  276:25 297:14
  297:18 301:7
  301:15 302:22
  318:14 319:4
**holiday**  221:9,9
  221:20,25
  222:16
**home**  133:7,7
**homes**  297:14
**honor**  50:5
**horse**  266:5
**hostile**  5:6
**hostilities**
  162:20
**hour**  41:1
  186:14,20
  303:25
**hours**  312:13
**house**  5:17 50:7
  50:11 51:24
  297:18,21
  300:12 301:15
**hr**  47:3 143:10
  143:25 144:13
  237:14

**human**  143:3
**hundred**
  322:18
**hung**  184:23,24
**hungry**  304:3
**hunt**  2:12 4:3
  5:9 7:6,6 8:2
  10:10,12,23
  11:3,11,19,23
  12:4,10,13,15
  13:3,4 17:24
  21:10,20 22:24
  23:2 54:7,16
  54:19 55:2,13
  55:17 56:3,7
  56:10 60:17
  61:5 64:24
  65:10,21 66:1
  66:7,14,24
  67:9 68:2,7,17
  69:8,24 71:8
  72:8,14,18
  76:22 81:21
  82:17 84:6,12
  84:17,19,22
  85:4,11,19,22
  86:21 87:6
  88:24 89:15
  90:4 99:10
  100:21,24
  101:3,23 102:4
  102:6,8 113:18
  115:1 116:25
  117:1 119:24

  124:5 131:3
  139:15 144:24
  145:1,2 146:7
  147:1 149:7,9
  151:11,20,23
  152:2,4,21
  153:2,13
  155:21 157:10
  157:24 158:24
  160:12 164:24
  165:7,19
  167:23 169:9
  169:11 174:19
  174:23 175:19
  175:25 176:2,5
  176:8,13,14
  177:12,14
  182:14,15,23
  183:4,21
  184:11,21
  185:14,19
  189:24 190:1,3
  193:1,8,12,13
  195:4 198:1,8
  200:23 203:4
  203:10,13
  204:3,21,23
  205:13,18,21
  206:9,14,18
  209:8 210:2,5
  210:11,12
  213:6,9,12,23
  215:19 217:6
  217:12,14

  220:18,25
  228:17,25
  241:10,22
  250:10 251:3,6
  251:12 266:3
  286:20 287:15
  298:21 307:24
  307:25 308:5
  308:10,14
  312:13 324:25
  331:7 332:22
  335:17 336:13
  336:15
**hussein**  211:2
  292:9,10 314:5

**i**

**i.e.**  125:19
  199:18 270:3
**ia**  192:12
**ib**  324:7 326:4
  327:8 328:13
  332:4 334:10
**idea**  68:19
  79:21 120:11
  126:5 127:3
  145:20 149:16
  190:1,5 215:13
  243:4,8 272:15
  272:17 273:5
  281:25 322:12
  333:13
**identification**
  55:7 60:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                          586-468-2411
www.veritext.com

69:20 85:14
175:18 185:13
286:22 295:7
298:20 300:4
308:19
**identified**
278:19
**identifies**
272:15,17
**identify** 7:4
131:20 199:15
**ilitch** 36:24
40:11,11
**illegal** 115:20
116:4,10 117:4
130:10 131:18
161:24 166:2,5
274:3,22
**illinois** 14:17
14:23 15:23
**illuminated**
303:1
**imad** 332:4
**image** 303:2
**immaterial**
330:9
**immediately**
110:25 183:13
197:3 285:10
**impact** 150:11
154:6
**impacted**
115:10,14
150:12,12,13

**implement**
103:21 104:7
104:10,11,20
107:18,20
**implementati...**
108:13
**implemented**
104:4 108:11
**important**
157:5,13,18,25
158:17 296:16
**impossible**
302:24
**impression**
258:16 282:18
**improperly**
130:22 131:7
**inability**
112:19
**inappropriate**
151:13 181:10
244:15
**incentive** 333:2
**incessantly**
159:18
**incidence** 30:5
**incident** 28:4
30:21 136:25
138:13 139:25
143:2 144:1,12
169:13,20,25
170:8 171:7
178:10 190:4
192:22 195:13

**incidents** 28:18
198:10
**include** 10:25
57:5 72:6
**included**
229:11,16
250:11 260:4,8
260:12,14
**including** 45:22
72:7 151:21
174:17
**income** 38:17
39:7,9 239:11
**incorporated**
249:13
**increase** 70:23
245:22
**incredulous**
167:2 268:16
**increment**
333:3
**independent**
42:18 86:14
97:11 110:4,21
123:3
**indicate** 26:13
32:24 67:2
152:8 154:13
163:20 166:1
169:7 173:6
180:22 201:4
209:14 211:20
217:23 218:14
305:13

**indicated** 23:18
24:6 26:1
28:17,22 29:24
40:10 45:24
48:17 54:9
58:22 67:12
68:21 72:19
78:16 80:1
89:3 97:5
98:15 102:9
106:11 109:10
109:14 122:12
124:6 136:7
137:21 143:24
147:4,6 148:1
148:18 149:10
150:17 159:11
160:20 162:25
167:24 168:5
173:12 180:6
181:16 182:8
182:16 184:6
184:22 193:3
195:5,13
202:24,24
206:10 209:12
214:2 235:14
235:17 245:16
277:16
**indicates** 56:20
58:12 61:20
62:5 63:2,13
90:15 114:10
115:3 116:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

133:18 161:22
183:11 205:3
**indicating**
39:18 130:9
158:9 182:5
201:20 202:18
202:20 203:21
208:14 213:13
**indication**
203:20 216:2
240:9 245:2
**indications**
264:24 265:1
**individual**
27:24 163:10
170:11 179:18
189:1 194:19
200:17 212:7
261:15 272:3
305:7 331:4
**individual's**
237:17
**individuals**
26:6,7 29:2
66:25 67:4,16
77:1 106:24
127:7 130:16
143:4 145:18
148:10,15
162:20 181:15
187:20,23
194:8,10,12,13
291:22 309:17
313:17 314:21

314:24 321:2
**ineffective**
290:10,24
293:19
**inform**   23:23
**information**
46:24 80:2
118:12 121:20
122:19,24
124:8 126:19
131:21 146:15
146:18,21
147:6,7,13
150:9 152:8
164:13 190:9
190:21 243:23
244:2 256:7,9
273:13 274:15
286:1 303:19
303:23 305:19
316:15,24
317:2 318:6
320:4 325:20
325:23
**informing**
24:12
**initial**   56:13
98:24 104:14
**initially**   112:3
125:18
**injunction**
285:19
**inkster**   298:25
299:12

**input**   117:22
**inquiries**   305:2
**inquiry**   170:20
170:21,24
305:4 327:6
**instance**   27:2
27:21 130:4
210:1 211:2
264:11,11
279:12
**instances**   89:11
130:6 142:4
149:13
**instruct**   11:22
**instructed**
10:25
**instructs**   9:23
**instruments**
212:4 254:12
254:14
**insurance**   41:3
42:10,13,16
47:13,16,25
48:3,8,12 57:5
57:9,11,16
**insured**   42:9
**intelligent**
215:6
**intend**   22:19
**intended**   6:21
**intent**   36:18
**interaction**
21:7 237:14
272:19 297:2

298:6
**interactions**
164:14 279:1
328:18
**intercession**
264:9
**interchangea...**
114:2
**interest**   12:23
**interested**
338:15 339:12
**interesting**
43:17
**interfered**
292:9
**interim**   75:15
75:17,24 76:4
83:23 193:15
193:19,24
194:5 212:4
252:19,22
253:1,4,4,17
254:2,5 255:12
255:12 282:12
285:12 291:5
292:1,5,21
**internal**   18:7
35:25 73:12
80:17 121:4
122:5 186:12
191:16,18,20
191:25 192:2
243:17 306:17

interpretation
281:18
interrupt
175:23
interrupted
196:14,23
interruptions
196:17
intervene
161:19
intervened
161:16
intervening 3:2
7:9 98:22
interview 45:15
46:4
interviewed
44:22,23
interviews
29:15 91:4
138:23 171:2
intimately
32:11
inventory
25:13 236:15
investigate
20:13 244:9
331:16
investigated
139:10
investigating
30:8 117:7
186:2 188:17
191:14

investigation
18:8,11 25:20
26:5,9 27:5,13
29:12,21 30:11
30:17 35:24
74:1,4,24
89:18 90:6,8
90:12,23 91:20
96:7 102:11,13
111:10 117:17
117:23 123:8
139:21 141:23
143:18 162:1,5
170:3 190:10
190:15 193:5
243:17 264:4,9
298:2 330:25
332:1 334:1
investigations
29:14 35:8
39:17,18 52:15
73:11,12,12,17
73:23,24 87:15
91:5 116:12
171:1
investigative
75:9 76:16,18
77:2,7 79:11
investigator
17:3,6,18 18:3
19:9 20:21
investigators
26:21 140:8

invoice 124:20
involve 142:8
involved 21:14
141:20,23
142:6 154:19
170:2,5,24
243:21,22
283:6 328:4
involvement
269:14,17
involves 188:11
involving 20:13
24:1 119:1,12
120:1 221:6
245:11 263:14
ironically 28:3
28:10
irs 18:9,19 20:8
20:12 21:6,12
21:15 41:8
121:7 125:4
126:15
isolated 30:3
issue 24:17,23
24:25 31:10
59:11,14 89:17
96:4 98:6
101:20 102:1,1
102:7,16,20
110:9,9 111:13
111:20 117:10
129:17 130:13
132:4 138:2,16
144:24 156:4

178:13 179:6,8
181:23 187:24
188:12 201:5
230:12 247:5
267:7 269:22
275:24 276:3
277:20 278:14
313:16
issued 141:8
247:3 271:14
305:17
issues 20:16
22:12 59:10
73:8 80:17
88:20 89:10,21
92:18,21
109:11 129:15
130:12 137:2
138:25 144:16
159:16 183:9
199:4 210:14
210:19 211:3,4
218:10 241:25
243:20 244:8
264:2,24
274:11 278:19
333:10 334:13
item 246:1
266:20,22
317:22,23
items 80:13,14
120:7 157:7,16
214:9,10
260:11,13,16

**[items - kias]** Page 41

307:4

**j**

**j** 7:11 118:5
**jahkarah** 1:19
6:3 338:2,17
**jamal** 221:24
**janet** 52:17,20
53:10,24
127:11 179:2
242:1,6
**january** 4:14
4:24,25 41:16
45:5 51:6,10
57:24 70:4,15
71:10 72:15
76:14 87:8,18
87:23,24 88:3
88:18 89:3
90:18 91:6,12
92:9,17 93:20
93:25 94:2,3
109:2,24
110:16 160:21
161:17 171:24
173:13,18,22
174:22 191:22
192:10 201:5
224:15 227:7
228:3 285:12
291:24 292:4
293:4,8,12
294:2,5 322:22

**jbrown** 2:8
**jenny** 324:10
**jeopardize**
92:12 114:11
115:4
**jerrod** 1:6 2:3
6:8 23:10,11
52:8 88:6
92:22
**jesus** 12:13
**jimmy** 303:3
304:4
**job** 1:20 27:15
31:23 34:8,18
35:1 36:17,24
109:15 112:20
154:7 161:11
168:20,22
177:16 180:3,8
180:17 193:22
194:1 208:3,6
210:21 212:12
212:13 214:17
219:24 244:7
255:21 271:19
284:7 286:7
290:11,24
291:4,12
293:24 318:14
328:25 329:14
329:20 330:11
**jobs** 212:17
289:13,25
329:10

**joe** 31:7,7 43:6
65:6 137:3
264:19
**joel** 118:5,5
**john** 297:3
298:3 299:8,11
299:20
**john's** 303:3
304:4
**joined** 31:17,18
34:25
**joining** 30:14
**jose** 14:10,11
17:8
**joseph** 2:4
15:22
**judge** 303:5
327:13,16,18
327:20 330:14
331:1,3,14
334:1,4
**july** 4:19 25:18
60:25 61:6
62:6,11 204:11
246:17
**june** 4:15,19
57:24 58:4
61:1,6 121:1,9
169:12,24
249:11
**jury** 5:4
**justice** 87:14
298:8 326:11
326:12 327:3,9

**justify** 283:3

**k**

**k** 28:13 41:5
237:25
**kahlil** 328:7
330:3 332:14
**karen** 13:14
21:22
**keep** 80:12
127:25 236:17
255:16 265:3
324:11
**keeper** 105:13
**keeping** 120:5
120:6 128:16
284:12 314:11
**kentucky** 30:1
**kept** 80:17
102:3 188:5,5
261:3
**kevin** 1:5 2:2
6:7 29:4,5
44:22,23 116:7
117:19 137:4
137:10 244:1
245:5 264:19
274:21
**key** 106:2,4,20
**keys** 106:24
**kia** 28:6,12
30:12,17
**kias** 28:14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| kickbacks | 65:14 67:25 | 161:13,14,17 | 271:4,5,7,11,16 |
| 328:22 | 69:14 78:11 | 164:11,15 | 271:21 272:9 |
| **kids**   43:1 | 80:24 81:2,17 | 166:9,9,25 | 272:20,22 |
| **killed**   84:7 | 88:7,10 89:13 | 168:24 169:1 | 275:17 277:9 |
| **kind**   25:3 31:25 | 90:7,11,21,22 | 170:18 172:11 | 279:4,12 280:1 |
| 45:12 46:13 | 91:1,2,3 93:2 | 173:3 181:5,8 | 280:2,3,19,25 |
| 56:3 91:14 | 95:2 96:9,11 | 185:3,16 186:7 | 281:7,23 282:1 |
| 105:24,25 | 96:25 98:1 | 186:11,14,23 | 282:10,17 |
| 106:18 135:22 | 100:23 101:15 | 187:19 189:6,7 | 283:16 284:21 |
| 137:5 138:3 | 104:6 108:1,5 | 189:24 190:9 | 285:21 286:18 |
| 167:4 175:3 | 109:17 110:7 | 190:12,13 | 292:14,24 |
| 177:23 178:12 | 110:11 115:9 | 192:14 197:17 | 294:3 300:6,14 |
| 187:1 188:10 | 115:12 117:9 | 198:14 199:6 | 302:2,4,10,11 |
| 217:15 238:25 | 117:18 118:18 | 199:18 202:11 | 302:13,23 |
| 243:24 269:2 | 118:20 124:13 | 202:13 203:17 | 306:5,16,21 |
| 271:4 | 125:24 126:3,9 | 205:14,22 | 309:8 312:1 |
| **knew**   24:3 65:2 | 128:6,8,10 | 206:25 208:18 | 313:15,15,15 |
| 106:19 110:11 | 129:3 130:1,14 | 211:3 214:13 | 314:8 315:20 |
| 130:17,17 | 130:18 131:16 | 215:9,14,20,22 | 315:23 316:1,8 |
| 131:9 142:2 | 131:25 133:6 | 216:16,20 | 316:12,14,22 |
| 164:17 168:6 | 134:15,23 | 219:6,14 225:9 | 317:14 320:9 |
| 180:7 224:12 | 135:1,4,6,12 | 226:8,19 228:8 | 321:12,19 |
| 225:7 316:16 | 136:5,12 137:1 | 228:12 233:4 | 325:12 326:24 |
| 328:10 | 137:10,19 | 234:16,25 | 327:3 328:20 |
| **know**   9:6 10:18 | 138:8,20 140:9 | 235:20,23 | 330:9,20 332:9 |
| 22:16,25 23:3 | 140:24 141:8 | 236:11 237:6 | 333:20 335:7 |
| 23:4,11 25:15 | 141:24,24 | 239:3 240:11 | 335:20,22 |
| 25:22 26:14,20 | 142:14 146:1,4 | 247:15 250:9 | **knowledge** |
| 27:14,22 29:5 | 148:25 152:14 | 250:13 251:16 | 12:8 33:6 |
| 29:9,17 30:23 | 153:19,23 | 257:11,21 | 69:13 90:10,14 |
| 34:7 36:9 38:8 | 154:1 156:25 | 258:14 262:3 | 130:16 182:1,6 |
| 39:11 49:8,10 | 157:3,5,25 | 263:4,5 264:6 | 183:5 275:20 |
| 49:12,16 50:13 | 158:15,25 | 264:8 265:14 | 331:3 335:19 |
| 56:6 64:19 | 159:3,5 161:11 | 268:12 270:25 | 338:10 339:6 |

**known** 21:4 24:21 180:5 333:4
**knows** 130:23 205:18 317:17

**l**

**l** 1:19 8:7,8 118:5 128:21 128:22 338:2 338:17
**labor** 205:6,14 205:23 206:3 227:3 234:2 259:22
**lack** 120:5,5,6
**lady** 194:17
**laid** 293:21
**language** 250:5 257:24
**lapointe** 145:16 153:3,5 154:6 315:7 316:2,14 317:17
**large** 246:19
**late** 31:3,20 72:21 193:21 292:3
**laughed** 251:15
**laundering** 20:14,18
**law** 1:16 2:13 3:5,12 6:12 11:8 17:1 21:4

