# EXHIBIT "B"

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   KEVIN SWOPE, PAUL
 6   VANDERPLOW, JERROD HART,
 7              Plaintiffs,
 8      vs.                 Case No. 2:24-cv-10240-MAG-DRG
 9                          Hon. Mark A. Goldsmith
10   CITY OF DEARBORN HEIGHTS, a
11   Michigan Municipal Corporation,
12              Defendant.
13   _____
14
15
16      The Deposition of JERROD HART
17      Taken at 41700 West Six Mile Road, Suite 101
18      Northville, Michigan
19      Commencing at 10:07 a.m.
20      Thursday, August 7, 2025
21      Stenographically reported by:
22      Joanne Marie Bugg, CSR-2592, RPR, RMR, CRR
23
24
25   Job No. 7528578
```

Page 59

```
 1    A.    In my severance, yeah.
 2    Q.    Well, let's talk about your severance. And we're going
 3          to end up backtracking back into your employment. When
 4          did you say you left the City of Dearborn Heights?
 5    A.    July 3rd, 2024.
 6    Q.    And you tendered your resignation to whom?
 7    A.    The mayor.
 8    Q.    And what date did you tender that resignation?
 9    A.    That was a constructive termination and that tendered
10          on July 3rd.
11    Q.    So you gave the mayor your resignation letter on July
12          3rd?
13    A.    I gave the mayor a constructive termination letter.
14    Q.    You handed the mayor?
15    A.    That he concurred with.
16    Q.    Okay.  So the mayor did not stop you from resigning;
17          is that fair to say?
18                MR. BROWN: Objection. He keeps stating he
19          didn't resign, and you keep insisting he did.
20    A.    Can I grab a water, or are there rules?
21    BY MS. HUNT:
22    Q.    You can grab a water.  I'll wait until you get back to
23          the microphone.
24                MR. BROWN:  So my objection is the question
25          assumes facts not in evidence. We don't agree that
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com          586-468-2411
www.veritext.com

Page 61

```
 1              within the city; is that correct?

 2      A.      I received a partial honor of my severance.  That is

 3              in, I believe, your Exhibit 2.

 4      Q.      How much did you continue to receive on a regular

 5              basis?

 6      A.      I don't know.  I don't know.

 7      Q.      Okay.  You did continue to receive funds?

 8      A.      Yes.

 9      Q.      After you left the City of Dearborn Heights?

10      A.      That is correct.

11      Q.      Did you continue to receive healthcare benefits?

12      A.      Yes.

13      Q.      During your tenure with the City of Dearborn Heights,

14              was your wife covered under your insurance?

15      A.      Yes.

16      Q.      Okay.  What about do you have children?

17      A.      My son is also covered under the family.

18      Q.      How old is your son?

19      A.      25.

20      Q.      After you left your employment with the city, did your

21              wife continue to receive those benefits?

22      A.      Yes.

23      Q.      All right. Did your son continue to receive those

24              benefits?

25      A.      Yes.
```

