## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

       Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

       Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

       Intervening Defendant.

_____

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

**PLAINTIFFS' OMNIBUS RESPONSE TO MOTIONS FOR SUMMARY
JUDGMENT FILED BY PRIMARY DEFENDANT (DKT. 116) AND
INTERVENING DEFENDANT (DKT. 115)**

NOW COME Plaintiffs, KEVIN SWOPE, PAUL VANDERPLOW, AND

JERROD HART, by and through their undersigned counsel, to respond in opposition

to the Motion for Summary Judgment filed by the City of Dearborn Heights (the

"City" or the "Primary Defendant"), found at Dkt. 116, and to the Motion for

Summary Judgment filed by the City of Dearborn Heights' City Council (the

"Council" or the "Intervening Defendant" and together with Primary Defendant, the

"Defendants") found at Dkt. 115 (together with Dkt. 116, the "Defendants' Summary Judgment Motions"), and in support thereof state as follows:

The Defendants' Summary Judgment Motions both fail.  Both suffer from at least three salient defects.  **First**, the two motions are built on highly debatable factual foundations.   A party seeking summary judgment is supposed to show the Court that no genuine material factual disputes exist.  Instead, the Defendants' tendentious motions provoke a factual debate on a myriad number of disputed subjects, such as whether the Plaintiffs were validly hired, whether Plaintiffs were constructively discharged, whether Plaintiffs spoke as private citizens about endemic Dearborn Heights corruption, whether Plaintiffs spoke about matters of "public concern,"  whether Councilman Hassan Saab filed a false police report and committed federal perjury in order to retaliate against Paul Vanderplow, whether Plaintiffs' job duties were inextricably related to their public statements, what the motivations of parties accused of retaliation were, etc.

If there is any genuine dispute of factual matters in summary judgment briefings, then "facts must be viewed in the light most favorable to the nonmoving party."  *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S. SCt. 2658, 174 L. Ed. 2d 490 (2009).   Rather than demonstrate a case devoid of material factual disputes, the Defendants' Summary Judgment Motions demand that this Court accept their

partisan factual view of the world over a well-documented competing view, *without a trial*.

**Second**, the Defendants' Summary Judgment Motions rely on no small amount of gimmickry and omission.   As for gimmickry, Defendants got the Plaintiffs to admit in their depositions that – in their capacities as the City's highest ranking Police officials – they thought it was part of their job to reform the Dearborn Heights Police Department (DHPD).   "Is it part of your responsibilities to make sure that the [DHPD] is run legally?" City Council Attorney Miotke asked Police Chief Hart.  [ECF No. 115-2, PageID. 3750, Lines 7-8].  To which Hart gave the obvious answer, and the answer the question was designed to solicit: "yes."   [*Id.*, Line 9].  Vanderplow and Swope answered similar questions the same way.

Defendants think that obtaining these "admissions" allows them to deprive the Plaintiffs of their First Amendment rights under cases like *Garcetti, Lane, and Boulton*.[1]  The City Council is so proud of this cheap stunt that it even uses a matrix in the middle of its brief to highlight where it is that Police Officials made these supposedly staggering admissions in their depositions.  *See, Dkt. No. 115, PageID. 3481*.  Yes, all good police officials worry about the health of the law enforcement organizations that they are charged with leading.  No, that does not deprive those

---

[1]  Three cases discussing the First Amendment rights of public employees.  *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Lane v. Franks*, 573 U.S. 228(2014); and *Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015).

same officials of their First Amendment rights.   Such a narrow mechanical interpretation of the First Amendment rights of public employees is directly contrary to what *Garcetti, Lane and Boulton* have to say about the First Amendment rights of public employees, as will be discussed below.   It is simply not enough to show that a statement made by a public employee "concerned" his or her employment to deprive that employee of a First Amendment right.   *Lane v. Franks*, 573 U.S. 228, 240 (2014)(interpreting *Garcetti v. Ceballos*, citation above).

*Garcetti, Lane, and Boulton* all favor the Plaintiffs.   This is why after superficially citing to these cases the Defendants do not apply this precedent to the facts of this case.   Only Plaintiffs provide this Court with actual analysis of what the seminal case of *Pickering* and its progeny say and mean.   *See Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968).   *Lane v. Franks,* in particular, is remarkably similar in its fact pattern – *Lane* involves both corruption and firings of whistleblowers supposedly because of budget constraints – and squarely favors the Plaintiffs.   That analysis is in the brief below.

As far as factual omissions go, neither of the Defendants manages to come clean with this Court and admit how the Dearborn Heights City Council voted 5-2, on February 28, 2023, to approve a collective bargaining agreement which expressly ratified the employment of all three Plaintiffs, by name, in resolution 23-099.   *See First Amended Complaint (FAC)*, ECF No 48-2, PageID.763.   This happened ten

months before that same Council voted to defund these same positions in January of 2024, purportedly over budgetary (parliamentary) concerns that apparently did not exist ten months prior.   Defendants' sudden concerns about the budget and their constitutional prerogatives as a "legislature" under the City's charter are retroactive inventions based on awkward analogies to the U.S. Congress, and plainly pretextual. As various legal memos attached to the First Amended Complaint ("FAC") demonstrate (*see* FAC, Exhibit 6), these constitutional and budgetary concerns are, in fact, the post-hoc inventions of one Attorney Gary Miotke, the attorney who, after losing his job as city corporation council, assisted the City Council as its "special council" in a vendetta against Mayor Bazzi that has resulted in Miotke recently regaining his sinecure.

Mayor Baydoun voted in favor of 23-099 while still a Councilman (Dkt. 48-2, PageId.761).   Thus, Mayor Baydoun personally ratified the employment of the Plaintiffs, who are specifically mentioned by name in 23-099.   Now his administration, acting through Attorney Miotke[2], recently told the Detroit Press in

---

[2] Mr. Miotke is both council of record to the City Council in this case (ECF No. 115, PageId.3504), and now also once again the Corporation Council to the City of Dearborn Heights (see **Exhibit 1** of attached brief), despite his previous statements to this Court that these were different institutions with differing interests.  [ECF No. 15].  Attorney Miotke made this conflict of differing institutional interests between the City and the City Council the basis for his successful motion to intervene (Dkt. 15), and yet he now represents *both* the Defendant and the Intervening Defendant in these proceedings.

January of 2026 that it "has learned" that Mayor Bazzi signed employment contracts with all three Plaintiffs.   *See* **Exhibit 1** ("The City's corporation counsel, Gary Miotke, …".).   In fact, Mayor Baydoun has known or had reason to know about these contracts for years.   The contracts have even been public record in these very proceedings since January of 202<u>4</u>.   [ECF No. 1, PageID.53-69].   For that matter, neither Defendant tells the Court that collective bargaining agreements, such as one used to ratify the Plaintiffs' employment with the City, expressly trump Act 78 under controlling Michigan law.   *Int'l Ass'n of Fire Fighters v. Warren*, 411 Mich. 642, 657 (1980).

**Third**, both motions continue to suffer from considerable irregularity in form even after this Court rejected earlier drafts and signaled to the Defendants that improvements were required.  [ECF No. 114].  Rather than offer this Court a lengthy list of *undisputed* or undisputable facts backed by detailed cites to the record (*see* FRCP 56(c)), the City offers this Court just 19 factual propositions, many of which are merely background filler or highly disputed.  [ECF No. 116, PageId.4760-4764]. The City chose to go light on established facts even after getting the Court's permission to file a brief up to 45 pages in length.  [ECF No. 117].  The City also attaches the wrong employment contracts to its brief for Swope and Vanderplow (the City provides no exhibit index, but these are the City Exhibits G, H, I and J), and no contract whatsoever for Hart (although two exist).  Both Defendants have filed briefs

that are replete with misquotations of the record or material misrepresentations of fact, as will be demonstrated below.

WHEREFORE, for the reasons set forth above as well as those found in the attached legal brief, Plaintiffs hereby make this response ("Response") to the Defendants' Summary Judgment Motions and ask this Court to deny such motions.

Dated: March 9, 2026      Respectfully submitted,

<u>/s/ Stephen J. Brown</u>
FAUSONE & GRYSKO PLC
Brandon M. Grysko (P82751)
Stephen J. Brown (P82687)
John Walsh (P88914)
Counsel to Plaintiffs, (248)-912-3213
41700 West Six Mile Road, Suite 101
Northville, Michigan 48168-3460

### Plaintiffs' Exhibit Index

| 1 | Detroit News Article of January 12, 2026 "Dearborn Heights City Council voids severance agreements with appointees." |
|---|---|
| 2 | The full deposition transcript of Mayor Bill Bazzi (without exhibits) |
| 3 | Jerrod Hart constructive discharge resignation letter |
| 4 | Paul Vanderplow constructive discharge resignation letter and constructive discharge letter from Mayor Bill Bazzi |
| 5 | Jerrod Hart Employment Contract, dated December 12, 2023 |
| 6 | Paul Vanderplow Employment Contract, dated January 2, 2025 |
| 7 | Kevin Swope Employment Contract, dated December 4, 2024 |
| 8 | Writing pursuant to which Mayor Bazzi asks Swope to resign |
| 9 | Excerpts from the deposition of Mariana Hernandez |
| 10 | Excerpts from City of Dearborn Heights Charter and related Interrogatory Answers 15 and 15 |
| 11 | Excerpts from the deposition of Ash Othman |
| 12 | Email to Attorney Gary Miotke dated May 21, 2025 |
| 13 | Affidavit of Jerrod Hart in support of this response |
| 14 | Affidavit of Paul Vanderplow in support of this response |
| 15 | Affidavit of Kevin Swope in support of this response. |
| 16 | Contemporaneously created diary timeline of the experiences of Hart (redacted to prevent the filing of irrelevant sensitive information) |
| 17 | Excerpts from the deposition of Hussein Farhat |
| 18 | Hassan Saab Facebook page, seeking a Police Chief who is "part of our community." |
| 19 | Excerpts from the deposition of Hassan Saab. |

*** The full deposition transcripts of Plaintiffs Hart, Swope, and Vanderplow are already part of the record and are found at Dkt. 115-2, 115-3, and 115-4, respectively.   As such, these depositions are not attached to this brief, and citations from such depositions will be made herein to Dkt. 115 and its subexhibits.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

_____

**BRIEF IN SUPPORT**
**OF PLAINTIFFS' OMNIBUS RESPONSE TO MOTIONS FOR SUMMARY**
**JUDGMENT FILED BY PRIMARY DEFENDANT  (DKT. 116) AND**
**INTERVENING DEFENDANT (DKT. 115)**

i

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................ ii

INDEX OF AUTHORITIES........................................................................ iv

STATEMENTS OF THE ISSUES PRESENTED ...................................... vi

CONTROLLING LAW AND MOST APPROPRIATE AUTHORITY............................. viii

PLAINTIFFS' FIRST COUNTER-STATEMENT OF MATERIAL FACTS ...................... 1

PLAINTIFFS' SECOND COUNTER-STATEMENT ................................ 3

OF MATERIAL FACTS .............................................................................. 3

PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS............................ 8

