**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

_____

**PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR**
**SUMMARY JUDGEMENT**

**EXHIBIT 2**

Bill Bazzi
August 29, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


KEVIN SWOPE, PAUL VANDERPLOW,

JERROD HART,

               Plaintiffs,

     vs.                  Case No. 2:24-cv-10240
                           Hon. Mark A. Goldsmith
                           Magistrate David R. Grand

CITY OF DEARBORN HEIGHTS, a

Michigan Municipal Corporation,

               Defendant,

CITY OF DEARBORN HEIGHTS CITY

COUNCIL, in its official capacity only,

Intervening Defendant.

_____/




     The Deposition of BILL BAZZI,

     Taken at 6045 Fenton Street,

     Dearborn Heights, Michigan,

     Commencing at 10:03 a.m.,

     Friday, August 29, 2025,

     Before Cheri L. Poplin, CSR-5132, RPR, CRR.

Page 2

```
 1  APPEARANCES:
 2      FOR PLAINTIFFS:
 3          STEPHEN JOSEPH BROWN
            Fausone & Grysko PLC
 4          41700 West Six Mile Road, Suite 101
            Northville, Michigan 48168
 5          248.912.3213
            jbrown@thefgfirm.law
 6
 7      FOR DEFENDANT:
 8          MONICA N. HUNT
            The Allen Law Group PC
 9          3031 West Grand Boulevard, Suite 525
            Detroit, Michigan 48202
10          313.871.5500
            mhunt@alglawpc.com
11
            ROGER A. FARINHA
12          Corporation Counsel Dearborn Heights
            6045 Fenton Street
13          Dearborn Heights, Michigan 48127
            313.689.8437
14          rafarinha@dearbornheightsmi.gov
15
        FOR INTERVENING DEFENDANT:
16
            TARIK D. TURFE
17          Hammoud, Dakhlallah, and Associates PLLC
            6050 Greenfield Road
18          Suite 201
            Dearborn, Michigan 48126
19          313.471.4009
            tt@hdalawgroup.com
20
            GARY T. MIOTKE
21          Miotke Law Office
            6828 Park Avenue
22          Allen Park, Michigan 48101
            313.388.4809
23          gmiotke@miotkelawoffice.com
24
     ALSO PRESENT:
25
            Hassan Saab, City Council
```

Page 3

```
 1                  TABLE OF CONTENTS
 2
 3  WITNESS                                         PAGE
 4  BILL BAZZI
 5
 6  EXAMINATION BY MR. BROWN                          6
 7  EXAMINATION BY MR. TURFE                        187
 8  RE-EXAMINATION BY MR. BROWN                     377
 9  RE-EXAMINATION BY MR. TURFE                     378
10
11                     EXHIBITS
12
13  EXHIBIT                                        PAGE
14  (Exhibits attached to transcript.)
15  EXHIBIT A                                        44
16  EXHIBIT B                                        54
17  EXHIBIT C                                        59
18  EXHIBIT D                                        64
19  EXHIBIT E                                        77
20  EXHIBIT F                                       140
21  EXHIBIT G                                       142
22  EXHIBIT H                                       148
23  EXHIBIT I                                       212
24  EXHIBIT K                                       234
25  EXHIBIT L                                       240
```

Page 4

```
 1  EXHIBIT N                                       278
 2  EXHIBIT O                                       286
 3  EXHIBIT J                                       380
 4  EXHIBIT M                                       380
```
```
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1  Dearborn Heights, Michigan
 2  Friday, August 29, 2025
 3  10:03 a.m.
 4
 5                  BILL BAZZI,
 6      was thereupon called as a witness herein, and after
 7      having first been duly sworn to testify to the truth,
 8      the whole truth and nothing but the truth, was
 9      examined and testified as follows:
10          MR. BROWN:  Good morning.  My name is
11      Attorney Stephen J. Brown, but I informally go by the
12      name of Joseph, which you can call me if you prefer.
13      I represent the plaintiff in this case, which is Case
14      Number 24-cv-10240 in the Eastern District of
15      Michigan, commonly called the Swope case, and we're
16      here this morning for the deposition of Mayor Bill
17      Bazzi, the mayor of Dearborn Heights.  We are sitting
18      in a conference room across from the City Council
19      chambers in the Dearborn Heights City Hall.  And I
20      presume we should go around the table, clockwise
21      perhaps, and announce who we are in the room.
22          MR. TURFE:  Tarik Turfe appearing on behalf
23      of the intervening defendant, City of Dearborn Heights
24      City Council.
25          MR. MIOTKE:  Gary Miotke appearing on
```

Bill Bazzi
August 29, 2025

Page 6

1   behalf of the intervening defendant, City of Dearborn
2   Heights City Council.
3           MR. FARINHA:  Roger Farinha, corporation
4   counsel, Dearborn Heights.
5           MS. HUNT:  Monica Hunt appearing on behalf
6   of the defendant, City of Dearborn Heights.
7           THE WITNESS:  Bill Bazzi, mayor of Dearborn
8   Heights.
9                   EXAMINATION
10  BY MR. BROWN:
11  Q.  Good morning, Mayor Bazzi.
12  A.  Good morning.
13  Q.  Have you been deposed before, sir?
14  A.  Yes.
15  Q.  I take it you're familiar somewhat with the rules and
16  modes of depositions?
17  A.  Yes.
18  Q.  I'll go over them very briefly just to make a record
19  of it, but since you're familiar, I'll go quickly.
20          First of all, I'm going to ask you any
21  number of questions today, and it's often hard for
22  lawyers to get the questions right the first time, the
23  phrasing, so if for whatever reason you don't
24  understand a question or you find it confusing, please
25  stop and tell me and I'll try and fix whatever mistake

Page 7

1   I've made, but if you answer a question, I'm going to
2   presume and assume that you understood the question,
3   that it made sense to you, and that you could proceed
4   with the answer; is that fair?
5   A.  Yes.
6   Q.  Second, we have a court reporter here.  Her name is
7   Cheri Poplin.  She needs to write down everything we
8   say, so as a courtesy to her, we need to keep our
9   communication verbal, and by that, I mean you can't
10  shake your head or nod because that's silent and she
11  can't write that down.  And at the same time we need
12  to use words that are normally found in the
13  dictionary.  It's hard for her to transcribe words
14  like uh-huh or nah, so yes and no, clear, dictionary
15  words are always best.
16          We're going to be here for quite some time,
17  so if you need a break, just ask for one.  The only
18  rule there is that you ask for a break after the last
19  question I ask is fully answered so that there's not a
20  question pending.
21          And then, finally, the subject of
22  objections always comes up.  Witnesses often become
23  confused because I'll ask you a question, there will
24  be a number of objections, perhaps we lawyers will
25  argue and yell at each other and try and show each

Page 8

1   other how smart we are, and then at the end I find
2   that the witness often doesn't know what to do, and
3   what you do is you do whatever your attorney tells you
4   to do.  The only time you're not going to answer a
5   question I presume is when your attorney tells you
6   don't answer.  But otherwise after the objections are
7   done, normally I'll say you can answer or I'll
8   rephrase the question and then you answer.  Make
9   sense?
10  A.  Yes.
11  Q.  All right.  So, sir, I'm going to ask you a number
12  of -- I apologize in advance.  I'm going to ask you a
13  number of background questions, and I'm going to do
14  that just so we understand a little bit about you and
15  your life and your perspective on things, and a lot of
16  these questions I probably already know the answers
17  to, but I need to have you describe it in your own
18  words.  I need to have it all in one deposition
19  transcript.
20          So with that said, can you state your
21  current job title, please?
22  A.  Mayor of Dearborn Heights.
23  Q.  And how old are you, sir?
24  A.  61.
25  Q.  Can you briefly describe your educational background

Page 9

1   starting with say high school and working your way
2   forward in time to your last degree?
3   A.  So after high school I took a few classes at community
4   college, Henry Ford, and after that I joined the
5   Marines, U.S. Marines.  Spent four years in the
6   Marines.  In the Marines I've taken several courses
7   when I was on active duty.  Took also a lot of college
8   classes in the evening when I was on active duty.  And
9   finished my bachelor's, aeronautical science.  I also
10  have a master's degree also in aeronautical science
11  from Embry-Riddle Aeronautical University.  Then
12  obviously I've taken a lot of courses with -- with the
13  military, a lot of courses that actually they can be
14  transferred to college credits.  Been to the police
15  academy, military police academy.  I've been to --
16  several courses I've took for aircraft maintenance.
17  Also for Ford Motor Company I've taken a lot of
18  courses, leadership engineering courses.  For Boeing
19  I've taken a lot of courses also engineering
20  management.  Also did Carnegie training, Dr. Deming
21  training.  I mean, that's just basic some of the
22  stuff, but I'm sure there's a lot more.
23  Q.  So you said you got some police training through the
24  military?
25  A.  Yes, sir.  I did -- I -- I went to the police academy

Bill Bazzi
August 29, 2025

Page 10

1  for military police academy, so I did my -- I was
2  military police.  I also -- a couple deployments later
3  they asked me to go to Fort Leonard Wood, and I was
4  actually an instructor at the police academy.
5  Q.  So on the military police side obviously MCOLES
6  doesn't apply, but did you get some kind of
7  certification or did you have some kind of title as a
8  military policeman in the end?
9  A.  Yeah.  I mean, you go to the academy.  You're
10  qualified military police, and in the military you do
11  both.  You do both -- there's two things that you do
12  in the military.  They're required to do a field
13  training, which is if you get deployed, you gotta
14  protect conveys, you gotta protect military
15  installations overseas, and also you have to do
16  Garrison, which is what the police -- civilian police
17  do, so you have to study the UCMJ.  There's actually
18  more -- more requirement in the UCMJ booklet than you
19  see in the civilian laws.  There's actually a few
20  additional things in the UCMJ than there is in the
21  civilian law.
22  Q.  So I always think of the military police as the
23  so-called MPs.  Are you an MP?
24  A.  Yeah.  Military police.  Well, I did that.  They
25  changed my field after 9/11.  After the hit on 9/11

Page 11

1  they actually asked me to -- a few years after they
2  asked me to transfer to intelligence, so I went and
3  did some training for intelligence.  I was
4  intelligence chief, and I did that for about ten years
5  with both the Marines, and also at the end I was part
6  of an intelligence unit, which is a joint intelligence
7  unit, part of European command.
8  Q.  And did that intelligence work take advantage of your
9  fluency in Arabic, then?
10  A.  I never actually -- I never once used Arabic as an
11  intelligence officer or as an intelligence chief.
12  Q.  But you are fluent in Arabic; is that correct?
13  A.  Yes.
14  Q.  So let's do the same chronology with your career, sir.
15  If you could, let's skip your high school jobs
16  delivering papers, but could you describe your first
17  job after college and then work your way forward in
18  time to your current job as mayor of Dearborn Heights?
19  A.  So I did four years first active duty in the Marines,
20  so that was my full-time job.  I got on active duty.
21  Wanted to finish my bachelor's.  I finished my
22  bachelor's degree, and at the same time I started
23  working for Boeing Aircraft Company.  I was part of
24  work in -- part of a corrective action unit.  This is
25  like any mishaps that happens in aircraft.  I was

Page 12

1  working on -- if there's any issues with aircraft,
2  that was the unit that I worked -- worked with, find
3  out root cause of issues at Boeing.  First I did that
4  at Boeing.  Finished my bachelor's.  Did an overseas
5  assignment for a little over two years, Middle East,
6  and --
7  Q.  For Boeing?
8  A.  Well, Boeing and DOD.  It's combined.  So they sent me
9  overseas for a little over two years, about two and a
10  half years.  Then I was working on defense system.  I
11  was -- there's few of us, few Americans that were
12  there.  And after that I came back to the U.S.
13  Q.  What year would that be, sir?
14  A.  I believe it was in around '92.
15  Q.  Okay.
16  A.  Yeah.  I lived in Seattle, Washington.  I should have
17  stated that.  So I left from Seattle, Washington,
18  overseas, came back to Seattle, Washington.  From
19  there I went back and enrolled in a master's program.
20  Then I continued working for Boeing, and at that time
21  I was working doing -- I was engineer at Boeing
22  towards -- at that time I was going to college for my
23  master's.  Then right after that finished my master's
24  and came to Michigan for about two years.  I was
25  contracting with various companies, you know, Ford,

Page 13

1  GM, Chrysler at that time.  Then Boeing asked -- you
2  know, I took leave of absence, you know, to come back
3  to Michigan, so Boeing asked me to come back.  You
4  know, I told them that I was going to put in my notice
5  and quit because I'm not going to go back to Seattle.
6  I had family here in Michigan.  So then they created a
7  job for me in Michigan, and they had me overlook about
8  25 companies.  I was in charge of doing audits on
9  those companies.  One of them is a billion dollar
10  company.  I was -- for two years that's all I did,
11  just audit these companies, made sure that their
12  quality is good, everything they shipped, till Boeing
13  was in good -- well, you know, these parts go on
14  aircraft, so you have to make sure that they're defect
15  free.  And I did that for about two years, and it was
16  a lot of travel.  I was traveling I would say, you
17  know, 120 percent of the time because I was traveling
18  on weekends as well, so I decided to leave Boeing at
19  that time.
20      Then I started working for Ford Motor
21  Company as an engineer.  Then when I started at
22  Boeing -- I'm sorry, at Ford, I decided to go back
23  into the reserves and went to the military police
24  training.
25  Q.  What year would this be, sir?

Bill Bazzi
August 29, 2025

Page 14

1 A.   '99.
2 Q.   Keep going.  Thank you.
3 A.   So I decided to change two careers, one, you know, get
4      into the military police for the Marine Corps and also
5      work -- work at Ford Motor Company, so I was doing
6      both, and Ford was great, you know, for veterans, so
7      they allowed me to do a lot of things in the military,
8      so I was doing a lot of trips even for the training,
9      that I went for military police training.  I was gone
10     for a few -- a few months.  They allowed me to leave.
11     And with that, you know, I've done -- so I was in the
12     reserves in '99, but I was -- after 9/11 I spent more
13     time on active duty than when I was on active duty,
14     traveling all over the U.S. and also overseas.  Then
15     from there, you know, I stayed with Ford.
16           Then I was -- in the meantime I was
17     actually in 9 -- in 2018 I was elected to be a council
18     person.  It was January 1st, 2018.  I started serving
19     as a council person, and in '21, around January I was
20     appointed mayor, and in November I ran for mayor, won
21     by 74 percent of the votes.
22 Q.   And here you are?
23 A.   Yes.  Here we are sitting here.
24 Q.   So you were in quality control in Boeing; correct?
25 A.   Yes.

Page 15

1 Q.   So you --
2 A.   Well, I'm sorry.  So I did quality control for -- for
3      Boeing, they don't call it quality -- well, it is
4      quality control, but I was -- towards the end I was
5      kind of like a supplier quality manager, so I was like
6      supplier quality engineer, and so there was a lot of
7      quality, a lot of engineering, and a lot of like
8      audits on suppliers to make sure that not just their
9      quality but we audited their books, and like for me
10     when I did the Boeing for the two years in Michigan, I
11     was auditing everything from their quality to their
12     finance, even their personnel, their certifications,
13     even their equipment.  I was auditing equipment to
14     make sure their equipments are calibrated.  Even the
15     people that were calibrating were certified to
16     calibrate this equipment.
17 Q.   Okay.  Thanks.
18           MR. BROWN:  Now that that question's over,
19     I'm just going to say let the record reflect that, you
20     know, ten minutes ago Hassan Saab walked in the room
21     with he's now with us sitting at the end of the table,
22     so that adds another person to the chambers.
23 BY MR. BROWN:
24 Q.   So what's your personal connection to Dearborn
25     Heights, sir?  Do you have family here?  Have you

Page 16

1      lived here in the past?  What are your roots here?
2 A.   So when I moved to Dearborn Heights when I came back
3      to Michigan, I settled in Dearborn Heights not too far
4      from the city hall.
5 Q.   What year was that?
6 A.   Roughly 2017, around approximately 2017, 2018.  I'm
7      sorry.  I'm sorry.  Wait, wait.  Hold on.  Got my
8      dates mixed.  Okay.  I'm thinking about something
9      else.  Okay.  So I moved -- oh, no.  I was -- no.  I
10     moved to Michigan, I'm sorry, roughly around '97, '98.
11     I'm sorry.
12 Q.   So you moved to Michigan in '97, '98 and you moved to
13     Dearborn Heights?
14 A.   Yes, sir.
15 Q.   But you didn't have family that was living here before
16     then?
17 A.   Not in Dearborn Heights.
18 Q.   You had family living close or . . .?
19 A.   In Dearborn.
20 Q.   I see.  So did you grow up in Dearborn, then?
21 A.   I grew up in Dearborn.  Went to school.  I wasn't born
22     in -- I was born overseas, but I grew up in Dearborn.
23     I went to Dearborn schools before I joined the
24     Marines.
25 Q.   Where did you go to high school?

Page 17

1 A.   Fordson.
2 Q.   Sorry?
3 A.   Fordson.
4 Q.   Fordson.  Is it fair to say that as a resident and the
5      mayor and a councilman, you are personally familiar
6      with the municipal government of Dearborn Heights?
7 A.   Yes.
8           MS. HUNT:  Objection to form and
9      foundation.
10 BY MR. BROWN:
11 Q.   And I understand now, sir, you are a potential new
12     ambassador to Tunisia; correct?
13 A.   I was appointed, yes.
14 Q.   Congratulations on that.
15 A.   Thank you.
16 Q.   I think we lawyers are going to want to know, if you
17     could, please, describe when it is you may be leaving
18     the United States to go to Tunisia, if you know.
19           MS. HUNT:  Object to speculation.
20           Go ahead.
21 A.   Yeah.  That's still up in the air.  I'm not sure yet.
22     There's still a few things that we're -- we're doing
23     right now, so I don't have a date yet.
24 BY MR. BROWN:
25 Q.   Could it be this fall?

Bill Bazzi
August 29, 2025

Page 18

1 A.   I have no idea.
2          MS. HUNT:  Same objection.
3 BY MR. BROWN:
4 Q.   But suppose you're in Tunisia and you're asked to come
5      back to attend a trial or you're subpoenaed to come
6      back for a trial.  Would you come back?
7          MS. HUNT:  Object to speculation.
8 A.   I have to check the protocol.  I'm not really sure.
9 BY MR. BROWN:
10 Q.   Are you aware of any protocol that would prevent you
11      from coming back?
12          MS. HUNT:  Object to foundation.
13 A.   I'm not sure.  This is foreign to me.  I don't know.
14 BY MR. BROWN:
15 Q.   All right.  So you became mayor of Dearborn Heights,
16      sir, as I recall you saying in 2021?
17 A.   Correct.
18 Q.   November?
19 A.   January I became mayor.  November I was elected.
20 Q.   So January of '22?
21 A.   Yes, sir.  No.  '21.  You confused me.
22 Q.   All right.
23 A.   January '21 I was appointed.  November of '21 I was
24      elected.
25 Q.   All right.  So before you became mayor, sir, did

Page 19

1      Dearborn Heights suffer from a corruption problem in
2      its government?
3          MS. HUNT:  Object to form and foundation.
4      Speculation.
5          MR. TURFE:  Same objection.
6 A.   I used to hear chatter from -- before I became the
7      mayor from police officers that I got to know at that
8      time, and -- and every -- everything was leading
9      towards -- towards that corruption, and when I was on
10      council, that's all you hear of corruption in the
11      city.
12 BY MR. BROWN:
13 Q.   What types of corruption were present in Dearborn
14      Heights?
15          MS. HUNT:  Objection to form, foundation,
16      and speculation.
17          MR. TURFE:  Same objection.
18 A.   Contracts.  You can go down the street and see, you
19      know, some streets supposed to be, you know, six,
20      seven inches concrete.  They're like -- some streets
21      since becoming the mayor found out some of them are
22      like not even three inches concrete, you know.
23      Police -- there's some police issues.  I was hearing
24      from residents.  And, again, just at that time before
25      I became councilman it was just people talking,

Page 20

1      chatter.  When I became council, people coming back --
2      coming to me and telling me.
3 BY MR. BROWN:
4 Q.   What kind of issues were you hearing about with
5      respect to the police department?
6          MS. HUNT:  Objection to form.
7 A.   Before I was on council or after?
8 BY MR. BROWN:
9 Q.   Before you were on council.
10          MS. HUNT:  Same objection.
11 A.   There was racism, you know, police officers being
12      racist towards, you know, this area.  You know, it
13      wasn't -- at that time it was not as Middle Eastern,
14      you know, people living in the city as much as there
15      is now back then, and there was a lot of, you know,
16      people come -- you know, talking about racism by
17      police officers when they get pulled over, the
18      disrespect.
19 BY MR. BROWN:
20 Q.   And this is by white officers against people from the
21      Middle East; is that correct?
22 A.   Basically -- mostly, yes.  It was white police
23      officers against, you know, Arab Americans.
24 Q.   Do you know what ticket fixing is, sir?
25          MS. HUNT:  Objection to form and

Page 21

1      foundation.
2          MR. TURFE:  Same objection.
3 A.   Yes.  Now I'm aware of it now.
4 BY MR. BROWN:
5 Q.   Has Dearborn Heights historically had a ticket fixing
6      issue with its police department?
7          MS. HUNT:  Objection to form, foundation,
8      and speculation.
9          MR. TURFE:  Same.
10 A.   I became aware of it -- when I became the mayor, I
11      became aware of it.
12 BY MR. BROWN:
13 Q.   And what did you become aware of?
14 A.   That there was ticket fixing.
15 Q.   Do you know who was doing it?
16 A.   There's -- there was few people's names that was
17      brought up, but I didn't get involved with -- in the
18      micromanagement when I was the mayor obviously.  The
19      chief and the two directors were handling all the
20      issues with like ticket fixing and other issues.
21 Q.   But you just mentioned names were brought up with
22      respect to ticket fixing.  Do you remember what those
23      names were?
24 A.   Yes, sir.
25 Q.   What were the names?

Bill Bazzi
August 29, 2025

Page 22

1  A.   Sergeant Bazzy was one of them, and there was a
2       Councilman Baydoun, he's a council chair, interfering
3       with police stops, and --
4  Q.   Is this Sergeant Mohamad Bazzy, sir?
5  A.   Yes, sir.
6  Q.   And that's spelled B-A-Z-Z-Y; is that correct?
7  A.   Yes.  Correct.
8  Q.   And do you have a relationship to Sergeant Mohamad
9       Bazzy?
10 A.   No.
11              MS. HUNT:  Objection as to form.
12              THE WITNESS:  Sorry.  I don't want to be
13      related.  No.
14 BY MR. BROWN:
15 Q.   Have you ever heard of a particular partnership
16      between police officers working for Dearborn Heights
17      and a law firm that charged fee to fix tickets?
18              MS. HUNT:  Objection as to foundation and
19      speculation.
20              MR. TURFE:  Same objection.
21 A.   I'm not -- please be specific.  I'm not -- I'm not
22      aware of that.
23 BY MR. BROWN:
24 Q.   All right.  Did you ever hear of Dearborn Heights
25      police officers redirecting city tow trucks at

Page 23

1       accident sites so that the car or vehicle that was
2       damaged in the accident would be towed to a lot owned
3       by their friends?
4               MR. TURFE:  Objection.
5               MS. HUNT:  Objection as to form,
6       foundation, and speculation.
7               MR. TURFE:  Same objection.
8  A.   I became aware that -- I'm not sure who they were
9       sending the cars to, but I became aware that we had to
10      go -- go out for bid and get a contract with a towing
11      company because that issue was brought up by the
12      former chief.
13 BY MR. BROWN:
14 Q.   So the City got a contract with a towing company to
15      prevent officers from directing accident vehicles to
16      tow lots owned by their friends?
17              MS. HUNT:  Objection.  Mischaracterization
18      of prior testimony and foundation.
19              MR. TURFE:  Same objection.
20 A.   We went out for bid, and we have a company to prevent
21      that from happening, from having people go -- so we
22      got a new towing company, went for proper bidding,
23      just to prevent people from going and asking like
24      whoever, and that's some of the issues that I -- I
25      heard in the past, you know, through the chief, that

Page 24

1       they were actually -- there's some -- some people
2       directing towing companies, other companies other than
3       the ones that we -- we were dealing with.
4  BY MR. BROWN:
5  Q.   So even after the City had its own official tow truck
6       company contracted, there were still officers who were
7       directing vehicles in accidents to private towing
8       companies?
9               MS. HUNT:  Objection.  Mischaracterization
10      of prior testimony and form.
11              MR. TURFE:  And join in the objection plus
12      an objection to the foundation.
13 A.   Yes.
14 BY MR. BROWN:
15 Q.   Do you have any information about the police
16      department ordering military grade firearms just so
17      they could be privately resold?
18              MS. HUNT:  Objection to foundation and
19      speculation.
20              MR. TURFE:  Same objection.
21 A.   I became aware of -- they were buying -- I don't know
22      if you're referring to the AR-15s with -- with
23      silencers, and Chief Hart actually brought that to my
24      attention, and it was -- there were -- actually the
25      previous chief that was here, he actually took his

Page 25

1       weapon, also it was an AR-15 with a silencer, when --
2       when -- when he was let go from the City of Dearborn
3       Heights.  So, yes, I was -- I became aware of AR-15s
4       with silencers and also some weapons that were
5       actually in the police station, that there were
6       some -- I believe they were PPKs, so, I mean, that's
7       not -- nothing that a regular person uses.
8  BY MR. BROWN:
9  Q.   So those were -- just to be clear, those were weapons
10      that were purchased by the Dearborn Heights Police
11      Department; correct?
12              MS. HUNT:  Objection as to foundation.
13 A.   The AR-15s with the silencers were purchased through
14      the City, and I don't know about the PPKs or the other
15      machine guns that they found at the police station.  I
16      don't know how they were purchased.
17 BY MR. BROWN:
18 Q.   But were the AR-15s then being resold to private
19      citizens?
20              MS. HUNT:  Objection to form, foundation,
21      and speculation.
22              MR. TURFE:  Same objection.
23 A.   I'm not aware of them being sold.  I'm -- I'm aware
24      that the police officers when they leave or when they
25      quit, they can take those firearms with them.

Bill Bazzi
August 29, 2025

Page 26

1 BY MR. BROWN:
2 Q.   I see.  Did you have knowledge of any sexual
3       misconduct that was taking place within the Dearborn
4       Heights Police Department before you became mayor?
5             MS. HUNT:  Objection as to form and
6       foundation.
7             MR. TURFE:  Same objection.
8 A.   I was told that there was sexual misconduct, yes, by
9       police officers.
10 BY MR. BROWN:
11 Q.   Were these problems isolated events or was this part
12      of a larger pattern?
13            MS. HUNT:  Objection to speculation and
14      foundation.
15            MR. TURFE:  Same objection.
16 A.   There's -- when I became the mayor, I said that I have
17      an open door policy, and we had a few officers that
18      used to come to my office and bring up some issues
19      that -- especially the first year I was in office, and
20      there was multiple -- multiple complaints.
21 BY MR. BROWN:
22 Q.   Do you have any information about money from drug
23      busts that had been seized by the police going
24      missing?
25            MS. HUNT:  Objection.  Form.  Foundation.

Page 27

1       Speculation.
2             MR. TURFE:  Same objection.
3 A.   I was alerted by the chief, Chief Hart, at that time
4       that there was money being taken from the evidence
5       room and officers -- people putting IOU statements,
6       stickies, and they were taking money.
7 BY MR. BROWN:
8 Q.   You referred to IOU stickies.  Can you further explain
9       that, please?
10 A.   I was told that there's a lot of IOU stickers, so they
11      take money from the evidence room, and they're --
12      Chief Hart brought up an issue just a few months on
13      the -- in -- in the position, told me that two
14      officers actually came up to him with a big wad of
15      money and said can you hold this for me on a Thursday,
16      I believe, and the city hall was just not even -- I
17      mean, it was almost closed, even the treasurer's
18      office, so the chief -- they gave him a big wad of
19      money and they basically told him, here, Chief, look
20      what we found, and I can't remember the amount.  You
21      know, didn't -- obviously didn't count it.  But he
22      pretty much told them to get that away from me, put it
23      back where you got it from, you know, basically you
24      can't take it to the treasurer to deposit or anything
25      and didn't know where it came from.

Page 28

1 Q.   Do you have any knowledge of a camera being placed in
2       the women's locker room at the police department?
3             MS. HUNT:  Objection to foundation.
4             MR. TURFE:  Same objection.
5 A.   Chief Hart called me and -- I think it was Chief Hart
6       or Chief Swope, one of them, brought to my attention
7       they found a camera in the girls' locker room.
8 BY MR. BROWN:
9 Q.   I want to talk about traffic stops on the streets of
10      Dearborn Heights being conducted by police officers.
11            Do you have any knowledge of certain
12      councilmen pulling over their cars to interfere with
13      local policemen right in the middle of a traffic stop
14      while it was ongoing?
15            MS. HUNT:  I'm going to object to
16      foundation, speculation, and form.
17            MR. TURFE:  Same objection.
18 A.   I have actually have heard it, but I saw the video
19      twice as council member -- Councilman Baydoun
20      interfering with a police stop, and there was a video
21      of both incidents that I saw, and there was -- the
22      second incident, I believe his brother-in-law was in
23      the car.
24 BY MR. BROWN:
25 Q.   Have you ever had knowledge of Dearborn Heights Police

Page 29

1       Department trafficking certain areas that were highly
2       trafficked -- let me start over again.
3             Have you any knowledge of the Dearborn
4       Heights Police Department ticketing certain streets or
5       roads used often by African-Americans for ticketing?
6             MS. HUNT:  Objection to form, foundation,
7       and speculation.
8             MR. TURFE:  Same objection.
9 A.   I was aware that there were -- there were some areas,
10      and that's one thing that I had a problem with when I
11      became the mayor, is they were in some areas but
12      they're not other areas.  They are patrolling certain
13      areas but not, you know, the whole entire city.
14 BY MR. BROWN:
15 Q.   And why were they patrolling only certain areas?
16            MS. HUNT:  Form and speculation.
17            MR. TURFE:  Same objection and objection to
18      the foundation.
19 A.   I became aware that they were just beefing up their
20      tickets and just their overtime.
21 BY MR. BROWN:
22 Q.   So they were beefing up tickets to earn overtime?
23 A.   Yes.
24            MS. HUNT:  Objection.  Mischaracterization
25      of testimony.

Bill Bazzi
August 29, 2025

Page 30

1           MR. TURFE:  And objection as to foundation.
2 BY MR. BROWN:
3 Q.   Were you aware of any pay-to-play or bribery issues
4      that were happening in Dearborn Heights before you
5      were mayor?
6           MS. HUNT:  Objection.  Form.  Foundation.
7      Speculation.
8           MR. TURFE:  Same objection.
9 A.   I was -- it's funny that you say that.  Actually the
10      previous chief told me -- I mean, he -- I wasn't aware
11      of any cases, but even the old chief admitted that
12      there's -- the city was pay-to-play city, get used to
13      it, mayor.
14 BY MR. BROWN:
15 Q.   The old chief told you get used to it, mayor?
16 A.   Yeah.
17           MS. HUNT:  Objection as to form.
18           MR. TURFE:  And foundation.
19 BY MR. BROWN:
20 Q.   What were his words?
21 A.   I'm sorry?
22 Q.   What were the old chief's words to you?
23 A.   Basically said this city is pay-to-play, you know,
24      just get used to it.
25 Q.   Do you have any knowledge or information about

Page 31

1      particular members of the Dearborn Heights City
2      Council being involved in the corrupt activities you
3      just described?
4           MS. HUNT:  Objection to form, foundation,
5      and speculation.
6           MR. TURFE:  Same objection.
7 A.   Basically when -- I've never actually seen -- seen
8      things, you know, other than, you know, like the
9      traffic stops I mentioned earlier, but just watching
10      the meetings, it just -- I mean, you can see certain
11      things do not make sense with the way you bid on
12      contracts, the way you -- I mean, that's the kind of
13      stuff, you know, that -- you can go watch meetings and
14      watch some other stuff.
15 BY MR. BROWN:
16 Q.   To your knowledge, how long has the corruption within
17      the Dearborn Heights city government been going on?
18           MS. HUNT:  Objection to form, foundation,
19      speculation, and a mischaracterization of prior
20      testimony.
21           MR. TURFE:  Same objection.
22 A.   Well, when I became the mayor, I was doing everything
23      as I could to make sure that we went through proper
24      bidding and -- and everything that we did was
25      basically documented and everything from going on

Page 32

1      BidNet, so, you know, like anything that happened
2      before, it was just like, you know, like hearsay
3      and -- and other than, you know, some of the stuff
4      that I -- I mentioned earlier.
5 BY MR. BROWN:
6 Q.   Does the Dearborn Heights Police Department have a
7      history of corruption?
8           MS. HUNT:  Objection to form, foundation,
9      and speculation.
10           MR. TURFE:  Same objection.
11 A.   Basically just based -- some of the stuff that I
12      mentioned, you know, people saying certain things, you
13      know, people bringing certain things to my attention,
14      and I did everything I can just to mitigate whatever,
15      if there's any issue, just to make sure we mitigate
16      issues and try to fix whatever issues is brought to
17      our attention.
18 BY MR. BROWN:
19 Q.   But my question is really a yes or no question.  I'm
20      asking you does the Dearborn Heights Police Department
21      have a history of corruption?
22           MS. HUNT:  Same objection.
23           MR. TURFE:  Same objection.
24 A.   I'm not -- I mean, I don't have like data in front of
25      me to say like, but, I mean, other than, you know,

Page 33

1      when we -- when I became the mayor, some of the stuff
2      that was brought forward to me.
3 BY MR. BROWN:
4 Q.   Is that a yes or a no, sir?
5 A.   Yes.
6 Q.   So what did you decide to do, Mayor Bazzi, about
7      corruption when you became mayor?
8 A.   First I brought in a commissioner, Commissioner
9      Thomas, Dr. JET.  I brought him in a few months in
10      office.  I was appointed at that time.  And I brought
11      him in as a commissioner because of all these things
12      that I was hearing, and we -- I just basically asked
13      him to come in and just -- just see what -- what --
14      what's going on at the police station, and he comes in
15      and he -- he's there just about a month or so and
16      basically told me that he needs help.
17 Q.   He said he needed help?
18 A.   Yes.
19 Q.   Why did he say that?
20           (Phone interruption)
21 BY MR. BROWN:
22 Q.   So Dr. Thomas told you that he needed help after a
23      month on the job?
24 A.   A little over -- yes.  About a month or so.
25 Q.   Did he say why he needed help?

Bill Bazzi
August 29, 2025

Page 34

1  A.   Yes.

2  Q.   What did he say?

3  A.   He goes, "This" -- "This police department is," he

4       used the word F, you know, F'd up, and he told me that

5       we have three police department in the City of

6       Dearborn Heights.

7  Q.   And what were those three police departments?

8  A.   You have the golden circle, you have the few

9       Arab American officers, and the ones that they just

10      don't want to get involved, they just want to do their

11      job.

12 Q.   So what was he referring to when he was talking about

13      the so-called golden circle?

14 A.   There was a few police officers I was aware -- I was

15      made aware that I guess they had a coin that they were

16      passing to each other, and on one side of it has a

17      black panther.  It says that if you're not in the

18      circle, you're against us, and on the other side you

19      turn it, if you're in the circle, you're with us, and

20      those are the ones that got the perks of everything in

21      the department.  I was made aware of that.

22 Q.   They're walking around with a coin with a panther on

23      it, sir?

24            MS. HUNT:  Objection to form.

25            MR. TURFE:  Same objection.

Page 35

1  A.   Yes.  I've seen it.

2  BY MR. BROWN:

3  Q.   You've seen that coin?

4  A.   Yes.

5  Q.   And who were the officers in this golden circle you

6       describe?

7  A.   I -- it's speculation, but, you know, I mean, they

8       don't say, hey, I'm in the golden circle, I'm not in

9       the golden circle.

10 Q.   Fine.  It's speculation.  But, to your knowledge, who

11      do you believe was in it sitting here today?

12            MS. HUNT:  Form, foundation, and

13      speculation.

14            MR. TURFE:  Same objection.

15 A.   Well, I know obviously the old chief, Chief Meyers.

16      Again, these are speculations from people who they

17      brought forward.  You know, Captain Smith.  There's

18      also a few lieutenants who departed, and there's a

19      Dottor, Reyna, Graf, and, you know, some of the

20      members on the SWAT team and Campbell, and those

21      are -- like some of the officers come to me, they

22      said, yeah, these guys, you know, basically they're

23      getting all the perks, you know, like the vehicles

24      and, you know, like all the good bells and whistles on

25      even their patrol cars.

Page 36

1  BY MR. BROWN:

2  Q.   Was Sergeant Mohamad Bazzy, to your knowledge, inside

3       this golden circle?

4            MS. HUNT:  Form, foundation, and

5       speculation.

6            MR. TURFE:  Same objection.

7  A.   No.  He brought issues that tells me who was in the

8       golden circle, so obviously he wasn't -- he told me he

9       wasn't.

10 BY MR. BROWN:

11 Q.   So going back to your earlier testimony, you say

12      Commissioner Thomas was here for about a month and

13      asked for more help; is that accurate?

14 A.   Yes, sir.

15 Q.   And what did you do to give him that more help, if

16      anything?

17 A.   Both Commissioner Thomas and I started looking outside

18      to see what we can do to find another chief, so both

19      Commissioner Thomas and I, we started talking to

20      different chiefs, different people in law enforcement

21      to see if we can find another chief in the City of

22      Dearborn Heights.

23 Q.   Were you looking for someone outside the current

24      police force within the Dearborn Heights police

25      government?

Page 37

1            MS. HUNT:  Object as to form.

2  A.   Yes.

3  BY MR. BROWN:

4  Q.   I'm sorry.  You were looking for an outsider; is that

5       fair?

6  A.   Yes.

7  Q.   Why were you looking for an outsider?

8            MS. HUNT:  Objection as to form and

9       foundation.

10 A.   That was at the request of Commissioner Thomas because

11      he couldn't really trust anybody in that department.

12      He wanted somebody from the outside.

13 BY MR. BROWN:

14 Q.   So what other steps did you take besides hiring

15      Commissioner Thomas to reform the Dearborn Heights

16      Police Department?

17            MS. HUNT:  Objection as to

18      mischaracterization of testimony.

19            MR. TURFE:  Same objection.

20 A.   Right around -- after maybe few months, I think about

21      the same time I brought Commissioner Thomas, you know,

22      we had a council meeting at a school.  It was during

23      Covid.  And we had I would say like roughly 40

24      something police officers showed up to the meeting and

25      just heckling and, you know, like no respect, nothing,

Bill Bazzi
August 29, 2025

Page 38

1   so then Commissioner Thomas actually had like a memo
2   about, you know, respect, and so both Commissioner
3   Thomas and I talked about basically having zero
4   tolerance.  You know, that's the first thing that I --
5   I did.  You have zero tolerance, you know, for
6   bullying, harassment, and -- and that's when
7   Commissioner Thomas started -- or incorporating some
8   procedures, writing procedures at that time to change
9   things, you know, behavior at the police station.
10  BY MR. BROWN:
11  Q.   So you said you had a meeting and you were heckled?
12        MS. HUNT:  Objection as to
13  mischaracterization of testimony.
14        MR. TURFE:  Same objection.
15  A.   It was a council meeting.  I was the mayor.  I was
16  appointed mayor at the time, yes.  About 40 police
17  officers came in.  They were heckling at me because I
18  brought Commissioner Thomas.
19  BY MR. BROWN:
20  Q.   Can you describe this memo about respect that you were
21  speaking of earlier?
22  A.   Basically Commissioner Thomas, I can't remember what
23  the memo said, but basically telling, you know,
24  officers if they go to -- you know, basically told
25  them that behavior is not tolerated, you know,

Page 39

1   because, you know, it's public meeting, you know,
2   everybody's watching it.  There's people from outside
3   the city, employees that come to these meetings and
4   didn't like their behavior.  Basically told them there
5   will be disciplinary action against any officer that
6   acts the way that they acted that night.
7   Q.   And that was a memo that Commissioner Thomas wrote?
8   A.   At that time, yes.  Because he was the only one here.
9   And he wrote it while he was here?
10  A.   Yes.  He was -- he was the commissioner, and
11  Chief Meyers was here at the time as well, but it came
12  from Commissioner Thomas because --
13  Q.   To your knowledge, is a copy of that memo somewhere on
14  a Dearborn Heights city computer system?
15        MS. HUNT:  Objection as to form and
16  foundation.
17        MR. TURFE:  Same objection.
18  A.   I'm not sure.  We changed our system, you know, a few
19  years ago.
20  BY MR. BROWN:
21  Q.   Was it a hard copy?
22  A.   I've actually read a hard copy.  They showed it to me
23  when it went out.
24  Q.   To your knowledge, is there a copy of that hard copy
25  somewhere in this building?

Page 40

1        MS. HUNT:  Form and foundation.
2   A.   I'm not sure.
3   BY MR. BROWN:
4   Q.   So how have your efforts to reform the Dearborn
5   Heights Police Department been received?
6        MS. HUNT:  Objection as to speculation and
7   foundation.
8        MR. TURFE:  Same objection.
9   A.   Not good.
10  BY MR. BROWN:
11  Q.   Have you received any pushback or resistance from
12  anybody?
13        MS. HUNT:  Form and foundation.
14        MR. TURFE:  Same objection.
15  A.   Yes.
16  BY MR. BROWN:
17  Q.   And who are the people who have resisted and pushed
18  back?
19  A.   The --
20        MS. HUNT:  I'm going to object to
21  speculation and foundation.
22        MR. TURFE:  Same objection.
23  A.   At that time it was the city attorney/prosecutor,
24  Mr. Miotke, council members, and a few people that
25  come to the meetings, almost every meeting that they

Page 41

1   brought with them.
2   BY MR. BROWN:
3   Q.   To your knowledge, why would the Dearborn Heights City
4   Council resist your attempts to reform the Dearborn
5   Heights Police Department?
6        MR. TURFE:  Objection to the form and
7   foundation and speculation.
8        MS. HUNT:  Same objection.
9   A.   That's a good question.  I don't know.
10  BY MR. BROWN:
11  Q.   You don't know why?
12  A.   Well, I can speculate.
13        MS. HUNT:  Asked and answered.
14  BY MR. BROWN:
15  Q.   No.  If you could -- if you think you know, please
16  tell me.
17        MS. HUNT:  Object to form, foundation, and
18  speculation.
19        MR. TURFE:  Same objection.
20        MS. HUNT:  And asked and answered.
21  BY MR. BROWN:
22  Q.   If you think you know, please tell me.
23        MS. HUNT:  Same objection.
24  A.   When somebody doesn't want something reformed
25  something good, it just leads to something not good.

Bill Bazzi
August 29, 2025

Page 42

1 BY MR. BROWN:

2 Q.  So how do you decide upon hiring Jerrod Hart as police

3     chief after you had become mayor?

4 A.  Commissioner Thomas, you know, after we had several

5     meetings and when he told me he needs help, he goes,

6     "That department is" -- he used the whole word, F'd

7     up.  We had several meetings afterwards trying to

8     figure out what we can do, and basically he told me

9     Meyers is -- is -- you know, has to go, and he's the

10    old chief, so both between me, myself, and -- and, God

11    rest his soul, JET, you know, Commissioner Thomas, we

12    started talking to other chiefs, you know, myself, you

13    know, trying to figure out what chief we need to bring

14    in to help Commissioner Thomas, and I reached out to

15    several -- several chiefs from different areas, and a

16    lot of them were pointing towards Chief Hart.  You

17    know, they were telling me he was -- he was a good

18    person, a good chief, you know, impeccable record, and

19    that's when I reached out to Chief Hart, you know,

20    brought him in for an interview between -- I can't --

21    I can't remember if it was -- I know our HR director

22    was there.  I can't remember if JET was at the

23    interview, but I know JET, you know, I'm pretty sure

24    he did also talk to -- he was at that meeting, initial

25    meeting with Chief Hart when we brought him to the

Page 43

1     City.

2 Q.  So is it your testimony that you heard that Chief Hart

3     was a good police officer from multiple sources?

4 A.  Yes.

5 Q.  How many?

6         MS. HUNT:  Objection as to speculation and

7     relevance.

8 A.  Several, because, you know -- you know, I mentioned

9     earlier I was in military police, and I still have a

10    lot of friends who are -- I mean, I think I'm one of

11    the few that didn't pursue a law enforcement career,

12    but I'm still friends with a lot that -- that pursued

13    it, and a lot of friends that I served with, you know,

14    some State Police, some with other cities that

15    actually recommended Chief Hart.

16 BY MR. BROWN:

17 Q.  So you used your contacts from your old police

18    training in order to find Chief Hart?

19 A.  Yes.

20 Q.  I want to show you the first exhibit we have here

21    today, Mayor Bazzi which we're going to call

22    Exhibit A.  I'm going to give a copy to you, to our

23    court reporter, I'll give one to Mr. Turfe, and one to

24    Mr. Miotke.

25        MR. BROWN:  Sorry, Hassan.  I'm hoping you

Page 44

1     can share with Gary.

2         (Marked EXHIBIT A for identification)

3 BY MR. BROWN:

4 Q.  So why don't you just look that over briefly if you

5     could.  We're going to call this A.  And I'll

6     represent to you that this is the First Amended

7     Complaint that we filed in the federal litigation

8     that's going on, and the reason why we're using this

9     document, among other things, is it's helpful to all

10    of us because it has numbered pages at the top.  Do

11    you see this page ID system at the top there, sir?

12 A.  Yes.

13 Q.  The first one says 730.  Do you see that?  I'm going

14    to be constantly referring you to pages, and you'll be

15    able to find them easily because the federal system

16    just stamps all these pages in sequential order.  Make

17    sense?

18 A.  Yes.

19 Q.  So if you could, can you go to an exhibit which is

20    attached --

21        THE WITNESS:  I'm going to need my glasses.

22        MS. HUNT:  Oh, you need your glasses?

23        THE WITNESS:  Yeah.

24        MS. HUNT:  Can we go on a quick break so

25    that -- are they in your office?

Page 45

1         THE WITNESS:  Yes.

2         MR. BROWN:  Let's go off the record so the

3     mayor can find his glasses.

4         (Recess taken at 10:49 a.m.)

5         (Back on the record at 10:54 a.m.)

6         MR. BROWN:  All right.  Let's go back on

7     the record.

8 BY MR. BROWN:

9 Q.  So, Mayor Bazzi, can you -- I just told you about the

10    page numbering system on these documents.  Can you go

11    to Page 810 at the end of this document?  You're at

12    737 now.

13 A.  Okay.  I was looking at Page 1 of . . .

14        MS. HUNT:  That's all right.

15 BY MR. BROWN:

16 Q.  You see how it says Exhibit 12 there?

17 A.  Yes.

18 Q.  All right.  Turn the page there.  All right.  Can you

19    tell me what this document is?  And I'm referring to

20    the next four pages which are marked 811 through 814.

21        MS. HUNT:  Take your time to read it.

22        THE WITNESS:  Okay.

23 A.  Yes.

24 BY MR. BROWN:

25 Q.  You've read it?

Bill Bazzi
August 29, 2025

1 A.   I know this document.

2 Q.   What is this document, sir?

3          MS. HUNT:  Objection as to form.

4 A.   It's a press release.

5 BY MR. BROWN:

6 Q.   Did you draft it?

7 A.   Yes.

8 Q.   When did you write this press release, Mr. Mayor?

9 A.   Approximately that date.  Probably around

10   January 24th, 2024.

11 Q.   All right.  Can you go to Page 812, please?  Do you

12   see it?

13 A.   Yes.

14 Q.   I'm going to read into the record the first paragraph

15   which is found on 812 so that you don't have to.  Save

16   your voice.  Here we go.

17          "The residents of our city deserve better

18   than these illegal attacks on the leadership of our

19   Police Department.  I brought Chief Hart and his team

20   into the department to change its culture and make it

21   more responsible to the long-unaddressed needs of our

22   businesses and especially our residents.  They have

23   succeeded in rooting out corruption and institutional

24   inefficiency.  'I believe in our officers.

25   Unfortunately, morale suffered from constant bullying,

1   inappropriate behavior, a lack of professionalism and

2   favoritism that made an already difficult job worse.

3   The people elected me to rectify these problems and

4   give them the responsive community-oriented law

5   enforcement they deserve to receive for the

6   hard-earned tax dollars they pay.  City Council's

7   actions threaten to turn back the clock."

8          You see that language, sir?

9 A.   Yes, sir.

10 Q.   Is this language an accurate explanation of why you

11   hired Jerrod Hart?

12 A.   Yes.

13 Q.   Was Jerrod Hart's status as an outsider, and by that I

14   mean someone who was not previously a part of the

15   Dearborn Heights government, something that attracted

16   you to Mr. Hart?

17 A.   Yes.

18 Q.   Did you think an outsider like Jerrod Hart would be

19   better at rooting out corruption?

20          MS. HUNT:  Objection to form and

21   speculation.

22          MR. TURFE:  Objection to foundation.

23 A.   Well, that's why I brought him, because we knew we had

24   an issue from what Dr. Thomas told me, and that's why

25   I brought in Chief Hart, yes.

1 BY MR. BROWN:

2 Q.   So how were Directors Swope and Vanderplow hired as

3   directors?

4 A.   When Commissioner Thomas passed away, Chief Hart still

5   was in transition trying to fix things, and we had --

6   at that time we had an issue in Dearborn Heights.

7   There was a break-in, a gunshot, and that's when

8   Mr. Vanderplow was involved.  He was working for ATF.

9   And we became to know him, and when Commissioner

10   Thomas passed, we -- I know Chief Hart, he needed

11   extra help, so we brought both Chief -- well, at that

12   time Director Swope and Director Vanderplow.

13 Q.   Was it your intent to empower Chief Hart by letting

14   him hire the people he wanted to hire?

15          MS. HUNT:  Objection as to form,

16   foundation, and speculation.

17          MR. TURFE:  Same objection.

18 A.   It was my intent to clean up the police department

19   and -- and give the City of Dearborn Heights the best

20   service we can in law enforcement.

21 BY MR. BROWN:

22 Q.   And do you think you would be helping Chief Hart by

23   allowing him to hire Swope and Vanderplow?

24          MS. HUNT:  Form.  Foundation.  Speculation.

25          MR. TURFE:  Same objection.

1 A.   Yes.

2 BY MR. BROWN:

3 Q.   Did you have the power to hire any chief you wanted?

4 A.   Yes.

5 Q.   Did you have the power to hire any directors you

6   wanted?

7 A.   Directors, yes.

8 Q.   Are Mr. Swope and Vanderplow the team that you

9   described at Page 812, that quote that I just read

10   back to you?

11          MS. HUNT:  Objection as to form and

12   foundation.

13          MR. TURFE:  Same objection.

14 BY MR. BROWN:

15 Q.   I'll go back to 812 and I'll read it.  You say in the

16   second sentence, "I brought Chief Hart and his team

17   into the department . . ."

18          Do you see that?

19 A.   Yes.

20 Q.   Are Vanderplow and Swope the team you're referring to

21   here?

22          MS. HUNT:  Same objection.

23          MR. TURFE:  Objection to foundation.

24 A.   Yes.

25 BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 50

1 Q. Do you have the responsibility to fight crime and keep
2    order as the city's mayor?
3         MS. HUNT:  Objection as to form.
4         MR. TURFE:  And to foundation.
5 A. As the mayor, I'm responsible for the safety of
6    everyone in the city, residents and also employees.
7 BY MR. BROWN:
8 Q. Was Kevin Swope and Paul Vanderplow's status as
9    outsiders also intentional?
10        MS. HUNT:  Objection as to form.
11 A. Yes.
12 BY MR. BROWN:
13 Q. So, Mr. Mayor, what did the police union do after the
14   City hired Hart and Vanderplow and Swope?
15        MS. HUNT:  Objection to form and
16   foundation.
17        MR. TURFE:  Same objection.
18 A. I know they -- I don't recall the timing, but I was
19   getting a lot of resistance at that time, so they --
20   obviously they were not happy that I brought in
21   somebody from the outside, and from the get-go I told
22   them both the chief and both directors, they're a
23   transition team, and just we wanted to train people
24   from within to rise up to the leadership positions.
25 BY MR. BROWN:

Page 51

1 Q. So did the City eventually work out its differences
2    with the police union with respect to Swope and
3    Vanderplow?
4         MS. HUNT:  Objection.  Mischaracterization
5    of prior testimony.
6         MR. TURFE:  And foundation.
7 A. I don't recall.  I don't have their documentations.  I
8    know that it was -- there were some negotiations back
9    and forth, so I'm not really sure.  I can't recall.
10 BY MR. BROWN:
11 Q. Were those negotiations ever written up in any sort of
12   contract or deal?
13        MS. HUNT:  Objection as to foundation.
14        MR. TURFE:  Same objection.
15 A. I do recall that actually I had both -- there was some
16   documentation, I don't have it in front of me
17   obviously, that names -- they accepted Chief Hart and
18   both directors in their contract.
19 BY MR. BROWN:
20 Q. They were grandfathered?
21        MS. HUNT:  Objection as to form and
22   foundation.
23        MR. TURFE:  Same objection.
24 A. I'm not sure if they're grandfathered, but they were
25   in there saying that they allowed them.

Page 52

1 BY MR. BROWN:
2 Q. I want to go back to Exhibit A, Mr. Mayor, and this
3    time if you can go to Pages -- I'm referring to
4    Exhibit A, which is in front of you.  If you can go to
5    Pages 760 to 765.  Can you arrive there?
6 A. Sure.
7 Q. In particular can you go to Page 762?  Please study
8    that document, and when you're ready, tell me what it
9    is.
10 A. It's a motion for the council to approve tentative
11   agreement between the City of Dearborn Heights and the
12   COAM, Command Officer Association.
13 Q. And you signed this document, sir?
14 A. Yes.
15 Q. That's your signature at the bottom?
16 A. Yes.
17 Q. And it's dated February 7th, 2023, this particular
18   document; is that correct?
19 A. Correct.
20 Q. Did you actually write this letter?
21 A. Yes.
22 Q. And did you send this letter to the City Council?
23 A. Yes.  There was a motion, 8-F, Motion, I'm sorry, it's
24   23-099, and the item on the agenda is 8-F.
25 Q. And as I understand, you're asking the City Council in

Page 53

1    this document to approve that motion; is that correct?
2 A. Correct.
3 Q. Can you go to Page 761, the page immediately prior?
4    Do you see the motion 23-099?
5 A. Correct.
6 Q. Is that the motion that you asked them to approve?
7 A. Correct.
8 Q. And now if you can go to Page 763.  Do you see that?
9    Are you there?
10 A. Yes.
11 Q. This is a summary of that motion; is that correct?
12 A. Yes.
13 Q. Did you send this summary to the City Council?
14 A. The Council was -- yes.  They did receive that.  They
15   have to get that before they vote on it.
16 Q. Can you please read, if you could, Paragraph 5-B of
17   this summary into the record?
18 A. "The following named persons and their positions are
19   grandfathered in under this agreement and will retain
20   their positions:
21        a.  Jerrod S. Hart, Chief of Police.
22        b.  Paul D. Vanderplow, Director of Support
23   Services.
24        c.  Kevin M. Swope, Director of Police
25   Operations."

Bill Bazzi
August 29, 2025

Page 54

1 Q.  This is the motion that the City Council approved?
2 A.  Yes.
3 Q.  At your request?
4 A.  Yes.
5 Q.  I want to go to some new exhibits now if we could.
6        MR. BROWN:  I guess we'll call this B.
7        (Marked EXHIBIT B for identification)
8 BY MR. BROWN:
9 Q.  Can you briefly look over this particular exhibit,
10     Mr. Mayor?  When you're ready to discuss it, let me
11     know.
12 A.  Yes.
13 Q.  Can you go to the last page, which is 6 of 6?
14 A.  Yes.
15 Q.  Do you see the signature block there, the City of
16     Dearborn Heights: Bill Bazzi, Mayor?
17 A.  Yes.
18 Q.  Is that your signature?
19 A.  Yes, sir.
20 Q.  You signed this document?
21 A.  Yes.
22 Q.  Who created this document, sir?
23        MS. HUNT:  Objection as to form and
24     foundation.
25        MR. TURFE:  Same objection.

Page 55

1 A.  It was myself and also I can't remember which
2     attorneys.  We had several attorneys working with us.
3 BY MR. BROWN:
4 Q.  So is this a document that was created by a city
5     official or by a private attorney?
6        MS. HUNT:  Objection as to foundation and
7     form.
8        MR. TURFE:  Same objection.
9 A.  I don't recall.
10 BY MR. BROWN:
11 Q.  Is there a chance that the human resources department
12     at the City prepared this document?
13        MS. HUNT:  Objection as to form,
14     foundation, and speculation.
15        MR. TURFE:  Same objection.
16        MS. HUNT:  If you know.
17 A.  Yeah.
18 BY MR. BROWN:
19 Q.  If you don't know who created it, that's fine to say.
20 A.  Yeah.  I just -- I don't recall at this time.
21 Q.  That's fine.  Can you go to Page 79 -- I'm sorry.
22     It's not 797 because it's not stamped.
23        Why did you sign this contract, Mr. Mayor?
24        MS. HUNT:  I'm going to object to form and
25     foundation.

Page 56

1        You can answer.
2 A.  Well, I know we still needed help in the City, and
3     that's why I signed it.  We still needed help and
4     still wanted Mr. Vanderplow to help us with the
5     transition.
6 BY MR. BROWN:
7 Q.  Did you sign this contract because the City Council
8     had approved the hiring of Paul Vanderplow?
9        MS. HUNT:  Object as to form.
10        MR. TURFE:  Objection to form and
11     foundation.
12 A.  Per the earlier motion that you showed me, yes.
13 BY MR. BROWN:
14 Q.  As the mayor of Dearborn Heights, do you have the
15     power to sign contracts on behalf of the City of
16     Dearborn Heights?
17 A.  For employment.  Not -- yes.
18 Q.  Can you rephrase that?
19 A.  For employment --
20        MR. TURFE:  Yeah.  I'm going to object as
21     to the foundation and the form of the question.
22        MS. HUNT:  Correct.  Same objection.
23 BY MR. BROWN:
24 Q.  I'll ask the question again.  We'll start over.
25        As mayor, do you have the power to sign

Page 57

1     contracts on behalf of the City of Dearborn Heights?
2        MR. TURFE:  Objection as to foundation.
3 A.  Employment contracts, yes.
4 BY MR. BROWN:
5 Q.  Do you personally consider this contract binding on
6     the City of Dearborn Heights?
7        MR. TURFE:  Objection as to form and
8     foundation.
9        MS. HUNT:  Objection to form and foundation
10     and it calls for a legal conclusion of a layman.
11        MR. TURFE:  Same objection.
12 A.  Yes.
13 BY MR. BROWN:
14 Q.  Can you go to Section 4.1 of this contract, please,
15     sir?  You see 4.1 there, sir?
16 A.  Yes.
17 Q.  This is on Page 5 of 6?  Do you see 5 of 6 at the
18     bottom?
19 A.  Yes.
20 Q.  I'll read you the second half of 4.1 very briefly so
21     you don't have to.  Save your voice.  Here we go.
22        "In the event the City chooses to terminate
23     this Agreement before January 1st, 2027, the City
24     shall pay Employee a sum equal to the Employee's
25     annual base salary together with payment for unused

Bill Bazzi
August 29, 2025

Page 58

1   vacation time and accumulated vacation time; and
2   unused sick days; and all other accumulated benefits
3   as set forth in the policies of the City of Dearborn
4   Heights.  In addition, the City shall pay the
5   Consolidated Omnibus Budget Reconciliation Act
6   (C.O.B.R.A.) premiums for medical, dental and vision
7   insurances benefits for up to one year unless Employee
8   otherwise secures medical insurance benefits, dental
9   and vision insurances benefits from another source.
10  The severance agreement terms listed in this paragraph
11  also apply should the City ask the Employee to resign,
12  and the Employee resigns pursuant to such request."
13          Do you see that language?
14 A.  Yes.
15 Q.  Has the City honored that contract with respect to
16  Paul Vanderplow?
17          MS. HUNT:  Objection as to form and
18  foundation.
19          MR. TURFE:  Same objection.
20 A.  I'm not sure if they have, but I believe that they're
21  waiting for the lawsuit.
22 BY MR. BROWN:
23 Q.  Has Paul Vanderplow received a severance?
24          MS. HUNT:  Objection as to form and
25  foundation.

Page 59

1          MR. TURFE:  Same objection.
2 A.  I'm not sure if he has or not.
3 BY MR. BROWN:
4 Q.  Sitting here today, you just don't know?
5          MS. HUNT:  Asked and answered.
6 BY MR. BROWN:
7 Q.  You can answer.
8 A.  I mean, as of right now I'm not sure.  I would have to
9   check on Monday.
10 Q.  So you're not aware if Paul has received a severance
11  or not; is that correct?
12          MS. HUNT:  Same objection.  Asked and
13  answered.
14          MR. TURFE:  Same objection.
15 A.  As of right now, I'm not aware.  I would have to check
16  with my HR.
17 BY MR. BROWN:
18 Q.  All right.
19          MR. BROWN:  Let's go to a new exhibit.
20  We're going to call this one C.
21          (Marked EXHIBIT C for identification)
22 BY MR. BROWN:
23 Q.  If you can look this guy over briefly, Mr. Mayor, and
24  tell me when you're ready to discuss it.
25 A.  Yes.

Page 60

1 Q.  You're ready?
2 A.  Yes.
3 Q.  What is this, sir?
4 A.  It's a contract with Chief Kevin Swope.
5 Q.  Can you go to the end of the document, of Exhibit C?
6 A.  Yes.
7 Q.  Do you see a signature there purporting to be that of
8   Bill Bazzi, Mayor, dated 10/15/2024?
9 A.  Yes.
10 Q.  Is that your signature, sir?
11 A.  Yes.
12 Q.  Did you sign this document?
13 A.  Yes.
14 Q.  While you were mayor of Dearborn Heights?
15 A.  Yes.
16 Q.  Why did you sign the document, Mr. Mayor?
17          MS. HUNT:  Objection to form and
18  foundation.
19          MR. TURFE:  Same objection.
20 A.  Again, we still -- you know, I brought him in as
21  transition team and we weren't done.  We were still
22  working with the department, trying to fix some of the
23  issues.
24 BY MR. BROWN:
25 Q.  You brought in Kevin Swope to help fix issues?

Page 61

1 A.  He was --
2          MS. HUNT:  Objection.  Mischaracterization
3   of prior testimony.
4          MR. TURFE:  And objection to the
5   foundation.
6 A.  He was part of the team.
7 BY MR. BROWN:
8 Q.  He was a part of Chief Hart's team?
9 A.  Well, part of the team, the transition team, yes.
10 Q.  All right.  Did you sign this contract because the
11  City Council had approved the hiring of Kevin Swope
12  when it approved the Collective Bargaining Agreement?
13          MS. HUNT:  Objection to foundation.
14 A.  Yes.
15 BY MR. BROWN:
16 Q.  Did you consider this contract binding on the City of
17  Dearborn Heights?
18          MS. HUNT:  Objection as to form,
19  foundation, and asks for a legal conclusion of a
20  layman.
21          MR. TURFE:  Same objection.
22 A.  Yes.
23 BY MR. BROWN:
24 Q.  Can you go to Section 4.1 of this contract, sir?  Do
25  you see the language at the top of Page 5 which is the

Bill Bazzi
August 29, 2025

Page 62

```
 1    second paragraph of 4.1?
 2 A.  Yes.
 3 Q.  Do you see how it's --
 4 A.  Sorry.
 5 Q.  Do you see it?
 6 A.  Yes.
 7 Q.  Is this language substantially similar to the language
 8    I just read from Paul Vanderplow's contract?
 9         MS. HUNT:  Take your time to read it over.
10         MR. TURFE:  I want to object insofar as the
11    document speaks for itself.
12 A.  Yes.
13 BY MR. BROWN:
14 Q.  I'm getting lazy and didn't want to read it into the
15    record, but I'm afraid I really should.  Here we go.
16         "In the event the City chooses to terminate
17    this Agreement before June 30th, 2026, the City shall
18    pay Employee a sum equal to the Employee's annual base
19    salary together with payment for unused vacation time
20    and accumulated vacation time; and unused sick days;
21    and all other accumulated benefits as set forth in the
22    policies of the City of Dearborn Heights.  In
23    addition, the City shall pay the Consolidated Omnibus
24    Budget Reconciliation Act (C.O.B.R.A.) premiums for
25    the medical, dental and vision insurances for up to
```

Page 63

```
 1    one year unless Employee otherwise secures medical
 2    insurance benefits, dental and vision insurances
 3    benefits from another source.  The severance agreement
 4    terms listed in this paragraph also apply should the
 5    City ask the Employee to resign, and the Employee
 6    resigns pursuant to such request."
 7         Do you see that language, sir?
 8 A.  Yes.
 9 Q.  Has the City complied with this contractual provision?
10         MR. TURFE:  Objection.  Form and
11    foundation.
12         MS. HUNT:  Same objection.  And it asks for
13    a legal conclusion from a layperson.
14         You can answer if you know.
15 A.  Well, I know the chief actually had a job, you know,
16    so it was --
17 BY MR. BROWN:
18 Q.  Has Kevin Swope received a severance?
19         MS. HUNT:  Asked and answered.
20 A.  I'm not sure.  I don't recall.
21 BY MR. BROWN:
22 Q.  You don't know if Kevin Swope's received a severance
23    as you sit here today?
24         MS. HUNT:  Asked and answered.
25 A.  I would have to check as well on that one.
```

Page 64

```
 1 BY MR. BROWN:
 2 Q.  Let's go to a new contract.
 3         MR. BROWN:  This will be D.
 4         (Marked EXHIBIT D for identification)
 5 BY MR. BROWN:
 6 Q.  Please look over Exhibit D, Mr. Mayor, and when you're
 7    ready to discuss it, please let me know.
 8 A.  Okay.
 9 Q.  Are you ready?
10 A.  Yes.
11 Q.  Mr. Mayor, what is this document?
12         MS. HUNT:  Object as to form.
13         MR. TURFE:  Same objection.
14 A.  It says Employment Agreement for Chief Hart.
15 BY MR. BROWN:
16 Q.  Can you go to the last page, sir?
17 A.  Yes.
18 Q.  Do you see a signature there purporting to be that of
19    Bill Bazzi, the Mayor of the City of Dearborn Heights,
20    dated 12/12/23?
21 A.  Yes.
22 Q.  Is that your signature?
23 A.  Yes.
24 Q.  Did you sign this document?
25 A.  Yes.
```

Page 65

```
 1 Q.  Did you sign this document while you were the mayor of
 2    the City of Dearborn Heights?
 3 A.  Yes.
 4 Q.  Did you sign this document because the City Council
 5    had approved the hiring of Jerrod Hart when it
 6    approved the Collective Bargaining Agreement?
 7         MR. TURFE:  Objection to form and
 8    foundation.
 9         MS. HUNT:  Same objection.
10 A.  Yes.
11 BY MR. BROWN:
12 Q.  Do you consider this contract binding on the City of
13    Dearborn Heights?
14         MS. HUNT:  Object as to form and
15    foundation, speculation, and requests a legal
16    conclusion from a layperson.
17         MR. TURFE:  Same objection.
18 A.  Yes.
19 BY MR. BROWN:
20 Q.  Has Jerrod Hart received his severance under this
21    contract?
22         MS. HUNT:  Objection as to form,
23    foundation, and speculation.
24         MR. TURFE:  Same objection.
25 A.  From the last I heard, he has, other than medical,
```

Bill Bazzi
August 29, 2025

Page 66

1    that he wanted to continue his COBRA for medical
2    insurance, but --
3 BY MR. BROWN:
4 Q.   So you're aware of Jerrod Hart receiving a severance
5      under this contract?
6           MS. HUNT:  Objection as to form and
7      foundation.
8 A.   I know we were asked to continue his medical, but
9      everything else I have to check.
10 BY MR. BROWN:
11 Q.   You believe you were asked to continue his medical?
12          MS. HUNT:  Asked and answered.
13 A.   Yes.
14 BY MR. BROWN:
15 Q.   I'm going to change subjects briefly, Mr. Mayor.
16          Mayor, who is Sergeant Mohamad Bazzy?
17 A.   He's a sergeant with the Dearborn Heights Police
18     Department.
19 Q.   Is Sergeant Bazzy somehow related to you or to your
20     wife?
21          MS. HUNT:  Asked and answered.
22 A.   He's definitely not related to me, and he's not
23     related -- he's related by -- by ex-marriage to my
24     wife.
25 BY MR. BROWN:

Page 67

1 Q.   I see.  Are you generally familiar with
2      Sergeant Bazzy's history as a Dearborn Heights police
3      officer?
4           MS. HUNT:  Form and foundation.
5 A.   I'm not really sure.  I don't -- I'm not sure what the
6      question is.
7 BY MR. BROWN:
8 Q.   Well, Sergeant Bazzy has been a police officer here at
9      Dearborn Heights for how long, sir, to your knowledge?
10 A.   I can't -- I can't recall how many years, but he's
11     been there for several years.
12 Q.   Several years?
13 A.   Yes, sir.
14 Q.   And are you familiar with the history of those several
15     years?
16 A.   Yes.
17          MS. HUNT:  Objection as to form.
18          MR. TURFE:  Same objection.  And objection
19     as to foundation.
20 BY MR. BROWN:
21 Q.   Sitting here today, what is your most honest appraisal
22     of Sergeant Bazzy's performance as a police officer
23     for the City of Dearborn Heights?
24          MS. HUNT:  Objection as to form and
25     foundation.

Page 68

1           MR. TURFE:  And joining the objection as to
2      speculation.
3 A.   I mean, that's a broad question.  I know he's on --
4      he's on leave right now and he's been on leave for --
5      for several months.
6 BY MR. BROWN:
7 Q.   You're an ex-military policeman; correct, sir?
8 A.   Yes.
9 Q.   So what is your appraisal of Sergeant Bazzy's
10     performance as a police officer?
11          MS. HUNT:  Form, foundation, and
12     speculation.
13          MR. TURFE:  Same objection.
14 A.   Unacceptable.
15 BY MR. BROWN:
16 Q.   It's unacceptable?
17 A.   Yes.
18 Q.   Why do you say it's unacceptable?
19 A.   Well, I know that -- I don't know what I can say, but
20     a previous lawsuit was filed by him.  Like I said, I
21     don't know what I can talk about that, that he filed a
22     lawsuit against the City which is frivolous.
23     Everything in it was a lie.
24 Q.   I'm not worried about his lawsuits against the City.
25     I'm asking you as an ex-police officer to give me an

Page 69

1    appraisal of Sergeant Bazzy as a police officer.
2           MS. HUNT:  Asked and answered.
3 A.   It is unacceptable.
4 BY MR. BROWN:
5 Q.   Why is it unacceptable?
6           MS. HUNT:  I'm going to object as to form,
7      foundation, and speculation.
8 A.   Performance and continuous -- from day one he
9      basically wanted to be the chief or the commissioner,
10     and ever since, you know, I became the mayor,
11     that's -- you know, that's his objective is to become
12     either commissioner after the commissioner died or the
13     chief of police.
14 BY MR. BROWN:
15 Q.   How could a sergeant leapfrog the positions of
16     lieutenant and captain and become chief of police or a
17     commissioner?
18          MS. HUNT:  Objection as to form and
19     foundation.
20          MR. TURFE:  Same objection.
21 A.   I have no idea.  Never happens.
22 BY MR. BROWN:
23 Q.   Is Sergeant Bazzy an honest police officer, in your
24     opinion?
25          MS. HUNT:  Objection as to form,

Bill Bazzi
August 29, 2025

Page 70

1  foundation, and speculation.
2           MR. TURFE:  Same objection.
3 A.  Based on what he filed against the City, it's not.
4 BY MR. BROWN:
5 Q.  I'm not asking what he filed against the City.  I'm
6     not asking about his legal claims.  I'm asking you as
7     an ex-cop, a trained police officer to give me an
8     appraisal about another police officer and that police
9     officer's level of proficiency and honesty.  What is
10    Sergeant Bazzy's level of honesty as a police officer
11    in your experience as his superior officer?
12           MS. HUNT:  Object as to form, foundation,
13    speculation.  I think he's answered the question.
14           MR. TURFE:  Same objection.
15 A.  I don't trust him.
16 BY MR. BROWN:
17 Q.  Why don't you trust him?
18           MS. HUNT:  Object as to form.
19 A.  Again, some of the stuff that came in front of me and
20    just what I've experienced from him.
21 BY MR. BROWN:
22 Q.  All right.  Could you flesh that out, Mr. Mayor?  What
23    came before you and what did you experience from him?
24           MS. HUNT:  Objection as to form.
25 A.  Just basically just trying to, as -- as mentioned

Page 71

1  earlier, leapfrog promotion from a sergeant to a
2  police chief or a commissioner and didn't want to do
3  the work or advancements, go to training, go to
4  staffing command, or even take any courses for
5  advancement, and complains -- complaining all the
6  time.
7 BY MR. BROWN:
8 Q.  Do you know if Sergeant Bazzy ever took a lieutenant's
9     test?
10           MS. HUNT:  Objection as to form,
11    foundation, and speculation.
12           MR. TURFE:  Same objection.
13 A.  Yes.
14 BY MR. BROWN:
15 Q.  Did he pass?
16           MS. HUNT:  Objection as to form,
17    foundation, and speculation.
18 A.  No.
19 BY MR. BROWN:
20 Q.  Have you ever experienced pressure as mayor of
21    Dearborn Heights to give Sergeant Bazzy a promotion?
22           MS. HUNT:  Objection as to form.
23           MR. TURFE:  Same objection.  And objection
24    as to foundation.
25 A.  Yes.

Page 72

1 BY MR. BROWN:
2 Q.  What type of pressure?
3           MS. HUNT:  Object as to form.
4           Go ahead.
5 A.  Community members, Council, City Council.
6 BY MR. BROWN:
7 Q.  What community members?
8 A.  They're actually named in the lawsuit.
9 Q.  Well, they may be named in the lawsuit, Mr. Mayor, but
10    can you name them for me here?
11 A.  One of them, the one that's named in the lawsuit,
12    Khalil Rahal.  He actually met with myself and
13    Chief Hart and the two directors and was just asking
14    for his promotion -- for us to promote him, and pretty
15    much all the council members and a few police
16    officers.
17 Q.  So was this pressure brought in favor of Bazzy because
18    he was an Arab American police officer?
19           MS. HUNT:  Objection as to foundation and
20    speculation.
21           MR. TURFE:  Same objection.
22 A.  Yes.
23 BY MR. BROWN:
24 Q.  Do you think the same pressure would have been applied
25    in favor of Sergeant Bazzy if he were African-American

Page 73

1  or white or Latino?
2           MS. HUNT:  Objection as to foundation and
3    speculation.
4           MR. TURFE:  Same objection.
5 A.  I'm not sure it would.
6 BY MR. BROWN:
7 Q.  You mentioned that you received pressure from a person
8    named Khalil Rahal; is that right?
9 A.  Khalil Rahal.
10 Q.  Khalil?
11 A.  Khalil.
12 Q.  Khalil Rahal?  Anyone else that you received pressure
13    from besides Mr. Rahal?
14 A.  Council members.
15 Q.  Who are those council members?
16 A.  There was a council -- the council chair at the time
17    was Dave Abdallah.  He's -- he's -- he's no longer a
18    council member.  Hassan Saab, Mohamad Baydoun.  He's
19    the council chair now.  And Hassan Ahmad.  He's a
20    councilman now.
21 Q.  Have you ever heard any one of these council members
22    refer to Sergeant Mohamad Bazzy as "my boy"?
23           MS. HUNT:  Objection as to form,
24    foundation, and speculation.
25           MR. TURFE:  Same objection.

Bill Bazzi
August 29, 2025

Page 74

1  A.   I don't recall.
2  BY MR. BROWN:
3  Q.   Did you feel pressure from any person to promote
4       Arab American police officers simply because they were
5       Arab Americans?
6              MS. HUNT:  Form, foundation, and
7       speculation.
8              MR. TURFE:  Same objection.
9  A.   Yes.
10 BY MR. BROWN:
11 Q.   What is your personal philosophy when it comes to
12      taking race into account in promoting people?
13             MS. HUNT:  Objection as to form.
14             MR. TURFE:  And the foundation.
15 A.   I believe that somebody has to prove themselves, you
16      know, something that you learn not just from the
17      military but also through the corporate America that I
18      work for.  You have to prove yourself.  You have to do
19      things before you get promoted.  It's not an
20      entitlement.
21 BY MR. BROWN:
22 Q.   Is it fair to say, Mr. Mayor, that you do not agree
23      that an Arab American mayor should be unfairly
24      promoting other Arab Americans based on a shared
25      ethnicity alone?

Page 75

1              MS. HUNT:  I'm going to object as to form.
2       Do you understand that question?
3       THE WITNESS:  No.
4  BY MR. BROWN:
5  Q.   Do you think it would be right for you as an
6       Arab American to promote an Arab American police
7       officer just because you're both Arabs?
8              MR. TURFE:  Objection as to foundation and
9       the form.
10             MS. HUNT:  Same objection.
11 A.   Well, for me, I don't promote somebody based on race.
12 BY MR. BROWN:
13 Q.   Do you believe in color blindness?
14             MS. HUNT:  I'm going to object to form,
15      foundation, and speculation.
16             Do you know what color blindness means?
17             MR. TURFE:  Same objection.
18 BY MR. BROWN:
19 Q.   Do you know what color blindness means, Mr. Mayor?
20             MS. HUNT:  In what context?
21 A.   I mean, I know in the military you do color blindness
22      for certain fields.  You have to know certain colors,
23      you know, like red -- between red, orange.
24 BY MR. BROWN:
25 Q.   I'm not talking about physical actual colors on the

Page 76

1       spectrum, Mr. Mayor.  I'm talking about a promotional
2       policy in which you refuse to take into account a
3       person's race or ethnicity and you just judge them
4       based on the content of their performance and
5       character.  That's that I mean by color blindness.
6              Do you agree with color blindness in
7       promoting people?
8  A.   No.
9              MS. HUNT:  I'm going to object to form,
10      foundation, speculation, and possibly relevance.
11             MR. TURFE:  Same objection.
12 A.   No.  I don't believe in promoting somebody for their
13      race, color, or religion.
14 BY MR. BROWN:
15 Q.   Thank you, Mr. Mayor.
16             Have you ever heard any member of the
17      Dearborn Heights City Council referring to anybody as
18      "from the community" or "not from the community"?
19             MR. TURFE:  Objection as to the form and
20      the foundation.
21             MS. HUNT:  Same objection.
22 A.   Yes.
23 BY MR. BROWN:
24 Q.   Do you think the phrase "from the community" is just a
25      polite way of saying Arab American and "not from the

Page 77

1       community" is another way of saying not Arab American?
2              MS. HUNT:  Objection as to form,
3       foundation, and speculation.
4              MR. TURFE:  Same objection.
5  A.   Yes.
6  BY MR. BROWN:
7  Q.   I want to show you another exhibit, which is actually
8       I believe going to be new.
9              MR. BROWN:  I guess this will be E.
10             (Marked EXHIBIT E for identification)
11 BY MR. BROWN:
12 Q.   All right.  Mr. Mayor, you're not going to know what
13      this is.  It's a legal document that's been prepared
14      in litigation.  I'm using it frankly because it has
15      attached to it a whole bunch of other documents, and,
16      again, they're all subject to our page numbering
17      system, which makes this a very effective way to flip
18      pages together.  Do you see that?
19 A.   Yes.
20 Q.   Can you go to Page 1459 of this document?  Do you see
21      that document there?
22 A.   Yes.
23 Q.   Give it a study, and when you're ready to discuss it,
24      let me know.
25 A.   Okay.

Bill Bazzi
August 29, 2025

Page 78

1  Q.  I'll read the first paragraph to you.  It reads, "This
2      situation underscores the pressing need for a
3      director/chief who is part of our community to head
4      the police department.  Such a leader can better
5      respond to the dangers that affect our children and
6      the entire community.  Understanding and addressing
7      the threats that Arab Americans, as well as
8      individuals from all racial backgrounds, face in
9      diverse school environments is crucial for the safety
10     and well-being of our entire community."
11             Do you see that?
12 A.  Yes.
13 Q.  Who wrote this?
14         MS. HUNT:  Objection as to foundation and
15     speculation.
16         MR. TURFE:  Same objection.
17 A.  It says at the top Hassan Saab.
18 BY MR. BROWN:
19 Q.  Do you remember receiving this?
20 A.  I don't recall this document.  I'd have to check my
21     email.
22 Q.  Do you see the part in the first sentence where it
23     says "This situation underscores the pressing need for
24     a director/chief who is part of our community"?  Do
25     you see that?

Page 79

1  A.  Yes.
2  Q.  Is "part of our community" this coded word for Arab
3      that we were discussing earlier?
4          MS. HUNT:  Objection as to form,
5      foundation, and speculation.  He doesn't know what the
6      drafter meant.
7          MR. TURFE:  Yeah.  Same objection.  He just
8      testified he never received it.
9          MS. HUNT:  You can answer if you know.
10 A.  I'm not really sure, but, I mean, that's --
11 BY MR. BROWN:
12 Q.  We'll move on.  We'll move on.
13         During all the time you worked at city hall
14     either as mayor or as councilman before that, did you
15     ever hear of so-called Arab only meetings?
16         MS. HUNT:  Objection as to form,
17     foundation, and speculation.
18         MR. TURFE:  Same objection.
19 A.  Yes.
20 BY MR. BROWN:
21 Q.  Who called those Arab only meetings?
22         MS. HUNT:  Foundation.
23         MR. TURFE:  Same objection.
24 A.  I'm not really sure which meetings you're referring
25     to.  If the one -- you're referring to the one in --

Page 80

1      yeah.  I'm not sure which one you're referring to.
2  BY MR. BROWN:
3  Q.  I'm not referring to any meetings right now,
4      Mr. Mayor.  I'm just asking you if you've ever heard
5      of Arab only meetings being held here in the Dearborn
6      Heights City Hall.
7          MS. HUNT:  Asked and answered.
8  A.  Yeah.  There was a meeting, but it wasn't -- you know,
9      it was just like Arab American meeting.  It was just a
10     meeting I showed up to.
11 BY MR. BROWN:
12 Q.  I don't know what you showed up to or not.
13         My only question is this:  Have you heard
14     of Arab only meetings taking place here at city hall?
15         MS. HUNT:  He's already answered that.
16     Asked and answered.
17         MR. TURFE:  Same objections.
18 A.  I was called to a meeting to the city hall, and I
19     showed up to the meeting, but I'm not really sure
20     what -- they called the meeting.
21 BY MR. BROWN:
22 Q.  Was it an Arab only meeting?  Were those words used?
23         MS. HUNT:  Objection as to form,
24     foundation.
25         MR. TURFE:  Same objection.

Page 81

1  A.  Well, it was -- there were like all Arab Americans in
2      that meeting.
3  BY MR. BROWN:
4  Q.  But in the lead-up to the meeting was it ever
5      described as Arab only?
6  A.  I'm not really sure what was -- before I was -- like I
7      said, when I was called to the meeting, I thought it
8      was going to be two, three of us till I showed up to
9      the meeting and it was a bunch of people in the -- in
10     Studio B.
11 Q.  Where was it?
12 A.  Studio B.  It's the next room.  It's actually the
13     council -- where the council has their meetings.
14 Q.  You're referring now to a particular meeting that you
15     remember?
16 A.  There was one meeting that I was a part of.  I believe
17     it was December of '22.
18 Q.  And as I understand it, you say there were all Arabs
19     in that meeting; is that correct?
20 A.  Yes.
21 Q.  What was discussed in the meeting?
22         MS. HUNT:  Objection as to foundation.
23 A.  Pretty much the entire meeting was based on they
24     wanted Sergeant Bazzy to be either a commissioner or
25     the chief.

Bill Bazzi
August 29, 2025

Page 82

1 BY MR. BROWN:
2 Q.   And who is they?
3 A.   At that time it was Councilman -- council chair at the
4      time, Dave Abdallah, Mohamad Baydoun, Hassan Ahmad.
5      Khalil Rahal was in that meeting, and there were
6      several Arab American officers.
7 Q.   Was there anyone in the meeting other than an
8      Arab American?
9 A.   No.
10 Q.  Were non-Arab Americans invited to the meeting?
11         MS. HUNT:  Objection as to foundation and
12      speculation.
13         MR. TURFE:  Same objection.
14 A.  I didn't call the meeting.  I thought it was going to
15      be just like a few of us to discuss some issues.  I
16      wasn't sure who was invited.  I wasn't the one that
17      called the meeting.
18 BY MR. BROWN:
19 Q.  Have you ever seen a video online in which
20      Sergeant Bazzy -- Mohamad Bazzy's brother brags that
21      Sergeant Bazzy is going to be the next chief of police
22      of Dearborn Heights?
23         MS. HUNT:  Objection as to form and
24      foundation.
25         MR. TURFE:  Same objection.

Page 83

1 A.   Yes.
2 BY MR. BROWN:
3 Q.   What do you think about the video?
4         MS. HUNT:  Objection as to form.
5         MR. TURFE:  Same objection.  And to the
6      foundation.
7 A.   It was a joke.
8 BY MR. BROWN:
9 Q.   Why do you say it was a joke?
10 A.  Because here you have a sergeant that can't even pass
11      the test to be a lieutenant wants to be the chief, the
12      next chief, and I didn't like it.  The last statement
13      is like just tell them I'm -- I'm his brother, he'll
14      take care of you.  I didn't like that statement.  It
15      just makes us look bad.
16 Q.  What was -- say that again if you could.
17 A.  Basically he's advocating for his brother to be the
18      next chief, and at the last statement he goes, "If my
19      brother" -- "If anybody pulls you over, just say that
20      you know me," basically.  And I didn't like that
21      statement.
22 Q.  This is Sergeant Mohamad Bazzy's big brother making
23      that statement?
24         MS. HUNT:  Objection as to form.
25         MR. TURFE:  Objection as to foundation.

Page 84

1 A.   His name was Sam, Sam Bazzy, yes.
2 BY MR. BROWN:
3 Q.   Is this the same Sergeant Mohamad Bazzy who you
4      testified to earlier was involved in ticket fixing?
5         MR. TURFE:  Objection to foundation and
6      the form.
7         MS. HUNT:  And mischaracterization of
8      testimony, prior testimony.
9 A.   Yes.
10 BY MR. BROWN:
11 Q.  Do you remember an incident in June of 2023 or
12      thereabouts in which Sergeant Bazzy was involved or
13      disciplined -- let me start that over again.  Sorry.
14         Do you remember an incident in June of 2023
15      in which Sergeant Bazzy was disciplined or written up
16      for not handling a use of force incident correctly?
17         MR. TURFE:  Objection to foundation.
18         MS. HUNT:  And form.
19 A.   Yes.
20 BY MR. BROWN:
21 Q.  Can you describe the incident in question?
22         MS. HUNT:  Objection as to foundation.
23 A.   From what I recall, it was -- it was one officer
24      basically hitting some -- one of the -- I don't want
25      to say a victim, but a person, smashing them into the

Page 85

1      concrete, and then I know -- I didn't see the video,
2      but just from -- from what I heard from our leadership
3      team that I believe it was at that time Chief Swope,
4      that he basically reviewed the tape or somebody
5      reviewed the tape, says it was excessive use of force,
6      and they disciplined Sergeant Bazzy and they
7      disciplined another sergeant, and they -- obviously
8      they disciplined the person that was involved, the
9      officer, with two AL suspensions and the one that
10      was -- that did the beating was -- received I believe
11      it was 60 days suspension.
12 BY MR. BROWN:
13 Q.  So Sergeant Bazzy himself did not do the actual
14      beating; is that fair?
15 A.   No.  He was -- he was on the scene after, I believe.
16 Q.  And why was Sergeant Bazzy disciplined?
17         MS. HUNT:  Objection as to form and
18      foundation.
19         MR. TURFE:  Same objection.
20 A.   My belief that he did nothing about the incident, and
21      he was basically blocking the person that was -- that
22      had -- that was beat up.
23 BY MR. BROWN:
24 Q.  And Sergeant Bazzy was the senior police officer there
25      at the scene?

Bill Bazzi
August 29, 2025

Page 86

1                  MS. HUNT:  Objection as to foundation and
2        speculation.
3                  MR. TURFE:  Same objection.
4 A.   Well, there was two sergeants.  I believe he was the
5        senior sergeant.
6 BY MR. BROWN:
7 Q.   So it was his responsibility to conduct an
8        investigation of the beating?
9                  MS. HUNT:  Objection as to form and
10        foundation.
11                  MR. TURFE:  Same objection.
12 A.   Based on my military experience, usually the person,
13        senior person, yes, makes sure -- ensures that proper
14        investigation is -- is done.
15 BY MR. BROWN:
16 Q.   And Sergeant Bazzy failed in that?
17                  MS. HUNT:  Objection as to form and
18        foundation.
19                  MR. TURFE:  Same objection.
20 A.   That's why he got the suspension, yes.
21 BY MR. BROWN:
22 Q.   Who disciplined Sergeant Bazzy?
23                  MS. HUNT:  Object as to form.
24                  MR. TURFE:  And object as to the
25        foundation.

Page 87

1 A.   I don't recall, but I believe it was Chief Swope.
2 BY MR. BROWN:
3 Q.   Are you aware of any pressure that Jerrod Hart came
4        under to reverse the disciplinary action of
5        Sergeant Bazzy?
6                  MS. HUNT:  Objection as to foundation and
7        speculation.
8                  MR. TURFE:  Objection as to the form.
9 A.   Yes.
10 BY MR. BROWN:
11 Q.   What was that pressure?
12 A.   From City Council.
13 Q.   Who on City Council?
14                  MS. HUNT:  Objection as to foundation and
15        speculation.
16                  MR. TURFE:  Same objection.
17 A.   He was -- it was Councilman Baydoun, Hassan Ahmad.  I
18        know they did not like that -- that he was
19        disciplined, and -- and I know I got the same as well
20        pressure, you know, from Hassan Saab.
21 BY MR. BROWN:
22 Q.   What was said to you?
23                  MR. TURFE:  Objection as to the foundation.
24                  MS. HUNT:  And form.
25 A.   Basically if -- if we don't reverse it, that they're

Page 88

1        going to come and trash Chief Swope at the meeting.
2 BY MR. BROWN:
3 Q.   Who said that?
4 A.   Councilman Saab.
5 Q.   Mr. Mayor, who is, and I'll mispronounce his name, but
6        help me with it, Khalil Rahal?  I keep misstating it.
7 A.   Yes, sir.  Khalil Rahal.
8 Q.   Khalil Rahal.  Do you know him?
9 A.   Yes, sir.
10 Q.   Who is he?
11 A.   He used to work for the county and now he works for
12        DTE.
13 Q.   You said he worked for the county?
14 A.   Yes, sir.
15 Q.   What was his position at the county?
16 A.   I know he's an attorney, so I think he was -- he was
17        doing a lot of the economics and development.
18 Q.   Is it fair to say he was a high ranking member of the
19        county government?
20                  MS. HUNT:  Objection to form and foundation
21        and speculation.
22                  MR. TURFE:  Same objection.
23 A.   He had a high position with the county, yes.
24 BY MR. BROWN:
25 Q.   Were you present at a meeting with Khalil Rahal in

Page 89

1        which Jerrod Hart and Kevin Swope were also present?
2                  MS. HUNT:  Asked and answered.
3 A.   Yes.
4 BY MR. BROWN:
5 Q.   When did that meeting take place?
6 A.   I don't recall the date, but I know it was at the
7        police station.
8 Q.   Was it after the discipline of Sergeant Bazzy?
9 A.   Yes.
10 Q.   And what did Mr. Khalil Rahal say to you during that
11        meeting?
12                  MS. HUNT:  Objection as to form and
13        foundation.
14                  MR. TURFE:  Same objection.
15 A.   Well, first, the way the meeting started, you know, he
16        was objecting to the discipline, and Chief Hart wanted
17        to actually show the tape, and -- and he brought in a
18        FOIA request, and Chief Hart was trying to do the
19        right thing.  He's like, "Hey, I can't show you the
20        tape unless you file this FOIA right now."  But the
21        FOIA was never filled out, and basically he didn't
22        want to look at the tape, and then the conversation
23        changed to basically trying to take care of
24        Sergeant Bazzy.
25 BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 90

1 Q.   What did Khalil Rahal say?

2        MS. HUNT:  Objection as to form.

3 A.   I don't recall that conversation, but it was basically

4      trying to promote or move Sergeant Bazzi into a higher

5      position.

6 BY MR. BROWN:

7 Q.   Did Khalil Rahal ever make threats during that

8      meeting?

9        MS. HUNT:  Objection as to form and

10       foundation.

11       MR. TURFE:  Same objection.

12 A.   He just -- from what I recall, it was basically just

13      saying that -- that the community's not gonna like

14      that and, you know, that kind of talk.

15 BY MR. BROWN:

16 Q.   Do you recall if Khalil Rahal ever told Jerrod Hart at

17      that meeting that he was going to get fired if

18      Sergeant Bazzi was not promoted?

19       MS. HUNT:  Objection as to form and

20       foundation.

21       MR. TURFE:  Same objection.

22 A.   There was a lot of stuff that was discussed.  I know

23      that he mentioned that I would not get elected --

24      reelected if I don't, you know, promote him, and I

25      believe he said -- I can't recall exactly what he told

Page 91

1      the chief, but it was not a good conversation.

2 BY MR. BROWN:

3 Q.   Do you know what the relationship is between

4      Sergeant Bazzy and Khalil Rahal?

5        MS. HUNT:  Objection to foundation and

6        speculation.

7        MR. TURFE:  Same objection.

8 A.   I know they're friends.

9 BY MR. BROWN:

10 Q.   Do you know how long they've been friends?

11 A.   No --

12       MS. HUNT:  Objection as to speculation.

13 A.   No idea.

14 BY MR. BROWN:

15 Q.   Can you go back to Exhibit A, please, Mr. Mayor?  And

16      can you travel to Page 774?  Are you there?

17 A.   Yes.

18 Q.   Please study that document and tell me when you're

19      ready to discuss it.

20 A.   Yes.

21 Q.   Have you seen this document before?

22 A.   Yes.

23 Q.   Did you see it in your capacity as mayor of Dearborn

24      Heights?

25 A.   Yes.

Page 92

1 Q.   What is this document?

2 A.   Whistleblower.  The whole document.

3 Q.   This is the document that was sent to you?

4 A.   Yes.  By the chief, Chief Hart.

5 Q.   Do you remember receiving this?

6 A.   Yes.

7 Q.   Can you go about halfway down the page?  Do you see

8      the paragraph that starts "In a shocking development"?

9 A.   Yes.

10 Q.   I'll read that into the record to save your voice.

11      Here we go.

12        "In a shocking development, after the

13      administration of discipline involving a response to

14      resistance, an influential political figure visited

15      the Dearborn Heights Police Department and made it

16      very clear we needed to appease the involved command

17      officer by giving him what he wanted - a high level

18      position within the police department."

19        Do you see that?

20 A.   Yes.

21 Q.   Was this the response to discipline mentioned earlier

22      in the disciplining of Sergeant Bazzy?

23        MS. HUNT:  Objection as to foundation and

24      speculation.

25        MR. TURFE:  Same objection.

Page 93

1 A.   After talking to the chief, yeah, that's what he was

2      referring to.

3 BY MR. BROWN:

4 Q.   That's what he was referring to in that paragraph?

5 A.   Yes, sir.

6 Q.   Thank you.  Is the influential political figure

7      mentioned in that paragraph Khalil Rahal?

8        MS. HUNT:  Objection as to foundation and

9        speculation.

10       MR. TURFE:  Same objection.

11 A.   After discussing with Chief Hart, yes.

12 BY MR. BROWN:

13 Q.   Let's go through a description of that meeting found

14      on this page.  Do you see the first bullet there?

15 A.   Where it says "We (Director Swope)?

16 Q.   I'll read it to save your voice.  Here's the first

17      bullet.

18        "We (Director Swope, Mayor Bazzi and I)

19      were warned that if we didn't appease this employee,

20      we would all be fired, and the Mayor would lose

21      re-election."

22        Do you see that?

23 A.   Yes.

24 Q.   Is that bullet point accurate?

25        MS. HUNT:  Objection as to foundation and

Bill Bazzi
August 29, 2025

Page 94

1  speculation and form.
2              MR. TURFE:  Same objection.
3 A.   Yes.
4 BY MR. BROWN:
5 Q.   Second bullet.  "When the individual was asked if the
6      council cares about our work with the DOJ COPS OA, he
7      said it's a joke to them and they want it to fail
8      because it would be on us, not them therefore securing
9      their political futures."
10             Do you see that language?
11 A.  Yes.
12 Q.  Is that accurate as well?
13             MS. HUNT:  Objection as to form and
14     foundation and speculation.
15             MR. TURFE:  Same objection.
16 A.  Yes.
17 BY MR. BROWN:
18 Q.  That's an accurate description of what was said during
19     this meeting?
20 A.  Yes.
21             MS. HUNT:  Objection as to form,
22     foundation, and speculation.
23 BY MR. BROWN:
24 Q.  And the individual referred to in that quotation would
25     be Khalil Rahal; correct?

Page 95

1              MS. HUNT:  Same objection.
2              MR. TURFE:  Same objection.
3 A.   Yes.
4 BY MR. BROWN:
5 Q.   Let's go to the third bullet, Mr. Mayor.  I'll read it
6      to you.  Save your voice.
7              "The individual who is anticipated to be
8      deposed also shared how the council thinks matters
9      under investigation are a joke and they are
10     considering having t-shirts made mocking the
11     investigations."
12             Do you see that?
13 A.  Yes.
14 Q.  Is that also an accurate description of that meeting?
15             MS. HUNT:  Objection as to form,
16     foundation, and speculation.
17 A.  Yes.
18 BY MR. BROWN:
19 Q.  Do you remember Khalil Rahal talking about having
20     T-shirts made?
21 A.  I recall, yes, he did mention the T-shirts.
22 Q.  Does Khalil Rahal have friends on the City Council?
23             MS. HUNT:  Objection as to speculation.
24             MR. TURFE:  Objection as to the foundation
25     and the form of the question.

Page 96

1 A.   Well, from what I know, yes.
2 BY MR. BROWN:
3 Q.   Let's go to the fourth bullet point.
4              "When asked how our employee has so much
5      pull in the community, he said he is well connected to
6      certain members of the City Council and has very
7      wealthy and influential connections to make this a
8      reality."
9              Do you see that?
10 A.  Yes.
11 Q.  Is this also an accurate description of something that
12     was said during that meeting?
13             MS. HUNT:  Objection as to foundation and
14     speculation.
15             MR. TURFE:  Same objection.
16 A.  Yes.
17 BY MR. BROWN:
18 Q.  Do you remember Kevin Swope ever being told that he
19     was going to get fired during that meeting if
20     Sergeant Bazzy was not promoted?
21             MS. HUNT:  Objection as to foundation and
22     speculation.
23             MR. TURFE:  Same objection.
24 A.  Yes.
25 BY MR. BROWN:

Page 97

1 Q.   In fact, did Mr. Khalil Rahal tell you at that meeting
2      that you would lose the next election if
3      Sergeant Bazzy was not promoted?
4              MS. HUNT:  Objection as to foundation and
5      speculation.
6 A.   Yes.
7 BY MR. BROWN:
8 Q.   Were you ever told that you would lose the next
9      election if an Arab police chief was not named?
10             MS. HUNT:  Objection as to form.
11             MR. TURFE:  And to foundation.
12 A.  Yes.
13 BY MR. BROWN:
14 Q.  Do you know if Khalil Rahal was acting alone or was he
15     acting in concert with certain members of the City
16     Council?
17             MS. HUNT:  Objection as to speculation and
18     foundation.
19             MR. TURFE:  And objection as to the form
20     and join in on the objection to foundation.
21 A.  Based on the statements he made, yes.
22 BY MR. BROWN:
23 Q.  Can you rephrase that, Mr. Mayor?  It's a little
24     confusing.  Yes as to what?
25             MS. HUNT:  I'm going to object as to form

Bill Bazzi
August 29, 2025

Page 98

1     of the question.
2             MR. TURFE:  And the foundation.
3  BY MR. BROWN:
4  Q.   I'll ask the question over again.
5  A.   Okay.
6  Q.   Do you think Khalil Rahal was acting alone or was he
7       acting in concert with certain members of the City
8       Council?
9             MR. TURFE:  Objection as to the form and
10        the foundation.
11            MS. HUNT:  Same objection and as to
12        speculation.
13 A.   Based on what the council was telling me and also what
14      Khalil Rahal was mentioning during the meeting, yes.
15 BY MR. BROWN:
16 Q.   They were operating together, in other words?  Is that
17      what you're saying?
18            MR. TURFE:  Objection as to the foundation
19        and mischaracterization of testimony and the form.
20            MS. HUNT:  Joining in the objection and
21        speculation.
22 A.   Based on the statement, yes.
23 BY MR. BROWN:
24 Q.   Why does a Cook County political official appear in
25      the City Hall of Dearborn Heights to exert pressure

Page 99

1       about a police sergeant?
2             MS. HUNT:  Objection as to form,
3         foundation, speculation, and I'm not sure who you're
4         talking about, but --
5  A.   Cook County?
6  BY MR. BROWN:
7  Q.   I'm sorry.  Yeah.  It is Chicago.  Look at that.
8             Why does a Wayne County official appear in
9         the City of Dearborn Heights to exert pressure about a
10        police sergeant?
11            MR. TURFE:  Objection as to the foundation
12        and the form of the question.
13            MS. HUNT:  And speculation.
14            If you know.
15 A.   I don't know.  It's a good question.
16 BY MR. BROWN:
17 Q.   You say it's a good question?
18 A.   Yes.
19 Q.   Why do you think it's a good question?
20            MR. TURFE:  Same objections.
21            MS. HUNT:  Same.
22 A.   It's a good question why somebody from the county
23      would actually come in and say that.
24 BY MR. BROWN:
25 Q.   Do you think the City Council of Dearborn Heights has

Page 100

1       treated Chief Hart fairly?
2             MR. TURFE:  Objection as to the form and
3         foundation.
4             MS. HUNT:  Objection as to speculation as
5         well.  Joining in previous objection.
6  A.   No.
7  BY MR. BROWN:
8  Q.   Why not?
9             MS. HUNT:  Objection as to form.
10            MR. TURFE:  Objection as to the foundation.
11 A.   Well, basically we had, you know, a meeting in this
12      room.  Can't discuss the specifics obviously.
13            MS. HUNT:  Do not discuss anything that was
14        in closed session or with counsel.
15 A.   Yeah.  It was --
16            MS. HUNT:  Legal counsel.
17 A.   Yeah.  It was --
18 BY MR. BROWN:
19 Q.   I'm not asking you to discuss anything from closed
20      sessions.  I'm just asking you why you believe the
21      City of Dearborn Heights has treated Jerrod Hart
22      unfairly.
23            MS. HUNT:  Objection as to form and
24        foundation.
25            MR. TURFE:  Same objection.

Page 101

1  A.   Well, the meeting I was talking about, you know, it
2       was basically saying some of the wrong things going on
3       in the City and the Council didn't want to hear it,
4       and the chief basically was so upset --
5             MS. HUNT:  Okay.  Was this a closed
6         session?
7             THE WITNESS:  Yeah.
8             MR. TURFE:  Yeah.  Let's not go there.
9             MS. HUNT:  Okay.  Then we don't talk about
10        that.
11 A.   No.  But, I mean, the whole residents heard it when he
12      came out, when the chief stormed out.  Everybody knew.
13      They said why is the chief yelling.  I mean, it was
14      public.
15            MR. TURFE:  We're just going to move to
16        strike that portion of the testimony to the extent
17        that it came from any type of meeting or conversation
18        as part of a closed session or a meeting amongst
19        counsel.
20            MR. BROWN:  The question expressly excluded
21        any closed session information or any discussion from
22        closed session.
23            MR. TURFE:  That's fine.  But the witness
24        testified to matters that were within those closed
25        sessions.

Bill Bazzi
August 29, 2025

Page 102

1          MR. BROWN:  Understood.  Understood that
2     that's your belief.  We'll move on.
3 BY MR. BROWN:
4 Q.   So to start with, do you think that the City Council
5     of Dearborn Heights has treated Paul Vanderplow
6     fairly?
7          MR. TURFE:  Objection as to the foundation
8     and the form of the question.
9          MS. HUNT:  And speculation.
10 A.   No.
11 BY MR. BROWN:
12 Q.   Why do you think the City Council of Dearborn Heights
13     has not treated Paul Vanderplow fairly?
14          MS. HUNT:  Objection as to foundation.
15          MR. TURFE:  Same objection.
16          MS. HUNT:  And form.
17 A.   It's -- basically it's the same thing.  You know,
18     they -- he was bringing up issues and the council
19     didn't want to hear it.
20 BY MR. BROWN:
21 Q.   What issues was he bringing up?
22          MS. HUNT:  Objection as to foundation.
23          MR. TURFE:  Same objection.
24 A.   Some of the stuff going on.  And when I assigned it to
25     internal affairs, he found some stuff in the

Page 103

1     treasurer's office and nobody wanted to hear.  It's
2     been like almost a year, and the council hasn't asked
3     me once what those investigations mean that
4     Mr. Vanderplow brought forward.
5 BY MR. BROWN:
6 Q.   You're testifying that Mr. Vanderplow discovered some
7     issues or problems with the treasury's office?
8          MS. HUNT:  Objection as to
9     mischaracterization of testimony.
10          MR. TURFE:  And the foundation.
11 A.   He brought some issues that was going on with the
12     treasurer, yes.
13 BY MR. BROWN:
14 Q.   And what were those issues?
15 A.   Abundant amount of money, a few hundred thousand
16     dollars just sitting there not secured overnight
17     several days, money missing from the safe.  Council
18     hasn't once told me how much money.  And misuse of
19     credit card, City credit card.  There was an internal
20     investigation.
21 Q.   And you're saying Mr. Vanderplow brought that to the
22     attention of City Council?
23 A.   Yes.
24          MS. HUNT:  Objection as to form and
25     foundation.

Page 104

1          MR. TURFE:  Same objection.
2 BY MR. BROWN:
3 Q.   What was your answer?
4 A.   Yes, sir.
5 Q.   And what was City Council's reaction?
6          MS. HUNT:  Objection as to speculation and
7     foundation.
8          MR. TURFE:  Same objection.
9 A.   They didn't want to hear it.  There was nothing --
10     nothing brought forward.  No investigation.  Nothing
11     by the council.
12 BY MR. BROWN:
13 Q.   So let's talk about Kevin Swope.  Do you think the
14     City of Dearborn Heights City Council has treated
15     Kevin Swope fairly?
16          MS. HUNT:  Object as to form, foundation,
17     and speculation.
18          MR. TURFE:  Same objection.
19 A.   No.
20 BY MR. BROWN:
21 Q.   Why not?
22          MS. HUNT:  Objection as to foundation.
23          MR. TURFE:  Same objection.
24 A.   Same thing.  Same -- same issues.  They didn't want to
25     hear anything going on.

Page 105

1 BY MR. BROWN:
2 Q.   Specifically with respect to Mr. Swope, what were
3     those issues?
4          MS. HUNT:  Objection as to foundation.
5          MR. TURFE:  Same objection.
6 A.   You know, some of the ones that I can recall, same
7     thing with Sergeant Bazzy, you know, about him being
8     promoted, and also there's a couple people that came
9     in from his city, Westland.  They didn't like those
10     two people that came from Westland, thought that he
11     brought those people, one officer and another person
12     was working records.
13 BY MR. BROWN:
14 Q.   Do you think the City Council of Dearborn Heights has
15     discriminated against Vanderplow and Swope and Hart?
16          MR. TURFE:  Objection as to the form and
17     foundation and calling for a legal conclusion.
18          MS. HUNT:  Same objection.
19 A.   Yeah.  I don't know about discrimination, but . . .
20 BY MR. BROWN:
21 Q.   Well, do you think if, for example, Jerrod Hart had
22     been an Arab American he would have been treated
23     differently?
24          MR. TURFE:  Objection as to the form and
25     foundation and speculation.

Bill Bazzi
August 29, 2025

Page 106

1          MS. HUNT:  Joining in the objection and
2    legal conclusion.  Asking for a legal conclusion from
3    a non -- or a layperson.
4 A.  I'm not sure how they would have treated the next
5    person.
6 BY MR. BROWN:
7 Q.  Did the treatment that Hart and Swope and Vanderplow
8    received from the City Council change in 2024?
9          MR. TURFE:  Objection as to the form and
10   foundation.
11         MS. HUNT:  Same objection and speculation
12   as well.
13 A.  Just remained the same.
14 BY MR. BROWN:
15 Q.  Why do you think City Council treated Hart and Swope
16   and Vanderplow the way they did?
17         MR. TURFE:  Objection to the form and
18   foundation.
19         MS. HUNT:  Same objection.
20 A.  Again, this is speculations from me.
21         MS. HUNT:  I don't want you to speculate.
22   If you know or you don't know.
23 BY MR. BROWN:
24 Q.  I'm asking for your personal opinion.  You're the
25   mayor of Dearborn Heights.  You were there for all of

Page 107

1    this, and I'm asking you what you think happened.
2          MR. TURFE:  Objection as to the form and
3    foundation.  The witness already stated that it would
4    be speculation.
5          MS. HUNT:  Same objection.
6 A.  It's based on some of the stuff that was being brought
7    forward, you know.  It doesn't seem like the Council
8    wanted to hear what the issues are with the police
9    department or even the City, you know, after a while.
10 BY MR. BROWN:
11 Q.  Why wouldn't the City Council want to hear about
12   problems at the City?
13         MR. TURFE:  Objection to form and the
14   foundation based off of speculative testimony.
15         MS. HUNT:  Same objection.
16 A.  That's a good question that we have to ask them.
17 BY MR. BROWN:
18 Q.  Do you remember Jerrod Hart contacting third party
19   government entities, like the FBI?
20         MR. TURFE:  Objection as to the foundation.
21         MS. HUNT:  And form.
22 A.  Yes.
23 BY MR. BROWN:
24 Q.  Do you remember Jerrod Hart contacting the Department
25   of Justice?

Page 108

1          MR. TURFE:  Same objection.
2          MS. HUNT:  Same.
3 A.  Yes.
4 BY MR. BROWN:
5 Q.  Do you have knowledge of Jerrod Hart contacting the
6    Michigan State Police?
7          MS. HUNT:  Form and foundation.
8          MR. TURFE:  Same objection.
9 A.  Yes.
10 BY MR. BROWN:
11 Q.  And do you have knowledge of what these communications
12   were about when Jerrod Hart contacted the FBI and the
13   Department of Justice and the Michigan State Police?
14         MS. HUNT:  Objection as to form and
15   foundation.
16         MR. TURFE:  Same objection.
17 A.  We discussed them with the chief, yes.
18 BY MR. BROWN:
19 Q.  What were those discussions?
20 A.  Basically some of the stuff that, some of them, ticket
21   fixing, some of the issues that they came up with, you
22   know, with the behavior, misconduct in the police
23   department, and I just can't recall all of it, but
24   there was, you know, several issues that were brought
25   forward.

Page 109

1 Q.  And Jerrod Hart was asking for help from the FBI on
2    those communications?
3          MS. HUNT:  Objection as to form and
4    foundation.
5          MR. TURFE:  Same objection.
6 A.  Yes.
7 BY MR. BROWN:
8 Q.  And was he asking for help from the Michigan State
9    Police in those communications?
10         MS. HUNT:  Same objection.
11         MR. TURFE:  Same objection.
12 A.  Yes.
13 BY MR. BROWN:
14 Q.  How about the Department of Justice?
15         MS. HUNT:  Same objection.
16         MR. TURFE:  Same objection.
17 A.  Yes.
18 BY MR. BROWN:
19 Q.  Do you remember seeing any correspondence between the
20   FBI and Jerrod Hart?
21 A.  No.
22 Q.  How about with the FBI and Jerrod Hart?
23 A.  No.
24 Q.  How about the Michigan State Police?
25 A.  No.

Bill Bazzi
August 29, 2025

Page 110

1 Q.   All right.  Do you think the City Council took actions
2      to punish or silence Hart and Swope and Vanderplow for
3      their work?
4           MR. TURFE:  Objection as to the form and
5      foundation.  Calls for speculative testimony.
6           MS. HUNT:  Same objection.
7           If you know.
8 A.   I'm not sure.
9 BY MR. BROWN:
10 Q.  Do you think the City Council members have tried to
11     get rid of Hart, Swope, and Vanderplow?
12          MR. TURFE:  Objection as to the form and
13     foundation, speculation.
14 A.  Yes.
15          MS. HUNT:  Same objection.
16 BY MR. BROWN:
17 Q.  Did the City Council become more aggressive towards
18     the plaintiffs after Jerrod Hart refused to promote
19     Sergeant Bazzy in 2023?
20          MR. TURFE:  Objection as to the form and
21     foundation, speculation.
22          MS. HUNT:  Same objection.
23 A.  Yes.
24 BY MR. BROWN:
25 Q.  Did the City Council become more aggressive towards

Page 111

1      the plaintiffs after Jerrod Hart disciplined
2      Sergeant Bazzy in mid '23?
3           MR. TURFE:  Same objections.
4           MS. HUNT:  Same objection.
5 A.   Yes.
6 BY MR. BROWN:
7 Q.   Are there certain City Council members directly
8      involved in the corrupt practices that you hired
9      Jerrod Hart to combat?
10          MR. TURFE:  Objection as to the form and
11     foundation, speculation.
12          MS. HUNT:  Same objection.
13 A.  Again, it would be speculations.
14          MR. TURFE:  Don't speak on speculations.
15     Just what you know.
16 BY MR. BROWN:
17 Q.  Do you have any information or knowledge of City
18     Council members being directly involved in the corrupt
19     practices that Jerrod Hart was investigating?
20          MR. TURFE:  Objection.  Form and
21     foundation.
22          MS. HUNT:  Form and foundation.
23          MR. TURFE:  Speculation and then asked and
24     answered.
25          MS. HUNT:  Same objection.

Page 112

1 A.   Just what the chief brought to my attention, the
2      ticket fixing.
3 BY MR. BROWN:
4 Q.   Let's talk first just about, if we could, Jerrod Hart.
5           Did the City Council have any valid reason
6      for criticizing or personally attacking Jerrod Hart?
7           MR. TURFE:  Objection as to the form,
8      foundation, and speculation.
9           MS. HUNT:  Same objection.
10 A.  I didn't see any issues.
11 BY MR. BROWN:
12 Q.  Correct me if I'm wrong, but you were Jerrod Hart's
13     direct supervisor; correct?
14 A.  Yes.
15 Q.  He reported directly to you?
16 A.  Yes.
17 Q.  While Jerrod Hart worked for the City, did he do a
18     good job?
19          MS. HUNT:  Objection as to form and
20     foundation.
21 A.  I was impressed with his work, yes.
22 BY MR. BROWN:
23 Q.  Did Chief Hart try hard to do well at his job?
24          MS. HUNT:  Objection as to foundation.
25 A.  Yes.

Page 113

1 BY MR. BROWN:
2 Q.   Did you ever see Chief Hart do something wrong that
3      you needed to discipline him for?
4           MS. HUNT:  Objection as to form.
5 A.   No.
6 BY MR. BROWN:
7 Q.   Did you ever have any performance issues at all with
8      Chief Hart?
9           MS. HUNT:  Objection as to form.
10 A.  No.
11 BY MR. BROWN:
12 Q.  How about Paul Vanderplow?  While he worked for the
13     City, did Paul Vanderplow do his job well?
14          MS. HUNT:  Objection as to form and
15     foundation.
16 A.  Yes.
17 BY MR. BROWN:
18 Q.  Do you think Paul Vanderplow tried hard to do well at
19     his job?
20          MS. HUNT:  Foundation.
21 A.  Yes.
22 BY MR. BROWN:
23 Q.  Did you ever see Paul Vanderplow do something wrong
24     while he was working for the City of Dearborn Heights?
25          MS. HUNT:  Form.

Bill Bazzi
August 29, 2025

Page 114

1 A.   No.
2 BY MR. BROWN:
3 Q.   Did you ever have any performance issues with Paul
4      Vanderplow?
5                MS. HUNT:  Object as to form.
6 A.   No.
7 BY MR. BROWN:
8 Q.   While he worked for the City, did Kevin Swope do his
9      job well?
10                MS. HUNT:  Form and foundation.
11 A.   Yes.
12 BY MR. BROWN:
13 Q.   Did Kevin Swope try hard to do well at his job?
14                MS. HUNT:  Form.  Foundation.
15 A.   Yes.
16 BY MR. BROWN:
17 Q.   Did you ever see Kevin Hart do anything wrong that
18      required you discipline --
19 A.   Swope.
20 Q.   I'm sorry.  Thank you.  Did you ever see Kevin Swope
21      do anything wrong that required you to discipline him?
22                MS. HUNT:  Objection as to form.
23 A.   No.
24 BY MR. BROWN:
25 Q.   Did Kevin Swope ever have any performance issues while

Page 115

1      he worked for the City of Dearborn Heights?
2                MS. HUNT:  Objection as to form.
3 A.   No.
4 BY MR. BROWN:
5 Q.   Was Jerrod Hart ever made the subject of a no
6      confidence vote while you were mayor?
7 A.   Yes.
8 Q.   Who brought a no confidence vote?
9                MS. HUNT:  Objection as to form.
10 A.   Saab.
11 BY MR. BROWN:
12 Q.   Was there any valid reason for bringing a no
13      confidence vote about Jerrod Hart?
14                MS. HUNT:  Objection as to foundation and
15      speculation.
16                MR. TURFE:  And the form.
17 A.   No.
18 BY MR. BROWN:
19 Q.   Did Jerrod Hart's initiatives ever become blocked or
20      rejected just because they came from him?
21                MS. HUNT:  Objection as to foundation and
22      speculation.
23                MR. TURFE:  Same objection.
24 A.   It was mentioned at a meeting, yes.
25 BY MR. BROWN:

Page 116

1 Q.   What was mentioned?
2 A.   That anything they put forward they would reject.
3 Q.   Who is "they" when you say?
4 A.   Some members of the council.  I don't recall who.
5 Q.   Can you just clarify further?  They said what?
6                MS. HUNT:  Asked and answered.
7 A.   Basically anything is brought forward by the team they
8      would reject.  I can't recall again, you know, which
9      council members said that in a meeting.
10 BY MR. BROWN:
11 Q.   But it was said in a meeting?
12                MS. HUNT:  Objection as to form and asked
13      and answered.
14                MR. TURFE:  And the foundation.
15 A.   Yes.
16 BY MR. BROWN:
17 Q.   I want to show you a new exhibit.  It's the same one
18      you have in front of you actually.  Can you go to
19      page -- that's not right.  It's going to be -- if you
20      can go to Exhibit A, I believe.  That's not right
21      either.  Hold on.  Excuse me.
22                MR. BROWN:  Perhaps we can go off the
23      record for five minutes and take a break.
24                MS. HUNT:  Sure.
25                MR. BROWN:  Thanks.

Page 117

1                (Recess taken at 12:05 p.m.)
2                (Back on the record at 12:16 p.m.)
3                MR. BROWN:  We're back on the record on the
4      deposition of Mayor Bill Bazzi.  It's now by my watch
5      12:17.  We're ready to proceed again.
6                MS. HUNT:  Thank you.  Just really quickly.
7      I know this has already been a long deposition.  It
8      will be a bit longer.  But I would just ask that the
9      audible sighs and maybe the side chatter kind of
10      minimize.  It's kind of distracting the deponent,
11      so . . .  That is just my request.
12                MR. TURFE:  And I just want to state for
13      the record that I'm not aware of any audible chatter
14      or side comments or anything to that nature.
15 BY MR. BROWN:
16 Q.   All right.  With that discussion terminated, we'll now
17      go to -- we'll return to, it's Exhibit E.  I'd like
18      you to travel if you could, sir, to Page ID 1449.  Do
19      you see that?  All right.  Then flip it over.  There
20      you go.
21 A.   Yes.
22 Q.   Do you see a document there that starts on Page 1450?
23 A.   Yes.
24 Q.   Briefly look this over and tell me when you're ready
25      to discuss it.

Bill Bazzi
August 29, 2025

Page 118

1    MS. HUNT:  Take your time to read it.
2    THE WITNESS:  Okay.
3 A.  I do remember the document, yes.
4 BY MR. BROWN:
5 Q.  Did you receive this document, Mr. Mayor?
6 A.  Yes, sir.
7 Q.  Who sent it to you?
8 A.  Chief Hart.
9 Q.  Did you receive this document while you were mayor for
10   the City of Dearborn Heights?
11 A.  Yes.
12 Q.  Do you remember on or about the date you received it?
13 A.  It was around July of 2024.
14 Q.  And you say Chief Hart sent you this document?
15 A.  Yes.
16 Q.  Do you remember receiving it?
17 A.  Yes.
18 Q.  Mr. Mayor, we're going to talk about a term called
19   "constructive termination," and I just want you to
20   have a common definition of what that means.  Do you
21   know what constructive termination means, Mr. Mayor?
22   MR. TURFE:  Objection.
23   MS. HUNT:  Objection as to form,
24   foundation.  I understand the question, but I will
25   object to requesting a legal definition from a

Page 119

1    layperson.
2    MR. TURFE:  Same objection.
3    MR. BROWN:  I'm not trying to get a legal
4    definition from a layperson.  I'm just trying to come
5    to a common understanding of the term so that we're
6    all on the same page.
7    MS. HUNT:  Same objection on the record.
8    MR. TURFE:  Same objection.
9 BY MR. BROWN:
10 Q.  I know you're not a lawyer, Mr. Mayor, but just tell
11   me what, in your own words, what constructive
12   termination means.
13 A.  Based on a conversation I had with the chief at the
14   time, my recollection of it is he couldn't really do
15   his job as the police chief because of the constraints
16   put on him.
17 Q.  So he felt like he was fired?
18   MS. HUNT:  Objection as to
19   mischaracterization of testimony and form and
20   foundation.
21   MR. TURFE:  Same objection.
22 A.  I know he couldn't do his job as the chief, and he
23   just said that basically -- I mean, the conversation
24   that I have -- that I had at the time with Chief Hart
25   that he couldn't really keep going with his job as the

Page 120

1    chief because of the -- was the obstacles put in his
2    way by Council.
3 BY MR. BROWN:
4 Q.  Did you do anything to cause the City to continue to
5    pay Chief Hart his severance period after July 2024?
6    MS. HUNT:  Objection as to form,
7    foundation.
8    MR. TURFE:  Same objection.
9 A.  I'm sorry.  Could you repeat that question?
10 BY MR. BROWN:
11 Q.  Did you cause Chief Hart to receive his severance
12   payments after July of 2024?
13   MS. HUNT:  Same objection.
14   MR. TURFE:  Same objection.
15 A.  Based on HR, I'm not sure if -- if she continued or --
16   you know, I don't get involved with every little
17   thing.
18 BY MR. BROWN:
19 Q.  Did you make a recommendation as mayor that Chief Hart
20   receive his severance?
21   MS. HUNT:  Objection as to foundation and
22   form.
23   MR. TURFE:  Same objection.
24 A.  Yes.
25 BY MR. BROWN:

Page 121

1 Q.  Let's go over this letter together, if we could,
2    Mr. Mayor.  I'll read some excerpts and you can tell
3    me what your testimony is with respect to them.  Let's
4    look at a quote from I believe it's Paragraph 1.
5    Here's a quote from the first paragraph.
6    "Council has taken multiple steps to ensure
7    that I cannot perform the duties of Chief by defaming
8    my character, undermining my authority, and
9    retaliating against me for exposing and correcting
10   problematic practices and procedures within the police
11   department."
12   Do you see that language in the first
13   paragraph?
14 A.  Yes.
15 Q.  This is a claim made by Chief Hart; correct?
16 A.  Correct.
17 Q.  Is that claim accurate to your mind?
18   MS. HUNT:  Objection as to form and
19   foundation.
20   MR. TURFE:  Same.
21   MS. HUNT:  And speculation.
22   MR. TURFE:  Same objection.
23 A.  Yes.
24 BY MR. BROWN:
25 Q.  Yes, it is accurate?

Bill Bazzi
August 29, 2025

Page 122

1  A.   Yes.
2  Q.   Here's a quote from the third paragraph.  I'll read
3       it.  Here we go.
4            "Thankfully, I found two highly capable and
5       willing police professionals (Directors Swope and
6       Vanderplow) to join the executive team on January 9,
7       2023.  Considering the threats and attempt at
8       defunding their positions and my recent
9       employment-induced heart attack, it is clear that the
10      physical harm I've suffered was and continues to stem
11      from my position as a law enforcement officer and the
12      City Council's reaction to the fact that I reported
13      violations of the law to the City of Dearborn Heights,
14      Federal Bureau of Investigation, Department of
15      Justice, and the Michigan State Police, to expose and
16      correct problematic police practices."
17           Do you see that?
18  A.   Yes.
19           MR. TURFE:  Objection to the form and the
20      foundation.
21  BY MR. BROWN:
22  Q.   Is that claim accurate?
23           MR. TURFE:  Objection to the foundation and
24      the form.  Calls for speculation.
25           MS. HUNT:  Same objection.

Page 123

1  A.   Yes.
2  BY MR. BROWN:
3  Q.   Here's a third quote which begins in the fourth
4       paragraph.  I'll read it into the record now.
5            "I have implemented many positive changes
6       to the organization, but there is still much work to
7       do with the DOG COPS Organizational Assessment and the
8       ongoing federal and state law enforcement
9       investigations into the Dearborn Heights Police
10      Department.  In light of the City Councils 'super
11      veto' defunding the Directors during a public meeting
12      on 1/23/2024, they went a step further and added an
13      agenda item and took a vote of 'no confidence' for
14      you, Roger and I.  This was a predictable and
15      retaliatory action."
16           Do you see that?
17  A.   Yes.
18  Q.   Is that claim accurate?
19           MR. TURFE:  Objection as to the form and
20      foundation.  Calls for speculation and a legal
21      conclusion.
22           MS. HUNT:  Same objection.
23  A.   Yes.
24  BY MR. BROWN:
25  Q.   While Chief Hart worked for the City did he

Page 124

1       experience, to your knowledge, any health issues?
2            MS. HUNT:  Objection as to foundation and
3       speculation.
4            MR. TURFE:  Same objection.
5            MS. HUNT:  And form.
6  A.   I was not aware of any health issues before.
7  BY MR. BROWN:
8  Q.   Before what, sir?
9  A.   Before the heart attack.
10  Q.   He suffered a heart attack while he was working for
11      the City of Dearborn Heights?
12           MS. HUNT:  Objection to form.
13  A.   While he was working for the City of Dearborn Heights
14      you're asking?
15  BY MR. BROWN:
16  Q.   Yes.
17  A.   I know he suffered a heart attack while he was working
18      as the chief in the City of Dearborn Heights.
19  Q.   Did Chief Hart ever inform you of his health issues
20      prior to becoming Chief of Police of Dearborn Heights?
21           MS. HUNT:  Asked and answered and objection
22      as to form.
23  A.   I was not aware of any health issues by the chief.
24  BY MR. BROWN:
25  Q.   Prior to hiring him or after you hired him?

Page 125

1  A.   Prior to hiring him.
2  Q.   How about immediately after you hired him?  When you
3       started working with Chief Hart, did you become aware
4       of any of his health issues?
5            MS. HUNT:  Objection as to asked and
6       answered.  Form and foundation.
7            MR. TURFE:  Same objection.
8  A.   Not during, but with the heart attack, obviously I
9       became aware of his health issues when he had a heart
10      attack on the job.
11  BY MR. BROWN:
12  Q.   Do you think Chief Hart was presumed to be racist
13      against Arabs?
14           MS. HUNT:  Objection as to form and
15      foundation.
16           MR. TURFE:  Same objection.
17           MS. HUNT:  And calls for a speculative
18      response.
19  A.   I did not see it.
20  BY MR. BROWN:
21  Q.   Do you think Jerrod Hart was targeted because he spoke
22      out against corruption at the City of Dearborn
23      Heights?
24           MS. HUNT:  Objection as to form and
25      foundation.

Bill Bazzi
August 29, 2025

Page 126

1               MR. TURFE:  Same objection.

2 A.  Yes.

3 BY MR. BROWN:

4 Q.  Let's talk about Paul Vanderplow now.  We're going to

5     switch subjects.

6           Can you go to the same exhibit and go to

7     Page 1446?  Please take a minute to look over this

8     document, and when you're ready to discuss it, let me

9     know.

10 A.  Okay.

11 Q.  You see the signature on Page 3 of 3?

12 A.  Yes.

13 Q.  That's Page ID 1448; correct?

14 A.  Correct.

15 Q.  You signed this document?

16 A.  Yes.

17 Q.  Is that your signature, your authentic signature?

18 A.  Yes.

19 Q.  Did you draft this document?

20 A.  Yes.

21 Q.  What is this document?

22           MS. HUNT:  Objection as to form.

23 A.  Subject of it says "Adjustment to contract due to

24     continued harassment."

25 BY MR. BROWN:

Page 127

1 Q.  What is the purpose of this document, Mr. Mayor?

2 A.  Basically documenting some of the issues, some of the

3     concerns we had.

4 Q.  Let me read the first paragraph to you.  It reads,

5     "Over the first few weeks of 2025 and with the

6     departure of Chief Swope, Director Vanderplow has

7     faced multiple attacks on his character from members

8     of the Department, members of City Council as well as

9     members of the public.  In every case, the attacks are

10     misguided and baseless with the sole purpose of

11     halting his work in holding employees accountable as

12     well as documenting waste, fraud and abuse within City

13     operations."

14           Do you see that?

15 A.  Yes.

16 Q.  You wrote this?

17 A.  Yes.

18 Q.  Is it your belief that this is true?

19 A.  Yes.

20 Q.  As you sit here today, do you still continue to

21     believe this is true?

22           MS. HUNT:  Objection as to form and

23     foundation.

24 A.  Yes.

25 BY MR. BROWN:

Page 128

1 Q.  I'll start the beginning of the next paragraph.

2           "On January 21, 2025, Director Vanderplow

3     was subject to yet another attack based upon his work

4     for the City.  Interim Chief Farhat attempted to

5     suspend Director Vanderplow without due process, and

6     under false pretenses.  Additionally,

7     Director Vanderplow has been subject to additional and

8     baseless legal actions by Department union members.

9     The most recent event was on January 28, 2025, during

10     an in-session Council meeting, Councilperson Hassan

11     Saab read into the official record un-verified

12     personnel complaints against Director Vanderplow.

13     Based on a preliminary review of the allegations, the

14     claims are false and misleading."

15           You wrote this language as well?

16 A.  Yes.

17           MS. HUNT:  Objection.  The document speaks

18     for itself.

19 BY MR. BROWN:

20 Q.  Did you believe this information -- I'm sorry.  Do you

21     believe this language was true at the time you wrote

22     it?

23 A.  Yes.

24 Q.  And as you sit here today, do you continue to still

25     believe it's true?

Page 129

1           MS. HUNT:  Object as to form.

2 A.  Yes.

3 BY MR. BROWN:

4 Q.  We're going to Page 3 of 3 at the top.  This is

5     Page ID 1447.  I'm sorry.  2 of 3.  Excuse me.

6           MR. MIOTKE:  You said 1447?

7           MR. BROWN:  Yes, sir.  Sorry.  Page 2 of 3.

8 BY MR. BROWN:

9 Q.  I'm quoting.  "Director Vanderplow uncovered and

10     documented the collusion of a City employee with a

11     vendor to provide services within the City against all

12     procurement guidelines.  Even after finding multiple

13     instances of willful and misleading statements,

14     Director Vanderplow was accused MULTIPLE times in a

15     public and on the record forum by Council members.

16     Even after several witnesses came forward to assert

17     Council statements were false, the Council still

18     maintained their vindictiveness against

19     Director Vanderplow."

20           Did you write that, sir?

21           MS. HUNT:  Objection as the document speaks

22     for itself.

23 A.  Yes.

24 BY MR. BROWN:

25 Q.  When you wrote this, did you think it was true?

Bill Bazzi
August 29, 2025

Page 130

1  A.   Yes.
2  Q.   And as you sit here today, do you still continue to
3       think this language is true?
4            MS. HUNT:  Object as to form.
5  A.   Yes.
6  BY MR. BROWN:
7  Q.   Continuing on.  "Based upon the multiple over acts by
8       Council and others, it is abundantly apparent that
9       Director Vanderplow will not be allowed to perform his
10      duties.  On several occasions, Councilperson Tom
11      Wencel stated on the record that if
12      Director Vanderplow has his name on any work product
13      it will not be considered.  This is tantamount to
14      constructive termination by Councils actions."
15           Do you see that?
16 A.   Yes.
17 Q.   You wrote that?
18 A.   Yes.
19 Q.   When you wrote it, did you think it was true?
20 A.   Yes.
21 Q.   As you sit here today, do you still continue to think
22      it's true?
23           MS. HUNT:  Object as to form.
24 A.   Yes.
25 BY MR. BROWN:

Page 131

1  Q.   I'll finish with the last paragraph.
2            "Therefore, to provide a level of
3       reassurance and financial protection, should
4       Director Vanderplow determine that his unemployment
5       with the City of Dearborn Heights is no longer tenable
6       based upon the cumulative actions of Council and/or
7       the Police Union(s), he will be constructively
8       relieved of his duties - with the City responsible for
9       compensating Director Vanderplow for the entirety of
10      his employment contract to be paid within ten calendar
11      days of his departure."
12           You wrote that, sir?
13 A.   Yes.
14 Q.   When you wrote it, did you believe it was true?
15 A.   Yes.
16 Q.   As you sit here today, do you still believe it's true?
17           MS. HUNT:  Object as to form.
18 A.   Yes.
19           MR. TURFE:  Object as to foundation.  Calls
20      for a legal conclusion.
21 BY MR. BROWN:
22 Q.   I want to go back to the top of Page 1447, Mr. Mayor.
23      In that language that I cited earlier, it talks about
24      collusion between a city employee and a vendor.  Do
25      you see that?

Page 132

1  A.   Yes.
2  Q.   What are you referring to here?  Can you explain this?
3  A.   They had a vendor that was doing work for the City,
4       and we asked multiple times for contracts before the
5       bidding that went out, and -- and Mr. Vanderplow went
6       back and forth trying to get the actual agreement or
7       see what actually -- it was just like a cover-up
8       basically.  They were not providing the right
9       information.  And that's what we referred to as
10      collusion between the vendor and also referred in this
11      statement.
12 Q.   Who was the vendor?
13           MS. HUNT:  Objection as to form.
14 A.   IB Lighting.
15 BY MR. BROWN:
16 Q.   Who was the city employee?
17           MS. HUNT:  Same objection.
18           MR. TURFE:  Objection as to form
19      foundation.
20 A.   He's no longer working with us.
21 BY MR. BROWN:
22 Q.   Fair enough.  But who was the employee?
23           MS. HUNT:  Object as to form.
24           MR. TURFE:  And the foundation.
25 A.   His last name is Blackburn.

Page 133

1  BY MR. BROWN:
2  Q.   I'm sorry?
3  A.   Blackburn.
4  Q.   Can you spell it, please?
5  A.   I believe Black B-U-R-N.  B-L-A-C-K-B-U-R-N.
6  Q.   All right.  Was this contract for lighting at the
7       city -- at the police administration building?
8  A.   Yes.
9            MS. HUNT:  Object as to form and
10      foundation.
11 BY MR. BROWN:
12 Q.   Was Paul Vanderplow in charge of the physical plant at
13      the police administration building?
14 A.   He was, yes, Director of Operations for the whole
15      justice center.
16           MR. TURFE:  Objection as to foundation.
17 BY MR. BROWN:
18 Q.   Was Khalil Rahal involved in this situation with the
19      vendor and the city employee?
20           MS. HUNT:  Object as to form, foundation,
21      and speculation.
22           MR. TURFE:  Same objection.
23 A.   I don't recall.
24 BY MR. BROWN:
25 Q.   Was DTE involved?

Bill Bazzi
August 29, 2025

Page 134

1      MS. HUNT:  Object as to form, foundation,
2  and speculation.
3      MR. TURFE:  Same objection.
4 A.  DTE was -- DTE and lighting, yes.
5 BY MR. BROWN:
6 Q.  Did you once promote Paul Vanderplow to interim
7  comptroller?
8      MS. HUNT:  Objection as to form.
9 A.  Yes.
10 BY MR. BROWN:
11 Q.  When did you do that?
12 A.  I don't recall the date.  It was shortly after the
13  last comptroller left.
14 Q.  In your view, did Paul Vanderplow have any skills or
15  education in accounting that made him an appropriate
16  choice for such a position?
17      MS. HUNT:  Objection as to form and
18  foundation.
19      MR. TURFE:  Same objection.
20 A.  Yes.
21 BY MR. BROWN:
22 Q.  Did Paul Vanderplow once work for the ATF?
23 A.  Yes.
24 Q.  Did Paul Vanderplow have financial training?
25      MS. HUNT:  Objection as to form and

Page 135

1  foundation.
2      MR. TURFE:  Same objection.
3 A.  Yes.
4 BY MR. BROWN:
5 Q.  Did Paul Vanderplow have accounting experience?
6      MS. HUNT:  Same objection.
7      MR. TURFE:  Same objection.
8 A.  Yes.
9 BY MR. BROWN:
10 Q.  What job did Paul Vanderplow have prior to coming to
11  work for Dearborn Heights?
12      MS. HUNT:  Objection as to form and
13  foundation.
14      MR. TURFE:  Same objection.
15 A.  I know the last job he had was SAC for ATF.  I know
16  he's worked at different --
17 BY MR. BROWN:
18 Q.  What did you say he was for ATF?
19      MS. HUNT:  I think he was finishing his
20  response, so . . .
21 A.  He was a special agent in charge of ATF, and I know
22  he's done audits from resume that I recall.  He did
23  some audits with the IRS.
24 BY MR. BROWN:
25 Q.  How did the City Council react to Vanderplow becoming

Page 136

1  interim comptroller?
2      MS. HUNT:  Objection as to form and
3  foundation and calls for a speculative response.
4      MR. TURFE:  Same objection.
5 A.  They would not allow him to sign checks.
6 BY MR. BROWN:
7 Q.  Did you have a right as the mayor of City of Dearborn
8  Heights to appoint any comptroller you want to that
9  position?
10      MS. HUNT:  I'm sorry.  Can you repeat that?
11 BY MR. BROWN:
12 Q.  Do you have a right as the mayor of Dearborn Heights
13  to appoint any comptroller you want to that position?
14      MS. HUNT:  Objection as to form and
15  foundation.
16      MR. TURFE:  Same objection.
17 A.  Yes.
18 BY MR. BROWN:
19 Q.  Why do you think the City Council and its members took
20  all these actions against Paul Vanderplow?
21      MS. HUNT:  Objection as to form,
22  foundation, calls for a speculative response.
23      MR. TURFE:  Same objection.
24 A.  That's a good question to ask the council.
25 BY MR. BROWN:

Page 137

1 Q.  You keep telling me that's a good question.  What do
2  you mean by that, that's a good question?
3      MS. HUNT:  I think he means he doesn't
4  know.
5 A.  Yeah.  I don't know.  I don't know why he was treated
6  that way.
7      MR. TURFE:  I'm going to object to the
8  foundation.
9      MS. HUNT:  Same objection.
10 BY MR. BROWN:
11 Q.  Did the City Council target Paul Vanderplow in 2024?
12      MS. HUNT:  Objection as to form and
13  foundation.  Calls for a speculative response.
14      MR. TURFE:  Same objection.
15 A.  You need to -- I guess I need specifics.  Target as
16  what?
17 BY MR. BROWN:
18 Q.  Were all these actions you've described and which
19  we've gone over in the letter you just wrote, did any
20  of these actions take place in 2024?
21      MR. TURFE:  Objection as to the form and
22  the foundation and calls for speculation.
23      MS. HUNT:  Same objection.
24 A.  Yes.
25 BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 138

1 Q.   Did any of these actions occur after February of 2024,
2      to your memory?
3            MR. TURFE:  Same objections.
4            MS. HUNT:  Same.
5 A.   I don't recall the dates.
6 BY MR. BROWN:
7 Q.   But after February '24?
8            MS. HUNT:  Asked and answered.
9 A.   Yeah.  I don't recall the exact dates.
10 BY MR. BROWN:
11 Q.   Thank you.  Do you think Paul Vanderplow was
12      considered part of Jerrod Hart's team?
13            MS. HUNT:  Objection as to form.
14            MR. TURFE:  And the foundation.
15 A.   He was part of the transition team, yes.
16 BY MR. BROWN:
17 Q.   Do you think Paul Vanderplow's been treated fairly by
18      the City Council of Dearborn Heights?
19            MR. TURFE:  Objection as to the form,
20      foundation, speculation, and asked and answered.
21            MS. HUNT:  Same objection.
22 A.   No.
23 BY MR. BROWN:
24 Q.   Did Paul Vanderplow ever tell you that his employment
25      with Dearborn Heights was no longer possible because

Page 139

1      he was not being allowed to do his job?
2            MS. HUNT:  Objection as to form and
3      foundation.
4            MR. TURFE:  Same objection.
5 A.   Yes.
6 BY MR. BROWN:
7 Q.   Did you make the recommendation that he be paid out on
8      his employment contract?
9            MS. HUNT:  Form and foundation.
10           MR. TURFE:  Objection as to foundation.
11 A.   Yes.
12 BY MR. BROWN:
13 Q.   Was he paid out on his employment contract?
14           MS. HUNT:  Objection as to form and
15      foundation.
16 A.   As of right now, no.  I need to check to see.  The
17      last I checked, no.
18 BY MR. BROWN:
19 Q.   So as you sit here today, you don't know if the City
20      of Dearborn Heights owes Paul Vanderplow any severance
21      pay?
22           MS. HUNT:  Asked and answered.  Object as
23      to form and foundation.
24           MR. TURFE:  And calls for a legal
25      conclusion.

Page 140

1 A.   The last I checked, no.  So, again, I have to check to
2      see.  I haven't checked recently.
3 BY MR. BROWN:
4 Q.   Let's switch gears now.  We're going to talk about
5      Kevin Swope.
6            Did you ask Kevin Swope to resign?
7            MS. HUNT:  Objection as to form and
8      foundation.
9            MR. TURFE:  Same objection.
10 A.   No.
11 BY MR. BROWN:
12 Q.   All right.  Thank you.
13           MR. BROWN:  Here's a new exhibit.  Where
14      are we at, Madam Court Reporter?
15           MR. TURFE:  F.
16           MR. BROWN:  F.
17           (Marked EXHIBIT F for identification)
18 BY MR. BROWN:
19 Q.   I've handed you Exhibit F, Mr. Mayor, which also has
20      at the bottom, just for identification purposes,
21      bottom right-hand corner CODH0436.
22           Do you see this document?
23 A.   Yes.
24 Q.   Can you briefly look over Exhibit F and then when
25      you're ready to discuss it, let me know?

Page 141

1 A.   Yes.
2 Q.   This appears to be an email drafted by you; is that
3      correct?
4 A.   Yes.
5 Q.   And by that, I mean the email address
6      BBazzi@dearbornheights Michigan Government is your
7      email address; correct?
8 A.   Correct.
9 Q.   And this email was dated 12/4/24; is that correct?
10 A.   Correct.
11 Q.   Can you please read the text of the email which is
12      rather short?
13 A.   It says, "Good morning Chief Swope, Can you please
14      submit your resignation effective end of Friday
15      January 10, 2024."
16 Q.   And you wrote that, sir?
17 A.   Yes.
18 Q.   I guess my question is, do you want to revisit your
19      earlier testimony about your answer to not asking
20      Swope to resign or can you explain this email or
21      provide any context?
22           MS. HUNT:  I'm going to object to the form
23      of the question.
24           MR. TURFE:  And I'm going to object to the
25      foundation and asked and answered and that it's

Bill Bazzi
August 29, 2025

Page 142

1  argumentative.
2 A.  Chief Swope actually asked me to submit this, and I
3     thought he wanted for his -- he's already had a job
4     offer with another department.
5 BY MR. BROWN:
6 Q.  Okay.
7 A.  So I -- he -- I met with him.  He asked to meet with
8     me outside, and I met with him, and he asked if I
9     could submit something for him to resign, so I thought
10    it was for his new position.
11 Q.  So your testimony is you sent him this request that he
12    resign at his request?
13 A.  Yes.
14 Q.  Okay.  Thank you.  I want to show you a new exhibit,
15    which I believe will be G.
16            (Marked EXHIBIT G for identification)
17 BY MR. BROWN:
18 Q.  Can you look this over briefly and then when you're
19    ready to discuss it, let me know?
20            MS. HUNT:  Take your time to read that.
21            THE WITNESS:  Okay.
22            MR. TURFE:  Before anything further, I just
23    want to object insofar as this -- whatever this
24    purported Exhibit G is, it's an incomplete document.
25            MR. BROWN:  Duly noted.

Page 143

1 A.  Okay.
2 BY MR. BROWN:
3 Q.  If you go to the second page, sir, there's this quote
4     ascribed to you by a reporter who wrote the article,
5     and I'll read the last paragraph of it.  It says, "As
6     pleased and optimistic as I am with Deputy Chief
7     Farhat's upcoming appointment, I am also disappointed
8     to see Chief Swope leave our City', Bazzi continued.
9     'Chief Swope was a great leader, and played an
10    important and effective role in our mission to both
11    improve our Police Department's operations and bring
12    it back to a higher level of respectability.  He is,
13    without a doubt, leaving our Department in a better,
14    more stable and more respected position.  I thank him
15    for his service, and I wish him nothing but the best
16    in his . . . position."
17 A.  Yes.
18 Q.  That's a quote --
19            MS. HUNT:  There's no question.
20 BY MR. BROWN:
21 Q.  So this is a reporter quoting you.  Do you understand
22    that?
23 A.  Yes.
24 Q.  Is this quote accurate?
25            MS. HUNT:  I'm going to object to form,

Page 144

1  foundation, speculation.
2 A.  Yes.
3            MR. TURFE:  I just want to state for the
4     record that the end of the sentence says, "I thank him
5     for his service, and wish him nothing but the best in
6     his new position," ascribing to Chief Swope.  Just
7     want to make sure that's clear.
8            MR. BROWN:  It was quoted in the record.
9            MR. TURFE:  I don't think you said "new
10    position" to end the quote.  I just want to make sure
11    it's there for completeness.
12            MR. BROWN:  Fair enough.
13 BY MR. BROWN:
14 Q.  But you actually said these words; correct, Mr. Mayor?
15            MS. HUNT:  Object as to form and
16    foundation.
17            MR. TURFE:  Same objection.
18 A.  Yes.
19 BY MR. BROWN:
20 Q.  And when you said these words, did you believe them to
21    be true?
22            MS. HUNT:  Same objection.
23 A.  Yes.
24 BY MR. BROWN:
25 Q.  And as you sit here today, do you still believe them

Page 145

1  to be true?
2            MS. HUNT:  Object as to form.
3 A.  Yes.
4 BY MR. BROWN:
5 Q.  Thank you.  Do you think Kevin Swope was allowed to do
6     his job while he was here?
7            MS. HUNT:  Object to form, foundation, and
8     calls for a speculative response.
9            MR. TURFE:  Same objection.
10 A.  I know there were some issues, so other than that, I'm
11    not a hundred percent.
12 BY MR. BROWN:
13 Q.  What were the issues?
14 A.  You know, we're going back to the same thing.  You
15    know, just obstacles of wanting to bring in certain
16    people to be in leadership positions.
17 Q.  What were the obstacles?
18            MS. HUNT:  Asked and answered.
19 A.  Certain members -- or certain persons to be -- be the
20    chief or even commissioner.
21 BY MR. BROWN:
22 Q.  Did you ever witness instances in which the City
23    Council made it difficult for Kevin Swope to do his
24    job?
25            MR. TURFE:  Objection as to form and

Bill Bazzi
August 29, 2025

Page 146

1    foundation and calls for speculation.
2              MS. HUNT:  Same objection.
3 A.   Based on the meetings which are public council
4    meetings and certain items that is put on the agenda.
5    It's all public records.
6 BY MR. BROWN:
7 Q.   Is that a yes?
8 A.   Yes.
9 Q.   Did you ever witness instances in which the City
10    Council called into question Kevin Swope's integrity?
11              MR. TURFE:  Objection as to form and
12    foundation.  Calls for speculation.
13              MS. HUNT:  Same objection.
14 A.   Yes.
15 BY MR. BROWN:
16 Q.   What were those instances?
17              MR. TURFE:  Objection.  Form and
18    foundation.  Calls for speculation.
19              MS. HUNT:  Same.
20 A.   The one I recall was in a council meeting just
21    questioning his integrity both, you know, at a council
22    meeting, and that's also public record.
23 BY MR. BROWN:
24 Q.   Well, Kevin Swope indirectly worked for you; correct?
25 A.   Yes.

Page 147

1 Q.   What was your opinion of his integrity?
2              MS. HUNT:  Objection as to form and
3    foundation.
4              MR. TURFE:  Same objection.
5 A.   He was -- he had integrity.
6 BY MR. BROWN:
7 Q.   Did you ever witness instances in which the City
8    Council blocked initiatives or proposals made by Kevin
9    Swope for no reason other than he was Kevin Swope?
10              MS. HUNT:  Objection as to form and
11    foundation.  Calls for a speculative response.
12              MR. TURFE:  Same objection.
13 A.   You know, as stated earlier, he put several items on
14    the agenda for council to approve and they were
15    denied.
16 BY MR. BROWN:
17 Q.   And why were they denied?
18              MS. HUNT:  Objection as to form and
19    foundation.
20              MR. TURFE:  Same objection.
21 A.   No idea.
22 BY MR. BROWN:
23 Q.   I want to show you a new exhibit.
24              MR. BROWN:  Forgive me.  Where are we at
25    now?

Page 148

1              MR. TURFE:  H.
2              (Marked EXHIBIT H for identification)
3 BY MR. BROWN:
4 Q.   Please look this over briefly, and when you're ready
5    to discuss it, let me know.
6 A.   Okay.
7 Q.   Have you seen this document before, sir?
8 A.   I do recall, yes.
9 Q.   This is a document concerning Kevin Swope; is that
10    accurate?
11 A.   Correct.
12 Q.   It appears to be an Employee Change of Status Form; is
13    that correct?
14 A.   Yes.
15 Q.   Can you identify the signature at the bottom of the
16    page, which is somewhat grainy?
17 A.   Looks like it was our -- a previous HR director.
18 Q.   And what was that person's name?
19 A.   Cameron Eggly.
20 Q.   I see.  And do you recognize this signature as
21    Mr. Eggly's?
22              MR. TURFE:  Objection to foundation.
23              MS. HUNT:  Same.
24 A.   I believe so.
25 BY MR. BROWN:

Page 149

1 Q.   Well, I mean, you worked as the mayor of Dearborn
2    Heights.  Were you familiar with Cameron Eggly's
3    signature?
4 A.   Yes.
5              MS. HUNT:  Objection as to form.
6 BY MR. BROWN:
7 Q.   Is that what Karen Eggly's signature looks like?
8              MS. HUNT:  Objection as to foundation.
9              MR. TURFE:  Are you saying Karen or
10    Cameron?  I'm not sure what your question is.
11              MR. BROWN:  What's the person's name?
12              MR. TURFE:  I'm not sure.  You said a name
13    and you actually said two names.  I don't know what
14    you're saying.
15 BY MR. BROWN:
16 Q.   What's the person's name, Mr. Mayor?
17 A.   Cameron.
18 Q.   Cameron.
19 A.   Yes.
20 Q.   Are you familiar with Cameron Eggly's signature?
21 A.   Yes.  I'm familiar with it.
22 Q.   And is that Cameron Eggly's signature at the bottom of
23    this page, to your knowledge?
24              MS. HUNT:  Objection as to form and
25    foundation.

Bill Bazzi
August 29, 2025

Page 150

1 A.   I'm not a signature expert, but it looks the same,
2      yes.
3 BY MR. BROWN:
4 Q.   Thank you, Mr. Mayor.  According to this document, is
5      Mr. Swope eligible for a payment after an employment
6      change?
7           MS. HUNT:  Objection as to form and
8      foundation.  Calls for a speculative response.
9           MR. TURFE:  Same objection.
10 A.  Again, you know, as I stated before, he was -- he
11     asked me for his resignation.  He's already had a
12     position at a different department before he asked me
13     for the resignation letter.
14 BY MR. BROWN:
15 Q.  And this is during a time in which you wanted to name
16     Interim Chief Farhat as the new police chief; is that
17     correct?
18          MS. HUNT:  Objection as to form and
19     foundation.
20          MR. TURFE:  Same objection.
21 A.  I don't recall the dates when -- when Farhat came
22     versus when -- when Chief Swope asked me to send --
23     submit the letter, so I don't have the timing.
24 BY MR. BROWN:
25 Q.  I understand you don't have the precise dates, but

Page 151

1      what I'm asking you is were you attempting to make
2      Chief Hussein Farhat police chief at the same time
3      that you sent this email on the 4th of December 2024?
4           MS. HUNT:  Objection as to form and
5      foundation.
6           MR. TURFE:  Same objection.
7 A.   Actually I wanted to keep Chief Hart as the chief --
8      I'm sorry, Chief Swope to be the chief, but when he
9      asked for a resignation or found out that he actually
10     got another position, then I wanted to appoint
11     somebody at that time.  You know, Farhat was here
12     already as an emergency manager.
13 BY MR. BROWN:
14 Q.  I see.  All right.  Thank you.
15 A.  He was not a chief.  He was an interim chief just on
16     the record.
17 Q.  You're speaking about Swope or Farhat?
18 A.  Farhat.
19 Q.  All right.  Thank you.
20 A.  He was not the chief.
21 Q.  Mr. Mayor, after this litigation started, while the
22     plaintiffs were still working for the City, did the
23     City ever take steps to prevent communications from
24     Attorney Hunt from reaching Vanderplow or Swope or
25     Hart?

Page 152

1           MS. HUNT:  I'm going to object to form, to
2      foundation.  Calls for a speculative response.
3           And I'm just going to caution anything as
4      it relates to attorney-client privilege, just be
5      cautious that it's not communications between us that
6      is discussed.
7 A.   Yeah.  I really don't understand the question.  I
8      mean, I know -- I mean, there was discussion with the
9      attorney, but I'm not sure where you're going with
10     that question.
11 BY MR. BROWN:
12 Q.  I'm not going to try and ask you about anything that
13     you've discussed with Ms. Hunt.  That's not my point
14     at all.  What I'm asking you is this.  Did the City
15     ever take steps to make sure that Ms. Hunt's
16     communications to the City were not also sent to Paul
17     Vanderplow or Jerrod Hart or Kevin Swope?
18          MS. HUNT:  Same objection.
19          MR. TURFE:  And I'll join in on those
20     objections.
21 A.  I don't recall to see if there's anything that was
22     excluded.
23 BY MR. BROWN:
24 Q.  Who would have been in charge, if anybody, of making
25     sure that the three plaintiffs did not receive

Page 153

1      communications from Ms. Hunt?
2           MS. HUNT:  Same objection.
3           MR. TURFE:  Same objections.
4 A.   I'm not sure.  Like I said, I'm not sure where this is
5      going.  Like I'm not aware of any -- any of this.
6 BY MR. BROWN:
7 Q.   Does the City have an IT specialist that controls its
8      email system?
9           MS. HUNT:  I'm going to object as to form
10     and foundation.
11 A.  I know we have an ID director, yes.
12 BY MR. BROWN:
13 Q.  Is that the person who's in charge of emails?
14          MS. HUNT:  Objection as to form and
15     foundation.
16 A.  IT, the records in charge of, yes, everything.
17 BY MR. BROWN:
18 Q.  And can the IT director in that capacity stop a person
19     from receiving emails that they shouldn't be
20     receiving?
21          MS. HUNT:  Objection as to form and
22     foundation.  Calls for a speculative response.
23 A.  Yeah.  I'm not really sure which emails.  I'm not
24     aware of --
25 BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 154

1 Q.  I'm not asking about any particular emails.  I'm
2      asking if there's an IT specialist at the City that
3      can prevent emails from being received by particular
4      people.
5            MS. HUNT:  Same objection.
6 A.  Yeah.  Again, I'm not aware of any emails that were --
7 BY MR. BROWN:
8 Q.  I'm not asking you about emails, sir.
9 A.  Yeah.
10 Q.  Listen to the question.  Is there someone at the City
11     who has the power to prevent certain emails from being
12     received by City employees?
13           MS. HUNT:  I'm going to object to form,
14     foundation, and calls for a speculative response.
15           MR. TURFE:  Same objection.
16           MS. HUNT:  I don't know if the mayor has
17     that information.
18 A.  Again, I'm not sure.  If the email is addressed to
19     you -- I'm not -- that's what I mean.  This is
20     confusing.  Because if I send you an email and I cc
21     you on it, I don't think there's a way that anybody
22     can un-cc you.  That's why I'm confused because if I
23     send you an email, you have to get that email.  I
24     don't think there's a mechanism to stop any emails.
25 BY MR. BROWN:

Page 155

1 Q.  Let me ask you this.  Who's the person who's in charge
2      of the IT department at the City right now?
3            MS. HUNT:  Asked and answered.
4 A.  Mr. -- Director Cooper.
5 BY MR. BROWN:
6 Q.  Director Cooper?
7 A.  Yes.
8 Q.  Is Director Cooper also managing the email system
9      managed by the City?
10           MS. HUNT:  Asked and answered.
11 A.  He's responsible for all IT matters, yes.
12 BY MR. BROWN:
13 Q.  I see.  And was Mr. Cooper also in charge of IT at the
14     time that the three plaintiffs were working here for
15     the City?
16 A.  Yeah.  He's been here since -- yes.
17 Q.  All right.  Thank you.  So what is Mr. Cooper's title?
18 A.  Director of IT.
19 Q.  Director of IT?
20 A.  Yes, sir.
21 Q.  How long has he worked for the City?
22 A.  Again, I don't have the right exact dates.  I would
23     say probably like around -- I think the same time
24     as -- I don't have the date.  I don't want to
25     speculate.  I can get it for you.

Page 156

1 Q.  Do you often work with Mr. Cooper?
2 A.  I may have some issues with -- IT issues.
3 Q.  But you're familiar with what he does?
4 A.  Yes.
5 Q.  Does Mr. Cooper have the power to search through
6      documents maintained by the City to search for
7      particular documents?
8            MS. HUNT:  Object as to form and
9      foundation.  Calls for a speculative response.
10 A.  I mean, he maintains the whole system, so if -- I'm
11     not sure if -- I'm not really sure if he does do -- go
12     through like all the emails.  I'm not sure.
13 BY MR. BROWN:
14 Q.  But does he have the ability to search through the
15     City's documents?
16           MS. HUNT:  Asked and answered.  Same
17     objection as prior.
18 A.  I'm sure he does, but, again, I'm not sure if like --
19     like everything that he's capable of doing, but . . .
20 BY MR. BROWN:
21 Q.  Can you tell me how the City stores its documents?
22           MS. HUNT:  Objection as to form and
23     foundation.  Calls for a speculative response.
24 A.  I'm not really sure.  I know we have a server, but I
25     don't know the details.

Page 157

1 BY MR. BROWN:
2 Q.  You have a server here onsite?
3 A.  We have --
4            MS. HUNT:  Objection as to form and
5      foundation.
6 A.  I know there's a -- there's a company that we deal
7      with.  I can't remember.  Again, I don't know the
8      exact -- like all the information.
9 BY MR. BROWN:
10 Q.  Would Mr. Cooper know?
11           MS. HUNT:  Objection as to form and
12     foundation.
13 A.  I hope so, yes.
14 BY MR. BROWN:
15 Q.  But there are also hard copy documents here in this
16     building; correct?
17           MS. HUNT:  Objection as to form and
18     foundation.  Speculation.
19           MR. TURFE:  Same objection.
20 A.  Not prior to a certain time.  Everything is online
21     now, but we went online, so we have iCloud.
22 BY MR. BROWN:
23 Q.  I see.  But before you went online, there were hard
24     copy files kept in the building?
25           MS. HUNT:  Objection as to form and

Bill Bazzi
August 29, 2025

Page 158

1  foundation.  Speculation.
2  A.  It depends what you're talking about.  I know building
3      department has copies, but I'm not sure which
4      department.
5  BY MR. BROWN:
6  Q.  Have you ever heard of something called the red file?
7          MS. HUNT:  Objection as to form and
8      foundation.
9  A.  Actually I heard about it a few days ago, but I don't
10     know what it is.
11 BY MR. BROWN:
12 Q.  I see.  Do you know where the red file is kept in the
13     building?
14         MR. TURFE:  Objection as to the form and
15     the foundation.
16 A.  No.
17         MS. HUNT:  Same objection.
18 BY MR. BROWN:
19 Q.  Do you know the software systems used by the City to
20     store data?
21 A.  All I know is Microsoft 365.
22 Q.  I see.  So perhaps you're telling me the best person
23     to ask all these questions about document storage and
24     data storage would be Director Cooper; is that
25     correct?

Page 159

1          MS. HUNT:  Objection to form, foundation,
2      and mischaracterization of testimony.
3  A.  Yes.  Anything IT, Mr. Cooper will be the person.
4  BY MR. BROWN:
5  Q.  All right.  But sitting here today, here we are today,
6      it is what?  August 29th.  Is there a file room in
7      this building we're sitting in here in Dearborn
8      Heights City Hall?
9          MS. HUNT:  I'm going to just object to form
10     and foundation.
11 A.  I'm not really sure like what you're talking about.  I
12     know there's -- we keep records, old records in the
13     basement of the city hall.
14 BY MR. BROWN:
15 Q.  Police department records?
16         MS. HUNT:  Objection as to form and
17     foundation.
18 A.  No.  Nothing police -- I've never seen any police
19     records in the city hall.
20 BY MR. BROWN:
21 Q.  I see.  Those are all kept in the police department's
22     building?
23         MR. TURFE:  Objection as to foundation.
24         MR. BROWN:  And to form.  Is that a
25     question?

Page 160

1  BY MR. BROWN:
2  Q.  I'm just asking you, where are documents pertaining to
3      the Dearborn Heights Police Department kept?
4          MS. HUNT:  Object to form, foundation, and
5      I think asked and answered.
6          MR. TURFE:  Same objection.
7  A.  I'm not -- I'm not really sure what documents you're
8      talking about.
9  BY MR. BROWN:
10 Q.  I'm not asking you about any documents in particular.
11     I'm asking you if there are any documents at all,
12     where are they kept?
13         MS. HUNT:  Well, that's a different
14     question, but I'm going to object to form and
15     foundation.
16 A.  I mean, if it's HR documents, they're with HR.  If
17     it's police documents, they're at the police station.
18     If it's building documents, they'd be kept in here in
19     the building department.  So I need to know what --
20 BY MR. BROWN:
21 Q.  Police department.
22         MS. HUNT:  Asked and answered.
23 A.  There's nothing.  I don't -- I have not seen any
24     police documents here at the city hall.
25 BY MR. BROWN:

Page 161

1  Q.  All right.  Thank you.  Mr. Mayor, when you hired
2      Jerrod Hart, were you aware of any budget in place
3      that controlled how much you could pay him or what his
4      salary would be?
5          MS. HUNT:  Just a second.  I'm going to
6      object to form, foundation.
7          MR. TURFE:  Same objection.
8  A.  So the budget would be whatever the budget was
9      allocated for the chief's position.
10 BY MR. BROWN:
11 Q.  And was there an allocation for the chief's position?
12 A.  Yes.
13 Q.  And what was it, to your memory?
14         MS. HUNT:  Objection to form and
15     foundation.
16         MR. TURFE:  Same objection.
17 A.  I don't recall the number.  I would have to go back
18     and look at the budget.
19 BY MR. BROWN:
20 Q.  But there was a number for paying a chief of police?
21         MS. HUNT:  Asked and answered.
22 A.  There was a budget for the chief, yes.
23 BY MR. BROWN:
24 Q.  What about for directors?
25         MS. HUNT:  Object as to form and

Bill Bazzi
August 29, 2025

Page 162

1  foundation.
2         MR. TURFE:  Same objection.
3 A.  I know we were short-staffed, so we -- we had -- we
4     had a budget, the police department budget for the two
5     directors as well.
6 BY MR. BROWN:
7 Q.  You say you were short-staffed.  You mean in the
8     police department?
9 A.  Yes.
10 Q.  So you're saying there were fewer employees than were
11     budgeted for in the police department?
12         MS. HUNT:  Objection as to form.
13 A.  Yes.
14 BY MR. BROWN:
15 Q.  And so you had extra funds that you could use to pay
16     directors without going over budget?
17         MS. HUNT:  Objection as to form,
18     foundation, and mischaracterization of testimony.
19         MR. TURFE:  Same objection.
20 A.  Yes.
21 BY MR. BROWN:
22 Q.  So did you ever exceed the budget for the Dearborn
23     Heights Police Department by hiring Jerrod Hart or
24     Kevin Swope or Paul Vanderplow?
25         MS. HUNT:  Objection as to form and

Page 163

1     foundation.
2 A.  I don't recall exceeding the budget.  I don't recall.
3 BY MR. BROWN:
4 Q.  But we're here now.  You've heard now that these
5     salaries were not in the budget.  Have you heard that?
6         MS. HUNT:  Objection as to form and
7     foundation.
8 A.  Yes.
9 BY MR. BROWN:
10 Q.  Is that true?
11         MS. HUNT:  Objection as to form.
12 A.  Well, we had the budget when I brought them here.
13 BY MR. BROWN:
14 Q.  When you say "we had the budget," do you mean you had
15     sufficient funds in the budget or what do you mean by
16     that?
17         MS. HUNT:  Objection as to form and
18     foundation and misrepresentation of earlier testimony.
19 A.  So every year that we budget for certain positions, so
20     I know we had the budget, you know, initially and
21     throughout when they were both, director -- the two
22     directors and the chief, you know, they were added in
23     the budget.
24 BY MR. BROWN:
25 Q.  I see.  During your time as mayor, were there other

Page 164

1     instances in which particular employees who were
2     already hired, who were already working had their
3     positions defunded?
4         MS. HUNT:  Objection as to form, and
5     foundation.
6         MR. TURFE:  Same objection.
7 A.  Yes.  I do recall that, yes.
8 BY MR. BROWN:
9 Q.  And what were those instances?
10 A.  I know there was a FOIA coordinator position that was
11     defunded and there was a -- the crime analyst position
12     that was defunded.
13 Q.  And did that result in people losing their jobs?
14         MS. HUNT:  Objection as to form.
15         MR. TURFE:  Same objection.
16 A.  Yes.
17 BY MR. BROWN:
18 Q.  I see.  Mr. Mayor, you stated you are Arab American;
19     correct?
20 A.  Yes.
21 Q.  Is your heritage from Lebanon?
22         MS. HUNT:  Objection as to relevance.
23     Form.
24 A.  Yes.
25 BY MR. BROWN:

Page 165

1 Q.  Have you ever described to Chief Hart, for example,
2     some of the politics that arises from tribal
3     relationships in Lebanon between people here in
4     Dearborn Heights?
5         MS. HUNT:  Object as to form, foundation,
6     relevance.
7 A.  I know we discussed it, yes.
8 BY MR. BROWN:
9 Q.  So, for example, can you trace your heritage back to a
10     particular tribe in Lebanon?
11         MS. HUNT:  Objection as to relevance.
12 A.  I'm not -- I wouldn't say like tribe.  Just like
13     heritage to where we come from, yes.
14 BY MR. BROWN:
15 Q.  I see.  And, to your knowledge, are there members of
16     City Council who can also trace their heritage back to
17     Lebanon?
18         MS. HUNT:  Objection as to form,
19     foundation, speculation, and relevance.
20         MR. TURFE:  Same objection.
21 A.  They should, yes.
22 BY MR. BROWN:
23 Q.  Have you ever described to Chief Hart the source of
24     some of the conflict between you and, for example,
25     Mohamad Bazzy being related to different links to

Bill Bazzi
August 29, 2025

Page 166

1  different tribes in Lebanon?
2        MS. HUNT:  Objection as to form,
3  foundation, relevance.  I don't like the word "tribes"
4  being used here.
5  BY MR. BROWN:
6  Q.  I'll use whatever heritage you want, but . . .
7        MS. HUNT:  If that's the term you want
8  coming out of your mouth, that's fine.
9  A.  Yeah.  I mean, it's confusing.  Like we -- I can't
10  recall the conversation we had, but I know Chief Hart
11  asked me some questions about, you know, the dynamics
12  of the community, and, I mean, I tried to explain it
13  the best I know, but I don't recall exact, you know,
14  content of the conversations we've had.
15  BY MR. BROWN:
16  Q.  Sure.  I guess what I'm trying to get at is this.  Is
17  there any chance that some of the stress that's
18  currently being experienced right now in Dearborn
19  Heights, conflicts between you and the City Council,
20  conflicts between councilmen, all of the stress we've
21  been discussing all day long, is there any chance that
22  any of this relates to some folks coming from --
23  relating to different groups back in Lebanon?
24        MS. HUNT:  Objection as to form,
25  foundation, relevance, speculation.

Page 167

1        MR. TURFE:  Yeah.  Same objection.
2  A.  I mean, I know what I -- I actually -- when you keep
3  saying -- you're asking your questions and it just
4  popped in my head an article that popped in the paper.
5  Actually it's public knowledge.  Again, Baydoun versus
6  Bazzy.  So that's -- there's an article on there, and
7  I have no idea what the heck this guy was talking
8  about.  I mean, who wrote the article?  I just said
9  the -- I just saw the heading Bazzy versus Baydoun.
10  This is something I've heard about like over a hundred
11  years ago.
12  BY MR. BROWN:
13  Q.  And what's that about?
14  A.  Just two family members, Bazzy versus Baydoun.
15  But somehow you raised that answer to my question.  Is
16  there something about links to Lebanon in that
17  article?
18  A.  I didn't read it.  I refuse to read garbage.
19  Q.  I see.  We'll leave it alone, then.
20        MR. TURFE:  And I just want to place an
21  objection on the record to any attempts at
22  trivializing a certain family's or family names or
23  tribe -- using the word "tribe" as a characteristic.
24  Just --
25        MR. BROWN:  There's no trivialization

Page 168

1  involved.
2        MR. TURFE:  I don't find that appropriate.
3  There are cities in Lebanon.  It's a country.
4        MR. BROWN:  This is a speaking objection.
5  If you have a problem, bring it to the Court.
6  Otherwise, maintain your objections out of the Federal
7  Rules of Civil Procedure, sir.
8        MR. TURFE:  I am.  Can you tell me what
9  rule you think I'm violating?
10        MR. BROWN:  Speaking objections.
11        MR. TURFE:  Okay.  Tell me what rule.  Is
12  there a number?
13        MR. BROWN:  Just keep talking, Tarik.
14        MR. TURFE:  Don't trivialize certain
15  people.
16        MR. BROWN:  No one's trivializing anybody.
17        MS. HUNT:  And I can't discount his
18  objection because it does tend to not only trivialize
19  family members but cultural differences here, so . . .
20        MR. BROWN:  I am making inquiries in a
21  deposition about the sources of the dysfunction here
22  at Dearborn Heights City Hall, and if folks think
23  that's irrelevant or trivialization, well, then knock
24  yourselves out and bring a motion to the Court.
25  BY MR. BROWN:

Page 169

1  Q.  Who is Hussein Farhat, Mr. Mayor?
2  A.  He was interim chief.
3  Q.  Did you hire him?
4  A.  Yes.
5  Q.  What was his position before becoming interim chief?
6  A.  He was emergency manager for Dearborn Heights.
7  Q.  So you hired him originally as an emergency manager?
8  A.  Yes.
9        MS. HUNT:  Objection as to form.
10  BY MR. BROWN:
11  Q.  And did he have any positions between the time he was
12  emergency manager and became interim chief?
13  A.  I don't recall, no.
14  Q.  And then he was interim chief for a while; is that
15  correct?
16        MS. HUNT:  Objection as to form and
17  foundation.
18  A.  A very short time.  I don't have the time.
19  BY MR. BROWN:
20  Q.  What happened?
21        MS. HUNT:  Objection as to form.
22  A.  He was basically -- he was unappointed from the
23  interim position.
24  BY MR. BROWN:
25  Q.  Did you unappoint him?

Bill Bazzi
August 29, 2025

Page 170

1 A.   Yes.

2 Q.   Why?

3          MS. HUNT:  Just object as to form and

4      foundation.

5          But go ahead.

6 A.   Performance and some of the things that he was

7      changing at the police department.

8 BY MR. BROWN:

9 Q.   What were the performance issues?

10 A.  His lack of leadership.  He -- we asked him some

11     questions that he lied about.  And he was also just

12     making changes to the police department procedures

13     that were putting our officers at risk.

14 Q.  What kind of changes was he making that was putting

15     officers at risk?

16 A.  He was asking them not to call in certain stops, you

17     know, so, I mean, my experience even as military

18     police you pull somebody over, you call in the plate,

19     you call in -- there's certain processes you have to

20     go through to make sure the officer's safe, they know

21     who they're pulling over, so he was asking them not to

22     do that, just to go approach a vehicle without

23     process.  And that was -- that was one of the issues.

24          And also when he was -- we were negotiating

25     a contract with the union and we asked him not to

Page 171

1      speak to the union, make concessions without the

2      administration, and he said he did not, which he lied

3      about.  And that's it.  That was two big things.

4          And the third one, I was actually out of

5      town, and I asked him to do something, and he was

6      basically belligerent and just basically it's like I

7      don't care, I'm going to do what I want to do.

8 Q.   And why do you think he was so belligerent?

9          MS. HUNT:  Objection as to form and

10     foundation.  It calls for a speculative response.

11 A.  I mean, you can see it now.  He's actually campaigning

12     with a person running for office.

13 BY MR. BROWN:

14 Q.  And who's the person running for office?

15         MR. TURFE:  Objection as to form and

16     foundation.

17 A.  Mohamad Baydoun.

18 Q.  And prior to joining Dearborn Heights city government,

19     where did Hussein Farhat work?

20 A.  Romulus.

21 Q.  And do you know what his position was in Romulus?

22         MS. HUNT:  Objection as to form,

23     foundation.

24 A.  Based on his resume and the interview, he was doing

Page 172

1      narcotics and just leading like detective work.

2 BY MR. BROWN:

3 Q.   Do you remember what rank he held within that

4      organization?

5 A.   I believe sergeant.

6 Q.   He was a sergeant for Romulus?

7 A.   I believe so.  I don't recall.

8 Q.   So he went from sergeant at Romulus and then he

9      skipped the lieutenant's part and skipped the

10     captain's part and became interim chief here at

11     Dearborn Heights; is that correct?

12         MS. HUNT:  Objection as to form and

13     foundation and it's a mischaracterization of

14     testimony.

15 A.  I just put him as interim chief because there was

16     nobody here and that actually qualified.

17 BY MR. BROWN:

18 Q.   I see.

19 A.   And just pending to see his performance and also want

20     to start doing searching for other chiefs.

21 Q.   Do you remember an incident in which Chief Farhat

22     tried to suspend Paul Vanderplow?

23 A.   That's one of them, yes.  That's one of the issues

24     that I had.

25 Q.   Did Paul Vanderplow actually report to Chief Farhat

Page 173

1      the time that happened?

2 A.   No.

3 Q.   And why is that?

4 A.   Director Vanderplow reported to me because he was

5      doing internal affairs.

6 Q.   Is it customary for an employee to be ordered into

7      someone's office here in Dearborn Heights and then

8      told that if they're not there within X amount of

9      minutes they'll be suspended?

10         MS. HUNT:  Objection as to form,

11     foundation, and speculation.

12 A.  No.  I don't recall any -- any incidents.

13 BY MR. BROWN:

14 Q.  Do you think it was Interim Chief Farhat's idea to

15     suspend Paul Vanderplow all by himself?

16         MS. HUNT:  Objection as to form,

17     foundation, and speculation.

18 A.  I have no idea, but I told him not to.

19 BY MR. BROWN:

20 Q.  Do you have any information of anyone at all

21     recommending to Chief Farhat that he suspend Paul

22     Vanderplow?

23         MS. HUNT:  Same objection.

24 A.  I don't recall who put him up to it, but -- I mean, I

25     don't have any data to show that this person was the

Bill Bazzi
August 29, 2025

Page 174

1  cause of it, but that's one of the issues that I had
2  with Farhat, the interim, is his belligerence and also
3  his not, you know, following protocol.
4 BY MR. BROWN:
5 Q.  Do you think Chief -- or Interim Chief Hussein Farhat
6    just felt protected by some other party?
7         MR. TURFE:  Objection as to form and
8    foundation.
9         MS. HUNT:  And speculation.
10 A.  Well, based on his -- I mean, my experience, based on
11    his behavior, probably.
12 BY MR. BROWN:
13 Q.  You used the phrase "put him up to it" in your answer
14    to a question just a few seconds ago.  You said you
15    didn't know who put him up to it.  Do you think
16    someone put Chief Farhat up to suspending Paul
17    Vanderplow?
18         MR. TURFE:  Objection to the form and the
19    foundation.
20         MS. HUNT:  Same objection.
21 A.  So before I talk -- before -- I mean, I know there was
22    some issues going on.  I was out of town that day.
23 BY MR. BROWN:
24 Q.  Yes, sir.
25 A.  And I actually had to come back early because of the

Page 175

1  issue when I saw that he suspended Mr. Vanderplow
2  and -- even though I told him just wait till I come
3  back and we'll discuss whatever issue, and he just
4  acted on himself to suspend -- to send the suspension
5  and cc everybody.
6 Q.  Do you think the suspension had anything to do with
7    Paul Vanderplow's interactions with City Council?
8         MR. TURFE:  Objection as to the form and
9    foundation.  Calls for speculation.
10         MS. HUNT:  Same.
11 A.  I know there was a lot of stuff going on at that time.
12    I don't recall, you know, the issues.
13         MR. BROWN:  I probably have another half
14    hour's worth of questions and I'll be done.  Do you
15    want to break now or how do you want to play this?
16         THE WITNESS:  We can keep going.  I'm good.
17         MS. HUNT:  You want to keep going?
18         THE WITNESS:  Yeah.
19         MR. BROWN:  I could use five minutes
20    myself.
21         MS. HUNT:  Okay.
22         (Recess taken at 1:16 p.m.)
23         (Back on the record at 1:24 p.m.)
24         MR. BROWN:  We're back on the record.  Let
25    the record reflect it's now 1:25.  We're continuing

Page 176

1  with the deposition of Mayor Bill Bazzi.
2 BY MR. BROWN:
3 Q.  Mr. Bazzi, do you have any information about any
4    particular relationship, friendship, association, call
5    it what you will, between Khalil Rahal and Mo Baydoun?
6         MR. TURFE:  Objection as to form and
7    foundation.  Calls for speculation.
8         MS. HUNT:  Same objection.
9 A.  I'm not really sure about their relationship.  I know
10    they know each other.
11 BY MR. BROWN:
12 Q.  Do you know how long they've known each other, any
13    other information?
14         MR. TURFE:  Same objection.
15         MS. HUNT:  Same.
16 A.  I'm not sure how long they've known each other.
17 BY MR. BROWN:
18 Q.  How about any relationship, friendship, interaction
19    between Hassan Saab and Sergeant Mohamad Bazzy?
20         MR. TURFE:  Same objection.
21         MS. HUNT:  Same.
22 A.  I know they know each other, but I don't know how long
23    they've known each other.
24 BY MR. BROWN:
25 Q.  Do you have any voicemails, emails, texts, or voice

Page 177

1  recordings from any person whatsoever demanding that
2  Chief Hart or either of his directors be terminated?
3         MS. HUNT:  Objection as to form and
4    foundation.
5         MR. TURFE:  Same objection.
6 A.  I don't recall seeing any -- like any of what you just
7    mentioned.
8 BY MR. BROWN:
9 Q.  Did you ever receive any emails demanding that
10    Chief Hart be fired?
11         MS. HUNT:  Objection as to form and
12    foundation.
13         MR. TURFE:  Same objection.
14 A.  I don't recall seeing -- I mean, I don't know.  I
15    can't remember.
16 BY MR. BROWN:
17 Q.  Do you know if the City of Dearborn Heights has issued
18    cell phones to City Council members?
19 A.  Yes.
20 Q.  That's paid for by Dearborn Heights money?
21         MS. HUNT:  Objection as to form and
22    foundation.
23         MR. TURFE:  Same objection.
24 A.  Yes.
25 BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 178

1 Q.  And those cell phones are used by City Council members
2     in their work as City Council members; is that
3     correct?
4          MS. HUNT:  Objection as to form and
5     foundation and calls for a legal conclusion.
6          MR. TURFE:  Same objection.
7 A.  Yes.
8 BY MR. BROWN:
9 Q.  Have you ever seen City Council members texting each
10    other on these cell phones provided by the city to
11    them?
12         MS. HUNT:  Same objection.
13         MR. TURFE:  Objection to the form and
14    foundation.
15 A.  I don't understand.  You mean during meetings or
16    outside meetings?
17 BY MR. BROWN:
18 Q.  Both.
19         MS. HUNT:  Object as to form and
20    foundation.
21         MR. TURFE:  Same objection.
22 A.  I'm not sure which -- I've seen them text, but I don't
23    know which phones they're using.
24 BY MR. BROWN:
25 Q.  You say you don't know which phones they're using?

Page 179

1 A.  I don't know if it's City-issued phone or if it's
2     personal.  I'm not sure.
3 Q.  I see.  So you have knowledge of City Council members
4     using their personal phones also while in City Council
5     meetings?
6          MR. TURFE:  Objection to form, foundation,
7     and a mischaracterization of the testimony.
8          MS. HUNT:  Same.
9 A.  I've seen them use cell phones during a meeting, but
10    I'm not sure which phones they're using.
11 BY MR. BROWN:
12 Q.  All right.  Does the City have a cell phone plan
13    provider, such as, for example, AT&T or one of those?
14         MS. HUNT:  Objection as to form and
15    foundation.
16         MR. TURFE:  Same objection.
17 A.  Yes.
18 BY MR. BROWN:
19 Q.  And what provider is that?
20 A.  I believe it's AT&T.
21 Q.  You believe it's AT&T?
22 A.  Yes.
23 Q.  Who here within the city government manages that
24    relationship with AT&T?
25         MS. HUNT:  Form and foundation.

Page 180

1          MR. TURFE:  Same objection.
2 A.  Our IT director.
3 BY MR. BROWN:
4 Q.  So would that, once again, be Mr. Cooper?
5 A.  Yes, sir.
6 Q.  Do you happen to know if City Council members use a
7     particular app, like WhatsApp, for city business?
8          MR. TURFE:  Objection as to the form and
9     foundation.
10         MS. HUNT:  Same.
11 A.  I mean, I've received some WhatsApp messages in the
12    past, but I don't know what they have now.
13 BY MR. BROWN:
14 Q.  I see.  Who would have sent you a WhatsApp message in
15    the past?
16         MR. TURFE:  Objection to the form and
17    foundation.
18         MS. HUNT:  Same.
19 A.  From council members?
20 BY MR. BROWN:
21 Q.  Yes, sir.
22 A.  Councilman Saab and also Councilman Hassan Ahmad, and
23    I've seen also Baydoun.
24 Q.  And did those WhatsApp messages concern Dearborn
25    Heights business?

Page 181

1          MS. HUNT:  Objection as to form and
2     foundation.
3          MR. TURFE:  Same objection.
4 A.  I don't recall.  It was -- I don't recall.
5 BY MR. BROWN:
6 Q.  Were they purely personal in nature or did it involve
7     matters before the council?
8          MR. TURFE:  Objection.  Form and
9     foundation.  Asked and answered.
10         MS. HUNT:  Same.
11 A.  I'm not really sure what -- if they're business or
12    personal.
13 BY MR. BROWN:
14 Q.  Did Hassan Saab ever tell you that he was an informant
15    for the FBI?
16         MR. TURFE:  Objection as to the form,
17    foundation, calls for speculation.
18         MS. HUNT:  Same objection.
19 A.  Just based on an article that I read about him, you
20    know.
21 BY MR. BROWN:
22 Q.  Is that a no?
23 A.  No.  Based on --
24         MR. TURFE:  Same objections.
25 A.  He never said anything to me, but based on the article

Bill Bazzi
August 29, 2025

Page 182

1    that I read.
2 BY MR. BROWN:
3 Q.   All right.  Thank you.  Have you ever heard Hassan
4      Saab tell anyone that Jerrod Hart was responsible for
5      the murder of babies in Gaza?
6              MR. TURFE:  Objection as to the form,
7      foundation, argumentative, and extremely inappropriate
8      question.
9              MS. HUNT:  Same objection in its entirety.
10 A.  I don't -- I don't recall.
11 BY MR. BROWN:
12 Q.  Was there ever a shirt placed on your seat at a City
13     Council meeting which -- T-shirt which reads on it "I
14     can't talk about it"?
15             MR. TURFE:  Objection.  Form and
16     foundation.
17             MS. HUNT:  Same.
18 A.  It's public.  Yes.
19 BY MR. BROWN:
20 Q.  What does that mean, "I can't talk about it"?
21             MS. HUNT:  Objection.  Form and foundation
22     and speculation.
23             MR. TURFE:  Same objection.
24 A.  Well --
25             MS. HUNT:  If you know.  You can answer if

Page 183

1    you know.
2 A.   Basically, I mean, just some of the stuff when --
3      stuff going on, you know, with the investigation.  You
4      can't discuss, and some members of the council wanted
5      to know, and when we tell them, you know, we can't
6      discuss it, you know, like lawsuit or something and
7      they thought it was a joke, so they put that stupid
8      shirt on my chair.
9 BY MR. BROWN:
10 Q.  They had a shirt made that said "I can't talk about
11     it," a T-shirt?
12             MR. TURFE:  Objection as to the form and
13     the foundation and mischaracterization of the
14     testimony.
15             MS. HUNT:  And speculation.  Joining in the
16     objection.
17 A.  Yeah.  It was a shirt that was placed on my chair,
18     yes.
19 BY MR. BROWN:
20 Q.  Do you happen to know who did that?
21 A.  I was told who did it.
22 Q.  Who was it?
23 A.  Councilman Saab.
24 Q.  To your knowledge, did Chief Jerrod Hart while he
25     worked here ever take steps, outreach steps to the

Page 184

1      Arab community?
2              MS. HUNT:  Objection as to form and
3      foundation.
4 A.   Yes, he has.
5 BY MR. BROWN:
6 Q.   What did he do?
7 A.   He was part of several initiatives that they actually
8      started, it's never been done before, inviting
9      community members to come in and do a crime stat, you
10     know, usually like every week, biweekly, and asked for
11     all community members to actually attend, and I've
12     actually attended with him several town hall meetings,
13     you know, with residents, and -- and I know he's --
14     people actually reached out to me and told me that he
15     was driving by and just stopped at, you know, random
16     residents, talking to residents, you know, and they
17     appreciated it.
18 Q.  To your knowledge, did Jerrod Hart while he worked
19     here ever show any insensitivity to your Arab
20     constituents?
21             MS. HUNT:  Objection to form and
22     foundation.
23 A.  I've never seen it.
24 BY MR. BROWN:
25 Q.  Do you think Jerrod Hart's racist against Arabs?

Page 185

1              MS. HUNT:  Foundation.
2 A.   Again, I've never seen it.  If he was, he would have
3      been a racist toward me.
4 BY MR. BROWN:
5 Q.   Are you friends with Jerrod Hart?
6 A.   Well, I brought him here.  I like him.
7 Q.   We talked briefly before about tickets that were being
8      given and then fixed or released or dismissed.  Do you
9      remember that?
10 A.  Yes.
11 Q.  Do you have knowledge of -- let me put it a different
12     way.
13             Do you happen to know if one particular
14     group, an ethnic group, a racial group, received the
15     benefit of one or more of those dismissals than any
16     other?
17             MR. TURFE:  Objection as to the form,
18     foundation, and calls for speculation.
19             MS. HUNT:  Same objection.
20 A.  I'm not sure if that's the case.  I'm not aware of a
21     special, you know, group, no.
22 BY MR. BROWN:
23 Q.  All right.  What MCOLES authority, to your knowledge,
24     do reserve officers have?
25             MS. HUNT:  Objection to foundation.

Bill Bazzi
August 29, 2025

Page 186

1 A.   I'm not sure what MCOLES certification.  I know
2       there's training, but I don't recall exactly what they
3       need.
4 BY MR. BROWN:
5 Q.   But do you have any knowledge of reserve officers
6       wearing a Dearborn Heights Police Department uniform?
7 A.   Yes.
8 Q.   Do you have any knowledge of reserve officers carrying
9       a weapon?
10        MS. HUNT:  Objection as to form,
11      foundation.
12 A.   Yes.
13 BY MR. BROWN:
14 Q.   Do you have any knowledge of Dearborn Heights reserve
15      officers activating emergency lights and sirens on
16      police vehicles?
17        MS. HUNT:  Object as to form.
18 A.   It was brought to my attention, yes.
19 BY MR. BROWN:
20 Q.   It was brought to your attention that was happening?
21 A.   That it happened, yes.
22 Q.   And what did you do about it, if anything?
23 A.   Well, the chief actually suspended the reserves till
24      further investigation or further training.
25 Q.   I see.

Page 187

1        MR. BROWN:  All right.  No further
2   questions.  Thank you.
3        MR. MIOTKE:  If we could take a moment just
4   so that we can kind of go over some of the stuff that
5   we were just going over.
6        (Recess taken at 1:36 p.m.)
7        (Back on the record at 1:50 p.m.)
8            EXAMINATION
9 BY MR. TURFE:
10 Q.  Okay.  Mayor Bazzi, I'm sure you're aware my name is
11      Tarik Turfe.  I represent the intervening defendant,
12      City of Dearborn Heights City Council.
13          For the record, I know you stated your
14      name.  Can you just spell your full legal name for the
15      record?
16 A.   B-I-L-L, B-A-Z-Z-I.
17        MR. TURFE:  The time we've come back is
18      1:50 p.m.
19 BY MR. TURFE:
20 Q.   And was this the name that was assigned to you at
21      birth?
22 A.   No.
23 Q.   What was the name assigned to you at birth?
24 A.   B-I-L-A-L.
25 Q.   So when was your name changed from Bilal to Bill?

Page 188

1        MS. HUNT:  Objection to relevance.
2 A.   I was a teenager.
3 BY MR. TURFE:
4 Q.   Any particular reason for that?
5 A.   No.
6 Q.   Okay.  What is your date of birth?
7 A.   5/5/63.
8 Q.   I want to ask how you prepared for this deposition, so
9       we'll start with when did you first understand that
10      you were going to be deposed as part of this lawsuit?
11        MS. HUNT:  Object as to form.
12 A.   I don't recall the date, the timing.
13 BY MR. TURFE:
14 Q.   Could it have been sometime early this year, maybe
15      around March?
16 A.   I don't have the date in front of me.
17 Q.   Just around that time period did you understand that
18      you were going to be deposed in this case?
19        MS. HUNT:  Objection to form.  Asked and
20      answered.
21 A.   Again, I'm not sure of the timing.  I'm running a city
22      of almost 70,000 people.  I'm not sure of timings of
23      everything.
24 BY MR. TURFE:
25 Q.   But you knew about this case; right?

Page 189

1 A.   Well, yes.
2 Q.   And since you're here, I think it's fair to say that
3       essentially you understood you were going to be
4       deposed; correct?
5 A.   Yes.
6 Q.   I'm not asking about attorneys.  Did you speak with
7       anybody about your deposition?
8 A.   Spoke to the City attorney.  I mean, obviously the
9       attorney representing the City.
10 Q.  I don't want to know anything about those.  I just
11      want to know anybody else did you speak with about
12      this deposition?
13        MS. HUNT:  I'm going to object as to form.
14 A.   Like I said, I talked to our attorney handling our
15      case.
16 BY MR. TURFE:
17 Q.   Okay.  Did you speak with your wife about this
18      deposition?
19 A.   She knows I have a deposition.
20 Q.   And when did you first speak with her about your
21      deposition?
22 A.   I don't recall the date.
23        MS. HUNT:  Objection to form.
24 BY MR. TURFE:
25 Q.   Sorry?

Bill Bazzi
August 29, 2025

Page 190

1 A.   I don't recall a time.
2 Q.   Was it just once?
3          MS. HUNT:  Same objection.
4 A.   I'm not sure.  Like I said, she knows that a
5      deposition is -- I'm in a deposition right now.
6 BY MR. TURFE:
7 Q.   And what did you speak with her specifically about
8      your deposition besides her just knowing that you had
9      it?
10          MS. HUNT:  Objection as to form and
11      relevance.
12 A.   The deposition, the federal case deposition.
13 BY MR. TURFE:
14 Q.   So you didn't discuss any of the substance of the case
15      with her?
16          MS. HUNT:  Same objection.
17 A.   I don't have the substance, so how can I discuss
18      substance if I don't have it?
19 BY MR. TURFE:
20 Q.   You don't know what this case is about?
21 A.   No.  I know what's it about.  The whole world knows
22      what the case is about.  It's public.
23 Q.   Okay.  And my question to you is, did you discuss this
24      with your wife?
25          MS. HUNT:  Object as to form.

Page 191

1 A.   No.
2 BY MR. TURFE:
3 Q.   Did you discuss this deposition with Ash Othman?
4          MS. HUNT:  Same objection.
5 A.   Again, this -- this deposition is -- obviously
6      everybody knows about it.
7 BY MR. TURFE:
8 Q.   Okay.  But that's not really an answer to my
9      questions.  I'm trying to figure out certain relevant
10      witnesses, people that have been brought up in this
11      case, and I want to understand your discussions with
12      them because they may lead to further discovery.
13 A.   No.
14 Q.   No, you never spoke with Ash Othman about this case?
15 A.   No.
16 Q.   Did you ever speak to Ahmad Fawaz about this case or
17      your deposition?
18          MS. HUNT:  Object as to form.
19 A.   No.
20 BY MR. TURFE:
21 Q.   There's been testimony in part of this case that Ash
22      Othman once called in a report to Mr. Vanderplow for
23      investigation of an ordinance matter at around Ford
24      and John Daly.  I think the business was Hashems Meat
25      Market.  Are you aware of that situation?

Page 192

1          MS. HUNT:  Objection as to form and
2      foundation.
3 A.   Well, she once worked for the city, so . . .  So I'm
4      sure she brought in like several issues.
5 BY MR. TURFE:
6 Q.   What was her role with the City?
7 A.   She was the executive -- executive secretary.
8 Q.   By executive, are you implying that that's within your
9      department, the administration?
10          MS. HUNT:  Objection as to form and
11      mischaracterization of testimony.
12 A.   Mayor's office.
13 BY MR. TURFE:
14 Q.   So you hired her?
15 A.   Yes.
16 Q.   Is she still working underneath you?
17          MS. HUNT:  Objection as to form.
18 A.   No.
19 BY MR. TURFE:
20 Q.   When did she stop?
21 A.   She went on maternity leave and never came back.
22 Q.   When did she get hired?
23 A.   I don't have the date in front of me.  I can get it
24      for you.
25 Q.   I want to go back to that specific situation that I

Page 193

1      discussed.  Are you aware of that specific call from
2      Ash to Mr. Vanderplow about the ordinance issue at
3      Hashems Meat Market?
4          MS. HUNT:  Same objection as to form and
5      foundation as previously.
6 A.   Several businesses complained about that business in
7      particular.
8 BY MR. TURFE:
9 Q.   Okay.  My question is, are you aware that Ash called
10      Vanderplow?
11          MS. HUNT:  Objection as to form and
12      foundation.
13 A.   I'm sure, yes.  Like I said, there's a lot of stuff
14      that comes through my desk, so . . .
15 BY MR. TURFE:
16 Q.   And how did you become aware that Ash called
17      Vanderplow?
18          MS. HUNT:  Objection as to form.
19 A.   I don't recall, but there's some businesses in the
20      area that were complaining they can't get to their
21      alley.
22 BY MR. TURFE:
23 Q.   What businesses complained?
24 A.   I don't recall everyone, but I received a call from a
25      local business that they said they can't get to the

Bill Bazzi
August 29, 2025

Page 194

1    alley.
2  Q.   And then what did you do after you received the call?
3  A.   Well, Ash Othman at that time, she took the call.  I
4       always refer them to people in my administration.
5  Q.   Okay.  So previously you said you got the call, but
6       now you're saying that Ash took the call.  Who took
7       the call of the complaint?
8            MS. HUNT:  Objection as to form and
9       mischaracterization of his earlier testimony.
10 A.   We received several calls.  I know I received one.
11      Maybe she received one.  I don't know what call she
12      received, but I know I received a call.  I receive
13      calls all the time with different issues in the city.
14      If I receive it, I refer it to someone.  If they
15      receive it, then they work on it.  So I'm not sure how
16      she received it.
17 BY MR. TURFE:
18 Q.   So you received a call and then you referred it to Ash
19      to then go report to Vanderplow?
20           MS. HUNT:  Objection as to form.
21 A.   I can't recall the specific.  You're talking something
22      that happened about two years ago.
23 BY MR. TURFE:
24 Q.   It was a little more recent than that.  I mean, it was
25      subject to motion for sanctions in this case.

Page 195

1            MS. HUNT:  Objection as to form and
2       argumentative.
3  BY MR. TURFE:
4  Q.   So did you instruct Ash to call Vanderplow about this
5       incident?
6  A.   I don't recall, like I said, the specifics.
7  Q.   If Ash Othman were to state that you instructed her to
8       call Vanderplow, would she be telling the truth?
9            MS. HUNT:  Objection as to form,
10      foundation.  Requests a response to information that's
11      not in the record or in testimony.  Speculation.
12 A.   Speculation.  Yeah.  Exactly.  Like I said, I'm
13      running a city.  I've been running a city since '21.
14      I don't remember every little detail in the city.
15 BY MR. TURFE:
16 Q.   Are you aware of any recorded conversations where an
17      Ash Othman admitted that you instructed her to call
18      Vanderplow about this incident for the direct purpose
19      of tracking Hassan Saab?
20           MS. HUNT:  Objection as to form and
21      foundation and speculation.
22 A.   No.  I don't recall that.
23 BY MR. TURFE:
24 Q.   You were recently at Ash Othman's house on a Sunday
25      for a birthday party; correct?

Page 196

1            MS. HUNT:  Objection as to form and
2       relevance.
3  A.   Yes.
4  BY MR. TURFE:
5  Q.   And Vanderplow was there?
6  A.   Yes.
7            MS. HUNT:  Is that a question?
8  BY MR. TURFE:
9  Q.   Was Vanderplow there?
10 A.   Yes.
11 Q.   Was Swope there?
12 A.   I didn't see him there.
13 Q.   Was Hart there?
14 A.   I was there a short time.  I don't recall everybody
15      that was there.  I don't recall seeing him either.
16 Q.   And was this case discussed at that party?
17           MS. HUNT:  Objection as to form and
18      foundation.
19 A.   What case?
20 BY MR. TURFE:
21 Q.   This lawsuit.  This Swope, Hart, and Vanderplow versus
22      the City of Dearborn Heights that is Case Number
23      24-cv-10240.
24           MS. HUNT:  Objection as to form and
25      foundation.

Page 197

1  A.   It was a birthday party for a one-year-old, so we
2       didn't discuss it with the one-year-old, no.
3  BY MR. TURFE:
4  Q.   I'm not asking if you discussed it with the
5       one-year-old.  I'm asking if you discussed amongst
6       each other.
7  A.   No.
8            MS. HUNT:  Objection as to form and
9       foundation.
10 BY MR. TURFE:
11 Q.   Did you discuss Hassan Saab?
12           MS. HUNT:  Objection as to form.
13 A.   There was a lot of people there.  No.  Sorry.
14           MS. HUNT:  Give me a chance to object.
15 BY MR. TURFE:
16 Q.   Did you discuss Hassan Saab?
17           MS. HUNT:  Objection as to form.
18 A.   I have better things to do than discuss Hassan Saab,
19      no.
20 BY MR. TURFE:
21 Q.   Well, Mr. Vanderplow testified that other things were
22      discussed, and I think that's pretty contradictory to
23      what you're telling me here.
24           MR. BROWN:  I'm going to object.  It
25      assumes facts not in evidence and seems to

Bill Bazzi
August 29, 2025

Page 198

```
 1    mischaracterize the testimony of Paul Vanderplow.
 2         MS. HUNT:  Same objection.
 3 A.  I don't know what you're talking about actually.
 4 BY MR. TURFE:
 5 Q.  So it's your testimony today that you never discussed
 6      this lawsuit nor did you discuss Councilman Saab at
 7      this party at Ash Othman's house?
 8         MS. HUNT:  Objection.  Asked and answered.
 9 A.  I don't recall discussing any of the two that you
10      mentioned.
11 BY MR. TURFE:
12 Q.  Also some background that I don't think was covered.
13           What's your current legal address?
14 A.  739 Kinloch, Dearborn Heights, Michigan, 48127.
15 Q.  And do you own any other pieces of real property in
16      the city of Dearborn Heights?
17         MS. HUNT:  Objection as to form and
18      relevance.
19 A.  No.
20 BY MR. TURFE:
21 Q.  Do you own any pieces of real property in the city of
22      Dearborn?
23         MS. HUNT:  Same objection.
24 A.  Yes.
25 BY MR. TURFE:
```

Page 199

```
 1 Q.  Can you state the address for the record, please?
 2 A.  Well, I don't want to say it in front of the other
 3      council member because . . .
 4 Q.  I'm sorry.  That's not a valid reason not to answer,
 5      so . . .
 6         MS. HUNT:  Well, I'm going to object based
 7      on relevance.  And I will say that Mayor Bazzi has an
 8      issue or a concern of safety.  If his safety is an
 9      issue here, if he does not feel comfortable providing
10      his other addresses on the record at a personal safety
11      for himself or his family, then I will not force him
12      to answer.
13         MR. TURFE:  Well, that's not a valid
14      objection because real property records are public in
15      the state of Michigan.
16         MS. HUNT:  Then there are other ways and
17      other methods of you being able to get that.
18         MR. TURFE:  But now that's just obstructing
19      the proceedings of the deposition.
20         MS. HUNT:  I'm not obstructing the
21      proceedings.  Mayor Bazzi fears for his safety and the
22      safety of his family.
23         MR. TURFE:  This is the first time I'm
24      hearing of such an objection.  So I'm going to
25      reiterate the question.
```

Page 200

```
 1 BY MR. TURFE:
 2 Q.  Can you list the address of another piece of property
 3      that you own outside of the city of Dearborn Heights?
 4         MS. HUNT:  I continue to object on the
 5      basis of relevance.
 6         MR. TURFE:  Are you instructing him not to
 7      answer?  We can just cut to the chase.
 8         MS. HUNT:  Then cut to the chase and don't
 9      answer.
10         MR. TURFE:  Okay.  Let the record reflect
11      that counsel has instructed the witness not to answer
12      the question.
13 BY MR. TURFE:
14 Q.  Do you own any real property in a neighborhood known
15      as Fairlane Woods?
16         MS. HUNT:  Same objection.
17         MR. TURFE:  Are you instructing him not to
18      answer?
19         MS. HUNT:  I'm objecting to the relevance.
20 BY MR. TURFE:
21 Q.  Okay.  So if she's not instructing you not to answer,
22      I'm going to have to ask you to respond, please.
23 A.  Yes.  But I'm not going to discuss specifics, like I
24      said.
25 Q.  Okay.  Do you currently reside at this Fairlane Woods
```

Page 201

```
 1      property?
 2 A.  I reside at 739 Kinloch Street, Dearborn Heights,
 3      Michigan, 48127.
 4 Q.  And during your time as mayor of Dearborn Heights, has
 5      that been the only address that you have resided at?
 6 A.  I reside at 739 Kinloch, Dearborn Heights, Michigan,
 7      48127.
 8 Q.  That's not my question.  My question is, during the
 9      time that you have been mayor of the City of Dearborn
10      Heights, has that been the only address that you have
11      resided at?
12         MS. HUNT:  Object as to the form and
13      relevance.
14 A.  I reside on 739 Kinloch Street, Dearborn Heights,
15      Michigan, 48127.
16 BY MR. TURFE:
17 Q.  Can we get an answer?  This will go a lot easier.
18 A.  I reside in Dearborn Heights, 739 Kinloch.
19         MS. HUNT:  He's indicated the address in
20      which he's answered.  It's been asked and answered.
21         MR. TURFE:  Let the record reflect that the
22      witness has purposely now three times decided not to
23      answer the question as to whether or not this was the
24      only address that he's ever resided at while he has
25      been the mayor of the City of Dearborn Heights.
```

Bill Bazzi
August 29, 2025

Page 202

1         MS. HUNT:  He has given the address of
2    where he has resided during his time as mayor of
3    Dearborn Heights.
4         MR. TURFE:  That's not my question.  My
5    question is at the time that he has lived during his
6    tenure as mayor of Dearborn Heights, and he refuses to
7    answer.
8         MS. HUNT:  He has given his address.
9         MR. TURFE:  Let's go to Exhibit, I believe
10   it is letter --
11        MR. BROWN:  I.
12        MR. TURFE:  No.  I'm going off of yours.
13 BY MR. TURFE:
14 Q.  Let's go to Exhibit A, Page ID 761.  Do you have that
15   exhibit in front of you, Mayor Bazzi?
16 A.  Yes.
17 Q.  And we've talked about it before, so I think there's a
18   pretty decent foundation established.  Do you
19   understand what this document is?
20 A.  Yes.
21   Motion by the Dearborn Heights City Council to approve
22   the tentative agreement between the City and the
23   Command Officers Association of Michigan?
24        MS. HUNT:  Is that a question?
25        MR. TURFE:  Yes.

Page 203

1 BY MR. TURFE:
2 Q.  Is that what you understand this letter and then the
3    following summary to be?
4 A.  Yes.
5 Q.  And if you can flip to Page 763.
6 A.  Yes.
7 Q.  Do you see that Section 2 gave three separate wage
8    increases to the police officers of the City of
9    Dearborn Heights?
10        MS. HUNT:  I'm going to object as the
11   document speaks for itself.
12 A.  I see it here, so, yes, it says wages -- wage
13   increase.
14 BY MR. TURFE:
15 Q.  And that was for three periods for '21 to '22, '22 to
16   '23, and then '23 to '24?
17        MR. BROWN:  Objection.  Best evidence.
18 A.  That's what it has on the document, yes.
19 BY MR. TURFE:
20 Q.  And on Page 762 you wrote to the City Council and you
21   requested that they approve these wage increases and
22   the other matters contained in the TA; right?
23        MS. HUNT:  Document speaks for itself.
24 A.  That's what it says.  "Motion for the City Council to
25   approve the Tentative Agreement between the City of

Page 204

1    Dearborn Heights and the Command Officers
2    Association . . ."  That's what it says.
3 BY MR. TURFE:
4 Q.  Okay.  And then on 761 you see that this motion was
5    brought as Motion 23-099; correct?
6 A.  Correct.
7 Q.  And it passed the City Council?
8 A.  Yes.
9 Q.  And can you just state for the record the council
10   members that voted in support of this resolution?
11        MS. HUNT:  I'm going to object as to form
12   and the document speaks for itself as to who is aye
13   and who is nay.  But you can go ahead and read.
14 A.  It says Councilman -- Council Chairman Abdallah,
15   Council Chair Pro Tem Muscat, Councilman Ahmad,
16   Councilman Baydoun, Councilwoman Bryer, ayes.  Nays
17   were Constan and Wencel, and absent none.
18 BY MR. TURFE:
19 Q.  And if you go back to 763, we see in Section 5-B that
20   three individuals and their positions were
21   grandfathered in by this agreement; correct?
22        MS. HUNT:  Objection as to form and
23   foundation and the document speaks for itself.
24 A.  That's what it says.
25 BY MR. TURFE:

Page 205

1 Q.  Did you draft this summary?
2 A.  Which summary?
3 Q.  This Page 763 to 765.
4 A.  I don't recall.  I think this was done by HR.  I'm not
5    sure.
6 Q.  Do you know why these positions needed to be
7    grandfathered in?
8        MS. HUNT:  Objection as to form,
9    foundation, and it calls for a legal conclusion from a
10   layperson.
11 A.  I'm not sure.
12 BY MR. TURFE:
13 Q.  You see 5-C?  "Should the City desire to fill these
14   Director positions in the future, it will do so under
15   the provisions of Act 78."  Do you see that language?
16 A.  Yes.
17 Q.  And when it says Director positions, 5-C is referring
18   to the positions of Director of Support Services then
19   held by Mr. Vanderplow and Director of Police
20   Operations then held by Mr. Swope?
21 A.  No.
22        MS. HUNT:  Is that a question?
23        MR. TURFE:  Yes.
24 BY MR. TURFE:
25 Q.  Is that what the director positions are referring to?

Bill Bazzi
August 29, 2025

Page 206

1    MS. HUNT:  Objection as to form,
2  foundation, and it calls for a legal conclusion of a
3  layperson.
4 A.  Mr. Vanderplow was not Act 78, so I don't know what
5  you're talking about.
6 BY MR. TURFE:
7 Q.  Was Mr. Swope Act 78?
8 A.  Well, Director Swope became the chief, but yeah, at
9  that time, yeah, he was Act 78.
10 Q.  So at the time of Mr. Swope being the Director of
11  Police Operations, he was, as you say, Act 78?
12 A.  I'm not sure.  Like I said, that's what it says in
13  5-C.
14 Q.  Okay.  Well, I want to make sure we get this correct.
15  So 5-C says in full, "The two Director's positions
16  above will be grandfathered.  Should the City desire
17  to fill these Director positions in the future, it
18  will do so under the provisions of Act 78."
19 A.  That's what it says.
20 Q.  Okay.  So in that paragraph, it uses Director twice
21  with a capital D.  What Director -- what two Director
22  positions is this paragraph referencing?
23    MR. BROWN:  Objection to form.  Best
24  evidence.
25    MS. HUNT:  Objection to asked and answered,

Page 207

1  form, foundation, and requesting a legal conclusion of
2  a layperson.
3 A.  I'm not really sure.  I don't know what you're asking.
4  I mean, it says here, "The two Director's position
5  above will be grandfathered.  Should the City desire
6  to fill these Director positions in the future, it
7  will do so under Act 78."
8 BY MR. TURFE:
9 Q.  So it's talking about the Director of Support Services
10  and Director of Police Operations; right?
11    MS. HUNT:  Objection.  Asked and answered.
12  Document speaks for itself.  You're asking him to
13  interpret a contract that he did not draft or a
14  summary that he did draft.
15 A.  Yeah.  Again, like I said, you know, I don't know who
16  did this summary.  I don't recall who did this
17  summary.
18 BY MR. TURFE:
19 Q.  Okay.  You don't recall who did the summary, but you
20  wrote a memo to the City Council asking them to make
21  it binding on the City?  How do you not understand it
22  if you recommended it to the Council?
23    MR. BROWN:  Objection.  Argumentative.
24    MS. HUNT:  Same.
25 A.  I don't know what you're talking about.  Binding as

Page 208

1  what?
2 BY MR. TURFE:
3 Q.  You're writing a memo on Page 762 to the City Council
4  asking them to vote on and pass this tentative
5  agreement, but you're telling me you don't understand
6  what it's referencing?
7    MS. HUNT:  I'm going to object to form,
8  characterization of 762 being a memo, appears to be a
9  correspondence, and argumentative.
10 A.  The memo is for the whole agreement.  This is not the
11  whole agreement.  There's agreement -- the union
12  agreement is a lot bigger than that one, so . . . I
13  didn't do the summary, but there's a big agreement
14  that goes in front of Council.
15 BY MR. TURFE:
16 Q.  So would you need the big agreement to tell me who is
17  being referenced in this 5-C mention of Director
18  positions?
19    MS. HUNT:  Objection.  Asked and answered
20  and argumentative.  Almost badgering.
21 A.  Yeah.  I don't recall, like I said, at this time.  I'd
22  have to go back.
23 BY MR. TURFE:
24 Q.  762, I called it a memo.  Your counsel maybe thought
25  best to be a correspondence.  But as part of your

Page 209

1  regular duties as the mayor of Dearborn Heights, you
2  often write to the City Council suggesting or
3  proposing legislation; correct?
4    MS. HUNT:  Objection as to form.
5 A.  This particular motion that you're talking about, 8-F,
6  it's for the whole agreement with the COAM agreement
7  to go in front of Council for approval.  It's the
8  entire contract.  Whatever was negotiated by the
9  attorneys and HR.
10 BY MR. TURFE:
11 Q.  But that wasn't my question.  My question was, do you
12  typically write to the City Council to either propose
13  or suggest certain actions to be taken by the Council?
14    MS. HUNT:  Object as to form.
15 A.  If we need anything, yeah, we put resolutions.  We put
16  stuff in front of Council, and it's up to the Council
17  to approve or disapprove.
18 BY MR. TURFE:
19 Q.  Okay.  And so when you say "we put stuff before the
20  Council," generally speaking, would you say that you
21  understand what you are putting before the Council?
22 A.  There, I understand that it's a contract for the
23  union to go in front of Council.  You know, that was
24  negotiated by the union.  The City and also the
25  Council approved it.  I mean, I understand that.  So I

Bill Bazzi
August 29, 2025

Page 210

1    don't know what the question is.
2 Q.   My question is centered around the fact that you don't
3      understand what the summary's referring to, but then
4      you are asking the City Council to approve it, and I
5      just want to understand if it's your general practice
6      to just throw things in front of the City Council or
7      do you, you know, review this stuff?
8          MS. HUNT:   Objection as to asked and
9      answered, form, foundation, and argumentative.
10 A.   Again, like I said several times, this contract was
11     negotiated by the union, police union, the City, and
12     attorneys, and whatever they agreed to, we put in
13     front of Council for them to approve, so the whole
14     entire contract was in front of City Council to
15     approve.
16 BY MR. TURFE:
17 Q.   Did you have a department head meeting before this
18     City Council meeting to discuss this resolution?
19         MS. HUNT:   Objection as to form and
20     foundation.
21 A.   I don't -- I don't recall every meeting that I have.
22 BY MR. TURFE:
23 Q.   Do you recall any particular meeting to discuss this
24     resolution?
25         MS. HUNT:   Same objection.

Page 211

1 A.   I don't recall every meeting.  I have probably like
2      ten, 15 meetings a day sometimes.
3 BY MR. TURFE:
4 Q.   If we go back to 763, and three officers are
5      identified that happen to be the plaintiffs in this
6      lawsuit, Jerrod Hart, Paul Vanderplow, and Kevin
7      Swope.  Do you see that in 5-B?
8 A.   Yes.
9 Q.   And who hired these individuals?
10         MS. HUNT:   I'm going to object as to form.
11 A.   Myself.
12 BY MR. TURFE:
13 Q.   And under what authority did you hire these
14     individuals?
15         MS. HUNT:   Object as to form and
16     foundation.
17         MR. BROWN:   Objection.  Vague.
18 A.   I have authority to hire and fire as mayor of the
19     City.
20 BY MR. TURFE:
21 Q.   Is that stated in the charter?
22 A.   Yes.
23         MR. TURFE:   I'm going to introduce
24     Exhibit I.  Is that right?
25         MR. BROWN:   Yes.  I.

Page 212

1          (Marked EXHIBIT I for identification)
2 BY MR. TURFE:
3 Q.   I apologize for the font in advance, but do you see
4      what I have now marked as Exhibit I, just selections
5      of the City of Dearborn Heights charter?
6 A.   I see something here, but it's, like I said, very
7      small font.  I need a microscope.
8          MR. TURFE:   How about we do this?  Can we
9      go off the record for a second?
10         MR. BROWN:   Sure.
11         (Discussion off the record at 2:18 p.m.)
12         (Back on the record at 2:19 p.m.)
13         MR. TURFE:   Back on the record.
14 BY MR. TURFE:
15 Q.   So, Mr. Mayor, do you see what I have on my screen?
16     It says "Section 5.3, Duties of the Mayor."
17 A.   Yes.
18 Q.   And have you seen this section from the City of
19     Dearborn Heights City Charter before?
20 A.   Yes.
21 Q.   Now, when you responded earlier that the city charter
22     authorized you to make these hires, is this the
23     portion of the charter that you were referring to?
24 A.   There's a thousand -- thousand different things that I
25     do that are not in the charter for the City, like

Page 213

1      answering complaints from residents.  There's a lot of
2      things that I do that is not in the charter obviously.
3 Q.   But your response earlier was that the basis for the
4      hires were from the charter.
5 A.   It says I'm responsible for enforcing all laws and
6      ordinances of the City, yes.  I have to do everything
7      I can to make sure that City laws, everything, peace,
8      everything is my responsibility.
9 Q.   Okay.  But I'm afraid that's not related to my
10     question.  My question is, what portion of the charter
11     gave you the authority that you testified to to allow
12     you to hire Swope, Hart, and Vanderplow?
13         MR. BROWN:   I'm going to object as calling
14     for a legal conclusion from a lay witness.
15 A.   I mean, it says removal and appointment of all
16     directors, comptroller right there, Number 2.
17 BY MR. TURFE:
18 Q.   So 5.3(b)?  Is that the section you're reading from?
19         MR. BROWN:   Same objection.
20 A.   That's what it says.  Hire all directors,
21     comptrollers, commissions, and boards.
22 BY MR. TURFE:
23 Q.   Okay.  And do you see here Section 5.11, "Civil
24     Service System"?
25 A.   Yes.

Bill Bazzi
August 29, 2025

Page 214

1 Q.   And have you ever read this section before?
2          MS. HUNT:  Objection as to form.
3 A.   I mean, I see it, yes.
4 BY MR. TURFE:
5 Q.   And have you ever had to consider this section
6      throughout your duties as the mayor of Dearborn
7      Heights?
8          MS. HUNT:  Object as to form and
9      foundation.
10         MR. BROWN:  Object to form.
11 A.  I rely on our attorneys to actually guide me through a
12     lot of the stuff in the charter.
13 BY MR. TURFE:
14 Q.   Okay.  And have you ever had to make a certain
15      employment decision that considered Section 5.11?
16         MS. HUNT:  Objection as to form and
17      foundation.
18 A.  Everything that I do I rely on my attorneys, the city
19     attorneys, and especially with the three -- with the
20     two directors, I extensively used attorneys to
21     actually guide me through this process, and there's
22     been, I'm sure you're aware, there was two recalls
23     they tried to recall me because I brought the three --
24     the director and -- the two directors and the police
25     chief.  Like I said, there's a lot of data out there.

Page 215

1      You can go research.  I don't know exactly like every
2      little one right now, the specifics, but you can go
3      pull the two recall petitions that were filed
4      regarding this.
5 BY MR. TURFE:
6 Q.   And why were the recalls filed?
7          MS. HUNT:  Objection as to form.
8 A.   I don't know.  Ask the person --
9          MS. HUNT:  And speculation.
10 A.  Yeah.
11 BY MR. TURFE:
12 Q.   Why do you believe that the recalls were filed?
13         MS. HUNT:  Objection as to form and
14      foundation.
15 A.   Good question.
16 BY MR. TURFE:
17 Q.   You have no beliefs as to why the recalls were filed?
18         MS. HUNT:  Same objection.
19 A.   It was frivolous.
20 BY MR. TURFE:
21 Q.   Okay.  Do you have a belief as to why the recalls were
22      filed?  You brought it up.  I need to ask the
23      question.
24         MS. HUNT:  It is asked and answered.
25 A.   Ask the person who filed it.  I don't know.

Page 216

1 BY MR. TURFE:
2 Q.   Do you understand that certain appointments or hires
3      even under Section 5.3(b) may be subject to the civil
4      service system in 5.11?
5          MR. BROWN:  Objection.  Misleading.
6          MS. HUNT:  Objection as to form and calls
7      for a legal conclusion from a layperson.
8 A.   Like I said, I relied on the attorneys to guide me
9      through this process of bringing the two directors and
10     the chief, so I went through whatever legal advice
11     that I had.
12 BY MR. TURFE:
13 Q.   And when you say you relied on attorneys, I don't want
14      to know substance.  I just want to know who, which
15      attorney.
16         MS. HUNT:  Objection as to form.
17 A.   It's in the recall.  I don't have the data in front of
18     me, so you'd have to pull the recall.  It was
19     commission for the election with a judge, and they
20     appealed it, and it went in front of three judges, and
21     they -- they turned it down, so . . .  It's a huge
22     document.
23 BY MR. TURFE:
24 Q.   Well, that's not related to the question that I asked.
25      I just want to know which attorney gave you the

Page 217

1      opinion about these charter topics that you just
2      testified you received.
3          MS. HUNT:  Objection as to form and
4      foundation.
5 A.   I talked to several attorneys.  I don't recall every
6      attorney I talked on specific issues.
7 BY MR. TURFE:
8 Q.   So I want to know about the attorneys that you -- I
9      want to know the identity of the attorney that gave
10     you any opinion regarding hiring these three
11     individuals.
12         MS. HUNT:  Asked and answered.  He said he
13     doesn't remember the names.
14 BY MR. TURFE:
15 Q.   Okay.  Was it Gary Miotke?
16 A.   Gary Miotke did not -- I don't remember discussing any
17     of this with him.
18 Q.   Was it Roger Farinha?
19 A.   Again, I don't remember.  I don't know how many times
20     I have to say.  I don't recall the specific attorney.
21 Q.   Was it Chris Mikula?
22 A.   Again, I don't recall the specific.  There's -- I deal
23     with a thousand different issues with the City.  I
24     don't recall which attorney I talked to about this
25     specific one.

Bill Bazzi
August 29, 2025

Page 218

1  Q.  Have you ever engaged an attorney not employed by the
2      City of Dearborn Heights for a legal opinion about
3      matters concerning the City?
4          MS. HUNT:  Objection as to form and
5      foundation.
6  A.  I don't recall.
7  BY MR. TURFE:
8  Q.  At the time that this -- we were looking at this
9      exhibit on Page 761 of Exhibit A.  Were there any
10     objections to the hiring of Hart, Vanderplow, and
11     Swope?
12         MS. HUNT:  Just a second.  Let's get to
13     761.
14 BY MR. TURFE:
15 Q.  So at that time were there any objections to the
16     hiring of Vanderplow, Hart, and Swope?
17         MR. BROWN:  Objection.  Confusing.
18         MS. HUNT:  Objection as to foundation.
19     Vague.
20 A.  You need to be specific.  I don't know.
21 BY MR. TURFE:
22 Q.  Were there any objections within the city to the
23     engagement of these three individuals?
24         MS. HUNT:  Same objection.
25 A.  I mean, I don't know what -- I don't recall, but I'm

Page 219

1      just looking at who voted for this contract.  It's the
2      ones that we just called out, the people who voted no,
3      which is Wencel and Constan.
4  BY MR. TURFE:
5  Q.  Can you go to Page 793?  I'm sorry.  Yeah.  793 of
6      this same document, same Exhibit A.  And you see that
7      this is the Employment Agreement Between the City of
8      Dearborn Heights and Paul Vanderplow?
9  A.  Yes.
10 Q.  And can you go to Page 5 of this contract?  It's the
11     stamp on the top 797.  And you signed this; right?
12 A.  Yes.
13 Q.  Did you draft this?
14         MS. HUNT:  Objection as to form.
15 A.  I think this was -- I have to look at the -- I think
16     this is from HR.
17 BY MR. TURFE:
18 Q.  Do you see the Bates stamp on the bottom right-hand
19     that says 50390671.v1-OGLETREE, O-G-L-E-T-R-E-E?
20 A.  Oh, yeah.
21 Q.  And what does that mean?
22         MS. HUNT:  Objection as to form and
23     foundation.
24 A.  What do you mean what does that mean?
25 BY MR. TURFE:

Page 220

1  Q.  What's Ogletree?
2          MS. HUNT:  Objection as to form and
3      foundation and calls for speculation.
4  A.  We have a law office that we deal with, Ogletree.
5  BY MR. TURFE:
6  Q.  That the City has engaged?
7          MS. HUNT:  Objection as to form.
8  A.  I have to go back and see how much -- I mean, what --
9      what we're engaged with, but I know we have that law
10     office that we deal with.
11 BY MR. TURFE:
12 Q.  And so Ogletree drafted this agreement?
13         MS. HUNT:  Objection as to form.
14     Mischaracterization of earlier testimony.
15 A.  I don't recall.
16 BY MR. TURFE:
17 Q.  Do you know who Christopher Mikula is?
18 A.  Yes.
19 Q.  And do you know where he works?
20 A.  I'm pretty sure it's Ogletree.
21 Q.  So did Chris draft this agreement?
22         MS. HUNT:  Objection as to form and asked
23     and answered.
24 A.  I'll have to check with HR.
25 BY MR. TURFE:

Page 221

1  Q.  So Exhibits B, C, and D, the employment agreements
2      between the City and the plaintiffs in this case --
3          MS. HUNT:  I'm sorry.  You said B, C --
4          MR. TURFE:  B, C, and D.
5  BY MR. TURFE:
6  Q.  And I think each of the agreements discuss the salary
7      of each individual in Section 3.1.  Do you see that?
8      The numbers seem to be off, but . . .
9  A.  What's the question?
10         MR. BROWN:  A couple of these contracts
11     have two 3.1s.
12         MR. TURFE:  I think all of these contracts
13     have two 3.1s, but regardless of the scrivener error.
14 BY MR. TURFE:
15 Q.  Do you see, for example, Chief Hart's salary of
16     $126,000?
17 A.  Yes.  I see it.
18 Q.  And you see Swope's salary of $126,000?
19 A.  Yes.  I see it.
20 Q.  And you see Vanderplow's salary of $117,220?
21 A.  Yes.
22 Q.  Do you have discretionary authority to raise any of
23     these individuals' salaries?
24         MS. HUNT:  Objection as to form and
25     foundation.

Bill Bazzi
August 29, 2025

Page 222

1 A.   Again, I have to go back and see what -- the different
2      salaries.  I don't have the data in front of me.  I
3      have to talk to HR.
4 BY MR. TURFE:
5 Q.   Well, in this situation, if Hart came to you and said
6      here's my contract, I want a raise, do you have the
7      authority to grant that raise?
8            MS. HUNT:  Objection as to form and
9      foundation.  Calls for a speculative response.
10           MR. BROWN:  Objection.  Misleading.
11 A.   Yeah.  I don't understand.
12 BY MR. TURFE:
13 Q.   You don't know if you have the authority as mayor to
14      give them a raise?
15           MS. HUNT:  Same objection.
16 A.   I'm within the budget.
17 BY MR. TURFE:
18 Q.   Was there budget allowance to give any of these
19      plaintiffs a raise?
20           MS. HUNT:  Objection as to form and
21      foundation.
22 A.   I don't have the budget in front of me, but I always
23      go by the budget, whatever we're budgeted for for the
24      police department.
25 BY MR. TURFE:

Page 223

1 Q.   Do you know if the salaries for these officers would
2      have to be within the amounts stated in the personnel
3      page of the fiscal year budget for the City of
4      Dearborn Heights?
5            MS. HUNT:  Foundation.
6 A.   I gotta go back and see what the personnel, because
7      the budget gets approved by the counsel, so whatever's
8      the budgeted, that's what I go by.
9 BY MR. TURFE:
10 Q.   But these salaries would have to fall within what is
11      on the personnel page; correct?
12           MS. HUNT:  Objection as to foundation.
13 A.   I'd have to go back and see what the personnel page
14      is.  Again, you know, it was approved by Council.
15 BY MR. TURFE:
16 Q.   I'm not asking you what they are.  I'm asking you if
17      they have to fall within what is on the personnel page
18      in the budget.
19           MS. HUNT:  Same objection.  Asked and
20      answered.
21 A.   Again, I don't have the personnel pages, so I don't
22      know.  I go by the budget.
23 BY MR. TURFE:
24 Q.   You're just not even answering the question.  I mean,
25      this is --

Page 224

1            MR. FARINHA:  It's argumentative.
2            MR. TURFE:  It's not argumentative.  This
3      is like the dozenth time that a question has been
4      asked and we're not even close to being on the same
5      subject matter.
6            MS. HUNT:  I think because you're not
7      liking the answer that he gives.
8            MR. TURFE:  No, I'm not.  I'm asking the
9      question about what the range that these salaries need
10      to fall on, and he's telling me he needs to review a
11      document.  That doesn't answer the question.  It's
12      irrelevant, the response.
13           MS. HUNT:  Do you know?  If you know, you
14      know.  If you don't know --
15 A.   I don't know.  I got a budget and I gotta meet the
16      budget, so . . .
17 BY MR. TURFE:
18 Q.   Okay.  So as mayor of Dearborn Heights, you don't know
19      if these three officers' salaries need to be within
20      what is stated on the budget?
21           MR. BROWN:  Objection.  Misstates prior
22      testimony.
23           MS. HUNT:  That's a different question.
24      That is a misstatement of his prior testimony.  I
25      believe that's a different question that was being

Page 225

1      asked before.  And I'm going to object as to
2      foundation.
3 BY MR. TURFE:
4 Q.   Do you have authority to authorize additional
5      compensation to City employees for the City of
6      Dearborn Heights?
7            MS. HUNT:  Object as to form.
8 A.   I have to meet within the budget.  Whatever's budgeted
9      for I have to follow, make sure that I'm within the
10      budget.
11 BY MR. TURFE:
12 Q.   Okay.  Do you recall if there was ever budget
13      allowance for additional compensation to be paid to
14      Jerrod Hart?
15 A.   You know, as I stated before, I have to go back to all
16      my documents to see because I did seek, like I said,
17      legal -- legal help with this thing here, and there's
18      probably like two, three inches of court documents, so
19      I don't recall every document.
20      So let's suppose that for, because we're looking at
21      Exhibit D, Hart, which is 126,600.  Do you see that?
22 A.   Yes.
23 Q.   So would that number have to be precisely stated in
24      the personnel page?
25 A.   Again, I don't --

Page 226

1        MS. HUNT:  Object as to form.
2 A.  I don't have the personnel page in front of me, but I
3      am within a budget.
4 BY MR. TURFE:
5 Q.  So if 126,600 was in the personnel page, would you
6      have authority to exceed that number?
7        MS. HUNT:  Objection as to form.
8 A.  Again, I don't have -- I don't have the personnel
9      page.  I can't answer that question.
10       MR. TURFE:  What am I on now?
11       MR. BROWN:  J.
12       MS. HUNT:  J.
13       MR. TURFE:  Okay.  I'm going to mark --
14     keep what is Exhibit J, and I will send it over
15     electronically.
16 BY MR. TURFE:
17 Q.  Mr. Mayor, do you see what I have now marked as
18     Exhibit J on the screen?  Actually hold on.  Let me
19     pull it up in a more easier way to look at it.  Here
20     we go.
21       Mr. Mayor, do you see what I have marked as
22     Exhibit J, Dearborn Heights Personnel Pages?
23 A.  I see what you have up there, yes.
24       MR. BROWN:  I'm going to object as to
25     authenticity.  I don't know what that is, but . . .

Page 227

1 BY MR. TURFE:
2 Q.  And do you see that it is a 24-page document?
3        MS. HUNT:  I'm going to object as to form.
4 A.  I see it.
5 BY MR. TURFE:
6 Q.  And I've scrolled down to Page 13, and do you see that
7      this says City of Dearborn Heights Personnel Page for
8      the Police Department?
9 A.  Yes.  I see that.
10 Q.  And do you see that the Chief of Police had a current
11     salary of 128,520 full-time equivalent for fiscal year
12     2024 to 2025?
13       MS. HUNT:  I'm going to object.  The
14     document speaks for itself.
15 BY MR. TURFE:
16 Q.  Do you see that?
17 A.  I mean, that's what you have up there, yes.
18 Q.  Okay.  So understanding that this is the salary for
19     the police chief, can you authorize payment of any
20     salary above this amount of 128,520?
21       MS. HUNT:  Objection as to form and
22     foundation.
23 A.  But it says here 126,000.
24 BY MR. TURFE:
25 Q.  I'm not worried about any other exhibit.  I'm just

Page 228

1      asking you about this particular line item in
2      Exhibit J.
3        MS. HUNT:  Same objection.
4 A.  I'd have to go back to the contract to see what the
5      contract says because every contract's different.  You
6      have your police officer, the COAM contract.  When
7      they negotiate that, there's a certain percentage.
8      Then the COAM.  Then you have to be a certain
9      percentage above that.  I have to go look at all the
10     contracts to see what this salary versus that and
11     versus what the actual -- they're contracted for.
12       MR. BROWN:  I'm also going to object as to
13     relevance since there's no data on this sheet as to
14     2023, which is when the actual Hart contract comes
15     from.
16       MS. HUNT:  And as to which budget this
17     actually pertains to.  I understand that we're looking
18     at the 2024, but there are, my understanding,
19     different versions of the budget.
20 BY MR. TURFE:
21 Q.  Okay.  So the contracts will dictate whether or not
22     you can authorize additional salary expenditures?  Is
23     that what you're saying?
24       MR. BROWN:  Objection.  Misstates prior
25     testimony.

Page 229

1        MS. HUNT:  Objection.  Form, foundation,
2      and argumentative.
3 A.  Again, I don't have all the data to speak to what your
4      question is because right here it says 126 and it says
5      128 up there.
6 BY MR. TURFE:
7 Q.  I'm not -- don't refer to any other exhibit.  This is
8      purely about this Exhibit J.  I'm trying to understand
9      if there were additional expenditures, could you
10     approve them?
11       MS. HUNT:  I'm going to object.  That's
12     been answered.  It's been asked several times.  He's
13     answered it several times.  It may not be as easy as a
14     yes or no answer, but he has answered that question.
15     And we're getting to the point where it's
16     argumentative.
17 A.  Again, I have to go back and look at all the details,
18     and I don't know what this version is.  I don't know
19     what's before this from 2023.
20 BY MR. TURFE:
21 Q.  Okay.  The version doesn't matter because the question
22     that I'm asking you is based off of what is on the
23     personnel page, can you authorize additional
24     expenditures as Mayor of the City of Dearborn Heights?
25     It's a very simple question.

Page 230

1    MS. HUNT:  Same objections.  Asked and
2    answered.
3 A.  It's whatever's budgeted for.
4 BY MR. TURFE:
5 Q.  Okay.  So if what's budgeted for is 128,520, can you
6    authorize the expenditure of 129?
7 A.  Again, we have to go back and look at all the
8    contracts and everything that -- if there's -- if
9    there's a gap -- I need to look at the contracts.  I
10   need to -- I follow the contract.
11 Q.  So the contract controls?
12 A.  Yeah.  Whatever the contract says.
13 Q.  Got it.  So the contract controls instead of the
14    budget; correct?
15    MS. HUNT:  Objection.  Asked.  Answered.
16    Mischaracterization of testimony.
17 A.  We've got union contracts and we're -- again, I have
18    to go back and look at exactly what the numbers.
19    There's a certain percentage between, like I said,
20    officers, COAM, and leadership, so I have to go back
21    and get those numbers and calculate the numbers.
22 BY MR. TURFE:
23 Q.  You go back to calculate the numbers you're
24    referencing and relying on the contract instead of the
25    budget?  Is that what your testimony is?

Page 231

1    MS. HUNT:  Same objections and relevance at
2    this point, and I feel like we're wasting precious
3    time with the same question --
4    MR. TURFE:  Well, if we can get an answer,
5    we would have been long gone off this topic.
6    MS. HUNT:  You've gotten an answer.
7 BY MR. TURFE:
8 Q.  So is that your testimony?
9 A.  Yes.
10 Q.  Okay.  Has Mr. Hart ever asked you for any additional
11    compensation outside of what has ever been in one of
12    his employment agreements?
13    MS. HUNT:  I'm going to object as to form.
14 A.  I don't remember.  I don't recall.
15 BY MR. TURFE:
16 Q.  What about Swope?
17    MS. HUNT:  Same objection.
18 A.  I don't recall.
19 BY MR. TURFE:
20 Q.  What about Vanderplow?
21    MS. HUNT:  Same.
22 A.  I don't recall.
23 BY MR. TURFE:
24 Q.  Have you ever been asked by anybody to give Hart
25    additional compensation outside of what is in his

Page 232

1    employment agreements?
2 A.  I don't recall that either.
3 Q.  What about Swope?
4 A.  Same.  I don't recall.
5 Q.  What about Vanderplow?
6 A.  Same.  I don't recall.
7 Q.  Did you ever authorize the payment of any additional
8    compensation to Hart outside of what has been in his
9    employment agreements?
10    MS. HUNT:  I'm going to object to form and
11    foundation.
12 A.  I don't recall that either.
13 BY MR. TURFE:
14 Q.  What about to Swope?
15    MS. HUNT:  Objection as to form and
16    foundation.
17 A.  Same.
18 BY MR. TURFE:
19 Q.  What about to Vanderplow?
20 A.  Same.  I don't recall.
21    MS. HUNT:  Same objection.
22 BY MR. TURFE:
23 Q.  As part of the job duties of Swope, Hart, and
24    Vanderplow, did you expect these officers to show up
25    at City Council meetings?

Page 233

1    MS. HUNT:  Objection as to form and
2    foundation.
3 A.  If they put something on the agenda, they show up.
4 BY MR. TURFE:
5 Q.  And they talk about it?
6 A.  They're agenda items.  Whatever's on the agenda.  If
7    they get questioned by Council.
8 Q.  So as part of their jobs inherently, it's, you know,
9    coming to City Council and making statements,
10    presentations, whatever you want to call it?
11    MS. HUNT:  Objection as to form and
12    mischaracterization of testimony.
13 A.  Only if Council asked them questions, they answer.
14 BY MR. TURFE:
15 Q.  And that's likely the same for other individuals
16    within the City of Dearborn Heights; correct?
17    MS. HUNT:  Same objection.
18    MR. BROWN:  Vague.
19 A.  If you put something on the agenda, the Council can
20    say they want to speak to so-and-so.  They show up to
21    the meeting and they answer whatever questions that
22    Council brings up.
23 BY MR. TURFE:
24 Q.  And is the Council required to agree with every single
25    thing that everybody says at its meetings?

Bill Bazzi
August 29, 2025

Page 234

1 A.  No.

2 Q.  And if we eventually get some records in this case and

3      we see the payroll records for Swope, Hart, and

4      Vanderplow, will we find any additional compensation

5      other than their salaried amounts?

6            MS. HUNT:  Objection as to form,

7      foundation, and speculation.

8 A.  Again, I don't recall any -- any of it, so . . .

9            MR. TURFE:  You know what?  I'm just going

10     to introduce it because I don't want to flip through

11     it.  Let's do K.

12           (Marked EXHIBIT K for identification)

13           MR. BROWN:  So let the record reflect, if

14     we may, to avoid confusion, J was always electronic;

15     correct?

16           MR. TURFE:  Yes.

17           MR. BROWN:  All right.  So J will be

18     missing from the hard copy forms for now.

19 BY MR. TURFE:

20 Q.  Do you see what I have marked as Exhibit K, the

21     meeting minutes from January 9, 2024, City of Dearborn

22     Heights City Council?

23 A.  I mean, I see something in front of me.  Which one are

24     you referring to?  Which item?

25 Q.  The title of the document.  Does it say January 9,

Page 235

1      2024, Minutes, Regular Meeting of the Dearborn Heights

2      City Council?

3            MS. HUNT:  What's in front of me says

4      minutes, January 9th, 2024.

5            MR. TURFE:  Oh.  Sorry.

6            MS. HUNT:  That's the same document you're

7      talking about?

8            MR. TURFE:  Yes.

9            MS. HUNT:  All right.

10 A.  Yes.

11 BY MR. TURFE:

12 Q.  Okay.  And if you go to the sixth page, do you see the

13     memorialization of Resolution 24-017?

14           MS. HUNT:  I'm sorry.  Can you repeat that?

15 BY MR. TURFE:

16 Q.  Do you see the memorialization of Resolution 24-017?

17     Fifth page.  I'm sorry.  I think it begins on 5 and

18     ends on 6.  Towards the bottom.

19 A.  What's the question?

20 Q.  I'm saying do you see that it's there?

21 A.  I see there's something, yeah.  24-017 motion.

22 Q.  And is this your first time ever seeing this

23     resolution or motion?

24           MS. HUNT:  I'm going to object as to form.

25 A.  I don't -- yeah.  I mean, by you bringing it, yeah, I

Page 236

1      see it now, yeah.

2 BY MR. TURFE:

3 Q.  Okay.  And do you see that this motion was voted and

4      adopted by the Dearborn Heights City Council?

5            MS. HUNT:  I'm going to object.  The

6      document speaks for itself.  And foundation.

7 A.  Yes.

8 BY MR. TURFE:

9 Q.  And were you present at the City Council meeting when

10     this motion was proposed and adopted?

11 A.  I don't recall.  It says here I'm here, but I haven't

12     been to a meeting for a while.

13 Q.  When's the last time you've been at a meeting?

14 A.  I don't recall.  When it started turning to be a clown

15     show.

16 Q.  When did it start turning to be a clown show?

17           MS. HUNT:  I'm going to object as to form

18     and foundation.

19 A.  Go back and look at it.  I don't recall the last

20     meeting I went to.  When people were heckling at me

21     and acting like clowns, that's when I stopped going.

22 BY MR. TURFE:

23 Q.  Do you know if any clowns have actually come to the

24     Dearborn Heights City Council meetings?

25           MS. HUNT:  I don't know what the objection

Page 237

1      is.

2            MR. BROWN:  Clown objection.  Vague.

3 BY MR. TURFE:

4 Q.  Do you know if any clowns have ever been to a City of

5      Dearborn Heights City Council meeting?

6            MS. HUNT:  Are we serious, Tarik?  Is that

7      your question?

8            MR. TURFE:  Yes.

9 A.  When you act like a clown, you know, people acting,

10     you know, uncivilized, barbarians, screaming and

11     yelling and you can't do nothing, that's clown show.

12 BY MR. TURFE:

13 Q.  Okay.  And are you not the mayor of the City of

14     Dearborn Heights?

15 A.  It's not my meeting.

16           MS. HUNT:  Objection.  Asked and answered.

17 A.  It's not my meeting.  The mayor doesn't have to be at

18     a Council meeting.

19 BY MR. TURFE:

20 Q.  And you don't recall the last time you've been at a

21     City Council meeting?

22           MS. HUNT:  Asked and answered.

23 A.  I lost track.

24 BY MR. TURFE:

25 Q.  It's been that long?

Bill Bazzi
August 29, 2025

Page 238

1  A.   Yes.
2  Q.   So 24-017, back to this resolution, do you understand
3       or recall the substance of the resolution?
4           MS. HUNT:  Object as to foundation and
5       form.
6  A.   I mean, I'm looking at it.  What's the question?
7  BY MR. TURFE:
8  Q.   Do you recall the substance?  Do you know what it's
9       about?
10          MS. HUNT:  Same objection.
11 A.   I mean, I see it right here.  I mean, I don't know
12      what the question is.
13 BY MR. TURFE:
14 Q.   Okay.  What is it about?
15      Want me to read the whole thing?
16 Q.   No.  I want you to tell me in your opinion or in your
17      interpretation what is this resolution about?
18          MS. HUNT:  Give him a second to read it.
19          MR. TURFE:  Okay.
20          MS. HUNT:  And I'm going to object to form
21      foundation and the document speaks for itself.
22          MR. MIOTKE:  Does he need a moment to do
23      so, so we can step out?
24          THE WITNESS:  No.  No.
25          MR. MIOTKE:  Okay.  All right.

Page 239

1  A.   Okay.  It's talking about budget amendment, but you're
2       talking about a federal case right now, so . . .
3  BY MR. TURFE:
4  Q.   What federal case?
5  A.   The one that we're doing a deposition for right now.
6  Q.   So what's the relation between the federal case and
7       this motion?
8  A.   Well, you're in a federal case and you're writing a
9       resolution against what's in the federal lawsuit,
10      so . . .
11 Q.   So are you saying that at the time of this motion
12      there was a lawsuit pending?
13 A.   We're in the lawsuit right now.  It's been going on.
14      I don't know the date when this was filed, this
15      lawsuit.
16 Q.   So can you go down to about the middle of Page 6 of
17      this exhibit?  And it is still part of
18      Resolution 24-017.  Do you see where it says
19      "communication dated January 3rd, 2024"?
20 A.   Yes.
21 Q.   Can you go back to the top of the page of this
22      exhibit?  It's the minutes of the January 9, 2024,
23      City Council meeting.  The top of the document.
24 A.   Okay.  The minutes for January 9th, 2024.  Yes.
25 Q.   Okay.  And so do you understand that this resolution

Page 240

1       was considered and passed on January 9, 2024?
2           MS. HUNT:  Objection as to form.
3  A.   I mean, I'm seeing a date, but I still -- like I said,
4       there's a federal lawsuit.  I don't know when this
5       lawsuit was filed.  I can't remember.  I don't recall
6       the dates.
7           MR. TURFE:  I'm going to jump out of order,
8       but it might just help us.  This will be L.
9           (Marked EXHIBIT L for identification)
10 BY MR. TURFE:
11 Q.   Do you see on the top of Exhibit L the court filing
12      stamp?
13 A.   Yes.
14 Q.   It's in blue ink?
15 A.   Um-hmm.
16 Q.   And do you see where it says ECF Number 1-2?
17 A.   Yes.
18 Q.   Do you understand that that means that this is the
19      first filing of this case submitted to the record?
20          MS. HUNT:  I'm going to object as to form
21      and foundation.
22 A.   I mean, I know -- I know it says EC, but I don't know
23      what that means, so . . .
24 BY MR. TURFE:
25 Q.   Do you see that it's filed on January 29, 2024?

Page 241

1  A.   For this one, yes.  That's what it says for this one.
2  Q.   Okay.  I can represent to you that this case was filed
3       on January 29th, 2024, so if we go back to the
4       Exhibit K, the meeting minutes of January 9, 2024, do
5       you understand that all of the matters considered at
6       this meeting were taken well before this lawsuit was
7       ever filed?
8           MS. HUNT:  I'm going to object as to form,
9       foundation, argumentative, and the documents speak for
10      themselves.
11 A.   Yeah.  I mean, I see the dates, yes.
12 BY MR. TURFE:
13 Q.   Okay.  So, now, we've still got to get back to your
14      understanding of Resolution 24-017.  Do you know what
15      it means?  What did the Council try to do?  What is it
16      about?
17          MS. HUNT:  Again, form and foundation.
18 A.   Yeah.  They're trying to defund positions.
19 BY MR. TURFE:
20 Q.   What positions?
21 A.   Okay.  Let me see.  They're trying to defund the two
22      directors positions.
23 Q.   Which specific directors?
24 A.   Director position of Police Operations and Support
25      Services.

Bill Bazzi
August 29, 2025

Page 242

1 Q.  And when was the first time you became aware of this
2      attempt?
3            MS. HUNT:  Object as to foundation, form.
4 A.  Probably before they put -- when they put the
5      resolution on.
6 BY MR. TURFE:
7 Q.  Do you know if this resolution had been previously
8      proposed by the City Council?
9 A.  I don't recall.
10 Q. Do you recall it being proposed in December of 2023 by
11     Councilman Zouher Abdel-Hak?
12           MS. HUNT:  Asked and answered.
13 A.  I don't recall.
14           MR. TURFE:  No.  It's not been asked and
15     answered.
16           MS. HUNT:  He said he didn't recall when it
17     was first presented.
18 BY MR. TURFE:
19 Q.  Do you recall being at the City Council meetings that
20     occurred in December of 2023?
21 A.  I don't know if I was here, but if you say I was
22     there, I gotta go back and see my schedule and see if
23     I was at the meeting.
24 Q.  And after you learned about this resolution, did you
25     talk to anybody about it?

Page 243

1 A.  I don't recall.  I know that -- like I mentioned
2      earlier, when they tried to defund those positions,
3      the police positions, my duties as a mayor is to make
4      sure that the safety of the residents and make sure
5      that the department -- police department is run
6      efficiency.  It has to be efficient, and that's what I
7      try to do is make sure that the City was run efficient
8      and you have an efficient police department and that's
9      it.
10 Q. Did you talk to Ahmad Fawaz about this resolution?
11           MS. HUNT:  Object as to form.
12 A.  I did not talk to Ahmad Fawaz about this resolution.
13 BY MR. TURFE:
14 Q.  Did you talk with any of the plaintiffs about this
15     resolution?
16           MS. HUNT:  Object as to form.
17 A.  Well, I'm sure they could see it now.  But if they
18     were present, I'm sure they were -- they saw the
19     resolution.
20 BY MR. TURFE:
21 Q.  So did you ever talk to Swope about this resolution
22     and I'm thinking about a time period before it was
23     passed, so before January 9, 2024?
24           MS. HUNT:  Object as to form.
25 A.  I don't recall.

Page 244

1 BY MR. TURFE:
2 Q.  Do you recall ever speaking to Vanderplow about this
3      resolution?
4            MS. HUNT:  Same objection.
5 A.  I don't recall.
6 BY MR. TURFE:
7 Q.  Well, you brought these guys in; right?
8 A.  Yes.
9 Q.  And when you learned about this resolution, you
10     weren't concerned that maybe some other part of the
11     City was trying to take them out?
12           MS. HUNT:  Objection.  Argumentative.
13 A.  I mean, obviously the -- they're trying to defund the
14     police, and there's other positions that they're
15     trying to defund at the police station, and my job as
16     the mayor is to ensure the safety of every resident
17     here, to make sure my police department is run
18     efficiently, and, like I mentioned earlier, there's
19     probably two, three inches of documents regarding this
20     here to make sure that I did everything per whatever
21     the attorneys at that time told me that I can do, my
22     duties as the mayor.
23 BY MR. TURFE:
24 Q.  And which attorneys -- I don't want to know what they
25     were saying.  I just want to know which attorneys were

Page 245

1      advising you on those duties?
2            MS. HUNT:  Asked and answered.
3 A.  I said it earlier.  It's probably in one of the
4      documents.  If you go to court documents for the
5      recall, you will see it in there.
6 BY MR. TURFE:
7 Q.  When did the recall happen?
8 A.  I don't know.  Ask the person who did it.  I can't
9      recall, but it was probably a year and a half, two
10     years ago.
11 Q. Year and a half, two years ago takes us into two very
12     different time periods from the time period I'm
13     discussing now, so then that answer just doesn't --
14     it's non-responsive.
15 A.  Again, I don't remember the date you're asking about,
16     but dates -- like I said, I'm running a city of 70,000
17     people.  There's a lot of stuff that go in front of
18     me.  I can't recall every day.  You know, if you give
19     me time, I can go back and look at the stuff.
20 Q. Would this be stuff that's in your office right here
21     at city hall?
22 A.  No.  I don't have my computer.
23           MS. HUNT:  Objection as to form and
24     foundation.
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 246

1 Q.  Where's your computer now?

2 A.  Not with me.

3 Q.  Where is it located right now?

4          MS. HUNT:  Objection as to relevance.

5          MR. TURFE:  It's discovery.

6          MS. HUNT:  His computer isn't discovery.

7    You can ask for specific information, but his computer

8    itself isn't discovery.

9 A.  I don't have it with me here.

10 BY MR. TURFE:

11 Q.  During your time as mayor of the City of Dearborn

12   Heights, who has had access to your computer?

13 A.  Nobody.  Other than, you know, the IT director if I

14   have issues with it.

15 Q.  Have you ever given access to your computer to your

16   wife?

17 A.  No.  I don't know why they keep mentioning my wife.

18   This is annoying.

19 Q.  Has your wife ever drafted any correspondence --

20 A.  No.

21 Q.  -- that you have -- are you going to let me finish the

22   question?  You kind of got ahead of it.

23          MS. HUNT:  Just ask the question, Tarik.

24 BY MR. TURFE:

25 Q.  Has your wife ever drafted any correspondence that you

Page 247

1    have sent in your capacity as mayor of Dearborn

2    Heights?

3          MS. HUNT:  Objection as to form and

4    foundation.

5 A.  No.

6 BY MR. TURFE:

7 Q.  Has she ever reviewed any correspondence that you've

8    drafted throughout your official duties as the mayor

9    of Dearborn Heights?

10          MS. HUNT:  Same objection.

11 A.  No.

12 BY MR. TURFE:

13 Q.  What about Paul Vanderplow?  Has he ever drafted any

14   correspondence that you have sent during your time as

15   the mayor of Dearborn Heights?

16          MS. HUNT:  Object as to form.

17 A.  No.

18 BY MR. TURFE:

19 Q.  Has he ever sent you draft of language that you have

20   eventually used in your official duties as mayor of

21   Dearborn Heights?

22          MS. HUNT:  I'm going to object as to form.

23 A.  I mean, he used to send me a lot of stuff about

24   corruption, the crap that was going on, and he let me

25   know what's going on.  I mean, I got a lot of memos

Page 248

1    from him regarding that.

2 BY MR. TURFE:

3 Q.  Well, not memos.  I'm asking you if he's ever given

4    you draft language that you have then incorporated

5    into things that you have either wrote or sent?

6          MS. HUNT:  Same objection.

7 A.  I've used whatever information he gave me.  Like if

8    there's something, I've put those in a memo.

9 BY MR. TURFE:

10 Q.  What were your thoughts on this Resolution 24-017 as

11   it was proposed and being considered by the City

12   Council?

13 A.  Which one?  This one here?

14 Q.  Yes.

15 A.  What about it?

16 Q.  What were your thoughts as it was being proposed and

17   considered by the City Council?

18 A.  Again, my -- my duties as a mayor to make sure that I

19   run an efficient city, make sure the safety of every

20   resident and the safety of my officers are my utmost

21   duties, and I had to make sure that I run an efficient

22   police station, and for them defunding the police, it

23   would have put the whole city in disarray.

24 Q.  So is it fair to say that you disagreed with the

25   resolution?

Page 249

1          MS. HUNT:  Mischaracterization.  Objection.

2    Mischaracterization of testimony.  Objection as to

3    form.

4 A.  Again, I used whatever information that I had from

5    attorney advice and that's what I followed.

6 BY MR. TURFE:

7 Q.  I'm asking if you disagreed with the resolution.  It's

8    a yes or no question.

9          MS. HUNT:  Same objection.

10 A.  The safety of the residents, safety of the whole city

11   was my responsibility, and I made sure that that's

12   what I follow.

13 BY MR. TURFE:

14 Q.  I'm going to keep asking until I get an answer.  This

15   is very important for this lawsuit.

16          Did you agree or disagree with the

17   Resolution 24-017?

18          MS. HUNT:  Do you understand the

19   resolution?

20 A.  No.  Well, the resolution to defund the police I don't

21   believe -- I'm not for defunding the police.

22 BY MR. TURFE:

23 Q.  So you disagreed with the resolution?

24 A.  I disagree with defunding the police.

25 Q.  Okay.  And do you understand that this resolution

Page 250

1    passed?
2 A.  It passed a vote of --
3          MS. HUNT:  Object as to the form of the
4    question.  But go ahead.
5 BY MR. TURFE:
6 Q.  Okay.  Do you understand that this resolution passed?
7          MS. HUNT:  Same objection.
8 A.  That's what it says.
9 BY MR. TURFE:
10 Q.  Okay.  Did you agree with any portion of 24-017?
11         MS. HUNT:  Object to the form of the
12   question and foundation.
13 A.  I don't agree with defunding the police, no.
14 BY MR. TURFE:
15 Q.  So you believe that the entirety of the resolution is
16   strictly about defunding the police?
17 A.  I don't agree on anything with defunding the police,
18   especially with the status that we were in at the
19   time.
20 Q.  Okay.  I'm going to read some portions of this since I
21   can't get a straight answer, from the exhibit,
22   Motion 24-017.
23         "1. Budgetary Amendment: The Council moves
24   to enact an immediate amendment to the current budget,
25   revisiting and adjusting allocations to address the

Page 251

1    financial implications of the unauthorized creation of
2    two director positions Director of Police Operations,
3    Director of Support Services within the Police
4    Department."
5          Do you see that language?
6 A.  Yes.
7 Q.  Do you agree with that?
8 A.  No.  I don't agree on defunding the police.
9 Q.  "2. Elimination of Compensation: Recognizing the lack
10   of requisite approvals, adherence to legal processes,
11   and formal notification to the Council, compensation
12   for all directors in these unauthorized positions
13   shall be eliminated forthwith."
14         Do you see that language?
15 A.  I see it.
16 Q.  Do you agree with it?
17 A.  I don't agree with defunding the police, no.
18 Q.  Do you agree with this language?
19 A.  I don't agree with the language because it's defunding
20   the police.
21 Q.  "Number 3. Refusal of Legal Fee Coverage: The Council
22   unequivocally refuses to approve any funding for legal
23   fees associated with the Mayor's unilateral hiring
24   decisions based on a email he had sent to the former
25   council chair.  Such requests shall be respectfully

Page 252

1    declined."
2          Do you see this language?
3 A.  Yes.
4 Q.  Do you agree with it?
5 A.  No.
6 Q.  Why don't you agree with it?
7 A.  Because I don't believe -- like I said, defunding the
8    police was not an option at the time with the status
9    that the city was in.
10 Q.  Is this talking about defunding the police or is it
11   talking about legal fees?
12 A.  The whole -- whole motion was about defunding the
13   police.
14 Q.  I'm talking about Number 3, not the whole motion.
15 A.  Well, it relates to defunding the police, so it's a
16   motion for -- the first item is defunding the police.
17 Q.  Okay.  But we're not talking about the first item.
18   We're talking about the third item.
19 A.  I understand.  But the third item relates to the first
20   one, so if you have a motion for the first -- for that
21   one for Number 3, then that would be different, but in
22   this case you're talking about defunding the police,
23   so, yes, I -- I -- I don't agree with it.
24 Q.  "Number 4. Affirmation of Act 78 Existence: The
25   Council reaffirms the existence and significance of

Page 253

1    Act 78, a law passed in 1964 with overwhelming public
2    support.  This affirmation is supported by the Mayor's
3    Attorney's admission during his recall hearing and
4    subsequent attempts to include the illegally hired
5    directors under Act 78 during police contract
6    negotiations."
7          Do you see that section?
8 A.  I see it.
9 Q.  Do you agree with this section?
10         MS. HUNT:  I'm going to object because it's
11   asking essentially if he's agreeing with terms that
12   are part of what appears to be an act, which is a
13   legislative act, which is his understanding of law
14   which he does not have the capacity to do as a
15   layperson, and it appears it is also dealing with a
16   personal attorney or his attorney -- his counsel as
17   mayor, admissions made by them, which he cannot speak
18   to.  So I'm objecting as to form, foundation, seeking
19   a legal conclusion from a layperson.
20         MR. TURFE:  No speaking objection there or
21   was it just me?
22         MR. BROWN:  Just you.
23         MR. TURFE:  All right.
24 BY MR. TURFE:
25 Q.  Do you agree with this section?

Bill Bazzi
August 29, 2025

Page 254

1  A.   Again, it's very vague.

2  Q.   So you can't form an opinion as to whether or not you
3       agree with this section?

4  A.   Again, it doesn't say which attorney.  It doesn't say
5       like what Act 78, existence of what.  I don't even
6       know if it was voted on.  You know, we asked about it,
7       but we never even received anything that if it was
8       voted on.

9  Q.   What was voted on?

10 A.   Act 78.

11 Q.   So are you suggesting that Act 78 is not valid law in
12      the City of Dearborn Heights?

13      MS. HUNT:  Objection.  That's a total
14      mischaracterization of his testimony.

15      MR. TURFE:  He said it wasn't voted on.

16      MR. FARINHA:  It was --

17      MR. TURFE:  Hold on.  Hold on.  Just one.

18 A.   No.  I said I don't have the data, so I can't tell you
19      if I do agree with it because it's vague.

20 BY MR. TURFE:

21 Q.   Okay.  So what about just the first sentence, "The
22      Council reaffirms the existence and significance of
23      Act 78, a law passed in 1964 with overwhelming public
24      support"?  Do you agree with that?

25      MS. HUNT:  I'm going to object because,

Page 255

1  well, that is vague.  There's --

2       MR. TURFE:  Speaking objection.

3  BY MR. TURFE:

4  Q.   It's a simple question.  Do you agree or disagree?

5       MS. HUNT:  Objection.  I'm going to place
6       my objections on the record, Tarik.  It's vague and it
7       is basically speculation asking for what the Council's
8       understanding was.

9       MR. TURFE:  You can just put form or
10      foundation.

11      MS. HUNT:  Form.  Foundation.  Speculation.

12      MR. TURFE:  There we go.

13      MS. HUNT:  All of it.

14 BY MR. TURFE:

15 Q.   Do you agree or disagree with that statement?

16 A.   Well, again, I'm not -- you know, it's pretty vague
17      and I don't know if the Council affirms the existence.
18      You know, it's the Council.  It's not the mayor.

19 Q.   Was Act 78 ever adopted in the City of Dearborn
20      Heights?

21      MR. BROWN:  Objection.  Calls for a legal
22      conclusion from a lay witness.

23      MS. HUNT:  And foundation.

24 A.   Again, there's about two inches of documents about
25      this case, so I have to go back and review all the

Page 256

1  legal documents from the -- just discussing these
2  three positions.

3  BY MR. TURFE:

4  Q.   As mayor of Dearborn Heights, is it important for your
5       position to understand this charter of the City of
6       Dearborn Heights?

7       MS. HUNT:  I'm going to object to, first of
8       all, argumentative, form, foundation.

9  A.   Well, that's why I went and got legal advice from
10      attorneys, and, again, like I said, you can go back to
11      the documents by the judges that they ruled in our --
12      you know, against defunding the police.

13 BY MR. TURFE:

14 Q.   As mayor of Dearborn Heights, do you believe that you
15      have to follow the Act 78 commission?

16      MS. HUNT:  Objection as to form and
17      foundation.

18 A.   Follow the city charter, do the best interests of the
19      City.

20 BY MR. TURFE:

21 Q.   And is Act 78 in the city charter?

22 A.   I don't --

23      MS. HUNT:  Calls for a legal conclusion
24      from a layperson.

25 A.   I'm not sure.

Page 257

1  BY MR. TURFE:

2  Q.   But you testified that you have to follow the city
3       charter; correct?

4  A.   Yes.  Again, I rely on attorneys, and if they tell me
5       like, you know, this is the way, if I do anything I
6       did, I followed the city -- not city attorney, but I
7       followed legal advice from attorneys.

8  Q.   So if the Act 78 is inside of the city charter, then
9       per your testimony you would have to follow it?  Do I
10      got that correct?

11      MS. HUNT:  Objection.

12      MR. BROWN:  Assumes facts not in evidence.

13      MS. HUNT:  Facts not in evidence.  Form and
14      argumentative.

15 A.   I would seek legal assistance, and, like I said, I
16      sought legal assistance for everything that I've done.

17 BY MR. TURFE:

18 Q.   Let's go to Section 5.  "Moratorium on External Hires:
19      The Council mandates that for the next 12 months, no
20      positions outside of Act 78, excluding the Chief,
21      Police Officers, Cadets, can be filled within the
22      Police Department.  This includes directors
23      commissioners, ombudsman, or contractors and other
24      related positions."

25      Do you see that?

Bill Bazzi
August 29, 2025

Page 258

1 A.   Yes.
2 Q.   Do you agree with that?
3          MS. HUNT:  Again, objection as to form.
4 A.   Again, you know, if it's defunding the police, you
5      know, if my police department needs extra police
6      officers, then, again, my objective is for the safety
7      of every resident in the city.
8 BY MR. TURFE:
9 Q.   My question wasn't about your objective.  My question
10     was do you agree with this statement proposed by the
11     City Council?
12          MS. HUNT:  Asked and answered.  He's
13     indicated the reason why he --
14          MR. TURFE:  Has what?  That's the question
15     I'm asking.
16 A.   I'm telling you.  The safety of my residents and
17     whatever I need to do to make sure my residents are --
18     and police officers are safe and has the proper --
19     proper staffing.
20 BY MR. TURFE:
21 Q.   I get that that's your goal, but I'm asking if you
22     agree with a certain portion of a resolution proposed
23     by City Council.
24 A.   I do not agree with any statement that says that I
25     have to defund the police or get rid of any police

Page 259

1      officers at the time is in question.
2 Q.   Okay.  Do you believe Section 5 states that?
3 A.   It says you can't bring any police officers basically.
4      It says no for 12 months.
5      It says you can't bring any police officers or you
6      can't bring any police officers outside of Act 78?
7 A.   No.  It says anything -- any -- even ombudsman or
8      contractors.
9 Q.   Are police officers ombudsmen?
10          MS. HUNT:  I'm going to object because it's
11     calling for a legal conclusion and an interpretation
12     of Act 78, which Mayor Bazzi doesn't have the ability
13     to do as a layperson.
14 A.   And, again, like I said before, everything I do I have
15     to go seek legal advice on everything, including this
16     item.
17 BY MR. TURFE:
18 Q.   Everything you do?
19 A.   If there's something that relates to something like
20     this, I don't know.  I don't know the entirety of
21     Act 78.  I would have to like -- like I said earlier,
22     that's in a document.  It's in a court.  It's been
23     filed.
24 Q.   What document in court?
25 A.   That I mentioned with the recall, the two recalls was

Page 260

1      attempted to get me out of office.
2 Q.   Okay.  But you said court.  Was that subject to a
3      lawsuit?
4 A.   No.  It's the recall that I mentioned about half an
5      hour ago.
6 Q.   So then why did you say court?  I'm trying to make
7      sure there's not a different claim.
8          MS. HUNT:  Tarik, you're being
9      argumentative now.  He's indicated that this is part
10     of another document.  He may have misspoke when he
11     said court.  I don't know.
12 A.   Well, I mean, the recall went to the court because
13     they -- it went in front of the election commission
14     and they voted no to it, so somebody appealed it, so
15     then they went in front of three judges, I believe,
16     and they denied it.
17 BY MR. TURFE:
18 Q.   Okay.  So you're saying that the recall was the
19     subject of a litigation?
20 A.   I didn't say litigation.  I'm just saying --
21 Q.   Or went to court?
22 A.   With the three positions, with the chief and the two
23     directors that's part of the recall.  They did the
24     recall based on those three.
25 Q.   Got it.  And I'm genuinely asking that recall

Page 261

1      eventually made its way to the courts?
2 A.   It made it to, yes.
3 Q.   Okay.  That's what I'm asking.  Okay.  Now,
4      "Section 6. Communication Protocol: The City Clerk is
5      hereby directed to communicate this resolution
6      promptly to all relevant stakeholders, transparently
7      conveying the Council's actions, expectations, and the
8      rectification process."
9          Do you see that?
10 A.   Yes.
11 Q.   Do you agree with that?
12          MS. HUNT:  Object to form, foundation,
13     relevance.  It is no part of his responsibilities.
14 A.   I mean, it's saying the city clerk, so the city
15     clerk -- it's asking the city clerk, not the mayor.
16 BY MR. TURFE:
17 Q.   Did you follow Act 78 in the hiring of Hart?
18          MS. HUNT:  Object to form, foundation, and
19     calls for a legal conclusion of a layperson.
20 A.   Again, I'm going to go back to the document that I
21     mentioned about the recall.  If you go back to that,
22     it has everything in there.  I don't recall every
23     little thing that was in the recall and what the
24     judges ruled, but I know they ruled in the favor of
25     the -- the hiring.

Bill Bazzi
August 29, 2025

Page 262

1 BY MR. TURFE:
2 Q.   Okay.  So you hire Hart way before this recall;
3      correct?
4            MS. HUNT:  Object as to form.
5 A.   I don't recall the timing.  It was -- I don't recall
6      the timing.
7 BY MR. TURFE:
8 Q.   Can you go to Exhibit A, Page 733?  Do you see
9      Paragraph 14, "The City hired Hart as its Chief of
10     Police on February 28, 2022"?
11 A.  That's what it says, yes.
12 Q.  And you understand that that is several months, if not
13     at least a year before this recall that you're talking
14     about?
15           MS. HUNT:  Object as to facts not in
16     evidence.
17 A.  Again, I don't have the dates for the recall.  I have
18     a lot of stuff that I do.  I don't have every little
19     detail of every date.
20 BY MR. TURFE:
21 Q.  Do you understand that the recall -- or do you recall
22     that the recall took place in July of 2023?
23           MS. HUNT:  I'm going to object as to form
24     and foundation.
25 A.  I'd have to look at it.  I don't have the dates with

Page 263

1      me right now.
2 BY MR. TURFE:
3 Q.   What would allow you to refresh your memory as to
4      these dates?
5            MS. HUNT:  Do you have anything to point
6      to?
7 A.   Yes.
8            MR. TURFE:  I have a Press and Guide
9      article that I can put up on the screen.
10 A.  I have to go to the court document.
11           MS. HUNT:  If it can be validated, then --
12     there would be a validation as relates to that.  It
13     would be dealing with a journalist's interpretation of
14     something.
15           MR. TURFE:  What letter are we on?
16           MR. BROWN:  It's going to be M.
17           MR. TURFE:  Okay.  I'm going to mark
18     Exhibit M.  It is an electronic item that I will send
19     to the reporter after.
20 BY MR. TURFE:
21 Q.  Mayor Bazzi, do you see --
22           MR. BROWN:  Excuse me, counsel.  May I
23     please object to the exhibit?  I don't know what it
24     is.  I know you're very adept at just pulling stuff
25     off the internet and telling us that's what it is, but

Page 264

1      I don't know, so I'll object to authenticity.
2            MS. HUNT:  I'm also objecting to
3      authenticity based on the representations of a
4      journalist that hasn't been verified, and I don't see
5      the Arab American News.  Subject to the document.
6 BY MR. TURFE:
7 Q.   Mayor Bazzi, do you see what I have marked as
8      Exhibit M?  It is an Arab American News article titled
9      "Wayne County Elections Commission unanimously rejects
10     petition to recall Dearborn Heights Mayor Bill Bazzi"?
11     Do you see that?
12 A.  I see that, yes.
13 Q.  And do you see that it appears to be published
14     July 26th, 2023?
15           MS. HUNT:  Again, I object based on the
16     verification of the information contained within the
17     document.
18           MR. TURFE:  You can have a standing
19     objection as to that.
20 BY MR. TURFE:
21 Q.  So do you see that it was published July 26th, 2023?
22 A.  I see what you have up there, yes.
23 Q.  Okay.  And there's a picture on the -- in the article,
24     and are you in this picture?
25 A.  Yes.

Page 265

1 Q.   And just for the record, it seems -- it appears that
2      you are seated in the back row right in front of a
3      door; is that correct?
4 A.   Yes.
5 Q.   Do you recall this meeting that you were at?
6 A.   Yes.  That was the Election Commission.
7 Q.   For the recall that you've been discussing; correct?
8 A.   One of them, yes.
9 Q.   And July 2023, is that about the time that this took
10     place?
11           MS. HUNT:  Objection as to form.
12 A.  Again, I don't recall the date.
13 BY MR. TURFE:
14 Q.  So the date right here on the photo by the Arab
15     American News states that it depicts a meeting at the
16     Wayne County Election Commission at Tuesday, July 25,
17     at the Coleman A. Young Municipal Center in Detroit.
18     Do you see that?
19 A.  I see it.
20           MS. HUNT:  And I'm just going to object to
21     the verification validity.
22           MR. TURFE:  That's fine.  You have a
23     standing objection as to that.
24 A.  Again, I see what you're -- what's up there, but I
25     don't -- I don't know how valid the date is.  I'm not

Bill Bazzi
August 29, 2025

Page 266

1    sure.
2 BY MR. TURFE:
3 Q.   Do you have any reason to believe that this is false?
4 A.   I didn't say it was false.  I just said I need to go
5      back to the time for the document when -- I mean, the
6      recall document when it was filed and when I went in
7      front of the Commission.
8 Q.   Okay.  What would allow you to go back and verify?
9      Because you just verified that you're in the picture.
10     The article says July 25th.  I'm trying to establish a
11     date here.
12 A.   I'd have to go to the documents from the Wayne County.
13 Q.   Election Commission?
14 A.   Yes.
15 Q.   Okay.
16          MR. BROWN:  I'm going to briefly step out.
17     There's no need to stop for me.  Let the record
18     reflect that Stephen J. Brown is leaving for a bio
19     break.  Thank you.
20 BY MR. TURFE:
21 Q.   So I think it's pretty clear that we've established
22     Hart was hired in February of 2022.  In January of
23     2023 there was a hiring of Vanderplow and Swope as per
24     Exhibit A, Page 733.  Do you see those, Paragraph 15?
25 A.   Yes.

Page 267

1 Q.   And so this recall came in the case of Vanderplow and
2      Swope several months after they were hired?
3 A.   Again, I'm not sure the timing.  I'd have to go back
4      and look.  But the recall -- the recall was -- again,
5      I don't want to misquote, so I'd have to go back to
6      the recall itself and see what was on the recall.
7 Q.   I'm not asking you the substance of the recall.  I'm
8      asking if it came several months after Vanderplow and
9      Swope were hired.
10          MS. HUNT:  I'm going to object as to form.
11 A.   I don't recall the timing.
12 BY MR. TURFE:
13 Q.   Did you hire Swope through Act 78?
14          MS. HUNT:  I'm going to object to form and
15     calls for a legal conclusion of a layperson.
16 A.   Again, I went by whatever legal advice that I had, and
17     obviously the recall was not accepted.
18 BY MR. TURFE:
19 Q.   Okay.  I don't know what any of that means.  The
20     question that I have is, do you know if Kevin Swope
21     was hired through the Act 78 process?
22          MS. HUNT:  Again, form, foundation, and
23     calls for a legal conclusion of a layperson.
24 A.   Again, I had advice from attorneys.  Whatever advice
25     that they had I made sure that I followed.  I don't

Page 268

1      know the whole Act 78 documents obviously.
2 BY MR. TURFE:
3 Q.   I don't really care about the advice from your
4      attorneys.  I'm asking if you know if Swope was hired
5      through the Act 78 process.  It's a very simple
6      question.
7          MS. HUNT:  And he just answered that he
8      listens to his attorneys as it relates to that.  So
9      objection again.  Asked and answered.
10          MR. TURFE:  It doesn't answer my question.
11     It does not answer my question.  This has been a
12     common theme here.
13 A.   Again, I listened to the attorney, the advice that I
14     had, and that was documented with the Court for the
15     recall, and that's the process that I followed or the
16     legal advice that I had at the time.
17 BY MR. TURFE:
18 Q.   Okay.  Do you know if Swope was hired through the
19     Act 78 commission?
20          MR. BROWN:  Objection.  Calls for --
21 BY MR. TURFE:
22 Q.   It's a very simple question.
23          MR. BROWN:  Calls for a legal conclusion
24     from a lay witness.
25          MS. HUNT:  Same objection and object as to

Page 269

1      form and foundation.
2 BY MR. TURFE:
3 Q.   Did Swope go through a Civil Service Commission
4      process?
5          MR. BROWN:  Same objection.
6          MS. HUNT:  Same.
7 A.   A director doesn't go through a civil service process.
8 BY MR. TURFE:
9 Q.   Okay.  And what's the basis for that?
10 A.   The mayor appoints and unappoints directors, chiefs.
11 Q.   Okay.  So by that answer, Swope did not go through
12     Act 78?
13          MS. HUNT:  Object as to mischaracterization
14     of his testimony.
15 A.   Again, he was a director and I followed the legal
16     advice from attorneys.
17 BY MR. TURFE:
18 Q.   And who gave that advice in this specific scenario
19     related to Swope?
20          MS. HUNT:  Object as to the form of the
21     question.
22 A.   I mentioned earlier that I had several attorneys I was
23     working with.  I'm not sure which one was in
24     particular that was for this particular case.
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 270

1 Q.  Did Paul Vanderplow go through the Act 78 process?
2 A.  It's the same answer as I would for Director Swope.
3      You know, I had advice from the attorneys and that's
4      the process I followed.
5 Q.  How was Mark Meyers hired?
6 A.  I'm not sure.  I wasn't -- I wasn't here when he was
7      hired.
8 Q.  You weren't here as in you weren't the mayor?
9 A.  No.  He was -- he was -- he was a chief when I became
10     the mayor.
11 Q.  Do you know if -- and we're going back to Resolution
12     24-017.  Do you know if any of the plaintiffs in this
13     lawsuit agreed with this resolution?
14         MS. HUNT:  Objection as to speculation,
15     foundation.
16 A.  Who -- who are you referring to?
17 BY MR. TURFE:
18 Q.  The plaintiffs, Hart, Swope, and Vanderplow.
19 A.  I don't know.  You would have to ask them.
20 Q.  But you don't have any independent knowledge of
21     whether or not they agreed to this?
22         MS. HUNT:  Asked and answered.
23 A.  I didn't -- I didn't ask them.
24 BY MR. TURFE:
25 Q.  Okay.  I believe I had marked L.  Let's refer to

Page 271

1      Exhibit L.  Can you state for the record what
2      Exhibit L is?
3          MS. HUNT:  Object to the form of the
4      question.
5 A.  It says Council Resolution 11-A.
6 BY MR. TURFE:
7 Q.  This is a council resolution?
8 A.  No.  It's from -- it's a memorandum.
9 Q.  From who?
10         MS. HUNT:  I'm going to object.  The
11     document speaks for itself.
12 A.  It's from Bill Bazzi.
13 BY MR. TURFE:
14 Q.  To the City Council and the clerk?
15 A.  Correct.
16 Q.  And if you go down to the end of the third page, is
17     this document the complete version of the memo?
18         MS. HUNT:  I'm going to object as to form
19     of the question.
20 A.  I don't understand.  There's three pages?
21 BY MR. TURFE:
22 Q.  Yeah.  Is this --
23 A.  So I don't know if there's -- I can't remember if
24     there's three pages or -- but here we got three pages,
25     so I'm assuming it's three pages.

Page 272

1 Q.  Okay.  And is this your signature on the bottom of the
2      last paragraph on Page 3?
3 A.  Yes.
4 Q.  And did you draft this memorandum?
5          MS. HUNT:  Object as to form of the
6      question.
7 A.  I don't recall.  I think I just got -- looks like
8      there's a few things that I got from different -- from
9      the charter.
10 BY MR. TURFE:
11 Q.  So you don't recall if you drafted this, but --
12 A.  No.
13         MS. HUNT:  I think he's still answering the
14     question.
15         MR. TURFE:  Oh, sorry.
16 A.  No.  I mean, took excerpts of different things from
17     the charter and some -- looks like copied and pasted
18     it.  I drafted this document, so I don't know what the
19     question is.
20 BY MR. TURFE:
21 Q.  Okay.  Did Paul Vanderplow help you draft this
22     document?
23 A.  No.
24 Q.  And what's the subject of this memo?
25         MS. HUNT:  Object as the document speaks

Page 273

1      for itself.
2 A.  It says "Council Resolution 11-A."
3 BY MR. TURFE:
4 Q.  Do you know if that's the same thing that we were just
5      talking about, this Resolution 24-017?
6 A.  I'd have to go back and look at it.  Where is that at?
7      Is that the one you --
8 Q.  Yep.
9 A.  It says here Resolution 24-017.  Let me see what this
10     says.  Because over here it says Resolution 11-A.  I
11     can't -- I mean, I don't know if it is or not
12     because -- oh, okay.  Here, the motion outlined 11-A.
13     11-A.  Yep.  That's what it says.
14 Q.  So it's talking about the same thing as
15     Resolution 24-017?
16         MS. HUNT:  I'm just going to object and
17     indicate that the documents speak for themselves.
18 A.  That's what it says, yes.
19 BY MR. TURFE:
20 Q.  Okay.  And what's the purpose of you writing this
21     memo?
22 A.  Do you want me to read the whole thing again?
23 Q.  No.  I just want to know the purpose of you writing
24     the memo.
25         MS. HUNT:  If you need to refresh your

Bill Bazzi
August 29, 2025

Page 274

1    memory, read it if you need to.
2              MR. BROWN:  Objection.  Best evidence.
3  A.  Rejects the Council resolution.  That's what it says.
4    The whole thing is basically reject the Council
5    Resolution 11-A.
6  BY MR. TURFE:
7  Q.  So the mayor has the authority to reject laws passed
8    by the City Council?
9              MS. HUNT:  I'm going to object as to form,
10    foundation.
11              MR. BROWN:  Misstates prior testimony.
12              MS. HUNT:  Misstatement of prior testimony
13    and argumentative.
14  A.  It says here the city charter and contrary to the law,
15    so . . .
16  BY MR. TURFE:
17  Q.  Well, I'm asking does the mayor have the power to
18    reject matters that are passed by the City Council?
19              MS. HUNT:  Same objections and calls for a
20    legal conclusion of a layperson.
21  A.  I followed the charter, and, like I said, you know,
22    this here was contrary to the charter.
23  BY MR. TURFE:
24  Q.  Does the charter give you the authority to reject
25    matters passed by the City Council?

Page 275

1              MS. HUNT:  Same objection.
2  A.  It gives me the authority to make sure all my
3    residents are safe, and defunding the police was not
4    one of them.
5  BY MR. TURFE:
6  Q.  Okay.  And that gives you the authority to reject a
7    matter that is considered and passed by the City
8    Council?  I'm asking that question.
9              MR. BROWN:  Objection.  Assumes facts not
10    in evidence.  Mischaracterizes prior testimony.
11              MS. HUNT:  Same.
12  A.  Again, you know, we keep going back to the same one.
13    This here was hiring the police chief and the two
14    directors, and I was doing everything, like I said,
15    advice by the -- by legal, by the attorneys, and we
16    just keep going back and forth with the same thing.
17    This was -- I had an advice from the attorneys and
18    that's what I followed.
19  BY MR. TURFE:
20  Q.  And you've -- strike that.
21         In this memo you cited to case law on the
22    second page, bottom of the third paragraph.  Do you
23    see those case law citations?
24  A.  Yes.
25  Q.  Who gave you those?

Page 276

1              MS. HUNT:  Objection as to form and form of
2    the question.
3  A.  Again, I got advice from different attorneys.  I'm not
4    sure which attorney gave me an advice on this one
5    here, so . . .
6  BY MR. TURFE:
7  Q.  So the attorneys just gave you this and you put it in
8    the memo?
9              MS. HUNT:  Objection as to form,
10    argumentative.
11  A.  I don't recall.
12  BY MR. TURFE:
13  Q.  And so, in essence, this memorandum seems to disagree
14    with the decision of the City Council in
15    Resolution 24-017; is that correct?
16  A.  That's what it says.  That's what the memo says.
17    Rejects the council resolution.
18  Q.  And so you wanted that resolution reversed; right?
19              MS. HUNT:  Objection.  Mischaracterizes the
20    crux of the memorandum.  Speaks as to information that
21    is not into evidence and mischaracterization of the
22    witness's prior testimony.
23  A.  It says it's to reject the Council Resolution 11-A.
24  BY MR. TURFE:
25  Q.  I know, but you wanted the resolution reversed; right?

Page 277

1              MS. HUNT:  Same objection.
2  A.  No.  I wanted -- I rejected the resolution, again,
3    because I was against defunding the police and I
4    wanted to make sure that I run an efficient police
5    department.
6  BY MR. TURFE:
7  Q.  Okay.  As this resolution stood, the resolution stood
8    in the way of those goals that you had; correct?
9              MS. HUNT:  Same objection.
10  A.  The resolution -- my objection was to make sure that
11    we keep Chief Hart, the two directors in place to make
12    sure that the City and the police department are run
13    efficiently and to make sure that we clean up all the
14    issues that we have had.
15  BY MR. TURFE:
16  Q.  And the resolution went counter to that; correct?
17              MS. HUNT:  I'm going to object to form and
18    foundation.
19              MR. BROWN:  Objection.  Vague.
20  A.  Again, I wanted to make sure that I run the city, and
21    I wanted to make sure that I don't disrupt the city
22    operation or police department.
23  BY MR. TURFE:
24  Q.  And did this resolution disrupt the operation of the
25    police department and the city?

Bill Bazzi
August 29, 2025

Page 278

1           MS. HUNT:  Objection as to form and
2     foundation and calls for speculation.
3  A.   The resolution was to defund the police positions.
4           MR. TURFE:  I'll pass around the next one.
5           MR. BROWN:  I think this is N.
6           MR. TURFE:  Yes.
7           (Marked EXHIBIT N for identification)
8  BY MR. TURFE:
9  Q.   Do you see the one-page memorandum from yourself to
10      Kevin Swope and Paul Vanderplow dated January 24,
11      2024?
12  A.   Yes.
13  Q.   And you wrote this?
14           MS. HUNT:  I'm going to object as to the
15      form of the question.
16  A.   That's what it says.  It's from me.
17  BY MR. TURFE:
18  Q.   Do you recall writing this?
19           MS. HUNT:  Same objection.
20  A.   I write a lot of memos, so I assume -- I assume so.
21  BY MR. TURFE:
22  Q.   Is this your signature next to the name Bill Bazzi?
23  A.   Yes.
24  Q.   And did you handwrite the date January 24, 2024, next
25      to your signature?

Page 279

1  A.   It looks like my handwriting, yes.
2  Q.   And what's the purpose or goal of this memo?
3           MS. HUNT:  I'm going to object.  The
4      document speaks for itself.
5           MR. BROWN:  Best evidence.
6  A.   Basically it says here the employment status of
7      Director Swope at the time and also
8      Director Vanderplow.
9  BY MR. TURFE:
10  Q.   What about their employment status?
11  A.   It says, yes, "Subject:  Employment Status."
12  Q.   So in this memo did you order them to return to work?
13           MS. HUNT:  I'm going to object to the form
14      of the question.
15  A.   It's for them to remain in position obviously.
16  BY MR. TURFE:
17  Q.   Despite the City Council Resolution 24-017; correct?
18  A.   Again, you know, I keep saying the same thing.  You
19      know, I want to make sure that we're not going to
20      defund any positions because the City with all the
21      stuff that was going on and I wanted to make sure that
22      I keep my police department, the residents safe, and I
23      had to make sure that we keep everybody -- the
24      leadership intact, and, you know, I said it before.
25      The previous attorney that -- you know, they were my

Page 280

1      transition team.
2  Q.   Who was that?
3  A.   Director Swope, Director Vanderplow, and the chief.
4      They weren't here for a pension or they weren't here
5      just for promotion.  They were here to serve the
6      residents and the people of Dearborn Heights.
7  Q.   Okay.  So back to like the overall subject of the
8      memo.  This is -- you understand that this memo came
9      after Resolution 24-017; right?
10  A.   Yes.
11  Q.   And you understand that this memo came after your memo
12      rejecting the resolution?
13           MS. HUNT:  I'm going to object to the
14      mischaracterization of the prior document.  I'm
15      assuming you're talking about Number 11 -- or I'm
16      sorry.  Letter L or Exhibit L.
17           MR. TURFE:  Yes.
18           MS. HUNT:  Mischaracterization of that
19      document.
20  A.   Again, I wanted to make sure my two directors remained
21      at the station considering everything that was going
22      on.
23  BY MR. TURFE:
24  Q.   I'm just asking about timeline.  You understand that
25      the employment status memo came after the ultra vires

Page 281

1      memo, as we've been calling it in this case?
2           MS. HUNT:  Same objection as prior.
3  BY MR. TURFE:
4  Q.   Timeline.
5  A.   Again, I see the date, but it was -- I just don't want
6      to lose my directors.  I don't want to lose my chief
7      or my two directors considering everything that was
8      going on at the police station.
9      And so is it fair to say that you ordered Swope and
10      Vanderplow to remain in their positions
11      notwithstanding whatever the Council did in the
12      Resolution 24-017?
13           MS. HUNT:  Objection.  Mischaracterization
14      of testimony and form of the question.
15  A.   Again, I wanted to make sure that I keep stability in
16      my police station, and I wanted to make sure that we
17      keep everything running smoothly at the police
18      station.
19  BY MR. TURFE:
20  Q.   So going back to Exhibit N, do you see where it says,
21      "Based upon the illegal actions of Council, it is my
22      order to Director Swope and Director Vanderplow that
23      they will remain employed by the City of Dearborn
24      Heights in their contractually established
25      positions . . ."?

Bill Bazzi
August 29, 2025

Page 282

1  A.   Yes.
2           MS. HUNT:  The document speaks for itself.
3  BY MR. TURFE:
4  Q.   You wrote that?
5  A.   That's what it says, yes.
6  Q.   So you ordered them back after what you call an
7       illegal action of the Council?
8           MS. HUNT:  The document speaks for itself.
9           MR. BROWN:  Objection.  Best evidence.
10      Mischaracterizes the document.  That's not what it
11      says.
12 A.   Again, you know, I sought advice from the attorneys,
13      and the action that they put to defund the police, I'm
14      not going to defund any -- any police positions at the
15      time because considering everything that was going on
16      at the police station.
17          MR. TURFE:  Let's take a short break.
18          (Recess taken at 3:48 p.m.)
19          (Back on the record at 3:54 p.m.)
20 BY MR. TURFE:
21 Q.   Did the city charter give you the right to order Swope
22      and Vanderplow to return back to work as indicated by
23      this memo in Exhibit N?
24          MS. HUNT:  I'm going to object.  Calls for
25      a legal conclusion of a layperson.

Page 283

1           MR. BROWN:  I'm going to object to the
2       characterization of the memo.
3  A.   We have a contract, and, again, I wasn't going to
4       defund the police.
5  BY MR. TURFE:
6  Q.   So what authority did you rely upon in order to order
7       them back to work?
8           MR. BROWN:  Same objections.
9  A.   I had a contract and I sought legal help, legal
10      advice.  It's gonna put the City in liability.
11 BY MR. TURFE:
12 Q.   Why would it put the City in liability?
13 A.   To defund the police and they have current contracts.
14 Q.   Did you ever consider the fact that this decision by
15      the Council was made via a valid and binding vote of
16      the City Council?
17          MR. BROWN:  Objection.  Assumes facts not
18      in evidence.
19          MS. HUNT:  Same.  And object as to form of
20      the question.
21 A.   The Council never sat and talked.  Again, you know, I
22      mentioned there was a lot of issues that were going on
23      at the police station.  They did not want to hear it.
24      And my objective was, again, it's my duty as a mayor
25      to make sure the city is run efficiently, and I cared

Page 284

1       about the safety of my officers.  I had to keep the
2       leadership intact.  And obviously the Council at that
3       time did not want instability at the police station.
4  BY MR. TURFE:
5  Q.   Did they vote to remove the chief?
6  A.   I don't have -- they voted to -- vote of no confidence
7       with the chief.
8  Q.   But did that remove his position?
9  A.   No.
10 Q.   But eventually you got the resolution reversed;
11      correct?
12          MR. BROWN:  Object.  Sorry.  Go ahead,
13      Monica.
14          MS. HUNT:  Object to information not in
15      evidence and form of the question.
16 A.   I'm not sure what resolution you're referring to.
17 BY MR. TURFE:
18 Q.   Resolution -- we've had two names, 11-A, 24-017.
19 A.   Again --
20          MS. HUNT:  Same objection.
21 A.   Again, I wasn't gonna defund any positions at the time
22      considering there was stuff that was going on at the
23      police station.
24 BY MR. TURFE:
25 Q.   Did you ever talk to Swope or Vanderplow about getting

Page 285

1       their jobs back?
2           MS. HUNT:  Object.  It assumes information
3       that's not into evidence and mischaracterizes earlier
4       testimony or any information and testimony in this
5       case.
6  A.   Based on the letter, I didn't want nobody to leave
7       based on the issues at the police station considering
8       all the concerns that we had about the police.
9  BY MR. TURFE:
10 Q.   And I just want to make clear.  I'm talking about any
11      conversations that you would have had with Swope and
12      Vanderplow about preserving their jobs after the City
13      Council's Resolution 24-017.
14          MR. BROWN:  Object.  I'm sorry.  The
15      question's misleading.  Object.
16 BY MR. TURFE:
17 Q.   Any conversations to that nature?
18 A.   I don't recall any conversations.  I was -- my --
19      again, my objective was to make sure we don't disrupt
20      police operations considering all the issues that the
21      police department was having at that time, so I wanted
22      to make sure that nobody leaves the police department
23      and disrupts the city operation and puts the risk to
24      my residents or the police officers without
25      leadership.

Bill Bazzi
August 29, 2025

Page 286

1 Q.   Did you ever tell Swope to file a lawsuit after the
2      resolution from the City Council?
3           MS. HUNT:  I'm going to object as to form,
4      the form of the question.
5 A.   I don't re -- why would I -- I don't recall any of
6      that conversation.
7 BY MR. TURFE:
8 Q.   Did you ever tell Vanderplow that he should file a
9      lawsuit after this resolution?
10          MS. HUNT:  Same objection.
11 A.   They weren't going to leave.  Like I said, I wasn't
12      going to fire them.
13 BY MR. TURFE:
14 Q.   But they eventually filed a lawsuit; right?
15 A.   Obviously.  That's why we're here.
16 Q.   And after they filed, did you meet with them?
17 A.   Well, I met with the directors.  I mean, I still had
18      to run the city regardless if there's a lawsuit.
19 Q.   Did you meet with them about the lawsuit?
20 A.   I met with them about city operations just to make
21      sure that they stay intact and focused on city
22      operations.
23          MR. TURFE:  Let's do Exhibit O.
24          (Marked EXHIBIT O for identification)
25 BY MR. TURFE:

Page 287

1 Q.   Do you see the document?  It's an eight-page.  On the
2      top it says ECF Number 4?
3 A.   Yes.
4 Q.   And have you seen this document before?  It's also
5      titled "Stipulated Order for Preliminary Injunction."
6      Do you see that title on the top right side?
7 A.   Yes.  I see it.
8          MS. HUNT:  Take your time and look it over.
9 A.   Yeah.  I mean . . .
10          Okay.  What about it?
11 BY MR. TURFE:
12 Q.   Have you seen this document before?
13 A.   I scanned through it, but I didn't read it word for
14      word.
15          MS. HUNT:  Have you seen it before today?
16 A.   Well, I actually -- I've gotten a lot of emails.  I'm
17      not sure if I looked at this.  I mean, I did see
18      the -- some of it if I did receive it.  But I remember
19      seeing the language.  I don't know if it was -- I know
20      they filed -- there was two different lawsuits.  There
21      was one and then they amended it.  I'm not sure which
22      one was which.
23 BY MR. TURFE:
24 Q.   Who's they?  The plaintiffs in this case?
25 A.   The plaintiff, yeah.

Page 288

1 Q.   Do you see in Paragraph 1 where it says, ". . . on
2      January 26th, 2024, counsel for Plaintiffs and
3      Defendant conducted a meet-and-confer to discuss
4      Plaintiffs' Complaint and Plaintiffs' request for
5      concurrence in its intended Motion for Preliminary
6      Injunction.  A second meet-and-confer was held on
7      January 29, 2024 to discuss the same"?
8 A.   Yeah.  I think this goes with the judge.
9          MS. HUNT:  I'm just going to object that
10      the document speaks for itself and as to foundation as
11      relates to Mayor Bazzi.
12          MR. BROWN:  And also Mr. Bazzi is a
13      layperson who wouldn't know what Local Rule 7.1(a)
14      provides for.
15 BY MR. TURFE:
16 Q.   Were you a part of any conference about this case on
17      January 26th, 2024?
18 A.   I know -- I gotta go back, like I said, look at
19      some -- some dates, but I know that we had -- there
20      was a conference with -- with a judge.  I'm not --
21      like I said, I --
22 Q.   That you participated in?
23 A.   I really don't recall.
24 Q.   Do you recall participating in any conference
25      involving the Court and the entry of this preliminary

Page 289

1      injunction?
2          MS. HUNT:  I'm going to object as to the
3      form of the question.
4 A.   Like I said, I was -- I'm not really sure which --
5      which meeting was which, but I want to make sure that
6      with -- when there was an injunction, there was
7      actually -- they were trying to stop paying my entire
8      employees of the city, and the council was trying to
9      disrupt the city operation, not just the police
10      department, but the entire city pay.  There was an
11      order by council members to stop paying everybody in
12      the city.
13 BY MR. TURFE:
14 Q.   And that is related to this injunction in this
15      lawsuit?
16          MS. HUNT:  I'm going to object to the form
17      of the question and foundation of the basis of the
18      lawsuit.
19 A.   Yeah.
20 BY MR. TURFE:
21 Q.   Do you remember authorizing Roger Farinha to enter
22      into this injunction on behalf of the City?
23          MS. HUNT:  I'm going to object.  Don't
24      speak on anything as it relates to legal conversations
25      or legal counsel or discussions.

Bill Bazzi
August 29, 2025

Page 290

1 A.  I had discussion with counsel.
2          MS. HUNT:  So I'm going to object based on
3     there could be some legal privilege here in dealing
4     with the City's attorney and legal information being
5     discussed between the client, which is the mayor, and
6     their legal counsel.
7 BY MR. TURFE:
8 Q.   Do you remember being on any email threads with
9     opposing counsel, counsel for the plaintiffs,
10     concerning the preliminary injunction?
11 A.  I've never even met --
12          MR. BROWN:  Mr. Brown.
13 A.  -- Mr. Brown.
14 BY MR. TURFE:
15 Q.   Not just Mr. Brown.  Maybe some other attorneys.
16     Maybe Mr. Grysko or somebody else from the firm.  Do
17     you remember being on any threads?
18 A.  I don't recall any emails.  Like I said, I got
19     probably in my inbox several thousand emails right
20     now.  I don't look at every email.  I don't recall.
21 Q.   Have you ever had any discussions with Kevin Swope
22     about the entry of an injunction?
23          MS. HUNT:  I'm going to object to the form
24     of the question.
25 A.  I don't recall having a conversation with Mr. Swope.

Page 291

1 BY MR. TURFE:
2 Q.   What about Paul Vanderplow?
3          MS. HUNT:  Same objection.
4 A.  I don't recall talking about an injunction with
5     Mr. Vanderplow.
6 BY MR. TURFE:
7 Q.   What about Jerrod Hart?
8          MS. HUNT:  Same objection.
9 A.  I don't recall talking to Mr. -- Chief Hart about the
10     injunction.
11 BY MR. TURFE:
12 Q.   Did you ever talk to Jim Allen about the entry of an
13     injunction?
14          MS. HUNT:  Again, do not speak -- well, no.
15     I'm going to object as to privileged information
16     pertaining to conversations between our client and
17     counsel.
18          MR. TURFE:  None of this is privileged.
19     Counsel is Roger Farinha.  I'm not asking about
20     conversations with Roger.  I'm asking about
21     conversations with Jim Allen.
22          MS. HUNT:  Jim Allen is an attorney, so if
23     there's anything that you spoke with him about that
24     pertains to legal -- privileged legal information,
25     then there's no disclosing of that.

Page 292

1 A.  Yeah.  I don't recall.  And, as stated, he's an
2     attorney as well, so . . .  We talk about different
3     cases.  I'm not sure.  I don't recall.
4 BY MR. TURFE:
5 Q.   Did Jim Allen ever send you a bill covering any
6     discussions that you might have had with him about
7     this injunction?
8          MS. HUNT:  Objection to the form and
9     foundation.
10 A.  I don't look at all the bills.  The bills go to the
11     attorney.
12 BY MR. TURFE:
13 Q.   So he was engaged by the City at this time?
14          MS. HUNT:  Objection as it mischaracterizes
15     the testimony of the client.
16 BY MR. TURFE:
17 Q.   Yeah.  If he's not engaged, then there's no
18     attorney-client privilege to assert, and you can
19     properly tell me if and what the substance of the
20     discussions you had with Jim Allen about this
21     injunction and about this case for that matter.
22 A.  I'm not sure --
23          MS. HUNT:  And, again, I'm going to object.
24     In the event that there is an attorney-client
25     relationship there, do not disclose anything as it

Page 293

1     relates to those privileged conversations that you
2     have.
3          MR. TURFE:  What's privileged?
4          MR. BROWN:  I'm going to object because it
5     misstates the law, and I'm going to object because
6     it's misleading.
7 A.  Again, I'm not sure like what the discussions.  He was
8     an attorney that worked with the City on different
9     matters, so I'm not sure what information or what we
10     discussed or which cases we discussed.
11 BY MR. TURFE:
12 Q.   Was Jim Allen ever engaged and paid by the City of
13     Dearborn Heights with respect to anything having to do
14     with this lawsuit?
15          MS. HUNT:  Object as to the form and
16     foundation.
17 A.  Again, I have to go back and check.  I'm not sure.  I
18     don't look at every bill.
19 BY MR. TURFE:
20 Q.   Who signs contracts on behalf of the City of Dearborn
21     Heights?
22          MS. HUNT:  Object to the form of that
23     question.
24 A.  Contracts for what?
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 294

1 Q.   For legal services.
2           MS. HUNT:  Same objection.
3 A.   I have to ask the City attorney.
4 BY MR. TURFE:
5 Q.   You don't know who signs contracts for legal services?
6           MS. HUNT:  Asked and answered.
7           Argumentative.
8 A.   City attorney.  Have to talk to him.
9 BY MR. TURFE:
10 Q.   So the City attorney would sign his own contract for
11      legal services?
12 A.   It's the --
13           MS. HUNT:  That's a mischaracterization of
14           his testimony.  And objection to the form of the
15           question.
16 A.   The City attorney per charter picks counsel to assist
17      him with City matters also.
18 BY MR. TURFE:
19 Q.   Okay.  Do you know if the current corporation counsel
20      has ever engaged Jim Allen for any advice on this
21      lawsuit?
22 A.   You have to ask him.  I'm not sure.
23 Q.   If there's a document that says that Jim Allen and
24      Roger provided advice to the City on this case, would
25      you dispute that?

Page 295

1           MS. HUNT:  Objection to form and
2      foundation.
3 A.   You have to ask them, so . . .  I'm not going to get
4      involved with like two attorneys talking about a legal
5      matter.
6 BY MR. TURFE:
7 Q.   So as it stands here today, you don't know if a
8      certain attorney was ever engaged and paid by your
9      City?
10           MS. HUNT:  That's a mischaracterization of
11      the testimony and not what you had asked earlier.
12      Argumentative.
13 A.   If you'd be specific what bills, we can go back and
14      look at the bills, but . . .
15 BY MR. TURFE:
16 Q.   Okay.  Bill for Jim Allen.
17 A.   I'm not sure.  I don't have the bills in front of me.
18 Q.   Can we get them?
19           MS. HUNT:  No.
20           MR. TURFE:  Why not?
21           MS. HUNT:  Those could be considered --
22           MR. TURFE:  Public information?
23           MS. HUNT:  Well, it depends on what's on
24      them.
25           MR. BROWN:  Paid for by the City?

Page 296

1           MS. HUNT:  Depends on what's on them.  They
2      could be -- have privileged legal information on them.
3           MR. TURFE:  A bill would have privileged
4      legal information?
5           MS. HUNT:  It could.
6           MR. BROWN:  Sure.  I have to redact all my
7      bills.
8           MS. HUNT:  Absolutely.
9           MR. TURFE:  Interesting.
10 BY MR. TURFE:
11 Q.   How are legal bills submitted to the City of Dearborn
12      Heights?
13           MS. HUNT:  Objection as to form and
14      foundation.
15 A.   It goes to legal and they submit it to the Council.
16 BY MR. TURFE:
17 Q.   And once it's submitted to the Council, it becomes
18      part of a meeting agenda package; correct?
19 A.   Well, you have to talk to the City attorney because I
20      don't look at -- there's certain things that -- that
21      they redact, so I'm not sure.
22 Q.   Is there a reason why you have refused to sign a check
23      payable to Mr. Miotke for services rendered to the
24      City Council?
25           MS. HUNT:  Objection as to form of the

Page 297

1      question and relevance.
2 BY MR. TURFE:
3 Q.   Is there a reason for that?
4           MS. HUNT:  Same objection.
5 A.   I don't consider him as the City attorney.
6 BY MR. TURFE:
7 Q.   Is he presently engaged as the City attorney?
8           MS. HUNT:  I'm going to object to form and
9      foundation, speculation.
10 A.   Mr. Miotke's been a problem from day one, so he's the
11      reason why we're here.
12 BY MR. TURFE:
13 Q.   So because of that problem, you refuse to sign a check
14      payable to him?
15           MS. HUNT:  Again, objection as to form, the
16      form of the question.
17 A.   I'm not going to sign any checks to anybody that does
18      not follow the process.
19 BY MR. TURFE:
20 Q.   And what part of the process did he not follow?
21 A.   He's not approved by the City attorney, and he should
22      know that.  He was an attorney for -- for the City for
23      a while, so he should understand that the City
24      attorney has to approve his contract.
25 Q.   But you signed the check payable to my law firm.

Bill Bazzi
August 29, 2025

Page 298

1 A.   I didn't sign it.  Probably I wouldn't have signed it
2      if I would have seen it.  I want to make sure that it
3      gets -- I want to make sure that --
4          MS. HUNT:  Okay.  Okay.  You don't need
5      to --
6 BY MR. TURFE:
7 Q.   So -- so recently --
8 A.   Well, thanks for that note actually.  I'll have to
9      make a note.
10         MS. HUNT:  Stop it.
11 BY MR. TURFE:
12 Q.   Recently the Court, and I don't want to speak for the
13     Court, but the Court suggested or implied that it was
14     going to refer us to a discovery mediator or a
15     discovery master and that the fees of that discovery
16     mediator or discovery master would be borne by the
17     parties to this lawsuit, of which the client of myself
18     and Mr. Miotke are, so when those bills are incurred,
19     are you also going to refuse to sign those checks for
20     payment?
21         MS. HUNT:  I'm going to object as to form.
22     I'm going to object as to foundation.  The --
23     speculation as to what could occur.
24     Mischaracterization of the Court's order or statement.
25         MR. BROWN:  Confusing.

Page 299

1          MS. HUNT:  Confusing.  And relevant as it
2      relates to this deposition.
3 BY MR. TURFE:
4 Q.   Are you going to withhold that money?
5 A.   I'll refer to my City attorney to give me advice on
6      that.
7 Q.   Well, you just had an opinion as to what you were
8      going to do with my checks and Gary's checks.  I want
9      to know before this occurs if you're going to do the
10     same thing to money that's owed to a discovery master.
11         MS. HUNT:  Again, objection as to form,
12     foundation.
13 A.   Again, it's --
14         MS. HUNT:  Speculation.
15 A.   I have to refer that matter to my city attorney,
16     Mr. Farinha.
17 BY MR. TURFE:
18 Q.   Was this the plan all along to get an injunction to
19     reverse a valid resolution of the City Council?
20         MS. HUNT:  Objection as to form and
21     foundation.  Argumentative.
22         MR. BROWN:  Misleading.
23 A.   Again, my objective is to run the city and not to stop
24     paying employees of the entire city and to make people
25     work for nothing, so I wanted to make sure that I run

Page 300

1      my city efficiently, and when it came to obviously
2      with the injunction, they were going to stop paying
3      every employee of the City.
4 BY MR. TURFE:
5 Q.   What part of the resolution contemplates not paying
6      everybody or every employee of the City?  I must have
7      missed that.
8          MS. HUNT:  I'm going to object as to vague.
9      Object as to foundation, form, and calls for a legal
10     conclusion that Mayor Bazzi is not qualified to give.
11 A.   It was an email sent to the treasurer by the Council
12     to stop paying people.
13 BY MR. TURFE:
14 Q.   Which people?
15 A.   Every employee.
16 Q.   Including yourself?
17 A.   It says all employees of the City.  I have to go back
18     and look at the memo.  That was a few -- couple years
19     ago.
20 Q.   What's the date of the email?
21 A.   I don't have it in front of me, but I saw the email.
22     I was obviously cc'd on it.
23 Q.   So how is that related to this preliminary injunction?
24         MS. HUNT:  Object as to form and
25     foundation.

Page 301

1 BY MR. TURFE:
2 Q.   Do you know?
3 A.   Well, like I said, I wanted to make sure that my city
4      is kept running, and I just didn't want to stop paying
5      people.
6 Q.   That's why the injunction was entered into?
7          MS. HUNT:  Objection as to form,
8      foundation, speculation as to Mayor Bazzi as to why it
9      was entered into, and calls for a legal conclusion of
10     a non-attorney.
11 BY MR. TURFE:
12 Q.   Is that why the injunction was entered into?
13         MS. HUNT:  Same objection.
14 A.   I'm not really sure what the -- like the injunction
15     that -- the language of it, but obviously the judge
16     made a decision, so I'm not -- based on whatever was
17     presented to them and made a decision to do that,
18     so . . .  You have to talk to the attorney.
19 BY MR. TURFE:
20 Q.   When did you first learn of the injunction?
21 A.   I don't recall.  I don't have the date.
22 Q.   How did you learn of it?
23         MS. HUNT:  Objection as to form.
24 A.   I can't recall the specifics.
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 302

1 Q.   You can't ever recall discussing the substance of this
2      injunction with anybody?
3          MS. HUNT:  Asked and answered.
4 A.   I talked to our attorneys, and that's what was -- you
5      know, discussed, so I'm not really sure when and where
6      things were discussed.
7 BY MR. TURFE:
8 Q.   Let's go to Page ID 79 of the injunction, the second
9      page.  Do you see where it says 2(a) in bold
10     "Plaintiffs are likely to succeed on the merits"?
11 A.  I see that's what it says, yes.
12 Q.  Did you approve of that language?
13         MS. HUNT:  Objection as to form,
14     foundation.
15 A.  Again, I'm not sure.  Like I said, we had to get
16     through our legal advice from our attorneys, so I'm
17     not sure what -- consider what was going on.  I'm not
18     really sure what that means.
19 BY MR. TURFE:
20 Q.  You don't know what it means if a document filed in
21     court says "Plaintiffs are likely to succeed on the
22     merits"?
23         MS. HUNT:  You're asking for a conclusion
24     from a layperson with regards to a legal document, so
25     objection.

Page 303

1          MR. TURFE:  I just saw a memo where he
2      cited case law.
3 A.   I mean, that's what it says.  I mean, I don't know
4      what -- what it entailed other than all that language
5      that they have.
6 BY MR. TURFE:
7 Q.   And you were okay with language that stated in a case
8      where your city was a defendant that the plaintiffs
9      were likely to win?
10         MS. HUNT:  Objection as it mischaracterizes
11     the information that -- or prior testimony and it
12     assumes information or facts that are not in evidence.
13 A.  Again, the City, that situation that I was in, that I
14     was faced, I was not going to get rid of my two
15     directors, my police chief just because they want me
16     to make chaos in my police department.  Okay?  So we
17     kept going back and forth.  Even till today I still
18     would have refused if they didn't quit to fire either
19     the directors or the police chief just to make sure my
20     police department is run efficiently.
21 BY MR. TURFE:
22 Q.  So you would have done anything to make sure that
23     these individuals would remain fully employed and paid
24     within the City of Dearborn Heights?
25         MS. HUNT:  I'm going to object as a

Page 304

1      mischaracterization of his testimony and form of the
2      question, argumentative.
3 A.   I would have done everything in my legal -- attorney
4      legal advice to make sure my residents are safe and my
5      police officers are safe.
6 BY MR. TURFE:
7 Q.   Even if it meant stipulating that your City would
8      incur liability in a lawsuit?
9          MS. HUNT:  Objection as to argumentative.
10         MR. BROWN:  Misstates prior testimony,
11     misleading.
12 A.  The City is in liability right now because a previous
13     attorney, Mr. Miotke, led to this where we're at right
14     now, so if you want me to be specific.
15 BY MR. TURFE:
16 Q.  Yeah.  You have dodged the questions all afternoon.
17 A.  No.  I didn't dodge the questions.
18 Q.  Let's be specific.
19 A.  Let's be specific.  Okay.  You have a City attorney
20     that was here, a prosecutor saw everything that was
21     going on at the police station and did nothing, and he
22     was a prosecutor.  So everything that was going on, he
23     was okay with it, and I'm not okay with it.  The
24     residents are not okay with it.  So, yes, I sought
25     legal advice to make sure my city's run efficiently,

Page 305

1      to make sure that there's no chaos and no people
2      beefing up their legal fees, and, yes, I would do
3      whatever it takes through the legal process, and
4      that's what I did.  I followed the legal advice by
5      attorneys.
6 Q.   What does any of what you just testified to have to do
7      with this case?  It sounds like you were just airing
8      out a past grievance.
9 A.   No.  I'm airing out the stuff that was going on at the
10     police station, and Chief Hart, Mr. Vanderplow, and
11     Director Swope, they -- they brought some of the
12     concerns, and that's one of them about some of the
13     beefing up cases, and your friend, Mr. Miotke, was
14     actually had -- he was having police officers stay
15     longer, having put my officers at risk.  Some were
16     working third shift.  Hold them off three, four hours
17     overtime.  I had a problem with that.  If he doesn't
18     have a problem with it, then I do.  So that's not a
19     grievance.  That was -- that's fact.
20 Q.  And just your categorization that it was a problem,
21     that's -- that's how it works around here?
22         MS. HUNT:  Object as to the form of the
23     question, vague, mischaracterizes statements -- or
24     prior testimony and argumentative.
25 A.  Again, my job as a mayor, I don't know how many mayors

Bill Bazzi
August 29, 2025

```
                                          Page 306
1    you see, their objective and their -- their job duties
2    is to make sure their city is safe, and that's what
3    I -- that's what I did.  All the police officers and
4    my residents are safe, and I followed protocols and I
5    got legal advice and that's it.
6 BY MR. TURFE:
7  Q.  Did you follow protocol when you asked a Dearborn
8      Heights police officer to fix a ticket for Ahmad Fawaz
9      and his daughter?
10          MS. HUNT:  Objection as to form and
11     foundation.
12          MR. BROWN:  Assumes facts not in evidence.
13 A.  I don't even recall Fawaz or his daughter having a
14     ticket period, so I don't know what you're talking
15     about, unless you guys are trying to set me up again.
16 BY MR. TURFE:
17 Q.  I just want to let you know you recall that you're
18     still under oath; correct?
19 A.  Yeah.
20 Q.  Okay.  Who had the authority to bind the City on this
21     preliminary injunction?
22          MS. HUNT:  Objection as to form and
23     foundation and seeks a legal conclusion.
24 A.  Again, we had -- we had legal -- legal help and we
25     were consulting with our attorneys to make sure that
```

```
                                          Page 307
1    there's no disruption to city operations.
2 BY MR. TURFE:
3  Q.  Which attorney?
4  A.  I'd have to go back and check.
5  Q.  If you look at the end of the document, does that
6      maybe refresh your memory?
7  A.  City -- city attorney, Mr. Farinha.
8  Q.  And that is who had the authority to enter into this
9      injunction on behalf of the City?
10 A.  I mean, he was the City attorney, and he -- and you
11     would have to talk to him about that.
12 Q.  Throughout his entire time here at City of Dearborn
13     Heights, was Vanderplow certified under MCOLES?
14          MS. HUNT:  Objection as to form and
15     foundation?
16          If you know.
17 A.  I have to go back and check to see if he was MCOLES.
18     He wasn't doing an MCOLES job.
19 BY MR. TURFE:
20 Q.  Here at Dearborn Heights he wasn't doing an MCOLES
21     job; correct?
22 A.  He was Director of Support Service.
23 Q.  And that was not under MCOLES?  You do not have to
24     have certification under MCOLES to do that job;
25     correct?
```

```
                                          Page 308
1  A.  I don't recall.  I have to go back and check his
2      certifications, what the requirement is.
3  Q.  Did you ever authorize him to have a police car?
4  A.  He did not have a police car.
5  Q.  He never had a police car with lights or sirens?
6  A.  I think every car at the police station has sirens.  I
7      don't, you know -- I don't recall that if it had -- I
8      know it was -- it was not a marked vehicle, and I
9      don't think it has -- he was testing a lot of vehicles
10     because he was Director of Support Service.
11 Q.  Did you ever authorize him to carry a firearm?
12          MS. HUNT:  Objection to form.
13 BY MR. TURFE:
14 Q.  A City-issued firearm?
15          MS. HUNT:  Objection to the form of the
16     question.
17          MR. BROWN:  Objection.  Misleading.
18 A.  I don't recall him -- I don't recall any firearm that
19     was -- again, he was a federal agent, so . . .
20 BY MR. TURFE:
21 Q.  That's nothing to do with my question.  My question
22     is, do you ever recall allowing him to have a
23     City-issued firearm?
24          MS. HUNT:  I'm going to object as to the
25     form of the question.  Assumes facts not in evidence.
```

```
                                          Page 309
1  A.  Again, it's not for me to authorize any -- anybody in
2      the police department to or not to have a firearm.
3 BY MR. TURFE:
4  Q.  Who authorizes that?
5  A.  The chief.
6  Q.  Have you ever authorized Vanderplow to have access to
7      a City device with access to LEIN?
8          MR. BROWN:  Can you say that again?  I'm
9      sorry.
10 BY MR. TURFE:
11 Q.  Have you ever authorized Vanderplow to have access to
12     a City device with access to LEIN?
13          MS. HUNT:  Object to form, foundation.
14          MR. BROWN:  I don't understand the
15     question.  What's access to lead?  Sorry.
16          MR. TURFE:  LEIN.  LEIN.  Law Enforcement
17     Information Network.
18          MR. BROWN:  Oh, sorry.  Thank you.
19          MS. HUNT:  And somewhat vague.  Go ahead.
20 A.  Yeah.  I'm not really sure what you're talking about,
21     so I don't -- he was Director of Support Service.  He
22     was responsible for purchasing and servicing
23     everything in the police station, so other than the
24     patrol service, he was -- he was doing pretty much
25     everything at the police station.
```

Bill Bazzi
August 29, 2025

Page 310

1 BY MR. TURFE:
2 Q.   So I want to make this clear.  He was not doing patrol
3      service?
4 A.   No.  He was Director of Support Service, so anything
5      that supports the police he was in charge of, and
6      also, in addition, I gave him internal affairs duties
7      because of his background as an investigator, federal
8      investigator.
9 Q.   But this is separate from patrol services within the
10     police department; correct?
11 A.   Well, he was in charge of, like I said, support
12     service, so I don't know what you're talking about, so
13     you have to be specific.
14 Q.   Was he on the street writing tickets?
15 A.   I don't recall him giving any tickets.
16 Q.   Was he on the street investigating things?
17 A.   You'll have to ask him.  I'm not really sure.
18 Q.   As far as your business with the City of Dearborn
19     Heights, you conduct that via email; correct?
20          MS. HUNT:  I'm sorry.  Can you repeat that?
21 BY MR. TURFE:
22 Q.   Your business with the City of Dearborn Heights, your
23     position as mayor, you use an email or you communicate
24     via email; correct?
25 A.   Yes.

Page 311

1 Q.   And you communicate via phone?
2 A.   Yes.
3 Q.   And these phone communications, do you have an office
4      phone at your office here in the city hall?
5 A.   Yes.
6 Q.   And do you have a City-issued cell phone?
7 A.   Yes.
8 Q.   And you have a personal cell phone?
9 A.   Yes.
10 Q.   And do you have a cell phone issued by any other
11     individual or third party?
12 A.   No.
13 Q.   Has anyone ever provided you with a cell phone for
14     use?
15 A.   No.
16          MS. HUNT:  Objection as to form and vague.
17 A.   Ever ever or . . .?  I mean, I had a government phone
18     when I was in the military.
19 BY MR. TURFE:
20 Q.   I'm talking about your time in Dearborn Heights.  I'll
21     make it easy on you.
22          MS. HUNT:  Objection as to form and vague
23     still.
24 A.   No.
25 BY MR. TURFE:

Page 312

1 Q.   There was some confusing testimony earlier.  I think
2      you said 2017 you came back, but then you said '97
3      that you came back to Dearborn Heights.  I just want
4      to flesh out that timeline.
5 A.   In 1996, like I said, '97, '98 time frame I can't
6      remember because I was doing so much stuff, so I think
7      that's when I moved to -- back to Dearborn Heights.
8      That's the first time I landed in Dearborn Heights.
9 Q.   Do you remember what address you lived at?
10 A.   Yeah.  On Kingsbury.
11 Q.   Okay.  And then you left Dearborn Heights?
12 A.   I don't recall, like I said.  I moved several times.
13     I don't recall like every -- I know I moved to
14     Dearborn for a short time, then went back to Dearborn
15     Heights.
16 Q.   Did you keep the house on Kingsbury?
17 A.   No.
18 Q.   So when you moved back to Dearborn Heights, that was
19     in '17?
20          MS. HUNT:  I object to the relevance of
21     this line of questioning.
22 A.   I said '97 I moved to Dearborn Heights.
23 BY MR. TURFE:
24 Q.   I know, but I think you testified that you left and
25     then you came back.  I just want to nail down very

Page 313

1      quickly when you came back what the address was.
2 A.   I served a lot.  I was called to active duty, so I
3      can't recall all the dates after 9/11, like I said
4      earlier in my testimony.  I've been called to do
5      various duties for the military.  So I left -- there's
6      one time I left for 14 months.  So I don't recall like
7      all the dates or the exact addresses, but I was in the
8      military.  When you're on military duty, you retain
9      your residence.  That's the process.
10 Q.   What street in Dearborn Heights?
11 A.   Kingsbury.  The address that I moved to was Kingsbury.
12 Q.   In 2017?
13 A.   2017 -- no.  1997.  I don't know why you're confusing
14     me.  '97, '98 I moved to Dearborn Heights.  I moved to
15     Kingsbury.  I moved from Seattle to Dearborn Heights
16     around '97, '98.  I don't have the dates.
17 Q.   Okay.  Can you name all of the streets that you've
18     owned property or resided at in Dearborn Heights?
19          MS. HUNT:  Object as to form, foundation.
20     I'm sorry.  Not foundation.  But relevance.
21 A.   Right now the only residency that I have, like I said,
22     in Dearborn Heights was on Kings -- I'm sorry, on
23     Kinloch.
24 BY MR. TURFE:
25 Q.   Okay.  But just any other -- so we have Kinloch.  We

Bill Bazzi
August 29, 2025

Page 314

1   have Kingsbury.  Do we have any other streets that
2   you've lived on?
3 A.   I lived on -- in Dearborn Heights?
4 Q.   Yeah.
5 A.   I lived in -- on Kingsbury, Centralia, and also, like
6   I said, I've been going back and forth, so I'm not
7   really sure the timing, but I was also at the house
8   for several years and the one I'm living in right now
9   is Kinloch.
10 Q.   We mentioned Sergeant Bazzy, not we, but Mr. Brown
11   mentioned Sergeant Bazzy earlier.  I believe that the
12   quote was "I don't want to be related."  Do you
13   remember that testimony?
14 A.   Yes.
15 Q.   It was mentioned in the context of ticket fixing.
16   What ticket fixing do you have knowledge of that he
17   did?
18      MS. HUNT:  Object as to form of the
19   question and mischaracterizes earlier testimony.
20 A.   I said when I sat with the chief and we went through,
21   and they discussed that he was involved in ticket
22   fixing.  I don't know the exact tickets.
23 BY MR. TURFE:
24 Q.   You have no direct knowledge of any specific examples
25   of tickets that he fixed?

Page 315

1 A.   I didn't go through all the tickets, but I did trust
2   Chief Hart to do what he needs to do to make sure that
3   doesn't happen again.
4 Q.   Did you see any evidence of any ticket fixing from
5   Sergeant Bazzy?
6      MS. HUNT:  Objection as to form and again
7   mischaracterizes information, earlier testimony.
8 A.   I trusted Chief Hart and that's the information that
9   was relayed to me, so . . .  There was no reason for
10   me not to trust Chief Hart's investigation and what
11   led him to say that there was ticket fixing by -- one
12   of them was Sergeant Bazzy.
13 BY MR. TURFE:
14 Q.   So you have no personal knowledge of any ticket fixing
15   done by Sergeant Bazzy?
16 A.   I did not actually see a ticket, but I know that there
17   was -- again, Chief Hart brought it to my attention.
18 Q.   Got it.  Councilman Baydoun, you've testified about
19   interference with police stops.  Do you remember that?
20 A.   Yes.
21 Q.   I believe you said, "I've heard it.  I saw the video
22   twice."  Do you remember that?
23 A.   Yes.
24 Q.   Okay.  What video are you talking about?
25 A.   Him interfering with police stop.  There was two

Page 316

1   videos.  One, he was with -- there was one -- there's
2   two different officers and two different times.
3 Q.   Okay.  Let's talk about the first one.
4 A.   I don't know which one is which.  I don't know which
5   one came first, but there was two officers.
6 Q.   Let's talk about not the first one chronologically but
7   just the first one from your memory.
8 A.   Okay.
9 Q.   What's the first one?
10 A.   Well, again, one of them was he had somebody in the
11   car with him.  I saw the video.  There was -- I
12   believe his brother-in-law was in the -- in the
13   vehicle with him when he stopped and -- I don't
14   remember.  It's been a while.  But basically the
15   officer telling him -- he identified himself as a
16   council member or something.  He also told him he was
17   interfering with a police stop.  And both of them were
18   pretty much the same.  I can't remember the first
19   officer, but the second one I believe was
20   Officer Kokoiy.
21 Q.   And do you know if tickets were issued at either of
22   these stops?
23 A.   I don't think the officer listened to the Council
24   member at that time, no.
25 Q.   So tickets were issued at both of these stops?

Page 317

1 A.   I don't recall.
2 Q.   But you said the officer didn't listen to the
3   councilman, so that leads to the suggestion that
4   tickets were issued, which, in fact, they were.  Do
5   you recall that?
6      MS. HUNT:  I'm going to object to the form
7   and foundation of that question.
8      MR. BROWN:  Misstates evidence not in the
9   record.
10 A.   Well, the officer told -- in both circumstances, from
11   what I recall, he told them that he's interfering and
12   he needs to leave, so I don't know if they issued the
13   tickets or not.  I didn't check.  That was after the
14   fact I saw that.
15 BY MR. TURFE:
16 Q.   You testified earlier that the previous chief admitted
17   to you that Dearborn Heights was a pay-to-play city.
18   Do you remember that?
19 A.   Yes.
20 Q.   What did you do about it?
21 A.   He's no longer with us.
22 Q.   So you fired the police chief?  That was your
23   response?
24 A.   Well, that was the -- again, like I said in the other
25   testimony, when Commissioner Thomas made that

Bill Bazzi
August 29, 2025

Page 318

1   recommendation he needs to go, you know, start looking
2   for a new chief, that's what we did.
3 Q.   Is Dearborn Heights still a pay-to-play city?
4             MS. HUNT:  Objection as to form and
5   foundation.
6 A.   It's not tolerated by me, and if it's happening, then
7   it should be reported.
8 BY MR. TURFE:
9 Q.   Is it still happening?
10 A.   I hope not.  It wasn't happening when Chief Hart and
11   the two directors were here.
12 Q.   Is it happening now because Chief Hart and the two
13   directors aren't here anymore?
14 A.   I don't know.  I don't recall.  I don't -- I -- I hope
15   not, like I said.
16 Q.   You were also asked if the Dearborn Heights Police
17   Department had a history of corruption, and I believe
18   you said -- you answered affirmatively.  You answered
19   yes; correct?
20 A.   I said it was brought to my attention that there was
21   stuff going on, and I verified it when I became the
22   mayor that there was corruption.
23 Q.   Okay.  What stuff and what's going on and what did you
24   verify?
25 A.   Well --

Page 319

1             MR. BROWN:  Objection.  Compound.
2             MS. HUNT:  And the form of the question.
3 BY MR. TURFE:
4 Q.   What stuff was brought to your attention?
5             MS. HUNT:  Same objection.
6 A.   It was brought to my attention there was, let's see,
7   marijuana, bags of marijuana sitting in the police
8   garage open, unsecured.  There was a lot of guns,
9   almost a thousand, I believe, guns were not
10   registered.  Let's see.  There was cash, just bags
11   open in the evidence room.  There's -- there was a lot
12   of misconduct allegations.  I'm sure you saw the
13   lawsuit.  Officers raping another officer.  There was
14   obviously the lawsuit, you know -- there's
15   allegations, but, you know, it's still going through
16   the process right now.  And so the evidence room we
17   had to pay close to 40 I believe thousand, I can't
18   remember, to make sure that everything is accounted
19   for in the evidence room.  We had a company from the
20   outside come in.  The Department of Justice came in,
21   and they validated everything that we're talking about
22   here that all the stuff was going on at the police
23   station, you know, prior to Chief Hart's arrival.
24 BY MR. TURFE:
25 Q.   Is this corruption or is this just bad practices?

Page 320

1             MR. BROWN:  Objection to form.
2             MS. HUNT:  Same.
3 A.   Well, I can tell you from a prior experience it is
4   corruption when you have money being taken from the
5   evidence room, putting IOUs, and there's drugs in the
6   evidence room, that cash bags are opened, there's
7   guns, they don't know who they belong to, and if you
8   talk about also, like I said, the marijuana in the
9   garage, nobody knows how much was brought in, how much
10   was taken out.  I mean, that's corruption if you talk
11   to anybody.
12 BY MR. TURFE:
13 Q.   Did somebody take this money from the City?
14             MS. HUNT:  Objection as to form and
15   foundation.
16 A.   Which money are you talking about?
17 BY MR. TURFE:
18 Q.   You said there was money unregistered or unsecured and
19   you're also saying corruption, so did somebody take
20   this money?
21 A.   Well --
22             MS. HUNT:  Same objection.
23 A.   Yeah.  Like I said, there was IOUs, so I don't even
24   know if that money was ever paid back.
25 BY MR. TURFE:

Page 321

1 Q.   Did somebody take these guns that weren't registered?
2             MS. HUNT:  Same objection.
3 BY MR. TURFE:
4 Q.   I'm trying to figure out where the corruption is.  It
5   sounds like a flawed process.  It doesn't sound like
6   corruption.  You're the one who's alleging it.  I want
7   to figure out what it's about.
8             MR. BROWN:  Objection.  Misleading.
9   Misstates prior testimony.  Argumentative.  Vague.
10 A.   I've never in my life even, like I said, you know,
11   with my law enforcement experience, even something so
12   minor at, you know, the station that we had in
13   military police, everything, every little thing, even
14   if you had like 20 different items, every item is
15   accounted for.  They know Item Number 1 belongs to
16   this person.  You know, when the chief came in, when
17   they had a company come in and audit, nothing, nobody
18   knew where anything was, and, again, I don't want to
19   get too much into it because it does put the City in a
20   liability if anybody has stuff that was in the
21   evidence room and they didn't recover, so . . .  I'm
22   not sure what was recovered, what was --
23             MS. HUNT:  That's fine.  Just wait until
24   his question is asked.
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 322

1 Q.  So do you know any specific individuals who benefited
2      from any of these things that you just testified to?
3 A.   I can't -- again, I -- I just saw the information and
4      then had the chief make sure that we got a third
5      company to come in, audit the evidence room, make sure
6      that everything in there is documented, so I don't
7      know the details.
8 Q.   That's non-responsive.  I'm asking you if you know, do
9      you have any personal knowledge of any individuals who
10     have benefited from the corrupt matters that you
11     testified to?
12            MS. HUNT:  Object to the form of the
13     question.
14            If you know.
15 A.   I don't know.  I would have to talk to Chief Hart and
16     the two directors.
17 BY MR. TURFE:
18 Q.   Okay.  You were asked earlier about reform efforts,
19     and I believe you testified that your reform efforts
20     were not well received.  Do you remember that
21     testimony?
22 A.   Yes.
23 Q.   And I believe there were -- you were asked who pushed
24     back against these reform efforts, and you testified
25     that Gary Miotke, council members, and people who

Page 323

1      would come to the meetings pushed back on your reform
2      efforts.  Do you remember that testimony?
3 A.   Yes, I do.
4 Q.   Okay.  How did Gary Miotke push back on your reform
5      efforts?
6 A.   He used to come to meetings and always fight with --
7      with our chief.  It's actually public knowledge.  You
8      can actually look at all the meetings that used to
9      come up and always arguing with our chief, Chief Hart,
10     at the time, and they would have like different people
11     come in and they'd just heckle and always talking bad
12     about -- you know, to the chief, and so, I mean,
13     that's -- I don't know.  I mean, that right there is
14     disruption and also -- yeah.
15 Q.   Was that it?
16            MR. BROWN:  Objection to form.
17            MS. HUNT:  Vague.
18 BY MR. TURFE:
19 Q.   Any other way that Gary pushed back on your reform
20     efforts?
21            MR. BROWN:  Same objection.
22 A.   Well, like I said, he comes to Council meetings and
23     just always, you know, talks bad about the stuff that
24     is going on and, you know, talk about basically
25     Chief Hart.  I mean, you can go back to the meetings

Page 324

1      and just review the meetings.
2 BY MR. TURFE:
3 Q.   You understand that Gary Miotke is a resident of the
4      city of Dearborn Heights; correct?
5 A.   Yes.
6 Q.   And that he has a right to appear at City Council
7      meetings and express his opinion?
8            MS. HUNT:  Objection as to the form of the
9      question and it's really a legal conclusion.
10            MR. BROWN:  Misleading.
11 BY MR. TURFE:
12 Q.   Do you understand he's got a right to come to the
13     Council and speak at public meetings?
14            MS. HUNT:  Same objection.
15 A.   Everybody has -- doesn't have to be a resident.
16     Anybody has the right to go speak.
17 BY MR. TURFE:
18 Q.   Okay.  So just because he might have spoke at a
19     meeting, that means he's pushing back on your reform
20     efforts?  I'm not tying the two together.
21 A.   It wasn't one meeting.  It was several meetings.
22 Q.   Do you have any specific examples of what you would
23     call this heckling or yelling?
24            MS. HUNT:  Objection.  Argumentative.
25 BY MR. TURFE:

Page 325

1 Q.   Any specific examples?
2 A.   I don't have the data in front of me.  I'd have to go
3      back and review it.  But every meeting that he would
4      come to would always be disruptive.
5 Q.   You were formerly a member of the Dearborn Heights
6      City Council; correct?
7 A.   Yes.
8 Q.   And who was the mayor during your tenure as a City
9      Council member?
10 A.   Mayor Paletko.
11 Q.   Did you and Mayor Paletko always agree on every issue?
12            MS. HUNT:  Objection to the form of the
13     question.
14 A.   Not every issue, no.
15 BY MR. TURFE:
16 Q.   And if you ever disagreed with Mayor Paletko on an
17     issue, did that mean that you were pushing back on his
18     efforts to do something in the city?
19            MS. HUNT:  Objection to the foundation.
20 A.   I'm not really sure of that question.
21 BY MR. TURFE:
22 Q.   You don't know how to answer that question?
23 A.   No.  I mean --
24            MS. HUNT:  Maybe if you can rephrase it.
25 A.   Yeah.  If you can rephrase it or be specific.  There's

Page 326

1  a lot of questions that we used to have, and sometimes
2  we'd meet and we'd talk about certain things.
3  BY MR. TURFE:
4  Q.  And you might disagree with him; right?
5  A.  Yeah.  But he tells me what -- you know, if there's
6     anything, I've brought some stuff to his attention,
7     came to his office several times.  I tell him certain
8     things and, you know, we sit and we talk.
9  Q.  And did you have a good working relationship with him?
10        MS. HUNT:  Objection.  Form and foundation.
11 A.  I mean, he was the mayor.  I was a Council member.
12 BY MR. TURFE:
13 Q.  So did you have a good working relationship with him?
14        MS. HUNT:  Asked and answered.
15 A.  Again, he was a -- I was fiduciary and he was a mayor,
16     so . . .
17 BY MR. TURFE:
18 Q.  Okay.  Do you have that same relationship with, for
19     example, Councilman Wencel?
20        MS. HUNT:  Object to foundation.
21 A.  I mean, like I don't know what relationship you're
22     talking about.  Like, you know, we go out to dinner or
23     like what?  You need to be specific.
24 BY MR. TURFE:
25 Q.  No.  The relationship that you just described that you

Page 327

1  had with Mayor Paletko when you were on the City
2  Council where you would go to his office and you would
3  discuss issues.  Do you have that relationship with
4  Councilman Wencel?
5  A.  Yes.  I used to talk to him, yes.
6  Q.  You said used to.  Why don't you do it anymore?
7        MS. HUNT:  I'm going to object as to the
8  form and possible speculation.
9  A.  I mean, if there's anything, and I've called him
10    several times before, so if there's anything, I would
11    bring it up to his attention.
12 BY MR. TURFE:
13 Q.  And what happened to no longer allow you to have that
14    relationship with Councilman Wencel?
15        MS. HUNT:  I'm going to object to the
16    relevance of this line of questioning.  I don't know
17    where it gets us in this case.  You're running out the
18    clock.
19 A.  I never said I had a bad relationship with
20    Councilman Wencel.  I saw him --
21 BY MR. TURFE:
22 Q.  You said you used to.
23 A.  No.  I mean, I used to be -- we used to be closer,
24    but, you know, that's all I said.
25 Q.  Okay.  And then why are you not as close as what you

Page 328

1  used to be?
2        MS. HUNT:  Same objection as to relevance.
3        If you know.
4  A.  I mean, I don't know.
5  BY MR. TURFE:
6  Q.  Okay.  Do you have that relationship with
7     Councilman Constan?
8        MS. HUNT:  Same objection.
9  A.  Yeah.  I talk to him when I see him.
10 BY MR. TURFE:
11 Q.  Does he come to your office to talk about city issues?
12 A.  No.  I mean, they never bring anything up, but if they
13    do, I'm willing to listen.
14 Q.  Do you have that relationship with
15    Councilwoman Malinowski Maxwell?
16        MS. HUNT:  Relevance.
17 A.  She doesn't come to my office, but I would talk to her
18    any time.
19 BY MR. TURFE:
20 Q.  Why doesn't she come to your office?
21        MS. HUNT:  Objection as to speculation and
22    foundation.
23 A.  I don't know.  Ask her.
24 BY MR. TURFE:
25 Q.  What about Councilman Bryer?

Page 329

1        MS. HUNT:  Relevance.
2  A.  She comes by my office every now and then.
3  BY MR. TURFE:
4  Q.  What about Councilman Ahmad?
5        MS. HUNT:  Same objection.
6  A.  He's welcome to come to my office any time.
7  BY MR. TURFE:
8  Q.  Did that relationship ever change at one point?
9  A.  Like I said, my office is always open.  That's the
10    first thing that I would say.  My office is always
11    open.  You guys can come and talk to me any time.
12 Q.  What about Councilman Baydoun?
13 A.  He's the Council chair.  If he wants to come and talk
14    to me, he knows where my office is.
15 Q.  What about Councilman Saab?
16 A.  Same thing.  My office is always open.  He can come
17    talk to me any time about city matters.
18 Q.  You said -- or excuse me.  Strike that.
19        You testified that you got a lot of
20    resistance at the time that you hired Swope and
21    Vanderplow; correct?
22        MS. HUNT:  Asked and answered I think two
23    or three times before.
24        But go ahead.
25 A.  Yes.

Bill Bazzi
August 29, 2025

Page 330

1 BY MR. TURFE:
2 Q.  And you testified that the police union was not happy
3      about someone being brought in from the outside?
4           MS. HUNT:  Objection.  It's a
5      mischaracterization of earlier testimony.
6 A.  Yeah.  I know they -- obviously they wanted somebody
7      within.
8 BY MR. TURFE:
9 Q.  Or was there issue that these individuals were not
10     hired through Act 78?
11          MS. HUNT:  Object to form, foundation, and
12     possibly calls for a legal conclusion.
13 A.  Again, I followed the legal protocol when I sought
14     legal help to help me with the process.
15 BY MR. TURFE:
16 Q.  Was a grievance ever filed concerning these positions
17     not being done through Act 78?
18          MS. HUNT:  Object to foundation.
19 A.  I can't -- I can't recall if there was or there
20     wasn't.
21 BY MR. TURFE:
22 Q.  You talked about contacts from Hart to the FBI, DOJ,
23     MSP.  Do you remember those contacts?
24          MS. HUNT:  Object as to vague and form of
25     the question.

Page 331

1 A.  You need to be specific.
2 BY MR. TURFE:
3 Q.  Do you remember testifying earlier about those
4      communications between Hart and these agencies?
5 A.  Yes.
6 Q.  And you were asked if there were -- or if you recalled
7      any correspondence.  You said no.  But I want to ask
8      if you were ever aware of any formal investigations
9      done by any of these agencies.
10          MS. HUNT:  Object to the foundation.
11 A.  Be specific.  You mean they have investigation or we
12     have investigation that we sent over?
13 BY MR. TURFE:
14 Q.  Did the FBI, for example, have any investigations?  Do
15     you recall any investigations that the FBI ever
16     undertook based off of what Chief Hart was telling
17     them?
18 A.  I'm not sure.  I'd have to ask them.
19 Q.  What about the DOJ?
20 A.  The DOJ when they were here, they brought up a lot of
21     concerns and it's actually on their website.
22 Q.  What were those concerns?
23 A.  That I mentioned.
24 Q.  What were they?  I don't think you ever mentioned
25     anything specific.  That's what I'm trying to get at.

Page 332

1           MS. HUNT:  Object to the form of the
2      question.
3 A.  The issues that I talked about, mishandling and the
4      things that were going on at the police station.  The
5      DOJ interviewed and they spent almost a year here with
6      us to go through all the issues and concerns, and they
7      documented it in the report.  I don't have it with me,
8      but . . .
9           MS. HUNT:  Can we stop for a second?  Are
10     you okay?  Do you need a break?
11          THE WITNESS:  No, no, no.  Let's keep
12     going.  He's running the clock, so let's run the
13     clock.
14          MR. TURFE:  Running the clock?  I'm not
15     sure how that would benefit me.
16 BY MR. TURFE:
17 Q.  You were asked if there was any valid reason for the
18     City Council's vote of no confidence.  Do you recall
19     that?
20 A.  Yes.
21 Q.  And you responded that there was no valid reason for
22     the no confidence vote; right?
23 A.  Correct.
24 Q.  And are you aware of what would be a valid reason for
25     a no confidence vote?

Page 333

1           MS. HUNT:  Object to form of the question.
2           MR. BROWN:  Objection.  Vague.
3 A.  Well, the person that introduced the three resolution
4      walked it on the agenda with less than a month on
5      duty.
6 BY MR. TURFE:
7 Q.  Who was that?
8 A.  I'm sorry?
9 Q.  Who was that?
10 A.  I believe it was Councilman Saab.
11 Q.  And is there a minimum time served requirement for a
12     City Council member to propose a resolution?
13          MS. HUNT:  Objection as to form and
14     argumentative.
15 A.  He hand walked it to that meeting or they entered it
16     to the meeting.  Never gave it to the Council.
17     There's a protocol you have to submit it and have the
18     Council have enough time to review it.
19 BY MR. TURFE:
20 Q.  Do you have any personal knowledge of anybody on the
21     Dearborn Heights City Council demanding that
22     Sergeant Bazzy be hired to any position in the City of
23     Dearborn Heights?
24          MS. HUNT:  I'm going to object as to form,
25     the form of the question.

Bill Bazzi
August 29, 2025

Page 334

1 A.  Be specific.
2 BY MR. TURFE:
3 Q.  Do you have any personal knowledge of Tom Wencel ever
4      demanding that Sergeant Bazzi be promoted within the
5      City of Dearborn Heights?
6 A.  I don't recall Wencel bringing that up to me, no.
7 Q.  Do you have any personal knowledge of Bob Constan ever
8      demanding that Sergeant Bazzi be promoted in the City
9      of Dearborn Heights?
10 A.  I don't recall Constan bringing that either.
11 Q.  Do you have any personal knowledge of Denise
12      Malinowski Maxwell ever demanding that Sergeant Bazzi
13      be promoted in Dearborn Heights?
14 A.  I don't recall Councilwoman Malinowski bringing that
15      also either to my attention.
16 Q.  Do you have any personal knowledge of Councilwoman
17      Nancy Bryer ever demanding that Sergeant Bazzi be
18      promoted in Dearborn Heights?
19 A.  I don't recall her coming to me, but I believe that
20      she was at the station with another council member.  I
21      don't know the specifics.
22 Q.  Do you have any personal knowledge that Mo Baydoun
23      ever demanded Sergeant Bazzi to be promoted at
24      Dearborn Heights?
25 A.  Yes.

Page 335

1 Q.  Okay.  What's that personal knowledge?
2 A.  Came up to me several times, and we were here in
3      December '22 saying that he should be the commissioner
4      or the chief.
5 Q.  And he demanded that of you?
6 A.  Well, he did ask.  I mean, obviously that's why they
7      called the meeting.
8 Q.  So he asked you to do that?
9          MR. BROWN:  Objection to form.
10 A.  Well, they have a meeting telling me he should be the
11      chief or the commissioner.
12 BY MR. TURFE:
13 Q.  Okay.  Did Hassan Saab ever demand that Sergeant Bazzi
14      be promoted at the City of Dearborn Heights?
15 A.  Yes.
16 Q.  What personal knowledge do you have of that?
17 A.  Him asking himself that he should be -- should be in
18      that position.
19 Q.  Him asking you?
20 A.  Yes.
21 Q.  When did he ask you that?
22 A.  Several times.  Before he was Council and after he was
23      Council.
24 Q.  And do you remember specific dates, times, locations?
25 A.  No.

Page 336

1 Q.  Do you have any personal knowledge that
2      Councilman Ahmad ever demanded that Sergeant Bazzi be
3      hired -- I'm sorry, be promoted at the City of
4      Dearborn Heights?
5 A.  Yes.
6 Q.  Okay.  What personal knowledge?
7 A.  Same thing.  You know, at that meeting -- at that
8      meeting December of '22 across the hall.
9 Q.  And who was at the meeting?
10 A.  As I mentioned earlier, Khalil Rahal, Council Chair at
11      the time Dave Abdallah, Councilman Baydoun,
12      Councilman Hassan Ahmad, and there were several other
13      police officers, Arab American officers.
14          MS. HUNT:  Did you say American officers?
15          THE WITNESS:  I'm sorry?
16          MS. HUNT:  Did you say American officers?
17          THE WITNESS:  Arab American officers.
18          MS. HUNT:  Oh, okay.
19 BY MR. TURFE:
20 Q.  Have you heard of Arab only meetings that took place
21      in the City of Dearborn Heights?
22          MS. HUNT:  Asked and answered.
23 A.  Previous counsel asked me that question and I said the
24      same thing.  There was a meeting.  I had no idea.  I
25      showed up and it was all Arab American in that

Page 337

1      meeting.  As I mentioned, it was people that I
2      mentioned.
3 BY MR. TURFE:
4 Q.  They were Arab American residents in the city of
5      Dearborn Heights; correct?
6 A.  There were three council members.
7 Q.  I'm just talking about generally.
8 A.  I don't know.  I didn't check their residency.
9 Q.  Generally in the city of Dearborn Heights are there
10      Arab American residents?
11 A.  I don't know their residency.  I don't check
12      residencies.
13 Q.  You don't know if there's Arab Americans that live in
14      Dearborn Heights?
15 A.  I don't check their residency.  I don't know if they
16      live in the city or if they live outside the city.
17      It's not a requirement --
18          MR. BROWN:  I think you're confusing --
19 BY MR. TURFE:
20 Q.  I'm not talking about the meeting.  I'm just talking
21      about in general in the city of Dearborn Heights.
22          MR. BROWN:  You're talking about just the
23      population --
24 BY MR. TURFE:
25 Q.  Just the population of the city of Dearborn Heights.

Bill Bazzi
August 29, 2025

Page 338

1 A.    I don't -- I don't know.  I have no idea.  If
2       there's -- I know there's one for sure that lives in
3       the city.  There's one --
4           MS. HUNT:  Are you talking about officers?
5           THE WITNESS:  Sorry.
6           MS. HUNT:  I think he's just talking about
7       the population of the residents of Dearborn Heights.
8 BY MR. TURFE:
9 Q.    No, no.  I'm just talking about the people of the city
10      of Dearborn Heights.
11          MR. BROWN:  Tarik's just talking about
12      everyone who lives in the city right now, no longer
13      about the meeting in particular.
14 A.   Okay.  So people in the city if they're police
15      officers?
16 BY MR. TURFE:
17 Q.   No.  Just the population of the city of Dearborn
18      Heights.
19 A.   Okay.  Okay.
20 Q.   The 60 or 70,000 people.
21 A.   Okay.
22 Q.   Are you aware if any of those people are
23      Arab Americans?
24 A.   Well, yeah.
25 Q.   Okay.  And are you aware that there are Arab Americans

Page 339

1       that are employees of the City of Dearborn Heights?
2 A.    Yes.  There's a few I'm sure.
3 Q.    And are you aware that there are Arab Americans that
4       are on the City Council of Dearborn Heights?
5 A.    Yes.  For sure.
6 Q.    And you yourself as mayor, you are an Arab American as
7       well; correct?
8 A.    Correct.
9 Q.    So if a meeting was called in Dearborn Heights due to
10      the existence of Arab Americans at all of these
11      different groups and levels and government functions,
12      would it be so shocking if only Arab Americans
13      participated in a meeting?
14          MR. BROWN:  Objection to form.  Misleading.
15 A.   Again, the meeting was set.  I had no idea the meeting
16      was set, as I mentioned earlier, and when I showed up,
17      I had no idea what the content of the meeting was,
18      so . . .
19          THE WITNESS:  This is more disruption.
20 BY MR. TURFE:
21 Q.   You testified earlier that you thought the video from
22      Sergeant Bazzy's brother was a joke; right?
23 A.   I said -- I said yeah, the content of it, you know,
24      especially saying that, you know, mention me and he'll
25      take care of you.  That's -- that's a joke for

Page 340

1       somebody to say something like that.
2 Q.    And you testified that Bazzy was a sergeant that
3       couldn't pass the lieutenant test yet he wanted to be
4       the next chief; correct?
5           MS. HUNT:  I'm going to object to the
6       mischaracterization of the testimony.
7 A.    Well, yeah.  I mean, obviously he failed the
8       lieutenant's test, yes.
9 BY MR. TURFE:
10 Q.   So he was not a lieutenant?  He was just a sergeant?
11 A.   Yes.
12 Q.   Does that mean he was unqualified to be the chief?
13 A.   I just said that he was not -- he didn't pass the test
14      for the next rank to lieutenant.
15 Q.   So he was unqualified to be the chief?
16          MS. HUNT:  That's a mischaracterization of
17      testimony.
18 BY MR. TURFE:
19 Q.   Would you think that Sergeant Bazzy was qualified to
20      be the chief?
21          MS. HUNT:  Object as to form of the
22      question.
23 A.   I don't see why he could be the chief, no.
24 BY MR. TURFE:
25 Q.   Okay.  You hired Hussein Farhat to be the chief;

Page 341

1       correct?
2           MS. HUNT:  Objection as to -- on the form
3       of the question, mischaracterization of testimony.
4 A.    I hired him to be the emergency manager first.
5 BY MR. TURFE:
6 Q.    But was he eventually hired as the chief of the police
7       department in Dearborn Heights?
8 A.    No.  He was never sworn in as the chief, no.
9 Q.    Okay.  You hired Ahmed Haidar as the Chief of Police
10      in Dearborn Heights; correct?
11 A.   He's the chief right now, yes.
12 Q.   And what was his highest position with the City of
13      Detroit?
14 A.   He was a master sergeant.
15 Q.   Not a lieutenant?
16 A.   He was actually qualified -- I believe he took the
17      test and he passed for the lieutenants, from my
18      recollection.
19 Q.   Do you have any personal knowledge of him passing that
20      test?
21          MS. HUNT:  Objection as to form of the
22      question.
23 A.   No.  I believe he -- I'm pretty sure he passed
24      because --
25 BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 342

1 Q.   Was he a corporal?
2 A.   No.  I mentioned --
3           MS. HUNT:  Objection.  Foundation.
4 A.   He said he's -- I said he was -- I think his resume
5      says he was a master sergeant.
6 BY MR. TURFE:
7 Q.   So he wasn't a lieutenant and he wasn't a corporal,
8      yet you still promoted him to this position of chief?
9           MS. HUNT:  Objection to mischaracterization
10     of testimony and foundation.
11 A.  He was a master sergeant, and I also checked him out.
12     He had a stellar record in Detroit.
13 BY MR. TURFE:
14 Q.  Okay.  I'm just looking for some consistency here.  If
15     your opinion is that Bazzy was not qualified but
16     Haidar and Farhat were at the same levels, how did you
17     get Haidar and Farhat to be chief but you're saying
18     Bazzy's not qualified?
19          MS. HUNT:  Objection as to form,
20     mischaracterization of testimony, and argumentative.
21 A.  Farhat was never a chief.  He was hired in as an
22     emergency manager.  He was short time interim.
23 BY MR. TURFE:
24 Q.  When's the first time you met Khalil Rahal?
25          MS. HUNT:  Objection as to relevance.

Page 343

1 A.   I don't recall the date, but it was several years ago.
2 BY MR. TURFE:
3 Q.   Do you remember where it was?
4 A.   I don't recall.
5 Q.   Do you know -- do you recall that the first time you
6      met Khalil Rahal was at Hassan Saab's house?
7           MS. HUNT:  Objection as to form,
8      foundation, assumes information or facts not in
9      evidence.
10 A.  Again, I can't recall, but if you say so.
11 BY MR. TURFE:
12 Q.  I'm asking you.
13 A.  I don't recall.  I don't recall what everybody -- I've
14     met a lot of people over the years.  I don't recall
15     the time and the date or the location, but if that's
16     the case, then yes.
17 Q.  You were originally very close with Khalil Rahal;
18     correct?
19          MS. HUNT:  Objection as to relevance.
20 A.  I was close?  I mean, I don't know about close, but we
21     would talk and have lunches together, yes.
22 BY MR. TURFE:
23 Q.  And would Hassan Saab be a part of those lunches?
24 A.  I've had other lunches with Mr. Rahal.
25 Q.  The question is, was Hassan Saab ever part of those

Page 344

1      lunches?
2 A.   Some of them, yes.
3           MS. HUNT:  Object as to the form of the
4      question.
5 BY MR. TURFE:
6 Q.   Does Khalil Rahal currently have a position with the
7      City of Dearborn Heights?
8           MS. HUNT:  Object to the form of the
9      question.
10 A.  No.
11 BY MR. TURFE:
12 Q.  Okay.  At any time during the employment of Hart,
13     Swope, or Vanderplow, was Khalil Rahal employed by the
14     City of Dearborn Heights?
15 A.  No.
16 Q.  So does Khalil Rahal have any supervisory authority
17     over Swope?
18 A.  No.
19 Q.  Hart?
20 A.  No.
21 Q.  Vanderplow?
22 A.  No.
23 Q.  Bazzy?
24 A.  No.
25 Q.  You?

Page 345

1 A.   No.
2 Q.   Corporation counsel?
3 A.   No.
4 Q.   So does he matter at all to the City of Dearborn
5      Heights?
6           MS. HUNT:  Objection as to form.
7           MR. BROWN:  Objection.  Argumentative.
8 A.   I don't know.  You would have to ask the people he's
9      close with.  I don't know how influential he is.
10 BY MR. TURFE:
11 Q.  Does he bind the City in any capacity?
12 A.  I don't know what that -- I mean, I wouldn't know.
13     Binding the City in what way?
14 Q.  In any way.  I'm asking.
15 A.  I don't know.
16 Q.  Does the City Council have any authority over the
17     promotion of police officers?
18          MS. HUNT:  I'm going to object to form and
19     calls for a legal conclusion.
20 A.  For police officers getting promoted, not the
21     directors or the chief, no, they don't.  It's the
22     union.  They go through a process for promotions.
23 BY MR. TURFE:
24 Q.  Right.  So how can the City Council have any influence
25     over the decisions with respect to police officers?

Bill Bazzi
August 29, 2025

Page 346

1          MS. HUNT:  I'm going to object to assumes
2     information that's not in evidence and possible
3     mischaracterization of earlier testimony.
4 A.   You need to be specific as to who you're talking
5     about.
6 BY MR. TURFE:
7 Q.   I'm asking if the City Council has any influence over
8     the promotion of police officers.  There's been all
9     these allegations that they demanded and required
10    things, but you just said that those decisions are
11    handled by the union.
12         MS. HUNT:  Same objection.
13 A.  For the -- for the -- they -- for the commissioner and
14    the chief, they don't -- you know, they -- that's the
15    ones that we're talking about, not to make somebody
16    who's a corporal, to make somebody who's a sergeant,
17    or to make somebody who's a lieutenant.  It was
18    specifically I said in my testimony they want them to
19    be either a commissioner or a chief.  That's my
20    testimony and I'll stick with it.
21 BY MR. TURFE:
22 Q.  But you don't have any personal knowledge of when any
23    of those demands were made?
24 A.  I just told you.  We had a meeting here with three
25    council members that they actually told me in the

Page 347

1     meeting that he should be the next chief or the
2     commissioner.  Mr. Khalil Rahal came to the police
3     station.  I mean, obviously you have testimony from
4     the two directors and the chief and myself that he was
5     there and he said what we said in one of the exhibits.
6 Q.   And did what the council members request, did it make
7     any difference?
8          MR. BROWN:  Objection to form.
9     Argumentative.  Misleading.
10         MS. HUNT:  Vague.
11         MR. BROWN:  Vague.  Compound.
12 A.   I mean, they requested it and, you know, they were --
13    they started putting pressure.
14 BY MR. TURFE:
15 Q.   What kind of pressure did they put?
16 A.   Just watch the Council meetings.  You'll see a lot of
17    stuff that they were voting no to.
18 Q.   What were they voting no to?  What pressure were they
19    putting on you regarding this request?
20 A.   Well, he's putting us in a worse situation, but
21    they're -- again, I mean, we saw the documents in the
22    federal case.  I mean, you see it.  It's in front of
23    your face.
24 Q.   I'm looking for it.  You testified that they put
25    pressure.  I want to know what pressure.

Page 348

1          MS. HUNT:  I'm going to object to the form
2     of the question.  Foundation.
3 A.   The resolutions to defund the police.  I mean, that's
4     the big one.
5 BY MR. TURFE:
6 Q.   That's pressure to promote Bazzy?
7 A.   Like I said, every place I went to they like -- every
8     time I see a Councilman, make him haram, they said
9     haram, poor guy, make him the chief, you know, make
10    him the commissioner.
11 Q.   And don't people ask you things -- I mean, you're the
12    mayor.  Do residents ask you things about the City of
13    Dearborn Heights?
14         MS. HUNT:  Objection to form.
15    Argumentative.
16 A.   They don't ask me to make somebody a chief or a
17    commissioner.
18 BY MR. TURFE:
19 Q.   Nobody's ever asked you to be -- to put anybody as
20    police chief during your time as mayor?
21         MS. HUNT:  Asked and answered.
22 A.   No.
23         MR. BROWN:  What does haram mean?
24 A.   Like poor guy.  Like he's pitiful.  Haram.  It means
25    he's pitiful for a man.

Page 349

1          MR. FARINHA:  It's bad.
2 BY MR. TURFE:
3 Q.   But ultimately notwithstanding, you know, this
4     pressure that you said exists, you were the one as
5     mayor that controlled this decision; correct?
6          MS. HUNT:  Objection as to form of the
7     question.  Vague.
8 A.   Again, like I said before, you know, it was not one
9     conversation.  They kept saying -- stressing that he
10    should be the chief or he should be the commissioner.
11 BY MR. TURFE:
12 Q.   And you didn't succumb to the pressure; right?
13 A.   Obviously not.  That's why he's not the chief or the
14    superintendent -- or, I'm sorry, the commissioner.
15 Q.   And that's the same reality for the conditions of the
16    employment with these individuals; right?  You made
17    the decision.  You didn't, you know, really worry
18    about the opinions of the City Council; correct?
19         MS. HUNT:  I'm going to object to the form
20    of the question and vagueness.
21         MR. BROWN:  Compound.  Confusing.
22 A.   Can you be specific?
23 BY MR. TURFE:
24 Q.   Did you consider what the City Council thought when
25    you hired Swope or Vanderplow or Hart?

Bill Bazzi
August 29, 2025

Page 350

1          MR. BROWN:  Same.  Confusing.  Vague.
2 A.    I'm the mayor and there was -- I sought legal advice,
3       and -- and I acted on -- based on the legal advice
4       that I received to bring in the chief and the two
5       directors.
6 BY MR. TURFE:
7 Q.    And the decision to retain these officers, again, you
8       made that decision?  You didn't consider what anybody
9       on the Council had to say?
10          MS. HUNT:  Objection.  Mischaracterizes
11      prior testimony.
12          MR. BROWN:  It's vague as well.  Do you
13      mean hire or do you mean --
14          MR. TURFE:  No.  Retain.  I just asked
15      about hired.
16          MS. HUNT:  Object to form of the question
17      as well.
18 BY MR. TURFE:
19 Q.    Did you consider the Council at that point?
20          MS. HUNT:  Same objection.
21 A.    Again, my -- my responsibility was the entire city and
22      to keep the police department intact.  I did not want
23      to disrupt the police department operation by getting
24      rid of the leadership and to throw the city in chaos.
25 BY MR. TURFE:

Page 351

1 Q.    So retaining leadership positions like these positions
2       here in this case, that's your decision and you made
3       it?
4          MS. HUNT:  Objection to form.
5          MR. BROWN:  Vague.
6          MS. HUNT:  Mischaracterization of
7       testimony.  Assumes information not in evidence.  Go
8       ahead.  I'm sorry.
9 A.    Again, I sought legal advice to bring the chief and
10      the two directors to make -- to help me out to make
11      sure that the city is run efficiently and the police
12      department is intact, and they serve the residents of
13      Dearborn Heights, and, again, they were my transition
14      team.  They were not here to collect pensions or just,
15      you know, ask for promotions.  They just wanted to
16      come in, help me transition the city, and build the
17      police department and promote from within.  They were
18      going to train every officer.  They were bringing good
19      things to the city, and when the Department of Justice
20      came in, they had a plan.
21 BY MR. TURFE:
22 Q.    Those positions of Swope and Vanderplow, did they
23      exist before they were hired?
24          MS. HUNT:  Object to foundation.
25 A.    They were -- no.  They were the first to be hired by

Page 352

1       the City of Dearborn Heights.
2 BY MR. TURFE:
3 Q.    You created them?
4          MS. HUNT:  Objection as to foundation.
5       Form of the question.
6 A.    I had gap in leadership, so I had to bring somebody to
7       help me with the police department.
8 BY MR. TURFE:
9 Q.    Okay.  So you said that the positions were not in
10      existence before these guys got here, so who created
11      those positions?
12 A.    Those -- those positions, again, the -- we had gap in
13      leadership up in upper leadership with the police
14      department, and I sought legal advice to do what I
15      did.
16 Q.    Okay.  But you -- notwithstanding your -- you got
17      legal advice, but you created the positions; correct?
18          MS. HUNT:  Objection.  Form and -- form of
19      the question.
20          MR. BROWN:  Misstates prior testimony.
21 A.    Again, you know --
22 BY MR. TURFE:
23 Q.    You've got to answer the question.
24 A.    I did.  I got legal advice to hire the two directors,
25      and, you know, based on, you know, my

Page 353

1       responsibilities, my duties as the mayor and the
2       situation that the City was in.
3 Q.    So you got legal advice to create the positions?  Is
4       that what you're telling me?
5 A.    I got legal advice to bring them in, yes.
6 Q.    And I know these positions did not exist before these
7       guys got here, but were these line items in the budget
8       before these guys got here?
9          MS. HUNT:  Objection to foundation.
10 A.    Yeah.  There was -- I don't recall what's in the --
11      but there was -- like I said, there was a deputy
12      chief.  I can't remember what was on the -- what was
13      on the line budget at that time, but I was within the
14      budget, you know, to bring in the two directors and
15      the chief.
16 BY MR. TURFE:
17 Q.    Was there a Director of Operations in the budget
18      before Swope was hired?
19          MR. BROWN:  Objection.  Best evidence.
20      Budget speaks for itself.
21 A.    I was within the budget.
22 BY MR. TURFE:
23 Q.    Do you recall if there was a Director of Operations
24      line item in the budget before Swope was hired?
25          MR. BROWN:  Same objection as my last one.

Bill Bazzi
August 29, 2025

Page 354

1 A.   Like I said, you know, there was several exodus from
2      the police department in leadership, and, you know,
3      there was somebody that was doing that position.  I
4      don't know what rank they were.  I don't have the data
5      in front of me right now.
6 BY MR. TURFE:
7 Q.   I don't recall is a fine answer.
8           MS. HUNT:  He was still finishing his
9      question.
10          MR. TURFE:  I know, but he's not even close
11     to answering the question.
12 BY MR. TURFE:
13 Q.   The question is --
14          MS. HUNT:  You have to let him finish his
15     answer.
16 BY MR. TURFE:
17 Q.   On the personnel page of the budget, before --
18          MS. HUNT:  Had you finished your answer?
19 BY MR. TURFE:
20 Q.   -- Swope was hired --
21 A.   I'm going to repeat my -- I'm going to repeat.  Again,
22     those positions, every -- every position in the
23     city -- in the police department, they had certain
24     police officers or sergeants or like leadership, could
25     be lieutenant, captain, you know, deputy chief, they

Page 355

1      had certain things that they needed to get done at the
2      police station, so when the directors came in, they
3      were filling some of this stuff, and, again, they were
4      a transition team.  They were not here to collect a
5      pension.  So there was something on the -- I was -- I
6      met the budget.  I was within the budget.  I did not
7      exceed the budget.
8 Q.   Okay.  None of that, not a single part of that was
9      responsive to my question.  My question is was before
10     Swope was hired, was there a line item on the budget
11     in the personnel page that you recall for Director of
12     Police Operations?
13          MR. BROWN:  You're coming to a point of
14     almost badgering the witness.  Asked and answered.
15          MR. TURFE:  I'm not badgering the witness.
16          MS. HUNT:  It is argumentative.
17          MR. TURFE:  The witness is wasting
18     everyone's time by not answering the question.
19          MR. FARINHA:  He has answered the question.
20          MS. HUNT:  He has answered the question,
21     and I believe he's answered it twice already.
22          MR. TURFE:  He has not answered a single
23     portion of it.
24          MS. HUNT:  It may not be a yes or no
25     question.

Page 356

1           MR. TURFE:  Roger, this is not your
2      deposition.
3           MR. FARINHA:  I'm not talking to you.  I'm
4      talking to the --
5           MR. TURFE:  You're talking to the record
6      and to the witness.
7           MR. FARINHA:  I'm talking to the counselor
8      and I'm explaining to them what we're hearing.
9           MS. HUNT:  He's answered the question
10     twice.  It's not a yes or no answer, but he's answered
11     it.  You are being argumentative with him.
12 A.   Again --
13 BY MR. TURFE:
14 Q.   Was the position in the budget on the personnel page?
15          MR. BROWN:  Same objection.  Badgering.
16          MS. HUNT:  Same.
17 A.   There's certain things that needed to be done at the
18     police station and there were certain job
19     responsibilities.  Okay.  Those -- those positions had
20     to have been done -- or those jobs had to have been
21     done or those responsibilities had to have been done,
22     so somebody was doing them before, so I was within the
23     budget and I acted like within the budget.
24 BY MR. TURFE:
25 Q.   Who was doing the position of Director of Police

Page 357

1      Operations before Kevin Swope?
2 A.   I don't have the -- I don't have the data in front of
3      me right now.
4 Q.   Who was doing the position of Director of Support
5      Services before Paul Vanderplow?
6 A.   I'm not sure.  We had two captains that left, and we
7      had a few lieutenants that left and we had a deputy
8      chief that left, so I'm not really sure who was doing
9      what.  I didn't have their job responsibilities.
10 Q.   Were the captains in the budget in the personnel page?
11 A.   I don't have it in front of me right now.  I'd have to
12     go back and look at it.
13 Q.   You were asked if Hassan Saab ever told you that he
14     was an FBI informant.  Do you remember that question?
15 A.   Yes.
16 Q.   And I believe your response was based on an article
17     that I had read about him.
18 A.   Correct.
19 Q.   And what article was that?
20 A.   It was an article that was written in two different
21     papers.  One that he was actually -- he got a car for
22     the mayor's son for a few hundred bucks that was worth
23     $3,000.  There was property.  There was -- I don't
24     recall the whole article, but there was also a
25     pharmacist that he -- basically it says that he could

Bill Bazzi
August 29, 2025

Page 358

1  have done time or something, that he turned his
2  partner or his friend. Hold on. What was that other
3  guy's name. Oh, Swidan, who was a pharmacist. I
4  think that's what the article was saying. I don't
5  have the article in front of me, but basically that's
6  what the article said.
7  Q.  Did the article say that Saab was an FBI informant?
8  A.  Well, it just said that -- I don't know what it says
9      about the FBI, but, you know, it was an FBI case.
10 Q.  Okay. So the statement that he's an informant, that's
11     just from your belief; right?
12 A.  From the article that I read.
13 Q.  But you just said it doesn't say that in the article.
14 A.  I don't have the article in front of me.
15          MS. HUNT: I'm going to object. That's a
16     mischaracterization of his testimony. He said he
17     didn't know.
18 BY MR. TURFE:
19 Q.  You testified previously that the City Council put
20     obstacles in the way of Chief Hart. Do you recall
21     that testimony?
22 A.  Yes.
23 Q.  What obstacles?
24          MS. HUNT: Asked and answered.
25 A.  I said, you know, he put up resolutions. He wanted to

Page 359

1  do certain things. He wanted to hire people, and they
2  were voting no, and that's why he was upset at the end
3  and he didn't want to -- he said this is constructive
4  termination. I can't run the police department.
5 BY MR. TURFE:
6 Q.  It's constructive termination if the Council doesn't
7      agree to a resolution? How does that follow?
8 A.  Defunding the police.
9 Q.  So if Chief Hart proposes a resolution that has
10     nothing to do with money and the Council votes against
11     the resolution, that's constructive termination?
12          MR. BROWN: Object to form. Argumentative.
13     Assumes facts not in evidence.
14          MS. HUNT: Calls for a legal conclusion.
15          MR. TURFE: A legal conclusion just given
16     by the witness.
17 BY MR. TURFE:
18 Q.  So is that constructive termination?
19          MS. HUNT: Let me finish my objection.
20     Calls for a legal conclusion of a layperson.
21          MR. BROWN: Speculation.
22          MS. HUNT: Do you remember the question?
23 A.  No. Repeat the question.
24 BY MR. TURFE:
25 Q.  So if Chief Hart proposed a resolution to the City

Page 360

1  Council, nothing to do with money, and the City
2  Council denied the resolution or voted against it, is
3  that constructive termination?
4          MR. BROWN: Same objections.
5          MS. HUNT: Same objection.
6 A.  There were a lot of resolutions that were introduced
7      by Chief Hart, and we've had several meetings with the
8      Council, and, as I said, there was -- there were not
9      just one resolution or there's not one motion. There
10     was several that he was trying to transition the
11     police department per the Department of Justice
12     recommendation.
13 BY MR. TURFE:
14 Q.  And the City Council voting against these resolutions,
15     is that what Hart said was constructive termination?
16          MR. BROWN: Objection.
17 A.  You probably have to ask the chief himself, but
18     basically he was -- he couldn't really do the things
19     he wanted to do with the police department to
20     transition move the city forward.
21 BY MR. TURFE:
22 Q.  Because the Council voting against resolutions?
23 A.  There was -- I know there was a lot of other things,
24     but, again, I can't recall every one of them. I have
25     to go back and look at the letter that -- that he

Page 361

1  submitted.
2 Q.  But I'm asking you ultimately this is because of
3      Council voting against resolutions; right?
4          MR. BROWN: Misstates prior testimony.
5      Argumentative.
6 A.  That's one of them. One of the things is that the
7      Council voting no on resolutions to move the City
8      forward to transition the police department.
9 BY MR. TURFE:
10 Q.  Okay. Who is the current City comptroller?
11 A.  We don't have one right now.
12 Q.  Okay. Who was the previous one?
13 A.  Shannon. Shannon was the previous one that left.
14 Q.  Okay. If Shannon ever came and proposed a resolution
15     to City Council and the City Council voted against it,
16     does that mean the City Council's constructively
17     terminating Shannon?
18          MR. BROWN: Objection to form.
19     Speculative. Argumentative. Assumes facts not in
20     evidence.
21          MS. HUNT: And foundation.
22 A.  I don't think -- I don't remember her putting a
23     resolution. I don't -- I can't recall.
24 BY MR. TURFE:
25 Q.  If anyone proposed a resolution, any city employee

Bill Bazzi
August 29, 2025

Page 362

1  proposed a resolution to City Council and they
2  rejected the resolution or voted against it, would
3  that also constitute constructive termination?
4       MR. BROWN:  This is now the same question
5  about six times in a row.  It's badgering.  Objection
6  to form.
7 A.  Again, the police chief was trying to reform the
8  police department and --
9 BY MR. TURFE:
10 Q.  I'm not talking about the police chief.
11 A.  I understand.  But I'm trying to explain here.  We
12  just keep going back to the same thing.  There's no
13  other department that needed reform in the city.  The
14  police department that needed reform.  The Department
15  of Justice, obviously the highest law enforcement
16  agency in the United States, says we needed reform.
17 Q.  Where did they say that?
18 A.  When they were here like for a year.
19 Q.  And they put that in writing?
20 A.  They said it in writing, yes.
21 Q.  Do you have a copy of that writing?
22 A.  I don't have it in my pocket now, but I can get it for
23  you.
24       MR. TURFE:  Let's go to Exhibit E,
25  Page ID 1446.

Page 363

1       (Discussion off the record; recess taken at
2       5:20 p.m.)
3       (Back on the record at 5:25 p.m.)
4 BY MR. TURFE:
5 Q.  Okay.  Do you have, Mayor Bazzi, in front of you
6  Exhibit E, Page 1446?
7       MR. TURFE:  Also, for the record, while the
8  mayor pulls that up, back on the record at 5:25 p.m.
9       MS. HUNT:  What page again?
10       MR. TURFE:  1446.
11 A.  Okay.
12 BY MR. TURFE:
13 Q.  Did you write this memo?
14 A.  Let me read it.
15       Yes.
16 Q.  Do you remember where you wrote this memo?
17       MS. HUNT:  Objection as to the form.
18 A.  I don't recall where I was at, no.
19 BY MR. TURFE:
20 Q.  Do you remember what computer you used to write this
21  memo?
22       MS. HUNT:  Same objection.
23 A.  I'm sure I used my city computer.
24 BY MR. TURFE:
25 Q.  Did Vanderplow get on your computer and type this?

Page 364

1       MS. HUNT:  Object to form and foundation.
2 A.  No.
3       MS. HUNT:  He said no.
4 BY MR. TURFE:
5 Q.  Did your wife get on your computer and type this?
6       MS. HUNT:  Objection as to form and
7  foundation.
8 A.  No.
9 BY MR. TURFE:
10 Q.  Towards the bottom in the second paragraph it says,
11  "Additionally, Director Vanderplow has been subject to
12  additional and baseless legal actions by Department
13  union members."
14       What legal actions was he subject to?
15       MS. HUNT:  I'm sorry.  I think we're still
16  trying to find that.
17       MR. TURFE:  It's on the first page, 1446.
18  Towards the bottom of the page.  It's in the second
19  paragraph.
20 A.  Okay.  What about that?
21 BY MR. TURFE:
22 Q.  What additional and baseless legal actions by
23  department union members has Vanderplow been subject
24  to?  I want to know specifics.
25 A.  Well, the one that comes to mind right now with the

Page 365

1  issue with -- with the lighting, and there was a
2  couple other things that I know he was -- he was
3  trying to help one of the officers that -- that he
4  pulled up to a scene or something, I can't remember
5  the details, trying to help, just be like a backup for
6  one of the officers, and that person filed a complaint
7  against Mr. Vanderplow.  And also with several
8  meetings they kept ask -- the Council kept saying that
9  with the lighting that they -- the lighting that was
10  for the justice center, there was -- one of the
11  employees actually contracted with the company that
12  did the lighting, and they just wanted to go back and
13  just say basically like admit for Mr. Vanderplow was
14  behind it, he was the one that ordered them to -- to
15  do the lighting even though he had nothing to do with
16  it, and, I mean, even the company that was doing the
17  work, they came back and they said it was one
18  particular person who's no longer with the City was
19  behind the whole thing for the IB, I said it earlier,
20  IB Lighting.
21 Q.  But I'm asking what legal actions?  It sounds like
22  what you're referring to are like complaints or
23  investigations.  Was there any lawsuits that he faced?
24       MS. HUNT:  He just mentioned it.
25 A.  Yeah.  I just said --

Bill Bazzi
August 29, 2025

Page 366

1 BY MR. TURFE:
2 Q.   Like where he was sued?
3 A.   Well, I know there's several lawsuits in the City now
4      for like police officers filing lawsuit, but I can't
5      recall one specific one against Mr. Vanderplow at this
6      point.
7 Q.   Okay.  The next sentence says in part,
8      ". . . Councilperson Hassan Saab read into the
9      official record un-verified personnel complaints
10     against Director Vanderplow."
11               Do you see that?
12 A.   Where?
13 Q.   The next sentence.
14 A.   Okay.  Yes.
15 Q.   Is that a legal action?
16 A.   No.  It says here his reputation, not legal action,
17     and also for him filing a police report against
18     Mr. Vanderplow, so, yes, that was actually legal
19     action when Councilman Saab filed something against
20     Mr. Vanderplow with State Police.
21 Q.   Okay.  And the next page, Page 2 of 3, second
22     paragraph, you wrote, "Based upon the multiple
23     over" -- did you meant to say overt acts?
24 A.   Okay.  "Based upon the multiple . . ."  Meant to say
25     like over like different.  I think I forgot to add a

Page 367

1      word like multiple or over more than one event.
2 Q.   Regardless, you say it is -- you said, "Based upon the
3      multiple over acts by Council and others, it is
4      abundantly apparent that Director Vanderplow will not
5      be allowed to perform his duties."
6 A.   Um-hmm.
7 Q.   Do you see that?
8 A.   Yes.
9 Q.   Does the Council have any oversight over Vanderplow?
10 A.   Well, when Councilman Wencel said it publicly that
11     anything is presented by Mr. Vanderplow is public,
12     that anything he presents he's not going to vote on
13     it.  He's going to vote no to anything Mr. Vanderplow.
14     I mean, that's basically is saying that he's not
15     allowing him to do his work.  If he introduces an item
16     to better the city or to better the police department
17     and now the councilman made it public, that he will
18     not vote on anything Mr. Vanderplow introduces.
19 Q.   And Tom Wencel is the only vote on the Dearborn
20     Heights City Council?
21 A.   Well, I mean, he said it publicly.
22 Q.   And he's the only vote, so his vote is the final say
23     on the City Council?
24               MR. BROWN:  Objection.  Argumentative.
25 A.   It says here, I mean, he's talking about

Page 368

1      Councilman Wencel stated on the record that if
2      Mr. Vanderplow has his name on any document products,
3      it will not be considered.
4 BY MR. TURFE:
5 Q.   How many votes does Tom Wencel have on the Dearborn
6      Heights City Council?
7               MR. BROWN:  Same objection.  Argumentative.
8               MS. HUNT:  I'm going to object to the form
9      of the question.
10 A.   One vote obviously.
11 BY MR. TURFE:
12 Q.   And how many members of the Dearborn Heights City
13     Council are there presently right now?
14 A.   Seven.
15 Q.   So Wencel's only one out of seven?
16               MR. BROWN:  Objection.  Badgering.
17     Argumentative.  Pointless.
18 A.   Yes.  One out of seven.
19 BY MR. TURFE:
20 Q.   And do you know of any matters in the City of Dearborn
21     Heights that have passed on a one out of seven vote?
22               MR. BROWN:  Same objection.
23               MS. HUNT:  Same objection to form,
24     foundation.
25 A.   Well, other Council members, I mean, he can -- like I

Page 369

1      said, you know, I'm not -- no.  Not one out of seven,
2      no.
3 BY MR. TURFE:
4 Q.   Okay.  So then I want to go back and I want to say how
5      would Vanderplow not be allowed to perform his duties?
6               MS. HUNT:  Object.  The question is
7      argumentative.
8               MR. BROWN:  Asked and answered.
9 BY MR. TURFE:
10 Q.   Let me strike that.
11              When Vanderplow shows up for work, do any
12     members of the City Council have to approve of his
13     day-to-day activities?
14 A.   They don't have to approve his activities, but when he
15     requests certain things for the department or even
16     when he was the interim comptroller and they refused
17     him signing the checks, that's -- that's infringing,
18     making sure he can't do his duties as the comptroller,
19     because I don't have a comptroller right now, so I
20     have an interim comptroller.
21 Q.   Is Vanderplow the interim comptroller?
22 A.   No.  He's gone.
23 Q.   Okay.  So, again, do the Council have day-to-day
24     oversight over what Vanderplow was doing at this time?
25 A.   Well, yes.  They voted no for him to do his duties

Bill Bazzi
August 29, 2025

Page 370

1   as -- as a comptroller and he couldn't sign checks, so
2   that's -- that's his duty.
3  Q.  That's his only job?
4  A.  Yeah.  That's one --
5  Q.  His only job is to show up, sign checks, and get paid?
6  A.  That's one of his biggest responsibilities to sign
7       checks, to make sure checks and make sure that the
8       treasurer as well.  Like I said, you know, earlier
9       testimony that there was some stuff that was going on
10      in the treasurer's office that he was not obviously
11      allowed to do certain things as a comptroller.
12 Q.  Doesn't the City's accountant sign checks?
13 A.  The what?
14 Q.  The City's accountant.
15          MS. HUNT:  Objection as to form and
16      foundation.
17 A.  City accountant?
18 BY MR. TURFE:
19 Q.  Yeah.
20 A.  What do you mean City accountant?
21 Q.  Doesn't the City have an accountant that signs checks
22      on his behalf?
23 A.  The comptroller --
24          MS. HUNT:  Objection as to the form and
25      foundation of that question.

Page 371

1  A.  So typically the comptroller, myself, and a treasurer
2       sign checks.
3  BY MR. TURFE:
4  Q.  Got it.  So if the controller couldn't sign it, like
5       if they were not at work that day, you could have
6       signed it; right?
7  A.  No.  It has to be three people.
8  Q.  The clerk can't sign along with the treasurer or the
9       mayor?
10 A.  It has to -- yeah.  The clerk, but the clerk, we
11      have -- we were like three, four weeks behind on
12      checks.  That's why we wanted Vanderplow to step in,
13      because vendors were not getting paid, things were
14      getting -- we were getting notices from vendors that
15      their checks is not received, so that's why
16      Mr. Vanderplow wanted to help with that matter.
17 Q.  Can you go back to Exhibit A, Page ID 811?
18          This is a press release that you wrote?
19 A.  Let me see.  You want me to read the whole thing or --
20 Q.  No.  I'm just asking you if this is a press release
21      that you wrote.
22 A.  Yeah.  It looks that way.
23 Q.  And on the second page, so Page ID 812, you wrote,
24      "They have succeeded in rooting out corruption and
25      institutional inefficiency."

Page 372

1           Do you see that?
2           MS. HUNT:  I'm just going to object.  The
3       document speaks for itself.
4  A.  Where?
5  BY MR. TURFE:
6  Q.  It's on the top of Page ID 812.  About four lines from
7       the top.
8           MR. BROWN:  Objection.  Best evidence.
9  A.  What about it?
10 BY MR. TURFE:
11 Q.  Do you see where it says --
12 A.  Yes.
13 Q.  Okay.  What corruption did they root out?
14          MS. HUNT:  Objection.  Asked and answered.
15 A.  Yeah.  I think I said it several times.  I mean, some
16      of the stuff, again, you know, you had -- I mean, I
17      don't know what some people consider not corruption,
18      but all the stuff that I discussed earlier.  You have,
19      you know, allegations of a police officer and males
20      having sex or raping another police officer in the --
21      in the conference room.  I mean, I don't know.  If
22      that's not corruption, I don't know what that is.  A
23      female putting a camera looking at other female naked
24      officers.  I don't know -- I don't know if that's
25      corrupt or not corruption, I don't know what is.  You

Page 373

1   have -- you have somebody that actually had a picture
2   of Obama with a knife mark in it, you know, in -- in
3   the SWAT room.  You have, like I said, guns
4   everywhere.  Nobody knows who some of the guns belong
5   to.  And the cash.  I mean, I don't know if -- to me
6   that's corruption.  If you ask anybody, that's
7   corruption.  You have one sergeant that -- you know,
8   there's discriminations.  There's a lawsuit with the
9   City with racism.  There's, I mean, the ticket fixing,
10  the ticket quota also.  I mean, that's corruption.
11  You can't -- police officer can't use ticket quotas as
12  something that -- you're basically screwing the city
13  on three occasions.  Well, first the residents.
14  You're giving them the ticket, you're working overtime
15  to give the tickets, and, you know, there's several
16  times that there was tickets were saying, oh, you
17  know, happy Martin Luther King Day, whatever, you
18  know, to dismissed tickets, and, I mean, I mean,
19  that's corruption if you ask me.  Also, use of
20  excessive force.  You know, I don't know, you know --
21  and, like I said, evidence room.  It's all -- it's all
22  here.  Every one of them here to me I categorize as
23  corruption, and, as I mentioned, with all the sexual
24  misconduct, you know, I mean, that's -- that's
25  corruption.  I mean, it's a crime.

Bill Bazzi
August 29, 2025

Page 374

BY MR. TURFE:

1  BY MR. TURFE:
2  Q.  And all of that was rooted out?
3  A.  Well, that's what the chief and the two directors were
4      trying to do.
5  Q.  Well, trying to and actually achieving that are two
6      different things.  Your press release says that they
7      succeeded in rooting it out.  Do you see that?
8  A.  Well, they succeeded by having some of them -- when
9      you open investigation on some, chase some of them
10     out, and Mr. Miotke, when you mentioned earlier that
11     he's getting -- you know, not -- he's interfering, he
12     would come to the Council meetings and giving, you
13     know, Council members advice, legal advice, not as a
14     resident, as legal advice, and also we were talking
15     about the stuff you have, but one sergeant flinging
16     dildos at people, you know, like he was -- you know,
17     he ended up leaving the department.  You know, I don't
18     know how much more you want me to say.  I mean,
19     that's -- they got rid of that stuff.
20 Q.  I'd like to connect the dots because it sounded like a
21     ramble, but I'll transition to something else.
22         Did the City Council have any supervisory
23     authority over Chief Hart's day-to-day activities?
24 A.  No.  That falls under the mayor.
25 Q.  Did the City Council have any supervisory authority

Page 375

1      under Kevin Swope and his day-to-day activities?
2  A.  No.
3  Q.  Did the City Council ever have supervisory authority
4      over Paul Vanderplow and his day-to-day activities?
5  A.  No.
6  Q.  Have you ever instructed anybody to contact any member
7      of the City Council about them proceeding in this
8      case?
9          MS. HUNT:  Object as to vague and form of
10         the question.
11         MR. BROWN:  Confusing.
12 A.  I'm confused.  I don't know what you're asking.
13 BY MR. TURFE:
14 Q.  Did you ever ask anybody to contact any member of the
15     City Council and ask them about proceeding in this
16     case?
17         MR. BROWN:  Proceeding in what sense?
18         MS. HUNT:  Can you rephrase that?  That's
19     kind of confusing to me as well.
20 BY MR. TURFE:
21 Q.  Okay.  Have you ever contacted anybody and asked that
22     third party to contact the City Council member to
23     inquire about them proceeding in this case?
24         MS. HUNT:  Who's them?
25         MR. TURFE:  City Council.

Page 376

1          MS. HUNT:  I'm still going to object to
2      form of the question.
3          MR. BROWN:  By proceeding, you mean,
4      intervening, Tarik?
5          MR. TURFE:  Yeah.
6          MR. BROWN:  Okay.  Thank you.
7  A.  Well, obviously I didn't want you or Mr. Miotke here
8      to intervene.  You know, I wanted the City to be
9      covered by MMRMA, so I would have asked anybody else
10     to intervene because you guys -- you -- both you and
11     Mr. Miotke are costing the City money.
12 BY MR. TURFE:
13 Q.  Did MMRMA approve the injunction?
14         MS. HUNT:  Stop.  That's an attorney-client
15     privilege.
16         MR. TURFE:  Why?  It's an insurance
17     company.
18         MS. HUNT:  They cover the risk management
19     for the company, so I -- I'm going to instruct you not
20     to answer that.
21 BY MR. TURFE:
22 Q.  Is Mr. Farinha an MMRMA attorney?
23 A.  Mr. Farinha is the City attorney.
24 Q.  So he's not an MMRMA attorney?
25 A.  He's the City attorney.

Page 377

1          MS. HUNT:  I would object to the form of
2      that question.
3  BY MR. TURFE:
4  Q.  Have you ever instructed any individuals to contact me
5      about representing the City Council in this case?
6  A.  I don't recall talking to anybody about you doing
7      anything with this case.
8          MR. TURFE:  Nothing further.
9          MS. HUNT:  You have seven minutes, Joseph.
10     Do you have anything?
11         MR. BROWN:  I just have a few crosses.  It
12     won't take long.  I promise you all.
13             RE-EXAMINATION
14 BY MR. BROWN:
15 Q.  Mr. Mayor, you're the executive officer overseeing the
16     City of Dearborn Heights; is that correct?
17 A.  Correct.
18 Q.  Is it appropriate for you at times to ask an underling
19     or a lieutenant or a secretary to draft something for
20     you to sign?
21         MS. HUNT:  I'm going to object as to the
22     form of that question.
23 A.  I mean, there's certain things that, you know, I just
24     need the information, but I look at the overall
25     content of everything that's submitted and I put it in

Bill Bazzi
August 29, 2025

Page 378

1  my own documents.
2 BY MR. BROWN:
3 Q.   When you worked at Boeing, did you ever run across
4      situations in which an executive would ask a
5      subordinate to draft something for their signature?
6            MS. HUNT:  Object as to relevance.
7 A.   I don't recall like we -- I'm not really sure.  I
8      can't recall that.
9            MR. BROWN:  That's fine.  No further
10     questions.
11           MS. HUNT:  I have no questions.
12           MR. TURFE:  Hold on.  We might have
13     something.
14               RE-EXAMINATION
15 BY MR. TURFE:
16 Q.   Pull up Exhibit E, please.  Can you refer to
17      Exhibit E, Page 1446, please?  1447, Page 2 of 3, the
18      last paragraph on the page that says "Therefore."  Do
19      you see that paragraph?
20 A.   Yes.
21 Q.   How did you come to the conclusion that Vanderplow
22      would be constructively relieved of his duties?
23 A.   Let me read it.
24           MR. BROWN:  Objection.  Best evidence.
25      Misleading.

Page 379

1 A.   Okay.  What's your question?
2 BY MR. TURFE:
3 Q.   How did you come to the conclusion that Vanderplow
4      would be constructively relieved of his duties?
5 A.   Well, as I mentioned earlier, he came to the city hall
6      when he found out some of the stuff that was going on
7      in the treasurer's office.  I brought him -- he came
8      to the city hall because I lost my comptroller.  She
9      was basically chased out.  And she -- when she left,
10     it was a big gap.  It was like short notice.  I
11     couldn't hire another comptroller.  Even right now I
12     don't have a comptroller.  So he came in -- he came to
13     help me out with his financial background to help me
14     in the comptroller's office, but even that -- you
15     know, he didn't do any police work.  He wanted to help
16     me as a comptroller, and even that, he was not given
17     the opportunity, like I mentioned earlier, to sign
18     checks, which is -- that's the huge duty of the
19     comptroller, and by them not allowing that basically
20     he was not allowed to do his duties.
21 Q.   Yeah.  Well, the comptroller was later on in May.
22     This is in February.  So I'm trying to figure out back
23     in February why did -- how did you make the conclusion
24     that he would be constructively relieved of his
25     duties?  This is specifically related to his role as

Page 380

1      Director of Support Services.
2 A.   I'd have to go back and look at that.  There was a lot
3      of stuff that was going on.  I can't recall like the
4      specifics.  But there was a lot of things that I need
5      to go back and look at, like for this one, what led me
6      to write this memo, you know, if it was --
7 Q.   Was it Paul Vanderplow's direction that led you to
8      this conclusion?  Did he tell you to write this?
9 A.   It was the City Council's actions that led me to write
10     this.
11           MR. TURFE:  Okay.  All done.
12           MR. BROWN:  All right.  It's 5:50.  We're
13     going off the record.  Thank you, Mayor Bazzi.
14           THE WITNESS:  Thank you.
15           (Marked EXHIBITS J AND M for
16           identification)
17           (The deposition was concluded at 5:50 p.m.
18     Signature of the witness was not requested by
19     counsel for the respective parties hereto.)
20
21
22
23
24
25

Page 381

1                  CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN )
3                   ) SS
4 COUNTY OF WAYNE   )
5
6            I, Cheri L. Poplin, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to either party nor interested in the event of
14     this cause.
15
16
17
18
19
20
21
22           Cheri L. Poplin, CSR 5132, RPR, CRR
23           Notary Public,
24           Wayne County, Michigan
25 My Commission expires:  August 21, 2031