# EXHIBIT 1

## COUNCIL RESOLUTION 23-099 APPROVING THE TA



# City of Dearborn Heights
6045 FENTON • DEARBORN HEIGHTS, MICHIGAN 48127

**Lynne M. Senia**
City Clerk

TO:     Mayor Bazzi

FROM:   City Clerk Senia

DATE:   March 6, 2023

RE:     Tentative Agreement Between the City and the Command Officers Association of Michigan/Dearborn Heights Police Supervisors Association

The following is a copy of a motion adopted at the Regular Meeting of the Dearborn Heights City Council held on February 28, 2023.

**23-099** Motion by Councilwoman Bryer, seconded by Councilman Muscat to approve the Tentative Agreement Between the City and the Command officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2025, and authorize the Mayor and Clerk to sign the completed contract on behalf of the City when all the changes are incorporated into the document, as outlined in 8-F. Per Mayor Bazzi communication dated February 7, 2023.

After further discussion, the motion was amended to reflect the following:

Motion by Councilwoman Bryer, seconded by Councilman Muscat to approve the Tentative Agreement Between the City and the Command officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2024, and authorize the Mayor and Clerk to sign the completed contract on behalf of the City when all the changes are incorporated into the document, as outlined in 8-F. Per Mayor Bazzi communication dated February 7, 2023.

Ayes:   Council Chairman Abdallah, Council Chair Pro Tem Muscat, Councilman Ahmad, Councilman Baydoun, Councilwoman Bryer.
Nays:   Councilman Constan, Councilman Wencel.
Absent: None.

Motion adopted

LMS/gs

cc:     COAM Police Supervisors
        Human Resources
        Treasurer
        Comptroller
        Act 78
        Act 345
        File



**Mayor's Office**

<table>
<tr><td>Approved for the Agenda of:<br>02-28-23</td><td>APPROVED<br>Motion No.<br>23 - 099</td></tr>
</table>

**8-F**

**Bill Bazzi**
Mayor

February 7, 2023

Honorable City Council
City of Dearborn Heights

Dear Council Members:

I'm requesting your approval for the following:

*"Motion for the City Council to approve the Tentative Agreement between the City of Dearborn Heights and the Command Officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2025, and further to authorize the Mayor and City Clerk to sign the completed contract when all the changes are incorporated into the document".*

Sincerely,

Bill Bazzi
Mayor

Original Material Reviewed and Approved by
the Dearborn Heights City Council
at the February 28, 2023 Regular Meeting

Proposal through Mediator -- Tentative Agreement
City of Dearborn Heights & Command Officers Association of Michigan
January 30, 2023

## SUMMARY

The parties agree to the following in addition to the tentative agreements previously reached:

1.  A three-year agreement from July 1, 2021 -- June 30, 2024

2.  Wages

    a.  7/1/2021 -- 6/30/2022 - 4% increase retro
    b.  7/1/2022 -- 6/30/2023 - 4% increase retro
    c.  7/1/2023 -- 6/30/2024 - 5% increase

3.  The differential language will provide members will receive either the wage increase noted above or the differential, whichever is greater in each contract year.

4.  The cap on compensatory (Comp) time is 320 hours. Members will be paid out (100%) of any hours exceeding the 320-hour cap contract. Provisions will be modified accordingly.

5.  Delete section 11.1c. and replaced with language in Section 11 that indicates the following:

    A.  The parties agree in this agreement reached under PERA the Mayor is authorized to appoint the Chief of Police outside of Act 78 consistent with the City Charter. Consistent with the City Charter provision outlined in 5.11(b). He may consider inside or outside applicants.

    B.  The following named persons and their positions are grandfathered in under this agreement and will retain their positions:

        a.  Jerrod S. Hart, Chief of Police
        b.  Paul D. Vanderplow, Director of Support Services
        c.  Kevin M. Swope, Director of Police Operations

    C.  The two Director's positions above will be grandfathered. Should the City desire to fill these Director positions in the future, it will do so under the provisions of Act 78.

Original Material Reviewed and Approved by
the Dearborn Heights City Council
at the February 28, 2023 Regular Meeting

**Proposal through Mediator – Tentative Agreement**
**City of Dearborn Heights & Command Officers Association of Michigan**
**January 30, 2023**

        D.     All challenges, in any forum, whether in grievance, litigation or elsewhere, to the appointment of these three individuals will be withdrawn based upon this agreement under PERA.

6.     Tentative Agreements are attached.

City of Dearborn Heights/Command Officers
Tentative Agreements
Prepared on January 31, 2023

Original Material Reviewed and Approved by
the Dearborn Heights City Council
at the February 28, 2023 Regular Meeting

9.1 Departmental seniority of a Police Supervisor will be from the date of hire as a sworn Police Officer. Seniority for all other purposes shall be determined in the following manner.

9.4: The City will post newly created or vacated lateral command vacancies and training opportunities for ten (10) calendar days. The filling of newly created or vacated lateral command vacancies will be by the City selecting from among three (3) candidates selected from all available candidates based on seniority in rank and qualifications. The City may select any one of the three (3) candidates.

9.5: If there are no interested candidates to fill a vacancy within any Bureau, then the appointment will be made from the lowest seniority equal ranking Road Patrol member.

9.6: Any member once assigned to a Bureau position will have the option to transfer back to the Road Patrol at the next scheduled Road Patrol shift selection, if the member has higher seniority than a member currently assigned to the Road Patrol.

11.1(C). ~~There shall be automatic progression from the rank of Deputy Chief to Chief without further testing and the Union waives the right of, and for, its members for testing for the rank of Chief.~~ The position of Chief of Police will be filled by the Mayor consistent with his/her rights under Section 5.11B of the City Charter and will be excluded from the Act 78 process. When a vacancy occurs in the Police Chief's position and the Mayor decides to fill said position, he/she may consider both internal and external candidates for that position.

The parties recognize that under this Agreement reached under PERA, the following individuals will retain their positions:

    \*    Jerrod S. Hart, Chief of Police

    \*    Paul D. Vanderplow, Director of Support Services

    \*    Kevin M. Swope, Director of Police Operations.

It is further agreed that should the City fill the Director's positions in the future, those positions will be filled in accordance with Act 78 provisions.

It is further agreed that all challenges to the appointment of these three individuals, whether in grievance, litigation, or elsewhere, will be withdrawn based upon this Agreement under PERA.

11.1(E)(4).    After the written portion and oral portion have been scored and appropriately weighted each eligible member shall have 1/12 (one-twelfth) point for each month of service as a

**EXHIBIT 2**

**12.14.23 J. HART EMAIL**

| | |
|---|---|
| **From:** | Jerrod S. Hart |
| **To:** | Bill Bazzi; Margaret M. Hazlett; Roger A. Farinha |
| **Cc:** | Paul D. Vanderplow; Kevin M. Swope |
| **Subject:** | Request for Legal Counsel |
| **Date:** | Thursday, December 14, 2023 6:56:00 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | Request for Legal Counsel .pdf |

Good morning Mayor!

Due to the disparate, harassing, threatening and retaliatory actions of the Dearborn Heights City Council culminating in their 12/12/2023 City Council motion to defund the Directors and constructively fire me, the Directors and I are respectfully requesting legal counsel be afforded to us, by the City of Dearborn Heights.

We have previously put the City on notice of this illegal behavior in prior written communications. I believe their actions also now violate Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law.

I am also requesting the following via FOIA:

Copies of ALL Oaths of Office held by the City Clerks Office, dated and signed by all parties for:

Dave Adballah

Mo Baydoun

Hassan Ahmad

Nancy Breyer

Robert Constan

Thomas Wencel

Zouher Abdel-Hak

Hassan Saab

Ray Muscat

Denise Maxwell – Malinowski (sp)


Respectfully,

Chief Hart


**Jerrod S. Hart** *Chief of Police*



**City of Dearborn Heights**

📍 25637 Michigan Ave., Dearborn Heights MI 48125

📞 (313) 277-7406  📱 (313) 542-3570

🌐 www.dearbornheightsmi.gov

Partnering *With* Our Community

**EXHIBIT 3**

**06.15.2023 J HART FOIA EMAIL**

| | |
|---|---|
| **From:** | Jerrod S. Hart |
| **To:** | Paul D. Vanderplow |
| **Subject:** | FW: Confidential Communication / FOIA |
| **Date:** | Thursday, January 4, 2024 6:29:00 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

**Jerrod S. Hart** *Chief of Police*



**City of Dearborn Heights**

📍 25637 Michigan Ave., Dearborn Heights MI 48125

📞 (313) 277-7406 📱 (313) 542-3570

🌐 www.dearbornheightsmi.gov

Partnering *With* Our Community

---

**From:** Jerrod S. Hart
**Sent:** Wednesday, August 9, 2023 1:16 PM
**To:** Jerrod Hart <jhart202@icloud.com>
**Subject:** FW: Confidential Communication / FOIA

---

**From:** Jerrod S. Hart <jshart@dearbornheightsmi.gov>
**Sent:** Thursday, June 15, 2023 9:51 PM
**To:** Raymond D. Muscat <RDMuscat@dearbornheightsmi.gov>; Dave Abdallah
<wabdallah@dearbornheightsmi.gov>; Bill Bazzi <BBazzi@dearbornheightsmi.gov>; Margaret M.
Hazlett <MHazlett@dearbornheightsmi.gov>; Roger A. Farinha
<RaFarinha@dearbornheightsmi.gov>; Mariana Hernandez
<MHernandez@dearbornheightsmi.gov>; Paul D. Vanderplow
<pdvanderplow@dearbornheightsmi.gov>; Kevin M. Swope <kmswope@dearbornheightsmi.gov>
**Subject:** Confidential Communication / FOIA

Good evening,
I am happy to hear you reconsidered your position on City Council Mr. Muscat. You
know I respect you as I do most council members. Sadly, you too are experiencing
the reward for honorable service to the City of Dearborn Heights and speaking the
truth.

