## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

---

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

## EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW                    Case No. 2:24-cv-10240
JERROD HART,                                     Hon. Mark A. Goldsmith
                                                 Magistrate David R. Grand

       Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

       Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

       Intervening Defendant.

---

## AFFIDAVIT IN SUPPORT OF PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

STATE OF MICHIGAN )
               )
COUNTY OF WAYNE  )

I, Jerrod Hart, being first duly sworn, depose and state as follows:

### I. Background and Qualifications

1.      I am 57 years old and I reside in Milan, Michigan.

2.      I make this affidavit based on my direct personal experiences and on

incidents of which I have direct personal knowledge. If called to do so, I could

testify under oath in court as to the events and facts described in this affidavit.   I hereby swear that all statements found in this affidavit are true and correct.

3.      I am a law enforcement officer with more than thirty-two (32) years of experience.

4.      I have more than twenty-six (26) years of service with the Novi Police Department. When I left the Novi Police Department, I was the Assistant Chief of Police.

5.      I served more than four (4) years as Chief of Police for the City of Saline, Michigan.

6.      I served more than two (2) years as Chief of Police for the City of Dearborn Heights, Michigan

7.      I possess extensive executive law enforcement experience in administration, investigations, emergency management, accreditation, and labor relations.

8.      By early 2022, I was professionally established, financially secure, and did not need to seek new employment.

**II. Recruitment to Dearborn Heights**

9.      In early 2022, shortly after my 54th birthday and while completing my fourth year as Chief of Police in Saline, I was contacted on my personal cell

phone by Robert "Bob" Stevenson, Executive Director of the Michigan Association of Chiefs of Police.

10. Mr. Stevenson advised that he had been contacted regarding the City of Dearborn Heights, which was seeking a new Chief of Police due to severe dysfunction within its police department.

11. Mr. Stevenson knew my reputation, leadership style, and experience with accreditation, organizational reform, and accountability, and asked whether I would be willing to explore the opportunity.

12. I grew up near Dearborn Heights, and my childhood church was located within the City. Because of that personal connection, and because I understood the gravity of what I was being told, I agreed to learn more.

13. Shortly thereafter, I spoke with former Dearborn Police Chief Ron Haddad, who encouraged me to meet with Mayor Bill Bazzi.

14. In early January of 2022, I met with Mayor Bazzi and the City's Human Resources Director, Margaret Hazlett, at City Hall.

15. During that meeting, the Mayor described a police department plagued by misconduct, corruption, internal hostility, and a lack of leadership.

16. The Mayor conveyed a sense of urgency and desperation. It was clear the City had been unable to attract qualified candidates willing to take on the situation.

3

17.    I made clear that I would not accept the position unless I could run the police department independently, ethically, and without political interference.

18.    I also disclosed to the Mayor that I suffer from Type II diabetes, and explained that unchecked political interference and hostility could seriously jeopardize my health.

19.    The Mayor assured me he had full authority under the City Charter to appoint the Chief of Police and command staff, and that the City Council supported reform.

20.    I relied on those assurances in accepting the position.

21.    After consulting with my wife and giving the matter serious thought, I accepted the position not out of ambition, but out of a sense of obligation to the profession and the community.

22.    I accepted the position believing the City genuinely wanted reform, transparency, and accountability.

**III.    Conditions Discovered Upon Assuming Office**

23.    I officially began my employment as Chief of Police of the Dearborn Heights Police Department on February 28, 2022.

24.    From my first days in the position, it was immediately apparent that the dysfunction described to me had been understated.

25.    The police facility itself was unsecured, deteriorated, and neglected.

4

26.     Keycard access systems were broken, keys were uncontrolled, and sensitive areas were accessible to unauthorized personnel.

27.     Evidence, property, cash, and firearms were stored throughout the building without proper controls.

28.     There were no cameras in critical areas, including stairwells and administrative floors.

29.     Many staff members used their own personal email accounts due to an unreliable city email system. This created issues for Freedom of Information requests and discovery.

30.     The physical condition of the building reflected the condition of the organization: no accountability, no discipline, and no effective oversight.

31.     Within weeks of my arrival, I began discovering serious irregularities involving evidence and property handling, firearms inventory and compliance, cash and forfeiture funds, and internal investigations that had never been completed.

## IV. Reports of Misconduct and Illegal Activity

### a. Evidence, Cash, and Firearms Mismanagement

32.     On April 28, 2022, Commissioner Joseph Tomas and I discovered large quantities of cash, jewelry, and evidence unsecured in the Directed Patrol Unit (DPU).

33.     I photographed Rolex watches, cash, and other valuables lacking chain-of-custody documentation.

34.     I immediately reported this to Mayor Bazzi and subsequently discussed it with Council Chair Dave Abdallah and Councilman Ray Muscat.

35.     I further requested a Michigan State Police audit of the DPU cash and evidence.

36.     Shortly thereafter, Sergeant Mitchell, the supervisor responsible for the DPU, retired abruptly after the investigation began.

