# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW  
JERROD HART,

    Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a  
Michigan Municipal Corporation,

    Defendant,

CITY OF DEARBORN HEIGHTS CITY  
COUNCIL, in its official capacity only,

    Intervening Defendant.

Case No. 2:24-cv-10240  
Hon. Mark A. Goldsmith  
Magistrate David R. Grand

_____

**<u>PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT</u>**

**<u>EXHIBIT 14</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

## AFFIDAVIT IN SUPPORT OF PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY DISPOSITION

STATE OF MICHIGAN )
                       )
COUNTY OF WAYNE )

I, Paul Vanderplow, being first duly sworn, depose and state as follows:

### I. Background and Qualifications

    1.    I am 54 years old and I reside in Roscommon, Michigan.

    2.    I make this affidavit based on my direct personal experiences and on incidents of which I have direct personal knowledge. If called to do so, I could

1

testify under oath in court as to the events and facts described in this affidavit. I hereby swear that all statements found in this affidavit are true and correct.

3. I am a law enforcement officer with more than thirty years of experience.

4. I began my federal law enforcement career in approximately 1995 with the Internal Revenue Service – Criminal Investigation Division (IRS-CID) in Detroit, Michigan.

5. I completed approximately twenty-six (26) weeks of formal training at the Federal Law Enforcement Training Center.

6. While assigned to IRS-CID, I investigated matters involving tax evasion, money laundering, public corruption, and illegal tax avoidance schemes.

7. In 2001, I transferred to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), where I served as a street agent, first-line supervisor, second line supervisor as the Assistant Special Agent in Charge of the Dallas Field Division. I was a Bureau Headquarters Division Chief for International Affairs, Chief of Staff for Field Operations, and then elevated to a Senior Executive Service member as the Chief of Special Operations.

8. In 2022, I was appointed Special Agent in Charge of the Detroit Field Division of the ATF.

**II. Recruitment to Dearborn Heights Police Department**

2

9. In or about July 2022, Dearborn Heights Police Chief Jerrod Hart contacted me regarding serious irregularities involving department-purchased firearms subject to Federal / ATF regulations.

10. At my direction, ATF investigators conducted an external firearms audit of the Dearborn Heights Police Department and reported that the Department's firearms recordkeeping was among the worst they had ever encountered.

11. Shortly thereafter, Dearborn Heights and the City of Westland were victims of a series of burglaries involving federal firearms dealers, and I worked closely with Chief Hart on those investigations.

12. During that time, Chief Hart explained that the Police Department lacked experienced administrative leadership and needed immediate reform.

13. In late 2022, Chief Hart invited me to meet with Dearborn Heights Mayor Bill Bazzi regarding a civilian executive role with the City.

14. Mayor Bazzi represented that he wanted to build a professional police department grounded in integrity, transparency, and accountability.

15. Although I was serving in what I considered my ideal federal posting and had seven productive years remaining before mandatory retirement, I accepted the City's offer in January 2023.

16. I accepted this role because I believed I could help serve the City, strengthen integrity within the department, and address corruption. I viewed the opportunity as a matter of public service and believed it was the right thing to do.

17. I began work in January 2023 as Director of Support Services for the Dearborn Heights Police Department, responsible for administrative, investigative, and compliance functions, reporting directly to Chief Hart.

### III. Property Room and Firearms Violations

18. During my first week of employment, I requested an audit and inspection of the department's seized property room, consistent with my standard practice in law enforcement leadership roles.

19. Captain Paul Erickson, who oversaw the property room, repeatedly refused or delayed access, providing multiple excuses.

20. I reported this resistance to Chief Hart.

21. After issuing a direct order on approximately the fourth day of my employment, I was finally granted access to the property room.

22. Upon entry, I observed extreme disorganization and conditions consistent with gross policy violations and possible criminal conduct.

23. I immediately reported these findings to Chief Hart and to City Corporations Counsel Roger Farhina.

24. The property room was sealed, locks were changed, and access was restricted to a single command officer.

25. The City was required to hire an external auditing firm at a cost of approximately $50,000, and remediation took more than six months.

26. I also discovered that the same property custodian was responsible for Michigan pistol sales records, which by law must be entered within ten days.

27. The Department was more than 900 pistol sales records in arrears, exposing law-abiding citizens to potential criminal liability and creating significant legal risk for the City.

