# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

---

## PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

## EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

      Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

      Intervening Defendant.

_____

## AFFIDAVIT IN SUPPORT OF PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT

STATE OF MICHIGAN )
                )
COUNTY OF WAYNE  )

I, **Kevin Swope**, being first duly sworn, depose and state as follows:

### I. Background and Qualifications

    1.     I am 48 years old and I reside in Green Oak Township, Michigan.

    2.     I make this affidavit based on my direct personal experiences and on

incidents of which I have direct personal knowledge. If called to do so, I could

1

testify under oath in court as to the events and facts described in this affidavit. I hereby swear that all statements found in this affidavit are true and correct.

3.     I am a law enforcement officer with more than twenty-seven (27) years of experience.

4.     I began my law enforcement career in January 1998 and remained a sworn officer until February 2025.

5.     During my career, I served in numerous roles, including Patrol Officer, Field Training Officer, Special Operations Officer, School Resource Officer, Youth Officer/Detective, Crisis Negotiator, Alcohol Enforcement and Selective Enforcement Team Member (OWI and hazardous driving enforcement), Patrol Division Sergeant, Traffic Bureau Commander, Accident Reconstruction Team Commander, Crisis Negotiation Team Commander, Office of Highway Safety Planning Grant Manager, Traffic Bureau criminal investigator, Patrol division lieutenant, Support Services Lieutenant, Professional Standards Lieutenant, Training Lieutenant, Accreditation Manager, liaison for a multi-jurisdictional dispatch center, Director of Police Operations, Interim Police Chief, and Police Chief.

6.     I obtained certifications in field training, alcohol enforcement, accident investigations, crisis negotiations, first aid, active shooter response, and other law enforcement-related areas.

7.    I attended Eastern Michigan University and Police Staff and Command and hold a bachelor's degree in criminal justice administration.

8.    In January 2023, I was eligible for an Act 88 retirement from the Westland Police Department.

## II. Recruitment to Dearborn Heights Police Department

9.    In late 2022, I learned from Westland Police Chief Jeff Jedruisk that the Dearborn Heights Police Department ("DHPD") was seeking a Director of Police Operations.

10.    Chief Jedruisk referred me to Dearborn Heights Police Chief Jerrod Hart.

11.    Before speaking with Chief Hart, I did not know him and did not know the exact responsibilities of the Director of Police Operations position at DHPD.

12.    At that time, I had finished first on the Westland Police Department Deputy Chief's test and had no intention of retiring from Westland PD.

13.    In December 2022, I spoke with Chief Jerrod Hart, who told me he had recently been appointed Chief of Police for Dearborn Heights and that the City was seeking to appoint a Director of Police Operations.

14.    In that December 2022 conversation, Chief Hart explained that the department had major issues and corruption and that the City needed experienced police leadership capable of turning the department around.

3

15.   Although I did not need to retire from Westland, I chose to retire to accept the Dearborn Heights position because I believed the work was important and needed.

16.   In making that decision, I left a high-paying salary position where I earned approximately $175,000 per year for a position in Dearborn Heights that paid approximately $90,000 per year.

17.   On December 12, 2022, I interviewed for the Director of Police Operations position with DHPD.

18.   On December 29, 2022, I was offered the position by HR Director Margaret Hazlett.

19.   The job offer included a Director of Police Operations job description, job acceptance form, director's fringe benefit guide, and a copy of my employment contract, and Director Hazlett specifically explained the position was an appointed Director position.

20.   I accepted the position and was appointed by Dearborn Heights Mayor Bill Bazzi as a director within the City of Dearborn Heights, with my first day on the job being January 9, 2023.

### III. Job Duties and Responsibilities Performed as Director

21.   Beginning January 9, 2023, I performed the job duties in the Director of Police Operations job description provided by HR Director Hazlett, including

supervising and leading personnel to fulfill objectives of police operations on a day-to-day basis.

