# EXHBIT "P"

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

## COLLECTIVE BARGAINING AGREEMENT

Between

## THE CITY OF DEARBORN HEIGHTS

and

## THE DEARBORN HEIGHTS POLICE
## SUPERVISORS ASSOCIATION

Effective July 1, 2021 to June 30, 2024

1

Contents

**ARTICLE 1**

  **PARTIES**

**ARTICLE 2**

  **PURPOSE AND INTENT**

**ARTICLE 3**

  **RECOGNITION**

**ARTICLE 4**

  **AGENCY SHOP**

**ARTICLE 5**

  **REPRESENTATION**

**ARTICLE 6**

  **DISCIPLINE**

**ARTICLE 7**

  **GRIEVANCE PROCEDURE**

**ARTICLE 8**

  **ARBITRATION**

**ARTICLE 9**

  **SENIORITY**

**ARTICLE 10**

  **EMPLOYEE'S RIGHTS**

**ARTICLE 11**

  **PROMOTIONS, LAYOFFS, RECALLS AND LEAVE OF ABSENCE**

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

**ARTICLE 12**

   ASSOCIATION ACTIVITIES

**ARTICLE 13**

   CHANGES IN WORKING CONDITIONS

**ARTICLE 14**

   CITY'S RIGHTS

**ARTICLE 15**

   COPIES OF CONTRACT

**ARTICLE 16**

   WAGES

**ARTICLE 17**

   UNIFORM ALLOWANCE

**ARTICLE 18**

   HOLIDAYS AND HOLIDAY PAY

**ARTICLE 19**

   OVERTIME AND COURT-TIME COMPENSATION

**ARTICLE 20**

   VACATIONS

**ARTICLE 21**

   FUNERAL LEAVE

**ARTICLE 22**

   SICK LEAVE

**ARTICLE 23**

   INSURANCE

**ARTICLE 24**

   PERSONAL LEAVE DAYS

3

**ARTICLE 25**

   **RETIREMENT AND PENSIONS**

**ARTICLE 26**

   **ARTICLE 27**

**ARTICLE 28**

   **HOURS**

**ARTICLE 29**

   **EDUCATION 70**

**ARTICLE 30**

   **PHYSICAL ASSESSMENT 71**

**ARTICLE 31**

   **JURY DUTY 72**

**ARTICLE 32**

   **ADA/FMLA LANGUAGE**

**ARTICLE 33**

   **SAFETY COMMITTEE**

**ARTICLE 34**

   **DURATION**

**Attachment A**

   **Authorization for Payroll Deduction**

**Attachment B**

**Attachment C**

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

# ARTICLE 1

## PARTIES

1.1      This Agreement is between the City of Dearborn Heights, a Michigan municipal corporation, (hereinafter referred to as the "Employer" or the "City"), and the Command Officer Association of Michigan (COAM) and its affiliate, the Dearborn Heights Police Supervisors Association (DHPSA), hereinafter referred to as "COAM", "DHPSA" or "Union".

# ARTICLE 2

## PURPOSE AND INTENT

2.1:      The general purpose of this Agreement is to set forth terms with respect to rates of pay, wages, hours of employment, and other conditions of employment and to promote orderly and peaceful labor relations for the mutual interest of the City of Dearborn Heights in its capacity as an Employer, its employees, the Association, and the citizens of the City of Dearborn Heights, Michigan.

# ARTICLE 3

## RECOGNITION

3.1:      The City of Dearborn Heights recognizes the Association as the sole and exclusive bargaining agent to the extent permitted and required by Act 336 of the Public Acts of 1947, as amended by Act 379 of the Public Acts of 1965, for all police officers of the rank of sergeant and above, including detectives, but excluding Chief and Deputy Chief.

3.2: Police officers and Association representatives shall have the right to express or communicate any view, grievance, complaint or opinion related to the conditions or

5

compensation of public employment or their betterment, all free from any and all restraint, interference, coercion, discrimination or reprisal.

3.3.     The City will deduct each month, upon signed authorization by individual officers, all initiation fees, dues and assessments certified by the Association and forward same to the Association's authorized Treasurer. The authorization shall be irrevocable for the term of this Agreement.

# ARTICLE 4
## AGENCY SHOP

4.1:     The parties recognize that all employees covered by this Agreement shall pay their fair share of the cost of negotiating and administering the Agreement.

4.2:     It shall be a continuing condition of employment that all employees covered by this Agreement shall either maintain membership in the Union by paying the Union's uniform dues, fees and assessments, or shall pay a collective bargaining service fee for cost of negotiating and administering this and succeeding agreements; provided, however, that a monthly service fee once set during the contract term shall not change for the remainder of the contract term.

4.3.     Any employee who has failed to either maintain membership or pay the requisite Agency Fee shall not be retained in the bargaining unit covered by this Agreement; provided, however, no employee shall be terminated under this Article unless:

A.     The Union has notified said employee by letter addressed to the employee's last known address spelling out that such employee is delinquent in payment of dues or fees, specifying the current amount of delinquency, and warning the employee that unless such amount is tendered within ten (10) calendar days, such employee will be reported to the City for termination from employment as provided for herein, and

6

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

B.     The Union has furnished the City with written proof that the foregoing procedure has been followed or has supplied the City with a copy of the notice that the employee has not complied with such request. The Union must further provide the City with written demand that the employee be discharged in accordance with this Article and provide to the City, in affidavit form signed by the Union Treasurer, a certification that the amount of the delinquency does not exceed the collective bargaining service fee including, but not limited to, the cost of administering and negotiating this and succeeding agreements.

4.4:   The City agrees to deduct from the pay of each police officer from whom it receives a written authorization to do so, the amount specified upon the authorization. Each police officer utilizing the city deduction from pay for the remittance of sums to the Union shall provide the City an authorization in the form attached hereto as Attachment "A". The form shall include an agreement by the police officer to hold the City harmless against any and all claims, demands, lawsuits, or other forms of liability that may arise out of or by reasons of action taken or not taken by the City for purpose of providing the deduction service. Furthermore, the police officer shall agree that in the event a refund is due such police officer for any reason, such police officer shall seek such refund from the Union.

4.5:   Such sums deducted from a police officer's pay, accompanied by a list of the police officers from whose pay they have been deducted and the amount deducted from such deductions shall be forwarded to the Union Treasurer at 25637 Michigan Ave., Dearborn Heights, Michigan 48125, within thirty (30) days after such collections have been made.

4.6:   In the event that a refund is due any police officer for any sums deducted from wages and paid to the Union, it shall be the responsibility of such police officer to obtain appropriate refund from the Union.

4.7:   The Union shall indemnify and save the City harmless against any and all claims, demands,

7

suits or other forms of liability that shall arise out of or by the reason of action taken or not taken by the City for the purpose of complying with any of the provisions of this Article.

4.8: The City shall not be responsible for inadvertence or negligence in complying with the terms of this Article.

4.9: The Employer will deduct from the pay of the employees in any month only the dues, fees or service charges incurred while an employee has been in the employ of the Employer and only such amounts becoming due and payable in such month.

4.10: The Employer shall not be liable for the remittance or payment of any sums other than those constituting actual deductions made; and, if for any reason it fails to make a deduction for any employee as above provided, it shall make that deduction from the employee's next pay in which such deduction is normally deducted after the error has been called to its attention by the employee or the Union.

4.11: The parties agree to respect the religious beliefs of any employee who is a member of or adherent to teachings of a bona fide religion, body or sect which has historically held conscientious objections to joining or supporting a labor organization and such employee shall not be required by either party to join or financially support any labor organization.

## ARTICLE 5

## REPRESENTATION

5.1: The Association shall be represented in all negotiations by a committee of any three (3) officers of the Association and such counsel, legal, economic or otherwise, as they shall retain. The City shall negotiate with those representatives and their counsel as herein provided.

8

5.2: The Association shall be represented in the grievance procedure by two (2) stewards, the President of the Association who shall act as Chief Steward, and such counsel as they shall retain. There shall be one (1) alternate for each steward and the Vice-President shall act as the alternate Chief Steward.

5.3: The President and a steward shall act as a grievance committee.

5.4: According to the Constitution and By-Laws of this Association, officers and other representatives of the Association shall be afforded time during regular working hours without loss of pay to fulfill their Association responsibilities. This to include all general meetings, Board meetings, negotiations with the City, processing of grievances, and administration and enforcement of this Agreement, General Union meetings, same not to exceed one per month. President of the Association shall be assigned police duties in the police station between the hours of 9:00 a.m. and 5:00 p.m., or hours in agreement with the Chief of Police, Monday through Friday, during which the President of the Association will be allowed to handle all Association business that will come before such President and attend all meetings pertaining to the Association during said hours without loss of time. Association business shall take precedence over all other non-emergency duties assigned to the President. The President will account for all time spent away from the Police Department while conducting Association business if so directed by the Chief of Police or the Mayor.

If the City calls in an Association representative during non-duty hours for grievance administration, such Association representative will be given compensatory time computed at straight time.

5.5 Up to three (3) elected delegates of the Union will be excused from work up to three (3) work days for the purpose of attending conferences or seminars relating to the administration of the collective bargaining agreement provided those conferences or seminars are held outside the City limits of the City and that the City is not required by manpower restrictions to call in persons to replace persons attending; provided one Union

9

designated person shall be permitted to attend such conference whether or not call in is necessary. Designated delegates will receive their regular pay from the City but shall not be considered on duty. The City will not be responsible for any delegate expenses incurred as a result of attending such conference or seminar.

5.6:

A.       All members of the bargaining unit shall have the right to be represented by the Command Officers Association of Michigan and/or an officer of the local union, and/or such Counsel as deemed necessary by the Union, at all grievance meetings with the City, disciplinary conferences or procedures. However, such representation shall not exceed three (3) officers of the Association and required outside counsel. The City will provide the Union with at least thirty-six (36) hours prior written notice of any hearing or board action at which disciplinary action against a bargaining unit member will be discussed or heard by such hearing or board.

B.       This section shall not preclude any member from representing themselves; provided, however, the results of such action shall also be given in writing to the Union within three (3) days.

5.7:       The City shall not enter into any agreements with employees covered by this Agreement individually or collectively or with any other organization seeking to represent such employees which in any way conflicts with the provisions hereof.

## ARTICLE 6
## DISCIPLINE

6.1:       No police officer shall be discharged or otherwise disciplined except for just cause. The claim of any police officer that such officer has been unjustly discharged or otherwise disciplined shall be processed as a grievance, including arbitration.

10

6.2      A penalty once levied may be reduced but may not be increased.

6.3      A change of shift shall be considered a just and reasonable disciplinary penalty in cases where there is cause for discipline; provided that no innocent member of the bargaining unit shall be transferred to accommodate a disciplinary shift transfer. An employee who was transferred for disciplinary reasons, will not without a showing of sufficient cause related to the offense, be required to stay on the shift that officer was transferred to because of the discipline for more than four (4) months.

6.4      For purposes of supervisors on a twelve (12) hour schedule, a day's suspension shall mean loss of eight (8) hours pay. All discipline shall be converted to hours. Discipline shall be prorated fairly between officers working both eight (8) and twelve (12) hour shifts.

## ARTICLE 7

## GRIEVANCE PROCEDURE

7.1:     **Purpose.**

The primary purpose of this procedure is to secure, at the lowest level possible, equitable solutions to the problems of the parties. Both parties agree that these proceedings shall be kept as confidential as may be appropriate at each level of the procedure.

7.2:

A.       A grievance under this Agreement is a written dispute, claim or complaint arising under and during the term of this Agreement and filed by either an employee, authorized representative of the bargaining unit, or the City. Grievances are limited to matters of interpretation or application of express provisions of this Agreement including interpretation and application of department rules, regulations and orders not previously approved by the Association, and shall at a minimum set forth the

11

following information:

(1)     Article and Section of the Agreement allegedly violated, and

(2)     Date of occurrence of each alleged violation, and

(3)     Manner of alleged violation including the name, if applicable, of the management representative who allegedly violated the agreement. The parties recognizing that an orderly grievance procedure is necessary agree that each Step must be adhered to as set forth herein or the grievance is forfeited. All grievances must be filed within thirty (30) calendar days after the occurrence of the circumstances giving rise to the grievance otherwise the right to file a grievance is forfeited and no grievance shall be deemed to exist.

B.     The term "employee" includes any individual or group who is a member of the bargaining unit covered by the Contract.

7.3     The Steps of the Grievance procedure are as follows:

STEP 1. Grievances will be filed with the Department and answered by the employee's immediate supervisor, or, if not available, the next ranking officer in charge. The immediate supervisor or higher ranking officer, whichever the case may be, shall make known that person's disposition of the grievance in writing within seven (7) working days after the grievance is filed.

STEP 2.   In the event the grievance is not resolved in Step 1, the Executive Board of the Association shall review the grievance to determine whether or not to appeal the matter further. If the Executive Board decides not to pursue the grievance, the matter shall be brought before the Association for vote. If the Association, by majority vote, decides to further appeal the grievance, then the president and/or steward shall continue with the processing of the

grievance as hereinafter set forth. If the Association decides against further pursuit of the grievance, the employee who may be aggrieved shall not be precluded from processing the grievance on the employee's own. If the grievance is to be appealed, then it shall be submitted within twenty (20) working days from the date of the written disposition of the grievance as per Step 1, to the Chief of Police or Deputy, who shall reply in writing within seven (7) work days after the grievance is submitted to the Chief. A meeting between the Chief and the Grievance Committee shall be held to discuss the grievance within the seven (7) work day period. The death, disability, vacancy or absence of the Chief of Police shall not cause an extension of the seven (7) work day period provided for in Step 2, but recourse shall be had to Step 3 at the end of the seven (7) work day period, the same as would obtain if the meeting were held and the grievance unresolved. The Association shall notify the City of its decision not to pursue a grievance in writing and shall specifically advise the City whether or not the grievant has elected to pursue the grievance on the employee's own.

