**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN SWOPE, PAUL VANDERPLOW, JERROD HART

      Plaintiffs,

v.

CITY OF DEARBORN HEIGHTS, a Michigan Municipal Corporation

      Defendant.

CITY COUNCIL FOR THE CITY OF DEARBORN HEIGHTS

      Intervening Defendant.

Case No. 2:24-cv-10240-MAG-DRG
Hon. Mark A. Goldsmith

---

**DEFENDANT CITY OF DEARBORN HEIGHTS' COMBINED MOTIONS IN LIMINE TO EXCLUDE THE DEPOSITION TESTIMONY OF BILL BAZZI AND TO EXCLUDE ALL EVIDENCE PERTAINING TO HUSSEIN BAZZY**

NOW COMES Defendant City of Dearborn Heights, pursuant to ECF No. 102, by an through Counsel, The Allen Law Group, and requests that this Court issue an Order excluding, or in the alternative limiting the use of the deposition testimony of Bill Bazzi and trial pursuant to FRE 701, 702, 801 and 802, and excluding all evidence pertaining to Hussein Bazzy pursuant to FRE 403.

On June 9, 2026, Defendant City of Dearborn Heights sought concurrence from counsel for Plaintiffs, however, such relief was not granted.

1

Defendant City of Dearborn Heights requests that this Honorable Court grant Defendant City of Dearborn Heights Motion to (1) exclude the use of Bill Bazzi's deposition transcript and testimony at trial, (2) exclude any and all evidence pertaining to Hussein Bazzy at trial, and (3) grant any further relief this Court deems necessary.

Respectfully Submitted

**THE ALLEN LAW GROUP, P.C.**

By:   */s/ Monica N. Hunt*
Monica Hunt (P68838)
3031 West Grand Boulevard
Suite 525
Detroit, Michigan 48202
(313) 871-5500
mhunt@alglawpc.com

Dated: June 9, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN SWOPE, PAUL VANDERPLOW, JERROD HART

Plaintiffs,

v.

CITY OF DEARBORN HEIGHTS, a Michigan Municipal Corporation

Defendant.

CITY COUNCIL FOR THE CITY OF DEARBORN HEIGHTS

Intervening Defendant.

Case No. 2:24-cv-10240-MAG-DRG

Hon. Mark A. Goldsmith

---

**DEFENDANT CITY OF DEARBORN HEIGHTS' BRIEF IN SUPPORT OF ITS COMBINED MOTIONS IN LIMINE TO EXCLUDE THE DEPOSITION TESTIMONY OF BILL BAZZI AND TO EXCLUDE ALL EVIDENCE PERTAINING TO HUSSEIN BAZZY**

NOW COMES Defendant City of Dearborn Heights, by and through Counsel, The Allen Law Group, and requests that this Court issue an Order excluding, or in the alternative limiting the use of the deposition testimony of Bill Bazzi and trial, and excluding all evidence pertaining to Hussein Bazzy, and states as follows:

3

## I.     Exclusion of the Deposition Testimony of Bill Bazzi

Defendant moves this Honorable Court for an order preventing the use of the transcript, and the testimony contained therein, of the Deposition of former City of Dearborn Heights Mayor Bill Bazzi, from being offered into evidence at Trial.

### A. Background

In the instant matter, Plaintiffs make a number of allegations that suggest that they, the former chief of police and directors within the Dearborn Heights Police Department, discriminated and retaliated against based on their race and due to their alleged disclosure of corruption and illegal actions within the Police Department.

During his deposition, Bill Bazzi was asked questions soliciting responses that were conclusory in nature and were legal conclusions. Bazzi, a non-attorney lay person, is not qualified to offer such a response. Moreover, a significant portion of Bazzi's testimony hinged on hearsay statements. Both issues require the exclusion of Bazzi's deposition testimony at trial.

### B. Law

Pursuant to FRE 701, fact witnesses are prohibited from offering "expert type" testimony. "[T]he witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding or the witness' testimony or the

4

determination of a fact in issue, *and* (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." (*Emphasis added).*

The Sixth Circuit Court of Appeals is clear that fact witnesses may not invade the jury's function by testifying about what result the witness believes the jury should reach. *Woods v. Lecureux*, 110 F.3d 1215, 1219 (6th Cir. 1997). Moreover, legal opinions, when offered by a non-lawyer lay witness, are both incompetent and unpersuasive. " *U.S. v. Canipe*, 569 F.3d 598, 603 (6th Cir. 2009) (proper to restrict law "opinion" testimony), citing *Torres v County of Oakland*, 758 F. 2d 147, 150 (6th Cir, 1985) ("The problem with [lay witness] testimony containing a legal conclusion is in the conveying witness' unexpressed, and perhaps erroneous, legal standards… This invade[s] the province of the court to determine the applicable law…"); also see *Carter v. Ford Motor Co.,* 561 F.3d 562, 567 (6th Cir. 2009).

## C. Analysis

During the course of Bazzi's testimony, counsel for Plaintiffs counsel, over the course of the seven plus hour deposition, asked numerous questions to elicit what would be deemed legal conclusions. Specifically:

1. Counsel sought testimony and response regarding Bazzi assertion that Plaintiff Vanderplow uncovered *collusion* of a city employee. See Ex. A, 129: 9-23; 131: 22-25; and 132: 2-11.
2. Counsel sought testimony and response regarding Bazzi's assertion that Plaintiffs' suffered *retaliation* at the hands of the City. See Ex. A, 121: 1-25; and 123:3-23.

5

3. Counsel sought testimony and response regarding Bazzi's assertion that a practice of *ticket-fixing* existed in the Police Department. See Ex. A, 21: 5-11; 15-24; 84:3-9; 108:11-25; 111:17-112:2; 314:10-22; 372:15-373:25.

4. Counsel sought testimony and response regarding Bazzi's assertion that *corruption* was an issue within the City. See Ex. A, 30: 25-31:14; 31:16-32:4, 33: 6-16; 46:14-47:12; 111:7-9, 17-19; 320: 3-11; 372:14-373:25.

Bazzi's testimony, as solicited from counsel for Plaintiff, contains specific terms that not only demand a particularized legal analysis, but have a separate, distinct and specialized meaning in the law different from that present in the vernacular. Courts have held that when this occurs, testimony must be excluded. *United States v. Hearst*, 563 F.2d 1331, 1351 (9th Cir. 1977). Further, courts have held that terms such as "discrimination" have a specialized meaning in the law and in lay use the term has a distinctly less precise meaning. *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir. 1980).

Moreover, the testimony of Bazzi is reliant upon nothing more than hearsay. Bazzi testimony related to belief that ticket fixing existed was due to the information told to him by Plaintiff Hart. See Ex. A, 315:4-17. Further, Bazzi testified that his only knowledge of *corruption* was based on what was told to him by Plaintiff Hart. Specifically, it was Plaintiff Hart that told him that money was being taken from the evidence room, and that cameras were placed in the women's locker room in the Police Department. See Ex. A 26:22-28:7.

Bazzi's testimony is attempting to show that the claims that Plaintiffs contend they complained about, were actually occurring. This is, however,

6

inadmissible unless Plaintiff can prove that a specific hearsay exception applies to Bazzi's statements. FRE 801(c), 802, *Cobbins v Tennessee Dept of Transp.*, 566 F. 3d 582, 588 (6th Cir 2009) (proponent of evidence has he burden of laying the foundation of admissibility, which is met where parties stipulate to admissibility); *U.S. v. Kendrick*, 853 F 2.d 492, 496 (6th Cir. 1988) (proponent of evidence has the burden of proving he hearsay exception). To prove this foundation, a proponent of a hearsay statement must offer independent evidence supporting the statements admissibility, because hearsay is "presumptively unreliable". The statement itself is not sufficient to support its admission into evidence. *U.S. v. Henderson*, 307 Fed. App. 970, 976 (6th Cir, 2009).

Due to the aforementioned reasons, Defendant City of Dearborn Heights requests that this Court preclude the use of Bill Bazzi's deposition testimony at trial, or in the alternative, preclude the use of testimony pertaining to legal conclusions and hearsay statements from use at trial.

## II. Exclusion of Testimony Pertaining to Hussein Bazzy

Defendant moves this Honorable Court for an order preventing the use of the any evidence pertaining to Hussein Bazzy, from being offered into evidence at Trial.

### A. Background

Plaintiffs Amended Complaint makes the unsubstantiated allegations that Plaintiffs were discriminated and retaliated against because of the Defendants'

interest in placing a Middle Eastern Officer, particularly Mohamad Bazzy, a Sergeant with the Dearborn Heights Police Department.  Plaintiffs spent an exhaustive amount of time during the course of discovery focusing on a social media video make by Bazzy's older brother, Hussein "Sam" Bazzy.

Plaintiffs contend that, because of the social media video made by Hussein Bazzy in his real estate office in which he promotes the career of his brother Bazzy by optimistically wishing his brother becomes Chief of Police, that a conspiracy was afoot to install Bazzy as a Chief. While Plaintiffs tend to rely on these claims, the evidence rejects the theories. Focus on such allegations at trial is unfairly prejudicial and is misleading to the jury.

## B. Law

Pursuant to FRE 403, relevant evidence may be excluded by this Court if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion or the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. Unfair prejudice exists when marginally relevant evidence might be given undue or preemptive weight by the jury or when it would be inequitable to allow use of such evidence." *Haberkorn v Chrysler Corp.,* 210 Mich App 354, 362, 533 NW2d 373 (1995).

In assessing the probative value against prejudicial effect, there are several factors considered: time necessary to present the evidence and the potential for

8

delay; whether the evidence is cumulative; how directly the evidence tends to provide the fact in support of which it is offered; how important the fact sought to be proved is; the potential for confusion; and whether the fact can be proved another way with fewer harmful collateral effects. *Id.,* citing *People v Oliphant*, 399 Mich 472, 490 (1976). Innuendo in questions and argument without factual support may divert the jurors' attention from the merits of the case and inflame their passions is improper and should be excluded. *Badalamenti v. William Beaumont Hospital – Troy*, 237 Mich App 278, 292 (1999).

