**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KEVIN SWOPE, PAUL VANDERPLOW,    Case No. 2:24-cv-10240-MAG-DRG
JERROD HART    Hon. Mark A. Goldsmith

      Plaintiffs,

v.

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation

      Defendant.

CITY COUNCIL FOR THE CITY OF
DEARBORN HEIGHTS

     Intervening Defendant.

---

## DEFENDANT CITY OF DEARBORN HEIGHTS' RESPONSE TO PLAINTIFFS' MOTIONS IN LIMINE

Now Comes Defendant City of Dearborn Heights ("Defendant" or "City"), by and through its Counsel, The Allen Law Group, in its response and objection to Plaintiffs' Kevin Swope ("Plaintiff Swope"), Jerrod Hart ("Plaintiff Hart") and Paul Vanderplow ("Plaintiff Vanderplow") (collectively referred to as "Plaintiffs") and states as follows:

1

**I.    Defendant City of Dearborn Heights' Response to Plaintiffs' Motion in Limine for the Admission of the Deposition Testimony of Bill Bazzi**

## A. Introduction

Plaintiffs seek to utilize the deposition testimony of former City for Dearborn Heights Mayor Bill Bazzi ("Bazzi"), in lieu of his live testimony at trial. Defendant will be severely prejudiced if Bazzi's August 29, 2021 deposition testimony is allowed to be admitted as trial testimony. At the time of his deposition, he resided, full-time, in the state of Michigan and within the jurisdiction of this Court. At the time of his deposition, Bazzi was the nominee to the position of Ambassador to Tunisia. Bazzi was subsequently appointed to that role.

During the deposition of Bazzi, counsel for Plaintiff sought information pertaining to Bazzi's availability for trial:

| | | |
|---|---|---|
| Joe Brown | Q. | And I understand now, sir, you are a potential new ambassador to Tunisia; correct? |
| Bill Bazzi | A. | I was appointed, yes. |
| | Q. | Congratulations on that. |
| | A. | Thank you. |
| | Q. | I think we lawyers are going to want to know, if you could, please, describe when it is you may be leaving the United States to go to Tunisia, if you know. |
| Monica Hunt | | Object to speculation. Go ahead. |
| | A. | Yeah.· That's still up in the air. I'm not sure yet. There's still a few things that we're -- we're doing right now, so I don't have a date yet. |
| | Q. | Could it be this fall? |
| | A. | I have no idea. |
| Monica Hunt | | Same objection. |

2

> Q.   But suppose you're in Tunisia and you're asked to come back to attend a trial or you're subpoenaed to come back for a trial. Would you come back?
>
> Monica Hunt   Object to speculation.
>
> A.   I have to check the protocol. I'm not really sure.
>
> Q.   Are you aware of any protocol that would prevent you from coming back?
>
> Monica Hunt   Object to foundation.
>
> A.   I'm not sure. This is foreign to me. I don't know.

A copy of Bazzi's Deposition Transcript is attached hereto as **Exhibit "A"**, 17:11-25, 18:1-13.

Hearing the uncertainty regarding Bazzi's availability for trial, counsel for Plaintiff took no effort to convert Bazzi's deposition to a *de bene esse* deposition, or renotice Bazzi's deposition for a similar deposition. A discovery deposition and trial depositions differ greatly. Allowing Bazzi's discovery deposition in lieu of his live testimony, severely prejudices the Defendants ability question Bazzi as a witness.

Further, Plaintiff has not established that Bazzi is not available for trial. Plaintiff's Motion in Limine assumes that Bazzi will not be in the United States or fulfilling his duties near his home in Dearborn Heights on or around the dates of trial. Plaintiff has not attempted to subpoena Bazzi for trial to determine his availability, nor has Plaintiff established that he is unable to return for trial. Additionally, with the widespread use of videoconferencing for meetings, depositions, and examination, Bazzi, if unavailable to appear in person, may appear via video, wherein he will be able to present live testimony without leaving Tunisia, if he is in fact there on the date of trial.

## B. Argument

The Federal Rules of Civil Procedure expressly states its for live testimony in open court over testimony taken in a deposition. *FRCP 32(a)(4)(E)*. "The preference for live testimony . . . is because of the importance of cross-examination, 'the greatest legal engine ever invented for the discovery of truth.'" *White v Illinois*, 502 US 346, 356 (1992) (quoting *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)). Specifically, confrontation "impress[es] [the witness] with the seriousness of the matter and guard[s] against the lie by the possibility of a penalty for perjury" as well as "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Maryland v. Craig*, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (quoting *Green*, 399 U.S. at 158); see also Davis, 415 U.S. at 316 (noting that cross examination is the "principal means by which the believability of a witness and the truth of his testimony are tested").

FRCP 32 (a)(1) provides:

At a hearing or trial, all or part of a deposition may be used against a party on these conditions:

(A) the party was present or represented at the taking of the deposition or had reasonable notice of it;

(B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and

(C) the use is allowed by Rule 32(a)(2) through (8).

