## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

_____

## PLAINTIFFS' RESPONSE TO INTERVENING DEFENDANT CITY OF DEARBORN HEIGHTS CITY COUNCIL'S MOTION IN LIMINE (DKT. 139)

NOW COME Plaintiffs, KEVIN SWOPE, PAUL VANDERPLOW, AND

JERROD HART, by and through their undersigned counsel, and in its response and

objection to Intervening Defendant City of Dearborn Heights City Council's Motion

in Limine (Dkt. 139) states as follows:

### Introduction

Intervening Defendant City of Dearborn Heights City Council ("Intervening

Defendant" or the " City Council") seeks to exclude from trial all evidence and

1

testimony concerning a March 24, 2024 stalking complaint filed by City Councilman Hassan Saab against Plaintiff Paul Vanderplow. The City Council argues that this evidence is irrelevant under Federal Rules of Evidence 401 and 402, and that any marginal probative value is substantially outweighed by unfair prejudice under Rule 403. This motion should be denied.

Contrary to the City Council's assertions, the stalking complaint is directly relevant to multiple claims and defenses in this case. The complaint was false, retaliatory, and part of a coordinated campaign of harassment designed to punish Plaintiffs for their protected whistleblowing activities and speech concerning corruption within the Dearborn Heights Police Department ("DHPD"). A subsequent investigation cleared Vanderplow of all wrongdoing. The complaint caused Vanderplow to be placed on temporary leave, denied him security clearances and professional opportunities, and exemplifies the pattern of adverse employment actions that ultimately led to his constructive discharge. Far from being "completely irrelevant," the stalking complaint goes to the heart of Plaintiffs' First Amendment retaliation claims (Count I and Count IX), their whistleblower claims under Michigan law (Count II), and their claims of constructive discharge and breach of contract (Count IV).

Far from being an innocent mistake in which Saab was mistaken about Vanderplow's reasons for being in his neighborhood, the record is replete with

2

instances of Saab using law enforcement mechanisms as a political tool. The City Council's motion rests on a fundamental mischaracterization of the relevance standard and misapplies Rule 403. Under binding Sixth Circuit precedent, the threshold for relevance is "extremely liberal," and evidence need only have "any tendency" to make a consequential fact more or less probable. *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992). The City Council seeks to exclude evidence vital to Plaintiffs' case without meeting the demanding standard required for Rule 403 exclusion, which permits exclusion only when probative value is "substantially outweighed" by prejudice. The stalking complaint is highly probative of retaliatory motive, temporal proximity, continuing course of conduct, and Councilman Saab's individual animus toward Vanderplow—all material facts in this litigation.

Moreover, the City Council's assertion that Councilman Saab "is not a defendant in this case" and has "no individual involvement" fundamentally misstates both the law and the factual record. Councilman Saab is a member of the Intervening Defendant City Council, the very entity sued in its official capacity. His actions as a Council member are directly attributable to the City Council as an institution, and evidence of his retaliatory conduct is admissible to prove the City Council's retaliatory intent and pattern of harassment. This Court has already rejected the strange notion that the City Council is somehow distinct from its members in its

3

discovery rulings, in which the Court required independent Council members to comply with discovery. *See* ECF No. 108, 109.

For these reasons, and those set forth below, the City Council's Motion in Limine should be denied in its entirety.

## Statement of Facts

### A. Background of the Case

Plaintiffs are three experienced law enforcement professionals hired by the City of Dearborn Heights to reform a corrupt police department. Mayor Bill Bazzi hired Jerrod Hart as Police Chief in February 2022, and subsequently hired Paul Vanderplow and Kevin Swope as directors within the DHPD in January 2023. The City Council ratified the employment of all three Plaintiffs by name through Resolution 23-099 on February 28, 2023, approving a collective bargaining agreement under Michigan's Public Employment Relations Act.

