**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

Intervening Defendant.

---

**PROPOSED JOINT FINAL PRETRIAL ORDER**
**FILED PER DOCKET 157**

NOW COME Plaintiffs, KEVIN SWOPE, PAUL VANDERPLOW, AND JERROD HART ("Plaintiffs"), the CITY OF DEARBORN HEIGHTS ("Primary Defendant") and the CITY COUNCIL OF DEARBORN HEIGHTS ("Intervening Defendant" and together with Primary Defendant, the "Defendants"), by and through their undersigned counsel, and for their Proposed Joint Final Pretrial Order ("JFPO")

filed pursuant to the Court's instructions found at ECF No. 157, Section II(b)(6), state as follows:

**(a)** **Jurisdiction**. The Plaintiffs have set forth the basis of this Court's jurisdiction in this matter in their First Amended Complaint ("FAC," Dkt. 48) at paragraphs 2-4. Plaintiffs aver jurisdiction under 28 USC §§ 1331, 1343 and 1367. This Court's jurisdiction is not in dispute.

**(b)** **Trial.** This shall be a jury trial. Plaintiffs estimate that they will require at least four (4) full days to present all witnesses and evidence, including a reading or other presentation of the Bazzi Deposition (discussed below). Defendants estimate that they will need at least four (4) full days to present all witness and evidence in its defense, and accordingly, the litigants jointly, and including jury selection and instructions, estimate between eight to ten full days of trial.

**(c)** **Statement of Claims and Defenses (Per Docket 157, Paragraph (1)(B)(6), starting at PageID6160.** After the summary judgment ruling (Dkt. 148) the following counts of the FAC survive to be tried by a jury:

**1.** Violation of Michigan Whistleblower's Protection Act, MCL 15.361. Count II, FAC [ECF No. 48, PageID.741]. This cause of action survived summary judgment as to all Plaintiffs.

a. Elements of Whistleblower action. Plaintiffs must demonstrate (1) engagement by the Plaintiffs in protected activity, (2) an adverse action that Defendants took against Plaintiffs, (3) a causation or link

between the Defendants' actions and the Plaintiffs' protected activity. *Wurtz v. Beecher Metro. Dist.*, 495 Mich. 242, 250-52 (2014). A fourth (4) *de facto* element is that the Plaintiffs must demonstrate that any justification that Defendants subsequently offer for their adverse actions is pretextual in nature. *DeBrow v Century 21 Great Lakes, Inc.*, 463 Mich. 534, 537-538 (2001).

b. Facts alleged to support Plaintiffs' claims: The facts alleged supporting Plaintiffs' Whistleblower claims are effectively the same as those supporting its First Amendment/Retaliation claims. Upon joining the DHPD, Plaintiffs discovered and publicly exposed a culture of corruption and inefficiency. Plaintiffs can testify as to all of the following problems: a "golden circle" of coin-carrying cronies who received favored treatment not based on seniority or merit; Ticket-fixing schemes; Routine interference with traffic enforcement stops by City Council members; Retired officers taking automatic weapons with them into retirement; Illegal traffic ticket quotas as a condition to overtime receipt; Failures to register firearms; and Drugs and cash going missing or being borrowed from the evidence room. Plaintiffs will testify to the abuse and retaliation to which they were exposed from making public these criticisms, in part because they were whistleblowers and in part for being non-Arabs.

c. Elements of Defense: "Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin*, 493 Mich. at 176 (citing *Hazle v. Ford Motor Co,*, 464 Mich. 456, 462, 628 N.W.2d 515, 520 (2001)). To be actionable, an employment action must be materially adverse to the employee-that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. *Chen v Wayne State University*, 284 Mich App 172, 201; 771 NW2d 820 (2009), citing *Meyer v City of Centerline*, 242 Mich App 560, 569; 619 NW2d 182 (2000).

d. Facts Alleged to Support Defenses: Plaintiffs have failed to identify adverse employment actions against them. Plaintiffs were not demoted. Plaintiffs were not discharged. Plaintiffs were not suspended. Plaintiffs were not terminated. Plaintiffs' roles were *not* defunded or eliminated, as testified by Plaintiffs. In fact, Plaintiffs admit that their

paychecks never ceased and that they was able to continue to operate the functions of his job after the vote to defund occurred. Moreover any action taken by Defendants were due to legitimate business decisions and concerns. ECF No. 116-4, PageID 4838, ECF No. 116-5, pageID 4850-4850.

e. Plaintiffs' calculation of damages: Plaintiffs attach at **Exhibit 1** a spreadsheet calculation for each of the three Plaintiffs setting forth comprehensive damages, including contractual damages, back pay, front pay, and other itemized amounts. A court, in rendering a judgment in an action brought pursuant to this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, or any combination of these remedies. A court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate. MCL 15.364. Michigan courts also have considered front pay awards in Whistleblower actions. In *Riethmiller v Blue Cross & Blue Shield of Michigan*, 151 Mich. App. 188, 201; 390 N.W.2d 227 (1986), the Court of Appeals wisely warned that front pay represents "the possibility of substantial monetary liability for some employers." *Riethmiller* also enumerated relevant considerations in the determination whether to award front pay including: "(1) whether reinstatement would be a feasible remedy, (2) the employee's prospects for other employment, and (3) the number of years remaining before the employee would be faced with mandatory retirement." 151 Mich. App. at 200-201.

f. Defendants' calculation of damages <u>$0.00</u>

**2.** Breach of Employment Contracts. This cause of action survived summary judgment as to all Plaintiffs. Count IV, FAC (ECF No. 48, PageID.744].

a. Elements of breach of contract action: Under Michigan law, Plaintiffs must demonstrate (1) the existence of an enforceable contract, (2) nonperformance amounting to breach of contract, and (3) damages suffered by the non-breaching party as a result of the breach. *Lossia v.*

*Flagstar Bancorp, Inc.*, 895 F.3d 423 (6th Cir. 2018)(*citing Miller-Davis Co. v. Ahrens Constr., Inc.*, 296 Mich. App. 56, 817 N.W.2d 609, 619 (Mich. Ct. App. Jan 28, 2010).

b. Facts alleged to support Plaintiffs' claims: Primary Defendant "does not contest" the existence of contracts. See Answer, ECF No. 54, at ¶¶ 80-86, PageID.925-926. Evidence as to breach is also clear, including the public statements made by Gary Miotke and Mayor Baydoun to the Detroit News on January 12, 2026 "*Dearborn Heights City Council voids severance agreements with appointees*." *See* ECF 123-1. In his deposition, Mayor Bazzi authenticated the contracts and admitted to signing them in his capacity as Mayor. The litigants' major remaining dispute concerning the contracts is whether they are enforceable such that breach is excused. In its Answer, the Primary Defendant has stated that it "does not contest" that the employment of Swope and Vanderplow was made pursuant to a City Council ratification of a collective bargaining agreement under the Michigan Public Employment Relations Act (PERA). See ECF No. 54 at ¶¶ 18-19, PageID. 904-905. Plaintiffs through their testimony can prove that the contracts were made pursuant to PERA and provide data as to their damages. See also, Exhibit 1 hereto.

c. Elements of Defense: A constructive discharge occurs when an employer intentionally makes an employee's working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Easter v. Jeep Corp., 750 F.2d 520, 522-23 (6th Cir. 1984). In determining if a claim exists, an employee's perception of his/her situation is judged objectively. Henry v. Lennox Industries, Inc., 768 F.2d 746, 752, n.3 (6th Cir. 1985). Therefore, a viable claim for constructive discharge arises only when a reasonable person would find the subject conditions "intolerable." *Id.* Matters pertaining to breaches of contract, that are "covered" by a CBA that includes a grievance procedure with final and binding arbitration, the resolution of the dispute is governed by the contract, and no PERA issue is presented. *Port Huron Educ. Ass'n MEA/NEA v. Port Huron Area Sch. Dist.*, 452 Mich. 309 (1996).

d. Facts Alleged to Support Defenses: Hart admits that he submitted his request to leave his position with the City. While Hart makes

the unsubstantiated claim that the Council constitutionally terminated him, he admits that there was no memorandum or resolution from the Council seeking to terminate him. *ECF No. 116-3, PageID 4830*. Hart admits that he and his family continued to receive health insurance benefits from the City as well as funds amounting to his regular pay. *ECF No. 116-3, PageID 4814*. Vanderplow and Swope fail to assert any claim for breach of contract. While they vaguely claim that the terms of the contract were breached. Vanderplow and Swope, as established above, admitted that not only did they never not receive their pay, they continued to receive benefit, received pay raises and were able to continue to operate in their positions. Plaintiffs' assertion that they are governed by a CBA, they have failed to exhaust their administrative remedies and assert the three-part grievance process as required under the CBA at issue which states that should the issue not be resolved through the grievance process, the CBA, which Plaintiffs argue governs here, at the very least, is subject to arbitration. Further, if the dispute implicates statutory rights under PERA, such as the obligation to bargain in good faith, the MERC has jurisdiction. *Kent County Education Asso. v. Cedar Springs Public Schools*, 157 Mich. App. 59 (1987)

e. Plaintiffs' calculation of damages: Plaintiffs attach at **Exhibit 1** a spreadsheet calculation for each of the three Plaintiffs setting forth comprehensive damages, including contractual damages, back pay, front pay, and other itemized amounts. "A breach of contract claim is a state law claim." *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407 (6th Cir. 2024). "Where state law claims come before a federal court on supplemental jurisdiction," as they did here, "the award of prejudgment interest rests on state law." *Mills v. River Terminal Ry. Co.*, 276 F.3d 222, 228 (6th Cir. 2002) (citing *Stallworth v. City of Cleveland*, 893 F.2d 830, 834-35 (6th Cir. 1990)); accord *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 692 n.13 (2d Cir. 1983) ("Because the applicability of state law depends on the nature of the issue before the federal court and not on the basis for its jurisdiction, state law applies to questions of prejudgment interest on . . . pendent [state-law] claims.") (citations omitted). In Michigan, prejudgment interest is not discretionary as the statute provides in relevant part that "interest on a money judgment recovered in a civil action shall be calculated . . . from the date of filing the complaint" and "shall be calculated on the entire amount of the money

judgment, including attorney fees and other costs." MCL 600.6013(8). Interest calculations are as yet not possible pending the outcome of the case.

f. Defendant's calculation of damages: $0.00.

