# Exhibit 1

LexisNexis®

**User Name:** Stephen Brown

**Date and Time:** Tuesday, November 10, 2026 9:26 AM EST

**Job Number:** 301761202

## Document (1)

1. *Int'l Ass'n of Fire Fighters v. Warren*

   **Client/Matter:** swope

   **Search Terms:**

   **Search Type:** Natural Language

   **Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| | -None- |

# Int'l Ass'n of Fire Fighters v. Warren

Supreme Court of Michigan

April 15, 1980, Argued ; November 2, 1981, Decided

Docket No. 63227

**Reporter**

411 Mich. 642 *; 311 N.W.2d 702 **; 1981 Mich. LEXIS 293 ***

LOCAL 1383 OF THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, also known as WARREN PROFESSIONAL FIRE FIGHTERS ASSOCIATION, AFL-CIO, Plaintiff-Appellant, v. CITY OF WARREN and POLICE AND FIRE CIVIL SERVICE COMMISSION FOR THE CITY OF WARREN, Defendants-Appellees

**Prior History:** **[***1]** 89 Mich App 135; 279 NW2d 556 (1979).

International Asso. of Fire Fighters v. Warren, 89 Mich. App. 135, 279 N.W.2d 556, 1979 Mich. App. LEXIS 2053 (1979)

**Disposition:** Reversed and remanded to the circuit court for entry of a summary judgment for the plaintiff.

## Syllabus

Local 1383, International Association of Fire Fighters, AFL-CIO, brought an action for declaratory judgment against the City of Warren and its Police and Fire Civil Service Commission, claiming that the parties' collective-bargaining agreement concerning seniority and promotions of employees of the city's fire department, which was negotiated under the public employment relations act, should prevail over conflicting provisions of the statute concerning civil service for police and fire departments and of the Warren City Charter. The Macomb Circuit Court, Walter P. Cynar, J., granted summary judgment for the **[***7]** defendants. The Court of Appeals, M. F. Cavanagh, P.J., and D. E. Holbrook, Jr., and N. J. Kaufman, JJ., affirmed, holding that the Constitution of 1963 requires approval of the voters of the municipality to discontinue or modify a statutory merit system for municipal employees (Docket No. 77-5147). Plaintiff appeals. *Held*:

The contractual provision governing promotions in the Warren Fire Department, which was made under the public employment relations act, is valid and enforceable. It sets forth the promotional system for employees in the Local 1383 bargaining unit, notwithstanding the conflicting provisions of the statute concerning civil service for police and fire departments and of the Warren City Charter.

1. The Constitution of 1963 specifically authorized the Legislature to enact laws governing public employment. Pursuant to that authority the public employment relations act was enacted to provide public employees the right to form and join labor organizations and to negotiate in good faith with public employers regarding "wages, hours, and other terms and conditions of employment". In federal labor law, seniority, promotions, and promotional criteria are among the **[***8]** "other terms and conditions of employment" under the National Labor Relations Act. The phrase is a technical one in labor relations law which has a specific meaning. In adopting the same language, the Legislature must have intended to include in the public employment relations act a meaning similar to that given by the federal interpretations. Accordingly, seniority, promotions, and promotional criteria are included within the statutory phrase; thus, these matters are mandatory subjects of collective bargaining.

2. When the Constitutional Convention of 1961 authorized the Legislature to enact laws "providing for the resolution of disputes concerning public employees", it must have perceived that the Legislature would thereby have the power to enact laws governing the resolution of disputes regarding as vital a concern as promotion and seniority.

The right to bargain and the duty to bargain in good faith specifically permit representatives of public employees to negotiate for changes in the conditions of employment, and public employers may resist the proposed changes during negotiations. The parties are free, for instance, to adopt substantive provisions of the statute concerning **[***9]** civil service for police and fire departments without change. It is the collective-negotiation system that the Legislature has determined to be the appropriate method for public employers and their employees to develop and specify terms and conditions of employment. The statutory procedure of the police and fire civil service statute does not address a collective-negotiation method for determining employment conditions.

3. The Supreme Court has consistently held that the public employment relations act prevails over conflicting legislation, charters, and ordinances in the face of challenges by cities, counties, public universities, and school districts. The same conclusion is mandated in this case by the reasoning of the Court's prior decisions. To decide this case in conformity with prior decisions, the public employment relations act must be viewed as the dominant law regulating labor relations in public employment. If the public employer and the union agree to a change in the system of promotions, the collective-bargaining agreement controls. The mandatory duty to bargain and the need for uniform treatment of all questions of labor relations in public employment, when contrasted **[***10]** with the permissive nature of the statute concerning civil service for police and fire departments, lead to the conclusion that the Legislature intended the duty to bargain under the public employment relations act to prevail over the police and fire civil service act.

4. The system of promotions in the police and fire civil service act will continue to have effect in municipalities that adopt the civil service system of the act, unless a different system or plan is incorporated in a collective-bargaining agreement. The original authority and duties of the defendant Police and Fire Civil Service Commission, as provided in the statute, were diminished *pro tanto* by the public employment relations act to the extent that the free administration of collective bargaining requires it.

5. The defendants assert that the Constitution of 1963 provides that a collective-bargaining agreement cannot modify an existing civil service system unless the modification is approved by a majority of the electors. The Court has decided in other cases that action by a public employer which is otherwise within its constitutional authority is subject to the obligation to bargain collectively under the **[***11]** public employment relations act because of the fundamental purpose of the constitutional provision which provides for the Legislature to enact laws for the resolution of disputes concerning public employees. The power of the Legislature is limited only where the disputes are in the state classified civil service. Therefore, it covers disputes arising in municipalities, which are merely permitted by the constitution to establish civil service systems. There is no suggestion in the constitutional provision for the adoption of civil service merit systems in local political subdivisions that a local civil service system must prevail when it conflicts with a collective-bargaining contract or bargaining obligations imposed by a general state law, nor does it hint that it was intended to limit the provision for the Legislature to enact laws for the resolution of disputes concerning public employees, nor indicate that it was intended to control collective bargaining conducted pursuant to such a law. The public policy of the state as to labor relations in public employment is for legislative determination. To require approval of a collective-bargaining agreement by the voters would hinder **[***12]** and frustrate the free administration of the public employment relations act.

6. The constitution authorizes the Legislature to enact state-wide laws regulating disputes concerning public employees. The primary purposes of the constitutional provision permitting local civil service systems were to allow them to be adopted without the express approval of the Legislature, to prohibit local political officials from unilaterally changing the merit system, and to protect local public employees from political purges. Where collective bargaining reaches the issues covered by local civil service systems, the restraint on the power of local public officers is inherent within the collective-bargaining process. If the Legislature were not free to provide for free and full collective bargaining in local civil service systems, the public employment relations act, a uniform state-wide law, would be converted into a local-option law. Each local government would have a wide choice in the subjects of collective bargaining, and local public employers could opt out of the statutory scheme for the resolution of disputes involving mandatory subjects of bargaining, such as promotions and seniority. **[***13]** That would severely erode the sound policies which lead to the conclusion that the public employment relations act is the dominant law governing disputes concerning public employees.

Justice Ryan, joined by Chief Justice Coleman, dissented because the decision denigrates the paramount authority conferred by the Constitution of 1963 on the citizens of the City of Warren to determine the kind of public employment system by which they will served. If the conflict were solely between the statutory provisions in this case, the provisions of the collective-bargaining agreement on seniority and promotions might prevail over conflicting local civil service guidelines. However, the collective-bargaining agreement cannot modify or alter an existing local civil service system under the Constitution of 1963.

**Counsel:** *Gregory, Van Lopik, Korney & Moore* (by *J. Douglas Korney)* for plaintiff.

*W. Thomas Marrocco, Jr.*, City Attorney, and *John J. Murray*, Chief Assistant City Attorney for defendants.

Amici Curiae:

*Zwerdling & Maurer* (by *George B. Washington*) for Council No. 25, AFSCME.

*Marston, Sachs, Nunn, Kates, Kadushin* **[***14]** *& O'Hare, P.C.* (by *Theodore Sachs, Ronald R. Helveston*, and *John R. Runyan, Jr.*) for Michigan State Fire Fighters Union.

**Judges:** Blair Moody, Jr., J. Kavanagh, Williams, Levin, and Fitzgerald, JJ., concurred with Blair Moody, Jr., J. Ryan, J. *(dissenting)*. Coleman, C.J. concurred with Ryan, J.

**Opinion by:** MOODY, JR.

## Opinion

**[*648]** **[**703]** Plaintiff, Local 1383 of the International Association of Fire Fighters (Local 1383), appeals from a Court of Appeals decision affirming a summary judgment in favor of defendants, the *City of Warren and the Police and Fire Civil Service Commission for the City of Warren (Civil Service Commission). 89 Mich App 135; 279 NW2d 556 (1979)*.

**[*649]** The question presented is whether a collective-bargaining agreement's provision concerning promotions, which is entered into under the public employment relations act (PERA), is valid and enforceable when it conflicts with provisions of a city charter and the fire and police civil service act, 1935 PA 78 (Act 78). *MCL 423.201 et seq*.; MSA 17.455(1) *et seq*.; *MCL 38.501 et seq*.; MSA 5.3351 *et seq*. The circuit court and Court of Appeals held the promotional **[***15]** system in the collective-bargaining agreement between Local 1383 and the City of Warren void. We granted leave to appeal. *407 Mich 897 (1979).*

We hold that the contract provision governing promotions entered into under PERA is valid and enforceable. We also hold that this provision sets forth the promotional system for employees in the Local 1383 bargaining unit, notwithstanding conflicting provisions in Act 78 or the Warren Charter. Accordingly, we reverse the Court of Appeals decision.

I

There is no material dispute as to the facts in this case. The provisions of Act 78 set forth a civil service merit appointment and promotional system for fire fighters and police officers which may be adopted by local municipalities. The authority and duties of a municipal civil service commission governing these occupations are also explicitly detailed in the act. The terms of Act 78 were incorporated by reference into the Warren Charter by an amendment approved by the electorate in 1961. Warren Charter § 7.18.

Local 1383 is the recognized and exclusive collective-bargaining representative of all Warren Fire **[*650]** Department employees, except the Fire Commissioner and civilian **[***16]** employees. Local 1383 and the City of Warren executed a collective-bargaining agreement concerning wages, hours, and conditions of employment. The agreement provided in pertinent part:

"*Article 12—Seniority.*

"(a) Seniority and its application shall be governed by the provisions of Act 78, Public Acts of 1935, except as provided in Section (b) below.

"(b) It is agreed that the promotional system for employees in the Local 1383 bargaining unit shall provide for promotions based upon seniority and reasonable qualifications as may be determined by the Fire Department after consultation with the Union."

**[**704]** Attached to the collective-bargaining agreement was a letter of understanding between Local 1383 and the City of Warren. The letter provided that if the Civil Service Commission refused to implement Article 12(b) of the agreement, the City of Warren would be held in violation of that provision only if the city failed to implement the new procedure after final judicial determination of its validity.