35:23 36:18 37:13 39:14 87:10 89:23 97:15 119:3,5 120:23 129:14 129:20 133:20 141:14,15 259:23 262:13 274:7
**laws** 6:23 88:17 231:2
**lawsuit** 8:20,25 142:19 296:16 324:5,5,8,16 326:4
**lawyer's** 22:22
**lay** 65:25 67:24 69:4 82:13 198:5 205:10 206:5 223:15 224:10 226:4 227:1 229:24 231:21 234:3 259:21 290:1
**lead** 108:6 274:18
**leadership** 321:20
**leading** 127:5
**learn** 20:23 23:5 33:15,17 51:15 111:6 116:14 138:1 239:14

**learned** 23:18 152:8 201:17 201:17
**learning** 239:21
**leave** 12:3 51:8 78:19 177:3 237:13 289:12 292:16 294:20 294:25
**leaves** 221:11
**leaving** 240:21
**led** 327:18
**left** 15:13 17:14 18:5,19 50:23 51:19 78:1,19 78:21,24 80:18 80:21,24 91:17 92:2,4 108:13 114:17 117:2 118:1 138:7 160:25 163:6 192:11 194:24 217:18 243:2 283:7,12 289:16 303:25 318:16 321:24
**legal** 65:25 67:24 69:4 82:13 198:5 205:9 206:5,5 223:15,15 224:10,10 226:3 227:1

229:24 231:21 234:2 259:21
**legs** 269:2
**length** 250:24
**leosa** 262:12
**letter** 5:7,9 247:18 249:20 250:5 287:14 287:16,19 288:3,7,12 289:23
**letters** 310:6
**level** 16:13 17:4 26:11 86:14 121:17 141:14 141:14 170:1 181:10 230:19 230:20 256:20 290:19 291:19 313:18 321:12 321:20 322:20
**levels** 52:16,22 125:24 168:13 241:25
**license** 81:13
**licensed** 238:12 261:16
**licensees** 28:8
**licenses** 16:23
**lie** 148:25
**lies** 150:24
**lieutenant** 29:3 74:12,17,20,21 106:15 107:22

113:2,4 117:18
168:9 169:5
192:15 319:5
**lieutenant's**
166:10 168:7
168:15
**life** 57:5,11,16
181:15
**lifetime** 167:2
**lift** 268:7
**lighting** 279:5
279:9 328:25
**lightings**
329:25
**lights** 82:7,10
82:11 83:1,9
235:11,15,21
236:16,22,25
237:3 326:19
326:22,25
327:2,5,9
**limit** 106:23
**limited** 182:1,6
242:21 316:20
**limits** 302:24
**line** 25:14
176:22 179:4
246:1 254:24
280:4
**lines** 118:16
148:23 230:15
280:1 321:13
322:2

**lisa** 187:12,14
187:25
**list** 52:12 53:22
329:6
**listed** 38:17
58:7 62:21,22
63:22 65:12,14
67:1,4,6,13,16
67:17 68:13
69:2 71:15
87:22 88:2
89:22 206:10
214:9 277:1
278:2
**listen** 271:20
**listened** 272:4
294:7
**lit** 302:22
**literally** 103:11
118:16
**litigation** 99:25
**little** 34:17
37:18 173:2
191:24 282:13
321:16,25
**live** 13:11,15,24
14:1,5,22 15:5
21:21 180:10
**lived** 13:8
294:9
**lives** 152:23
187:13
**living** 13:20,23
14:3

**livonia** 13:7,9
13:16,24
**llc** 238:22
239:2,3
**lo** 317:16
**local** 21:7,10,14
21:18 140:11
170:10
**locate** 122:9,10
**located** 95:3
201:23 202:6
238:2 298:2,12
**location** 1:16
303:18
**lock** 80:19
**locked** 261:4
**locks** 106:25
**logging** 108:1
**logistics** 37:13
**long** 13:8,20
14:11,16,25
15:7,11 17:25
18:9,24 19:10
19:18,22 29:21
49:21 51:18
98:1,25 125:25
155:10 164:15
164:21 177:4
191:20 192:9
250:11 272:12
**longer** 140:21
156:6 188:11
**look** 56:16
57:23 63:12

70:9 77:8
79:21 96:15
109:20,23
112:24 118:18
131:25 151:16
155:14 156:10
162:23 165:22
180:4 185:17
201:25 204:24
205:2 209:16
209:19 233:5
237:19 239:13
250:14 271:23
280:11 296:4
303:24 304:16
315:24
**looked** 79:22
124:9 137:10
137:11,11
165:14 175:10
186:8 199:18
244:4,24
285:14 304:2
**looking** 32:16
32:22 35:4
43:15 44:17
70:22 72:14
87:7 92:8
125:18,19,24
186:13 188:2
195:2 199:9
204:1,18
215:25 216:1
314:15 319:11

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[lose - making]

Page 45

lose 333:22
lot 29:7 32:12
    32:13 73:11
    187:22 214:14
    242:19 266:4
    306:18 313:7
    313:22
loud 148:14,15
louis 30:1
lucas 52:17,21
    52:22 53:24
    127:11,22
    129:7 179:2
    242:1,6
lucas's 53:10
    242:10
lump 48:21
lurch 289:12
luttrell 135:13
    135:14,17
    136:2,9,14
lying 196:25
    334:7

**m**

m 5:21 94:20
    94:25
ma'am 36:13
    53:15 54:6
    71:21 74:2,19
    77:25 78:15
    128:18 132:22
    166:18 193:9
    203:12,24

204:8 287:9
323:21 336:23
machine 199:7
    199:7 256:12
    256:15
madam 312:11
made 22:6 38:9
    77:4,18 78:24
    81:5 86:8,11
    86:12,13,23
    88:5,10,12,15
    88:18 89:3,9
    90:8,13,24
    91:5,11 95:20
    97:3 103:22
    109:16 110:17
    110:21 111:1,1
    111:2,23,23
    116:1 119:9
    134:12,16,20
    136:22 141:13
    147:7 148:1,7
    148:18 152:6
    156:16,20
    158:8,13,14,14
    158:15 159:12
    161:4 171:9,17
    171:20 172:5
    181:7 187:6
    190:22 197:4
    198:13,19
    207:8,8,14
    208:18,22
    211:16 239:11

243:5 254:7
263:10 264:5
264:18,25
265:10 278:22
279:5,8,14
282:4 290:9
293:15 305:2
312:3,4,7
313:1 316:15
mag 1:9 6:10
magnanimous
    322:12
mahdi 134:6
    140:14,16
    194:17 265:4
    286:14
mahdi's 140:17
mahood 319:6
maiden 244:23
main 182:9
    212:17
maintain 18:16
    98:12 193:3,4
maintained
    99:3
maintaining
    58:15 63:4
    106:7
maintenance
    52:16,25
majority
    256:24 313:23
make 11:5,9,16
    11:22 35:11

40:24 51:21
54:19 72:5
74:14 76:25
84:3 87:21
109:23 110:4
110:13 112:2
113:7,14
120:13 131:6
146:13 148:4
148:19,21
151:9 152:6
156:25 157:14
158:18 175:19
178:22 179:18
179:19 191:9
199:17,22
210:18 214:4
214:14 257:20
295:2 310:25
makes 147:14
    150:7 162:11
    214:6 274:2
    294:14
makeup 50:15
    75:1,3,4 76:15
    76:18 77:7
making 12:6
    89:17 95:17
    160:2 161:8
    181:8,9,22
    183:7 196:23
    213:24 219:6
    234:5,7,10,13
    258:11 263:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[making - meal]** Page 46

268:14 279:18
296:19 314:21
320:23
**male** 272:3,6
272:25 273:20
281:21 282:2
286:9,12
**malfeasance**
119:23
**maligned**
290:23 331:17
**malinowski**
272:18
**man** 331:17
**manage** 107:2
108:22,23
194:6,6
**managed**
199:12
**management**
16:25 35:5,6
92:11 102:20
105:22,25
114:10 115:3
115:10 119:22
120:1 144:14
264:9 266:8
267:11 268:2
276:7,8 309:18
326:9
**manager** 27:16
32:10 230:14
**managing** 53:4
53:6

**manhattan**
17:17
**manner** 6:24
67:17 131:18
216:8 311:6
**map** 329:18
**mapquest** 5:14
298:24 299:4
**march** 115:18
162:23,24
163:18 168:18
193:21 200:25
201:2,3 292:3
292:3,21 297:3
298:1 300:22
301:21
**margaret** 47:3
**mariana** 177:2
186:6 253:13
**marine** 22:4
**mark** 84:25
197:21
**marked** 55:6
60:21 68:10,12
69:19 70:1
85:12,13
175:17 185:12
235:7,9 286:21
295:6 298:19
300:3 308:18
**market** 5:15
303:20
**marketplace**
42:19

**marking** 69:21
287:7
**marquart**
94:19,20,22
121:13 275:6
**maryland**
16:21
**master** 16:13
**matches** 302:18
**material** 231:1
**matter** 6:7 8:16
39:19 66:9
96:24 136:10
138:16 144:11
161:16 196:4
208:19 214:18
214:22 253:9
263:18 264:4
269:15 307:10
327:15,17
330:16 332:5
333:12
**matters** 9:3
138:19 192:7,8
196:8 242:11
324:4
**maxwell**
272:18
**mayor** 11:5
12:6 44:16
45:22 46:1,4
46:12,15 70:14
87:12 120:20
161:1 172:13

176:16 177:2,5
177:15 178:11
182:1,16 191:1
204:17 239:14
239:18 240:1,5
240:17 248:25
249:12,15,20
253:15 254:21
254:24 256:24
257:20,21,24
258:10,16,25
271:6,23
274:21 275:8
289:20 292:11
292:11,15
313:24 334:23
334:25
**mayor's** 177:20
271:10 305:12
317:15
**mayoral**
177:23
**mazloum** 91:8
91:12,21,24
134:5 135:1
**mckinney**
15:10,11,13
**mcl** 109:5
115:21
**mcole** 36:3
**mcoles** 238:12
261:16
**meal** 31:13,18
32:6 34:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**mean** 21:9 54:8
  82:19 99:21
  121:25 124:16
  129:12 139:4
  165:8,16
  184:16 190:20
  201:12 219:22
  221:15 236:20
  245:14 246:13
  251:14 253:5
  261:13 267:17
  288:6 302:18
  322:12,13
**meandering**
  314:9
**meaning**
  184:23
**means** 6:25
  99:17 100:13
  116:6 231:25
  231:25 292:14
**meant** 124:13
  195:22 281:9
  281:14
**medical** 57:5,8
  57:8 63:18
**meet** 24:1
  28:25 44:3,9
  44:15,15 59:2
  59:5,9,21,23
  106:14,16
  221:23
**meeting** 31:24
  32:8 43:5,23

44:20,21 45:8
45:9,17,19
46:3 59:9,25
93:6,8 132:13
143:12,14
150:4 151:5
156:3 158:15
159:4 162:14
162:17,22
163:2 164:6,17
166:13 168:18
172:4,25 173:7
173:10,16,22
174:2,11
179:11 231:19
243:10 255:2
264:1 266:11
266:13 268:6
290:13 294:8
304:6 312:1,8
319:1 321:8
322:19
**meetings** 44:14
44:18 45:25
59:7,12,12,15
59:16,17,24,24
105:6,9 107:4
120:19 127:13
127:15 135:16
135:19 136:8
136:10 146:14
147:19 148:12
150:14 154:25
155:3,7,11,16

155:18 172:1
172:23 186:23
196:19 202:12
207:9 208:21
210:3 216:13
218:5,16
219:11 231:3,5
231:15 278:16
278:22 313:17
314:21 316:5
318:20 320:24
321:4 331:18
**member** 27:11
64:15 147:21
147:24 148:20
152:9 163:10
165:9,11,12
200:10 233:19
234:25 235:1
279:13 280:6
310:19 316:3
**members** 29:6
136:15 146:16
146:18 148:20
152:9 202:8
210:25 211:1
218:9,13
219:16 232:6
232:17,25
233:11 271:16
277:17 306:19
311:2 315:1,8
317:19 318:8

**memorandum**
  93:5
**memory** 94:21
  128:15 334:4
**memos** 141:22
**mention** 11:13
  148:20
**mentioned**
  21:21 40:2
  65:9 89:20
  105:14 106:6
  129:6 132:18
  134:9 150:1
  154:3 172:14
  201:22 228:17
  247:23 254:9
  306:4 317:11
  318:3 321:23
  327:22 332:15
  336:3
**mere** 273:19
  330:9
**merit** 257:18
**meritless**
  294:15
**mess** 54:12
  104:22
**message** 31:23
  219:8
**met** 31:13,14
  32:3,5 44:11
  45:24 46:1
  59:19 106:12
  181:15 213:11

| | | | |
|---|---|---|---|
| 214:3,4,11 | **miles** 326:14 | 220:21,23 | 307:19,23 |
| 284:9 285:7,8 | **mind** 29:22 | 223:19 224:1 | 308:3,7,11,13 |
| **metro** 28:7 | **mine** 116:13 | 224:22 225:8 | 308:17,21,23 |
| 29:25 30:1 | 301:5 | 225:14,23 | 310:23 311:8 |
| **mhunt** 2:16 | **minimal** 122:25 | 226:7,13 227:4 | 312:14 313:4 |
| **mi** 1:18 2:7,13 | 291:2 | 230:1,11,24 | 313:13 315:16 |
| 2:15,22 3:7,14 | **minimize** | 231:10,11 | 316:10 319:24 |
| **michael** 327:13 | 106:21 | 232:3 233:13 | 320:16 323:17 |
| 328:8 334:7,12 | **minus** 48:23 | 234:4,23 | 324:2,23 |
| **michelle** 123:3 | 62:21 | 241:14,18,21 | 325:12,15 |
| 124:7,24,25 | **minute** 45:13 | 241:24 242:5 | 327:8 329:3,11 |
| 282:4 | 49:20,21 | 248:1,2,14,19 | 331:9 332:17 |
| **michigan** 1:2 | **minutes** 36:12 | 248:20 251:7 | 332:21,24 |
| 1:10 5:15 6:9 | 207:17 217:5,5 | 251:20,21 | 333:21 335:10 |
| 6:13,15 13:24 | 219:19 269:1 | 252:2,7,10 | 335:18,23 |
| 14:1 15:19 | 312:13 318:5 | 257:9 260:1 | 336:16,18 |
| 87:13 97:9 | 331:21 | 261:20 262:1 | **miotkelawoff...** |
| 135:8,9 170:22 | **miotke** 3:4,5 | 262:17 263:3 | 3:8 |
| 231:5 249:9 | 4:4,6 10:7 11:1 | 268:10 269:3 | **miraculously** |
| 265:9,20 | 12:17 55:9,12 | 269:10 270:23 | 302:21 |
| 269:23,25 | 56:5,9 68:15 | 274:1 277:15 | **mirrors** 68:12 |
| 298:3,13,14,25 | 69:5 84:21,23 | 278:6,10 | 68:25 |
| 314:2 326:14 | 85:1,3,5,9,16 | 283:15,18 | **mis** 119:22 |
| 338:19 | 88:21 98:22 | 284:1,23 | **mischaracteri...** |
| **mid** 292:3 | 99:8,12,21 | 285:17 286:23 | 164:23 |
| **middle** 77:24 | 100:17,22 | 287:1,7,10 | **mischaracteri...** |
| 156:13 163:7 | 102:2,5 113:7 | 288:19 291:8 | 167:19 |
| 215:11 300:19 | 113:11 114:14 | 291:23 293:1 | **miserably** |
| **midway** 249:4 | 114:21 116:16 | 295:3,5,9,12 | 104:25 106:7 |
| **midwest** 30:2 | 123:18,22,25 | 297:19 298:18 | **misleading** |
| **mike** 29:6 | 145:14 151:6 | 298:22 300:16 | 86:17 223:16 |
| 334:1,19,25 | 151:15 152:1 | 301:13 302:1 | 252:1 257:8 |
| **mile** 1:17 2:6 | 159:12,20,24 | 302:12 303:14 | 261:25 262:10 |
| 6:13 | 160:8,13,24 | 305:22 307:17 | 263:2 283:12 |

313:11
**mismanaged**
200:5
**mismanagem...**
119:1,12,21
120:3 126:16
275:3
**missed** 160:11
**missing** 199:20
219:3
**misstated** 61:3
**misstates**
167:18 184:9
209:7 213:21
215:18 231:22
233:9 252:1
292:22 301:11
316:7 320:14
**misstating**
270:22
**mistaken** 14:21
163:15
**mistreated**
293:7
**misunderstand**
241:1
**mix** 59:21
**mixed** 187:21
**mm** 190:8
200:18
**mmrma** 261:14
**mo** 130:5 162:6
162:20 163:8
165:5 168:9,12