Page 64

```
 1    A.    Yes.

 2    Q.    Okay.  Who was or is Kevin Swope?

 3    A.    He was my director of support services.

 4    Q.    Did you hire him?

 5    A.    The mayor hired him at my recommendation.

 6    Q.    Did you interview Mr. Swope?

 7    A.    I did.

 8    Q.    Was that a part of the panel that we discussed

 9          earlier?

10    A.    No.

11    Q.    Now, you indicated that it was at the mayor's

12          recommendation?

13    A.    No.  At my recommendation.

14    Q.    At your recommendation the mayor hired him?  I'm

15          sorry.

16    A.    Correct, yes.

17    Q.    When did you interview Mr. Swope, if you recall?

18    A.    It would have been in the last quarter of 2022.

19    Q.    And, again, I'm sorry. What did you indicate his title

20          was?

21    A.    Director of support -- no. Kevin was a director of

22          police operations, I think, was his title.

23    Q.    All right. And why was he hired?

24    A.    I spoke to Kevin because I recognized that there had

25          been absolutely zero preparation for succession
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 65

1   planning at the police department.  That the culture

2   of the police department was one that needed to be

3   changed significantly. And I needed an outside person

4   who has experience in accreditation, and in

5   leadership, and that's why I hired Kevin.

6   Q.   Okay.  So was the purpose of bringing Mr. Swope in to

7        assist in creating a succession plan, or for him to be

8        the succession plan?

9   A.   No. For him to come in and assist me with the work

10       with the organizational assessment, creating solid and

11       contemporary police policies and procedures.

12  Q.   And you indicated you needed an outsider?

13  A.   Yes.

14  Q.   Why?

15  A.   Because there was absolutely zero support from within

16       the police department, especially with the command.

17       And they were also part of the problem.

18  Q.   So you're saying there was absolutely no one within

19       the police department --

20  A.   There was potential.

21  Q.   If I could finish my question.

22  A.   Yeah.

23  Q.   You're saying that there was absolutely no one within

24       the police department that had knowledge or historical

25       knowledge that could assist you with this process?

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 68

1    Q.   Could you fire him?

2    A.   I could ask the mayor to fire him.

3    Q.   Did Mr. Swope supervise any other individuals within

4         the police department?

5    A.   Everyone within the patrol division, captain,

6         lieutenant, sergeants, officers.

7    Q.   When you created this position, did you create the

8         position, or did you have Mr. Swope in mind for this

9         position?

10   A.   No, I --

11              MR. BROWN:  Objection.  Assumes facts not in

12         evidence.  You can answer.

13   A.   I created the position for it.

14   BY MS. HUNT:

15   Q.   Okay.

16   A.   Yes.

17   Q.   You created the position.  Did you interview for that

18        position?

19   A.   I did.

20   Q.   Interview individuals.

21   A.   I interviewed Kevin for the position.

22   Q.   So Kevin Swope was the only person you interviewed for

23        that position?

24   A.   Yes.

25   Q.   Did you place an ad or do some sort of recruiting for

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

```
 1    A.    Yes.

 2    Q.    Did you recommend Mr. Vanderplow for this position?

 3    A.    Yes.

 4    Q.    What was his role?

 5    A.    While he was employed at Dearborn Heights?

 6    Q.    Correct.

 7    A.    I hired him as the director of support services, so

 8          he'd be in charge of the investigative staff, records,

 9          vehicle maintenance, dispatch, and the budget.

10    Q.    The director of services?

11    A.    Support services.

12    Q.    Support services, was that an existing position, or

13          was that created by you?

14    A.    It was not created by me.

15    Q.    Who held the role prior to Mr. Vanderplow?

16    A.    No one that I'm aware of.

17    Q.    Was that a new position that was created?

18    A.    Yes.

19    Q.    During your time there?

20    A.    It was new to the department.

21    Q.    And you said you didn't create it. Who created it?

22    A.    The mayor.

23    Q.    Did the mayor interview Mr. Vanderplow?

24    A.    I want to say he did, but I can't say for certain. I

25          do not recall.
```

```
 1        whoever they were that the officer had pulled over a

 2        break.

 3   Q.   So there were two?

 4   A.   There were two that I was aware of with him.

 5   Q.   Do you know those dates?

 6   A.   I don't.  I want to say one of them happened before I

 7        got there, and that investigation is still in the

 8        file. The other one Mo Baydoun called me on my cell

 9        phone on a Saturday or Sunday to tell me how racist

10        this officer was, and blah, blah, blah.  He had his

11        cousin pulled over, and he just pulled up to the

12        traffic stop, and just wanted to talk to the officer.

13        And I'm like, You can't do that.

14                And then when I watched the video with

15        Captain Erickson in the following days, the officer

16        did nothing wrong. You got Mo, and I think it's his

17        brother-in-law Jafer, one of the Jafers who roll up on

18        this traffic stop.  And this officer, he's dealing

19        with the motorist that's pulled over, right?  So

20        there's the influence that's going on to take care of

21        things. And I've only heard about emails. I don't know

22        if it's from Kevin or Paul that are out there about

23        the mayor, and possibly other elected officials asking

24        for tickets to be dismissed.