   1.   Plaintiffs agreed to work for the City of Dearborn Heights knowing in advance that they would be confronting a corrupt police department......................................................... 8

   2.   The Police Union objects to the hiring of Swope and Vanderplow outside of Act 78, and the issue is resolved with City Council ratification of a collective bargaining agreement under PERA. ................................................................ 13

   3.   Plaintiffs find that the DHPD is just as corrupt as Commissioner Thomas warned them it would be, and they speak out publicly about such corruption and attempt to reform the DHPD.............................................................................................. 15

   4.   The constant pressure to promote the career of an underperforming Arab-American Sergeant and the retaliation experienced for disciplining that same Sergeant. 17

   5.   Plaintiffs face an orchestrated retaliatory campaign of harassment and personal attack by members of the Dearborn Heights City Council, including current Mayor Baydoun. ....................................................................................................... 19

   6.   The false criminal accusations, perjury, and attempted witness tampering committed by City Councilman Hassan Saab, all done as retaliation against Paul Vanderplow. .................................................................................................... 20

   7.   Plaintiffs are constructively terminated.............................................. 22

   8.   The Dearborn Heights City Council's intentional and material breach of the severance provisions of the Plaintiffs' employment contracts and repeated violations of this Court's injunction (Dkt. 4)....................................................................... 23

STANDARD ............................................................................................... 24

INVOCATION OF FRCP 56(d) ................................................................. 25

ARGUMENT .............................................................................................. 26

   I.   Breach of Contract: The Plaintiffs' employment contracts with the city were validly created, were ratified under PERA, are legally enforceable, and have been intentionally breached by the City............................................................................................. 26

**II.     The Plaintiffs' Whistleblower claim under MCL § 15.361 survives summary judgment.** ....................................................................................................... 30

The City Council's go-to pretext for retaliation, breach and harassment: .................. 33

the budget. ....................................................................................................... 33

**III.     The Plaintiffs' Title VII and Eliott-Larsen claims survive summary judgment...** 34

**IV.     The ADA and age discrimination Counts survive summary judgment.** ............... 40

**V.    At the time the FAC was filed, this Court's injunction was the only thing that prevented the Defendants from violating the FLSA** ...................................................... 41

**VI.     Under the *Pickering, Garcetti, Connick, Lane* and *Boulton* cases, the Defendants have violated Plaintiffs' First Amendment Rights and retaliated against Plaintiffs for speaking out as private citizens on matters of public concern.** ........................................... 41

A separate analysis dedicated to First Amendment "retaliation." ................................ 46

**CONCLUSION** .................................................................................................................. 49

**LOCAL RULE CERTIFICATION** ................................................................................... 51

**CERTIFICATE OF SERVICE** ......................................................................................... 51

# INDEX OF AUTHORITIES

**Cases**

*Already, LLC v. Nike,*
   568 U.S. 85 (2013) ............................................................................41

*Boulton v. Swanson,*
   795 F.3d 526 (6th Cir. 2015) ..........................................................47

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................24

*Connick v. Myers,*
   461 U.S. 138 (1983) ........................................................................45

*DeBrow v. Century 21 Great Lakes, Inc.,*
   463 Mich 534 (2001) .......................................................................31

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ........................................................... 42, 44, 45

*Int'l Ass'n of Fire Fighters v. Warren,*
   411 Mich. 642 (1981) ............................................................... 27, 33

*International Assoc. of Fire Fighters v. Warren,*
   411 Mich. 642 (1980) .................................................................... vii

*Lane v. Franks,*
   573 U.S. 228 (2014) ................................................................ passim

*Leary v. Daeschner,*
   228 F.3d 729 (6th Cir. 2000) ..........................................................47

*McDonnell Douglass,*
   411 U.S. 792 (1973) ........................................................... 34, 39, 45

*Pickering v. Board of Ed. Township Highschool Dist.,*
   391 U.S. 563 (1968) ..................................................... vii, 43, 46

*Smith v. Hudson,*
   600 F.2d 60 (6th Cir. 1979) ............................................................25

*Snyder v. Phelps,*
   562 U.S. 44 (2011) ..........................................................................45

*United States v. Diebold, Inc.,*
   369 U.S. 654 (1962) ........................................................................25

*Waters v. Churchill,*
   511 U.S. 661 (1994) ........................................................................43

*Wurtz v. Beecher Metro. Dist.,*
   495 Mich. 242 (2014) ......................................................................31

*Yeschick v. Mineta,*
   675 F.3d 622 (6th Cir. 2012) ..........................................................25

**Statutes**

Fed. R. Civ. P. 56(a) .................................................................................25
MCL § 15.361 ...........................................................................................30

**Other Authorities**

1935 PA 78 ................................................................................................27
Fair Labor Standards Act ..........................................................................41
Michigan Public Employment Relations Act (PERA) .................................. passim
Resolution 23-099 ......................................................................................5
Resolution 24-017 ......................................................................................5

**Rules**

FRCP 56(d) ...............................................................................................25
FRCP Rule 56 ................................................................................... vii, 24

## STATEMENTS OF THE ISSUES PRESENTED

1.     Whether the City is in breach of legally enforceable employment contracts with the Plaintiffs?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

2.     Whether the Plaintiffs have suffered "constructive discharges" from

their managerial jobs with the DHPD?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

3.     Whether the Plaintiffs spoke out as "private citizens" concerning

matters of public concern (i.e., the corruption and ineffectiveness of the DHPD) and

not just pursuant to their job duties?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

4.     Whether the Defendants have retaliated against the Plaintiffs for an

exercise of Plaintiffs' First Amendment rights?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

5.     Whether the Plaintiffs have suffered from adverse employment actions

(i.e. constructive discharge) due to a "protected activity" for purposes of the

Michigan Whistleblowers' Protection Act?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

6.     Whether the City can be both *directly and indirectly* demonstrated to

have engaged in racial discrimination against the Plaintiffs on the basis of their race

for purposes of both Title VII and the Michigan Elliot-Larsen Civil Rights Act?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

7.     Whether the City has violated the Americans with Disabilities Act and

the Federal Age Discrimination in Employment Act?

| | |
|---|---|
| Plaintiffs' Answer: | Yes. |
| Intervening Defendant's Answer: | No. |
| Primary Defendant's Answer: | No. |
| The Court Should Answer: | Yes. |

## CONTROLLING LAW AND MOST APPROPRIATE AUTHORITY

With respect to the contractual dispute, which focuses mostly on the threshold validity of certain employment contracts, Plaintiffs rely on Michigan law establishing the supremacy of the Michigan Public Employment Relations Act (PERA) over Act 78.  *See, e.g., International Assoc. of Fire Fighters v. Warren*, 411 Mich. 642, 657 (1980).

With respect to the First Amendment dispute (Counts I and IX), Plaintiffs rely on the effectively the same case law that Defendant's rely on (see fn. 1, above), in addition to *Pickering v. Board of Ed. Township Highschool Dist., 205 Will Cty.*, 391 U.S. 563 (1968).

With respect to the Title VII and Eliott-Larsen dispute, Plaintiffs rely on fundamentally the same law as is found in the Defendants' Summary Judgment Motions.  This dispute is more factual than legal in nature (and hence inappropriate for resolution by summary judgment).

With respect to the mechanics, standards, and burdens of proof and production concerning summary judgment, Plaintiffs rely on Rule 56 of the Federal Rules of Civil Procedure (FRCP) and its interpretive case law from the Sixth Circuit.

**PLAINTIFFS' FIRST COUNTER-STATEMENT OF MATERIAL FACTS**

(Against City only, Dkt. 116, starting at PageID. 4760, 19 material facts)

1. Mostly admitted, except for the fact that Mayor Baydoun has been Mayor for some times and events relevant to this case, including the ongoing campaign of retaliation waged against Plaintiffs.  *See* Dkt. 116, at fn. 1; *See also* **Exhibit 1.**  Hence, denied that Mr. Bazzi was Mayor "at all relevant times" relevant to this dispute.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted that Bazzi engaged Joseph Thomas.   Denied that Thomas was engaged merely to improve professionalism within the DHPD.  Thomas was engaged because of the long-existing reputation of the DHPD as a corrupt organization. Bazzi entered office with the goal of confronting DHPD corruption.  *See* Mayor Bazzi Deposition, **Exhibit 2**, *33: 6 to 34:6, 42: 4-16.*

6. Admitted.

7. Admitted that such problems existed at the DHPD but denied that Hart only knew of such issues "*upon being hired*" by the City.  Hart has testified that he knew before accepting the position of Police Chief that the DHPD suffered from significant corruption and institutional issues, and he chose to become Chief in part because of such problems, so that he could improve the DHPD. *See* **Exhibit 13**, ¶¶ 12-22.

8. The allegation refers to the hiring of Kevin Swope and is intentionally misleading without being factually inaccurate.  Hart did not hire Swope immediately after joining the DHPD, as if according to some prearranged plan.  Rather, Commissioner Thomas unexpectedly died from Corona-Virus complications, leaving Police Chief Hart overwhelmed with work and in need of extra help to reform the DHPD.  Exhibit 2, 48: 2-12.  Swope and Vanderplow were hired after the death of Thomas to assist an overwhelmed Hart.

1

9. Plaintiffs contest this non-factual statement of opinion and note that the cited text from the Hart deposition does not remotely support the claims found in factual allegation 9.  Hart testified that the "Mayor hired [Swope] at my recommendation."  *See* Hart Deposition, ECF No. 115-2, PageID.3572, line 5.

10. Admitted.

11. Plaintiffs contest this non-factual statement of opinion and note that the cited text from the Hart deposition does not support the claims found in factual allegation 11.  In fact, Hart testified that he had not created the position of Director of Services, but rather Mayor Bazzi had.  See ECF No. 115-2, PageID.3582, lines 12-22.  *See also*, answer to factual allegation 9, above.

12. The allegation is intentionally misleading without being factually inaccurate.  Plaintiffs deny having a premeditated plan to raise spurious claims of corruption concerning the DHPD immediately after starting to work for the City ("Almost immediately …").

13. Admitted that such investigations and reporting were made.  Denied that Plaintiffs engaged in such speech only pursuant to their job duties.  Plaintiffs made such statements as private citizens.

14. Admitted that Plaintiffs have reported being retaliated against for their reporting of the DHPD's corruption issues to the public, to federal officials, and to the Intervening Defendant.

15. Admitted that Plaintiffs investigated a wide-spread ticket fixing scheme.  As to what has or has not "panned out" with respect to such investigation, Plaintiffs note that as of February 2026, the Defendants have still not produced discovery concerning fines and tickets, which is now the subject of the Court's order found at Dkt. 109, ¶ 9.