I, too, am frustrated with the recent orchestrated hijacking of council meetings and
full-on assault and quid-pro-quo behavior of some council members toward select
department heads, more specifically myself and my executive team.

Either through closed-session, confidential discussions and/or monthly reports, you are aware of the many irregularities I have discovered in my short tenure, my firm position and policy on police neutrality, and council interference with traffic stops/tickets I affirm are reasons for this disparate treatment coupled with a refusal to provide preferential treatment to a Dearborn Heights Police Department employee, outside of Act 78. Both of my Directors and I verbally affirmed we would provide no such preferential treatment and that all employees would be treated equally. Shortly thereafter, we were all accused of dereliction of duty by the same member, who said "he heard we were refusing to investigate internal matters". There are absolutely no misgivings about what occurred during this meeting from my Directors and I. We immediately debriefed and were in amazement of what just transpired.

I am in a protected class in both age and medical condition (Type 2 Diabetes) under the Americans with Disabilities Act and this disparate treatment is designed to exacerbate my condition. It has worked and I have the data to prove it. I am providing notice to preserve all of my rights, privileges, and protections afforded to me as a Whistleblower in my capacity as Chief of Police for the City of Dearborn Heights. The thought of having to call out this behavior has been weighing on me for quite some time, but the council meeting on Tuesday, June 13, 2023, was a circus.

I am filing this initial Freedom of Information Act Request for the following information pertaining to FY 2021 thru Present, for all full-time City of Dearborn Heights employees during the requested timeframe for:

1. Gross pay to include all tranches of compensation to include but not limited to:
   Name
   Work Classification (ie Clerk I, Police Officer etc)
   Hourly pay
   Overtime
   Holiday
   Longevity
   Premium Pay

2. All full-time employees work schedules to include total hours worked in all categories FY 2021 thru Present

3. All employee payouts upon separation to include payment schedules and balances. FY 2021 thru Present

4. All detailed billing documents from 2021-end of employment with the City of Dearborn Heights for Gary Miotke indicating fee schedule, minutes and hours worked and full vs half day for prosecution services.

5. Employment dates for Gary Miotke.

6. Number of current employees by classification who purchased time; how much,

and how it was, or is being paid for.

7. All Employees currently participating in the DROP program.

8. Labor contract for Fire Chief Dave Brogan and any council motions and/or approvals and records of review by Corporation Counsel Gary Miotke.

9. All current labor contracts and Letters of Understanding for all Police Department labor groups including the LOU pertaining to the rank of Police Chief and two Directors signed March 29, 2023, and subject to council approval under motion 23-099.

10. All City Council policies pertaining to ethics, conflicts of interest, use of telecommunication devices during public meetings, and disclosing information from a closed session.

Most of this information is privy to me, but I chose to remain professional and follow proper protocol by filing, and paying for my FOIA. Please let me know if a deposit is needed. I agree to receive this information electronically if it eases the burden on already overworked department heads. My sincere apologies to my colleagues for adding to your workload, but you too recognize the disparate treatment new Directors receive.

My personal email is jhart202@icloud.com

Thank you,
Jerrod S. Hart
Chief of Police

---

**From:** Raymond D. Muscat <RDMuscat@dearbornheightsmi.gov>
**Sent:** Thursday, June 15, 2023 7:29 AM
**To:** Dave Abdallah <wabdallah@dearbornheightsmi.gov>; Mo Baydoun <MABaydoun@dearbornheightsmi.gov>; Robert J. Constan <RjConstan@dearbornheightsmi.gov>; Nancy A. Bryer <NABryer@dearbornheightsmi.gov>; Hassan M. Ahmad <HmAhmad@dearbornheightsmi.gov>; Thomas G. Wencel <TGWencel@dearbornheightsmi.gov>; Bill Bazzi <BBazzi@dearbornheightsmi.gov>; Mariana Hernandez <MHernandez@dearbornheightsmi.gov>; Margaret M. Hazlett <MHazlett@dearbornheightsmi.gov>; Lynne Senia <LSenia@dearbornheightsmi.gov>; Jerrod S. Hart

<[jshart@dearbornheightsmi.gov](mailto:jshart@dearbornheightsmi.gov)>; Roger A. Farinha <[RaFarinha@dearbornheightsmi.gov](mailto:RaFarinha@dearbornheightsmi.gov)>
**Subject:** Re: City Council

Thank you all so very much. I just want this city to move forward. There are so many things we as council members need to do before speaking out. Don't take for granted what someone else told you, go and find out yourself. I too need do some soul searching, I will be taking some time off from the everyday doings of our job.
Sincerely
Ray Muscat
Dearborn Heights
Council Pro-Tem
313-595-7883

---

**From:** Raymond D. Muscat
**Sent:** Wednesday, June 14, 2023 7:01:12 AM
**To:** Dave Abdallah <[wabdallah@dearbornheightsmi.gov](mailto:wabdallah@dearbornheightsmi.gov)>; Mo Baydoun
<[MABaydoun@dearbornheightsmi.gov](mailto:MABaydoun@dearbornheightsmi.gov)>; Robert J. Constan <[RjConstan@dearbornheightsmi.gov](mailto:RjConstan@dearbornheightsmi.gov)>;
Nancy A. Bryer <[NABryer@dearbornheightsmi.gov](mailto:NABryer@dearbornheightsmi.gov)>; Hassan M. Ahmad
<[HmAhmad@dearbornheightsmi.gov](mailto:HmAhmad@dearbornheightsmi.gov)>; Thomas G. Wencel <[TGWencel@dearbornheightsmi.gov](mailto:TGWencel@dearbornheightsmi.gov)>;
Bill Bazzi <[BBazzi@dearbornheightsmi.gov](mailto:BBazzi@dearbornheightsmi.gov)>; Mariana Hernandez
<[MHernandez@dearbornheightsmi.gov](mailto:MHernandez@dearbornheightsmi.gov)>; Margaret M. Hazlett
<[MHazlett@dearbornheightsmi.gov](mailto:MHazlett@dearbornheightsmi.gov)>; Lynne Senia <[LSenia@dearbornheightsmi.gov](mailto:LSenia@dearbornheightsmi.gov)>; Jerrod S. Hart
<[jshart@dearbornheightsmi.gov](mailto:jshart@dearbornheightsmi.gov)>; Roger A. Farinha <[RaFarinha@dearbornheightsmi.gov](mailto:RaFarinha@dearbornheightsmi.gov)>
**Subject:** City Council

Council Chair and Mr.Mayor, I formally declare effective immediately I am formally sending you my resignation as councilman of the City of Dearborn Heights. I can no longer be an effective member of this council body. I hope you accept this and wish you all great success in the future.
My personal health both physically and emotionally mean way to much for me and my family to continue.
We once had a strong community bond that for what ever reason has been broken, and as much as I have tried nothing seems to have worked.
I thank all those who have supported me the last 8 years and allowed me to help anyway I can. And for those that I wasn't able to help, I apologize for failing you.

Ray Muscat
Dearborn Heights
Council Pro-Tem
313-595-7883
LEGAL CONFIDENTIAL: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The information and/or documents in this message are privileged and confidential, for use only by the intended recipient. If you are not the intended recipient, any disclosure, distribution, use or copying of the contents of this message is prohibited. If you have received this message in error, please notify us immediately and delete this message from your system.

**EXHIBIT 4**

**HART MEMO 1.9.2024**



**POLICE
DEPARTMENT**

Jerrod Hart
Chief of Police

Bill Bazzi
Mayor



To: Bill Bazzi
Mayor

From: Jerrod S. Hart      *JSH #263*
Chief of Police

Date: 01/09/2024

Re: Whistle Blower

I request you enact your emergency powers to provide immediate legal protection under all applicable Whistleblowers' Protection Acts and provide independent legal counsel for Director Swope, Director Vanderplow and I.

As you know, I authored an email on December 14, 2023, alerting you that Directors Swope, Vanderplow, and I have been under constant retaliation from several members of the Dearborn Heights City Council since our refusal to provide preferential treatment to a command officer of the Dearborn Heights Police Department. Their requested action violates our commitment to treat all employees fairly, the collective bargaining agreement, and Act 78.

Additionally, on June 15, 2023, I authored an email to you and several other City employees outlining multiple concerns as a Whistleblower. Our complaint has gone unanswered.

In a shocking development, after the administration of discipline involving a response to resistance, an influential political figure visited the Dearborn Heights Police Department and made it very clear we needed to appease the involved command officer by giving him what he wanted – a high level position within the police department.