### b. Accreditation Fraud and Untruthfulness

37.     On May 5, 2022, I reported failed accreditation compliance to Neal Rossow, who led the Michigan Law Enforcement Accreditation Commission (MLEAC).

38.     I discovered that required employee evaluations were fabricated, staff were instructed to sign policies they had never read, and proofs were uploaded to falsely show compliance.

39.     On May 26, 2022, I formally suspended the accreditation process due to untruthfulness.

### c. Firearms and ATF Violations

40.     In July 2022, I discovered illegal purchasing and possession of National Firearms Act weapons, including suppressors, on police letterhead.

41.   Firearms inventories were inconsistent and changed repeatedly.

42.   A department-owned firearm was later found in a magistrate's desk.

43.   I reported these issues to Mayor Bazzi, Council Chair Abdallah, and Council Member Ray Muscat.

### d.   Ticket Fixing and Political Interference

44.   In early 2023, my Directors uncovered hundreds of traffic citations improperly dismissed at the civil-infraction conference stage.

45.   On March 8, 2023, I authorized an investigation into ticket fixing.

46.   On June 2, 2023, I formally warned City Council in writing not to interfere with enforcement decisions.

## V. Demands for Preferential Treatment

47.   On January 26, 2023, Directors Vanderplow, Swope, and myself met with City Council Members Mo Baydoun, Hassan Ahmad, and Nancy Breyer.

48.   During that meeting, Councilman Baydoun made three explicit demands that Sergeant Mohamad Bazzy receive preferential treatment, including promotion and protection from discipline.

49.   I refused each demand.

50.   My Directors, Paul Vanderplow and Kevin Swope, also refused.

51.   This meeting marked a drastic and immediate escalation of the ongoing retaliation against me.

## VI. External Reporting

52.     Throughout 2022 and 2023, I repeatedly reported misconduct, corruption, and legal violations to City leadership.

53.     When it became clear the problems exceeded internal capacity, I sought assistance from state and federal authorities.

54.     I contacted and worked with the United States Department of Justice (DOJ) Office of Community Oriented Policing Services (COPS), seeking outside evaluation and reform.

55.     DOJ representatives expressed shock at the level of dysfunction they encountered.

56.     City Council members openly mocked the DOJ process and expressed a desire for it to fail.

## VII.  Retaliation

57.     After refusing to provide preferential treatment and continuing to expose misconduct,  I and my leadership team became targets.

58.     City Council members engaged in a sustained campaign of retaliation, including public accusations, threats to defund key positions, interference with investigations, false complaints, and budgetary sabotage.

59.     My directors were targeted as means of forcing my removal.

60.     These actions were intentional and retaliatory.

8

61.    On September 26, 2023, Councilman Hassan Saab publicly attacked and attempted to extort Director Swope during a Council Meeting.

62.    In January 2024, City Council voted to defund the positions of Directors Vanderplow and Swope, despite their positions being contractually protected.

63.    When Director Swope reported the extortion, police systems were improperly accessed by Sergeant Bazzy, Sergeant Zrien, and Officer Hammoud to monitor the report.

64.    The information was leaked to Councilman Saab within minutes.

## VIII. Constructive Discharge

65.    City Council knew that removing my executive support would make it impossible for me to continue as Chief.

66.    In June 2024, the City Council further gutted the police budget, eliminated positions, and cut operational funding.

67.    These actions rendered my continued employment untenable.

68.    I continued working despite these conditions, at the direction of the Mayor, until my health deteriorated.

69.    City Council members knew I suffered from deteriorating health and applied more pressure and stress in an attempt to force me out.

9

70.     Dave Abdallah told me I was too old for the job and that the end was near. He told me to "go home and play with your granddaughter."

71.     I was constructively discharged as a direct result of deliberate actions taken by the City Council.

## IX. Medical Harm and Damages

72.     On October 10, 2023, I suffered a heart attack at my desk while at work.

73.     This was three days after the October 7, 2023, attack by Hamas on Israel.

74.     Prior to my medical emergency on October 10, 2023, Mayor Bazzi informed me that members of the City Council intended to pressure me to make a public statement at that evening Council's meeting expressing support for Palestine.

75.     I understood from that conversation that there would be political pressure placed upon me in my official capacity to take a public position on an international conflict during a City Council meeting.

76.     At the time this occurred, I was already experiencing significant stress related to the ongoing interference, pressure, and events described elsewhere in this affidavit.

77.     Subsequently, I underwent cardiac catheterization and later required placement of a coronary stent during a second catheterization.

78.    I developed chronic spontaneous urticaria, a stress-induced  medical condition requiring ongoing treatment with a biologic drug.

79.    I experienced severe anxiety, insomnia, and emotional distress.

80.    Because of this, I began counseling with a licensed therapist.

81.    My reputation, career, and future earning capacity were permanently damaged.

82.    My family suffered significant emotional and financial harm as a result of these events.

83.    All statements herein are true and correct to the best of my knowledge. Further affiant saith not.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 5, 2026.

JERROD HART

11