28. This was reported to the Michigan State Police Firearms Unit, who is the repository for the State system.

29. I further discovered that the Department lacked a complete and reliable inventory of its own firearms.

30. This issue was evident as late as November 2024, when a duty weapon was discovered behind a filing cabinet during a renovation and was not listed on any departmental inventory.

## IV. Preferential Promotion Demand

31. On January 26, 2023, I attended a meeting with Chief Hart, Director Kevin Swope, and City Council members Mo Baydoun, Hassan Ahmad, and Nancy Bryer.

32. During that meeting, Councilman Baydoun repeatedly demanded the promotion of Sergeant Mohamad Bazzy, who was not eligible for such promotion under the collective bargaining agreement.

33. When the request was refused, Councilman Baydoun called for the removal of Chief Hart, Director Swope, and myself, and stated that we should be replaced with "someone from the community," which I understood to mean someone of Arab ethnicity.

34. I promptly reported this incident to Mayor Bazzi and the Director of Human Resources.

35. During this time period and nearly all relevant time periods, I experienced consistent and ongoing efforts to pressure myself, Chief Hart, and Director Swope to halt lawful administrative actions and to permit actions that would have violated applicable law, City policy, or the collective bargaining agreement.

36. As these events unfolded, I sought guidance and reported my concerns to numerous individuals and agencies. I spoke with City Councilman Ray Muscat, who at that time expressed support for adherence to lawful process and proper governance. I also communicated my concerns to federal law enforcement agents, including agents of the Federal Bureau of Investigation and the Internal Revenue Service; members of the Michigan State Police; representatives of

relevant regulatory agencies; outside legal counsel; leadership members from neighboring municipalities; representatives of the Michigan Municipal Risk Management Authority (MMRMA); and members of the City's external audit staff.

37. It became my understanding, based on the pattern of conduct I observed and information available to me at the time, that certain individuals identified throughout this affidavit as acting on behalf of or as intermediaries for members of the local Arab community or individuals described as "Arab elders" were exerting influence over City governmental processes and personnel in a manner that I believed was intended to shield improper or unlawful conduct from scrutiny.

38. For instance, I observed that Hussein Farhat, while acting as Emergency Manager for the City of Dearborn Heights, was assigned a City email account, but that he did not log in to that account at any time. It was my understanding that this position was created for him in title only,

39. I became concerned that the direction in which the City was heading created vulnerabilities for fraud, abuse of public resources, and potential broader harm to the public interest.

**V. Asset Forfeiture Irregularities**

40. Following this meeting, I began reviewing Internal Affairs files maintained by Captain Erickson and encountered obstruction, missing records, and disorganized files requiring reconstruction.

41. On February 14, 2023, after a Dearborn Heights City Council meeting, Councilman Baydoun accused Chief Hart, Director Swope, and me of unprofessional and criminal conduct without evidence.

42. On February 17, 2023, Captain Erickson abruptly went on leave until retirement amid inquiries into his areas of responsibility.

43. On February 24, 2023, the officer responsible for firearms inventory and training records resigned during ongoing inquiries.

44. In or about March 2023, I began reviewing the Police Department's asset forfeiture funds, totaling approximately $1.8 million across multiple accounts.

45. I identified missing records and undocumented transfers.

46. Dearborn Heights City Treasurer Lisa Hicks-Clayton repeatedly obstructed my access to documentation and bank records.

47. Independent auditors confirmed my concerns regarding the forfeiture account.

48. I reported these issues to City leadership and to federal authorities, including the Federal Bureau of Investigation and the United States Department of Justice.

## VI. Appointment as City Internal Affairs Investigator

49. In or about January 2024, Mayor Bazzi appointed me as Internal Affairs Investigator for the City of Dearborn Heights.

50. In that role, I investigated allegations of fraud, waste, and abuse involving City employees, excluding police department matters.

## VII. Retaliation and Escalation

51. Beginning in 2023 and continuing through April 2025, members of the Dearborn Heights City Council engaged in repeated public and private actions intended to remove me from my position.

52. At all relevant times, I was authorized to carry a firearm under HR 218 – Law Enforcement Officers Safety Act of 2004, as a retired law enforcement officer in good standing.

53. Despite knowing that I was lawfully licensed after I had multiple discussions explaining this, Council Members, particularly Hassan Saab, Mo Baydoun, Tom Wencel, and Denise Malinowski publicly made an issue of the fact that I carried a firearm.

54. In January 2024, the City Council voted to defund my position after previously ratifying my employment contract ten months earlier.