22.    I exercised operational control and responsibility over police operations functions and recommended improved methods for performing duties within my command.

23.    I reviewed, developed, and maintained best-practice policies, procedures, and directives, and reviewed resource allocation including personnel and financial resources.

24.    I assisted in preparation of the annual department budget, coordinated and reviewed performance evaluations, provided data-driven feedback to patrol operations, and briefed the Chief of Police, Jerrod Hart, on conditions requiring attention.

25.    I served as liaison between the Office of Community Oriented Policing Services (COPS Office) Collaborative Reform Initiative (CRI) Team and DHPD, conducted disciplinary hearings as needed, acted as liaison with community groups, mentored and coached members of the department, and performed additional duties assigned by Chief Hart.

**IV. Improper Promotion Pressure and Early Retaliatory Conduct**

26.    On January 26, 2023, I met with Council Members Mo Baydoun, Hassan Ahmad, and Nancy Breyer in the DHPD Chief's conference room.

27.     During this meeting, Councilman Baydoun made three separate requests on three separate occasions that Sergeant Mohamad Bazzy be treated differently than other members of the department for facilitating a promotion to the rank of lieutenant.

28.     Chief Hart denied the first request at that meeting, Director Paul Vanderplow denied the second request at that meeting, and I denied Councilman Baydoun's third request at that meeting.

29.     Councilman Baydoun's request at this meeting was, in my understanding, an attempt to improperly influence a promotional decision and would violate the supervisors' collective bargaining agreement.

30.     After the requests were denied, Councilman Baydoun reacted negatively and argued Sgt. Bazzy deserved a promotion based on perceived performance and involvement in the community.

31.     On February 14, 2023, during a conversation with Chief Hart, Councilman Baydoun became irate and made baseless and unsubstantiated allegations that Chief Hart, Director Vanderplow, and I were engaged in criminal or inappropriate conduct related to internal investigations.

32.     Councilman Baydoun made the February 14th accusation in the presence of other council members in a public hallway at City Hall.

33.    Councilman Baydoun's accusations occurred after I removed internal investigations from Captain Paul Erickson so that I could complete them because Captain Erickson was not fulfilling job responsibilities with respect to those investigations.

34.    On a later date, Councilman Baydoun told me he was protective of Captain Erickson because Erickson was married to a woman from the Lebanese community.

35.    Councilman Baydoun also disclosed that he previously believed Captain Erickson was racist, but that view changed after learning who Erickson was married to.

**V. Internal Investigations and Operational Reviews**

36.    In early 2023, I initiated a review of the Traffic Bureau's operations and discovered an illegal ticket quota system developed by officers within the department.

37.    I learned that this ticket quota system was being managed by Sergeant Jordan Dottor, who was in charge of the Traffic Bureau.

38.    I determined the ticket quota process was illegal and I eliminated the practice by issuing a directive via email and a formal order to all personnel through the PowerDMS record management system.

39.    In early 2023, I shared information about the quota system with the City-Attorney, the District Court, and City Leadership.

40.    After the quota practice was eliminated, the District Court complained that revenue had decreased as a result of a reduction in the number of tickets being written.

41.    Following my investigation and dismantling of the Traffic Bureau's quota practices, Council Members expressed displeasure in City Council meetings and on social media regarding my investigation and the resulting dismantling of the bureau.

42.    In early 2023, around the same period, I received information from Officer Faten Shokr indicating that Sergeant Dottor was engaged in an inappropriate relationship with an officer who was Dottor's subordinate.

43.    I conducted an internal investigation into the allegation and interviewed both individuals, and both denied any inappropriate relationship.

44.    Later, the officer involved filed a lawsuit in federal court alleging that he was coerced into an inappropriate relationship with Sergeant Dottor.

45.    In early 2023, while I was investigating multiple Traffic Bureau issues—including the illegal quota system, an allegation of an inappropriate supervisory relationship, a ticket-fixing scheme, and inquiries into improper

storage and handling of firearms and ammunition—two members of the Traffic Bureau left DHPD to work for other agencies.