**STEP 3.** If the grievance is not resolved within the seven (7)work day period provided in Step 2, the grievance shall be submitted to the Mayor or representative within ten (10) working days and the Mayor or representative shall reply in writing within twenty (20) days after the date the grievance is submitted to said Mayor. The death, disability, vacancy or absence of the Mayor shall not cause an extension of the twenty (20) day period provided for in Step 3, but recourse shall be had to arbitration or to Civil Service at the end of the twenty (20) day period provided for below, the same as would obtain if meeting were held and the grievance unresolved.

Grievances affecting a number of police officers may be treated as a policy grievance and entered directly at the second Step of the grievance procedure.

All police officers shall have the right to be represented by not more than two (2) employee

13

Association representatives and counsel at all disciplinary conferences or procedures. Notification shall be promptly given to the Association of any disciplinary action taken against any police officers which results in official entries being added to the police officer's personnel file. In addition, a copy of any correspondence to be placed in the officer's departmental personnel file or Civil Service file will be sent directly to the officer.

7.6: If the grievance is not resolved in Step 3, the grievant shall designate an election of remedies by specifically stating thereon whether the aggrieved employee elects to proceed in accordance with Act 78 or the Rules of the American Arbitration Association. If the employee shall elect to proceed in accordance with the provisions of Act 78, and if the Civil Service Commission or the Court should decide that they lack jurisdiction to hear the matter or if they decide that the matter is not cognizable under Act 78, then the employee may resort to binding arbitration under the rules of the American Arbitration Association.

# ARTICLE 8
## ARBITRATION

8..1:   Any unresolved grievance, having been processed through Step 3 of the Grievance Procedure, may be submitted to arbitration, or Act 78 resolution in accordance with this Agreement, by either party in accordance with the following:

    A.   Arbitration or Act 78 resolution shall be invoked by written notice to the other party within thirty (30) days of Step 3 determination of intention to arbitrate or secure Act 78 resolution. The party desiring arbitration shall, within thirty (30) days of receipt of the answer of the City at Step 3 of the Grievance Procedure of this Agreement, request the American Arbitration Association to appoint an impartial arbitrator in accordance with the Labor Arbitration Rules and Regulations of the American Arbitration Association then in effect.

    B.   The decision of the arbitrator shall be final and binding upon the City, the

14

Association and the affected police officers.

C.      The arbitrator shall have no power or authority to add to, or to subtract from or to modify any of the terms of this Agreement.

D.      Any and all costs incurred for the purpose of arbitration shall be shared equally between the City and the Association. Each party shall be responsible for its own expenses including representatives and witnesses.

E.      The grievance procedures provided herein shall be the exclusive remedy for the Association, the City and the employees and there shall be no right to pursue any other procedures or remedies under Act 78, Public Acts, 1935, or the Courts on matters subject to the grievance procedure as provided herein, unless Act 78 is specifically elected by the aggrieved at the time of filing the grievance with the City. In no event shall an aggrieved employee be granted both an arbitration and an Act 78 hearing arising out of the same grievance.

F       DHPSA agrees that should it decide that a grievance shall not be pursued past Step III, it shall so advise the city in writing; provided such dropping of a member's grievance shall not affect that member's Act 78 rights, if any, and DHPSA will not finance an Act 78 action.

8.2     All arbitration hearings will be held on city premises.

## ARTICLE 9
## SENIORITY

9.1:    Departmental seniority of a command officer will be from the date of hire as a sworn police officer. Seniority for all other purposes shall be determined in the following manner:

15

A. A member of this Association with the highest rank will be number 1 in seniority and on down the chain of command.

B. In instances where two or more members hold the same rank, the member with the most time in that rank shall be designated as number 1 in seniority.

9.2 A police officer shall forfeit such officer's seniority rights only for the following reasons:

A. The officer resigns.

B. The officer is dismissed and is not reinstated.

C. The officer is absent without leave for a period of five (5) days or more. Exceptions to this may be made by the City on the grounds of good cause for failure to report.

D. The officer retires.

E. A settlement with employee has been made for total disability.

9.3 A seniority list shall be furnished to the Association by the City once every twelve (12) months.

9.4 The City will post newly created or vacated lateral command vacancies and training opportunities for ten (10) calendar days. The filling of newly created or vacated lateral command vacancies will be by the City selecting from among three (3) candidates selected from all available candidates based on seniority in rank and qualifications. The City may select any one of the three (3) candidates.

9.5: In the event a Bureau duty assignment is terminated by the City, the officer may, in the City's

16

discretion, be reassigned to the patrol division and shall select shift by seniority.

9.6: If there are no interested candidates to fill a vacancy within any Bureau, then the appointment will be made from the lowest seniority equal ranking Road Patrol member.

9.7: Any member once assigned to a Bureau position will have the option to transfer back to the Road Patrol at the next scheduled Road Patrol shift selection, if the member has higher seniority than a member currently assigned to the Road Patrol.

# ARTICLE 10
## EMPLOYEE'S
## RIGHTS

10.1: At no time shall any member of the Association be required to answer to any allegation(s) of misconduct unless said allegation(s) has been reduced to writing and the member shall be provided with a copy of the allegation(s) and an opportunity to read same before answering any questions or making any statements regarding the allegation(s). Further, at the member's request, the member shall have the right to representation from an Executive Board member and/or a member of the grievance committee, or an attorney of such member's choice, present during the time any answers are given or statements made. A. If at any time, a member is answering to an allegation(s) which may result in criminal charges being filed against him/her, the Association member shall be advised of his/her rights (MIRANDA WARNING) prior to any questioning.

B. At no time shall any member of the Association be required to take a polygraph test to prove or disprove any allegation(s) made against such member unless such member so desires.

10.2:

    A.     The private and personal life of any employee is not within the appropriate

concern or attention of the City, as long as it is consistent with the high standards which the profession and the Association has set. The parties, having recognized the liability inherent in outside law enforcement-type activity on both employees and the City as defined by the Michigan Supreme Court, agree that all outside employment must be approved by the Chief of Police.

B.      Neither the home address nor photograph of any member suspected of wrongdoing shall be given to the press or the news media without the written consent of the member.

10.3: The City recognizes its responsibility to continue to give reasonable support and assistance to all employees with respect to the performance of and the carrying out of their respective duties as police officers.

10.4: No provision of this Agreement is intended to prohibit the City from offering to the Union President a proposed settlement of disciplinary action, whether imminent or effective.

10.5: Any discussions or conversations occurring between an Association officer and any member who has been charged with a violation of the Rules and Regulations of the Dearborn Heights Police Department or charged with any contract violations, shall be privileged to the extent that the Association officer shall not be called to testify as to said conversations in any arbitration or Civil Service Hearing by the City.

10.6: The City will offer a police supervisor who has a reasonable grounded fear of an adverse personnel action, and who requests Union representation, the option of Union representation in the investigatory interview.

10.7: The Association reserves the right as citizens to appear before and petition the City Council

18

on matters of concern.

## ARTICLE 11

## PROMOTIONS, LAYOFFS, RECALLS AND LEAVE OF ABSENCE

11.1: Promotions shall be in accordance with the provisions of Act 78, P.A. of 1935, as amended, except as follows:

A.     Each applicant's unexpurgated personnel file shall be submitted to the oral examiners.

B.     The Oral Board Examiners shall be department neutral, that is to say, not members of the Dearborn Heights Police Department or border communities. Oral Board Examiners shall hold the rank of Lieutenant or above. Eligible examiners shall be deemed neutral when agreed upon by both the City and Union.

C.     The position of Chief of Police will be filled by the Mayor consistent with his/her rights under Section 5.11B of the City Charter and will be excluded from the Act 78 process. When a vacancy occurs in the Police Chief's position and the Mayor decides to fill said position, he/she may consider both internal and external candidates for that position.

The parties recognize that under this Agreement reached under PERA, the following individuals will retain their positions:

*     Jerrod S. Hart, Chief of Police

*     Paul D. Vanderplow, Director of Support Services

19

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

\*     Kevin M. Swope, Director of Police Operations.

It is further agreed that should the City fill the Director's positions in the future, those positions will be filled in accordance with Act 78 provisions.

It is further agreed that all challenges to the appointment of these three individuals, whether in grievance, litigation, or elsewhere, will be withdrawn based upon this Agreement under PERA.

D.     Eligibility for purpose of promotion shall be two years in rank/grade.  At the close of the application date and time.

E.     The Promotional examination process for eligible members shall be as follows:

1.     The promotional examination process for eligible members shall consist of a written exam portion and an oral exam portion which shall be weighted at 50% written and 50% oral.

2.     Eligible members must score 70% or higher on the written portion and 70% or higher on the oral portion. Members failing to score a minimum of 70% on the written portion shall be disqualified from the promotional process and shall not be allowed to participate in the oral portion. Members failing to score a minimum of 70% on the oral portion will not be eligible for promotion.

3.     Eligible members must have a combined score (written & oral) of 70% or higher to be eligible for promotion.

4.     After the written portion and oral portion have been scored and appropriately weighted each eligible member shall have 1/12 (one-twelfth) point for each month of service as a police officers with the city of Dearborn Heights, including probationary time, added to their overall score. There shall be no maximum cap for

20

these seniority points.

After the written portion and the oral portion have been scored and appropriately weighed each eligible member shall receive educational points as follows: Applicants who have earned an Associate's Degree from an accredited University shall be awarded 1 points added to their overall score. Applicants who have earned a Bachelor's Degree from an accredited University shall be awarded 2 points to their overall score. Applicants who have earned a Graduate degree (Master's, PHD or JD) shall be awarded 3 points.

   a. Members who have earned advanced degrees from an accredited University and wish to receive the additional points shall submit proof from the University of the Degree to Human Resources so it can be verified at the time of application. Proof shall be an unofficial transcript from the University.

   b. Points will only be awarded for the member's single highest degree earned, up to a maximum of three points.

5. The questions for the written examination portion shall be drawn from the following sources:

   a. Up to three (3) textbooks/sources recommended by the Chief of Police and approved by the Dearborn Heights Police & Fire Service Commission (Textbooks to be relevant to Police Supervision and the rank being tested).

6 The eligibility list for promotion shall expire two (2) years from the date that it was established and certified by the Dearborn Heights Police and Fire Civil Service Commission.

11.2: Layoffs and recalls shall be in accordance with the provisions of Act 78, P.A. of 1935, as amended. A laid off bargaining unit member shall retain recall rights for a period not to exceed that person's departmental seniority or retirement age,

21

whichever is sooner.

11.3: A police officer shall be entitled to a leave of absence for specified purposes and period of time without loss of seniority.

    A.    Leaves shall be granted for a period of up to three (3) months to employees who are physically or mentally or otherwise disabled from performing their duties, upon showing proper proof of such disability through the period of absence from a fully qualified physician within whose Board certified specialty the symptoms lay.

    B.    The City may grant leaves of absence for other cause in its sole discretion.

    C.    The City recognizes and agrees that it shall provide "forms" upon which a City employee may request a leave of absence. Any employee desiring a leave for any reason shall submit such application in excess of thirty (30) days prior to the date the leave is to commence and the City shall grant or deny such requests within ten (10) days of receipt of the request. The thirty (30) day requirements may be waived in a situation the City in its discretion feels is an emergency.

11.4: A police officer during such officer's leave shall not do any type of police work.

11.5: If the police officer returns within the period or periods granted, said police officer's "Continuous Service Time" will not be interrupted.

## ARTICLE 12
## ASSOCIATION
## ACTIVITIES

22

12.1: **Bulletin Boards.**

The City agrees to furnish and maintain a suitable bulletin board in a convenient place for the posting of Association notices and other material.

12.2: **Meetings.**

The Association may schedule and conduct its meetings on Police Department property provided it does not disrupt the duties of the employees in the efficient operation of the Department.

12.3: **Strike and Lockout Prohibition.**

The Association and the City will not engage in, sanction or promote strike action or a lockout during the term of this Agreement or any extension thereof.

12.4: The Association President or any Association member performing Association business during normal working hours will be considered on duty and shall be allowed to use a department vehicle when traveling to and from the location where said business is to be conducted.

## ARTICLE 13

## CHANGES IN WORKING CONDITIONS

13.1: A copy of each special order, general order, procedural directive, notation or training bulletin shall be furnished to the Union President.

The Union President or in such person's absence the next assistant in line shall be given written notice in advance of any anticipated major change in working conditions, and a good faith conference shall be held thereon before it is placed in effect. Emergency situations shall be exempt.

A special conference on important matters shall be made three (3) calendar days in advance

23

wherever possible and an agenda of the matters to be taken up at the meeting shall be presented at the time the conference is requested. Matters taken up in the special conference shall be confined to those on the agenda.

## ARTICLE 14
## CITY'S RIGHTS

14.1: The City reserves the right to assign tasks to police officers and to set up rules and regulations necessary to operate the Police Department as efficiently as possible, subject to the provisions of this Agreement.

14.2: Before new bureaus are established, the City will consult with the Association to solicit its views concerning organization of such bureaus.

14.3: It is understood and agreed that the Chief and Deputy Chief can perform bargaining unit work.

14.4: The Union recognizes the right of the city to operate and manage its affairs in all respects in accordance with its responsibilities. The powers or authority which the City has not officially abridged, delegated, or modified by this agreement are retained by the City.

14.5: The Union recognizes the exclusive rights of the City to establish reasonable work rules, determine reasonable schedules of work, determine and establish methods, processes, and procedures by which such work is to be performed, as well as set work standards. The City also reserves the right to make work assignments in emergency situations.

14.6: The City has the right to schedule overtime work as required and consistent with the provisions set forth in Article XIX.