### C. Analysis

Plaintiffs' reliance on a video of an older brother advocating for his younger brother's promotion does not amount to anything more than an offer of love and support. See Exhibit "B". Bazzy, himself, admits that the video references his becoming Chief of Police. See Exhibit "C", 85:4-7. He contends that it is a reference to the community supporting the Chief of Police. *Id* at 85:8-11. Bazzy testifies that no one, including his brother has done anything to cause his to receive a promotion outside of the recognized promotional system in the City. *Id.* at 74:21-75:16.

Further, toward the end of the video, Hussein Bazzy jokingly states that if one were to get pulled over in Dearborn Heights, that they should state the name of his real estate practice and they would be taken care of. See Exhibit "B". While

9

Plaintiffs attempt to use this video to fuel their frivolous claim of ticket-fixing, Bazzy admits that this was joke made by his big brother. See Ex. C, 86:1-12.

Submission of the video contained herein any testimony related to the video would confuse and prejudice the jury and should therefore not be allowed when such evidence contains no probative value in this case. *Berwald v. Kasal*, 102 Mich App 269, 273 (1980). This evidence is more prejudicial than probative under Rule 403. As such the video attached as Exhibit "B" and any evidence related to it must excluded from trial.

For these reasons, Defendant City of Dearborn Heights requests that this Court preclude any and all testimony and evidence involving Hussein (Sam) Bazzy from introduction and use at trial.

## III.    Conclusion

Defendant City of Dearborn Heights requests that this Honorable Court grant Defendant City of Dearborn Heights Motion to (1) exclude the use of Bill Bazzi's deposition transcript and testimony at trial, (2) exclude any and all evidence pertaining to Hussein Bazzy at trial, and (3) grant any further relief this Court deems necessary.

LOCAL RULE CERTIFICATION: I, Monica N. Hunt , certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom;

consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point(for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Respectfully Submitted

**THE ALLEN LAW GROUP, P.C.**

Dated: June 9, 2026             By:    /s/ Monica N. Hunt
                                       Monica Hunt (P68838)
                                       3031 West Grand Boulevard
                                       Suite 525
                                       Detroit, Michigan 48202
                                       (313) 871-5500
                                       mhunt@alglawpc.com

CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, I did serve the foregoing pleading with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record registered for electronic filing.

By:    /s/ Monica N. Hunt
       Monica Hunt (P68838)

11

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW,

JERROD HART,

              Plaintiffs,

   vs.                     Case No. 2:24-cv-10240
                           Hon. Mark A. Goldsmith
                           Magistrate David R. Grand

CITY OF DEARBORN HEIGHTS, a

Michigan Municipal Corporation,

              Defendant,

CITY OF DEARBORN HEIGHTS CITY

COUNCIL, in its official capacity only,

Intervening Defendant.

_____/

     The Deposition of BILL BAZZI,

     Taken at 6045 Fenton Street,

     Dearborn Heights, Michigan,

     Commencing at 10:03 a.m.,

     Friday, August 29, 2025,

     Before Cheri L. Poplin, CSR-5132, RPR, CRR.

Bill Bazzi
August 29, 2025

Page 2

APPEARANCES:

FOR PLAINTIFFS:
        STEPHEN JOSEPH BROWN
        Fausone & Grysko PLC
        41700 West Six Mile Road, Suite 101
        Northville, Michigan 48168
        248.912.3213
        jbrown@thefgfirm.law

FOR DEFENDANT:
        MONICA N. HUNT
        The Allen Law Group PC
        3031 West Grand Boulevard, Suite 525
        Detroit, Michigan 48202
        313.871.5500
        mhunt@alglawpc.com

        ROGER A. FARINHA
        Corporation Counsel Dearborn Heights
        6045 Fenton Street
        Dearborn Heights, Michigan 48127
        313.689.8437
        rafarinha@dearbornheightsmi.gov

FOR INTERVENING DEFENDANT:

        TARIK D. TURFE
        Hammoud, Dakhlallah, and Associates PLLC
        6050 Greenfield Road
        Suite 201
        Dearborn, Michigan 48126
        313.471.4009
        tt@hdalawgroup.com

        GARY T. MIOTKE
        Miotke Law Office
        6828 Park Avenue
        Allen Park, Michigan 48101
        313.388.4809
        gmiotke@miotkelawoffice.com

ALSO PRESENT:

        Hassan Saab, City Council

Page 3

TABLE OF CONTENTS

WITNESS                                          PAGE

BILL BAZZI

EXAMINATION BY MR. BROWN                            6

EXAMINATION BY MR. TURFE                          187

RE-EXAMINATION BY MR. BROWN                       377

RE-EXAMINATION BY MR. TURFE                       378


                     EXHIBITS


EXHIBIT                                          PAGE

(Exhibits attached to transcript.)

EXHIBIT A                                          44

EXHIBIT B                                          54

EXHIBIT C                                          59

EXHIBIT D                                          64

EXHIBIT E                                          77

EXHIBIT F                                         140

EXHIBIT G                                         142

EXHIBIT H                                         148

EXHIBIT I                                         212

EXHIBIT K                                         234

EXHIBIT L                                         240

Page 4

EXHIBIT N                                         278

EXHIBIT O                                         286

EXHIBIT J                                         380

EXHIBIT M                                         380

Page 5

Dearborn Heights, Michigan

Friday, August 29, 2025

10:03 a.m.


                    BILL BAZZI,

was thereupon called as a witness herein, and after

having first been duly sworn to testify to the truth,

the whole truth and nothing but the truth, was

examined and testified as follows:

        MR. BROWN:  Good morning.  My name is

Attorney Stephen J. Brown, but I informally go by the

name of Joseph, which you can call me if you prefer.

I represent the plaintiff in this case, which is Case

Number 24-cv-10240 in the Eastern District of

Michigan, commonly called the Swope case, and we're

here this morning for the deposition of Mayor Bill

Bazzi, the mayor of Dearborn Heights.  We are sitting

in a conference room across from the City Council

chambers in the Dearborn Heights City Hall.  And I

presume we should go around the table, clockwise

perhaps, and announce who we are in the room.

        MR. TURFE:  Tarik Turfe appearing on behalf

of the intervening defendant, City of Dearborn Heights

City Council.

        MR. MIOTKE:  Gary Miotke appearing on

Bill Bazzi
August 29, 2025

Page 18

A.   I have no idea.

MS. HUNT:  Same objection.

BY MR. BROWN:

Q.   But suppose you're in Tunisia and you're asked to come back to attend a trial or you're subpoenaed to come back for a trial.  Would you come back?

MS. HUNT:  Object to speculation.

A.   I have to check the protocol.  I'm not really sure.

BY MR. BROWN:

Q.   Are you aware of any protocol that would prevent you from coming back?

MS. HUNT:  Object to foundation.

A.   I'm not sure.  This is foreign to me.  I don't know.

BY MR. BROWN:

Q.   All right.  So you became mayor of Dearborn Heights, sir, as I recall you saying in 2021?

A.   Correct.

Q.   November?

A.   January I became mayor.  November I was elected.

Q.   So January of '22?

A.   Yes, sir.  No.  '21.  You confused me.

Q.   All right.

A.   January '21 I was appointed.  November of '21 I was elected.

Q.   All right.  So before you became mayor, sir, did

Page 19

Dearborn Heights suffer from a corruption problem in its government?

MS. HUNT:  Object to form and foundation. Speculation.

MR. TURFE:  Same objection.

A.   I used to hear chatter from -- before I became the mayor from police officers that I got to know at that time, and -- and every -- everything was leading towards -- towards that corruption, and when I was on council, that's all you hear of corruption in the city.

BY MR. BROWN:

Q.   What types of corruption were present in Dearborn Heights?

MS. HUNT:  Objection to form, foundation, and speculation.

MR. TURFE:  Same objection.

A.   Contracts.  You can go down the street and see, you know, some streets supposed to be, you know, six, seven inches concrete.  They're like -- some streets since becoming the mayor found out some of them are like not even three inches concrete, you know. Police -- there's some police issues.  I was hearing from residents.  And, again, just at that time before I became councilman it was just people talking,

Page 20

chatter.  When I became council, people coming back -- coming to me and telling me.

BY MR. BROWN:

Q.   What kind of issues were you hearing about with respect to the police department?

MS. HUNT:  Objection to form.

A.   Before I was on council or after?

BY MR. BROWN:

Q.   Before you were on council.

MS. HUNT:  Same objection.

A.   There was racism, you know, police officers being racist towards, you know, this area.  You know, it wasn't -- at that time it was not as Middle Eastern, you know, people living in the city as much as there is now back then, and there was a lot of, you know, people come -- you know, talking about racism by police officers when they get pulled over, the disrespect.

BY MR. BROWN:

Q.   And this is by white officers against people from the Middle East; is that correct?

A.   Basically -- mostly, yes.  It was white police officers against, you know, Arab Americans.

Q.   Do you know what ticket fixing is, sir?

MS. HUNT:  Objection to form and

Page 21

foundation.

MR. TURFE:  Same objection.

A.   Yes.  Now I'm aware of it now.

BY MR. BROWN:

Q.   Has Dearborn Heights historically had a ticket fixing issue with its police department?

MS. HUNT:  Objection to form, foundation, and speculation.

MR. TURFE:  Same.

A.   I became aware of it -- when I became the mayor, I became aware of it.

BY MR. BROWN:

Q.   And what did you become aware of?

A.   That there was ticket fixing.

Q.   Do you know who was doing it?

A.   There's -- there was few people's names that was brought up, but I didn't get involved with -- in the micromanagement when I was the mayor obviously.  The chief and the two directors were handling all the issues with like ticket fixing and other issues.