FRCP 32(a)(4) provides that:

A party may use for any purpose the deposition of a witness, whether or not a party if the court finds: …

(A) that the witness is dead;

(B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence as procured by the party offering the depositions;

(C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment;

(D) that the party offering the deposition could not procure the witness's attendance by subpoena; or

(E) on motion and notice, that exceptional circumstances make it desirable – in the interest of justice and with due regard to the to be used.

In this case, Plaintiff seeks to simple use a trial transcript instead of making any effort to determine the availability of Bazzi for trial, either in person, or remotely. The circumstances of this case do not warrant Bazzi deposition testimony being allowed in lieu of his trial appearance. Here, Bazzi is not dead. There is no evidence that he cannot testify due to age, illness, infirmity or imprisonment. There is, however, evidence that he can be procured by subpoena to appear live, in person or remotely. There are no exceptional circumstances that necessitate the use of deposition testimony at trial.

### C. Conclusion

To allow the discovery deposition transcript in as evidence, particularly when Plaintiff has made no showing that they have attempted to determine Bazzi's availability, is not only unnecessary, it is also prejudicial. Therefore, in the interest of justice, Defendant prays that this Honorable Court deny Plaintiff's Motion for the admission of the deposition testimony of Bill Bazzi.

II.   **Defendant City of Dearborn Heights' Response to Plaintiffs' Motion in Limine to Exclude Plaintiffs' Tax Returns and any Evidence Concerning Their Wealth or Affluence**

### A. Introduction

Plaintiffs attempt to exclude their tax returns and evidence related to their financial situation from the jury at trial. Plaintiffs, however, made their financial circumstances, including tax returns, wealth and influence, into this matter. Plaintiffs, in their Amended Complaint, seeks, amongst a myriad of other damages, "compensatory damages in an amount to be determined as fair and just under the circumstances by the trier of fact, including but not limited to loss of earnings; loss of career opportunities…". (ECF No 48, PageId 757, ¶ F). Plaintiff's tax returns and financial circumstance should be used, if necessary, to determine any loss and to determine the mitigation of damages.

Having affirmatively placed their loss of earnings and career trajectory before this Court, Plaintiffs cannot now selectively wall off the documentary evidence that

is most probative of those very claims. Tax returns and related financial records constitute the most reliable and objective evidence available to quantify what Plaintiffs actually earned, before, during, and after their employment with the City of Dearborn Heights. Without access to this evidence, the jury would be left to evaluate Plaintiffs' damage claims in a vacuum, relying solely on Plaintiffs' self-serving characterizations of their financial losses.

Further, Plaintiff Swope contends that he quit his position as Chief of Police in South Haven, the job that he voluntarily left the City of Dearborn Heights for, because of his inability to financially remain in that City. A copy of Swope's Deposition Transcript is attached hereto as **Exhibit "B"**, 163:23-25, 164:3-7. When leaving his position of Chief in South Haven, he ended up taking a position that paid even less than that job. *Id* at 163:20-22.

## B. Argument

Fed R. Civ. P. 401 provides: "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed R. Civ. P. 401 defines relevant evidence broadly as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

the evidence." Plaintiffs' tax returns and financial circumstances satisfy this standard with ease.

The financial records at issue are directly relevant to at least three independent and consequential issues in this case: (1) the actual amount of Plaintiffs' alleged lost earnings; (2) whether and to what extent Plaintiffs have mitigated, or failed to mitigate, their damages; and (3) the credibility of Plaintiff Swope's specific factual assertions regarding the financial circumstances surrounding his subsequent employment decisions.

Plaintiff Swope's own deposition testimony underscores the central relevance of his financial situation. Swope testified that he left his position as Chief of Police in South Haven, the very position he voluntarily sought when he left the City of Dearborn Heights, because he was financially unable to remain in that community. *See* Exhibit "B", 163:23–25; 164:3–7. Swope is not merely claiming that Defendant caused him professional harm; he is asserting that the financial consequences of his departure from Dearborn Heights were so severe that they rendered him unable to sustain subsequent employment in the very position he chose as his alternative.

Critically, when Swope left the South Haven Chief of Police position, itself a position that presumably reflected a step in his desired career path, he accepted a role paying *even less* than that position. *Id.* at 163:20–22. This decrease in compensation is precisely the type of evidence that a jury must be permitted to

examine critically and in full context. The jury is entitled to evaluate whether Plaintiffs' successive departures and diminishing compensation reflect the damages they attribute to Defendant, or whether they reflect independent decisions, personal financial mismanagement, failure to mitigate, or other intervening causes wholly unrelated to any alleged wrongdoing by the City.

Plaintiffs have made their financial circumstances a centerpiece of their narrative. They cannot now invoke the exclusionary rules of evidence as a shield against scrutiny of the very financial story he has chosen to tell.