### B. The City Council's Campaign of Retaliation

Beginning in early 2023, members of the City Council, including Councilman Hassan Saab and then-Councilman Mo Baydoun, began pressuring Plaintiffs to provide preferential treatment to underperforming Arab-American officers and to cease their anti-corruption efforts. When Sergeant Bazzy was later disciplined in a

4

use-of-force incident, rather than promoted, the Saab-Beydoun led Council greatly expedited its pressure campaign.

On January 9, 2024, the City Council voted 5-2 to defund Plaintiffs' positions in a transparently retaliatory resolution. Mayor Bazzi issued a memorandum declaring the resolution ultra vires and in violation of federal law, including the Fair Labor Standards Act and the First Amendment. **Exhibit 1**.

### C. The March 2024 Stalking Complaint

On or about March 24, 2024, City Councilman Hassan Saab against Plaintiff Paul Vanderplow alleging criminal stalking. The complaint was entirely false. The incident became thoroughly memorialized in the briefing that took place in connection with Vanderplow's motion for sanctions pertaining to the false accusation. *See* Dkt. Items 24, 37 and 39. Vanderplow has stated in an affidavit that in driving by Saab's home  he was merely responding to an incoming request for a police investigation that had been received by a City employee, Ash Othman, and then passed on to him. [ECF No. 24-2, PageID.490, ¶ 4].

Vanderplow has since been cleared of all charges of stalking and, in fact, is now a MCOLES-licensed patrol officer. However, the false accusation caused immediate and continuing harm to Vanderplow. He was placed on temporary leave from duty. He was denied clearance to serve as the DHPD's executive representative

on the FBI's Joint Terrorism Task Force. He was temporarily denied admission to police academy training.

Further investigation revealed that Saab fabricated key aspects of the complaint and attempted witness tampering. In his deposition, Saab falsely testified that Ash Othman had "admitted" that Mayor Bazzi told her to fabricate the story about receiving a call requesting police assistance, and Saab even produced a written document making this false claim. However, when Othman was deposed, she testified unequivocally that Saab's account was a lie. **Exhibit 2**, 34:10 to 36:13; 40:19 to 40:23. Othman also testified to how Saab attempted to tamper with her future testimony using both carrots (a job offer) and sticks (sexual defamation). *Id.* at 37:22 to 38:1-18; 40:25 to 41:23.

The stalking complaint (and related witness tampering) was part of a coordinated campaign of retaliation against Plaintiffs for exposing corruption and opposing illegal preferential treatment for Arab-American officers.

### D. Plaintiffs' Constructive Discharge

The cumulative effect of the City Council's harassment, defunding attempts, denial of professional opportunities, false accusations, and ongoing sabotage made Plaintiffs' employment untenable. Hart resigned on July 3, 2024, citing constructive discharge. Vanderplow resigned in April/May 2025 after he could no longer perform

6

his duties due to Council obstruction. Swope resigned after Mayor Bazzi asked him to step aside to make room for an underqualified Arab-American candidate.

## Legal Standards

Motions in limine are designed "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). Denial of a motion in limine does not guarantee that evidence will be admitted at trial; it simply means the court declines to make a definitive pretrial ruling. *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), *aff'd*, 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984).

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid 401. "The standard for determining whether evidence is relevant is extremely liberal." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992). District courts have broad discretion in determining relevance, and may be reversed only for abuse of discretion. *Id*.

Under Rule 402, all relevant evidence is admissible unless excluded by constitutional provision, federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Irrelevant evidence is not admissible. *Id*.

Rule 403 permits exclusion of relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The requirement that probative value be "substantially outweighed" is significant. *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 377-78 (6th Cir. 1983). The decision to admit relevant but potentially prejudicial evidence "is placed within the sound discretion of the trial court." *United States v. Brady*, 595 F.2d 359, 361 (6th Cir. 1979). Crucially, evidence must be more than merely damaging to the adverse party to warrant exclusion; it must be unfairly prejudicial. *Kolada*, 716 F.2d 373, at 378.