**3.** Violation of Title VII of the Civil Rights Act of 1964. Count V, FAC (ECF No. 48, PageID.745]. This cause of action survived summary judgment as to Plaintiffs Swope and Vanderplow but not Hart.

a. Title VII Theory 1--Disparate Treatment—Elements. To demonstrate a violation of Title VII under a theory of disparate treatment, Plaintiffs Swope and Vanderplow must show that (1) Defendant City constructively discharged the Plaintiffs or otherwise subjected them to disadvantageous treatment concerning their compensation, terms, conditions, or privileges of employment, (2) the Defendant's actions caused the Plaintiff some harm with respect to an identifiable term or condition of employment, and (3) the Plaintiffs' race was a determinative factor in Defendant's decision to take that action. Essentially, Plaintiffs must prove intentional racial discrimination.

b. Title VII Alternative Theory 2—Mixed Motive—(lesser included theory to Disparate Treatment—Elements). To demonstrate a violation of Title VII under a theory of mixed motive, Plaintiffs Swope and Vanderplow must show that (1) Defendant City constructively discharged the Plaintiffs or otherwise subjected them to disadvantageous treatment concerning his compensation, terms, conditions, or privileges of employment, (2) the Defendant's actions caused the Plaintiff some harm with respect to an identifiable term or condition of employment, and (3) that Plaintiffs' race was a motivating factor in Defendant's decision to take the challenged action.

c. Title VII Alternative Theory 3—Hostile Work Environment—Elements. To demonstrate a violation of Title VII under a theory of hostile work environment, Plaintiffs Swope and Vanderplow must show that (1) while employed by Defendant, the Plaintiff was subjected to

harassment, (2) the harassment was unwelcome, (3) the harassment was because of Plaintiffs' race, (4) the harassment was sufficiently severe or pervasive that a reasonable person in the Plaintiffs' position would find the work environment hostile or abusive, (5) Plaintiff believed his work environment to be hostile or abusive as a result of Defendant's conduct, and (6) the City is "legally responsible" for the harassment.

d. Facts alleged to support all of Plaintiffs' claims of race discrimination: Plaintiffs can testify as to the racial hostility and discrimination they faced for refusing to promote an under deserving Arab-American police officer, Sergeant Bazzy, who had failed the MCOLES test to be even a lieutenant. Plaintiffs can testify as to Arab-only meeting(s) to which they were not invited. They can testify as to being in meetings in which a local power broker (Kahil Rahal) told Mayor Bazzi that he would lose the next election without an Arab American Police Chief to replace Hart. The testimony will show that an inexperienced detective from Romulus (Hussein Farhat) was then hired by Mayor Bazzi and promoted within months to Interim Police Chief, skipping the ranks of Sergeant, Lieutenant, and Captain (and in violation of the very Act-78 protocols that the City Council claimed to be upholding when they defunded Swope and Vanderplow – but this time with the City Council applauding rather than defunding). Swope can testify that he was asked to resign to allow the inexperienced-but-Arab Romulus Detective Farhat to become Police Chief. Swope was directly present and witnessed the events directly subsequent to the swearing in of Hussein Farhat, which became an overt celebration of Farhat's racial identity. Vanderplow can testify that while Interim Chief, Farhat targeted Vanderplow for retaliation. Vanderplow can testify that he was not allowed to become comptroller when his ability to sign City checks was blocked by the City Council, only to then be replaced by a less experienced Arab-American, Mahdi Baydoun.

All three Plaintiffs allege that City Council members leaked sensitive City information to outsiders, and orchestrated a group of citizens to harass the Plaintiffs at City Council meetings and challenge all reform actions taken by the Plaintiffs under the guise of being concerned citizens. In fact, such concerned citizens were mere foils used by the City Council to harass Plaintiffs and parroted talking points prepared by Baydoun and his agents. Several of such same "concerned citizens" now work for Mayor Baydoun's government, have been given high salaries, and now support his "reform"

policies. Baydoun's reform policies are similar or identical to the very same policies such concerned citizens vociferously opposed when first proposed by Plaintiffs. Plaintiffs allege that Baydoun has effectively copied many of their reform policies after first sabotaging the Plaintiffs when they tried to first implement those policies themselves.

Hart states that he was told at the end of his employment that he just could not speak to the Arab community for reasons unexplained except by race. Vanderplow can testify as to being defamed in City Council meetings, and how he was treated in a manner that the City's own attorney, Attorney Farinha (himself Arab-American), criticized as lacking due process. Documentary evidence includes City Councilman Saab writing public statements that the Dearborn Police Chief needed to be "from the community," and Mayor Bazzi testified that "from the community" was a coded phrase for Arab-American. [Bazzi Dep., ECF 123-2, 76:24 to 77:5]. All three plaintiffs faced a campaign of harassment that was partially motivated by race, and all were constructively terminated, consistent with the documentary evidence that Plaintiffs will seek to admit at trial.

In his deposition, Mayor Bazzi, the executive officer for the City of Dearborn Heights, admitted that the Plaintiffs Swope and Vanderplow were not treated fairly. [Bazzi Dep., ECF 123-2, 102:4-10; 104: 13-19]. Bazzi himself testified that he felt pressure to promote Arab-American officers simply due to their race. [Bazzi Dep. 74: 3-9]. Mayor Bazzi, the Plaintiffs' direct supervisor and the City's commanding law enforcement officer, testified that he was pleased with the Plaintiffs' job performance and had no reason to discipline them. [Bazzi dep., ECF 123-2, (Hart: 112:12 to 113:5), (Vanderplow: 113:11 to 114:1), and (Swope: 114: 8-23)].

Othman and Hernandez can similarly testify to a climate of racial harassment and intimidation within the government of the City of Dearborn Heights.

e. Elements of Defense: To establish a claim of discrimination, a plaintiff must prove that they were treated differently than a similarly situated employee outside of their class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). To be properly comparable, the individuals "must have dealt with the same supervisor, have been subject to the same

standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct of the employer's treatment of them for it." *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir. 1988) Failure to provide evidence regarding the alleged comparator's "position, job responsibilities, years of experience, length of tenure [ ], or disciplinary history" is fatal to Plaintiffs' prima face case of discrimination. *Fuelling v. New Vision Med. Labs. LLC*, 284 F. App'x 247, 255 (6th Cir. 2008) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004)).

f. Facts Alleged to Support Defenses: Here, Plaintiff to not even attempt to provide comparators, but only assert that requests for preferential treatment were made on behalf of Arab employees. Plaintiffs claims of demands for an officer of middle eastern descent to be promoted to chief has been dispelled ECF 116-12 PageID No 4895-4896, as well as the unfounded assertion that *Arab -only* meetings took place in the City. ECF No 116-13, PageID No 4901-4902. Moreover, The City Council, at all time relevant to the Plaintiffs' employment, was comprised of a majority of the same racial group as the Plaintiffs (white male/female). At no point relevant to this case was the City Council comprised of a majority of Arab Americans, meaning that said Arab Americans could have never exerted their will as a voting majority to retaliate against or make racially motivated decisions against Plaintiffs. Further, no individual City Council member has ever had any hiring or firing authority over any position within the City of Dearborn Heights, or the Police Department and no private citizen has ever had any hiring or firing authority over any position within the City of Dearborn Heights, or the Police Department.

g. Plaintiffs' calculation of damages: Plaintiffs attach at **Exhibit 1** a spreadsheet calculation for each of the three Plaintiffs setting forth comprehensive damages, including contractual damages, back pay, front pay, and other itemized amounts. The Title VII plaintiff bears the burden of proving damages with "reasonable certainty," see *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983) (citing *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 314-16 (6th Cir. 1975)). But "back pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case." *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) (quoting *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 880 (6th Cir. 1991)). Generally, back

pay is calculated by subtracting "the amount that the plaintiff actually earned while being discriminated against [from] the amount that the plaintiff would have earned if no discrimination had occurred." *Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 821 (6th Cir.), *cert. denied*, 137 S. Ct. 198, 196 L. Ed. 2d 128 (2016)).