The Fire Commissioner informed the Civil Service Commission that, pursuant to Article 12(b), the Fire Department was in the process of qualifying persons for promotions **[***17]** and would submit a list of names from which the department would make promotions. The Civil Service Commission took the position that it was the body which determined qualifications, through competitive examinations, for promotion of Fire Department employees under Act 78. It also said that it was unaware of any election in which the electors of the City of Warren had voted to rescind or repeal the adoption of the civil service system of the act.

**[*651]** Local 1383 brought this action seeking a declaratory judgment that the terms of the collective-bargaining agreement prevail over any contrary provisions of Act 78, and any rules or regulations adopted by the Civil Service Commission pursuant to the act. Both parties filed motions for summary judgment. The circuit court granted summary judgment in favor of defendants. The Court of Appeals affirmed.

II

The critical question posed by this case is whether a normal and vital subject of bargaining can be removed from the public bargaining table by local charter provisions.

In 1963, the people adopted a new constitution which specifically authorized the Legislature to enact laws governing public employment. *Article 4, § 48 **[***18]** of the constitution* provides:

"The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service."

Acting pursuant to this explicit constitutional authorization, PERA was enacted by the Legislature in 1965. This basic law provided public employees the right to form and join labor organizations and to negotiate in good faith with public employers regarding "wages, hours, and other terms and conditions of employment".

Accordingly, the duty of the City of Warren to bargain collectively with Local 1383 is set forth in § 15 of PERA, which reads:

"A public employer shall bargain collectively with the representatives of its employees as defined in section **[*652]** 11 and is authorized to make and enter into collective bargaining agreements with such representatives. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question **[***19]** arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if

requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." MCL 423.215; MSA 17.455(15).

This Court has repeatedly recognized that § 15 of PERA was patterned after § 8(d) of the National Labor Relations Act (NLRA). 29 USC 158(d). The language of these PERA and NLRA sections is virtually identical. Consequently, when defining the scope of bargaining, Michigan cases have followed Federal decisions and have adopted a broad and expansive interpretation of "wages, hours, and other terms and conditions of employment". See, *e.g.,* Central Michigan University Faculty Ass'n v Central Michigan University, 404 Mich 268; 273 NW2d 21 (1978); Detroit Police Officers Ass'n v Detroit, 391 Mich 44; 214 NW2d 803 (1974); Detroit Police Officers Ass'n v Detroit, 61 Mich App 487; 233 NW2d 49 (1975), *lv den 395 Mich 756 (1975).*

**[**705]** In Federal labor law, seniority, promotion, and promotional criteria are among other terms and conditions of employment under NLRA § 8(d). [1] In **[***20]** a **[*653]** technical sense, the meaning of the phrase "other terms and conditions of employment" has developed to include seniority, promotion, and promotional criteria. In fact, seniority is so clearly a mandatory subject of bargaining that there is little litigation concerning this concept. Morris, ed, The Developing Labor Law (Washington, DC: Bureau of National Affairs, Inc, 1971), p 406.

A rule of statutory construction adopted by the Legislature states:

"All words and phrases shall be construed and understood according to the common and approved usage of the language; **[***21]** but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a; MSA 2.212(1).

"[O]ther terms and conditions of employment" is a technical phrase in labor relations law. That phrase has a specific meaning. We are convinced that the Legislature, by using the phrase in PERA, intended to include a meaning similar to that afforded by Federal interpretations.

Accordingly, our Court has recognized that seniority, promotion, and promotional criteria are included within the phrase "other terms and conditions of employment". We have concluded that these matters are mandatory subjects of collective bargaining. *CMU, supra; DPOA, supra*, 391 Mich 44. [2]

**[***22]**

**[*654]** "The subjects included within the phrase 'wages, hours, and other terms and conditions of employment' are referred to as 'mandatory subjects' of bargaining. Once a specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject, and neither party may take unilateral action on the subject absent an impasse in negotiations." (Citations omitted.) *CMU*, 277.

It may also be fairly deduced that when the Constitutional Convention authorized the Legislature to enact laws "providing for the resolution of disputes concerning public employees", Const 1963, art 4, § 48, it must have perceived that the Legislature would thereby have the power to enact laws governing the resolution of disputes regarding so vital a concern as promotion and seniority.

---

[1] See *Ford Motor Co v Huffman, 345 U.S. 330; 73 S Ct 681; 97 L Ed 1048 (1953)*; *National Labor Relations Board v Century Cement Manufacturing Co, Inc, 208 F2d 84 (CA 2, 1953)*; *Rapid Roller Co v National Labor Relations Board, 126 F2d 452 (CA 7, 1942)*. See also *Inland Steel Co v National Labor Relations Board, 170 F2d 247, 251 (CA 7, 1948)*; *Detroit Police Officers Ass'n v Detroit, 61 Mich App 487; 233 NW2d 49 (1975)*.

[2] *Detroit Police Officers Ass'n v Detroit, 61 Mich App 487; 233 NW2d 49 (1975)*, held that standards and criteria for promotion are a mandatory subject of bargaining. The DPOA bargaining unit did not represent the supervisory officers whose qualifications would be the subject of collective bargaining. Promotions are such an important topic of employment relations that even promotions out of a bargaining unit are mandatory subjects. In the instant case the "supervisory" employees of the Fire Department, other than the Fire Commissioner, are within the same bargaining unit. See MCL 423.213; MSA 17.455(13).

The right to bargain and the duty to bargain in good faith specifically permit employees' representatives to engage in negotiations for the purpose of changing conditions of employment. Public employers may resist the proposed changes during negotiations. The parties are free, for instance, to adopt substantive provisions of Act 78 without change. It is the collective-negotiation **[***23]** system that the Legislature has determined to be the appropriate method for public employers and their employees to develop and specify terms and conditions of employment. Collective negotiation is the proper procedure for changing employment conditions once the exclusive representative of the employees has been selected. MCL 423.215; MSA 17.455(15). The Act 78 procedure neither addresses nor focuses **[**706]** upon a collective-negotiation method for determining employment conditions. [3]

**[*655]** Following the mandate of PERA and the case law interpreting **[***24]** § 15, the City of Warren and Local 1383 bargained about the mandatory subjects and executed a collective-bargaining agreement incorporating a promotion system.

III

This Court has consistently held that PERA prevails over conflicting legislation, charters, and ordinances in the face of contentions by cities, counties, public universities and school districts that other laws or the constitution carve out exceptions to PERA. [4] That same conclusion is mandated **[*656]** in the instant case by the reasoning employed in our prior decisions.

**[***25]** An apparent conflict between PERA and the county civil service act, MCL 38.401 et seq.; MSA 5.1191(1) *et seq.*, was before this Court in Wayne County Civil Service Comm v Board of Supervisors, 384 Mich 363; 184 NW2d 201 (1971). Discussing the purpose of the county civil service act, 1941 PA 370, this Court concluded that the concept of public employees' collective bargaining could not have been in the minds of the legislators in 1941.

Under the county civil service act, a county civil service commission has an extensive, if not exclusive, role in the control of employment relations within the county. This Court concluded that PERA and the county civil service act could not be harmonized, and that the civil service commission "has no lawful part in the administration, directly or indirectly, of the act of 1965 [PERA]". *Wayne County Civil Service Comm*, 376.

This Court held:

---

[3] Compare MCL 123.841; MSA 5.3331 which regulates the maximum hours of fire department employees. MCL 123.842(e); MSA 5.3332(e) exempts from the maximum-hours requirements of the previous section, "any municipality which, by agreement with the collective bargaining agent representing affected employees, does not require its employees engaged in fire fighting or subject to the hazards thereof, to be on duty more than 40 hours in any consecutive 7-day period".

[4] In some instances the judiciary has been excepted from the duty to bargain under PERA. In the Matter of the Petition for a Representation Election Among Supreme Court Staff Employees, 406 Mich 647; 281 NW2d 299 (1979); *Council No 23*, Local 1905, AFSCME v Recorder's Court Judges, 399 Mich 1; 248 NW2d 220 (1976). The result in *Council No 23* consisted of two opinions. The opinions agreed that the probation officer removal statute, MCL 771.10; MSA 28.1140, which insures employees a full hearing before a court may recommend removal of the officer, prevails over a collective-bargaining provision for binding arbitration of employees' grievances. The opinion of Justice Lindemer concluded that the Legislature did not mean to encumber the judicial process in adopting § 15 of PERA. His opinion expressed the concern that binding arbitration could result in the reinstatement of a probation officer, whose duties are central to the administration of criminal justice, after the court could no longer trust the officer or have confidence in him or her. *Council No 23*, 7. Justice Williams' opinion expressed concerns regarding the legislative intent under PERA to delegate to an arbitrator the power to reinstate "so sensitive a judicial official as a probation officer". *Council No 23*, 9.

*Cf.* Livingston County v Livingston Circuit Judge, 393 Mich 265; 225 NW2d 352 (1975) (circuit court is public employer under PERA); Judges of the 74th Judicial Dist v Bay County, 385 Mich 710; 190 NW2d 219 (1971) (district court is public employer; unfair labor practice charge under PERA may be asserted against a judge).

"[T]he act of 1965 [PERA] operates, '*to the extent of the repugnancy*,' as a partial repeal of the act of 1941 [county civil service act]; but no more than that. In short shrift this means that the purposed thrust of the act of 1965, that of prohibiting strikes by public employees **[***26]** and providing collective bargaining, negotiation and enforced mediation of labor disputes arising out of public employment coming within the scope of the act, must be implemented and administered exclusively as provided therein. Hence, the original authority and duty of the plaintiff civil service commission was diminished *pro tanto*, by the act of 1965, to the extent of free administration of the latter according to its tenor." *Wayne County Civil Service Comm*, 374.

**[**707]** The defendant County Board of Supervisors contended **[*657]** that PERA "to the extent that it places rates of pay, hours of work and other conditions of employment * * * into the area of collective bargaining supersedes *pro tanto* those provisions or parts of [the county civil service act] dealing with the same subject matters". This Court agreed with the supervisors' contentions. *Wayne County Civil Service Comm*, 371.

The state universities have argued that constitutional and statutory grants of authority alter the scope of collective bargaining and the duty to bargain under PERA. In *Board of Control of Eastern Michigan University v Labor Mediation Board, 384 Mich 561; 184 NW2d 921 [***27] (1971)*, it was determined that the university is a public employer and subject to PERA. Our Court again emphasized the public policy of the predominance of PERA by the succinct statement:

"The public policy of this state as to labor relations in public employment is for legislative determination. The sole exception to the exercise of legislative power is the state classified civil service, the scheme for which is spelled out in detail in Article 11 of the Constitution of 1963." *EMU*, 566.

In another case where the university's existence was specifically provided for by the constitution, we determined that PERA was superimposed upon and limited the constitutional authority of the University of Michigan Board of Regents. Responding to the university's contention that student interns and residents were not employees within PERA we stated:

"If the Legislature had intended to exclude students/employees from the operation of PERA, they could have written such an exception into the law." *Regents of the [*658] University of Michigan v Employment Relations Comm, 389 Mich 96, 110; 204 NW2d 218 (1973)*.