168:12,12,18
**mohamad**
136:20 162:7
**moment** 12:14
114:15 203:6
323:18 335:14
**monetary**
221:6
**money** 20:14
20:18 188:11
199:20,24
219:3 243:7
333:22
**monica** 2:12
7:6 21:9 61:4
72:3 99:19
114:14 169:8
174:18 189:20
192:17 209:25
213:5 251:19
332:21
**month** 26:4
41:21,25 88:3
161:2 201:9
**monthly** 41:18
**months** 24:9,11
25:16,16 26:2
30:20 61:10
62:10,10 64:4
155:12,13
161:2 270:11
270:12
**moran** 123:6,7
123:14 124:7

282:5,7,17,18
**morning** 6:2
7:6,8,11 8:3,4
**morph** 138:21
**mother** 54:17
**motion** 5:12
171:9,14,17
172:5,9,17
173:6,13,17,22
174:7 249:3,5
249:6 296:1
**mouth** 181:13
290:25 317:9
**move** 14:9,13
101:21 121:20
230:12 240:16
312:10
**moved** 32:12
32:13
**moving** 10:5
57:3 102:9
109:1 118:24
169:7
**msp** 97:9 102:9
102:23 103:18
103:22 104:1,3
104:11,21
111:4,4,9,13
135:7 170:21
275:11
**msp's** 111:6
**multiple** 130:1
135:13 159:15
179:21 189:13

250:25 311:18
311:22 319:4
331:17
**muni** 259:23
**municipal** 1:10
6:9
**muscat** 249:7
**muslim** 215:2

| n |
|---|

**n** 2:1 3:1 4:1
5:21 6:1 8:7
143:13 146:3
**nail** 242:25
**name** 6:2 8:6,8
13:13 37:5
49:6 64:19
65:3,11,13
66:16 67:1,5
67:13,22 69:1
94:8,17,18,22
94:23,24 97:12
113:3,6,10
118:6,14 123:4
123:5 125:7,8
128:13,23
135:14 145:20
145:23,24
146:8 150:2
152:13,13
154:18 159:10
162:21 194:19
194:21 202:15
208:7,10

237:17,18,21
237:23 239:6
244:20,22,24
260:18 264:22
328:9,11
330:20 331:21
**named** 8:24
11:7 305:8
**names** 88:11
114:3 118:12
128:25 129:4
194:14 264:21
**nancy** 163:7
**narrative**
151:13 154:22
**nearly** 109:3
273:15
**necessarily**
27:22 55:22
250:21 253:6
255:16 256:14
262:20
**necessary**
48:24 170:14
**need** 10:1,17
32:14 55:22
56:3 85:10
121:20 142:14
157:14,16
158:1,6 176:4
209:17 223:24
224:20 268:23
279:25 306:14
308:8

**needed** 26:25
32:10,23 50:9
127:25,25
157:6 191:7
231:7 232:20
242:18 256:20
262:16,16
306:14
**needing** 109:17
**needs** 12:9
32:11,17
118:15 151:7
158:19 181:9
321:19
**negative** 37:8
285:7
**negotiated**
64:13 70:24,25
**neighbor's**
324:17
**neither** 77:23
338:11 339:7
**never** 47:24
84:3 99:18
106:18 126:1
126:18 137:12
146:9 159:19
160:1 161:20
172:23 226:1
233:19 234:25
240:18 253:20
261:17 286:7,7
304:7 319:13
319:16 329:22

330:13,14
331:22
**new** 20:16
64:13 70:13
71:7,13 75:23
105:2 175:9
326:22
**newly** 32:24
33:2,5
**news** 138:22
**nine** 93:23
155:12
**ninety** 48:23
**nodded** 107:13
**nominated**
239:18 240:2,6
240:6
**nominee**
240:13
**non** 9:3 59:14
119:22,23
159:17
**nonresponsive**
151:16
**nonsense**
154:21 155:9
216:15 291:21
**nonsensical**
122:15 178:21
181:5,12 182:8
215:7
**normal** 150:10
**normally**
246:25 297:13

**northville** 1:18
2:7 6:13
**northwestern**
16:21,25
**notary** 6:14
296:9 338:18
**note** 11:4
117:25 118:11
151:6
**noted** 12:16
13:3 124:22
**notes** 103:6
**notice** 5:6
223:6 226:21
226:24 287:22
289:15 295:21
**notification**
199:1
**notifications**
88:19 89:10
**notify** 46:15,19
**notifying** 46:18
46:22
**noting** 12:24
**notion** 240:19
**novi** 14:7
**nuanced** 244:3
**number** 6:9
37:8 54:17
58:23 85:18
86:25 87:2
106:9,23
118:14,24
125:11 144:21

161:22 169:7
175:10 200:10
213:7 216:1
220:24 229:2,5
230:6,21 234:8
236:8,24 237:3
237:10 248:9
248:10,11,13
248:22 263:6
266:6 282:22
298:23 300:2
309:4,15,23
**numbered**
236:14
**numbers** 108:3
228:7,10,15
309:1 329:17
**numerous**
147:18 299:12

**o**

**o** 5:21 6:1 8:7
108:17 118:5
128:21,22
146:3 177:10
177:10,11
**o'clock** 217:4
**oakland** 21:13
**oaths** 6:15
**object** 60:13
64:22 66:9,9
67:7 69:3,5
71:3 76:20
82:12 86:16

89:25 151:12
205:8 251:6
257:7 259:20
270:19 277:6
285:4 300:13
325:16
**objected**
251:12
**objecting** 11:1
66:11
**objection** 6:16
10:24 11:6,9
11:16,22 12:15
65:16,24 66:6
66:20 67:23
68:5,15 88:21
88:22 89:12
119:20 123:18
123:21,22
130:25 139:13
146:23 151:14
151:15 152:19
152:24 153:12
157:8,20
158:21 164:22
165:2,17
167:18 182:11
182:22 183:19
184:9,17
197:25 198:4
205:17 206:4
209:6 213:21
215:17 223:14
223:23 224:8

225:5,13,22
226:3,11,25
230:7 231:20
233:9 234:1
251:25 261:18
261:24 262:9
263:1 268:4
273:24 277:11
278:4,8 283:11
283:23 284:19
291:7 292:22
297:15 301:10
301:22 302:8
303:13 305:20
310:21 311:3
313:2,10
315:11 316:6
320:14 329:3
329:11 331:7
332:17 333:17
**objections** 7:14
9:21 226:12
336:25
**obligation**
231:19
**observations**
272:10 315:15
**obtain** 41:2
122:4,24
168:22
**obtained** 114:7
**obviously** 29:8
34:15 80:13
99:12 164:18

283:16
**occasion**
163:24 235:15
235:18
**occasions** 108:7
130:2 163:23
**occurred**
139:19 156:2
169:14
**occurs** 139:10
**october** 5:18
36:11
**odd** 76:3
**oddly** 200:9
**offer** 32:15
43:20 180:18
**offered** 64:12
**office** 53:19
78:25 80:6,8
86:15 95:2
117:25 118:4
122:5,5 135:8
135:15,21,23
177:20 194:6
219:4 256:10
260:12 263:21
298:4 304:1
305:12 314:13
317:15 326:21
**officer** 36:19
75:6 92:7
105:19 118:9
130:24 134:4,5
134:6 140:19

**[officer - okay]** Page 52

| | | | |
|---|---|---|---|
| 151:1 164:9 | 145:21 155:8 | 26:19 28:5 | 71:9,22 72:25 |
| 200:12,14 | 158:6 160:10 | 29:10,21 30:11 | 73:8,16,20,25 |
| 238:12 244:18 | 169:15 172:20 | 30:20,23 31:14 | 74:3,6,8,16,16 |
| 244:21 245:3,4 | 175:19,25 | 31:22 32:1 | 74:21,21 75:4 |
| 263:12,17,20 | 179:25 185:18 | 33:17,21 34:10 | 75:11,11,17 |
| 270:14 304:8 | 186:3 195:16 | 35:3,15,22 | 76:6,25 77:4,6 |
| 338:1,2 | 197:8 206:16 | 36:9,18 37:5 | 77:10,17 78:7 |
| **officers** 74:9 | 207:3 229:5 | 37:19 38:5,8 | 78:9,11,14,16 |
| 82:21 83:6 | 240:8 256:21 | 38:13,23 39:4 | 79:1,10 80:5,8 |
| 119:3 129:20 | 260:5 261:1 | 39:6,9,11,24 | 81:16,22 82:1 |
| 130:2 131:23 | 276:4 280:21 | 40:7,15,17 | 82:22,24 83:1 |
| 170:10,12,13 | 287:7 288:13 | 41:10 42:12,18 | 83:4,16,25 |
| 235:2 249:8 | 288:18 293:7 | 43:1,5,16 | 85:3,9 86:4,7 |
| 264:7 274:8 | 297:25 304:15 | 44:10,23 45:1 | 86:10,25 87:5 |
| 314:2,3 319:3 | 310:10 318:4 | 46:6,9 47:6,10 | 87:17,25 88:5 |
| 319:7 | 320:1 324:11 | 47:24 48:2,5,7 | 88:10,12,14 |
| **offices** 289:9 | 331:17 335:17 | 48:12,15,17,20 | 89:2,16,20 |
| **official** 126:9 | **ohio** 187:10,13 | 49:1,4 50:6,18 | 90:5,11,15,22 |
| 130:24 135:9 | **oiled** 256:12,14 | 50:23 52:3,6 | 91:1,3,11,15,19 |
| 262:13 282:10 | **okay** 8:13,15 | 53:10,16,21 | 91:23 92:4,6 |
| 293:14 | 8:18,22,24 9:2 | 54:1,1 55:3 | 92:20 93:3,12 |
| **officials** 119:4 | 9:5 10:1,13,15 | 56:1,20,24 | 93:20,24 94:3 |
| 129:21 274:8 | 10:17,23 11:19 | 57:15,23 58:2 | 94:6,12,15,18 |
| **oh** 19:21 21:2 | 12:13 13:5,8 | 58:6,12 59:5 | 94:22,25,25 |
| 37:9 38:12 | 13:13 14:1,9 | 60:18,25 61:9 | 95:2,5,8,10,15 |
| 50:20 56:5 | 14:19,22 15:5 | 61:17,20,23 | 95:22 97:1,8 |
| 81:9 82:8 85:1 | 15:21 16:19 | 62:13,16,19 | 97:17,23 |
| 85:20 87:5 | 17:10 18:5,14 | 63:17 64:1,9 | 101:13,19,23 |
| 100:23 101:4,5 | 19:4,7,22,24 | 64:12 65:2,5,8 | 102:7,15,18,22 |
| 104:22 108:1 | 21:3 22:3,5,11 | 65:11,14,22 | 103:1,4,10,17 |
| 109:8 121:4 | 22:14,19 23:15 | 66:3,12,25 | 103:21 104:2,9 |
| 129:9 135:13 | 23:23 24:3,6 | 68:3,21 69:14 | 104:13,18 |
| 138:20 143:10 | 24:11,14,17 | 69:16,23,23 | 105:1,6,12,14 |
| 143:10,20 | 25:7,10 26:1 | 70:3,15,22 | 106:3,6 107:8 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 109:14,20 | 154:5,5,10,25 | 214:1,4,12 | 261:7 262:6 |
| 112:14,22 | 155:7,16,22,24 | 215:14 216:9 | 263:6,16 264:3 |
| 113:23 114:1 | 157:11 158:12 | 217:15,20 | 265:4,18,23 |
| 115:13,23 | 158:17,25 | 218:3,7,14,22 | 266:2,3,19 |
| 116:3,9 117:9 | 159:3 160:1 | 221:18,25 | 267:1,23 269:3 |
| 117:13,15,22 | 161:14,18,22 | 222:7,20 224:2 | 269:11 270:13 |
| 118:20,24 | 162:4,8 164:4 | 225:24 226:8 | 270:24 271:25 |
| 119:8,11,17 | 166:1 167:7,14 | 227:5,15,17,21 | 274:15 275:3 |
| 120:13,17 | 167:24 169:19 | 228:5 229:3,5 | 275:23 276:13 |
| 121:16 123:14 | 169:23 170:2,7 | 229:14,20 | 276:16,18,25 |
| 123:14 124:13 | 171:13 172:11 | 230:17,21 | 278:20 279:17 |
| 124:16 125:9,9 | 172:14,19,25 | 231:14 232:12 | 283:2,7 286:4 |
| 125:12,15 | 173:5,10,16,21 | 232:19 233:18 | 286:17,23,23 |
| 126:3,21 127:1 | 174:1,1,6,9,15 | 234:15,24 | 286:25 287:13 |
| 127:7,21 128:2 | 174:15 175:5,8 | 235:14 236:7 | 289:1 290:12 |
| 128:7,20 129:6 | 175:13,22 | 236:10,16,24 | 290:20 291:3 |
| 129:16 130:8 | 176:8,9,12 | 237:13,23 | 291:24 292:10 |
| 131:6 132:23 | 177:4,12,19 | 238:5,14,25 | 294:7,13 295:9 |
| 133:9,25 | 178:13 179:13 | 239:5,21 240:9 | 296:4,23 |
| 134:15,23 | 180:13,16 | 240:23 241:14 | 297:13,20 |
| 135:1,4 136:5 | 181:16,25 | 241:18,21 | 298:12,16 |
| 136:22,25 | 182:19,24 | 243:5,16 | 300:1,24 301:6 |
| 138:1,1,5,11 | 183:17 184:22 | 245:16 246:11 | 303:15 304:20 |
| 139:18,21,24 | 185:3,8,11 | 246:22,25 | 305:5,18 |
| 140:14,24 | 186:1,4 190:9 | 247:9,17,21 | 308:22,24 |
| 141:2,19 142:1 | 190:17 193:7 | 248:4,9,19,24 | 309:5,11,23 |
| 142:1,4,10 | 195:22 196:22 | 249:25 250:4,9 | 310:10,24 |
| 143:2,7,18 | 198:19 200:17 | 250:18 251:13 | 311:9 312:10 |
| 145:1,9 146:1 | 201:7,15,15 | 251:20 252:18 | 312:15,25 |
| 146:20 148:4,7 | 203:20 204:18 | 253:15 254:7 | 313:16,19 |
| 148:9,17 | 205:14,22 | 254:13,25 | 315:6,17,22 |
| 149:19 150:1 | 206:1 207:18 | 256:22 257:23 | 317:2,11,21 |
| 151:11 152:1 | 208:2 210:5 | 258:10,15,19 | 318:12 319:20 |
| 153:7,16,20,23 | 211:7,12,23 | 260:6,21 261:5 | 320:3,12,20 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[okay - page]**

Page 54

322:4,8,15,25
323:14 324:10
324:20 333:7
333:22 335:23
336:24
**older** 281:20,24
282:2
**once** 18:19
36:19 95:23
140:4 159:19
170:20 188:9
293:18 294:9
**ones** 26:10
134:11 155:15
199:25 245:7
276:24
**online** 186:23
**open** 96:24
143:14 146:13
150:14 158:14
158:14 207:9
216:12 231:5
329:15 331:18
**opens** 317:9
**operate** 75:18
**operating** 58:6
75:14 83:22
256:14
**operation**
258:2
**operational**
37:13 244:1
**operations** 73:6
291:2 314:6

328:21 330:24
**opinion** 205:9
**opportunity**
57:15 86:4
265:10 329:1
**option** 285:16
**optional** 231:25
**orange** 118:17
**order** 105:17
157:14 256:18
285:13,18
330:15
**ordering**
104:16 336:14
336:17,22
**ordinance**
303:21 304:8
304:11 306:2
306:12
**ordinances**
303:21
**ordinary** 298:8
**org** 75:7
**organization**
238:14,15,18
238:25
**organizations**
88:2
**original** 85:25
175:24
**originally**
246:3
**ostensibly**
247:20

**outcome** 138:2
141:5,8,11
338:16 339:12
**outgoing**
322:13
**outline** 264:16
**outlined** 249:14
289:23
**outlining** 93:9
312:18
**outside** 40:3
96:21 97:6
110:21 138:19
148:4 166:6,14
170:13 188:9
210:16
**outstanding**
332:8
**overall** 59:12
127:12
**oversaw** 58:23
60:3
**oversee** 53:17
53:18 54:1
105:22
**overseer**
192:13
**oversight** 120:9
127:2
**overtime**
115:19 116:4
117:4 130:14
**owed** 222:3,21
222:22