25   Q.   So, to your knowledge, there's only the two incidents
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 144

```
 1        with Mo Baydoun with the exception of what you heard
 2        about possibly the mayor and others?
 3   A.   Correct.
 4   Q.   So you don't know for certain of any other elected
 5        officials that requested tickets to be dismissed other
 6        than the two videos that you saw of Mo Baydoun?
 7   A.   And the other allegations that have been made about
 8        the mayor and others having tickets dismissed.
 9   Q.   But you don't have firsthand knowledge of that?
10   A.   No.
11   Q.   You just heard about them?
12   A.   That's correct.
13   Q.   Did you bring the allegations of ticket fixing or
14        ticket dismissal by the elected officials to any other
15        body, agency?
16   A.   I know the state police were advised. I believe I
17        previously testified to that. They were always a part
18        of my conversation, regardless of which law
19        enforcement agency I was talking to. But whether it
20        was in their arena or not, it just describes what's
21        going on at this place.
22   Q.   So your discussion with MSP or whomever about the
23        ticket dismissals, I believe, I want to make sure I
24        understand your testimony correctly. It always
25        involved the elected officials?
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 145

1    A.    Not always involved the elected officials, no, no.

2    Q.    But you did speak to MPS about --

3    A.    MSP.

4    Q.    MSP, and that included elected officials?

5    A.    Yes.

6    Q.    And you don't have necessarily anything in writing

7          from MPS?

8    A.    MSP, no.

9    Q.    You're only aware of the two videos with Mo Baydoun

10         that you have firsthand knowledge of?

11   A.    Yes.

12   Q.    Moving onto the next page, there's the allegation on

13         27 that private citizens acting in concert with city

14         council also threatened and took adverse action

15         against the plaintiffs.  And then on the next page on

16         paragraph 38 you mention Khalil Rahal. Is that the

17         private citizen that you are referring to in paragraph

18         27?

19   A.    He's one of them.

20   Q.    Okay.  So with regards to 27, in addition to Khalil

21         Rahal, what other private individuals or private

22         citizens?

23   A.    Sue Kaminski, Rachel LaPointe and her husband, and

24         their platform DBH 411, Pam Swirple, and there's

25         another lady.  I cannot remember her name. And Vince

Page 147

```
 1    Q.   So Sue Kaminski was critical of you?
 2    A.   Oh, it wasn't critical.
 3    Q.   Let me finish my question.
 4    A.   My goodness, it was personal.
 5              MR. BROWN: Let her finish.
 6    A.   Sure, yeah.
 7   BY MS. HUNT:
 8    Q.   So there were comments made by Sue Kaminski that were,
 9         I'll use the word, critical of you, and you believe
10         that to be an adverse action?
11    A.   I know it is.
12    Q.   Okay.
13    A.   Intimidate, harass, completely berate someone that
14         does not fall in line with Mo Baydoun, Hassan Saab,
15         Hassan Ahmad, that's their MO. That's.
16              MR. BROWN:  Are you using the phrase
17         adverse action, counsel, in a legal sense now, or are
18         you just talking in English vernacular?
19   BY MS. HUNT:
20    Q.   I'm asking how it was -- it's here in your complaint
21         how you mean adverse actions were taken against you?
22    A.   Yeah, they were used to threaten --
23    Q.   So if you're using the --
24    A.   Sorry.
25    Q.   I'm saying if you believe that is what you just
```

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 148