16. Admitted that Hart has asserted that he had been constructively terminated, and that Hart tendered his resignation letter that expressly described how he had been constructively terminated.  Denied that the tender of a resignation letter, where such resignation is induced by on-the-job abuse, is inconsistent with constructive termination.  In fact, Hart calls the letter his "constructive

termination" letter.  *See* ECF 115-2, PageID.3567, lines 6-19.  The letter in question is at **Exhibit 3.**

17. Admitted.

18. The allegation is intentionally misleading without being factually inaccurate. Swope testified that he knew that his job in Dearborn Heights "was about to be up, due to the fact that Hussein Farhat was being forced into the police department in a position that he was not qualified for.  And the Mayor stated that he needed an Arab-American police chief so he could be relected."  *See* ECF No 115-3, PageID.4020, lines 13-19.

19. The allegation is intentionally misleading without being factually inaccurate. After Vanderplow's job became untenable due to the amount of abuse and obstruction that he was receiving from the Dearborn Heights City Council, his attorney Brandon Grysko tendered a resignation letter dated April 23, 2025 announcing Vanderplow's constructive termination.  In his deposition Vanderplow states that he gave two weeks' worth of notice "to ensure I didn't leave employees in the lurch and not able to do their jobs."  *See* ECF No. 115-4, PageID.4569, lines 9-13.  The letter in question, with typos corrected by hand, is at **Exhibit 4**.

## PLAINTIFFS' SECOND COUNTER-STATEMENT OF MATERIAL FACTS

(Against City Council only, Dkt. 115, starting at PageID. 3480, 38 material facts)

1. Admitted.

2. Admitted that Vanderplow and Swope were hired by former Mayor Bill Bazzi.  Denied that new "departments" were created for Vanderplow and Swope, it being understood that they would be working inside the DHPD under Chief Hart as his "team." See ECF 48-2, PageID.812 (Bazzi: "I brought Chief Hart *and his team* into the department to change its culture . . ."). [Emphasis added].  See also, Exhibit 2, at 49: 15-24.

3. Admitted that Vanderplow and Swope were not hired through the procedures act of 78 ("Act 78").  Denied that such appointments were "illegal" under the City Charter and Michigan law.  Answering further, such appointments were subsequently ratified by the City Council on February 28, 2023 in resolution 23-099 by a vote of 5-2.

4.  Admitted that each of Hart, Swope and Vanderplow entered into employment agreements.   The Intervening Defendant's legal conclusions concerning such contracts are denied.  Hart entered into two such agreements, with the second superseding the first.   Each of Swope and Vanderplow entered into three such agreements, with the last one superseding the previous two.[3]

> a.  The last and most current Employment Agreement signed by Hart is found attached at **Exhibit 5** and is dated December 12, 2023 (this was Bazzi Deposition Exhibit D);
>
> b.  The last and most current Employment Agreement signed by Vanderplow is attached at **Exhibit 6** and is dated January 2, 2025 (this was Bazzi Deposition Exhibit B);  and
>
> c.  The last and most current Employment Agreement signed by Swope is attached at **Exhibit 7** and is dated October 15, 2024 (this was Bill Bazzi Deposition Exhibit C).

5.  Admitted.

6.  Admitted that the quoted text is accurately quoted.   Denied that any of the Plaintiffs ever stated that their reports were "always and exclusively" made within their employment duties.  Plaintiffs deny that they gave up their First Amendment rights when they agreed to attempt to reform the DHPD.

7.  Admitted that Hart made the statements and reports listed.   Defendant's conclusory statement that such statements are "well within" the course and scope of Hart's employment is denied.   Hart denies that he forfeited his First Amendment rights by going to work as Dearborn Heights Police Chief.  Hart further denies that he ceased speaking as a private citizen concerning matters of public concern when he accepted employment at the DHPD.

---

[3]   The City attaches the wrong contracts to its brief for Swope and Vanderplow. Exhibits starting with PageID.4868 and 4887 are superceded contracts. The City's Exhibits G and J are not the most recent contract.  The City attaches no contract whatsoever to its brief concerning Hart, despite his being party to a contract.  The correct contracts are described above and attached hereto.

8. Swope admits that the statements and reports listed by Intervening Defendant were made. Swope denies that he forfeited his First Amendment rights by going to work at the DHPD. Swope further denies that he ceased speaking as a private citizen concerning matters of public concern when he accepted employment at the DHPD.

9. Vanderplow admits that the statements and reports listed by Intervening Defendant were made. Vanderplow denies that he forfeited his First Amendment rights by going to work at the DHPD.

10. Admitted.

11. Denied. The removal of the expense item from the agenda on February 29, 2024 resulted in a legislative pocket-veto of Swope's training, and such removal came at the insistence of Hassan Saab, who cited the litigation (while being video-taped) as his reason from removing the time.

12. See answer 11, directly above.

13. See answer 11 above. Defendants have relied upon parliamentary machinations and pocket-vetoes to discriminate against Swope (rather than an up-or-down public vote) when other similarly situated officers and managers of the City, for example the Fire Chief, received training benefits.

14. Admitted.

15. Denied that such hires were illegal. Denied that the City Council was motivated by budgetary concerns when it passed Resolution 24-017 to defund the Plaintiffs' job positions (after previously ratifying such positions in Resolution 23-099 10 months prior). The City Council passed Resolution 24-017 to retaliate against the Plaintiffs.

16. Admitted that such two memoranda were written at the behest of Bill Bazzi and are found at Dkt. 48-2, PageID. 779-786. Denied that such memoranda "supplanted" the legislative authority of the City Council.

17. Admitted that Plaintiffs filed their first complaint on January 29, 2024. The balance of the factual allegation, which alleges a conspiracy between Bazzi and the Plaintiffs, is denied.

18. Admitted.

19. Admitted.

20. Plaintiffs deny Paragraph 20 because it is not factual in nature and is rather a long argumentative and narrative statement. ("The pendency of the injunction is important in consideration …."). Plaintiffs deny leaving their positions voluntarily and submit that they were constructively discharged.

21. Admitted that Hart left his job on such date. Denied that he did so voluntarily. See also, Plaintiffs' answer to factual allegation #16 made by the City.

22. Admitted. The "constructive termination letter" is attached as Exhibit 3, and it details the reasons why Hart states that he was constructively terminated.

23. Admitted.

24. Admitted.

25. Admitted, subject to the additional fact that Mayor Bazzi expressly asked Swope for such a resignation letter. See **Exhibit 8.**

26. Admitted that Swope searched for a new position while still employed by Dearborn Heights. Denied that there is anything "ironic" about Swope making sure that he had an income to support his family after it became clear to him that his job with the City of Dearborn Heights was untenable and would soon end, one way or another, against his will. *See* Swope Deposition, ECF No 115-3, PageID. 4020, lines 13-19 ("*Well, my intent was to have a backup plan because of the fact that I knew my job in Dearborn Heights was – was about to be up due to the fact that Hussein Farhat was being forced into the police department in a position that he was not qualified for. [Police Chief] And the Mayor stated that he needed an Arab-American police chief so he could be reelected.*").

27. Admitted that such a claim was made. Denied that the City has only failed to pay severance. The City has also failed to pay Swope for his outstanding vacation days and other significant amounts still owing. See Exhibit 15.

28. Admitted that Swope was paid his full salary for all days that he worked. Denied that he was paid more salary than he was owed.  Denied that the City has complied with Swope's employment contract.

29. The quoted text is not found on page 282 of the Bazzi deposition as Intervening Defendant claims, and would appear to refer to what Mayor Bazzi told the Plaintiffs after their positions were purportedly defunded in January of 2024, not after Mayor Bazzi made the decision to install an unqualified person as Police Chief to appease the racial demands made by third parties in late 2024.  The quote, wherever it might exist or if it exists at all, is therefore taken out of chronological context.

30. Admitted that Swope's job as Police Chief in South Haven was untenable and lasted one month, due to housing and commuting issues unrelated to his performance.

31. Admitted that Vanderplow was once employed as Director of Support Services, and then in a variety of other roles – including Comptroller – as requested by Mayor Bazzi, who stated that Vanderplow had the requisite accounting skills and education to be comptroller.  *See Bazzi Deposition*, Exhibit 2, 134: 6 to 136:5.  Denied that Vanderplow worked for the City after May 9, 2025 (*See* factual allegation 32, immediately below).

32. Admitted that Vanderplow was constructively terminated, and as a result, he was no longer employed by the City after May 9, 2025.   A letter written by Mayor Bill Bazzi, detailing the facts surrounding such constructive termination, is attached at Exhibit 4 (Such letter constitutes an admission made by the City's chief executive officer).

33. Admitted.

34. Admitted.  As with Swope, Vanderplow's claim against the City under his employment contract is not for wages denied him while he was still working for the City.   His (contractual) claim, rather, is for severance and other amounts owing upon his constructive termination.

35. Admitted that Vanderplow received all salary and other benefits that were due him while he was a working employee of the city.  His (contractual) claim, rather, is for severance and other amounts owing upon his constructive termination.

36.  Factual allegation 36 is a conclusory legal statement and not a statement of any material fact.   The Defendants have gone from alleging that Vanderplow engaged in the criminal stalking of Councilman Saab (ECF No. 37) to the new realization that Saab had indeed fabricated the stalking event in order to retaliate against Vanderplow, and, moreover, engaged in perjury and witness tampering to hide his actions.  (*See* the discussion of the testimony of Ash Othman, set forth further below).

37. Admitted.

38. Denied to the extent that factual allegation 38 contains any factual allegation and is not a legal conclusion.   Saab's actions may or may not expose the City Council to liability under *Monell*, but Saab nevertheless was a member of the City Council, and he acted in retaliation against Plaintiffs.

### PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1. **Plaintiffs agreed to work for the City of Dearborn Heights knowing in advance that they would be confronting a corrupt police department.**

   1.1. Bill Bazzi served as interim Mayor for the City of Dearborn Heights starting in January of 2021 after the COVID-19 death of Mayor Paletko.    In November of 2021, Bazzi ran for Mayor and won on his own account.   Exhibit 2, 18:23-24.

   1.2. In his deposition, Bazzi described how the DHPD had long suffered from multiple forms of corruption.   Exhibit 2, 19:13 to 33:5.   Bazzi testified that "it was my intent to clean up the police department and — and to give the City of Dearborn Heights the best service in law enforcement."    Exhibit 2, 48:18-20.

1.3. To that end, Bazzi appointed a well-respected senior African-American police officer, Joseph "Jet" Thomas, as "Police Commissioner" to analyze the precise problems suffered by the DHPD.  Exhibit 2, 33:8-18.

1.4. Within a month on the job, however, Commissioner Thomas reported back to Bazzi that the DHPD was "*F'd up*" and that Thomas "needed help" if he was going to try to reform the department.  Exhibit 2: 33:5 to 34:11.   In fact, Thomas reported the existence of a so-called "Golden Circle" or clique of officers surrounding then Police Chief Meyers, whom Meyers undeservedly favored for promotions and other privileges.  *Id.*

1.5. Thomas even described how members of the "Golden Circle" were issued physical coins with a black panther image on it, to indicate their elite membership in this group favored by Meyers.  Exhibit 2, 34:14 to 35:4.