Key takeaways from this meeting:

- We (Director Swope, Mayor Bazzi and I) were warned that if we didn't appease this employee, we would all be fired, and the Mayor would lose re-election.

- When the individual was asked if the council cares about our work with the DOJ COPS OA, he said it's a joke to them and they want it to fail because it would be on us, not them therefore securing their political futures.

- The individual who is anticipated to be deposed also shared how the council thinks matters under investigation are a joke and they are considering having t-shirts made mocking the investigations.

- When asked how our employee has so much pull in the community, he said he is well connected to certain members of the City Council and has very wealthy and influential connections to make this a reality.

Clearly, this individuals' warnings have come to fruition with two City Council resolutions to defund our positions after I reaffirmed my position to treat all staff fairly:

- A City Council member clearly and publicly articulated he would retaliate against us during a council meeting.

- He also promised to have Director Vanderplow removed from future public meetings when we have video evidence of others creating disturbances who were never removed.

- A video was sent to the PD via social media from of the involved employee's relative and the employee implying he would be the Chief of Police.

You are aware of inquiries we have initiated regarding federal and state forfeiture funds, misappropriation of city owned property, ticket fixing, civil rights violations, ticket quotas, interfering with traffic stops, and extortion. City Council is also aware of some of these issues and instead of supporting anti-corruption and best-practices, they want to make t-shirts to mock the process and continued job insecurity/defunding of budgeted and legal positions under PERA.

The question as to "why" this is happening on the one-year anniversary of Directors Swope and Vanderplow's employment is outlined above and in multiple investigations.

Based on the above information, I am requesting you authorize the Directors and I to employ, at the City's expense, an attorney of our choosing to represent us in these illegal actions. This is needed to provide all residents and visitors of Dearborn Heights a professional, neutral police department free of political influence and corruption.

I appreciate your unwavering support and steadfast approach to always doing the right thing for ALL residents.

**EXHIBIT 5**

**COUNCIL RESOLUTION 11-A 1.9.2024**



| Approved for the Agenda of: | |
|---|---|
| 1/9/2024 | Motion No. |

11.A.

## City Council

TO:       Honorable City Council Members

FROM:    Councilman Hassan Saab

DATE:    January 3, 2024

RE:       Councilman Saab - Resolution - Budget Amendment, Dearborn Heights Police Department Directors

Whereas the positions of Director of Police Operations and Director of Support Services, absent from the city's charter, have bypassed essential legal procedures, resulting in an unauthorized financial burden on the city;

Whereas the Council was not formally notified of these appointments, despite their inclusion in the budget, raising concerns about transparency and adherence to legal processes;

Whereas the Mayor's attorney, a direct appointee of the Mayor, has provided an opinion seemingly aligned with the Mayor's position, prompting concerns about a potential conflict of interest;

Whereas the Mayor's inconsistent statements regarding the existence of Act 78, including denial, admission of violation during a recall, and attempts to include the illegally hired directors under Act 78 during police contract negotiations, have raised questions about credibility;

*Now therefore be it resolved,* that this Council, unwavering in its commitment to lawful governance, fiscal responsibility, and transparency, proposes a series of comprehensive measures to rectify the situation:

1. Budgetary Amendment: The Council moves to enact an immediate amendment to the current budget, revisiting and adjusting allocations to address the financial implications of the unauthorized creation of two director positions Director of Police Operations, Director of Support Services within the Police Department.

2. Elimination of Compensation: Recognizing the lack of requisite approvals, adherence to legal processes, and formal notification to the Council, compensation for all directors in these unauthorized positions shall be eliminated forthwith.

3. Refusal of Legal Fee Coverage: The Council unequivocally refuses to approve any funding for legal fees associated with the Mayor's unilateral hiring decisions based on a email he had sent to the former council chair.  Such requests shall be respectfully declined.

4. Affirmation of Act 78 Existence: The Council reaffirms the existence and significance of Act 78, a

law passed in 1964 with overwhelming public support. This affirmation is supported by the Mayor's Attorney's admission during his recall hearing and subsequent attempts to include the illegally hired directors under Act 78 during police contract negotiations.

5. Moratorium on External Hires: The Council mandates that for the next 12 months, no positions outside of Act 78, excluding the Chief, Police Officers, Cadets, can be filled within the Police Department. This includes directors, commissioners, ombudsman, or contractors and other related positions.

6. Communication Protocol: The City Clerk is hereby directed to communicate this resolution promptly to all relevant stakeholders, transparently conveying the Council's actions, expectations, and the ongoing rectification process.

This motion, upon approval, shall be effective immediately.

**Attachments:**

None

**EXHIBIT 6**

**MAYOR ULTRA VIRES MEMO**

*Dana Flamont*

## MEMORANDUM

To:   Hon. Dearborn Heights City Council
       Hon. Dearborn Heights City Clerk

Fr:    Mayor Bill Bazzi

Re:   Council Resolution 11-A 1/6/24

Da:   1/22/24

The purpose of this memorandum is to outline the several reasons why the above captioned resolution is *ultra vires* of the Dearborn Heights City Charter and otherwise contrary to law. Normally, Section 7.13 of the Charter sets forth the appropriate procedure to reject a Council resolution. However, Resolution 11-A of 1/9/24 is a legal nullity since Council passed it outside of its charter-mandated duties and authority. However, to the extent this council or any tribunal deems the resolution to be in order, please also consider this correspondence as a formal veto of that resolution. I note also that Council, in passing this ordinance, has done so contrary to advice that both Corporation Counsel and special Labor Counsel rendered several times since Council proposed it in October 2023. I have reason to believe, moreover, that Council passed Resolution 11-A of 1/06/2024 outside of the Open Meetings Act, a matter I intend to pursue in Circuit Court if forced to do so, noting specifically that the crime-fraud exception invalidates any efforts to shield communications with outside counsel from disclosure.

I begin by noting that pursuant to Section 5.3 (a), (f), and (h) provide my office with the following authority and responsibilities:

    (a) It shall be his responsibility to enforce all of the laws and ordinances of the City;
    (f)  He shall prepare and administer the annual budget and keep the Council fully advised at all times as to the financial condition and needs of the City;
    (h) He shall, on or before the first of April of each year, prepare and submit to the Council a complete itemized proposed budget for the next fiscal year in accordance with the provisions of this Charter.

By eliminating funding for the two director positions at issue, my ability to enforce local and state laws and ordinances is impaired. It is also the duty and responsibility of the mayor and not council to prepare and administer the budgets passed by this Council on an annual basis. Once adopted Council may not

unilaterally and without notice abrogate the budget it passed. To act otherwise would render my charter authority under these provisions meaningless.

Pursuant to Charter Section 7.3(d) a prior ordinance or ordinance may be repealed or amended only by reference to that legislation's title and number. The city's budget ordinance passed last year was not referenced in resolution 11-a of 1/6/24.

Finally, the Charter lacks clear authority for Council to unilaterally[1] modify a budget to altogether remove funds for budgeted positions. Pursuant to Charter Section 8.5, Council's ability to amend a budget is limited to the "transfer of unused balances appropriated for one purpose to another balance... [or] to appropriate available revenues of a class not included in the annual budget." If the framers of the Charter had wanted to vest in Council the ability to make unilateral eliminations of budgeted positions, they could have done so. The fact that they did not indicates that Council lacks authority for the above resolution. This reading of Section 8.5 conforms to the canon of statutory construction *expression unius est exclusion alterius* or the expression of one thing suggests the exclusion of others. See *Greiff v Greiff (In re Estate of Greif*, 332 Mich. App. 251 (2020) citing *Pittsfield Charter Twp v Washtenaw Co,* 468 Mich 702, 712 (2003).

Turning to the reasons under state law that the Council's actions are not only illegal but unwise are set forth here. To begin with and most obviously, the City is subject to the Fair Labor Standards Act which clearly requires that the Directors be compensated for the time that they work. This Council's resolution is a clear violation of federal law exposing the city to double damages, attorneys fees, and fines. It is also a criminal act subjecting each member of this Council voting for this resolution to six months imprisonment and a $10,000 fine, penalties that I intend to see enforced should Council insist on enforcing its illegal resolution.

The resolution also violates the terms of a collective bargaining agreement which this Council approved. Quite simply, this Council cannot unilaterally change the wages, hours, terms and conditions of these employee's employment without collective bargaining. To do so, would constitute a clear violation of the Public Employees Relations Act as well as other law protecting public employees. See *Org of Sch Administrators & Supervisors, AFSA, AFL-CIO v Detroit Bd of Ed,* 229 Mich App 54, 65; 580 NW2d 905 (1998).

---

[1] The same reasoning does not apply where the mayor, as progenitor of the budget, presents amendments for council approval throughout the fiscal year.

Comments from this Council make clear that its actions are retaliatory in nature in violation of these employees First Amendment Constitutional Rights as well as violations of the Whistleblowers Protection Act. I have no intention of allowing this City to trample the rights of its dedicated employees and thereby exposing the taxpayers to civil liability.