55. On or about February 4, 2024, Dearborn Heights City Council member Hassan Saab filed a criminal complaint against me alleging stalking after observing me driving in his vicinity while I was on official City business.

56. The Michigan State Police investigated that complaint and determined it to be invalid.

57. As a result of that false accusation, I was placed on leave and suffered reputational harm and professional damage.

58. Prior to the false stalking accusation, I had been vetted and selected for admission into the January 2025 police academy.

59. After the false stalking accusation was made by Councilman Saab, I was denied admission into that police academy class.

60. I was also denied clearance to serve as the Dearborn Heights Police Department's executive representative on the Federal Bureau of Investigation's Joint Terrorism Task Force ("JTTF").

61. Earlier in my career, while employed by the ATF, I had served on the Federal partner board associated with that same task force.

62. It is my understanding that the false stalking accusation was the sole reason I was denied both the academy admission and the JTTF clearance,

63. A Lieutenant with the Michigan State Police authored a letter of clearance to the Michigan Commission of Law Enforcement Standards (MCOLES) addressing the matter.

64. That letter allowed me to obtain clearance and ultimately secure admission into the June 2025 Police academy class.

65. In public City Council meetings throughout 2024 and 2025, Council members repeatedly disparaged me by name and accused me of misconduct.

66. This conduct was unusual because, during prior investigations involving other individuals, Council members were typically quiet and did not publicly comment in this manner.

67. At various City Council meetings throughout this period, multiple Dearborn Heights employees appeared to criticize myself, Director Swope, and Chief Hart. These employees included: Rachel LaPointe (Water Billing Supervisor), Zouhair Abdel Hak (Treasurer's Office), Sue Kaminsky (Mayor's Secretary), Gary Miotke (City Attorney), Amad Elzayt (Emergency Management Director), and Rose Tripepi (Building Board of Appeals).

68. These individuals often made statements and allegations that relied upon confidential or internal documentation and information. Such materials would not have been accessible to them in the ordinary course of their respective

job duties and could only have been obtained if disclosed or leaked by City Council members.

69. After Chief Hart, Director Swope, and I were constructively terminated, it is my understanding that these individuals ceased appearing at City Council meetings, despite the fact that many of the issues which they had previously expressed concern remained ongoing.

70. The individuals all remain Dearborn Heights employees under now Mayor Mo Baydoun's administration.

71. In addition to these individuals, TCD news, an organization controlled and influenced by Mo Baydoun, consistently criticized myself, Director Swope, and Chief Hart.

72. TCD is now the contracted press relations firm for the City of Dearborn Heights.

73. On April 3, 2025, while I was on duty at the scene of a flooded area of the City, Councilman Tom Wencel approached and stated to me that my "time was limited."

74. That statement was captured on video.

75. On the evening of April 22, 2025, the City Council voted 6-0 to prevent me from fulfilling responsibilities and duties in my position of Interim Comptroller and to remove my authority to sign financial documents on behalf

12

of the City, despite the recommendation of Mayor Bazzi and my known formal education and high-level experience.

76. Prior to that date, the City Council had never vetoed administrative signatory authority.

77. The non-approval/removal of my authority effectively stripped me of my core executive responsibilities and rendered my continued employment untenable.

78. I was subsequently replaced by an unqualified individual with substantially less managerial and accounting experience than I had. This individual was a younger Arab American.

79. These actions taken against me occurred after and in response to my reporting of corruption, financial irregularities, and refusal to provide preferential treatment.

## VIII. Constructive Discharge

80. The cumulative effect of the defunding vote, false criminal accusation, public disparagement, threats, removal of authority, and ongoing hostility created working conditions that were intolerable.

81. On April 22, 2025, I considered myself constructively discharged.

82. My final day of employment with the City of Dearborn Heights was May 9, 2025.

83. After my termination, I was able to attend the Oakland Police Academy and later accepted employment as a police officer with the Village of Kalkaska.

84. My salary with Dearborn Heights was approximately $117,000 per year, while my salary with the Village of Kalkaska is approximately $46,000 per year.

85. Had the actions described above not occurred, I would have remained in my position with Dearborn Heights for approximately three additional years.

86. As a direct result of my employment with Dearborn Heights and the retaliation I experienced, I suffered severe reputational, emotional, and physical stress, and damage to my marriage.

87. My adult children pursuing law enforcement careers have also been negatively affected.

88. All statements herein are true and correct to the best of my knowledge. Further affiant saith not.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 4th, 2026.

_____
PAUL VANDERPLOW