46. At the time I arrived at DHPD, there were three individuals assigned to the Traffic Bureau.

47. Over a short period of time in early 2023, while I was conducting the above investigations, all three Traffic Bureau members resigned from DHPD.

48. On March 1, 2023, an investigation was initiated regarding Corporal Pellerito's failure to enter approximately 900 pistol sale records into the State of Michigan database.

49. I understood that failure to process pistol sale records in accordance with Michigan law constitutes a criminal offense, and this matter was reported to the State of Michigan.

50. On March 8, 2023, I initiated an investigation into a ticket-fixing scheme involving traffic violations improperly voided and dismissed at the Dearborn Heights District Court and by officers in the CLEMIS system.

51. This investigation revealed several thousand violations had been dismissed through the described process.

52. This ticket-fixing scheme was reported by former Police Sergeant Jordan Dottor and corroborated by Court Administrators Michelle Adkins and Katie Shaw.

53.     Dottor, Adkins, and Shaw stated that the officers most frequently involved in improper dismissals were Sergeant Bazzy and Sergeant Zrien, and my investigation identified additional officers who had improperly dismissed tickets.

54.     I reported this ticket-fixing scheme to the Federal Bureau of Investigation ("FBI") during a meeting held at the FBI offices in Detroit, Michigan.

## VI. Use-of-Force Matter and Related Pressure/Threats

55.     On June 19, 2023, DHPD Officer Bailey was involved in an arrest resulting in a use of force.

56.     A Use of Force review determined Officer Bailey used excessive force during the above incident.

57.     Lieutenant Pawlus, Sergeant Zrien, and Sergeant Bazzy were also investigated for poor job performance in connection with related matters.

58.     The June 19, 2023, Use of Force incident was reported to the Michigan State Police and the FBI.

59.     Officer Bailey, Sergeant Zrien, Sergeant Bazzy, and Lieutenant Pawlus were each issued discipline related to poor job performance and other policy violations.

60.     On September 26, 2023, Councilman Hassan Saab made a statement to me on the public record regarding a FOIA request he had submitted.

61.     Councilman Saab told me that if I did not approve his FOIA request he would release "skeletons" from my prior employment.

62.     I had no prior employment issues that could have been released, and Saab's "skeletons" statement was made to intimidate me and damage my professional reputation.

63.     On September 29, 2023, Councilman Saab's conduct was documented in an official police report, which was eventually hand-delivered to the FBI and also sent to the Michigan State Police.

64.     In connection with an embezzlement matter, within minutes of my request for a report number and before I began drafting the report, Sergeant Zrien, Sergeant Bazzy, and Officer Hammoud accessed the associated case number in the records management system.

65.     The records management system maintains audit logs documenting access to case numbers, including the access described in the prior paragraph.

66.     Before I prepared the police report, I learned that Councilman Saab had already been informed by members of DHPD that he was being named in a police report.

67.     Shortly thereafter, Councilman Saab posted on social media stating DHPD was preparing to retaliate against him.

### VII. Community/Political Interference Meeting and FOIA/Video Attempt

68.     On October 30, 2023, I attended a meeting in Chief Hart's Office with Dearborn Heights Mayor Bill Bazzi, Chief Hart, and City Attorney Roger Farhina.

69.     During this meeting, Mayor Bazzi raised the idea of hiring Hussein Farhat into a Director-level position within DHPD.

70.     Mayor Bazzi further stated that Farhat would be able to attend community meetings with him and would be well received because Farhat was Lebanese. Additionally, Mayor Bazzi stated that he believed Farhat would be more effective with members of the community than the current police administration because Farhat was "from the community."

71.     During that same meeting, Mayor Bazzi discussed with City Attorney Farhina the potential hiring of a Yemeni woman for a position at City Hall, and Farhina expressed support for hiring her.