14.7: It is understood by the parties that every incidental duty connected with assignments enumerated in job descriptions is not always specifically described.

24

Nevertheless, it is intended that all such duties shall be performed by such employees.

14.8:   The City reserves the right to classify positions based on assigned duties or responsibilities or make changes in assigned duties and responsibilities. The City has the responsibility in such classifications and duty assignments to provide equal compensation for equal work and to reflect duties and responsibilities by appropriate classifications and compensation. In cases where an employee considers that these principles are not being observed, that employee may seek redress through the grievance procedure set forth in Article VII.

14.9:   The City reserves the right to discipline or discharge for cause.

14.10:   The City reserves the right in accordance with Article 11, Section 2, to lay off for lack of work or funds, or the occurrence of conditions beyond the control of the City, or where such continuation of work would be wasteful and unproductive.

14.11:   No policies or procedures covered in this Agreement shall be construed as delegating to others or as reducing or abridging any of the following authority conferred on City officials:

A.   The Charter responsibility of the Mayor as executive officer for enforcing the laws of the State, City Charter or Ordinances, recommending an annual budget of appropriation, and the efficient performance of all executive departments, among other executive responsibilities defined by the Charter.

B.   The Charter responsibility of the City Council as the legislative body for the enactment of ordinances, the appropriation of money and the determination of the City's budget, among other legislative responsibilities defined by the Charter.

25

C.     The responsibility of the City for establishing, amending, and administering an Act 78 Civil Service merit system of employment, a classification plan, adopting rules and regulations regarding employment and exercising personnel administration responsibilities.

D.     The responsibility of the City for establishing, amending, and administering a compensation plan, and a fringe benefit program including an insurance program, a disability program, and other similar programs.

E.     The Charter responsibilities of the City in determining the functions and organization of the respective departments or divisions.

F.     The responsibilities of Department Heads governed by Charter provisions, ordinances, and Civil Service rules:

   (1)     To hire, assign, transfer, and promote employees to positions within the agency;

   (2)     To suspend, demote, discharge, or take other disciplinary action against employees;

   (3)     To relieve employees from duties because of lack of funds;

   (4)     To determine the methods, means and personnel necessary for departmental or agency operations;

   (5)     To control departmental or agency budget;

   (6)     To take whatever actions are necessary in situations of emergency to perform the functions of the department.

G.     The responsibilities to administer pay and fringe benefit plans, to provide the necessary surveys, research, rules, regulations, resolutions, and ordinances for this purpose subject to the authority of the departments and the City Council.

H.     The responsibility of the City for establishing, amending, and administering the Act 345 Retirement Plan of the City.

26

14.12: The Police Chief may convene a disciplinary review board consisting of three (3) superior officers to review the circumstances in any contemplated disciplinary action against an employee and based upon this review to make an advisory recommendation to the Police Chief that the charges are founded or unfounded. The Union shall have the right to challenge the selection of the disciplinary review board and have one (1) of its members replaced without cause.

## ARTICLE 15
## COPIES OF CONTRACT

15.1: The City agrees to deliver a copy of this Agreement to the Association for its distribution to each police officer within thirty (30) days of the formal execution of this Agreement.

## ARTICLE 16

## WAGES

16.1: Annual Base Salary

A. Commencing upon ratification of this Agreement by the Union and the City Council, the City shall adjust the base wage rate of the bargaining unit members as follows:

- 7/1/2021-6/30/2022:    4% increase (retroactive)

- 7/1/2022-6/30/2023:    4% increase (retroactive)

- 7/1/2023-6/30/2024:    5% increase

(Percentage of Patrol Officer's Annual Base Wage)

27

Sergeant:          119%

Lieutenant:        126%

Captain:           134%

*Employees will receive either the wage increase noted above or the differential, whichever is greater in each contract year*

B.     For and in consideration of the rank changes granted in previous negotiations, the Association for itself and its individual member's covenants not to institute or support any action, legal or otherwise, which would be construed as a challenge to the rank changes provided hereunder and agrees to jointly defend any such action with the City.

C.     In prior contracts the parties had previously made provision for a capped COLA program. Such a capped program was consciously deleted from this Agreement.

16.2: Reserve for future use.

28

16.3: <u>Longevity Pay.</u>

A.   Police Supervisors hired by the City of Dearborn Heights on or before April 13, 2011 shall be entitled to longevity pay on or before December 1st of each year of this Agreement, determined by hourly rate of pay in effect in the month of November as follows:

2% after 5 years' service

3% after 8 years' service

4% after 10 years' service

5% after 12 years' service

6% after 15 years' service

6.5% after 17 years' service

7% after 20 years' service

B.   The anniversary date for computing Longevity Pay shall be December 31st of each year. Longevity Pay for a police officer having more than one (1) year at the time of termination of the officer's employment shall be computed pro-rata from commencement date of employment to the 31st of December of each year. Longevity Pay shall be paid to the police officer on or before the 1st day of December of each year.

C.   Members entering into the City of Dearborn Heights on or after April 13, 2011 shall not be entitled to a longevity benefit. For purposes of this Section, the City and the Union agree that if any other union agrees to an alternative longevity savings method, this Section shall be opened for negotiation for modification or amendment at the request of either party.

16.4:  In absence of both the Chief and Deputy Chief for periods of a day or more, a Captain who acts as Chief shall be paid as Chief for the time spent as Chief,

29

calculated in daily increments.

16.5: An employee shall receive full pay upon satisfactory completion of their 6 month probationary period. During probation sergeants will be paid at the rate of 70% of the increase above their prior base wage. Lieutenants and Captains are not subject to a probationary wage adjustment under these provisions.

16.6: It is agreed that there will be no step up pay for vacations, personal days, etc.

## ARTICLE 17

## UNIFORM ALLOWANCE

17.1: Each police Officer shall keep and maintain a set of uniforms, in serviceable condition, neat and clean, at the officer's own expense, and shall receive additional compensation therefore, for the maintenance of same, an allowance of two percent (2%) of that member's base wage payable on or before the 30"' day of September annually. This shall be included in the Officer's final average compensation.

A.     Effective July 1, 2020, bargaining unit members hired on or after April 13, 2011 and who have attained eight (8) full years of service, shall receive an additional two percent (2%) for a maximum uniform allowance of four percent (4%) of the maximum base salary which shall be payable on or before the 30th day of September Annually.

17.2: In the event through extraordinary services, articles of uniform and apparel are damaged or destroyed in the line of duty, upon approval by appropriate officer, said police officer shall receive additional compensation in an amount necessary to replace said articles destroyed or damaged as soon as reasonably possible.

CLARIFICATION ON DAMAGED OR DESTROYED CLOTHING

ARTICLES THROUGH EXTRAORDINARY SERVICES

A. Uniform or apparel damage incurred where it was necessary for an officer to use physical force while attempting to affect an arrest.

B. Uniform or apparel damage incurred while pursuing a person who is attempting to flee from an arrest.

C. Uniform or apparel damages incurred while an officer is either aiding or assisting an injured person.

D. - Uniform or apparel damage incurred while investigating a major crime (B & E, Robbery, Arson).

E. Uniform or apparel damage incurred during a major disaster such as flood, fire, gasoline truck accidents, etc.

F. Uniform or apparel damage incurred while handling wild or vicious animals.

G. Apparel to be considered civilian attire as required by Department Rules and Regulations for officers in certain positions or details.

H. Personal jewelry is not required and will not be replaced.

I. Patent leather shoes are not covered. Officers wear them at their own risk.

J. Watches, although not required, are considered an essential item, but with a replacement or repair value not to exceed twenty ($20.00) dollars (includes watch bands and watch chains).

K. The replacement value of articles will be determined after said articles have been turned into the Chiefs office. Due to unusual wear, age, condition and serviceability, some articles' value will be pro-rated.

17.3    The City agrees to receive recommendations concerning uniforms from two members of the Union's executive board prior to making changes in the police uniform. It is understood by the parties to this Agreement that the process of receiving recommendations is advisory only and that the final decision

31

rests with the Chief of Police.

17.4    Police Supervisors shall have the option of wearing the Department approved "Class B" uniform keeping in mind officers choosing to wear the "Class B" uniforms shall be required to keep and maintain at least one (1) "Class A" uniform (long sleeve shirt, trousers and tie) available for formal occasions and ceremonies, and shall be required to cover any visible tattoos while wearing the Class A and Class B uniform unless excused by the Chief of Police, in the Chief's sole discretion, as a result of extreme hot weather. "Class B" uniforms shall now include a Department approved "Baseball style" hat which may be worn at the officer's option.

17.5    Police Supervisors shall be allowed to grow facial hair that is neatly trimmed, not more than a half inch in depth, and not extend on to the neck area.

## Exceptions:

1.      Personnel with a medical condition that precludes shaving or compliance with any part of this subsection shall be required to present a written statement to the Office of the Chief of Police signed by a medical doctor verifying the employee's condition annually. The employee may be required to undergo an examination by a medical doctor of the City's choosing for further confirmation of condition.

2.      Personnel seeking religious accommodations that preclude shaving or compliance with any part of this subsection shall be required to notify the Office of the Chief of Police in writing annually.

## ARTICLE 18

## HOLIDAYS AND HOLIDAY PAY

18.1: Effective July 1, 2005, all employees shall be paid as provided for in Article 18 for the following holidays.

| | |
|---|---|
| New Year's Day | Veteran's Day |
| Presidents Day | Thanksgiving Day |

32

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

| | |
|---|---|
| Good Friday | Christmas Eve |
| Independence Day | Christmas Day |
| Labor Day | New Year's Eve |
| Employee's Birthday | Memorial Day |

18.2: Effective July 1, 2005, in lieu of paid holidays or holiday time off, each police supervisor shall be paid a lump sum equal to six and three-tenths (6.3%) of the employee's base wage salary Holiday pay to be computed at base wage rate of salary based on Article XVI. Holiday pay shall be paid to the Police Supervisor on or before the 1st day of December annually.

18.3: Effective July 1, 2017, for bargaining unit members hired on or after April 13, 2011, the following holiday pay schedule shall become effective:

A. After 10 years of service, each Police Supervisor shall be paid an additional three percent (3%) for a lump sum equal to nine and three-tenths percent (9.3%) of the employee's base wage salary.

B. After 15 years of service, each Police Supervisor shall be paid an additional five percent (5%) for a lump sum equal to eleven and three-tenths percent (11.3%) of the employee's base wage salary.

C. After 20 years of service, each Police Supervisor shall be paid an additional seven percent (7%) for a lump sum equal to thirteen and three-tenths percent (13.3) of the employee's base wage salary.

18.4: Upon termination of employment, police supervisors with at least one (1) year Department seniority shall be entitled to receive compensation equal to the number of holidays having occurred since the preceding January 1st and the date of such termination.

33

## ARTICLE 19

## OVERTIME AND COURT-TIME COMPENSATION

19.1: In the event that any police officer assigned to a (8) eight hour work shift works more than eight (8) hours, such officer shall receive additional pay at the rate of time and one-half for such time over eight (8) hours. Officers assigned to (8) hours work shift shall have a minimum of four (4) hours at overtime pay for call. An employee assigned to twelve (12) hour work shift works more than twelve (12) hours, such officer shall receive additional pay at the rate of time and one-half for such time over twelve (12) hours. Scheduled overtime at the start of a shift is not call-in time. Officers assigned (12 hours work shift shall have a minimum of six (6) hours at overtime pay for call-in. If the assignment is completed prior to four (4) or six (6) hours, the officer can elect to go off duty and receive pay only for actual time worked or be given additional assignments to complete the four (4) or six (6) hours.

19.2:

A.   In lieu of overtime compensation as provided above, at the election of the police officer, compensatory time in the ratio of 1.5 hours of compensatory time for 1.0 hours of overtime shall be allowed. A police officer shall not accumulate more than three hundred twenty (320) hours of compensatory time.  Upon ratification of the new collective bargaining agreement in 2022, the City will pay out all supervisors' compensatory time banks that exceed 320 hours as of the date of ratification.

B.   Upon resignation, retirement or death of a police officer, full pay shall be due to the police officer or such officer's "Designated Beneficiary" (attachment C) or estate for up to three hundred twenty (320) hours accumulated compensatory time.

C.   Detective Bureau Personal "On Call" for any given week or prorated to a daily basis shall receive eight (8) hours of compensatory time for being available.

D.   In the event that an employee assigned to work twelve (12) work schedules is unable to complete an entire shift overtime of less than six (6) hours will be staffed only with

34

approval of the Division Captain. Overtime of six hour of more will be staffed.

E.    On or before October 1, 2017, and each year after, a members not in the DROP shall have forty (40) hours of unused compensatory time paid out provided that he or she has at least three hundred-twenty (320) hours of compensatory time in his or her bank. On or before December 31, 2017, and each year after, a members not in the DROP shall have forty (40) hours of unused compensatory time paid out provided that he or she has at least three hundred-twenty (320) hours of compensatory time in his or her bank. or her bank.

19.4: **Court-Time.**Each police officer when required to attend any court at a time other than such officer's regular working shift, shall be paid therefore at the rate of time and one-half the officer's regular rate for actual court time with a guarantee as follows: 20th District Court three (3) hours pay. All other courts four (4) hours pay. There shall be no option to have Court time paid as compensatory time.

19.5: Emergencies notwithstanding, members must work one full shift or have one full shift excused by use of furlough time, personal day or compensatory time following use of a sick day to be eligible for overtime. It is the responsibility of the member to notify the on-duty desk officer of their eligibility for overtime.

19.6: A Police Supervisor who is certified as an Evidence Technician and who processes a scene above and beyond what is considered a preliminary evidence search or collection (i.e. processing a scene for latent prints, blood stain analysis or collection and so on) shall be compensated at a rate of two (2) hours of overtime if handled during their regular shift. There shall be no option to have this time paid as compensatory time.