Q.   But you just mentioned names were brought up with respect to ticket fixing.  Do you remember what those names were?

A.   Yes, sir.

Q.   What were the names?

Bill Bazzi
August 29, 2025

Page 26

BY MR. BROWN:

Q. I see. Did you have knowledge of any sexual misconduct that was taking place within the Dearborn Heights Police Department before you became mayor?

MS. HUNT: Objection as to form and foundation.

MR. TURFE: Same objection.

A. I was told that there was sexual misconduct, yes, by police officers.

BY MR. BROWN:

Q. Were these problems isolated events or was this part of a larger pattern?

MS. HUNT: Objection to speculation and foundation.

MR. TURFE: Same objection.

A. There's -- when I became the mayor, I said that I have an open door policy, and we had a few officers that used to come to my office and bring up some issues that -- especially the first year I was in office, and there was multiple -- multiple complaints.

BY MR. BROWN:

Q. Do you have any information about money from drug busts that had been seized by the police going missing?

MS. HUNT: Objection. Form. Foundation.

Page 27

Speculation.

MR. TURFE: Same objection.

A. I was alerted by the chief, Chief Hart, at that time that there was money being taken from the evidence room and officers -- people putting IOU statements, stickies, and they were taking money.

BY MR. BROWN:

Q. You referred to IOU stickies. Can you further explain that, please?

A. I was told that there's a lot of IOU stickers, so they take money from the evidence room, and they're -- Chief Hart brought up an issue just a few months on the -- in -- in the position, told me that two officers actually came up to him with a big wad of money and said can you hold this for me on a Thursday, I believe, and the city hall was just not even -- I mean, it was almost closed, even the treasurer's office, so the chief -- they gave him a big wad of money and they basically told him, here, Chief, look what we found, and I can't remember the amount. You know, didn't -- obviously didn't count it. But he pretty much told them to get that away from me, put it back where you got it from, you know, basically you can't take it to the treasurer to deposit or anything and didn't know where it came from.

Page 28

Q. Do you have any knowledge of a camera being placed in the women's locker room at the police department?

MS. HUNT: Objection to foundation.

MR. TURFE: Same objection.

A. Chief Hart called me and -- I think it was Chief Hart or Chief Swope, one of them, brought to my attention they found a camera in the girls' locker room.

BY MR. BROWN:

Q. I want to talk about traffic stops on the streets of Dearborn Heights being conducted by police officers.

Do you have any knowledge of certain councilmen pulling over their cars to interfere with local policemen right in the middle of a traffic stop while it was ongoing?

MS. HUNT: I'm going to object to foundation, speculation, and form.

MR. TURFE: Same objection.

A. I have actually have heard it, but I saw the video twice as council member -- Councilman Baydoun interfering with a police stop, and there was a video of both incidents that I saw, and there was -- the second incident, I believe his brother-in-law was in the car.

BY MR. BROWN:

Q. Have you ever had knowledge of Dearborn Heights Police

Page 29

Department trafficking certain areas that were highly trafficked -- let me start over again.

Have you any knowledge of the Dearborn Heights Police Department ticketing certain streets or roads used often by African-Americans for ticketing?

MS. HUNT: Objection to form, foundation, and speculation.

MR. TURFE: Same objection.

A. I was aware that there were -- there were some areas, and that's one thing that I had a problem with when I became the mayor, is they were in some areas but they're not other areas. They are patrolling certain areas but not, you know, the whole entire city.

BY MR. BROWN:

Q. And why were they patrolling only certain areas?

MS. HUNT: Form and speculation.

MR. TURFE: Same objection and objection to the foundation.

A. I became aware that they were just beefing up their tickets and just their overtime.

BY MR. BROWN:

Q. So they were beefing up tickets to earn overtime?

A. Yes.

MS. HUNT: Objection. Mischaracterization of testimony.

Bill Bazzi
August 29, 2025

Page 30

MR. TURFE: And objection as to foundation.

BY MR. BROWN:

Q. Were you aware of any pay-to-play or bribery issues that were happening in Dearborn Heights before you were mayor?

MS. HUNT: Objection. Form. Foundation. Speculation.

MR. TURFE: Same objection.

A. I was -- it's funny that you say that. Actually the previous chief told me -- I mean, he -- I wasn't aware of any cases, but even the old chief admitted that there's -- the city was pay-to-play city, get used to it, mayor.

BY MR. BROWN:

Q. The old chief told you get used to it, mayor?

A. Yeah.

MS. HUNT: Objection as to form.

MR. TURFE: And foundation.

BY MR. BROWN:

Q. What were his words?

A. I'm sorry?

Q. What were the old chief's words to you?

A. Basically said this city is pay-to-play, you know, just get used to it.

Q. Do you have any knowledge or information about

Page 31

particular members of the Dearborn Heights City Council being involved in the corrupt activities you just described?

MS. HUNT: Objection to form, foundation, and speculation.

MR. TURFE: Same objection.

A. Basically when -- I've never actually seen -- seen things, you know, other than, you know, like the traffic stops I mentioned earlier, but just watching the meetings, it just -- I mean, you can see certain things do not make sense with the way you bid on contracts, the way you -- I mean, that's the kind of stuff, you know, that -- you can go watch meetings and watch some other stuff.

BY MR. BROWN:

Q. To your knowledge, how long has the corruption within the Dearborn Heights city government been going on?

MS. HUNT: Objection to form, foundation, speculation, and a mischaracterization of prior testimony.

MR. TURFE: Same objection.

A. Well, when I became the mayor, I was doing everything as I could to make sure that we went through proper bidding and -- and everything that we did was basically documented and everything from going on

Page 32

BidNet, so, you know, like anything that happened before, it was just like, you know, like hearsay and -- and other than, you know, some of the stuff that I -- I mentioned earlier.

BY MR. BROWN:

Q. Does the Dearborn Heights Police Department have a history of corruption?

MS. HUNT: Objection to form, foundation, and speculation.

MR. TURFE: Same objection.

A. Basically just based -- some of the stuff that I mentioned, you know, people saying certain things, you know, people bringing certain things to my attention, and I did everything I can just to mitigate whatever, if there's any issue, just to make sure we mitigate issues and try to fix whatever issues is brought to our attention.

BY MR. BROWN:

Q. But my question is really a yes or no question. I'm asking you does the Dearborn Heights Police Department have a history of corruption?

MS. HUNT: Same objection.

MR. TURFE: Same objection.

A. I'm not -- I mean, I don't have like data in front of me to say like, but, I mean, other than, you know,

Page 33

when we -- when I became the mayor, some of the stuff that was brought forward to me.

BY MR. BROWN:

Q. Is that a yes or a no, sir?

A. Yes.

Q. So what did you decide to do, Mayor Bazzi, about corruption when you became mayor?

A. First I brought in a commissioner, Commissioner Thomas, Dr. JET. I brought him in a few months in office. I was appointed at that time. And I brought him in as a commissioner because of all these things that I was hearing, and we -- I just basically asked him to come in and just -- just see what -- what -- what's going on at the police station, and he comes in and he -- he was there just about a month or so and basically told me that he needs help.

Q. He said he needed help?

A. Yes.

Q. Why did he say that?

(Phone interruption)

BY MR. BROWN:

Q. So Dr. Thomas told you that he needed help after a month on the job?

A. A little over -- yes. About a month or so.

Q. Did he say why he needed help?

Bill Bazzi
August 29, 2025

Page 46

A. I know this document.

Q. What is this document, sir?

MS. HUNT: Objection as to form.

A. It's a press release.

BY MR. BROWN:

Q. Did you draft it?

A. Yes.

Q. When did you write this press release, Mr. Mayor?

A. Approximately that date. Probably around January 24th, 2024.

Q. All right. Can you go to Page 812, please? Do you see it?

A. Yes.

Q. I'm going to read into the record the first paragraph which is found on 812 so that you don't have to. Save your voice. Here we go.

"The residents of our city deserve better than these illegal attacks on the leadership of our Police Department. I brought Chief Hart and his team into the department to change its culture and make it more responsible to the long-unaddressed needs of our businesses and especially our residents. They have succeeded in rooting out corruption and institutional inefficiency. 'I believe in our officers. Unfortunately, morale suffered from constant bullying,

Page 47

inappropriate behavior, a lack of professionalism and favoritism that made an already difficult job worse. The people elected me to rectify these problems and give them the responsive community-oriented law enforcement they deserve to receive for the hard-earned tax dollars they pay. City Council's actions threaten to turn back the clock."

You see that language, sir?

A. Yes, sir.

Q. Is this language an accurate explanation of why you hired Jerrod Hart?

A. Yes.

Q. Was Jerrod Hart's status as an outsider, and by that I mean someone who was not previously a part of the Dearborn Heights government, something that attracted you to Mr. Hart?

A. Yes.

Q. Did you think an outsider like Jerrod Hart would be better at rooting out corruption?

MS. HUNT: Objection to form and speculation.

MR. TURFE: Objection to foundation.

A. Well, that's why I brought him, because we knew we had an issue from what Dr. Thomas told me, and that's why I brought in Chief Hart, yes.

Page 48

BY MR. BROWN:

Q. So how were Directors Swope and Vanderplow hired as directors?

A. When Commissioner Thomas passed away, Chief Hart still was in transition trying to fix things, and we had -- at that time we had an issue in Dearborn Heights. There was a break-in, a gunshot, and that's when Mr. Vanderplow was involved. He was working for ATF. And we became to know him, and when Commissioner Thomas passed, we -- I know Chief Hart, he needed extra help, so we brought both Chief -- well, at that time Director Swope and Director Vanderplow.

Q. Was it your intent to empower Chief Hart by letting him hire the people he wanted to hire?

MS. HUNT: Objection as to form, foundation, and speculation.

MR. TURFE: Same objection.

A. It was my intent to clean up the police department and -- and give the City of Dearborn Heights the best service we can in law enforcement.

BY MR. BROWN:

Q. And do you think you would be helping Chief Hart by allowing him to hire Swope and Vanderplow?

MS. HUNT: Form. Foundation. Speculation.

MR. TURFE: Same objection.