Further, Plaintiff's tax returns and financial circumstances are relevant. A necessary requirement of many of Plaintiffs claims, including their age discrimination claim, Plaintiffs have a duty to mitigate their damages by seeking new employment and a damages award, *if awarded*, may be reduced to the extent that the employer shows that the employee fails to do so. *Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999).

Tax returns and financial records are indispensable to this inquiry. They provide objective, contemporaneous documentation of: what Plaintiffs actually earned following their separation from the City of Dearborn Heights; whether Plaintiffs sought and obtained comparable employment; whether the positions Plaintiffs accepted were commensurate with their prior experience, seniority, and earning capacity; and whether any claimed earnings gap reflects Defendant's alleged

9

conduct or Plaintiffs' own failure to take reasonable steps to minimize their losses. To exclude Plaintiffs' tax returns would be to deprive the jury, and Defendant, of the most probative evidence available on this critical issue.

**C. Conclusion**

Plaintiffs' tax returns and financial circumstances are squarely relevant to the amount of their claimed losses, their compliance with their duty to mitigate, and the credibility of Plaintiffs own account of their post-departure employment decisions. Defendant respectfully requests that the Court deny Plaintiffs' Motion in Limine and permit this evidence to be presented to the jury.

**III.**     <u>**Defendant City of Dearborn Heights' Response to Plaintiffs'
Motion in Limine to Exclude Irrelevant and Improper Character
Evidence or Anecdotes Concerning Plaintiff Paul Veanderplow**</u>

**A. Introduction**

Plaintiff Vanderplow's Motion in Limine seeks to present this jury with a carefully curated and fundamentally incomplete portrait of the events underlying this litigation. He asks this Court to permit him to testify about the harassment and mistreatment he allegedly suffered at the hands of City officials and employees, while simultaneously barring the jury from learning how he himself treated those same colleagues, including subordinates over whom he exercised authority. This selective presentation of the evidence is not only inequitable; it is incompatible with the truth-seeking function of a jury trial.

The evidence Plaintiff seeks to exclude goes to the heart of the central factual disputes in this case: whether the treatment Plaintiff Vanderplow experienced rose to the level of harassment or adverse employment action, and whether the Cit's actions toward him were the product of discriminatory or retaliatory animus, or rather a legitimate response to his own conduct and demeanor in the workplace. The jury is entitled to consider the full picture. Plaintiff's Motion must be denied.

## B. Argument

Fed R. Civ. P. 401 establishes a deliberately broad relevance standard: evidence is relevant if it has "any tendency" to make a fact of consequence to the determination of the action more or less probable. The Sixth Circuit applies an extremely liberal standard for relevancy. *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006). Evidence need not be dispositive to be relevant, it need only have some tendency to bear on a consequential fact.

The evidence of Plaintiff Vanderplow's own conduct, temperament, and interpersonal behavior in the workplace is relevant to multiple consequential issues in this litigation:

- Whether the incidents Plaintiff characterizes as harassment, intimidation, or adverse treatment were, in fact, what he claims them to be, or whether they were reasonable workplace responses to his own behavior;

- Whether Plaintiff's perception of mistreatment reflects objective reality or a pattern of overreaction and hypersensitivity to ordinary workplace friction;

11

- Whether Plaintiff himself engaged in the very conduct, intimidation, denigration, and professional retaliation, that he attributes to Defendants; and

- Whether any adverse employment actions taken with respect to Plaintiff were motivated by discriminatory animus or by legitimate, non-pretextual concerns about his conduct and fitness for his supervisory role.

Each of these issues is directly disputed in this case, and evidence bearing on them satisfies Fed R. Civ. P. 401 by any measure. Plaintiff's anticipated reliance on Fed R. Civ. P. 403 does not support exclusion. Fed R. Civ. P. 403 is not a tool to sanitize the factual record in a plaintiff's favor. It permits exclusion only where the danger of unfair prejudice substantially outweighs the probative value of the evidence. Here, the probative value of the evidence of Plaintiff Vanderplow's conduct is not merely significant, it is essential. Plaintiff has constructed his entire narrative around the claim that he was the target of harassment, intimidation, and hostile treatment within the City. The evidence Defendant seeks to introduce demonstrates that Plaintiff himself engaged in precisely those behaviors toward others, that incidents he characterizes as victimization were in significant part products of his own provocation and overreaction, and that his characterizations of colleagues' ordinary workplace communications as "defamatory" and "harassing" reflect a strikingly skewed and self-serving framework for assessing professional interaction.

12

This evidence does not invite the jury to punish Plaintiff for unrelated bad acts. It invites the jury to evaluate, on a fully informed basis, whether the events at the core of this lawsuit occurred as Plaintiff describes them. That is precisely what Fed R. Civ. P. 403 preserves.