## Argument

## I.    The Stalking Complaint is Relevant to Multiple Claims and Defenses in This Case.

### A.    The Stalking Complaint is Relevant to Retaliatory Motive and Animus.

Plaintiffs have asserted First Amendment retaliation claims and whistleblower retaliation claims under Michigan law. A core element of these claims is that the City Council took adverse actions against Plaintiffs because of their protected speech and whistleblowing activities.

8

The stalking complaint is direct evidence of retaliatory motive. Evidence that a City Councilmember filed a false criminal complaint against a Plaintiff who had been reporting corruption and resisting pressure to provide illegal preferential treatment is plainly relevant to whether the City Council acted with retaliatory intent.

The City Council's motion appears based, in part, on the completely erroneous assumption that the stalking event occurred in March of 2025 and not March of 2024. *See* ECF No. 139, PageID.5817. This despite the event being heavily briefed in May and June of 2024. *See* "Plaintiff's Motion for Order to Show Cause and Impose Contempt Sanctions, ECF No. 24.

Considering the correct timeline, the temporal proximity is striking. Plaintiffs had been reporting widespread corruption since early 2023. In September 2023, Councilman Saab directly threatened Vanderplow and Swope if they did not drop disciplinary charges against an Arab-American sergeant. In January 2024, the City Council voted to defund Plaintiffs' positions. In March 2024, just two months after the defunding resolution and while this litigation was pending, Councilman Saab filed the false stalking complaint. This chronology demonstrates a continuing pattern of escalating retaliation.

The stalking complaint easily satisfies the liberal relevance standard. It demonstrates that a member of the defendant City Council was willing to abuse the

9

criminal justice system to harass and harm a Plaintiff who had opposed corruption and refused to grant preferential treatment to politically favored officers. This evidence makes it more probable that the City Council's other adverse actions—including the defunding resolution, denial of training opportunities, and obstruction of Vanderplow's duties—were similarly motivated by retaliatory animus rather than legitimate governmental interests.

## B. The Stalking Complaint Constitutes an Adverse Employment Action.

The City Council argues that Vanderplow faced no adverse employment action via his temporary leave of absence because he "received all of the pay he was supposed to receive during this period." ECF No. 139, PageID5814. This argument conflates compensation with an adverse employment action.

An adverse employment action is not limited to termination or reduction in pay. A materially adverse employment action in the retaliation context consists of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Burlington Northern and Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2415 (2006)). Being placed on administrative leave, being denied security clearances, being excluded from professional training, and

10

suffering reputational harm all constitute adverse employment actions regardless of whether compensation was recovered for the leave period.

The stalking complaint directly caused Vanderplow to be placed on temporary leave of duty due to having been falsely and maliciously accused of committing a crime. These consequences are paradigmatic adverse employment actions. Evidence of the stalking complaint is relevant to establish that Vanderplow suffered tangible harm as a result of the City Council's retaliatory campaign. Under the liberal relevance standard, this evidence "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992), Fed R. Evid. 401.

The City Council's narrow focus on whether Vanderplow was paid during his leave ignores the broader context. The forced administrative leave, denial of professional opportunities, and reputational damage are all material facts that make it more probable that Vanderplow was subjected to a hostile and retaliatory work environment that ultimately led to his constructive discharge. Accordingly, the City Council's Motion must be denied.

**II.    The Probative Value of the Stalking Complaint Is Not Substantially Outweighed by Unfair Prejudice.**

11

The Sixth Circuit has made clear that the requirement that the probative value must be substantially outweighed to warrant exclusion of Federal Rule of Evidence 403 is significant. *Koloda v. Gen. Motors Parts Div., Gen. Motors Corp.*, 716 F.2d 373, 377-78 (6th Cir. 1983). As demonstrated above, the stalking complaint is highly probative of multiple material facts. This is not marginally relevant evidence; it is central to Plaintiffs' retaliation claims.