Front pay is also contemplated. Courts generally award front pay when reinstatement is inappropriate or infeasible. *Schwartz v. Gregori*, 45 F.3d 1017, 1022 (6th Cir.), *cert. denied*, 133 L. Ed. 2d 36, 116 S. Ct. 77 (1995). Thus, the remedies of reinstatement and front pay are alternative, rather than cumulative. See *Id*. Determination of when to award front pay is within the discretion of the trial court, and such awards are reviewed under the abuse of discretion standard. *Id*. Title VII claimants have a duty to mitigate an award of front pay. *Shore v. Federal Express Corp.*, 42 F.3d 373, 378 (6th Cir. 1994).

h. Defendant's calculation of damages <u>$0.00.</u>

**4.** Violation of Michigan Elliot-Larsen Civil Rights Act ("ELCRA").

a. ELCRA had the same elements as a federal Title VII action and follows the same analytical algorithm. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014)("The prima facie requirements for a discrimination case are the same under Michigan law and federal law."). As such, the parties incorporate herein by reference their discussion of the Title VII action, above.

b. Facts alleged to support Plaintiffs' claims: *See* facts pertaining to Title VII.

c. Elements of Defense: To establish a prima facie failure-to-accommodate claim, Plaintiff Hart must show that (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position, with or without reasonable accommodation; (3) Defendants knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Defendants failed to provide the necessary accommodation. *Brumley v. UPS*,

909 F.3d 834, 839 (6th Cir. 2018) (citing *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016) (citing *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 579 (4th Cir. 2015)); *see also Blanchet*, 27 F.4th at 1228. To establish a discrimination claim under the ADA, outside the specific context of accommodations, a plaintiff must also show that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and that he suffered an adverse employment decision because of his disability. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013) (citing *Gilday v. Mecosta Cnty.*, 124 F.3d 760, 762 (6th Cir. 1997); 42 U.S.C. § 12111(8)).

d. Facts Alleged to Support Defenses: Courts consider a variety of other tests concerning reasonable accommodations. *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). However, here, Harts has failed to an accommodation, that it was reasonable, and that it was unreasonably denied. If there is no accommodation request to consider, there can be no analysis as to the reasonableness of Defendants' actions related to effecting or denying that request. Further, no individual City Council member has ever had any hiring or firing authority over any position within the City of Dearborn Heights, or the Police Department and no private citizen has ever had any hiring or firing authority over any position within the City of Dearborn Heights, or the Police Department.

e. Plaintiffs' calculation of damages: Plaintiffs attach at **Exhibit 1** a spreadsheet calculation for each of the three Plaintiffs setting forth comprehensive damages, including contractual damages, back pay, front pay, and other itemized amounts.

f. Defendant's calculation of damages <u>$0.00.</u>

**(d) Lay Witnesses**

a. Plaintiffs' Lay Witnesses shall include the following, reserving the right to call additional witnesses on rebuttal:

i. Jerrod Hart (Plaintiff). Hart will testify as to the history of his police career and why he chose to join the DHPD. Hart will testify to his experiences as the Police Chief of Dearborn Heights, and the discrimination and racial retaliation that he faced for attempting to reform the department. He will describe how he was hired, and how Swope and Vanderplow came to be recruited and hired. He will testify as to the state of the DHPD when he started his job, and what he tried to do to reform it. Hart will testify as to the various episodes and incidents generally described in the First Amended Complaint, specifically involving Sergeant Bazzy, Khalil Rahal and Mo Baydoun. He will speak as to why and how he was constructively terminated and the toll that discharge has taken on him. He will speak to what his damages are.

ii. Kevin Swope (Plaintiff). Kevin Swope will testify as to the same subjects as Hart generally. In addition, Swope will testify in detail as to his tenure as Police Chief after Hart was terminated, and how he came to be replaced by Hussein Farhat. Swope will testify as to how and why he was asked to resign by Mayor Bazzi, and the arrangements that Swope had with Bazzi with respect to such resignation. Swope will testify as to his reasons for seeking future possible replacement employment before being asked to resign by Mayor Bazzi.

iii. Paul Vanderplow (Plaintiff). Paul Vanderplow will testify as to the same subjects as Swope and Hart generally. In addition, he will testify as to various incidents in which he was targeted for attempting to do his job. These would include his investigation of the unauthorized installation of lighting at the Dearborn Heights Justice Center, also called the "IB Electric" affair. Vanderplow will also testify as to his interaction with Hussein Farhat, and the treatment, abuse, and defamation that he suffered at the hands of the City Council,

including the unprecedented reading into the public record of unfounded allegations made against him for the sole purpose of embarrassing him. Vanderplow can describe and testify as to the so-called "stalking incident" that became the subject of ECF No. 24. Vanderplow will also testify as to his experiences attempting to serve as City Comptroller. He will testify as to how and when he came to be constructively terminated and his damages.

iv. Mayor Bill Bazzi (deposed in this matter, via 32(a)(3) deposition transcript). Plaintiffs will seek introduction of the Bazzi Deposition as affirmative evidence. The deposition transcript speaks for itself and is part of the record at ECF. No. 123-2.

v. Roger Farinha. Roger Farinha was Corporate Counsel to the City of Dearborn Heights during most of the time relevant to the First Amended Complaint. In his capacity as a fact witness he can testify or corroborate the testimony of the Plaintiffs with respect to events that he directly witnessed.

vi. Mariana Hernandez (deposed in this matter, known to both parties). Mariana Hernandez can testify as to budgetary matters and the ability of Mayor Bazzi to hire Directors Swope and Vanderplow under the then-existing budget. She may also testify as to the climate of racial favoritism prevalent inside the Dearborn Heights city government.

vii. Ash Othman (deposed in this matter, known to both parties). Ash Othman can testify as to the same matters as Hernandez, and in addition has first-hand knowledge of the stalking incident and of Councilman Hassan Saab's attempts to tamper with her testimony concerning that incident.

viii. Plaintiffs reserve the right to call any witness called by the Defendants

ix. Rebuttal witnesses, as required

b. Defendants' Lay Witnesses shall include

i. Mayor Mo Beydoun. Will testify concerning his personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through his service as Chair of the Dearborn Heights City Council, his

tenure as Mayor of the City of Dearborn Heights, and his long-standing residency in the City. Specifically, Mayor Baydoun will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to his decisions on certain votes, particularly related to Resolution 11-A. Mayor Baydoun will testify to his understanding the budgetary requirements and how it affects the City at large as well as the Police Department. His testimony will also include his understanding of the culture of the Police Department while Plaintiffs were employed with the City.

ii. Hassan Saab. Will testify concerning his personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through his service as a member of the City Council and his long-standing residency in the City. Specifically, Mr. Saab will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to his decisions on certain votes, particularly related to Resolution 11-A. Mr. Saab will testify to his understanding the budgetary requirements and how it affects the City at large as well as the Police Department. His testimony will also include his understanding of the culture of the Police Department while Plaintiffs were employed with the City.

iii. Lisa Hicks-Clayton. Will testify concerning her personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through her service as Treasurer of the City of Dearborn Heights as well as co-workers with the Plaintiffs. Ms. Clayton Hicks will testify as to her working relationship with the Plaintiffs, specifically Plaintiff Vanderplow. She will also discuss the challenges placed on the City administration due to Plaintiff Vanderplow's actions and behaviors.

iv. Thomas Wencel. Will testify concerning his personal knowledge of the facts and circumstances underlying the

claims and defenses in this matter, acquired through his service as a member of the City Council and his long-standing residency in the City. Specifically, Mr. Wencel will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to his decisions on certain votes, particularly related to Resolution 11-A. Mr. Wencel will testify to his understanding the budgetary requirements and how it affects the City at large as well as the Police Department. His testimony will also include his understanding of the culture of the Police Department while Plaintiffs were employed with the City.

v. Denise Maxwell Malinowski. Will testify concerning her personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through her service as a member of the City Council and his long-standing residency in the City. Specifically, Ms. Maxwell Malinowski will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to her decisions on certain votes, particularly related to Resolution 11-A. Ms. Maxwelll-Malinowski will testify to her understanding the budgetary requirements and how it affects the City at large as well as the Police Department. Her testimony will also include her understanding of the culture of the Police Department while Plaintiffs were employed with the City.

vi. Nancy Bryer. Will testify concerning her personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through her service as a member of the City Council and her residency in the City. Specifically, Ms. Bryer will testify as to her understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. She will further testify as to her decisions on certain votes, particularly related to Resolution 11-A. Ms. Bryer will testify to her understanding the budgetary requirements and how it affects

the City at large as well as the Police Department. Her testimony will also include her understanding of the culture of the Police Department while Plaintiffs were employed with the City.

vii. Robert Constan. Will testify concerning his personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through his service as a member of the City Council and his long-standing residency in the City. Specifically, Mr. Constan will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to his decisions on certain votes, particularly related to Resolution 11-A. Mr. Constan will testify to his understanding the budgetary requirements and how it affects the City at large as well as the Police Department. His testimony will also include his understanding of the culture of the Police Department while Plaintiffs were employed with the City.

viii. Mahdi Beydoun. Will testify concerning his personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through his service as current Comptroller of the City of Dearborn Heights as well as co-workers with the Plaintiffs. Specifically, Mahdi Beydoun will discuss his background, accomplishments and role with City, including his work in finance and the comptroller's office which qualifies his for his position. Mr. Beydoun will testify as to his working relationship with the Plaintiffs, specifically Plaintiff Vanderplow. He will also discuss the challenges placed on the City administration due to Plaintiff Vanderplow's actions and behaviors.

ix. Khalil Rahal. Will testify concerning his relationship with the City of Dearborn Heights. He will also testify as to the powers, or lack therefore, to make decision in the City related to government affairs, and employment matters. Mr. Rahal

will testify as to any meetings that he held with elected officials within the City.

x. Chief Michael Guzowski. May testify as to his personal knowledge of matters within the Police Department. Specifically, he may testify to the culture within the Police Department, his promotion to Chief, as well as his working relationship with the Plaintiffs.

xi. Captain Shaun Pawlus. May testify as to his personal knowledge of matters within the Police Department. Specifically, he may testify to the culture within the Police Department, his promotion to Captain, as well as his working relationship with the Plaintiffs.