Our holding in *CMU* specifically included the subject of promotional **[***28]** criteria within the scope of mandatory bargaining under PERA. It was urged that since Central Michigan University derives its existence from constitutional authority, PERA did not have full application to university employees. After explaining that PERA was intended to cover all public employees except for those in the state classified civil service, we reasoned that

"PERA was intended by the Legislature to supersede conflicting laws and is superimposed even on those institutions which derive their powers from the Constitution itself.

* * *

"[T]he unique status accorded state universities by constitutional and statutory authority does not alter the scope of their collective bargaining obligation under the PERA. If university professors are truly unique and thus different from other public employees, the Legislature must carve out an exception to the PERA. This Court cannot." *CMU*, 279, 281.

Conflicting provisions of PERA and the teachers' tenure act, *MCL 38.71 et seq*.; MSA 15.1971 *et seq*., were before this Court in *Rockwell v Crestwood School Dist Board of Education, 393 Mich 616; 227 NW2d 736 (1975)*. Section 6 of PERA provides that public employees disciplined **[***29]** for striking are entitled, upon request, to a determination whether their actions violated the anti-strike provisions of PERA. The request is to be made after the discipline has been imposed. *MCL 423.206*; MSA 17.455(6). The teachers' tenure act requires a hearing prior to discharge or demotion **[*659]** of tenured employees, *MCL 38.101*; MSA 15.2001. The *Crestwood* Court reviewed

our decisions which "consistently construed the PERA as the dominant law regulating public employee labor relations". *Crestwood*, 629. Our Court reasoned:

"The 1937 Legislature in enacting the teachers' tenure act could not have anticipated collective bargaining or meant to provide for the resolution of labor relations disputes in public employment." *Crestwood*, 630.

**[**708]** The apparent intent of the Legislature that PERA be the governing law for public employment relations and disputes; the consistent holdings of this Court that PERA is the dominant law regulating public employment relations; and the need for uniform treatment of all public employment relations questions resulted in this Court concluding that PERA prevailed over the teachers' tenure act.

Of particular significance **[***30]** are the holdings of this Court involving charter provisions. In two pertinent cases, it was determined that collective-bargaining obligations under PERA, in effect, prevailed over charter enactments otherwise lawful under article 7, § 22 of the 1963 Constitution. In *DPOA* we concluded that the incorporation of a pension and retirement plan in a city charter did not obviate the duty under PERA to bargain in good faith about pension plans. PERA was compared with the home-rule cities act. *MCL 117.1 et seq*.; MSA 5.2071 *et seq.*

We stated:

"On the one hand the Legislature has adopted PERA which * * * foreseeably placed retirement plan issues on the collective bargaining table. On the other hand, it has allowed cities under the home rule cities act to incorporate the substance of their retirement plans into **[*660]** their city charters and to make those plans amendable only by a popular vote." *DPOA, 391 Mich 64*.

This Court, however, avoided finding a complete conflict between PERA and the home-rule cities act. The statutes were reconciled by interpreting the latter to permit a city charter to incorporate only the general outline of a retirement plan. The substantive **[***31]** details and terms of the plan were required to be left to collective negotiation under PERA. The Detroit Charter's substantive detail of a retirement plan was held to have gone beyond the requirement of the home-rule cities act and conflicted with PERA. It was reasoned that the city was required to bargain under PERA about the details of the plan since MCL 117.36; MSA 5.2116 of the home-rule cities act states:

"No provision of any city charter shall conflict with or contravene the provisions of any general law [PERA] of the state."

Furthermore, we rejected the contentions of the City of Detroit that approval by the voters is required under the home-rule cities act to change the substantive details of Detroit's retirement plan.

The civilian trial board provision of the Pontiac Charter was reviewed by this Court in *Pontiac Police Officers Ass'n v Pontiac (After Remand), 397 Mich 674; 246 NW2d 831 (1976)*. The City of Pontiac refused to bargain with the association about grievance procedures, invoking the charter which provided that a trial board would review police misconduct charges and impose discipline.

The Court of Appeals decision in *Pontiac* held, *inter alia*, **[***32]** that the charter provision for a trial board was valid and not a mandatory subject of **[*661]** bargaining under PERA. *Pontiac Police Officers Ass'n v Pontiac, 50 Mich App 382; 213 NW2d 217 (1973)*, *lv gtd and vacated* 391 Mich 814; 216 NW2d 759 (1974), (Supplemental Opinion), 54 Mich App 282; 220 NW2d 794 (1974), (After Remand), 397 Mich 674; 246 NW2d 831 (1976). The rationale of the first Court of Appeals decision, adhered to in the *Supplemental Opinion*, was based upon its interpretation of statutory law and the Michigan Constitution.

The Court of Appeals, citing the home-rule provision of the constitution, [5] stated that the management, operation, and control **[**709]** of a city's police department, including discipline of police officers by a trial board, is a

[5] *Const 1963, art 7, § 22* provides:

municipal concern. Relying upon Act 78 and its authorization to municipalities to create police and fire civil service commissions, the Court of Appeals concluded that "the Legislature has recognized that the management, operation and control of these departments is a matter of local concern". Pontiac, 50 Mich App 382, 385. These interpretations formed the basis of the holding that the charter **[***33]** provision for a trial board was not a mandatory subject of bargaining under PERA.

Although three separate opinions were written in *Pontiac (After Remand)*, all of the participating justices agreed that grievance and disciplinary procedures are mandatory subjects of bargaining under PERA. Furthermore, all concurred that **[*662]** PERA's duty to bargain collectively **[***34]** prevails over conflicting provisions of a home-rule city's charter. Five justices specifically agreed that the duty "to perform in accordance with the terms of a collective bargaining agreement prevails over conflicting [charter] provisions". *Pontiac (After Remand)*, 677, 685. It is clear that this Court rejected the Act 78 local concerns analysis of the Court of Appeals and its municipal concerns exception to PERA.

IV

To decide the present case in conformity with the consistent prior determinations of this Court, PERA must be viewed as the dominant law regulating public employment relations. Although this Court has not previously had occasion to consider the conflicting requirements of the fire and police civil service act in contrast with PERA, our previous decisions compel a conclusion that the provisions of PERA control.

The same policy considerations which have led this Court to conclude that PERA repealed by implication conflicting provisions of the county civil service act in *Wayne County Civil Service Comm*, that it diminished *pro tanto* the teachers' tenure act in *Crestwood*, that it governed promotional criteria in *CMU*, that it controlled university **[***35]** labor negotiations in *EMU* and *U of M* and that it prevailed over charter provisions permitted by the constitution in *DPOA* and *Pontiac (After Remand)*, guide us to the conclusion that PERA also governs the instant dispute.

PERA requires a public employer to bargain about promotions, but does not require the public employer to agree to a proposal about promotions made by its employees. MCL 423.215; MSA 17.455(15). If the employer and the union agree to **[*663]** a change in the promotion system, the collective-bargaining agreement controls promotions. The mandatory bargaining duty of PERA and the need for uniformity, contrasted with the permissive nature of Act 78, lead us to determine that in enacting PERA the Legislature intended the bargaining duty to prevail over Act 78. The promotion system in Act 78 will continue to have effect in municipalities that adopt the civil service system of the act, unless a different system or plan is incorporated in a collective-bargaining agreement.

The original authority and duties of the Police and Fire Civil Service Commission outlined in Act 78 were "diminished *pro tanto*" by PERA "to the extent of free administration" **[***36]** of PERA in the same manner that county civil service commissions had their authority diminished. *Wayne County Civil Service Comm*, 374. The "free administration" of collective bargaining can only be achieved when all subjects of bargaining are included in the collective-negotiation process.

V

The defendants urge, and the Court of Appeals held, that Article 12 of the collective-bargaining agreement was void and unenforceable. Their rationale is based upon what is perceived to be a conflict between the collective-bargaining agreement authorized by PERA and the local civil service provision of the Michigan Constitution. Const 1963, art 11, § 6 provides:

---

"Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section."

"By ordinance or resolution of its governing body which shall not take effect until approved by a majority of the **[**710]** electors voting thereon, unless otherwise provided by charter, each county, township, city, village, school district and other governmental unit or authority **[*664]** may establish, modify or discontinue a merit system for its employees other than teachers under contract or tenure. The state civil service commission may on request furnish technical services to any such unit on a reimbursable basis."

Defendants **[***37]** assert that the agreement cannot modify an existing civil service system.

In addition, the defendants argue, and the Court of Appeals determined, that the intent underlying this constitutional provision was to insure that no civil service system for public employees could be modified without a vote of the electorate of the political entity involved. Hence, defendants conclude that a conflict between article 11, § 6 and the collective-bargaining contract must be determined pursuant to that constitutional mandate. We disagree with both conclusions.

In this case, as in other cases that have been decided by this Court with reference to PERA, the public employer premised its claimed exemption from bargaining on some constitutional provision. The basic point of these prior consistent determinations was precisely that action which is otherwise within the authority granted by the constitution is subject to the bargaining obligation under PERA. PERA itself is authorized by article 4, § 48 of the constitution. In view of the fundamental purpose of this constitutional provision which provides for the *Legislature* to enact laws for the resolution of disputes concerning public employees, **[***38]** in each instance when a conflict arose PERA, from its constitutional base, predominated over the conflicting charter, ordinance, or statute and its constitutional foundation. [6]

In this regard, it is significant to note that article 4, § 48 couched in sweeping language the **[*665]** power of the Legislature to enact laws regarding public employees' disputes. That power is limited in only one particular. The only disputes excepted are "those in the *state* classified civil service". (Emphasis added.) In contrast, article 11, § 6 is a provision that simply permits the establishment, modification, or discontinuance of civil service merit systems in *local political subdivisions* of the state. The scope of article 4, § 48 covers disputes arising in local municipalities, yet the two constitutional provisions may be reconciled.

By its terms, article 11, § 6 does not suggest that a local civil service system must prevail when it conflicts with **[***39]** a collective-bargaining contract or bargaining obligations imposed by a general state law. There is no hint that the scope of article 11, § 6 was intended to limit article 4, § 48 and the applicability of the governing law for public employment relations enacted by the Legislature to resolve public employees' disputes. Nor is there an indication that article 11, § 6 was intended to control collective-bargaining negotiations conducted pursuant to such a law.

In a statutory context, we have mentioned that the Legislature may not have been fully conscious of the need to harmonize collective-bargaining procedures with an established civil service system. Nevertheless, this Court concluded that the purposes of collective bargaining required that the power of civil service be diminished *pro tanto*. Wayne County Civil Service Comm, supra. In a like manner, the Constitutional Convention and the people may not have been fully aware of all the possible conflicts between article 4, § 48 and article 11, § 6 of the constitution. For the same reasons, the collective-bargaining system mandated by PERA under article 4, § 48 should be **[*666]** held to prevail "to the extent of free **[***40]** administration * * * according to its tenor". *Wayne County Civil Service Comm*, 374. "The public policy of this state as to labor relations in public employment is for legislative determination." *EMU*, 566.

We are not persuaded that the purpose of article 11, § 6 was to prohibit, without an affirmative vote of the electorate, the modification **[**711]** of a local civil service system by a collective-bargaining agreement. Article 4, § 48 and PERA do not require approval by the voters of collective-bargaining contracts. To require it would hinder and frustrate the free administration of PERA.

---

[6] See the discussion of the exception in fn 4, *supra*.