**owes** 221:4
**owing** 71:23
**own** 37:2 38:21
40:3 42:15
80:6 100:8,15
136:18 192:7
258:12
**owner** 332:25

**p**

**p** 2:1,1 3:1,1
6:1 8:7,8
**p.m.** 116:20,23
217:8,11 269:5
269:8 323:23
324:1 336:25
337:2
**packed** 81:19
**packet** 171:15
**page** 4:2,10 5:2
5:22 70:4
86:25 87:2
92:8 109:1
118:25,25
144:21 176:19
176:20 180:4
183:12 195:5
200:9 204:24
206:11,14
216:1 221:16
222:25 224:3
230:22 247:11
247:25 248:3
248:13,14,15

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

248:16,21,24
249:4,19 258:4
266:7 277:2,2
287:13,21
294:11 296:4,5
296:22,25
297:23 300:11
300:18,24,25
301:19 310:2,8
310:9 312:10
312:16
**pages** 249:22
300:5
**paid** 52:4 53:20
58:14 63:3
68:21 76:1
153:19 222:14
223:7 227:17
227:18,22,23
228:19 229:8
243:7 246:25
247:4,6,12
289:18,18
291:24
**paper** 22:8
**paperwork**
25:14 46:24
**paragraph**
87:7 88:3
89:22 114:10
115:3 116:1
117:3 119:9
129:17 130:11
133:18 145:7

150:18 162:2
206:13 213:8
222:25 224:14
224:21 226:16
227:6 230:25
248:3,5 258:4
266:7 269:11
274:2,8 276:16
277:2,3 287:21
288:17 294:14
296:22 297:23
311:9,10
312:15 323:2
**paragraphs**
250:25 277:8
278:3 294:12
**paraphrase**
195:20
**pardon** 53:5
75:5 101:5
121:5 172:21
194:18 200:21
203:12,18
207:1 220:16
220:17 276:6
**park** 3:6,7
174:25
**part** 8:20 29:22
36:24 40:10
54:9 57:16
65:23 66:17
86:10 91:5
93:2 98:23
101:10,13,24

108:11,15,21
117:16,23
120:11 126:8
130:10 133:18
161:23 180:17
181:24 209:21
244:7 248:6
280:22 281:2,4
281:4,9,13
292:8 309:12
309:20 312:7
317:19 327:11
329:5 332:9
334:9
**partially**
190:19,20
**participation**
279:15
**particular** 25:8
27:1 39:22
58:3 61:10
68:14 72:9
89:10 101:1
104:3 115:14
152:6,9 157:6
157:7 164:9
167:15 193:5
194:8 196:8
210:13,18
269:15 304:14
324:5 330:6
331:16
**particularly**
210:15

**parties** 6:17
99:24 311:18
311:23 332:12
338:12,14
339:8,11
**partners** 21:18
**partnership**
238:22
**parts** 77:11
**party** 8:18,25
11:7 12:20
97:19 98:2
99:16,17
101:10 103:8
103:15 107:8
108:8,9 123:7
324:4 326:5
**pass** 100:22
131:21 142:13
166:8 168:16
308:2
**passed** 103:13
168:15,24
297:2
**passes** 11:25
**passing** 286:24
**past** 37:17
141:10 188:18
272:24 297:9
297:13,17,20
306:8 328:23
**pat** 108:17,19
108:22,23

**paul** 1:5,13 2:2
4:13,18,23 6:6
6:7 7:13,19 8:8
131:24 134:4
189:2 261:9
263:14 287:23
**pay** 42:15
49:13,14 64:3
64:10,12 71:18
71:19 173:8,19
174:12 220:10
220:25 221:5,9
221:14,20
224:16 227:8
245:17 246:12
247:11 251:3
254:17 294:23
**payables** 53:23
**paycheck** 49:24
50:19 51:1,3
51:16,23 72:21
72:21,22
207:22 240:25
241:5,16
**paychecks**
51:11
**paying** 52:24
53:13,13
**payment** 50:16
62:9,14,14,17
220:7 222:11
224:17 227:9
**payments**
53:17 243:5

276:10
**payouts** 221:8
221:20,25
**payroll** 194:20
223:7
**pc** 2:13
**peace** 238:12
**pellerito**
105:11,12
106:12,17
107:6,22
108:10,13
112:4,7,12,18
270:16
**penalty** 296:19
**pending** 332:10
**penny** 50:25
220:9
**pension** 41:5,7
41:11,15,21
**people** 26:12
29:1 76:17
100:10 106:9
127:5 130:14
131:19 142:14
163:12 165:5
165:15,23
194:16 199:2
219:19 229:2,5
233:7 260:23
262:15 264:19
275:23 276:2
289:15,25
304:19 311:24

311:25 313:7
313:15 316:16
316:23 317:18
319:5 325:21
327:18
**people's** 202:10
297:13
**percent** 63:3,6
322:18
**perfectly** 241:9
**perform** 112:19
180:8 187:10
208:2,5 283:9
283:21 284:3,9
284:13 286:10
288:2 289:1
291:18 292:19
**performance**
279:16
**performing**
128:8 291:3,11
292:5
**period** 49:13,14
50:16 96:12
139:22 289:18
**periods** 293:8
**perjury** 296:19
**permits** 111:24
270:4
**permitted** 6:21
122:10 231:4
**perpetrator**
189:19

**perpetuate**
154:21
**person** 9:14
31:12 106:8
108:11,15
128:11 131:8
132:13 189:3
191:9 211:19
291:13
**personal**
221:10 222:16
335:19
**personality**
322:13
**personally**
245:9 274:17
**personnel** 25:9
25:10,12 26:6
26:22 112:2
138:21,24
243:21 256:11
**pertaining**
95:16 96:4
97:2 102:15
249:20,22
**pertains** 177:22
266:7
**pertinent**
268:18
**ph** 319:7
**philly** 143:13
**phone** 31:12
44:1 45:12
51:2 73:19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

94:10 131:22
132:13 179:13
181:7 185:4
187:7 215:5
240:24,24
289:10 297:14
297:18 301:15
302:20,22
303:1,11
**photo** 302:20
**photographer**
302:23
**phrase** 72:4,5
241:16
**phrased** 266:20
266:22
**physical** 35:5
52:15 54:10
106:2 245:3
**physically**
53:16 284:12
**pick** 152:13
317:9,9
**picked** 329:18
**picture** 300:12
300:23 301:2
301:20 302:2,5
**piece** 191:13
**pile** 110:2
270:8
**pistol** 109:3,6
109:11,25
110:2,8 111:16
111:17 112:8

269:12 270:3
270:17 271:2
271:14 273:9
273:15 277:18
278:7 309:18
**place** 27:24
97:24 108:3
111:25 127:5,8
133:16 135:19
162:22 196:18
218:18 266:14
290:4,6 299:19
313:19 333:16
**placed** 10:24
66:16 67:22
190:22 294:19
**places** 32:14
278:24,25
**plaintiff** 129:18
294:19
**plaintiffs** 1:7
2:2 5:12 7:12
87:8 92:10
99:1,24 109:3
115:18 118:25
133:19 145:6
161:24 216:25
247:22 287:22
296:1
**plan** 42:24
111:23
**plant** 35:5
52:16

**plante** 123:6,7
123:14 124:7
282:4,7,17,18
**platform**
218:18
**played** 137:19
**playing** 220:1
**plc** 1:16 2:5
6:12
**please** 7:4,16
8:6 9:12,17
10:3,4,14,18
54:20 139:14
157:23 168:4
206:13 210:8
222:24 224:4
237:24 283:24
287:22 291:14
294:11 312:12
**plenty** 19:21
**point** 11:6
20:15 47:3
75:14 101:16
108:12 126:2
126:18 133:4
166:11 186:5
188:9,15
193:14 201:10
206:21 231:16
239:14,17
240:14 244:25
247:25 250:20
251:17 256:23
291:20 304:18

310:3 323:6
327:4
**pointed** 275:1
327:13 329:17
329:18
**pointing** 99:11
**police** 20:25
21:9,10 23:7
25:2 27:19,20
33:6 35:11,16
35:16,17,18,20
36:7 44:9,11
45:10 53:14
64:14,15,21
73:5,11 74:9
78:2 83:6
87:13 97:9
109:5 111:9
115:19 116:3
117:4 118:9
126:25 138:6
138:16,16,19
140:12,18,19
141:16 151:1
157:4,12
161:25 162:16
164:16 165:14
165:22,24
168:22 170:22
178:14 188:11
188:14 189:3,6
191:7,10,14,17
192:6,12
219:13 232:6

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

232:17,25
233:12,17,19
234:11 235:2,5
235:7 236:11
238:6,11 249:9
257:25 258:2
267:12 268:2
283:22 293:20
293:24 294:15
294:18 297:2
314:3,6 315:10
316:23 323:12
326:9 330:23
**policies** 104:23
105:1,2,7
227:12 228:13
**policy** 57:13,16
76:25 77:4,5
334:6
**politely** 177:25
**political** 257:6
257:11 272:1
**pool** 316:20
**pop** 236:20
**portion** 56:18
217:16
**portions**
192:14
**position** 18:5
19:2,5,8,14,18
19:24 20:3
21:1 23:5,12
23:14,16,19,24
24:2,4,12 26:3

31:11 32:15,18
32:20,23,25
33:3,10,14,18
33:18,22 34:2
34:11,13 43:8
44:19,24 45:10
45:15 46:7,10
46:16,20,23
53:10 58:22
64:19 65:3
72:25 73:3,4,5
73:11 74:22
75:11,24 118:7
126:12 140:17
151:9 153:24
162:15 168:3
168:25 171:10
172:6 180:19
194:23 199:3
206:22 208:12
210:21 246:2,2
252:14 253:4,4
253:6,10,17
257:17 259:18
313:20 314:5
**positions** 74:8
75:21 210:16
253:1
**possession**
133:1 192:21
260:10 336:5
**possibility**
240:1 245:11

**possible** 111:25
**possibly** 75:7
202:20
**post** 16:17
**potentially**
245:10 310:25
**prattle** 159:16
159:18 318:5
**pre** 36:17
**preferential**
161:25 166:2
**prejudice**
332:10,11
**preliminary**
285:19 305:2
**prepare** 180:1
295:13
**prepared** 27:7
217:13 339:3
**presence** 11:1
11:22 296:9
**present** 11:17
135:18 195:9
195:10,11
208:9 209:2,3
209:15 218:12
219:17 260:20
334:24
**presentation**
197:12
**presented**
156:6 187:25
207:16

**president**
239:18,25
**presumably**
12:19 275:7
**pretty** 27:15
30:1 35:7
45:18 220:4
322:19 334:5
**prevailed** 335:5
**prevented**
285:2
**preventing**
283:8,20
**previous** 42:19
42:21,22 47:16
226:12
**previously** 24:7
214:16 231:14
233:18 234:18
235:4 237:15
251:22 252:21
**pride** 21:17
**primarily** 75:1
129:25
**printed** 298:24
**prior** 9:7 13:15
13:23 20:25
23:11 24:3,11
26:2 30:13
33:23 44:4,11
44:19,20 45:1
45:19 53:7
58:3 64:4 86:5
86:6 102:10,20

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
                                                   www.veritext.com

120:8 128:3
141:8 142:23
164:23 167:18
167:19 184:9
207:18 209:7
213:21 215:18
231:22 233:9
242:6 252:1
270:22 276:21
292:22 296:11
301:11 313:20
316:7 320:14
338:5

**private** 145:3
145:10,13
199:7,8 314:20

**privy** 146:16
316:19

**pro** 273:3

**probably** 100:3
272:4 281:24
302:18

**probative**
123:1

**problem** 12:8
93:2 106:18
111:5 120:12
126:8 187:3
199:15,17
268:13 327:11
333:15

**problematic**
50:4,9

**problems** 32:9
283:5 322:19

**procedural**
6:22 77:1
188:12 192:8

**procedures**
60:3,6,10
79:15 104:23
105:2,3,7

**proceed** 7:23
55:1 116:24
203:9 269:9

**proceeded**
188:3,16

**proceeding** 6:4
6:20 99:17
337:3 339:4

**proceedings**
338:3,5,6,9
339:6

**process** 76:18
109:6 111:18
112:1 127:24
137:16 158:6
166:7,15,17,22
167:3,10 192:7
201:20 257:18
265:15 270:14
270:16 321:15

**processed** 52:4
109:4,25
110:12 263:11
271:3 273:9,16

**processes** 60:2
60:5,9 109:17
276:10

**processing**
112:8 127:2

**produce** 99:19
100:2,11
192:21 251:19

**produced** 6:19
98:23 99:4,23
100:6 189:23

**produces** 99:22

**producing**
100:14

**professional**
4:11,16,21
179:23 180:4
302:23

**proffered**
312:18

**profit** 39:11

**program** 35:24
329:5

**prohibited**
115:20 231:1

**project** 25:5,8

**projects** 24:1
79:4,5

**promote**
162:15 165:21
166:6,14
168:13,19
199:2

**promoted**
164:9 167:16
168:2 321:11

**promoting**
321:8

**promotion**
322:21

**promotional**
166:7,15,16,22

**promotions**
166:22

**promulgated**
255:21

**proper** 49:10
108:2 120:5
330:11

**properly**
199:13 264:7

**property**
113:16,21
114:1

**proposed**
322:11

**proprietorship**
238:21

**prorate** 246:15

**prorated** 62:23
76:2 246:12,16

**prosecutor**
118:22 318:23

**prospects**
240:10

**protect** 82:21
262:16

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**protecting** 83:6

**protection** 198:15

**proven** 182:5

**provide** 37:12
95:15 98:8
124:7 161:24
179:15 191:3

**provided** 27:12
70:19 83:14
185:20 220:12
220:17 221:5

**provides** 329:6

**providing**
53:21 122:19
316:24

**provision** 48:4
226:8 230:25

**public** 73:13
119:5 133:20
138:22,25
148:2,5,8,18
150:5 152:11
154:20 159:22
161:5 196:20
231:4 266:23
266:24 296:9
315:9 316:4
318:4 320:23
321:3 338:18

**pull** 83:20,25

**pulling** 94:21
128:14

**pulpit** 154:23
293:16

**purchase** 270:3

**purchased**
83:14

**purchases**
127:17

**purely** 290:17

**purported**
259:8 314:4

**purportedly**
228:18 251:3
319:9

**purports**
295:25 296:5

**purpose** 44:14
58:14 61:14
70:12 77:13
83:10 138:18

**purposes** 8:15
9:11 59:14
63:4 157:17
159:10 176:7
209:1 214:21
250:19 325:8

**pursuant** 68:22

**purview** 188:10
188:12 191:8

**put** 32:13 49:10
65:18,20 79:6
93:4 111:25
127:5,8 132:12
169:1,4 177:25
207:2,5 208:7

208:10 229:2,5
229:6 251:15
253:15 291:21
293:22

**putting** 104:23
108:2 260:3
325:16

**q**

**qualifications**
202:16

**qualified** 338:7

**quality** 330:12

**quashing**
218:23

**question** 9:12
9:16,19 10:19
10:20 17:20
22:23 23:17
33:4 57:22
64:25 65:4,5
66:2,13 67:10
68:18 69:9
73:20 76:23
78:4 88:25
100:22 101:4,7
113:19 115:2
131:4 139:16
144:7 147:2,25
151:13,24
152:3 155:22
166:20 182:12
198:7 205:9
207:12 209:1

223:18,25
225:1,6 226:6
230:4 231:9,10
232:14 236:2
238:16 249:25
253:25 257:8
257:10 259:14
259:21 261:19
261:25 262:2
262:10,18
263:1 265:13
267:8,22 268:7
268:15,19
270:12,20
273:10 277:7
277:14 283:4
291:9 298:16
299:14 306:16
310:12,16,20
311:5 312:17
314:8 315:17
316:9 325:16
335:24,25

**questioned**
189:17

**questions** 56:4
100:19 101:17
128:5 151:8
197:14 220:19
220:25 221:1
263:6 266:4,6
289:10 291:14
311:2 324:25
325:2,14

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                       586-468-2411
www.veritext.com

332:20,22
336:12
**quick** 111:24
**quiet** 116:18
**quit** 220:5,6
252:6
**quite** 21:12
27:15 110:10
128:18 172:22
181:13 203:19
270:21 327:17
**quota** 115:20
116:4,10 117:5
130:10 274:3
274:22
**quotas** 309:19
**quote** 50:9
143:5 208:22
310:11 311:20
**quotes** 151:4

**r**

**r** 2:1 3:1 5:21
6:1 8:7 94:20
94:20 108:17
177:10,10,11
**race** 213:2,14
213:15,16
214:8,24
216:19
**rachel** 145:16
153:3,5 154:5
315:7 316:2,14
317:16

**rafarinha** 2:23
**rahal** 328:7
330:3 332:14
**raise** 7:16 64:3
64:10,12
183:15,23
184:13,15
204:6,10
333:10
**raised** 244:8
264:13 277:19
313:16
**raising** 278:14
**ramming** 28:7
**ramp** 202:9
**ramped** 162:20
**ran** 113:4
**random** 189:9
**rank** 91:23
92:4
**ranks** 129:3
**rapids** 14:8
**rather** 143:5
164:14 195:20
264:11
**ratified** 246:18
**ratify** 323:13
**reach** 23:13
25:2 26:2
43:10,11
**reached** 27:23
30:18,21,24
43:12,25 124:6