```
 1              stated, I'm just trying to understand what you mean.
 2    A.        Sure.  The very first day I met the city council in a
 3              restaurant.  I told them I had diabetes. I had some
 4              health concerns. Culturally they want -- the Arab
 5              culture is to make friends through food, and so on and
 6              so forth. There is a lot of food I couldn't eat that
 7              day. And I told them all respectfully I have diabetes.
 8              I have to very be very controlled on my diet. I'm
 9              trying to manage this without insulin. They all knew
10              it, and they took advantage of it.  Instead of being
11              good human beings, they used it to their advantage to
12              cause my glucose to go up.  To cause my heart attack
13              on October 7th at my desk.  And it may be a stretch
14              for you to believe that, but it's something at trial
15              we will absolutely show in black and white.
16                   MR. BROWN: Just answer the question.
17    A.        I have to take -- can I take a restroom break?  I'm
18              starting to get really upset.
19                   MR. BROWN: All right.
20    A.        Reliving this stuff, apparently six months of therapy
21              isn't enough.
22                   (Break at 2:10 p.m.)
23                   (Back on the record at 2:12 p.m.)
24                   MR. BROWN:  Back on the record.
25    BY MS. HUNT:
```

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 149

```
 1    Q.   So we discussed the statements and the actions of Sue
 2         Kaminski.  If I could take a step back, I don't want
 3         to upset you, and I apologize.  But when you mentioned
 4         you met the council at, did you say, a coney island?
 5    A.   No, at a restaurant Al Shallal.
 6    Q.   Okay.  Was it the entire commission or council?
 7    A.   I know Dave Abdallah was there, Ray Muscat, Mo
 8         Baydoun, Hassan Ahmad, Nancy Bryer, and Tom Wencel
 9         showed up a few minutes after, and I think he had to
10         leave early. I think he was volunteering somewhere.
11    Q.   Okay.  And you indicate that they caused your insulin
12         to increase. Did you eat while you were there?
13    A.   No. I think we should clarify that.
14    Q.   Okay.
15    A.   As we were eating, I couldn't partake in the bread.
16    Q.   Okay.
17    A.   I couldn't partake in the sweets. That's a large part.
18         Now, I drank that Yemeni coffee like it was going out
19         of style. But so I had to -- I felt compelled to share
20         with them the reason I'm not.
21    Q.   Sure.
22    A.   And they say, Well, it's not sugar.  It's made with
23         honey. I'm like sugar is higher on the glycemic index,
24         right, so we had this conversation. And they're very
25         well aware of my health problems.
```

Page 151

1       is that correct?

2   A.  Hassan Saab, and Denise Malinowski, I think, had

3       joined.

4   Q.  And it doesn't appear from the list that you gave me

5       Tom Wencel was not at this meeting?

6   A.  He was there, but he came late.

7   Q.  Okay.  You also mentioned Rachel LaPointe,

8       L-A-P-O-I-N-T-E?

9   A.  LaPointe, yes.

10  Q.  And how did any of her actions adversely affect you?

11  A.  She runs a website, her and her husband, called DBH

12      411, I believe it is. And within minutes of me sending

13      out a memorandum to the police department, she had

14      already received this memo and put it up on her

15      website. And this was the defunding, if I remember

16      correctly, of my directors, that council vote.

17  Q.  Have you ever reached out to Ms. LaPointe to determine

18      how she would get a hold of those memorandums?

19  A.  No, not at that point.

20  Q.  When did you discover this?

21  A.  Seconds after it happened.

22  Q.  Thank you. But around what time?

23  A.  This was -- well, I'm trying to think of when they

24      illegally defunded Paul and Kevin's positions. Would

25      have been right after the first of the year of '24, I

Page 152

1      believe.

2   Q.   Okay.  So around January of '24. Was that the first

3        time you were made aware of Ms. LaPointe and her

4        website?

5   A.   No, no, no.

6   Q.   Were there other memos or department matters that were

7        placed on her website prior to that January of '24

8        period of time?

9   A.   I'm not sure. I didn't monitor it. Somebody just

10       brought to it my attention, and I do not remember who

11       that within minutes it was up.

12  Q.   Did you have a conversation with anyone within your

13       department about this memorandum being made public so

14       quickly?

15  A.   Paul and Kevin, Director Vanderplow and Swope.

16  Q.   Did you direct them to do an investigation, or find

17       out why?

18  A.   Complete waste of time, yeah.

19  Q.   So it was brought to their attention, and it just --

20       you just let it go?

21  A.   Yeah.  It was just the propaganda war that was going

22       on.

23  Q.   What about Pam Swirple?

24  A.   She is the, I believe, still wife of a sergeant who

25       decided to leave the organization after an

Page 154