1.6. Thomas recommended bringing in an outside Police Chief because, he stated, that "he couldn't really trust anybody in that department."  Exhibit 2: 37: 4-12.   Thomas stated that then-serving Police Chief Meyers "has to go." Exhibit 2: 42:9.

1.7. Commissioner Thomas wrote Mayor Bazzi a detailed memo of his initial findings (Exhibit 2, 39: 7-23).   (The City has refused or failed to produce this memo in discovery).

1.8. When Thomas and Bazzi presented such memo to the City Council they were "heckled" by around 40 police officers in a public meeting.   Exhibit 2: 37:20 to 38:18.

1.9. Thomas and Bazzi therefore reached out to the police chiefs of surrounding communities for recommendations for a new police chief for the DHPD. "[A] lot of them were pointing towards Chief Hart.  You know, they were telling me he was – he was a good person, a good chief, you know, impeccable record . . .".   Exhibit 2, 42:15-18.

1.10.    Bazzi then reached out to Hart, interviewed Hart, and Hart agreed to serve as Dearborn Heights Police Chief.  Exhibit 2, 42:20 to 43:19.  Hart, for his part, testified that he knew in advance that his mission, if he became Police Chief, would be to reform a highly corrupt police department.   [ECF No. 115-2, PageID. 3528 at lines 4-8].

1.11.    After Hart joined the DHPD to assist the overwhelmed Commissioner Thomas, Commissioner Thomas then himself died of COVID-19 related health problems.   Now Hart replaced Thomas as the overwhelmed person in need of help, which is why Bazzi hired both Swope and Vanderplow to assist Hart.  Exhibit 2, 48: 2-20.

1.12.    Bazzi and Hart found and hired Paul Vanderplow as Director of Support Services within the DHPD because Vanderplow was a high-ranking federal

law enforcement officer working for the Federal Alcohol, Tobacco and Firearms ("ATF") agency, with specialization in accounting and white-collar crimes.  ATF Agent Vanderplow had worked with Bazzi and Hart before on gun cases within Dearborn Heights, and they knew Vanderplow to be a highly competent and qualified individual.   [ECF No. 115-2, PageID.3578, line 12 to PageID.3581, line 3].

1.13.    Bazzi and Hart found and hired Kevin Swope as Director of Police Operations because he was a highly qualified and reputable officer who was recommended by Mr. Bob Pfannes, the Romulus Police Chief.   [ECF No. 115-2, PageID.3577, lines 4-18].

1.14.    According to Mariana Hernandez (Mayor Bazzi's Chief of Staff), at the time both Swope and Vanderplow were hired, the DHPD was well within its budget for paying salaries of police officials for a variety of reasons, including the death of Commissioner Thomas (freeing up one entire commissioner's salary) and the fact that "we had at least 10 [officer's] positions vacant in the department."  **Exhibit 9**, 69:25 to 70:23.

1.15.    Hernandez further testified that at the time Swope and Vanderplow were hired that Mayor Bazzi was operating under an existing budget, was in the "middle" of its budgetary cycle (Exhibit 10: 69:10), and was well within that budget's restrictions.  Exhibit 9, 67:5 to 71:14.

1.16.   In Hernandez's experience, under those circumstances in which Mayor Bazzi was not making requests for new salary funding in excess of the existing budget, and facing an emergency situation, he did not need to approach the City Council for permission to make new police management hires.  Exhibit 9, 67:25 to 68:1 ("If it was within budget, he could hire without the council's approval.).

1.17.   According to the City's Charter, **Exhibit 10**, Mayor Bazzi is responsible for the enforcement of the City's laws [Charter, Section 5.3(a)] and "shall be the conservator of the peace and may exercise within the City the powers conferred on sheriffs to suppress disorder . . .".

1.18.   Mayor Bazzi himself stated that when he hired both Swope and Vanderplow as directors working under Jerrod Hart, he "had the budget" to do so, and in fact the roles that he was hiring Swope and Vanderplow for had been in the past fulfilled by other police officials whose positions were currently vacant.  Exhibit 2, 356:17 to 357: 9.  Thus, Bazzi was not even adding new managerial functionalities when he hired Swope and Vanderplow but was rather only creating new titles for old positions.   Although the title "director" often implied leadership of an entire separate department within the City government, here the word "director" was titular only and both Swope and Vanderplow worked within the DHPD.

12

1.19.     Ash Othman, another person working from time to time in the Mayor's

office as a "Confidential Secretary" to the Mayor, stated that in her

experience, the Mayor has the ability to hire individuals whose salaries fit

within the existing budget, and the "City Council can either concur with it or

not.  And even if they don't, the Mayor can still hire the person."  **Exhibit**

**11**, 73:14 to 74:1.

## 2. The Police Union objects to the hiring of Swope and Vanderplow outside of Act 78, and the issue is resolved with City Council ratification of a collective bargaining agreement under PERA.

2.1.  The police labor union (hereinafter, the "Police Union") objected to the

hiring of Swope and Vanderplow.   The Police Union objected because

Swope and Vanderplow were non-union members who were not hired

according to Michigan's Act-78 (a Michigan law providing for specific

procedures in the hiring and promoting of police officials and union

members).   Exhibit 2, 50:13 to 51:25.

2.2. The Police Union further objected because Swope and Vanderplow, who

were given the title of "directors," were fulfilling roles normally filled by

Police Union Lieutenants or Captains, in other words union members. *Id.*

2.3.  Mayor Bazzi resolved the dispute with the Police Union through negotiation.

The Police Union agreed that both Swope and Vanderplow would be

accepted and "grandfathered" (ECF. No 48-2, PageID.763), but in the future,

and under non-emergency situations, such managerial positions for managers serving directly below the Police Chief, would be filled using Police Union members.  This written agreement, which became part of a new collective bargaining agreement (the "CBA"), is found at Dkt. 48-2, PageID.765.

2.4. On February 7, 2023, Mayor Bazzi sent the proposed CBA to the City Council for approval.   His cover letter to the City Council is at Dkt 48-2, PageID.762.   The CBA specifically provides for the "grandfathering" of Swope and Vanderplow's positions and jobs, using their specific names. ECF. No. 48-2, PageID.763, 765.

2.5. Thereafter, the City Council voted 5-2 to approve the CBA under the Michigan Public Employment Relations Act ("PERA").

2.6. The current Mayor of the City, Mayor Mo Baydoun, voted in favor of adopting the CBA under PERA.   ECF No. 48-2, PageID. 761.

2.7. After the CBA was approved, Mayor Bazzi entered into Employment Contracts with the three Plaintiffs, signing all three contracts (and superseding contracts) in his capacity as Mayor of the City with authorization to sign binding contracts.   Exhibit 2, 57: 12 (Vanderplow Employment Contract); 60: 10-14 (Swope Employment Contract); and 64: 16-25 (Hart Employment Contract).

**3. Plaintiffs find that the DHPD is just as corrupt as Commissioner Thomas warned them it would be, and they speak out publicly about such corruption and attempt to reform the DHPD.**

3.1.   Mayor Bazzi testified that he encountered all of the following forms of

corruption within the DHPD after becoming Mayor of the City:

3.1.1.   The above-described coin-carrying "Golden Circle" (Exhibit 2, 34:14 to 35:4);

3.1.2.   A ticket-fixing scheme, allegedly involving Sergeant Mohamad Bazzy among others (Exhibit 2, 21:10 to 22:1);

3.1.3.   The interference with ongoing traffic violation stops being conducted by the DHPD by then Councilman Mo Baydoun (Exhibit 2, 22:1-3), who would pull his pickup truck up to an ongoing traffic stop to attempt to intimidate the police officer into giving the motorist "a break" and thereby curry political favor with motorists.  (Plaintiffs possess a video tape of such an event in which Mo Baydoun interferes with a traffic stop and is recorded by the Officer's chest camera);

3.1.4.   City Police Officers directing vehicles involved in Dearborn Heights traffic accidents to tow lots owned by friends, instead of to the tow lot with a City Contract (Exhibit 2, 22: 24 to 24:3);

3.1.5.   Retired or quitting police officers being allowed to keep fully automatic AR-15 rifles equipped with silencers after they left the employ of the DHPD (24:15 to 25:25);

3.1.6.   Endemic sexual misconduct and harassment including the transmission of texts of genital images, at least one rape charge (Exhibit 2, 372:15-21), and a camera placed in the female officers locker room (Exhibit 2, 28:1-7);

3.1.7.   Racist acts committed by officers with impunity (Exhibit 2, 373:7-9);

3.1.8.   The illegal conditioning of overtime privileges on traffic ticket quotas, such that to be able to earn overtime pay, officers had to give out a requisite number of traffic tickets (the DHPD, in its legal ignorance,  had actually created a Powerpoint presentation of how this illegal system worked, which has not been produced in discovery) [ECF 115-2, PageID.3627, lines 4-22];

3.1.9.   The racial targeting of certain areas and streets of the City, demographically frequented by African-Americans motorists, for a greater number of traffic tickets.  (Exhibit 2: 29:3-13);

15

3.1.10. A general "pay to play" culture that ex-Police Chief Meyers told Mayor Bazzi that he would just have to accept. ("Just get used to it."). (Exhibit 2, 30: 3-24);

3.1.11. A failure to register firearms owned by citizens in the City [ECF 115-2, PageID.3605, lines 2-17]; and

3.1.12. Problems with missing or unaccounted for cash or drugs from the Police evidence room (officers were taking cash from the evidence room and leaving behind personal IOUs). (Exhibit 2, 26:22 to 27:25).

3.2. Chief Hart, in his deposition and in his attached affidavit (Exhibit 13), describes his efforts to address these issues, including by creating a zero-tolerance environment for racism in the DHPD, the return to a merit-based system governing promotions (no more panther coins), and in bringing in the Federal Department of Justice and the Minnesota State Police to assist in investigations and help make recommendations for improvements. [ECF 115-2, PageID.3585, lines 7-13].

3.3. Chief Hart, as well as Director Vanderplow and Director Swope, on multiple occasions spoke before the Dearborn Heights City Council to address concerns about corruption and to propose new policies and practices.

3.4. New and reformative policies and practices, including Hart's recommendation to Mayor Bazzi, were often written up and promulgated on a document management system called "POWER DMS."   [ECF 115-2, PageID.3647, lines 4-23]. Plaintiffs only gained access to the Power DMS system on February 27, 2026 after months of stalling and obfuscation by the City, which had previously

16

claimed not to be in possession of Power DMS documents. As of this writing,

March 3, 2026, Power DMS documents have yet to be produced in discovery.

**4. The constant pressure to promote the career of an underperforming Arab-American Sergeant and the retaliation experienced for disciplining that same Sergeant.**

4.1. All three Plaintiffs have described as being under constant pressure to

advance the career of Sergeant Mohamad Bazzy, an underperforming Arab-

American police officer.  Mo Baydoun even asked Hart to "take care of his

boy" by promoting Bazzy, but Hart refused due to his policy of merit-based

promotions only.   [ECF 115-2, PageID.3668, line 18 to PageID.3669, line

19].