Finally, under Article 6 of the applicable collective bargaining agreement, members of the bargaining unit may not be terminated without just cause and in accordance with the grievance and arbitration procedure set forth in Article 7. Illegally reducing the pay of these employees constitutes a form of constructive discharge. Beyond violating the terms of the collective bargaining agreement, such a termination without any form of due process would deprive these public employees of a vested property right to their employment in violation of the Fourteenth Amendment to the United States Constitution.

In closing, while this resolution is so clearly deficient constituting a legal nullity and should be deemed void *ab initio*, without conceding its enforceability, if a tribunal should disagree with any of the above, let this memorandum also serve as a veto for the reasons set forth above.

*Dana Flamont*

# MEMORANDUM

To: Hon. Dearborn Heights City Council
Hon. Dearborn Heights City Clerk

Fr: Mayor Bill Bazzi

Re: Council Resolution 24-025

Da: 1/22/24

The purpose of this memorandum is to outline the several reasons why the above captioned resolution is *ultra vires* of the Dearborn Heights City Charter and otherwise contrary to law. Normally, Section 7.13 of the Charter sets forth the appropriate procedure to reject a Council resolution. However, Resolution 24-025 of 1/16/24 is a legal nullity since Council passed it outside of its charter-mandated duties and authority. However, to the extent this council or any tribunal deems the resolution to be in order, please also consider this correspondence as a formal veto of that resolution. I note also that Council, in passing this ordinance, has done so contrary to advice that both Corporation Counsel, placing the city in jeopardy of legal liability. I have reason to believe, moreover, that Council passed Resolution 24-025 outside of the Open Meetings Act, a matter I intend to pursue in Circuit Court if forced to do so, noting specifically that the crime-fraud exception invalidates any efforts to shield communications with outside counsel from disclosure.

I begin by noting that pursuant to Section 5.13(b) vests with the appointed corporation counsel the duty to act as legal advisor to the "Mayor *and the Council in matter relating to their official duties,"* making clear that, in matters relating to their official duties it "shall" be the corporation counsel's duty to act as Council's legal advisor. Section 5.13(f) vests in him the duty to call attention to *"all matter of law...affecting the city."* This language does not leave room for Council to cause the chaos associated with "appealing to" some other lawyer to provide legal advice that contradicts that the corporation counsel shall give. Council's ability to choose legal counsel under the Charter is limited to their confirmation of the corporation counsel. Once confirmed, City Council may obtain special legal counsel under 5.13(j) to *assist* but not directly oppose corporation counsel. 5.13(j) also specifies that special legal counsel appear "Of Counsel" to the corporation counsel. According to Black's Law Dictionary, the term "Of Counsel" denotes some affiliation with the corporation:

> An attorney affiliated with a law firm but is not actually a member as an employee, such as a partner or associate. This is an attorney who may work on individual cases that are brought into the firm that deal with the attorney's specialty or for a semi-retired member of the firm. A phrase commonly applied in practice to the counsel employed by a party in a cause, and particularly to one employed to assist in the preparation or management of a cause, or its presentation on appeal, but who is not the principal attorney of record for the party.

The ABA has issued guidance as to the meaning of the term "of counsel" as well in Formal Opinion 9-357. According to that opinion:

> The use of the title "of counsel," or variants of that title, in identifying the relationship of a lawyer or law firm with another lawyer or firm is permissible as long as the relationship between the two is a close, regular, personal relationship and the use of the title is not otherwise false or misleading.

The above definitions imply an affinity of some kind between the corporation counsel and the lawyer or firm to be hired. It is not, under any reading of the term, an invitation for this city to fund a taxpayer-funded rebellion of the legislation branch against the duly-elected executive. It is not lost upon me that one of the firms served prior administrations that the voters of this city did not return, for whatever reason, to control of the executive branch. The attempt of the legislative branch to appoint legal counsel whose sole purpose is to use tax-payer funds to, in effect, re-litigate the result of the last election will be resisted by all means available to this administration.

Should either of the retained firms intend to rely upon the assurances of individual members of council or the council as a whole for a claim of detrimental reliance, *quantum meruit*, express contractual promise or otherwise for payment of their fees, they should be aware that, not only will their reliance be unjustified, but rely upon an illegal act of this Council *ultra vires* of its powers and that this administration shall resist any effort to leave the taxpayers of this city responsible

for what is inherently and explicitly a political dispute and personal vendetta. Should this Council desire to appoint legal counsel to work contrary to the efforts of the duly-appointed corporation counsel, its resort is to the ballot box and not the public purse.

**EXHIBIT 7**

**M BAYDOUN EMAIL 1.25.2024**

**From:** Mo Baydoun <MABaydoun@dearbornheightsmi.gov>
**Sent:** Thursday, January 25, 2024 4:44 PM
**To:** Bill Bazzi <BBazzi@dearbornheightsmi.gov>; Lisa A. Hicks-Clayton <LHicks-clayton@dearbornheightsmi.gov>; Jerrod S. Hart <jshart@dearbornheightsmi.gov>; Cynthia A. King <CKIng@dearbornheightsmi.gov>; Margaret M. Hazlett <MHazlett@dearbornheightsmi.gov>; Colleen R. Garcia <CGarcia@dearbornheightsmi.gov>; Hassan M. Ahmad <HmAhmad@dearbornheightsmi.gov>; Lynne Senia <LSenia@dearbornheightsmi.gov>
**Subject:** Motion 24-017

Mayor Bazzi, City Treasurer Hicks-Clayton, Police Chief Hart, Comptroller King, Human Resources Director Hazlett, and Deputy City Treasurer Garcia:

At Tuesday night's meeting, the City Council unanimously over-rode the Mayor's untimely veto of Motion 24-017, the Resolution regarding "Budget Amendment, Dearborn Heights Police Department Directors".

Among other things, this motion enacted an immediate budget amendment to the City's budget and eliminated compensation for the two Police Department "director" positions known as Director of Police Operations and Director of Support Services. Per the motion, these things were required to take place "forthwith".

Despte the motion being adopted on January 9, 2024, the Mayor and his administration ignored it. The directors continued to work in the Police Department. Presumably, the Mayor and his administration also took steps for the directors to be paid and provided benefits by the City.

Now, despite the over-ride of the Mayor's veto, it appears that the Mayor and his administration still inexplicably and incorrectly believe that they can ignore Motion 24-017. The directors still appear to be working. Presumably, they are also being paid and provided benefits by the City.

While there have never been any valid excuses for failing to comply with the entirety of Motion 24-017, there certainly can be no further excuses now for anyone affiliated with the City using or allowing the use of City resources to pay the directors or to provide them with benefits. Any such use or allowing the use of City resources in this manner is clearly legally unauthorized and frankly criminal. If it continues, steps will be taken to ensure that it stops forthwith and that all who are responsible in any fashion for it happening will be held accountable both civilly and criminally for their blatant violations of the law.

Pursuant to the Uniform Budgeting and Accounting Act, any unauthorized use of City resources to pay the directors or to provide them with benefits will be reported to the State Treasurer who in turn will be required to report it to the Attorney General for review and appropriate actions. Besides possible criminal prosecution, such actions may include civil actions against the responsible officials to recover illegally expended City resources.

Further, I will be making an appointment with the Michigan State Police to address these matters.

Please do what is necessary to stop the unauthorized use of City resources to pay the directors or to provide them with benefits. As part of this, you should also stop any existing automatic salary deposit arrangements and also withhold any authorizations for them.

I trust that this email is clear, and that Motion 24-017 will be complied with by everyone affiliated with the City.

Respectfully,



**Council Chairman Mo Baydoun**

**MaBaydoun@DearbornHeightsMI.Gov**

**(313)-641-0100**

LEGAL CONFIDENTIAL: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The information and/or documents in this message are privileged and confidential, for use only by the intended recipient. If you are not the intended recipient, any disclosure, distribution, use or copying of the contents of this message is prohibited. If you have received this message in error, please notify us immediately and delete this message from your system.

**EXHIBIT 8**

**EMPLOYMENT STATUS MEMO**



Mayor's Office

Bill Bazzi
Mayor

**Date**    January 24, 2024

**To**    Kevin Swope
Director, Patrol Services

Paul Vanderplow
Director, Support Services

**From**    Bill Bazzi    $1/24/24$
Mayor

**Subject**    Employment Status

This memorandum will serve to document the employment status of Kevin Swope, Director - Patrol Services and Paul Vanderplow, Director – Support Services.

On January 23, 2024, the Dearborn Heights City Council took actions to "de-fund" the two-(2) Director positions which would effectively terminate their contracts without cause or due process. The Charter lacks clear authority for Council to unilaterally modify a budget to altogether remove funds for budgeted positions. Pursuant to Charter Section 8.5, Council's ability to amend a budget is limited to the "transfer of unused balances appropriated for one purpose to another balance... [or] to appropriate available revenues of a class not included in the annual budget." The City is subject to the Fair Labor Standards Act which clearly requires that the Directors be compensated for the time that they work. This Council's resolution is a clear violation of federal law exposing the city to double damages, attorneys fees, and fines. It is also a criminal act subjecting each member of this Council voting for this resolution to six months imprisonment and a $10,000 fine, penalties that I intend to see enforced should Council insist on enforcing its illegal resolution.