72.     Mayor Bazzi stated that he did not want to hire the Yemeni woman because she had "baggage" and because she was not Lebanese.

73.     On that same day, October 30, 2023, I also attended a meeting with City Attorney Roger Farhina, Chief Hart, Mayor Bazzi, and Khalil Rahal.

74.    This meeting occurred after Mayor Bazzi was contacted by Khalil Rahal, who expressed concern about discipline issued to Sergeant Bazzy arising from the June 19, 2023, Use of Force investigation.

75.    At this meeting, Rahal requested to view video footage related to the incident, and I told Rahal that he would need to submit a FOIA to view it.

76.    Rahal signed the FOIA request form but immediately stopped completing it, and he was not shown the video.

77.    During the meeting, Rahal stated Sergeant Bazzy was powerful and well-connected within the community.

78.    Rahal further stated that if discipline against Sergeant Bazzy was not removed, nothing would move forward in City Council involving the Police Department.

79.    Rahal asserted that he had the support of seven City Council Members who would vote in accordance with his direction on police-related matters.

80.    Rahal also advised Chief Hart and I that if the situation was not "neutralized," we would lose our jobs and Mayor Bazzi would not be re-elected.

**VIII. Harassment Regarding Education/Terrorism Course**

81.    On November 13, 2023, Councilman Dave Abdallah called me about an educational reimbursement request I had submitted that was scheduled for the November 14, 2023, City Council agenda.

82.     During this call, Councilman Abdallah stated he was offended that that I had taken an "Introduction to Terrorism" course as part of my college education.

83.     I explained to Councilman Abdallah that the course was mandatory for completion of my degree, to which he responded asserting that I only took the course because I worked in a community with Arab Americans.

84.     On that same day, November 13, 2023, at approximately 12:21 p.m., I sent an email to department personnel asking whether any other employee had ever been questioned by City Council regarding reimbursement for a college course and whether anyone had received approval to take terrorism-related courses.

85.     In response to this email, I received several verbal responses, including from Sergeant Gondek, who indicated that no one had previously been questioned regarding such reimbursement.

86.     In that same email, I stated that the telephone call from Councilman Abdallah constituted harassment and intimidation.

87.     At a City Council meeting following the November 13, 2023 email, Councilman Baydoun made public statements on video ridiculing me and stating that my conduct was disrespectful and would not be tolerated.

**IX. DTE Lighting Investigation Background and Council Action Targeting Position**

88.    In November 2023, Director Vanderplow initiated an investigation into a DTE contract related to installation of interior and exterior lighting at DHPD, and I was regularly briefed on this matter.

89.    Irregularities identified in the in the lighting program and inconsistencies in related internal investigations resulted in City Council making multiple complaints and allegations against Chief Hart, Director Vanderplow, and myself.

90.    City Officials were notified of the lighting investigation and its findings, and the FBI was also notified.

91.    On December 12, 2023, City Council Motion Number 23-573, authored by City Council Member Abel-Hak, was approved for placement on the agenda and called for elimination of my position, but it was not voted on that night.

**X. Procurement/Process Server (Koda Group) and False "Conflict" Claims**

92.    On April 30, 2023, after completing a three-bid procurement process to identify a process-serving company to assist DHPD in serving subpoenas, I prepared a memorandum to Chief Hart recommending Koda Group, Inc.

93.    After my recommendation, Mayor Bazzi approved Koda Group, identifying the matter as a priority due to the impact timely subpoena service has on victims, defendants, the court system, and due process.

94.    Koda Group served numerous subpoenas and was initially paid in a timely manner.

95.    In early 2024, the City Council began withholding payment to Koda Group after Councilman Hassan Saab made public accusations during City Council meetings and in emails claiming I was steering bids to friends.

96.    As a result of these accusations, Koda Group was not paid for several months.

97.    Councilman Saab publicly asserted that the owner of Koda Group was a personal friend of mine from my prior employment with the City of Westland.