19.7: A Police Supervisor who is assigned to dispatch, jail guard services, or a combination of both for any combination of one (1) hour or more while on regular shift shall be compensated with two (2) hours of overtime. There shall be no option to have this time paid as compensatory time.

35

19.8: The assignment of civilians to bargaining unit members for the purpose of any ride-along program or training shall be done so at the discretion of the Chief of Police, scheduled in advance with reasonable notice and done so strictly on a volunteer basis. Supervisors who choose to participate in the Department ride-along program shall be compensated with one (1) hour of overtime for up to eight (8) hours. There shall be no option to have this time paid as compensatory time.

## ARTICLE 20

## VACATIONS

20.1: With each officer's anniversary date effective July 1, 2009, each supervisor in the bargaining unit shall receive any and all vacation time converted to hours as follows:

20.2: The City will provide each officer, on January 31st of each year, with a list setting forth the officer's accumulated sick and vacation time.

20.3:

| After 1 full year | 116 hours | 14 days+4 hours | 9 days+8 hours |
|---|---|---|---|
| cc | 2 full years | 156 hours | 19 days+4 hours | 13 days |
| cc | 3 full years | 172 hours | 21 days+4 hours | 14 days+4 hours |
| cc | 4 full years | 188 hours | 23 days+4 hours | 15 days+8 hours |
| cc | 5 full years | 196 hours | 24 days+4 hours | 16 days+4 hours |
| cc | 6 full years | 236 hours | 29 days+4 hours | 19 days+8 hours |
| cc | 10 full years | 244 hours | 30 days+4 hours | 20 days+4 hours |
| cc | 11 full years | 252 hours | 31 days+4 hours | 21 days |
| cc | 12 full years | 260 hours | 32 days+4 hours | 21 days+8 hours |
| cc | 13 full years | 268 hours | 33 days+4 hours | 22 days+4 hours |
| cc | 14 full years | 276 hours | 34 days+4 hours | 23 days |

36

| cc | 15 full years | 284 hours | 35 days+4 hours | 23 days+8 hours |
|---|---|---|---|---|
| cc | 16 full years | 292 hours | 36 days+4 hours | 24 days+4 hours |

Members who have not purchased service credits over 60 months shall be entitled to an extra 12 hours of vacation time upon reaching 16 years of service for a new maximum of 304 hours to be credited on his or her anniversary date.

All earned vacation time may be taken in two (2) hour increments for purposes of an eight (8) hour shift schedule. For purposes of a twelve (12) hour schedule vacation time may be taken in three (3) hour increments. Any/all "excess" time earned less than twelve (12) hours may be reported to the Division Captain within a fifteen (15) day grace period of such time earned for credit to the Supervisor's compensatory bank, or in the case of furlough, on or before the officer's anniversary date.

20.4: All vacation time must be taken in the year following the year in which earned. Accumulated vacation time accrued before June 30, 1987 may be taken by the officer with approval of the Chief of Police or designee.

20.5: At least five (5) frozen banked vacation days will be purchased by the City annually, at the individual bargaining unit member's option, from bargaining unit members with banked days and that person's bank accordingly reduced. All red circled banked vacation days will be frozen in value as of June 30, 1993 and shall not increase in value nor accrue any roll up costs from future salary increases Effective November 1, 2010 a police officer may now bank up to two-hundred forty-four (244) hours of vacation time. However, it is understood a police officer may only use up to two hundred ninety-two (292) hours of vacation time per year (anniversary date to anniversary date). At the time of normal retirement, DROP enrollment, duty disability retirement or death (as provided for elsewhere in this agreement), any/all vacation time shall be addressed in accordance with and as provided for elsewhere of this agreement.

Vacation days will be frozen in value on the date they are banked and shall not increase in value nor accrue any roll up cost from future salary increases.

20.6: An employee shall be allowed to schedule furlough work days and receive compensatory time up to

37

sixty (60) hours (not to exceed contractual maximums) at a rate of time and one-half. (Example: twelve (12) hours furlough work equals eighteen (18) hours compensatory time. Eight (8) hours furlough work equals twelve (12) hours compensatory time.

20.7:  Furlough time that is requested 35 days in advance shall be approved 30 days in advance if manpower permits.

20.8:  Once furlough time has been approved, notwithstanding an emergency, it shall not be revoked.

## ARTICLE 21

### FUNERAL LEAVE

21.1: A police officer shall be entitled to nine (9) calendar days per funeral to make preparation for and attend the funeral and burial of an immediate member of the officer's family within three hundred (300) miles of the City of Dearborn Heights. An immediate member of the family for this purpose shall be deemed a husband, wife, children, parents, parents-in-law, grandparents, brothers, sisters, brothers-in-law, sisters-in-law, daughters-in-law, sons-in-law, foster parents, step father, step mother, step brothers and step sisters as well as step children and any persons living within the same household even if not related by blood or marriage. The officer shall also be entitled to five (5) calendar days for the funeral of grandparents-in-law or grandchildren if within three hundred (300) miles of the City of Dearborn Heights. One (1) additional calendar day for travel will be given for funerals over three hundred (300) miles. The additional time is subject to the approval of the Chief, and the Chief's refusal to grant the extension, is subject to the grievance procedure of this contract.

A police officer shall be entitled to one (1) calendar day to actually attend the funeral service for an aunt or uncle.

## ARTICLE 22

### SICK LEAVE

22.1: A sick leave day for the purpose of this Article shall mean a regular duty day.

22.2:  As of July 1, 2009, each employee will accumulate one (1) sick day at the beginning of each month. On February 15 of each year thereafter, the excess sick days, above two hundred twenty-five (225); or that employee's contractual maximum, at the Supervisor's option, shall be

38

paid off at a rate of 1/2 day's pay for each sick day.

22.3: A police officer shall be charged sick day time for regular duty days not worked because of illness.

22.4: All police officers in the bargaining unit who are injured or become ill in the line of duty as defined by the Workers' Compensation Act shall be carried on the City payroll at no loss of take-home pay for such officer's classification for a period not to exceed one year from date of injury. The employee shall continue to earn sick leave, vacation leave, longevity pay, hospitalization, life insurance and shall have continuous service for seniority. A police officer shall receive uniform allowance at a pro-rated rate for months served on active duty prior to the date of such illness or injury. The employee shall not earn uniform allowance during the period of this special leave provided the employee shall not be docked for the first thirty (30) days of such leave. As a condition of continued receipt of the pay differential provided by this Section, any employee injured on the job, for whom any physician has declared to be totally disabled or for whom no precise date for return to work can be given by a physician for return to work, shall file for disability retirement under the Act 345 Retirement Plan and not later than such employee's sixth consecutive month of injury. As a further condition, such employee shall also file for a United States Government, Social Security Disability payment not later than such officer's fifth consecutive month of injury. Receipt of United States Social Security Administration disability benefits or disability retirement under the Act 345 Retirement Plan shall simultaneously and without more, terminate the obligations of this Section.

Retroactive United States Government Social Security Administration Disability payments covering any period for which the City made a differential payment shall be payable to the City to the extent of such differential paid and for the period of the benefit.

No employee under the provisions of this Section shall, in conjunction with the provisions of this Section, or any insurance plan or the income from any other source, be entitled to receive from the City more than 100% of the employee's actual wage loss. The term "physician" shall mean a medical doctor (M.D.) or doctor of osteopathy (D.O.).

Supervisors shall not earn compensatory time hours while on Worker's Compensation.

22.5: When a police officer's employment terminates by reason of retirement or death, the employee or the employee's designated beneficiary (or if no beneficiary has been designated, then as

39

provided by law), respectively shall be entitled to full pay for all accumulated sick days (to be paid in eight (8) hour increments). See Attachment "Designation of Beneficiary."

22.6: The City shall procure and maintain at its own expense an insurance policy providing for each employee for non-duty sickness or accidents, weekly benefits for twenty-six (26) weeks. The weekly short-term disability (STD) benefit level shall be sixty percent (60%) of the employee's weekly base salary (up to five hundred dollars ($500) per week maximum). STD may only be used when an employee has a continuous, incapacitating serious health condition as certified by a physician. STD cannot be used for an intermittent leave or to care for a family member. Benefits begin on the eighth (8th) day of non-occupational injury or sicknesses after accumulated sick time and PTO has been exhausted. Medical leaves resulting from an employee's pregnancy shall entitle employees to paid leave for up to six (6) weeks in the case of a normal delivery, and up to eight (8) weeks for a Caesarean Section, or the length of time determined to be medically necessary as certified by the employee's physician. An employee is not eligible for holidays which may occur while he/she is receiving short-term disability payments. Additional sick leave and paid time off are not accrued during periods of short-term disability.

22.7: For reasons other than the above, a police officer shall be paid one-half (1/2) of accumulated eight (8) hour increment sick leave days upon severance of employment.

22.8: This City will provide each officer, on January 31st of each year, with a list setting forth the officer's accumulated sick and vacation time.

22.9: Employees who attain maximum accumulation of sick days may, at their option, use or schedule off, with reasonable notice, the excess earned sick day per month without any recourse from the City provided the excess sick day accumulation does not fall below the maximum days earned nor cause overtime to be scheduled.

22.10: Effective July 1, 2005, a police supervisor may use and shall be charged sick time for regular duty days not worked because of illness, injury or a scheduled medical or dental procedure or checkup. The City recognizes that sometimes a family member's illness or injury requires the employee's time and care. For that reason, the City allows police officers to use accrued sick time for the care of an eligible family member. If the time off is for the

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

care of a family member with an illness, accrued sick time may be used for those family members in the following circumstances:

- The care of an eligible family member who is ill or injured

- Accompanying an eligible family member to a scheduled medical or dental procedure or checkup

- Attending an eligible family member who is hospitalized.

## Medical and Dental Appointments:

Employee's need to make appropriate arrangements in advance with their supervisor. Accrued sick time may be used for scheduled medical and dental appointments.

## Family member shall be defined as:

- Spouses (through statutory or common-law marriages) or any persons living within the same household even if not related by blood or law.

- Sons & Daughters (includes biological, adopted, or foster children, stepchildren, and legal wards under 18 years old). Children older than 18 are covered if they are unable to care for themselves due to disability.

- Parents (Biological, adoptive, step or foster parents, parents-in-law)

Effective July 1, 2005, each employee in the bargaining unit will be allowed to use twelve (12) sick days per year for purposes as set forth in this Article. These twelve (12) sick days can be used throughout the course of the annual year without penalty or incidence. If the employee uses more than twelve (12) sick days annually, "banked" sick time may be used in conjunction with this Article or in conformance with Article 59 provided the employee supplies the employer with written proof of illness or injury from a physician for said employee or persons covered in this Article. If employees meet these criteria, no "incident" shall be charged to them, nor shall this day be charged against the employee's twelve (12) "allowed" sick days per year, if the employee supplies the employer with prior documentation of on of the above reasons at least five (5) days in advance. The only exceptions to this rule are emergency situations and contractually approved absences such as bereavement leave, etc. Employees who fail to comply with the above requirements

41

will be charged with an "incident". When an employee reaches his or her eleventh (11th) allowed sick day, the employee will receive a conference with the City to allow the City to remind the employee of this policy and its disciplinary implications. Any employee who exceeds the twelve (12) allowed sick days (excluding approved leaves) will be subject to the City's "no fault" attendance policy explained as follows:

- One (1) day = 1 incident

    Discipline for the accumulation of an absence incidence shall be imposed as follows:

- 1 incident = written warning

- 2nd and subsequent incidents = progressive discipline

When an employee has one (1) absence incident, the employee will receive a conference with the City in which the City will provide the employee an opportunity to explain their absence. The person will be given an opportunity to provide a credible written medical opinion (not a conclusory statement) by a medical doctor or a doctor of osteopathy as a medical explanation for such incident. This conference will also allow the City to once again explain this policy and its disciplinary implications in case of continued incidents. At this conference the City will either enforce or adjust the "no fault" incident policy at the City's sole discretion.

All incidents of absence shall be counted in a consecutive twelve (12) month period beginning July 1 and ending June 30.

## ARTICLE 23

### INSURANCE

23.1: The City shall maintain, for each officer, life insurance coverage of Fifty Thousand Dollars ($50,000) term life insurance coverage with an additional coverage of Fifty Thousand Dollars ($50,000) for accidental death and for dismemberment. The City shall pay the premium cost for insurance coverage.

23.2: Police Officers who retire from the DHPSA bargaining unit after July 1, 2009, shall receive a ten thousand dollar ($10,000) life insurance benefit payable to a beneficiary designated by the retired employee. The City shall pay the premium cost for such insurance coverage.

42

23.3    Healthcare Plan Options

A. For all active who are not enrolled in the DROP:

The City will provide full-time employees the ability to select health insurance coverage from at least four (4) PPO options. At least one of these options will be a PPO with in-network benefits including: a deductible of $100 single, $200 family; plan-paid coinsurance of 90%; coinsurance annual maximum of $500 single, $1,000 family; office visit copay of $20; emergency room copay of $150; and prescription drug copays of $10 generic, $40 brand formulary, and $80 brand non-formulary Mail order prescriptions will require two copays for a 90-day supply of medication.

1. One of the four (4) PPO options will also be a Health Savings Account qualified plan.

2. The City is responsible for the design of the medical plan options not specified in Article 23 with the objective of giving employees a range of options that yield lower payroll deductions.

3. All active employees will be required to share in the cost of their healthcare through the City in accordance with P.A. 152 as that Act is implemented by the City. In the event P.A. 152 is repealed, the City and the Union agree to open up the contract for negotiations as to health care, only. It is the intent of the City to adopt the hard cap starting January 1, 2018. If the City opts out of PA 152, an affected COAM member will not pay more than seven percent (7%) of his or her base wage.