Page 49

A. Yes.

BY MR. BROWN:

Q. Did you have the power to hire any chief you wanted?

A. Yes.

Q. Did you have the power to hire any directors you wanted?

A. Directors, yes.

Q. Are Mr. Swope and Vanderplow the team that you described at Page 812, that quote that I just read back to you?

MS. HUNT: Objection as to form and foundation.

MR. TURFE: Same objection.

BY MR. BROWN:

Q. I'll go back to 812 and I'll read it. You say in the second sentence, "I brought Chief Hart and his team into the department . . ."

Do you see that?

A. Yes.

Q. Are Vanderplow and Swope the team you're referring to here?

MS. HUNT: Same objection.

MR. TURFE: Objection to foundation.

A. Yes.

BY MR. BROWN:

Bill Bazzi
August 29, 2025

Page 82

BY MR. BROWN:

Q.   And who is they?

A.   At that time it was Councilman -- council chair at the time, Dave Abdallah, Mohamad Baydoun, Hassan Ahmad. Khalil Rahal was in that meeting, and there were several Arab American officers.

Q.   Was there anyone in the meeting other than an Arab American?

A.   No.

Q.   Were non-Arab Americans invited to the meeting?

MS. HUNT:  Objection as to foundation and speculation.

MR. TURFE:  Same objection.

A.   I didn't call the meeting.  I thought it was going to be just like a few of us to discuss some issues.  I wasn't sure who was invited.  I wasn't the one that called the meeting.

BY MR. BROWN:

Q.   Have you ever seen a video online in which Sergeant Bazzy -- Mohamad Bazzy's brother brags that Sergeant Bazzy is going to be the next chief of police of Dearborn Heights?

MS. HUNT:  Objection as to form and foundation.

MR. TURFE:  Same objection.

Page 83

A.   Yes.

BY MR. BROWN:

Q.   What do you think about the video?

MS. HUNT:  Objection as to form.

MR. TURFE:  Same objection.  And to the foundation.

A.   It was a joke.

BY MR. BROWN:

Q.   Why do you say it was a joke?

A.   Because here you have a sergeant that can't even pass the test to be a lieutenant wants to be the chief, the next chief, and I didn't like it.  The last statement is like just tell them I'm -- I'm his brother, he'll take care of you.  I didn't like that statement.  It just makes us look bad.

Q.   What was -- say that again if you could.

A.   Basically he's advocating for his brother to be the next chief, and at the last statement he goes, "If my brother" -- "If anybody pulls you over, just say that you know me," basically.  And I didn't like that statement.

Q.   This is Sergeant Mohamad Bazzy's big brother making that statement?

MS. HUNT:  Objection as to form.

MR. TURFE:  Objection as to foundation.

Page 84

A.   His name was Sam, Sam Bazzy, yes.

BY MR. BROWN:

Q.   Is this the same Sergeant Mohamad Bazzy who you testified to earlier was involved in ticket fixing?

MR. TURFE:  Objection as to foundation and the form.

MS. HUNT:  And mischaracterization of testimony, prior testimony.

A.   Yes.

BY MR. BROWN:

Q.   Do you remember an incident in June of 2023 or thereabouts in which Sergeant Bazzy was involved or disciplined -- let me start that over again.  Sorry.

Do you remember an incident in June of 2023 in which Sergeant Bazzy was disciplined or written up for not handling a use of force incident correctly?

MR. TURFE:  Objection as to foundation.

MS. HUNT:  And form.

A.   Yes.

BY MR. BROWN:

Q.   Can you describe the incident in question?

MS. HUNT:  Objection as to foundation.

A.   From what I recall, it was -- it was one officer basically hitting some -- one of the -- I don't want to say a victim, but a person, smashing them into the

Page 85

concrete, and then I know -- I didn't see the video, but just from -- from what I heard from our leadership team that I believe it was at that time Chief Swope, that he basically reviewed the tape or somebody reviewed the tape, says it was excessive use of force, and they disciplined Sergeant Bazzy and they disciplined another sergeant, and they -- obviously they disciplined the person that was involved, the officer, with two AL suspensions and the one that was -- that did the beating was -- received I believe it was 60 days suspension.

BY MR. BROWN:

Q.   So Sergeant Bazzy himself did not do the actual beating; is that fair?

A.   No.  He was -- he was on the scene after, I believe.

Q.   And why was Sergeant Bazzy disciplined?

MS. HUNT:  Objection as to form and foundation.

MR. TURFE:  Same objection.

A.   My belief that he did nothing about the incident, and he was basically blocking the person that was -- that had -- that was beat up.

BY MR. BROWN:

Q.   And Sergeant Bazzy was the senior police officer there at the scene?

Bill Bazzi
August 29, 2025

Page 106

MS. HUNT:  Joining in the objection and legal conclusion.  Asking for a legal conclusion from a non -- or a layperson.

A.  I'm not sure how they would have treated the next person.

BY MR. BROWN:

Q.  Did the treatment that Hart and Swope and Vanderplow received from the City Council change in 2024?

MR. TURFE:  Objection as to the form and foundation.

MS. HUNT:  Same objection and speculation as well.

A.  Just remained the same.

BY MR. BROWN:

Q.  Why do you think City Council treated Hart and Swope and Vanderplow the way they did?

MR. TURFE:  Objection to the form and foundation.

MS. HUNT:  Same objection.

A.  Again, this is speculations from me.

MS. HUNT:  I don't want you to speculate. If you know or you don't know.

BY MR. BROWN:

Q.  I'm asking for your personal opinion.  You're the mayor of Dearborn Heights.  You were there for all of

Page 107

this, and I'm asking you what you think happened.

MR. TURFE:  Objection as to the form and foundation.  The witness already stated that it would be speculation.

MS. HUNT:  Same objection.

A.  It's based on some of the stuff that was being brought forward, you know.  It doesn't seem like the Council wanted to hear what the issues are with the police department or even the City, you know, after a while.

BY MR. BROWN:

Q.  Why wouldn't the City Council want to hear about problems at the City?

MR. TURFE:  Objection to form and the foundation based off of speculative testimony.

MS. HUNT:  Same objection.

A.  That's a good question that we have to ask them.

BY MR. BROWN:

Q.  Do you remember Jerrod Hart contacting third party government entities, like the FBI?

MR. TURFE:  Objection as to the foundation.

MS. HUNT:  And form.

A.  Yes.

BY MR. BROWN:

Q.  Do you remember Jerrod Hart contacting the Department of Justice?

Page 108

MR. TURFE:  Same objection.

MS. HUNT:  Same.

A.  Yes.

BY MR. BROWN:

Q.  Do you have knowledge of Jerrod Hart contacting the Michigan State Police?

MS. HUNT:  Form and foundation.

MR. TURFE:  Same objection.

A.  Yes.

BY MR. BROWN:

Q.  And do you have knowledge of what these communications were about when Jerrod Hart contacted the FBI and the Department of Justice and the Michigan State Police?

MS. HUNT:  Objection as to form and foundation.

MR. TURFE:  Same objection.

A.  We discussed them with the chief, yes.

BY MR. BROWN:

Q.  What were those discussions?

A.  Basically some of the stuff that, some of them, ticket fixing, some of the issues that they came up with, you know, with the behavior, misconduct in the police department, and I just can't recall all of it, but there was, you know, several issues that were brought forward.

Page 109

Q.  And Jerrod Hart was asking for help from the FBI on those communications?

MS. HUNT:  Objection as to form and foundation.

MR. TURFE:  Same objection.

A.  Yes.

BY MR. BROWN:

Q.  And was he asking for help from the Michigan State Police in those communications?

MS. HUNT:  Same objection.

MR. TURFE:  Same objection.

A.  Yes.

BY MR. BROWN:

Q.  How about the Department of Justice?

MS. HUNT:  Same objection.

MR. TURFE:  Same objection.

A.  Yes.

BY MR. BROWN:

Q.  Do you remember seeing any correspondence between the FBI and Jerrod Hart?

A.  No.

Q.  How about with the FBI and Jerrod Hart?

A.  No.

Q.  How about the Michigan State Police?

A.  No.

Bill Bazzi
August 29, 2025

Page 110

Q.   All right.  Do you think the City Council took actions to punish or silence Hart and Swope and Vanderplow for their work?

MR. TURFE:  Objection as to the form and foundation.  Calls for speculative testimony.

MS. HUNT:  Same objection.

If you know.

A.   I'm not sure.

BY MR. BROWN:

Q.   Do you think the City Council members have tried to get rid of Hart, Swope, and Vanderplow?

MR. TURFE:  Objection as to the form and foundation, speculation.

A.   Yes.

MS. HUNT:  Same objection.

BY MR. BROWN:

Q.   Did the City Council become more aggressive towards the plaintiffs after Jerrod Hart refused to promote Sergeant Bazzy in 2023?

MR. TURFE:  Objection as to the form and foundation, speculation.

MS. HUNT:  Same objection.

A.   Yes.

BY MR. BROWN:

Q.   Did the City Council become more aggressive towards

Page 111

the plaintiffs after Jerrod Hart disciplined Sergeant Bazzy in mid '23?

MR. TURFE:  Same objections.

MS. HUNT:  Same objection.

A.   Yes.

BY MR. BROWN:

Q.   Are there certain City Council members directly involved in the corrupt practices that you hired Jerrod Hart to combat?

MR. TURFE:  Objection as to the form and foundation, speculation.

MS. HUNT:  Same objection.

A.   Again, it would be speculations.

MS. HUNT:  Don't speak on speculations. Just what you know.

BY MR. BROWN:

Q.   Do you have any information or knowledge of City Council members being directly involved in the corrupt practices that Jerrod Hart was investigating?

MR. TURFE:  Objection.  Form and foundation.

MS. HUNT:  Form and foundation.

MR. TURFE:  Speculation and then asked and answered.

MS. HUNT:  Same objection.