A single instance of a compelling demonstration of why this evidence must come before the jury is Plaintiff Vanderplow's own deposition testimony. When asked to identify a specific example of the harassing and defamatory conduct he attributed to the City Treasurer, a City employee, Plaintiff testified as follows:

Monica Hunt
Q. What did she say to you?
A. Again, some nonsensical, you know, "You're -- you're yelling at me." We were on the phone. There was no yelling. She made up various facts of, you know, "You're making a bigger deal out of this than it needs to be." No, I'm making it an inappropriate level deal. Again, I -- I really wish I recorded her so everybody else can enjoy the nonsensical stuff that comes out of her mouth. I wish I had. Quite frankly, she's one of the most condescending, ill-advised, uneducated individuals I've ever met in my life.

Paul Vanderplow
Q. Okay. So you indicated that her engaging in harassing and defamatory behavior toward you --
A. Yes.
Q. --was her saying that you're yelling at her?
A. Yes.
Q. And that you're making a bigger deal of the issue than it was?
A. For the most part, yes, generally speaking.
Q. Okay. And then you go on to talk to the mayor about her knowledge being vastly limited.
A. Yes.
Q. Calling her unprofessional?

A. Yes.

Q. And indicating that she has proven that her actual knowledge, skills, and abilities were limited?

A. Yes.

Q. You indicated that she has nonsensical segues while avoiding main conversation; is that correct?[1]

Q. Is that what you've indicated to the mayor during the course of this communication with him?

A. Yes.

Q. Okay. And you don't find that to be defamatory?

A. No.[2]

Q. When she says here she "requested that he not elevate and raise his voice," is that what you yelling at her?

A. She said it during the conversation too.

Q. Right. During the conversation with you?

A. Yes.

Q. That you were yelling at her?

A. Yes.

Q. And that's what you indicated was, I think you said, harassing and defamatory?

A. Yes.[3]

Plaintiff Vanderplow served as Acting Chief of Staff and Director within the Police Department, a senior supervisory role carrying significant authority over employees within that organization. His conduct in that role, including his manner of handling conflict, his treatment of subordinates, and his responses to criticism or perceived challenge, is directly relevant to understanding the environment in which

---

[1] A copy of Vanderplow's Deposition Transcript is attached hereto as Exhibit "C", 181:4-25, 182:1-10.

[2] *Id.* at 182:16-21

[3] *Id* at 183:22-25; 184:1-8

the events underlying this case occurred and to assessing the credibility of his characterizations of that environment.

Here, Plaintiff cannot introduce sweeping allegations of harassment while simultaneously arguing that the jury should be insulated from evidence of his own role in shaping that workplace. The incidents Plaintiff has catalogued as evidence of his mistreatment do not exist in a vacuum. Each must be evaluated in the context of the relationships and dynamics in which it occurred, including Plaintiff's own conduct within those relationships.

Where the record establishes that his perception of mistreatment reflects a pattern of overreaction disproportionate to the actual circumstances, that evidence is indispensable to a fair adjudication of his claims. To permit Plaintiff to present his account while concealing the evidence that places it in context would be to compromise the integrity of the fact-finding process itself.

Finally, the breadth of Plaintiff's motion deserves specific attention. Plaintiff's request to exclude not merely specific items of evidence but rather any "anecdotes or narratives" about him personally is, in effect, a request to present this jury with an edited version of events, one in which Plaintiff's own conduct and character are placed beyond scrutiny. No rule of evidence authorizes such relief, and the prejudice to Defendant of litigating under such restrictions would be severe and irreparable.

## C. Conclusion

Plaintiff Vanderplow asks this Court to allow him to tell only half of his story. The evidence of Plaintiff's own conduct is directly relevant to the central issues in this case, carries substantial probative value, and is not subject to exclusion under Fed R. Civ. P. 403. Defendant respectfully requests that the Court deny Plaintiff Vanderplow's Motion in Limine in its entirety.

## IV.   CONCLUSION

Defendant City of Dearborn Heights respectfully Requests that this Honorable Court deny Plaintiffs' Combined Motions in Limine in their entirety.

### <u>LOCAL RULE CERTIFICATION</u>

I, Monica N. Hunt, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials, bulleted and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all texts that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that this document is the appropriate length. Local Rule 7.1(d)(3).

Dated: June 16, 2026

/s/ Monica N. Hunt
MONICA N. HUNT (P68838)
THE ALLEN LAW GROUP, PC
Attorney for Defendant
3031 W Grand Boulevard, Suite 525
Detroit, Michigan 48202
(313)871-5500/mhunt@alglawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2026, I did serve the foregoing paper with the

Clerk of the Court using the ECF system which will send notification of such filing

to all attorneys of record registered for electronic filing.

*/s/ Monica N. Hunt*

Monica N. Hunt

# EXHIBIT "A"

Bill Bazzi
August 29, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW,

JERROD HART,

          Plaintiffs,

   vs.                Case No. 2:24-cv-10240
                          Hon. Mark A. Goldsmith
                          Magistrate David R. Grand

CITY OF DEARBORN HEIGHTS, a

Michigan Municipal Corporation,

          Defendant,

CITY OF DEARBORN HEIGHTS CITY

COUNCIL, in its official capacity only,

Intervening Defendant.