The probative value is particularly high because the stalking complaint is direct evidence of retaliatory animus by a member of the defendant City Council. It is not circumstantial evidence from which retaliation must be inferred; it is a Council member taking concrete action to harm a Plaintiff through the criminal justice system. Moreover, the subsequent evidence of perjury and witness tampering by Saab further increases the probative value by demonstrating the depth of his retaliatory intent and willingness to abuse process.

On the other hand, the City Council does not identify any specific prejudice beyond the fact that the evidence is damaging to its defense. But in order to exclude evidence under Rule 403, it must be more than merely damaging to the adverse party; it must be unfairly prejudicial. *Kolada*, 716 F.2d 373, at 378. Furthermore, the City Council does not explain how evidence of Saab's conduct would create a "distorted" image of Saab. The evidence is what it is: Saab filed a false criminal complaint, the

complaint was investigated and dismissed, and subsequent discovery revealed perjury and witness tampering. This is not distortion; it is the factual record.

Accordingly, the City Council cannot meet the demanding "substantially outweighs" standard given the evidence's centrality to Plaintiffs' case and its Motion must be denied.

## IV. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Intervening Defendant City Council's Motion in Limine in its entirety.

Respectfully submitted,

Dated: June 25, 2026

/s/ Stephen J. Brown
FAUSONE & GRYSKO PLC
Attorney for Plaintiffs
41700 Six Mile Road, Suite 101
Northville, MI 48168
(248) 380-0000; FAX (248) 380-343
jbrown@thefgfirm.law

13

## LOCAL RULE CERTIFICATION

I, Attorney Stephen J. Brown, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnote); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Respectfully submitted,

/s/ Stephen J. Brown

## CERTIFICATE OF SERVICE

I, Stephen J. Brown, hereby certify that on the 25th day of June, 2026, I served a copy of **PLAINTIFFS' RESPONSE TO INTERVENING DEFENDANT CITY OF DEARBORN HEIGHTS CITY COUNCIL'S MOTION IN LIMINE (DKT. 139)** on all appearing attorneys and service recipients registered for receipt via electronic filing. I declare under penalties of perjury that this Proof of Service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

/s/ Stephen J. Brown

14

# EXHIBIT 1

JAN 22 AM 8:34

## MEMORANDUM

To:   Hon. Dearborn Heights City Council
      Hon. Dearborn Heights City Clerk

Fr:   Mayor Bill Bazzi

Re:   Council Resolution 11-A 1/6/24

Da:   1/22/24

The purpose of this memorandum is to outline the several reasons why the above captioned resolution is *ultra vires* of the Dearborn Heights City Charter and otherwise contrary to law.  Normally, Section 7.13 of the Charter sets forth the appropriate procedure to reject a Council resolution.  However, Resolution 11-A of 1/9/24 is a legal nullity since Council passed it outside of its charter-mandated duties and authority.  However, to the extent this council or any tribunal deems the resolution to be in order, please also consider this correspondence as a formal veto of that resolution.  I note also that Council, in passing this ordinance, has done so contrary to advice that both Corporation Counsel and special Labor Counsel rendered several times since Council proposed it in October 2023.  I have reason to believe, moreover, that Council passed Resolution 11-A of 1/06/2024 outside of the Open Meetings Act, a matter I intend to pursue in Circuit Court if forced to do so, noting specifically that the crime-fraud exception invalidates any efforts to shield communications with outside counsel from disclosure.

I begin by noting that pursuant to Section 5.3 (a), (f), and (h) provide my office with the following authority and responsibilities:

(a) It shall be his responsibility to enforce all of the laws and ordinances of the City;
(f)  He shall prepare and administer the annual budget and keep the Council fully advised at all times as to the financial condition and needs of the City;
(h) He shall, on or before the first of April of each year, prepare and submit to the Council a complete itemized proposed budget for the next fiscal year in accordance with the provisions of this Charter.