xii. Gary Miotke. Mr. Miotke served as counsel to to the City of Dearborn Heights prior to, during and after Plaintiffs' employment with the City. He is also a resident of the City. He will testify as to his knowledge surrounding facts of the claims made by Plaintiff as well as his firsthand knowledge of the actions of Plaintiffs.

xiii. Ray Muscat. Former City Council Member. May testify as to his personal knowledge of the facts and circumstances underlying the claims and defenses in this matter, acquired through her service as a member of the City Council and his residency in the City. Specifically, Mr. Muscat will testify as to his understanding of Act 78 and its application to the hiring and promotion processes within the Police Department. He will further testify as to his decisions on certain votes, particularly related to Resolution 11-A. and as to his understanding the budgetary requirements and how it affects the City at large. His testimony will also include his understanding of the culture of the Police Department while Plaintiffs were employed with the City.

xiv. Defendants reserve the right to call Rebuttal witnesses as necessary

xv. Defendants reserve the right to call any witness called by the Plaintiffs

**(e) Expert Witnesses**

a. Plaintiffs' Experts. Plaintiffs shall not seek to introduce the testimony of any expert witness except as described below. All three of the Plaintiffs are highly experienced police and law enforcement officials with expert knowledge of law enforcement and law enforcement administration. Factual questions pertaining to such matters are within their direct personal experience in this case. To the extent any question involving police department administration, credentialing, organizational behavior or public policies pertaining to policing is deemed by the Court to require expert testimony then such party-witnesses would qualify as experts in those areas.

Similarly, Plaintiff Paul Vanderplow has prepared certain spreadsheets quantifying his losses and those of his fellow plaintiffs. His status as a party litigant and fact witness does not preclude him from offering expert testimony concerning matters within his specialized knowledge and expertise. The Sixth Circuit has expressly recognized that the Federal Rules of Evidence "distinguish between lay and expert testimony, not witnesses." *United States v. White*, 492 F.3d 380, 403 (6th Cir. 2007). Indeed, the Sixth Circuit has explained that "[i]n these instances, a witness becomes a dual witness—offering both lay and expert testimony." *United States v. Rahim*, No. 18-1172, slip op. at 13 (6th Cir. May 7, 2019). Similarly, the Advisory Committee Note to the 2010 amendment to Fed. R. Civ. P. 26(a)(2)(C) expressly recognizes that "[a] witness who is not required to provide a report under Rule

26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705."

Vanderplow possesses formal education in accounting and personally prepared spreadsheets itemizing and calculating the damages claimed by Plaintiffs. His knowledge of his own losses and those of his fellow plaintiffs is factual and personal in nature. However, should the Court deem his loss quantification to be expert in nature, his testimony concerning the preparation of those spreadsheets, the underlying financial records, the calculations performed, and the resulting damages is admissible to the extent it satisfies Fed. R. Evid. 701 or 702, as applicable. To the extent his testimony involves specialized accounting knowledge beyond the scope of permissible lay opinion, his status as a plaintiff and fact witness does not disqualify him from offering expert testimony, provided that the requirements of Fed. R. Evid. 702 and the applicable expert-disclosure provisions of Fed. R. Civ. P. 26(a)(2) have been satisfied. Any interest Vanderplow has in the outcome of this litigation is properly addressed through cross-examination and the jury's assessment of credibility, rather than categorical exclusion of his testimony.

Plaintiff makes these statements out of an abundance of caution. In point of fact, the use of spreadsheets in 2026 to tally losses using basic 6th-grade arithmetic skills does not require highly specialized knowledge requiring an expert witness and is well within Vanderplow's accounting and mathematical skills. None of the Plaintiffs are "retained" expert witnesses and all have been disclosed as witnesses and then deposed by Defendants, including about their alleged damages.

b. Defendants' Experts: None by Defendants. Further, Defendants object to the use of any of Plaintiffs' testimonies as expert testimony.

**(f) All Witnesses.**

a. Plaintiffs' lay witnesses are all parties in interest, or have been disclosed on previous witness lists by role or by name, or have been named in amended initial disclosures, the last such disclosure having been sent on September 3, 2025. In addition, all of Plaintiffs' witnesses with the exception of Roger Farinha have been deposed in discovery.
b. Defendants' lay witnesses have been identified through witness lists and initial disclosures.

**(g) Depositions.** The only outstanding issue with respect to the use of depositions at trial is that of the deposition transcript (and all deposition exhibits) of Mayor Bill Bazzi, which was taken on August 29, 2025. Bazzi is now U.S. Ambassador to Tunisia. Plaintiffs seek to use this transcript as affirmative evidence under FRCP 32(a)(3), 32(a)(4) and FRE 801(d)(2). This evidentiary dispute has now been effectively briefed twice. The first time in Plaintiffs' Motion in Limine seeking admission the deposition and in the Defendants' response in opposition. [ECF Nos. 135, 141]. The Second time in the Defendants' Motion in Limine to exclude the Bazzi deposition and in Plaintiffs' response in opposition. [ECF Nos. 137,144]. As discussed below, oral argument took place on this subject on July 1, 2026. See section on open issues, below.

Other depositions may be used for witness impeachment, consistent with the Federal Rules of Evidence 613 and 801(d).

**(h) Exhibits.** The parties have, consistent with this Court's instructions exchanged proposed exhibits. To avoid the inherent clumsiness and unworkability of using letters to delineate exhibits (e.g. Exhibits T, TT, TTT, etc), the parties have agreed to a numbering system in which Plaintiffs are assigned exhibit numbers 1-99, Primary Defendants are assigned exhibit numbers 100-199, and Intervening Defendants is assigned exhibit numbers 200 through 299. Plaintiffs have preliminarily offered 63 exhibits (numbers 1-63), the Primary Defendant 22 (Numbers 100-122) and the Intervening Defendant 44 (numbers 200-244).

Of the Plaintiff's exhibits, three are offered to summarize and explain the Plaintiffs' quantification of damages and shall be offered into evidence consistent with Federal Rule of Evidence (FRE) 1006. If this Court rejects the use of such exhibits as affirmative evidence, then the exhibits will be offered as demonstrative exhibits. These three proposed trial exhibit lists, or close variations on them, are attached hereto as **Exhibit 2.**

THIS ISSUE IS STILL PENDING OBJECTIONS

## (i) Evidentiary Issues and other Open Pre-trial Issues

A list of outstanding evidentiary disputes to be adjudicated or other rulings that the litigants will look to the Court to provide before trial can begin is as follows:

a. All three Motions in Limine (MIL) remain open and undecided, except that the Court addressed the use of the Mayor Bazzi deposition in June and July of 2026 (discussed below):
    i. Plaintiff's MIL, Dkt. 135, opposed by response found at Dkt. 141;
    ii. City's MIL, Dkt. 137, opposed by response found at Dkt. 144; and
    iii. City Council's MIL, Dkt. 139, opposed by response found at Dkt. 145

b. All three motions to reconsider filed by the respective parties
    i. Dkt. 149 (responses at Dkt's152, 153);
    ii. Dkt. 151 (response at Dkt. 154 and reply at 156); and
    iii. Dkt. 150 (response at Dkt. 154 and reply at 155

c. Use of the Mayor Bazzi Deposition. This is covered by Plaintiffs' MIL 135, and the City's MIL 137. Oral argument took place just on the subject of the use of the deposition under Federal Rule of Civil Procedure (FRCP). Oral argument took place on July 1, 2026, and Plaintiffs believe they prevailed in that argument. Defendants contest that appraisal. The Court thereafter asked the parties to confer on the matter and file a report setting forth all contested

excerpts of the transcript for use at trial. A three-hour conference took place on or about July 8, 2026, and the report is now found at Dkt. 147.

d. Status of City Council as litigant. City Council has made recent statements to the Court that it wishes to exit the case and cease being a separate litigant, in light of Plaintiffs' agreement that the injunction found at Dkt. # 4 can be dissolved or lifted. Plaintiffs have further expressed an agreement in principle to allow City Council to exit the case by stipulation, *provided that* the consequences of such a withdrawal do not prejudice the Plaintiffs or bestow tactical advantage on the City Council. That would mean, at a minimum, that (1) Plaintiffs' counsel may address all sitting and ex-members of the City Council who testify at trial as "hostile" witnesses for purposes of cross-examination, (2) an additional stipulation that all exhibits that City Council once listed as its future trial exhibits (**Exhibit 2**) are authentic and shall be stipulated as admissible into evidence at trial, (3) a waiver of all appeals and rights of appeal by the City Council, and (4) FRE Rule 801(d)(2) treatment stipulated to by the City for any out-of-court statement made by a member of City Council to date.

e. Authenticity and admissibility of trial exhibits, generally. Plaintiff submits that the nature of the documents proposed as trial exhibits by the litigants in this case are not susceptible to authenticity challenges made by reasonable people. Plaintiff therefore believes that the Court should admit all such exhibits into evidence, en masse, on motion of the parties or of Plaintiff alone. With limited time for testimony, the admission into evidence of proposed trial exhibits should be handled pretrial to streamline trial, with the onus on any party challenging the admission of a particular document to raise its objections pretrial. Documents should be assumed to be authentic/admissible unless proven to be inauthentic/admissible. Otherwise, a short week of trial will not allow time for the formal piece-meal moving into evidence of approximately 200 total exhibits. This would apply to all exhibits not otherwise the subject of a MIL or other objection.

f. Whether all trial exhibits offered by Plaintiffs to quantify an explain damages shall be admitted into evidence under FRE 1006 or will be allowed as demonstrative exhibits only.

g. Plaintiffs' Trial Brief. To be filed.

h. Defendants will submit trial briefs as required.