Clearly, the constitution authorized the Legislature to enact state-wide laws regulating disputes regarding public employees. With regard to local civil service systems, we are convinced a primary purpose of article 11, § 6 was to allow local governments to adopt merit principles by a vote of their electorate without express authorization of or approval by the state Legislature. In addition, this provision would block local political officials from unilaterally changing merit systems and at the same time would protect local employees from political purges. See 1 Official Record, **[***41]** Constitutional Convention 1961, pp 1749-1760.

The purpose of article 11, § 6 is not directed toward the broad power delegated to the Legislature for the resolution of disputes concerning public employees. This Court has uniformly concluded that the home-rule power of public employers is subject to collective bargaining. *Pontiac (After Remand), supra; DPOA, supra.* Where collective bargaining does not exist or where an agreement does not reach issues covered by civil service systems, article 11, § 6 provides a check by the people on the powers of elected officials. However, where **[*667]** collective bargaining reaches the issues covered by local civil service systems, the restraint on the power of local officials is inherent within the collective-bargaining process.

We are satisfied that the local civil service section of the constitution was not intended to preclude the Legislature from enacting PERA to provide for free and full local collective bargaining, including the vital concerns of promotions and seniority. If this were not the case, PERA, a uniform state-wide law, would be converted into a local-option law. Each locality would cut a wide swath in determining **[***42]** what would be a subject of bargaining in the heart of the bargaining process. In place of the specific exemption of only one group of public employees, the state classified civil service, numerous local public employers would be allowed to opt out of the scheme promulgated by PERA for the resolution of disputes involving mandatory subjects of bargaining, such as promotions and seniority. This would severely erode the sound policies which have led this Court to conclude that PERA and its constitutional source should be the dominant authority governing disputes concerning public employees. *CMU, supra; Crestwood, supra.*

VI

It is consistent with the tradition of determinations in this state that PERA, promulgated in response to specific constitutional authorization, should take precedence over Act 78 and the Warren City Charter. The scope of article 4, § 48 covers public employment disputes arising in local municipalities. Article 11, § 6 permits the establishment of civil service systems in political subdivisions of the state. A conflict between these two **[*668]** provisions is reconciled by acknowledging that the public policy of this state as to public employment relations **[***43]** is ultimately for legislative determination. PERA is the product of that determination. Therefore, PERA is the dominant law governing public employment negotiations.

We therefore conclude that Article 12(b) of the collective-bargaining agreement between Local 1383 and the City of Warren is valid. The seniority and promotional provision of the collective-bargaining agreement governs promotions in the Warren Fire Department. Accordingly, we reverse the decisions of the Court of Appeals and circuit court, and remand to the circuit court for entry of summary judgment in favor of plaintiff Local 1383.

No costs, a public question being involved.

**Dissent by:** RYAN

## Dissent

**[**712]** Ryan, J. *(dissenting).*

I dissent from the Court's opinion because, in my view, it erroneously denigrates the constitutionally assured [1] paramount authority of the citizens of the City of Warren to determine at the ballot box, as indeed they have, the kind of public employment system by which they wish to be served.

**[***44]** I adopt as though it were my own the succinct and persuasively sound statement of the Honorable DONALD E. HOLBROOK, JR., who, writing for the Court of Appeals in this case, declared:

"Were the instant conflicts solely between the statutory provisions of PERA and Act 78, we would probably find *Detroit Police Officers Ass'n v Detroit, 391 Mich 44; 214 NW2d 803 (1974)*, controlling so as to require a **[*669]** finding that the provisions of the collective bargaining agreement prevailed over conflicting Civil Service Commission promotional guidelines. However, in the face of conflict with *Const 1963, art 11, § 6*, we hold that the provisions of the collective bargaining agreement cannot modify or alter an existing civil service system." *89 Mich App 135, 143; 279 NW2d 556 (1979)*.

End of Document

[1] *Const 1963, art 11, § 6*.

# Exhibit 2

The Detroit News
SERVING MICHIGAN SINCE 1873

**WAYNE COUNTY**

# Dearborn Heights City Council voids severance agreements with appointees



**Julia Cardi**
The Detroit News

Jan. 12, 2026, 11:04 p.m. ET

*Dearborn Heights* — Months after Dearborn Heights' former mayor resigned, severance agreements he approved for a handful of appointees have created another source of tension in the vitriolic relationship between him and the current city leadership.

Dearborn Heights City Council has passed a resolution to void severance agreements former Mayor Bill Bazzi made with several mayoral appointees, saying they never authorized the agreements, which violates the city charter.

The city's corporation counsel, Gary Miotke, told The News that Mayor Mo Baydoun's administration has learned of five employment agreements so far with severance terms Bazzi signed off on. Three involve former police officials embroiled in an ongoing federal whistleblower lawsuit against the city, and two agreements with current employees.

Baydoun, who was elected mayor in November, said his intention wasn't to target anyone in particular, but about transparency by the city and his duty to handle the city's finances responsibly. Baydoun was previously the City Council president and was appointed mayor after Bazzi's resignation before Baydoun was elected to a full term this past fall.

Bazzi, a vocal supporter of President Donald Trump before his reelection in 2024, has since been appointed the ambassador of Tunisia.

"This is a way to say there are 64,000 residents that are expecting us to do the best that we can," said Baydoun at a council meeting in late November. "This all belongs to the residents... We're saying we're not paying anybody any severance, and if you're an at-will employee and don't have a job, Dearborn Heights is not forced to pay you."

Like Baydoun, Miotke contends City Council didn't know about the agreements, and has discovered them during a time when the city is concerned about its finances.

"Mayor Bazzi just went ahead and took liberties and ended up entering into agreements that he did nothave the authority to enter into," Miotke said.

A spokesperson for Bazzi couldn't be reached for comment.

But an attorney representing the three police officials who have sued the city — former chief Jerrod Hart, Paul Vanderplow and Kevin Swope — contends Bazzi did have the authority to create the agreements and said the city remains bound to them.

"Taking a vote on it in a City Council meeting does not change that reality," Brown said in an email to The News. "The City Council can vote if it likes, but it votes for breach and is being sued for breach."

He said the issue will likely be decided in court based on a determination about whether the former police department leaders had valid employment contracts.

The lawsuit filed by the three former police brass in 2024 accuses Arab American city leaders of "race-based sabotage and harassment" and broadly claims ineptness among officials throughout branches of Dearborn Heights government, including City Council and the police department.

The suit includes accusations of mismanagement of federal and state funds, claims of nearly 900 pistol sales improperly recorded by the city, and an ongoing scheme to fix traffic tickets for friends of police and elected officials.

Before his appointment as ambassador, Bazzi had a tension-filled relationship with the Dearborn Heights City Council.

Bazzi hired the three former police officials who have sued the city. And the council and mayor clashed over the city's budget, which last year council members said fell several million dollars short in anticipated revenue — one reason Miotke, the city's corporation counsel, said Dearborn Heights doesn't have extra money to pay out severance terms for city employees.

The acrimony eventually led Bazzi to stop attending City Council meetings before his resignation.

City Council laid out details of severance paid to Hart, the former police chief who held the position for about two-and-a-half years until he quit in July 2024, in a court motion last June in the three police officials' lawsuit against the council.

Hart was still receiving his $128,500 salary under a term of his contract for a year of severance, which the city requested to stop paying as part of its June 12 filing. The filing sought to lift an injunction imposed in February 2024 that, in part, barred the city from taking adverse employment actions against the police officials. The three still worked for the police department when the order was put in place.

U.S District Court Judge Mark Goldsmith denied the motion last September.

The city did not pay severance to Vanderplow and Swope, whose employment terms included severance terms of one year's salary, according to Brown. Brown argued the city has breached Swope and Vanderplow's contracts by their refusal to pay out their severance, as well as breaching Hart's contract by not paying health care benefits during his severance period.

Brown claimed the Dearborn Heights government has a culture of cronyism, "race obsession" and "rampant corruption" and drove Hart, Swope and Vanderplow to quit. Brown said it's ironic the city then argued last year the February 2024 injunction imposed by the court was no longer necessary.

"One is reminded of the old joke about the prisoner who murders his parents and then asks the criminal court for clemency because he is an orphan," Brown wrote.

*jcardi@detroitnews.com*

# Exhibit 3

Approved for the Agenda of: 02-28-23

APPROVED
Motion No. 23 - 099

8-F

# Mayor's Office

**Bill Bazzi**
Mayor

February 7, 2023

Honorable City Council
City of Dearborn Heights

Dear Council Members:

I'm requesting your approval for the following:

*"Motion for the City Council to approve the Tentative Agreement between the City of Dearborn Heights and the Command Officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2025, and further to authorize the Mayor and City Clerk to sign the completed contract when all the changes are incorporated into the document".*

Sincerely,

Bill Bazzi
Mayor

Original Material Reviewed and Approved by the Dearborn Heights City Council at the February 28, 2023 Regular Meeting

Proposal through Mediator – Tentative Agreement
City of Dearborn Heights & Command Officers Association of Michigan
January 30, 2023

## SUMMARY

The parties agree to the following in addition to the tentative agreements previously reached:

1. A three-year agreement from July 1, 2021 – June 30, 2024

2. Wages

    a. 7/1/2021 – 6/30/2022 - 4% increase retro
    b. 7/1/2022 – 6/30/2023 - 4% increase retro
    c. 7/1/2023 – 6/30/2024 - 5% increase

3. The differential language will provide members will receive either the wage increase noted above or the differential, whichever is greater in each contract year.

4. The cap on compensatory (Comp) time is 320 hours. Members will be paid out (100%) of any hours exceeding the 320-hour cap contract. Provisions will be modified accordingly.

5. Delete section 11.1c. and replaced with language in Section 11 that indicates the following:

    A. The parties agree in this agreement reached under PERA the Mayor is authorized to appoint the Chief of Police outside of Act 78 consistent with the City Charter. Consistent with the City Charter provision outlined in 5.11(b). He may consider inside or outside applicants.

    B. The following named persons and their positions are grandfathered in under this agreement and will retain their positions:

        a. Jerrod S. Hart, Chief of Police
        b. Paul D. Vanderplow, Director of Support Services
        c. Kevin M. Swope, Director of Police Operations

    C. The two Director's positions above will be grandfathered. Should the City desire to fill these Director positions in the future, it will do so under the provisions of Act 78.

Original Material Reviewed and Approved by
the Dearborn Heights City Council
at the February 28, 2023 Regular Meeting



**D.** **All challenges, in any forum, whether in grievance, litigation or elsewhere, to the appointment of these three individuals will be withdrawn based upon this agreement under PERA.**

**6.** **Tentative Agreements are attached.**

Original Material Reviewed and Approved by
the Dearborn Heights City Council
at the February 28, 2023 Regular Meeting

**City of Dearborn Heights/Command Officers**
**Tentative Agreements**
**Prepared on January 31, 2023**

9.1 Departmental seniority of a Police Supervisor will be from the date of hire as a sworn Police Officer. Seniority for all other purposes shall be determined in the following manner.

9.4: The City will post newly created or vacated lateral command vacancies and training opportunities for ten (10) calendar days. The filling of newly created or vacated lateral command vacancies will be by the City selecting from among three (3) candidates selected from all available candidates based on seniority in rank and qualifications. The City may select any one of the three (3) candidates.