**reaching** 23:12
28:1
**read** 22:8,8
67:19 137:8
208:23 214:12
224:20 225:17
258:6,8 293:12
293:17 295:21
296:12,25
297:11,25
298:10 307:9
309:6
**reading** 183:16
307:18
**reads** 223:2
**ready** 240:16
**real** 127:19
173:3 174:4
272:19
**realization**
250:17
**realize** 250:15
**really** 22:22
106:19 112:24
155:8 172:21
173:24 174:8
181:11 240:22
242:23,25
251:14 264:8
277:9 290:14
295:17,18
323:5
**reason** 32:13
51:22 85:20

136:1 199:23
223:5 225:9
226:20,24
251:3 255:7
267:9 270:15
271:1 273:7
301:17
**reasons** 278:12
**reassigned**
112:5
**recall** 8:14,18
8:22,23,24 9:1
9:4 22:18
25:15,16 26:4
28:1,20 29:6
30:23,24 31:22
32:3,5,7 33:1
37:16 38:16,21
39:14 41:19,20
41:25 43:24
44:7,8 45:4
47:7 48:6,19
51:20 52:12
57:14,17 62:13
62:15 67:18,22
70:6 77:17
78:10 84:2
88:11,12 90:2
90:5 91:9,18
91:23 93:19
94:8,24 96:2,6
97:19 102:25
103:7 109:12
109:18 110:19

**[recall - record]**                                          Page 62

| | | | |
|---|---|---|---|
| 110:23 111:8 | 251:1,2,14,17 | 46:23 47:1,12 | 319:2,4 |
| 112:25 113:5 | 255:2 260:3,6 | 48:2,5,20,23 | **receiver**   130:23 |
| 115:16 118:4 | 260:9,21 261:6 | 49:2,23 50:15 | **receives**   99:16 |
| 125:8 131:14 | 261:13 262:5 | 50:19,24 51:1 | 158:19 |
| 132:20 134:11 | 263:14,15 | 51:4,12,19 | **receiving**   41:12 |
| 134:19 135:21 | 264:21 266:8 | 55:10 56:25 | 41:15 42:19 |
| 136:1,6,15,22 | 266:10,13,15 | 57:11,13,15,21 | 47:10,15 52:24 |
| 137:25 138:4 | 266:16,19,25 | 58:10,15,18 | 57:14 63:18 |
| 140:5 141:5,11 | 267:1,3 269:21 | 61:21 62:9,16 | 146:20 173:7 |
| 145:21 147:17 | 269:24 274:21 | 62:19 63:6,10 | 220:7 314:14 |
| 156:11,11,21 | 275:13 276:24 | 63:24 68:3 | **recently**   331:11 |
| 159:9 160:24 | 277:18,22 | 71:13,17 75:23 | **recipient** |
| 169:17 170:23 | 279:17,23 | 76:6,10 80:16 | 229:12,16 |
| 171:10,16,19 | 280:9,13,16,20 | 98:10 103:4 | **recognize**   55:8 |
| 172:7,13,22 | 282:5 283:1,5 | 107:14 131:22 | 55:14 56:11 |
| 173:21,24,24 | 299:16 301:16 | 141:17,21 | 69:25 194:21 |
| 174:1,6 183:10 | 303:4,7,10,12 | 173:19 174:12 | 288:14 300:21 |
| 183:15,16 | 306:7,9,11,23 | 174:15 190:17 | **recollection** |
| 185:1,7,8,24 | 307:5,10 | 207:22 221:8 | 103:6 170:9 |
| 186:1 193:17 | 309:10,16 | 246:19 294:23 | 173:2 233:6 |
| 193:19 194:14 | 313:16,19,22 | 294:24 | 273:2 280:14 |
| 194:15,22 | 314:1,7,10,16 | **received**   47:4,7 | 280:17 317:25 |
| 204:9 211:13 | 314:17,23 | 47:24 50:1 | 320:11,17 |
| 218:1,3 221:1 | 317:23 320:18 | 55:9 62:13 | 322:8 324:21 |
| 229:18 230:15 | 320:19,20 | 63:25 64:3 | **recommendat...** |
| 232:8 233:2,7 | 321:6 322:6 | 66:4,16 68:9 | 103:9,10,22 |
| 233:14 237:4,7 | 329:17 | 72:20 103:14 | 104:3,11,21 |
| 239:10,21,23 | **recalled**   94:17 | 103:17 107:9 | 107:15 |
| 241:8 242:11 | **recalling** | 131:8 132:2 | **reconcile** |
| 242:15 243:2 | 207:16 265:22 | 146:17 187:12 | 146:20 |
| 243:14 245:20 | **recant**   331:23 | 190:21 204:6,9 | **record**   6:4,5,17 |
| 245:24,25 | **receipt**   109:7 | 207:24 216:21 | 7:4 8:6 9:15 |
| 246:4,4,22,24 | **receive**   16:22 | 244:2 245:16 | 10:6,24 11:5 |
| 250:3,4,8,12 | 41:17 42:8,12 | 246:22 280:24 | 11:11 12:16,25 |

54:21,23,24
100:14 109:20
109:21 113:7
113:15 116:15
116:19,21,22
120:5,6 124:18
128:16 151:7
151:10 159:11
162:24 177:9
203:7 208:24
209:22 210:2
216:14 217:7,9
217:10 237:24
269:4,6,7
279:11 293:14
293:18 314:11
314:12 320:2
323:20,22,24
323:25 331:6
331:22 335:15
336:25 338:9
339:5
**recorded**  6:24
181:11 278:16
278:23 338:6
**recording**  6:19
156:10 195:17
195:21 208:24
209:17,19,25
280:23 281:1
294:7 338:8
339:4
**recordings**
147:19 149:3

150:16 154:17
155:14 197:9
197:20 208:22
233:5 280:12
**records**  35:9
52:15 100:8
109:4,6 110:2
110:2,8 112:5
112:8 113:4
122:14 151:5
269:12 270:17
271:3,14 273:9
273:15 278:7
304:17 315:21
315:22,23
**recruited**  23:8
23:9
**rectifiable**
187:24
**rectified**  49:19
178:23
**rectify**  263:25
**red**  260:4
**reduced**  338:7
**refer**  130:7
149:2 154:16
195:21 205:12
207:12 281:1
320:10
**reference**
247:21 269:12
274:3,6 282:4
294:14 298:12

**referenced**
64:20 109:11
130:9,11 144:6
144:12 307:11
327:8
**references**
243:12
**referred**  276:17
323:1 324:3
**referring**
265:19 278:21
299:1 310:6
312:21 317:3
317:12 318:12
**reflect**  10:6
**reflecting**  91:4
**refresh**  317:24
320:10
**refusal**  199:2
**refuse**  215:5
**refused**  191:5
215:5 322:20
**regard**  177:8
239:6 263:8
275:24 290:17
306:15 319:10
321:8
**regarding**  5:8
31:11,23 91:12
91:19 111:13
116:12 120:14
144:12 243:24
263:17 314:4

**regardless**
100:9 221:11
**regards**  23:16
26:5 29:11
30:12 63:21
90:12 107:1,8
109:21,24
119:25 123:8
126:15 130:8
132:3 134:16
136:9,19
140:14 144:10
146:10 147:7
152:5 156:12
162:12 172:5
185:5 196:8
200:1 217:21
218:4
**register**  304:21
**registered**
24:23
**registers**  53:22
**regular**  60:8
155:19 156:2
172:1 173:8
174:12 238:22
**regularly**  59:2
207:22,24
**rehabilitation**
89:18 112:18
**reimbursed**
329:25 330:7,8
**related**  8:15 9:3
140:25 193:5

211:25 338:11
339:7
**relates**  90:9
120:3 127:14
127:16 190:14
197:22 210:20
**relating**  5:24
**relation**  271:6
**relationship**
73:4 223:5
244:19 256:24
**relative**  338:13
339:10
**relayed**  316:15
**release**  50:12
**relevant**  248:5
**relied**  92:14
115:6
**relieved**  161:1
221:13 222:13
334:12
**religious**  187:8
**remain**  19:12
**remainder**
114:9 115:2
**remained**  257:2
289:10
**remaining**  72:1
72:2
**remains**  70:10
**remember**
16:24 17:2
29:3,4 31:21
34:17 47:4

97:14,25 111:8
111:11 113:9
123:13 124:11
128:12 131:11
134:3 137:4,5
140:4 145:19
161:2 163:12
165:4 166:25
171:5,22
178:12,21
185:2 186:16
187:9 201:3
206:22 209:11
237:18,20
243:19 244:17
244:23 245:1,7
247:6 251:15
264:23 265:15
270:7,8,21
273:1 279:25
283:4 303:2
314:15 319:11
320:12 321:14
322:10 324:20
326:5,18 334:8
335:6
**remembered**
131:10
**remind**  17:19
210:7
**reminded**
260:17
**remove**  50:12
259:3,17

**removed**
219:16
**reorganize**
77:14
**rep**  335:1
**repeat**  123:20
123:25 148:25
225:5 234:21
241:10
**repeated**  203:7
215:8
**repeating**
149:10
**rephrase**  9:17
9:18 33:8,25
42:14 45:23
63:11 67:11
89:2 166:20
259:14 262:4
**replaced**  327:2
**replacing**
326:25 327:5
**report**  27:4,7
27:18 89:24
90:5,11,13
91:3,11,19,22
92:18,20,23
93:10,12,17
94:6 98:8,10
98:12,14 100:5
101:1 103:5,7
103:15 107:9
107:16 110:4
110:13 117:3

130:21 131:6
133:23,24
134:15,20
136:23 137:23
140:24 142:12
144:16 196:21
196:24 200:11
201:8 202:2
245:13 277:18
294:19 334:3
**reported**  1:19
87:9 88:1,2
90:18 91:6
92:10 93:3
94:1,3 109:3
115:19 118:25
119:11 129:18
129:19 131:12
131:14 133:19
134:1,24 135:2
137:3,7 210:14
245:4 263:10
274:17 276:23
292:11
**reporter**  6:2,3
7:14,23 8:5 9:6
11:20 12:14
17:19,23 54:5
54:21,24
116:19,22
123:20,24
175:23 176:1
182:25 183:3
200:20,22

203:6,7,9
210:7,10 217:7
217:10 269:4,7
295:4,8 308:12
312:11 323:20
323:22,25
335:14 336:13
336:16,19,21
336:24
**reporting**  9:9
89:16,21 90:13
111:17 170:5
202:6 218:10
267:6 273:14
309:16
**reportings**
198:21,23
**reports**  79:11
80:16 86:13
88:5,7,10,12,14
88:15,18 89:3
89:8 90:8,20
90:24 109:24
110:18,21
120:13 134:12
141:12,15,22
142:1,5
**represent**
12:21 250:15
318:10
**representative**
12:20 328:7
**represented**
165:6 211:18

**reputation**
150:12 154:22
293:14
**request**  64:10
89:18 99:8
162:18 166:5
167:9,11,11
190:22
**requested**
122:20 131:17
183:14,22
203:8 307:4
**requesting**
98:20 99:6
**requests**  215:8
**require**  328:19
328:19
**required**  9:23
173:19 174:12
174:16
**requirement**
213:11 214:3,4
214:11 262:25
**requirements**
34:25
**requires**  109:5
**rescinded**
130:6
**reside**  13:6
14:19 22:1
**residence**  13:23
**residing**  13:15
**resign**  260:23

**resignation**
294:4
**resolution**
323:1
**resolved**  332:5
**resources**
143:3
**respect**  192:22
220:25 236:7
237:10 243:17
253:12 259:17
261:14 264:4
265:24 269:15
269:17,22
277:5 303:11
304:17 320:4
325:24 326:12
333:11 334:1
335:3
**respectfully**
183:14
**respond**  9:23
17:21 151:7
192:18 303:17
**responded**
89:21 264:14
306:3
**responding**
312:17
**response**  12:24
107:10 111:7
121:16 122:15
125:22 151:9
284:10 310:12

**responsibilities**
20:11,20 52:17
52:23 70:19
71:2 105:23
177:7 193:23
194:3
**responsibility**
54:10
**responsible**
53:21 60:2
93:1 104:25
112:8,11,14
120:9 126:22
127:1 312:16
**restart**  115:2
**restate**  144:7
147:25 165:18
223:17 230:4
267:8 271:21
283:25 315:13
**result**  90:12
104:11 118:21
143:21
**resulting**
141:22
**results**  27:13
90:6 91:4
103:18,18
118:19
**resume**  10:13
**retain**  257:25
258:11
**retained**  92:14
115:6 194:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| **retaining** 323:2 | 295:20,22 | 41:7,12 43:10 | 120:22 121:6 |
| **retaliate** 277:4 | 300:5 317:24 | 43:20,23,25 | 121:19 122:8 |
| **retaliated** | **reviewed** | 44:6 45:8 46:3 | 127:4,10,21 |
| 198:20,23 | 295:19 | 46:22 47:15,19 | 129:10,13,23 |
| 199:11 200:4,8 | **reviewing** | 47:21 51:10,18 | 130:18,21 |
| 202:5 213:17 | 170:17 | 52:9,13 54:4 | 132:1 133:13 |
| 219:21 273:14 | **revoked** 285:11 | 56:13,16 57:11 | 136:19 137:20 |
| 278:1 | **revolving** 35:10 | 57:13,18 58:18 | 137:23 140:21 |
| **retaliating** | **reyna** 137:4 | 58:21 59:7,11 | 141:5 143:15 |
| 203:23 322:17 | 264:19 | 60:5 62:5 63:2 | 143:21 144:20 |
| **retaliation** | **rhetoric** 162:19 | 63:8,21 66:2 | 144:20 149:5,8 |
| 161:23 201:19 | 262:15 | 67:19,21 68:19 | 149:17,23 |
| 217:24 | **rid** 285:15 | 68:24 69:16 | 150:3,7 153:3 |
| **retire** 112:25 | **ridicule** 210:24 | 70:8,12,18 | 155:2,10,16 |
| **retired** 113:5 | **ridiculous** | 71:13,17 72:13 | 158:3,8,8 |
| 144:3 260:16 | 310:12,16,20 | 72:17 75:20 | 159:6,8 160:24 |
| 260:19 262:13 | 311:2,4 312:17 | 77:5,24 78:1 | 161:4,8 163:7 |
| **retirement** | 312:22 | 78:13 79:1 | 163:12,20 |
| 221:23 | **right** 7:5,17 8:9 | 80:10,14 81:13 | 166:5 171:1,16 |
| **retro** 245:16 | 11:3,8 13:3 | 82:5,18 84:3,6 | 171:19,22,25 |
| 246:12 247:11 | 14:3,13,22,25 | 84:6 85:9,19 | 172:8,17 |
| **retroactive** | 15:2,7,9,15 | 85:23 86:10 | 173:15 175:15 |
| 62:9,16 64:4 | 17:14 18:19 | 87:7,21,25 | 176:11,25 |
| 204:10 | 19:20 20:5,19 | 88:7 92:12,17 | 177:24 179:15 |
| **return** 298:4,8 | 21:24 22:1 | 93:17 95:19,25 | 179:22 180:1,6 |
| **returned** 49:5,8 | 23:9,15 25:4 | 96:3,7,10 97:5 | 180:10,22 |
| 49:13 50:2 | 26:12 28:12,20 | 97:12 98:14 | 183:11 184:2 |
| 101:25 102:3 | 28:25 29:2,17 | 103:24 106:11 | 184:22 186:1 |
| 178:23 179:1 | 30:3,16,19 | 107:18 110:20 | 186:16 187:10 |
| 185:6 207:19 | 31:9,21 34:10 | 110:23 111:6 | 190:12,20 |
| **revenue** 18:7 | 35:12 36:3,4 | 111:12 112:11 | 191:3,6,10,18 |
| 35:25 121:4 | 36:16,21 37:1 | 113:3 114:5,9 | 195:1 196:7 |
| **review** 86:4 | 37:20 38:16,19 | 114:12,25 | 198:13 200:19 |
| 124:4 295:16 | 39:21 40:13,24 | 115:5,17 | 201:22 202:2 |

203:25 206:23
207:1,3,6
213:20 215:23
217:2,12
220:11,18
221:3 222:7,24
223:11 226:18
228:21 230:12
231:18 232:4
232:23 235:11
236:20 237:7
238:20 239:10
239:24 240:14
240:19 241:3
243:12 245:1
245:20 246:19
247:6 250:18
251:2 252:21
252:25 253:9
253:20,23
254:9,19 255:2
255:7,15,22
256:19 257:2,5
258:22 260:2
260:11 261:10
261:13 262:18
264:16 265:7
267:3,5,17
268:22 269:14
271:1 272:13
272:21 273:6
273:11 274:2,6
274:20 277:10
277:24 278:11