```
 1        what happened to them.
 2    A.  Pam was very outspoken on internet platforms. She
 3        would send me direct Facebook messages. She sent me a
 4        video of Sergeant Bazzy sitting in his brother's real
 5        estate office saying he's going to be the chief of
 6        police. Joking about it. Wanted action done. She was
 7        just a constant tool to harass, and just cause chaos
 8        in the police department.
 9    Q.  Okay.  And how do you believe that she was working in
10        concert with the council?
11    A.  Hated Mo Baydoun.
12    Q.  She hated Mo Baydoun?
13    A.  Hated him. She told me she hates Arabs, and they're
14        destroying the city, okay, in a meeting. She showed up
15        to a community meeting.  I can't even remember where
16        it was, but it was a former church. It's an Arab
17        meeting place now. Bint something. But she and Angela,
18        I can't remember Angela's last name, came up to me.
19        They're destroying the city. They're using you to
20        destroy the city. Yeah, yeah, yeah. And she's making
21        comments on Mo Baydoun's website about keep up the
22        good work. Stay focused.
23    Q.  Okay.  So you're saying that she and Angela hated Mo
24        Baydoun, and it appears that they --
25    A.  I didn't say Angela. Angela was at a meeting.
```

Page 159

1    Q.   What was -- strike that.

2              It says here in 29 that on January 26th of

3         2023 Mo Baydoun asked on three separate occasions for

4         a promotion for Sergeant Bazzy; is that correct?

5    A.   That is correct.

6    Q.   Okay.  Were the three separate occasions on January

7         26th of 2023, or did they happen on separate different

8         days?

9    A.   For purposes of that paragraph, it would have been

10        three separate occasions.

11   Q.   Okay.

12   A.   On the same -- in the same meeting.

13   Q.   Okay. So you're sitting down having a conversation, or

14        having a conversation with Mo Baydoun, and all three

15        times he asked about promoting Bazzy?

16   A.   Yes. He didn't ask. I want to clarify that. He told

17        me.

18   Q.   Here it says he asked on three separate occasions.

19   A.   Asked, told, pretty much the same thing when you're in

20        that meeting.

21   Q.   Were you aware of Sergeant Bazzy's work history with

22        the PD?

23   A.   Not intimately aware.

24   Q.   Were you opposed to promoting Bazzy?

25   A.   Well, Sergeant Bazzy failed the lieutenant's test, and

Page 160

1    he was not up for any type of promotion. And they

2    demanded that I move him from his sergeant's position

3    on a shift to a director level position.

4  Q.    Was there any communication with council member

5         Baydoun about the testing for promotions?

6  A.    Can you clarify for me?

7  Q.    Sure. That was a bad question. During this

8         conversation on January 26th of 2023, did you advise

9         Mr. Baydoun that Sergeant Bazzy had failed his

10        lieutenant's examination?

11 A.    No, I would not notify council to that. And that's

12        controlled by Act 78, not Jerrod Hart.

13 Q.    Was there any discussion about the inability to

14        promote that type of position -- to that type of

15        position?

16              MR. BROWN:   Could you try that again?

17 BY MS. HUNT:

18 Q.    Sure. Was there any discussion with Mr. Baydoun about

19        the inability to promote Mr. Bazzy or Sergeant Bazzy

20        to the director's position that he was seeking?

21 A.    I think I'm getting it. I was the first person that Mo

22        asked to take care of his boy, and to promote him. And

23        I said that can't happen. There's processes in place.

24        He has to, you know, take tests. I just can't appoint,

25        you know, somebody to these positions. They're covered

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 165

1    Q.    Does Khalil Rahal, himself, can he fire you?

2    A.    No.

3    Q.    Can he fire Kevin Swope?

4    A.    No.

5    Q.    Can he fire Paul Vanderplow?

6    A.    No.

7    Q.    Does he have the ability to change any of the benefits

8          or salary that either you or your co-plaintiffs have?

9    A.    Not that I'm aware of.

10   Q.    Okay.  Did he, himself, threaten to fire you?