4.2. Mayor Bazzi, for his part, describes Sergeant Bazzy as lazy (Exhibit 2, 70:25

to 71:6), untrustworthy (Exhibit 2, 70:15), and engaging in multiple forms of

corruption, including ticket-fixing (Exhibit 2, 21:13 to 22:7).

4.3. Mayor Bazzi stated that he was under pressure to promote Arab-Americans

based on race alone.  (Exhibit 2, 74:2-9).  Mayor Bazzi remembers attending

a meeting at Dearborn Heights City Hall attended only by Arabs, in which

the only item on the agenda was the promotion of Sergeant Mohamad Bazzy.

(Exhibit 2, 80:3 to 81:25).

4.4. On one occasion in mid-2023 Mayor Bill Bazzi and the Plaintiffs met with

Khalil Rahal, a political operative inside Wayne County governmental

17

circles, who warned Mayor Bazzi that he would lose the next election (ECF No. 115-2, PageID.3675, lines 4-12), and who warned Jerrod Hart, that he would be fired, if Arab-Americans were not promoted.  [ECF No. 115-2, PageID. 3672, lines 3-9].  The meeting upset Hart to such a degree that he wrote a memorandum about it to preserve his memory.  [ECF 48-2, PageID.774-775 ("Key takeaways from this meeting: . . . ")].

4.5. Not only was Sergeant Mohamad Bazzy not promoted, but by mid of 2023 he faced discipline for the poor handling and investigation of a use of force incident.  (Exhibit 2, 84:11-19).

4.6. Councilman Saab demanded that disciplinary actions against Saab be dropped.  *See* FAC, Dkt. 48, at ¶ 36.

4.7. Although the discipling of Bazzy was entirely warranted, Hart claims that the campaign of harassment that Plaintiffs faced accelerated after the disciplining of Sergeant Bazzy.  [ECF 115-2, PageId.3774, line 24 to PageId.3775, line 4].

4.8. Councilman Saab also made public pronouncements of the "pressing need for a director/chief who is part of our community."  (Exhibit 18).  Saab's insinuation being that Jerrod Hart, a life-long Michigander, who grew up in Taylor and whose family church was in Dearborn Heights, is not "part of the

community."  *See* Exhibit 13 for Jerrod Hart's affidavit and Exhibit 18 for Saab's posting.

4.9. As Mayor Bazzi has himself testified, Defendants have routinely used the phrase "not part of our community" as a coded dog-whistle phrase meaning "non-Arab."  Exhibit 2, 76:24 to 77:5.

## 5. Plaintiffs face an orchestrated retaliatory campaign of harassment and personal attack by members of the Dearborn Heights City Council, including current Mayor Baydoun.

5.1. Plaintiffs noticed a particular pattern in their appearances before the City Council in which the same citizens, armed with leaked confidential internal documentation, would show up to personally attack them and their reform initiatives. *See* **Exhibit 14, ¶¶** 67-70.

5.2.  Such citizens, who routinely received leaked internal documentation, include Citizens LaPointe, Hak, Kaminsky, El Zayt, Tripepi and Mazloum.  These citizens would normally raise talking points echoing positions maintained by Mo Baydoun. *Id*.

5.3. Most of these same citizens were subsequently given jobs by the Baydoun administration once Baydoun became Mayor. *Id*.

5.4. TCD News Outlet, an organization owned or controlled by Baydoun, was also extremely critical of the Plaintiffs and is now the contracted PR firm for the City. *Id*. at ¶¶ 71-72.

19

5.5. After the Plaintiffs were constructively discharged, the above-named citizens stopped attending City Council events and stopped their criticism of the DHPD, despite the same problems and issues that such citizens were purportedly concerned about still persisting or even getting worse. *Id*. at ¶ 69.

5.6. Councilman Tom Wencel was recorded in June of 2025 (Plaintiffs possess the recording, which has been authenticated by Wencel in his deposition) speaking at a public event in Dearborn Heights describing the "political" tactics employed by Mo Baydoun and his allies against his perceived enemies:

> *"He doesn't know enough and he's got different motivations, and… so they look at every other candidate as an enemy here. Where you're supposed to be looking at just as an opponent like you'd play a game, not, you know, you're supposed to look at your opponent as an enemy but not hate the guy and do whatever you can to destroy him."*

## 6. The false criminal accusations, perjury, and attempted witness tampering committed by City Councilman Hassan Saab, all done as retaliation against Paul Vanderplow.

6.1. In the Spring of 2024, Hassan Saab filed a police report against Plaintiff Paul Vanderplow, alleging that Vanderplow was stalking him at his home. The incident became thoroughly memorialized in the briefing that took place in connection with Vanderplow's motion for sanctions pertaining to the false accusation.  *See* Dkt. Items 24, 37 and 39.

6.2. Vanderplow has stated in a separate affidavit that in driving by Saab's home he was merely responding to an incoming request for a police investigation that had been received by a City employee, Ash Othman, and then passed on to him.  [ECF No. 24-2, PageID.490, ¶ 4].

6.3. An investigation was subsequently performed by the Michigan State Police, who later cleared Vanderplow of all charges.  Vanderplow nonetheless suffered material damages from the false charges, including the denial of clearance to serve as the DHPD's executive representative on the FBI's Joint Terrorism Task Force and the temporary denial of admission to Police academy training. *See* Exhibit 14, **¶¶** 57-64.

6.4. In his deposition, Councilman Hassan Saab testified as to how Ash Othman had supposedly confessed to him that she had in fact not received any call requesting police help, and that Vanderplow and Mayor Bazzi had pressured her to make that story up to give Vanderplow an excuse or alibi for being in the vicinity of Saab's house. Saab even produced a document in his deposition attributing a quote to Othman "Ashley Othman admitted Bill told her to send the email to protect Vanderplow's stalking case."    (Exhibit 19, 148:22 to 151:19)(Saab's document is not attached here due to its highly vulgar content, but it is Exhibit 5 of his deposition, and in the Plaintiffs' possession).

6.5. Ash Othman, in her own deposition, testified that Saab's description of her "admission" was a lie (Exhibit 11, 34:10 to 36:13; 41:19 to 40:23).  Othman also testified that Saab had in fact both offered her employment (Exhibit 11, 38: 1-6, 104:5-19) and also indirectly threatened her family (Exhibit 11, 38: 10-18).  Othman further described how Saab was spreading false rumors about her within the Arab community that she stated would have a particularly damaging effect "within this community."  (Exhibit 11, 40:25 to 41:23).

## 7.  Plaintiffs are constructively terminated.

7.1. Chief of Staff Mariana Hernandez testified that one reason all three Plaintiffs were given employment contracts to begin with was to protect them against retaliation in their capacity as corruption-fighters. (Exhibit 9, 74:18-24);

7.2. The Plaintiffs' employment contracts were drafted by the City's HR director, Margaret Hazlett.  (Exhibit 9; 72:7-23);

7.3. Jerrod Hart suffered a job-induced heart attack on October 10, 2023, in part caused by pressure he was under from the City Council to criticize Israel after the Hamas attack on Gaza of October 7, 2023. *See* Exhibit 13, ¶¶ 72-76;

7.4. Jerrod Hart finally left his job on July 3, 2024 due to the unceasing harassment and toll on his health.   His letter detailing the reasons why he claimed to be constructively discharged is found at Exhibit 3.

22

7.5. Paul Vanderplow left his position in April/May of 2025 because he felt he could no longer do his job and due to the harassment, smear campaign, and sabotage he had experienced.   His letter describing his reasons for quitting and a related letter that Mayor Bazzi confirming his constructive termination are both found at Exhibit 4.

7.6. Kevin Swope left his job after Mayor Bazzi asked him to resign (Exhibit 8) to make space for Hussein Farhat, an ex-Corporal who skipped the ranks of Sergeant, Lieutenant and Captain to become Interim Police Chief.   That position was one the Mayor could fill through appointment of Farhat outside of Act 78.  [ECF No. 115-3, PageID.4020, lines 13-19].

7.7. Swope's contract states that severance payments will apply if the Mayor asks Swope to resign, and the Mayor asked Swope to resign.   *See* Exhibit 7 at ¶ 4.1 (last sentence) and Exhibit 8.

## 8.  The Dearborn Heights City Council's intentional and material breach of the severance provisions of the Plaintiffs' employment contracts and repeated violations of this Court's injunction (Dkt. 4).

8.1.  Upon being constructively discharged, Jerrod Hart was to receive a year of salary as a severance, and the City also promised to pay his medical insurance COBRA expenses out of the City's own pocket.   *See* Exhibit 5, ¶ 4.1, also found at ECF 48-2, PageID.802.   The City paid Hart's severance salary as agreed.   Hart is the only Plaintiff to have received his contractual severance.

23

But the City breached the COBRA promise by deducting health care premium payments from Hart's severance paychecks.  The City ignored Hart's communications on this subject for over a year, resulting in the loss of thousands of dollars to Hart.

8.2. Upon being constructively discharged (See Exhibit 4), Paul Vanderplow was to receive substantively identical severance benefits promised to Jerrod Hart. See Exhibit 6, ¶ 4.1.  The City has failed or refused to make any payment whatsoever under Vanderplow's severance provisions, despite the admission from the Mayor that Vanderplow was constructively terminated.

8.3. Mayor Bazzi expressly asked Kevin Swope to resign in order to allow Bazzi to hire Hussein Farhat as Police Chief outside of Act 78.  See Exhibit 8. Upon being asked to resign, Kevin Swope was to receive a year of severance.  See Exhibit 7, ¶ 4.1.  The City has failed or refused to make any payment whatsoever under Swope's severance provisions.

## STANDARD

The purpose of the summary judgement rule, as reflected by Federal Rule of Civil Procedure 56, "is to isolate and dispose of factually unsupportable claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, entry of a summary judgement is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of

24

law." Fed. R. Civ. P. 56(a). The Sixth Circuit Court of Appeals has held that summary judgment is to be used with "extreme caution," as it is a drastic remedy. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed*, 444 U.S. 986 (1979). A court reviewing a summary judgement motion must construe all reasonable inferences in favor of the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "A genuine issue of material facts exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Yeschick v. Mineta*, 675 F.3d 622, 632 (6th Cir. 2012).

## INVOCATION OF FRCP 56(d)

Since June of 2024 the City has intentionally frustrated discovery in these proceedings, and to date has produced less than 1,200 pages of (often redundant or irrelevant) documents in a document-intensive case, even though Plaintiffs know responsive documents to exist and even know where such documents are kept. The City's most recent production was made March 5, 2026. Long-awaited document searches that that City should have conducted *over a year ago* were finally conducted on February 27, 2026, after three motions to compel filed over a year's time (Dkt. 60, 67 and 103). *See* the Court's orders at ECF No. 108, ¶108 (C), PageID.1989 and ECF No. 109, Paragraphs 9 and 10, PageID.1992. Had this Court not granted a 10-day filing extension (Dkt. 122), this brief was to have been filed on the same day

that Defendants were finally ordered to conduct document searches on their informational systems.  [ECF. No. 101, PageID.1814].