Based upon the illegal actions of Council, it is my order to Director Swope and Director Vanderplow that they will remain employed by the City of Dearborn Heights in their contractually established positions with the Police Department at full pay and benefits as outlined in their respective contracts. Further, the Directors have full authority to administer the roles and responsibilities within the Police Department.

# EXHIBIT 9

## VANDERPLOW EMPLOYMENT CONTRACT

## PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT
## BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW

This Professional Services Employment Agreement (hereinafter "Agreement") is to set forth the terms and conditions of employment of a **FULL TIME EXEMPT** employee, and is entered into between the City of Dearborn Heights, a municipal corporation (hereinafter "City") and **PAUL D. VANDERPLOW** (hereinafter "Employee"); collectively referred to as the "Parties".

WHEREAS, the MAYOR is empowered, to appoint and retain a full time **DIRECTOR OF SUPPORT SERVICES,** and hereby appoints Employee for the effective and efficient operation of the City's Police Department; and

WHEREAS Employee has agreed to accept employment as a full time employee, subject to the terms, conditions and provisions of this Agreement.

THEREFORE, in consideration of the mutual covenants contained herein, the consideration of which is hereby stipulated to, the Parties agree as follows:

**Recitals.** The introductory, "whereas," and "therefore" paragraphs set forth above (hereafter, "Recitals") are an integral part of this Agreement and are incorporated into it by reference.

### I. TERM

1.1     The full time employee appointment shall be for the term commencing on July 1, 2023 (the "Commencement Date") and shall continue up to and including June 30, 2026.

### II. EMPLOYMENT

2.1     **DUTIES.**  The Employee shall serve the City as the Director of Support Services of its Police Department as set forth by applicable laws under City of Dearborn Heights Charter and Ordinances.

The Employee shall specifically serve the City as follows:

1.  Serve as the Director of Support Services and as such to manage and lead the records division and civilian dispatch division of the police department. To recommend and implement processes and procedures aligned with current best practices, applicable laws, and policies to achieve the efficient and ethical management of the aforementioned divisions;
2.  Serve the residents of Dearborn Heights in a fair and respectful manner, and where feasible within the confines of the law, and legal practices, provide transparency into the policies and procedures of the Dearborn Heights police department;
3.  To lead the employees of the police department in all matters germane to the above mentioned scope of responsibilities.

1

4. The Director's immediate supervisor shall be the Police Chief. Director acknowledges, understands and agrees that the Police Chief shall have the final authority and the power to direct, control or supervise the manner of Director's duties, consistent with the laws of the State of Michigan, the City Charter, City Ordinances, and this Agreement.

The Employee shall perform these specific duties with reasonable care, diligence, skill and expertise and perform all duties necessary to meet the goals and expectations of the City.

**2.2    CITY COUNCIL MEETINGS.** Generally, the Director shall not be required to attend meetings of the City Council, both public and closed, except to the extent to which attendance would be in lieu of the Police Chief who through absence, or other causes is unable to attend and requests the Director to attend on his/her behalf.

**2.3    INDEMNIFICATION.** To the extent it may be permitted to do by applicable law, the City does hereby agree to defend, hold harmless, and indemnify the Employee from any and all demands, claims, suits, actions, judgments, expenses and attorneys' fees included in any legal proceedings brought against the Employee in the employee's individual or official capacity as an employee, provided that the incident(s), which is (are) the basis of any demand, claim, suits, actions, judgments, expenses and attorneys' fees, arises in the future, from an act or omission of the Employee, as an employee of the City; excluding, however, any demand, claim, suits, actions, judgments, expenses and attorneys' fees for those claims or any causes of action where the Employee committed an intentional, willful and wrongful act or omission, or acted in bad faith; and excluding any costs, fees, expenses or damages that would be recoverable or payable under an insurance contract, held either by the City or by the Employee. The provisions of this Paragraph 2.3 shall survive the termination, expiration or other end of this Agreement and/or the Employee's employment with the City.

**2.4    HOURS OF WORK.** Employee and City understand and agree that Employee is being employed in a salaried exempt full-time position, with a 260 workday calendar. The Employee acknowledges the proper performance of the duties require the Employee to generally observe normal business hours and will also require the performance of necessary services outside of normal business hours. In general, the Employee's business hours shall be flexible in nature and be eight (8) hours per day Monday through Friday. The Employee shall not regularly work weekends or holidays set forth as set by the City, however, it is understood that there may be circumstances, including but not limited to emergency or safety concerns and community relations requirements, which require Employee to work additional hours, weekends, or holidays. Should additional work be required, it is with the understanding that no further compensation shall be earned. The Employee's Monday through Friday work schedule is permitted by mutual consent between the City and the Employee.

## III. COMPENSATION

**3.1    SALARY.** The City shall compensate the Employee at the gross rate of One Hundred Seventeen Thousand, Two Hundred Twenty Dollars and 00/100 ($117,220.00) dollars per year effective July 1, 2023. Base salary adjustments will be made to ensure an eight percent (8%)

2

differential between the base salary of captain in the police supervisor's collective bargaining agreement and the Director of Support Services position is maintained._ Annually, on or before June 1st, and each year thereafter, the Chief shall meet with the Director to conduct an evaluation of Director's job performance, including an evaluation of Director's performance and/or completion of the goals and expectations previously established. The format and the content of said performance evaluation shall be established by the Chief and shall be provided to the Director prior to the performance review. The Chief, may in his or her discretion, initiate performance evaluations at other times in addition to those set forth herein. Based on the evaluation, the Chief may recommend a pay increase consistent with City wage scales, studies, or policy. The salary shall be paid bi-weekly via the City's payroll system and shall be subject to any applicable withholding or deductions required by the law. The City shall forward a W-2 to the Employee in accordance with federal law.

**3.2    BENEFITS.**  The City shall make Social Security and Medicare match on behalf of the Employee and place the employee on the City's General Liability Policy, UIA, and Workers' Compensation Policy. The Employee is allowed to participate in the City's benefit plan to include medical, dental, vision, and life insurance as outlined in a separate document which will be provided to the employee in accordance with Public Act 152 (hard cap) for medical, and will adhere to the 90 days waiting period for benefit eligibility. Employee will be subject to the City's published rates, fees, and eligibility rules for any health insurance programs and coverage levels that Employee chooses to enroll in. Employee's regular work schedule must conform to the required minimum hours per week necessary to qualify for coverage. Employee may request a current version of the employee benefits guide from the City's human resources department to ensure Employee is informed of the benefits offerings and any applicable enrollment rules and deadlines. All holidays observed by the City shall also be paid, non-work days for the Employee, barring an emergency situation which may require the Employee's attendance.  Commensurate with the holiday pay schedule as outlined in the police supervisor's collective bargaining agreement, the Employee shall be entitled to holiday pay at six and three/tenths percent (6.3%) of base pay to be issued by December 1 each year. Commensurate to other City employees holding a Director level position, the City shall provide a designated work area, staff support, equipment, necessary training and access to a vehicle insured and maintained by the City.

The Employee is eligible for additional fringe benefits commensurate to those as outlined in the police supervisor's collective bargaining agreement for longevity and seniority pay. As a condition of employment, the City agrees to provide, at no cost to the Director, a semi or unmarked police vehicle which will afford the Director the opportunity to lawfully respond to emergency situations and to drive to and from his place of residence in accordance with City policy.

**3.3.    UNIFORM ALLOWANCE.**  Employee will be paid two percent (2%) of base salary as an annual stipend for the purpose of maintaining a set of uniforms, in serviceable condition, neat and clean.  The stipend will be issued on or about the 30th of September.

## IV. TERMINATION

**4.1**    Employee understands that employment with the City is "at-will" and both the City and Employee may terminate the employment relationship at any time, for any reason, with or without notice and with or without cause, and wages earned shall be paid at the next payroll session. Unless terminated, or mutually extended as set forth in Paragraph 5.5 below, this Agreement will

3

automatically terminate at the end of the day on June 30, 2026. In the event the Employee chooses to terminate this Agreement before June 30, 2026, Employee will endeavor to provide the City with two (2) business weeks' notice of termination. Employee understands that no representative of the City has the authority to modify, orally or in writing, the at-will nature of Employee's employment relationship except through a written modification to this Agreement signed by the Mayor and Employee, which expressly refers to and modifies the Employee's at-will employment.

In the event the City chooses to terminate this Agreement before June 30, 2026, the City shall pay Employee a sum equal to the Employee's base salary times the number of working days and Holidays in the next succeeding one-hundred eighty (180) calendar day period, together with payment for unused vacation time, and accumulated vacation time, and unused sick days and all other accumulated benefits as set forth in the policies of the City of Dearborn Heights. In addition, the City shall pay the Consolidated Omnibus Budget Reconciliation Act (C.O.B.R.A.) premiums for the medical, dental and vision insurances for up to six (6) months unless Employee otherwise secures medical insurance benefits, dental and vision insurances benefits from another source. If the Employee waives the medical insurance, then the waive amount shall be prorated for six (6) month value.

## V. GENERAL PROVISIONS

**5.1     COMPLETE AGREEMENT.**  This Agreement sets forth and establishes the entire understanding between the City and the Employee relating to the employment of the Employee by the City.  Any prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement.  The Parties by mutual written agreement may amend any provision of this Agreement during the term of this Agreement; such amendments shall be incorporated and made a part of this Agreement.