98.    On February 29, 2024, during a City Council meeting, Councilman Saab stated on the record words to the effect of: "There definitely is a relationship and there definitely is a conflict," and he stated he intended to have me investigated "by an outside agency."

99.    Councilman Saab's allegation that I was friends with the owner of Koda Group was false, and the owner of Koda Group later confirmed this publicly during a City Council meeting.

**XI. Retaliation Through Denial of Training (PERF)**

100.    I submitted a request to attend the Police Executive Research Forum (PERF) Southern Management Institute of Policing training course, and my request was denied on multiple occasions during public City Council meetings.

101.   On February 29, 2024, during a recorded City Council session, Councilman Saab stated that my request should be denied because I had filed a lawsuit against the City, and he stated that "it should be part of the litigation."

102.   During that same session, City Attorney Farhina referenced that a Fire Department command officer had been sent to Harvard for similar training.

103.   I understood the denial of my training request to be retaliation against me for filing a whistleblower lawsuit.

104.   My PERF training request was denied despite it being established that federal forfeiture funds could be used to pay for the training, which would not impact the City's budget.

105.   On multiple occasions, City Council either denied the training request outright or removed the request from the City Council agenda.

106.   In early 2024, Councilman Tom Wencel sent me a communication indicating that he wished to discuss my PERF training request but that he would be late to the City Council meeting.

107.   At that meeting in early 2024, Councilman Wencel arrived shortly after the Council completed its vote on my PERF training request, and the vote resulted in a tie causing the request to fail.

108.   City Council eventually approved payment for the PERF training, but only after the training session had already begun.

## XII. 2024 Retaliatory Complaints, Towing Irregularities, and Reporting

109.   In early 2024, the owner of the City of Dearborn Height's towing vendor informed me that he received a call from Sergeant Bazzy requesting towing fees be waived for Bazzy's cousin, a Melvindale Police Officer.

110.   The towing vendor advised me that as a result of Sergeant Bazzy's request, the fees were reduced.

111.   On April 2, 2024, Councilman Hassan Saab filed a police report alleging that Director Vanderplow was stalking him.

112.   I conducted an internal investigation into Councilman Saab's stalking complaint and determined that it was unfounded. The police report was subsequently submitted to the Michigan State Police.

113.   The Michigan State Police later determined Director Vanderplow had not engaged in stalking behavior toward Councilman Saab.

114.   Councilman Saab has a documented history of filing complaints against DHPD members, including prior police reports determined to be false, for which the prosecutor declined to authorize charges.

115.   In 2024, I was informed by Director Vanderplow that Sergeant Bazzy was directing officers not to tow vehicles following arrests, and that Sergeant Bazzy was contacting private towing companies outside the City contract to remove vehicles from accident scenes and parking lots.

116.   An investigation into towing irregularities determined Sergeant Bazzy traveled to a residence in Dearborn Heights without being dispatched and directed an officer not to contact the owner of a stolen vehicle.

117.   The investigation further revealed that Sergeant Bazzy requested the officer allow the person in possession of the stolen vehicle to retain it, and the officer declined and made appropriate notifications.

118.   In 2024, all towing-related irregularities identified during this investigation were reported to the FBI.

**XIII.  City Credit Card Matter and Council Attacks on Leadership**

119.   On May 14, 2024, Director Vanderplow was notified by Mayor Bazzi that fraudulent charges had been identified on a City-issued American Express card assigned to City Treasurer Lisa Hicks-Clayton.

120.   I did not personally conduct the investigation into the credit card matter, but I oversaw the Detective Bureau, which reported the suspected fraudulent activity to the Wayne County Prosecutor's Office and the Michigan State Police.

121.   The credit card investigation involved allegations that Hicks-Clayton purchased concert tickets using the City-issued credit card without authorization.