4. In the event a permanent full-time employee elects to waive coverage under the City's healthcare plan, they shall be compensated at $2,000 per contract year if the alternative plan is not with the City. In the case of married City employees, whereby both are eligible to receive benefits, the employee who opts out of the insurance will receive $1,000.

B. For employees who enter the bargaining unit on or before July 1, 2017 and who enter DROP or retire:

1. Healthcare benefits while in the DROP and in retirement include a PPO with in-network benefits including: a deductible of $100 single, $200 family; plan-paid coinsurance of 90%; coinsurance annual maximum of $500 single, $1,000 family; office visit copay of $20; emergency room copay of $50; and prescription drug copays of $0 generic and $15 brand. Mail order prescriptions will require two copays for a 90-day supply of medication.

2. Upon Medicare eligibility, retirees must enroll in Medicare Part A and Part B. A retiree shall be

43

responsible for the costs associated with Medicare and will be responsible for any additional or increased participation costs imposed by the Medicare or other governmentally sponsored health-related programs affecting retirees. Retirees shall be subjected to any and all deductibles as required by Medicare. Medicare-eligible retirees shall receive a Medicare Advantage plan or Medicare complementary coverage.

3.  DROP participants shall be considered retired for healthcare purposes. A retiree's cost share contribution shall continue be up to one percent (1 %) of retiree's Act 345 retirement benefit. If under current premium formula the cost share to retirees is less than one percent (1%), the retirees will pay the lesser amount until the cost sharing amount reaches one percent (1%) or more and then the one percent (1 %) formula takes effect. Upon reaching the age of sixty-five (65) the member's Act 345 retirement benefit contribution as provided for in this section shall thereby be reduced to five-tenths percent (.5%). DROP participants may have this cost share deducted from his/her DROP account (the one percent (1 %) formula shall not include any DROP interest which has accrued and shall still be based on the retiree's ACT 345 benefit only) or at the employee's (or designated beneficiary where applicable) option, this cost may be deducted from any further lump sum payout upon separation from employment or death.

4.  In the event a member elects waive coverage under the City's healthcare plan, they shall be compensated at $2,000 per contract year if the alternative plan is not with the City. In the case of married City employees, whereby both are eligible to receive benefits, the employee who opts out of the insurance will receive $1,000.

C. For employees who were hired on or before April 13, 2011 and enter the bargaining unit after July 1, 2017:

1.  Healthcare benefits and insurance premium cost share while in the DROP shall be the same as the COAM member had at the time of DROP election until reaching retirement.

    Healthcare benefits and insurance premium cost share while in retirement shall be the same as the Supervisor' had at the time of retirement until reaching Medicare eligible age. However, the employee will only be responsible for paying one percent (1%) of his or her Act 345 retirement towards his or her retirement health care benefit.

2.  Upon Medicare eligibility, retirees must enroll in Medicare Part A and Part B. A retiree shall be responsible for the costs associated with Medicare and will be responsible for any additional or increased participation costs imposed by the Medicare or other governmentally sponsored health-related programs affecting retirees. Retirees shall be subjected to any and all deductibles as required

44

by Medicare. Medicare-eligible retirees shall receive a Medicate Advantage plan or Medicare complementary coverage.

3. In the event a member elects to waive coverage under the City's healthcare plan, they shall be compensated at $2,000 per contract year if the alternative plan is not with the City. In the case of married City employees, whereby both are eligible to receive benefits, the employee who opts out of the insurance will receive $1,000.

4. This retirement health care benefit is intended to be a lifelong vested benefit for the member, the member's spouse as long as the member remains married, and for dependents until they attain the age of 26 years.

D. For employees who hired into the City after April 13, 2011:

1. Healthcare benefits while in the DROP may remain the same as the member had at time of DROP election until his/her separation from employment. This is to include spouse and covered children/dependents. While in the DROP, the member's insurance premium cost share contribution through the City shall be in accordance with P.A. 152 until such time he or she separates from employment.

2. In the event the DROP participant elects to waive the City's healthcare plan he/she shall be compensated at two-thousand five-hundred ($2500) per plan year if the alternative plan is not with the City. In the case of married City employee, whereby both are eligible to receive benefits, the employee who opts out of the insurance will receive one-thousand two-hundred fifty ($1250).

3. The City shall not provide post-retirement healthcare insurance after separation from employment. The employee shall contribute three percent (3%) of his/her base wage per pay period to the "Medical Expense Reimbursement Trust" in lieu of a retiree healthcare benefit. The City shall contribute an additional one percent (1%). This contribution will be withheld from the employee's pay throughout their tenure with the City and the City remains responsible for investing the contribution into the trust.

4. For Supervisors hired after April 13, 2011, who retire and separate employment under Public Act 345, whom are not entitled to post-retirement healthcare, the City shall provide a stipend in the amount of fifty percent (50%) of that retiree's chosen post-retirement healthcare premium cost plan (up to a maximum of five thousand ($5,000) dollars). This stipend shall be paid to the retiree (or retiree's spouse in cases where the retiree has pre-deceased his/her spouse) on or about December 1st of each year for the following plan year

45

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

and is not intended to cover any premium related to the Medicare Parts (A, B, or D). The retiree shall submit documentation to the City prior to December 1st of each year showing the retiree's enrollment plan and cost share for the following year.

E.    Each child (who is related by birth, marriage, legal adoption, or legal guardianship) ceases to be covered upon reaching age 26 or as provided by federal law. Medically proven "Special needs" children shall remain covered regardless of age.

F.    Excluded from benefits coverage are maternity benefits for persons acting as surrogate Mothers.

G.    Whenever more than one family member is employed by the City, there shall be no duplicate health benefits coverage.

H.    As a matter of clarification, it is understood that retiree health insurance, other than duty disability retirement, is only provided for persons (and current spouses) that have 25 years of police service either through active police service or a combination of active police service and military time purchased prior to June 30, 1989. Eligible police service time will include an employee's entire past Dearborn Heights cadet service and/or prior police service and/or military service and/or service credits.

I.    Persons (and spouses as of the date of disability retirement) retired because of duty disability shall be entitled to the same health insurance as defined by stipulations outlined in Article B, C or D. The duty disability retiree or eligible spouse is entitled to receive a monthly retirement benefit from the Act 345 Retirement System.

J.    In the event that death results to a member in the line of duty or a member who becomes totally incapacitated for duty by reason of a personal injury or disease occurring as the natural and proximate result of causes arising out of and in the course of that person's employment by the City and retired by the Board, the employee's surviving dependents shall have coverage as set forth in Article 23. Spouse ceases to be covered when he or she remarries.

23.4 The City will maintain a dental plan providing the following benefit levels to active and DROP

personnel:

| | |
|---|---|
| Class I (preventative) | 100% ($2,500 annual maximum on Class I, II, and III) |
| Class II (restorative) | 100% ($2,500 annual maximum on Class I, II, and III) |
| Class III (major) | 80% ($2,500 annual maximum on Class I, II, and III) |
| Class IV (orthodontics) | 75% ($5,000 lifetime maximum) — no age limit |

The City will maintain the same policy into retirement for any member hired on or before April 13, 2011.

23.5 The City will maintain a vision insurance plan that is or equivalent to Blue Cross Blue Shield - Blue Vision (12/12/12) — VSP. This benefit level includes: one eye exam per year, one pair of contact lenses per year, and pair of glasses per year. The City will maintain the same policy into retirement for any member hired on or before April 13, 2011.

23.6 The City shall not be required to cover the retiree who is covered under such other hospitalization plan which is equivalent or better or becomes covered while being covered under the City retiree plan, provided, however the coverage shall continue and shall not be terminated if the City is reimburse for said premiums within ninety (90) days after notifying the retiree of amount of premium due and said retiree's coverage shall remain in full force and effect. The City shall resume payments on behalf of the retiree when such other hospital plan ceases. The retiree's coverage shall not be changed to include any other persons being covered under medical, dental or vision benefits after the retiree's separation from employment. The City shall not be required to cover a retiree or covet retiree family member who is eligible to be covered under another health care plan. Should the retiree, once having the retiree's benefits terminated, cease to be covered by another plan, the retiree ma y be reinstated by filing a written application for such coverage to be reinstated pursuant to this agreement (if the retiree meets eligibility requirements). The City shall resume coverage on behalf of an otherwise eligible retiree or family member when such other coverage ceases to be eligible.

23.7 All benefits shall be subject to standard preprinted provisions set forth in the policy or policies.

23.8 When employment is interrupted by layoff, discharge, resignation, quit, strike, retirement, leave of

absence (except those covered under Article 11, Section 3 (a)) or any other reason, all insurance coverage continues only for the balance of the month in which such termination occurs or until the next premium is due, whichever is sooner.

23.9 The Employer shall have no obligations to duplicate any benefit an employee receives under any other policy or with any other employer notwithstanding the circumstances of eligibility, amount or duration of benefit, and it shall be the obligation of the employee to inform the Employer of any and all insurance coverage enjoyed by said employee other than coverage provided by the Employer herein a party.

23.10 Should the City be obligated by law to contribute to a governmentally sponsored insurance program, state, national or otherwise, which duplicates the benefits provided by the City under insurance policies currently in effect as a result of this Agreement, it is the intent of the parties that the City not be obligated to provide double coverage; to escape such double coverage, the City shall be permitted to cancel benefits or policies which duplicate compulsory governmentally sponsored insurance programs; provided, however, the City agrees to maintain the benefit level established by this Agreement supplementing compulsory policies if necessary.

23.11 The City shall be permitted to select and reselect the insurance carrier for any insurance required by this Article provided that substantially equivalent benefit levels are maintains, it being understood that different insurance carriers may not offer identical policies. For purposes of determining equivalency of the package, the package will be submitted to a mutually agreeable insurance consultant.

23.12 The City reserves the right to subrogation and recovery of amounts paid by the City, or its health insurance plans, on behalf of a person covered by a City health insurance plan(s) because of an injury in which the person covered by the City's health insurance plan is entitled to recovery or is paid damages by another party.

23.13 No health insurance plan of the City in conjunction with any other group health plan or plan or plans without limit as to source or nature shall be construed so as to require payment of more than 100% of the employee's or retiree's actual loss.

23.14 The City shall provide liability insurance with no deductible charged to the officer. Policy

48

limits, deductibles and carrier shall be at the discretion of the City.

## ARTICLE 24

### PERSONAL LEAVE DAYS

24.1: Each police officer shall be entitled to five (5) personal leave days per calendar year and no reason need be given.

If a personal leave day is requested six (6) days or less in advance and granted, it shall not be revoked.

If any request for personal leave days is not granted, the decision may be appealed verbally to the Chief of Police and then to the Mayor or designated representative.

A personal leave day may not be unreasonably withheld. Having to call in another officer on overtime for replacement is not sufficient reason alone for denial.

If there is a conflict between two (2) or more officers in request for personal leave days, seniority shall prevail if requests are made within a twenty-four (24) hour period.

The City shall not be required to grant personal leave days when an emergency exists.

The personal leave days for a police officer entering the DHPSA will be prorated only for the calendar year that they entered.

## ARTICLE 25

### RETIREMENT AND PENSIONS

25.1:

A.    Effective for all bargaining unit members retiring on or after July 1, 2005 and subject to sub-section (B) of this section, the member shall be entitled to a pension, pursuant to Public Act 345 payable throughout the member's life of two and eight-tenths percent (2.8%) per year of the member's average final compensation. Upon reaching twenty-five (25) years of service, an additional five percent(5%) shall be added to

49

equal seventy-five percent (75%) with a one and one half percent (1.5%) increase per year thereafter up to (30) thirty years.

This shall commence from the officer's date of hire as a police officer including any/all purchased or credited eligible time without regard to age.

25.2: Effective July 1, 2009, in accordance with Section 6(f) (MCLA 38.556 (f)) average final compensation will be taken from the average of the three (3) years of highest annual compensation received during all of the years of service with the City. The provisions of Section 1 (b) above shall also apply to this Section 2 (a).

A.

1    For persons who are active members of this bargaining unit or for future members who were hired into the City of Dearborn Heights on or before July 1, 2011, at the employee's option, a credit amount (at the prevailing hourly rate of pay) of up to one hundred twenty-five (125) unused sick days (in eight hour increments or 1000 hours) may be included into the F.A.C. but not paid out. A credit amount (at the prevailing hourly rate of pay) of up to three hundred twenty (320) hours of unused compensatory time and a credit amount (at the prevailing hourly rate of pay) of up to two hundred forty-four (244) hours of unused furlough time may be included into the F.A.C. and shall be paid out in accordance with Section 25.3.

2    Persons hired into the City of Dearborn Heights on or after July 1, 2011, shall not be entitled to include any credited amount of unused sick days, compensatory time and/or furlough time into the F.A.C.

25.3: Persons retiring shall receive any lump sum distribution to which entitled (for example: accumulated sick, vacation and compensatory time) at time of retirement in three (3) annual installments commencing with such person's first day of retirement with interest being paid on a declining balance method at 70% of the one year time certificate of deposit rate of the City Depository as of the last day of work:

50

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

| | |
|---|---|
| 1st Installment | 34% |
| 2nd Installment | 34% |
| 3rd Installment | 32% |
| | 100% |

Persons entering the deferred retirement option plan (DROP) may at their option carry over any or all accumulated sick (up to twenty-five (25) days), vacation and compensatory time. The lump sum distribution annual installment payment on this balance would then commence with such person's first day of separation from the DROP.