Page 112

A.   Just what the chief brought to my attention, the ticket fixing.

BY MR. BROWN:

Q.   Let's talk first just about, if we could, Jerrod Hart.

Did the City Council have any valid reason for criticizing or personally attacking Jerrod Hart?

MR. TURFE:  Objection as to the form, foundation, and speculation.

MS. HUNT:  Same objection.

A.   I didn't see any issues.

BY MR. BROWN:

Q.   Correct me if I'm wrong, but you were Jerrod Hart's direct supervisor; correct?

A.   Yes.

Q.   He reported directly to you?

A.   Yes.

Q.   While Jerrod Hart worked for the City, did he do a good job?

MS. HUNT:  Objection as to form and foundation.

A.   I was impressed with his work, yes.

BY MR. BROWN:

Q.   Did Chief Hart try hard to do well at his job?

MS. HUNT:  Objection as to foundation.

A.   Yes.

Page 113

BY MR. BROWN:

Q.   Did you ever see Chief Hart do something wrong that you needed to discipline him for?

MS. HUNT:  Objection as to form.

A.   No.

BY MR. BROWN:

Q.   Did you ever have any performance issues at all with Chief Hart?

MS. HUNT:  Objection as to form.

A.   No.

BY MR. BROWN:

Q.   How about Paul Vanderplow?  While he worked for the City, did Paul Vanderplow do his job well?

MS. HUNT:  Objection as to form and foundation.

A.   Yes.

BY MR. BROWN:

Q.   Do you think Paul Vanderplow tried hard to do well at his job?

MS. HUNT:  Foundation.

A.   Yes.

BY MR. BROWN:

Q.   Did you ever see Paul Vanderplow do something wrong while he was working for the City of Dearborn Heights?

MS. HUNT:  Form.

Bill Bazzi
August 29, 2025

Page 118

MS. HUNT: Take your time to read it.

THE WITNESS: Okay.

A. I do remember the document, yes.

BY MR. BROWN:

Q. Did you receive this document, Mr. Mayor?

A. Yes, sir.

Q. Who sent it to you?

A. Chief Hart.

Q. Did you receive this document while you were mayor for the City of Dearborn Heights?

A. Yes.

Q. Do you remember on or about the date you received it?

A. It was around July of 2024.

Q. And you say Chief Hart sent you this document?

A. Yes.

Q. Do you remember receiving it?

A. Yes.

Q. Mr. Mayor, we're going to talk about a term called "constructive termination," and I just want you to have a common definition of what that means. Do you know what constructive termination means, Mr. Mayor?

MR. TURFE: Objection.

MS. HUNT: Objection as to form, foundation. I understand the question, but I will object to requesting a legal definition from a

Page 119

layperson.

MR. TURFE: Same objection.

MR. BROWN: I'm not trying to get a legal definition from a layperson. I'm just trying to come to a common understanding of the term so that we're all on the same page.

MS. HUNT: Same objection on the record.

MR. TURFE: Same objection.

BY MR. BROWN:

Q. I know you're not a lawyer, Mr. Mayor, but just tell me what, in your own words, what constructive termination means.

A. Based on a conversation I had with the chief at the time, my recollection of it is he couldn't really do his job as the police chief because of the constraints put on him.

Q. So he felt like he was fired?

MS. HUNT: Objection as to mischaracterization of testimony and form and foundation.

MR. TURFE: Same objection.

A. I know he couldn't do his job as the chief, and he just said that basically -- I mean, the conversation that I have -- that I had at the time with Chief Hart that he couldn't really keep going with his job as the

Page 120

chief because of the -- was the obstacles put in his way by Council.

BY MR. BROWN:

Q. Did you do anything to cause the City to continue to pay Chief Hart his severance period after July 2024?

MS. HUNT: Objection as to form, foundation.

MR. TURFE: Same objection.

A. I'm sorry. Could you repeat that question?

BY MR. BROWN:

Q. Did you cause Chief Hart to receive his severance payments after July of 2024?

MS. HUNT: Same objection.

MR. TURFE: Same objection.

A. Based on HR, I'm not sure if -- if she continued or -- you know, I don't get involved with every little thing.

BY MR. BROWN:

Q. Did you make a recommendation as mayor that Chief Hart receive his severance?

MS. HUNT: Objection as to foundation and form.

MR. TURFE: Same objection.

A. Yes.

BY MR. BROWN:

Page 121

Q. Let's go over this letter together, if we could, Mr. Mayor. I'll read some excerpts and you can tell me what your testimony is with respect to them. Let's look at a quote from I believe it's Paragraph 1. Here's a quote from the first paragraph.

"Council has taken multiple steps to ensure that I cannot perform the duties of Chief by defaming my character, undermining my authority, and retaliating against me for exposing and correcting problematic practices and procedures within the police department."

Do you see that language in the first paragraph?

A. Yes.

Q. This is a claim made by Chief Hart; correct?

A. Correct.

Q. Is that claim accurate to your mind?

MS. HUNT: Objection as to form and foundation.

MR. TURFE: Same.

MS. HUNT: And speculation.

MR. TURFE: Same objection.

A. Yes.

BY MR. BROWN:

Q. Yes, it is accurate?

Bill Bazzi
August 29, 2025

Page 122

A.   Yes.

Q.   Here's a quote from the third paragraph.  I'll read it.  Here we go.

"Thankfully, I found two highly capable and willing police professionals (Directors Swope and Vanderplow) to join the executive team on January 9, 2023.  Considering the threats and attempt at defunding their positions and my recent employment-induced heart attack, it is clear that the physical harm I've suffered was and continues to stem from my position as a law enforcement officer and the City Council's reaction to the fact that I reported violations of the law to the City of Dearborn Heights, Federal Bureau of Investigation, Department of Justice, and the Michigan State Police, to expose and correct problematic police practices."

Do you see that?

A.   Yes.

MR. TURFE:  Objection to the form and the foundation.

BY MR. BROWN:

Q.   Is that claim accurate?

MR. TURFE:  Objection to the foundation and the form.  Calls for speculation.

MS. HUNT:  Same objection.

Page 123

A.   Yes.

BY MR. BROWN:

Q.   Here's a third quote which begins in the fourth paragraph.  I'll read it into the record now.

"I have implemented many positive changes to the organization, but there is still much work to do with the DOG COPS Organizational Assessment and the ongoing federal and state law enforcement investigations into the Dearborn Heights Police Department.  In light of the City Councils 'super veto' defunding the Directors during a public meeting on 1/23/2024, they went a step further and added an agenda item and took a vote of 'no confidence' for you, Roger and I.  This was a predictable and retaliatory action."

Do you see that?

A.   Yes.

Q.   Is that claim accurate?

MR. TURFE:  Objection as to the form and foundation.  Calls for speculation and a legal conclusion.

MS. HUNT:  Same objection.

A.   Yes.

BY MR. BROWN:

Q.   While Chief Hart worked for the City did he

Page 124

experience, to your knowledge, any health issues?

MS. HUNT:  Objection as to foundation and speculation.

MR. TURFE:  Same objection.

MS. HUNT:  And form.

A.   I was not aware of any health issues before.

BY MR. BROWN:

Q.   Before what, sir?

A.   Before the heart attack.

Q.   He suffered a heart attack while he was working for the City of Dearborn Heights?

MS. HUNT:  Objection as to form.

A.   While he was working for the City of Dearborn Heights you're asking?

BY MR. BROWN:

Q.   Yes.

A.   I know he suffered a heart attack while he was working as the chief in the City of Dearborn Heights.

Q.   Did Chief Hart ever inform you of his health issues prior to becoming Chief of Police of Dearborn Heights?

MS. HUNT:  Asked and answered and objection as to form.

A.   I was not aware of any health issues by the chief.

BY MR. BROWN:

Q.   Prior to hiring him or after you hired him?

Page 125

A.   Prior to hiring him.

Q.   How about immediately after you hired him?  When you started working with Chief Hart, did you become aware of any of his health issues?

MS. HUNT:  Objection as to asked and answered.  Form and foundation.

MR. TURFE:  Same objection.

A.   Not during, but with the heart attack, obviously I became aware of his health issues when he had a heart attack on the job.

BY MR. BROWN:

Q.   Do you think Chief Hart was presumed to be racist against Arabs?

MS. HUNT:  Objection as to form and foundation.

MR. TURFE:  Same objection.

MS. HUNT:  And calls for a speculative response.

A.   I did not see it.

BY MR. BROWN:

Q.   Do you think Jerrod Hart was targeted because he spoke out against corruption at the City of Dearborn Heights?

MS. HUNT:  Objection as to form and foundation.

Bill Bazzi
August 29, 2025

Page 126

MR. TURFE: Same objection.

A.  Yes.

BY MR. BROWN:

Q.  Let's talk about Paul Vanderplow now. We're going to switch subjects.

Can you go to the same exhibit and go to Page 1446? Please take a minute to look over this document, and when you're ready to discuss it, let me know.

A.  Okay.

Q.  You see the signature on Page 3 of 3?

A.  Yes.

Q.  That's Page ID 1448; correct?

A.  Correct.

Q.  You signed this document?

A.  Yes.

Q.  Is that your signature, your authentic signature?

A.  Yes.

Q.  Did you draft this document?

A.  Yes.

Q.  What is this document?

MS. HUNT: Objection as to form.

A.  Subject of it says "Adjustment to contract due to continued harassment."

BY MR. BROWN:

Page 127

Q.  What is the purpose of this document, Mr. Mayor?

A.  Basically documenting some of the issues, some of the concerns we had.

Q.  Let me read the first paragraph to you. It reads, "Over the first few weeks of 2025 and with the departure of Chief Swope, Director Vanderplow has faced multiple attacks on his character from members of the Department, members of City Council as well as members of the public. In every case, the attacks are misguided and baseless with the sole purpose of halting his work in holding employees accountable as well as documenting waste, fraud and abuse within City operations."

Do you see that?

A.  Yes.

Q.  You wrote this?

A.  Yes.

Q.  Is it your belief that this is true?

A.  Yes.

Q.  As you sit here today, do you still continue to believe this is true?

MS. HUNT: Objection as to form and foundation.