_____/

The Deposition of BILL BAZZI,

Taken at 6045 Fenton Street,

Dearborn Heights, Michigan,

Commencing at 10:03 a.m.,

Friday, August 29, 2025,

Before Cheri L. Poplin, CSR-5132, RPR, CRR.

Bill Bazzi
August 29, 2025

Page 14

A.   '99.

Q.   Keep going.  Thank you.

A.   So I decided to change two careers, one, you know, get into the military police for the Marine Corps and also work -- work at Ford Motor Company, so I was doing both, and Ford was great, you know, for veterans, so they allowed me to do a lot of things in the military, so I was doing a lot of trips even for the training, that I went for military police training.  I was gone for a few -- a few months.  They allowed me to leave.  And with that, you know, I've done -- so I was in the reserves in '99, but I was -- after 9/11 I spent more time on active duty than when I was on active duty, traveling all over the U.S. and also overseas.  Then from there, you know, I stayed with Ford.

     Then I was -- in the meantime I was actually in 9 -- in 2018 I was elected to be a council person.  It was January 1st, 2018.  I started serving as a council person, and in '21, around January I was appointed mayor, and in November I ran for mayor, won by 74 percent of the votes.

Q.   And here you are?

A.   Yes.  Here we are sitting here.

Q.   So you were in quality control in Boeing; correct?

A.   Yes.

Page 15

Q.   So you --

A.   Well, I'm sorry.  So I did quality control for -- for Boeing, they don't call it quality -- well, it is quality control, but I was -- towards the end I was kind of like a supplier quality manager, so I was like supplier quality engineer, and so there was a lot of quality, a lot of engineering, and a lot of like audits on suppliers to make sure that not just their quality but we audited their books, and like for me when I did the Boeing for the two years in Michigan, I was auditing everything from their quality to their finance, even their personnel, their certifications, even their equipment.  I was auditing equipment to make sure their equipments are calibrated.  Even the people that were calibrating were certified to calibrate this equipment.

Q.   Okay.  Thanks.

     MR. BROWN:  Now that that question's over, I'm just going to say let the record reflect that, you know, ten minutes ago Hassan Saab walked in the room with he's now with us sitting at the end of the table, so that adds another person to the chambers.

BY MR. BROWN:

Q.   So what's your personal connection to Dearborn Heights, sir?  Do you have family here?  Have you

Page 16

lived here in the past?  What are your roots here?

A.   So when I moved to Dearborn Heights when I came back to Michigan, I settled in Dearborn Heights not too far from the city hall.

Q.   What year was that?

A.   Roughly 2017, around approximately 2017, 2018.  I'm sorry.  I'm sorry.  Wait, wait.  Hold on.  Got my dates mixed.  Okay.  I'm thinking about something else.  Okay.  So I moved -- oh, no.  I was -- no.  I moved to Michigan, I'm sorry, roughly around '97, '98.  I'm sorry.

Q.   So you moved to Michigan in '97, '98 and you moved to Dearborn Heights?

A.   Yes, sir.

Q.   But you didn't have family that was living here before then?

A.   Not in Dearborn Heights.

Q.   You had family living close or . . .?

A.   In Dearborn.

Q.   I see.  So did you grow up in Dearborn, then?

A.   I grew up in Dearborn.  Went to school.  I wasn't born in -- I was born overseas, but I grew up in Dearborn.  I went to Dearborn schools before I joined the Marines.

Q.   Where did you go to high school?

Page 17

A.   Fordson.

Q.   Sorry?

A.   Fordson.

Q.   Fordson.  Is it fair to say that as a resident and the mayor and a councilman, you are personally familiar with the municipal government of Dearborn Heights?

A.   Yes.

     MS. HUNT:  Objection to form and foundation.

BY MR. BROWN:

Q.   And I understand now, sir, you are a potential new ambassador to Tunisia; correct?

A.   I was appointed, yes.

Q.   Congratulations on that.

A.   Thank you.

Q.   I think we lawyers are going to want to know, if you could, please, describe when it is you may be leaving the United States to go to Tunisia, if you know.

     MS. HUNT:  Object to speculation.
     Go ahead.

A.   Yeah.  That's still up in the air.  I'm not sure yet.  There's still a few things that we're -- we're doing right now, so I don't have a date yet.

BY MR. BROWN:

Q.   Could it be this fall?

Bill Bazzi
August 29, 2025

Page 18

A.   I have no idea.

MS. HUNT:  Same objection.

BY MR. BROWN:

Q.   But suppose you're in Tunisia and you're asked to come back to attend a trial or you're subpoenaed to come back for a trial.  Would you come back?

MS. HUNT:  Object to speculation.

A.   I have to check the protocol.  I'm not really sure.

BY MR. BROWN:

Q.   Are you aware of any protocol that would prevent you from coming back?

MS. HUNT:  Object to foundation.