By eliminating funding for the two director positions at issue, my ability to enforce local and state laws and ordinances is impaired.  It is also the duty and responsibility of the mayor and not council to prepare and administer the budgets passed by this Council on an annual basis.  Once adopted Council may not

unilaterally and without notice abrogate the budget it passed. To act otherwise would render my charter authority under these provisions meaningless.

Pursuant to Charter Section 7.3(d) a prior ordinance or ordinance may be repealed or amended only by reference to that legislation's title and number. The city's budget ordinance passed last year was not referenced in resolution 11-a of 1/6/24.

Finally, the Charter lacks clear authority for Council to unilaterally[1] modify a budget to altogether remove funds for budgeted positions. Pursuant to Charter Section 8.5, Council's ability to amend a budget is limited to the "transfer of unused balances appropriated for one purpose to another balance... [or] to appropriate available revenues of a class not included in the annual budget." If the framers of the Charter had wanted to vest in Council the ability to make unilateral eliminations of budgeted positions, they could have done so. The fact that they did not indicates that Council lacks authority for the above resolution. This reading of Section 8.5 conforms to the canon of statutory construction *expression unius est exclusion alterius* or the expression of one thing suggests the exclusion of others. See *Greiff v Greiff (In re Estate of Greif*, 332 Mich. App. 251 (2020) citing *Pittsfield Charter Twp v Washtenaw Co*, 468 Mich 702, 712 (2003).

Turning to the reasons under state law that the Council's actions are not only illegal but unwise are set forth here. To begin with and most obviously, the City is subject to the Fair Labor Standards Act which clearly requires that the Directors be compensated for the time that they work. This Council's resolution is a clear violation of federal law exposing the city to double damages, attorneys fees, and fines. It is also a criminal act subjecting each member of this Council voting for this resolution to six months imprisonment and a $10,000 fine, penalties that I intend to see enforced should Council insist on enforcing its illegal resolution.

The resolution also violates the terms of a collective bargaining agreement which this Council approved. Quite simply, this Council cannot unilaterally change the wages, hours, terms and conditions of these employee's employment without collective bargaining. To do so, would constitute a clear violation of the Public Employees Relations Act as well as other law protecting public employees. See *Org of Sch Administrators & Supervisors, AFSA, AFL-CIO v Detroit Bd of Ed*, 229 Mich App 54, 65; 580 NW2d 905 (1998).

---

[1] The same reasoning does not apply where the mayor, as progenitor of the budget, presents amendments for council approval throughout the fiscal year.

Comments from this Council make clear that its actions are retaliatory in nature in violation of these employees First Amendment Constitutional Rights as well as violations of the Whistleblowers Protection Act. I have no intention of allowing this City to trample the rights of its dedicated employees and thereby exposing the taxpayers to civil liability.

Finally, under Article 6 of the applicable collective bargaining agreement, members of the bargaining unit may not be terminated without just cause and in accordance with the grievance and arbitration procedure set forth in Article 7. Illegally reducing the pay of these employees constitutes a form of constructive discharge. Beyond violating the terms of the collective bargaining agreement, such a termination without any form of due process would deprive these public employees of a vested property right to their employment in violation of the Fourteenth Amendment to the United States Constitution.

In closing, while this resolution is so clearly deficient constituting a legal nullity and should be deemed void *ab initio*, without conceding its enforceability, if a tribunal should disagree with any of the above, let this memorandum also serve as a veto for the reasons set forth above.

# EXHIBIT 2

Ash Othman
January 14, 2026                                    1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN


KEVIN SWOPE, PAUL VANDERPLOW,

JERROD HART,

      Plaintiffs,

      -vs-          Case No. 2:24-cv-10240

CITY OF DEARBORN HEIGHTS, a Michigan

Municipal Corporation,

      Defendant,

CITY OF DEARBORN HEIGHT CITY COUNCIL,

in its official capacity only,

      Intervening Defendant.