**(j)** Stipulations of Fact. Consistent with Local Rule 16.2(b)(4), the parties hereby stipulate as set forth in **Exhibit 3**. *[Work on stipulations is ongoing]*

***So Stipulated and Agreed,***

Respectfully submitted,

Dated: October 30, 2026

/s/ Stephen J. Brown
FAUSONE & GRYSKO PLC
Attorney for Plaintiffs
41700 Six Mile Road, Suite 101
Northville, MI 48168
(248) 380-0000; FAX (248) 380-343
jbrown@thefgfirm.law

/s/ Monica Hunt, with permission

THE ALLEN LAW GROUP
Attorney Monica Hunt (P68838)
Attorneys for the City of Dearborn Heights
3031 W. Grand Blvd.
Detroit, MI. 48202-3046
(313) 961-0200
mhunt@alglawpc.com

*[Mr. Turfe's signature withheld by agreement pending adjudication or stipulation as to ECF. No. 158]*

HAMMOUD, DAKLALLAH & ASSOCIATES, PLLC
Kassem Dakhlallah (P70842)
Tarik D. Turfe (P83690)
Attorneys for Intervening Defendant Dearborn Heights City Council
6050 Greenfield Rd, Ste 201
Dearborn, Michigan 48126
(313) 551-3038
tt@hdalawgroup.com

**SO ORDERED,**

**Dated: November__, 2026**

**Detroit, Michigan**

______________________________
**MARK A. GOLDSMITH**
**United States District Judge**

# EXHIBIT 1

## SETTLEMENT OPERATION PLAN - 26-1028

| | | BASE OF CLAIM - CONTRACTUAL | | | BASE OF CLAIM - TRIAL | | |
|---|---|---|---|---|---|---|---|
| | | HART | SWOPE | VANDERPLOW | HART | SWOPE | VANDERPLOW |
| ***Base Contract*** | | | | | | | |
| *1* | Damages from failure to pay contract services | $53,401 | $126,600 | $210,961 | $53,401 | $126,600 | $210,961 |
| ***Items due per contract*** | | | | | | | |
| *2* | Vacation Pay | $66,063 | $35,670 | $61,046 | $66,063 | $35,670 | $61,046 |
| *3* | Personal Day Pay | $9,807 | $6,356 | $6,356 | $9,807 | $6,356 | $6,356 |
| *4* | Sick Pay | $32,691 | $17,531 | $25,425 | $32,691 | $17,531 | $25,425 |
| *5* | Holiday Pay | $33,682 | $16,838 | $34,911 | $33,682 | $16,838 | $34,911 |
| *6* | Uniform Allowance | $11,063 | $5,064 | $10,500 | $11,063 | $5,064 | $10,500 |
| *7* | MCOLES Allowance | $6,000 | $3,000 | $3,000 | $6,000 | $3,000 | $3,000 |
| *8* | Health Benefit Allowance | $14,400 | $5,000 | $10,000 | $14,400 | $5,000 | $10,000 |
| *9* | Vehicle Allowance (Through 2026) | $12,000 | $12,000 | $24,000 | $12,000 | $12,000 | $24,000 |
| *10* | Academy Allowance | $0 | $0 | $11,000 | $0 | $0 | $11,000 |
| *11* | Education Benefit | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 |
| *12* | ***SUBTOTAL (Category) - Lines 2-11*** | ***$200,706*** | ***$116,459*** | ***$201,237*** | ***$200,706*** | ***$116,459*** | ***$201,237*** |
| *13* | ***SUBTOTAL - Lines 1-11*** | ***$254,107*** (1) (2) | ***$243,059*** (1) (2) (6) (12) | ***$412,198*** (1) (2) (6) (12) | ***$254,107*** (1) (2) | ***$243,059*** (1) (2) (6) (12) | ***$412,198*** (1) (2) (6) (12) |
| ***Claimed Amounts*** | | | | | | | |
| *14* | Total Lost Earnings Damages (2027-2036) | $0 | $0 | $0 | $315,853 (3) (7) (17) | $269,320 (3) (7) (13) (17) | $1,008,532 (3) (7) (13) (17) |
| *15* | Emotional Distress | $0 | $0 | $0 | $1,000,000 (4) | $1,000,000 (4) (8) (14) | $1,000,000 (4) (8) (14) |
| *16* | ***SUBTOTAL (Category) - Lines 14-15*** | ***$0*** | ***$0*** | ***$0*** | ***$1,315,853*** | ***$1,269,320*** | ***$2,008,532*** |
| | ***Total - Individual Plaintiff - Lines 13 & 16*** | ***$254,107*** | ***$243,059*** | ***$412,198*** | ***$1,569,960*** | ***$1,512,379*** | ***$2,420,731*** |
| | ***Total - All Plaintiffs*** | | ***$909,364*** | | | ***$5,503,070*** | |

| | |
|---|---|
| (5) (10) (13) | *Plus attorney's fees and costs to be determined by the Court, currently estimated at approximately $600,000* |

| WHISTLEBLOWERS' PROTECTION ACT | | |
|---|---|---|
| **Hart, Swope, Vanderplow** | | |
| (1) | Lost Wages | *MCL 15.364. See also Morris v Clawson Tank Co, 459 Mich 256, 263–264; 587 NW2d 253 (1998)* |
| (2) | Lost fringe benefits and seniority | *MCL 15.364* |
| (3) | Front pay / future wage loss | *Riethmiller v Blue Cross & Blue Shield of Mich, 151 Mich App 188, 200–201; 390 NW2d 227 (1986).*<br>*See also Henry v City of Detroit, 234 Mich App 405, 416 (1999).* |
| (4) | Actual damages / emotional distress | *MCL 15.364; Phinney v Perlmutter, 222 Mich App 513, 559–560; 564 NW2d 532 (1997)* |
| (5) | Attorney fees, litigation costs, and witness fees | *MCL 15.364* |

| TITLE VII | | |
|---|---|---|
| **Swope & Vanderplow** | | |
| (6) | Back Pay | *Schwartz v Gregori, 45 F3d 1017, 1022 (6th Cir. 1995);*<br>*Shore v Federal Express Corp, 42 F3d 373, 378 (6th Cir. 194);*<br>*Fite v First Tenn Prod Credit Corp, 861 F2d 884, 893 (6th Cir. 1988)* |
| (7) | Front pay / future wage loss | *Schwartz v Gregori, 45 F3d 1017, 1022 (6th Cir. 1995);*<br>*Shore v Federal Express Corp, 42 F3d 373, 378 (6th Cir. 194);*<br>*Fite v First Tenn Prod Credit Corp, 861 F2d 884, 893 (6th Cir. 1988)* |
| (8) | Compensatory damages | *42 USC § 1981a(b)(3); Landgraf v. USI Film Prods., 511 U.S. 244, (1994)* |
| (9) | Prejudgment interest | *Loeffler v Frank, 486 US 549, 558 (1988);*<br>*EEOC v Wooster Brush Co, 727 F2d 566, 578 (6th Cir. 1984)* |
| (10) | Attorney fees and expert fees | *42 USC § 2000e-5(k)* |

| ELLIOTT-LARSEN CIVIL RIGHTS ACT | | |
|---|---|---|
| **Swope & Vanderplow** | | |
| (11) | Damages for injury or loss | *MCL 37.2801(1), (3)* |
| (12) | Back pay | *Schafke v Chrysler Corp, 147 Mich App 751, 754–755; 383 NW2d 141 (1985)* |
| (13) | Future wage loss / front pay | *Riethmiller, 151 Mich App at 200–201* |
| (14) | Emotional and other noneconomic damages | *Hyde v Univ of Mich Bd of Regents, 226 Mich App 511, 522–524; 575 NW2d 36 (1998)* |
| (15) | Attorney fees, costs, and witness fees | *MCL 37.2801(3); MCL 37.2802* |
| (16) | Prejudgment interest | *MCL 600.6013; Paulitch v Detroit Edison Co, 208 Mich App 656, 661–663; 528 NW2d 200 (1995)* |

| | |
|---|---|
| (17) | "Total Lost Earnings Damages" was computed utilizing a net computational method mitigating amounts realized or anticipated in other employment. |

# HART

Start of employment date: February 28, 2022
End of employment date: July 3, 2024
Contract End Date: June 30, 2026

| AGE | CY | NOTE | What I actually made or expect to make | What I would have made had I not been wrongfully fired by DH | Difference = back pay or front pay, damages | |
|---|---|---|---|---|---|---|
| 54 | 2022 | | $90,594.00 | $90,594.00 | $0.00 | |
| 55 | 2023 | | $103,863.00 | $103,863.00 | $0.00 | |
| 56 | 2024 | *(1)* | $135,570.00 | $135,570.00 | $0.00 | |
| 57 | 2025 | *(2)* | $111,785.00 | $138,288.00 | ($26,503.00) | |
| 58 | 2026 | *(3)* | $44,000.00 | $70,898.00 | ($26,898.00) | ***($53,401.00)*** |
| 59 | 2027 | *(4) (5)* | $90,000.00 | $141,053.76 | ($51,053.76) | |
| 60 | 2028 | | $94,500.00 | $143,874.84 | ($49,374.84) | |
| 61 | 2029 | | $99,225.00 | $146,752.33 | ($47,527.33) | |
| 62 | 2030 | | $104,186.25 | $149,687.38 | ($45,501.13) | |
| 63 | 2031 | | $109,395.56 | $152,681.13 | ($43,285.56) | |
| 64 | 2032 | | $114,865.34 | $155,734.75 | ($40,869.41) | |
| 65 | 2033 | *(6)* | $120,608.61 | $158,849.44 | ($38,240.84) | |
| | | | ***$1,218,592.76*** | ***$1,587,846.62*** | ***($369,253.86)*** | ***($315,852.86)*** |

| | |
|---|---|
| (1) | Terminated on or about 03-Jul-24. Received 12 months severence |
| (2) | Severence payout for 6 months from January 2025 to June 2025 |
| (3) | Contract was scheduled from July 1, 2023 until June 30, 2026 - therefore this is only a half year computation/consideration |
| (4) | It would stand to reason without the reputational damage by CoDH, follow on employment in the Metro Detroit area at or near a salary level pursuant to exp |
| (5) | Current salary increase was calculated at 5% to give the best possible consideration of salary disparity comparison. Assumption of 2% increase was used a |
| (6) | Retirement is predicted/planned for at age 65 |