9.5: If there are no interested candidates to fill a vacancy within any Bureau, then the appointment will be made from the lowest seniority equal ranking Road Patrol member.

9.6: Any member once assigned to a Bureau position will have the option to transfer back to the Road Patrol at the next scheduled Road Patrol shift selection, if the member has higher seniority than a member currently assigned to the Road Patrol.

11.1(C). ~~There shall be automatic progression from the rank of Deputy Chief to Chief without further testing and the Union waives the right of, and for, its members for testing for the rank of Chief.~~ The position of Chief of Police will be filled by the Mayor consistent with his/her rights under Section 5.11B of the City Charter and will be excluded from the Act 78 process. When a vacancy occurs in the Police Chief's position and the Mayor decides to fill said position, he/she may consider both internal and external candidates for that position.

The parties recognize that under this Agreement reached under PERA, the following individuals will retain their positions:

* Jerrod S. Hart, Chief of Police
* Paul D. Vanderplow, Director of Support Services
* Kevin M. Swope, Director of Police Operations.

It is further agreed that should the City fill the Director's positions in the future, those positions will be filled in accordance with Act 78 provisions.

It is further agreed that all challenges to the appointment of these three individuals, whether in grievance, litigation, or elsewhere, will be withdrawn based upon this Agreement under PERA.

11.1(E)(4). After the written portion and oral portion have been scored and appropriately weighted each eligible member shall have 1/12 (one-twelfth) point for each month of service as a

# Exhibit 4

Case 2:24-cv-10240-MAG-DRG ECF No. 48-2, PageID.761 Filed 12/20/24 Page 2 of 55

# City of Dearborn Heights

6045 FENTON • DEARBORN HEIGHTS, MICHIGAN 48127

Lynne M. Senia
City Clerk

TO: Mayor Bazzi

FROM: City Clerk Senia *lms*

DATE: March 6, 2023

RE: Tentative Agreement Between the City and the Command Officers Association of Michigan/Dearborn Heights Police Supervisors Association

The following is a copy of a motion adopted at the Regular Meeting of the Dearborn Heights City Council held on February 28, 2023.

**23-099** Motion by Councilwoman Bryer, seconded by Councilman Muscat to approve the Tentative Agreement Between the City and the Command officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2025, and authorize the Mayor and Clerk to sign the completed contract on behalf of the City when all the changes are incorporated into the document, as outlined in 8-F. Per Mayor Bazzi communication dated February 7, 2023.

After further discussion, the motion was amended to reflect the following:

Motion by Councilwoman Bryer, seconded by Councilman Muscat to approve the Tentative Agreement Between the City and the Command officers Association of Michigan/Dearborn Heights Police Supervisors Association for a collective bargaining agreement to expire June 30, 2024, and authorize the Mayor and Clerk to sign the completed contract on behalf of the City when all the changes are incorporated into the document, as outlined in 8-F. Per Mayor Bazzi communication dated February 7, 2023.

Ayes: Council Chairman Abdallah, Council Chair Pro Tem Muscat, Councilman Ahmad, Councilman Baydoun, Councilwoman Bryer.
Nays: Councilman Constan, Councilman Wencel.
Absent: None.

Motion adopted

LMS/gs

cc: COAM Police Supervisors
Human Resources
Treasurer
Comptroller
Act 78
Act 345
File

Office: (313) 791-3430 • Fax: (313) 791-3401
lsenia@dearbornheightsmi.gov

# Exhibit 5

# COLLECTIVE BARGAINING AGREEMENT

Between

THE CITY OF DEARBORN HEIGHTS

and

THE DEARBORN HEIGHTS POLICE
SUPERVISORS ASSOCIATION
Effective July 1, 2021 to June 30, 2024

on matters of concern.

## ARTICLE 11

## PROMOTIONS, LAYOFFS, RECALLS AND LEAVE OF ABSENCE

11.1: Promotions shall be in accordance with the provisions of Act 78, P.A. of 1935, as amended, except as follows:

A. Each applicant's unexpurgated personnel file shall be submitted to the oral examiners.

B. The Oral Board Examiners shall be department neutral, that is to say, not members of the Dearborn Heights Police Department or border communities. Oral Board Examiners shall hold the rank of Lieutenant or above. Eligible examiners shall be deemed neutral when agreed upon by both the City and Union.

C. The position of Chief of Police will be filled by the Mayor consistent with his/her rights under Section 5.11B of the City Charter and will be excluded from the Act 78 process. When a vacancy occurs in the Police Chief's position and the Mayor decides to fill said position, he/she may consider both internal and external candidates for that position.

The parties recognize that under this Agreement reached under PERA, the following individuals will retain their positions:

* Jerrod S. Hart, Chief of Police

* Paul D. Vanderplow, Director of Support Services

* Kevin M. Swope, Director of Police Operations.

It is further agreed that should the City fill the Director's positions in the future, those positions will be filled in accordance with Act 78 provisions.

It is further agreed that all challenges to the appointment of these three individuals, whether in grievance, litigation, or elsewhere, will be withdrawn based upon this Agreement under PERA.

D. Eligibility for purpose of promotion shall be two years in rank/grade. At the close of the application date and time.

E. The Promotional examination process for eligible members shall be as follows:

1. The promotional examination process for eligible members shall consist of a written exam portion and an oral exam portion which shall be weighted at 50% written and 50% oral.

2. Eligible members must score 70% or higher on the written portion and 70% or higher on the oral portion. Members failing to score a minimum of 70% on the written portion shall be disqualified from the promotional process and shall not be allowed to participate in the oral portion. Members failing to score a minimum of 70% on the oral portion will not be eligible for promotion.

3. Eligible members must have a combined score (written & oral) of 70% or higher to be eligible for promotion.

4. After the written portion and oral portion have been scored and appropriately weighted each eligible member shall have 1/12 (one-twelfth) point for each month of service as a police officers with the city of Dearborn Heights, including probationary time, added to their overall score. There shall be no maximum cap for

wherever possible and an agenda of the matters to be taken up at the meeting shall be presented at the time the conference is requested. Matters taken up in the special conference shall be confined to those on the agenda.

## ARTICLE 14
## CITY'SRIGHTS

14.1: The City reserves the right to assign tasks to police officers and to set up rules and regulations necessary to operate the Police Department as efficiently as possible, subject to the provisions of this Agreement.

14.2: Before new bureaus are established, the City will consult with the Association to solicit its views concerning organization of such bureaus.

14.3: It is understood and agreed that the Chief and Deputy Chief can perform bargaining unit work.

14.4: The Union recognizes the right of the city to operate and manage its affairs in all respects in accordance with its responsibilities. The powers or authority which the City has not officially abridged, delegated, or modified by this agreement are retained by the City.

14.5: The Union recognizes the exclusive rights of the City to establish reasonable work rules, determine reasonable schedules of work, determine and establish methods, processes, and procedures by which such work is to be performed, as well as set work standards. The City also reserves the right to make work assignments in emergency situations.

14.6: The City has the right to schedule overtime work as required and consistent with the provisions set forth in Article XIX.

14.7: It is understood by the parties that every incidental duty connected with assignments enumerated in job descriptions is not always specifically described.

Case 2:24-cv-10240-MAG-DRG ECF No. 125-4, PageID.5422 Filed 03/16/26 Page 6 of 8



Nevertheless, it is intended that all such duties shall be performed by such employees.

14.8: The City reserves the right to classify positions based on assigned duties or responsibilities or make changes in assigned duties and responsibilities. The City has the responsibility in such classifications and duty assignments to provide equal compensation for equal work and to reflect duties and responsibilities by appropriate classifications and compensation. In cases where an employee considers that these principles are not being observed, that employee may seek redress through the grievance procedure set forth in Article VII.

14.9: The City reserves the right to discipline or discharge for cause.

14.10: The City reserves the right in accordance with Article 11, Section 2, to lay off for lack of work or funds, or the occurrence of conditions beyond the control of the City, or where such continuation of work would be wasteful and unproductive.

14.11: No policies or procedures covered in this Agreement shall be construed as delegating to others or as reducing or abridging any of the following authority conferred on City officials:

A. The Charter responsibility of the Mayor as executive officer for enforcing the laws of the State, City Charter or Ordinances, recommending an annual budget of appropriation, and the efficient performance of all executive departments, among other executive responsibilities defined by the Charter.

B. The Charter responsibility of the City Council as the legislative body for the enactment of ordinances, the appropriation of money and the determination of the City's budget, among other legislative responsibilities defined by the Charter.

C. The responsibility of the City for establishing, amending, and administering an Act 78 Civil Service merit system of employment, a classification plan, adopting rules and regulations regarding employment and exercising personnel administration responsibilities.

D. The responsibility of the City for establishing, amending, and administering a compensation plan, and a fringe benefit program including an insurance program, a disability program, and other similar programs.

E. The Charter responsibilities of the City in determining the functions and organization of the respective departments or divisions.

F. The responsibilities of Department Heads governed by Charter provisions, ordinances, and Civil Service rules:

(1) To hire, assign, transfer, and promote employees to positions within the agency;

(2) To suspend, demote, discharge, or take other disciplinary action against employees;

(3) To relieve employees from duties because of lack of funds;

(4) To determine the methods, means and personnel necessary for departmental or agency operations;

(5) To control departmental or agency budget;

(6) To take whatever actions are necessary in situations of emergency to perform the functions of the department.

G. The responsibilities to administer pay and fringe benefit plans, to provide the necessary surveys, research, rules, regulations, resolutions, and ordinances for this purpose subject to the authority of the departments and the City Council.

H. The responsibility of the City for establishing, amending, and administering the Act 345 Retirement Plan of the City.

Case 2:24-cv-10240-MAG-DRG ECF No. 125-4, PageID.5424 Filed 03/16/26 Page 8 of 8



14.12: The Police Chief may convene a disciplinary review board consisting of three (3) superior officers to review the circumstances in any contemplated disciplinary action against an employee and based upon this review to make an advisory recommendation to the Police Chief that the charges are founded or unfounded. The Union shall have the right to challenge the selection of the disciplinary review board and have one (1) of its members replaced without cause.

## ARTICLE 15
## COPIES OF CONTRACT

15.1: The City agrees to deliver a copy of this Agreement to the Association for its distribution to each police officer within thirty (30) days of the formal execution of this Agreement.

## ARTICLE 16

## WAGES

16.1: Annual Base Salary

A. Commencing upon ratification of this Agreement by the Union and the City Council, the City shall adjust the base wage rate of the bargaining unit members as follows:

- 7/1/2021-6/30/2022: 4% increase (retroactive)
- 7/1/2022-6/30/2023: 4% increase (retroactive)
- 7/1/2023-6/30/2024: 5% increase

(Percentage of Patrol Officer's Annual Base Wage)

# Exhibit 6

**PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT BETWEEN THE CITY OF DEARBORN HEIGHTS AND KEVIN SWOPE**

This Professional Services Employment Agreement (hereinafter "Agreement") is to set forth the terms and conditions of employment of a **FULL TIME EXEMPT** employee, and is entered into between the City of Dearborn Heights, a municipal corporation (hereinafter "City") and **KEVIN SWOPE** (hereinafter "Employee"); collectively referred to as the "Parties".