280:9,14,15,18
280:19 281:7
281:12 282:1
282:12 285:25
289:5,17,20
292:18 294:18
295:2,22
296:22 299:8
299:19,21
300:1,18,19
301:14,19
305:13 306:2
309:3,14
310:15,18
311:16 312:3
317:7 318:10
318:15,16
319:9,20
320:12,17
321:1,3 322:10
322:19 323:5
323:10,17,19
324:7,9,23
330:3 333:10
333:25 334:8
334:24 335:11
**rights** 87:11
90:16,17 91:5
119:4 133:20
133:23 134:1,3
134:16 136:23
137:24 140:25
141:2,3,4,13
142:16 144:5,8

169:13,19
195:6,7 196:11
197:23 198:3
198:11 210:14
210:19,22
211:10,22
218:24 263:7,8
265:7,9 276:17
276:22
**ring** 29:12
**ringing** 175:3
324:19
**road** 1:17 2:6
2:21 3:13 6:13
168:15 298:14
298:15 299:1,6
299:20
**rob** 237:22
**rock** 187:9
**roger** 2:19
10:10 55:24
56:2 163:13
**rogue** 202:13
202:20,22,25
203:1,22
**role** 29:12
127:7 191:22
193:25 194:11
219:25 252:19
253:16 255:12
305:10 311:1
**roled** 75:19,20
**roles** 252:25

**roll** 297:4
**room** 9:22 10:7
10:11 96:5,16
113:16,17,20
113:21 114:1,2
114:3,6 163:13
163:14 199:1
260:24 331:5
**rooms** 113:20
**rosco** 333:11
**roughly** 15:17
18:1 25:18
**round** 40:13
**route** 298:24
299:10,15,18
304:1
**routine** 38:4
330:17
**routinely** 38:2
**rowdy** 170:11
**ruben** 113:11
113:13 260:17
**rudimentary**
286:6
**ruin** 208:25
**ruining** 154:22
**rule** 5:12
152:11 296:1
330:22
**rules** 6:23 9:6
127:20
**rumor** 188:24
190:7

**run** 28:15 35:4
35:11
**running** 106:1
157:17 202:13
202:20,22
203:21
**runs** 91:14

**s**

**s** 2:1 3:1 4:9 5:1
5:21,21 6:1
128:21,22
145:24
**saab** 148:24
197:8 200:10
200:12,13,14
200:15 201:7
208:18,20,23
272:21 279:19
280:16 285:9
290:23 291:22
293:12 294:15
297:1,10 298:5
298:9 301:18
302:5,15 325:8
325:10,20,24
335:20
**saab's** 5:17
297:18,20
300:12 301:14
**safe** 80:8,10,12
80:22,25 81:4
140:1 260:13
260:14

**safety** 138:24
**saint** 14:7
15:22
**sake** 228:4
**salary** 47:8
48:17 49:2
56:17,21,21
63:3 70:23
76:2 222:11,18
222:20,21
224:17 227:9
227:16,18,19
**sale** 269:12
273:9 278:7
**sales** 109:3,6,12
109:18,25
110:2,8 111:17
112:8 270:17
271:3,14
273:15 277:18
309:18
**san** 14:10,11
17:8
**sanctions** 268:8
**sandwich** 304:4
304:5
**sat** 163:6,7,8,10
194:18
**saving** 80:3
**saw** 103:6,8
104:17 110:1
128:13 170:17
242:21 244:5
298:5 304:25

319:13
**saying** 124:11
152:14 153:14
181:19 188:7
200:4 201:7
203:20 211:7
219:6 221:14
221:18,19
227:21,23
241:13 255:23
268:18 270:13
271:25 272:2
273:1 279:24
280:10 284:25
292:15 303:8
306:24 307:15
318:13,24
319:12,22
320:5 321:15
**says** 161:20
183:22 189:24
190:2 213:1
225:18,25
226:9,15,19,23
227:6,16,17
232:1,19 248:5
248:22 249:4,6
249:15 287:22
294:18 297:1
302:5 311:16
312:16
**scenario**
121:14 137:21

**scene** 82:21
138:16 139:2,7
139:9,19 140:2
**scenes** 28:9
83:7
**schedule** 59:16
**scheduled** 48:2
325:9
**schedules** 79:4
**scheme** 119:2
129:16,20,24
130:9 164:20
274:7,23
**school** 15:21,22
16:17
**scrutiny** 211:9
**search** 132:17
**season** 30:25
40:22
**second** 44:21
45:9 55:11
60:19 94:16
133:2 135:21
166:13 168:1
168:18 176:19
230:22 245:17
249:4 258:4
303:15 317:23
321:17 335:12
335:13
**seconded** 249:7
**secrecy** 20:14
20:18

**section** 56:17
57:3 58:12
62:22 63:2
115:21 221:16
**secure** 260:15
**see** 32:12 44:16
56:18 61:2,7
61:21 63:14
87:15 91:19,22
92:15 100:1
103:4,10 109:7
115:7,21 119:6
129:3 144:22
145:19 155:14
169:17,18
171:4 176:17
189:22 204:25
206:12 209:22
212:20,21
216:7,17 217:1
223:9,10
224:13 225:20
227:2,13 231:7
231:8,12,13
232:21 243:10
245:9 247:13
248:5,7,22
249:1,16,23
250:1 254:4
256:3 276:19
277:20 278:14
283:16 285:15
287:15,25
294:16,21

299:1 300:8,17
300:19 301:6,9
301:12 308:24
310:6,10,13
311:10,20
314:18 317:21
319:20 321:10
**seeing** 90:5
103:7 174:1
185:24 246:4
251:15 270:8
**seem** 121:19
**seemed** 33:5
34:19 43:17,17
128:6,10
148:13 154:18
**seems** 30:19
37:20 110:1,14
132:5 173:15
**seen** 161:20
185:22 187:21
287:16 296:2
300:9,25
330:14
**segues** 182:9
**seizures** 276:10
**select** 316:16
**selected** 257:16
**semi** 235:9
302:23
**send** 97:1 143:4
143:13 193:10
232:24

**sending** 233:2
**sends** 276:11
**senia** 248:25
**sense** 179:19
277:8
**sensitive** 80:13
260:13
**sent** 193:11
228:23 307:14
309:7,11,11
319:14,17
**sentence** 223:2
224:13 225:20
250:25
**separate** 134:8
163:23 192:18
214:22 277:8
**september**
28:21
**sergeant** 74:17
91:8 92:5
105:19 134:5,8
136:19 137:18
138:5,9 162:7
162:13,15
164:11,19
166:7 167:15
202:3 211:4,4
211:8,8 243:14
243:14,17
244:12 245:2
264:12,16
319:6,6,6
321:8,10,19

322:5,12,20
**sergeants** 74:11
74:20 75:6
**series** 309:1
**serious** 311:17
**seriously** 307:3
**served** 165:24
**service** 18:7
35:25 36:17
121:4 167:3
221:23 257:12
257:14 335:2
**services** 4:11
4:16,21 23:6
33:11 34:3
43:8 52:6
58:21 73:1
74:23 75:12,18
83:23 104:10
109:16 111:19
157:13 177:17
179:7 220:12
220:17 230:18
251:23 252:16
258:1 259:19
261:23 283:10
283:22 284:3
284:14,18
285:3 290:21
290:23 291:4
291:12 292:6
293:5,6 326:8
328:19

**session** 101:7,9
101:11,14,18
101:25 223:8
266:11,14,17
267:22,25
268:9,20
**set** 47:12 58:15
59:16,16 61:21
63:4 186:25
227:12 228:13
233:23 250:5
300:9
**setting** 222:20
**settled** 10:4
**seven** 74:14,25
145:3 196:2,3
**several** 16:20
17:3 24:7
25:12 27:16
29:1,6 40:6
130:13 164:18
212:14,16
219:5 264:15
264:18 274:11
319:2
**severance** 72:6
72:7,12 174:17
174:18 221:6
221:14,19
222:1,9,12
**severe** 283:5
**sexual** 244:8,14
244:16 245:11

**shahverdian**
339:2,15
**share** 69:17
121:6
**shared** 22:5
42:4
**sharing** 56:7
**shell** 261:2
**shenanigans**
137:9
**shift** 138:12
**shocked** 167:4
167:12,14,25
302:25
**shoddy** 128:16
**shokr** 245:3
**shores** 14:7
**shortly** 28:11
112:25 113:5
144:2,3
**shotgun** 199:5
201:23 202:6
**show** 5:13
138:14,15
148:8 160:5
170:10 267:25
296:1 298:24
306:15 320:21
323:15
**showed** 155:15
304:22 319:16
**showing** 132:15
315:6 319:7

**shown** 11:7
**shows** 150:4
273:13
**sic** 51:7 145:24
**sick** 221:9,20
222:1 227:11
228:9
**side** 168:18
244:1 300:18
**sign** 212:3,10
212:15 249:12
254:10,16,20
254:22 255:4,8
255:15 256:2
296:8
**signature**
176:22 180:4
296:5,6 337:1
338:16 339:14
**signed** 62:11
175:8 188:6
327:7,10,12
**signer** 290:8,12
**signing** 64:4
70:6,13 255:23
256:1 296:12
**signs** 299:13,16
**silence** 81:22
**silliness** 155:8
**similar** 10:23
26:22 70:25
125:17 241:20
301:4,24

**simplify** 157:22
**simply** 11:12
71:10 297:9
**singer** 187:8
**single** 336:7
**sir** 124:1
144:23 149:6
160:7 229:3
230:23 231:9
231:12 248:18
307:22 309:2
311:5 315:5
317:4
**siren** 82:5 83:2
83:4 235:18,24
237:11
**sirens** 83:9
235:11 236:17
236:22
**sit** 77:2 179:24
180:18 207:13
**sitting** 94:16
128:12,24
205:22 250:3
331:5 334:3
**situation** 219:2
219:9 243:13
244:11,12,14
263:16 265:5
273:18 289:22
304:14 305:6
333:23
**situations**
219:18 265:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**six** 1:17 2:6
6:12 14:12
15:17 61:10
62:10,10 64:4
74:7,14,16,25
163:12 196:3
212:5 270:11
270:12 277:8
286:6 312:13
**skills** 32:21
182:6 338:10
339:6
**slight** 76:15
**slow** 17:20 54:5
297:8
**smart** 240:15
**sole** 238:21
**somebody** 35:4
111:16 130:4,5
131:20 144:18
171:15 208:10
209:17 211:17
233:16 285:14
316:17,18
321:19
**son** 22:9 331:14
**soon** 31:22 53:5
103:25 201:14
285:9
**sorry** 28:17
31:9 32:4 47:6
52:20 55:4
61:6 62:1
67:21 71:4

73:20 107:5,14
108:15 125:2
142:15 144:5
155:20 160:7
160:21 165:10
165:21 166:19
169:8,9 175:20
180:18 185:18
194:20 198:9
200:14 203:15
206:1,16,24
210:9,11
217:12 229:23
242:3 287:4
288:13 291:17
291:17 297:16
298:21 307:21
308:14 324:12
335:17,25
**sort** 16:22
126:14 153:20
221:6 240:2,19
243:16 244:13
245:11,21,22
257:17 259:16
263:13 264:3
299:4 304:23
**sound** 97:21
114:15 247:24
**sounded**
322:13
**sounds** 112:7
251:20 322:11

**source** 188:24
188:25
**south** 298:4
326:14
**southern** 1:3
**speak** 94:10,12
95:5,22,25
96:3,12 109:19
111:12,15
122:16,18,22
123:2 150:5
155:25 156:1
159:17 172:8
196:13 197:6
197:11 208:20
210:8 218:5,16
219:19 240:5
297:4 304:13
304:20 319:12
319:14 321:4
**speaker** 55:10
189:25
**speaking** 113:2
148:9,17 149:4
152:7 178:11
181:24 197:13
218:11,17
269:21,24
274:20 315:9
321:2,2
**speaks** 182:12
**spearheaded**
328:8

**special** 18:15
18:23,24 19:1
19:6 20:1,12
24:20,24
**specific** 59:11
59:14 98:5
130:6 157:16
197:21 236:8
254:14 279:10
317:11,23
318:1
**specifically**
23:14 66:10
88:9 100:1
115:12 124:11
213:1 215:1
232:8 233:14
243:7 264:23
277:9 279:17
285:1 317:2,21
321:6
**speculation**
263:2 284:20
301:11 302:9
305:21 331:8
**speculative**
152:20
**speed** 297:7
**spell** 8:6 145:20
146:5 237:23
**spelled** 28:13
**spent** 20:17
**spew** 154:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

spewed   262:15
331:22
split   75:20
136:16
spoke   33:11
34:23 76:9
94:7 96:10,23
109:10 121:13
160:1 169:20
172:11 200:1
215:11 263:23
269:18 275:18
275:24 276:3
285:18 295:15
316:4 319:21
spoken   156:22
167:8
sponsored
238:8
spread   76:2
squad   236:12
st   30:1
staff   26:25
27:11 33:8
59:25 111:23
136:15 176:23
177:1,2,5,15
179:2,5 252:22
253:10,24
254:1,2 289:24
staffed   33:11
33:16,18
stage   140:3

stalking   200:10
207:7
stamp   308:25
309:4
stamped
176:20
stamping
248:13
stamps   309:2
stand   9:20
107:12 154:19
311:12 312:19
312:25
standards
205:6,15,24
206:3
standing   59:7,9
66:8
stare   297:5
start   17:16,21
34:5 37:15
40:17 41:15
45:2,4,6 82:11
103:24 105:1
111:5 119:11
177:24 201:19
202:10 203:11
203:19 217:16
270:6 274:16
277:25
started   18:23
19:5 35:15
40:14 72:20
74:3 77:21

80:3 92:6
103:2 104:23
113:1 122:2
124:22 127:4
137:20 140:22
155:3 160:21
170:20 186:13
186:24 187:6
188:1 199:9
201:13 243:19
256:15,23
322:19 327:3,6
331:15
starting   20:25
44:4,12 45:1
51:6 102:10
120:8 121:11
128:3 141:9
263:12 277:2
starts   248:15
308:8 309:7
310:5
state   13:24
16:6,16 17:14
21:18 35:18
70:24 87:13
88:17 97:9
110:7,8,10
119:2,13 120:2
120:3 126:16
126:24 141:14
159:19 170:22
189:18 197:1
200:2 209:18

215:10 239:16
269:23,25
275:4 306:1
338:19
stated   9:7
11:12 12:18,19
62:6 99:22
101:18 120:14
159:10 178:5
183:17 214:16
218:14 272:24
273:7,17 292:2
311:12 325:22
statement
12:16,18 69:15
73:14 124:14
132:1 151:13
152:5 156:17
156:20 157:1
158:8,13,15
160:18 166:12
168:4 211:16
262:21 271:5
273:25 279:14
284:8 296:24
312:18,19,22
statements
86:12 146:13
147:7,14 148:2
148:4,7,19,21
152:6 159:12
159:15 161:5,9
202:8 203:21
210:25 216:11

[statements - supplement]                                              Page 73

216:12 242:21
264:6 278:15
278:20,21,22
296:18 313:1
334:11
**states** 1:1 22:4
87:8 89:22
92:9 109:2
222:23 248:6
297:23 335:20
**stating** 209:20
218:22 255:3
322:15
**stationed** 14:18
**status** 59:15,24
138:8
**statutory**
311:20
**steal** 28:14
**stealing** 28:7,8
**stellar** 21:5
**stenographic**
6:25
**step** 125:1
160:20
**stephen** 2:4
7:11 325:1
**steps** 125:19
**stick** 29:8
**sticker** 175:24
**sticky** 117:25
118:11,17
**stint** 15:16

**stipend** 58:14
63:4
**stipulate**
283:12
**stipulation** 7:1
**stolen** 28:15
**stonewalled**
122:3,13,13
**stop** 10:3 12:13
114:15 155:7
299:12,13,16
**stopped** 155:18
156:2,7 272:12
**stops** 82:24
**stories** 151:2
**straight** 94:21
110:3 132:8
**strange** 151:12
**street** 297:3
298:3,5
**stretch** 269:2
**strike** 8:19
14:17 20:23
42:8 46:18
57:18 60:8
64:9 67:3
76:13 90:6
102:11 106:21
108:22 109:22
115:23 117:9
122:17 125:2
126:22 127:14
128:17 139:8
139:11 141:20

153:4,10
155:17 159:21
161:14 162:11
163:1 173:11
174:9 178:9
190:13 194:9
202:18 204:5
213:15 215:25
**string** 250:11
306:23 317:1
**struck** 245:10
**structure** 305:1
**stuck** 118:17
**stuff** 108:5
181:12
**stupid** 279:4
**subject** 39:19
60:16 66:18
115:19 116:4
117:4 136:9
169:16 277:11
**submit** 294:4
**subsequent**
58:2
**substance**
229:8
**substantially**
34:12
**substantiate**
125:21 243:8
**substantiation**
124:19
**substantive**
151:19