11   A.    That he would threaten me?

12   Q.    Did Khalil Rahal say, I will fire you?

13   A.    No, he couldn't.

14   Q.    Now, you made a statement that he said the council

15         could?

16   A.    He said the council was.

17   Q.    Okay.

18   A.    Yes.

19   Q.    Did the council fire you?

20   A.    Yeah, they did.  They constructively terminated me.

21   Q.    Constructive termination.  Did you receive a memorandum

22         from the council saying you're fired?

23   A.    From the council, no.

24   Q.    Or a resolution from the council that you're fired?

25   A.    No.

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 242

1      suspension?

2   A. No. Not that my recollection was. It was a couple day

3      suspension.

4   Q. Okay.

5   A. Which pulling a knife on somebody, and a suspension is

6      wild. He either did or didn't do it.

7   Q. Is it part of your responsibilities to make sure that

8      the department is run legally?

9   A. Yes.

10  Q. When you made your reports to these various agencies,

11     did you consider it to be part of your duties to make

12     those reports to those agencies as the senior law

13     enforcement official in Dearborn Heights?

14  A. Which issues are you speaking of?

15  Q. Well, let's, I guess, walk through them here, all

16     right? You ended up indicating that there was a

17     report regarding the chain of custody for evidence and

18     evidence management system within Dearborn Heights?

19  A. Reported to the Wayne County prosecutor and her number

20     two?

21  Q. Yes. Did you feel that that was something that you

22     were supposed to do as part of your job duties?

23  A. Absolutely. They're the prosecuting authority.

24  Q. With respect to the nearly 900 pistol sales records

25     that were not processed, you reported that to MSP; is

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

1       that correct?

2   A.   That is correct.

3   Q.   All right. Did you feel that that was part of your

4       duties to report that as well to MSP?

5   A.   I believe there was an MCL number attached to that,

6       and it was criminal activity, and yes.

7   Q.   Okay.  In terms of the police overtime that you say

8       was subject to an illegal ticket quota system, you

9       reported that to whom?

10   A.   To Michigan State Police.

11   Q.   Did you believe --

12   A.   And that was actually Director Swope, if I remember

13       correctly.

14   Q.   Do you believe that that was something that you and

15       Director Swope needed to make sure was reported to MSP

16       per your duties?

17   A.   Absolutely.

18   Q.   It also says here reported widespread corruption

19       involving mismanagement of federal and state

20       forfeiture funds.  Do you see that?

21   A.   Yes.

22   Q.   Okay.  And who was that reported to, again?

23   A.   That was Director Vanderplow was to report that to the

24       FBI.

25   Q.   And do you believe that that was part of his and your

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 244

1      duties to make sure that that was reported to the FBI?

2  A.  Yes.

3  Q.  You know, as I understood it, there was like two

4      people who you were aware of that ended up getting

5      some sort of breaks on their tickets. And as I

6      understand it, these breaks that were given were given

7      because officers went and voided tickets somehow; is

8      that correct?

9  A.  This was Director Swope's investigation.  Probably

10     better questions for him.  But it was my understanding

11     that officers would leave a note on the traffic door

12     and tell the sergeants to dismiss tickets, or they

13     would go in after they wrote a ticket and dismiss it.

14 Q.  So did they dismiss the tickets, or did they void out

15     the tickets and not send them over to court?

16 A.  Well, here's the problem. The electronic system, I

17     believe, automatically sends it over. So they void it

18     in their car, right?  Could be voided in the car, or

19     they give direction to Sergeant Dottor to dismiss the

20     tickets.

21 Q.  Okay.  All right. Again, as you refer to it in the

22     amended complaint ticket fixing scheme, that was

23     something that was reported again to MSP, right?

24 A.  That is correct.

25 Q.  Okay.  And, again, that was part of your duties and