On March 2, 2026 Defendants' lawyers claimed to need additional time to review "thousands" of documents generated by such searches for privileged material.  Documents that should have been produced well over a year ago will finally be produced in the days (or likely hours) before this filing is to be made.  All of this is intentional, part of Defendants' deliberate campaign of slow-walking discovery.  The situation materially prejudices the Plaintiffs, who have not had the benefit of proper discovery, or the ability to thoroughly review documents in time to answer the Defendants' Summary Judgment Motions.   Plaintiff's own production to the Defendants is not at issue and never has been.  [ECF No. 109, ¶¶ 3-6].

## ARGUMENT

### I.  Breach of Contract: The Plaintiffs' employment contracts with the city were validly created, were ratified under PERA, are legally enforceable, and have been intentionally breached by the City.

The Plaintiffs' Statement of Material Additional Facts ("SOMAF") makes clear the Plaintiffs' employment contracts found at Exhibits 5, 6, and 7 were drafted by the City's HR Department and then signed by the Mayor in his capacity as the City's chief law enforcement officer.  (SOMAF, § 1).  Nobody debated that Mayor Bazzi  had the power and authority to hire any Police Chief that he wanted, even outside of Act 78.   As for Vanderplow and Swope, the employment of both

26

"Directors" was outside of Act 78, but then subsequently ratified by the City Council when it adopted the CBA with the Police Union that specifically mentioned Swope and Vanderplow by name.   (SOMAF, §§ 1-2).   Both of the Directors were employed within the DHPD; no new internal organization or department was created for either of them.

Michigan law is clear that PERA trumps Act 78 and trumps a city charter, which exposes Defendants' Act 78/budgetary pretexts for what they are: lies.  *See, Int'l Ass'n of Fire Fighters v. Warren*, 411 Mich. 642, 648 (1981)("The question presented is whether a collective-bargaining agreement's provision concerning promotions, which is entered into under the public employment relations act (PERA), is valid and enforceable when it conflicts with provisions of the city charter and the fire and police civil service act, 1935 PA 78 (Act 78)").   The question presented by *Warren* is precisely the question presented here.   *Warren* answered that question clearly, with the holding that PERA trumped Act 78 and was superior to any conflicting charter provision.   "Therefore, PERA is the dominant law governing employment negotiations."  *Id.* at 668.

In addition to contradicting *Warren*, the City Council's arguments that the three Plaintiffs were hired outside the "constitutional"[4] constraints of the City's

---

[4]   In this context, the words "constitution" and "constitutional" allude to the City's Charter and the division of parliamentary rights thereunder, not the Federal Constitution.

budgetary process contradict the direct testimony of Mayor Bazzi, Mariana Hernandez, and Ash Othman.   Indeed, if such budgetary and constitutional concerns were first raised in good faith in January of 2024  –  and they were not – then the same budgetary concerns should have prevented the City Council from ratifying the CBA back in February of 2023.

Instead, the CBA was ratified under PERA and only then did Attorney Miotke invent the City Council's budgetary arguments a full ten months later, as a pretext for retaliating against the Plaintiffs by defunding their positions.   The dishonest "defunding" campaign is in fact the Defendant City Council's worst act of retaliation, and it was a public act the existence of which cannot be debated.   The defunding is also powerful evidence, in other words.   When they were hired on an emergency basis, at the mid-life of an existing budget cycle, there was ample money in the City's police department budget to pay the Plaintiffs' salaries because the DHPD was short-staffed by about 10 officers at the time and the Police Commissioner had just died.

The Mayor testified that he "had the budget" to hire Swope and Vanderplow under such emergency circumstances, who simply did the work that would otherwise be done by Police officers at the Lieutenant or Captain rank.  (SOMAF, § 1). Bazzi further testified as to how Commissioner Thomas, before he died, had recommended that such new hires had to be from the outside.   Hernandez has also testified as to

why it was that three individuals seeking to reform a highly corrupt police department needed employment contracts to protect them, because the knives would be out for them in a corrupt organization trying to defend itself.

The City has breached the severance provisions of all three employment contracts – Swope and Vanderplow getting the worst of it – and has even proudly admitted its breaches publicly in newspaper articles. *See* Exhibit 1. Here, the City Council's inherent dishonesty is on full display. The Council now claims in January of 202<u>6</u> that it has only recently discovered contracts entered into by Mayor Bazzi after he left office (see Exhibit 1), when such employment contracts have been public record in these proceedings for two years, since January of 2024 (ECF No. 1-2, PageID.53-69). City Council Attorney Gary Miotke has had the existence of such severance provisions personally explained to him on May 21, 2025, in writing. See **Exhibit 12**. Yet, his clients still claim to have only recently "discovered" the existence of Plaintiff's employment contracts.

If it can be demonstrated that each of the Plaintiffs was constructively discharged (and it can), then each of the Plaintiffs was owed his contractual severance benefits, which in each case is found at Section 4.1 of each employment contract. See **Exhibits 6, 7 and 8**. Defendants would now like to debate the facts of whether constructive discharge has occurred (ECF No. 116, PageID.4796-97), which is not possible in the summary judgment procedural environment.

With respect to Chief Hart, the City has honored his severance provisions with respect to the payment of his salary (but not the payment of health benefits). It is therefore strange to read that the City now debates whether Hart was ever constructively discharged (ECF No. 116, PageID.4796) when the City has already acted as if Hart was constructively discharged and paid his severance pay for the full year required by his contract. Hart's only remaining contractual claim with the City in connection with his employment contract pertains to the City's failure to pay his COBRA benefits as promised after he left the City's employ against his will.

As for Swope and Vanderplow, however, the City is in full breach of their entire contractual severance provision, including both salary and health care benefits. There can be no debating this claim, as the City has admitted as much in the Detroit News on January 12, 2026: "*Dearborn Heights City Council voids severance agreements with appointees*." See Exhibit 1.

## II. The Plaintiffs' Whistleblower claim under MCL § 15.361 survives summary judgment.

The litigants agree as to the elements of a whistleblower cause of action under Michigan law, but then genuinely disagree as to the material facts driving whether the elements are satisfied. Thus, summary judgment is not possible under Sixth Circuit law, cited above. As for what those elements are, the City's brief correctly lays out at PageID.4773-74 the elements of a whistleblower claim, which are **(1)** engagement by the Plaintiffs in protected activity, **(2)** an adverse action that

Defendants took as to the Plaintiffs, and **(3)** a causation or link between what the Defendants did and the protected activity.  In other words, element three requires evidence that Defendants sought to punish or retaliate against Plaintiffs for engaging in protected activity.  *Wurtz v. Beecher Metro. Dist.*, 495 Mich. 242, 250-52; 848 N.W.2d 121, 125-26 (2014).  Even after these elements are established, however, the Defendants can attempt to justify their actions and Plaintiffs must then show such justifications to be pretextual.  *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich 534, 537-538, 620 N.W.2d 836 (2001).

Having got the elements right, and apparently acknowledging that Plaintiffs' fight against corruption was a "protected activity," the City then makes the factually incorrect claim that Plaintiffs have "failed to identify adverse employment actions against them." [ECF No. 116, PageID.4776].  Plaintiffs genuinely disagree.  In fact, all three Plaintiffs claim that they were sabotaged by the City Council in doing their jobs (for no valid reason) and exposed to such miserable, humiliating, and abusive working conditions that they were forced to quit.  Jerrod Hart sets forth his reasons for quitting due to constructive discharge at Exhibit 3.  Paul Vanderplow's attorneys set forth his reasons at Exhibit 4, which was buttressed by Mayor Bazzi's own confirmatory writing, also at Exhibit 4.  Kevin Swope testified as to the own abuse he has suffered, and that he also saw the writing on the wall and that his days as Police Chief (he replaced Hart as Police Chief) were numbered because Mayor Bazzi

was determined to replace him as Police Chief with an underqualified Arab American detective from another town.   [ECF 115-3, PageID.4020, lines 13-19].

The City would like to factually debate whether Plaintiffs have been constructively discharged after first setting forth in its own brief the "non-exclusive" list of seven factors that can be used in Michigan federal court to measure whether a "reasonable person felt compelled to resign."  [ECF No. 116, PageID.4795].  If seven factual factors are required, however, then the facts are too extensive and too extensively debatable for summary judgment.  The City does not even attack the third whistle-blower element in its brief, which is a link between the abuse suffered by the Plaintiffs and their protected activity.   If the City had made such an attack, however, the Plaintiffs have a wealth of evidence indicating that the City Council came after them precisely because they were speaking out about Dearborn Height corruption and attempting to do something about it.   Jerrod Hart, for example, has testified that the City Council went so far as to consider having t-shirts made "mocking the investigations."   *See* FAC, Exhibit 4, PageID.774.   Writing on January 9, 2024 (six months before he resigned)  in summary of his conversations with local Arab-American powerbroker Khalil Rahal, Hart wrote "it's a joke to them and they want it to fail because it will be on us, not them securing their political futures."  [ECF No. 48-2, PageId. 774].

32

**The City Council's go-to pretext for retaliation, breach and harassment: the budget.**

Defendants' attempt to portray their campaign of harassment, defunding, and general sabotage directed against the Plaintiffs as just a legitimate defense of their "legislative" budgetary powers and prerogatives. *See* Dkt. 116 at PageId.4778. This is a mere "pretext" for their retaliatory behavior and can easily be exposed as such. In the first place, and as discussed above, the City Council voted in resolution 23-099 to approve a CBA that ratified the Plaintiff's jobs, and thereby placed Plaintiff's positions above subsequent budgetary attack by effect of PERA and the *Warren* case. The Defendants' budget pretext is no longer even legally possible, because of PERA and *Warren*. Factually, the City Council's own actions in passing the CBA in February of 2023 belie their belief that they were defending their legislative prerogatives in January 2024. In fact, and as Bazzi, Hernandez and Othman have all testified, Mayor Bazzi hired the Plaintiffs with ample room inside his existing budget to do so, in the middle of a budgetary season, and with the same functionalities already historically performed by police department officials. (SOMAF, § 1). Binding employment contracts were thereafter drafted by the City's HR Department and then signed by Mayor Bazzi. *Id*. Policing and law enforcement are at the very heart of the Mayor's own "constitutional" powers under the City's charter and the Mayor also enjoys his own budgetary privileges under the charter. *Id*.; *See also* Exhibit 10.