**5.2     BINDING EFFECT/ASSIGNMENT.** This Agreement shall be binding on the City and the Employee as well as their heirs, assigns, executors, personal representatives and successors in interest.  This Agreement is personal to each of the parties and neither party may assign or delegate any of its rights or obligations under this Agreement without first obtaining the other's written consent.

**5.3     SAVINGS CLAUSE.**  If any term or provision of this Agreement, as applied to any party or to any circumstance, is declared by a court of competent jurisdiction hereof to be illegal, unenforceable or void in any situation and in any jurisdiction, such determination shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction.  The Parties agree that the court or arbitrator making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases or to replace any illegal, unenforceable or void term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

4

5.4 **CONTROLLING LAW.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan and jurisdiction shall rest in a court of competent jurisdiction within Wayne County, Michigan.

5.5 **EXTENSION.** This Agreement may be extended by mutual written agreement only.

5.6 **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument. A signature made on a facsimile copy of this Agreement or a signature to this Agreement transmitted by facsimile shall have the same effect as an original signature.

**WHEREFORE,** the Parties have executed this Agreement freely and voluntarily by affixing their signatures below:

**Paul D. Vanderplow**

Date: _12 · DEC_ , 2023.

**CITY OF DEARBORN HEIGHTS: BILL BAZZI, MAYOR**

Date: _/2//2_ , 2023.

5

# EXHIBIT 10

## HART EMPLOYMENT CONTRACT

## PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT
## BETWEEN THE CITY OF DEARBORN HEIGHTS AND JERROD S. HART

This Professional Services Employment Agreement (hereinafter "Agreement") is to set forth the terms and conditions of employment of a **FULL TIME EXEMPT** employee, and is entered into between the City of Dearborn Heights, a municipal corporation (hereinafter "City") and **JERROD S. HART** (hereinafter "Employee"); collectively referred to as the "Parties".

WHEREAS, the MAYOR is empowered, to appoint and retain a full time **POLICE CHIEF,** and hereby appoints Employee for the effective and efficient operation of the City's Police Department; and

WHEREAS Employee has agreed to accept employment as a full time employee, subject to the terms, conditions and provisions of this Agreement.

THEREFORE, in consideration of the mutual covenants contained herein, the consideration of which is hereby stipulated to, the Parties agree as follows:

**Recitals.** The introductory, "whereas," and "therefore" paragraphs set forth above (hereafter, "Recitals") are an integral part of this Agreement and are incorporated into it by reference.

### I. TERM

1.1     The full time employee appointment shall be for the term commencing on July 1, 2023 (the "Commencement Date") and shall continue up to and including June 30, 2026.

### II. EMPLOYMENT

2.1     **DUTIES.** The Employee shall serve the City as the Police Chief of its Police Department as set forth by applicable laws under City of Dearborn Heights Charter and Ordinances.

The Employee shall specifically serve the City as follows:

1. Serve as the POLICE CHIEF and as such to lead the operations of the police department, and to recommend and implement processes and procedures aligned with current best practices, applicable laws, and policies to achieve the efficient and ethical management of the police department;
2. Serve the residents of Dearborn Heights in a fair and respectful manner, and where feasible within the confines of the law, and legal practices, provide transparency into the policies and procedures of the Dearborn Heights police department;
3. To lead the employees of the police department in all matters germane to the above mentioned scope of responsibilities.
4. The Chief's immediate supervisor shall be the Mayor.  Chief acknowledges, understands and agrees that the Mayor shall have the final authority and the power to direct, control or supervise

the manner of Chief's duties, consistent with the laws of the State of Michigan, the City Charter, City Ordinances, and this Agreement.

The Employee shall perform these specific duties with reasonable care, diligence, skill and expertise and perform all duties necessary to meet the goals and expectations of the City.

2.2 **CITY COUNCIL MEETINGS.** Except to the extent prohibited by or in material conflict with applicable laws and authorities, the Employee shall attend meetings of the City Council, both public and closed, to the extent permitted by Michigan Open Meetings Act.

2.3 **INDEMNIFICATION.** To the extent it may be permitted to do by applicable law, the City does hereby agree to defend, hold harmless, and indemnify the Employee from any and all demands, claims, suits, actions, judgments, expenses and attorneys' fees included in any legal proceedings brought against the Employee in the employee's individual or official capacity as an employee, provided that the incident(s), which is (are) the basis of any demand, claim, suits, actions, judgments, expenses and attorneys' fees, arises in the future, from an act or omission of the Employee, as an employee of the City; excluding, however, any demand, claim, suits, actions, judgments, expenses and attorneys' fees for those claims or any causes of action where the Employee committed an intentional, willful and wrongful act or omission, or acted in bad faith; and excluding any costs, fees, expenses or damages that would be recoverable or payable under an insurance contract, held either by the City or by the Employee. The provisions of this Paragraph 2.3 shall survive the termination, expiration or other end of this Agreement and/or the Employee's employment with the City.

2.4 **HOURS OF WORK.** Employee and City understand and agree that Employee is being employed in a salaried exempt full-time position, with a 260 workday calendar. The Employee acknowledges the proper performance of the duties require the Employee to generally observe normal business hours and will also require the performance of necessary services outside of normal business hours. In general, the Employee's business hours shall be flexible in nature and be eight (8) hours per day Monday through Friday. The Employee shall not regularly work weekends or holidays set forth by the City, however, it is understood that there may be circumstances, including but not limited to emergency or safety concerns and community relations requirements, which require Employee to work additional hours, weekends, or holidays. Should additional work be required, it is with the understanding that no further compensation shall be earned. The Employee's Monday through Friday work schedule is permitted by mutual consent between the City and the Employee.

### III. COMPENSATION

3.1 **SALARY.** The City shall compensate the Employee at the gross rate of One Hundred Twenty-Six Thousand, Six Hundred dollars and 00/100 ($126,600.00) per year effective July 1, 2023. Base salary adjustments will be made to ensure a eight percent (8%) differential between the salary for the position of Police Chief and the base salary for Director of Operations position.

Annually, on or before June 1, 2023, and each year thereafter, the Mayor shall meet with Chief to conduct an evaluation of Chief's job performance, including an evaluation of Chief's performance and/or

completion of the goals and expectations previously established. The format and the content of said performance evaluation shall be established by the Mayor, and shall be provided to the Chief prior to the performance review. The Mayor, may in his or her discretion, initiate performance evaluations at other times in addition to those set forth herein. Based on the evaluation, the Mayor may recommend a pay increase consistent with City wage scales, studies, or policy. The salary shall be paid bi-weekly via the City's payroll system and shall be subject to any applicable withholding or deductions required by the law. The City shall forward a W-2 to the Employee in accordance with federal law.

3.2 **BENEFITS.** The City shall make Social Security and Medicare match on behalf of the Employee and place the employee on the City's General Liability Policy, UIA, and Workers' Compensation Policy. The Employee is allowed to participate in the City's benefit plan to include medical, dental, vision, and life insurance as outlined in a separate document which will be provided to the employee in accordance with Public Act 152 (hard cap) for medical, and will adhere to the 90 days waiting period for benefit eligibility. Employee will be subject to the City's published rates, fees, and eligibility rules for any health insurance programs and coverage levels that Employee chooses to enroll in. Employee's regular work schedule must conform to the required minimum hours per week necessary to qualify for coverage. Employee may request a current version of the employee benefits guide from the City's human resources department to ensure Employee is informed of the benefits offerings and any applicable enrollment rules and deadlines. All holidays observed by the City shall also be paid, non-work days for the Employee, barring emergency situation which may require the Employee's attendance. Commensurate with the holiday pay schedule as outlined in the police supervisor's collective bargaining agreement, the Employee shall be entitled to holiday pay at six and three/tenths percent (6.3%) of base pay to be issued by December 1 each year. Commensurate to other City employees holding a leader level position, the City shall provide a designated work area, staff support, equipment, necessary training and access to a vehicle insured and maintained by the City. The Employee is eligible for additional fringe benefits commensurate to those as outlined in the police supervisor's collective bargaining agreement for longevity and seniority pay. As a condition of employment, the City agrees to provide, at no cost to the Chief, a semi or unmarked police vehicle which will afford the Chief the opportunity to lawfully respond to emergency situations and to drive to and from his place of residence in accordance with City policy.

**3.3. UNIFORM ALLOWANCE.** Employee will be paid two percent (2%) of base salary as an annual stipend for the purpose of maintaining a set of uniforms, in serviceable condition, neat and clean. The stipend will be issued on or about the 30th of September.

3.4 **MCOLES CERTIFICATION BONUS.** Employee will be paid $3,000 annual stipend for meeting and maintaining licensure through Michigan Commission on Law Enforcement Standards and such payment shall be issued around or about March 1 annually.