122.   The outcome of the credit card investigation is unknown to me.

123.   The investigation into the unauthorized credit card charges was discussed in multiple City Council meetings, but rather than addressing the

unauthorized spending, City Council members directed negative comments and accusations against police leadership, including Director Vanderplow and I, in emails and in public meetings.

## XIV. False Hiring/Relationship Accusations and FOIA Abuse Pattern

124.   Councilman Hassan Saab accused me repeatedly in emails and public City Council meetings of hiring Roger Schurig and Erika Mazzitello in violation of City hiring rules.

125.   Councilman Saab's allegations were baseless and false.

126.   Officer Robert Schurig completed the full Act 78 hiring process and was hired in compliance with applicable rules and laws.

127.   Erika Mazzitello was a civilian employee who was hired through the City's Civil Service process, and her position was later defunded by City Council.

128.   After Ms. Mazzitello was hired as FOIA Coordinator, Saab submitted multiple FOIA requests and alleged that I was involved in an inappropriate relationship with Ms. Mazzitello. This allegation was baseless and false.

129.   While I was serving as DHPD Chief of Police, I provided a report to City Attorney Roger Farhina and Mayor Bazzi detailing the volume of FOIA requests and police reports submitted by Councilman Saab.

130.   In my experience, Councilman Saab's FOIA requests and police reports were used in a manner that repeatedly diverted time and resources away from

routine police operations. The volume of Councilman Saab's FOIA requests and the nature of the allegations in police reports were atypical and included false or unsupported allegations.

## XV. July 2024 Public Meeting Retaliation and Ongoing Smears

131.   On July 9, 2024, Director Paul Vanderplow attended  a City Council meeting as a member of the public.

132.   The following day on July 10, 2024, Councilmembers Hassan Ahmad, Tom Wencel, Hassan Saab, and Mo Baydoun contacted me and complained that Director Vanderplow's body language during the meeting was inappropriate or objectionable.

133.   On multiple occasions throughout my employment, Councilman Saab posted statements on social media accusing me of corruption, which had no basis other than to harm my reputation.

134.   During my employment, Councilman Saab also stated that Dearborn Heights needed a police chief "from the community," which I understood to mean an Arab American.

135.   Throughout my employment, City leadership engaged in repeated conduct directed toward me that included harassment, discriminatory treatment, and retaliatory actions while I was performing my duties.

136.   The harassment, discriminatory treatment, and retaliation included coordinated emails, statements during City Council meetings, and public social media posts.

137.   Those communications were based on false or misleading information and were presented in a manner intended to intimidate, harass, and retaliate against me.

## XVI. Defunding Vote and Whistleblower Acknowledgement

138.   On January 7, 2024, Mayor Bazzi sent me an email stating that he considered me a whistleblower based on my reporting of illegal activity and misconduct to him and the City Council.

139.   In that email, Mayor Bazzi instructed me to continue performing my duties even if City Council defunded my position.

140.   On January 9, 2024, City Council passed a motion during a public meeting that defunded my position at DHPD.

141.   After January 9, 2024, and at the direction of Mayor Bazzi, I continued performing my duties as Director of Police Operations and continued receiving pay and benefits.

142.   My position was incorporated into the Dearborn Heights Police Supervisors Association collective bargaining agreement pursuant to PERA, and that agreement was ratified by the union and approved by City Council.

**XVII. Appointment as Chief, Contract Negotiations, and "Arab American Chief" Statements**

143.   In July 2024, I was sworn in as Chief of Police for the City of Dearborn Heights and reported to Mayor Bill Bazzi.

144.   As Chief of Police, I administered law enforcement responsibilities for the City, oversaw daily operations, ensured compliance with local, state, and federal laws, implemented departmental policies and procedures, acted as liaison with city officials and community groups, coordinated investigations, and ensured integrity and professionalism in the department.

145.   From mid-2024 through late December 2024, City administration officials and labor attorney Ken Wilson negotiated a contract concerning police command staff.