25.4: Effective July 1, 2001, the employees' Act 345 contribution shall be reduced from five and one-half percent (5.5%) to four and one-half percent (4.5%). Effective July 1, 2003, the employees' Act 345 contribution shall be reduced from four and one-half percent (4.5%) to three and three-quarters percent (3.75%). Effective July 1, 2004, the employees' Act 345 contribution shall be reduced from three and three-quarters percent (3.75%) to three percent (3%). Effective upon execution of the July 1, 2021 through June 30, 2024 contract, employees' Act 345 contributions shall be six percent (6%).

25.5: Effective July 1, 1997, an employee shall have the right to receive a partial or total refund of his or her accumulated contributions (without interest) at the time of the employee's retirement. This refund will not be subject to the distribution provisions of Section 3 of this Article. If an employee makes such an election, the employee's retirement allowance shall be reduced proportionately. The document entitled "Factors to Compute Reduction in Monthly Retirement Allowance Applicable to Withdrawals Made at Retirement" will be attached as Addendum C to this contract. The Factor will be based upon the G83 Male Mortality Table with an interest rate based upon the PBGC Interest rate in effect on July 1 of each year. The parties agree to submit an informational revision to Addendum C each year, after July 1, based on the new PBGC Interest rate; however, the parties agree that they will not alter their reliance on the G83 Male Mortality Table or the PBCG Interest Rate during the life of this contract.

25.6

A.          Retiree Supplementary Benefit: Effective for employees retiring on and after July 1,

51

2001, there shall be paid an annual retiree bonus subject to the terms of this provision. The annual retiree bonus shall be paid on or about October 1 of each year. To be eligible to receive the annual retiree bonus, the employee must have retired a minimum of five (5) complete plan years prior to the July 1 date immediately preceding the October 1 bonus payment date. (A plan year is July 1 through June 30). Unless there are insufficient funds to pay any annual retiree bonus (see C below) or unless the annual retiree bonus is to be prorated due to insufficient funds (see C below) the annual retiree bonus paid each October to the retiree (or his or her survivor beneficiary) shall be equal to one-twelfth (1/12) of the total pension benefit payments paid to the retiree (or his or her survivor beneficiary) during the one-year period of July 1-June 30 immediately preceding the October 1 bonus payment date.

B.          The annual retiree bonus will be based on "excess earnings" as described herein. An internal "Police Officer Retiree Bonus Fund" (hereinafter "Fund") shall be set up within the Act 345 Firefighter and Police Plan Trust (hereinafter "Act 345 Plan"). The Fund will initially be established by no later than October 1, 2001, with an initial contribution amount equal to five (5) times the average total monthly pension benefit payments paid to all Police Officer retirees during the one-year period of July 1, 1999 - June 30, 2000 as reported in the July 1, 2001, actuarial valuation report (i.e., the initial contribution amount shall be the total pension benefit payments paid to all Police Officer retirees from July 1, 1999 - June 30, 2000, divided by twelve (12), with the result then multiplied by five (5)). All annual retiree bonuses will be paid from this internal Fund, assuming it has sufficient funds (see below). Annually, the Fund will be credited with earnings/losses, based on the actual average principal equal to the estimated market rate of return presented in the most recent actuarial valuation for the Act 345 Plan. In addition, annual contributions shall be made to the Fund each October 1 (commencing October 1, 2001,) provided that the Act 345 Plan's estimated market rate of return for that year, as reported in the most recent actuarial valuation for the Act 345 Plan, is greater than nine (9.0%) percent. The total potential annual contribution to all retiree bonus funds in the Act 345 Plan will be equal to earnings above nine (9.0%) percent to a maximum of ten (10.0%) percent, based on the estimated market rate of return reported in the most recent actuarial valuation for the Act 345 Plan. That is, the total annual contribution amount shall be a maximum of one (1.0%) percent of total Act 345 Plan investment earnings, and that total annual contribution amount shall be allocated among all retiree bonus funds within the Act 345 Plan in any plan year. The amount of potential contribution to be allocated to the Police Officer Retiree Bonus Fund will be the total annual contribution amount prorated based on the total actuarial accrued

liability for all Police Officer participants in the Act 345 Plan in relationship to the total actuarial liability for all participants in the Act 345 Plan, as set forth in the most recent actuarial valuation for the Act 345 Plan. In addition to the foregoing, the annual contribution to any retiree bonus fund in the Act 345 Plan in any plan year shall in no event cause the retiree bonus fund to have a fund balance in excess of ten (10) times the total average monthly pension benefit payments paid in the previous plan year to retirees covered by that retiree bonus fund (i.e. total monthly pension benefit payments made to retirees covered by that retiree bonus fund during the immediately preceding July 1 - June 30 plan year period divided by twelve (12), and the result multiplied by ten (10).

C.        Should the Police Officer Retiree Bonus be made available to Police Officer retirees who retired prior to July 1, 2001, and in the event the Police Officer Retiree Bonus Fund in any particular year lacks sufficient funds to pay a full annual retiree bonus to all eligible Police Officer retirees, then a full annual bonus will be paid only to those eligible Police Officer retirees who retired on or after July 1, 2001. Further, should the Police Officer Retiree Bonus Fund in any particular year lack sufficient funds to pay a full annual retiree bonus to those eligible Police Officer retirees who retired on or after July 1, 2001, then to the extent there are sufficient funds to do so, a reduced annual retiree bonus shall be paid to those eligible Police Officer retirees who retired on or after July 1, 2001, on a pro-rata basis. Any such determination of insufficient funds must be made and certified by the Act 345 Plan's actuary.

## 25.7: **Duty Disability.**

The City shall provide health care benefits for the surviving spouse and children less than 26 years of age for a duty disability retiree who dies prior to attaining normal retirement age. If a duty disability retiree dies prior to attaining normal retirement age, his pension shall be paid to his surviving spouse.

25.8

A.        Employees are also permitted to purchase up to thirty-six (36) months of past police and active military service prior to employment as a sworn police officer with the City or any combination of past cadet, police and/or military time not to exceed thirty-six (36) months. It is understood and agreed by both parties that with the exception of past cadet service, the first twenty-four (24) months of time shall be paid by the employee at four percent (4%) of

53

employee's base wage as provided in Article 16. For those employees (including past police cadets) opting to purchase an additional twelve (12) months of previous time, the cost per employee shall be five percent (5%) of employee's base wage as provided in Article 16. Employees may use earned time, personal funds, payroll deduction or transfer funds from other retirement accounts as permitted by the IRS Employees wishing to purchase any past time must enroll in the buyback program by June 30, 2007.

B.     Effective July 1, 2009, any current or future employee is also permitted to purchase a combined maximum of up to sixty (60) months service credits. The cost per employee shall be five percent (5%) of the employee's base wage as provided in Article 16 for the first forty-eight (48) months. The additional twelve (12) months must be purchased at the cost of twenty four and one-half percent (24.5%) of the employee's base wage. An employee may use any earned time, personal funds, payroll deduction or transfer funds from other retirement accounts as permitted by the IRS. Supervisors hired after July 1, 2009 shall have seventy-two (72) months from date of hire to enroll and purchase in full any/all time as outlined in Subsection (C), after which time the opportunity to purchase additional service credit(s) shall cease.

## 25.9 Deferred Retirement Option Plan (DROP)

### A. OVERVIEW

Effective January 11, 2007, any Employee who is a member of the City of Dearborn Heights Police and Fire Act 345 Retirement System may at any time voluntarily elect to participate in the City of Dearborn Heights Police and Fire Retirement System Deferred Retirement Option Plan (hereinafter "DROP") after attaining the minimum requirements for a full, unreduced normal service retirement/pension or as provided for in their respective bargaining agreement or any such Employee who has attained twenty five (25) years of service credit. DROP Participation for the Chiefs and Deputy Chiefs of the Police and Fire Departments is granted in accordance with Section 6(d) of Public Act 345 of 1937, as amended.

Upon commencement of DROP participation, the Participant's DROP Benefit shall be the dollar amount of the Employee's monthly pension benefit computed by using the contractual guidelines and formula(s) that are in effect on the particular DROP date. During participation in the DROP, the Participant continues with full employment status, receives all future promotions and benefit/wage increases, and is considered an

54

employee of the City of Dearborn Heights.

The Participant's DROP Benefit shall be credited monthly to the Participant's DROP Account which shall be established within the City of Dearborn Heights Police and Fire Retirement System (the "Police and Fire Retirement System"). The Participant's DROP Account shall be maintained and managed by the Board of Trustees of the Police and Fire Retirement System (the "Retirement Board"). Upon termination of employment, the Participant shall retire and will begin to receive payment(s) from his/her individual DROP Account as described herein. The DROP payment(s) are in addition to all other contractual pension benefits. The Participant is solely responsible for analyzing the tax consequences of participation in the DROP. The City of Dearborn Heights shall no longer pay for tuition and textbooks for a member taking courses after he or she enter into the DROP. Members who are currently enrolled in an educational program and in the DROP as of July 1, 2016 shall be entitled to continue and complete the program and be reimbursed.

## B. PARTICIPATION PERIOD

The maximum period for participation in the DROP is eighty-four (84) months (the "Participation Period") after which time the employee shall terminate employment with the City. There is no minimum time period for participation.

Upon termination of employment, the retiree shall receive the monthly retirement benefit previously credited to their DROP Account and shall be eligible for distribution of their DROP Account Balance in accordance with Section I herein.

## C ELECTION TO PARTICIPATE

Once commenced, participation in the DROP program is IRREVOCABLE (except as specifically provided in Subsection L herein). An Employee who wishes to participate in the DROP shall complete and sign such application form or forms as shall be required by the Retirement Board. The Retirement Board shall review the application within a reasonable time period and make a determination as to the Employee's eligibility for participation in the DROP. On the Employee's effective DROP Date, he or she shall become a DROP Participant and shall cease to accrue additional retirement benefits otherwise credited to active members of the Police and Fire Retirement System. The amount of credited service, multiplier and average final compensation shall be fixed as of the Participant's DROP Date. Increases in compensation and accrual of additional service during DROP Participation will NOT be factored into the pension benefits

55

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

of active or former DROP Participants (except as specifically provided in Subsection L).

Except with regard to the retirement benefits expressly provided herein, DROP

Participants will continue with full employment status with all rights and privileges afforded to employees of the Police and Fire Departments, in the appropriate case, and this applicable bargaining unit, including, but not limited to, future promotions, benefit/wage increases, union membership and representation, as well as, retirement system membership and Board representation.

After an eligible Employee attains thirty (30) years of service credit, the allowed DROP Participation Period for that Employee will be reduced by one month of DROP Participation for every month beyond thirty (30) years of service credit that the Employee delays making a DROP enrollment election.

## D. DROP BENEFIT

The Participant's DROP Benefit shall be the regular monthly retirement benefit to which the Employee would have been entitled if the Employee had actually terminated employment and retired on the DROP Date (less the annuity withdrawal reduction as set forth in Subsection E and/or actuarial reductions as a result of the Employee electing an Optional form of benefit under the Plan, if applicable).

The Participant's DROP Benefit shall be credited monthly to the Participant's individual DROP Account. A DROP Participant may at the time of DROP Election elect to receive his or her benefit in the form of the Current Pension Plan's Option I or Option II Benefit and nominate a named beneficiary in accordance with the Police and Fire Retirement System provisions.

The term "spouse" for purposes of benefit qualification of DROP Participants, shall mean: (1) the person to whom the Participant was legally married on the Participant's date of death if such death occurs during DROP Participation; or (2) the person to whom the retiree was legally married on both the effective date of termination of DROP Participation and the retiree's date of death provided such death occurs after termination of DROP Participation. The definition of "spouse" herein may be amended pursuant to an Eligible Domestic Relations Order entered pursuant to Michigan Public Act 46 of 1991, as amended (MCL §38.1701 et seq.).

## E. REFUND OF RETIREMENT CONTRIBUTIONS

An Employee who elects to participate in the DROP (and correspondingly, ceases to accrue

56

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

additional retirement benefits otherwise credited to active members of the Police and Fire Retirement System) may elect the Refund of Retirement Contributions Option provided by their respective Collective Bargaining Agreements at the time of electing DROP participation. This Option and all other retirement options under the Police and Fire Retirement System which are available to Retirement System Members shall only be available to the DROP Participant at such time as he or she elects DROP Participation and not thereafter.

The Refund of Retirement Contributions Option election shall be made commensurate with the Participant's DROP election, but not thereafter, and the Refund amount at time of DROP will be utilized to compute the actuarial reduction of the Participant's DROP Benefit, as well as the Employee's monthly retirement benefit from the Police and Fire Retirement System after termination of employment. The Refund amount (accumulated contributions) shall be withdrawn from the Police and Fire Retirement System at the time of DROP Enrollment and subject to withdrawal by a DROP Participant at the time of DROP Election.

DROP Participants who do not elect the Annuity Withdrawal Option shall have their full unreduced benefit credited to their DROP Account.

At the time of the Refund of Retirement Contributions Option election, if an Employee is electing a straight life form of benefit with no qualifying spouse, the Refund reduction computation is based in part upon the actuarial life expectancy of the Employee (rather than the life expectancies of both the Employee and qualified spouse). There shall be no adjustments to the benefits payable to the DROP participant/retiree upon the subsequent marriage of a qualifying spouse during the employees participation in the DROP. In the event such spouse (i.e. qualified after calculation of the Refund election), subsequently qualifies for benefits payable by the Police and Fire Retirement System, said benefits shall not be adjusted based upon the Employee's Refund of Retirement Contributions election.

## F. LUMP SUM DISTRIBUTION OF ACCUMULATED LEAVE TIME

Sick Day Bank.

At the time of DROP election, an Employee may elect to place up to the contractually agreed upon sick days into the Employee's Final Average Compensation.

Any excess sick days and/or furlough at time of DROP enrollment will be distributed in accordance with the Employee's respective Collective Bargaining Agreement.