A.  Yes.

BY MR. BROWN:

Page 128

Q.  I'll start the beginning of the next paragraph.

"On January 21, 2025, Director Vanderplow was subject to yet another attack based upon his work for the City. Interim Chief Farhat attempted to suspend Director Vanderplow without due process, and under false pretenses. Additionally, Director Vanderplow has been subject to additional and baseless legal actions by Department union members. The most recent event was on January 28, 2025, during an in-session Council meeting, Councilperson Hassan Saab read into the official record un-verified personnel complaints against Director Vanderplow. Based on a preliminary review of the allegations, the claims are false and misleading."

You wrote this language as well?

A.  Yes.

MS. HUNT: Objection. The document speaks for itself.

BY MR. BROWN:

Q.  Did you believe this information -- I'm sorry. Do you believe this language was true at the time you wrote it?

A.  Yes.

Q.  And as you sit here today, do you continue to still believe it's true?

Page 129

MS. HUNT: Object as to form.

A.  Yes.

BY MR. BROWN:

Q.  We're going to Page 3 of 3 at the top. This is Page ID 1447. I'm sorry. 2 of 3. Excuse me.

MR. MIOTKE: You said 1447?

MR. BROWN: Yes, sir. Sorry. Page 2 of 3.

BY MR. BROWN:

Q.  I'm quoting. "Director Vanderplow uncovered and documented the collusion of a City employee with a vendor to provide services within the City against all procurement guidelines. Even after finding multiple instances of willful and misleading statements, Director Vanderplow was accused MULTIPLE times in a public and on the record forum by Council members. Even after several witnesses came forward to assert Council statements were false, the Council still maintained their vindictiveness against Director Vanderplow."

Did you write that, sir?

MS. HUNT: Objection as the document speaks for itself.

A.  Yes.

BY MR. BROWN:

Q.  When you wrote this, did you think it was true?

Bill Bazzi
August 29, 2025

Page 130

A.  Yes.

Q.  And as you sit here today, do you still continue to think this language is true?

MS. HUNT:  Object as to form.

A.  Yes.

BY MR. BROWN:

Q.  Continuing on.  "Based upon the multiple over acts by Council and others, it is abundantly apparent that Director Vanderplow will not be allowed to perform his duties.  On several occasions, Councilperson Tom Wencel stated on the record that if Director Vanderplow has his name on any work product it will not be considered.  This is tantamount to constructive termination by Councils actions."

Do you see that?

A.  Yes.

Q.  You wrote that?

A.  Yes.

Q.  When you wrote it, did you think it was true?

A.  Yes.

Q.  As you sit here today, do you still continue to think it's true?

MS. HUNT:  Object as to form.

A.  Yes.

BY MR. BROWN:

Page 131

Q.  I'll finish with the last paragraph.

"Therefore, to provide a level of reassurance and financial protection, should Director Vanderplow determine that his unemployment with the City of Dearborn Heights is no longer tenable based upon the cumulative actions of Council and/or the Police Union(s), he will be constructively relieved of his duties - with the City responsible for compensating Director Vanderplow for the entirety of his employment contract to be paid within ten calendar days of his departure."

You wrote that, sir?

A.  Yes.

Q.  When you wrote it, did you believe it was true?

A.  Yes.

Q.  As you sit here today, do you still believe it's true?

MS. HUNT:  Object as to form.

A.  Yes.

MR. TURFE:  Object as to foundation.  Calls for a legal conclusion.

BY MR. BROWN:

Q.  I want to go back to the top of Page 1447, Mr. Mayor.  In that language that I cited earlier, it talks about collusion between a city employee and a vendor.  Do you see that?

Page 132

A.  Yes.

Q.  What are you referring to here?  Can you explain this?

A.  They had a vendor that was doing work for the City, and we asked multiple times for contracts before the bidding that went out, and -- and Mr. Vanderplow went back and forth trying to get the actual agreement or see what actually -- it was just like a cover-up basically.  They were not providing the right information.  And that's what we referred to as collusion between the vendor and also referred in this statement.

Q.  Who was the vendor?

MS. HUNT:  Objection as to form.

A.  IB Lighting.

BY MR. BROWN:

Q.  Who was the city employee?

MS. HUNT:  Same objection.

MR. TURFE:  Objection as to form foundation.

A.  He's no longer working with us.

BY MR. BROWN:

Q.  Fair enough.  But who was the employee?

MS. HUNT:  Object as to form.

MR. TURFE:  And the foundation.

A.  His last name is Blackburn.

Page 133

BY MR. BROWN:

Q.  I'm sorry?

A.  Blackburn.

Q.  Can you spell it, please?

A.  I believe Black B-U-R-N.  B-L-A-C-K-B-U-R-N.

Q.  All right.  Was this contract for lighting at the city -- at the police administration building?

A.  Yes.

MS. HUNT:  Object as to form and foundation.

BY MR. BROWN:

Q.  Was Paul Vanderplow in charge of the physical plant at the police administration building?

A.  He was, yes, Director of Operations for the whole justice center.

MR. TURFE:  Objection as to foundation.

BY MR. BROWN:

Q.  Was Khalil Rahal involved in this situation with the vendor and the city employee?

MS. HUNT:  Object as to form, foundation, and speculation.

MR. TURFE:  Same objection.

A.  I don't recall.

BY MR. BROWN:

Q.  Was DTE involved?

Bill Bazzi
August 29, 2025

Page 314

have Kingsbury.  Do we have any other streets that you've lived on?

A.   I lived on -- in Dearborn Heights?

Q.   Yeah.

A.   I lived in -- on Kingsbury, Centralia, and also, like I said, I've been going back and forth, so I'm not really sure the timing, but I was also at the house for several years and the one I'm living in right now is Kinloch.

Q.   We mentioned Sergeant Bazzy, not we, but Mr. Brown mentioned Sergeant Bazzy earlier.  I believe that the quote was "I don't want to be related."  Do you remember that testimony?

A.   Yes.

Q.   It was mentioned in the context of ticket fixing.  What ticket fixing do you have knowledge of that he did?

MS. HUNT:  Object as to form of the question and mischaracterizes earlier testimony.

A.   I said when I sat with the chief and we went through, and they discussed that he was involved in ticket fixing.  I don't know the exact tickets.

BY MR. TURFE:

Q.   You have no direct knowledge of any specific examples of tickets that he fixed?

Page 315

A.   I didn't go through all the tickets, but I did trust Chief Hart to do what he needs to do to make sure that doesn't happen again.

Q.   Did you see any evidence of any ticket fixing from Sergeant Bazzy?

MS. HUNT:  Objection as to form and again mischaracterizes information, earlier testimony.

A.   I trusted Chief Hart and that's the information that was relayed to me, so . . .  There was no reason for me not to trust Chief Hart's investigation and what led him to say that there was ticket fixing by -- one of them was Sergeant Bazzy.

BY MR. TURFE:

Q.   So you have no personal knowledge of any ticket fixing done by Sergeant Bazzy?

A.   I did not actually see a ticket, but I know that there was -- again, Chief Hart brought it to my attention.

Q.   Got it.  Councilman Baydoun, you've testified about interference with police stops.  Do you remember that?

A.   Yes.

Q.   I believe you said, "I've heard it.  I saw the video twice."  Do you remember that?

A.   Yes.

Q.   Okay.  What video are you talking about?

A.   Him interfering with police stop.  There was two

Page 316

videos.  One, he was with -- there was one -- there's two different officers and two different times.

Q.   Okay.  Let's talk about the first one.

A.   I don't know which one is which.  I don't know which one came first, but there was two officers.

Q.   Let's talk about not the first one chronologically but just the first one from your memory.

A.   Okay.

Q.   What's the first one?

A.   Well, again, one of them was he had somebody in the car with him.  I saw the video.  There was -- I believe his brother-in-law was in the -- in the vehicle with him when he stopped and -- I don't remember.  It's been a while.  But basically the officer telling him -- he identified himself as a council member or something.  He also told him he was interfering with a police stop.  And both of them were pretty much the same.  I can't remember the first officer, but the second one I believe was Officer Kokoiy.

Q.   And do you know if tickets were issued at either of these stops?

A.   I don't think the officer listened to the Council member at that time, no.

Q.   So tickets were issued at both of these stops?

Page 317

A.   I don't recall.

Q.   But you said the officer didn't listen to the councilman, so that leads to the suggestion that tickets were issued, which, in fact, they were.  Do you recall that?

MS. HUNT:  I'm going to object to the form and foundation of that question.

MR. BROWN:  Misstates evidence not in the record.

A.   Well, the officer told -- in both circumstances, from what I recall, he told them that he's interfering and he needs to leave, so I don't know if they issued the tickets or not.  I didn't check.  That was after the fact I saw that.

BY MR. TURFE:

Q.   You testified earlier that the previous chief admitted to you that Dearborn Heights was a pay-to-play city.  Do you remember that?

A.   Yes.

Q.   What did you do about it?

A.   He's no longer with us.

Q.   So you fired the police chief?  That was your response?

A.   Well, that was the -- again, like I said in the other testimony, when Commissioner Thomas made that

Bill Bazzi
August 29, 2025

Page 318

recommendation he needs to go, you know, start looking for a new chief, that's what we did.

Q. Is Dearborn Heights still a pay-to-play city?

MS. HUNT: Objection as to form and foundation.

A. It's not tolerated by me, and if it's happening, then it should be reported.

BY MR. TURFE:

Q. Is it still happening?

A. I hope not. It wasn't happening when Chief Hart and the two directors were here.

Q. Is it happening now because Chief Hart and the two directors aren't here anymore?

A. I don't know. I don't recall. I don't -- I -- I hope not, like I said.

Q. You were also asked if the Dearborn Heights Police Department had a history of corruption, and I believe you said -- you answered affirmatively. You answered yes; correct?

A. I said it was brought to my attention that there was stuff going on, and I verified it when I became the mayor that there was corruption.