A.   I'm not sure.  This is foreign to me.  I don't know.

BY MR. BROWN:

Q.   All right.  So you became mayor of Dearborn Heights, sir, as I recall you saying in 2021?

A.   Correct.

Q.   November?

A.   January I became mayor.  November I was elected.

Q.   So January of '22?

A.   Yes, sir.  No.  '21.  You confused me.

Q.   All right.

A.   January '21 I was appointed.  November of '21 I was elected.

Q.   All right.  So before you became mayor, sir, did

Page 19

Dearborn Heights suffer from a corruption problem in its government?

MS. HUNT:  Object to form and foundation. Speculation.

MR. TURFE:  Same objection.

A.   I used to hear chatter from -- before I became the mayor from police officers that I got to know at that time, and -- and every -- everything was leading towards -- towards that corruption, and when I was on council, that's all you hear of corruption in the city.

BY MR. BROWN:

Q.   What types of corruption were present in Dearborn Heights?

MS. HUNT:  Objection to form, foundation, and speculation.

MR. TURFE:  Same objection.

A.   Contracts.  You can go down the street and see, you know, some streets supposed to be, you know, six, seven inches concrete.  They're like -- some streets since becoming the mayor found out some of them are like not even three inches concrete, you know.  Police -- there's some police issues.  I was hearing from residents.  And, again, just at that time before I became councilman it was just people talking,

Page 20

chatter.  When I became council, people coming back -- coming to me and telling me.

BY MR. BROWN:

Q.   What kind of issues were you hearing about with respect to the police department?

MS. HUNT:  Objection to form.

A.   Before I was on council or after?

BY MR. BROWN:

Q.   Before you were on council.

MS. HUNT:  Same objection.

A.   There was racism, you know, police officers being racist towards, you know, this area.  You know, it wasn't -- at that time it was not as Middle Eastern, you know, people living in the city as much as there is now back then, and there was a lot of, you know, people come -- you know, talking about racism by police officers when they get pulled over, the disrespect.

BY MR. BROWN:

Q.   And this is by white officers against people from the Middle East; is that correct?

A.   Basically -- mostly, yes.  It was white police officers against, you know, Arab Americans.

Q.   Do you know what ticket fixing is, sir?

MS. HUNT:  Objection to form and

Page 21

foundation.

MR. TURFE:  Same objection.

A.   Yes.  Now I'm aware of it now.

BY MR. BROWN:

Q.   Has Dearborn Heights historically had a ticket fixing issue with its police department?

MS. HUNT:  Objection to form, foundation, and speculation.

MR. TURFE:  Same.

A.   I became aware of it -- when I became the mayor, I became aware of it.

BY MR. BROWN:

Q.   And what did you become aware of?

A.   That there was ticket fixing.

Q.   Do you know who was doing it?

A.   There's -- there was few people's names that was brought up, but I didn't get involved with -- in the micromanagement when I was the mayor obviously.  The chief and the two directors were handling all the issues with like ticket fixing and other issues.

Q.   But you just mentioned names were brought up with respect to ticket fixing.  Do you remember what those names were?

A.   Yes, sir.

Q.   What were the names?

EXHIBIT "B"

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

---

KEVIN SWOPE, PAUL VANDERPLOW,

and JERROD HART,

             Plaintiffs,

     v.                          Case No.

CITY OF DEARBORN HEIGHTS, a      2:24-cv-10240-MAG-DRG

Michigan Municipal Corporation,

             Defendant,

       and

DEARBORN HEIGHTS CITY

COUNCIL,

             Intervening

             Defendant.

---

             DEPOSITION OF KEVIN SWOPE

DATE:          Monday, August 18, 2025

TIME:          10:07 a.m.

LOCATION:      Fausone & Grysko, PLC

               41700 Six Mile Road, Suite 101

               Northville, MI 48168

REPORTED BY:   Jahkarah L. Haynes-Young

JOB NO.:       7548430

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 162

plaintiffs do what they can to provide that document. This is a quasi-privilege that, it sounds like, that's being approached or invoked. So we would request that that is something that the plaintiff attempt to provide or locate.

MR. BROWN: Sure.

MS. HUNT: Thank you. And we will move on now.

And I'm going to move on by handing it over to Mr. Miotke.

MR. MIOTKE: Okay. Thank you.

EXAMINATION

BY MR. MIOTKE:

Q  Mr. Swope, I just have some followup, a bunch of follow-up questions with respect to questions that were asked by Ms. Hunt. I would add one more thing to the list of rules, which is if you don't understand a question that I ask, please ask me to rephrase it and clarify it, because sometimes I do that, sometimes other people do it, but I kind of get ahead of myself sometimes.

A  Okay.

Q  So if you don't understand, please let me rephrase. All right?

A  Okay.

Page 163

Q  Okay. What's your middle name?

A  Michael.