_____/


    The Deposition of ASH OTHMAN,

    Taken at 41700 Six Mile Road,

    Suite 101,

    Northville, Michigan,

    Commencing at 10:16 a.m.,

    Wednesday, January 14, 2026,

    Before Donna K. Sherman, CSR# 2691.

Ash Othman
January 14, 2026                                                      2

APPEARANCES:

Appearing on Behalf of the Plaintiffs:

STEPHEN JOSEPH BROWN (P82687)

Fausone & Grysko, PLC

41700 Six Mile Road

Suite 101

Northville, Michigan   48168

(248) 912-3213

jbrown@thefgfirm.law

Appearing on Behalf of the City of Dearborn Heights:

SEAN M. FARRELL (P86402)

The Allen Law Group

3031 W. Grand Boulevard

Suite 525

Detroit, Michigan   48202

(313) 871-5500

alglawpc.com

Appearing on Behalf of the Defendant City Council:

TARIK D. TURFE (P83690)

Hammoud Dakhlallah & Associates, PLC

6050 Greenfield Road

Suite 201

Dearborn, Michigan   48120

(313) 471-4009

tt@hdalawgroup.com

Ash Othman
January 14, 2026                                                    34

certain other pages from the Hassan Saab deposition.

All right?

A   Okay.

Q   Can you open it up and give it a read.  You'll see at the bottom of, uhm, three pages in, you'll see these pages.  Do you see that.  There is page 146 and then 147 and then 148 and 149.  Do you see those numbers?

A   Yes.

Q   So there's highlighting there.

Uhm, and it talks about this very same document that you and I just talked about, the one you said was either true or facts.  And I'm going to start asking here questions that Hassan Saab answered in his own deposition and I want you to tell me whether Hassan Saab was telling the truth or whether he was lying, okay?

A   Okay.

Q   Here's the question.

Uhm, I'm going to start at page 149.  Quote, what did Ashley Othman tell you about that situation. And here's Saab, I believe that same day, Ashley called me, said, I really fucked up.  No, strike that.  I think I really fucked up.  I'm like, okay.  I did something I should have never did.

What is it?

Ash Othman
January 14, 2026                                                35

She said, Bill Bazzi told me to write an email, send it to Defective Vanderplow at all costs.

What's that?

She's like, he told me to say that I asked him to pass by your house to investigate something.

I told her, what authority does Vanderplow have to investigate the city.

She's like, well, it's something to do on John Daley.

So I'm okay. What is it.

Well, I can't talk about it exactly. What she said, I said. Okay. And.

She's like, I have to call Vanderplow, and then she's like, I believe it's in here. I'm sorry. Give me a second.

So, that's Hassan Saab describing things that you supposedly said.

And I'm asking you, did you actually say this stuff?

A    No, I didn't.

Q    Is this a lie?

A    Yeah.

Q    Did you ever say, I really fucked up?

A    No.

Q    Did you, did Mayor Bazzi ever ask you to make up a

Ash Othman
January 14, 2026                                        36

phone call so that Paul Vanderplow could go stalk Hassan Saab?

A    No.

Q    And then Mr. Turf asks Hassan Saab further down the page, this is at line 20, question, so did the Mayor and Vanderplow use Ashley Othman to create an alibi for Vanderplow to pass by your house?  To which Hassan Saab says, yes.

So my question to you, Miss Othman, is this a true statement or is it a lie?

A    It's a lie.

Q    Did you, Ashley Othman, create an alibi for Vanderplow?

A    No.

Q    Thank you, Miss Othman.

A    Can I add something to that?

Q    If you wish.  I'm not your attorney.  I can't tell you what to do or give you advice.

A    I am being thrown into drama that I don't appreciate being thrown into it.  I actually provided my Verizon phone records when I actually made a call that day to Director Vanderplow.  I actually did it from my personal cellphone and the time is on my phone records.