# SWOPE

Start of employment date: 09-Jan-23
End of employment date: 10-Jan-25
Contract End Date: 30-Jun-26

| AGE | CY | NOTE | What I actually made or expect to make | What I would have made had I not been wrongfully fired by DH | Difference = back pay or front pay, damages | |
|---|---|---|---|---|---|---|
| 45 | 2023 | (1) | $99,607.15 | $99,607.15 | $0.00 | |
| 46 | 2024 | (2) | $156,736.29 | $156,736.29 | $0.00 | |
| 47 | 2025 | (3) | $92,317.04 | $126,600.00 | ($34,282.96) | *($34,282.96)* |
| 48 | 2026 | (4) (5) | $113,850.00 | $129,132.00 | ($15,282.00) | |
| 49 | 2027 | (6) | $119,542.50 | $131,714.64 | ($12,172.14) | |
| 50 | 2028 | | $125,519.63 | $134,348.93 | ($8,829.31) | |
| 51 | 2029 | (7) | $131,795.61 | $137,035.91 | ($5,240.31) | |
| 52 | 2030 | | $133,113.56 | $139,776.63 | ($6,663.07) | |
| 53 | 2031 | | $134,444.70 | $142,572.16 | ($8,127.46) | |
| 54 | 2032 | | $135,789.14 | $145,423.61 | ($9,634.46) | |
| 55 | 2033 | | $137,147.04 | $148,332.08 | ($11,185.04) | |
| 56 | 2034 | | $138,518.51 | $151,298.72 | ($12,780.21) | |
| 57 | 2035 | | $139,903.69 | $154,324.69 | ($14,421.00) | |
| 58 | 2036 | | $141,302.73 | $157,411.19 | ($16,108.46) | |
| 59 | 2037 | | $142,715.76 | $160,559.41 | ($17,843.66) | |
| 60 | 2038 | | $144,142.91 | $163,770.60 | ($19,627.69) | |
| 61 | 2039 | | $145,584.34 | $167,046.01 | ($21,461.67) | |
| 62 | 2040 | | $147,040.19 | $170,386.93 | ($23,346.75) | |
| 63 | 2041 | | $148,510.59 | $173,794.67 | ($25,284.08) | |
| 64 | 2042 | | $149,995.69 | $177,270.56 | ($27,274.87) | |
| 65 | 2043 | (8) | $151,495.65 | $180,815.97 | ($29,320.32) | *($269,320.49)* |
| | | | **$2,829,072.71** | **$3,147,958.16** | **($318,885.45)** | |

| | |
|---|---|
| (1) | Amount received documented in 2023 W2 |
| (2) | Amount received documented in 2024 W2. Also includes retroactive pay from 2023 |
| (3) | Amount scheduled to be paid as documented in "Kevin Swope Payout Calculation" dated 01/14/2025 by Cameron Eggly |
| (4) | It would stand to reason without the reputational damage by CoDH, follow on employment in the Metro Detroit area at or near a salary level pursuant to expe |
| (5) | Current salary increase was calculated at 5% to give the best possible consideration of salary disparity comparison. Assumption of 2% increase was used as |
| (6) | Realistic salary increase based on current contract is approximately 5%. Assumption of 2% increase was used as conservative mark as is standard in the inc |
| (7) | Based upon the industry it is unlikely the wage rate will increase past this level or at a de minimis rate. |
| (8) | Retirement is predicted/planned for at age 65 |

# VANDERPLOW

Start of employment date: 09-Jan-23
End of employment date: 09-May-25
Contract End Date: 01-Jan-27

| AGE | CY | NOTE | What I actually made or expect to make | What I would have made had I not been wrongfully fired by DH | Difference = back pay or front pay, damages | |
|---|---|---|---|---|---|---|
| 52 | 2023 | *(1)* | $96,607.16 | $96,607.16 | $0.00 | |
| 53 | 2024 | *(2)* | *$156,338.33* | *$117,220.00* | *$0.00* | |
| 54 | 2025 | *(3)* | $56,043.22 | $117,634.35 | ($61,591.13) | |
| 55 | 2026 | *(4)* | $48,000.00 | $134,446.70 | ($86,446.70) | ***($148,037.83)*** |
| | | | | | | |
| 56 | 2027 | *(5)* | $50,400.00 | $150,000.00 | ($99,600.00) | |
| 57 | 2028 | *(6)* | $52,920.00 | $153,000.00 | ($100,080.00) | |
| 58 | 2029 | | $55,566.00 | $156,060.00 | ($100,494.00) | |
| 59 | 2030 | | $58,344.30 | $159,181.20 | ($100,836.90) | |
| 60 | 2031 | | $61,261.52 | $162,364.82 | ($101,103.31) | |
| 61 | 2032 | | $64,324.59 | $165,612.12 | ($101,287.53) | |
| 62 | 2033 | | $67,540.82 | $168,924.36 | ($101,383.54) | |
| 63 | 2034 | | $70,917.86 | $172,302.85 | ($101,384.99) | |
| 64 | 2035 | | $74,463.75 | $175,748.91 | ($101,285.15) | |
| 65 | 2036 | *(7)* | $78,186.94 | $179,263.89 | ($101,076.94) | ***($1,008,532.37)*** |
| | | | $990,914.49 | $2,108,366.36 | ($1,156,570.20) | |

| | |
|---|---|
| (1) | Amount received documented in 2023 W2 |
| (2) | Amount received documented in 2024 W2. Also includes retroactive pay from 2023 |
| (3) | Amount received documented in 2025 W2. Also includes error in W2 that was never addressed in the amount of $2,299.31 |
| (4) | Number is a high estimate due to raise in pay and night differential as well as new contrat expected in 2026 by Kalkaska PD |
| (5) | It would stand to reason without the reputational damage by CoDH, follow on employment in the Metro Detroit area at or near a salary level pursuant to expe |
| (6) | Current salary increase was calculated at 5% to give the best possible consideration of salary disparity comparison. Assumption of 2% increase was used as |
| (7) | Retirement is predicted/planned for at age 65 |

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

KEVIN SWOPE, PAUL VANDERPLOW
JERROD HART,

Plaintiffs,

v

CITY OF DEARBORN HEIGHTS, a
Michigan Municipal Corporation,

Defendant,

CITY OF DEARBORN HEIGHTS CITY
COUNCIL, in its official capacity only,

Intervening Defendant.

Case No. 2:24-cv-10240
Hon. Mark A. Goldsmith
Magistrate David R. Grand

---

**The Parties' Joint Trial Exhibit List [Draft 6-23/26 12:02]**

- **<u>Plaintiffs' Exhibits found at Exhibits 1-99</u>**
- **<u>Exhibits offered by Primary Defendant start at Exhibit 100</u>**
- **<u>Exhibits offered by Intervening Defendant start at Exhibit 200</u>**
- **<u>All blank spaces in chart below indicate reserved exhibits</u>**

| Exhibit | Document Description & "Notes" | Bate Number or other Identifier | Subject to objection?<br><br>Basis of Objection? (E.g. authenticity, hearsay, relevance, etc.) | Admitted into Evidence or Stipulated to by the Parties?<br><br>"Admitted?" |
|---|---|---|---|---|
| 1. | (Second and Last) Hart Employment Contract dated 12/12/23, First Amended Complaint ("FAC") Exhibit 10 | ECF 48-2, PageID. 799-803 | | |
| 2. | All Materials pertaining to PERA (Public Employee Relations Act) hiring of SWOPE and Vanderplow, FAC, Exhibit 1 | ECF 48-2, PageID.761-765 | | |
| 3. | Email thread pertaining to Muscat resignation and to Hart FOIA requests and accusations, FAC Exhibit 3 | ECF 48-2, PageID. 769-772 | | |
| 4. | Hart's Whistle Blower letter of 1/9/2024 | ECF 48-2, PageID. 774-775 | | |