WHEREAS, the MAYOR is empowered, to appoint and retain a full time **POLICE CHIEF**, and hereby appoints Employee for the effective and efficient operation of the City's Police Department; and

WHEREAS Employee has agreed to accept employment as a full time employee, subject to the terms, conditions and provisions of this Agreement.

THEREFORE, in consideration of the mutual covenants contained herein, the consideration of which is hereby stipulated to, the Parties agree as follows:

**Recitals.** The introductory, "whereas" and "therefore" paragraphs set forth above (hereafter, "Recitals") are an integral part of this Agreement and are incorporated into it by reference.

## I. TERM

1.1 The full time employee appointment shall be for the term commencing on July 3, 2024 (the "Commencement Date") and shall continue up to and including June 30, 2026.

## II. EMPLOYMENT

2.1 **DUTIES.** The Employee shall serve the City as the Police Chief of its Police Department as set forth by applicable laws under City of Dearborn Heights Charter and Ordinances.

The Employee shall specifically serve the City as follows:

1. Serve as the POLICE CHIEF and as such to lead the operations of the police department, and to recommend and implement processes and procedures aligned with current best practices, applicable laws, and policies to achieve the efficient and ethical management of the police department.
2. Serve the residents of Dearborn Heights in a fair and respectful manner, and where feasible within the confines of the law, and legal practices, provide transparency into the policies and procedures of the Dearborn Heights police department.
3. To lead the employees of the police department in all matters germane to the above mentioned scope of responsibilities.
4. The Chief's immediate supervisor shall be the Mayor. Chief acknowledges, understands and agrees that the Mayor shall have the final authority and the power to direct, control or supervise

Bill Bazzi
Exhibit C
8/29/25
Rptr: Cheri Poplin



DEFENDANT'S EXHIBIT 8

the manner of Chief's duties, consistent with the laws of the State of Michigan, the City Charter, City Ordinances, and this Agreement.

The Employee shall perform these specific duties with reasonable care, diligence, skill and expertise and perform all duties necessary to meet the goals and expectations of the City.

2.2 **CITY COUNCIL MEETINGS.** Except to the extent prohibited by or in material conflict with applicable laws and authorities, the Employee shall attend meetings of the City Council, both public and closed, to the extent permitted by Michigan Open Meetings Act. The employee may elect a designee to appear on their behalf, when needed.

2.3 **INDEMNIFICATION.** To the extent it may be permitted to do by applicable law, the City does hereby agree to defend, hold harmless, and indemnify the Employee from any and all demands, claims, suits, actions, judgments, expenses and attorneys' fees included in any legal proceedings brought against the Employee in the employee's individual or official capacity as an employee, provided that the incident(s), which is (are) the basis of any demand, claim, suits, actions, judgments, expenses and attorneys' fees, arises in the future, from an act or omission of the Employee, as an employee of the City; excluding, however, any demand, claim, suits, actions, judgments, expenses and attorneys' fees for those claims or any causes of action where the Employee committed an intentional, willful and wrongful act or omission, or acted in bad faith; and excluding any costs, fees, expenses or damages that would be recoverable or payable under an insurance contract, held either by the City or by the Employee. The provisions of this Paragraph 2.3 shall survive the termination, expiration or other end of this Agreement and/or the Employee's employment with the City.

2.4 **HOURS OF WORK.** Employee and City understand and agree that Employee is being employed in a salaried exempt full-time position, with a 2080 hour work year. The Employee acknowledges the proper performance of the duties require the Employee to generally observe normal business hours and will also require the performance of necessary services outside of normal business hours. In general, the Employee's business hours shall be flexible in nature and be forty (40) hours per week. The Employee shall not regularly work weekends or holidays set forth by the City, however, it is understood that there may be circumstances, including but not limited to emergency or safety concerns and community relations requirements, which require Employee to work additional hours, weekends, or holidays. Should additional work be required, it is with the understanding that no further compensation shall be earned. All hours worked, to include but not limited to tasks such as telephone calls, emailing, telework and remote work shall be included in the (40) hour work week. The Employee's Monday through Friday work schedule is permitted by mutual consent between the City and the Employee.

## III. COMPENSATION

3.1 **SALARY.** The City shall compensate the Employee at the gross rate of One Hundred Twenty-Six Thousand, Six Hundred dollars and 00/100 ($126,600.00) per year effective July 3, 2024. Base salary adjustments will be made to ensure that there is no less than an eight percent (8%) differential between the salary for the position of Police Chief and any subordinate employee.

Annually, on or before June 1, 2025, and each year thereafter, the Mayor shall meet with Chief to conduct an evaluation of Chief's job performance, including an evaluation of Chief's performance and/or completion of the goals and expectations previously established. The performance evaluation shall be private and confidential, and any discussion of the results must be done in a closed session, to the extent permitted by law. The format and the content of said performance evaluation shall be established by the Mayor and shall be provided to the Chief prior to the performance review. The Mayor, may in his or her discretion, initiate performance evaluations at other times in addition to those set forth herein. Based on the evaluation, the Mayor may recommend a pay increase consistent with City wage scales, studies, or policy. The salary shall be paid bi-weekly via the City's payroll system and shall be subject to any applicable withholding or deductions required by the law. The City shall forward a W-2 to the Employee in accordance with federal law.

## III. BENEFITS

3.1 **BENEFITS.** The City shall make Social Security and Medicare match on behalf of the Employee and place the employee on the City's General Liability Policy, UIA, and Workers' Compensation Policy. The Employee is allowed to participate in the City's benefit plan to include medical, dental, vision, and life insurance as outlined in a separate document which will be provided to the employee in accordance with Public Act 152 (hard cap) for medical and will adhere to the 90 days waiting period for benefit eligibility. Employee will be subject to the City's published rates, fees, and eligibility rules for any health insurance programs and coverage levels that Employee chooses to enroll in. Employee's regular work schedule must conform to the required minimum hours per week necessary to qualify for coverage. Employee may request a current version of the employee benefits guide from the City's human resources department to ensure Employee is informed of the benefits offerings and any applicable enrollment rules and deadlines. All holidays observed by the City, listed in the Fringe Benefit Policy for Department Heads, and those holidays listed in the DHPSA CBA shall also be paid, non-workdays for the Employee, barring emergency situation which may require the Employee's attendance. Commensurate with the holiday pay schedule as outlined in the police supervisor's collective bargaining agreement, the Employee shall be entitled to holiday pay at a pre-determined percentage of their base pay. The percentage of base pay shall be equal to the calculation used for the most senior DHPSA member, to be issued by December 1 each year. Commensurate to other City employees holding a leader level position, the City shall provide a designated work area, staff support, equipment, necessary training and access to a vehicle insured and maintained by the City. The Employee is eligible for additional fringe benefits commensurate to those as outlined in the police supervisor's collective bargaining agreement for longevity and seniority pay. As a condition of employment, the City agrees to provide, at no cost to the Chief, a semi or unmarked police vehicle which will afford the Chief the opportunity to lawfully respond to emergency situations and to drive to and from his place of residence in accordance with City policy.

3.2 **PAID TIME OFF.** Employee will accrue sick day hours and vacation day hours at rate which is enumerated in the DHPSA CBA for the most senior DHPSA member. The sick day hours and vacation day hours may be banked without limitations and shall be paid out at 100% upon Employee's separation from the City. Employee shall earn 6 personal days at the beginning of each year. Personal days must be used in the year they are earned. Employee shall receive funeral leave consistent with the DHPSA CBA.

3.3 **UNIFORM ALLOWANCE.** Employee will be paid an annual stipend commensurate to the benefit received by the most senior police captain, or deputy chief, if applicable. The purpose of this annual stipend is to maintain police uniforms and equipment. This stipend will be issued on or about the 30th of September.

3.4 **MCOLES CERTIFICATION BONUS.** Employee will be paid $3,000 annual stipend for meeting and maintaining licensure through Michigan Commission on Law Enforcement Standards and such payment shall be issued around or about March 1 annually.

3.5 **ATTENDANCE AT PROFESSIONAL MEETINGS AND SEMINARS.** The City recognizes its commitment to the professional development of the Employee for the benefit of the City. The City agrees to pay for the professional dues for the Employee's membership in national, state and regional professional associations. The Employee will be entitled to attend conferences such as the annual conferences of the International Association of Chiefs of Police, the Police Executive Research Forum, the Major Cities Chiefs Association and the Michigan Association of Chief's of Police. The Employee shall be reimbursed by the City for all travel and subsistence expenses incurred while attending conferences and meetings. The City also agrees to allow the Employee to attend seminars, courses, institutes and symposiums that contribute to the Employee's professional development.

3.5 **Fringe Benefit Policies for Department Heads.** Employee shall receive benefits which are listed in this professional services employment agreement and those which are listed in the Dearborn Heights Fringe Benefit Policies for Elected Officials, Department Heads & Deputy Department Heads. In instances where there is a conflict amongst this professional service agreement and the Dearborn Heights Fringe Benefit Policies document, this professional services agreement shall prevail. The Dearborn Heights Fringe Benefit Policies for Elected Officials, Department Heads & Deputy Department Heads document will accompany and be a part of this agreement.

## IV. TERMINATION

4.1 Employee understands that employment with the City is "at-will", and both the City and Employee may terminate the employment relationship at any time, for any reason, with or without notice and with or without cause, and wages earned shall be paid at the next payroll session. Unless terminated, or mutually extended as set forth in Paragraph 5.5 below, this Agreement will automatically terminate at the end of the day on June 30, 2026. In the event the Employee chooses to terminate this Agreement before June 30, 2026, Employee will endeavor to provide the City with two (2) business weeks' notice of termination. Employee understands that no representative of the City has the authority to modify, orally or in writing, the at-will nature of Employee's employment relationship except through a written modification to this Agreement signed by the Mayor and Employee, which expressly refers to and modifies the Employee's at-will employment.

In the event the City chooses to terminate this Agreement before June 30, 2026, the City shall pay Employee a sum equal to the Employee's annual base salary together with payment for unused vacation time and accumulated vacation time; and unused sick days; and all other accumulated benefits as set forth in the policies of the City of Dearborn Heights. In addition, the City shall pay the Consolidated Omnibus Budget Reconciliation Act (C.O.B.R.A.) premiums for the medical, dental and vision insurances for up to one (1) year unless Employee otherwise secures medical insurance benefits, dental and vision insurances benefits from another source. The severance agreement terms listed in this paragraph also apply should the City ask the Employee to resign, and the Employee resigns pursuant to such request.

## V. GENERAL PROVISIONS

5.1 **COMPLETE AGREEMENT.** This Agreement sets forth and establishes the entire understanding between the City and the Employee relating to the employment of the Employee by the City. Any prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement. The Parties by mutual written agreement may amend any provision of this Agreement during the term of this Agreement; such amendments shall be incorporated and made a part of this Agreement.

5.2 **BINDING EFFECT/ASSIGNMENT.** This Agreement shall be binding on the City and the Employee as well as their heirs, assigns, executors, personal representatives and successors in interest. This Agreement is personal to each of the parties and neither party may assign or delegate any of its rights or obligations under this Agreement without first obtaining the other's written consent.