**sudden** 303:1
**sued** 331:25
332:3
**suggest** 240:14
244:8,15
**suite** 1:17 2:6
2:14 3:13 6:13
**sum** 48:21
224:16 227:8
229:8
**summer** 202:1
**sunday** 325:25
**superman**
99:10
**supervise** 52:9
52:11,14 73:1
140:7 149:17
**supervising**
194:11
**supervision**
138:20,23
330:11
**supervisor**
17:13 19:16
52:7,18 126:4
126:7 160:14
161:25 162:4
**supervisor's**
234:11 237:20
**supervisors**
233:19 235:2
249:10
**supplement**
98:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

support   5:11
23:6 33:10
34:3 43:8 52:6
58:21 73:1
74:23 75:9,12
75:18 83:23
104:10 179:6
230:18 251:23
252:15 257:25
259:18 261:23
283:10,22
284:3,14,18
285:3 290:21
290:22 291:4
291:12 292:6
293:5,6 296:1
307:3 326:8
supportive
109:16 111:19
157:12 177:17
supposed   12:19
112:3 227:22
227:23 266:16
294:24 298:13
302:20 319:1
supposedly
302:22,25
326:2
sure   23:18 33:8
33:9 34:1,16
42:15 45:24
47:2,12 51:21
54:19 63:12
66:15 67:12

72:5 73:22
79:12,18 81:5
83:3 98:17
118:13 129:12
133:15,15
138:10 139:3
157:25 162:9
166:21 168:6
175:19 188:15
198:6 199:21
199:22 207:20
224:25 230:9
232:6,25
239:17,20
240:8 241:17
246:9 251:9
255:1 268:21
268:25 271:10
273:10 277:13
299:17 303:9
308:9 309:13
surrounding
169:24
surveys   260:7
suspected   87:9
88:1
suspend   285:13
swear   7:15
swearing   9:7,8
switching   92:8
swope   1:5 2:2
6:7 44:22,24
45:6 65:19
67:2,5,13 73:1

73:10 117:11
117:20 118:3
118:18 130:1,7
131:15 132:8
132:16 134:2
134:13,20
137:10,15
142:7 163:7,8
163:17 164:2
170:16,18
172:13 192:13
192:16 202:4
216:22 232:10
243:22,23
244:1 245:5
269:19,25
274:21 275:2,8
308:20 322:2
323:3
swope's   73:5
116:8 246:2
sworn   6:17
7:20 238:12
338:5
sycon   319:6
system   92:11
114:10 115:4
115:10,20
116:5,10 117:5
119:22 124:17
130:10 132:15
133:17 186:18
236:11,15
250:14 261:2

266:8 267:11
268:2 274:3,22
276:8 309:18
319:18
systems   37:6,10
37:11 99:4
238:15 239:1,6
239:8,12

t

t   3:4 4:9 5:1,21
5:21 94:20
table   10:19,20
101:4 173:23
tabled   171:23
172:14 173:17
tail   178:22
179:18
take   6:4,14
10:1,17,19
15:2 28:21
29:21 54:16
56:16 57:16
63:12 74:15
78:2,5,7,13
79:7,10 80:21
81:22 96:15
97:24 117:16
117:23 131:25
132:21 135:19
150:25 160:20
162:22,23
165:8 168:14
168:17,21

169:2 170:12
176:5 186:17
195:22 196:17
199:3 215:5
217:4 218:18
222:4 228:2
231:24 234:6
281:3 287:22
289:15 297:6
299:11,18
303:24 307:3
315:24 323:18
324:6
**taken** 5:16 6:7
6:11 8:10 9:3
16:20 125:19
219:15 279:16
300:12 338:3
338:12 339:9
**takes** 265:14
**talk** 22:11,14
46:17 60:1
101:2,8 120:25
131:20 148:15
151:21 159:20
159:24 160:4
178:15 181:25
203:16 258:19
259:2 266:21
285:8 323:18
326:3
**talked** 32:16,17
96:21 136:11
193:14 210:13

217:18,24
263:21 264:5
309:14 327:22
**talking** 9:15
24:4 72:11,15
117:2 118:1
128:12 148:10
148:14 174:19
174:20 186:20
203:19 209:24
222:18 241:2
277:10 312:5
314:8,19
317:22 326:24
**targeted**
189:18
**targeting**
189:14
**tarik** 3:11 7:8
286:24 308:10
323:18 331:4
**task** 26:24
211:5 322:6
**tasks** 177:21
**tax** 20:13,17
38:20 333:2,3
**taxes** 38:11,13
38:21,23
**teach** 111:18
**team** 37:7
59:12 73:13,16
73:22 77:12
117:16 127:5

**teamed** 110:6
**teams** 59:19
**technically**
15:6,10 18:25
36:16 50:3
53:9 244:22
**teleconferenc...**
186:18
**tell** 7:21 32:20
43:16 46:9,12
46:13 66:10
94:18 105:25
110:17,20
115:13 120:17
131:21 178:20
186:21 197:10
198:10 208:13
208:16 209:21
211:25 220:5
250:24 280:25
286:11 301:2,5
312:12 327:20
329:9
**telling** 110:25
179:3 183:24
228:18 311:1
327:5
**tells** 29:23
31:16 291:13
**tem** 273:3
**temporarily**
80:19
**temporary**
294:20,25

**ten** 109:6
**tenant** 333:7
**tends** 208:25
**tentative** 249:7
249:21,22
250:6 323:7
**tenure** 236:4,18
257:3
**term** 57:20,23
58:6 60:25
61:9 70:14,15
71:10 139:2
164:21 172:16
175:11 201:13
241:4 253:13
271:23
**terminate**
223:4 224:15
227:7 229:21
230:6
**terminated**
194:25 226:10
226:17,20,23
285:10
**termination**
71:24 220:3
229:10
**terms** 61:16
68:25 99:22
143:9 221:5,25
222:8 233:22
236:21,24
238:2 259:3
266:20 268:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

275:3 276:25
277:24 289:17
292:12 297:1
298:16 309:15
311:1 316:2
320:20
**terroristic**
20:15
**test**  166:10
168:15,25
169:1,2,3
**testified**  7:22
190:14 231:14
233:18 234:18
237:15 251:22
260:12 261:7
273:12 278:13
314:25
**testify**  252:3
302:16 319:4
319:25
**testifying**  241:8
314:10,16,17
314:17 317:20
338:5
**testimony**
51:22 109:12
164:23 167:19
167:19 184:10
209:7 213:22
215:18 230:15
231:22 233:10
235:4 240:23
242:2,7,12,15

246:11 252:1,4
254:11 266:10
270:22 274:10
274:12 276:22
277:22,22
292:23 301:11
307:11 314:1
314:20 316:7
320:15
**texas**  15:10
**thank**  8:9 13:2
17:23 54:15
55:12,25 56:7
62:3 72:17
116:25 123:24
149:8 176:1
177:13 183:3
192:25 200:22
203:10 204:1
210:10 220:21
287:9 295:11
308:13,13,22
324:24 326:3
333:6
**thanks**  56:2
307:1
**thanksgiving**
31:1
**thefgfirm.law**
2:8
**theft**  29:12
**thing**  25:3
46:14 99:19,19
110:10 117:19

117:24 137:14
150:9 154:2
165:5 167:5
177:23 200:13
208:19 237:10
272:1,2 275:2
305:16 312:16
316:14 318:2
**things**  32:10,22
34:20 57:4
78:23 99:23
108:4 121:18
137:18 150:23
157:5,16,19
158:1 164:20
189:17 202:7,9
207:15,15
213:25 214:1,7
214:14,14
216:18 218:6,7
218:12,15
219:12,15
244:5,14
250:21 256:20
268:14 271:18
271:18 277:1,5
278:2 279:11
279:20 306:12
306:15,18
309:15,16,20
310:25 315:9
315:25 330:17
**think**  14:8 18:1
21:15 45:11

46:13 48:4
61:3 69:10
74:7,14 76:9
77:5 79:9 84:7
84:12 93:10,10
96:21 100:3
105:4,20
123:12 126:13
126:19 128:22
129:13 136:11
136:14 137:3
137:15 142:3
144:14 150:7
153:9,25
158:17 160:18
160:19 161:1
163:13 167:4
171:5,6,14
172:3 173:1
175:4 184:6
191:22 192:10
198:25 205:2
207:2,6 208:20
209:25 214:25
217:18 223:24
233:18 236:14
240:11,12,12
241:15,19
242:19,23
247:5,7 248:3
259:7,7 260:15
260:18 265:20
266:21 267:18
268:12 270:21

271:4,15,22
272:2,3,7,11,13
272:25 273:17
273:19 274:24
274:25 276:7
276:13 281:19
286:24 303:3
305:11 309:24
310:15,18,24
321:23 322:10
324:6,19,23
327:1 330:8,9
331:21 332:7,7
332:13 334:13
**thinking** 34:14
101:23
**third** 97:19
98:2 103:8,15
107:8 108:8,9
123:7 163:9
164:2 168:1
194:19 310:3
311:18,22
**thirty** 169:9
**thomas** 31:7,7
31:16 34:24
43:6 102:24
260:7
**thought** 43:14
65:13 91:7,8
91:13,15 97:21
98:3 131:10
134:5,6 135:7
135:20 141:1

141:10,18
154:3 160:11
163:9 167:1
171:18,21,23
174:25 175:1,1
240:22,25
241:4 247:4
307:23 308:14
321:23 324:17
332:10 335:1,4
**thoughts** 43:15
**thread** 176:16
308:5,7
**threaten**
147:11
**threatened**
145:5 147:24
154:14 162:12
**threatening**
150:20 297:7
**threats** 161:22
**three** 13:10
15:1,8,12 24:9
24:11 25:16,23
25:24 26:2,19
28:9,18 29:23
30:20 35:21
44:13,18 49:22
50:12 75:7
98:3 104:16
125:14 145:18
160:5,5 162:17
162:17 163:15
163:16,21,21

163:23 168:13
170:10 194:16
217:3,5 225:18
271:11 300:5
318:20 324:6
326:14,21
328:19 329:16
329:19
**throw** 264:22
**throwing** 188:1
**thrown** 108:4
**thumb** 98:15
**ticket** 115:20
116:4,10 117:4
118:2,15 119:2
129:16,19,24
130:5,8,10,12
130:17,23
131:7,8 274:3
274:7,22,23
309:18
**ticketed** 303:22
**ticketmaster**
186:2,19 187:4
187:7
**tickets** 130:3,14
130:18,22
131:17 187:4
187:12 274:11
305:16
**tifa** 333:2,5,7
333:11
**tiger** 40:15

**till** 227:25
**time** 1:15 7:3
9:15 10:9
11:20 14:4
15:17 20:17
22:2 24:10,14
25:16 27:17
29:4,7,15
30:19 31:25
32:15 33:11
34:9 35:15
36:17,24 40:10
43:7 44:10
47:17,22 49:1
49:23 50:16,18
62:10,14,23
66:9 72:2 74:2
75:21 76:3,7
76:16 79:22
81:7 90:3
91:25 93:19,22
96:12 103:1
104:1 105:13
105:20 106:2
106:10 108:11
108:15,21
110:1,14 113:4
118:8 121:8
131:19 134:5
135:15 138:14
143:11 144:22
144:24 145:21
148:6,13
155:24 156:9

| | | | |
|---|---|---|---|
| 156:12 161:6 | 296:11 298:4 | 254:1 | **tone** 309:24 |
| 163:24 164:2,7 | 303:23 304:10 | **titles** 19:1,2 | **tones** 215:12 |
| 164:12,17 | 305:11 311:6 | 52:13 | **took** 17:3,5 |
| 165:4 166:13 | 312:12 315:3 | **tobacco** 36:1 | 34:11 49:20 |
| 168:1,5 170:15 | 315:15,18,19 | **today** 9:8,10,21 | 50:11 51:2 |
| 170:19 171:8 | 316:16 318:5,5 | 11:12 81:16 | 78:12,21 |
| 171:21 173:3 | 319:11 320:9 | 98:19 133:3 | 125:25 132:19 |
| 174:4,9 183:10 | 320:10,19 | 188:21,22 | 145:5,11 |
| 186:5,8,12 | 321:9,14,17,24 | 205:22 207:13 | 150:18 155:8 |
| 193:14 196:13 | 322:24 327:12 | 250:3 285:22 | 183:24 186:14 |
| 199:18,24 | 328:10 334:15 | 295:14,21 | 192:14 194:10 |
| 204:4,8,16 | **timeline** 206:23 | 298:25 307:22 | 240:24,24 |
| 205:6,11 | 207:3,5 | 309:15 | 241:7 243:25 |
| 206:22 207:1,2 | **timely** 51:12 | **today's** 98:20 | 244:1 263:17 |
| 207:25 210:8 | **times** 8:22 | **together** 40:5 | 266:14 274:17 |
| 211:13 212:12 | 44:13 54:17 | 41:11 45:13 | 281:9 289:23 |
| 219:24 221:3,9 | 96:11 148:6,17 | 73:8 91:14 | 290:4,6 298:3 |
| 221:10,10,21 | 160:3,5,6 | 135:22 137:5 | 307:15 |
| 222:1,16 223:5 | 162:17,18 | 138:3 224:17 | **top** 38:18,22 |
| 224:18,19 | 163:21,21 | 227:9 | 78:10 91:10 |
| 226:20 227:10 | 167:5 171:16 | **told** 50:4,9 | 97:21 131:11 |
| 227:10 238:10 | 179:14,21 | 71:18,19 100:4 | 134:11 136:6 |
| 244:6,19 246:5 | 189:13 225:18 | 110:23 111:1 | 147:17 163:13 |
| 246:12 247:1,2 | 235:20,23 | 120:17 132:10 | 175:2 198:12 |
| 247:8 256:15 | 236:24 237:3 | 147:20 186:10 | 198:25 199:10 |
| 257:25 258:18 | 237:11 244:13 | 195:9,11 | 205:2 207:16 |
| 258:20,22 | 279:5 318:20 | 196:15 197:7 | 245:7 248:13 |
| 260:15,15 | 324:4,6 331:17 | 209:2,9 216:18 | 250:2 251:1 |
| 265:14,22 | **tire** 199:6,7 | 219:14 220:10 | **topic** 156:1 |
| 270:7 272:12 | **title** 18:14,16 | 305:3,5 325:10 | 317:8 |
| 276:24 281:17 | 19:8 20:14 | **tom** 195:12,25 | **total** 44:13 |
| 285:14 291:25 | 53:12 65:11 | 196:7 209:5,10 | 74:14 119:21 |
| 292:4 293:8 | 135:9 161:12 | 333:11,13,15 | 228:2 |
| 294:4,24 | 194:15 214:18 | | |

totals 75:10
tour 104:14
toured 104:18
104:22
toward 77:20
77:21 181:2,17
towards 110:15
town 187:13
325:22
township 14:7
track 17:2,10
236:17 265:3
traffic 82:16,18
82:24 83:5
118:8 243:20
244:6
trail 327:18
train 108:8
180:3
trained 179:17
179:22
trainee 19:9,10
training 35:23
35:24,25 36:1
105:6 107:1,25
108:12 112:17
127:19 129:10
129:12
trainings 105:9
107:5,21 108:6
127:13,15
180:1,19
traits 32:21

transaction
124:18 331:16
331:19
transactions
124:10,21
125:20,21
212:21,24
213:19 255:20
256:3,6
transcriber
339:1
transcript 6:19
9:11 209:22,25
241:23 303:16
336:14 339:3,5
transcripting
9:9
transcriptionist
338:8
transferred
17:12 242:20
transition
289:11
translated
183:18
transpired
243:9
traveling
325:11
treasurer
126:13 178:1
180:23 189:14
191:4 199:19
214:25 215:12

255:3 275:16
treasurer's
49:6 122:4
219:3 256:10
treasury
199:20
treat 215:4
treated 22:16
150:14 184:24
211:14 215:2
216:8 263:22
293:4,5
treating 264:7
treatment
161:25 166:2
202:8 216:21
264:19
tree 279:4,9
306:5 324:17
trees 84:7
trial 5:4 92:13
114:12 115:5
319:8
tribal 21:18
tried 84:3
121:24,25
124:9 150:25
206:22 208:20
259:6 284:9
285:13 318:19
trip 298:8
true 189:10,11
246:10 254:21
258:18 278:17

338:9 339:5
trump 239:18
239:25 240:2
truncated
214:19 218:13
291:19
truth 7:21,21
7:22
try 25:13 104:6
104:20 126:6
139:14 218:9
219:24 264:1
266:4 275:20
275:21
trying 32:22
33:4 34:21,21
122:3 123:12
125:20 207:2,5
207:5 218:11
242:25 267:17
268:11 275:16
284:24,25
285:14 293:2
317:21 329:21
tt 3:15
tuesday 1:14
tunisia 239:15
239:19
turfe 3:11 7:8,8
11:1,4,15,21,25
12:6 84:15,18
84:24 85:2,8
114:23 325:8
325:10,13