33

The Defendants' understanding of their own budgetary and "constitutional" powers under the City's charter is exaggerated and based mostly on inapt analogies to the budgetary powers of the United Stated Congress under the Federal Constitution.   The City's charter does not in fact give the City Council the same "power of the purse" reserved for the United Stated Congress, and in fact the budget is just that under the charter, a rough guideline for future spending that is not strictly binding on the Mayor.   According to interrogatory answers made by the City to interrogatories 14 and 15, the City has either spent significantly more *or significantly less* than the actual budgeted amount for the DHPD in every year in the last five years.   The charter also gives the Mayor significant leeway in spending decisions, especially when it comes to the Police power.  The relevant provisions of the Charter as well as the relevant interrogatory answers are collectively found at **Exhibit 10.**

### III.      The Plaintiffs' Title VII and Eliott-Larsen claims survive summary judgment.

As the City has itself written, on-the-job racial discrimination can be proven either directly or indirectly.     [ECF No. 116, PageID.4783].     Only *indirect* discrimination requires a claimant to engage in the three-part burden-shifting analysis created by *McDonnell Douglass*, 411 U.S. 792, 802-803, 93 S.Ct.1817, 36 L.Ed. 2d 668 (1973).   Direct evidence requires no *McDonnell* burden-shifting.

Defendants are wrong when they assume that Plaintiffs have no direct evidence of "direct" racial discrimination at the DHPD.     [ECF No. 116,

PageID.4783-84].   A full history of the personal experiences of each of the Plaintiffs is found in their personal affidavits attached at **Exhibits 13** (Hart), **14** (Vanderplow) and **15** (Swope) and incorporated into this brief by reference, and such histories provide evidence of direct racial discrimination, in this case against whites and in favor of Arab-Americans.

Plaintiffs have described, for example, the pressure that they were put under to promote an undeserving Arab-American Sergeant, Sergeant Bazzy.  Plaintiffs have described how the campaign against them took on a new intensity after they disciplined that same Sergeant Bazzy.  Jerrod Hart has described a meeting in which Khalil Rahal, an emissary from Wayne County's own power system and the County Executive, who told Mayor Bazzi pointblank that he needed to find an Arab police chief or lose the next election.  Mayor Bazzi then acknowledged in his deposition that Jerrod Hart's claims concerning the Rahal meeting were accurate.  (Exhibit 2, 93:3 to 98:22 in which Bazzi comments on the accuracy of FAC Exhibit 4, PageID.774-75].

As further corroboration, Sergeant Bazzy's big brother then posted a widely seen online video featuring Sergeant Bazzy, in full uniform, announcing his little brother's potential future as Dearborn Heights Police Chief.  [Video Story[5] posted

---

[5]   The cited content was published as an Instagram "Story," a temporary post that is publicly viewable for approximately 24 hours before disappearing unless archived

by Sam Hussein Bazzy (@sambazzy1), INSTAGRAM, (n.d.) (screen capture on file with counsel)].  Mayor Bazzi has described accidentally attending a meeting in which only Arabs were present in which the promotion of an Arab-American was the only item on the agenda.  (Exhibit 2, 80:4 to 85:25).  Paul Vanderplow has described being unfairly replaced as Comptroller by an Arab-American with far less experience after the City Council voted to prevent him from having the ability to sign the City's checks. *See* Exhibit 14**, ¶¶** 75-79.

Kevin Swope has described being asked by Mayor Bazzi to resign for no other reason that making space for Mr. Hussein Farhat, an under-qualified Arab-American part-time real estate agent, and a Corporal-ranked Detective, from Romulus, to become Police Chief. *See* **Exhibit 15, ¶¶** 150-151, 160-169. Jerrod Hart has described his discomfort in having to work with an unqualified Arab-American "Emergency Manager" as a colleague, Hussein Farhat, that everyone in City Hall knew was being groomed to replace him as Police Chief at the first opportunity. [ECF No. 115-2, PageID.3687, line 14 to PageID.3688, line 4]. Hart even kept a contemporaneous diary or "timeline" of events that sets forth in daily detail his direct personal experiences.   See **Exhibit 16**.

---

by the account holder. The Story at issue was preserved by Plaintiffs via contemporaneous screen recording and remains in counsel's possession.

Mr. Hussein Farhat, a part-time real estate agent and investigator, worked in Romulus and held the police rank of "corporal" until coming to work for Dearborn Heights.  **Exhibit 17**, 35:2 to 36:13.  After Mayor Bazzi succumbed to the racial pressure he was under to make an Arab-American Police Chief, after the Rahal interview, Bazzi set about grooming Farhat to be his new Police Chief, despite Farhat holding only the rank of mere corporal, and working for an entirely different city.   To do this, Bazzi first installed Farhat as "Director of Emergency Management" with the clear intent of making Farhat Police Chief as soon as he could.   Vanderplow has testified that Farhat did little to no work as Emergency Manager, as if his position were meaningless and Farhat was merely biding his time and waiting for events to develop. Exhibit 14, ¶ 38. Kevin Swope even had to draft the City's emergency procedure manual while Farhat was serving in his fake role as Emergency Manager. Exhibit 15, ¶ 151.

Even Farhat himself has testified that when he first toured the Dearborn Heights Police Department, while he was no longer even a police officer and was "working" as Emergency Manager, Bazzi told him "*all these people are going to be working for you one day.*"   Exhibit 17, 34:13 to 34:24.  Thereafter, Bazzi made arrangements to offer Swope a severance package if he resigned so that Bazzi could directly name Farhat as Interim Police Chief without having to comply with Act 78 (the Chief position is not subject to Act 78).

37

Nothing explains the meteoric rise of a Corporal-Investigator from another city to Dearborn Heights Police Chief *within a period of months* except for that Corporal's race: Arab-American.   Plaintiffs knew, even as they worked to reform the City of Dearborn Heights, that their days as City employees were numbered because they were the wrong race: white.   And if Bazzi left early to become Ambassador, as he signaled that he would, then Plaintiffs would have nobody left to even half-heartedly protect them, as Mayor Bazzi was doing up until then.

Plaintiffs submit to this Court that all of the above facts are evidence of the *direct* on-the-job racism that they suffered from, not *indirect*.   Even if the evidence is better described as indirect evidence, there can be no question that Plaintiffs pass muster under *McDonnell Douglas* and its elements, which the City sets forth at PageID.4783 of its brief.   As has already been analyzed above and will not be repeated here, Plaintiffs belong to a protected class by pertaining to a particular race. Plaintiffs were well qualified for their jobs at the City.   Plaintiffs suffered an adverse employment action by being constructively terminated and through all the separate incidents that eventually added up to constructive termination.   Thus, even the prima facie elements of an indirect claim found at PageID.4783 are satisfied.

In its brief at PageID.4784-86, the City makes the claim that Plaintiffs have failed to establish "comparators" showing how equally positioned Arab-Americans were treated differently from the Plaintiffs.    This line fails for at least two reasons.

First, the argument fails to consider the fact that Plaintiffs were the three highest ranking law enforcement officials in the City of Dearborn Heights.   There can be only one Police Chief, for example, and the City cannot explain just what other large group of Dearborn Heights police chiefs that Police Chief Hart was supposed to compare himself to.  The same logic applies to both Vanderplow and Swope, who together occupied the second and third most powerful positions within the DHPD.

Second, there actually are direct comparators.  They include (1) the likeable but unqualified person who was being groomed to take the job of Police Chief (Hussein Farhat) from Jerrod Hart and later from Kevin Swope, (2) the person that the City Council attempted to bully the Plaintiffs into promoting (Sergeant Mohamad Bazzy), and (3) the under-qualified person who replaced Paul Vanderplow as Comptroller (Mahdi Baydoun) after the City Council refused to grant Vanderplow check-signing privileges.  Instead of being sabotaged, attacked and harassed, all three individuals – none of whom being qualified to be promoted – received preferential treatment or favoritism based on nothing more than their race. The supposedly missing "comparators" are Hussein Farhat, Mohamad Bazzy and Mahdi Baydoun, all three Arab-Americans.

Finally, *McDonnell Douglas* requires the City to proffer a proper justification for its actions, and then for Plaintiffs to show such justification is a mere pretext. That discussion, involving the pretext of budgetary or constitutional prerogatives of

the City Council, is already contained above.    Plaintiffs have already established

that the City's supposed justification is a post-hoc excuse, and a lie.   For this reason,

the Title VII and Eliott-Larsen counts survive summary judgment.

## IV.    The ADA and age discrimination Counts survive summary judgment.

Jerrod Hart has alleged that the City Council – knowing full well that he

suffered from a heart condition, diabetes and other physical ailments – intentionally

heaped abuse and stress upon him with the goal of driving him from his job by

destroying his health. Exhibit 13, ¶ 69.  In that, they succeeded; Hart had a heart

attack while on the job at Dearborn Heights, due to the retaliatory stress that he was

under. Now the Defendants claim that Hart never requested an "accommodation"

from them.  The "accommodation" was to be spared the harassment and abuse that

eventually forced Hart's constructive discharge, and Hart requested such

accommodation, if it can be called that, on multiple occasions.    While the

Defendants now claim that they did not know of Hart's conditions or that Hart made

his disabilities know to the Defendants, these are factual arguments that are belied

by the evidence.   Perhaps the most poignant example of the ageism that Plaintiffs

faced would be Councilman David Abdallah asking Hart why he did not just go

home to play with his granddaughter and enjoy his old age rather than attempt to go

down in a sinking ship with Mayor Bazzi. Exhibit 13, ¶ 70.  Each of Swope and

Vanderplow have evidence of being replaced by younger and less qualified individuals: Swope by Farhat, and Vanderplow by Mahdi Baydoun.

## V.    At the time the FAC was filed, this Court's injunction was the only thing that prevented the Defendants from violating the FLSA

At the beginning of this litigation, Plaintiffs faced the threat of having their job positions "defunded" such that they faced the choice between working for free or not at all.   This directly invoked the Fair Labor Standards Act (FLSA).   Due to the City Council's defunding action, Plaintiffs sought and gained the injunction of this Court found at ECF. No. 4.   Twice now, the City Council has attempted to lift this injunction (ECF No. 66, 83) and twice now this Court has decided that the injunction needs to stay in place, most recently at ECF No. 94.   Now, Defendants move for summary judgment because they had to be restrained/enjoined from violating the FLSA.   The Court's injunction, however, does not moot the FLSA count, although the severance related controversy is contractual in nature.   *Already, LLC v. Nike*, 568 U.S. 85, 91, 133 S. Ct. 721, 184 L. Ed. 2d 553 (2013) ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued.").

## VI.    Under the *Pickering, Garcetti, Connick, Lane* and *Boulton* cases, the Defendants have violated Plaintiffs' First Amendment Rights and retaliated against Plaintiffs for speaking out as private citizens on matters of public concern.

In *Garcetti v. Cebellos*, the Supreme Court created a two-step process to determine whether a public employee's speech is entitled to First Amendment Protection.  *Garcetti v. Ceballos*, 547 U.S. 410,  126 S.Ct. 1951, 164 L.Ed. 2d 689 (2006).   That two-step process is as follows:

> The first [step] requires determining whether the employee spoke **as a citizen** on a **matter of public concern**.   If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.   If the answer is yes then the possibility of a First Amendment claim arises.   The question becomes whether the relevant government entity had an **adequate justification** for treating the employee differently from any other member of the general public."