## IV. TERMINATION

4.1 Employee understands that employment with the City is "at-will" and both the City and Employee may terminate the employment relationship at any time, for any reason, with or without notice and with or without cause, and wages earned shall be paid at the next payroll session. Unless terminated, or mutually extended as set forth in Paragraph 5.5 below, this Agreement will

automatically terminate at the end of the day on June 30, 2026. In the event the Employee chooses to terminate this Agreement before June 30, 2026, Employee will endeavor to provide the City with two (2) business weeks' notice of termination. Employee understands that no representative of the City has the authority to modify, orally or in writing, the at-will nature of Employee's employment relationship except through a written modification to this Agreement signed by the Mayor and Employee, which expressly refers to and modifies the Employee's at-will employment.

In the event the City chooses to terminate this Agreement before June 30, 2026, the City shall pay Employee a sum equal to the Employee's annual base salary together with payment for unused vacation time and accumulated vacation time; and unused sick days; and all other accumulated benefits as set forth in the policies of the City of Dearborn Heights. In addition, the City shall pay the Consolidated Omnibus Budget Reconciliation Act (C.O.B.R.A.) premiums for the medical, dental and vision insurances for up to one (1) year unless Employee otherwise secures medical insurance benefits, dental and vision insurances benefits from another source.

## V. GENERAL PROVISIONS

5.1 **COMPLETE AGREEMENT**. This Agreement sets forth and establishes the entire understanding between the City and the Employee relating to the employment of the Employee by the City. Any prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement. The Parties by mutual written agreement may amend any provision of this Agreement during the term of this Agreement; such amendments shall be incorporated and made a part of this Agreement.

5.2 **BINDING EFFECT/ASSIGNMENT.** This Agreement shall be binding on the City and the Employee as well as their heirs, assigns, executors, personal representatives and successors in interest. This Agreement is personal to each of the parties and neither party may assign or delegate any of its rights or obligations under this Agreement without first obtaining the other's written consent.

5.3 **SAVINGS CLAUSE.** If any term or provision of this Agreement, as applied to any party or to any circumstance, is declared by a court of competent jurisdiction hereof to be illegal, unenforceable or void in any situation and in any jurisdiction, such determination shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. The Parties agree that the court or arbitrator making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases or to replace any illegal, unenforceable or void term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

5.4 **CONTROLLING LAW.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan and jurisdiction shall rest in a court of competent jurisdiction within Wayne County, Michigan.

5.5 **EXTENSION.** This Agreement may be extended by mutual written agreement only.

5.6    **COUNTERPARTS.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument.  A signature made on a facsimile copy of this Agreement or a signature to this Agreement transmitted by facsimile shall have the same effect as an original signature.


      **WHEREFORE,** the Parties have executed this Agreement freely and voluntarily by affixing their signatures below:

**JERROD S. HART**                              **CITY OF DEARBORN HEIGHTS: BILL BAZZI, MAYOR**



_Jerrod S Hart_                                _signature_
Date: ___12/12___, 2023.           Date: ___12/12___, 2023.

# EXHIBIT 11

## SWOPE EMPLOYMENT CONTRACT

## PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT
## BETWEEN THE CITY OF DEARBORN HEIGHTS AND KEVIN M. SWOPE

This Professional Services Employment Agreement (hereinafter "Agreement") is to set forth the terms and conditions of employment of a **FULL TIME EXEMPT** employee, and is entered into between the City of Dearborn Heights, a municipal corporation (hereinafter "City") and **KEVIN M. SWOPE** (hereinafter "Employee"); collectively referred to as the "Parties".

WHEREAS, the MAYOR is empowered, to appoint and retain a full time **DIRECTOR OF POLICE OPERATIONS,** and hereby appoints Employee for the effective and efficient operation of the City's Police Department; and

WHEREAS Employee has agreed to accept employment as a full time employee, subject to the terms, conditions and provisions of this Agreement.

THEREFORE, in consideration of the mutual covenants contained herein, the consideration of which is hereby stipulated to; the Parties agree as follows:

**Recitals.** The introductory, "whereas," and "therefore" paragraphs set forth above (hereafter, "Recitals") are an integral part of this Agreement and are incorporated into it by reference.

## I. TERM

1.1    The full time employee appointment shall be for the term commencing on July 1, 2023 (the "Commencement Date") and shall continue up to and including June 30, 2026.

## II. EMPLOYMENT

2.1    **DUTIES.** The Employee shall serve the City as the Director of Police Operations of its Police Department as set forth by applicable laws under City of Dearborn Heights Charter and Ordinances.

The Employee shall specifically serve the City as follows:

1. Serve as the Director of Police Operations and as such to lead the operations of the police department and to recommend and implement processes and procedures aligned with current best practices, applicable laws, and policies to achieve the efficient and ethical management of the aforementioned divisions;
2. Serve the residents of Dearborn Heights in a fair and respectful manner, and where feasible within the confines of the law, and legal practices, provide transparency into the policies and procedures of the Dearborn Heights police department;
3. To lead the employees of the police department in all matters germane to the above mentioned scope of responsibilities.
4. The Director's immediate supervisor shall be the Police Chief. Director acknowledges, understands and agrees that the Police Chief shall have the final authority and the power to direct,

1

control or supervise the manner of Director's duties, consistent with the laws of the State of Michigan, the City Charter, City Ordinances, and this Agreement.

The Employee shall perform these specific duties with reasonable care, diligence, skill and expertise and perform all duties necessary to meet the goals and expectations of the City.

2.2 **CITY COUNCIL MEETINGS.** Generally, the Director shall not be required to attend meetings of the City Council, both public and closed, except to the extent to which attendance would be in lieu of the Police Chief who through absence, or other causes is unable to attend and requests the Director to attend on his/her behalf.

2.3 **INDEMNIFICATION.** To the extent it may be permitted to do by applicable law, the City does hereby agree to defend, hold harmless, and indemnify the Employee from any and all demands, claims, suits, actions, judgments, expenses and attorneys' fees included in any legal proceedings brought against the Employee in the employee's individual or official capacity as an employee, provided that the incident(s), which is (are) the basis of any demand, claim, suits, actions, judgments, expenses and attorneys' fees, arises in the future, from an act or omission of the Employee, as an employee of the City; excluding, however, any demand, claim, suits, actions, judgments, expenses and attorneys' fees for those claims or any causes of action where the Employee committed an intentional, willful and wrongful act or omission, or acted in bad faith; and excluding any costs, fees, expenses or damages that would be recoverable or payable under an insurance contract, held either by the City or by the Employee. The provisions of this Paragraph 2.3 shall survive the termination, expiration or other end of this Agreement and/or the Employee's employment with the City.

2.4 **HOURS OF WORK.** Employee and City understand and agree that Employee is being employed in a salaried exempt full-time position, with a 260 workday calendar. The Employee acknowledges the proper performance of the duties require the Employee to generally observe normal business hours and will also require the performance of necessary services outside of normal business hours. In general, the Employee's business hours shall be flexible in nature and be eight (8) hours per day Monday through Friday. The Employee shall not regularly work weekends or holidays set by the City, however, it is understood that there may be circumstances, including but not limited to emergency or safety concerns and community relations requirements, which require Employee to work additional hours, weekends, or holidays. Should additional work be required, it is with the understanding that no further compensation shall be earned. The Employee's Monday through Friday work schedule is permitted by mutual consent between the City and the Employee.

### III. COMPENSATION

3.1 **SALARY.** The City shall compensate the Employee at the gross rate of One Hundred Seventeen Thousand, Two Hundred Twenty Dollars and 00/100 ($117,220.00) dollars per year effective July 1, 2023. Base salary adjustments will be made to ensure an eight percent (8%) differential between the base salary of captain in the police supervisor's collective bargaining agreement and the Director of Operations position is maintained. Annually, on or before June 1st,

2

and each year thereafter, the Chief shall meet with the Director to conduct an evaluation of Director's job performance, including an evaluation of Director's performance and/or completion of the goals and expectations previously established. The format and the content of said performance evaluation shall be established by the Chief and shall be provided to the Director prior to the performance review. The Chief, may in his or her discretion, initiate performance evaluations at other times in addition to those set forth herein. Based on the evaluation, the Chief may recommend a pay increase consistent with City wage scales, studies, or policy. The salary shall be paid bi-weekly via the City's payroll system and shall be subject to any applicable withholding or deductions required by the law. The City shall forward a W-2 to the Employee in accordance with federal law.

3:2     **BENEFITS.**  The City shall make Social Security and Medicare match on behalf of the Employee and place the employee on the City's General Liability Policy, UIA, and Workers' Compensation Policy. The Employee is allowed to participate in the City's benefit plan to include medical, dental, vision, and life insurance as outlined in a separate document which will be provided to the employee in accordance with Public Act 152 (hard cap) for medical, and will adhere to the 90 days waiting period for benefit eligibility. Employee will be subject to the City's published rates, fees, and eligibility rules for any health insurance programs and coverage levels that Employee chooses to enroll in. Employee's regular work schedule must conform to the required minimum hours per week necessary to qualify for coverage. Employee may request a current version of the employee benefits guide from the City's human resources department to ensure Employee is informed of the benefits offerings and any applicable enrollment rules and deadlines. All holidays observed by the City shall also be paid; non-work days for the Employee, barring an emergency situation which may require the Employee's attendance. Commensurate with the holiday pay schedule as outlined in the police supervisor's collective bargaining agreement, the Employee shall be entitled to holiday pay at six and three/tenths percent (6.3%) of base pay to be issued by December 1 each year. Commensurate to other City employees holding a Director level position, the City shall provide a designated work area, staff support, equipment, necessary training and access to a vehicle insured and maintained by the City.
The Employee is eligible for additional fringe benefits commensurate to those as outlined in the police supervisor's collective bargaining agreement for longevity and seniority pay. As a condition of employment; the City agrees to provide, at no cost to the Director, a semi or unmarked police vehicle which will afford the Director the opportunity to lawfully respond to emergency situations and to drive to and from his place of residence in accordance with City policy.