146.   A central purpose of these negotiations was to create and bargain a police command-level position for Hussein Farhat, who had served as the City's Emergency Manager.

147.   Based on prior City budgets and threatened and implemented reductions by City Council, it was my understanding the proposed contract was unlikely to receive approval due to fiscal impact.

148.   During negotiations, City administrators and labor attorney Ken Wilson discussed alternative positions for Farhat in an effort to circumvent existing contractual provisions and Act 78 requirements.

149.   During those discussions, substantial compensation packages and benefits were proposed to secure approval to place Farhat into a police department position. Other roles including Deputy Chief and two Captain positions were offered to the command union.

150.   The command union opposed Farhat's promotion, citing he lacked executive-level law enforcement experience and the qualifications necessary to perform the duties.

151.   During the period in which Hussein Farhat served as the City's Emergency Manager, I observed that he did not attend scheduled emergency management meetings. During that same timeframe, I determined that the City's emergency procedures manual required substantial revision and updating. In order to ensure operational readiness and compliance, I undertook responsibility for reviewing and rewriting the emergency procedures manual.

152.   Mayor Bazzi, labor attorney Ken Wilson, and City Attorney Farhina discussed possible titles for Farhat including Police Commissioner, Deputy Chief, and Director of Police Operations.

153.   During a telephone conversation in the fall of 2024 about contract negotiations, labor attorney Ken Wilson told me I should have a backup plan and advised Mayor Bazzi intended to replace me with an Arab American.

154.   This statement was consistent with remarks Mayor Bazzi made directly to me regarding the need for Arab American leadership within the police department for purposes of his reelection.

## XVIII. Contingency Job Search Based on Threats and Workplace Environment

155.   Beginning in 2023, due to repeated threats of termination by City Council and potential termination by Mayor Bazzi, I sought alternative employment opportunities as contingency plans.

156.   The threats of job loss, retaliation, harassment, and discriminatory conduct created an unhealthy work environment and made continued employment at DHPD untenable.

157.   While employed at DHPD, I obtained approval for part-time employment to maintain contingency plans.

158.   In May 2024, I applied for positions with Chelsea Schools and as a CALEA Assessor solely to ensure alternate employment options in the event I was terminated or forced out.

159. My contingency actions were not job abandonment and were not an intent to voluntarily resign from my Dearborn Heights position.

## XIX. Labor Disputes and Related Communications

160. Based on multiple conversations with Mayor Bazzi and Ken Wilson during command-staff negotiations, I understood that after the end of 2024 I would be replaced as Chief of Police with Hussein Farhat.

161. After Farhat was sworn in as Deputy Chief during a large public ceremony, the Command Officers' Union filed multiple grievances and unfair labor practice charges, asserting that Mayor Bazzi violated the collective bargaining agreement and Act 78.

162. In subsequent discussions, labor attorney Ken Wilson and Mayor Bazzi acknowledged the City faced significant exposure relating to those grievances and unfair labor practice charges.

163. On November 8, 2024, City Attorney Roger Farhina emailed Mayor Bazzi, Director Vanderplow, labor attorney Ken Wilson, and me regarding the grievances and unfair labor practice charges.

164. In that email, Farhina asserted that "the only articulable reason for rejecting a fair and just contract is racial animus," referenced an "Arab Mayor" and "Arab Director's appointment," and stated the Mayor was "breaking the glass ceiling for the first time in the Police Department."

165.   In fact, the basis for the grievances and unfair labor practice charges was that Farhat's appointment violated the collective bargaining agreement, Act 78, and a previously agreed-upon tentative agreement.

## XX. Forced Resignation and Nonpayment of Contractual Amounts

166.   In December 2024, I spoke with Mayor Bazzi regarding my opportunity with another police agency and informed him I would not voluntarily resign.

167.   It was well known within City leadership that the Mayor had the right to appoint the Chief of Police, and it was further known that Mayor Bazzi intended to employ an Arab American Chief of Police to enhance his reelection chances.