57

An Employee may elect to "roll-over" up to twenty-five (25) sick days into his/her DROP Sick Day Bank. With the maximum earned Sick Day Bank correspondingly increased. (i.e. If an employee elects to "roll-over" 10 sick days, then his/her Sick Day Bank maximum will increase to 94 sick days) (When an Employee begins DROP Participation, the Employee will earn a lump sum of twelve (12) sick days to start (which will be prorated should the Employee terminate DROP Participation prior to completing the first year of DROP Participation), and may accrue a maximum of 84 sick days for Police Officer Employees (to be credited at one per month after completing the first 12 months of DROP Participation) until termination of employment. These sick days will be paid out at the prevailing hourly rate of pay in (8) hour increments and distributed in a lump sum. For those DROP Participants covered by the DHPOA Collective Bargaining Agreement, the 13th bonus sick day will be paid at the rate of twelve (12) hours compensatory time and added to the Employee's compensatory time bank on January 1st of each year. (DROP Participants only)

Compensatory Time.

At the time of DROP election, the contractually agreed upon compensatory time shall be paid out at the prevailing hourly rate of pay and shall be included in the computation of the employee's Final Average Compensation.

Any excess remaining compensatory time shall be carried forward and rolled into the Employee's DROP compensatory time bank. Upon termination from employment compensatory time shall be paid out in a lump sum but will not be included in the calculation of Final Average Compensation.

Furlough Accumulation.

Any additional unused furlough time shall be paid out in a lump sum at time of termination of employment but will not be included in the calculation of Final Average Compensation.

## G. DROP ACCOUNTS

For each DROP Participant, an individual DROP Account shall be created in which shall be accumulated at DROP Interest, the Participant's DROP Benefits. All individual DROP Accounts shall be maintained for the benefit of each DROP Participant and will be managed by the Police and Fire Retirement Board in the same manner as the funds of the Police and Fire Retirement System. DROP Interest for each DROP Participant shall be five percent (5%) per annum and credited quarterly. The Retirement Board shall provide each participant with an annual statement of their account activity. The reference to

58

individual DROP Accounts shall be interpreted to refer to the accounting records of the Police and Fire Retirement System and not to the actual segregation of moneys in the funds of the Police and Fire Retirement System. At the Employee's request, one additional statement per year may be provided to the Employee.

## H. CONTRIBUTIONS

Employee's contributions to the Police and Fire Retirement System shall cease during DROP Participation for each Employee entering the DROP.

## I. DISTRIBUTIONOF DROP FUNDS

Upon termination of employment, the former DROP Participant must choose one, or a consistent combination of, the following distribution methods to receive payment(s) from his or her individual DROP Account:

1. A total lump sum distribution to the recipient.

2. A partial lump sum distribution to the recipient.

3. A lump sum direct rollover to another qualified plan to the extent allowed by federal law and in accordance with the Retirement Board's rollover procedures.

4. An annuity payable for the life of the recipient.

5. An optional form of annuity as established by Public Act 345 of 1937, as amended.

6. A monthly distribution to the recipient.

7. No distribution, in which case the accumulated balance shall remain in the Plan to the extent allowed by federal law.

After termination of DROP Participation, an individual's DROP Account will be credited annually with interest based upon the greater of (1) five and one-half percent (5.5%) per annum, or (2) one-half (1/2) of the market rate of return earned by the Police and Fire Retirement System in the prior calendar year.

A former Participant may change their distribution method as may be applicable no more

59

than once per annum prior to June 30th of each year in accordance with such procedures and time guidelines as adopted by the Retirement Board.

A former Participant may elect a total lump sum distribution of any remaining balance in their DROP Account at any time after termination of employment which will be paid within 90 days after receiving the member's request. All benefit payments under the Plan shall be made (or commence in the case of an annuity) as soon as practical after entitlement thereto, but in no event later than the April 1 following the later of:

The calendar year in which the Member attains age 70 1/2, or

The calendar year in which the Participant's employment terminated.

If the Accumulated Balance in any former Participant's account becomes less than $5,000 [or such other amount as provided in Internal Revenue Code Section 411(a) (11) (A)], then the Retirement Board, in its sole discretion, shall have the option of distributing the former Participant's entire account, in the form of a lump sum, to the Former Participant.

Any and all distributions from Participant's DROP Account shall not be subject to offset by any workers' compensation wage loss payments received by the Participant, including any redemption amounts.

Any eligibility for receipt of a post-retirement benefit improvement (a/k/a "13th check") shall be made at time of enrollment in DROP.

## J. DEATH DURING DROP PARTICIPATION

Except as otherwise provided in Subsection L, if an Employee participating in the DROP dies either: (I) before full retirement (i.e.,. before termination of service); or (ii) during full retirement (i.e., after termination of service) but before the DROP account balance has been fully paid out, the Participant's designated beneficiaiy(ies) shall receive the remaining balance in the Participant's DROP Account in the manner in which they elect from the previously mentioned distribution methods (Subsection I). In the event the Participant has failed to name a beneficiary, the account balance shall be payable to the Participant's beneficiary of benefits from the Police and Fire

Retirement System. If there is no such beneficiary, the account balance shall be paid in a lump sum to the Participant's estate. Benefits payable from the Police and Fire Retirement System shall be determined as though the DROP Participant had separated from service on the day prior to the Participant's date of death.

## K. DISABILITY DURING DROP PARTICIPATION

Except as otherwise provided in Subsection L, in the event a DROP Participant becomes totally and permanently disabled from further performance of duty as a Police Officer or Fire Fighter in the appropriate case, in accordance with the provisions of the Police and Fire Retirement System, the Participant's participation in the DROP shall cease and the member shall receive such benefits as if the member had retired and terminated employment during the Participation Period. Application and determination of disability shall be conducted in accordance with the Police and Fire Retirement System provisions; however, the Participant shall not be eligible for disability benefits from the Police and Fire Retirement System, except as specifically provided in Subsection L. DROP Members who are off of work on Worker's Compensation for over 1 full year shall terminate employment.

## L. SPECIAL PROVISION FOR DUTY DISABILITY AND DUTY DEATH A DROP
Participant who is found by the Retirement Board, in accordance with Retirement System provisions, to be totally and permanently incapacitated for duty by reason of a personal injury or disease occurring as the natural and proximate result of causes arising out of and in the course of the Employee's employment with the City, may retroactively revoke the Participant's DROP election if the revocation occurs before the payment of a distribution to the Employee from the Participant's DROP account or before payment of disability or retirement benefits to the Employee from the Retirement System. If a DROP Participant dies in the line of duty while in the employ of the City, the DROP Participant's eligible survivors (i.e., survivors qualified under Section 6(2) of Public Act 345 of 1937, as amended, and the Participant's applicable Collective Bargaining Agreement) and the Participant's eligible DROP beneficiary(ies) may, by unanimous agreement, retroactively revoke the Participant's DROP election if the revocation occurs before payment of a distribution from the Participant's DROP account or payment of benefits from the Police and Fire Retirement System. If a DROP election revocation is made as prescribed by this Subsection, the Participant's DROP Account is not distributed,

61

and the Participant or the Participant's beneficiary(ies), as applicable, is entitled to all benefits provided by the Police and Fire Retirement System as if a DROP election had not been made.

In the event of revocation of DROP participation as provided herein, there shall be no requirement for retroactive payment of employee contributions which would otherwise have been paid by the Employee to the Retirement System and the Employee shall receive service credit for all service rendered during DROP participation or as otherwise provided in the applicable Collective Bargaining Agreement.

## M. INTERNAL REVENUE SERVICE COMPLIANCE

The Internal Revenue Service has accepted the DROP concept because the Employee/DROP Participant does not have either actual or constructive receipt of the DROP payments (while still employed), and the Employee ceases to accumulate additional credit toward retirement benefits once DROP Participation commences. The DROP is intended to operate in accordance with Section 415 of the Internal Revenue Code, as amended, as well as with any other applicable laws and regulations, state of Michigan or federal. In the event the Board of Trustees finds any DROP provision to be in violation of any applicable law, that provision shall be null and void and the remaining DROP provisions shall constitute the terms of the DROP.

The City of Dearborn Heights Police and Fire Retirement System consists of a defined benefit plan. The DROP Account shall be established as part of the defined benefit plan of the Retirement System or such other plan as the Retirement Board and the Union's shall agree upon (i.e., I.R.C. section 415(m) benefit plan) after consultation with appropriate legal counsel.

## N. DROP COST

The City and those applicable Collective Bargaining Associations which agree to adopt the DROP Program intend for the DROP Program to be essentially cost neutral (i.e., $\pm$ 0.2% of covered payroll). The parties recognize the complexity in estimating the actuarial cost impact of the DROP on the Police and Fire Retirement System. Accordingly, after a 10 year period from the establishment of the DROP, the Retirement Board will direct that the Retirement System's Actuary to conduct an evaluation as to the cost impact of the

DROP on the Retirement System. In the event that the actuary determines that the DROP has had a positive cost to the Retirement System (i.e., > .2% of covered payroll), the DROP shall be amended in such manner, as recommended by the Actuary and approved by the parties, to result in an essentially cost neutral program. Subsequent amendments to the DROP will not impact DROP Participants.

In the event that the City determines that the DROP has had a positive cost to the City, the DROP shall be amended and approved by the parties. Dearborn Heights Police and Fire Act 345 Retirement System members currently covered by their respective bargaining agreement upon ratification of this document, (January 11, 2007) shall be exempt from any future amendments (unless mutually agreed upon by both parties) and will be governed under the current terms and conditions of this document.

The City of Dearborn Heights disclaims any and all responsibility for any tax implications that may affect a DROP Participant. The City recommends that each Employee consult with a professional tax advisor, certified professional accountant, or other such individual capable of providing tax advice.

## O. HEALTH CARE

DROP Participants shall be eligible for the health care coverage provided to retirees in accordance with their respective Collective Bargaining Agreements.

During the participant's enrollment in DROP, the City will provide and be responsible for the costs of health care coverage for any additional qualified persons added to the participant's health care plan during enrollment in DROP. This health care coverage for qualified persons added during DROP participation shall cease upon termination from DROP and leaving employment.

## ARTICLE 26

## MISCELLANEOUS PROVISIONS

26.1: In the event that this Agreement is not resolved prior to the expiration of the fiscal year, then any economic benefits agreed upon when the contract is settled shall be retroactive to the beginning of the

63

fiscal year.

26.2: If any Article or Section of this Agreement or an appendixes or supplements thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal, the remainder of this Agreement shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such Article or Section.

26.3: All letters of understanding shall expire with the term of the Agreement during which negotiated unless specifically incorporated into the Agreement.

26.4: Whenever used in this Agreement the term "Physician" shall mean a medical doctor (M.D.) or doctor of osteopathy (D.O.) and such physician's statement concerning disability shall include:

    (1)    Patient's illness

    (2)    How and why the illness disabled the patient

    (3)    The period of expected disability including the start and estimated return to work date.

26.5: Notwithstanding anything in this Agreement to the contrary, the City may, in its discretion, institute the Public-Safety Officer concept of police and fire service.

26.6: For a police officer who retires under Public Act 345 on or-after July 1, 2001, the City shall provide that police officer with the same or equivalent optical and dental coverage as active bargaining unit members.

26.7: The City shall provide and maintain all issued equipment so that it is safe for use at all times by police personnel.

26.8: The parties agree that during the course of this agreement the following issues will be kept open for negotiations until such time as the parties come to an agreement:

    •    Annuity Withdrawal without Penalty

The language will then become implemented and included into the collective bargaining agreement unless both parties agree to terminate negotiations on these issues.

26.9: Effective July 1, 2007 Command Officers will be compensated at the rate of two percent (2%) and every year thereafter. This compensation shall be paid in a lump sum on or before the 1st day of October of each year. This compensation shall be computed at a percentage of each Supervisor's maximum base salary

A.          The City and the Union agree that members entering into the City on or after April 3, 2011 shall not be entitled to the compensation described in Article 26, Section 9.

## ARTICLE 27

## RESIDENCY

27.1: There shall be no residency requirement for a Police Supervisor covered under this Agreement.

27.2: The positions of Deputy Chief and Chief must be filled by residents of the City of Dearborn Heights. Nonresident eligible applicants may write for the position of Deputy Chief provided that if a non-resident applicant is the first-eligible person for promotion, and should such person accept promotion, such person must become a resident within 180 days of appointment.

## ARTICLE 28

## HOURS

28.1: Road patrol Supervisor's shifts shall be of six (6) month duration or any other duration as agreed upon, and the number of shifts and their hours shall be mutually agreed upon by both the City and the Union. The Union will post an agreed upon signup sheet for the shift selections sixty (60) days prior to the proposed shift change. The shift selections will be made by seniority. The Union will then submit the signup sheet to the Uniform Division Captain fifty-five (55) days prior to the shift change.

Shift change shall be concurrent with the DHPOA Road Patrol shift change.

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

Once shifts are selected and posted they shall not be changed unless mutually agreed upon by both parties.

While on a twelve (12) hour 2 on-3 off / 2 on-2 off shift schedule, the working day will consist of shifts of twelve (12) hours each. The day and night shift shall begin at 0630 and 1830 respectively. Shifts shall be determined on a rank and seniority basis.

While assigned to twelve (12) hour shift schedule, Police Supervisors will be assigned to work a seven (7) out of fourteen (14) day schedule. The additional eight (8) hours per month scheduled will be paid at time and one-half for a total of twelve (12) hours per month and will be added into the Police Supervisor's compensatory time bank at a rate of six (6) hours per pay period. All other hours in excess of that described above shall be paid under the overtime provisions as described in the contract. However, except in an emergency, no one will be scheduled to work more than fourteen (14) consecutive hours.

If a Supervisor transitions from one shift/slot to another, the hours worked within the current cycle will be handled at the Uniform Division Captain's level. However, in no case shall an employee be required to work more or less hours within the scheduled cycle the employee was transferred from.