Q. Okay. What stuff and what's going on and what did you verify?

A. Well --

Page 319

MR. BROWN: Objection. Compound.

MS. HUNT: And the form of the question.

BY MR. TURFE:

Q. What stuff was brought to your attention?

MS. HUNT: Same objection.

A. It was brought to my attention there was, let's see, marijuana, bags of marijuana sitting in the police garage open, unsecured. There was a lot of guns, almost a thousand, I believe, guns were not registered. Let's see. There was cash, just bags open in the evidence room. There's -- there was a lot of misconduct allegations. I'm sure you saw the lawsuit. Officers raping another officer. There was obviously the lawsuit, you know -- there's allegations, but, you know, it's still going through the process right now. And so the evidence room we had to pay close to 40 I believe thousand, I can't remember, to make sure that everything is accounted for in the evidence room. We had a company from the outside come in. The Department of Justice came in, and they validated everything that we're talking about here that all the stuff was going on at the police station, you know, prior to Chief Hart's arrival.

BY MR. TURFE:

Q. Is this corruption or is this just bad practices?

Page 320

MR. BROWN: Objection to form.

MS. HUNT: Same.

A. Well, I can tell you from a prior experience it is corruption when you have money being taken from the evidence room, putting IOUs, and there's drugs in the evidence room, that cash bags are opened, there's guns, they don't know who they belong to, and if you talk about also, like I said, the marijuana in the garage, nobody knows how much was brought in, how much was taken out. I mean, that's corruption if you talk to anybody.

BY MR. TURFE:

Q. Did somebody take this money from the City?

MS. HUNT: Objection as to form and foundation.

A. Which money are you talking about?

BY MR. TURFE:

Q. You said there was money unregistered or unsecured and you're also saying corruption, so did somebody take this money?

A. Well --

MS. HUNT: Same objection.

A. Yeah. Like I said, there was IOUs, so I don't even know if that money was ever paid back.

BY MR. TURFE:

Page 321

Q. Did somebody take these guns that weren't registered?

MS. HUNT: Same objection.

BY MR. TURFE:

Q. I'm trying to figure out where the corruption is. It sounds like a flawed process. It doesn't sound like corruption. You're the one who's alleging it. I want to figure out what it's about.

MR. BROWN: Objection. Misleading. Misstates prior testimony. Argumentative. Vague.

A. I've never in my life even, like I said, you know, with my law enforcement experience, even something so minor at, you know, the station that we had in military police, everything, every little thing, even if you had like 20 different items, every item is accounted for. They know Item Number 1 belongs to this person. You know, when the chief came in, when they had a company come in and audit, nothing, nobody knew where anything was, and, again, I don't want to get too much into it because it does put the City in a liability if anybody has stuff that was in the evidence room and they didn't recover, so . . . I'm not sure what was recovered, what was --

MS. HUNT: That's fine. Just wait until his question is asked.

BY MR. TURFE:

Bill Bazzi
August 29, 2025

Page 370

as -- as a comptroller and he couldn't sign checks, so that's -- that's his duty.

Q. That's his only job?

A. Yeah. That's one --

Q. His only job is to show up, sign checks, and get paid?

A. That's one of his biggest responsibilities to sign checks, to make sure checks and make sure that the treasurer as well. Like I said, you know, earlier testimony that there was some stuff that was going on in the treasurer's office that he was not obviously allowed to do certain things as a comptroller.

Q. Doesn't the City's accountant sign checks?

A. The what?

Q. The City's accountant.

MS. HUNT: Objection as to form and foundation.

A. City accountant?

BY MR. TURFE:

Q. Yeah.

A. What do you mean City accountant?

Q. Doesn't the City have an accountant that signs checks on his behalf?

A. The comptroller --

MS. HUNT: Objection as to the form and foundation of that question.

Page 371

A. So typically the comptroller, myself, and a treasurer sign checks.

BY MR. TURFE:

Q. Got it. So if the controller couldn't sign it, like if they were not at work that day, you could have signed it; right?

A. No. It has to be three people.

Q. The clerk can't sign along with the treasurer or the mayor?

A. It has to -- yeah. The clerk, but the clerk, we have -- we were like three, four weeks behind on checks. That's why we wanted Vanderplow to step in, because vendors were not getting paid, things were getting -- we were getting notices from vendors that their checks is not received, so that's why Mr. Vanderplow wanted to help with that matter.

Q. Can you go back to Exhibit A, Page ID 811?

This is a press release that you wrote?

A. Let me see. You want me to read the whole thing or --

Q. No. I'm just asking you if this is a press release that you wrote.

A. Yeah. It looks that way.

Q. And on the second page, so Page ID 812, you wrote, "They have succeeded in rooting out corruption and institutional inefficiency."

Page 372

Do you see that?

MS. HUNT: I'm just going to object. The document speaks for itself.

A. Where?

BY MR. TURFE:

Q. It's on the top of Page ID 812. About four lines from the top.

MR. BROWN: Objection. Best evidence.

A. What about it?

BY MR. TURFE:

Q. Do you see where it says --

A. Yes.

Q. Okay. What corruption did they root out?

MS. HUNT: Objection. Asked and answered.

A. Yeah. I think I said it several times. I mean, some of the stuff, again, you know, you had -- I mean, I don't know what some people consider not corruption, but all the stuff that I discussed earlier. You have, you know, allegations of a police officer and males having sex or raping another police officer in the -- in the conference room. I mean, I don't know. If that's not corruption, I don't know what that is. A female putting a camera looking at other female naked officers. I don't know -- I don't know if that's corrupt or not corruption, I don't know what is. You

Page 373

have -- you have somebody that actually had a picture of Obama with a knife mark in it, you know, in -- in the SWAT room. You have, like I said, guns everywhere. Nobody knows who some of the guns belong to. And the cash. I mean, I don't know if -- to me that's corruption. If you ask anybody, that's corruption. You have one sergeant that -- you know, there's discriminations. There's a lawsuit with the City with racism. There's, I mean, the ticket fixing, the ticket quota also. I mean, that's corruption. You can't -- police officer can't use ticket quotas as something that -- you're basically screwing the city on three occasions. Well, first the residents. You're giving them the ticket, you're working overtime to give the tickets, and, you know, there's several times that there was tickets were saying, oh, you know, happy Martin Luther King Day, whatever, you know, to dismissed tickets, and, I mean, I mean, that's corruption if you ask me. Also, use of excessive force. You know, I don't know, you know -- and, like I said, evidence room. It's all -- it's all here. Every one of them here to me I categorize as corruption, and, as I mentioned, with all the sexual misconduct, you know, I mean, that's -- that's corruption. I mean, it's a crime.

# EXHIBIT "B"

H Bazzy Social Media Video

EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


KEVIN SWOPE, PAUL VANDERPLOW

JERROD HART,

    Plaintiffs,

 vs.         Case No. 2:24-cv-10240

           Hon. Mark A. Goldsmith

CITY OF DEARBORN HEIGHTS, a

Michigan Municipal Corporation,

    Defendant,


CITY OF DEARBORN HEIGHTS CITY

COUNCIL, in its official capacity only,

     Intervening Defendant.

_____

  The Deposition of SERGEANT MOHAMAD BAZZY,

  Taken at 41700 West Six Mile Road, Suite 101,

  Northville, Michigan,

  Commencing at 1:10 p.m.,

  Wednesday, January 20, 2026,

  Before Nancy M. Keith, CSR-5679.

Sergeant Mohamad Bazzy
January 20, 2026

Page 2

APPEARANCES:

STEPHEN JOSEPH BROWN
JOHN WALSH
Fausone & Grysko, P.L.C.
41700 Six Mile Road
Suite 101
Northville, Michigan  48168
248.912.3232
jbrown@thefgfirm.law
          Appearing on behalf of the Plaintiffs.

SEAN M. FARRELL
The Allen Law Group
3031 West Grand Boulevard
Suite 525
Detroit, Michigan  48202
313.871.5500
sfarrell@alglawpc.com
          Appearing on behalf of Defendant City of
          Dearborn Heights.

Page 3

TARIK DAVID TURFE
Hammoud, Dakhlallah and Associates, P.L.L.C.
6050 Greenfield Road
Suite 201
Dearborn, Michigan  48126
313.471.4009
tt@hdalawgroup.com
          Appearing on behalf of Defendant City of
          Dearborn Heights City Council.

JAMES R. ACHO
Cummings, McClorey, Davis & Acho, P.L.C.
17436 College Pkwy
Livonia, Michigan  48152
734.261.4510
jacho@cmda-law.com
          Appearing on behalf of Mohamad Bazzy.

Page 4

TABLE OF CONTENTS

WITNESS                                    PAGE

SERGEANT MOHAMAD BAZZY

EXAMINATION
BY MR. BROWN                                  7
EXAMINATION
BY MR. TURFE                                 95
EXAMINATION
BY MR. FARRELL                               99
RE-EXAMINATION
BY MR. TURFE                                100

                  EXHIBITS

EXHIBIT                                    PAGE
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1                         26
DEPOSITION EXHIBIT 2                         34
DEPOSITION EXHIBIT 3                         47
DEPOSITION EXHIBIT 4                         51
DEPOSITION EXHIBIT 5                         58

Page 5

DEPOSITION EXHIBIT 6                        101

Sergeant Mohamad Bazzy
January 20, 2026

Page 74

A. I actually met Khalil Rahal through my brother, Hussein Bazzi, who was introduced to Bill Bazzi.

Q. Is he friends with your family this Khalil Rahal?

A. I'd say acquaintances.

Q. How long have you known him?

A. Probably about -- myself probably since 2020.

Q. How long have you known Mo Baydoun?

A. I've known Mo Baydoun from when he was in high school. He used to hang out with my cousin.

Q. Are you buddies with Mo Baydoun?

A. I would say friends, not close friends but, you know.

Q. If Mo Baydoun referred to you as his boy or, "my boy," would that surprise you?

A. That's just like how us Arab Americans talk between each other. It doesn't really mean that you're, you know, blood affiliated it's just like saying, "Yeah, he's one of my friends."