Q  Okay. And you lived at some address in Brighton, Some 5574. I don't recall the exact address.

A  Yes, Eggert.

Q  How do you spell that?

A  E-G-G-E-R-T.

Q  Okay. And you live where now?

A  I live on Willow Oak Drive in Brighton, Green Oak Township, Brighton mailing address.

Q  I see. And with whom did you live at the 5574 address?

A  My wife and five -- or four kids.

Q  Including stepchildren and --

A  That's correct.

Q  Okay. With whom do you live at the current address?

A  My -- same, the same group of people.

Q  Same people? Okay. And you testified that you're being paid $80,000 per year; is that correct?

A  That's correct.

Q  Okay. Why did you leave South Haven?

A  I left South Haven for a few different reasons. The -- the number one reason was that I

Page 164

was ...

MR. BROWN: Thanks, Amanda.

THE WITNESS: So the number one reason was the fact that I could not afford to obtain housing, because I was going to use the payouts from Dearborn Heights to -- to purchase a home. That's -- that's the first reason.

And the second reason was because I had a family emergency with my mom, who fell down and broke a bunch of bones and -- and whatnot, so I had to be closer to help take care of her.

BY MR. MIOTKE:

Q  Okay. Did either one of these things have to do with any action taken by the City of South Haven?

A  No.

Q  All right. With regard to the payouts that you've alleged are to be owed by the City, how much is it that you believe you are owed?

A  Two hundred four thousand dollars.

Q  All right. And that is for payout, severance, or what?

A  So payout -- so salary. So it's a severance, according to the contract.

Q  So how many years of severance is that

Page 165

supposed to be?

A  It's one.

Q  So what was your last salary?

A  Salary was $126,600.

Q  Okay. And how do we get to $204,000?

A  Because I had vacation time banked. I had sick time banked. I had all these different banks of time, which gets paid out when you leave a -- when you leave a City, and I still haven't received it. Even -- you know, the City has supplied an e-mail that states I should have been paid. Ms. Monica Hunt sent that. I have a copy of it. And I still haven't got the money.

Q  All right. Well, let me ask you this. Of that $204,000, how much of it is what you consider to be severance and how much of it is what you consider to be payouts, banks?

A  So the salary is 126, and then any -- the contract -- contract also reads all benefits in which would have been received, which is sick time, vacation time, those type of banks.

Q  All right. But you've also testified that you've been receiving health insurance benefits.

A  That's in there, too.

Q  Okay. Is that included within the $204,000,

42 (Pages 162 - 165)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

EXHIBIT "C"

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

KEVIN SWOPE, PAUL VANDERPLOW,

and JERROD HART,

       Plaintiffs,

    v.                Case No.

CITY OF DEARBORN HEIGHTS, a    2:24-cv-10240-MAG-DRG

Michigan Municipal Corporation,

       Defendant.

DEPOSITION OF PAUL VANDERPLOW

DATE:          Tuesday, August 19, 2025

TIME:          10:11 a.m.

LOCATION:     Law Firm of Fausone & Grysko, PLC

              41700 West Six Mile Road, Suite 101

              Northville, MI 48168

REPORTED BY:  Jahkarah L. Haynes-Young

JOB NO.:     7548431

Page 178

treasurer?

A   Correct.

Q   Is that correct?

A   Yes.

Q   You stated earlier that you had concerns with her handling of forfeiture funds; is that correct?

A   Correct.

Q   Did you ever -- strike that.

Are you familiar with the incident that you were speaking to Mayor Bazzi about in this complaint?

A   Yeah, I kind of remember it.  Yeah.

Q   Okay.  What was the issue?

A   We bounced a police union check.

Q   Did you talk to her about the check being bounced?

A   I did.

Q   Why was the check bounced?

A   You'd have to ask her.

Q   What did she tell you?

A   I don't remember.  Some nonsensical answer I couldn't make head or tail out of.

Q   Did the returned check ever get rectified?

A   I would assume it did, yes.

Q   How did you come to find out that the check

Page 179

had been returned?

A   As the acting chief of staff, Janet Lucas, called me telling me that the union had complained that the check bounced or something along that line.  And as chief of staff, I was asked to check into the issue.  And frankly, I would've done it as support services as well.

Q   How did you check into the issue?

A   Called Clayton.

Q   And did you have a conversation with her?  Did you have a meeting with her?

A   We had a conversation.

Q   Okay.  Was that by phone?

A   Always, or more times than not.

Q   All right.  And did she provide you with an explanation as to why the check was bounced?

A   She said something, as a trained financial individual, I couldn't make head or tail whatever she said.  It didn't make sense to me.

Q   Did you ask her for clarification?

A   Multiple times.

Q   All right.  As a trained financial professional, did you ever have the -- or ask her to sit down with you so that you can explain?

A   Oh, yes.

Page 180

Q   All right.  Did you ever prepare trainings for her?