I have no reason to lie to cover for anybody.  And, I was actually asked to lie about that situation, about how it really happened or to change my story to

Ash Othman
January 14, 2026                                                    37

say, well, that's not true. We know Bill Bazzi told you to do this, when none of that was true. My job with the city of Dearborn Heights, I barely got paid anything. I think that whole statement is throwing me into something that has nothing to do with me because it's not true.

Q    Fair enough, ma'am. Who asked you to lie?

A    Hassan Saab made a call to me, and it wasn't around that time. It was around the time that an officer from MSP was supposed to contact me. He told me, I know it's not true what you're saying. I know there wasn't complaints that came through. If there were, who made the complaint. I know I received several complaints. Chief of Staff Marianna Hernandez received several complaints and so did Stephanie Shockey, ordinance complaints. I did my job. I just said, hey, this business is still receiving complaints. Our ordinance officers don't want to go there. Director Bill Dishroon reached out to him. We then reached out to Mayor Bill Bazzi at the time. But I didn't lie about anything. I have no reason to lie about any of it.

Q    Thank you, ma'am.

Did Hassan Saab offer you anything, any bribes, any money, anything, any type of benefit in order to change your story?

Ash Othman
January 14, 2026                                                38

A    Not, I don't want to say to change my story. I know a few months back before our friendship ended he had stated to me when I told him I was no longer working with the city, that if I needed a job he was opening a business in Dearborn and I could run it for him. That was one of our last few conversations that we had.

Q    Okay. Did Hassan Saab ever do anything to threaten you or to say something negative would happen to you if you didn't change your story about this incident?

A    He didn't tell me if I didn't change my story. He told me being involved in this would, so, my husband was born and raised in the city of Dearborn, Dearborn Heights. He told me that it would put me family at risk. I'm raising two little girls. I need to be careful being involved in any of this. It would isolate me from the community and it would potentially destroy my life and that I would get personal lawsuits that come at me for speaking about any of this.

(Exhibit 3 marked)

BY MR. BROWN:

Q    All right. Thank you.

So, I'm going to show you one more document, ma'am. We're going to call this Othman Exhibit 3. Which also happens to be what was Saab Exhibit 5. And I'm going to show you this document and again, this is

Ash Othman
January 14, 2026                                        40

to them was made to create an alibi.

Do you see that?

A    Yes.

Q    My question is very simple, Miss Othman.  Is this true or is this a lie?

A    It's a lie.

Q    You never said you made a stupid mistake; did you?

A    No.

Q    You never said you really fucked up, right?

A    No.

Q    You never said that you were trying to create an alibi for Mr. Vanderplow, correct?

A    No.

Q    When I say correct, well, let me say that again.

This is an example of me messing up a question.

Is it true that you tried to create an alibi for Paul Vanderplow?

A    No.

Q    Thank you.

So, just to rephrase, is this statement drafted by Hassan Saab true or false?

A    False.

Q    Thank you.

A    Can I add something.  I don't see it in here.  But I

Ash Othman
January 14, 2026                                          41

received a call after his deposition from another attorney on this case.  It was Monica.  She had stated Hassan Saab said, I was having an affair with Mayor Bill Bazzi and Director Vanderplow.  That is not true.  And as a female that comes from within this community and I know you're married.  I'm not sure if you're married.  But I know you come from within our community.  I don't know if you do.  To put that on a female, I have a nine and a half year old daughter and my youngest daughter had just turned 16 months.

So, to make claims of that basically while I was pregnant or right before I was pregnant, it doesn't just destroy my life.  It destroys my daughter's life.

Uhm, she was born August, 2024.  I never had an affair with anybody I worked with at the city of Dearborn Heights.  I have only ever been with my husband.  Both of those kids are his.  But to say that to somebody in regards to somebody I just don't think it's right and for everybody to just sit here and have allowed it to be said, I just think inexplicably wrong, completely.  And my daughter is one and a half.  And I have another daughter who's nine and a half that are in this community.

Q    All right.  I understand.

I do understand.