| | | | | |
|---|---|---|---|---|
| 5. | "Traffic Safety Program" TSP Powerpoint video | SWOPE 00001569 through 0001576 | | |
| 6. | July 2023 "Memorandum" concerning Mo Baydoun traffic stop statements of 7/5/21 compiled by Lieutenant Hatten | SWOPE 00001577 through 00001583 | | |
| 7. | Hart to Council "Communications" concerning DOJ COPS Collaborative Reform Initiative | SWOPE 00395610 through 00395611 | | |
| 8. | Transcript of Bill Bazzi Deposition of August 29, 2025 and all sub-exhibits thereto | In the possession of all litigants | Yes. See ECF Nos. 135, 141, 137 | |
| 9. | Hart email correspondence to Mayor Bazzi, dated 12-14-23 | ECF 48-2, PageID. 767 | | |
| 10. | Hart Bazzi correspondence of June 16, 2023 | CODH5964 through 5966 | | |
| 11. | Hart's contemporary timeline, redacted to prevent publication of irrelevant sensitive information | ECF 123-16 | | |
| 12. | Hart Notice of Constructive Termination dated 7/3/24 | ECF 123-3 | | |
| 13. | Hassan Saab Defunding Resolution 11(A), 24-017, dated 1/3/24, FAC Exhibit 5 | ECF 48-2, PageID. 777-778 | | |
| 14. | Memorandum of Mayor Bill Bazzi, dated 1/22/24, FAC Exhibit 6 | ECF 48-2, PageID.780-782 | | |
| 15. | Memorandum of Mayor Bill Bazzi, dated 1/22/24, FAC Exhibit 6 | ECF 48-2, PageID. 783-786. | | |

| | | | | |
|---|---|---|---|---|
| 16. | Email of January 25, 2024 from Mo Baydoun directing Mayor Bazzi and Treasurer Hicks-Clayton not to pay Directors Vanderplow and Swope and to deprive them of benefits, FAC Exhibit 7 | ECF 48-2, PageID.788-789 | | |
| 17. | Memorandum of Mayor Bill Bazzi, dated January 24, 2024, FAC Exhibit 8 | ECF 48-2, PageID. 791 | | |
| 18. | "Information Update" of January 24, 2024 promulgated by Mayor Bazzi, FAC Exhibit 12 | ECF 48-2, PageID. 811-814 | | |
| 19. | Excerpts from the Charter of the City of Dearborn Heights, including Chapters 4 (Section 4.9), 5 (Sections 5.3 and 5.13), 6, 7, 8 (Section 8.5) and 9, each in their entirety. | Public Records | | |
| 20. | Miotke email to Mr. Jamal describing Mayor's powers and authority under City Charter Section 4.9(a), dated 2/2/2025 | CODH4451-4452 | | |
| 21. | Interrogatory Answers of the Primary Defendant to Plaintiffs' Interrogatories 14-15, dated and sworn 1/26/26 | Un-Bated. | | |
| 22. | Video tape of Sergeant Bazzy and his brother discussing ticket-fixing and how Sergeant Bazzy will be made Police Chief of Dearborn Heights (video exhibit authenticated during Bazzy deposition on 1/20/26 at 83:14 to 84:7) | Available to all parties. Video Exhibit to Bazzy Deposition. | Yes. *See* ECF. Nos. 135, 141, 137 | |
| 23. | Excerpt of Hart "Log" from November 27, 2023 | SWOPE00000051 | | |

| | | | | |
|---|---|---|---|---|
| 24. | Dept of State Police Audit Letter concerning April/May 2022 Audit | SWOPE00000319 through 00000323 | | |
| 25. | "Corruption" Emails from January 9, 2024, pertaining to 1/9/24 Memo | SWOPE00000982 through 0000983 | | |
| 26. | Saab post of October 2023 concerning need for director/chief "who is part of the community." | SWOPE0001038; Saab Deposition Exhibit 4 | | |
| 27. | Email thread of June 14-15, 2023 between Hart and Muscat | SWOPE00001078 through 00001081 | | |
| 28. | Hart "Request for legal counsel" dated 12/14/23 | SWOPE00001411 | | |
| 29. | Lapoint Email of 1-10-24 | SWOPE00395665 | | |
| 30. | Recording of Councilman Wencel on tactics employed by now Mayor Mo Baydoun of June 2025 (audio exhibit authenticated during Wencel deposition on 9/5/26 at 26:12 to 29:1). | Available to all parties. Audio Exhibit to Wencel Deposition. | | |
| 31. | FRE Rule 1006 Damages Exhibit – Summary of Hart Damages | Provided to counsel and attached to Joint Final Pretrial Order ("JFPO") at Exhibit 1 thereto | | |
| 32. | (Superseded) Second Swope Employment Contract dated 12/12/23, FAC Exhibit 11 | ECF 48-2, PageID.805-809 | | |
| 33. | (Third and Last) Swope Employment Contract dated October 15, 2024 | Bazzi Deposition Exhibit C | | |
| 34. | Kevin Swope request for SMIP Program Training, November 2023 | SWOPE00001204 through 00001213 | | |

| | | | | |
|---|---|---|---|---|
| 35. | Saab Facebook entry “Mayor needs to fire this guy immediately” date 9/30/23 | SWOPE00001432 | | |
| 36. | Email dated 12-4-24 pursuant to which Mayor Bazzi asks Kevin Swope to resign | ECF 123-8, also Bazzi Deposition Exhibit F | | |
| 37. | Kevin Swope “Employee change of status form” signed by Cameron Eggly, 1/14/25 | Bazzi Deposition Exhibit H, SWOPE 00001498 through 0001508 | | |
| 38. | Swope/Eggly Correspondence on Contract Payout Amounts of January 20256 | SWOPE00000599 through 00000602 | | |
| 39. | Farinha recommendation re SWPE training | CODH1349 through 1351 | | |
| 40. | FRE Rule 1006 Damages Exhibit – Summary of Swope Damages | Exhibit 1 of JFPO | | |
| 41. | Superseded Second Vanderplow Employment Contract, dated 12/12/23, FAC Exhibit 9 | ECF 48-2, PageID. 793-797 | | |
| 42. | (Third and Last) Vanderplow Employment Contract, dated January 2, 2025 | ECF 123-6, Bazzi Deposition Exhibit B. | | |
| 43. | Saab Vanderplow stalking materials, March 4, 2024 | SWOPE00001464 through 00001495 | | |
| 44. | Vanderplow email to Eggly, Farinha and Bazzi of1/29/25 (7:09 pm)(Concerning City Council meeting of 1/28/25. | SWOPE00394069 | | |

| | | | | |
|---|---|---|---|---|
| 45. | January 30, 2025 Eggly email to Bazzi "Status of leadership and assignments" | SWOPE 00014665 through 00014666 | | |
| 46. | October 8, 2025, Bazzi Resignation Email | CODH5621-5629 | | |
| 47. | IB Electric Investigative materials pertaining to order of lighting through "miscommunication" | SWOPE00237148 through 00237149 | | |
| 48. | Memorandum of information, Council text on IB Electric | SWOPE00237337 through00237388 | | |
| 49. | Email Vanderplow, Clayton, re DTE Check of 3/26/26 | SWOPE00237171 through 00237172 | | |
| 50. | Corporation Counsel to City Council Memo from Roger Farinha dated 7-11-24 | CODH1354 through 1355 | | |
| 51. | Farinha Saab emails of July 2024 in which Farinha accuses Councilman Saab of filing false police reports | CODH1352 through 1353 | | |
| 52. | Email from Bazzi naming Vanderplow as Interim Controller as of 4/19/2025 | CODH5660 | | |
| 53. | February 3, 2025 Memo from Mayor Bazzi to Paul Vanderplow "Adjustment to contract due to continued harassment" | SWOPE00001603 through 00001605 | | |
| 54. | Vanderplow Resignation Letter of April 23, 2025 | ECF 124, PageID.5380-5381 | | |
| 55. | DHS Tentative Selection letter to Vanderplow of 8/4/25 | SWOPE00395572 through 0395573 | | |
| 56. | DHS retraction of job opportunity due to DH "Termination" and opportunity costs | SWOPE00395576 through 00395577 | | |
| 57. | Vanderplow/Interim Chief Farhat email thread of 12/30/24 | SWOPE00016696 through 00016705 | | |

| | | | | |
|---|---|---|---|---|
| 58. | Vanderplow/Interim Chief Farhat email thread of mid January, 2025 | SWOPE00017138 through 00017152 | | |
| 59. | Text of Bill Bazzi press releases concerning 1/28/25 City Council Meeting | SWOPE00017776 | | |
| 60. | Allegation and rebuttal sheet, Vanderplow-Interim Chief Farhat | SWOPE00017603 through 00017605 | | |
| 61. | Muscat email regarding budget amendments dated 5/24/2023 | CODH6303 | | |
| 62. | FRE Rule 1006 Damages Exhibit – Summary of Vanderplow Damages | Exhibit 1 of JFPO | | |
| 63. | IB Electric Investigative materials prepared by Paul Vanderplow and presented to City Council | SWOPE00018387 through 00018540 | | |
| 64. | | | | |
| 65. | | | | |
| 66. | | | | |
| 67. | | | | |
| 68. | | | | |
| 69. | | | | |
| 70. | | | | |
| 71. | | | | |
| 72. | | | | |
| 73. | | | | |
| 74. | | | | |
| 75. | | | | |
| 76. | | | | |
| 77. | | | | |
| 78. | | | | |
| 79. | | | | |

| | | | | |
|---|---|---|---|---|
| 80. | | | | |
| 81. | | | | |
| 82. | | | | |
| 83. | | | | |
| 84. | | | | |
| 85. | | | | |
| 86. | | | | |
| 87. | | | | |
| 88. | | | | |
| 89. | | | | |
| 90. | | | | |
| 91. | | | | |
| 92. | | | | |
| 93. | | | | |
| 94. | | | | |
| 95. | | | | |
| 96. | | | | |
| 97. | | | | |
| 98. | | | | |
| 99. | | | | |
| | | | | |
| | | | | |
| | **End of Plaintiff's Exhibits and start of Primary Defendant's Exhibits** | | | |
| | | | | |
| 100. | E-mail title "unexpectable/unprofessional | Bates CODH 0295-0312 | | |