5.3 **SAVINGS CLAUSE.** If any term or provision of this Agreement, as applied to any party or to any circumstance, is declared by a court of competent jurisdiction hereof to be illegal, unenforceable or void in any situation and in any jurisdiction, such determination shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. The Parties agree that the court or arbitrator making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases or to replace any illegal, unenforceable or void term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

5.4 **CONTROLLING LAW.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan and jurisdiction shall rest in a court of competent jurisdiction within Wayne County, Michigan.

5.5 **EXTENSION.** This Agreement may be extended by mutual written agreement only.

5.6 **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument. A signature made on a facsimile copy of this Agreement or a signature to this Agreement transmitted by facsimile shall have the same effect as an original signature..

**WHEREFORE,** the Parties have executed this Agreement freely and voluntarily by affixing their signatures below:

**Kevin Swope**

Date: 10/15, 2024.

**CITY OF DEARBORN HEIGHTS: BILL BAZZI, MAYOR**

Date: 10/15, 2024.

# Exhibit 7

Outlook

**Resignation**

**From** Bill Bazzi <BBazzi@dearbornheightsmi.gov>
**Date** Wed 12/4/2024 11:18 AM
**To** Kevin M. Swope <kmswope@dearbornheightsmi.gov>

Good morning Chief Swope,
Can you please submit your resignation effective end of Friday January 10, 2024.
Thank you

Respectfully,

**Bill Bazzi,** *Mayor*

**City of Dearborn Heights**
6045 Fenton, Dearborn Heights MI 48127
(313) 791-3490
www.dearbornheightsmi.gov

LEGAL CONFIDENTIAL: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. The information and/or documents in this message are privileged and confidential, for use only by the intended recipient. If you are not the intended recipient, any disclosure, distribution, use or copying of the contents of this message is prohibited. If you have received this message in error, please notify us immediately and delete this message from your system.

Bill Bazzi
Exhibit F
8/29/25
Rptr: Cheri Poplin

# Exhibit 8

FAUSONE & GRYSKO, PLC
ATTORNEYS AT LAW

April 23, 2025

Via Email (mhunt@alglawpc.com) and U.S. Mail

Ms. Monica Hunt
The Allen Law Group
3031 W. Grand Blvd., Suite 525
Detroit, MI, 48202

Re: Constructive Discharge and Termination of Paul Vanderplow, as it relates to existing federal litigation, 24-cv-10240, in the Eastern District of Michigan, Swope, et al., v. City of Dearborn Heights (the "Legal Proceedings")

Dear Ms. Hunt:

I am writing to you in your capacity as attorney for the City of Dearborn Heights (the "City") in the Legal Proceedings. Please take notice that Plaintiffs now consider Mr. Paul Vanderplow to have been constructively discharged, effective as of April 22, 2024. As a courtesy to the City, Mr. Vanderplow's last full day of employment with the City of Dearborn Heights (the "City") will be May 9, 2024. (5)

Mr. Vanderplow will continue to prosecute his claims in these proceedings and reserves all rights. The facts surrounding and leading to his constructive discharge will now add to the body of evidence that Plaintiffs will seek to introduce into evidence at trial and in support of a renewed motion for sanctions, which they shall ultimately refile in the coming weeks or month.

"To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)(*quoting Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

The City Council of Dearborn Heights has now spent the last two years vindictively and actively trying to get rid of Mr. Vanderplow, and then bragging about it publicly.

The City Council's adverse actions and intrigues have included (1) attempts at defunding Mr. Vanderplow's position after initially ratifying his employment contract, (2) filing false "stalking" charges against Vanderplow, charges that have since been investigated and found invalid by the Michigan State Police, (3) publicly disparaging and defaming Vanderplow, by name, in City Council meetings and communications and (4) manufacturing an attempted "suspension" of Mr. Vanderplow that Mayor Bazzi ultimately negated, but not before causing serious stress to Mr. Vanderplow and damage to his reputation. The available evidence strongly suggests that the personal campaign against Mr. Vanderplow is partially motivated by his having been hired in part

FAUSONE & GRYSKO, PLC
ATTORNEYS AT LAW



to break a cycle of corruption within the City government (that his attackers have participated in), and partially by simple racism on the part of the City Council members against non-Arab police officers.

But additional discriminatory and retaliatory incidents continue to occur.

On April 3, 2025, while Mr. Vanderplow was on duty at the scene of a flooded area of the City, Councilperson Wencel taunted Vanderplow and made the statement that Vanderplow's "time was limited". These statements were captured on video by Director Vanderplow.

Last night, on the evening of April 22, 2025, the City Council voted 6-0 to prevent Mr. Vanderplow from assuming the position of Interim Comptroller and allowing Mr. Vanderplow the authority to sign documents on behalf of the City, all consistent with the recommendations of Mayor Bazzi. Such matters have not normally been the subject of City Council votes until last night. The council session was video taped.

Based upon these incidents as well as a multitude of other non-listed actions by Council members, most of which are in open and obvious violation of a federal injunction, it is evident that the employment of Vanderplow has been constructively terminated by council members. We look forward to litigating these matters as well as our other claims, in federal court.

Sincerely,

Brandon M. Grysko

CC: Paul Vanderplow (via email)
Attorney Gary Miotke (via email)

CITY OF DEARBORN HEIGHTS, MICHIGAN
INCORPORATED 1963
DEI GRATIA

# Mayor's Office

**Bill Bazzi**
Mayor

| | |
|---|---|
| **Date** | February 3, 2025 |
| **To** | Paul D. Vanderplow<br>Director, Support Services/Internal Affairs |
| **From** | Bill Bazzi<br>Mayor |
| **Subject** | Adjustment to contract due to continued harassment |

Over the first few weeks of 2025 and with the departure of Chief Swope, Director Vanderplow has faced multiple attacks on his character from members of the Department, members of City Council as well as members of the public. In every case, the attacks are misguided and baseless with the sole purpose of halting his work in holding employees accountable as well as documenting waste, fraud and abuse within City operations.

On January 21, 2025, Director Vanderplow was subject to yet another an attack based upon his work for the City. Interim Chief Farhat attempted to suspend Director Vanderplow without due process, and under false pretenses. Additionally, Director Vanderplow has been subject to additional and baseless legal actions by Department union members. The most recent event was on January 28, 2025, during an in-session Council meeting, Councilperson Hassan Saab read into the official record un-verified personnel complaints against Director Vanderplow. Based on a preliminary review of the allegations, the claims are false and misleading. Additionally, based on the false claims, the Patrolman's Union as well as the Command Officer Union stood in opposition to Director Vanderplow. Unfortunately, the actions by Councilperson Saab did cause and continue to cause great harm to the reputation and stature of Director Vanderplow. Further, it has weakened his ability to carry out his duties as a Police Director.

Vanderplow, Paul
Adjustment to Contract

During 2024, a well-documented false narrative being purported by Council members regarding Director Vanderplow's uncovering of a preferential award of a contract within the City. Director Vanderplow uncovered and documented the collusion of a City employee with a vendor to provide services within the City against all procurement guidelines. Even after finding multiple instances of willful and misleading statements, Director Vanderplow was accused MULTIPLE times in a public and on the record forum by Council members. Even after several witnesses came forward to assert Council statements were false, the Council still maintained their vindictiveness against Director Vanderplow.

Based upon the multiple over acts by Council and others, it is abundantly apparent that Director Vanderplow will not be allowed to perform his duties. On several occasions, Councilperson Tom Wencel stated on the record that if Director Vanderplow has his name on any work product it will not be considered. This is tantamount to constructive termination by Councils actions.

Therefore, to provide a level of reassurance and financial protection, should Director Vanderplow determine that his employment with the City of Dearborn Heights as no longer tenable based upon the cumulative actions of Council and/or the Police Union(s), he will be constructively relieved of his duties - with the City responsible for compensating Director Vanderplow for the entirety of his employment contract to be paid within ten-(10) calendar days of his departure.

Vanderplow, Paul
Adjustment to Contract

Director Vanderplow has performed admirably for the City of Dearborn Heights in his role as Director of Support Services as well as the role of City Internal Affairs investigator. On more than one occasion, Director Vanderplow has provided a beacon of hope to residents who feel marginalized by the actions of City employees as well as self-serving Councilpersons. This action will be effective as of the date of this memo and will remain in his file as an addendum of his employment contract.

Bill Bazzi
Mayor

# Exhibit 9

Case 2:24-cv-10240-MAG-DRG ECF No. 123-6, PageID.5195 Filed 03/09/26 Page 2 of 7

## PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW

This Professional Services Employment Agreement (hereinafter "Agreement") is to set forth the terms and conditions of employment of a **FULL TIME EXEMPT** employee, and is entered into between the City of Dearborn Heights, a municipal corporation (hereinafter "City") and **PAUL D. VANDERPLOW** (hereinafter "Employee"); collectively referred to as the "Parties".

WHEREAS, the MAYOR is empowered, to appoint and retain a full time **POLICE DIRECTOR – SUPPORT SERVICES,** and hereby appoints Employee for the effective and efficient operation of the City's Police Department; and

WHEREAS Employee has agreed to accept employment as a full time employee, subject to the terms, conditions and provisions of this Agreement.

THEREFORE, in consideration of the mutual covenants contained herein, the consideration of which is hereby stipulated to, the Parties agree as follows:

**Recitals.** The introductory, "whereas" and "therefore" paragraphs set forth above (hereafter, "Recitals") are an integral part of this Agreement and are incorporated into it by reference.

### I. TERM

1.1 The full time employee appointment shall be for the term commencing on **January 1st, 2025** (the "Commencement Date") and shall continue up to and including **JANUARY 1ST, 2027**.

### II. EMPLOYMENT

2.1 **DUTIES.** The Employee shall serve the City as the **Director – Support Operations** of its Police Department as set forth by applicable laws under City of Dearborn Heights Charter and Ordinances.

The Employee shall specifically serve the City as follows:

1. Serve as the Director of Support Services and as such to manage and lead the records division and civilian dispatch division of the police department. To recommend and implement processes and procedures aligned with current best practices, applicable laws, and policies to achieve the efficient and ethical management of the aforementioned divisions;
2. Serve the residents of Dearborn Heights in a fair and respectful manner, and where feasible within the confines of the law, and legal practices, provide transparency into the policies and procedures of the Dearborn Heights police department;
3. To lead the employees of the police department in all matters germane to the above mentioned scope of responsibilities.

Bill Bazzi
Exhibit B
8/29/25
Rptr: Cheri Poplin



DEFENDANT'S EXHIBIT V 3

**PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT**
**BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW**

4. Serve as the primary Internal Affairs investigator for matters affecting City and will enable the assigned individual the ability to identify potential issues and reports of corruption, fraud waste and abuse affecting the City of Dearborn Heights.
5. The Director's immediate supervisor shall be the Police Chief. Director acknowledges, understands and agrees that the Police Chief shall have the final authority and the power to direct, control or supervise the manner of Director's duties, consistent with the laws of the State of Michigan, the City Charter, City Ordinances, and this Agreement.