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[turfe - understand]**                                                    Page 80

327:14,16,19
327:20 331:3,5
331:14 334:1,4
335:12
**turfe's** 331:1
**turn** 70:3 80:18
86:25 122:3
144:20 183:12
222:24 248:9
266:2 294:11
297:8
**turned** 81:5
117:19 118:3
118:17 186:11
188:12 280:23
304:18 315:20
315:25
**turning** 137:14
230:21 296:22
309:23
**twardzik**
324:10
**twenty** 21:25
145:3 160:21
290:5,5
**twice** 171:18
**two** 18:1,3
19:11,19 24:9
24:11 25:15
26:2 28:9,18
30:20 31:15
37:19 40:14,21
40:22 44:13,18
75:6,8,21 84:9

93:22,24,25
94:1 97:7 98:3
107:6 113:20
125:14 131:10
132:2,9 134:3
135:18 136:8
136:14 137:11
144:15 155:6
168:13 169:9
185:9 188:6,18
188:21 217:5
243:13 247:6
264:23 269:1
286:8 288:16
289:14,18
293:8 319:14
326:20 327:1
330:13
**type** 16:11 19:7
59:24 60:8
74:8 80:14
118:13 137:16
177:3 221:23
243:10 284:9
305:1 317:13
**types** 59:17
79:2 127:16
254:14
**typewriting**
338:7
**typical** 47:2
**typically** 81:23
101:25 139:12

**typo** 288:11
**typos** 288:16

**u**

**u** 5:21,21 8:8
94:20 108:17
146:3 177:10
177:11
**u.s.** 42:23 47:20
87:13 135:14
135:20,23
239:18 265:9
**ultimate** 220:3
**ultimately**
122:24 137:19
**unable** 122:9
293:23 314:11
**unaware**
100:18
**uncommon**
25:1,2
**uncovered**
118:3
**under** 6:22
58:6,9 63:8
68:4 70:19,21
71:13 72:9,13
115:20 162:1,4
173:19 174:12
174:16 205:23
206:2 234:8,11
237:5 243:20
246:7 258:15
262:12 271:23

271:23 282:18
296:19
**underlying**
19:7
**understand**
6:18 9:17 33:7
36:6 51:22
57:7,22 64:25
65:4 67:10
68:18 69:9
70:23 73:10
76:23 78:4
81:10 83:19
88:25 96:10
107:21 121:19
124:11 125:20
127:20 131:4
139:4,16 140:8
145:6 147:2
153:14 155:22
157:9,13,18
158:6 164:25
180:21 186:7,9
203:16 223:20
225:3 226:6
232:14 236:2
238:16,17,20
241:2,12 242:1
247:17 254:11
255:11 256:13
265:1 268:11
274:12 275:17
275:22 280:1,3
280:5,21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                         586-468-2411
www.veritext.com

282:13 285:1
288:9 299:11
299:14 313:7
321:1,5 326:7
326:23 329:24
334:15
**understandable**
192:19
**understanding**
35:12 52:3
65:22 66:4,15
66:23 68:11,24
71:9 89:8
102:18 105:24
109:22 128:7
128:25 129:24
137:22 165:12
165:20,25
170:7 180:16
202:17,19
214:21 233:22
242:10 247:18
250:6 258:20
258:24 269:18
277:21 282:7
**understands**
129:14 223:3
225:2,19
**understood**
9:19,24 10:21
10:22 11:2
32:11 54:6,18
57:20 165:16
180:17 184:16

224:5 242:24
253:3 256:19
274:10 289:22
292:10 296:15
296:18
**undue** 210:24
**uneducated**
128:1 181:15
**unexpected**
5:19
**unfairly** 22:16
**unfortunately**
22:9 34:22
91:13 297:22
326:6
**unidentified**
55:10 189:25
**uniform** 35:7
58:13
**uniformed**
243:21
**uniforms** 58:15
58:19 63:5
**unintelligible**
157:21 183:20
**union** 64:14,15
65:19 66:18
178:14 179:3
233:20 235:2
246:17 260:19
323:13 335:1
**unions** 70:25
71:1

**unit** 65:23 66:5
66:17 76:16,19
77:2,7 235:1
**united** 1:1 22:4
335:20
**university**
16:21
**unmarked**
84:24
**unpaid** 185:5
**unprofessional**
5:19 182:3
**unreported**
170:15
**unsubstantiat...**
216:12 293:13
293:21
**unsure** 27:6
**untimely** 51:16
**untrue** 151:1
**untruths**
331:22
**unused** 224:18
227:10,11
228:6,9
**unverified**
208:23
**updated** 61:14
77:15
**updating** 60:9
**upset** 323:12
**use** 72:4,5
82:15 108:8
120:5 124:17

139:2 175:1
202:22 236:3
248:12
**used** 82:20
127:17,17
143:9 235:14
235:17,21,24
236:18,25
237:3,11 241:4
241:16 261:3
**uses** 6:21
**using** 48:6 72:5
72:8 143:8
236:22
**utilization**
120:6
**utilize** 48:13
57:7 58:19
80:10 82:10
83:2,4,9
**utilized** 170:13
**utilizing** 220:1

**v**

**v** 1:8 8:7 69:21
69:22 128:21
128:22
**v4** 84:11,14
**v5** 176:3
**vacation**
224:18,18
227:10,10
228:6

**vague**  67:8
68:6 88:22
128:5 183:20
278:4 301:11
**valid**  310:13
311:7
**validate**  256:4
315:14
**valkenburgh**
128:13,14,17
**vanderplow**
1:5,13 2:2 4:14
4:19,24 6:7,8
7:13,13,16,19
8:3,10 13:5
55:3 69:22
72:19 85:23
117:2 150:23
150:25 193:2
202:13 217:15
220:24 261:9
269:11 287:23
294:19 300:1
308:15 324:3
325:5,19 326:3
336:3
**various**  59:10
80:13 88:17
114:7 119:5
122:3 124:9
133:20 137:8
151:2 159:16
181:7 192:14
199:4 207:3,8

207:8 211:4
275:16,19
278:15 279:1,5
309:16 315:25
328:17
**vastly**  182:1
212:8
**vault**  80:20
81:6 92:24
97:11 98:6
104:14,18
105:13,22,23
106:8,17 107:2
108:24 112:15
113:23 115:11
123:8 260:25
**vaults**  100:16
114:2
**vehicle**  29:11
82:2,20,20
199:6 201:23
235:5,7,9,21,24
236:3,7,8,25
237:11 297:3,8
300:18,18,22
301:3,7,21
302:6,15,17
**vehicles**  28:7
236:1
**vendor**  53:20
328:12
**vendors**  328:24
329:6,9,14,16

**venegas**  145:20
150:1 152:7
318:1
**venue**  187:16
**verbal**  95:19
132:14
**verbally**  218:12
**verification**
47:2
**verified**  50:10
54:13 334:10
**verify**  137:13
189:12 315:3
**veritext**  6:4
**versa**  99:20
**versus**  128:8
**vet**  315:4
**viable**  163:25
240:12,13
285:15 322:14
**vice**  99:20
**victor**  8:7
**video**  5:16
171:4
**videos**  151:17
**videotape**
210:4
**view**  212:20,24
259:12,16
**vince**  145:19
320:21
**violated**  137:24
141:3,3 195:6
195:8 196:12

198:3,11
210:23 211:10
313:8
**violation**  88:17
109:5 134:4,16
134:20 136:23
141:13 143:22
169:13,19
211:21 304:24
311:19
**violations**
20:17 87:9,10
87:12 88:1
89:23 90:16,18
91:6 119:4
133:20,23
134:1 140:25
141:13 144:4,5
144:9 276:17
276:22 303:20
306:3
**violent**  21:19
**virginia**  13:17
13:18,21 15:6
15:14 324:16
**vision**  48:3,7
57:5,9 63:18
**visiting**  136:2
**voice**  183:15,23
184:15
**voiles**  128:17
128:17,20
**volunteering**
224:25

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
www.veritext.com

**vote** 180:9,13
195:14,25
196:4,7 212:6
290:4,7 307:4
313:20
**voted** 172:17
212:5 286:5,8
286:9
**votes** 196:3
**voting** 243:7
**vs** 6:8

**w**

**w** 8:7
**wages** 223:7
**wait** 17:20
241:22 286:23
335:12
**waited** 201:8
201:15,18
**waiting** 290:1
**waived** 337:1
**walk** 318:4
**walked** 193:22
279:25
**want** 11:4
17:19 34:14
51:21 54:19
72:4 73:18
89:2 117:5
125:3 140:10
143:5 151:8
156:25 162:23
166:12 175:20

195:20 199:22
210:7 217:15
219:12 222:11
241:17 264:22
267:10,13,19
268:1,7,23
271:9,10,14
272:5 277:20
278:14 283:3
294:9 299:18
308:1,10
316:12 320:17
323:12 326:3
**wanted** 70:14
130:5 143:12
164:8 165:5,9
165:13,21
166:14 169:4
185:17 211:17
263:8 271:2,7
271:21,22
321:10
**wanting** 322:4
**washington**
15:6 238:4
**watch** 172:25
271:10
**watched** 54:13
173:1,3,3,25,25
**water** 194:16
**way** 9:14 69:17
72:5 103:16
117:7 136:16
146:15 150:12

150:13 154:7
170:16 215:3,4
224:2 233:7
234:6 236:10
237:7 247:15
259:17 267:18
270:21 273:11
281:7 283:13
283:17 286:8
286:18 297:6,9
309:14 310:3
318:6 319:7
322:16 335:7
**wayne** 324:8
**we've** 12:18
63:17 84:7
128:12 225:17
309:14
**weapon** 81:8
81:23 83:12,13
83:15,20 261:8
261:9,23
**weapons** 78:5
80:19 81:4
260:22
**week** 93:22,24
93:25,25 212:6
247:4 289:14
289:18
**weekly** 59:25
**weeks** 25:23,24
29:23 30:22
49:22 50:12
93:23 98:4

155:6 177:6,10
177:10 247:6
286:8
**welcome** 56:9
**wencel** 156:5
156:16 158:4
195:12,25
208:14 209:10
209:11 272:7
279:19 280:20
281:19,23
306:24 312:4
**wencel's** 196:7
310:16 312:22
**went** 17:17
18:7 20:5 26:7
26:13 28:6
104:14 110:2
115:17 131:25
132:8 137:15
140:9 155:9
158:20,23
159:1 170:12
170:15 173:25
190:4 233:12
304:1,4,25
330:17 331:21
**west** 1:17 2:6
2:14
**westchester**
15:22
**westland** 30:6
**whatsoever**
297:2 298:6,7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[wheel - workplace]

Page 84

| | | | |
|---|---|---|---|
| **wheel** 297:8 | 54:6,18,20 | 259:22,25 | 72:22 73:8 |
| **whereabouts** | 60:15 65:6,8 | 262:11 268:5 | 78:8,9,17,20 |
| 325:8,20,24 | 65:18,25 66:12 | 268:25 273:25 | 83:22 111:23 |
| **whistleblower** | 66:22 67:24,25 | 277:13 278:9 | 115:19 116:4 |
| 198:14,15 | 69:4,21,23 | 283:24 284:21 | 117:4 136:17 |
| **white** 271:11 | 71:6 82:13,15 | 285:6 287:5,9 | 138:9 140:9 |
| 272:2,6,7,11,14 | 86:19 87:5 | 288:13,18 | 143:25 149:14 |
| 273:20 277:19 | 89:13 90:2 | 291:18 292:24 | 153:7,10 175:5 |
| 278:13,14,18 | 113:9,12 | 295:11 297:17 | 187:18 245:14 |
| 281:20 282:2 | 119:21 124:2 | 301:12,24 | 264:10 285:2 |
| **widespread** | 144:23 146:4 | 302:10 310:22 | 289:21,24 |
| 118:25 119:12 | 146:25 149:6 | 311:4 315:13 | 293:20 318:22 |
| 119:17 120:1 | 151:7 152:25 | 316:8 329:5,13 | 330:15 |
| 129:19 | 157:9,22 | 331:10 332:19 | **worked** 24:6 |
| **wife** 13:12 | 158:23 160:7 | 333:18 338:4 | 39:15 76:3 |
| 21:22 22:20 | 160:10 165:3 | **wondering** | 79:5 97:25 |
| 42:4,24 114:22 | 165:18 167:21 | 289:16 | 106:16 123:5 |
| 244:21 | 174:22 175:22 | **woodbridge** | 129:1 138:4 |
| **wife's** 13:13 | 176:6,12 | 13:19,20 | 166:22,23 |
| **window** 297:4 | 177:11 183:2 | **word** 77:5 | 187:23 191:23 |
| **winter** 30:25 | 184:19 185:16 | 78:13 129:13 | 191:25 247:2,6 |
| **wise** 38:9 | 198:5,6 200:21 | 202:23 | 261:12 263:24 |
| 112:22 126:21 | 203:11 204:1 | **wording** 89:14 | **working** 21:18 |
| 273:22 334:6 | 205:10,11,20 | **words** 49:11 | 23:25 24:18,25 |
| **wish** 181:11,13 | 206:6,7 213:10 | 106:6 143:13 | 31:5 37:3 38:5 |
| 315:3 | 223:16,17,24 | 195:21 202:21 | 76:11 79:18,19 |
| **withdraw** | 224:11,12 | 209:13 234:5,6 | 87:17 106:9 |
| 283:16 | 225:7 226:4,5 | 236:3 241:20 | 111:5 128:2 |
| **withdrawn** | 227:1,2 229:25 | 247:1 262:22 | 129:15 146:11 |
| 332:9,11 | 230:9 231:21 | **work** 8:15 9:3 | 147:5 160:4 |
| **witness** 6:17,18 | 231:24 233:11 | 16:20 17:15,17 | 280:22 298:5 |
| 7:15,20 11:2 | 234:3,22 | 17:25 22:12 | **workings** 33:6 |
| 12:2 17:22 | 241:12,19 | 36:18,23 37:2 | **workplace** |
| 21:12 22:20 | 251:10,13 | 37:12 40:2,7 | 293:13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**works**  15:18
126:23  147:15
321:16,22
330:3
**worried**  168:10
**worry**  168:9
**would've**  27:10
126:19  168:14
168:16,24
179:6  183:9
192:13  245:13
247:12  253:17
254:22  255:8
272:4  275:1
297:9  316:19
328:24  329:19
**wrapped**  25:22
30:11,16
**wrapping**
217:16
**write**  53:16
**writer**  53:8
**writing**  130:14
132:12
**written**  7:1
53:20  77:6
126:14
**wrong**  154:2
331:24
**wrongfully**
259:12
**wrote**  93:9

**x**

**x**  4:1,9  5:1
222:13

**y**

**yard**  324:17
**yards**  299:23
**yeah**  15:17
23:1  25:25
28:14  31:20
49:9,20  50:20
56:6  66:8  75:9
82:8  85:7,9
87:3  95:1
98:17  99:8,21
100:17  102:1,4
104:22  112:13
116:16  123:17
133:8  143:10
143:10,20
146:4  150:2
159:2,7  167:21
169:15  172:10
178:12,12
189:8  194:12
201:21  205:1
206:25,25
218:21  228:20
229:4,13
237:22  246:21
248:14  255:6
266:1  268:11
280:21,24
287:6  288:13

288:18  292:24
293:7  295:1,21
297:12,23
303:6  304:12
306:13  307:10
308:3,4,8
310:10,10,11
318:18  319:13
319:13  322:7,7
324:11,14
325:15,21
326:20  327:17
327:23  329:2
332:2  335:4,16
**year**  15:15  16:1
18:1  22:2
37:17  38:9,14
38:23  39:8
40:13  48:22
49:2  56:21,25
61:21  62:20
64:1  76:2  88:3
96:13,14  99:5
141:10  155:11
155:11  156:14
156:15  201:1,8
219:23  221:23
246:16  280:8
306:8  335:21
**years**  13:10,22
14:12  15:1,8
15:12  16:7
18:1,3,10,12,17
19:11,19,23

20:9  37:19
122:3  144:14
164:18,18
167:16  227:25
282:22,25
330:14
**yelled**  184:24
215:16,21
**yelling**  181:6,7
181:19  183:6
183:18,25
184:4
**yesterday**
10:24  12:19
85:8,12  99:23
190:7  307:20
325:5
**yesterday's**
85:6
**young**  1:19  6:3
194:17  287:8
338:2,17
**younger**  216:7
216:17
**younis**  245:4

**z**

**zoom**  186:18,20
302:21  311:24
**zoomed**  302:20
**zrien**  244:19

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.