> 547 U.S. at 418 (citations omitted; emphasis added).

***Garcetti's* two steps therefore asks three questions**: (1) did the Plaintiffs speak as citizens or merely as employees?; (2) did Plaintiffs speak on a matter of "public concern"?; and (3) did the City and the City Council lack any "adequate justification" for treating the Plaintiffs as they did?   The answer to all three questions is yes.

Garcetti <u>first</u> asks if Plaintiffs spoke as private citizens.   The Supreme Court measures whether speech was private or conducted only through employment by looking at "whether the speech at issue is itself ordinarily within the scope of the employee's duties, not whether it merely concerns those duties."   *Lane v. Franks*, 573 U.S. 228, 240, 134 S.Ct. 2369, 189 L.Ed. 312 (2014).   In *Lane*, the Supreme

Court ruled that a public employee who had taken actions to combat corruption as part of his job duties and who was subsequently laid off, supposedly due to budgetary and financial concerns, had in fact spoken as a private citizen. *Lane*, 573 U.S. at 241. *Lane* is therefore close to being a factual match to this case.

The Supreme Court expressly stated in *Lane* that "it would be antithetical to our jurisprudence" to put public employees in a dilemma of having to choose between speaking out truthfully and "the desire to avoid retaliation and keep their jobs." *Id.* "Government employees are often in the best position to known what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686, (1994). For example, teachers working at schools have a special knowledge about what is going on inside the educational system, and as a result their speech concerning the school system enjoys First Amendment protections, even when that speech happens to concern their employment. *Pickering*, 391 U.S. 563, at 572. What holds for teachers should hold for law enforcement.

In this case, the Plaintiffs faced an extraordinarily corrupt City government, which they spoke out about in a myriad number of ways. Fighting corruption may have "concerned" their jobs, but it was something that all three Plaintiffs did as a personal service to Dearborn Heights and to this State. Plaintiffs left high-paying jobs for the altruistic purpose of fighting corruption in Dearborn Heights. The

Plaintiff's choice to fight corruption was a personal and political choice, a choice not made merely in a professional capacity.  Fighting corruption is not a technical, apolitical, or mundane task that is entirely job-related because corruption itself is not ordinary, or at least it is not supposed to be in the United States.  Nor is the defense of corruption ever a valid managerial goal.   *Lane* clearly applies here both on the law and on the facts.   Moreover, public speaking by those exposing corruption is one of the best disinfectants for corruption.  Defendants would have this Court believe that corrupt public officials can repress free speech by more honest government workers and then get away with it.

The underline second Garcetti question is whether rampant governmental corruption and cronyism – for example, IOU's left in Police evidence rooms were drug bust cash used to be – are matters of public concern?  Should the citizens of Dearborn Heights have a "concern" about corruption in their own municipal government? These questions should answer themselves.  The Supreme Court in *Garcetti* held that "[e]xposing governmental inefficiency and misconduct is a matter of considerable [public] significance." *Garcetti*, 547 U.S., at 425.  The Supreme Court has stated that speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community' or when it 'is a subject of legitimate news interest, that is, a subject of general interest and of value and concern to the public.'" *Lane v. Franks*, 573 U.S.

at 241 (*quoting Snyder v. Phelps*, 562 U.S. 443,453, 131 S. Ct. 1207, 179 L. Ed.2d

172 (2011)).    As the Supreme Court in *Connick* noted, public employers should,

"as a matter of good judgment" be receptive to constructive criticism from

employees.    *Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed. 708

(1983).   There cannot, in sum, be any reasonable doubt that corrupt municipal

governance is a matter of "public concern."

The underlined third Garcetti question asks if the Defendants had any adequate

justification for attempting to defund the Plaintiff's positions and for the general

campaign of harassment that they waged against the Plaintiffs.   This third Garcetti

question mirrors the *McDonnell Douglas* analysis, which asks whether a government

employer has any valid reason for its discriminatory behavior, and then puts the onus

on the Plaintiff to demonstrate that such purported reason is in reality just an excuse

or a pretext.

Here, these questions are well covered already in the text above.   The

Defendants' supposed concerns for the "constitutional" prerogatives of the City

Council as a legislative body, and for the budgetary process in general, flies in the

face of the Defendants' express ratification of the employment of these Plaintiffs

under PERA, and the chronology of events.   The City Council, as led by Mo

Baydoun, and now the City's executive branch, again as led by Mo Baydoun,  have

used the excuses of budgetary and parliamentary concerns as a pretext for racial

discrimination and the punishment of whistleblowers. Defendants now want this Court to believe that Plaintiffs' claims of racism contradict with their whistleblower claims, but the two rationales for abusing the Plaintiffs co-exist quite nicely in a mutually reinforcing way within the City Council's mentality.

*Pickering* is the seminal case here, and is described by Justice Sotomayor in *Lane* (573 U.S. 228, at 231) as establishing a balance "between the interest of the [employee], as a citizen, in commenting on matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. 563 at 568. In this case, Defendants have no excuse for attempting to sabotage an anti-corruption effort seeking to improve the public services provided by the DHPD. Defendants have punished Plaintiffs not for wrongdoing but for doing right. Defendants are not promoting "efficiency" through their attacks on Plaintiffs, but rather inefficiency. So, the *Pickering* "balance," if it even applies here, strongly favors the Plaintiffs. In sum, "[a] public employee does not abandon their constitutional rights in order to keep their job as a public official." So stated the City's legal counsel in her brief found at ECF. No. 37, PageID.617, and she quoted *Pickering.*

### A separate analysis dedicated to First Amendment "retaliation."

A significant overlap exists between the elements of First Amendment retaliation and the elements of a direct First Amendment violation, already set forth

above.  To show retaliation, a public employee must show (1) that he or she was engaged in constitutionally protected speech, (2)  that the defendant's adverse actions caused plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was motivated *at least in part* as a response to the exercise of constitutional rights. *Boulton v. Swanson,* 795 F.3d 526, 530-31 (6th Cir. 2015)(*quoting Leary v. Daeschner* 228 F.3d 729, 737 (6th Cir. 2000).

Here, the existence of a constitutional right of free speech by private citizens speaking on matters of public concern is already established above.   As for the second element, the question of whether the Defendants' actions have caused Plaintiff to suffer chill-casting injuries, the best way for this Court to answer this question may be just to read the personal affidavits of Hart, Vanderplow and Swope, which are respectively attached hereto at Exhibits 13, 14 and 15.   A contemporaneously kept diary or timeline of events kept by Jerrod Hart is also attached at Exhibit 16.  All of these materials are incorporated herein by reference. The adverse action suffered by Plaintiffs include the attempted defunding of their positions, months of harassment, public disparagement in City Council meetings, targeted sabotage of reform efforts, and in the end, constructive termination.   These actions would cause ordinary people to think twice about speaking out on matters of public concern.

Defendants now point to the raises that Plaintiffs received as evidence that they never even suffered at all while City employees, but Defendants conveniently forget that only Mayor Bazzi stood behind those raises, and he was known to be leaving for Tunisia as the new American ambassador nearly a year ago. Plaintiffs knew full well that their jobs with the City were doomed, and that they had no long-term future at the City. The City Council, after all, had already tried once to defund their positions. When asked why he thought he was going to be fired, Swope answered "[b]ecause of the fact that City Council wanted me fired. [ECF No. 115-3, PageId. 4014, lines 23-24]. Even Mayor Bazzi himself succumbed to racial pressure before he left, by attempting to elevate Hussein Farhat, a mere detective from Romulus, to Police Chief.

As for the third element, there is ample evidence that the Defendants have been motivated "at least in part" by the Plaintiff's exercise of free speech that points out how corrupt the DHPD was and still is under the Defendants' governance. The attempted defunding that came after Plaintiffs began cleaning house at the DHPD is evidence enough. This is cause and effect, on chronological display. As are the T-shirts that Khalil Rahal stated the City Council was thinking of making that mocked Plaintiffs' reform efforts (SOMAF, §4; ECF 48-2, PageID.774), or the orchestrated vituperation and obstruction that Plaintiffs faced when they attended City Council meetings. (SOMAF, §5). Plaintiffs were all described by Mayor Bazzi as honest

48

and hardworking employees who meant well and never required disciplining. (Exhibit 2, 112:17 to 115:3)    When asked if the City Council had treated the Plaintiffs fairly, in all three instances Mayor Bazzi answered no.   (Exhibit 2, 100:6, 102:10, 104: 19).  Bazzi testified that there was no valid reason for Hassan Saab's "no confidence" measure against Hart and his team.  (Exhibit 2, 115:5-17).  In sum, nothing else explains the treatment that Plaintiffs received from the Defendants other than the Plaintiffs' exercise of First Amendment rights speaking out against the Defendants' corruption and the Plaintiffs' race. These two reasons are hardly contradictory or mutually exclusive.

## CONCLUSION

Anyone who denies that Plaintiffs were ever persecuted or exposed to "adverse" employment actions because of their race and because of their corruption-fighting should read the attached personal affidavits of Hart, Vanderplow and Swope found at **Exhibits 13, 14,** and **15**, which are fully incorporated herein by reference. At the personal request of Mayor Bill Bazzi, the three Plaintiffs left the comfortable high-paying jobs that they already had to try to do something to improve the DHPD. As their reward, Plaintiffs then faced a determined counterattack from representatives of the very racist and corrupt culture that they came to change.  Now the defenders of corruption move for summary judgment.  However, this controversy is far too factually complicated to be resolved using summary judgment.

Dated: March 9, 2026

                    Respectfully submitted,

                    /s/ Stephen J. Brown
                    FAUSONE & GRYSKO PLC
                    Brandon M. Grysko (P82751)
                    Stephen J. Brown (P82687)
                    Counsel to Plaintiffs
                    41700 West Six Mile Road, Suite 101
                    Northville, Michigan 48168-3460
                    (248) 380-0000
                    jbrown@thefgfirm.law

## LOCAL RULE CERTIFICATION

I, Attorney Stephen J. Brown, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnote); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts).  I also certify that it is the appropriate length.  Local Rule 7.1(d)(3).

Respectfully submitted,

/s/ Stephen J. Brown

## CERTIFICATE OF SERVICE

I, Stephen J. Brown, hereby certify that on the 9th day of March, 2026, I served a copy of **PLAINTIFFS' OMNIBUS RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT FILED BY PRIMARY DEFENDANT (DKT. 116) AND INTERVENING DEFENDANT (DKT. 115)** on all appearing attorneys and service recipients registered for receipt via electronic filing.  I declare under penalties of perjury that this Proof of Service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

/s/ Stephen J. Brown

M:\Legacy Clients\BMG\Swope-Vanderplow-Hart\Pleadings\Omnibus Response to MSD.docx