3.3.     **UNIFORM ALLOWANCE.**  Employee will be paid two percent (2%) of base salary as an annual stipend for the purpose of maintaining a set of uniforms, in serviceable condition, neat and clean. The stipend will be issued on or about the 30th of September.

3.4     **MCOLES CERTIFICATION BONUS:**  Employee will be paid $3,000 annual stipend for meeting and maintaining licensure through Michigan Commission on Law Enforcement Standards and such payment shall be issued around or about March 1 annually.

## IV. TERMINATION

4.1     Employee understands that employment with the City is "at-will" and both the City and Employee may terminate the employment relationship at any time, for any reason, with or without

notice and with or without cause, and wages earned shall be paid at the next payroll session. Unless terminated, or mutually extended as set forth in Paragraph 5.5 below, this Agreement will automatically terminate at the end of the day on June 30, 2026. In the event the Employee chooses to terminate this Agreement before June 30, 2026, Employee will endeavor to provide the City with two (2) business weeks' notice of termination. Employee understands that no representative of the City has the authority to modify, orally or in writing, the at-will nature of Employee's employment relationship except through a written modification to this Agreement signed by the Mayor and Employee, which expressly refers to and modifies the Employee's at-will employment.

In the event the City chooses to terminate this Agreement before June 30, 2026, the City shall pay Employee a sum equal to the Employee's base salary times the number of working days and Holidays in the next succeeding one-hundred eighty (180) calendar day period, together with payment for unused vacation time, and accumulated vacation time, and unused sick days; and all other accumulated benefits as set forth in the policies of the City of Dearborn Heights. In addition, the City shall pay the Consolidated Omnibus Budget Reconciliation Act (C.O.B.R.A.) premiums for the medical, dental and vision insurances for up to six (6) months unless Employee otherwise secures medical insurance benefits, dental and vision insurances benefits from another source.

## V. GENERAL PROVISIONS

5.1 **COMPLETE AGREEMENT.** This Agreement sets forth and establishes the entire understanding between the City and the Employee relating to the employment of the Employee by the City. Any prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement. The Parties by mutual written agreement may amend any provision of this Agreement during the term of this Agreement; such amendments shall be incorporated and made a part of this Agreement.

5.2 **BINDING EFFECT/ASSIGNMENT.** This Agreement shall be binding on the City and the Employee as well as their heirs, assigns, executors, personal representatives and successors in interest. This Agreement is personal to each of the parties and neither party may assign or delegate any of its rights or obligations under this Agreement without first obtaining the other's written consent.

5.3 **SAVINGS CLAUSE.** If any term or provision of this Agreement, as applied to any party or to any circumstance, is declared by a court of competent jurisdiction hereof to be illegal, unenforceable or void in any situation and in any jurisdiction, such determination shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. The Parties agree that the court or arbitrator making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases or to replace any illegal, unenforceable or void term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

4

**5.4    CONTROLLING LAW.**  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan and jurisdiction shall rest in a court of competent jurisdiction within Wayne County, Michigan.                     .

**5.5    EXTENSION.**  This Agreement may be extended by mutual written agreement only.

**5.6    COUNTERPARTS.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument.  A signature made on a facsimile copy of this Agreement or a signature to this Agreement transmitted by facsimile shall have the same effect as an original signature.

   **WHEREFORE,** the Parties have executed this Agreement freely and voluntarily by affixing their signatures below:

**KEVIN M. SWOPE**                                   **CITY OF DEARBORN HEIGHTS:**
                                                     **BILL BAZZI, MAYOR**

Date:  12/12         , 2023.              Date:  12/12          , 2023.

5

50390671.v1-OGLETREE

**EXHIBIT 12**

**MAYOR PRESS RELEASE**



# INFORMATION UPDATE

### City of Dearborn Heights, Michigan
#### Bill Bazzi, Mayor

January 24, 2024

*For more information, contact:*                    **FOR IMMEDIATE RELEASE**
Bill Bazzi, Mayor
City of Dearborn Heights
Tel: (313) 791-3493
E-mail: bbazzi@dearbornheightsmi.gov

## Dearborn Heights Mayor expresses disappointment over actions to defund police department

*Dearborn Heights, Michigan* – At its January 23 meeting, the Dearborn Heights City Council approved several resolutions that have run afoul with the City's Administration.

During the meeting, the Dearborn Heights City Council approved several illegal resolutions that expose the taxpayers to hundreds of thousands of dollars in legal fees and liability, as well as exposing some members to criminal prosecution for flagrant violations of federal law. In doing so, they have openly defied the legal advice of the city's corporation counsel who city council confirmed nearly two years ago.

During the meeting, the City Council approved the cancellation of salary and benefits for Police Department Directors Kevin Swope and Paul Vanderplow, allegedly eliminating their positions. City Council also introduced and passed "No Confidence" Resolutions for Police Chief Jerrod Hart, City Attorney Roger Farihna, and Mayor Bazzi.

*(more)*

City of Dearborn Heights
6045 Fenton
Dearborn Heights, Michigan 48127
(313) 791-3400

"The residents of our city deserve better than these illegal attacks on the leadership of our Police Department. I brought Chief Hart and his team into the department to change its culture and make it more responsive to the long-unaddressed needs of our businesses and especially our residents. They have succeeded in rooting out corruption and institutional inefficiency. "I believe in our officers. Unfortunately, morale suffered from constant bullying, inappropriate behavior, a lack of professionalism and favoritism that made an already difficult job worse. The people elected me to rectify these problems and give them the responsive community-oriented law enforcement they deserve to receive for the hard-earned tax dollars they pay. City Council's actions threaten to turn back the clock.

These three individuals, who together represent over 90 years of high-level law enforcement management have made remarkable strides in bringing the Dearborn Heights Police Department back to a well-managed, transparent and respectable organization in the eyes of our community. As a Mayor who has emphasized the restoration of law and order, accountability, transparency and respectability in our community, I am astounded our Council Members have made the effort to so blatantly defund and derail the Dearborn Heights Police Department and put our progress in jeopardy".

Since the new Administration has begun its "cleaning-up" initiative of the department, several areas of serious concern have been identified and corrected. Among them are:

- **Traffic Ticket Fixing:** The administration uncovered and addressed/eliminated a decade-long ticket fixing scandal, which was shown to void thousands of tickets by officers, for "preferred" business people, residents and other personal contacts.

- **Traffic Ticket Quota System:** The administration also uncovered an illegal ticket writing quota system, which rewarded selected officers for taking part. Reportedly, officers would, during a traffic stop, simply warn and release a

*(more)*

City of Dearborn Heights
6045 Fenton
Dearborn Heights, Michigan 48127
(313) 791-3400

motorist, then return to their patrol car, write a ticket, and immediately void the ticket (to ensure the officer would receive "credit" for writing the ticket).

- **Excessive Use of Restraint/Force:** The administration, in response to several complaints, investigated select officers' use of excessive force. The Administration has since developed stringent policies governing the use of restraining when facing unusual circumstances. After discovering these abuses, selected Council Members attempted to remove the Department's Leadership who corrected the situation.

- **Evidence Room Policies:** The police administration corrected the flagrant disregard of evidence room basic polices and procedures.

"It's alarming that selected Council Members would oppose having a professional, seasoned leadership team with a proven track record in place, which is committed to effectively instilling law and order, accountability, and partnering with the community on many mutually-beneficial initiatives. This is even more frustrating that their efforts are, in part, further fueled by the support of a disgruntled former city attorney who was earlier relieved of his duties due to ineffective performance.

We will continue to work in the best interest of our Dearborn Heights community and will not succumb to attempts of intimidation or harassment of myself or my staff, to strongarm this administration to work for the interest of a select few -- or be bullied into replacing this PD leadership team with underqualified individuals.  In my elected capacity as Mayor, I take seriously the responsibility of making decisions for the safety and well-being of our nearly 65,000 residents.  Although I certainly disagree with some City Council members on how they would like to run the City, I do respect their point of view and their responsibilities in their

*(more)*

City of Dearborn Heights
6045 Fenton
Dearborn Heights, Michigan 48127
(313) 791-3400

elected capacity. However, it appears that some council members may not fully understand their role and responsibilities in local government.

I took an oath to lead the City and lawfully execute my duties in accordance with the best interest of our nearly 65,000 residents, as opposed to the demands which serve the special interests of a select few. This administration continues to work tirelessly as we identify and analyze critical bottlenecks, implement new ideas, strategies and solutions to effectively propel our City forward. We hope that the entire council body will join us, and see the value of working together and utilizing their role as council members to help not impede this progress."

##