168.   I understood that if Farhat were promoted to Chief of Police, the union grievances and unfair labor practice charges would be resolved.

169.   After lengthy discussions, Mayor Bazzi asked me to resign via an email sent on December 4, 2025 requesting that I resign by January 10, and I complied with that request.

170.   After my separation, I was not paid severance compensation, accrued leave time, or additional benefits owed under the terms of my employment contract.

171.   The total amount owed to me under my employment contract and accruals is $204,702.18.

172.   On or about January 29, 2025, labor attorney Ken Wilson sent an email to City leadership stating I should be paid one full year of salary, unused vacation time for 2024 and 2025, and holiday pay.

173.   I asked Mayor Bazzi multiple times about payment of my severance, accrued time, and benefits, and he referred me to Human Resources Director Eggly.

174.   Director Eggly completed and submitted a payment request form to the Comptroller authorizing my payout, but the payment was never issued.

175.   On April 17, 2025, I received information from Paul Vanderplow that MMRMA City Attorney Monica Hunt accidentally left him on an email addressing my contractual payouts.

176.   In that email, Hunt wrote words to the effect that payouts "could be used as a strategy to resolve the overall case involving Swope, Hart and Vanderplow," and that she could recommend a payout of unused vacation or PTO.

177.   Around that same time, labor attorney Ken Wilson recommended in an email that I was due most of the terms of my contract.

178.   During my tenure and shortly thereafter, several City employees separated from City employment and, to my understanding, were paid accrued benefits and leave balances upon separation.

179.   I did not receive payment of my accrued benefits and contractual payouts.

## XXI. Damages, Emotional Distress, Reputational and Financial Harm

180.   While employed as Director of Police Operations and Chief of Police, I experienced significant emotional and physical distress.

181.   I was repeatedly threatened with termination, which caused ongoing anxiety about my financial stability.

182.   City officials publicly accused me of misconduct, including steering bids and submitting fraudulent City Council agenda items, despite my innocence.

183.   The public nature of the accusations damaged my professional reputation and negatively affected my family's sense of security and pride.

184.   At police functions I was questioned by peers, compounding the harm to my professional standing.

185.   The stress and embarrassment disrupted relationships with my family and created turmoil in my personal and professional life.

186.   Still today, when I meet others, my experience in Dearborn Heights is frequently raised first and triggers additional stress and embarrassment due to the treatment I experienced.

187.   At the time of my separation, I had 288 hours of sick time and 586 hours of vacation time accrued. My hourly rate was $60.87.

188.   In addition to accrued hours, I was entitled to a $3,000 MCOLES bonus, a $5,064 uniform allowance (calculated as 4% of base pay), $16,837.80 in holiday pay (calculated as 13.3% of base pay), and one year of severance pay totaling $126,600. The total amount owed to me for these items is $204,702.18.

189.   The amounts described herein represent only a portion of my damages and are separate from, and in addition to, other damages I have suffered as a result of Defendants' actions.

190.   The amount described above is less than the verbal offer made to me by Mayor Bazzi during discussions about my termination, during which he stated I would be paid my entire contract amount.

191.   Before my departure, Mayor Bazzi and HR Director Eggly assured me these payments would be processed immediately upon my termination.

192.   Despite those assurances, the City failed to honor its contractual obligations and withheld compensation that was rightfully mine.

193.   The City's refusal to pay what was due caused immediate and severe financial hardship.

194.   My anticipated payouts were earmarked for housing and relocation expenses necessary for establishing permanent residence in South Haven.

195.   The City's withholding of funds sabotaged my ability to secure stable housing and directly undermined my capacity to continue serving as Chief of Police in South Haven.

196.   The financial distress caused by withholding of funds was a decisive factor in my departure from South Haven PD.

197.   All statements herein are true and correct to the best of my knowledge. Further affiant saith not.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 4th, 2026.

KEVIN SWOPE

31