28.2: Road patrol shifts shall be selected by seniority with the exception of probationary sergeants who will be assigned by the City with the below listed guidelines

A. During a sergeant's probationary period, the City may require them to work on every shift. If the probationary sergeant is unable to select a specific shift as required by the Administration, the City will first ask for volunteers to be moved. If no supervisor volunteers to be moved from the shift they selected, the City will displace the lowest seniority sergeant working on the desired shift, not the platoon. Once a sergeant has been displaced from their selected shift, they may not be displaced again for 6 months.

B. The City and the Union will work together to determine scheduling for both the probationary and non-probationary Police Supervisors.

66

C.  The period of displacement for a non-probationary Police Supervisor shall not exceed 28 calendar days.

28.3: All shifts shall be eight (8), twelve (12), or mutually (the City and the Union) agreed upon straight hours.

28.4: **Work Schedules.**

The work schedule shall be posted at least thirty (30) days in advance of the start of the new schedule where possible. Subject to departmental manpower requirements police supervisors shall be permitted to voluntarily trade work or leave days. Supervisors shall be assigned to permanent shifts for a period of six (6) months or any other agreeable terms. Personnel will be on either an eight (8), twelve (12) hour or mutually agreed upon scheduled that is agreed upon by both the City and the Union.

28.5: Agreement of the City and the majority vote of the union can amend the work schedule at any time.

28.6: If a Supervisor is going to be absent (vacation, illness, etc.) during their assigned time to select their shift, it shall be their responsibility to notify a member of the DHPSA Executive Board of their selection.  In the event a Supervisor fails to notify an Executive Board member of their shift selection they shall forfeit their turn.  Such Supervisor may contact an Executive Board member and will be able to select from the remaining shift openings at that time.

28.7: Officers shall receive overtime pay at the rate of time and one-half for all time spent in mandatory training in excess of eight (8) hours. For purposes of a twelve (12) hour schedule, training scheduled eight (8) hours or more shall be considered a full work day. Training scheduled less than eight (8) hours, the officer will be required to return to normal duty upon returning to the station. Training in excess of twelve (12) hours will be paid at the rate of time and one-half overtime.

28.8: The work schedule for employees shall be either an eight (8) hour work day or twelve (12)

67

hour work day or any other agreeable schedule.

28.9: For purposes of an eight (8) hour work schedule, employees assigned to work shifts that run consecutive for six (6) work days shall be paid overtime for any days worked thereafter until the employee is off two (2) days, unless requested by an employee, then such employee waives any overtime. For purposes of a twelve (12) hour schedule, employees assigned to work shifts that run consecutive for three (3) work days shall be paid overtime for any days worked thereafter until the employee is off two (2) days, unless requested by a police officer, then such officer waives any overtime.

28.10: No bargaining unit member shall be permitted to work more than sixteen (16) consecutive hours without approval of the Division Captain.

28.11: Roll Call shall be considered work time of the regular eight (8) or twelve (12) hour shift.

28.12: Road Patrol Division minimum personnel standards shall be as follows: <u>Eight (8)</u>

<u>Hour:</u>

(0630-1430) 3 supervisors / 2 supervisors to maintain the shift

(1430-2230) 3 supervisors / 2 supervisors to maintain the shift

(2230-0630) 3 supervisors / 2 supervisors to maintain the shift

<u>Twelve (12) Hour:</u>

(0630-1830) 3 supervisors / 2 supervisors to maintain the shift

(1830-0630) 3 supervisors / 2 supervisors to maintain the shift

One (1) supervisor shall be allowed furlough per platoon per shift.

## ARTICLE 29

## EDUCATION

29.1: The City of Dearborn Heights, upon written application, will pay for tuition and textbooks for police officers taking courses offered in a recognized degree awarding Police Administration

68

curriculum subject to the conditions hereinafter set forth and upon completion of a semester where a grade of "C" average or better is maintained in that semester. The police officer must pass the courses with a credit and receipts have to be furnished upon completion in order to be reimbursed. Certificates or diplomas received shall become a part of the Police Officer's Civil Service Personnel Jacket.

A.      The courses taken must relate directly to police work or be a part of a recognized Police Administration Degree Curriculum.

B.      Grants or scholarships by the Federal Government, State Government, college or other sources shall be turned over to the City or deducted from the City reimbursement program.

C.      Employees claiming reimbursement must prove and sign they paid the amount sought reimbursed for either books or tuition.

29.2: Officers shall not be obligated to seek City reimbursement for tuition or books and may elect to secure an education completely at their own expense. Officers not seeking reimbursement for tuition or books shall not be subject to the provisions of Section 1 above.

29.3: The City of Dearborn Heights shall no longer pay for tuition and textbooks for a member taking courses after he or she enter into the DROP. Members who are currently enrolled in an educational program and in the DROP as of July 1, 2016 shall be entitled to continue and complete the program and be reimbursed.

29.4: **Training Time -** The Union agrees that its members should receive high quality training that is both mandated and recommended as law enforcement best practices. The Union agrees to forego the following articles to accommodate a forty (40) hour training week and any other mutually agreed upon mandatory, department wide training. Scheduling for these events will be with appropriate notice.

1.   Article 20 – Vacations
2.   Article 24.1 – Personal Leave Days
3.   Article 28.1-9 – Hours

69

Dearborn Heights Police Supervisors/COAM<br>
Effective July 1, 2021 through June 30, 2024<br>
Signature Copy

## ARTICLE 30

### PHYSICAL ASSESSMENT

30.1: The City shall have the option to institute and reinstate physical assessment programs at City expense during duty time without limitation provided such programs provide confidential medical assessments to bargaining unit members which are not shared with the City by the assessing agency. Examples of such programs include blood pressure screening, weight screening, cholesterol screening, blood chemistry testing including computerized blood chemistry testing, complete blood counts with differential and platelet count, sedimentation rates, liver functions, urinalysis, full physical examinations, psychiatric screening, EKGs and similar medical tests designed to assist a professional in making life style recommendations to the tested individual.

30.2: Tests may be conducted on City premises or at an off-site facility. The testing agency will be selected by the City in its discretion provided that agency is advised of its responsibility to maintain test information confidential between the testing agency and the tested individual. Participation in the physical assessment program(s) is required.

## ARTICLE 31
### JURY DUTY

31.1: Bargaining unit members who are called to serve upon a jury shall be assigned to the day shift for the day(s) for which they are obligated to report for jury duty. At the conclusion of jury service for the day, the bargaining unit member shall report for duty- to-finish -the work shift.  If jury service lasts for eight (8) hours or longer, it shall be considered a full work day for the supervisor and they shall not be obligated to return to work. The assigning of an officer to the day shift pursuant to this Article shall not result in the payment of overtime to any officer. Officers assigned to jury duty shall not be entitled to use Department vehicles.

## ARTICLE 32
### ADA/FMLA LANGUAGE

32.1: This contract shall be in compliance with the Americans with Disabilities Act (ADA). Employees

70

covered by this contract shall be entitled to all rights as contained within this contract. The City and Union shall comply with their obligations under the ADA and recognize the need to reasonably accommodate the disabled, as provided for under the ADA. They agree as necessary during the term of this agreement to discuss any specific problems which may arise in complying with the ADA.

32.2: The City and the Union shall comply with the Family Medical Leave Act (FMLA) and the regulations implementing that Act, which are specifically incorporated herein. Employee paid time off such as sick days and personal days will be charged for FMLA leave, in accordance with FMLA regulations. Unpaid FMLA leave will not be granted until all paid time off to which an employee can be charged for FMLA leave is exhausted.

32.3: Health insurance coverage will be maintained for the duration of the FMLA leave. Upon their return from FMLA leave, employees will be returned to the same or an equivalent position to that which they occupied when the employee commenced leave in accordance with FMLA regulations. Employees shall also remain entitled to all other benefits to which they are entitled under this agreement.

32.4: With respect to seniority, no time spent on FMLA leave will jeopardize the position of seniority an employee held when the employee commenced leave.

32.5: Members who are on FMLA leave shall not be able to work any overtime until he or she has returned to work one full shift.

# ARTICLE 33
## SAFETY COMMITTEE

33.1: All accidents which result in bodily injury shall be reported immediately in accordance with the City of Dearborn Heights Safety Procedures Manual.

33.2: The Union President, or his designee, shall be a member of the City of Dearborn Heights Employee Safety Committee. Such member shall attend all meetings of the Safety Committee as requested by the Human Resource Director.

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

## ARTICLE 34

### DURATION

34.1: This is the sole Agreement between the parties and shall be binding upon the parties for a period of three (3) years, from July 1, 2021 to June 30, 2024. This Agreement may be mutually amended by the parties, and in such event, an amendment will, unless otherwise specifically so stated, become an integral part of the Agreement and shall remain in full force and effect for the term of this Agreement.

The parties shall commence negotiation on or before April 1, 2024 for a succeeding contract unless by mutual agreement, the parties decide to continue the terms of this Agreement.

34.2 If the Agreement between the City of Dearborn Heights and the Police Officers Union has a monetary increase in any form or fashion other than wages, then the City and the COAM agree to immediately open the agreement for financial equity.

72

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

IN WITNESS WHEREOF, the parties have executed this Agreement on the _____ day of

_____, 2023.

FOR THE DEARBORN HEIGHTS POLICE          FOR THE CITY OF DEARBORN
SUPERVISORS ASSOCIATION:                 HEIGHTS

By: _____              By: _____

Its: _____             Its: _____


By: _____              By: _____

Its: _____             Its: _____


By: _____              By: _____

Its: _____             Its: _____

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

## Attachment A

### Authorization for Payroll Deduction

**PLEASE PRINT**

BY: _____

      Last Name            First Name     Middle Initial

TO: CITY OF DEARBORN HEIGHTS, MICHIGAN

Effective_____I hereby authorize you to deduct from my earnings $ _____ per month or such other amount as Dearborn Heights Police Supervisors Association, hereinafter called DHPSA, may certify as my share of the cost of administration and negotiation of this and succeeding collective bargaining agreements with the City of Dearborn Heights. In consideration of the City of Dearborn Heights providing this deduction service, I agree to hold the City of Dearborn Heights harmless against any and all claims, demands, lawsuits or other forms of liability that may arise out of, or by reason of, action taken or not taken by the City for the purpose of providing this deduction service. I further specifically agree that in the event that a refund of sums deducted under this authorization is due to me for any reason, that in consideration of the City of Dearborn Heights providing this deduction service, to seek such refund from DHPSA. The amounts deducted hereunder shall be paid to the Treasurer of DHPSA at the address provided, and to be provided, by said DHPSA. This authorization shall remain in effect unless terminated by me upon sixty (60) days prior written notice to DHPSA and the City of Dearborn Heights upon termination of Agreement or upon termination of my employment.

_____

Employee's Signature

74

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

**Attachment B**

## CITY OF DEARBORN HEIGHTS ACT 345 RETIREMENT SYSTEM

*Factors to Compute Reduction in Monthly Retirement Allowance*

Applicable to Retirements for the Period

July 1, 2002 to June 30, 2003

| Age    Nearest    Birthday    at Retirement | Factor |
|---|---|
| 45 | 0.00494 |
| 46 | 0.00500 |
| 47 | 0.00507 |
| 48 | 0.00515 |
| 49 | 0.00523 |
| 50 | 0.00531 |
| 51 | 0.00540 |
| 52 | 0.00549 |
| 53 | 0.00559 |
| 54 | 0.00570 |
| 55 | 0.00581 |
| 56 | 0.00593 |
| 57 | 0.00606 |
| 58 | 0.00620 |

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

| 59 | 0.00635 |
|----|---------|
| 60 | 0.00651 |
| 61 | 0.00668 |
| 62 | 0.00686 |
| 63 | 0.00706 |
| 64 | 0.00727 |
| 65 | 0.00750 |

*Age waiver required prior to age 50.*

Example:       Member retires at age 50 and withdraws $10,000.

Age 50 factor of .00531 times $10,000 equals a monthly reduction of $53.10.

83 Group Annuity Mortality Table with the July, 2002 PBGC Interest Rate of 4.50%.

76

Dearborn Heights Police Supervisors/COAM
Effective July 1, 2021 through June 30, 2024
Signature Copy

## Attachment C

## Designation of Beneficiary

TO: CITY OF DEARBORN HEIGHTS, MICHIGAN I hereby designate,

| (Print Name) | (Social Security #) |
|---|---|
| (Print Name) | (Social Security #) |
| (Print Name) | (Social Security #) |
| (Print Name) | (Social Security #) |

as primary beneficiary (ies) of any employment related benefits payable by the City of Dearborn Heights, Michigan on account of my death or due me from the City of Dearborn Heights, Michigan at the time of my death under the Collective Bargaining Agreement with the Dearborn Heights Police Supervisors Association or otherwise.

In the even such designated beneficiary (ies) predeceases me, **I** hereby designate,

| (Print Name) | (Social Security #) |
|---|---|
| (Print Name) | (Social Security #) |
| (Print Name) | (Social Security #) |
| (Print Name) | (Social Security #) |

instead. I reserve the right to change the designated beneficiary (ies). In case of conflict between the requirements of the Collective Bargaining Agreement existing at the time of death, or any statute and this Designation of Beneficiary, such Collective Bargaining Agreement or statute shall control the disposition of any employment-related benefits payable **due to the death of the employee.**

In addition, it is understood and agreed that the City of Dearborn Heights, Michigan may require the designated beneficiary to sign an agreement to indemnify and hold the City of Dearborn Heights, Michigan harmless from liability as a result of delivering any monies to the beneficiary.

(Signature)                              (Date)
Name: Address:

CC: H.R. Department, Comptroller's Office

77

55659692.v1-OGLETREE