Q. I understand, and what you're saying is he may have referred to you as "my boy"?

A. Yeah. Maybe.

Q. Has Mo Baydoun ever done anything to your knowledge to get you a promotion above the rank of sergeant in the Dearborn Heights Police Department?

MR. TURFE: Objection. Form and foundation. It's a mischaracterization of prior

Page 75

testimony and assumes facts not in evidence.

MR. FARRELL: Same objection.

A. No. He's never done anything to get me promoted.

BY MR. BROWN:

Q. How about Hassan Saab --

MR. TURFE: Same objections.

A. No, he hasn't.

MR. BROWN: I haven't finished my question yet but when I do you can object.

BY MR. BROWN:

Q. Has Hassan Saab ever done anything to get you promoted above the rank of sergeant inside the Dearborn Heights Police Department?

MR. TURFE: Same objections.

MR. FARRELL: Same objections.

A. No.

BY MR. BROWN:

Q. So we talked earlier about the ranking system inside the police department from officer, corporal, sergeant to lieutenant, you remember that?

A. Yes.

Q. And we talked about Act 78; correct?

A. Correct.

Q. In your view is it normal for a sergeant to be promoted to police chief with skipping the other ranks

Page 76

that come in between such as lieutenant or deputy chief?

A. Would it be normal? No.

Q. You consider that highly irregular?

A. Yeah, absolutely.

Q. Would that violate Act 78?

A. Absolutely -- I mean -- well, under our contract now the chief can or the mayor can pick whoever he wants to be the chief of police as long as they're MCOLES certified. So you can be a police officer and he can make you the chief of police.

Q. Do you know if the same is true for directors?

A. We don't have directors anymore. The only two directors we had were your clients, Swope and Vanderplow.

Q. Have you ever heard of any City Councilman for Dearborn Heights trying to get you promoted to a higher job above sergeant?

MR. TURFE: Objection --

A. Not that I recall.

MR. TURFE: -- form and foundation. Assumes facts not in evidence and mischaracterization of testimony.

MR. FARRELL: Same objection.

BY MR. BROWN:

Page 77

Q. Your answer is not that you can recall?

A. Yeah. Not that I can recall.

Q. Do you know anything at all about Mo Baydoun asking Chief Hart to promote you?

MR. TURFE: Same objections.

MR. FARRELL: Same objections.

A. I don't even know if he asked him or not. I never had that conversation with him.

BY MR. BROWN:

Q. Same question with Khalil Rahal, do you have any knowledge at all about Khalil Rahal telling Mayor Bazzi that he needed to promote you?

MR. TURFE: Same objection.

MR. FARRELL: Same objection.

A. No.

BY MR. BROWN:

Q. And if anything like that happened it wouldn't be because you did something to cause that to happen; is that accurate?

A. Yes.

Q. As you sit here today do you think you deserve to be promoted inside the Dearborn Heights Police Department above the rank of sergeant?

A. I think I deserve promotions but I'd have to go through the process, a fair process, you know, have a

Sergeant Mohamad Bazzy
January 20, 2026

Page 82

officer in there that was in cahoots with Bill Bazzi and Chief Hart at the time, his name was Officer Mazloum. He was actually taken care of by Hart and Mayor Bazzi but, yeah, during that meeting a lot of the officers expressed their, you know, dislikes with what Hart was doing and the way the organization was being run.

Q. Did Mayor Bazzi attend that meeting?

A. Yes. Yep.

Q. And how was it organized? I mean, how did you guys know there was going to be this all Arab meeting?

A. I don't recall. I think it was through at the time Mayor Bill Bazzi and some of the City Council members because.there was a lot of issues going on in the community, a lot of City Council members were hearing rumors that the Arab Americans were getting harassed and what not.

Q. Did you receive an e-mail for example --

A. No. No.

Q. -- that said, "Attend this meeting, it's going to be all Arabs"?

A. No. No. It was all word of mouth.

MR. ACHO: This young lady has to take down the transcript so please wait until Mr. Brown asks his entire question and then you can answer.

Page 83

BY MR. BROWN:

Q. I wanted to show you a few videos if I could, and one of them will be of your brother, and mostly I want to do it just to make sure that it's actually authenticated which means it's real if that's all right.

A. I remember the video, it was on Instagram. He posted it. It was him basically saying that he wants to see his brother being the chief of police one day.

Q. That's right, sir, but let me show it to you and you tell me if this is a real video or not and if it's really you, if that's all right, and then we'll move on.

A. Here you go. I'm going to send this, by the way, to the court reporter and we will mark it as an exhibit to the deposition but for now, these gentlemen have already seen it a number of times. Here's the video. Just watch it.

(Off the record at 2:24 p.m.)

(Video playback)

(Back on the record at 2:25 p.m.)

BY MR. BROWN:

Q. Have you seen that video before, sir?

A. Yeah.

Q. And that's your big brother there talking?

Page 84

A. Yes.

Q. And that's really him; correct?

A. Yes.

Q. And that's you in your police uniform as well?

A. Yes.

Q. And I guess the video is real; right?

A. Yes.

Q. Joe (sic) Wencel sat here and said that a recording of his was generated by artificial intelligence.

A. Who did?

Q. Councilman Wencel. And I guess you're not telling me that this is an artificial intelligence created video, are you?

A. No.

MR. TURFE: Objection. Form and foundation and a micharacterization of testimony.

BY MR. BROWN:

Q. Is it real?

A. Yes.

Q. That really happened?

A. Yes.

Q. Can you tell me when you shot that video around, if you know?

A. I don't know. Have no idea. Whenever Bill Bazzi got a hold of it.

Page 85

Q. I see. And you were a sergeant at the time you made that video; is that accurate, sir?

A. Yes.

Q. And you hear your brother saying, "We're going to make this guy the chief of police"? Do you remember hearing that?

A. Yeah.

Q. Who is the "we" that he's referring to that's going to make you the chief of police?

A. He's talking about the community supporting the chief of police.

Q. I see. Did you hear him talk about all the problems at the Dearborn Heights Police Department in the video?

A. I heard him say in the video there were problems. He heard it from other officers.

Q. Did you tell him about those problems?

A. He knew about some of the problems. He heard about a lot of problems that I didn't talk to him about. He talks to a lot of people. He's on social media and he talks to a lot of people.

Q. But are those problems that you're talking about in the video, are they pre Hart problems or after Hart problems, post Hart problems?

A. Those are after Hart.

Sergeant Mohamad Bazzy
January 20, 2026

Page 86

Q. I see. Did you hear your brother talking about how if you pull the folks over they should just say "Bazzi sells" and you'll take care of them?

A. Oh, yeah. Yeah.

Q. Sounds a lot like ticket fixing, doesn't it?

A. You think that was ticket fixing or do you think that was just a joke?

Q. I don't know, that's why I'm asking you.

A. It was a joke.

Q. I mean, I'm a big brother and I mess with my little brothers all the time.

A. That was a joke.

Q. Do you own any interest in any business selling marijuana?

A. No.

Q. Are you connected in any way with a marijuana shop operating out of Dearborn?

A. No.

Q. Have you ever been involved in a situation where a friend of yours was scammed into buying a stolen car?

MR. TURFE: Objection. Form and foundation. Relevance.

MR. FARRELL: Same objection.

A. A friend of mine scammed into buying a stolen car?

BY MR. BROWN:

Page 87

Q. Yeah.

A. Not that I recall.

Q. Did you ever change the status of a car that was reported as stolen to unstolen in order that a friend could keep a car that he had purchased?

MR. TURFE: Same objections.

A. No.

MR. FARRELL: Same objection.

BY MR. BROWN:

Q. Have you ever taken any actions in your career to cause any traffic tickets to be dismissed?

A. Have I taken any action as -- I mean, based on what?

Q. Well, that's what I'm asking you, sir. In your entire career since 2011 have you ever taken any actions to cause any traffic ticket to be dismissed?

A. Absolutely.

Q. How many would you say?

A. I don't recall how many but it was under professional courtesy.

Q. How many times did you show this professional courtesy to have tickets dismissed?

A. I don't recall. Numerous times. I don't recall the amount.

Q. And what would the professional courtesy be, sir?

A. If they were a police officer's family member or if it

Page 88

was somebody who the mayor knew who he called me to have the officer dismiss the ticket. That's basically it.

Q. Have you ever dismissed a ticket at the request of Mo Baydoun?

MR. TURFE: Objection. Form and foundation.

A. Negative. Not that I can recall.

BY MR. BROWN:

Q. Have you ever received a request to dismiss a ticket from Mo Baydoun in which Ash (inaudible) and others were present?

MR. TURFE: Same objection.

A. No.

BY MR. BROWN:

Q. Have you ever been investigated for redirecting tow trucks from J & T Crova, the City's licensed tow truck dealer and contracted tow truck dealer to a tow truck or a tow yard owned by a friend in Dearborn?

A. No.

Q. Are you familiar with any camera footage that shows you in possession of keys opening a tow yard lot in Dearborn, Michigan?

A. In Dearborn, Michigan?

Q. Correct, sir.

Page 89

A. No.

Q. Have you ever been involved in any manner in which a car that was supposed to be towed to J & T Crova was towed somewhere else?

A. Not that I recall.

Q. While you're working for Dearborn Heights as a police officer did you ever have a second job?

A. No. Not that I recall. I mean besides my -- I have a few rental properties.

Q. You own some rental properties?

A. Yes.

Q. So you're a landlord in essence?

A. Yes.

Q. Have you ever had a romantic or sexual relationship with other officers?

A. Other officers, no.

Q. How about Fatme Shokr?

A. Never ever.

Q. Have you ever had a relationship with a police cadet?

A. Yes.

Q. And that police cadet worked for the City of Dearborn Heights?

A. She was actually completed with -- I mean, not at the time she was working, this was after she left there so she wasn't employed at the time.