A   It's not my job to train her.  She's the professional.  Just look at her signature page.  She has certifications from everybody known to God.

Q   All right.  But you just indicated that you knew that she had -- or did not feel that she had the acumen to perform the job.  Is that fair?

A   I didn't vote for her.

Q   All right.  So do you live in the City of Dearborn Heights?

A   No.

Q   Okay.  So you couldn't vote for her; is that correct?

A   No, I wouldn't anyway.

Q   Okay.  So with understanding that you did not believe that she understood this part of her job, did you offer to sit down or -- I'm sorry -- create trainings to assist her with this position?

A   Again, I can only explain it to her.  I can't understand it for her.

Q   All right.  In this email, you indicate that the treasurer engaged in harassing and defamatory behavior?

A   Correct.

Page 181

Q   Who is this harassing and defamatory behavior toward?

A   Me.

Q   What did she say to you?

A   Again, some nonsensical, you know, "You're -- you're yelling at me."  We were on the phone.  There was no yelling.  She made up various facts of, you know, "You're making a bigger deal out of this than it needs to be."  No, I'm making it an inappropriate level deal.

Again, I -- I really wish I recorded her so everybody else can enjoy the nonsensical stuff that comes out of her mouth.  I wish I had.  Quite frankly, she's one of the most condescending, ill-advised, uneducated individuals I've ever met in my life.

Q   Okay.  So you indicated that her engaging in harassing and defamatory behavior toward you --

A   Yes.

Q   -- was her saying that you're yelling at her?

A   Yes.

Q   And that you're making a bigger deal of the issue than it was?

A   For the most part, yes, generally speaking.

Q   Okay.  And then you go on to talk to the

46 (Pages 178 - 181)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 182

mayor about her knowledge being vastly limited.

A   Yes.

Q   Calling her unprofessional?

A   Yes.

Q   And indicating that she has proven that her actual knowledge, skills, and abilities were limited?

A   Yes.

Q   You indicated that she has nonsensical segues while avoiding main conversation; is that correct?

MR. BROWN: Objection. Best evidence. The document speaks for itself. Is there a question we can answer about the document?

MS. HUNT: I've been asking him.

BY MS. HUNT:

Q   Is that what you've indicated to the mayor during the course of this communication with him?

A   Yes.

Q   Okay. And you don't find that to be defamatory?

A   No.

MR. BROWN: Objection. Argumentative.

BY MS. HUNT:

Q   Okay. But it's your --

THE REPORTER: I didn't hear your

Page 183

answer.

THE WITNESS: It was no.

THE REPORTER: Thank you.

BY MS. HUNT:

Q   But to be clear, to your knowledge, what she said to you was that you were yelling at her and that you're making a bigger deal out of the bounced check?

A   Out of -- more or less, yes. I would've -- there were other issues being said. I don't recall them at this time.

Q   All right. She indicates that, in that conversation, if we turn to the very first page, which is Bates 288, that you immediately elevated and that she respectfully requested that you not elevate or raise your voice. Do you recall that?

A   I recall reading it.

Q   Okay. Would that be what you just stated, at least translated into that you were yelling at her?

MR. BROWN: Objection to form. Ambiguous. Vague. Unintelligible.

BY MS. HUNT:

Q   When she says here she "requested that he not elevate and raise his voice," is that what you took as her asking you or telling you that you were yelling at her?

Page 184

A   She said it during the conversation too.

Q   Right. During the conversation with you?

A   Yes.

Q   That you were yelling at her?

A   Yes.

Q   And that's what you indicated was, I think you said, harassing and defamatory?

A   Yes.

MR. BROWN: Objection. Misstates prior testimony.

BY MS. HUNT:

Q   She also goes on to say that you continued to raise -- I would assume -- you said "he's continued." I would assume that to be that he continued to raise his voice. Is that what you understood it to mean?

MR. BROWN: Objection to form. Best evidence.

THE WITNESS: You would have to ask her.

BY MS. HUNT:

Q   Okay. All right. And she indicated that she -- "that he continued, and I hung up," meaning she hung up. "No one should ever be yelled at or treated in such disrespect." Did she hang up the call on you?

Page 185

Do you recall that?

A   I don't remember.

Q   Okay. Do you know if there was a conversation after that phone call with Ms. Hicks-Clayton with regards to the unpaid check or the returned check?

A   I don't recall.

Q   Okay. You don't recall if there's a conversation between the two of you?

A   That's correct.

Q   Okay. I am handing what is now 6.

(Exhibit 6 was marked for identification.)

MS. HUNT: Here you go.

MR. BROWN: That's one for each of us.

THE WITNESS: I didn't know if you wanted to look that first.

MR. BROWN: Oh, sorry.

BY MS. HUNT:

Q   Now, this is a email that was provided to the Dearborn City Council. It appears to at least be directed to Chairman Baydoun. Have you seen this document before?

A   No. At least I don't recall seeing it, to be fair.

47 (Pages 182 - 185)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com