| | | | | |
|---|---|---|---|---|
| 101. | E-mail titled "Notice of Hostile Actions" | Bates CODH 0288-0290 | | |
| 102. | Professional Services Contract for Kevin Swope dated January 9, 2023 | Bates CODH 0075-0083 | | |
| 103. | Professional Services Contract for Kevin Swope dated December 12, 2023 | Bates CODH 0103-0107 | | |
| 104. | Professional Services Contract for Paul Vanderplow dated January 9, 2023 | ECF No, 116-10, Page ID 4882-4886 | | |
| 105. | Professional Services Contract for Paul Vanderplow dated December 12, 2023 | Bates CODH 0115-0119 | | |
| 106. | Kevin Swope South Haven Application | CODH 0439-0445 | | |
| 107. | Kevin Swope South Haven Interview Information | CODH 0452-0476 | | |
| 108. | Kevin Swope South Haven Offer Letter | CODH 0480-0481 | | |
| 109. | Professional Services Contract for Paul Vanderplow dated January 2, 2025 | P Vanderplow Deposition Exhibit 3 | | |
| 110. | Professional Services Contract for Kevin Swope dated October 15, 2024 | K Swope Deposition Exhibit 8 | | |
| 111. | Professional Services Contract for Jerrod Hart dated February 21, 2022 | Bates CODH 0151 - 0155 | | |
| 112. | Professional Services Contract for Jerrod Hart dated December 12, 2023 | Bates CODH 0195 - 0199 | | |
| 113. | E-mail titled "unexpectable/unprofessional" | Bates CODH 0255 | | |
| 114. | Fringe Benefits Policy | Bates CODH 0139-142 | | |

| | | | | |
|---|---|---|---|---|
| 115. | Kevin Swope South Haven Employment Documents | Bates CODH 0482-0496 | | |
| 116. | City Charter Section 7.1 | ECF No. 115-10, PageId 4743 | | |
| 117. | February 29, 2024 City Counsel Meeting Minutes | ECF 115-5, PageId 4709-4713 | | |
| 118. | May 14, 2024 City Counsel Meeting Minutes | ECF 115-6, PageId 4715-4720 | | |
| 119. | May 28, 2024 City Counsel Meeting Minutes | ECF 115-7, PageId 4723-4731 | | |
| 120. | Email titled “Professional Behavior – P. Vanderplow | Bates CODH 0291-0292 | | |
| 121. | Email titled “Request for Police Officer Presence at Council Meetings” | Bates Swope 00001385-00001387 | | |
| 122. | Swope Wage Benefit Complaint | Bates Swope 00001613-00001615 | | |
| 123. | | | | |
| 124. | | | | |
| 125. | | | | |
| 126. | | | | |
| 127. | | | | |
| 128. | | | | |
| 129. | | | | |
| 130. | | | | |
| 131. | | | | |
| 132. | | | | |

| | | | | |
|---|---|---|---|---|
| 133. | | | | |
| 134. | | | | |
| 135. | | | | |
| 136. | | | | |
| 137. | | | | |
| 138. | | | | |
| 139. | | | | |
| 140. | | | | |
| 141. | | | | |
| 142. | | | | |
| 143. | | | | |
| 144. | | | | |
| 145. | | | | |
| 146. | | | | |
| 147. | | | | |
| 148. | | | | |
| 149. | | | | |
| 150. | | | | |
| 150. | | | | |
| 151. | | | | |
| 152. | | | | |
| 153. | | | | |
| 154. | | | | |
| 155. | | | | |
| 156. | | | | |
| 157. | | | | |
| 158. | | | | |

| | | | | |
|---|---|---|---|---|
| 159. | | | | |
| 160. | | | | |
| 161. | | | | |
| 162. | | | | |
| 163. | | | | |
| | **End of Primary Defendant's Exhibits and start of Intervening Defendant's Exhibits** | | | |
| 200. | E-mail title "unexpectable/unprofessional | Bates CODH 0295-0312 | | |
| 201. | E-mail titled "Notice of Hostile Actions" | Bates CODH 0288-0290 | | |
| 202. | Professional Services Contract for Kevin Swope dated January 9, 2023 | Bates CODH 0075-0083 | | |
| 203. | Professional Services Contract for Kevin Swope dated December 12, 2023 | Bates CODH 0103-0107 | | |
| 204. | Professional Services Contract for Paul Vanderplow dated January 9, 2023 | ECF No, 116-10, Page ID 4882-4886 | | |
| 205. | Professional Services Contract for Paul Vanderplow dated December 12, 2023 | Bates CODH 0115-0119 | | |
| 206. | Kevin Swope South Haven Application | CODH 0439-0445 | | |
| 207. | Kevin Swope South Haven Interview Information | CODH 0452-0476 | | |
| 208. | Kevin Swope South Haven Offer Letter | CODH 0480-0481 | | |
| 209. | Professional Services Contract for Paul Vanderplow dated January 2, 2025 | P Vanderplow Deposition Exhibit 3 | | |

| | | | | |
|---|---|---|---|---|
| 210. | Professional Services Contract for Kevin Swope dated October 15, 2024 | K Swope Deposition Exhibit 8 | | |
| 211. | Professional Services Contract for Jerrod Hart dated February 21, 2022 | Bates CODH 0151 - 0155 | | |
| 212. | Professional Services Contract for Jerrod Hart dated December 12, 2023 | Bates CODH 0195 - 0199 | | |
| 213. | E-mail titled “unexpectable/unprofessional” | Bates CODH 0255 | | |
| 214. | Fringe Benefits Policy | Bates CODH 0139-142 | | |
| 215. | Kevin Swope South Haven Employment Documents | Bates CODH 0482-0496 | | |
| 216 | City Charter Section 7.1 | ECF No. 115-10, PageId 4743 | | |
| 217 | February 29, 2024 City Counsel Meeting Minutes | ECF 115-5, PageId 4709-4713 | | |
| 218 | May 14, 2024 City Counsel Meeting Minutes | ECF 115-6, PageId 4715-4720 | | |
| 219 | May 28, 2024 City Counsel Meeting Minutes | ECF 115-7, PageId 4723-4731 | | |
| 220 | Email titled “Professional Behavior – P. Vanderplow | Bates CODH 0291-0292 | | |
| 221 | Email titled “Request for Police Officer Presence at Council Meetings” | Bates Swope 00001385-00001387 | | |
| 222 | Swope Wage Benefit Complaint | Bates Swope 00001613-00001615 | | |

| | | | | |
|---|---|---|---|---|
| 223 | City of Dearborn Heights Ordinances | ECF No. 15-2, PageID.177-178 | | |
| 224 | Act 78 of 1935 | ECF No. 15-2, PageID.180-189 | | |
| 225 | Minutes of City of Dearborn Heights City Council Meeting January 9, 2024 | ECF No. 15-2, PageID.210-216 | | |
| 226 | Dearborn Heights City Charter Section 8.5 | ECF No. 15-2, PageID.218 | | |
| 227 | Dearborn Heights City Council Motion 24-025 | ECF No. 15-2, PageID.220 | | |
| 228 | Minutes of City of Dearborn Heights City Council Meeting January 23, 2024 | ECF No. 15-2, PageID.222-229 | | |
| 229 | Minutes of City of Dearborn Heights City Council Meeting February 13, 2024 | ECF No. 15-2, PageID.222-268 | | |
| 230 | City Charter Section 4.9 | ECF No. 41-2 | | |
| 231 | 2023 – 2024 Dearborn Heights Budget Personnel Pages | ECF No. 41-3 | | |
| 232 | Minutes of City of Dearborn Heights City Council Meeting April 23, 2024 | ECF No. 41-4 | | |
| 233 | City Charter Sections 5.3, 5.13, and 5.15 | ECF No. 58-2 | | |
| 234 | City Charter Section 18.9 | ECF No. 58-3 | | |
| 235 | City Charter Section 8.9 | ECF No. 58-4 | | |
| 236 | City Charter Sections 8.4, 8.5, and 8.6 | ECF No. 58-5 | | |
| 237 | Select City Council Meeting Agendas | ECF No. 58-10 | | |
| 238 | Report to Michigan Department of Treasury Documents | ECF No. 66-2 | | |
| 239 | Dearborn Heights City Council Motion 24-017 | | | |

| | | | | |
|---|---|---|---|---|
| 240 | Dearborn Heights City Council Motion 23-099 | ECF No. 1-2, PageID.21-25 | | |
| 241 | Bill Bazzi January 22 and 24, 2024 Memorandum | ECF No. 1-2, PageID.40-46, 51 | | |
| 242 | City Charter Sections 5.13 and 5.15 | ECF No. 83-10 | | |
| 243 | Kevin Swope December 4, 2024 Resignation Memo | ECF No. 115-8 | | |
| 244 | CBA Excerpts (City of Dearborn Heights) | ECF No. 125-4 | | |
| 245 | | | | |
| 246 | | | | |
| 247 | | | | |
| 248 | | | | |
| 249 | | | | |
| 250 | | | | |
| 251 | | | | |
| 252 | | | | |
| 253 | | | | |
| 254 | | | | |
| 255 | | | | |
| 256 | | | | |
| 257 | | | | |
| 258 | | | | |
| 259 | | | | |
| 260 | | | | |
| 261 | | | | |
| 262 | | | | |
| 263 | | | | |
| 264 | | | | |

| | | | | |
|---|---|---|---|---|
| 265 | | | | |
| 266 | | | | |
| 267 | | | | |
| 268 | | | | |
| 269 | | | | |
| 270 | | | | |

# EXHIBIT 3

Stipulated Facts under negotiation and will be added here in the near future