The Employee shall perform these specific duties with reasonable care, diligence, skill and expertise and perform all duties necessary to meet the goals and expectations of the City.

2.2 **CITY COUNCIL MEETINGS.** Except to the extent prohibited by or in material conflict with applicable laws and authorities, the Employee shall attend meetings of the City Council, both public and closed, to the extent permitted by Michigan Open Meetings Act. The employee may elect a designee to appear on their behalf, when needed.

2.3 **INDEMNIFICATION.** To the extent it may be permitted to do by applicable law, the City does hereby agree to defend, hold harmless, and indemnify the Employee from any and all demands, claims, suits, actions, judgments, expenses and attorneys' fees included in any legal proceedings brought against the Employee in the employee's individual or official capacity as an employee, provided that the incident(s), which is (are) the basis of any demand, claim, suits, actions, judgments, expenses and attorneys' fees, arises in the future, from an act or omission of the Employee, as an employee of the City; excluding, however, any demand, claim, suits, actions, judgments, expenses and attorneys' fees for those claims or any causes of action where the Employee committed an intentional, willful and wrongful act or omission, or acted in bad faith; and excluding any costs, fees, expenses or damages that would be recoverable or payable under an insurance contract, held either by the City or by the Employee. The provisions of this Paragraph 2.3 shall survive the termination, expiration or other end of this Agreement and/or the Employee's employment with the City.

2.4 **HOURS OF WORK.** Employee and City understand and agree that Employee is being employed in a salaried exempt full-time position, with a 2080 hour work year. The Employee acknowledges the proper performance of the duties require the Employee to generally observe normal business hours and will also require the performance of necessary services outside of normal business hours. In general, the Employee's business hours shall be flexible in nature and be forty (40) hours per week. The Employee shall not regularly work weekends or holidays set forth by the City, however, it is understood that there may be circumstances, including but not limited to emergency or safety concerns and community relations requirements, which require Employee to work additional hours, weekends, or holidays. Should additional work be required, it is with the understanding that no further compensation shall be earned. All hours worked, to include but not limited to tasks such as telephone calls, emailing, telework and remote work shall be included in the (40) hour work week. The Employee's Monday through Friday work schedule is permitted by mutual consent between the City and the Employee.

Case 2:24-cv-10240-MAG-DRG ECF No. 123-6, PageID.5197 Filed 03/09/26 Page 4 of 7

PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT
BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW

## III. COMPENSATION

3.1 **SALARY.** The City shall compensate the Employee at the gross rate of **One Hundred Seventeen Thousand, Two Hundred Twenty Dollars and 00/100 ($117,220.00) dollars per year effective July 1, 2023. Base salary adjustments will be made to ensure an eight percent (8%) differential between the base salary of captain in the police supervisor's collective bargaining agreement and the Director of Support Services position is maintained.** Base salary adjustments will be made to ensure that there is no less than an eight percent (8%) differential between the salary for the position of Director – Support Services and any subordinate employee.

Annually, on or before June 1st, and each year thereafter, the Chief shall meet with the Director to conduct an evaluation of the Director's job performance, including an evaluation of Director's performance and/or completion of the goals and expectations previously established. The format and the content of said performance evaluation shall be established by the Chief and shall be provided to the Director prior to the performance review. The Chief, may in his or her discretion, initiate performance evaluations at other times in addition to those set forth herein. Based on the evaluation, the Chief may recommend a pay increase consistent with City wage scales, studies, or policy. The salary shall be paid bi-weekly via the City's payroll system and shall be subject to any applicable withholding or deductions required by the law. The City shall forward a W-2 to the Employee in accordance with federal law.

## III. BENEFITS

3.1 **BENEFITS.** The City shall make Social Security and Medicare match on behalf of the Employee and place the employee on the City's General Liability Policy, UIA, and Workers' Compensation Policy. The Employee is allowed to participate in the City's benefit plan to include medical, dental, vision, and life insurance as outlined in a separate document which will be provided to the employee in accordance with Public Act 152 (hard cap) for medical and will adhere to the 90 days waiting period for benefit eligibility. Employee will be subject to the City's published rates, fees, and eligibility rules for any health insurance programs and coverage levels that Employee chooses to enroll in. Employee's regular work schedule must conform to the required minimum hours per week necessary to qualify for coverage. Employee may request a current version of the employee benefits guide from the City's human resources department to ensure Employee is informed of the benefits offerings and any applicable enrollment rules and deadlines. All holidays observed by the City, listed in the Fringe Benefit Policy for Department Heads, and those holidays listed in the DHPSA CBA shall also be paid, non-workdays for the Employee, barring emergency situation which may require the Employee's attendance. **Commensurate with the holiday pay schedule as outlined in the police supervisor's collective bargaining agreement, the Employee shall be entitled to holiday pay at a pre-determined percentage of their base pay. The percentage of base pay shall be equal to the calculation used for the most senior DHPSA member, to be issued by December 1 each year.** Commensurate to other City employees holding a leader level position, the City shall provide a designated work area, staff support, equipment, necessary training and access to a vehicle insured and maintained by the City. The Employee is eligible for additional fringe benefits commensurate

Case 2:24-cv-10240-MAG-DRG ECF No. 123-6, PageID.5198 Filed 03/09/26 Page 5 of 7

**PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT**
**BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW**

to those as outlined in the police supervisor's collective bargaining agreement for longevity and seniority pay. As a condition of employment, the City agrees to provide, at no cost to the Director, a semi or unmarked police vehicle which will afford the Director the opportunity to lawfully respond to emergency situations, use for City business, attend training and to drive to and from his place of residence in accordance with City policy.

3.2 **PAID TIME OFF.** Employee will accrue sick day hours and vacation day hours at rate which is enumerated in the DHPSA CBA for the most senior DHPSA member. The sick day hours and vacation day hours may be banked without limitations and shall be paid out at 100% upon Employee's separation from the City. Employee shall earn 6 personal days at the beginning of each year. Personal days must be used in the year they are earned. Employee shall receive funeral leave consistent with the DHPSA CBA.

3.3 **UNIFORM ALLOWANCE.** Employee will be paid an annual stipend commensurate to the benefit received by the most senior police captain, or deputy chief, if applicable. The purpose of this annual stipend is to maintain police uniforms and equipment. This stipend will be issued on or about the 30th of September.

3.4 **MCOLES CERTIFICATION BONUS.** Employee will be paid $3,000 annual stipend for attaining and/or meeting and maintaining licensure through Michigan Commission on Law Enforcement Standards and such payment shall be issued around or about March 1 annually.

3.5 **ATTENDANCE AT PROFESSIONAL MEETINGS AND SEMINARS.** The City recognizes its commitment to the professional development of the Employee for the benefit of the City. The City agrees to pay for the professional dues for the Employee's membership in national, state and regional professional associations. The Employee will be entitled to attend conferences such as the annual conferences of the International Association of Chiefs of Police, the Police Executive Research Forum, the Major Cities Chiefs Association and the Michigan Association of Chief's of Police. The Employee shall be reimbursed by the City for all travel and subsistence expenses incurred while attending conferences and meetings. The City also agrees to allow the Employee to attend seminars, courses, institutes and symposiums that contribute to the Employee's professional development.

3.5 **Fringe Benefit Policies for Department Heads.** Employee shall receive benefits which are listed in this professional services employment agreement and those which are listed in the Dearborn Heights Fringe Benefit Policies for Elected Officials, Department Heads & Deputy Department Heads. In instances where there is a conflict amongst this professional service agreement and the Dearborn Heights Fringe Benefit Policies document, this professional services agreement shall prevail. The Dearborn Heights Fringe Benefit Policies for Elected Officials, Department Heads & Deputy Department Heads document will accompany and be a part of this agreement.

Case 2:24-cv-10240-MAG-DRG ECF No. 123-6, PageID.5199 Filed 03/09/26 Page 6 of 7

**PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT**
**BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW**

## IV. TERMINATION

4.1 Employee understands that employment with the City is "at-will", and both the City and Employee may terminate the employment relationship at any time, for any reason, with or without notice and with or without cause, and wages earned shall be paid at the next payroll session. **Unless terminated, or mutually extended as set forth in Paragraph 5.5 below, this Agreement will automatically terminate at the end of the day on JANUARY 1ST, 2027.** In the event the Employee chooses to terminate this Agreement before JANUARY 1ST, 2027, Employee will endeavor to provide the City with two (2) business weeks' notice of termination. Employee understands that no representative of the City has the authority to modify, orally or in writing, the at-will nature of Employee's employment relationship except through a written modification to this Agreement signed by the Mayor and Employee, which expressly refers to and modifies the Employee's at-will employment.

In the event the City chooses to terminate this Agreement before JANUARY 1ST, 2027, the City shall pay Employee a sum equal to the Employee's annual base salary together with payment for unused vacation time and accumulated vacation time; and unused sick days; and all other accumulated benefits as set forth in the policies of the City of Dearborn Heights. In addition, the City shall pay the Consolidated Omnibus Budget Reconciliation Act (C.O.B.R.A.) premiums for the medical, dental and vision insurances for up to one (1) year unless Employee otherwise secures medical insurance benefits, dental and vision insurances benefits from another source. The severance agreement terms listed in this paragraph also apply should the City ask the Employee to resign, and the Employee resigns pursuant to such request.

## V. GENERAL PROVISIONS

5.1 **COMPLETE AGREEMENT.** This Agreement sets forth and establishes the entire understanding between the City and the Employee relating to the employment of the Employee by the City. Any prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement. The Parties by mutual written agreement may amend any provision of this Agreement during the term of this Agreement; such amendments shall be incorporated and made a part of this Agreement.

5.2 **BINDING EFFECT/ASSIGNMENT.** This Agreement shall be binding on the City and the Employee as well as their heirs, assigns, executors, personal representatives and successors in interest. This Agreement is personal to each of the parties and neither party may assign or delegate any of its rights or obligations under this Agreement without first obtaining the other's written consent.

5.3 **SAVINGS CLAUSE.** If any term or provision of this Agreement, as applied to any party or to any circumstance, is declared by a court of competent jurisdiction hereof to be illegal, unenforceable or void in any situation and in any jurisdiction, such determination shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending provision in any other situation or in any other jurisdiction. The Parties agree that the court or arbitrator making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or

**PROFESSIONAL SERVICES EMPLOYMENT AGREEMENT**
**BETWEEN THE CITY OF DEARBORN HEIGHTS AND PAUL D. VANDERPLOW**

phrases or to replace any illegal, unenforceable or void term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

5.4 **CONTROLLING LAW.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan and jurisdiction shall rest in a court of competent jurisdiction within Wayne County, Michigan.

5.5 **EXTENSION.** This Agreement may be extended by mutual written agreement only.

5.6 **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument. A signature made on a facsimile copy of this Agreement or a signature to this Agreement transmitted by facsimile shall have the same effect as an original signature.

**WHEREFORE,** the Parties have executed this Agreement freely and voluntarily by affixing their signatures below:

**Paul D. Vanderplow**

[signature]

Date: January 2, 2025.

**CITY OF DEARBORN HEIGHTS: BILL BAZZI, MAYOR**

[signature]

Date: January 2nd, 2025.